ACCEPTED
03-15-00348-CV
6616789
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/24/2015 10:54:52 AM
JEFFREY D. KYLE
CLERK

**NO. 03-15-00348-CV**

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/24/2015 10:54:52 AM
JEFFREY D. KYLE
Clerk

**IN THE COURT OF APPEALS**
**THIRD JUDICIAL DISTRICT OF TEXAS**
**AUSTIN, TEXAS**

_____

**TODD ENRIGHT,**
*Appellant,*

**v.**

**ASCLEPIUS PANACEA, LLC; ASCLEPIUS PANACEA GP, LLC; DAILY PHARMACY, LLC; DAILY PHARMACY GP, LLC; AND TOTH ENTERPRISES II, P.A. D/B/A VICTORY MEDICAL CENTER,**
*Appellees.*

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT, CAUSE NO. D-1-GN-14-004689, THE HONORABLE GISELA D. TRIANA PRESIDING

# APPELLEES' BRIEF

Eric J. Taube
State Bar No. 19679350
Paul Matula
State Bar No. 13234354
Rola Daaboul
State Bar No. 24068473
etaube@taubesummers.com
pmatula@taubesummers.com
rdaaboul@taubesummers.com
TAUBE SUMMERS HARRISON TAYLOR MEINZER
  BROWN LLP
100 Congress Avenue, 18th Floor
Austin, Texas 78701
Telephone:  512/472-5997
Telecopier: 512/472-5248

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

**Appellant**
Todd Enright

**Appellant and Trial Counsel**
Jonah Davis Jackson
Jennifer B. Poppe
Vinson & Elkins, LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7588
Telephone:  512/542-8400
Telecopier:  512/542-8612
jpoppe@velaw.com
jjackson@velaw.com

Thomas S. Leatherbury
Vinson & Elkins, LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Telephone:  214/220-7700
Telecopier:  214/999-7792
tleatherbury@velaw.com

**Appellees**
Asclepius Panacea, LLC
Asclepius Panacea GP, LLC
Daily Pharmacy, LLC
Daily Pharmacy GP, LLC
Toth Enterprises II, P.A. d/b/a
   Victory Medical Center

**Appellees and Trial Counsel**
Eric J. Taube
Paul Matula
Rola Daaboul
Taube Summers Harrison
   Taylor Meinzer Brown LLP
100 Congress Avenue, #1800
Austin, Texas 78701
Telephone:  512/472-5997
Telecopier:  512/472-5248
etaube@taubesummers.com
pmatula@taubesummers.com
rdaaboul@taubesummers.com

i

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ..................................................i

INDEX OF AUTHORITIES....................................................... iv - vi

REFERENCE CITATION GUIDE ................................................. vii

REQUEST FOR ORAL ARGUMENT............................................. viii

ISSUES PRESENTED.................................................................ix

STATEMENT OF FACTS ..............................................................1

SUMMARY OF THE ARGUMENT ...................................................11

STANDARD OF REVIEW .............................................................12

ARGUMENT ............................................................................15

    I.    Enright failed to negate any bases of personal jurisdiction in VMC's allegations .................................................................15

    II.    The Fiduciary Shield Doctrine does not protect Enright from specific jurisdiction.................................................................19

    III.    The record contains ample evidence of minimum contacts to support personal jurisdiction over Enright .....................................20

        A.    The record reflects Enright purposefully availed himself of the privilege of doing business in Texas ...........................21

        B.    Enright's Texas contacts were substantially connected to the claims alleged by VMC...................................................26

            1.    Common Law Fraud......................................................26
            2.    Texas Securities Act claim ...........................................27
            3.    Tortious Interference claim ...........................................29
            4.    Conversion Claim........................................................30
            5.    Money Had and Received Claim....................................31
            6.    Action for Accounting..................................................31

**C.** **The exercise of personal jurisdiction over Enright does not offend traditional notions of fair play and substantial justice**................................................................32

    1.    Enright is not burdened by defending in a Texas forum......................................................................34

    2.    The State of Texas has an interest in adjudicating the dispute.................................................................37

    3.    VMC has an interest in obtaining convenient and effective relief...............................................................37

    4.    The interstate judicial system's interest favors the Texas forum...................................................................38

    5.    The shared interest of the several states in furthering substantive social policies favors the Texas forum........39

**PRAYER**...........................................................................................40

**CERTIFICATE OF COMPLIANCE** ..................................................41

**CERTIFICATE OF SERVICE** ...........................................................41

**APPENDIX:**

A.    December 13, 2014 initial email sent by Enright to Franklin.

B.    Emails between QVL's attorney and Enright regarding the "game plan" for QVL's payments to VMC.

# INDEX OF AUTHORITIES

## CASES

*Apple Imports, Inc., v. Koole*,
     945 S.W.2d 895 (Tex. App.–Austin 1997, writ denied) .............................30

*BMC Software Belg. v. Marchand*,
     83 S.W.3d 789 (Tex. 2002) ...................................................................14

*Burger King v. Rudzewicz,*
     105 S. Ct. 2174, 471 U.S. 462 (1985) ...........................................................26

*Calder v. Jones*,
     465 U.S. 783, 104 S.Ct. 1482 (1984) ...........................................................15

*Camac v. Dontos*,
     390 S.W.3d 398 (Tex. App.—Dallas 2012, reh'g denied) ................... *passim*

*Citrin Holdings, LLC, v. Minnis*,
     305 S.W.3d 269 (Tex. App.–Houston [14th Dist.] 2009) .............................14

*City of Keller v. Wilson*,
     168 S.W.3d 802 (Tex. 2005) ....................................................................14

*CSR Ltd. v. Link*,
     925 S.W.2d 591 (Tex. 1996) ............................................................. 12, 13

*EMI Music Mexico, S.A. de C.V. v. Rodriguez*,
     97 S.W.3d 847 (Tex. App.–Corpus Christi 2003, no pet.) ..........................24

*Ennis v. Loiseau*,
     164 S.W.3d 698 (Tex. App.—Austin 2005) ......................................... 13, 19

*In re Enron Corp. Securities, Derivative & ERISA Litigation*,
     235 F.Supp.2d 549 (S.D. Tex. 2002) ...........................................................28

*In re FirstMerit Bank*,
     52 S.W.3d 749 (Tex. 2001) ....................................................................26

*Guardian Royal Exchange Assur., Ltd. v. English China Clays, PLC*,
15 S.W.2d 223 (Tex. 1991) ............................................................32

*Hodge v. Northern Trust Bank*,
54 S.W.3d 518 (Tex. App.—Eastland 2001, pet. denied.) ...........................30

*Horowitz v. Berger*,
377 S.W.3d 115 (Tex. App.—Houston [14th Dist.] 2012) ...........................15

*Hutchings v. Chevron U.S.A.*,
62 S.W.2d 752 (Tex. App.—El Paso 1993) ...............................................32

*Merry Homes, Inc. v. Luc Dao*,
359 S.W.3d 881 (Tex. App.—Houston [14th Dist.] 2012) ...........................31

*Michiana Easy Livin' Country, Inc. v. Holten*,
168 S.W.3d 777 (Tex. 2005) ...............................................................21

*Moki Mac River Expeditions v. Drugg*,
221 S.W.3d 569 (Tex. 2007) ...................................................... 17, 21

*Moncrief Oil Int'l v. OAO Gazprom*,
414 S.W.3d 142 (Tex. 2013) .................................................................16

*Prudential Ins. Co. of America v. Financial Review Services, Inc.*,
29 S.W.3d 74 (Tex. 2000) ...................................................................29

*Retamco Operating, Inc. v Republic Drilling Co.*,
278 S.W.3d 333 (Tex. 2009) ....................................................... 13, 20, 21

*Richardson v. First Nat'l Life Ins. Co.*,
19 S.W.2d 836 (Tex. 1967) ...................................................................32

*Rittenmeyer v. Grauer*,
104 S.W.3d 725 (Tex. App.—Dallas 2003, no pet.) ..................................38

*Russell v. A.E. Marketing, LLC*,
No. 05-00-01583-CV, 2001 WL 722509
(Tex. App.—Dallas June 28, 2001) .................................................. 13, 24

*Sauceda v. Wells Fargo Bank, N.A.*,
No. SA-12-CV-01094-DAE, 2013 WL 690534
(W.D. Tex. Feb. 25, 2013) ..............................................................31

*Spir Star AG v. Kimich*,
310 S.W.3d 868 (Tex. 2010) ................................................. 12, 26

*Sterling Trust v. Adderley*,
168 S.W.3d 835 (Tex. 2005) ..........................................................28

*Tabacinic v. Frazier,*
372 S.W.3d 658 (Tex. App.—Dallas 2012, no pet.) ....................................19

*Televentures, Inc. v. International Game Technology*,
12 S.W.3d 900 (Tex. App.—Austin 2000) ...........................................21

*Texas Capital Securities Management, Inc. v. Sandefer*,
80 S.W.3d 260 (Tex. App.—Texarkana 2002) ...........................................28

*TexVa, Inc. v. Boone*,
300 S.W.3d 879 (Tex. App.—Dallas 2009, pet. denied) ...................... 20, 38

*TransFirst Holdings, Inc. v. Phillips*,
No. 3-06-CV-2303-P, 2007 WL 631276 (N.D. Tex. Mar. 1, 2007) .............15

*Wright v. Saga Engineering, Inc.*,
37 S.W.3d 238 (Tex. App.–Houston [1st Dist.] 2004) ...............................36

## **STATUTES**

Tex. Civ. Prac. & Rem. Code §17.042 ......................................................15

Tex. Civ. Prac. & Rem. Code §17.045 ......................................................15

Tex. Rev. Civ. Stat. Ann. art. 581-4(a) (Vernon Supp. 2013) ..............................27

Tex. Rev. Civ. Stat. Ann. art. 581-33A(2) (Vernon Supp. 2013) .................... 27, 28

Tex. Rev. Civ. Stat. Ann. art. 581-33F (Vernon Supp. 2013) ...............................37

# REFERENCE CITATION GUIDE

## The Parties

In lieu of using the full names of the parties, this Brief may refer to the parties as follows:

| | |
|---|---|
| Asclepius Panacea, LLC;<br>Asclepius Panacea GP, LLC;<br>Daily Pharmacy, LLC;<br>Daily Pharmacy GP, LLC; and<br>Toth Enterprises II, P.A. d/b/a<br>Victory Medical Center | collectively, "Appellees" or "VMC" |
| Todd Enright | "Appellant" or "Enright" |
| QVL Pharmacy #181 GP, LLC;<br>QVL Pharmacy #162 GP, LLC; and<br>QVL Pharmacy Holdings, Inc. | collectively, "QVL" |
| Enright and QVL | collectively, the "Defendants" |

## The Record on Appeal

This Brief will refer to the record as follows:

| | |
|---|---|
| Clerk's Record | "CR __" |
| Deposition Testimony in Clerk's Record | "CR __, [Name] Dep. at __" |
| Reporter's Record | "__ RR __" |
| Appellant's Brief | "App't Br. at __" |
| Appendix | "App. __" |

## **REQUEST FOR ORAL ARGUMENT**

Appellees agree with Appellant that oral argument would be beneficial to assist the Court's review of the record supporting the trial court's decision.

## ISSUES PRESENTED

VMC believes the following issues are presented in Enright's appeal:

ISSUE 1: Did Enright satisfy his burden to negate all bases of personal jurisdiction as alleged in VMC's live pleading?

ISSUE 2: Did the trial court correctly conclude Enright had minimum contacts with the State of Texas sufficient to establish specific jurisdiction, based on the factually and legally sufficient evidence before it?

ISSUE 3: Did the trial court correctly conclude that the exercise of personal jurisdiction over Enright would not offend traditional notions of fair play and substantial justice, based on the factually and legally sufficient evidence before it?

This case arises out of VMC's equity purchase of two Texas pharmacies from QVL in December 2013 and subsequent events involving VMC, QVL and Enright. Enright resides out of state, but all the other individuals involved were in Texas. CR 510-11, Enright Dep. at 185:15-186:9. Contrary to Enright's characterization, VMC's representative Dr. William Franklin did not initiate the relationship with Enright. CR 437-38(¶¶3, 4). In December 2013, Franklin and his companies owned other retail pharmacies in Austin, and were familiar with the attendant licensing requirements and day to day operations of such businesses. CR 532(¶13). Franklin's initial contact with Enright was a phone call on December 12, 2013. CR 437(¶3). This was the day after QVL's CEO Chad Collins first called Franklin on or about December 11 to gauge his interest in purchasing one of QVL's Texas pharmacies. CR 436-37(¶2). Enright was not on the first call between Collins and Franklin, but when Franklin expressed interest in acquiring the pharmacy Collins told him he could not discuss specifics details, such as the price, and that he needed to confirm with another individual. *Id*. Collins and Franklin agreed to have another call. *Id*.

The second call was on December 12. CR 437(¶3). Collins and Franklin were in Texas for the call, and Enright introduced himself to Franklin as a partner of QVL's lender White Winston, but did not elaborate on the details of that

relationship. *Id*. On this second call, and others, Franklin and Enright directly discussed and negotiated the terms of the equity purchase, such as the price, the structure of the sale, and the feasibility of transferring the licenses needed to operate a pharmacy. *Id*. Collins said little on this second call and was not even present for the subsequent calls between Enright and Franklin. *Id*. Based on this, it was Franklin's impression that Enright had authority to negotiate the terms of the sale. *Id*.

On December 13, the day after their initial call, Enright emailed Franklin in Texas to follow up on VMC's interest in buying two QVL pharmacies in Texas. App. A; CR 466; CR 437-38(¶4). Enright's first email exchange with Franklin is significant for several reasons. First, it was initiated by Enright, not Franklin. CR 466. Second, Enright refers to the QVL pharmacy in Austin as "our licensed store" and further explained "we have a license owned by an LLC in Houston".[1] *Id*. Third, Enright's email exchange with Franklin, which discusses details of the sale and how the license transfer would be facilitated, makes no mention of any loans or financing by White Winston. *Id*. The exchange ended with Enright's invitation to Franklin for another call that afternoon "to explain the process". *Id*. Collins was not included on Enright's last email. *Id*. Enright's email to Franklin merely identifies him as "*T.M. Enright, Partner*" but does not say the partner of

---

[1] Collins initially contacted Franklin about purchasing QVL's Austin store, which was located across the street from a VMC pharmacy, but the existence of a second QVL store for sale in Houston was also brought up, thus the references in Enright's emails to a Houston store. CR 437-38(¶4).

2

what. *Id*.

Franklin and Enright had at least one other phone call to negotiate details before the equity purchase closed on December 31, 2013. CR 438(¶5). Neither Collins nor anyone else purporting to represent QVL was on the subsequent calls. *Id*. Enright explained to Franklin that QVL was getting out of the retail pharmacy business in order to focus on the development of pharmacy-related compliance software, which would be a more lucrative venture for QVL. CR 438-39(¶6). The two discussed not only White Winston's financing of the purchase loan to VMC, but details of the sale such as the price and operations after the sale. *Id*(¶¶5, 6). The timing of the license transfer for the two stores, the so-called "transition", was particularly important to VMC, since it impacted their ability to purchase drug inventory for the stores. *Id*(¶6). In this regard, Enright told Franklin that due to the way the sale was structured during the transitional period all sales revenue for the two pharmacies would be collected by QVL and deposited into a secure lockbox bank account, which VMC could access at any time. CR 438(¶5). Enright also told Franklin VMC could purchase its inventory during the transition through QVL's existing arrangements with its drug wholesaler American Bergin Corporation ("ABC"). CR 438-39(¶6). Enright told Franklin QVL would provide services to VMC during the transitional period, including help acquiring drug inventory, and IT and billing-related services to facilitate collection of insurance

payments. *Id*(¶¶5, 6). These terms were spelled out in the Transition Services Agreement ("TSA") entered into by VMC and QVL, which was executed along with the Partnership Interest Purchase Agreement at closing (collectively, the "Transaction"). CR 20-36.

Among other terms, the TSA called for QVL to collect and account for receipts for VMC drug sales (mostly reimbursements from insurance companies), deposit those funds into QVL's lockbox account, retain invoiced amounts as compensation for QVL's transition services, with the balance to be paid to VMC. CR 22; CR 36. QVL's transition services would be needed until VMC obtained new pharmacy licenses and switched over billing software, a period the parties anticipated would take several months. CR 534(¶16). VMC also entered into a loan agreement with White Winston for approximately $675,000 to finance the purchase. CR 58-85. During his calls with Franklin, Enright never explained he was negotiating the Transaction terms only on behalf of White Winston, rather than QVL, or that his sole role in the negotiations was limited to the loan. CR 437(¶4); CR 439(¶7). Enright now claims his communications with Franklin involved only the terms of the White Winston loan, but Franklin recalled it differently. CR 437-39(¶¶3-7). Moreover, emails produced in discovery by QVL show its attorney sent a draft of the original letter of intent between QVL and VMC to Enright and Collins for review prior to closing, and asked if it was "Good

to go to [VMC's] counsel?". CR 526. Enright's involvement in the terms of the sale were not limited to the White Winston loan. CR 437-39(¶¶3-7).

Immediately after the Transaction closed on December 31, 2013, VMC took over operations of the two QVL pharmacies and changed the name to Victory. 2 RR 31:23-25. Owing to the TSA, VMC and QVL had an ongoing relationship that required QVL to process, collect and account for insurance payments on QVL's sales, as well as provide other services, during the transition period. CR 22; CR 36. The transition did not go smoothly. In early January 2014, VMC was unable to acquire drug inventory from ABC which was needed for the two stores, because QVL had exceeded its credit limit with the wholesaler. CR 431; CR 438-39(¶6). That same month, Enright traveled to Texas and met with Franklin and Collins to discuss this problem with the TSA and QVL's trouble buying inventory from ABC. CR 209(¶4); CR 439(¶8). A month earlier, while the terms of the TSA were being negotiated, Enright told Franklin that QVL "would have no trouble" ordering the inventory VMC needed from ABC. CR 438-39(¶6). Enright never mentioned QVL's credit limits with ABC, or that those limits were cumulative of all QVL's other remaining pharmacy locations.[2] *Id*. QVL and Enright promised VMC that

---

[2] In early 2014, QVL had at least one other location in Tyler, Texas. CR 433-34. After the Transaction closed, Enright solicited VMC to buy QVL's Tyler pharmacy too. CR 439(¶8). In a May 2014 email, Enright pitched the Tyler store to Franklin and offered "to have QVL do the transfer", but Franklin declined. CR 433-34. The May 2014 email exchange between Enright and Franklin about QVL's Tyler store is consistent with the type of negotiations the two had in

5

they would fix the problem and pay down QVL's account with ABC in order to free up credit, but the problem with ABC purchases persisted. CR 537-38(¶¶23-24). This forced VMC to find other sources for drug inventory. CR 431.

Of larger concern was QVL's accounting and paying over to VMC of the amounts QVL collected in the lockbox bank account. In February 2014, VMC received the first monthly TSA invoice from QVL, detailing the nature of the services and what amounts had been charged against VMC's sales receipts. CR 538(¶26). QVL's invoice included unexplained "finance charges" and banking fees related to QVL's line of credit with White Winston. *Id.* These charges were unrelated to QVL's transition services and neither party to the TSA contemplated passing on QVL's banking charges to VMC. CR 482, Collins Dep. at 165:4-22. Although neither Enright nor White Winston were parties to the TSA, QVL's bookkeepers in Texas[3] emailed the TSA invoices to Enright for review, at his request, before sending them to VMC, so that Enright could add whatever QVL operating expenses he believed should be passed on to VMC. CR 404-05. These extra charges added by Enright improperly reduced the amounts VMC received from QVL under the TSA. CR 407-10.

December 2013 for the Austin and Houston stores, and further demonstrates Enright's hands-on role in marketing and selling off the QVL stores. *Id.*

[3] The two bookkeepers, Sandra Gonzales and Joyce Montgomery, were still QVL employees when the TSA began in January 2014, and were tasked with providing QVL's transition services under the TSA.

As the months progressed, the TSA invoices and related accounting statements were delayed. *Id.* Funds QVL collected and owed VMC under the TSA were paid late or not at all. *Id.* Despite requests, QVL could not provide VMC with an accurate accounting of its insurance collections are a cogent explanation of the transition service charges. *Id.* An April 2014 email exchange illustrates the growing problem. *Id.* When VMC emailed Collins and QVL's bookkeepers requesting information on items detailed on the monthly TSA invoices for the three prior months, including various expenses and charges QVL passed on to VMC, the response came not from QVL, but directly from Enright. *Id.* Enright explained to VMC that the QVL bookkeepers would respond in five days and that QVL would need to obtain an advance on its line of credit from White Winston in order to pay VMC. *Id.* In May, Enright assured Franklin that QVL would continue providing transition services to VMC and that "*we* will allow releases of cash from the lockbox" to pay VMC monthly. CR 431-34 (emphasis added).

In reality, QVL was in the process of winding down and the company was being run by Enright personally. CR 470-71, Collins Dep. at 44:23-45:4. The two bookkeepers were no longer QVL employees, but reported to Enright under consulting agreements with White Winston. CR 476, Collins Dep. at 52:8-11. By spring, QVL had shuttered its operations, liquidated its assets and laid off its staff

7

in Texas. CR 474, Collins Dep. at 48:1-24. Even CEO Collins had quit and was working as a consultant to White Winston, reporting to Enright. CR 474-75, Collins Dep. at 48:19-49:5. All funds deposited into QVL's lockbox account, including VMC's receipts, were swept out to pay QVL's debt to White Winston under the financing agreement between those two companies. CR 438(¶5). At any given time, the balance in the lockbox account was zero. CR 490, Collins Dep. at 245:24-246:7. Notwithstanding its obligations under the TSA, QVL was not permitted to transfer any funds out of the lockbox account, including funds belonging to VMC, without prior approval from Enright. CR 438(¶5); CR 507, Enright Dep. at 83:19-21. In order to pay its creditors, including VMC, QVL had to request and receive additional advances from White Winston, through Enright. CR 488, Collins Dep. at 243:2-15. But the two individuals who requested these advances on behalf of QVL, bookkeepers Gonzales and Montgomery, took their orders from Enright. Enright was the individual who decided which QVL creditors would be paid and what amounts. CR 484-85, Collins Dep. at 187:12-188:5.

In April 2014, QVL charged VMC with violating the terms of the TSA by depositing their cash receipts from sales at the two pharmacies into VMC's own bank account, rather than into QVL's lockbox account. App. B; CR 414-16; CR 519-20. VMC denied any breach of the TSA. CR 517-18. But the TSA payments from QVL slowed and by June 2014 stopped altogether. CR 371-72(¶9); CR 541-

8

42(¶32). When VMC demanded to know when QVL would pay the funds owed under the TSA, QVL's attorney in Texas, Amy Moss, emailed Enright seeking "guidance" and a "game plan" from him on how to respond to VMC. App. B; CR 414-16. By this time, VMC had paid off its purchase loan to White Winston. CR 13(¶30). But the TSA was still in effect. CR 540(¶30). In response, Enright directed Moss to tell VMC, among other things, that QVL would send only a partial payment and keep the rest as "security for future service payments." CR 415. Although the terms of the TSA clearly did not permit QVL to take this action and withhold VMC's funds, Moss complied with Enright's guidance and promised him to "put it out there" to VMC. App. B; CR 414. To make sure his orders were followed in connection with the TSA, Enright directed the (former) QVL bookkeeper: "Joyce, I don't want anything going out for Franklin until I have reviewed." CR 412.

Enright's game plan did not go over well with VMC. CR 541-42(¶32). VMC's repeated requests to QVL regarding payment went unanswered. *Id*. Then in July 2014, after repeated demands by VMC, QVL finally issued a check to VMC in the amount of approximately $65,000. CR 456-59. This amount was represented to be partial payment for amounts that QVL collected in the lockbox for the month of May. CR 523. None of the parties disputed QVL owed VMC the money under the TSA. CR 373(¶12). At the time QVL issued the check in July,

9

Collins confirmed QVL had sufficient funds available under its line of credit with White Winston to pay this amount. CR 486, Collins Dep. at 232:6-13. Moreover, in July Enright had specifically directed bookkeepers Gonzales and Montgomery in Texas to send VMC the check. CR 523. But when VMC received the QVL check and attempted to negotiate it in August 2014, VMC was advised by its Texas bank that QVL's bank account was "frozen/blocked". CR 420-22. Although Enright's brief claims there were simply insufficient funds in QVL's account, the record reflects QVL's bank actually contacted Enright about the check when it was presented and asked him "Is it okay to pay?" CR 424-25. Montgomery, who signed the QVL check, was fully authorized to do so at that time. CR 487, Collins Dep. at 241:7-16. But Enright directed QVL's bank not to pay the check. CR 424-25; CR 427-29. Although Enright had initially approved QVL's July payment to VMC and so-advised the bookkeepers, he later directed Collins and the bookkeepers that QVL was not to pay VMC anything more under the TSA unless and until VMC executed a release of any and all claims that VMC might have against White Winston and Enright individually. CR 427-29; CR 443; CR 464; CR 492, Collins Dep. at 250:12-17. When bookkeeper Gonzales reminded Enright that he approved QVL's release of the payment to VMC the previous month, Enright replied that she had misunderstood. CR 427-29. There were no more payments by QVL. CR 373(¶12).

Throughout this period, Enright communicated by email and phone directly with QVL's CEO Collins, bookkeepers Montgomery and Gonzales, and with the company's attorney Moss - all of them in Texas - advising them on how QVL should handle the TSA problems and what to tell VMC about the overdue payments. CR 412; CR 414-16; CR 418; CR 424-25; CR 427-29; CR 442-44; CR 456-59; CR 464-66; CR 516-21; CR 523-24. Enright also traveled to Texas at least four times in 2014 and met with Franklin and the aforementioned individuals to discuss the TSA. CR 209(¶4); CR 439(¶8). This included a trip on July 30 when Enright met with Gonzales and Montgomery to discuss the problems with VMC and the TSA. CR 449-50(No.2). Three months after QVL's last check to VMC was dishonored, VMC filed suit against QVL and Enright. CR 3-8. QVL answered the suit, but was soon out of business and its attorneys were granted leave to withdraw. CR 174-76. The claims against Enright are common law fraud, fraud under the Texas Securities Act, tortious interference with the TSA, conversion of VMC's funds, money had a received and a request for an equitable accounting. CR 542-45.

## SUMMARY OF THE ARGUMENT

A review of the record makes clear the trial court properly exercised personal jurisdiction over Defendant Enright. VMC's live petition asserts tort, statutory and equitable claims against Enright, based on his actions in and toward

11

the State of Texas. VMC's live petition and the evidence in the record detail Enright's purposeful and deliberate communications with individuals in Texas, by phone and email, in connection with the facts that form the basis of VMC's claims. Further, Plaintiffs filed a lengthy response to Enright's special appearance, including 40 exhibits as support. Enright also traveled to Texas numerous times last year in connection with the events that form the basis of VMC's claims.

Enright's argument that the fiduciary shield doctrine cloaks him from the jurisdiction of Texas courts is not supported by the law, which provides an individual is always liable for his own tortious actions, regardless of his title. Having initiated and participated in a fraudulent transaction carried out within Texas, Enright then directed co-defendant QVL's unlawful actions in connection with the TSA. Enright's New Hampshire residency does not place him beyond the jurisdiction of this state's courts, and the principles of due process do not warrant a different result. The trial court's order denying Enright's special appearance should be affirmed.

## STANDARD OF REVIEW

**Personal Jurisdiction**

When, as here, the trial court does not make findings of fact and conclusions of law in support of its ruling, the Court of Appeals infers "all facts necessary to support the judgment and supported by the evidence." *See Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010) (citing *CSR Ltd. v. Link*, 925 S.W.2d 591, 594

12

(Tex. 1996)). The trial court necessarily makes factual determinations when making its decision regarding a defendant's special appearance. *See Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005) (appellate court looks to the trial court as the fact-finder and sole arbiter of the witnesses' credibility and the weight that their testimony should be afforded). Unless challenged on appeal, the trial court's findings of fact are binding upon the appellate court. *Russell v. A.E. Marketing, LLC*, No. 05-00-01583-CV, 2001 WL 722509, \*2 (Tex. App.—Dallas June 28, 2001). If the record contains some probative evidence from which reasonable inferences can be drawn or the findings are not so contrary to the overwhelming weight of the evidence as to be manifestly wrong, the appellate court may not disregard the trial courts findings on appeal. *Id*.

Under a constitutional due-process analysis, a court has personal jurisdiction when "(1) the nonresident defendant has established minimum contacts with the forum state, and (2) the assertion of jurisdiction complies with 'traditional notions of fair play and substantial justice'." *Retamco Operating, Inc. v Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009). "A defendant establishes minimum contacts with a state when it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id*. Three key principals govern analysis of whether a nonresident defendant has purposefully availed itself of privilege of conducting

13

business in the form state: (1) the court considers the defendant's own actions, not the unilateral actions of others; (2) the court considers whether the defendant's acts were purposeful, rather than random, isolated or fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of doing business in Texas. *Citrin Holdings, LLC, v. Minnis*, 305 S.W.3d 269, 279 (Tex. App.–Houston [14th Dist.] 2009).

Under the Texas long-arm statute, the plaintiff bears the initial burden of pleading allegations sufficient to confer jurisdiction. *BMC Software Belg. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). When the initial burden is met, *the burden shifts to the defendant to negate* <u>*all potential bases for personal jurisdiction*</u> *the plaintiff pled. Id* (emphasis added).

**Legal and Factual Sufficiency**

When reviewing for legal sufficiency, courts consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The appellate courts credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id*. The court will conclude that the evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only

14

evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810. In reviewing for factual sufficiency, the court considers all of the evidence and will set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Horowitz v. Berger*, 377 S.W.3d 115, 122 (Tex. App.—Houston [14th Dist.] 2012).

## ARGUMENT

**I.** **Enright failed to negate any bases of personal jurisdiction in VMC's allegations.**

VMC's petition establishes the trial court had specific jurisdiction over Enright under the Texas Long Arm Statute, Tex. Civ. Prac. & Rem. Code §17.045, because he actively engaged in business in Texas. Doing business in Texas includes the commission of a tort, in whole or in part. *Id*., §17.042(2). It is not necessary that a nonresident defendant's conduct actually occur in Texas, as long as the defendant's acts were purposefully directed towards the state. *Camac v. Dontos*, 390 S.W.3d 398, 412-13 (Tex. App.—Dallas 2012, reh'g denied); *see also TransFirst Holdings, Inc. v. Phillips*, No. 3-06-CV-2303-P, 2007 WL 631276, *4 (N.D. Tex. Mar. 1, 2007) (false representations in legal documents, emails, letters, and phone calls directed towards plaintiff's home office in Texas constituted sufficient minimum contacts to support the exercise of specific jurisdiction over defendant); *Calder v. Jones*, 465 U.S. 783, 789-90, 104 S.Ct. 1482, 1487 (1984).

15

VMC's petition identifies specific actions by Enright that took place in Texas, or were directed at Texas, in connection with the tort, statutory and equitable claims against him. CR 529-547. These alleged actions include Enright's multiple and unsolicited communications with Franklin in Texas in December 2013, wherein Enright negotiated the terms of the sale for QVL and made fraudulent representations about the collection and accounting of VMC insurance receipts and the ability of QVL to provide drug inventory through its wholesaler account. *Id*. VMC's petition alleges Enright then personally directed QVL's agents in Texas on how to carry out the TSA, including: (a) what charges QVL was to bill VMC for; (b) what amounts of VMC's funds should be paid and when; and (c) what "game plan" QVL's attorney in Texas should execute to explain withholding VMC's funds. CR 538-42(¶¶27, 29, 32). All of the other individuals at issue were in Texas when all actions relevant to the claims regarding the Transaction and subsequent events took place. CR 510-11, Enright Dep. at 185:15-186:9.

On its face, VMC's petition alleges sufficient contacts between Enright and Texas to support specific jurisdiction. *See Moncrief Oil Int'l v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013); *see also Camac*, 390 S.W.3d at 411 (Plaintiffs' pleading that defendant committed torts in Texas by misrepresenting what plaintiffs were acquiring as franchisees in Texas, the meetings in Texas at which

16

the allegedly fraudulent statements were made, the constant and systematic calls and emails to and from Texas regarding the acquisition, the reliance by the plaintiffs on the misrepresentations, and defendant's role as the principal spokesman and actor in the perpetration of wrongdoing that was the gravamen of the lawsuit was enough to meet their initial burden of alleging a cause of action sufficient to confirm jurisdiction under the long-arm statute). Accordingly, Enright must negate all bases of jurisdiction in VMC's allegations. *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). An examination of the evidence before the trial court shows Enright failed to meet that burden.

Enright ignores or misrepresents much of the evidence in the record and relies on vague and conclusory statements in his and Collins' affidavits, which are largely inconsistent with Franklin's affidavit and other evidence. For example, regarding VMC's purchase of the two pharmacies, Franklin's affidavit details the fraudulent misrepresentations Enright made on multiple phone calls about the sale and how the TSA would be carried out. CR 437-39(¶¶3-9). These include Enright's representations that VMC would have "no trouble" acquiring drug inventory from QVL's vendor, and that VMC's sales receipts would be deposited into QVL's secure lockbox account where VMC could access them at any time. CR 438-39(¶¶5, 6). In contrast, Enright's affidavits (the record includes two) do not explicitly deny he made these representations to Franklin. Rather, his affidavit

17

simply states he "did not discuss with Dr. Franklin other details of the proposed transaction" on their initial call. CR 210(¶6). As for his subsequent calls with Franklin, Enright's affidavit merely states "our interaction again concerned only the financing" of the sale. CR 210(¶7). Neither of Enright's affidavits indicate precisely what was said on the phone calls. As for Collins' affidavit, he participated only in Enright's first call with Franklin on December 12, and would have no knowledge of their subsequent calls. CR 171(¶6). Collins' account of the December 12 call is vaguely described as "limited to discussions regarding the financing and the coordination of the same" but provides no details of what Enright said. *Id.* Neither the Collins nor Enright affidavits explicitly deny the statements Franklin attributes to Enright on their calls. CR 52-56; CR 170-73; CR 208-11.

In addition, Enright failed to negate the jurisdictional contacts with Texas he established through his supervision and direction of QVL's attorney, Montgomery, Gonzales and Collins in connection with the TSA. Enright's Brief overlooks the 2014 emails wherein he gave QVL's attorney and the bookkeepers specific directions on what amounts to pay VMC and when, and what to tell VMC about the TSA. CR 404-05; CR 412; CR 416; CR 442-44; CR 523-24. For example, when Enright learned of Franklin's repeated demands to QVL for late TSA payments in June 2014, he directed Gonzales "Let's talk about sending him a check for April, net of several items we spoke of. Thanks." CR 516-521. As

18

discussed more fully herein, this specific evidence of Enright's Texas contacts supported the trial court's decision.

## II.    The Fiduciary Shield Doctrine does not protect Enright from specific jurisdiction.

In footnote 9 of his brief, Enright attempts to discount his personal actions under the fiduciary shield doctrine.    App't Br. at 14.    That doctrine is not applicable.    VMC did not assert contract claims against Enright.    CR 542-45. VMC's claims are based on Enright's own tortious and fraudulent acts in Texas for which he may be held personally liable.    *Id*.    Texas courts have either expressly rejected the fiduciary shield doctrine as a defense to specific jurisdiction or have limited its application, clarifying that the doctrine does not shield an officer or employee for his own tortious, fraudulent actions.    *See Tabacinic v. Frazier,* 372 S.W.3d 658, 668 (Tex. App.—Dallas 2012, no pet.).    *See also Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005) ("Even if the fiduciary shield were adopted by this Court, it would not protect [defendant] from the exercise of specific jurisdiction, even if all his contact were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct, directed at the forum state, for which he may be held personally liable."); *Camac v. Dontos*, 390 S.W.3d 398, 411 (Tex. App.—Dallas 2012, reh'g denied) (It is well settled that a corporate agent or officer may be held personally liable for fraudulent statements or knowing

misrepresentations, even when such are made in his capacity as a corporate representative).

In addition, as shown herein, Enright could not have been acting as White Winston's fiduciary when he negotiated the equity purchase and the TSA with Franklin in December 2013. Enright claims White Winston had no ownership interest or control over QVL. CR 461. These circumstances do not warrant a departure from clear Texas authority establishing when the fiduciary shield doctrine protects individual actors from personal jurisdiction. *See TexVa, Inc. v. Boone*, 300 S.W.3d 879, 889-90 (Tex. App.—Dallas 2009, pet. denied) (Fiduciary shield doctrine not available to shield defendants from liability or jurisdiction in their personal capacity where defendants made misrepresentations to plaintiff in their capacity as officers of corporation).

## III. The record contains ample evidence of minimum contacts to support personal jurisdiction over Enright.

Courts consider three factors in determining whether an out-of-state defendant purposefully availed itself of the privilege of conducting activities in Texas: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person; (2) the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated; and (3) the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction. *Retamco Operating, Inc. v Republic Drilling Co.*, 278 S.W.3d 333,

20

338-39 (Tex. 2009) (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007)). "Purposeful availment alone will not support an exercise of specific jurisdiction . . . unless the defendant's liability arises from or relates to the forum contacts." *Retamco* at 340 (quoting *Moki Mac* at 579). Courts look for a "substantial connection between the defendant's forum contacts and the operative facts of the litigation." *Retamco* at 340.

### A. The record reflects Enright purposefully availed himself of the privilege of doing business in Texas.

#### i. Pre-Transaction contacts

Enright's relevant actions in connection with the Transaction were his own and not the unilateral acts of others. Collins claims he set up the first phone call between Enright and Franklin, after he first contacted Franklin. Unlike the cases Enright relies on, *Michiana* and *TeleVentures* (*Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777 (Tex. 2005); *Televentures, Inc. v. International Game Technology*, 12 S.W.3d 900 (Tex. App.—Austin 2000)), Franklin did not reach out beyond the boundaries of Texas to initiate a relationship with Enright. Franklin was contacted first by Collins, then by Enright. CR 436-38(¶¶2-4). Unilateral actions by Franklin were not the genesis of Enright's involvement in the Transaction and the events that followed. CR 436-39(¶¶2-9). Enright reached out to Franklin, not the other way around. CR 437-38(¶¶3-4).

21

On his own volition, Enright followed up with Franklin with an email the day after their first call, stating:

> Dr. Franklin, it was a pleasure to speak with you yesterday regarding your interest in purchasing the Austin and (potentially) our licensed store (to be moved to your target location) in Houston. . . . We look forward to working with you on this matter and speaking in the near future. Thanks.
>
> T.M. Enright, Partner

App. A; CR 466. This friendly and unsolicited message from Enright hardly demonstrates the actions of an individual who seeks to avoid establishing contacts in Texas. Nor does Enright's exchange with Franklin attempt to clarify what he now claims was a limited role in the Transaction as White Winston's agent for purposes of discussing a loan. From the beginning, Enright referred to QVL's Austin location as "*our* licensed store" and later stated "*we* have a license owned by an LLC in Houston". *Id.* Enright's initial emails imply he had an interest in the QVL pharmacies and could negotiate their sale, or at least that he wished to convey that impression to Franklin. Significantly, Collins is not even copied on Enright's last email to Franklin that day, wherein he invited Franklin "to speak this afternoon." *Id.* Enright's emails do not mention financing or White Winston, but do mention details of the proposed sale and how the transition could be effectuated. *Id.* Enright's initial written exchange with Franklin and the phone calls with Franklin regarding the terms of the Transaction, detailed in the record,

demonstrate Enright's willingness to do business in Texas, and were not limited to details of the White Winston loan.

In this regard, the record establishes Enright sought the benefits of doing business in Texas. Although he claims he acted at all times in his "official capacity" for White Winston, the nature of Enright's relationship with the company is murky. Enright was not an employee, officer, or owner of White Winston, and the term "partner" is merely a title. CR 500, Enright Dep. at 12:19-24; CR 503, Enright Dep. at 23:7-9. Enright is "self-employed" as a consultant for one of White Winston's three members, a company called Lillian White Investment, which pays him a fee for the services he provides, indirectly, to White Winston. CR 501-02, Enright Dep. at 15:25-16:12; CR 503, Enright Dep. at 23:10-25. Enright's deliberate efforts to reach across state lines to market and sell multiple Texas pharmacies that White Winston did not own or control suggests he had a personal interest in the Transaction, and the events that followed.

The suggestion in Enright's Brief that his pre-Transaction activities cannot support personal jurisdiction because the fraud claims were released in 2014 improperly conflates his jurisdictional arguments with the merits of the case. Enright cites no legal authority for this argument, and his claim that VMC does "not dispute" the alleged release is flat wrong. At this stage of the proceeding, the Court is not charged with determining the merits of VMC's allegations against

Enright. *See EMI Music Mexico, S.A. de C.V. v. Rodriguez*, 97 S.W.3d 847, 856 (Tex. App.–Corpus Christi 2003, no pet.) ("When reaching a decision to exercise or decline jurisdiction based on the defendant's alleged commission of a tort, the trial court should examine only the necessary jurisdictional facts and should not reach the merits of the case."); *see also Camac v. Dontos*, 390 S.W.3d 398, 409 (Tex. App.—Dallas 2012, reh'g denied) (At the special appearance stage, the merits of a claim are not at issue, and the court of appeals does not determine whether any claim asserted is viable.).

Enright asserted the affirmative defense of release in his answer to the lawsuit. CR 39-56. But at this early stage, VMC has had no opportunity to conduct discovery on this defense, and the trial court made no determination, either express or implied, that Enright was covered by the purported release. CR 567-68. Enright's affirmative defense is premature and does not avoid the trial court's personal jurisdiction. *See Russell*, 2001 WL 722509 at *3 (Holding that out-of-state defendants' affirmative defense of agency did not shield them from personal jurisdiction due to their own misrepresentations to individuals in Texas).

### ii. Post-Transaction contacts

Following the sale, Enright traveled to Texas at least four times last year, where he met with Collins, Franklin, Gonzales, Montgomery and Moss. CR 448-50 (Nos. 1, 2). He admits VMC and/or the TSA were discussed at two of his

24

Texas meetings with QVL's agents. CR 449-50(No.2). These Texas meetings took place during the period of time Enright was acting as the *de facto* head of QVL. No individual at White Winston ordered Enright to take any of these Texas trips, nor was the company's approval required. CR 504, Enright Dep. at 28:2-21. Throughout the first half of 2014, Enright communicated frequently with Montgomery and Gonzales in Texas, directing them via email on what items to include on the TSA invoices, how much to pay VMC and when. CR 404-05; CR 412; CR 442-44; CR 523-24. In June 2014, QVL's attorney in Texas dutifully followed through with Enright's "game plan" and communicated to VMC his directions that QVL would withhold VMC's funds as "security" for fabricated future services, even though such action violated the terms of the TSA. App. B; CR 414-16. The fact attorney Moss asked Enright for directions on how QVL should proceed in light of the compounding problems with VMC is proof Enright was the individual making all the decisions for QVL.

Enright's directions continued through August 2014, when he directed QVL's bank not to pay the check in the amount of $64,752 that QVL had issued to VMC, which had been deposited at VMC's Texas bank. CR 420-22; CR 424-25. The evidence establishes Enright controlled QVL, a company that had ceased to exist for all intents and purposes by 2014 and whose agents took all their orders from Enright. The record evidence supports the trial court's conclusion that

Enright purposefully availed himself of the privilege of doing business in Texas.

**B.    Enright's Texas contacts were substantially connected to the claims alleged by VMC.**

Specific jurisdiction is limited to claims that "arise out of or relate to" a nonresident's forum contacts. *Spir Star AG*, 310 S.W.3d at 874 (citing *Burger King v. Rudzewicz*, 105 S. Ct. 2174, 471 U.S. 462, 472 (1985)); *Retamco*, 278 S.W.3d at 338. In such cases, there must be a "substantial connection" between defendant's contacts and the operative facts of the litigation. *Spir Star AG*, 310 S.W.2d at 874. As detailed herein, Enright's alleged contacts with Texas are directly related to VMC's claims.

**1.    Common Law Fraud**

The elements of a common law fraud claim are: (1) the defendant made a representation to the plaintiff, (2) the representation was material, (3) the representation was false, (4) when the representation was made, the defendant knew it was false, or made the representation recklessly, as a positive assertion, and without knowledge of its truth, (5) the defendant made the representation with the intent that the plaintiff act on it, (6) the plaintiff relied on the representation, and (7) the representation caused plaintiff's injury. *In re FirstMerit Bank*, 52 S.W.3d 749, 758 (Tex. 2001). The record includes extensive evidence of Enright's communications with Franklin in December 2013. In the phone calls with Franklin Enright made representations regarding: (a) QVL's plan to sell its stores (most of

them in Texas) and go into the pharmacy software business; (b) that VMC's receivables deposited into QVL's lockbox account would be safe, secure, and accessible at any time; and (c) the ability of VMC to acquire drug inventory for the two stores through QVL's wholesale account. CR 437-39(¶¶3, 5, 6). Those material representations, made to Franklin in Texas, were knowingly false.

By the time Franklin and Enright first spoke, QVL's board of directors had decided months earlier not to enter into the software business, but instead wind down the company and liquidate its assets. CR 479, Collins Dep. at 101:3-14. Enright knew this. Enright also knew VMC's funds in QVL's lockbox account would be neither secure nor accessible. That account was controlled by White Winston and Enright, and all deposits were routinely swept out to pay down QVL's line of credit, through an arrangement that preexisted the sale and was never disclosed to Franklin. CR 507, Enright Dep. at 83:4-21. Franklin relied on these representations to his detriment. CR 542(¶34).

### 2. Texas Securities Act claim

The Texas Securities Act (the "Act") prohibits the fraudulent sale in Texas of "securities", which is defined to include limited partnership interests like those VMC purchased from QVL. TEX. REV. CIV. STAT. ANN. art. 581-4(a) (Vernon Supp. 2013). Fraudulent sales include those that are accompanied by untruths or omissions, described in the Act. *Id.;* TEX. REV. CIV. STAT. ANN. art. 581–33A(2)

27

(Vernon Supp. 2013). The Act establishes both primary and secondary liability for securities violations. *Sterling Trust v. Adderley*, 168 S.W.3d 835, 839 (Tex. 2005). Primary liability arises when a person "offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." *Id.*; 581–33A(2). Both control persons and aiders are jointly and severally liable with the primary violator "to the same extent as if [they] were" the primary violator. *Id.* To make a prima facie case for control person liability, the plaintiff must demonstrate that the defendant had actual power or influence over the controlled person and that the defendant induced or participated in the alleged violation. *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F.Supp.2d 549, 567 (S.D. Tex. 2002) (citing *Texas Capital Securities Management, Inc. v. Sandefer*, 80 S.W.3d 260, 261 (Tex. App.—Texarkana 2002)).

VMC alleges Enright's liability as a "control person" under the Act. His initial email exchange with Franklin, his role in negotiating the QVL pharmacy sale, and his subsequent direction of QVL's agents in connection with the TSA demonstrate his power and influence over the company. Enright's fraudulent statements to Franklin made during those calls are detailed above.

### 3.  Tortious Interference claim

The elements of a tortious interference claim are: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss.  *Prudential Ins. Co. of America v. Financial Review Services, Inc.*, 29 S.W.3d 74, 77-78 (Tex. 2000).

VMC alleges Enright tortiously interfered with the TSA by directing QVL to withhold VMC's funds, to bill VMC for illegitimate charges, and to withhold any further payments to VMC unless he personally approved them.  CR 544(¶¶38, 39).  Enright's written directions to the QVL bookkeepers and the company's attorney appear throughout the record.  App. B; CR 404-05; CR 414-16; CR 427-29; CR 442-44.  Enright does not explicitly deny that QVL's failure to pay VMC breached the terms of the TSA.  Further proof of Enright's interference with the TSA is seen in the August 26 email, where QVL's bank asks Enright if it is "ok to pay" the $64,752.44 check QVL issued to VMC the previous month.  CR 424-25.  QVL had available credit to honor the check, but Enright directed QVL's bank not to.  Enright's actions directly caused VMC's injuries.  CR 427-29; CR 486, Collins Dep. at 232:6-10.

### 4. Conversion Claim

The elements of a conversion claim are: 1) the plaintiff owned, possessed, or had the right to immediate possession of property, 2) the property was personal property, 3) the defendant wrongfully exercised dominion or control over the property, and 4) the plaintiff suffered injury. *Apple Imports, Inc., v. Koole*, 945 S.W.2d 895, 899 (Tex. App.–Austin 1997, writ denied). Special bank deposits can be converted. *Hodge v. Northern Trust Bank*, 54 S.W.3d 518, 522 (Tex. App.—Eastland 2001, pet. denied.).

VMC contends Enright wrongfully exercised dominion and control over VMC's funds which QVL deposited into the lockbox under the TSA. Enright's direct control over the TSA and VMC's funds in QVL's lockbox account is clear from his own emails. An example of Enright's control appears in his May 2014 email in which he informs Franklin: ". . . the TSA is in place and QVL will keep undertaking the work required in the agreement. *We* will allow releases of cash from the lockbox on a monthly basis as set forth in the agreement." CR 431-34 (emphasis added). The emails contained in the record show Enright knew who the funds deposited in the lockbox belonged to, and knew QVL's failure to pay them over to VMC directly violated the TSA.

### 5. Money Had and Received Claim

Money had and received is an equitable doctrine designed to prevent unjust enrichment. *Merry Homes, Inc. v. Luc Dao*, 359 S.W.3d 881, 883 (Tex. App.—Houston [14th Dist.] 2012). This cause of action arises when a party obtains money that, in equity and good conscience, belongs to another. *Id*. A claim for money had and received is not based on wrongdoing; rather, the only question is whether the defendant holds money that, in equity and good conscience, belongs to another. *Id*. The same evidence described above supports personal jurisdiction over Enright on this claim. The VMC funds that were swept out of QVL's lockbox account to pay QVL's debt to White Winston were indirectly received by Enright, owing to his consulting fee arrangement with Lillian White Investments. The consulting fee, paid to Enright by Lillian White Investments, came from White Winston. CR 503, Enright Dep. at 23:10-25.

### 6. Action for Accounting

VMC also seeks an equitable accounting by Enright of all of VMC's funds that were deposited into QVL's lockbox account. "An action for accounting may be a suit in equity, or it may be a particular remedy sought in conjunction with another cause of action." *Sauceda v. Wells Fargo Bank, N.A.*, No. SA-12-CV-01094-DAE, 2013 WL 690534, *2 (W.D. Tex. Feb. 25, 2013). An action for an accounting is a proper action "when the facts and accounts in issue are so complex

that adequate relief cannot be obtained by law." *Id*. at \*2 (citing *Hutchings v. Chevron U.S.A.*, 862 S.W.2d 752, 762 (Tex. App.—El Paso 1993)); *Richardson v. First Nat'l Life Ins. Co.*, 419 S.W.2d 836, 838 (Tex. 1967).

The evidence described above, including Enright's personal direction and control over the QVL bookkeepers in Texas who were supposed to account for VMC's funds, supports jurisdiction over Enright on the action for accounting. The bookkeepers reported directly to Enright, who ordered them not to issue any TSA payments or invoices to VMC without his approval. CR 412; CR 418; CR 442-44. VMC also sought an accounting of its funds from QVL. But counsel for QVL withdrew early in the case and those defendants are not represented. CR 174-76. These circumstances limit the trial court's ability to grant meaningful equitable relief on this claim, if there is no personal jurisdiction over Enright, who controlled the accounting function for QVL. Enright's contacts are substantially connected to each of VMC's claims; therefore the trial court's ruling should be affirmed.

**C.      The exercise of personal jurisdiction over Enright does not offend traditional notions of fair play and substantial justice.**

Once it is determined that a nonresident defendant purposefully established minimum contacts with the forum state, the contacts are evaluated in light of other factors to determine whether the assertion of personal jurisdiction comports with fair play and substantial justice. *Guardian Royal Exchange Assur., Ltd. v. English China Clays, PLC*, 815 S.W.2d 223, 228 (Tex. 1991). Only in "rare cases" will the

exercise of jurisdiction not comport with fair play and substantial justice. *Camac v. Dontos*, 390 S.W.3d 398, 413 (Tex. App.—Dallas 2012, reh'g denied). The factors include: (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies, and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Id.*

Enright's Brief addresses none of these factors. App't Br. 26-32; *Camac*, 390 S.W.3d at 413 (Defendant offered no authority or argument as to the factors appellate court must consider in making fair play and substantial justice determination and, therefore, did not meet his burden to disprove jurisdiction). Instead, he argues jurisdiction in Texas is unfair because documents regarding VMC's loan agreement with White Winston called for mandatory venue in the Commonwealth Massachusetts. *Id.* VMC did not sue Defendants for breach of any document related to the loan agreement between VMC and White Winston. CR 542-45. The claims asserted against Enright arise out of his negotiation of the terms of the QVL purchase agreement, his pre-Transaction representations regarding the TSA, and his subsequent interference with QVL's performance of the TSA. CR 529-47.

As shown herein, all these events took place in or were aimed at Texas. In addition, the TSA, which Enright directly involved himself in from the beginning, permits jurisdiction of related disputes in Texas courts. CR 20-36(¶6.08). Enright was aware of this term since he received a draft of the TSA from QVL's attorney during the negotiations. CR 401-02. More importantly, under the five factors listed above, personal jurisdiction over Enright in this case does not offend due process.

### 1. Enright is not burdened by defending in a Texas forum.

Enright presented no evidence that defending a lawsuit in Texas poses a burden to him. Enright has obtained counsel in Texas and is able to effectively participate in litigation. To the extent his physical presence in Texas is required by this suit, he travels to the state frequently, nearly a dozen times in the last two years (as of last September). CR 448-49(No.1).

Further, it should come as no surprise to Enright that his actions had an economic impact in Texas. Enright was well aware last summer that his "game plan" for the TSA would likely end in a Texas lawsuit. He was warned on three occasions. On July 10, 2014, QVL's attorney Moss warned Enright in an email that she expected "a potential lawsuit against QVL probably if the monies owed to [Franklin] are not paid by the end of the week." CR 456-59. Enright responded to Moss:

Amy, a check was sent today per Sandra. While I understand [Franklin's] frustration, *a lawsuit will really grind things to a halt*. Thanks." CR 455-59 (emphasis added).

Ten days later on July 22, Franklin emailed Enright directly about the late TSA payments, and charged Enright with blocking an earlier QVL check for part of the May TSA payment. CR 461-62. Franklin warned Enright that he would be liable for any damages that might result from withholding VMC's money due to his control over QVL. *Id*. Enright responded that neither he nor White Winston "have any control or equity interest in QVL" and warned Franklin that if he was sued personally "you and your firm will find yourself the subject of *a swift and deliberate counterclaim* which will not recede when you realize the folly of action." *Id* (emphasis added).

The following month on August 15, 2014, ten days before Enright refused QVL's bank permission to honor the $64,752 check to VMC, QVL's attorney again emailed Enright warning of a lawsuit:

> I know I sound like a broken record, but I talked to David [VMC's lawyer] again. *Patience is basically all gone and I expect a nasty letter – lawsuit shortly*. QVL is in default under the terms of the TSA. Can we tell David how much Dr. Franklin is owed? Is it possible to deal with the release today or to expedite this? Please let me know how I can assist." CR 464 (emphasis added).

Enright responded to Moss:

Amy, as I said yesterday, we are prepared to advance the 2nd half of the last TSA due under the LOC and I have said we would do so for weeks (it's about $65k). They have a draft of the release, and it can be edited so that they only release WW upon execution. I am on my way to Nantucket now so if this is going to get addressed before Labor Day it should happen soon. Thanks. CR 464.

Enright reasonably anticipated being haled into a Texas court to answer for his actions. *See Wright v. Saga Engineering, Inc.*, 137 S.W.3d 238, 252 (Tex. App.–Houston [1st Dist.] 2004) (Holding that there is a foreseeable injurious effect of sending false information into Texas knowing it will be relied upon, for which the defendant must reasonably anticipate being haled into court). Moss warned Enright that QVL was in breach of the TSA by holding onto VMC's funds and that VMC had called foul on his "game plan". CR 428. The evidence shows Enright refused to permit the payment, even though Collins admitted QVL had available credit and Gonzales believed Enright had approved sending the check. CR 427-29; CR 486, Collins Dep. at 232:6-13.

Enright's tortious and fraudulent conduct, directed toward individuals in Texas, related to contractual obligations to be performed in Texas, and constitutes the type of activity Texas courts have consistently held give rise to specific personal jurisdiction. The fact Enright issued his commands from New Hampshire or Nantucket hardly matters.

**2. The State of Texas has an interest in adjudicating the dispute.**

The retail pharmacies VMC purchased are in its home state of Texas. The damages incurred by VMC, including the converted proceeds from drug sales in Texas, had a direct impact in Texas. The contract Enright is alleged to have interfered with, the TSA, was between Texas companies, and was to be carried out in Texas, by individuals who reside here.

Furthermore, Texas has a direct interest in business practices that involve the sale of securities in this state. As demonstrated by the terms of the Texas Securities Act, this State's laws govern the manner in which securities, including limited partnership interests, are marketed and sold. As discussed above, civil action may be brought under the Act for violations by those who directly or indirectly control the seller of securities. *See* TEX. REV. CIV. STAT. art. 581-33F (Vernon Supp. 2013). Texas, more so than any other jurisdiction, has an interest in ensuring that the terms of the Act are met, and that an enforcement action is effectively litigated.

**3. VMC has an interest in obtaining convenient and effective relief.**

Since the suit was filed, QVL has gone out of business and has no attorney in the trial court. CR 174-76; CR 470-71, Collins Dep. at 44:23-45:4. The location of QVL's records and witnesses remain unknown for the most part, but are presumed to be in Texas where the company was based. Enright's suggestion,

37

implicit in his argument, that his home state of New Hampshire, or the Commonwealth of Massachusetts, offer more suitable forums to litigate VMC's is not supported by the facts. All of the witnesses, save Enright, are in Texas. It would be neither convenient nor effective for VMC to present these claims in a far-away tribunal. Such action would require extensive travel by the attorneys and witnesses located in Texas, and would likely require that court to apply and interpret Texas statutory and common law governing the dispute. VMC's interest in pursuing its claims and obtaining relief are better served by proceeding in a Texas court.

### 4. The interstate judicial system's interest favors the Texas forum.

For the same reasons, the interests of the interstate judicial system are furthered by proceeding in the Texas forum. Texas has a compelling interest in providing a forum for redressing harm endured principally by a resident of this State. *See TexVa, Inc. v. Boone*, 300 S.W.3d 879, 891 (Tex. App.—Dallas 2009, pet. denied) (citing *Rittenmeyer v. Grauer*, 104 S.W.3d 725 (Tex. App.—Dallas 2003, no pet.)). The VMC entities were all formed in Texas, where they own and operate retail businesses. The economic harm those entities have sustained is felt in Texas.

**5. The shared interest of the several states in furthering substantive social policies favors the Texas forum.**

The shared interests of the several states are furthered by proceeding in the Texas forum. According to Enright, White Winston is a Utah corporation, and its offices are located in that state. CR 501, Enright Dep. at 15:9-17. But White Winston is not a party to the case. Nor was it a party to the purchase agreement and the TSA, the terms of which Enright and Franklin initially negotiated over the phone. CR 437(¶3). The State of Utah has no substantive interest in the outcome of this case.

Nor do the State of New Hampshire or the Commonwealth of Massachusetts. Enright claims he performed his consulting work for White Winston out of an office in his home state of New Hampshire. CR 501, Enright Dep. at 15:9-17. But there is no evidence in the record that Enright was even in New Hampshire when the phone calls and emails at issue in this case took place. All of the face-to-face meetings at issue in the allegations took place in Texas, including Enright's meeting with the bookkeepers to discuss the TSA in late July 2014. CR 449-50(No.2). None of these facts support a substantive social policy interest by the Commonwealth of Massachusetts, either. Enright is not a Massachusetts resident, VMC and QVL are not Massachusetts entities, and White Winston's offices are in Utah.

## PRAYER

For the foregoing reasons, Appellees Asclepius Panacea, LLC; Asclepius Panacea GP, LLC; Daily Pharmacy, LLC; Daily Pharmacy GP, LLC; and Toth Enterprises II, P.A. d/b/a Victory Medical Center respectfully request that, after full briefing and oral argument, this Court affirm the Order of the Honorable Gisela D. Triana denying Todd Enright's Special Appearance.

Respectfully submitted,

TAUBE SUMMERS HARRISON TAYLOR
  MEINZER BROWN LLP
100 Congress Avenue, 18th Floor
Austin, Texas 78701
Telephone:  512/472-5997
Telecopier: 512/472-5248

By: */s/ Paul Matula*
    Eric J. Taube
    State Bar No. 19679350
    Paul Matula
    State Bar No. 13234354
    Rola Daaboul
    State Bar No. 24068473
    etaube@taubesummers.com
    pmatula@taubesummers.com
    rdaaboul@taubesummers.com

ATTORNEYS FOR APPELLEES

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Appellees' Brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i)(2)(B). According to the word count tool of the computer program used to prepare this document, this Brief contains 9,473 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Appellees' Brief was filed electronically and served on all counsel below via e-mail and certified mail, RRR in compliance with Tex. R. App. P. 9.5(b) and L.R.3 on the 24th day of August, 2015.

Jonah Davis Jackson                              *(via email and Certified Mail, RRR)*
Jennifer B. Poppe
Vinson & Elkins, LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7588


Thomas S. Leatherbury                            *(via email and Certified Mail, RRR)*
Vinson & Elkins LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201


*/s/ Paul Matula*
Paul Matula

# APPENDIX

# APPENDIX A

**From:** Dr. William Franklin [dr.williamfranklin@gmail.com]
**Sent:** Friday, December 13, 2013 8:18 PM
**To:** 'T.M. Enright'
**Subject:** RE: Follow-up

Mr. Enright,
I think I got it. We move the LLC to Austin.
Billy

**From:** T.M. Enright [mailto:tenright@whitewinston.com]
**Sent:** Friday, December 13, 2013 1:45 PM
**To:** Dr. William Franklin
**Subject:** Re: Follow-up

Dr. We are saying the same thing. We have a license owned by an LLC in Houston. The plan would be for you to buy the LLC and immediately move the location/license to your new location in Dallas.

It may be easier to explain the process by phone. Are you available to speak this afternoon?

T.M. Enright
850.570.4793
Sent from my iPhone

On Dec 13, 2013, at 2:18 PM, "Dr. William Franklin" <dr.williamfranklin@gmail.com> wrote:

Mr. Enright
Thankyou for your prompt attention to this matter. There must have been some confusion about our interests during the conversation. We do not intend to move the pharmacy that we are purchasing. What we want to do is license a second pharmacy in Austin under the same Tax ID. Can this also expedite the licensing process? Will it cost less than 100k? Can we just do it by applying for a second license once the deal is closed? I am going to forward this communication to my Administrator who will begin gathering the documents. Once again thankyou. And have a wonderful weekend.
Billy

**From:** T.M. Enright [mailto:tenright@whitewinston.com]
**Sent:** Friday, December 13, 2013 12:37 PM
**To:** Dr Franklin
**Cc:** Chad Collins | Corp-CEO
**Subject:** Follow-up

Dr Franklin, it was a pleasure to speak with you yesterday regarding your interest in purchasing the Austin (and potentially) our licensed store (to be moved to your target location) in Houston. As we discussed, I have attached a form of personal financial statement and form release which should be prepared for any party that holds in excess of 20% of the stock/equity of your current business. Also, as we discussed, we would like to also view the following:

1. Last 2 full years of corporate tax returns for your companies practice.
2. 2013 YTD Consolidated Income Statement.

We look forward to working with you on this matter and speaking in the near future. Thanks,

**T.M. Enright, Partner**

466

# APPENDIX B

From: Moss, Amy C. [Amy.Moss@chamberlainlaw.com]
Sent: Friday, June 13, 2014 3:56 PM
To: 'T.M. Enright'
CC: Chad Collins | Corp-CEO; Sandra Gonzalez | Corp-Accounting
(sandra.gonzalez@qvlpharmacy.com); Joyce Montgomery | Corp-Accounting
(joyce.montgomery@qvlpharmacy.com)
Subject: RE: Dr. F TSA

I understand. I will put it out there.

Amy Moss
Chamberlain, Hrdlicka, White, Williams & Aughtry
Two Allen Center
1200 Smith Street, Suite 1400
Houston, TX 77002
Main: 713-658-1818
Direct: 713-654-9662
Fax: 713-658-2553
Email: amy.moss@chamberlainlaw.com

CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by U.S. Treasury Regulations, Chamberlain, Hrdlicka, White, Williams & Aughtry informs you that any U.S. tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential, may be privileged and should be read or retained only by the intended recipient. If you have received this transmission in error, please immediately notify the sender and delete it from your system.

From: T.M. Enright [mailto:tenright@whitewinston.com]
Sent: Friday, June 13, 2014 10:52 AM
To: Moss, Amy C.
Cc: Chad Collins | Corp-CEO; Sandra Gonzalez | Corp-Accounting (sandra.gonzalez@qvlpharmacy.com);
Joyce Montgomery | Corp-Accounting (joyce.montgomery@qvlpharmacy.com)
Subject: Re: Dr. F TSA

Amy, here would be my position: (i) May charges are due so there is no question on those being deducted; (ii) June is 1/2 through (and there is no proration of costs), so that is not an issue andshould be dedcuted; (iii) the company has no collateral (in the form on AR) to collect from so holding a month is reasonable; and (iv) Dr. Franklin's unilateral transfer of the funds (in violation of the agreement) does not make anyone feel inclined to extend him any credit courtesies. Thanks.

T.M. Enright, Partner



**white winston**
SELECT ASSET FUNDS

NEW YORK  BOSTON  LOS ANGELES  SALT LAKE CITY

850.570.4793 (Direct Dial)
801.938.7540 (Administrative)
tenright@whitewinston.com



On Jun 13, 2014, at 11:41 AM, Moss, Amy C. <amy.moss@chamberlainlaw.com> wrote:

CONFIDENTIAL

ENR000214

414

Ok. I will explain this to David. I think he will not be happy with so many withholdings to the April payment. He is going to say what is the justification for the deductions and we are going to have to hang our hat on the breach.

Amy Moss
Chamberlain, Hrdlicka, White, Williams & Aughtry
Two Allen Center
1200 Smith Street, Suite 1400
Houston, TX 77002
Main: 713-658-1818
Direct: 713-654-9662
Fax: 713-658-2553
Email: amy.moss@chamberlainlaw.com

CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by U.S. Treasury Regulations, Chamberlain, Hrdlicka, White, Williams & Aughtry informs you that any U.S. tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential, may be privileged and should be read or retained only by the intended recipient. If you have received this transmission in error, please immediately notify the sender and delete it from your system.

**From:** T.M. Enright [mailto:tenright@whitewinston.com]
**Sent:** Friday, June 13, 2014 10:17 AM
**To:** Moss, Amy C.
**Cc:** Chad Collins | Corp-CEO; Sandra Gonzalez | Corp-Accounting (sandra.gonzalez@qvlpharmacy.com); Joyce Montgomery | Corp-Accounting (joyce.montgomery@qvlpharmacy.com)
**Subject:** Re: Dr. F TSA

Amy, here is what I understand:

1. QVL is going to account for May and deduct that amount due QVL from any balance due Toth for April.
2. QVL is going to hold one-month of average TSA charges (from the April TSA credit) as security for future services payments since they no longer hold any receivables under the TSA Agreement.
3. QVL is going to hold the full payoff for the 2 computer systems (as well as the termination fees relating thereto) from the April TSA payment.

4. If there are any amounts remaining from the April TSA credit, (after the application of 1-3 above), QVL will send it to Toth in 5 days from the accounting of 1-3 above.

Let me know if you have questions. Thanks.

T.M. Enright, Partner

<image001.gif>

850.570.4793 (Direct Dial)
801.938.7540 (Administrative)
tenright@whitewinston.com

ENR000215

On Jun 13, 2014, at 10:57 AM, Moss, Amy C.
<amy.moss@chamberlainlaw.com> wrote:

Ok - I need some guidance on the TSA.

As I see it Dr. F is still in breach (though David disagrees) from the movement of the lock box. QVL is holding its April and May money, which is giving Dr. F fits. Michelle is not in any position to terminate the TSA. So what is QVL's next move? Do I send the notice of breach – which I have only held off because David has begged me not to upset Dr. F further saying he will go postal if I send it? I can send it but then what? Will QVL pay his money? Terminate the TSA? I need a game plan here, please. Thanks!

Amy Moss
Chamberlain, Hrdlicka, White, Williams & Aughtry
Two Allen Center
1200 Smith Street, Suite 1400
Houston, TX 77002
Main: 713-658-1818
Direct: 713-654-9662
Fax: 713-658-2553
Email: amy.moss@chamberlainlaw.com

CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by U.S. Treasury Regulations, Chamberlain, Hrdlicka, White, Williams & Aughtry informs you that any U.S. tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential, may be privileged and should be read or retained only by the intended recipient. If you have received this transmission in error, please immediately notify the sender and delete it from your system.

CONFIDENTIAL

# SELECTED AUTHORITIES

 KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Elias v. Mr. Yamaha, Inc., Tex.App.-El Paso, October 12, 2000

945 S.W.2d 895
Court of Appeals of Texas,
Austin.

APPLE IMPORTS, INC. dba
Apple Toyota, Appellant,
v.
Debbie KOOLE and Pete Resendez, Appellees.

No. 03–96–00524–CV. | May 15, 1997. | Rehearing Overruled June 19, 1997.

Buyers brought Deceptive Trade Practices Act claim against automobile dealer, claiming that their trade-in car was sold and mishandled, although they decided not to complete purchase. The County Court, Travis County, J. David Phillips, J., entered judgment on jury verdict in favor of buyers on most claims but refused to set aside finding that dealer did not convert trade-in car. Dealer appealed and buyers cross-appealed. The Court of Appeals, Jones, J., held that: (1) buyers were "consumers" for purposes of Act; (2) whether buyers were consumers was to be decided by judge, rather than jury; (3) evidence that dealer sold car before buyers returned following business day to cancel new car purchase was legally sufficient to support finding that dealer violated Act; but (4) jury's finding that dealer did not convert buyers' trade-in car was supported by evidence that buyers saw trade-in car in parking lot, but did not pick it up on advice of their attorney.

Affirmed.

West Headnotes (13)

**[1]** **Antitrust and Trade Regulation**
Questions of law or fact

Whether plaintiff is consumer, for purposes of Deceptive Trade Practices Act, is generally question of law to be determined by trial court from evidence. V.T.C.A., Bus. & C. § 17.45(4).

Cases that cite this headnote

**[2]** **Appeal and Error**
Findings of fact and conclusions of law

Trial court's legal conclusion will not be reversed unless it is erroneous as matter of law.

Cases that cite this headnote

**[3]** **Antitrust and Trade Regulation**
Consumers, purchasers, and buyers; consumer transactions

To qualify as consumer under Deceptive Trade Practices Act, person must seek or acquire goods or services by purchase or lease, and goods or services sought or acquired must form basis of complaint. V.T.C.A., Bus. & C. § 17.45(4).

Cases that cite this headnote

**[4]** **Antitrust and Trade Regulation**
Consumers, purchasers, and buyers; consumer transactions
**Antitrust and Trade Regulation**
Sale

From car buyer's point of view, trade-in of their previous car was simply means of making purchase, and thus buyers were "consumers" for purposes of Deceptive Trade Practices Act claim that trade-in was improperly handled after buyers decided not to complete purchase, despite seller's contention that handling of trade-in was collateral service to purchase of new car. V.T.C.A., Bus. & C. § 17.45(4).

1 Cases that cite this headnote

**[5]** **Antitrust and Trade Regulation**
Consumers, purchasers, and buyers; consumer transactions

Determination of consumer status, under Deceptive Trade Practices Act, is made by looking at transaction from plaintiff's perspective. V.T.C.A., Bus. & C. § 17.45(4).

1 Cases that cite this headnote

**[6]** **Antitrust and Trade Regulation**

🔑 Questions of law or fact

Unless there is dispute concerning factual issues that create consumer status under Deceptive Trade Practices Act, question of consumer status is question of law for court to decide; if facts are disputed, jury is called upon to resolve factual issues, but court still must decide legal effect of resolved issues. V.T.C.A., Bus. & C. § 17.45(4).

1 Cases that cite this headnote

**[7]** **Antitrust and Trade Regulation**
🔑 Questions of law or fact

Dispute over whether car buyers were "consumers" entitled to bring claim under Deceptive Trade Practices Act revolved around legal interpretation of facts, and thus was to be decided by judge, rather than jury. V.T.C.A., Bus. & C. § 17.45(4).

Cases that cite this headnote

**[8]** **Appeal and Error**
🔑 Verdict

**Appeal and Error**
🔑 Total failure of proof

In reviewing legal sufficiency of evidence, Court of Appeals considers only evidence and inferences, viewed in light most favorable to verdict, that tend to support finding, and disregards all evidence and inferences to contrary; if there is any evidence of probative force to support finding, it is upheld.

Cases that cite this headnote

**[9]** **Appeal and Error**
🔑 Extent of Review

**Appeal and Error**
🔑 Clear or palpable weight or preponderance

In reviewing factual sufficiency of evidence to support finding on which appellee had burden of proof at trial, Court of Appeals examines entire record and sets aside judgment only if evidence as whole is so weak that finding is clearly wrong and unjust.

Cases that cite this headnote

**[10]** **Antitrust and Trade Regulation**
🔑 Weight and sufficiency

When dealer took possession of buyers' old car, for stated purpose of appraising it for its "trade-in" value, dealer impliedly represented that it would not sell old car until new car transaction was completed and dealer had title to old car, and thus evidence that dealer sold car before buyers returned following business day to cancel new car purchase was legally sufficient to support finding that dealer violated Deceptive Trade Practices Act. V.T.C.A., Bus. & C. §§ 17.46–17.63.

3 Cases that cite this headnote

**[11]** **Appeal and Error**
🔑 Interrogatories and special verdicts

**Appeal and Error**
🔑 Extent of Review

If party seeks to set aside adverse "non-finding" by jury as matter of law, record must be examined for evidence that supports jury's findings, while ignoring all evidence to contrary, and if there is no evidence to support fact finder's answer, entire record must then be examined to see if contrary proposition is conclusively established.

Cases that cite this headnote

**[12]** **Conversion and Civil Theft**
🔑 In general; nature and elements

To establish conversion of personal property, plaintiff must prove that plaintiff owned or had legal possession of property or entitlement to possession, defendant unlawfully and without authorization assumed and exercised dominion and control over property to exclusion of, or inconsistent with plaintiff's rights as owner, plaintiff demanded return of property, and defendant refused to return property.

31 Cases that cite this headnote

**[13]** **Conversion and Civil Theft**
👉 Conversion or theft

Jury's finding, that dealer did not convert buyers' trade-in car, was supported by evidence that buyers saw trade-in car in parking lot, but did not pick it up on advice of their attorney, and thus finding would not be set aside.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*897** David R. Sapp, Law Offices of David R. Sapp, Austin, for appellant.

Malcolm Greenstein, Greenstein & Kolker, Austin, for appellees.

Before POWERS, JONES and KIDD, JJ.

**Opinion**

JONES, Justice.

Our opinion issued April 10, 1997 is withdrawn, and the following is issued in lieu thereof.

Appellant Apple Imports, Inc., doing business as Apple Toyota ("Apple"), appeals a judgment awarding damages to Debbie Koole and Pete Resendez, appellees, for violations of the Texas Deceptive Trade Practices Act ("DTPA"). *See* Tex. Bus. & Com.Code Ann. §§ 17.46–.63 (West 1987 & Supp.1997). In six points of error, Apple contends that appellees lacked standing to bring suit under the DTPA and that the evidence was legally and factually insufficient to support a finding that Apple engaged in any false, misleading, or deceptive act. In a cross-point, appellees assert that the trial court erred in not setting aside the jury's determination that Apple did not convert appellees' automobile. We will affirm the judgment of the trial court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On Saturday December 3, 1994, appellees visited Apple's automobile dealership and decided to purchase a used Mazda MX–3. As part of the consideration for the Mazda, appellees orally agreed to trade in their Dodge Dynasty. Due to the late

hour, appellees were unable to complete the necessary papers to consummate the transaction before the dealership closed for the day. At an Apple employee's suggestion, appellees drove the Mazda home and left their Dodge at Apple, planning to return on Monday to finalize the paperwork for the purchase. Over the weekend, however, appellees changed their minds about buying the Mazda. When appellees returned to the dealership on Monday to give back the Mazda and retrieve their Dodge Dynasty, however, they discovered that Apple had already sold the Dodge to a wholesaler in Eagle Pass, Texas, without their authorization and without title to the car. Apple arranged to have appellees' car returned from Eagle Pass on Friday, December 9, 1994. However, appellees did not pick up the vehicle until July of 1995. When appellees finally recovered their Dodge, they discovered it had an additional 800 miles on the odometer and a long scratch on the driver's side of the car that had not been present in December when they originally took it to the Apple dealership.

Appellees filed suit against Apple alleging violations of the DTPA and conversion. A jury found Apple to have engaged in a false, misleading, or deceptive act and awarded $2,000 in damages; however, the jury found that Apple did not convert appellees' Dodge. Apple appeals the trial court's judgment. In a cross-point, appellees argue that the trial court erred in failing to set aside the jury's finding that Apple did not convert appellees' car.

**DISCUSSION**

**[1]** **[2]** In its first point of error, Apple contends appellees lacked standing to bring suit under the DTPA because they do not qualify as "consumers" under the act. Whether a plaintiff is a consumer is generally a question of law to be determined by the trial court from the evidence. *HOW Ins. Co. v. Patriot Fin. Servs. of Texas, Inc.,* 786 S.W.2d 533, 539 (Tex.App.—Austin 1990, writ denied), *disapproved on other grounds, Hines v. Hash,* 843 S.W.2d 464, 469–70 (Tex.1992). The trial court's legal conclusion will not be reversed unless it is erroneous as a matter of law. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, writ denied).

**[3]** **[4]** Under the DTPA, a consumer is an individual who seeks or acquires, by purchase or lease, any goods or services. *See* Tex. Bus. & Com.Code Ann. § 17.45(4) (West 1987). In order to qualify as a consumer under the DTPA, two requirements must be met: (1) the person must seek or

acquire goods or services by purchase or lease, and (2) the goods or services sought or acquired must form the basis of the complaint. *Sherman Simon Enters., Inc. v. Lorac Serv.* **\*898** *Corp.,* 724 S.W.2d 13, 14 (Tex.1987). Apple argues that appellees do not meet the second part of this test because appellees' complaint is based on the *handling* of their Dodge Dynasty, which Apple insists was a collateral service to their purchase of the Mazda. We disagree.

**[5]** The determination of consumer status is made by looking at the transaction from the plaintiff's perspective. *Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705, 707 (Tex.1983). From appellees' viewpoint, the only transaction was the purchase of the Mazda MX–3. The trade-in of the Dodge Dynasty was simply a means to make the purchase. *See id.* The planned trade-in was to form part of the consideration for the purchase of the Mazda and, therefore, was an integral part of the consumer transaction. Appellees' complaint arose out of a single transaction—the attempted purchase of the Mazda. The trial court's conclusion that appellees were consumers was not erroneous.

**[6]** **[7]** Apple argues, in the alternative, that the trial court erred in not submitting to the jury the question of whether appellees were consumers. Unless there is a dispute concerning the factual issues that create a consumer status, the question of consumer status is a question of law for the court to decide. *See Leonard & Harral Packing Co. v. Ward,* 883 S.W.2d 337, 342 (Tex.App.—Waco 1994), *rev'd on other grounds,* 937 S.W.2d 425 (Tex.1996); *3Z Corp. v. Stewart Title Guar. Co.,* 851 S.W.2d 933, 937 (Tex.App.—Beaumont 1993, writ denied). If the facts are disputed, the jury is called upon to resolve the factual issues, but the court still must decide the legal effect of the resolved issues. *See id.* In the present case, there is no dispute concerning the facts that create appellees' consumer status. Rather, the parties' dispute revolves around a legal interpretation of those facts. The trial court did not err in failing to submit a jury question on appellees' consumer status. We overrule point of error one.

**[8]** **[9]** In points of error two through five, Apple argues that the evidence is legally and factually insufficient to support the jury's finding that Apple violated the DTPA. In reviewing the legal sufficiency of the evidence, we consider only the evidence and inferences, viewed in the light most favorable to the verdict, that tend to support the finding, and we disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If there is any evidence of probative force to

support the finding, it will be upheld. *See Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988). In reviewing the factual sufficiency of the evidence to support a finding on which the appellee had the burden of proof at trial, we examine the entire record and will set aside a judgment only if the evidence as a whole is so weak that the finding is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

**[10]** Apple contends that its act of selling appellees' Dodge was merely a mistake and does not constitute or create a misrepresentation. Under the particular circumstances of this case, we disagree. When it took possession of appellees' car to determine its "trade-in" value, Apple made an *implied* representation. Violation of an implied representation has been held to constitute a "laundry list" violation under the DTPA. *See Rickey v. Houston Health Club, Inc.,* 863 S.W.2d 148, 151 (Tex.App.—Texarkana 1993), *writ denied per curiam,* 888 S.W.2d 812 (Tex.1994); *Lone Star Ford, Inc. v. McGlashan,* 681 S.W.2d 720, 724 (Tex.App.—Houston [1st Dist.] 1984, no writ). In *Lone Star,* the court said that when a dealer represents he can sell a used vehicle, " he necessarily represents he can transfer a legal title to the new owner." *Lone Star Ford,* 681 S.W.2d at 724. Similarly, when Apple took possession of appellees' Dodge Dynasty for the stated purpose of appraising it for its "trade-in" value, we believe Apple impliedly represented that it would not sell appellees' car until the transaction was completed and there was a clear showing of a valid complete transfer of ownership.[1] *See* **\*899** Tex. Transp. Code Ann. § 501.071 (West Supp.1997) (prohibiting the sale of a motor vehicle without a transfer of the certificate of title); *cf. Najarian v. David Taylor Cadillac,* 705 S.W.2d 809, 811 (Tex.App.—Houston [1st Dist.] 1986, no writ) (in transfer of automobile, a clear showing of a valid and complete transfer of ownership is required). Apple's general manager testified that the dealership "commonly" sold vehicles without first securing legal title, and it is undisputed that Apple sold appellees' Dodge before appellees completed the transfer of the automobile. Thus, looking at the evidence in the light most favorable to the verdict, we cannot say the evidence is legally insufficient to support the jury's finding that Apple violated the DTPA. Further, after reviewing the entire record, we conclude that the evidence supporting the jury's finding is not so weak as to make the finding clearly wrong and unjust. We overrule points of error two through five. Having overruled those points of error, we need not address point six.

In a cross-point, appellees challenge the jury's negative answer to question five of the jury charge, which asked whether Apple converted appellees' automobile and whether such conduct was a proximate cause of damages. Appellees assert that the trial court erred in failing to set aside the jury's answer to question five because the jury's failure to find that Apple converted appellees' Dodge was contrary to the overwhelming weight and preponderance of the evidence. [2]

 [11]    Appellees must overcome two hurdles to set aside an adverse "non-finding" by the jury as a matter of law. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982). First, the record must be examined for evidence that supports the jury's findings, while ignoring all evidence to the contrary. If there is no evidence to support the fact finder's answer, the entire record must then be examined to see if the contrary proposition is conclusively established. *Sterner,* 767 S.W.2d at 690.

 [12]    [13]    To establish conversion of personal property, a plaintiff must prove that: (1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the

exclusion of, or inconsistent with the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Whitaker v. Bank of El Paso,* 850 S.W.2d 757, 760 (Tex.App.—El Paso 1993, no writ). After carefully reviewing the record, we conclude that the record contains some evidence to support the jury's finding. Apple's general manager told appellees that their Dodge would be returned on Friday, December 9, 1994. Although the Dodge was at Apple on Friday, appellees did not pick it up. On Saturday, December 10, while appellees were returning the Mazda MX–3 to the dealership, they saw their Dodge in the parking lot, but did not pick it up on the advice of their attorney. We conclude that the record contains more than a scintilla of evidence that Apple did not refuse to return appellees' car, a required element of conversion. We overrule appellees' cross-point.

## CONCLUSION

We affirm the judgment of the trial court.

**All Citations**

945 S.W.2d 895

Footnotes

1     We do not hold that an implied representation like the one discussed above exists in all bailment situations. *See, e.g.,* 8A Tex. Jur.3d *Bailments* § 1 (1995). The present case is not a typical bailment case, since possession of appellees' car was transferred only because it was going to form part of the consideration for their purchase of another car. Thus, Apple's very possession of the Dodge Dynasty was a necessary part of the transaction involving appellees' proposed or attempted purchase of the Mazda.

2     Because it is not readily apparent from the argument briefed that appellees were attempting to raise a factual sufficiency complaint, *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 632–33 (Tex.1986), and because the trial court would not have been authorized to disregard the jury's answer to question five merely because it was against the great weight and preponderance of the evidence, we construe appellees' cross-point as a challenge to the *legal* sufficiency of the evidence rather than the *factual* sufficiency. *See Novy v. Employers Casualty Co.,* 536 S.W.2d 101, 103 (Tex.Civ.App.—Austin 1976, writ ref'd n.r.e.).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Spir Star AG v. Kimich,    Tex.,    March 12, 2010

83 S.W.3d 789
Supreme Court of Texas.

BMC SOFTWARE BELGIUM, N.V., Petitioner,

v.

Michel MARCHAND, Respondent.

No. 00–1019.   |   Argued Sept. 5, 2001.   |   Decided June 27, 2002.   |   Rehearing Denied Aug. 29, 2002.

Employee sued Houston based corporation and its foreign subsidiary for breach of contract, fraud, negligent misrepresentation, and declaratory relief. The 127th District Court, Harris County, Sharolyn Wood, J., denied foreign subsidiary's special appearance contesting jurisdiction, and foreign subsidiary appealed. The Court of Appeals affirmed and foreign subsidiary petitioned Supreme Court for review. The Supreme Court, James A. Baker, J., held that: (1) trial court did not have specific jurisdiction over foreign subsidiary; (2) trial court did not have general jurisdiction over foreign subsidiary; (3) foreign subsidiary was not the alter ego of its parent for jurisdictional purposes; and (4) trial court did not abuse its discretion in denying employee's request for a continuance of the special appearance hearing.

Court of Appeals reversed, and judgment rendered.

West Headnotes (36)

**[1]**    **Courts**
    Presumptions and Burden of Proof as to Jurisdiction

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute.

62 Cases that cite this headnote

**[2]**    **Courts**
    Presumptions and Burden of Proof as to Jurisdiction

A defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases.

53 Cases that cite this headnote

**[3]**    **Appeal and Error**
    Cases Triable in Appellate Court

**Appeal and Error**
    Proceedings preliminary to trial

In an appeal of a decision denying a special appearance, the Court of Appeals should review the trial court's factual findings for legal and factual sufficiency and the trial court's legal conclusions de novo.

254 Cases that cite this headnote

**[4]**    **Courts**
    Determination of questions of jurisdiction in general

Whether a court has personal jurisdiction over a defendant is a question of law.

50 Cases that cite this headnote

**[5]**    **Appeal and Error**
    Proceedings preliminary to trial

If a trial court enters an order denying a special appearance, and the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds.

115 Cases that cite this headnote

**[6]**    **Appeal and Error**
    Proceedings preliminary to trial

In an appeal of a decision denying a special appearance, the Courts of Appeals may review the fact findings for both legal and factual sufficiency.

4 Cases that cite this headnote

**[7]**    **Appeal and Error**
    Proceedings preliminary to trial

In an appeal of a decision denying a special appearance, Supreme Court's review of the trial court's fact findings is limited to legal sufficiency.

11 Cases that cite this headnote

**[8]** **Appeal and Error**

Findings of fact and conclusions of law

Appellate courts review a trial court's conclusions of law as a legal question.

147 Cases that cite this headnote

**[9]** **Appeal and Error**

Findings of fact and conclusions of law

The appellant may not challenge a trial court's conclusions of law for factual insufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness.

212 Cases that cite this headnote

**[10]** **Appeal and Error**

Rulings on questions of law

If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal.

100 Cases that cite this headnote

**[11]** **Appeal and Error**

Particular findings implied

When a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied.

127 Cases that cite this headnote

**[12]** **Appeal and Error**

Conclusiveness in General

When a trial court does not issue findings of fact with its ruling and the appellate record includes the reporter's and clerk's records, the trial court's implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court.

197 Cases that cite this headnote

**[13]** **Appeal and Error**

Total failure of proof

For legal sufficiency points, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails.

40 Cases that cite this headnote

**[14]** **Courts**

Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Broad language of the long-arm statute extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

69 Cases that cite this headnote

**[15]** **Constitutional Law**

Non-residents in general

Personal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

161 Cases that cite this headnote

**[16]** **Courts**

Business contacts and activities; transacting or doing business

A nonresident defendant that has purposefully availed itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction.

68 Cases that cite this headnote

**[17]  Courts**

   Purpose, intent, and foreseeability; purposeful availment

Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established minimum contacts with the forum state such that the forum state has personal jurisdiction.

80 Cases that cite this headnote

**[18]  Courts**

   Nature, number, frequency, and extent of contacts and activities

A defendant should not be subject to a foreign court's jurisdiction based upon random, fortuitous, or attenuated contacts.

4 Cases that cite this headnote

**[19]  Courts**

   Contacts with forum state in general

Because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum contacts analysis is particularly important when the defendant is from a different country.

21 Cases that cite this headnote

**[20]  Courts**

   Unrelated contacts and activities; general jurisdiction

**Courts**

   Related contacts and activities; specific jurisdiction

Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction.

36 Cases that cite this headnote

**[21]  Courts**

   Related contacts and activities; specific jurisdiction

"Specific jurisdiction" is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum.

24 Cases that cite this headnote

**[22]  Courts**

   Unrelated contacts and activities; general jurisdiction

"General jurisdiction" is present when a defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state.

118 Cases that cite this headnote

**[23]  Courts**

   Fraud, racketeering, and deceptive practices

Alleged discussion between foreign corporation's officers in Texas regarding their plans to defraud future employee did not establish special jurisdiction in Texas over employee's fraud and negligent misrepresentation claims against foreign corporation, where all of corporation's contacts with employee occurred outside of Texas, employee was not a party to any of the conversation in Texas, negotiations on and offer of stock options to employee occurred in Europe, and employee accepted employment offer in Belgium and worked in Belgium.

2 Cases that cite this headnote

**[24]  Courts**

   Unrelated contacts and activities; general jurisdiction

General jurisdiction may only be exercised when the nonresident defendant's contacts in a forum are continuous and systematic.

23 Cases that cite this headnote

**[25]  Courts**

☞ Particular cases

Alleged discussion between foreign corporation's officers in Texas regarding their plans to defraud future employee did not constitute substantial activities within Texas such as to establish general jurisdiction in Texas over foreign corporation, where all of corporation's contacts with employee occurred outside of Texas, employee was not a party to any conversations in Texas, negotiations on and offer of stock options to employee occurred in Europe, and employee accepted employment offer in Belgium and worked in Belgium.

1 Cases that cite this headnote

**[26]    Courts**
    ☞ Related or affiliated entities;  parent and subsidiary

Foreign subsidiary's unrelated purchases of products from parent corporation headquartered in Texas were insufficient to establish general jurisdiction in Texas over subsidiary, for purposes of employee's fraud and negligent misrepresentation claims against subsidiary; there was not evidence establishing that subsidiary's contacts with Texas were continuous and systematic, and unrelated purchases were not the type of contacts that justified a finding that subsidiary could have reasonably anticipated being haled into court in Texas.

7 Cases that cite this headnote

**[27]    Corporations and Business Organizations**
    ☞ Jurisdiction over shareholders, directors, or officers of foreign corporations

Personal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in Texas is one in which the parent corporation exerts such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction, and the court can impute the parent corporation's doing business to the subsidiary.

43 Cases that cite this headnote

**[28]    Corporations and Business Organizations**
    ☞ Presumptions and burden of proof

The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation, as the law presumes that two separate corporations are indeed distinct entities.

24 Cases that cite this headnote

**[29]    Corporations and Business Organizations**
    ☞ Identity of directors, officers, or shareholders

Courts will not because of stock ownership or interlocking directorship disregard the separate legal identities of corporations, unless such relationship is used to defeat public convenience, justify wrongs, such as violation of the anti-trust laws, protect fraud, or defend crime.

2 Cases that cite this headnote

**[30]    Corporations and Business Organizations**
    ☞ Jurisdiction and venue in general

To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary, and the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

45 Cases that cite this headnote

**[31]    Corporations and Business Organizations**
    ☞ Parent and subsidiary corporations in general

A subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders.

9 Cases that cite this headnote

**[32]**    **Corporations and Business Organizations**
    👉 Jurisdiction over shareholders, directors, or officers of foreign corporations

Foreign subsidiary was not alter ego of Texas based parent corporation, for purposes of determining whether Texas courts had personal jurisdiction over foreign subsidiary, though parent corporation had a senior vice-president for worldwide marketing and corporations shared a letterhead, absent evidence that parent corporation considered subsidiary's revenue as its own, performed services for subsidiary that were not charged, offered subsidiary financial assistance, treated its subsidiary as a mere department or office, typically recruited, controlled or approved subsidiary's personnel, or typically compensated subsidiary's employees with stock options.

14 Cases that cite this headnote

**[33]**    **Corporations and Business Organizations**
    👉 Labor and employment liabilities and violations

A parent company's offering a stock option plan to a subsidiary's employees is acceptable under Internal Revenue Service regulations and is not evidence of abnormal control over the subsidiary such that the subsidiary is the alter ego of the parent.

3 Cases that cite this headnote

**[34]**    **Appeal and Error**
    👉 Continuance

Supreme Court will not disturb a trial court's order denying a motion for continuance unless the trial court has committed a clear abuse of discretion.

95 Cases that cite this headnote

**[35]**    **Appeal and Error**
    👉 Abuse of discretion

A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.

70 Cases that cite this headnote

**[36]**    **Pretrial Procedure**
    👉 Grounds for continuance in general

Trial court did not abuse its discretion in overruling plaintiff's objection to special appearance hearing and not allowing plaintiff more time to complete discovery, where hearing was held on special appearance seven months after it was filed, plaintiff was able to serve numerous written discovery requests and depose Chief Executive Officer of defendants, and plaintiff did not file motion to compel any discovery that defendants did not provide.

30 Cases that cite this headnote

**Attorneys and Law Firms**

**\*792** Merritt B. Chastain, III, Thomas H. Wilson, Houston, Vinson & Elkins, for Petitioner.

Stuart M. Nelkin, Carol Nelkin, Nelkin & Nelkin, Houston, for Respondent.

**Opinion**

Justice BAKER delivered the opinion of the Court.

This is an interlocutory appeal from the denial of a foreign corporation's special appearance. A divided court of appeals affirmed the trial court's ruling. 80 S.W.3d 52. We conclude that the foreign corporation's contacts with Texas are insufficient to create either specific or general jurisdiction. We also conclude that the trial court did not abuse its discretion in denying the plaintiff's motion to continue the special appearance hearing. We therefore reverse the court of appeals' judgment and render judgment dismissing the plaintiff's claims against the foreign corporation for want of jurisdiction.

**\*793  I. BACKGROUND**

Michel Marchand, a Belgian citizen, was employed by Platinum Technologies in Belgium. In March 1996, Marchand began negotiating with Gerd Ordelheide and Adri Kok for employment with BMC Software Belgium, N.V. (BMCB). Ordelheide and Kok were directors of BMCB, a wholly-owned subsidiary of BMC Software, Inc. (BMCS), a Delaware corporation headquartered in Houston.

On March 29, 1996, Marchand and BMCB signed a letter agreement outlining the terms of Marchand's employment with BMCB, including the offer of options to purchase 20,000 shares of BMCS stock. The agreement did not specify when the options would be granted or when Marchand could exercise them. The letter agreement also referenced a "management agreement" that Marchand had apparently presented to BMCB. On June 13, 1996, BMCB and Marchand executed the management agreement between BMCB and a company called Procurement, N.V., of which Marchand was the sole officer and director. The record shows that Marchand asked BMCB to hire Procurement as a management company so that Marchand could work for Procurement as an independent contractor rather than directly for BMCB. Apparently, this arrangement enabled Marchand to reduce his Belgian tax liability. The management agreement was in German, and it stated that Belgian law applies and the court at Brussels had exclusive jurisdiction.

When Marchand actually began working for BMCB is unclear. But it is clear that in July 1997, BMCB discharged Procurement and Marchand. Marchand was never granted any options to purchase BMCS stock. He sued BMCB and BMCS for breach of contract, fraud, negligent misrepresentation, and declaratory relief. Marchand alleged both specific and general jurisdiction over BMCB. BMCB filed a special appearance, which the trial court denied. BMCB appealed the trial court's interlocutory order. *See* TEX. CIV. PRAC. & REM.CODE § 51.014(a)(7). The court of appeals affirmed, 80 S.W.3d at 55, and BMCB petitioned this Court for review.

## II. THIS COURT'S JURISDICTION

Until 1997, a trial court's order denying a special appearance was reviewable only on appeal after trial. *Canadian Helicopters Ltd. v. Wittig,* 876 S.W.2d 304, 307 (Tex.1994). But the Legislature amended section 51.014 of the Civil Practice and Remedies Code to permit an interlocutory appeal from a trial court's ruling on a special appearance.

Typically, a court of appeals judgment in an interlocutory appeal is conclusive and an appeal to this Court is not allowed. *See* TEX. GOV'T CODE § 22.225(b). However, because there is a dissent in the court of appeals, we may exercise jurisdiction in this case. *See* TEX. GOV'T CODE § 22.225(c).

## III. APPLICABLE LAW

### A. SPECIAL APPEARANCE —STANDARD OF REVIEW

[1] [2] The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute. *See McKanna v. Edgar,* 388 S.W.2d 927, 930 (Tex.1965). A defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases. *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985). This Court has never clearly articulated the standard for reviewing a trial court's order denying a special appearance. The Fourth Court of Appeals has held that, because personal jurisdiction involves both legal and factual questions, appellate courts should review **\*794** the trial court's decision for an abuse of discretion. *See, e.g., Klenk v. Bustamante,* 993 S.W.2d 677, 681 (Tex.App.-San Antonio 1998, no pet.). However, other courts of appeals review the trial court's factual findings for legal and factual sufficiency and review the trial court's legal conclusions *de novo. See, e.g., E.L.M. LeBlanc v. Kyle,* 28 S.W.3d 99, 101 (Tex.App.-Texarkana 2000, pet. denied); *In re Estate of Judd,* 8 S.W.3d 436, 440–41 (Tex.App.-El Paso 1999, no pet.); *C–Loc Retention Sys., Inc. v. Hendrix,* 993 S.W.2d 473, 476 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *Cadle v. Graubart,* 990 S.W.2d 469, 471 (Tex.App.Beaumont 1999, no pet.); *Ball v. Bigham,* 990 S.W.2d 343, 347 (Tex.App.Amarillo 1999, no pet.); *Garner v. Furmanite Australia Pty, Ltd.,* 966 S.W.2d 798, 802 (Tex.App.-Houston [1st Dist.] 1998, pet. denied); *Al–Turki v. Taher,* 958 S.W.2d 258, 260–61 (Tex.App.-Eastland 1997, pet. denied).

[3] [4] [5] [6] [7] We agree with the latter view and disapprove of those cases applying an abuse of discretion standard only.[1] Whether a court has personal jurisdiction over a defendant is a question of law. *See Hotel Partners v. Craig,* 993 S.W.2d 116, 120 (Tex.App.-Dallas 1994, writ denied) (stating that this Court's decision in *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991), suggests that personal

jurisdiction is a legal question). However, the trial court frequently must resolve questions of fact before deciding the jurisdiction question. *See E.L.M. LeBlanc,* 28 S.W.3d at 101; *C–Loc Retention Sys.,* 993 S.W.2d at 476. If a trial court enters an order denying a special appearance, and the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds. *See Hotel Partners v. KPMG Peat Marwick,* 847 S.W.2d 630, 632 (Tex.App.-Dallas 1993, writ denied). Our courts of appeals may review the fact findings for both legal and factual sufficiency. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). This Court's review of the trial court's fact findings is limited to legal sufficiency. *Ortiz,* 917 S.W.2d at 772.

 **[8]** **[9]** **[10]** Appellate courts review a trial court's conclusions of law as a legal question. *Hitzelberger v. Samedan Oil Corp.,* 948 S.W.2d 497, 503 (Tex.App.-Waco 1997, pet. denied). The appellant may not challenge a trial court's conclusions of law for factual insufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness. *Templeton v. Dreiss,* 961 S.W.2d 645, 656 n. 8 (Tex.App.-San Antonio 1998, pet. denied); *Dallas County v. Sweitzer,* 881 S.W.2d 757, 763 (Tex.App.-Dallas 1994, writ denied). If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal. *Scholz v. Heath,* 642 S.W.2d 554, 559 (Tex.App.-Waco 1982, no writ).

 **\*795** **[11]** **[12]** **[13]** When a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *See Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 666 (Tex.1987); *In re W.E.R.,* 669 S.W.2d 716, 717 (Tex.1984). When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989); *Zac Smith & Co.,* 734 S.W.2d at 666. For legal sufficiency points, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992).

## B. IN PERSONAM JURISDICTION

 **[14]** The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident defendants. *See* TEX. CIV. PRAC. & REM.CODE §§ 17.041–.045. That statute permits Texas courts to exercise jurisdiction over nonresident defendants that "does business" in Texas, and the statute lists some activities that constitute "doing business." TEX. CIV. PRAC. & REM.CODE § 17.042. The list of activities, however, is not exclusive. We have held that section 17.042's broad language extends Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977). Thus, we rely on precedent from the United States Supreme Court and other federal courts, as well as our own State's decisions, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction. *See Guardian Royal,* 815 S.W.2d at 226; *U–Anchor Adver.,* 553 S.W.2d at 762.

 **[15]** **[16]** **[17]** **[18]** **[19]** Personal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). A nonresident defendant that has "purposefully availed" itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (discussing the constitutional boundaries of personal jurisdiction). Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established "minimum contacts" with the forum state. *Guardian Royal,* 815 S.W.2d at 227. However, a defendant should not be subject to a foreign court's jurisdiction based upon "random," "fortuitous," or "attenuated" contacts. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. Because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum contacts analysis is particularly important when the defendant is from a different country. *CSR Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996) (citing *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)).

[20] [21] [22] Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. **\*796** *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Guardian Royal,* 815 S.W.2d at 226. Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Guardian Royal,* 815 S.W.2d at 228. In contrast, general jurisdiction is present when a defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Guardian Royal,* 815 S.W.2d at 228; *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990).

## IV. ANALYSIS

In his original petition in the trial court, Marchand alleged the following to support jurisdiction over BMCB: (1) BMCB is operated by and is a wholly owned subsidiary of BMCS; (2) BMCS provides support to and uses its wholly owned subsidiaries such as BMCB to jointly market BMCS's products worldwide; (3) BMCS and BMCB have the same officers; (4) BMCB has continuous and systematic contacts with BMCS; (5) BMCB uses stock in BMCS to entice employees to work for it; and (6) the stock allegedly offered to Marchand is located in Houston, Texas.

The court of appeals determined that the trial court could have reasonably concluded that BMCB failed to negate all possible bases for establishing specific jurisdiction. In doing so, the court of appeals explained that the evidence shows that BMCB and BMCS officers discussed Marchand and the stock option offer in Texas. 80 S.W.3d at 59–60. Furthermore, the court of appeals concluded that the record showed that BMCB had sufficient continuous and systematic contacts with BMCS and thus Texas to establish the trial court's general jurisdiction. In so concluding, the court of appeals relied upon alleged conversations in Texas about Marchand between BMCB and BMCS officers, BMCB's selling BMCS's software and services, BMCS's including its subsidiaries' financial performance on annual reports, and BMCB providing its employees BMCS stock options as part of an employee incentive plan. 80 S.W.3d at 58–59. Because the court of appeals determined the trial court could have found specific and general jurisdiction over BMCB, it did

not reach BMCB's argument that the evidence is not legally sufficient to establish that BMCB was BMCS's alter ego. 80 S.W.3d at 59.

## A. SPECIFIC JURISDICTION

Marchand asserts that the trial court had specific jurisdiction over BMCB because BMCB committed a tort in whole or in part in Texas. *See* TEX. CIV. PRAC. & REM.CODE § 17.042(2). Specifically, Marchand alleges that Ordelheide and Max Watson, BMCS's chairman and chief executive officer, discussed in Texas the stock-options offer BMCB made to Marchand and, in this conversation, they planned to defraud him. Marchand argues that the discussion Ordelheide and Watson had in Texas forms the basis of his fraud and negligent misrepresentation claims about the stock options. In response, BMCB argues that there is no evidence in the record to support the trial court's implied fact findings to support specific jurisdiction. We agree with BMCB.

[23] Here, Marchand alleges that his fraud and negligent misrepresentation claims arise from the alleged Watson–Ordelheide conversation in Texas. *See Schlobohm,* 784 S.W.2d at 357 ("Where the activities of a defendant in a forum are isolated or disjointed ... jurisdiction is proper if the cause of action arises from a particular activity."). But they do not. The nature of the claims demonstrate that they can only arise from BMCB's contact **\*797** with Marchand, which all occurred outside of Texas. Even assuming Watson and Ordelheide talked in Texas about Marchand's employment and the stock options, Marchand was not a party to those conversations. BMCB negotiated with Marchand about his employment, and offered the stock options to Marchand, in Europe. Moreover, Marchand accepted the employment offer in Belgium and worked in Belgium. Consequently, BMCB made no representations to Marchand in Texas, and he did not rely to his detriment on the conversation in Texas. *See T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992) (fraud requires showing that plaintiff acted in reliance on defendant's material misrepresentation); *Federal Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (negligent misrepresentation requires that the plaintiff justifiably rely on the defendant's representation). Therefore, Marchand's alleged damages arose outside of Texas. *See, e.g., Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A. Institucion de Banca Multiple Grupo Financiero Serfin,* 974 S.W.2d 918, 926 (Tex.App.El Paso 1998, no pet.) (holding that specific jurisdiction did not exist where

defendant deposited money in Texas but misrepresentations to plaintiffs about that money occurred elsewhere).

There is no evidence to support the trial court's conclusion that BMCB committed a tort in whole or in part in Texas so that specific jurisdiction exists. *See Guardian Royal,* 815 S.W.2d at 227; TEX. CIV. PRAC. & REM.CODE § 17.042(2); *see also Roberson,* 768 S.W.2d at 281. Accordingly, we conclude that the trial court lacked specific jurisdiction over BMCB.

## B. GENERAL JURISDICTION

Marchand also contends that the trial court has general jurisdiction over BMCB. Marchand relies on the alleged Watson–Ordelheide conversation and BMCB's purchasing products from BMCS in Texas. On the other hand, BMCB asserts that these events are not enough to establish general jurisdiction. We agree and conclude that neither of the events Marchand relies upon are continuous or systematic so as to establish general jurisdiction in Texas.

[24] [25] General jurisdiction may only be exercised when the nonresident defendant's contacts in a forum are continuous and systematic. *Helicopteros,* 466 U.S. at 414–15, 104 S.Ct. 1868; *Guardian Royal,* 815 S.W.2d at 228; *Schlobohm,* 784 S.W.2d at 357. Though a single act may be enough to show general jurisdiction in some instances, the alleged conversation between Ordelheide and Watson in Texas is not enough here. *See Guardian Royal,* 815 S.W.2d at 230 n. 12. We have recognized that "[g]eneral jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction." *CSR Ltd.,* 925 S.W.2d at 595 (citing *Guardian Royal,* 815 S.W.2d at 228). For the reasons discussed above, the alleged Watson–Ordelheide conversation does not constitute "substantial activities" within the forum to meet the more onerous burden of proving general jurisdiction. *See Guardian Royal,* 815 S.W.2d at 228.

[26] Furthermore, BMCB's purchasing products from BMCS in Texas to distribute in Europe is not enough to establish general jurisdiction. In *Helicopteros,* the United States Supreme Court examined a Colombian corporation's contacts with Texas to decide if Texas courts could exercise general jurisdiction. *Helicopteros,* 466 U.S. at 415–16, 104 S.Ct. 1868. The nonresident defendant had purchased helicopters, equipment, and training services from **\*798** a

Texas company, sent its employees to Texas for training, and sent its chief executive officer to Houston for contract negotiation. *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868. The Supreme Court held that these contacts were insufficient to warrant a Texas court's exercising general jurisdiction. *Helicopteros,* 466 U.S. at 415–16, 104 S.Ct. 1868 (reversing *Hall v. Helicopteros,* 638 S.W.2d 870 (Tex.1982)). The Court noted that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros,* 466 U.S. at 418, 104 S.Ct. 1868.

This case is analogous to *Helicopteros.* Marchand's claims against BMCB do not arise from the purchases BMCB made from BMCS. To the contrary, Marchand's claims arise from his employment with BMCB in Belgium and the alleged misrepresentations BMCB made to Marchand concerning his employment. BMCB's unrelated purchases in Texas from BMCS are not the type of contacts that justify a finding that BMCB could have "reasonably anticipate[d] being haled into court" here. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *see also Helicopteros,* 466 U.S. at 418, 104 S.Ct. 1868.

There is no evidence to support the trial court's conclusion that BMCB's contacts with Texas were continuous and systematic so that they established general jurisdiction. *See Helicopteros,* 466 U.S. at 414–15, 104 S.Ct. 1868; *Guardian Royal,* 815 S.W.2d at 228; *Schlobohm,* 784 S.W.2d at 357; *see also Roberson,* 768 S.W.2d at 281. Thus, we conclude that the trial court lacked general jurisdiction over BMCB.

## C. ALTER EGO

Marchand's jurisdictional allegations in his original petition can be read to allege that the trial court has general jurisdiction over BMCB because it is BMCS's alter ego. In response, BMCB contends that there is no evidence to support a determination that it is BMCS's alter ego.

[27] [28] [29] Personal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in Texas is one that would allow the court to impute the parent corporation's "doing business" to the subsidiary. *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1159 (5th Cir.1983); *Walker v. Newgent,* 583 F.2d 163, 167 (5th

Cir.1978). The rationale for exercising jurisdiction is that "the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.' " *Hargrave,* 710 F.2d at 1159 (citations omitted); *see also Conner v. ContiCarriers & Terminals, Inc.,* 944 S.W.2d 405, 418 (Tex.App.-Houston [14th Dist.] 1997, no writ). The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation. *Walker,* 583 F.2d at 167; *Conner,* 944 S.W.2d at 418–19; *see also Lucas v. Texas Indus., Inc.,* 696 S.W.2d 372, 375 (Tex.1984). This is because Texas law presumes that two separate corporations are indeed distinct entities:

> The general rule seems to be that courts will not because of stock ownership or interlocking directorship disregard the separate legal identities of corporations, unless such relationship is used to defeat public convenience, justify wrongs, such as violation of the anti-trust laws, protect fraud, or defend crime.

*Bell Oil & Gas Co. v. Allied Chem. Corp.,* 431 S.W.2d 336, 339 (Tex.1968) (citations omitted).

**\*799** **[30]** To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. *Conner,* 944 S.W.2d at 418–19 (discussing *Hargrave,* 710 F.2d at 1160; *Walker,* 583 F.2d at 167). But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *See Hargrave,* 710 F.2d at 1160; *Conner,* 944 S.W.2d at 419; *see also Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571, 573 (Tex.1975).

**[31]** We conclude that there is no evidence to support any implied findings by the trial court to support that BMCB was BMCS's alter ego so that general jurisdiction exists in Texas. In *Gentry,* this Court held that "[a] subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." *Gentry,* 528 S.W.2d at 573. Though

*Gentry* dealt with whether a subsidiary corporation should be regarded as its parent's alter ego for purposes of service of process, the Fifth Circuit and our courts of appeals have relied on its alter ego rule in determining personal jurisdiction. *See Walker,* 583 F.2d at 167; *Gutierrez v. Raymond Int'l, Inc.,* 484 F.Supp. 241, 253 (S.D.Tex.1979); *Conner,* 944 S.W.2d at 419; *3–D Elec. Co. v. Barnett Constr. Co.,* 706 S.W.2d 135, 139 (Tex.App.-Dallas 1986, writ ref'd n.r.e.). Accordingly, general jurisdiction does not extend to BMCB to the extent Marchand relies on BMCB and BMCS having duplicate officers.

In addition to alleging that BMCB and BMCS share the same officers, Marchand argues that the record shows the following to establish BMCB's alter-ego status: (1) BMCS's SEC documents incorporate BMCB's financial performance, and BMCS's annual report includes BMCB's financial performance on a consolidated basis; (2) BMCS gives BMCB financial assistance; (3) BMCS provides stock options for BMCB's employees; (4) BMCS treats BMCB's offices, employees, and accounts receivable as its own property; (5) BMCS personnel has offices at its subsidiary facilities; (6) BMCS performs human resources, accounting, risk management, and marketing services for BMCB; (7) BMCS recruits employees for BMCB and approves hiring and competition; (8) BMCB and BMCS use the same letterhead and use the terms "BMC" and "BMC Software" interchangeably; and (9) Watson's deposition testimony shows that BMCB is a mere BMCS operation or department.

**[32]** There is no evidence in the record to support Marchand's assertions that BMCB is BMCS's alter ego. There are no SEC filings in the record, and nothing in BMCB's annual report supports a reasonable inference that BMCS considered its subsidiaries' revenue as its own or that it offered BMCB financial assistance. The annual report's listing international sales figures could represent either the subsidiaries' revenue or BMCS's revenue from selling its products *to* those subsidiaries. Moreover, the annual report's listing Belgium as a location of *both* International Offices and Independent Agents fails to show that BMCS treated its subsidiaries as mere departments or offices. BMCS's referencing its subsidiaries in its annual report is a common business practice, which the Internal Revenue Service, the SEC, and generally accepted accounting **\*800** principles recommend. *See Calvert v. Huckins,* 875 F.Supp. 674, 678–79 (E.D.Cal.1995). Finally, the annual report's stating that BMCS engaged in hedging transactions to protect against the

volatility of foreign currency exchange rates is not evidence that BMCS engaged in risk management for BMCB.

 [33]    Additionally, the letter agreement between Marchand and BMCB is not evidence that BMCS typically recruits, controls, and approves personnel whom BMCB employs or that BMCS typically compensates BMCB employees with stock options. And, in any event, a parent company's offering a stock option plan to a subsidiary's employees is acceptable under IRS regulations and is not evidence of abnormal control over the subsidiary. *See In re Silicone Gel Breast Implants Prods. Liab. Litig. (MDL 926),* 837 F.Supp. 1128, 1136 (N.D.Ala.1993), *vacated in part on other grounds by,* 887 F.Supp. 1455 (N.D.Ala.1995).

Further, Watson's deposition testimony that BMCS employees were "from time to time ... in the offices of a variety of our subsidiaries" does not permit a reasonable inference that BMCS exerted such control over BMCB that the two entities ceased to be separate. *See Hargrave,* 710 F.2d at 1160; *Conner,* 944 S.W.2d at 418. Moreover, in discussing certain BMCS employees in his deposition, Watson identified a senior vice-president for worldwide marketing and a vice—president for human resources. But the existence of these two positions for BMCS is not evidence that BMCS performed marketing and human resources for its subsidiaries, or that, even if BMCS did perform such services, the subsidiaries were not charged for them. Similarly, BMCS and BMCB having letterhead with "BMC Software" is no evidence that the two entities do not observe corporate formalities, because both entities have "BMC Software" as part of their names.

In sum, the record does not reveal any evidence to support the trial court's conclusion that BMCB was BMCS's alter ego. *See Hargrave,* 710 F.2d at 1160; *Walker,* 583 F.2d at 167; *Conner,* 944 S.W.2d at 419; *see also Roberson,* 768 S.W.2d at 281. We therefore conclude that the trial court did not have general jurisdiction over BMCB based on BMCS's "doing business" in Texas.

### V. OTHER ISSUES

Before the special appearance hearing, Marchand objected to the hearing going forward because of BMCB's and BMCS's alleged failure to cooperate in discovery and requested that the trial court continue the hearing so that he could complete discovery. The trial court overruled the objection and denied the motion for continuance. Marchand asserts that, even if we reverse the court of appeals' judgment, we should remand his claims for further proceedings, because the trial court prevented him from conducting sufficient discovery before the special appearance hearing.

 [34]    [35]    [36]    This Court will not disturb a trial court's order denying a motion for continuance unless the trial court has committed a clear abuse of discretion. *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex.1986). A trial court "abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). Here, the record shows that Marchand had ample time to conduct, and did conduct, discovery. BMCB filed its special appearance on January 29, 1999, and the trial court held the hearing seven months later on September 7, 1999. During that time, Marchand deposed Watson and served numerous written discovery requests on BMCS and BMCB. Although BMCB and BMCS objected to several discovery requests, the record does not reveal that Marchand ever filed a motion to compel  **\*801**  or otherwise attempted to obtain any discovery BMCB and BMCS did not provide. Based on the record, we cannot conclude that the trial court abused its discretion in overruling Marchand's objection to the special appearance hearing and denying his motion for a continuance to conduct further discovery.

### VI. CONCLUSION

We hold that there is no evidence to support the trial court's conclusion that BMCB's contacts with Texas were sufficient to confer either specific or general jurisdiction. In so holding, we also conclude that there is no evidence to support a finding that BMCB was BMCS's alter ego so that general jurisdiction in Texas exists. Finally, we hold that the trial court did not abuse its discretion in denying its motion to continue the special appearance hearing. Accordingly, we reverse the court of appeals' judgment and render judgment dismissing Marchand's claims against BMC Software Belgium, N.V. for want of jurisdiction.

**All Citations**

83 S.W.3d 789, 45 Tex. Sup. Ct. J. 930

Footnotes

1    *See Whalen v. Laredo Nat'l Bancshares Inc.,* 37 S.W.3d 89, 91 (Tex.App.-San Antonio 2000, pet. denied); *Joe Guerra Exxon Station v. Michelin Tyre Pub. Ltd.,* 32 S.W.3d 383, 386 (Tex.App.-San Antonio 2000, no pet.); *Case v. Grammar,* 31 S.W.3d 304, 307–08 (Tex.App.-San Antonio 2000, no pet.); *Jones v. J.P. Sauer & Sohn,* 27 S.W.3d 157, 161 (Tex.App.-San Antonio 2000, pet. denied); *Eakin v. Acosta,* 21 S.W.3d 405, 407–08 (Tex.App.-San Antonio 2000, no pet.); *Long Distance Int'l, Inc. v. Telefonos de Mexico, S.A.,* 18 S.W.3d 706, 711 (Tex.App.-San Antonio 2000), *rev'd on other grounds,* 49 S.W.3d 347 (Tex.2001); *Transportes Aereos de Coahuila, S.A. v. Falcon,* 5 S.W.3d 712, 717 (Tex.App.-San Antonio 1999, pet. denied); *Jones v. Beech Aircraft Corp.,* 995 S.W.2d 767, 769–70 (Tex.App.-San Antonio 1999, pet. dism. w.o.j.); *Magnolia Gas Co. v. Knight Equip. Mfg. Corp.,* 994 S.W.2d 684, 689 (Tex.App.-San Antonio 1998, no pet.); *Klenk,* 993 S.W.2d at 681.

**End of Document**                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

📁 KeyCite Yellow Flag - Negative Treatment

**Disagreement Recognized by** TXU Energy Retail Co., LP v. Emanuel Medical Center, Inc., N.D.Tex., May 28, 2003

105 S.Ct. 2174
Supreme Court of the United States

BURGER KING CORPORATION, Appellant

v.

John RUDZEWICZ.

No. 83–2097. | Argued Jan. 8, 1985. | Decided May 20, 1985.

Franchisor brought action against franchisee alleging breach of franchise obligations and trademark infringement. The United States District Court for the Southern District of Florida entered judgment in favor of franchisor and franchisee appealed. The Court of Appeals for the Eleventh Circuit, 724 F.2d 1505, reversed and denied rehearing, 729 F.2d 1468. The Supreme Court, Justice Brennan, held that: (1) where it was not clear that Court of Appeals had found Florida long-arm statute unconstitutional as applied, Supreme Court did not have jurisdiction over appeal; (2) jurisdictional statement would be treated as petition for writ of certiorari; and (3) exercise of long-arm jurisdiction over Michigan franchisee in Florida did not offend due process.

Reversed and remanded.

Justice Stevens dissented and filed an opinion in which Justice White joined.

West Headnotes (27)

**[1]** **Federal Courts**
🔑 Proceedings to Obtain Review

Where it was unclear whether Court of Appeals actually held statute unconstitutional as applied to the circumstances of the case, jurisdiction did not properly lie in the Supreme Court by appeal and appeal would be dismissed, with the jurisdictional statement treated as a petition for writ of certiorari, which would be granted. 28 U.S.C.A. § 1254(2).

3 Cases that cite this headnote

**[2]** **Federal Courts**
🔑 Particular Cases, Contexts, and Questions

Parties cannot stipulate to a particular construction of state law, and thereby obtain jurisdiction over appeal to Supreme Court, where state law might, in fact, be in harmony with the Federal Constitution; Supreme Court's jurisdiction is properly invoked only where a Court of Appeals has squarely held that the statute is unconstitutional on its face or as applied and jurisdiction does not lie if the decision might rest on other grounds. 28 U.S.C.A. § 1254(2).

15 Cases that cite this headnote

**[3]** **Constitutional Law**
🔑 Non-residents in general

Due process clause protects an individual's liberty in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations; although the protection operates to restrict state power, it is ultimately a function of the individual liberty interest preserved by the due process clause rather than a function of federalism concern. U.S.C.A. Const.Amend. 14.

445 Cases that cite this headnote

**[4]** **Federal Courts**
🔑 Purpose, intent, and foreseeability; purposeful availment

**Federal Courts**
🔑 Related contacts and activities; specific jurisdiction

Where forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, fair-warning requirement is satisfied if the defendant has purposefully directed his activities at residence of the forum and the litigation results from injuries that arise out of or relate to those activities.

2420 Cases that cite this headnote

**[5]** **Constitutional Law**
 🔑 Consent;  forum-selection clauses

**Contracts**
 🔑 Agreement as to place of bringing suit; forum selection clauses

Where forum selection provisions have been obtained through freely negotiated agreements and are not unreasonable and unjust, their enforcement does not offend due process. U.S.C.A. Const.Amend. 14.

252 Cases that cite this headnote

**[6]** **Federal Courts**
 🔑 Manufacture, Distribution, and Sale of Products

Publisher who distributes magazines in a distant state may fairly be held accountable in that forum for damages resulting therefrom an allegedly defamatory story.

10 Cases that cite this headnote

**[7]** **Federal Courts**
 🔑 Unrelated contacts and activities;  general jurisdiction

Parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.

293 Cases that cite this headnote

**[8]** **Federal Courts**
 🔑 Purpose, intent, and foreseeability; purposeful availment

State generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors and, where those individuals purposefully derive benefit from their interstate activities, it may be unfair to allow them to escape having to account in other states for the consequences that arise proximately from such activities and, for those reasons, forum may legitimately exercise personal jurisdiction over a nonresident who

purposefully directs activities toward forum residents.

987 Cases that cite this headnote

**[9]** **Federal Courts**
 🔑 Purpose, intent, and foreseeability; purposeful availment

Constitutional touchstone in long-arm jurisdiction cases is whether the defendant purposefully established minimum contacts in the forum state.

2513 Cases that cite this headnote

**[10]** **Constitutional Law**
 🔑 Non-residents in general

**Federal Courts**
 🔑 Purpose, intent, and foreseeability; purposeful availment

Foreseeability of causing injury in another state is not a sufficient benchmark for exercising personal jurisdiction; foreseeability which is critical to due process analysis is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there.

868 Cases that cite this headnote

**[11]** **Federal Courts**
 🔑 Purpose, intent, and foreseeability; purposeful availment

Purposeful availment requirement for long-arm jurisdiction insures that defendant will not be haled into a jurisdiction solely as the result of random, fortuitous, or attenuated contacts or the unilateral activity of another party or a third person.

3038 Cases that cite this headnote

**[12]** **Federal Courts**
 🔑 Nature, number, frequency, and extent of contacts and activities

Jurisdiction is proper where the contacts of the defendant proximately result from actions by

the defendant himself which create a substantial connection with the forum.

626 Cases that cite this headnote

**[13]    Federal Courts**
　　 Nature, number, frequency, and extent of contacts and activities

So long as it creates a substantial connection with the forum, even a single act can support jurisdiction.

204 Cases that cite this headnote

**[14]    Federal Courts**
　　 Business contacts and activities; transacting or doing business

When defendant has availed himself of the privilege of conducting business in a forum, jurisdiction cannot be avoided merely because the defendant did not physically enter the forum state.

640 Cases that cite this headnote

**[15]    Federal Courts**
　　 Commercial Contacts and Activities; Contracts and Transactions

So long as a commercial actor's efforts are purposefully directed toward residents of another state, absence of physical contacts cannot defeat personal jurisdiction there.

258 Cases that cite this headnote

**[16]    Constitutional Law**
　　 Non-residents in general

Once it has been decided that a defendant has purposefully established minimum contacts with the forum state, the contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.

3780 Cases that cite this headnote

**[17]    Federal Courts**

　　 Weight and sufficiency

Where defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.

1243 Cases that cite this headnote

**[18]    Courts**
　　 Construction and application of particular rules

Jurisdictional rules may not be employed in such a way as to make litigation so gravely difficult and inconvenient that a party is unfairly at a severe disadvantage in comparison to his opponent.

118 Cases that cite this headnote

**[19]    Federal Courts**
　　 Nature, number, frequency, and extent of contacts and activities

Individual's contact with an out-of-state party cannot alone automatically establish sufficient minimum contacts in the other party's home forum to permit exercise of jurisdiction in that forum.

321 Cases that cite this headnote

**[20]    Federal Courts**
　　 Contract disputes

Parties' negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, must be evaluated in determining whether the defendant has purposefully established minimum contacts with the forum.

2558 Cases that cite this headnote

**[21]    Federal Courts**
　　 Investment, finance, and credit

Michigan franchisee who deliberately reached out beyond his state of residence and negotiated with a Florida franchisor for purchase of a

long-term franchise and the manifold benefits that would derive from affiliation with the nationwide organization, who entered into a carefully structured 20-year relationship which envisioned continuing and wide-reaching contacts with Florida, who accepted regulation of his business from the Miami headquarters of the franchisor, and who was required to make monthly payments to the franchisor in Miami was constitutionally subject to long-arm jurisdiction in Florida in dispute arising out of the franchise arrangement. West's F.S.A. § 48.193(1)(g); U.S.C.A. Const.Amend. 14.

491 Cases that cite this headnote

**[22]** **Federal Courts**
🔑 Contract disputes

Although choice-of-law provision on a contract, standing alone, would be insufficient to confer jurisdiction in forum whose law is to apply, choice-of-law provision should not be ignored in considering whether defendant has purposefully invoked the benefits and protections of a state's law.

130 Cases that cite this headnote

**[23]** **Federal Courts**
🔑 Purpose, intent, and foreseeability; purposeful availment

State of residence of nationwide franchisor had more than a negligible interest in providing a convenient forum, notwithstanding the franchisor's size and ability to conduct litigation anywhere in the country; absent compelling consideration, defendant who has purposefully derived commercial benefit from his affiliations in a forum may not defeat jurisdiction there simply because of his adversary's greater net wealth.

562 Cases that cite this headnote

**[24]** **Federal Courts**
🔑 In general; convenience, fairness, and interest of justice

To the extent that it is inconvenient for a party who has minimum contacts with a forum to litigate there, the considerations can be accommodated through change of venue, rather than denial of jurisdiction.

6 Cases that cite this headnote

**[25]** **Federal Courts**
🔑 Particular Contexts and Causes of Action

Inconvenience which Michigan franchisee would suffer from litigating franchise dispute in Florida was not so substantial as to render it unconstitutional to subject him to jurisdiction in Florida.

32 Cases that cite this headnote

**[26]** **Federal Courts**
🔑 Weight and sufficiency

Evidence sustained trial court's finding that franchisee was not the victim of misrepresentation, fraud, or duress in connection with franchise agreement rendering it unconstitutional to subject him to jurisdiction in franchisor's state of residence.

24 Cases that cite this headnote

**[27]** **Federal Courts**
🔑 Purpose, intent, and foreseeability; purposeful availment

Quality and nature of an interstate transaction may sometimes be so random, fortuitous, or attenuated that it cannot fairly be said that the potential defendant should reasonably anticipate being haled into court in another jurisdiction.

2045 Cases that cite this headnote

**\*\*2176** *Syllabus* [*]

Appellant is a Florida corporation whose principal offices are in Miami. It conducts most of its restaurant business through a franchise operation, under which franchisees are

licensed to use appellant's trademarks and service marks in leased standardized restaurant facilities for a period of 20 years. The governing contracts provide that the franchise relationship is established in Miami and governed by Florida law, and call for payment of all required monthly fees and forwarding of all relevant notices to the Miami headquarters. The Miami headquarters sets policy and works directly with the franchisees in attempting to resolve major problems. Day-to-day monitoring of franchisees, however, is conducted through district offices that in turn report to the Miami headquarters. Appellee is a Michigan resident who, along with another Michigan resident, entered into a 20-year franchise contract with appellant to operate a restaurant in Michigan. Subsequently, when the restaurant's patronage declined, the franchisees fell behind in their monthly payments. After extended negotiations among the franchisees, the Michigan district office, and the Miami headquarters proved unsuccessful in solving **\*\*2177** the problem, headquarters terminated the franchise and ordered the franchisees to vacate the premises. They refused and continued to operate the restaurant. Appellant then brought a diversity action in Federal District Court in Florida, alleging that the franchisees had breached their franchise obligations and requesting damages and injunctive relief. The franchisees claimed that, because they were Michigan residents and because appellant's claim did not "arise" within Florida, the District Court lacked personal jurisdiction over them. But the court held that the franchisees were subject to personal jurisdiction pursuant to Florida's long-arm statute, which extends jurisdiction to any person, whether or not a citizen or resident of the State, who breaches a contract in the State by failing to perform acts that the contract requires to be performed there. Thereafter, the court entered judgment against the franchisees on the merits. The Court of Appeals reversed, holding that "[j]urisdiction under these circumstances would offend the fundamental fairness which is the touchstone of due process."

*Held:* The District Court's exercise of jurisdiction pursuant to Florida's long-arm statute did not violate the Due Process Clause of the Fourteenth Amendment. Pp. 2181–2190.

 **\*463** (a) A forum may assert specific jurisdiction over a nonresident defendant where an alleged injury arises out of or relates to actions by the defendant *himself* that are purposefully directed toward forum residents, and where jurisdiction would not otherwise offend "fair play and substantial justice." Jurisdiction in these circumstances may

not be avoided merely because the defendant did not *physically* enter the forum. Pp. 2181–2185.

(b) An individual's contract with an out-of-state party cannot *alone* automatically establish sufficient minimum contacts in the other party's home forum. Instead, the prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, must be evaluated to determine whether a defendant purposefully established minimum contacts within the forum. Pp. 2185–2186.

(c) Here, appellee established a substantial and continuing relationship with appellant's Miami headquarters, and received fair notice from the contract documents and the course of dealings that he might be subject to suit in Florida. The District Court found that appellee is an "experienced and sophisticated" businessman who did not act under economic duress or disadvantage imposed by appellant, and appellee has pointed to no other factors that would establish the *unconstitutionality* of Florida's assertion of jurisdiction. Pp. 2186–2190.

[724 F.2d 1505 (CA11 1984)](), reversed and remanded.

**Attorneys and Law Firms**

*Joel S. Perwin* argued the cause and filed briefs for appellant.

*Thomas H. Oehmke* argued the cause and filed a brief for appellee.

**Opinion**

Justice BRENNAN delivered the opinion of the Court.

The State of Florida's long-arm statute extends jurisdiction to "[a]ny person, whether or not a citizen or resident of this state," who, *inter alia,* "[b]reach [es] a contract in this state by failing to perform acts required by the contract to be performed in this state," so long as the cause of action  **\*464** arises from the alleged contractual breach. [Fla.Stat. § 48.193(1)(g)]() (Supp.1984). The United States District Court for the Southern District of Florida, sitting in diversity, relied on this provision in exercising personal jurisdiction over a Michigan resident who allegedly had breached a franchise agreement with a Florida corporation by failing to make required payments in Florida. The question presented is whether this exercise of long-arm jurisdiction offended "traditional conception[s] of fair play and substantial justice"

embodied in the Due Process Clause of the Fourteenth Amendment. *International Shoe Co. v.* **\*\*2178** *Washington, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945).*

# I

## A

Burger King Corporation is a Florida corporation whose principal offices are in Miami. It is one of the world's largest restaurant organizations, with over 3,000 outlets in the 50 States, the Commonwealth of Puerto Rico, and 8 foreign nations. Burger King conducts approximately 80% of its business through a franchise operation that the company styles the "Burger King System"—"a comprehensive restaurant format and operating system for the sale of uniform and quality food products." App. 46.[1] Burger King licenses its franchisees to use its trademarks and service marks for a period of 20 years and leases standardized restaurant facilities to them for the same term. In addition, franchisees acquire a variety of proprietary information concerning the "standards, specifications, procedures and methods for operating **\*465** a Burger King Restaurant." *Id.,* at 52. They also receive market research and advertising assistance; ongoing training in restaurant management;[2] and accounting, cost-control, and inventory-control guidance. By permitting franchisees to tap into Burger King's established national reputation and to benefit from proven procedures for dispensing standardized fare, this system enables them to go into the restaurant business with significantly lowered barriers to entry.[3]

In exchange for these benefits, franchisees pay Burger King an initial $40,000 franchise fee and commit themselves to payment of monthly royalties, advertising and sales promotion fees, and rent computed in part from monthly gross sales. Franchisees also agree to submit to the national organization's exacting regulation of virtually every conceivable aspect of their operations.[4] Burger King imposes these standards and undertakes its rigid regulation out of conviction that "[u]niformity of service, appearance, and quality of product is essential to the preservation of the Burger King image and the benefits accruing therefrom to both Franchisee and Franchisor." *Id.,* at 31.

Burger King oversees its franchise system through a two-tiered administrative structure. The governing contracts **\*466** provide that the franchise relationship is established

in Miami and governed by Florida law, and call for payment of all required fees and forwarding of all relevant notices to the Miami headquarters.[5] The Miami headquarters sets policy and works directly with its franchisees in attempting to resolve major problems. See nn. 7, 9, *infra.* Day-to-day monitoring of franchisees, however, is conducted through a network of 10 district offices which in turn report to the Miami headquarters.

The instant litigation grows out of Burger King's termination of one of its franchisees, **\*\*2179** and is aptly described by the franchisee as "a divorce proceeding among commercial partners." 5 Record 4. The appellee John Rudzewicz, a Michigan citizen and resident, is the senior partner in a Detroit accounting firm. In 1978, he was approached by Brian MacShara, the son of a business acquaintance, who suggested that they jointly apply to Burger King for a franchise in the Detroit area. MacShara proposed to serve as the manager of the restaurant if Rudzewicz would put up the investment capital; in exchange, the two would evenly share the profits. Believing that MacShara's idea offered attractive investment and tax-deferral opportunities, Rudzewicz agreed to the venture. 6 *id.,* at 438–439, 444, 460.

Rudzewicz and MacShara jointly applied for a franchise to Burger King's Birmingham, Michigan, district office in the autumn of 1978. Their application was forwarded to Burger King's Miami headquarters, which entered into a preliminary agreement with them in February 1979. During the ensuing four months it was agreed that Rudzewicz and MacShara would assume operation of an existing facility in Drayton Plains, Michigan. MacShara attended the prescribed management courses in Miami during this period, see n. 2, *supra,* and the franchisees purchased $165,000 worth of restaurant equipment from Burger King's Davmor Industries division in **\*467** Miami. Even before the final agreements were signed, however, the parties began to disagree over site-development fees, building design, computation of monthly rent, and whether the franchisees would be able to assign their liabilities to a corporation they had formed.[6] During these disputes Rudzewicz and MacShara negotiated both with the Birmingham district office and with the Miami headquarters.[7] With some misgivings, Rudzewicz and MacShara finally obtained limited concessions from the Miami headquarters,[8] signed the final agreements, and commenced operations in June 1979. By signing the final agreements, Rudzewicz obligated himself personally to

payments exceeding $1 million over the 20-year franchise relationship.

**\*468**  The Drayton Plains facility apparently enjoyed steady business during the summer of 1979, but patronage declined after a recession began later that year. Rudzewicz and MacShara soon fell far behind in their monthly payments to Miami. Headquarters sent notices of default, and an extended period of negotiations began among the franchisees, the Birmingham district office, and the Miami headquarters. After several Burger King officials in Miami had engaged in prolonged but ultimately unsuccessful negotiations with the franchisees  **\*\*2180**  by mail and by telephone, [9] headquarters terminated the franchise and ordered Rudzewicz and MacShara to vacate the premises. They refused and continued to occupy and operate the facility as a Burger King restaurant.

### B

Burger King commenced the instant action in the United States District Court for the Southern District of Florida in May 1981, invoking that court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) and its original jurisdiction over federal trademark disputes pursuant to § 1338(a). [10] Burger King alleged that Rudzewicz and MacShara had breached their franchise obligations "within [the jurisdiction of] this district court" by failing to make the required payments "at plaintiff's place of business in Miami, Dade County, Florida," ¶ 6, App. 121, and also charged that they were tortiously infringing  **\*469**  its trademarks and service marks through their continued, unauthorized operation as a Burger King restaurant, ¶¶ 35–53, App. 130–135. Burger King sought damages, injunctive relief, and costs and attorney's fees. Rudzewicz and MacShara entered special appearances and argued, *inter alia,* that because they were Michigan residents and because Burger King's claim did not "arise" within the Southern District of Florida, the District Court lacked personal jurisdiction over them. The District Court denied their motions after a hearing, holding that, pursuant to Florida's long-arm statute, "a non-resident Burger King franchisee is subject to the personal jurisdiction of this Court in actions arising out of its franchise agreements." *Id.,* at 138. Rudzewicz and MacShara then filed an answer and a counterclaim seeking damages for alleged violations by Burger King of Michigan's Franchise Investment Law, Mich.Comp.Laws § 445.1501 *et seq.* (1979).

After a 3-day bench trial, the court again concluded that it had "jurisdiction over the subject matter and the parties to this cause." App. 159. Finding that Rudzewicz and MacShara had breached their franchise agreements with Burger King and had infringed Burger King's trademarks and service marks, the court entered judgment against them, jointly and severally, for $228,875 in contract damages. The court also ordered them "to immediately close Burger King Restaurant Number 775 from continued operation or to immediately give the keys and possession of said restaurant to Burger King Corporation," *id.,* at 163, found that they had failed to prove any of the required elements of their counterclaim, and awarded costs and attorney's fees to Burger King.

Rudzewicz appealed to the Court of Appeals for the Eleventh Circuit. [11] A divided panel of that Circuit reversed the  **\*470**  judgment,  **\*\*2181**  concluding that the District Court could not properly exercise personal jurisdiction over Rudzewicz pursuant to Fla.Stat. § 48.193(1)(g) (Supp.1984) because "the circumstances of the Drayton Plains franchise and the negotiations which led to it left Rudzewicz bereft of reasonable notice and financially unprepared for the prospect of franchise litigation in Florida." *Burger King Corp. v. MacShara,* 724 F.2d 1505, 1513 (1984). Accordingly, the panel majority concluded that "[j]urisdiction under these circumstances would offend the fundamental fairness which is the touchstone of due process." *Ibid.*

 **[1]**    **[2]**    Burger King appealed the Eleventh Circuit's judgment to this Court pursuant to 28 U.S.C. § 1254(2), and we postponed probable jurisdiction. 469 U.S. 814, 105 S.Ct. 77, 83 L.Ed.2d 25 (1984). Because it is unclear whether the Eleventh Circuit actually held that Fla.Stat. § 48.193(1)(g) (Supp.1984) *itself* is unconstitutional as applied to the circumstances of this case, we conclude that jurisdiction by appeal does not properly lie and therefore dismiss the appeal. [12] Treating the jurisdictional  **\*471**  statement as a petition for a writ of certiorari, see 28 U.S.C. § 2103, we grant the petition and now reverse.

### II

#### A

 **[3]**    **[4]**    The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a  **\*472**  forum with which he has established

no meaningful "contacts, ties, or relations." **\*\*2182** *International Shoe Co. v. Washington,* 326 U.S., at 319, 66 S.Ct., at 160. [13] By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (STEVENS, J., concurring in judgment), the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit," *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

 **[5]**    **[6]**    **[7]**    Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, [14] this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984), and the litigation results from alleged injuries that "arise out of or relate to" those activities, **\*473** *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 1984). [15] Thus "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State" and those products subsequently injure forum consumers. *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S., at 297–298, 100 S.Ct., at 567–568. Similarly, a publisher who distributes magazines in a distant State may fairly be held accountable in that forum for damages resulting there from an allegedly defamatory story. *Keeton v. Hustler Magazine, Inc., supra;* see also *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (suit against author and editor). And with respect to interstate contractual obligations, we have emphasized that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other State for the consequences of their activities. *Travelers Health Assn. v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950). See also *McGee v. International Life Insurance Co.,* 355 U.S. 220, 222–223, 78 S.Ct. 199, 200–201, 2 L.Ed.2d 223 (1957).

 **[8]**    We have noted several reasons why a forum legitimately may exercise personal jurisdiction over a nonresident who "purposefully directs" his activities toward forum residents. A State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. **\*\*2183** *Id.,* at 223, 78 S.Ct., at 201; see also *Keeton v. Hustler Magazine, Inc., supra,* 465 U.S., at 776, 104 S.Ct., at 1479. Moreover, where individuals "purposefully derive benefit" from their interstate activities, **\*474** *Kulko v. California Superior Court,* 436 U.S. 84, 96, 98 S.Ct. 1690, 1699, 56 L.Ed.2d 132 (1978), it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity. *McGee v. International Life Insurance Co., supra,* 355 U.S., at 223, 78 S.Ct., at 201.

 **[9]**    **[10]**    Notwithstanding these considerations, the constitutional touchstone remains whether the defendant purposefully established "minimum contacts" in the forum State. *International Shoe Co. v. Washington, supra,* 326 U.S., at 316, 66 S.Ct., at 158. Although it has been argued that foreseeability of causing *injury* in another State should be sufficient to establish such contacts there when policy considerations so require, [16] the Court has consistently held that this kind of foreseeability is not a "sufficient benchmark" for exercising personal jurisdiction. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S., at 295, 100 S.Ct., at 566. Instead, "the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.,* at 297, 100 S.Ct., at 567. In defining when it is that a potential defendant should "reasonably anticipate" out-of-state litigation, the Court frequently has drawn from the reasoning of *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–1240, 2 L.Ed.2d 1283 (1958):

"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application **\*475** of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant

purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

[11]  [12]  [13]  This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, *Keeton v. Hustler Magazine, Inc.,* 465 U.S., at 774, 104 S.Ct., at 1478; *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S., at 299, 100 S.Ct., at 568, or of the "unilateral activity of another party or a third person," *Helicopteros Nacionales de Colombia, S.A. v. Hall, supra,* 466 U.S., at 417, 104 S.Ct., at 1873. [17] Jurisdiction is proper, however, **2184** where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. *McGee v. International Life Insurance Co., supra,* 355 U.S., at 223, 78 S.Ct., at 201; see also *Kulko v. California Superior Court, supra,* 436 U.S., at 94, n. 7, 98 S.Ct., at 1698, n. 7. [18] Thus where the defendant "deliberately" has **476** engaged in significant activities within a State, *Keeton v. Hustler Magazine, Inc., supra,* 465 U.S., at 781, 104 S.Ct., at 1481, or has created "continuing obligations" between himself and residents of the forum, *Travelers Health Assn. v. Virginia,* 339 U.S., at 648, 70 S.Ct., at 929, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

[14]  [15]  Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there. *Keeton v. Hustler Magazine, Inc., supra,* 465 U.S., at 774–775, 104 S.Ct., at 1478; see also *Calder v. Jones,* 465 U.S., at 778–790, 104 S.Ct., at 1486–1487; *McGee v. International Life Insurance Co.,* 355 U.S., at 222–223, 78 S.Ct., at 200–201. Cf. *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 317, 63 S.Ct. 602, 605, 87 L.Ed. 777 (1943).

[16]  [17]  [18]  Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S., at 320, 66 S.Ct., at 160. Thus **477** courts in "appropriate case[s]" may evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S., at 292, 100 S.Ct., at 564. These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. See, *e.g., Keeton v. Hustler Magazine, Inc., supra,* 465 U.S., at 780, 104 S.Ct., at 1481; *Calder v. Jones, supra,* 465 U.S., at 788–789, 104 S.Ct., at 1486–1487; *McGee v. International Life Insurance Co., supra,* 355 U.S., at 223–224, 78 S.Ct., at 201–202. On the other hand, where a defendant who purposefully has directed his activities at **2185** forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional. For example, the potential clash of the forum's law with the "fundamental substantive social policies" of another State may be accommodated through application of the forum's choice-of-law rules. [19] Similarly, a defendant claiming substantial inconvenience may seek a change of venue. [20] Nevertheless, minimum requirements inherent in the concept of "fair play and substantial **478** justice" may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities. *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S., at 292, 100 S.Ct., at 564; see also *Restatement (Second) of Conflict of Laws §§ 36–37 (1971).* As we previously have noted, jurisdictional rules may not be employed in such a way as to make litigation "so gravely difficult and inconvenient" that a party unfairly is at a "severe disadvantage" in comparison to his opponent. *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 18, 92 S.Ct. 1907, 1917, 32 L.Ed.2d 513 (1972) (*re* forum-selection provisions); *McGee v. International Life Insurance Co., supra,* 355 U.S., at 223–224, 78 S.Ct., at 201–202.

**B**

**(1)**

 [19]     [20]     Applying these principles to the case at hand, we believe there is substantial record evidence supporting the District Court's conclusion that the assertion of personal jurisdiction over Rudzewicz in Florida for the alleged breach of his franchise agreement did not offend due process. At the outset, we note a continued division among lower courts respecting whether and to what extent a contract can constitute a "contact" for purposes of due process analysis. [21] If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot. The Court long ago rejected the notion that personal jurisdiction might turn on "mechanical" tests, *International Shoe Co. v. Washington, supra,* 326 U.S., at 319, 66 S.Ct., at 159, or on "conceptualistic ... theories of the place of contracting or of performance," **\*479** *Hoopeston Canning Co. v. Cullen,* 318 U.S., at 316, 63 S.Ct., at 604. Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Id.,* at 316–317, 63 S.Ct., at 604–605. It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

 **\*\*2186**  [21]     In this case, no physical ties to Florida can be attributed to Rudzewicz other than MacShara's brief training course in Miami. [22] Rudzewicz did not maintain offices in Florida and, for all that appears from the record, has never even visited there. Yet this franchise dispute grew directly out of "a contract which had a *substantial* connection with that State." *McGee v. International Life Insurance Co.,* 355 U.S., at 223, 78 S.Ct., at 201 (emphasis added). Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately "reach[ed] out beyond" Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and  **\*480**  the manifold benefits that would derive from affiliation with a nationwide organization.

*Travelers Health Assn. v. Virginia,* 339 U.S., at 647, 70 S.Ct., at 929. Upon approval, he entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida. In light of Rudzewicz' voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the "quality and nature" of his relationship to the company in Florida can in no sense be viewed as "random," "fortuitous," or "attenuated." *Hanson v. Denckla,* 357 U.S., at 253, 78 S.Ct., at 1239; *Keeton v. Hustler Magazine, Inc.,* 465 U.S., at 774, 104 S.Ct., at 1478; *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S., at 299, 100 S.Ct., at 568. Rudzewicz' refusal to make the contractually required payments in Miami, and his continued use of Burger King's trademarks and confidential business information after his termination, caused foreseeable injuries to the corporation in Florida. For these reasons it was, at the very least, presumptively reasonable for Rudzewicz to be called to account there for such injuries.

The Court of Appeals concluded, however, that in light of the supervision emanating from Burger King's district office in Birmingham, Rudzewicz reasonably believed that "the Michigan office was for all intents and purposes the embodiment of Burger King" and that he therefore had no "reason to anticipate a Burger King suit outside of Michigan." 724 F.2d, at 1511. See also *post,* at 2190 (STEVENS, J., dissenting). This reasoning overlooks substantial record evidence indicating that Rudzewicz most certainly knew that he was affiliating himself with an enterprise based primarily in Florida. The contract documents themselves emphasize that Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced from Miami. See n. 5, *supra.* Moreover, the parties' actual course of dealing repeatedly confirmed that decisionmaking authority was vested in the Miami headquarters  **\*481**  and that the district office served largely as an intermediate link between the headquarters and the franchisees. When problems arose over building design, site-development fees, rent computation, and the defaulted payments, Rudzewicz and MacShara learned that the Michigan office was powerless to resolve their disputes and  **\*\*2187**  could only channel their communications to Miami. Throughout these disputes, the Miami headquarters and the Michigan franchisees carried on a continuous course of direct communications by mail and by telephone, and it was the Miami headquarters that made the key negotiating

decisions out of which the instant litigation arose. See nn. 7, 9, *supra.*

 **[22]** **[23]** Moreover, we believe the Court of Appeals gave insufficient weight to provisions in the various franchise documents providing that all disputes would be governed by Florida law. The franchise agreement, for example, stated:

> "This Agreement shall become valid when executed and accepted by BKC at Miami, Florida; it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida. The choice of law designation does not require that all suits concerning this Agreement be filed in Florida." App. 72.

See also n. 5, *supra.* The Court of Appeals reasoned that choice-of-law provisions are irrelevant to the question of personal jurisdiction, relying on *Hanson v. Denckla* for the proposition that "the center of gravity for choice-of-law purposes does not necessarily confer the sovereign prerogative to assert jurisdiction." 724 F.2d, at 1511–1512, n. 10, citing 357 U.S., at 254, 78 S.Ct., at 1240. This reasoning misperceives the import of the quoted proposition. The Court in *Hanson* and subsequent cases has emphasized that choice-of-law *analysis* —which focuses on all elements of a transaction, and not simply on the defendant's conduct —is distinct from minimum-contacts jurisdictional analysis —which focuses at the threshold **\*482** solely on the defendant's purposeful connection to the forum.[23] Nothing in our cases, however, suggests that a choice-of-law *provision* should be ignored in considering whether a defendant has "purposefully invoked the benefits and protections of a State's laws" for jurisdictional purposes. Although such a provision standing alone would be insufficient to confer jurisdiction, we believe that, when combined with the 20-year interdependent relationship Rudzewicz established with Burger King's Miami headquarters, it reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there. As Judge Johnson argued in his dissent below, Rudzewicz "purposefully availed himself of the benefits and protections of Florida's laws" by entering into contracts expressly providing that those laws would govern franchise disputes. 724 F.2d, at 1513.[24]

**(2)**

 **[24]** **[25]** Nor has Rudzewicz pointed to other factors that can be said persuasively to outweigh the considerations discussed above and to establish the *unconstitutionality* of Florida's assertion of jurisdiction. We cannot conclude that Florida had no "legitimate interest in holding [Rudzewicz] answerable **\*483** on a claim related to" the contacts he had established in that State. *Keeton v. Hustler Magazine, Inc.,* 465 U.S., at 776, 104 S.Ct., at 1479; see also *McGee v. International Life Insurance* **\*\*2188** *Co.,* 355 U.S., at 223, 78 S.Ct., at 201 (noting that State frequently will have a "manifest interest in providing effective means of redress for its residents").[25] Moreover, although Rudzewicz has argued at some length that Michigan's Franchise Investment Law, Mich.Comp.Laws § 445.1501 *et seq.* (1979), governs many aspects of this franchise relationship, he has not demonstrated how Michigan's acknowledged interest might possibly render jurisdiction in Florida *unconstitutional.*[26] Finally, the Court of Appeals' assertion that the Florida litigation "severely impaired [Rudzewicz'] ability to call Michigan witnesses who might be essential to his defense and counterclaim," 724 F.2d, at 1512–1513, is wholly without support in the record.[27] And even to the extent that it is inconvenient **\*484** for a party who has minimum contacts with a forum to litigate there, such considerations most frequently can be accommodated through a change of venue. See n. 20, *supra.* Although the Court has suggested that inconvenience may at some point become so substantial as to achieve *constitutional* magnitude, *McGee v. International Life Insurance Co., supra,* 355 U.S., at 223, 78 S.Ct., at 201, this is not such a case.

 **[26]** The Court of Appeals also concluded, however, that the parties' dealings involved "a characteristic disparity of bargaining power" and "elements of surprise," and that Rudzewicz "lacked fair notice" of the potential for litigation in Florida because the contractual provisions suggesting to the contrary were merely "boilerplate declarations in a lengthy printed contract." 724 F.2d, at 1511–1512, and n. 10. See also *post,* at 2190 (STEVENS, J., dissenting). Rudzewicz presented many of these arguments to the District Court, contending that Burger King was guilty of misrepresentation, fraud, and duress; that it gave insufficient notice in its dealings with him; and that the contract was one of adhesion. See 4 Record 687–691. After a 3-day bench trial, the District Court found that Burger King had made no misrepresentations, that Rudzewicz and MacShara "were and are experienced and sophisticated businessmen," and that "at no time" did they "ac[t] under economic duress or disadvantage imposed by" Burger King. App. 157–158. See also 7 Record 648–649. Federal Rule of Civil

Procedure 52(a) requires that "[f]indings of fact shall not be set aside unless clearly erroneous," and neither Rudzewicz nor the Court of Appeals has pointed to record evidence that would support a "definite and firm conviction" that the District Court's findings are mistaken. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). See also **\*485 \*\*2189** *Anderson v. Bessemer City,* 470 U.S. 564, 573–576, 105 S.Ct. 1504, —— – ——, 84 L.Ed.2d 518 (1985). To the contrary, Rudzewicz was represented by counsel throughout these complex transactions and, as Judge Johnson observed in dissent below, was himself an experienced accountant "who for five months conducted negotiations with Burger King over the terms of the franchise and lease agreements, and who obligated himself personally to contracts requiring over time payments that exceeded $1 million." 724 F.2d, at 1514. Rudzewicz was able to secure a modest reduction in rent and other concessions from Miami headquarters, see nn. 8, 9, *supra;* moreover, to the extent that Burger King's terms were inflexible, Rudzewicz presumably decided that the advantages of affiliating with a national organization provided sufficient commercial benefits to offset the detriments.[28]

### III

 [27]    Notwithstanding these considerations, the Court of Appeals apparently believed that it was necessary to reject jurisdiction in this case as a prophylactic measure, reasoning that an affirmance of the District Court's judgment would result in the exercise of jurisdiction over "out-of-state consumers to collect payments due on modest personal purchases" and would "sow the seeds of default judgments against franchisees owing smaller debts." 724 F.2d, at 1511. We share the Court of Appeals' broader concerns and therefore reject any talismanic jurisdictional formulas; "the **\*486** facts of each case must [always] be weighed" in determining whether personal jurisdiction would comport with "fair play and substantial justice." *Kulko v. California Superior Court,* 436 U.S., at 92, 98 S.Ct., at 1696–1697.[29] The "quality and nature" of an interstate transaction may sometimes be so "random," "fortuitous," or "attenuated"[30] that it cannot fairly be said that the potential defendant "should reasonably anticipate being haled into court" in another jurisdiction. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S., at 297, 100 S.Ct., at 567; see also n. 18, *supra.* We also have emphasized that jurisdiction may not

be grounded on a contract whose terms have been obtained through "fraud, undue influence, or overweening bargaining power" and whose application would render litigation "so gravely difficult and inconvenient that [a party] will for all practical purposes be deprived of his day in court." *The Bremen v. Zapata Off-Shore Co.,* 407 U.S., at 12, 18, 92 S.Ct., at 1914, 1917. Cf. *Fuentes v. Shevin,* 407 U.S. 67, 94–96, 92 S.Ct. 1983, 2001–2002, 32 L.Ed.2d 556 (1972); *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311, 329, 84 S.Ct. 411, 421, 11 L.Ed.2d 354 (1964) (BLACK, J., dissenting) (jurisdictional rules may not be employed against small consumers so as to "crippl[e] their defense"). Just as the Due Process Clause allows flexibility in ensuring that commercial actors are not effectively **\*\*2190** "judgment proof" for the consequences of obligations they voluntarily assume in other States, *McGee v. International Life Insurance Co.,* 355 U.S., at 223, 78 S.Ct., at 201, so too does it prevent rules that would unfairly enable them to obtain default judgments against unwitting customers. Cf. *United States v. Rumely,* 345 U.S. 41, 44, 73 S.Ct. 543, 545, 97 L.Ed. 770 (1953) (courts must not be " 'blind' " to what " '[a]ll others can see and understand' ").

 **\*487**   For the reasons set forth above, however, these dangers are not present in the instant case. Because Rudzewicz established a substantial and continuing relationship with Burger King's Miami headquarters, received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida, and has failed to demonstrate how jurisdiction in that forum would otherwise be fundamentally unfair, we conclude that the District Court's exercise of jurisdiction pursuant to Fla.Stat. § 48.193(1)(g) (Supp.1984) did not offend due process. The judgment of the Court of Appeals is accordingly reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice POWELL took no part in the consideration or decision of this case.

Justice STEVENS, with whom Justice WHITE joins, dissenting.

In my opinion there is a significant element of unfairness in requiring a franchisee to defend a case of this kind in the forum chosen by the franchisor. It is undisputed that appellee maintained no place of business in Florida, that he

had no employees in that State, and that he was not licensed to do business there. Appellee did not prepare his French fries, shakes, and hamburgers in Michigan, and then deliver them into the stream of commerce "with the expectation that they [would] be purchased by consumers in" Florida. *Ante,* at 2182. To the contrary, appellee did business only in Michigan, his business, property, and payroll taxes were payable in that State, and he sold all of his products there.

Throughout the business relationship, appellee's principal contacts with appellant were with its Michigan office. Notwithstanding its disclaimer, *ante,* at 2185, the Court seems ultimately to rely on nothing more than standard boilerplate language contained in various documents, *ante,* at 2187, **\*488** to establish that appellee " 'purposefully availed himself of the benefits and protections of Florida's laws.' " *Id.,* at 2187. Such superficial analysis creates a potential for unfairness not only in negotiations between franchisors and their franchisees but, more significantly, in the resolution of the disputes that inevitably arise from time to time in such relationships.

Judge Vance's opinion for the Court of Appeals for the Eleventh Circuit adequately explains why I would affirm the judgment of that court. I particularly find the following more persuasive than what this Court has written today:

> "Nothing in the course of negotiations gave Rudzewicz reason to anticipate a Burger King suit outside of Michigan. The only face-to-face or even oral contact Rudzewicz had with Burger King throughout months of protracted negotiations was with representatives of the Michigan office. Burger King had the Michigan office interview Rudzewicz and MacShara, appraise their application, discuss price terms, recommend the site which the defendants finally agreed to, and attend the final closing ceremony. There is no evidence that Rudzewicz ever negotiated with anyone in Miami or even sent mail there during negotiations. He maintained no staff in the state of Florida, and as far as the record reveals, he has never even visited the state.

> "The contracts contemplated the startup of a local Michigan restaurant whose profits would derive solely from food sales made to customers in Drayton Plains. The sale, which involved the use of an intangible trademark in Michigan and occupancy of a Burger King facility **\*\*2191** there, required no performance in the state of Florida. Under the contract, the local Michigan district office was responsible for providing all of the services

due Rudzewicz, including advertising and management consultation. Supervision, moreover, emanated from that office alone. To Rudzewicz, the Michigan office was for all intents and purposes the embodiment **\*489** of Burger King. He had reason to believe that his working relationship with Burger King began and ended in Michigan, not at the distant and anonymous Florida headquarters....

> "Given that the office in Rudzewicz' home state conducted all of the negotiations and wholly supervised the contract, we believe that he had reason to assume that the state of the supervisory office would be the same state in which Burger King would file suit. Rudzewicz lacked fair notice that the distant corporate headquarters which insulated itself from direct dealings with him would later seek to assert jurisdiction over him in the courts of its own home state....

> "Just as Rudzewicz lacked notice of the possibility of suit in Florida, he was financially unprepared to meet its added costs. The franchise relationship in particular is fraught with potential for financial surprise. The device of the franchise gives local retailers the access to national trademark recognition which enables them to compete with better-financed, more efficient chain stores. This national affiliation, however, does not alter the fact that the typical franchise store is a local concern serving at best a neighborhood or community. Neither the revenues of a local business nor the geographical range of its market prepares the average franchise owner for the cost of distant litigation....

> "The particular distribution of bargaining power in the franchise relationship further impairs the franchisee's financial preparedness. In a franchise contract, 'the franchisor normally occupies [the] dominant role'....

> "We discern a characteristic disparity of bargaining power in the facts of this case. There is no indication that Rudzewicz had any latitude to negotiate a reduced rent or franchise fee in exchange for the added risk of suit in Florida. He signed a standard form contract whose terms were non-negotiable and which appeared **\*490** in some respects to vary from the more favorable terms agreed to in earlier discussions. In fact, the final contract required a minimum monthly rent computed on a base far in excess of that discussed in oral negotiations. Burger King resisted price concessions, only to sue Rudzewicz far from home. In doing so, it severely impaired his ability to call

Michigan witnesses who might be essential to his defense and counterclaim.

"In sum, we hold that the circumstances of the Drayton Plains franchise and the negotiations which led to it left Rudzewicz bereft of reasonable notice and financially unprepared for the prospect of franchise litigation in Florida. Jurisdiction under these circumstances would offend the fundamental fairness which is the touchstone of

due process." 724 F.2d 1505, 1511–1513 (1984) (footnotes omitted).

Accordingly, I respectfully dissent.

**All Citations**

471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528, 53 USLW 4541

Footnotes

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1 Burger King's standard Franchise Agreement further defines this system as "a restaurant format and operating system, including a recognized design, decor, color scheme and style of building, uniform standards, specifications and procedures of operation, quality and uniformity of products and services offered, and procedures for inventory and management control...." App. 43.

2 Mandatory training seminars are conducted at Burger King University in Miami and at Whopper College Regional Training Centers around the country. See *id.,* at 39; 6 Record 540–541.

3 See App. 43–44. See generally H. Brown, Franchising Realities and Remedies 6–7, 16–17 (2d ed. 1978).

4 See, *e.g.,* App. 24–25, 26 (range, "quality, appearance, size, taste, and processing" of menu items), 31 ("standards of service and cleanliness"), 32 (hours of operation), 47 ("official mandatory restaurant operating standards, specifications and procedures"), 48–50 (building layout, displays, equipment, vending machines, service, hours of operation, uniforms, advertising, and promotion), 53 (employee training), 55–56 (accounting and auditing requirements), 59 (insurance requirements). Burger King also imposes extensive standards governing franchisee liability, assignments, defaults, and termination. See *id.,* at 61–74.

5 See *id.,* at 10–11, 37, 43, 72–73, 113. See *infra,* at 2187.

6 The latter two matters were the major areas of disagreement. Notwithstanding that Burger King's franchise offering advised that minimum rent would be based on a percentage of "approximated capitalized site acquisition and construction costs," *id.,* at 23, Rudzewicz assumed that rent would be a function solely of renovation costs, and he thereby underestimated the minimum monthly rent by more than $2,000. The District Court found Rudzewicz' interpretation "incredible." 7 Record 649.

With respect to assignment, Rudzewicz and MacShara had formed RMBK Corp. with the intent of assigning to it all of their interest and liabilities in the franchise. Consistent with the contract documents, however, Burger King insisted that the two remain personally liable for their franchise obligations. See App. 62, 109. Although the franchisees contended that Burger King officials had given them oral assurances concerning assignment, the District Court found that pursuant to the parol evidence rule any such assurances "even if they had been made and were misleading were joined and merged" into the final agreement. 7 Record 648.

7 Although Rudzewicz and MacShara dealt with the Birmingham district office on a regular basis, they communicated directly with the Miami headquarters in forming the contracts; moreover, they learned that the district office had "very little" decisionmaking authority and accordingly turned directly to headquarters in seeking to resolve their disputes. 5 *id.,* at 292. See generally App. 5–6; 5 Record 167–168, 174–179, 182–184, 198–199, 217–218, 264–265, 292–294; 6 *id.,* at 314–316, 363, 373, 416, 463, 496.

8 They were able to secure a $10,439 reduction in rent for the third year. App. 82; 5 Record 222–223; 6 *id.,* at 500.

9 Miami's policy was to "deal directly" with franchisees when they began to encounter financial difficulties, and to involve district office personnel only when necessary. 5 *id.,* at 95. In the instant case, for example, the Miami office handled all credit problems, ordered cost-cutting measures, negotiated for a partial refinancing of the franchisees' debts, communicated directly with the franchisees in attempting to resolve the dispute, and was responsible for all termination matters. See 2 *id.,* at 59–69; 5 *id.,* at 84–89, 94–95, 97–98, 100–103, 116–128, 151–152, 158, 163; 6 *id.,* at 395–397, 436–438, 510–511, 524–525.

Rudzewicz and MacShara were served in Michigan with summonses and copies of the complaint pursuant to Federal Rule of Civil Procedure 4. 2 *id.,* at 102–103.

MacShara did not appeal his judgment. See *Burger King Corp. v. MacShara,* 724 F.2d 1505, 1506, n. 1 (CA11 1984). In addition, Rudzewicz entered into a compromise with Burger King and waived his right to appeal the District Court's finding of trademark infringement and its entry of injunctive relief. See 4 Record 804–816. Accordingly, we need not address the extent to which the tortious act provisions of Florida's long-arm statute, see Fla.Stat. § 48.193(1)(b) (Supp.1984), may constitutionally extend to out-of-state trademark infringement. Cf. *Calder v. Jones,* 465 U.S. 783, 788–789, 104 S.Ct. 1482, 1486–1487, 79 L.Ed.2d 804 (1984) (tortious out-of-state conduct); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790 (1984) (same).

The District Court had found both that Rudzewicz fell within the reach of Florida's long-arm statute and that the exercise of jurisdiction was constitutional. The Court of Appeals did not consider the statutory question, however, because, as Burger King acknowledged at argument, that court "accepted the parties' stipulation" that § 48.193 reached Rudzewicz "in lieu of [making] a determination of what Florida law provides." Tr. of Oral Arg. 12. Burger King contends that an appeal is proper "on the basis of the Circuit Court's holding that *given that stipulation* the statute was unconstitutional as applied." *Id.,* at 13 (emphasis added).

> We disagree. Our "overriding policy, historically encouraged by Congress, of minimizing the mandatory docket of this Court in the interests of sound judicial administration," *Gonzalez v. Automatic Employees Credit Union,* 419 U.S. 90, 98, 95 S.Ct. 289, 294, 42 L.Ed.2d 249 (1974) (construing 28 U.S.C. § 1253), would be threatened if litigants could obtain an appeal through the expedient of stipulating to a particular construction of state law where state law might in fact be in harmony with the Federal Constitution. Jurisdiction under 28 U.S.C. § 1254(2) is properly invoked only where a court of appeals *squarely* has "held" that a state statute is unconstitutional on its face or as applied; jurisdiction does not lie if the decision might rest on other grounds. *Public Service Comm'n v. Batesville Telephone Co.,* 284 U.S. 6, 7, 52 S.Ct. 1, 76 L.Ed. 135 (1931) (*per curiam* ). Consistent with "our practice of strict construction" of § 1254(2), *Fornaris v. Ridge Tool Co.,* 400 U.S. 41, 42, n. 1, 91 S.Ct. 156, 157, n. 1, 27 L.Ed.2d 174 (1970) (*per curiam* ), we believe that an appeal cannot lie where a court of appeals' judgment rests solely on the stipulated applicability of state law. Rather, it must be reasonably clear that the court independently concluded that the challenged statute governs the case and held the statute itself unconstitutional as so applied. The Court of Appeals did neither in this case, concluding simply that "[j]urisdiction under these circumstances would offend the fundamental fairness which is the touchstone of due process." 724 F.2d, at 1513.

> Of course, if it were clear under Florida law that § 48.193(1)(g) governed every transaction falling within its literal terms, there could be no objection to a stipulation that merely recognized this established construction. But the Florida Supreme Court has not ruled on the breadth of § 48.193(1)(g), and several state appellate courts have held that the provision extends only to the limits of the Due Process Clause. See, *e.g., Scordilis v. Drobnicki,* 443 So.2d 411, 412–414 (Fla.App.1984); *Lakewood Pipe of Texas, Inc. v. Rubaii,* 379 So.2d 475, 477 (Fla.App.1979), appeal dism'd, 383 So.2d 1201 (Fla.1980); *Osborn v. University Society, Inc.,* 378 So.2d 873, 874 (Fla.App.1979). If § 48.193(1)(g) is construed and applied in accordance with due process limitations as a matter of state law, then an appeal is improper because the statute cannot be "invalid as repugnant to the Constitution ... of the United States," 28 U.S.C. § 1254(2), since its boundaries are defined by, rather than being in excess of, the Due Process Clause. See, *e.g., Calder v. Jones, supra,* 465 U.S., at 787–788, n. 7, 104 S.Ct., at 1486, n. 7; *Kulko v. California Superior Court,* 436 U.S. 84, 90, and n. 4, 98 S.Ct. 1690, 1695–1696, and n. 4, 56 L.Ed.2d 132 (1978).

Although this protection operates to restrict state power, it "must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause" rather than as a function "of federalism concerns." *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702–703, n. 10, 102 S.Ct. 2099, 2104–2105, n. 10, 72 L.Ed.2d 492 (1982).

We have noted that, because the personal jurisdiction requirement is a waivable right, there are a "variety of legal arrangements" by which a litigant may give "express or implied consent to the personal jurisdiction of the court." *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, supra,* at 703, 102 S.Ct., at 2105. For example, particularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction. See *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964). Where such forum-selection provisions have been obtained through "freely negotiated" agreements and are not "unreasonable and unjust," *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972), their enforcement does not offend due process.

15    "Specific" jurisdiction contrasts with "general" jurisdiction, pursuant to which "a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S., at 414, n. 9, 104 S.Ct., at 1872, n. 9; see also *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

16    See, *e.g., World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 568, 62 L.Ed.2d 490 (1980) (BRENNAN, J., dissenting); *Shaffer v. Heitner,* 433 U.S. 186, 219, 97 S.Ct. 2569, 2588, 53 L.Ed.2d 683 (1977) (BRENNAN, J., concurring in part and dissenting in part).

17    Applying this principle, the Court has held that the Due Process Clause forbids the exercise of personal jurisdiction over an out-of-state automobile distributor whose only tie to the forum resulted from a customer's decision to drive there, *World-Wide Volkswagen Corp. v. Woodson, supra;* over a divorced husband sued for child-support payments whose only affiliation with the forum was created by his former spouse's decision to settle there, *Kulko v. California Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); and over a trustee whose only connection with the forum resulted from the settlor's decision to exercise her power of appointment there, *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In such instances, the defendant has had no "clear notice that it is subject to suit" in the forum and thus no opportunity to "alleviate the risk of burdensome litigation" there. *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S., at 297, 100 S.Ct., at 567.

18    So long as it creates a "substantial connection" with the forum, even a single act can support jurisdiction. *McGee v. International Life Insurance Co.,* 355 U.S., at 223, 78 S.Ct., at 201. The Court has noted, however, that "some single or occasional acts" related to the forum may not be sufficient to establish jurisdiction if "their nature and quality and the circumstances of their commission" create only an "attenuated" affiliation with the forum. *International Shoe Co. v. Washington,* 326 U.S. 310, 318, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945); *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S., at 299, 100 S.Ct., at 568. This distinction derives from the belief that, with respect to this category of "isolated" acts, *id.,* at 297, 100 S.Ct., at 567, the reasonable foreseeability of litigation in the forum is substantially diminished.

19    See *Allstate Insurance Co. v. Hague,* 449 U.S. 302, 307–313, 101 S.Ct. 633, 637–640, 66 L.Ed.2d 521 (1981) (opinion of BRENNAN, J.). See generally Restatement (Second) of Conflict of Laws §§ 6, 9 (1971).

20    See, *e.g.,* 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought"). This provision embodies in an expanded version the common-law doctrine of *forum non conveniens,* under which a court in appropriate circumstances may decline to exercise its jurisdiction in the interest of the "easy, expeditious and inexpensive" resolution of a controversy in another forum. See *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).

21    See, *e.g., Lakeside Bridge & Steel Co. v. Mountain State Construction Co.,* 445 U.S. 907, 909–910, 100 S.Ct. 1087, 1088–1089, 63 L.Ed.2d 325 (1980) (WHITE, J., dissenting from denial of certiorari) (collecting cases); Brewer, Jurisdiction in Single Contract Cases, 6 U.Ark. Little Rock L.J. 1, 7–11, 13 (1983); Note, Long-Arm Jurisdiction in Commercial Litigation: When is a Contract a Contact?, 61 B.U.L.Rev. 375, 384–388 (1981).

22    The Eleventh Circuit held that MacShara's presence in Florida was irrelevant to the question of Rudzewicz's minimum contacts with that forum, reasoning that "Rudzewicz and MacShara never formed a partnership" and "signed the agreements in their individual capacities." 724 F.2d, at 1513, n. 14. The two did jointly form a corporation through which they were seeking to conduct the franchise, however. See n. 6, *supra.* They were required to decide which one of them would travel to Florida to satisfy the training requirements so that they could commence business, and Rudzewicz participated in the decision that MacShara would go there. We have previously noted that when commercial activities are "carried on in behalf of" an out-of-state party those activities may sometimes be ascribed to the party, *International Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945), at least where he is a "primary participan[t]" in the enterprise and has acted purposefully in directing those activities, *Calder v. Jones,* 465 U.S., at 790, 104 S.Ct., at 1487. Because MacShara's matriculation at Burger King University is not pivotal to the disposition of this case, we need not resolve the permissible bounds of such attribution.

23    *Hanson v. Denckla,* 357 U.S., at 253–254, 78 S.Ct., at 1239–1240. See also *Keeton v. Hustler Magazine, Inc.,* 465 U.S., at 778, 104 S.Ct., at 1480; *Kulko v. California Superior Court,* 436 U.S., at 98, 98 S.Ct., at 1700; *Shaffer v. Heitner,* 433 U.S., at 215, 97 S.Ct., at 2585.

24    In addition, the franchise agreement's disclaimer that the "choice of law designation does not *require* that all suits concerning this Agreement be filed in Florida," App. 72 (emphasis added), reasonably should have suggested to Rudzewicz that by negative implication such suits *could* be filed there.

   The lease also provided for binding arbitration in Miami of certain condemnation disputes, *id.,* at 113, and Rudzewicz conceded the validity of this provision at oral argument, Tr. of Oral Arg. 37. Although it does not govern the instant

dispute, this provision also should have made it apparent to the franchisees that they were dealing directly with the Miami headquarters and that the Birmingham district office was *not* "for all intents and purposes the embodiment of Burger King." 724 F.2d, at 1511.

Complaining that "when Burger King is the plaintiff, you won't 'have it your way' because it sues all franchisees in Miami," Brief for Appellee 19, Rudzewicz contends that Florida's interest in providing a convenient forum is negligible given the company's size and ability to conduct litigation anywhere in the country. We disagree. Absent compelling considerations, cf. *McGee v. International Life Insurance Co.,* 355 U.S., at 223, 78 S.Ct., at 201, a defendant who has purposefully derived commercial benefit from his affiliations in a forum may not defeat jurisdiction there simply because of his adversary's greater net wealth.

Rudzewicz has failed to show how the District Court's exercise of jurisdiction in this case might have been at all inconsistent with Michigan's interests. To the contrary, the court found that Burger King had fully complied with Michigan law, App. 159, and there is nothing in Michigan's franchise Act suggesting that Michigan would attempt to assert exclusive jurisdiction to resolve franchise disputes affecting its residents. In any event, minimum-contacts analysis presupposes that two or more States may be interested in the outcome of a dispute, and the process of resolving potentially conflicting "fundamental substantive social policies," *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S., at 292, 100 S.Ct., at 564, can usually be accommodated through choice-of-law rules rather than through outright preclusion of jurisdiction in one forum. See n. 19, *supra.*

The only arguable instance of trial inconvenience occurred when Rudzewicz had difficulty in authenticating some corporate records; the court offered him as much time as would be necessary to secure the requisite authentication from the Birmingham district office, and Burger King ultimately stipulated to their authenticity rather than delay the trial. See 7 Record 574–575, 578–579, 582, 598–599.

We do not mean to suggest that the jurisdictional outcome will always be the same in franchise cases. Some franchises may be primarily intrastate in character or involve different decisionmaking structures, such that a franchisee should not reasonably anticipate out-of-state litigation. Moreover, commentators have argued that franchise relationships may sometimes involve unfair business practices in their inception and operation. See H. Brown, Franchising Realities and Remedies 4–5 (2d ed. 1978). For these reasons, we reject Burger King's suggestion for "a general rule, or at least a presumption, that participation in an interstate franchise relationship" represents consent to the jurisdiction of the franchisor's principal place of business. Brief for Appellant 46.

This approach does, of course, preclude clear-cut jurisdictional rules. But any inquiry into "fair play and substantial justice" necessarily requires determinations "in which few answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.' " *Kulko v. California Superior Court,* 436 U.S., at 92, 98 S.Ct., at 1697.

*Hanson v. Denckla,* 357 U.S., at 253, 78 S.Ct., at 1239; *Keeton v. Hustler Magazine, Inc.,* 465 U.S., at 774, 104 S.Ct., at 1478; *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S., at 299, 100 S.Ct., at 568.

---

**End of Document**     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Disagreement Recognized by** Zellerino v. Roosen, E.D.Mich., July 29, 2015

104 S.Ct. 1482
Supreme Court of the United States

Iain CALDER and John South, Appellants,

v.

Shirley JONES.

No. 82–1401.  |  Argued Nov. 8, 1983.  |  Decided March 20, 1984.

Respondent, a professional entertainer, brought suit in California Superior Court claiming that she had been libeled in an article written and edited by petitioners in Florida. The Superior Court granted petitioners' motion to quash service of process for lack of jurisdiction. The California Court of Appeal, 138 Cal.App.3d 128, 187 Cal.Rptr. 825, reversed, and petitioners appealed. The Supreme Court, Justice Rehnquist, held that it was proper for a court in California to exercise jurisdiction over two Florida newspapermen in a libel action arising out of their intentional conduct in Florida which was allegedly calculated to cause injuries to plaintiff in California.

Affirmed.

West Headnotes (5)

**[1]** **Federal Courts**
  👉 Particular Cases, Contexts, and Questions
**Federal Courts**
  👉 Review of state courts

Jurisdiction by appeal did not lie in Supreme Court over a ruling of the California Court of Appeal which reversed an order quashing service of process for lack of personal jurisdiction against Florida defendants on First Amendment grounds; however, Supreme Court would treat the jurisdictional statement as a petition for writ of certiorari and grant the petition. U.S.C.A. Const.Amend. 1; 28 U.S.C.A. § 2103.

82 Cases that cite this headnote

**[2]** **Constitutional Law**
  👉 Non-residents in general

Due process clause of Fourteenth Amendment permits personal jurisdiction over defendant in any state in which defendant has certain minimum contacts such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice; in judging minimum contacts, a court properly focuses on the relationship among the defendant, the forum and the litigation. U.S.C.A. Const.Amend. 14.

1916 Cases that cite this headnote

**[3]** **Federal Courts**
  👉 Plaintiff's Residence; Nonresident Plaintiffs

A plaintiff's lack of "contacts" will not defeat otherwise proper jurisdiction but they may be so manifold as to permit jurisdiction when it would not exist in their absence.

509 Cases that cite this headnote

**[4]** **Federal Courts**
  👉 Defamation

It was proper for a court in California to exercise jurisdiction over two Florida newspapermen in a libel action arising out of their intentional conduct in Florida which was allegedly calculated to cause injuries to plaintiff in California.

1299 Cases that cite this headnote

**[5]** **Federal Courts**
  👉 Defamation

First Amendment concerns did not enter into the jurisdictional analysis in determining whether it was proper for a court in California to exercise jurisdiction over two Florida newspapermen in a libel action. U.S.C.A. Const.Amend. 1.

623 Cases that cite this headnote

**\*\*1483  \*783**  *Syllabus* [*]

Respondent, a professional entertainer who lives and works in California and whose television career was centered there, brought suit in California Superior Court, claiming that she had been libeled in an article written and edited by petitioners in Florida and published in the National Enquirer, a national magazine having its largest circulation in California. Petitioners, both residents of Florida, were served with process by mail in Florida, and, on special appearances, moved to quash the service of process for lack of personal jurisdiction. The Superior Court granted the motion on the ground that First Amendment concerns weighed against an assertion of jurisdiction otherwise proper under the Due Process Clause of the Fourteenth Amendment. The California Court of Appeal reversed, holding that a valid basis for jurisdiction existed on the theory that petitioners intended to, and did, cause tortious injury to respondent in California.

*Held:*

1. Jurisdiction by appeal does not lie, but under 28 U.S.C. § 2103 the jurisdictional statement will be treated as a petition for certiorari, which is hereby granted. P. 1486.

2. Jurisdiction over petitioners in California is proper because of their intentional conduct in Florida allegedly calculated to cause injury to respondent in California. Pp. 1486 – 1488.

 **\*\*1484**  (a) The Due Process Clause permits personal jurisdiction over a defendant in any State with which the defendant has "certain minimum contacts ... such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In judging minimum contacts, a court properly focuses on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977). P. 1486.

(b) Here, California is the focal point both of the allegedly libelous article and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California. P. 1486.

(c) Petitioners are not charged with mere untargeted negligence, but rather their intentional, and allegedly tortious, actions were expressly aimed at California. They wrote

and edited an article that they **\*784**  knew would have a potentially devastating impact upon respondent, and they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the magazine has its largest circulation. Under these circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in the article. P. 1487.

(d) While petitioners' contacts with California are not to be judged according to their employer's activities there, their status as employees does not insulate them from jurisdiction, since each defendant's contact with the forum State must be assessed individually. P. 1487.

(e) First Amendment concerns do not enter into the jurisdictional analysis. Such concerns would needlessly complicate an already imprecise inquiry. Moreover, the potential chill on protected First Amendment activity stemming from defamation actions is already taken into account in the constitutional limitations on the substantive law governing such actions. P. 1487.

138 Cal.App.3d 128, 187 Cal.Rptr. 825 (1982), affirmed.

**Attorneys and Law Firms**

*John G. Kester* argued the cause for petitioners. With him on the briefs was *Aubrey M. Daniel III.*

*Paul S. Ablon* argued the cause for respondent. With him on the brief were *Stephen S. Monroe* and *Richard P. Towne.\**

\* Briefs of *amici curiae* urging reversal were filed for the Association of American Publishers, Inc., by *R. Bruce Rich;* for the Authors League of America, Inc., by *Irwin Karp;* and for the Reporters Committee for Freedom of the Press et al. by *George R. Clark, Peter C. Gould, Barry D. Umansky, Harvey Lipton, Robert C. Lobdell, W. Terry Maguire, Robert D. Sack, Bruce W. Sanford, J. Laurent Scharff,* and *Richard M. Schmidt, Jr.*

**Opinion**

Justice REHNQUIST delivered the opinion of the Court.

Respondent Shirley Jones brought suit in California Superior Court claiming that she had been libeled in an article written and edited by petitioners in Florida. The article was published in a national magazine with a large circulation in California.

Petitioners were served with process by mail in Florida and caused special appearances to be entered on their behalf, moving to quash the service of process for lack of personal **\*785** jurisdiction. The superior court granted the motion on the ground that First Amendment concerns weighed against an assertion of jurisdiction otherwise proper under the Due Process Clause. The California Court of Appeal reversed, rejecting the suggestion that First Amendment considerations enter into the jurisdictional analysis. We now affirm.

Respondent lives and works in California. She and her husband brought this suit against the National Enquirer, Inc., its local distributing company, and petitioners for libel, invasion of privacy, and intentional infliction of emotional harm. [1] The Enquirer is a Florida corporation with its principal place of business in Florida. It publishes a national weekly newspaper with a total circulation of over 5 million. About 600,000 of those copies, almost twice the level of the next highest State, are sold in California. [2] Respondent's and her husband's **\*\*1485** claims were based on an article that appeared in the Enquirer's October 9, 1979 issue. Both the Enquirer and the distributing company answered the complaint and made no objection to the jurisdiction of the California court.

Petitioner South is a reporter employed by the Enquirer. He is a resident of Florida, though he frequently travels to California on business. [3] South wrote the first draft of the challenged article, and his byline appeared on it. He did most of his research in Florida, relying on phone calls to sources in California for the information contained in the article. [4] Shortly before publication, South called respondent's **\*786** home and read to her husband a draft of the article so as to elicit his comments upon it. Aside from his frequent trips and phone calls, South has no other relevant contacts with California.

Petitioner Calder is also a Florida resident. He has been to California only twice—once, on a pleasure trip, prior to the publication of the article and once after to testify in an unrelated trial. Calder is president and editor of the Enquirer. He "oversee[s] just about every function of the Enquirer." J.A., at 24. He reviewed and approved the initial evaluation of the subject of the article and edited it in its final form. He also declined to print a retraction requested by respondent. Calder has no other relevant contacts with California.

In considering petitioners' motion to quash service of process, the superior court surmised that the actions of petitioners in Florida, causing injury to respondent in California, would ordinarily be sufficient to support an assertion of jurisdiction over them in California. [5] But the court felt that special solicitude was necessary because of the potential "chilling effect" on reporters and editors which would result from requiring them to appear in remote jurisdictions to answer for the content of articles upon which they worked. The court also noted that respondent's rights could be "fully satisfied" in her suit against the publisher without requiring petitioners to appear as parties. The superior court, therefore, granted the motion.

The California Court of Appeal reversed. [138 Cal.App.3d 128, 187 Cal.Rptr. 825 (1982).](#) The court agreed that neither petitioner's contacts with California would be sufficient **\*787** for an assertion of jurisdiction on a cause of action unrelated to those contacts. See *[Perkins v. Benguet Mining Co.,](#)* [342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)](#) (permitting general jurisdiction where defendant's contacts with the forum were "continuous and systematic"). But the court concluded that a valid basis for jurisdiction existed on the theory that petitioners intended to, and did, cause tortious injury to respondent in California. The fact that the actions causing the effects in California were performed outside the State did not prevent the State from asserting jurisdiction over a cause of action arising out of those effects. [6] The court rejected **\*\*1486** the superior court's conclusion that First Amendment considerations must be weighed in the scale against jurisdiction.

[1]    A timely petition for hearing was denied by the Supreme Court of California. J.A., at 122. On petitioners' appeal to this Court, probable jurisdiction was postponed. [—— U.S. ——, 103 S.Ct. 1766, 76 L.Ed.2d 341 (1983).](#) We conclude that jurisdiction by appeal does not lie. *[Kulko v. California,](#)* [436 U.S. 84, 90, and n. 4, 98 S.Ct. 1690, 1695, and n. 4, 56 L.Ed.2d 132 (1978).](#) [7] Treating the jurisdictional statement as **\*788** a petition for writ of certiorari, as we are authorized to do, [28 U.S.C. § 2103,](#) we hereby grant the petition. [8]

[2]    [3]    The Due Process Clause of the Fourteenth Amendment to the United States Constitution permits personal jurisdiction over a defendant in any State with which the defendant has "certain minimum contacts ... such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' *[Milliken v. Meyer,](#)* 311

U.S. 457, 463 [61 S.Ct. 339, 342, 85 L.Ed. 278 (1940) ].” *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In judging minimum contacts, a court properly focuses on “the relationship among the defendant, the forum, and the litigation.” *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977). See also *Rush v. Savchuk,* 444 U.S. 320, 332, 100 S.Ct. 571, 579, 62 L.Ed.2d 516 (1980). The plaintiff's lack of “contacts” will not defeat otherwise proper jurisdiction, see *Keeton v. Hustler Magazine, Inc.,* —— U.S. ——, —— – ——, 104 S.Ct. 1473, 1480 – 1482, 78 L.Ed.2d —— (1984), but they may be so manifold as to permit jurisdiction when it would not exist in their absence. Here, the plaintiff is the focus of the activities of the defendants out of which the suit arises. See *McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

 **[4]**    The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California.[9] The article was drawn from California sources, **\*789** and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners **\*\*1487** is therefore proper in California based on the “effects” of their Florida conduct in California. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297–298, 100 S.Ct. 559, 567–568, 62 L.Ed.2d 490 (1980); Restatement (Second) of Conflicts of Law § 37.

Petitioners argue that they are not responsible for the circulation of the article in California. A reporter and an editor, they claim, have no direct economic stake in their employer's sales in a distant State. Nor are ordinary employees able to control their employer's marketing activity. The mere fact that they can “foresee” that the article will be circulated and have an effect in California is not sufficient for an assertion of jurisdiction. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S., at 295, 100 S.Ct., at 566; *Rush v. Savchuk,* 444 U.S., at 328–329, 100 S.Ct., at 577–578. They do not “in effect appoint the [article their] agent for service of process.” *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S., at 296, 100 S.Ct., at 566. Petitioners liken themselves to a welder employed in Florida who works on a boiler which subsequently explodes in California. Cases which hold that jurisdiction will be proper over the manufacturer, *Buckeye Boiler Co. v. Superior Court,* 71 Cal.2d 893, 80 Cal.Rptr. 113,

458 P.2d 57 (1969); *Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961), should not be applied to the welder who has no control over and derives no direct benefit from his employer's sales in that distant State.

Petitioners' analogy does not wash. Whatever the status of their hypothetical welder, petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of **\*790** that injury would be felt by respondent in the State in which she lives and works and in which the *National Enquirer* has its largest circulation. Under the circumstances, petitioners must “reasonably anticipate being haled into court there” to answer for the truth of the statements made in their article. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S., at 297, 100 S.Ct., at 567; *Kulko v. Superior Court,* 436 U.S. 84, 97–98, 98 S.Ct. 1690, 1699–1700, 56 L.Ed.2d 132 (1978); *Shaffer v. Heitner,* 433 U.S. 186, 216, 97 S.Ct. 2569, 2586, 53 L.Ed.2d 683 (1977). An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.

Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually. See *Rush v. Savchuk,* 444 U.S., at 332, 100 S.Ct., at 579 (“The requirements of *International Shoe* ... must be met as to each defendant over whom a state court exercises jurisdiction”). In this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis.

 **[5]**    We also reject the suggestion that First Amendment concerns enter into the jurisdictional analysis. The infusion of such considerations would needlessly complicate an already imprecise inquiry. *Estin v. Estin,* 334 U.S. 541, 545, 68 S.Ct. 1213, 1216, 92 L.Ed. 1561 (1948). Moreover, the potential chill on protected First Amendment activity stemming from libel and defamation actions is already taken into account in the constitutional limitations on the substantive law governing such suits. See *New York Times, Inc. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94

S.Ct. 2997, 41 L.Ed.2d 789 (1974). To reintroduce those concerns at the jurisdictional stage would be a form of double counting. We have already declined in other contexts to grant special procedural **\*\*1488** protections to defendants in libel and defamation actions in addition to the constitutional protections **\*791** embodied in the substantive laws. See, *e.g., Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (no First Amendment privilege bars inquiry into editorial process). See also *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979) (implying that no special rules apply for summary judgment).

We hold that jurisdiction over petitioners in California is proper because of their intentional conduct in Florida calculated to cause injury to respondent in California. The judgment of the California Court of Appeal is

*Affirmed.*

### All Citations

465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804, 10 Media L. Rep. 1401

Footnotes

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1  Respondent's husband subsequently filed a voluntary dismissal of his complaint.

2  A geographic analysis of the total paid circulation for the September 18, 1979 issue of the *Enquirer* showed total sales, national and international, of 5,292,200. Sales in California were 604,431. The State with the next highest total was New York, with 316,911. J.A., at 39–41.

3  South stated that during a four-year period he visited California more than 20 times. J.A., at 32. A friend estimated that he came to California from 6 to 12 times each year. J.A., at 66.

4  The superior court found that South made at least one trip to California in connection with the article. South hotly disputes this finding, claiming that an uncontroverted affidavit shows that he never visited California to research the article. Since we do not rely for our holding on the alleged visit, see n. 6, *supra,* we find it unnecessary to consider the contention.

5  California's "long-arm" statute permits an assertion of jurisdiction over a nonresident defendant whenever permitted by the state and federal Constitutions. Section 410.10 of the California Code of Civil Procedure provides: "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

6  The Court of Appeal further suggested that petitioner South's investigative activities, including one visit and numerous phone calls to California, formed an independent basis for an assertion of jurisdiction over him in this action. In light of our approval of the "effects" test employed by the California court, we find it unnecessary to reach this alternate ground.

7  *Kulko* involved an assertion of jurisdiction under the same California statute at issue here. The Court held that the case was improperly brought to the Court as an appeal, since no state statute was "drawn into question ... on the ground of its being repugnant to the Constitution, treaties or laws of the United States," 28 U.S.C. § 1257(2). Petitioners attempt to distinguish *Kulko* on the ground that the defendant in that case argued only that the Due Process Clause precluded the exercise of *in personam* jurisdiction over him, whereas petitioners argued below that the California statute as applied to them would be unconstitutional. We are unpersuaded by this shift in emphasis. The jurisdictional statute construed by the California Court of Appeal provides that the State's jurisdiction is as broad as the Constitution permits. See n. 5, *supra.* As in *Kulko,* the opinion below does not purport to determine the constitutionality of the California jurisdictional statute. Rather, the question decided was whether the Constitution itself would permit the assertion of jurisdiction. Under the circumstances, we find an appeal improper regardless of the terminology in which the petitioners couch their jurisdictional defense.

8  Although there has not yet been a trial on the merits in this case, the judgment of the California appellate court "is plainly final on the federal issue and is not subject to further review in the state courts." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 485, 95 S.Ct. 1029, 1041, 43 L.Ed.2d 328 (1975). Accordingly, as in several past cases presenting jurisdictional issues in this posture, "we conclude that the judgment below is final within the meaning of [28 U.S.C.] § 1257." *Shaffer v. Heitner,* 433 U.S. 186, 195–196, n. 12, 97 S.Ct. 2569, 2575–2576, n. 12, 53 L.Ed.2d 683 (1977). See also *Rush v. Savchuk,* 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980); *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Kulko v. Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).

9  The article alleged that respondent drank so heavily as to prevent her from fulfilling her professional obligations.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

390 S.W.3d 398
Court of Appeals of Texas,
Dallas.

Brad CAMAC, Appellant

v.

Jordan DONTOS, Jennifer
Dontos, & Crave, LLC, Appellees.

No. 05–11–00765–CV.   |   April 17,
2012.   |   Rehearing Overruled June 12, 2012.

**Synopsis**

**Background:** Franchisee brought action against vending machine company, a foreign corporation, alleging fraud, breach of franchise agreement, interference with contractual and business relationships, and violations of multiple federal and state trade regulations. Company representative specially appeared and objected to court's exercise of personal jurisdiction over him. The 68th Judicial District Court, Dallas County, Martin Hoffman, J., denied representative's special appearance, finding it had **specific jurisdiction** over him. Representative appealed.

**Holdings:** The Court of Appeals, Murphy, J., held that:

[1] franchisee pled jurisdictional facts sufficient to bring representative within provisions of long-arm statute;

[2] operative facts of franchisee's claims were substantially connected to representative's Texas contacts;

[3] fiduciary shield doctrine did not apply to negate bases of specific personal jurisdiction over representative;

[4] representative made sufficient contacts with Texas and thus purposefully availed himself of the laws of Texas; and

[5] trial court's assertion of personal jurisdiction over representative did not offend traditional notions of fair play and substantial justice.

Affirmed.

West Headnotes (33)

**[1]** **Constitutional Law**
 ☛ Personal jurisdiction in general

 **Courts**
 ☛ Jurisdiction of the Person in General

Personal jurisdiction concerns a court's power to bind a particular person or party, and that power is grounded in constitutional guarantees of due process. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[2]** **Constitutional Law**
 ☛ Non-residents in general

 **Courts**
 ☛ Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Courts may exercise personal jurisdiction over a nonresident defendant if the long-arm statute permits the exercise of jurisdiction and the assertion of jurisdiction is consistent with federal and state constitutional due process guarantees. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 19; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

**[3]** **Courts**
 ☛ Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

The requirements of the long-arm statute are considered satisfied if the exercise of personal jurisdiction is consistent with federal due process limitations. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

**[4]** **Constitutional Law**

**Non-residents in general**

Due process permits a court to exercise personal jurisdiction over a nonresident defendant only when the defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[5]** **Courts**
**Purpose, intent, and foreseeability; purposeful availment**

Minimum contacts with the forum state are established as to permit a court to exercise personal jurisdiction over a nonresident defendant when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

Cases that cite this headnote

**[6]** **Courts**
**Purpose, intent, and foreseeability; purposeful availment**

A nonresident defendant establishes minimum contacts with the forum state as to permit a court to exercise personal jurisdiction over the defendant if the defendant's conduct and connection with the state is such that the defendant could reasonably anticipate being sued in the forum state.

Cases that cite this headnote

**[7]** **Appeal and Error**
**Cases Triable in Appellate Court**

The question of whether a trial court has personal jurisdiction over a nonresident defendant is one of law that is reviewed de novo.

1 Cases that cite this headnote

**[8]** **Appeal and Error**
**Particular findings implied**

When the trial court does not issue findings of fact or conclusions of law in support of its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied.

1 Cases that cite this headnote

**[9]** **Appearance**
**Objections relating to process or service**

A defendant claiming it is not amenable to process in Texas must file a verified special appearance challenging the trial court's exercise of jurisdiction. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

Cases that cite this headnote

**[10]** **Courts**
**Allegations, pleadings, and affidavits**

The plaintiff bears the initial burden of pleading jurisdictional facts sufficient to bring a nonresident defendant within the provisions of the long-arm statute, and the plaintiff's pleadings and its response to the special appearance may be considered in determining whether the plaintiff satisfied its burden; the nonresident defendant then carries the burden of negating all bases of personal jurisdiction alleged by the plaintiff. V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

1 Cases that cite this headnote

**[11]** **Courts**
**Presumptions and Burden of Proof as to Jurisdiction**

The defendant can negate personal jurisdiction on either a factual or legal basis.

1 Cases that cite this headnote

**[12]** **Courts**
**Presumptions and Burden of Proof as to Jurisdiction**

A factual attack against a plaintiff's assertion of personal jurisdiction requires the defendant to present evidence that it has no contacts

with Texas, effectively disproving the plaintiff's allegations; the plaintiff then responds with its own evidence that affirms its allegations.

Cases that cite this headnote

**[13]    Courts**
    👉 Allegations, pleadings, and affidavits
    **Courts**
    👉 Presumptions and Burden of Proof as to Jurisdiction

In a legal attack on **specific jurisdiction**, the defendant takes the defendant's factual allegations as true; under this challenge, the defendant may prevail by showing (1) those assumed facts are insufficient to establish jurisdiction; (2) the defendant's Texas contacts fall short of purposeful availment; (3) the claims do not arise from the contacts; or (4) traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

Cases that cite this headnote

**[14]    Courts**
    👉 Unrelated contacts and activities; general jurisdiction
    **Courts**
    👉 Related contacts and activities; **specific jurisdiction**

A defendant's contacts with a forum can give rise to either specific or general jurisdiction.

Cases that cite this headnote

**[15]    Courts**
    👉 Related contacts and activities; **specific jurisdiction**

**Specific jurisdiction** is established if the defendant's alleged liability arises from or is related to the defendant's contacts with the state.

Cases that cite this headnote

**[16]    Courts**
    👉 Related contacts and activities; **specific jurisdiction**

When **specific jurisdiction** is alleged, the minimum contacts analysis focuses on the relationship among the defendant, the litigation, and the forum.

Cases that cite this headnote

**[17]    Constitutional Law**
    👉 Non-residents in general
    **Courts**
    👉 Purpose, intent, and foreseeability; purposeful availment
    **Courts**
    👉 Related contacts and activities; **specific jurisdiction**

The minimum contacts analysis requires the court to review whether (1) the defendant purposefully availed itself of the privilege of conducting activities in the forum state and (2) whether the operative facts of the litigation bear a substantial connection to the defendant's contacts with the state; if both requirements are met, the court then must determine if the exercise of **specific jurisdiction** over the nonresident defendant comports with traditional notions of fair play and substantial justice.

Cases that cite this headnote

**[18]    Courts**
    👉 Determination of questions of jurisdiction in general

The court determines a special appearance challenging exercise of personal jurisdiction based on the pleadings and any stipulations, affidavits, and other evidence relevant to the jurisdictional dispute. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a(3).

1 Cases that cite this headnote

**[19]    Courts**
    👉 Allegations, pleadings, and affidavits

Franchisee pled sufficient jurisdictional facts to bring representative of vending machine company, a nonresident defendant, within provisions of long-arm statute, as was necessary for trial court to exercise personal jurisdiction

over representative, in action alleging fraud, breach of franchise agreement, interference with contractual and business relationships, and violations of multiple federal and state trade regulations; franchisee alleged that representative had committed tortious acts in Texas by misrepresenting the routes franchisee was acquiring as franchisee in Texas, among other tortious acts that occurred in Texas. V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

1 Cases that cite this headnote

**[20]  Appeal and Error**
 Questions of jurisdiction

In reviewing an order denying a special appearance challenge to personal jurisdiction, courts are not concerned with the merits of the plaintiff's claims.

Cases that cite this headnote

**[21]  Courts**
 Allegations, pleadings, and affidavits

Operative facts of franchisee's claims against vending machine company's representative were substantially connected to representative's Texas contacts, as was necessary to establish personal jurisdiction, in action alleging fraud, breach of franchise agreement, and violations of multiple federal and state trade regulations; franchisee alleged that, through false representations and omissions, representative encouraged franchisee ultimately to close on the deal to become a franchisee, and the focus at trial would be the role representative played in inducing franchisee to enter into the franchise agreement and purchase the vending machine routes.

Cases that cite this headnote

**[22]  Courts**
 Related contacts and activities;  specific jurisdiction

To determine whether a nonresident's liability arises from or relates to his contacts in the forum state, as is necessary to establish personal

jurisdiction, the court focuses its analysis on the relationship among the defendant, the litigation, and forum.

Cases that cite this headnote

**[23]  Courts**
 Related contacts and activities;  specific jurisdiction
**Courts**
 Determination of questions of jurisdiction in general

At the special appearance stage of a personal jurisdiction challenge, the merits of a claim are not at issue, and the court does not determine whether any claim asserted is viable; rather, in determining whether the plaintiff's claims arise from or relate to the nonresident defendant's forum contacts, the court looks for a connection between those claims and the operative facts of the litigation, which are those facts that will be the focus of the trial.

Cases that cite this headnote

**[24]  Courts**
 Presumptions and Burden of Proof as to Jurisdiction

It is only when a plaintiff fails to plead jurisdictional allegations that a nonresident defendant can satisfy its burden of negating all bases of personal jurisdiction simply by presenting evidence that it is a nonresident.

1 Cases that cite this headnote

**[25]  Courts**
 Tortious or intentional conduct;  fraud and breach of fiduciary duties

Fiduciary shield doctrine did not apply to negate bases of specific personal jurisdiction over nonresident representative of vending machine company who allegedly made misrepresentations and perpetrated fraud and other intentional torts against franchisee; that representative's actions may have been taken on behalf of his company did not alter the jurisdictional inquiry.

Cases that cite this headnote

[26] **Courts**
🔑 Fiduciary duties in general; fiduciary shield

Under the "fiduciary shield doctrine," jurisdiction over an individual cannot be based upon jurisdiction over a corporation; thus, a nonresident corporate officer or employee is protected from the trial court's exercise of general jurisdiction over him when his only contacts with Texas were made on behalf of his employer.

1 Cases that cite this headnote

[27] **Courts**
🔑 Tortious or intentional conduct; fraud and breach of fiduciary duties

One's status as an employee does not necessarily insulate him from jurisdiction; the fiduciary shield doctrine does not protect a corporate officer or employee from a trial court's exercise of **specific jurisdiction** as to intentional torts or fraudulent acts for which he may be held individually liable.

1 Cases that cite this headnote

[28] **Corporations and Business Organizations**
🔑 Fraud

A corporate agent or officer may be held personally liable for fraudulent statements or knowing misrepresentations, even when the statements or representations are made in his capacity as a corporate representative.

1 Cases that cite this headnote

[29] **Courts**
🔑 Tortious or intentional conduct; fraud and breach of fiduciary duties

Vending machine company's representative made sufficient contacts with Texas and thus purposefully availed himself of the laws of Texas, such that trial court could exercise personal jurisdiction over representative, in action alleging fraud, breach of franchise

agreement, and violations of multiple federal and state trade regulations; representative did not deny franchisee's allegations of contacts in the forum state and did not deny that, as an officer in charge of franchise sales, it was to his personal advantage or benefit to complete the transaction in Texas, especially at a time when his company was in dire financial straits.

Cases that cite this headnote

[30] **Courts**
🔑 Purpose, intent, and foreseeability; purposeful availment

There are three aspects to the purposeful availment inquiry to determine personal jurisdiction: first, only the defendant's contacts with the forum state count, not the unilateral activity of another; second, the contacts relied upon must be purposeful, rather than random, isolated, or fortuitous; and third, the nonresident defendant must avail himself of the jurisdiction by seeking some benefit, advantage, or profit.

Cases that cite this headnote

[31] **Constitutional Law**
🔑 Representatives of organizations; officers, agents, and employees
**Courts**
🔑 Tortious or intentional conduct; fraud and breach of fiduciary duties

Trial court's assertion of personal jurisdiction over vending machine company's representative, a nonresident defendant who had made sufficient contacts with Texas and thus purposefully availed himself of the laws of the state, did not offend traditional notions of fair play and substantial justice, in action alleging fraud, breach of franchise agreement, and violations of multiple federal and state trade regulations; even if representative had presented an argument that satisfied appellate briefing rules, action did not present itself as the rare case in which exercise of jurisdiction would not comport with fair play and substantial justice. Rules App.Proc., Rule 38.1(i).

Cases that cite this headnote

**[32]    Constitutional Law**

 Non-residents in general

When determining whether the trial court's assertion of personal jurisdiction over a nonresident defendant would offend traditional notions of fair play and substantial justice, courts look to: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies.

Cases that cite this headnote

**[33]    Constitutional Law**
 Non-residents in general

To establish that the trial court's assertion of personal jurisdiction over a nonresident defendant would offend traditional notions of fair play and substantial justice, the nonresident defendant bears the burden of presenting a compelling case that the presence of some consideration would render jurisdiction unreasonable.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*402** Sean Higgins, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, Houston, TX, John R. Henderson, Bank of America Plaza, Dallas, TX, for Appellant.

Gary E. Smith, Gary E. Smith, P.C., Dallas, TX, for Appellee.

Before Justices O'NEILL, FRANCIS, and MURPHY.

**OPINION**

Opinion By Justice MURPHY.

Brad Camac appeals the trial court's order denying his special appearance in a **\*403** franchise dispute filed against him and others by Jordan and Jennifer Dontos and Crave, LLC (collectively, the Dontoses).[1] We affirm the trial court's order.

**BACKGROUND**

The underlying dispute involves a franchise agreement the Dontoses entered into with 24Seven Vending (USA) Limited, a New Zealand company, for vending machine routes located in Texas. Camac, a California resident, was the Vice President of Franchise Sales for 24Seven and handled the sale of the vending machine franchise in Texas to the Dontoses.

According to the Dontoses, they were promised two established vending machine routes within Farmers Branch and Carrollton, Texas, each of which was said to generate minimum average weekly gross sales of $6,730. The Dontoses borrowed $333,000 from a bank recommended by 24Seven, paid that amount plus a $175,000 deposit to 24Seven, quit their jobs, and moved from Seattle, Washington to Carrollton to manage their franchise. Ultimately, 24Seven did not tender the described routes, and instead, the Dontoses were asked to accept below-average sales routes that required greater driving distances between accounts. The Dontoses also later learned 24Seven was running into financial difficulty in the time just before they became franchisees and that 24Seven was to be sold to another company called Bacon Whitney Corporation. The Dontoses claim this information, as well as the availability of the promised routes, was either misrepresented or concealed from them.

Camac is one of ten defendants[2] the Dontoses sued alleging violations of the Federal Trade Commission franchise rule, 16 C.F.R. §§ 436.2, 436.9 (2004), the Texas Business Opportunity Act, TEX. BUS. & COM.CODE ANN. § 51.301 (West 2009), the Deceptive Trade Practices–Consumer Protection Act, TEX. BUS. & COM.CODE ANN. §§ 17.41–.926 (West 2011), and the Washington Franchise Investment Protection Act, WASH. REV.CODE ANN.. § 19.100.170 (West 2008). The Dontoses also alleged causes of action for fraud, breach of the franchise agreement, and interference with contractual and business relationships. As to Camac, the Dontoses specifically alleged he was the "principal spokesman and actor" in the fraud perpetrated on them by the defendants.

Camac specially appeared and objected to the court's exercise of personal jurisdiction over him. Camac argued his only contacts with Texas arose out of his employment with 24Seven. Camac verified his special appearance in which he attested he never conducted business in Texas in his individual capacity, but rather, "any contacts [he] may have had with the State of Texas were on behalf of [his] former employer, 24Seven (USA) Limited." The Dontoses responded with an affidavit of Jordan Dontos, which they incorporated into their sixth amended petition. The trial court denied the special appearance, finding it had **specific jurisdiction** over Camac. [3] Camac appealed that ruling. *See* **\*404** TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (West 2008) (interlocutory appeal).

## DISCUSSION

Camac raises several arguments in his single issue challenging the trial court's denial of his special appearance. Those include assertions the Dontoses' jurisdictional facts pleaded and contained in Jordan Dontos's affidavit are insufficient, that Camac did not purposefully avail himself of jurisdiction in Texas because his contacts were at the direction of his employer, there is no connection between the facts alleged and the operative facts of the case, and he negated the jurisdictional allegations. We conclude the trial court properly found it had **specific jurisdiction** over Camac and limit our analysis accordingly.

### Due Process

 **[1]** **[2]** **[3]** Personal jurisdiction concerns a court's power to bind a particular person or party. *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996) (orig. proceeding). That power is grounded in constitutional guarantees of due process. Texas courts may exercise personal jurisdiction over a nonresident defendant if the Texas long-arm statute permits the exercise of jurisdiction and the assertion of jurisdiction is consistent with federal and state constitutional due process guarantees. *Kelly v. Gen. Interior Constr., Inc.,* 301 S.W.3d 653, 657 (Tex.2010). The requirements of the Texas long-arm statute are considered satisfied if the exercise of personal jurisdiction is consistent with federal due process limitations. *Id.*

 **[4]** **[5]** **[6]** The due process clause of the federal constitution permits a court to exercise personal jurisdiction over a nonresident defendant only when the defendant has

"established minimum contacts with the forum state, and the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.' " *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 575 (Tex.2007) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Minimum contacts are established when the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). The defendant's conduct and connection with the state must be such that it could reasonably anticipate being sued in the forum state. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002).

### Standards & Burdens

 **[7]** **[8]** The question of whether a trial court has personal jurisdiction over a nonresident defendant is one of law that we review de novo. *Kelly,* 301 S.W.3d at 657. When, as here, the trial court does not issue findings of fact or conclusions of law in support of its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Moki Mac,* 221 S.W.3d at 574; *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002).

 **\*405** **[9]** **[10]** A defendant claiming it is not amenable to process in Texas must file a verified special appearance challenging the trial court's exercise of jurisdiction. *See* TEX.R. CIV. P. 120a; *Petrie v. Widby,* 194 S.W.3d 168, 174 (Tex.App.-Dallas 2006, no pet.). The plaintiff bears the initial burden of pleading jurisdictional facts sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Kelly,* 301 S.W.3d at 658. The plaintiff's pleadings and its response to the special appearance may be considered in determining whether the plaintiff satisfied its burden. *Flanagan v. Royal Body Care, Inc.,* 232 S.W.3d 369, 374 (Tex.App.-Dallas 2007, pet. denied). The nonresident defendant then carries the burden of negating all bases of personal jurisdiction alleged by the plaintiff. *Kelly,* 301 S.W.3d at 658.

 **[11]** **[12]** **[13]** The defendant can negate jurisdiction on either a factual or legal basis. *Id.* at 659. A factual attack requires the defendant to present evidence that it

has no contacts with Texas, effectively disproving the plaintiff's allegations. *Id.* The plaintiff then responds with its own evidence that affirms its allegations. *Id.* In a legal attack on **specific jurisdiction**, the defendant takes the defendant's factual allegations as true. Under this challenge, the defendant may prevail by showing (1) those assumed facts are insufficient to establish jurisdiction, (2) the defendant's Texas contacts fall short of purposeful availment, (3) the claims do not arise from the contacts, or (4) traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction. *Id.*

### Specific Jurisdiction

 **[14]** **[15]** **[16]** **[17]** A defendant's contacts with a forum can give rise to either specific or general jurisdiction. *BMC Software,* 83 S.W.3d at 795–96. **Specific jurisdiction** is established if the defendant's alleged liability arises from or is related to the defendant's contacts with the state. *Spir Star AG v. Kimich,* 310 S.W.3d 868, 873 (Tex.2010). When **specific jurisdiction** is alleged, the minimum-contacts analysis focuses on the relationship among the defendant, the litigation, and the forum. *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 338 (Tex.2009); *Moki Mac,* 221 S.W.3d at 575–76. This analysis requires the court to review whether (1) the defendant purposefully availed itself of the privilege of conducting activities in the forum state and (2) whether the operative facts of the litigation bear a substantial connection to the defendant's contacts with the state. *Moki Mac,* 221 S.W.3d at 578–79. If both these requirements are met, we then must determine if the exercise of **specific jurisdiction** over the nonresident defendant comports with traditional notions of fair play and substantial justice. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cnty.,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

### Analysis

Camac argues the trial court erred in denying his special appearance as to specific personal jurisdiction because (1) he did not purposefully avail himself of jurisdiction in Texas because his contacts were at the direction of his employer, (2) the Dontoses did not meet their pleading burden of alleging facts showing Camac committed a tort in Texas, and the facts alleged have no connection to the operative facts of the case, and (3) he negated the Dontoses' jurisdictional allegations,

and Jordan Dontos's opposing affidavit is conclusory and speculative.

 **[18]** The court determines a special appearance based on the pleadings and any stipulations, affidavits, and other evidence relevant to the jurisdictional dispute. **\*406** TEX.R. CIV. P. 120a(3); *Kelly,* 301 S.W.3d at 658 n. 4; *Flanagan,* 232 S.W.3d at 374. In this case, the record consists of the Dontoses' sixth amended petition, Camac's verified special appearance, the affidavit of Jordan Dontos, and Camac's supplemental affidavit. We begin with Camac's argument the Dontoses failed to meet their pleading burden.

### *The Dontoses' Initial Burden to Plead Jurisdictional Facts*

 **[19]** Camac asserts the Dontoses' allegations against him are "conclusory" and fail to state "facts showing that Camac committed a tort in the state of Texas." As such, he is assuming the truth of the allegations and is attempting to negate jurisdiction on a legal basis. *See Kelly,* 301 S.W.3d at 659.

The Dontoses alleged that Camac committed tortious acts in Dallas County, Texas. Specifically, they pleaded the following jurisdictional allegations as to Camac:

> [Camac] is an individual residing and working, at all material times, through the 24Seven offices in Dallas County, Texas. *He is or was at all material times, Vice President of Franchise Sales for [24Seven] and the principal spokesman and actor for [24Seven] ... in the perpetration of the "shell game" that is the gravamen of this suit.* He was in charge of sales at the Dallas office of 24Seven. *He met with [the Dontoses], in Dallas, on several occasions and communicated with them on a constant and systematic basis by email and phone both to and from Dallas, Texas.[ ] The first meeting was March 2, 2007, before [the Dontoses] had entered into any agreements with any of the Defendants.* At that time, he knew or should have known that 24Seven was in dire financial straits, that it was in or near receivership and that the Routes were not available. He had a

duty to pass this information on to [the Dontoses] but failed to do so. Had he done so, [the Dontoses] would not have entered into the Agreement or paid the initial $175,000. *He met with [the Dontoses], in Dallas, after they had entered into the Agreement and paid the $175,000 but before the final closing on August 31, 2007. At that time, he represented that Routes 116 and 117 were available when he knew or should have known they were not and represented that the acquisition by Bacon Whitney was a "good deal" because it was adequately funded and that Bacon Whitney would take over the Texas franchises, including [the Dontoses'].* Based upon a reasonable reliance on these material representations, [the Dontoses] closed and paid the rest of the money and incurred the bank loan. All of these statements were material to [the Dontoses'] decisions and none of them were true. *These tortuous [sic] acts of fraud were committed in Dallas County, Texas* and are sufficient specific minimum contacts with the State of Texas to confer personal jurisdiction on Camac in a Texas court; put Camac on fair notice that he could be sued in Texas as required by traditional notions of fair play and substantial justice and the U.S. Constitution and the laws of the State of Texas. Also, his title, duties and apparent authority and constant presence in Texas as "Head of Sales" of the Dallas Office constitutes sufficient general contact with the State of Texas to confer personal jurisdiction on Camac in a Texas court; put Camac on fair notice that he could be sued in Texas as required by the traditional notions of fair play and substantial justice and the U.S. Constitution and the Laws of the State of Texas. Both the specific and general **\*407** contacts

described above are, separately and in tandem, purposeful, continuous, systematic and longstanding. The Affidavit of Jordan Dontos, filed concurrently herewith, is incorporated herein by reference.

(Emphasis added).

The referenced affidavit of Jordan Dontos, which was incorporated into the sixth amended petition, included attestations that:

(1) "Jennifer and I moved to Dallas on July 3, 2007. *From then until closing, [we] were in constant contact with Camac, by both phone and email. He was handling the sale of the franchise to us."*

(2) *"Before July 3rd, he called us and emailed us from Dallas. He told us that 'I am in Dallas all the time'. After July 3rd, we were in Dallas and all of the calls and emails came to us in Dallas. Some of them were from him, in Dallas.* He seemed anxious to hurry the closing and we got the impression that he needed to get it closed to collect his commission."

(3) "After being informed by a fellow franchisee that 24/Seven was being sold to Bacon Whitney, *I immediately contacted Camac (via phone from Dallas) with questions and concerns as to 1) why we were never made aware of the sale and 2) the potential impact it would have on our business, which we were being pressured (by Camac) to close as fast as possible. He was not forthcoming with any details about the sale, but assured us that it was good for us because [Halpert & Denny, the financial backers for Bacon Whitney] were very well-funded so we wouldn't have to deal with the financial or processing deficiencies of 24/Seven.* He presented it as a more attractive alternative to 24/Seven —as if we were getting out of a bad deal—which was more alarming given the fact we were never under the impression there was anything wrong with 24/Seven to begin with."

(4) *"After that phone call, we met Camac at the company warehouse in Dallas. Again he indicated the sale was best for everyone without giving any specifics. Just that we'd be better off because they would be able to better focus on the franchise model and franchisee needs, as well as obtain more clients and routes to sell. We*

*went to dinner that evening and at the bar, while we waited for a table, I again tried to get information about the sale and Camac tried to avoid the subject by simply offering the same re-assurance that the sale was nothing but positive and not to worry."*

(5) "If Camac had given us any information it would have changed our decision to move forward with the deal. He never indicated that the sale would not even include our franchise as an asset, (in fact, to the contrary, he lead us to believe it would) that we weren't even really part of the same group in Dallas even though we were managed as such, and he certainly never told us of the financial difficulties at 24/7 at any point in the sales process."

(6) *"When he met with [us] in Dallas, the second time, after we had entered into the Agreement and paid the $175,000 but before the final closing on August 31, 2007, he again represented that Routes 116 and 117 were available when he ***408** knew or should have known they were not and represented that the acquisition by Bacon Whitney was a 'good deal' because it was adequately funded and that Bacon Whitney would take over the Texas franchises, including our Franchise."*

(7) *"Also, he told us his title, duties and apparent authority were as "Head of sales" for the Dallas Office."*

(8) "Because of his position with the 24/Seven, Brad Camac knew or should have known that these Routes were not available and of the financial condition of the VTL Group, 24Seven and Bacon Whitney."

(9) *"Brad Camac was instrumental in obtaining and closing this loan through emails and phone calls made from and to Dallas, Texas.* The loan was set to close on August 30 but it was delayed (by Camac) until August 31. The reason for the delay, we found out later, was the transfer from 24/Seven to Bacon Whitney."

(Emphasis added).

[20] Camac asserts the allegations are vague and conclusory because the Dontoses did not set forth any facts to support the allegations. For example, he contends that although the Dontoses alleged they were not told in the March 2007 meeting that 24Seven was facing financial difficulties, he argues they did not allege facts substantiating that claim that 24Seven was actually in such condition. He further contends

they did not allege facts demonstrating Camac had a duty to tell them 24Seven was in financial trouble or that the routes were unavailable. Even if Camac were correct, his complaints go to the merits of the Dontoses' claims. And in reviewing an order denying a special appearance, we are not concerned with the merits of the plaintiff's claims. *See Michiana,* 168 S.W.3d at 790–91.

The Dontoses were required to plead sufficient allegations to bring Camac within the reach of Texas's long-arm statute. *See Kelly,* 301 S.W.3d at 658. Based on the specific allegations described above that Camac committed tortious acts in Texas by misrepresenting the routes the Dontoses were acquiring as franchisees in Texas, the meetings in Texas at which the allegedly fraudulent statements were made, the constant and systematic calls and e-mails to and from Texas regarding the acquisition, the reliance by the Dontoses on those representations by acquiring substantial debt and leaving their home and moving to Texas, and Camac's role as the principal spokesman and actor in the "perpetration of the 'shell game' that is the gravamen" of the lawsuit, we conclude the Dontoses satisfied their initial burden—even if we do not consider the affidavit incorporated into the pleading. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042(2) (West 2008) (allowing personal jurisdiction for any tort committed "in whole or in part" in Texas). We therefore overrule Camac's sole issue to that extent.

**Substantial Connection**

[21] [22] Camac also argues he is not subject to the jurisdiction of the trial court because the allegations have no connection to the operative facts of the case. This argument also assumes the truth of the allegations and is a legal challenge to the second requirement for **specific jurisdiction**: whether Camac's liability arises from or relates to his Texas contacts. *Moki Mac,* 221 S.W.3d at 579. In making this determination, we focus our analysis on the relationship among the defendant, the litigation, and forum. *Id.* at 575–76.

***409** The Dontoses claim as to Camac that he was the "principal spokesman and actor" in the fraud perpetrated on them by all ten defendants. They specifically rely on alleged representations and omissions by Camac during meetings in Texas: (1) in the March 2007 meeting with the Dontoses in Dallas, Camac misrepresented the availability of the promised routes and did not tell them 24Seven was facing financial difficulties; (2) in the meeting in Dallas before their closing in August 2007, the Dontoses alleged Camac again misrepresented the availability of the routes

and the specifics regarding 24Seven's acquisition by Bacon Whitney (that the acquisition was a "good deal" and that Bacon Whitney would take over their franchise) and did not tell them relevant information about the acquisition (such as, that Bacon Whitney would not be taking over their franchise but would be collecting their franchise fees). Based on those allegations, the Dontoses assert causes of action for federal and state franchise disclosure rule violations, DTPA violations, fraud, breach of the franchise agreement, and interference with contractual or business relationships.

In arguing the Dontoses' liability theories are unrelated to the operative facts, Camac goes through each cause of action separately. He maintains: (1) the facts do not set forth a violation of the FTC franchise rule, the business opportunity act, or DTPA; (2) any violation of the Washington franchise act necessarily occurred in that state and not Texas; (3) the allegations do not amount to fraud because the Dontoses must show the representations were material and were made knowingly or recklessly; (4) there is no allegation Camac was a party to the franchise agreement; and (5) the Dontoses alleged no act of interference by Camac. He asserts the Dontoses' "allegations against Camac are an attempt to establish personal jurisdiction, not a cause of action."

 **[23]**    We observe first that we need not address each cause of action separately in conducting a "relatedness" analysis because all of the Dontoses' claims are based on the same forum contacts. *See Touradji v. Beach Capital P'ship, L.P.,* 316 S.W.3d 15, 26 (Tex.App.-Houston [1st Dist.] 2010, no pet.).* Additionally, Camac's arguments go to the merits of the Dontoses' claims-that is, whether causes of action have been pleaded or can exist on the facts alleged. At the special appearance stage, the merits of a claim are not at issue, and we do not determine whether any claim asserted is viable. Rather, in determining whether the Dontoses' claims arise from or relate to Camac's Texas contacts, we look for a connection between those claims and the operative facts of the litigation. *Moki Mac,* 221 S.W.3d at 585.* The operative facts are those that will be the focus of the trial. *See id.; see also Pulmosan Safety Equip. Corp. v. Lamb,* 273 S.W.3d 829, 839 (Tex.App.-Houston [14th Dist.] 2008, pet. denied).* Here, the relevant focus is the Dontoses' allegations Camac was the main actor in the fraudulent "shell game" perpetrated on them.

This point is to be distinguished from the conclusion reached by a panel of this Court in *Dontos v. Bruno,* 339 S.W.3d 777 (Tex.App.-Dallas 2011, no pet.).* Mark Bruno was another

of the ten defendants sued by the Dontoses. Bruno was the president of Bacon Whitney and met with the Dontoses and other Texas franchisees in Dallas in November 2007 to evaluate the Texas franchises before Bacon Whitney determined which ones to take over. *Id.* at 779.* Bruno filed a special appearance, which was granted, and this Court affirmed because the Dontoses "fail[ed] to establish any substantive connection between Bruno's contacts with Texas and the operative facts of the litigation." **\*410** *Id.* at 781.* In reaching this conclusion, the Court emphasized that neither Bruno nor Bacon Whitney were parties to the franchise agreement and did not play any role in inducing the Dontoses to enter into the agreement or buy the routes or franchise from 24Seven. *Id.*

Unlike the allegations against Bruno, the Dontoses alleged Camac, through false representations and omissions, encouraged them ultimately to close on the deal. Thus, the focus at trial will be the role he played in inducing them to enter into the franchise agreement and purchase the vending machine routes, as well as the effect his statements had on their decision to move forward with the deal. We therefore conclude the operative facts of the Dontoses' claims are substantially connected to Camac's Texas contacts and overrule his issue to that extent.

### Camac's Burden to Negate All Bases of Personal Jurisdiction

Once the Dontoses met their pleading burden, it became Camac's burden of negating, with evidence, all bases of personal jurisdiction alleged by the Dontoses. *See Kelly,* 301 S.W.3d at 658.* He argues he did that. We therefore look to his verified special appearance and supplemental affidavit to evaluate Camac's contention.

In his special appearance, Camac argued the Dontoses failed to allege "any specific contacts between Camac and Texas" and asserted the fiduciary shield doctrine protected him from personal jurisdiction in Texas because his only contacts arose "solely in his capacity as an employee" of 24Seven, the Dontoses' franchisor. The only bases Camac verified to negate personal jurisdiction were that he (1) was a resident of California, (2) did not maintain a physical address, post office box, telephone number, or bank account in Texas, and (3) "in his individual capacity" (a) had not engaged in business in Texas, (b) did not maintain a place of business in Texas, (c) did not have employees or agents in Texas, (d) had not availed himself of the benefits and privileges of conducting

activities in Texas, (e) had not committed a tort in Texas, and (f) did not own, lease, or rent real property or other assets in Texas. In his supplemental affidavit, Camac averred further that (1) all his dealings with the Dontoses were in his capacity as an employee or officer of 24Seven, (2) he never acted in his individual capacity in any dealings, transactions, communications, meetings, correspondence, conversations, "or the like" with the Dontoses, (3) he had not entered into any contracts or agreements with the Dontoses in his "individual capacity," (4) he had not received any money from the Dontoses, (5) he was a salaried employee of 24Seven and did not work on a commission basis or receive any money for execution of the franchise agreement, and (6) "[d]uring the relevant time period referred to" in Jordan Dontos's affidavit and in the petition, he worked in the 24Seven office in Los Angeles, and not in Texas.

In short, Camac provided verification that he had no individual contacts with Texas and everything he did was as an employee or officer of 24Seven. Significantly, he did not negate any of the Dontoses' allegations and evidence that he was in constant contact with the Dontoses in Texas by phone and e-mail, he misrepresented the promised routes, he assured them Bacon Whitney was well-funded, he failed to advise them of the financial and processing deficiencies of 24Seven, he met with them in Dallas, he "told" them his title and duties with 24Seven were as "Head of Sales" for the Dallas office, and he handled the Dontoses' purchase of the Texas franchise. He further admits that he was the Vice President for 24Seven's Franchise Sales.

**\*411** **[24]** **[25]** It is only when a plaintiff fails to plead jurisdictional allegations that a nonresident defendant can satisfy its burden simply by presenting evidence that it is a nonresident. *See id.* at 659 & n. 5. Because the Dontoses satisfied their pleading burden, Camac had to do more than show he was a nonresident in order to negate all bases for jurisdiction. Camac failed to do so—rather, he asserted he is not liable because his actions were as an officer and employee of 24Seven. We therefore consider whether he can insulate himself from the Dontoses' allegations of personal jurisdiction on that basis.

**[26]** In his special appearance, Camac cites the fiduciary shield doctrine as the basis for negating personal jurisdiction; on appeal, he asserts simply that the contacts he made in his corporate capacity should not count against him for purposes of personal jurisdiction when he is sued individually. The fiduciary shield doctrine is based on the

principle that "jurisdiction over an individual cannot be based upon jurisdiction over a corporation." *Nichols v. Tseng Hsiang Lin,* 282 S.W.3d 743, 750 (Tex.App.-Dallas 2009, no pet.). Thus, a nonresident corporate officer or employee is protected from the trial court's exercise of general jurisdiction over him when his only contacts with Texas were made on behalf of his employer. *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 438 (Tex.1982) ("Absent some allegation of a specific act in Texas, or one with reasonably foreseeable consequences within this state's borders, a nonresident employee of a foreign corporation cannot be sued in Texas simply because his or her employer solicits business here.").

**[27]** **[28]** But one's status as an employee does not necessarily insulate him from jurisdiction. *See Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). The doctrine does not protect a corporate officer or employee from a trial court's exercise of **specific jurisdiction** as to intentional torts or fraudulent acts for which he may be held individually liable. *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 250 (Tex.App.-Houston [1st Dist.] 2004, pet. denied); *SITQ E.U., Inc. v. Reata Rests., Inc.,* 111 S.W.3d 638, 651 (Tex.App.-Fort Worth 2003, pet. denied). Instead, it is well settled that a corporate agent or officer may be held personally liable for fraudulent statements or knowing misrepresentations, even when the statements or representations are made in his capacity as a corporate representative. *Wright,* 137 S.W.3d at 250. Thus, under those principles, a nonresident who travels to Texas and makes purportedly fraudulent statements is subject to **specific jurisdiction** in Texas. *Petrie,* 194 S.W.3d at 175; *Stein v. Deason,* 165 S.W.3d 406, 415 (Tex.App.-Dallas 2005, no pet.).

Here, having failed to refute the Dontoses' allegations (and related evidence) of his purportedly fraudulent statements, Camac has failed to negate all bases for the Texas court's exercise of **specific jurisdiction** as to his acts. That Camac's actions may have been taken on behalf of 24Seven only does not alter the jurisdictional inquiry. Accordingly, we overrule Camac's issue to the extent he contends he negated the Dontoses' jurisdictional allegations as to **specific jurisdiction**. [4]

**\*412** *Purposeful Availment*
**[29]** **[30]** Finally, Camac argues he did not purposefully avail himself of jurisdiction in Texas. Minimum contacts

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

with the forum state are established when the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson,* 357 U.S. at 253, 78 S.Ct. 1228. There are three aspects to our "purposeful availment" inquiry. *See Michiana,* 168 S.W.3d at 785. First, only the defendant's contacts with the forum state count, not the unilateral activity of another. *Id.* Second, the contacts relied upon must be "purposeful," rather than "random, isolated, or fortuitous." *Id.* (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Third, the nonresident defendant must "avail" himself of the jurisdiction by seeking some benefit, advantage, or profit. *Id.* ("Jurisdiction is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there.").

Within the context of the special appearance proceeding, Camac offered no evidence refuting the Dontoses' claims as alleged and as attested in Jordan's affidavit about the financial state of 24Seven, the availability of the promised routes, and the specifics of the Bacon Whitney acquisition. Significantly, Camac does not dispute that the alleged misrepresentations and omissions were made in Texas. Rather, Camac contends his contacts "resulted from the decisions of his employer, 24Seven" and "were in the course of his employment by 24Seven, for the purpose of performing 24Seven's business."

As described above, the fiduciary shield doctrine does not protect a corporate officer or employee from a trial court's exercise of <mark>specific jurisdiction</mark> as to intentional torts or fraudulent acts for which he may be held individually liable. *Wright,* 137 S.W.3d at 250; *SITQ,* 111 S.W.3d at 651. Camac did not address the purposefulness of his Texas contacts or deny he made the representations or failed to disclose information. Nor did he refute the Dontoses' statements they would not have entered into the agreement had they known the truth or received the omitted information. Camac asserts only that "any contacts [he] may have had with the State of Texas were on behalf of [his] former employer, 24Seven (USA) Limited." In that context and in response to Jordan's statement in his affidavit he and his wife "got the impression [Camac] needed to get [the purchase] closed to collect his commission," Camac denied in his supplemental affidavit that he received a commission for the transaction with the Dontoses.

Applying the three parts of our "purposeful availment" inquiry to this record, we conclude Camac has not shown he negated the Dontoses' allegations he purposefully availed himself of benefits of the forum. The first two points are inapplicable—it is Camac's contacts that are being counted, and they are not "random, isolated, or fortuitous." *Michiana,* 168 S.W.3d at 785. He admits he was the Vice President of Franchise Sales for 24Seven. As to the third question of whether Camac **\*413** "availed" himself of the forum's laws or protection by seeking some benefit, advantage, or profit, the fact that he did not receive a "commission" on the Dontoses' sale is not conclusive. He has not denied that as an officer in charge of franchise sales it was to his personal advantage or benefit to complete the transaction, especially at a time when the company was in dire financial straights according to the Dontoses' allegations.

Regardless of whether the Dontoses' claims have merit or whether Camac ultimately is held liable for the actions he performed in connection with his employment with 24Seven, Camac's contacts with Texas are sufficient to satisfy the jurisdictional requirement that he purposefully availed himself of the laws of Texas. And he reasonably could have anticipated being sued in Texas for the consequences of misrepresentations or omissions in connection with those franchise contacts. *See Petrie,* 194 S.W.3d at 175 (nonresident who travels to Texas and makes purportedly fraudulent statements is subject to <mark>specific jurisdiction</mark> in Texas); *Deason,* 165 S.W.3d at 415 (same). The Dontoses' allegations were sufficient to support the trial court's implied finding that Camac purposefully established minimum contacts with Texas to support <mark>specific jurisdiction</mark>.

### Fair Play and Substantial Justice

[31] [32] [33] Once minimum contacts sufficient to support jurisdiction are established, we must consider these contacts in light of other factors to determine whether the trial court's assertion of personal jurisdiction over a nonresident defendant would offend traditional notions of fair play and substantial justice. *See Asahi Metal Indus. Co.,* 480 U.S. at 113. In making this determination, we look to (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Id.; Spir Star AG,* 310 S.W.3d at 878. Camac bears the burden of presenting " 'a compelling case that the presence of some consideration would render jurisdiction unreasonable'

" to defeat jurisdiction. *Spir Star AG,* 310 S.W.3d at 879 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 231 (Tex.1991)).

Although he generally asserted in the trial court that the "assumption of jurisdiction" over him would "offend traditional notions of fair play and substantial justice" and would deprive him of "the right to due process," he made no argument as to why the trial court's exercise of jurisdiction would be unfair. And on appeal, Camac has offered no authority or argument as to the factors we must consider in making the determination of whether the trial court's assertion of jurisdiction over him would offend notions of fair play and substantial justice; he does not address this part of our analysis at all in his opening brief or reply brief. When a party fails to adequately brief a contention, he presents nothing for our review. TEX.R.APP. P. 38.1(i); *Devine v. Dallas Cnty.,* 130 S.W.3d 512, 512–14 (Tex.App.-Dallas 1999, pet. denied). Accordingly, we conclude Camac did not meet his burden.

Even if Camac had presented something for us to review, once a court determines that a nonresident defendant has purposefully established minimum contacts, only in "rare cases" will the exercise of jurisdiction not comport with fair play and substantial justice. *Deason,* 165 S.W.3d at 415 (citing *Guardian Royal,* 815 S.W.2d at 231). This is not such a rare case. *See Petrie,* 194 S.W.3d at 176; *Deason,* 165 S.W.3d at 415.

### *414 CONCLUSION

Based on our review of the pleadings and affidavits, we conclude Camac had contacts with Texas out of which the Dontoses' claims arose. Consequently, the trial court properly denied Camac's special appearance. We affirm the trial court's order and overrule Camac's sole issue.

**All Citations**

390 S.W.3d 398

Footnotes

1    Crave, LLC is a Texas limited liability company the Dontoses formed to enter into the vending machine franchise as described below.

2    The remaining defendants include 24Seven, VTL Group Limited, which was the parent or sister company of 24Seven, Vending Technology Limited, which is another company affiliated with 24Seven and VTL, Bacon Whitney, the bank that loaned the Dontoses the purchase money, and various individuals involved in the process. The other defendants are not parties to this appeal.

3    The Dontoses had alleged both general and **specific jurisdiction**. The transcript of the hearing is not part of the record before us. In its order, the trial court stated it reviewed the pleadings and affidavits filed, as well as considered arguments of counsel. The affidavits are part of our record. The Dontoses' sixth amended petition was the live pleading at the time of the trial court's ruling on Camac's special appearance.

4    Accordingly, we do not need to analyze further Camac's complaint Jordan's affidavit was defective because it was not made on personal knowledge, did not set forth facts that would be admissible in evidence, and did not show that Jordan was competent to testify. He further characterized Jordan's affidavit as conclusory and lacking foundation. Camac cites several statements in which he claims Jordan either "failed to set forth the factual basis for his statements" or did not explain how he knew the information. We observe, however, that beyond the affidavit recital that the statements were made based on Jordan's personal knowledge, the facts in the affidavit showed the statements were made based on his personal meetings and communications with Camac. Camac's arguments regarding details of Camac's knowledge and the meetings and other communications go to proof. As described above, the allegations and supporting affidavit statements were sufficient for purposes of the Dontoses' jurisdictional allegations, and Camac did not refute those statements.

305 S.W.3d 269
Court of Appeals of Texas,
Houston (14th Dist.).

CITRIN HOLDINGS, LLC, Jacob
Citrin, Cargo Investors LLC, and
Cargo Investors II LLC, Appellants,
v.
Matthew MINNIS and Cullen 130, LLC, Appellees.

No. 14–09–00186–CV.　|　Dec. 8, 2009.

**Synopsis**
**Background:** Texas resident brought claims for fraud, fraudulent inducement, breach of contract, breach of fiduciary duty, and negligent misrepresentation against New York resident and nonresident corporate defendants in connection with business relationships relating to real estate transactions. The 133rd District Court, Harris County, Jaclanel McFarland, J., denied defendants' special appearances to contest personal jurisdiction. Defendants appealed.

**[Holding:]** The Court of Appeals, William J. Boyce, J., held that Texas had specific jurisdiction under due process "minimum contacts" analysis over both individual and corporate nonresident defendants.

Affirmed.

West Headnotes (40)

**[1]**　**Appeal and Error**
　　Cases Triable in Appellate Court

Determining whether a trial court has personal jurisdiction over a defendant presents a question of law subject to de novo review.

Cases that cite this headnote

**[2]**　**Courts**
　　Allegations, pleadings, and affidavits

**Courts**

**Presumptions and Burden of Proof as to Jurisdiction**

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident within the provisions of the Texas long-arm statute, and burden then shifts to nonresident defendant to negate all bases of personal jurisdiction asserted by plaintiff. V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[3]**　**Appeal and Error**
　　Questions of jurisdiction

Appellate court will not resolve any merits-based questions on an appeal regarding a special appearance to contest personal jurisdiction. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

1 Cases that cite this headnote

**[4]**　**Courts**
　　Business contacts and activities; transacting or doing business

The broad language of long-arm statute's "does business" requirement for exercise of personal jurisdiction reaches to the full extent authorized by federal due process requirements. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[5]**　**Courts**
　　Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Long-arm statute's requirements for exercise of personal jurisdiction over a nonresident defendant are satisfied if the exercise of personal jurisdiction comports with federal due process requirements. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[6]**　**Constitutional Law**

 Non-residents in general

Federal due process requirements for exercise of personal jurisdiction over a nonresident defendant are satisfied if (1) the nonresident defendant has "minimum contacts" with forum state and (2) the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[7]    Constitutional Law**

 Non-residents in general

Minimum contacts are sufficient, under due process requirements for exercising personal jurisdiction over a nonresident defendant, when defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[8]    Constitutional Law**

 Non-residents in general

Three key principles govern analysis of whether nonresident defendant has purposefully availed itself of privilege of conducting business in forum state, as requirement under due process principles for exercise of personal jurisdiction: first, the court considers the defendant's own actions and does not consider the unilateral activity of another party; second, the court considers whether the defendant's actions were purposeful rather than random, isolated, or fortuitous; third, the defendant must seek some benefit, advantage, or profit by availing itself of the privilege of doing business in forum state. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[9]    Constitutional Law**

 Non-residents in general

In context of jurisdictional due process analysis, a nonresident defendant may purposefully avoid

forum state by structuring its transactions to neither profit from state's laws nor subject itself to personal jurisdiction. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[10]    Constitutional Law**

 Non-residents in general

Nonresident defendant's contacts with forum must be considered as a whole and not in isolation, focusing on the nature and quality of the contacts, in context of jurisdictional due process analysis. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[11]    Constitutional Law**

 Non-residents in general

When there are multiple nonresident defendants, the contacts of each defendant with forum must be analyzed individually in determining whether exercise of personal jurisdiction comports with due process. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[12]    Constitutional Law**

 Non-residents in general

When specific jurisdiction is asserted against a nonresident defendant, the court focuses on the relationship between the defendant, the forum, and the litigation when performing due process "minimum contacts" analysis. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[13]    Constitutional Law**

 Non-residents in general

The cause of action must arise from or relate to the nonresident defendant's contacts with the forum in order to permit exercise of specific jurisdiction under due process "minimum contacts" analysis. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[14]** **Constitutional Law**
   ⚷ Non-residents in general

Specific jurisdiction over a nonresident defendant is established under due process "minimum contacts" analysis if (1) the defendant's activities were purposefully directed to the forum state; and (2) there is a substantial connection between the defendant's forum contacts and the operative facts of the litigation. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[15]** **Constitutional Law**
   ⚷ Non-residents in general

An assertion of general jurisdiction over a nonresident compels a more demanding due process "minimum contacts" analysis than does an assertion of specific jurisdiction, and requires a showing of substantial activities within the forum. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[16]** **Constitutional Law**
   ⚷ Non-residents in general

Under due process principles, the cause of action need not arise from or relate to the nonresident defendant's contacts with the forum if general jurisdiction over defendant exists. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[17]** **Constitutional Law**
   ⚷ Non-residents in general

Under due process analysis, general jurisdiction over a nonresident defendant is "dispute blind" and requires contacts with forum state of a continuous and systematic nature. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[18]** **Constitutional Law**
   ⚷ Non-residents in general

Court examines the nonresident defendant's contacts and forum-related activities up to the time suit was filed in determining under due process analysis whether defendant had continuous and systematic contacts with forum state sufficient to support general jurisdiction. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[19]** **Courts**
   ⚷ Presumptions and Burden of Proof as to Jurisdiction

Nonresident defendant must negate all bases for personal jurisdiction to prevail in a special appearance to contest jurisdiction. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

1 Cases that cite this headnote

**[20]** **Courts**
   ⚷ Factors Considered in General

A single basis for personal jurisdiction is sufficient to confer jurisdiction over a nonresident defendant.

2 Cases that cite this headnote

**[21]** **Courts**
   ⚷ Unrelated contacts and activities; general jurisdiction
   **Courts**
   ⚷ Related contacts and activities; specific jurisdiction

The court need not address general jurisdiction if it finds that a nonresident defendant is subject to specific jurisdiction.

3 Cases that cite this headnote

**[22]** **Courts**
   ⚷ Related contacts and activities; specific jurisdiction

If the court finds specific jurisdiction over a nonresident defendant based on one cause of action, the court need not address jurisdiction as to any other causes of action.

2 Cases that cite this headnote

**[23]     Constitutional Law**
      Non-residents in general

Once the court concludes under due process analysis that nonresident defendant has sufficient minimum contacts with the state to establish personal jurisdiction, the defendant bears the burden of establishing that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[24]     Constitutional Law**
      Non-residents in general

To determine under due process analysis whether the exercise of personal jurisdiction over nonresident defendant offends traditional notions of fair play and substantial justice, the court considers (1) the burden on the defendant; (2) the interests in the forum state in adjudicating the dispute; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[25]     Constitutional Law**
      Non-residents in general

Only in rare cases will the exercise of personal jurisdiction not comport with fair play and substantial justice, as required under due process principles, when a nonresident defendant has purposefully availed itself of the privilege of conducting business within a forum. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[26]     Appearance**
      Objections to jurisdiction in general

**Appearance**
      Operation and Effect in General

**Corporations and Business Organizations**
      Appearance

Individual nonresident defendant was not subject to personal jurisdiction based on personal service effected on him following his deposition in action arising from business relationships among that defendant, a resident plaintiff, and various corporate entities they created to engage in real estate transactions, where individual and corporate defendants timely filed special appearances to contest jurisdiction and parties agreed that depositions were subject to the special appearance. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

Cases that cite this headnote

**[27]     Process**
      Parties

The privilege against process is effective for a nonresident defendant who enters the state solely to contest personal jurisdiction on any matter connected with the contested action. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

Cases that cite this headnote

**[28]     Constitutional Law**
      Business, business organizations, and corporations in general

**Courts**
      Contract disputes

**Courts**
      Torts in general

Under due process analysis, Texas court had specific jurisdiction over individual nonresident defendant on resident plaintiff's contractual and tort claims involving business relationships among plaintiff, defendant, and corporate entities they created to engage in real estate transactions; defendant had multiple Texas contacts over many months that were not unilaterally initiated by plaintiff, those contacts culminated in an operating agreement for a corporate entity, plaintiff performed his obligations under that agreement in Texas,

and defendant was also alleged to have made misrepresentations that induced plaintiff to sign a "we are partners" document in Texas. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[29]** **Constitutional Law**
 Consent; forum-selection clauses
**Courts**
 Contract disputes
**Courts**
 Torts in general

Under due process analysis for determining existence of personal jurisdiction of Texas court over New York resident on contractual and tort claims, New York resident's multiple Texas-centered contacts outweighed a New York choice-of-law provision in operating agreement for corporate entity that he formed with plaintiff for purpose of making real estate transactions. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[30]** **Constitutional Law**
 Non-residents in general

Standing alone, entering a contract with a resident of forum state does not necessarily establish minimum contacts sufficient to support personal jurisdiction over a nonresident defendant under due process principles, but a single contract may establish sufficient minimum contacts when considered against a backdrop of prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[31]** **Courts**
 Contract disputes

Generally, a nonresident defendant party is not subject to personal jurisdiction in Texas on a contractual claim if contract calls for performance out of state. V.T.C.A., Civil Practice & Remedies Code § 17.042(1).

**[32]** **Constitutional Law**
 Non-residents in general

In conducting due process analysis for personal jurisdiction over nonresident defendant on a tort claim, court should focus on the defendant's actual contacts with Texas rather than attempting to discern whether a given set of circumstances amounts to "directing" a tort towards Texas. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[33]** **Constitutional Law**
 Non-residents in general

Specific jurisdiction over a nonresident resident on a fraud claim is not necessarily established, under due process "minimum contacts" analysis, by evidence that nonresident defendant made misrepresentations in a single telephone call to a Texas resident. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[34]** **Constitutional Law**
 Non-residents in general

Fraudulent misrepresentations made over a series of contacts to induce a party to enter a transaction can support personal jurisdiction over nonresident defendant under due process "minimum contacts" analysis. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[35]** **Constitutional Law**
 Consent; forum-selection clauses
**Courts**
 Commercial Contacts and Activities; Contracts and Transactions

A choice-of-law clause selecting the laws of a different forum weighs against finding a nonresident defendant subject to personal jurisdiction in Texas, but it is merely one

factor to consider under due process "minimum contacts" analysis. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[36] Constitutional Law**
 Business, business organizations, and corporations in general
**Courts**
 Related or affiliated entities;  parent and subsidiary

Only the contacts with Texas arising at the time of and after the creation of Delaware holding company by New York resident would be considered in analyzing, under due process principles, whether Texas court could exercise personal jurisdiction over holding company on Texas resident's contractual and tort claims arising from business relationships with New York resident; court could not attribute to that corporation a purpose to do business in Texas based upon contacts arising before corporation existed and before it conceivably could have done any business anywhere. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[37] Constitutional Law**
 Business, business organizations, and corporations in general
**Courts**
 Related or affiliated entities;  parent and subsidiary

Under due process "minimum contacts" analysis, Texas court had specific personal jurisdiction on resident plaintiff's contractual and tort claims over Delaware holding company with principal place of business in New York that owned majority interest in a New York company created by plaintiff and New York resident to engage in real estate transactions, though operating agreement for the latter entity contained a New York choice-of-law provision; holding company contracted to create the latter entity, which conducted day-to-day business from 2004 until late 2006 through plaintiff as a Houston-based employee, thereby establishing

a purpose to do business in Texas. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[38] Constitutional Law**
 Business, business organizations, and corporations in general
**Courts**
 Contract disputes
**Courts**
 Torts in general

Under due process "minimum contacts" analysis, Texas court had specific personal jurisdiction, with respect to resident plaintiff's contractual and tort claims, over New York limited liability company (LLC) and Delaware LLC that plaintiff formed with New York resident to engage in real estate transactions; plaintiff's activities in Texas were attributable to LLCs, were not random, isolated, or fortuitous, and were designed to confer a benefit on LLCs, and claims at issue arose from and related to LLCs' contacts with Texas. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[39] Constitutional Law**
 Business, business organizations, and corporations in general
**Constitutional Law**
 Representatives of organizations;  officers, agents, and employees
**Courts**
 Contract disputes
**Courts**
 Torts in general
**Courts**
 Jurisdiction of Agents, Representatives, or Other Third Parties Themselves

Under due process analysis, exercise of personal jurisdiction by Texas court over individual and corporate nonresident defendants would not offend traditional notions of fair play and substantial justice in contract and tort action by resident plaintiff arising from business

relationships concerning real estate transactions; individual defendant had twice traveled to Texas to meet with plaintiff prior to signing an operating agreement for a corporate defendant, that particular corporate defendant had already submitted to jurisdiction in Texas, and requiring litigation of claims in multiple jurisdictions would be inefficient, burdensome on plaintiff, and a waste of juridical resources. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[40]** **Constitutional Law**
&#128273; Non-residents in general

Due to modern transportation, distance to travel is generally not a significant consideration in determining under due process analysis whether exercise of personal jurisdiction over nonresident defendant would offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*274** Paul D. Clote, Larry R. Veselka, Kristen Lee Mckeever, Christina A. Bryan, Houston, for Appellants.

Brandon Trent Allen, Jean C. Frizzell, Jennifer Horan Greer, John Scott Black, Houston, for Appellees.

Panel consists of Justices ANDERSON and BOYCE.

**OPINION**

WILLIAM J. BOYCE, Justice.

Appellants Jacob Citrin, Citrin Holdings LLC, Cargo Investors LLC, and Cargo Investors II LLC challenge the trial court's order denying their special appearances. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (Vernon 2008). We affirm.

**Background**

**I. Parties**

This case involves claims for fraud, fraudulent inducement, breach of contract, breach of fiduciary duty, and negligent misrepresentation arising from business relationships among two individuals and various entities they created to engage in real estate transactions. There are two plaintiffs:

- **Matthew Minnis,** a Texas resident.

- **Cullen 130 LLC,** a limited liability company formed under Delaware law. *See* Del.Code Ann. tit. 6, §§ 18–201–18–216 (2009). Cullen 130 was formed in October 2004 as a holding company for Minnis, who is the sole member of Cullen 130.

**\*275** Minnis and Cullen 130 sued five defendants:

- **Jacob Citrin,** a New York resident.

- **Citrin Holdings LLC,** a limited liability company formed under Delaware law. *See id.* Citrin Holdings was formed on October 6, 2004 as a holding company for Citrin, who is the sole member of Citrin Holdings.

- **Cargo Ventures LLC,** a limited liability company formed under New York law. *See* N.Y. Ltd. Liab. Co. §§ 201–214 (McKinney 2009). Citrin originally created Cargo Ventures in December 2003 and served as its only member until Citrin and Minnis executed the Cargo Ventures Operating Agreement in October 2004. After executing the operating agreement, Citrin ceased to be a member of Cargo Ventures. From October 2004 onward, Citrin Holdings owned 55 percent of Cargo Ventures and Cullen 130 owned 45 percent. Citrin and Minnis both signed the operating agreement individually. Citrin is the "manager" of Cargo Ventures.

- **Cargo Investors LLC,** a limited liability company formed under Delaware law. *See* Del.Code Ann. tit. 6, §§ 18–201–18–216. Cargo Investors was formed in March 2005. Cargo Investors holds equity interests in real estate investments in the freight and warehousing markets. Citrin Holdings owns 55 percent of Cargo Investors and Cullen 130 owns 45 percent. Citrin is the "manager" of Cargo Investors.

- **Cargo Investors II LLC,** a limited liability company formed under Delaware law. *Id.* Cargo Investors II was

formed in January 2006. Cargo Investors II holds equity interests in real estate investments in the freight and warehousing markets. Citrin Holdings owns 80 percent of Cargo Investors II and Cullen 130 owns 20 percent. Citrin is the "manager" of Cargo Investors II.

## II. Facts

Matthew Minnis and Jacob Citrin met while Citrin worked for a company that developed and leased warehouse space at airports. Minnis was a broker for a tenant who leased warehouse and office space from Citrin's company in 2003.

Citrin traveled to Houston, Texas to meet with Minnis in mid–2003. Citrin states in an affidavit that the trip's purpose was to celebrate signing the lease. Minnis states in his affidavit that he and Citrin began discussions during this trip focused on starting a business together to purchase, develop, and manage real estate. Citrin states that "it is possible that Mr. Minnis and I generally and vaguely discussed the possibility of doing further business together" during the 2003 Houston visit, "but I did not consider those discussions to be serious...."

Citrin and Minnis continued their dialogue into 2004 through telephone calls and e-mails, and during face-to-face discussions in Houston. Citrin traveled to Houston again in mid–2004 to meet with Minnis. During this meeting in Houston, Citrin wrote on a piece of paper the following: "We are partners. 55% Jake, 45% Matt." Citrin and Minnis both signed this document. Although no copies of this document were made and the original has disappeared, Citrin and Minnis confirmed the writing's existence in their affidavits and depositions. Minnis asserts the "we are partners" document created a partnership agreement. Citrin contends this document is not an enforceable contract.

According to Minnis, Citrin made misrepresentations to induce him to sign the "we are partners" document. Minnis alleges **\*276** that Citrin promised they would be partners; that the two partners would build a real estate portfolio together; and that Citrin always would act in Minnis's best interest. Minnis alleges that Citrin made these promises in telephone calls, faxes, and e-mails directed to Minnis in Texas, and in person while Minnis and Citrin met in Houston.

In October 2004, the prolonged discussions between Citrin and Minnis culminated in a signed contract called the Cargo Ventures Operating Agreement. Citrin Holdings and Cullen 130 became the sole members of Cargo Ventures. Citrin and Minnis signed the contract in their individual capacities as well as their representative capacities on behalf of Citrin Holdings and Cullen 130. Citrin and Minnis subsequently signed contracts creating Cargo Investors and Cargo Investors II to hold equity interests in real estate investments in the freight and warehousing markets. Citrin, on behalf of Citrin Holdings, and Minnis, on behalf of Cullen 130, signed the Cargo Investors Operating Agreement in March 2005; they signed the Cargo Investors II Operating Agreement in January 2006.

All three operating agreements obligated Citrin (in his capacity as "manager") and Minnis (in his capacity as "the controlling owner of Cullen 130") to "devote such time, attention, and effort to the Company as is reasonably necessary for the management of the Company and the conduct of its business." Minnis and Cullen 130 maintained offices in Houston and operated out of Houston at all relevant times before and after execution of the Cargo Ventures Operating Agreement in October 2004. The operating agreement's signature pages listed Houston addresses for Minnis and Cullen 130. According to Minnis's affidavit, "My company, Cullen 130, is based solely in Houston, Texas. Since its inception, its only place of business has been Houston, Texas."

In furtherance of the operating agreements related to Cargo Ventures, Cargo Investors, and Cargo Investors II, Minnis asserts in his affidavit that he "actively pursued and developed potential projects, assisted in bringing potential projects to closing, and participated in the ongoing management and direction of consummated projects, and fulfilled my management and decision-making responsibilities for the Cargo Entities based out of Texas." Minnis further states, "From 2004 until late 2006, I conducted business on behalf of, and provided services to, the three Cargo Entities on a day-to-day basis from my office in Houston, Texas." Citrin and Citrin Holdings operated out of New York and communicated with Minnis and Cullen 130 in Houston by telephone, fax, e-mail, and mail.

Cargo Ventures and Cargo Investors entered several transactions with Millennium Partners during 2004 and 2005. Millennium Partners is partly owned by Citrin's father-in-law. In 2005, another entity approached Cargo Ventures and Cargo Investors with an offer to participate in future transactions on terms more favorable than those provided by Millennium Partners. Citrin and Citrin Holdings wanted to continue transacting with Millennium Partners but needed Minnis's consent on behalf of Cullen 130 to do so.

Negotiations continued for several months and ended with Minnis consenting on Cullen 130's behalf to transactions with Millennium Partners.

Minnis and Cullen 130 allege that Citrin made a series of misrepresentations to induce them to consent to transactions with Millennium Partners. Minnis and Cullen 130 allege that Citrin and Citrin Holdings promised to (1) grant Cargo Ventures, Cargo Investors, and Cargo Investors II **\*277** greater profit interests in future transactions; and (2) restructure certain existing partnerships and business relationships to compensate Cargo Ventures, Cargo Investors, and Cargo Investors II for entering into less favorable agreements with Millennium Partners. Minnis and Cullen 130 assert that these misrepresentations were made in telephone calls from Citrin to Minnis and Cullen 130 in Texas.

Citrin, acting through Citrin Holdings, began proceedings to dissolve Cargo Ventures, Cargo Investors, and Cargo Investors II in late 2006. Minnis and Cullen 130 received notice in a fax sent to Houston that Citrin Holdings had dissolved the three entities. Minnis and Cullen 130 subsequently filed this suit against Citrin, Citrin Holdings, Cargo Ventures, Cargo Investors, and Cargo Investors II on December 13, 2006 alleging six causes of action: (1) fraud involving alleged misrepresentations relating to the "we are partners" document and the Millennium Partners transactions; (2) breach of contract relating to the "we are partners" document and the Cargo Ventures Operating Agreement; (3) breach of fiduciary duty and good faith; (4) negligent misrepresentation; (5) an action for an accounting; and (6) an action for majority oppression.

Defendants Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II challenged the existence of personal jurisdiction in Texas by filing special appearances under Texas Rule of Civil Procedure 120a. The trial court denied the special appearances in an order signed on February 5, 2009. Defendant Cargo Ventures did not file a special appearance. Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II timely filed a notice of appeal on February 25, 2009. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (Vernon 2008). Appellants timely filed a request for findings of fact and conclusions of law under Texas Rule of Civil Procedure 296; none were filed.

### Standard of Review

 **[1]** Determining whether a trial court has personal jurisdiction over a defendant presents a question of law subject to *de novo* review. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002).

Trial courts frequently must resolve fact questions before deciding the jurisdictional question. *Id.* If the trial court does not sign findings of fact and conclusions of law, all facts necessary to support the trial court's ruling and supported by the evidence are implied in favor of the trial court's decision. *Id.* at 794–95. When the appellate record includes the reporter's record and the clerk's record, parties may challenge the legal and factual sufficiency of these implied findings. *Id.* If the appellate court determines that the trial court's findings are supported by sufficient evidence, or if the material facts are undisputed, then the appellate court decides as a matter of law whether those facts negate all bases for personal jurisdiction. *Id.*

 **[2]** The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident within the provisions of the Texas long-arm statute. *Id.; Cerbone v. Farb,* 225 S.W.3d 764, 766–67 (Tex.App.-Houston [14th Dist.] 2007, no pet.). The burden then shifts to the nonresident defendant to negate all bases of personal jurisdiction asserted by the plaintiff. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *Cerbone,* 225 S.W.3d at 767.

 **[3]** The court will not resolve any merits-based questions on appeal regarding a special appearance. **\*278** *Pulmosan Safety Equip. Corp. v. Lamb,* 273 S.W.3d 829, 839 (Tex.App.-Houston [14th Dist.] 2008, pet. denied).

### Governing Law

 **[4]** **[5]** Texas courts may not exercise personal jurisdiction over a nonresident defendant unless federal due process requirements and the Texas long-arm statute are satisfied. *See* Tex. Civ. Prac. & Rem.Code Ann. § 17.042(1) (Vernon 2008); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 412–13, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The Texas long-arm statute authorizes personal jurisdiction over a nonresident defendant who "does business" in Texas. [1] Tex. Civ. Prac. & Rem.Code Ann. § 17.042; *see also Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990) ( "Our long arm statute authorizes the exercise of jurisdiction over those who do business in Texas."). The long-arm statute is limited by federal due process requirements;

the broad language of section 17.042's "does business" requirement reaches to the full extent authorized by federal due process requirements. *See Moki Mac,* 221 S.W.3d at 575; *Marchand,* 83 S.W.3d at 795; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). Thus, the statute's requirements are satisfied if the exercise of personal jurisdiction comports with federal due process requirements. *See Guardian Royal,* 815 S.W.2d at 226.

 **[6]**  **[7]**  Federal due process requirements are satisfied if (1) the nonresident defendant has "minimum contacts" with Texas; and (2) the exercise of personal jurisdiction over the nonresident defendant does not offend "traditional notions of fair play and substantial justice." *See Helicopteros,* 466 U.S. at 412–13, 104 S.Ct. 1868; *Moki Mac,* 221 S.W.3d at 575. Minimum contacts are sufficient when a nonresident defendant " 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.' " *Moki Mac,* 221 S.W.3d at 575 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

## I. Minimum Contacts

To determine whether a nonresident defendant has sufficient minimum contacts with Texas to support the exercise of personal jurisdiction, the court must determine whether the nonresident defendant "purposefully availed" itself of the privilege of conducting business in Texas. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). Purposeful availment is the "touchstone of jurisdictional due process." *Michiana Easy Livin' Country,* 168 S.W.3d at 784.

 **[8]**  **[9]**  **[10]**  **[11]**  Three key principles govern analysis of purposeful availment. *Id.* at 785. First, the court considers the defendant's own actions; it does not consider the unilateral activity of another party. *Id.* Second, the court considers whether **\*279** the defendant's actions were purposeful rather than "random, isolated, or fortuitous." *Id.* Third, the defendant must seek "some benefit, advantage, or profit by availing itself" of the privilege of doing business in Texas. *Id.* A defendant may purposefully avoid Texas by structuring its transactions to neither profit from Texas's laws nor subject itself to personal jurisdiction. *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174; *Moki Mac,* 221 S.W.3d at 575. The defendant's contacts must be considered as a whole and not in isolation, focusing on the nature and quality of the contacts.

*Guardian Royal,* 815 S.W.2d at 230 n. 11. When there are multiple defendants, the contacts of each defendant must be analyzed individually. *See Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Shapolsky v. Brewton,* 56 S.W.3d 120, 135 (Tex.App.-Houston [14th Dist.] 2001, pet. denied), *disapproved of on other grounds by Michiana Easy Livin' Country,* 168 S.W.3d at 788–89.

Minimum contacts analysis is further analyzed in terms of (1) specific jurisdiction; and (2) general jurisdiction.

 **[12]**  **[13]**  **[14]**  When specific jurisdiction is asserted, the court focuses on the relationship between the defendant, the forum, and the litigation. *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868; *Moki Mac,* 221 S.W.3d at 575–76. The cause of action must "arise from or relate to" the nonresident defendant's contacts with the forum. *Guardian Royal,* 815 S.W.2d at 228. Specific jurisdiction over a nonresident defendant is established if (1) the defendant's activities were purposefully directed to the forum state; and (2) there is a substantial connection between the defendant's forum contacts and the operative facts of the litigation. *Moki Mac,* 221 S.W.3d at 585.

 **[15]**  **[16]**  **[17]**  **[18]**  An assertion of general jurisdiction compels a more demanding minimum contacts analysis and requires a showing of substantial activities within the forum. *See Guardian Royal,* 815 S.W.2d at 228. The cause of action need not "arise from or relate to" the nonresident defendant's contacts with the forum. *See id.* Rather, general jurisdiction is "dispute blind" and requires contacts of a continuous and systematic nature. *See Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. 1868; *Guardian Royal,* 815 S.W.2d at 228. Thus, it is more difficult to establish general jurisdiction. *See Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. 1868; *Guardian Royal,* 815 S.W.2d at 228. To determine whether a nonresident defendant had continuous and systematic contacts with Texas sufficient to support general jurisdiction, the court examines the defendant's contacts and forum-related activities up to the time suit was filed. *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 170 (Tex.2007).

 **[19]**  **[20]**  **[21]**  **[22]**  The defendant must negate all bases for personal jurisdiction to prevail in a special appearance. *See Shapolsky,* 56 S.W.3d at 135. A single basis for personal jurisdiction is sufficient to confer jurisdiction over a defendant. *See id.* The court need not address general jurisdiction if it finds that a defendant is subject to specific jurisdiction. *See id.* If the court finds specific jurisdiction over

a defendant based on one cause of action, the court need not address jurisdiction as to any other causes of action. *See id.*

## II. Fair Play and Substantial Justice

 **[23]**    Once the court concludes that the defendant has sufficient minimum contacts with the state to establish personal jurisdiction, the defendant bears the burden of establishing that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *Conner v. ContiCarriers & Terminals,* **\*280** *Inc.,* 944 S.W.2d 405, 411 (Tex.App.-Houston [14th Dist.] 1997, no writ).

 **[24]**    **[25]**    To determine whether the exercise of personal jurisdiction offends traditional notions of fair play and substantial justice, the court considers (1) the burden on the defendant; (2) the interests in the forum state in adjudicating the dispute; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 476–77, 105 S.Ct. 2174; *Guardian Royal,* 815 S.W.2d at 228. Only in rare cases will the exercise of personal jurisdiction not comport with fair play and substantial justice when a nonresident defendant has purposefully availed itself of the privilege of conducting business within a forum. *Guardian Royal,* 815 S.W.2d at 231.

### Analysis

Appellants Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II contend the trial court erred in denying their respective special appearances. We address each appellant in turn.

### I. Jacob Citrin

Minnis and Cullen 130 assert that personal jurisdiction over Citrin is established because they effected personal service on him, and because the minimum contacts standard is satisfied. Minnis and Cullen 130 contend Citrin is subject to specific jurisdiction based on (1) the existence of long-term contractual relationships with Minnis and Cullen 130; and (2) misrepresentations Citrin allegedly made to Minnis and Cullen 130. Minnis and Cullen 130 do not contend that Citrin is subject to general jurisdiction in Texas.

### A. Personal Service

 **[26]**    Citrin filed his special appearance on April 13, 2007. On January 16, 2009, the trial court signed an order compelling Citrin to appear for deposition by January 23, 2009. The trial court limited the scope of the deposition to "any pending or potential transactions, and any efforts associated therewith, by any Defendant or affiliated person or entity, that would in any way affect, transfer, diminish, or dilute the assets made subject to Plaintiffs' claims."

Minnis and Cullen 130 effected personal service on Citrin after his deposition was concluded on January 23, 2009. Relying on *Oates v. Blackburn,* 430 S.W.2d 400, 402–03 (Tex.App.-Houston [14th Dist.] 1968, writ ref'd n.r.e.), they contend that personal service of process on Citrin in Texas is sufficient to establish personal jurisdiction in Texas.

 **[27]**    We reject Minnis's and Cullen 130's contention in light of the parties' course of conduct. It is undisputed that Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II timely filed special appearances. "The issuance of process for witnesses, the taking of depositions, the serving of requests for admissions, and the use of discovery processes, shall not constitute a waiver of such special appearance." Tex.R. Civ. P. 120a. "Every appearance, prior to judgment, not in compliance with this rule is a general appearance." *Id.* The "privilege against process is effective for a defendant who enters the state solely to contest jurisdiction under Rule 120a on any matter connected with the contested action." *Oates,* 430 S.W.2d at 403. Consistent with Rule 120a, counsel for Minnis and Cullen 130 stated during a January 13, 2009 hearing that "[w]e've been operating under the impression and with the agreement that depositions are subject to the special appearance...."

 **\*281**    In light of the parties' agreement—acknowledged on the record by counsel for Minnis and Cullen 130—we conclude that Citrin is not subject to personal jurisdiction in this matter based on personal service effected upon him following his deposition. [2]

### B. Minimum Contacts

 **[28]**    **[29]**    We next consider whether Citrin purposefully availed himself of the privilege of doing business in Texas. The circumstances relating to Citrin individually involve analysis of contacts relating to contract and tort claims.

**[30]** Standing alone, entering a contract with a Texas resident does not necessarily establish minimum contacts sufficient to support personal jurisdiction. *Burger King,* 471 U.S. at 478–79, 105 S.Ct. 2174; *Nogle & Black Aviation, Inc. v. Faveretto,* 290 S.W.3d 277, 283 (Tex.App.-Houston [14th Dist.] 2009, no pet.); *Ashdon, Inc. v. Gary Brown & Assocs.,* 260 S.W.3d 101, 113 (Tex.App.-Houston [1st Dist.] 2008, no pet.); *Olympia Capital Assocs., L.P. v. Jackson,* 247 S.W.3d 399, 417 (Tex.App.-Dallas 2008, no pet.). But a single contract may establish sufficient minimum contacts when considered against a backdrop of "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing [.]" *Burger King,* 471 U.S. at 478–79, 105 S.Ct. 2174; *see also Fish v. Tandy Corp.,* 948 S.W.2d 886, 890 (Tex.App.-Fort Worth 1997, pet. denied) (nonresident defendant established purposeful availment by negotiating with Texas corporation through personal visits to Texas and through telephone, mail, and faxes to and from Texas).

**[31]** The contract's place of performance is an important consideration. *See Barnstone v. Congregation Am Echad,* 574 F.2d 286, 288–89 (5th Cir.1978); *Fleischer v. Coffey,* 270 S.W.3d 334, 338 (Tex.App.-Dallas 2008, no pet.). The Texas long-arm statute specifically references place of performance. *See* Tex. Civ. Prac. & Rem.Code Ann. § 17.042(1) ("[A] nonresident defendant does business in this state if the nonresident ... contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state."). Generally, a party is not subject to jurisdiction in Texas if a contract calls for performance out of state. *See Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807–08 (Tex.2002); *Ashdon, Inc.,* 260 S.W.3d at 113; *Jackson,* 247 S.W.3d at 417–18. A contract calling for performance in Texas can support personal jurisdiction in appropriate circumstances. *See Fleischer,* 270 S.W.3d at 338; *Nogle & Black Aviation, Inc.,* 290 S.W.3d at 283. It is reasonable to subject a nonresident defendant to personal jurisdiction in Texas in connection with litigation arising from a contract specifically designed to benefit from the skills of a Texas resident who performs contractual obligations in Texas. *See Nogle & Black Aviation, Inc.,* 290 S.W.3d at 283.

**[32]** As noted above, Minnis and Cullen 130 also have asserted tort claims. They contend that a defendant subjects himself to personal jurisdiction in Texas by directing a tort toward Texas. The Texas **\*282** Supreme Court addressed this approach to personal jurisdiction in *Michiana Easy Livin' Country,* 168 S.W.3d at 790–92. *Michiana Easy Livin'*

*Country* teaches that courts should focus their jurisdictional analysis on the defendant's actual contacts rather than attempting to discern whether a given set of circumstances amounts to "directing" a tort towards Texas. *See id.* at 791. Because minimum contacts analysis addresses the actions and reasonable expectations of the nonresident defendant, this court will weigh Citrin's alleged conduct in terms of its significance as evidence of contacts between Citrin and Texas. *See id.*

**[33]** **[34]** Specific jurisdiction is not necessarily established by evidence that a nonresident defendant made misrepresentations in a single telephone call to a Texas resident. *Id.* at 791–92. But fraudulent misrepresentations made over a series of contacts to induce a party to enter a transaction can support personal jurisdiction. *See Glencoe Capital Partners II, L.P. v. Gernsbacher,* 269 S.W.3d 157, 164–67 (Tex.App.-Fort Worth 2008, no pet.) (defendants were subject to personal jurisdiction in Texas based on misrepresentations during numerous telephonic board meetings over multiple years that induced Texas-based board members, who called into the meetings from Texas using a toll-free number, to enter certain transactions).

**[35]** Citrin contends that he did not purposefully avail himself of the privilege of doing business in Texas because the Cargo Ventures Operating Agreement contained a choice of law clause selecting New York law. A choice of law clause selecting the laws of a different forum weighs against finding a defendant subject to personal jurisdiction in Texas. *See Michiana Easy Livin' Country,* 168 S.W.3d at 792. Choice of law clauses "should not be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws.' " *Id.* (quoting *Burger King,* 471 U.S. at 482, 105 S.Ct. 2174). But neither are they dispositive. *See Electrosource, Inc. v. Horizon Battery Techs., Ltd.,* 176 F.3d 867, 873 (5th Cir.1999). A choice of law clause is merely one factor to consider in determining whether a forum state has personal jurisdiction over a nonresident defendant. *Id.* The "we are partners" document did not contain a choice of law clause.

Citrin states in his affidavit that "[s]ince December 3, 2003, I have traveled to Texas approximately seven or eight times as a representative of Cargo Ventures, and during three or four of those trips, I visited the offices of Matthew Minnis ... the sole member of Delaware limited liability company Cullen 130, LLC...." Citrin nonetheless argues that he structured his contractual relationship with Minnis to avoid subjecting

himself to personal jurisdiction in Texas. A defendant can avoid a forum by structuring his transactions so that he does not profit from the forum's laws and does not subject himself to its jurisdiction. *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174; *Moki Mac,* 221 S.W.3d at 575; *Michiana Easy Livin' Country,* 168 S.W.3d at 785. Citrin further contends that the "we are partners" document is not enforceable, and that the asserted misrepresentations are not actionable because they are at most vague statements regarding potential future activities.

Weighing the parties' arguments in light of the considerations discussed above, we conclude that Minnis and Cullen 130 have established specific jurisdiction as to Citrin individually on this record.

Citrin contracted with Minnis, a Texas resident, in contemplation of an ongoing business relationship to be performed at least in part in Texas. Citrin conducted **\*283** prolonged discussions with Minnis before signing the "we are partners" document and the Cargo Ventures Operating Agreement. In the course of these discussions, Citrin traveled to Houston in mid–2003 to meet with Minnis; communicated face-to-face with Minnis in Texas and via telephone, fax, e-mail, and mail; traveled to Houston again in mid–2004 to meet with Minnis; drafted and signed the disputed "we are partners" document in Houston; and signed the Cargo Ventures Operating Agreement individually. Minnis and Cullen 130 allege that Citrin sought to obtain the benefits of Minnis's contacts and efforts without compensating Minnis.

These circumstances differ significantly from *Michiana Easy Livin' Country,* in which the transaction at issue originated in a single outbound telephone call from a vehicle-seeking Texas resident to an out-of-state dealer. Here, in contrast, the circumstances involve multiple Texas contacts over many months in the course of an ongoing relationship that "was not unilaterally initiated by the Texas resident." *See Nogle & Black Aviation, Inc.,* 290 S.W.3d at 283; *cf. Michiana Easy Livin' Country,* 168 S.W.3d at 784. These circumstances demonstrate Citrin's purposeful contact with Texas along with an intent to obtain benefits from those contacts, and they defeat any suggestion that Citrin's business-related presence in Texas was merely "random, isolated, or fortuitous." *Michiana Easy Livin' Country,* 168 S.W.3d at 785; *see also GJP, Inc. v. Ghosh,* 251 S.W.3d 854, 879 (Tex.App.-Austin 2008, no pet.) ("We cannot agree ... that [the defendant's] physical presence in Texas when closing the sale is 'fortuitous' rather than 'purposeful' in the sense the

United States and Texas supreme courts have employed those concepts."); *cf. Info. Servs. Group, Inc. v. Rawlinson,* No. 14–09–00242–CV, 2009 WL 3643515, at \*6 (Tex.App.-Houston [14th Dist.] Nov. 5, 2009, no pet. h.) ("... Rawlinson did not elect to visit Texas; it is undisputed that he attended the conferences at [the plaintiff's] direction.").

These multiple contacts culminated in the Cargo Ventures Operating Agreement, which obligated Minnis and Citrin to "devote such time, attention, and effort to the Company as is reasonably necessary for the management of the Company and the conduct of its business." Minnis performed his obligations under the Cargo Ventures Operating Agreement in Texas. In his affidavit, Minnis states that he actively pursued and developed potential projects, assisted in bringing potential projects to closing, and participated in ongoing management and decision-making responsibilities from his office in Texas. These facts demonstrate that the parties' contractual dispute has a " '*substantial* connection' " with Texas. *See Burger King,* 471 U.S. at 479, 105 S.Ct. 2174 (original emphasis) (quoting *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

In light of this evidence, the presence of a New York choice of law provision in the Cargo Ventures Operating Agreement is not dispositive and is outweighed by the other Texas-centered contacts discussed above. The evidence of Texas-based contractual performance in this case reinforces the exercise of specific jurisdiction. *See Tex. Civ. Prac. & Rem.Code Ann. § 17.042(1); Nogle & Black Aviation, Inc.,* 290 S.W.3d at 283 (upholding exercise of personal jurisdiction in Texas over nonresident based on contract designed to benefit from the skills of a Texas resident who performed the contract in Texas); *Fleischer,* 270 S.W.3d at 338 (contract calling for performance in Texas supported jurisdiction in Texas).

**\*284** Citrin also is alleged to have made misrepresentations that induced Minnis to sign the "we are partners" document in Houston; these misrepresentations are alleged to have been made face-to-face to Minnis in Houston, and via faxes, e-mails, and mail sent to Minnis in Houston. Citrin made additional alleged misrepresentations during multiple telephone calls to Minnis in Texas to obtain Minnis's consent, on behalf of Cullen 130, to pursue transactions with Millennium Partners. These multiple, significant contacts provide additional support for the exercise of personal jurisdiction over Citrin individually in Texas. *See Gernsbacher,* 269 S.W.3d at 165 (series of fraudulent misrepresentations made to Texas resident to

induce participation in transaction supported jurisdiction); *Fish,* 948 S.W.2d at 890 (pre-contract negotiations consisting of personal trips to Texas, telephone calls, mail, and faxes to and from Texas supported jurisdiction). When Citrin responds by arguing that the alleged misrepresentations are too vague or otherwise not actionable, and that the "we are partners" document is not enforceable, he invites us to resolve the merits of Minnis's and Cullen 130's claims against him. Abundant case law teaches that we should not reach the merits of the parties' dispute in the course of addressing personal jurisdiction, and we decline to do so here. *See, e.g., Pulmosan Safety Equip. Corp.,* 273 S.W.3d at 839.

This record supports the trial court's exercise of specific jurisdiction over Citrin individually and establishes a substantial connection between Citrin's Texas contacts and the operative facts of the litigation.

## II. Citrin Holdings LLC

 **[36]**   **[37]**   We now turn to personal jurisdiction over Citrin Holdings, a Delaware limited liability company owned solely by Citrin with its principal place of business in New York. Citrin Holdings was the majority owner of Cargo Ventures, Cargo Investors, and Cargo Investors II. Cullen 130 was the minority owner of these entities.

A threshold question arises regarding the universe of contacts that should be considered as to Citrin Holdings. Because it was formed in October 2004, Citrin Holdings contends that Texas contacts arising from Citrin's individual activities before that time are not germane to deciding whether it is subject to personal jurisdiction. Minnis and Cullen 130 contend that pre-October 2004 contacts can be considered because Citrin testified that he had planned to create Citrin Holdings while he was negotiating with Minnis. We base our analysis below as to Citrin Holdings on contacts arising when Citrin Holdings was created in October 2004 and thereafter. Regardless of Citrin's individual intent before October 2004 to create Citrin Holdings at some later date, we cannot attribute to Citrin Holdings a purpose to do business in Texas based upon contacts arising before this entity existed and before it conceivably could have done any business anywhere. *See Michiana Easy Livin' Country,* 168 S.W.3d at 784–85 (purposeful availment must consider the defendant's own actions).

To support the exercise of personal jurisdiction, Minnis and Cullen 130 rely heavily on Citrin Holdings' execution of the Cargo Ventures Operating Agreement in October 2004,

the Cargo Investors Operating Agreement in March 2005, and the Cargo Investors II Operating Agreement in January 2006. Citrin Holdings and Cullen 130 constitute the entire membership of each entity. On this record, Cullen 130 performed its obligations and activities under each operating agreement in Texas. Minnis and Cullen 130 assert that Citrin Holdings regularly communicated **\*285** with them in Houston and sent a series of notices to Houston in furtherance of the operating agreements governing Cargo Ventures, Cargo Investors, and Cargo Investors II. Citrin Holdings made alleged misrepresentations to induce Minnis and Cullen 130 into authorizing transactions with Millennium Partners. Minnis and Cullen 130 allege these misrepresentations were made in a series of communications to Minnis and Cullen 130 in Texas.

For its part, Citrin Holdings stresses that each of the operating agreements contains a choice of law clause selecting New York law (as to Cargo Ventures) or Delaware law (as to Cargo Investors and Cargo Investors II). Citrin Holdings also relies heavily on *TeleVentures, Inc. v. Int'l Game Tech.,* 12 S.W.3d 900 (Tex.App.-Austin 2000, no pet.), in arguing that it did not purposefully avail itself of the privilege of doing business in Texas.

The dispute in *TeleVentures* arose after IGT, a Nevada corporation with its principal place of business in Nevada, signed two letters of intent in late 1995 with TeleVentures, a Texas corporation with its principal place of business in Texas. *Id.* at 904. The letters addressed the companies' joint efforts to develop devices that would allow guests to play casino-style games on their hotel televisions. *Id.* Under these letters, the parties stated their intent to sign a formal agreement if preliminary tests of the in-room hotel gaming system were satisfactory. *Id.* at 904–05. IGT and TeleVentures communicated via personal visits, faxes, letters, and telephone calls for more than a year thereafter. *Id.* at 905. TeleVentures's employees traveled to Nevada, but no IGT employees or representatives came to Texas. *Id.* The parties never signed a formal agreement; instead, IGT sent a letter to TeleVentures in Texas in January 1997 terminating all relations between the two companies. *Id.* The termination letter prompted TeleVentures to sue IGT for breach of contract, breach of fiduciary duty, fraud in the inducement, fraud, negligent misrepresentation, and tortious interference. *Id.*

The appellate court concluded that neither the letters of intent nor communications directed to TeleVentures in Texas

provided a sufficient basis for specific jurisdiction over IGT in Texas. *Id.* at 909. In so holding, the court stressed that TeleVentures's role in the project evaporated after IGT chose a technological configuration that effectively excluded TeleVentures from further participation. *Id.* TeleVentures nonetheless continued to develop marketing tools and a device called the "game cube" that IGT never used, but these unilateral activities by TeleVentures were insufficient to establish purposeful availment by IGT. *Id.* "Although IGT had knowledge of the game cube, IGT neither required nor requested it." *Id.* The court also noted that the second letter of intent contemplated the creation of a partnership between IGT and TeleVentures calling for performance in Nevada, and that TeleVentures changed its state of incorporation from Texas to Nevada during its relationship with IGT. *Id.* at 905, 910. The court concluded that "[t]he terms of the letters of intent and the history of the parties' negotiations do not reveal purposeful conduct by IGT sufficient to subject it to the jurisdiction of the Texas district court." *Id.* at 910.

The circumstances here involving Citrin Holdings are distinguishable from those at issue in *TeleVentures,* in which the Texas corporation's role diminished over time and the center of gravity of the parties' relationship shifted towards Nevada. Unlike *TeleVentures,* negotiations here ripened into three formal contracts—including the Cargo Ventures Operating **\*286** Agreement—to which Citrin Holdings was a party.

In contrast to *TeleVentures*, in which the parties' activities migrated away from Texas, the activities at issue here maintained a consistent Texas connection and focus sufficient to establish a purpose by Citrin Holdings to do business in Texas. Citrin Holdings contracted to create Cargo Ventures, which conducted day-to-day business from 2004 until late 2006 through Minnis as a Houston-based Cargo Ventures employee. The process leading to the Cargo Ventures Operating Agreement was not unilaterally initiated or pursued by Minnis or Cullen 130. Additionally, Cargo Ventures does not challenge the exercise of personal jurisdiction over it by a Texas court. This latter fact underscores that contractual performance occurred in Texas, and diminishes the importance of the New York choice of law provision contained in the Cargo Ventures Operating Agreement.

The circumstances here more closely parallel those described in *Nogle & Black Aviation.* "The doctrine of purposeful availment recognizes that a defendant can make choices to avoid benefitting from activities in Texas." *Nogle & Black*

*Aviation, Inc.,* 290 S.W.3d at 283 (citing *Moki Mac,* 221 S.W.3d at 575, and *Michiana Easy Livin' Country,* 168 S.W.3d at 785). "Even though N & B may have made some such choices, such as not locating any employees or offices in Texas and not targeting the Texas market, it specifically chose to use the work of this Texas resident." *Nogle & Black Aviation, Inc.,* 290 S.W.3d at 283. "That work was performed in Texas...." *Id.* These circumstances mean it is "not unreasonable" to expect litigation in Texas arising in connection with the performance of a contract in Texas by an entity with whom Citrin Holdings purposefully chose to contract. *See id.; see also Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 340 (Tex.2009) ("[W]e have found that, even in instances where a contract was signed in another state, an out-of-state company with no physical ties to Texas still has minimum contacts with Texas when it is clear the company purposefully directed its activities towards Texas."). Accordingly, the district court properly concluded on this record that specific jurisdiction exists as to Citrin Holdings.

### III. Cargo Investors LLC and Cargo Investors II LLC

 **[38]**   Minnis and Cullen 130 contend that Cargo Investors and Cargo Investors II are subject to general and specific jurisdiction because (1) Cullen 130, a member of both Cargo Investors and Cargo Investors II, maintains an office in and operates out of Texas; and (2) Minnis and Cullen 130 performed work on behalf of Cargo Investors and Cargo Investors II in Texas. Appellants contend that the record does not support a finding that Minnis or Cullen 130 conducted work on behalf of Cargo Investors or Cargo Investors II from Texas.

In support of their special appearances, Cargo Investors and Cargo Investors II submitted an affidavit signed by Jacob Citrin. Among other things, Citrin averred that these two entities

- "simply hold equity interests in certain investments, but do not offer or provide real estate development or property management services;"

- have no employees; and

- have never been organized under Texas law, never maintained an office or other place of business in Texas, do not conduct any business in Texas, have never owned or leased property in Texas, and do not maintain bank accounts in Texas.

**\*287** Citrin further stated that "Minnis was never an employee of Cargo Investors I or Cargo Investors II, and to my knowledge as the manager of both entities, neither Minnis nor Cullen 130 conducted business on behalf of Cargo Investors I or Cargo Investors II." Citrin echoed these assertions in his deposition testimony.

Minnis filed an affidavit in response to the special appearances in which he referred to Cargo Ventures, Cargo Investors and Cargo Investors II collectively as the "Cargo Entities." Minnis averred that

- he has lived in Houston his entire life;

- his primary residence is in Houston;

- Cullen 130 is based solely in Houston, where it has been based since its inception;

- "From 2004 until late 2006, I conducted business on behalf of, and provided services to, the three Cargo Entities on a day-to-day basis from my office in Houston, Texas;" and

- "I actively pursued and developed potential projects, assisted in bringing potential projects to closing, participated in the ongoing management and direction of consummated projects, and fulfilled my management and decision-making responsibilities for the Cargo Entities based out of Texas."

Cargo Investors and Cargo Investors II thereafter filed a supplemental affidavit signed by Jacob Citrin, in which he disputed the accuracy of Minnis's statement that Minnis conducted business on behalf of all three Cargo Entities on a day-to-day basis in Texas. Citrin asserted that "[t]he vast majority, if not all, of Mr. Minnis' work for our business together was on behalf of Defendant Cargo Ventures." Citrin added, "Although Mr. Minnis was given the title of President of Cargo Investors I, he did not actually do anything meaningful as a result of having that title. With regard to Cargo Investors II, he was not even conferred with any title, and performed no work for that holding company." Citrin also signed a second supplemental affidavit in which he disputed the accuracy of Minnis's assertion "that he performed work to identify and develop properties to be owned by Cargo Investors I and Cargo Investors II." Cargo Investors and Cargo Investors II also point to an excerpt from Minnis's deposition in which Minnis agreed with the assertion that "all

of the for-a-fee development work that you and Jake [Citrin] did together [was] done through Cargo Ventures...."

The record here demonstrates that a fact dispute exists regarding the extent to which Minnis's and Cullen 130's Texas activities were performed on behalf of Cargo Investors and Cargo Investors II. As noted earlier, the district court did not file findings of fact; therefore, all facts necessary to support the trial court's ruling and supported by the evidence are implied in favor of the trial court's decision. *Marchand,* 83 S.W.3d at 794–95. We conclude that the evidence here is legally and factually sufficient to support the district court's implied finding that Minnis and Cullen 130 acted on behalf of Cargo Investors and Cargo Investors II when they performed activities in Texas. The activities Minnis and Cullen 130 performed in Texas suffice to establish specific jurisdiction in Texas as to Cargo Investors and Cargo Investors II because these activities (1) are attributable to these appellants; (2) are not random, isolated, or fortuitous; and (3) were designed to confer a benefit, advantage or profit. *See Michiana Easy Livin' Country,* 168 S.W.3d at 785. Furthermore, the claims at issue in this litigation arise from and relate to these contacts with Texas. *Guardian Royal,* 815 S.W.2d at 228. These contacts suffice to establish specific jurisdiction as to Cargo Investors **\*288** and Cargo Investors II. [3]

### C. Fair Play and Substantial Justice

[39] Having concluded that the Texas contacts of Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II demonstrate purposeful availment and are substantially connected to the operative facts of the litigation, we next must determine whether exercising personal jurisdiction over appellants offends traditional notions of fair play and substantial justice.

To answer this question, the court considers (1) the burden on the defendant; (2) the interests in the forum state in adjudicating the dispute; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 476–77, 105 S.Ct. 2174. Only in rare cases will the exercise of personal jurisdiction offend traditional notions of fair play and substantial justice. *Retamco Operating, Inc.,* 278 S.W.3d at 341–42. The defendant bears the burden of establishing that the exercise of

personal jurisdiction would offend traditional notions of fair play and substantial justice. *Conner,* 944 S.W.2d at 411.

 **[40]** After considering all of the factors, we conclude that the exercise of personal jurisdiction in this case is consistent with traditional notions of fair play and substantial justice. Appellants contend that defending this suit in Texas would be a "considerable burden" because (1) Citrin is a New York resident, and (2) Citrin Holdings, Cargo Investors, and Cargo Investors II are based in New York. Appellants may well incur greater expenses defending this suit in Texas compared to New York, but that is true for any nonresident defendant. *See id.* Distance to travel is generally not a significant consideration due to modern transportation. *See Gernsbacher,* 269 S.W.3d at 168. Further, Citrin traveled to Texas to personally meet with Minnis on two separate occasions prior to signing the "we are partners" document and Cargo Ventures Operating Agreement. Also, defendant Cargo Ventures submitted to jurisdiction in Texas. Requiring Minnis and Cullen 130 to litigate their claims against the defendants in separate jurisdictions would be (1) inefficient; (2) burdensome on Minnis and Cullen 130; and (3) a waste of judicial resources. *See Kelly v. Gen. Interior Constr., Inc.,* 262 S.W.3d 79, 86 (Tex.App.-Houston [14th Dist.] 2008, pet. granted).

 **\*289** After weighing all of the relevant factors, we conclude that exercising personal jurisdiction over appellants would not offend traditional notions of fair play and substantial justice.

### Conclusion

We reject the issues raised on appeal and affirm the trial court's order denying the special appearances of Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II.

Former Justice GUZMAN not participating.

### Footnotes

1    The Texas long-arm statute provides as follows:
     In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:
     (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
     (2) commits a tort in whole or in part in this state; or
     (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.
     Tex. Civ. Prac. & Rem.Code Ann. § 17.042(1)-(3).

2    Minnis and Cullen 130 contend that personal service on Citrin also established personal jurisdiction as to Citrin Holdings, Cargo Investors, and Cargo Investors II because Citrin was the sole owner of Citrin Holdings and the "manager" of the latter two entities. Given our holding that personal service upon Citrin in Texas did not establish personal jurisdiction in light of the parties' agreement, we do not address whether personal service effected upon Citrin would have been sufficient to establish personal jurisdiction in Texas as to these separate entities.

3    For diversity purposes in federal court, the citizenship of a limited liability company's members is attributed to the LLC itself. *See, e.g., Harvey v. Grey Wolf Drilling Co.,* 542 F.3d 1077, 1080 (5th Cir.2008) ("[L]ike limited partnerships and other unincorporated associations or entities, the citizenship of a LLC is determined by the citizenship of all of its members.") (citations omitted). However, personal jurisdiction is a separate inquiry. *Cf. Goforit Entm't LLC v. Digimedia.com L.P.,* 513 F.Supp.2d 1325, 1331 (M.D.Fla.2007) (Rule for measuring citizenship in diversity cases does not mean that a limited partnership necessarily is subject to personal jurisdiction in every state of which its partners are citizens; "A limited partnership does not necessarily derive any benefit from the forum merely by virtue of having a limited partner there, nor does it necessarily do business there."). The personal jurisdiction determination in this case does not depend upon attributing Texas citizenship to LLCs. Instead, it rests upon a sufficiently supported implied finding that the Texas-based activities of Minnis and Cullen 130 also are the Texas-based activities of Cargo Investors and Cargo Investors II. In light of this conclusion, we do not reach the parties' remaining contentions regarding specific jurisdiction as to Cargo Investors and Cargo Investors II. We also do not address general jurisdiction. *See Shapolsky,* 56 S.W.3d at 135.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by**    Harris County Flood Control District v. Kerr,    Tex., June 12, 2015

168 S.W.3d 802
Supreme Court of Texas.

The CITY OF KELLER, Petitioner,

v.

John W. WILSON, Grace S. Wilson, Johnny L. Wilson and Nancy A. Wilson, Respondents.

No. 02–1012.   |   Argued Oct. 19, 2004.   |   Decided June 10, 2005.   |   Rehearing Denied Sept. 2, 2005.

**Synopsis**

**Background:** Landowners brought action against city to recover damages for inverse condemnation and for violations of Water Code. The 96th District Court, Tarrant County, Jeff Walker, J., entered judgment on jury verdict in favor of landowners. City appealed. The Fort Worth Court of Appeals, 86 S.W.3d 693, affirmed. City filed petition for review.

**Holdings:** The Supreme Court, Brister, J., held that:

[1] both the "exclusive" and "inclusive" standards for no-evidence review are correct, in that the two standards reach the same result, and

[2] no evidence established that city's approval of revised drainage plans, which resulted in flooding of landowners' farm property, was an intentional taking.

Judgment of Court of Appeals reversed; case remanded.

O'Neill, J., filed concurring opinion in which Medina, J., joined.

West Headnotes (54)

**[1]**    **Eminent Domain**
     Nature and grounds in general

To recover damages from city for inverse condemnation, landowners had to prove the city intentionally took or damaged their property for public use, or was substantially certain that would be the result. Vernon's Ann.Texas Const. Art. 1, § 17.

3 Cases that cite this headnote

**[2]**    **Appeal and Error**
     Total failure of proof

The traditional scope of no-evidence review does not disregard contrary evidence if there is no favorable evidence, or if contrary evidence renders supporting evidence incompetent or conclusively establishes the opposite.

290 Cases that cite this headnote

**[3]**    **Appeal and Error**
     Sufficiency of Evidence in Support

When conducting a legal-sufficiency review, evidence can be disregarded whenever reasonable jurors could do so, an inquiry that is necessarily fact-specific.

132 Cases that cite this headnote

**[4]**    **Appeal and Error**
     Sufficiency of Evidence in Support

When courts conducting legal-sufficiency review use the "exclusive" standard and disregard contrary evidence, they must recognize certain exceptions to it.

2 Cases that cite this headnote

**[5]**    **Libel and Slander**
     Construction of language used

Publications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself.

4 Cases that cite this headnote

**[6]**    **Appeal and Error**

☛ Review of constitutional questions

A court reviewing legal sufficiency, in an action alleging a defamatory publication, cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict.

4 Cases that cite this headnote

**[7]** **Contracts**

☛ Construction as a whole

Reviewing courts must construe contracts as a whole; courts do not consider only the parts favoring one party and disregard the remainder, as that would render the latter meaningless.

10 Cases that cite this headnote

**[8]** **Contracts**

☛ Construing instruments together

Writings executed at different times must be considered together if they pertain to the same transaction.

4 Cases that cite this headnote

**[9]** **Appeal and Error**

☛ Sufficiency of Evidence in Support

In reviewing intentional infliction of emotional distress claims for legal sufficiency, appellate court considers the context and the relationship between the parties.

4 Cases that cite this headnote

**[10]** **Appeal and Error**

☛ Sufficiency of Evidence in Support

When conducting legal-sufficiency review, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did.

5 Cases that cite this headnote

**[11]** **Appeal and Error**

☛ Extent of Review

If evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded when conducting legal-sufficiency review, even if that means rendering judgment contrary to the jury's verdict.

2 Cases that cite this headnote

**[12]** **Judgment**

☛ Evidence to sustain judgment

**Judgment**

☛ Defects and objections

Incompetent evidence is legally insufficient to support a judgment, even if admitted without objection.

11 Cases that cite this headnote

**[13]** **Appeal and Error**

☛ Extent of Review

Evidence showing supporting evidence to be incompetent cannot be disregarded when conducting legal-sufficiency review, even if the result is contrary to the verdict.

3 Cases that cite this headnote

**[14]** **Appeal and Error**

☛ Extent of Review

**Evidence**

☛ Opinions of Witnesses in General

When expert testimony is required, lay evidence supporting liability is legally insufficient; in such cases, a no-evidence review cannot disregard contrary evidence showing the witness was unqualified to give an opinion.

7 Cases that cite this headnote

**[15]** **Appeal and Error**

☛ Extent of Review

If an expert's opinion is based on certain assumptions about the facts, an appellate court conducting legal-sufficiency review cannot disregard evidence showing those assumptions were unfounded.

10 Cases that cite this headnote

**[16] Appeal and Error**
&#128273; Matters or Evidence Considered in Determining Question

An appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis.

5 Cases that cite this headnote

**[17] Appeal and Error**
&#128273; Total failure of proof

Evidence that might be "some evidence" when considered in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent.

4 Cases that cite this headnote

**[18] Appeal and Error**
&#128273; Sufficiency of Evidence in Support

In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla, and thus is legally insufficient, if jurors would have to guess whether a vital fact exists.

138 Cases that cite this headnote

**[19] Appeal and Error**
&#128273; Inferences from facts proved

When the circumstances are equally consistent with either of two facts, neither fact may be inferred, and the appellate court must view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances.

19 Cases that cite this headnote

**[20] Appeal and Error**
&#128273; Sufficiency of Evidence in Support

When the circumstantial evidence of a vital fact is meager, a reviewing court conducting legal-sufficiency review must consider not just

favorable but all the circumstantial evidence, and competing inferences as well.

308 Cases that cite this headnote

**[21] Appeal and Error**
&#128273; Matters or Evidence Considered in Determining Question

An appellate court conducting a legal-sufficiency review cannot disregard undisputed evidence that allows of only one logical inference; by definition, such evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it.

56 Cases that cite this headnote

**[22] Evidence**
&#128273; Uncontroverted evidence
**Trial**
&#128273; Uncontroverted facts or evidence

Jurors are not free to reach a verdict contrary to undisputed evidence that allows of only one logical inference; indeed, uncontroverted issues need not be submitted to a jury at all.

9 Cases that cite this headnote

**[23] Appeal and Error**
&#128273; Sufficiency of Evidence in Support

Undisputed contrary evidence becomes conclusive, and thus cannot be disregarded when conducting legal-sufficiency review, when it concerns physical facts that cannot be denied.

9 Cases that cite this headnote

**[24] Appeal and Error**
&#128273; Sufficiency of Evidence in Support

Undisputed contrary evidence may become conclusive, such that it cannot be disregarded when conducting legal-sufficiency review, when a party admits it is true.

23 Cases that cite this headnote

**[25] Appeal and Error**

Sufficiency of Evidence in Support

Evidence is conclusive, such that it cannot be disregarded during legal-sufficiency review, only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case.

227 Cases that cite this headnote

**[26]** **Appeal and Error**
Sufficiency of Evidence in Support

For purposes of conducting legal-sufficiency review, undisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.

18 Cases that cite this headnote

**[27]** **Appeal and Error**
Sufficiency of Evidence in Support

Proper legal-sufficiency review prevents reviewing courts from substituting their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth.

5 Cases that cite this headnote

**[28]** **Appeal and Error**
Extent of Review

When evidence contrary to a verdict is conclusive, it cannot be disregarded when conducting legal-sufficiency review.

47 Cases that cite this headnote

**[29]** **Appeal and Error**
Sufficiency of Evidence in Support

The standard for legal sufficiency works in tandem with the standard of review—whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated.

28 Cases that cite this headnote

**[30]** **Appeal and Error**
Verdict

Cases involving what a party knew or why it took a certain course of action are not amenable to legal-sufficiency review under the "exclusive" standard, under which all contrary evidence is disregarded.

1 Cases that cite this headnote

**[31]** **Appeal and Error**
Province of jury

**Appeal and Error**
Province of jury or trial court

Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.

134 Cases that cite this headnote

**[32]** **Appeal and Error**
Conclusiveness in General

**Evidence**
Credibility of witnesses in general

Jurors may choose to believe one witness and disbelieve another, and reviewing courts cannot impose their own opinions to the contrary.

76 Cases that cite this headnote

**[33]** **Appeal and Error**
Verdict

Reviewing courts must assume jurors decided all of credibility questions in favor of the verdict if reasonable human beings could do so.

15 Cases that cite this headnote

**[34]** **Evidence**
Uncontroverted evidence

Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses.

5 Cases that cite this headnote

**[35]** **Evidence**



 Testimony of Experts

Uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.

6 Cases that cite this headnote

**[36]    Trial**
 Credibility of Witnesses

Jury's decisions regarding credibility must be reasonable.

1 Cases that cite this headnote

**[37]    Evidence**
 Uncontroverted evidence

Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted.

39 Cases that cite this headnote

**[38]    Evidence**
 Credibility of witnesses in general

Jurors are not free to believe testimony that is conclusively negated by undisputed facts.

20 Cases that cite this headnote

**[39]    Appeal and Error**
 Verdict

Whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal-sufficiency review.

9 Cases that cite this headnote

**[40]    Trial**
 Conflicting evidence

It is the province of the jury to resolve conflicts in the evidence.

25 Cases that cite this headnote

**[41]    Appeal and Error**
 Verdict

Courts reviewing all the evidence in a light favorable to jury's verdict must assume that jurors resolved all conflicts in accordance with that verdict.

27 Cases that cite this headnote

**[42]    Appeal and Error**
 Verdict

In every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their legal-sufficiency review.

35 Cases that cite this headnote

**[43]    Trial**
 Uncontroverted facts or evidence
**Trial**
 Inferences from evidence

Even if evidence is undisputed, it is the province of the jurors to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess.

6 Cases that cite this headnote

**[44]    Appeal and Error**
 Verdict

Courts reviewing all the evidence in a light favorable to the verdict must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their legal-sufficiency review.

77 Cases that cite this headnote

**[45]    Appeal and Error**
 Verdict

Both the "exclusive" standard for scope of no-evidence review, under which contrary evidence is disregarded, and the "inclusive" standard,

under which reviewing court considers all of the evidence in the light favorable to verdict, are correct; the two standards reach the same result.

9 Cases that cite this headnote

**[46]    Appeal and Error**
 Conclusiveness in General

A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within the zone of reasonable disagreement.

152 Cases that cite this headnote

**[47]    Appeal and Error**
 Verdict

**Appeal and Error**
 Inferences from facts proved

Whether a reviewing court conducting legal-sufficiency review starts with all or only part of the record, the court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it; but if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it.

769 Cases that cite this headnote

**[48]    Trial**
 Sufficiency of evidence

Legal sufficiency of the evidence is a question of law, not of fact.

159 Cases that cite this headnote

**[49]    Appeal and Error**
 Sufficiency of Evidence in Support

**Judgment**
 Weight and sufficiency

**Judgment**
 Where directed verdict or binding instructions would have been proper

**Trial**
 Nature and Grounds

The test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict (JNOV), and appellate no-evidence review.

72 Cases that cite this headnote

**[50]    Evidence**
 Sufficiency to support verdict or finding

The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.

692 Cases that cite this headnote

**[51]    Appeal and Error**
 Verdict

Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

1885 Cases that cite this headnote

**[52]    Eminent Domain**
 Weight and sufficiency

**Evidence**
 Nature of Subject

No evidence established that city's approval of revised drainage plans, which resulted in flooding of landowners' farm property, was an intentional taking, although landowners' expert testified that flooding was inevitable, city knew that development would increase runoff at the head of drainage system, and prior drainage plan had required drainage ditch across landowners' property; three sets of engineers had certified that revised plans met city's codes and regulations and thus would not increase downstream flooding, and no evidence showed that city knew more than it was told by the engineers. Vernon's Ann.Texas Const. Art. 1, § 17.

5 Cases that cite this headnote

**[53] Eminent Domain**

    Appeal and error

In conducting legal-sufficiency review of finding that city's approval of revised drainage plans, which resulted in flooding of landowners' farm property, was an intentional taking, appellate court could not disregard contrary evidence explaining why city had approved the revised drainage plans; critical question in the case was city's state of mind, i.e., whether city knew or should have known that flooding was substantially certain, and appellate court could not evaluate what city knew by disregarding most of what it was told. Vernon's Ann.Texas Const. Art. 1, § 17.

6 Cases that cite this headnote

**[54] Evidence**

    Testimony of Experts

When a case involves scientific or technical issues requiring expert advice, jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*807** Dabney D. Bassel, Larry Bracken, Law Snakard & Gambill, P.C., Fort Worth, Douglas H. Conner III, L. Stanton Lowry, Boyle & Lowry, L.L.P., Irving, for petitioner.

James B. Barlow, Barlow & Garsek, Fort Worth, Robert L. Russell Bush, Bush & Morrison, Arlington, David R. Casey, Hurst, for respondents.

Jay Doegey, Assistant City Attorney for the City of Corpus Christi, Texas, Corpus Christi, Theodore P. Gorski Jr., Office of the City Attorney for City of Fort Worth, Mark G. Daniel, Evans Gandy Daniel & Moore, Fritz Quast, Taylor Olson Adkins Sralla & Elam, LLP, Fort Worth, Monte Akers, Texas Municipal League, Austin, Michael A. Bucek,

Senior Assistant City Attorney, Irving, Robert F. Brown, Brown & Hofmeister, L.L.P., Richardson, Bruce S. Powers, Assistant County Attorney, Michael A. Stafford, Harris County Attorney, Houston, for Amicus Curiae.

**Opinion**

Justice BRISTER delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, and Justice GREEN join, and in which Justice O'NEILL and Justice MEDINA joined as to Parts I through IV.

Must an appellate court reviewing a verdict for legal sufficiency start by considering all the evidence or only part? Over the years, we have stated both as the proper scope of review. While some see the standards as opposing, we disagree; like a glass that is half-full or half-empty, both arrive at the same point regardless of where they start.

But both standards must be properly applied. Rules and reason sometimes compel that evidence must be credited or discarded whether it supports a verdict or contradicts it. Under either scope of review, appellate courts must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. As we find the evidence here meets neither standard, we reverse.

**I. Factual and Procedural History**

The City of Keller is one of several fast-growing communities on the outskirts of **\*808** Fort Worth. [1] As part of that growth, the City approved plans for two new subdivisions, Estates of Oak Run and Rancho Serena, including plans for storm water drainage.

The Wilsons own property southeast of the new subdivisions, with a tract owned by Z.T. Sebastian lying between. Before development, surface water flowed generally north to south from the land where the subdivisions were built, across the Sebastian and Wilson properties, and into the Little Bear Creek Watershed.

In 1991, the City adopted a Master Drainage Plan providing for drainage easements across both the Sebastian and Wilson properties, and thence into Little Bear Creek. The City's codes require developers to comply with the Master Plan, to provide

drainage for a 100–year rain event, and to avoid increasing the volume or velocity of water discharged upon downhill properties.

The developers of Oak Run and Rancho Serena submitted plans to the City indicating they would buy a drainage easement and build a ditch forty-five feet wide and more than two hundred yards long across the Sebastian property, and deed both to the City upon completion. [2] The plans also included detention basins on the subdivision properties, but omitted any drainage easement or ditch across the Wilsons' property. The City's director of public works approved the developers' plans, and the City accepted the works on completion.

In accordance with the Master Plan, the City built a box culvert south of the Wilsons' property. But as the developers' drainage ditch ended at the Wilsons' north property line, there was no link between the two. The Wilsons alleged and the jury found this omission increased flooding on the Wilsons' property, ruining eight acres of farmland the jury valued at almost $300,000.

 [1]    To recover damages for inverse condemnation, the Wilsons had to prove the City intentionally took or damaged their property for public use, or was substantially certain that would be the result. [3] They do not allege the City intentionally flooded their land, but do allege it approved revised plans that it knew were substantially certain to have that effect.

The City contends no evidence supports the jury's finding of an intentional taking. It presented evidence that engineers for the developers, for the City, and for an outside firm the City retained all certified that the revised drainage plan complied with the City's codes and regulations—including the ban against increasing downstream runoff. Thus, the City asserts it had no reason to be substantially certain the opposite would occur, until it did.

A divided court of appeals rejected this contention. [4] In its legal sufficiency review, the court refused to consider the various engineers' certifications because "we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary." [5] The City challenges **\*809** this omission as applying the wrong scope of review.

We have on many occasions stated the scope of review precisely as the court of appeals says (the "exclusive" standard). [6] But we have also stated that a reviewing court must consider "*all* of the evidence" in the light favorable to the verdict (the "inclusive" standard). [7] Sometimes we have mentioned neither reviewing all evidence nor disregarding some part of it. [8] Finally, we have sometimes expressly mentioned both. [9]

Although this Court has used both the exclusive and the inclusive standards interchangeably over the years, commentators say the two are different. [10] Because this **\*810** important issue is dispositive here, we address it in some detail, and reserve for another day the City's arguments that a governmental entity cannot be liable for approving a developer's plans, or accepting rather than constructing the works at issue.

## II. Contrary Evidence That Cannot Be Disregarded

The question presented here is not a new one. More than 40 years ago, then Justice Calvert [11] addressed the standards for reviewing legal and factual sufficiency in the most-cited law review article in Texas legal history. [12] Frustrated that despite this Court's efforts to explain those standards "a growing number of recent decisions indicate a continuing misunderstanding," [13] the author summarized and attempted to clarify Texas law up to 1960. [14] The article's impact remains substantial today, having been cited more than 100 times by Texas courts in the last five years.

According to the article:

> "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact. [15]

We have quoted a similar formulation on many occasions. [16]

Notably, Justice Calvert then proceeded to put the question before us in the proper context:

> It is in deciding "no evidence" points in situation (c) that the courts follow the further rule of viewing the evidence in its most favorable light in support of the finding of the vital fact, considering only the evidence and the inferences which support the finding and rejecting the evidence and the inferences which are contrary to the finding. [17]

 **[2]** Clearly, the traditional rule in Texas has never been that appellate courts must reject contrary evidence in every no-evidence review. Instead, the traditional scope of review does not disregard contrary evidence if there is no favorable evidence **\*811** (situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above).

 **[3]** **[4]** As the following examples show, this has remained the rule since. We do not presume to categorize all circumstances in which contrary evidence must be considered in a legal sufficiency review. Evidence can be disregarded whenever reasonable jurors could do so, [18] an inquiry that is necessarily fact-specific. But it is important that when courts use the exclusive standard and disregard contrary evidence, they must recognize certain exceptions to it.

### A. Contextual Evidence

In Justice Calvert's first situation—a complete absence of evidence of a vital fact—it is generally irrelevant whether a reviewing court considers contrary evidence. [19] If supporting evidence is absent, opposing evidence cannot change that result. But in a number of cases, the lack of supporting evidence may not appear until all the evidence is reviewed in context.

 **[5]** **[6]** For example, publications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself. [20] A court reviewing legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict. [21]

 **[7]** **[8]** Similarly, reviewing courts must construe contracts as a whole; we do not consider only the parts favoring one party and disregard the remainder, as that would render the latter meaningless. [22] Even writings executed at different times must be considered together if they pertain to the same transaction. [23]

 **[9]** It is not just writings that reviewing courts must consider in context. For example, in reviewing intentional infliction of emotional distress claims for legal sufficiency, "we consider the context and the relationship between the parties." [24] Acts that might constitute outrageous conduct when dealing with a hearing-impaired consumer [25] may be legally insufficient between **\*812** business parties. [26] In our no-evidence reviews of successful claims, we have invariably reviewed not just evidence showing the conduct was outrageous, but also evidence showing that, in context, it was not. [27]

 **[10]** More generally, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did. [28] If a witness's statement "I did not do that" is contrary to the jury's verdict, a reviewing court may need to disregard the whole statement, but cannot rewrite it by disregarding the middle word alone.

 **[11]** Thus, if evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded even if that means rendering judgment contrary to the jury's verdict. Either "evidence contrary to the verdict" must be defined to exclude material contextual evidence, or it must be an exception to the general rule.

### B. Competency Evidence

 **[12]** **[13]** It has long been the rule in Texas that incompetent evidence is legally insufficient to support a judgment, even if admitted without objection. [29] Thus, evidence showing it to be incompetent cannot be disregarded, even if the result is contrary to the verdict. If the rule were

otherwise, incompetent evidence would *always* be legally sufficient, because the evidence showing it to be incompetent could never be considered.

Thus, for example, if an eyewitness's location renders a clear view of an accident "physically impossible," it is no evidence of what occurred, even if the eyewitness thinks otherwise.[30] Similarly, an employee's testimony that he was in the course and scope of his employment is legally insufficient to support a verdict against his employer if the evidence shows that legal conclusion to be incompetent.[31]

 **[14]**   **[15]**   This exception frequently applies to expert testimony. When expert testimony is required, lay evidence supporting liability is legally insufficient.[32] In **\*813** such cases, a no-evidence review cannot disregard contrary evidence showing the witness was unqualified to give an opinion.[33] And if an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded.[34]

 **[16]**   After we adopted gate-keeping standards for expert testimony,[35] evidence that failed to meet reliability standards was rendered not only inadmissible but incompetent as well.[36] Thus, an appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis.[37] Similarly, review of an expert's damage estimates cannot disregard the expert's admission on cross-examination that none can be verified.[38]

 **[17]**   Thus, evidence that might be "some evidence" when considered in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent. Again, such evidence cannot be disregarded; it must be an exception either to the exclusive standard of review or to the definition of contrary evidence.

### C. Circumstantial Equal Evidence

As noted above, Justice Calvert believed the exclusive standard applied only when a no-evidence challenge asserted the evidence was no more than a scintilla.[39] But he went on to note a "variation" that required contrary inferences to be considered when the equal-inference rule applied.[40]

 **[18]**   **[19]**   In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists.[41] "When the circumstances are equally consistent with either of two facts, neither fact may be inferred."[42] In such cases, we must "view each piece of circumstantial **\*814** evidence, not in isolation, but in light of all the known circumstances."[43]

Justice Calvert argued there was "no necessity for the variation" because drawing an inference based on meager evidence was unreasonable whether or not the reviewing court considered the opposing inferences.[44] Nevertheless, he recognized that "[t]he opposing inference is present and it does no harm to note its presence."[45]

In subsequent cases this Court has continued to note rather than disregard the presence of equal but opposite inferences, often because lower courts have overlooked them. Thus, for example, one might infer from cart tracks in spilled macaroni salad that it had been on the floor a long time, but one might also infer the opposite—that a sloppy shopper recently did both.[46] Similarly, when injury or death occurs without eyewitnesses and only meager circumstantial evidence suggests what happened, we cannot disregard other meager evidence of equally likely causes.[47]

 **[20]**   Thus, when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

### D. Conclusive Evidence

 **[21]**   **[22]**   Next, Justice Calvert noted that Texas courts conducting a no-evidence review traditionally do not disregard contrary evidence that conclusively establishes the opposite of a vital fact.[48] He argued that this is to some extent not a "true" no-evidence claim, as proponents may have to show not only that no evidence supports the verdict but that the opposite was proved as a matter of law.[49] There are several types of conclusive evidence. First, an appellate court conducting a legal sufficiency review cannot "disregard undisputed evidence that allows of only one logical inference."[50] By definition, such evidence can be

viewed in only one light, and reasonable jurors can reach only one conclusion from it. Jurors are not free to reach a verdict contrary to such evidence;[51] indeed, uncontroverted issues **\*815** need not be submitted to a jury at all.[52]

Reviewing legal sufficiency in such cases encompasses a general no-evidence review, because if some evidence supports the verdict then the contrary evidence was not "undisputed." But the review does not stop there; the evidence must also have only one logical inference. Undisputed evidence that reasonable jurors could disbelieve has two: (1) it is true, or (2) it is not.

 **[23]**     Most often, undisputed contrary evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied. Thus, no evidence supports an impaired-access claim if it is undisputed that access remains along 90 percent of a tract's frontage.[53] Evidence that a buyer believed a product had been repaired is conclusively negated by an accompanying letter to the contrary.[54] And an insured's liability has not been determined by an "actual trial" if the insured did not appear, present evidence, or challenge anything presented by his opponent.[55]

 **[24]**     Undisputed contrary evidence may also become conclusive when a party admits it is true. Thus, a claimant's admission that he was aware of a dangerous premises condition is conclusive evidence he needed no warning about it.[56] Similarly, an ex-employee's admission that she obtained other employment may prove conclusively that she did not detrimentally rely on a defendant's promise to re-hire her.[57] And jurors may not find that an indictment was based on a defendant's misleading report when the district attorney admits it was his own mistake.[58]

 **[25]**     It is impossible to define precisely when undisputed evidence becomes conclusive. For example, an injured employee's return to work may prove conclusively that an injury was not total,[59] or it may not.[60] Circumstances in which a body is found may conclusively establish suicide,[61] or allow **\*816** jurors to infer otherwise.[62] Evidence is conclusive only if reasonable people could not differ in their conclusions,[63] a matter that depends on the facts of each case.

 **[26]**     There is another category of conclusive evidence, in which the evidence *is* disputed. Undisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.

Thus, for example, in *Murdock v. Murdock,* we found no evidence to support a verdict establishing the defendant's paternity when blood tests conclusively proved he was not the child's father.[64] The evidence was directly disputed—the child's mother testified she had conjugal relations with no one else during the relevant time.[65] Nevertheless, we held there was no evidence to support the paternity verdict because of conclusive evidence to the contrary.[66]

Similarly, in *Texas & New Orleans Railroad Co. v. Compton,* we found no evidence that a railroad's negligence caused an automobile to slam into the sixtieth car of a slow-moving train.[67] Again, the evidence was hotly disputed—while railroad witnesses testified that warning signs were in place at the crossing, the car's driver and a passenger testified they saw nothing, and would have been able to stop if they had.[68] Nevertheless, we held there was no evidence to support the claim because, if the driver could not see the side of a train before he hit it, he could not have seen a crossing sign either.[69]

Of course, there are few instances in which disputed evidence is conclusive, and many instances in which undisputed evidence is not. As our sister court has noted, testimony by a paid informant is legally sufficient to support a conviction, even if "[t]wenty nuns testify that the defendant was with them at the time, far from the scene of the crime ... [and] [t]wenty more nuns testify that they saw the informant commit the crime."[70] But a more famous clerical hypothetical by Judge Learned Hand shows the opposite limit:

> If, however, it were proved by twenty bishops that either party, when he used the words [in a contract], intended something else than the usual meaning which the law imposes upon them, he would still be held....[71]

While jurors may generally believe either sinners or saints, their discretion is limited when it is proved beyond question that an "eyewitness" was actually far away in prison or totally blind on the day of the crime.

**[27]** **[28]** Proper legal-sufficiency review prevents reviewing courts from substituting **\*817** their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth. When evidence contrary to a verdict is conclusive, it cannot be disregarded.

### E. Clear–and–Convincing Evidence

**[29]** Since the time of Justice Calvert's article, new claims and burdens of proof have arisen that require additions to the four types of no-evidence review Justice Calvert considered exhaustive. Beginning with the United States Supreme Court's opinion in *Jackson v. Virginia,* appellate courts have recognized that, while "one slender bit of evidence" may be all a reviewing court needs to affirm a verdict based on the preponderance of the evidence, a higher burden of proof requires a higher standard of review.[72] As we recently stated, the standard for legal sufficiency works in tandem with the standard of review—"whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated."[73] If the rule were otherwise, legally sufficient evidence to support a preponderance-of-the-evidence verdict would satisfy the higher burdens as well, thus rendering their differences meaningless.[74]

Accordingly, we have held that a legal sufficiency review must consider *all* the evidence (not just that favoring the verdict) in reviewing cases of parental termination,[75] defamation,[76] and punitive damages.[77] In such cases, again, evidence contrary to a verdict cannot be disregarded.

### F. Consciousness Evidence

**[30]** Further, we have had to particularize legal-sufficiency review in cases involving what a party knew or why it took a certain course, as they are not amenable to review under the exclusive standard.

Long before gross negligence had to meet a clear-and-convincing burden, we recognized in *Burk Royalty Co. v. Walls* that no-evidence review of such findings had to include "all of the surrounding facts, circumstances, and conditions, not just individual elements or facts."[78] As then Chief Justice Greenhill noted in concurring, speeding and running

a red light may not be legally sufficient evidence of gross negligence if one's wife and daughter are bleeding to death in the back seat.[79] Reviewing courts assessing evidence of conscious indifference cannot disregard part of what a party was conscious of.[80]

For the same reasons, the exclusive standard of review has proven problematic in insurance bad-faith cases. Liability in **\*818** such cases requires proof that the insurer denied coverage after it became reasonably clear.[81] But that standard will always be met if reviewing courts must disregard any evidence that coverage was unclear.[82] Subsequent cases show that reviewing courts are in fact looking at *all* the evidence to determine whether coverage was reasonably clear.[83]

This problem arises in other contexts as well. In discrimination cases, discharged employees will never have to prove that the reason given for termination was a pretext if no-evidence review must disregard that reason.[84] Government officials will never be entitled to immunity if we consider only evidence suggesting they should have acted differently.[85] And limitations will never run under the discovery rule if reviewing courts must disregard all evidence that claimants knew of their claims.[86]

This is not to say a reviewing court may credit a losing party's explanations or excuses if jurors could disregard them. For example, while an insurer's reliance on an expert report may foreclose bad faith recovery,[87] it will not do so if the insurer had some reason to doubt the report.[88] But a reviewing court cannot review whether jurors could reasonably disregard a losing party's explanations or excuses without considering what they were.

### III. Contrary Evidence That Must Be Disregarded

As trials normally focus on issues that jurors could decide either way, reviewing **\*819** courts must disregard evidence contrary to the verdict far more often than they must consider it. Just as no-evidence review that starts by disregarding contrary evidence often must end up considering considerably more, no-evidence review that begins by considering all the evidence must usually end up considering considerably less.

Again, we do not presume to categorize all circumstances in which contrary evidence must be disregarded; a few examples serve to demonstrate that even under the inclusive standard, viewing all the evidence in a light favorable to the verdict often requires that much of it be disregarded.

### A. Credibility Evidence

**[31]** **[32]** Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.[89] They may choose to believe one witness and disbelieve another.[90] Reviewing courts cannot impose their own opinions to the contrary.[91]

**[33]** Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it.[92]

For example, viewing the evidence in the light favorable to the verdict means that if both parties in a traffic accident testify they had the green light, an appellate court must presume the prevailing party did and the losing party did not. If the parties to an oral contract testify to conflicting terms, a reviewing court must presume the terms were those asserted by the winner. When all the evidence is viewed in the light most favorable to the jury verdict, some of it must be completely discounted. Though not disregarded at the outset, the end result is the same.

This has always been our practice in cases using the inclusive scope of review. Thus, we have concluded that a bailee sold cotton without the bailor's consent, despite the former's denials, because the jury verdict favored the latter.[93] And we have affirmed a gross negligence verdict based on testimony that the defendant's speed was 80 miles per hour, without mentioning his own testimony to a speed half that.[94]

**[34]** **[35]** Nor is it necessary to have testimony from both parties before jurors **\*820** may disbelieve either. Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses.[95] Thus, an architect's uncontradicted testimony that he relied on a 20–year warranty was not binding on jurors when the bid specifications he prepared included only much shorter warranties.[96] Nor was an insured's uncontradicted testimony about lost furnishings binding on jurors when the fire scene contained several indications of arson but few of burnt furniture.[97] Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.[98]

**[36]** **[37]** **[38]** **[39]** Of course, "[t]he jury's decisions regarding credibility must be reasonable."[99] Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted.[100] And as noted above, they are not free to believe testimony that is conclusively negated by undisputed facts. But whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review.

### B. Conflicting Evidence

**[40]** **[41]** It is the province of the jury to resolve conflicts in the evidence.[101] Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict.[102]

Again, this has always been the case even in those cases using the inclusive scope of review. For example, in such cases we have sometimes detailed only the evidence that supported a jury's fraud finding.[103] We have affirmed a bad-faith verdict for legal sufficiency despite "significant evidence" that the insurer acted in **\*821** good faith.[104] We have found some evidence of lost profits, even though income tax returns showed the contrary.[105] And we have affirmed a jury's negligence finding despite a defendant's evidence asserting it could not have prevented the accident.[106]

In none of these cases did we state that the scope of review required us to disregard evidence contrary to the verdict; instead, we started by considering the entire record in each. But in each case we either discounted or never mentioned conflicting evidence contrary to the verdict because viewing

the evidence in the light favorable to the verdict required us to do so.

Of course, it is not always clear whether evidence is conflicting. Evidence is not conflicting just because the parties cannot agree to it. For example, evidence that a hospital controlled a doctor's rotation and patient assignments raises no material conflict with evidence that a different entity controlled the details of medical treatment, as only the latter is material in a malpractice case. [107] Similarly, evidence showing the terms of one loan does not conflict with undisputed evidence that the parties never reached an agreement regarding the terms of another. [108]

 **[42]**    But in every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their legal sufficiency review.

### C. Conflicting Inferences

 **[43]**    Even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess. Thus, in product liability cases jurors may find evidence of a defect from subsequent modifications, even if there were plenty of other reasons for the changes. [109] Even if a defendant admits approaching an intersection from the wrong way on a one-way street, jurors may infer the plaintiff failed to keep a proper lookout, as that is one possible inference from the accident itself. [110] Similarly, jurors may infer that relatives tore down posters of a missing child to assist the child's father, even though another inference was that the signs simply embarrassed them. [111]

 **[44]**    Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their legal sufficiency review.

### IV. Reconciling the Standards

 **[45]**    Having noted the dual lines of authority stating the scope of no-evidence review, and the proper application and

exceptions to each, we turn to the question of which one is correct. For the reasons  **\*822**  discussed below, we believe the answer is both.

### A. Goals: The Standards Must Be The Same

 **[46]**    Whether a court begins by reviewing all the evidence or disregarding part in a legal-sufficiency review, there can be no disagreement about where that review should end. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. [112] A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement. [113]

 **[47]**    Similarly, there is no disagreement about how a reviewing court should view evidence in the process of that review. Whether a reviewing court starts with all or only part of the record, the court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. [114] But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it. [115]

Given these premises, it is no coincidence that the two standards should reach the same result—indeed they *must.* Any scope of appellate review smaller than what reasonable jurors could believe will reverse some verdicts that are perfectly reasonable; any scope of review larger than what reasonable jurors could believe will affirm some verdicts that are not.

 **[48]**    Further, the two must coincide if this Court is to perform its constitutional duties. Although factual sufficiency has been the sole domain of the intermediate appellate courts in Texas since 1891, our jurisdiction has always included legal sufficiency, as that is a question of law, not of fact. [116] Construing either standard to require us to do less would be just as unconstitutional as construing either to allow us to do more.

This is not to say judges and lawyers will always agree whether evidence is legally  **\*823**  sufficient. As discussed more fully below, reasonable people may disagree about what reasonable jurors could or must believe. But once those boundaries are settled, *any* standard of review must coincide with those boundaries—affirming jury verdicts based on

evidence within them and reversing jury verdicts based on evidence that is not. Any standard that does otherwise is improperly applied.

### B. Other Motions: The Standards Must Be The Same

[49]     Just as the scope of no-evidence review must coincide with its goals, the scope of review should not depend upon the motion in which it is asserted. Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise. Accordingly, the test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.

Our statements of the standard for reviewing a directed verdict present the same mixed bag found with general no-evidence review. We have most often used the exclusive standard, stating that courts reviewing directed verdicts must consider only evidence supporting the nonmovant's case and disregard all contrary evidence. [117] But we have also stated that reviewing courts should use the inclusive standard, considering all the evidence in a light contrary to the directed verdict. [118] And we have sometimes stated both, requiring reviewing courts to consider all the evidence in a light contrary to the directed verdict and then to disregard all conflicting evidence that supports it. [119]

By contrast, cases concerning judgments non obstante veredicto most often utilize the inclusive scope of review. Beginning with the 1931 amendment authorizing trial judges to grant them, [120] we have generally reviewed such orders by considering all the evidence in a light favorable to the *824 verdict that was set aside. [121] In later years we have sometimes adopted the exclusive standard, [122] but our opinions doing so usually cite to general no-evidence cases in which no judgment n.o.v. was involved. [123]

The one exception in which both standards do not expressly appear is in the scope of review for summary judgments. Here, there is only one standard—a reviewing court must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. [124] Reviewing courts do *not* disregard the evidence supporting the motion; *825 if they did, all summary judgments would be reversed.

In practice, however, a different scope of review applies when a summary judgment motion is filed without supporting evidence. [125] In such cases, evidence supporting the motion is effectively disregarded because there is none; under the rule, it is not allowed. Thus, although a reviewing court must consider all the summary judgment evidence on file, in some cases that review will effectively be restricted to the evidence contrary to the motion.

The standards for taking any case from the jury should be the same, no matter what motion is used. If only one standard were proper, we would not expect both to appear in cases reviewing directed verdicts, judgments notwithstanding the verdict, and summary judgments. But both do.

### C. Federal Courts: The Standards Are The Same

The federal courts have had a similar split of authority between the inclusive and exclusive standards for scope of review. But no longer—the United States Supreme Court recently concluded in *Reeves v. Sanderson Plumbing Products, Inc.* that the two tests are the same. [126]

Under Rule 50 of the federal rules of procedure, a court should render judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." [127] In deciding whether all or only part of the evidence should be considered, the Supreme Court stated:

The Courts of Appeals have articulated differing formulations as to what evidence a court is to consider in ruling on a Rule 50 motion. Some decisions have stated that review is limited to that evidence favorable to the nonmoving party, while most have held that review extends to the entire record, drawing all reasonable inferences in favor of the nonmovant.

On closer examination, this conflict seems more semantic than real. Those decisions holding that review under Rule 50 should be limited to evidence favorable to the nonmovant appear to have their genesis in *Wilkerson v. McCarthy* [128] . In *Wilkerson,* we stated that "in passing upon whether there is sufficient evidence to submit an

issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of" the nonmoving party. [129] But subsequent decisions have clarified that this passage was referring to the evidence to which the trial court should *give credence,* not the evidence that the court should *review.* In the analogous context of summary judgment under Rule 56, we have stated that the court must review the record "taken as a whole." And the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." It therefore follows that, in entertaining a motion for judgment as a **\*826** matter of law, the court should review all of the evidence in the record. [130]

We address the Supreme Court's conclusion as to the most appropriate standard below; the relevant point here is its conclusion that differences between the inclusive and exclusive standards are more semantic than real.

### D. Objections: The Standards Are Not The Same

While we have used the two standards for the scope of review interchangeably for many years in many different contexts, several arguments suggest they are not the same.

First, the courts of appeals often use the two standards in illustrations of the difference between legal and factual sufficiency, with the exclusive standard tied to the former and the inclusive standard to the latter:

> When [reviewing] legal sufficiency, we consider *only* the evidence and inferences that tend to support the award of damages and disregard all evidence and inferences to the contrary.... When we review factual sufficiency, we consider and weigh *all* of the evidence and will set aside the verdict only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. [131]

But there have always been exceptions to this distinction. [132] As demonstrated in Parts II and III above, it is generally true that the *result* of legal-sufficiency review is to disregard contrary evidence, but there are exceptions when a reviewing

court cannot. It is not surprising that in drawing the general distinction between legal and factual sufficiency, courts have not complicated that distinction by listing the several exceptions in which the scope of review—though not the standard of review—may overlap.

Second, it has been argued that the exclusive standard "is an important prophylactic" against invasion of the jury's province, as appellate judges are less likely to consider contrary evidence when they should not if the exclusive standard is used. [133] But if that is true, the opposite should also be the case—appellate courts are less likely to consider contrary evidence *when they must* (as shown in Part II) if the exclusive standard is used. No matter which standard is used, appellate courts must take care not to consider or disregard too little or too much.

**\*827** Conversely, several factors appear to favor application of the inclusive standard. First, when we have said "we must look only at that evidence which tends to support the judgment," [134] we could not have been speaking literally; no glasses filter evidence, and judges cannot abandon such judgments to law clerks or litigants. It is often hard to say whether evidence does or does not support a verdict —the same facts may support different conclusions, [135] or may support one part of a verdict but not another. [136] Nor can evidence supporting a verdict be identified by which party offered it—parties depend on admissions and cross-examination during their opponent's case, and minimize damaging evidence by presenting it during their own. As a practical matter, a court cannot begin to say what evidence supports a verdict without reviewing it all.

Second, an appellate court that begins by disregarding one party's evidence may strike many citizens as extending something less than justice for all. Concerns about open government and open courts suggest an appellate process that considers all the evidence, though deferring to the jury's verdict. While there is some dispute whether Lady Justice should wear a blindfold, [137] the metaphor was surely never intended to suggest that justice disregards the facts.

In sum, the exclusive standard is helpful in recognizing the distinctive roles of judge and jury, intermediate and supreme court. By contrast, the inclusive standard is helpful in recognizing what courts actually do, and must be seen to do. Both are important; we should avoid choosing between them if we can.

### E. Conclusion: The Standards Are The Same

As both the inclusive and exclusive standards for the scope of legal-sufficiency review have a long history in Texas, as both have been used in other contexts to review matter-of-law motions, as the federal courts have decided the differences between the two are more semantic than real, and as both—properly applied—must arrive at the same result, we see no compelling reason to choose among them.

 [50]    [51]    The key qualifier, of course, is "properly applied." The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

While judges and lawyers often disagree about legal sufficiency in particular cases, **\*828** the disagreements are almost always about what evidence jurors can or must credit and what inferences they can or must make. It is inevitable in human affairs that reasonable people sometimes disagree; thus, it is also inevitable that they will sometimes disagree about what reasonable people can disagree about. This is not a new problem; Justice Calvert noted it almost fifty years ago:

> The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence. The application of the rule can lead to strange results. It is theoretically possible, and sometimes not far from actual fact, that five members of the Supreme Court will conclude that the evidence supporting a finding of a vital fact has no probative force, and in reaching the conclusion through application of the rule will thus hold, in effect, that the trial judge who overruled a motion for instructed verdict, the twelve jurors who found the existence of the vital fact, the three

justices of the Court of Civil Appeals who overruled a "no evidence" point of error and four dissenting justices of the Supreme Court are not men [138] of "reasonable minds." [139]

It is not hubris that occasionally requires an appellate court to find a jury verdict has no reasonable evidentiary basis. As Justice Frankfurter stated long ago:

> Only an incompetent or a wilful judge would take a case from the jury when the issue should be left to the jury. But since questions of negligence are questions of degree, often very nice differences of degree, judges of competence and conscience have in the past, and will in the future, disagree whether proof in a case is sufficient to demand submission to the jury. The fact that [one] thinks there was enough to leave the case to the jury does not indicate that the other [is] unmindful of the jury's function. The easy but timid way out for a trial judge is to leave all cases tried to a jury for jury determination, but in so doing he fails in his duty to take a case from the jury when the evidence would not warrant a verdict by it. A timid judge, like a biased judge, is intrinsically a lawless judge. [140]

### V. Application to the Facts

It remains to apply the scope of review to the facts presented.

 [52]    A majority of the court of appeals affirmed the verdict for the Wilsons, finding legally sufficient evidence that the City knew increased flooding on the Wilsons' property was substantially certain to occur. [141] The majority pointed to the following proof. First, the Wilsons' expert testified that the revised plan was certain to **\*829** create flooding. [142] Second, as the City admittedly knew that development would increase runoff and the Sebastian ditch would channel it toward the Wilsons, so it knew "with absolute certainty" that flooding would be the result. [143] Third, the City "did

not explain" why the Master Plan required a drainage ditch across the Wilsons' property but the revised plan did not, thus allowing jurors to infer that the City knew this omission would cause flooding. [144]

 **[53]**   Of course, the City *did explain* why it approved the new plan—because three sets of engineers said the omitted ditch was unnecessary—but the court felt compelled by the scope of review to disregard that evidence.

For several of the reasons stated earlier, we believe the court of appeals did not properly apply the scope of review. The critical question in this case was the City's state of mind— the Wilsons had to prove the City *knew* (not should have known) that flooding was substantially certain. A reviewing court cannot evaluate what the City knew by disregarding most of what it was told.

 **[54]**   Moreover, when a case involves scientific or technical issues requiring expert advice (as this one does), jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so. [145] Here, it was uncontroverted that three sets of engineers certified that the revised plans met the City's codes and regulations—and thus would not increase downstream flooding. The same firm that drew up the original Master Plan certified the revised one; unless the City had some reason to know the first certification was true and the second one was false (of which there was no evidence), there was only one logical inference jurors could draw.

None of the evidence cited by the court of appeals showed the City knew more than it was told by the engineers. The Wilsons' expert testified that flooding was (in his opinion) inevitable, but not that *the City* knew it was inevitable. The Wilsons' expert gave no opinion on the latter point.

Second, ending a ditch at a neighbor's property line may be evidence that a defendant was substantially certain of the result in some cases, but not in the context of this one. City witnesses admitted knowing development would increase runoff at the head of this drainage system, but not flooding at its foot. Calculating the effect of detention ponds and absorption in a grassy drainage ditch forty-five feet wide and over two hundred yards long required hydrological formulas, computer models, and mathematical calculations. The omission of the ditch across the Wilsons' property obviously raised concerns that the City investigated, but was

no evidence that the City knew the advice it received in response was wrong.

The Wilsons also point to a letter Sebastian's attorney wrote the City demanding indemnity in case the new ditch flooded the Wilsons. But attorneys must protect a client from potential liability whether it is **\*830** real or imagined—and justly so. In the letter, the attorney never purports to be an expert in hydrology, or cite the opinions of anyone who was. This letter may have required the City to investigate, but again is no evidence it knew the advice it received was wrong. [146]

Our concurring colleagues believe reasonable jurors could nevertheless disregard what all the engineers certified because the City had a financial incentive to believe them rather than pay the Wilsons. Of course, defendants have a financial incentive to avoid paying damages in every case; if that incentive alone is some evidence of liability, then plaintiffs create enough evidence to go to the jury every time they file suit.

But more important, this ignores what the Wilsons had to prove—not that the City *might* have disbelieved the engineers' reports, but that it *did.* This requires evidence of "objective indicia of intent" showing the City knew identifiable harm was occurring or substantially certain to result. [147] Jurors' doubts about the engineers' reports or the City's motives could not supply them with objective indicia that the City knew flooding would occur. Constitutional concerns about the roles of judge and jury do not allow either to make such evidence up.

We agree with the court of appeals that the Wilsons presented some evidence that the City damaged their property, and that in drawing up and approving drainage plans it was acting for a public purpose. The missing piece in the evidence here is proof that the City knew the plans it approved were substantially certain to increase flooding on the Wilsons' properties. While the City certainly knew that fact after the flooding started, the Wilsons never pleaded or submitted to the jury any takings theory other than the City's initial approval.

Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we hold there was no evidence the City's approval of the revised drainage plan was an intentional taking.

Accordingly, we reverse the court of appeals' judgment against the City under article I, section 17 of the Texas Constitution. Because the court of appeals declined to address the jury's alternate verdict for the Wilsons on a claim under the Texas Water Code, we remand the case to that court to determine that issue.

Justice O'NEILL filed a concurring opinion in which Justice MEDINA joined.

Justice JOHNSON did not participate in the decision.

Justice O'NEILL, joined by Justice MEDINA, concurring.

The Court does an excellent job of explaining the appropriate scope of no-evidence review: the reviewing court "must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." 168 S.W.3d at 807. I agree with this standard and join Parts I through IV of the Court's opinion. But I cannot join Part V, because the Court misapplies the standard that it so carefully **\*831** articulates by crediting evidence the jury could reasonably disregard.

The City of Keller's Master Drainage Plan required it in part to condemn a 2.8–acre drainage easement on the Wilson property for construction of an earthen channel forty-five feet wide and five feet deep that would funnel water from the adjoining Sebastian property over the Wilson property into the Little Bear Creek Watershed. The City chose not to proceed with this portion of the plan, though, claiming reliance on engineers' assurances that the developers' installation of retention ponds on neighboring land could prevent flooding. The drainage channel that was actually built ended at the edge of the Sebastian property and funneled water directly onto the Wilsons' land, destroying eight acres of farmland worth almost $300,000. The Court holds that the jury was required to believe the City's testimony that it relied on the engineers' assurances and thus did not know flooding was substantially certain to occur, stating that when a case requires expert testimony "jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so." 168 S.W.3d at 829. Even if this were an appropriate review standard—which it hasn't been until today—I believe the jury had a reasonable basis upon which to disregard the City's professed reliance; the City had a financial incentive to disclaim knowledge of the flooding,

and the Wilsons presented some evidence that the City had independent knowledge flooding was substantially certain to occur. In my view, the jury was the proper body to weigh the witnesses' credibility and resolve these disputed fact issues. I nevertheless agree that the City cannot be liable for a taking in this case because I believe that a city's mere act of approving a private development plan cannot constitute a taking for public use. Accordingly, I concur in the Court's judgment but not its reasoning.

I

Questions of intent are generally proved only by circumstantial evidence; as the court of appeals in this case aptly noted, "defendants will rarely admit knowing to a substantial certainty that given results would follow from their actions," and therefore the jury must be "free to discredit defendants' protestations that no harm was intended and to draw inferences necessary to establish intent." 86 S.W.3d 693, 704. I agree with the Court that the jury's ability to disbelieve the City's protestations is not itself "evidence of liability." 168 S.W.3d at 830. Instead, the jury's ability to weigh the witnesses' credibility means that the City's testimony did not conclusively establish its lack of liability. Because liability is not conclusively negated, we must examine the record to see if there is legally sufficient evidence from which the jury could infer that the City knew flooding was substantially certain to occur. I would hold that the evidence of intent that was presented in this case allowed the jury to draw such an inference.

At trial, the Wilsons presented evidence that the City had independent sources of knowledge that flooding was substantially certain to occur. First, they demonstrated that the developers' plan itself was flawed. Rather than incorporate a drainage ditch running across the Wilson property, as the City's Master Plan required, the developers' plan ended the drainage ditch abruptly at the edge of the Wilson property. The Wilsons' expert testified that the plan's implementation would necessarily "increase the volume and flow of water across the Wilson property from the rate of fifty-five cubic feet per second to ninety-three cubic feet per second." **\*832** 86 S.W.3d at 703. Second, the City was aware that water flowed across the Wilson property before the development commenced, and, as the court of appeals pointed out, the City's Director of Public Works admitted that the City knew the development would increase the water's flow and velocity; specifically, he testified that "the City knew the upstream

water would be absorbed less and would flow faster due to the removal of trees and vegetation from the developments and from the forty-five-foot-wide earthen channel" that ended at the Wilson property's edge. *Id.* at 705. Finally, there was evidence that the City received a letter warning that the developers' plan would subject the Wilson property to flooding.

While I believe there is some evidence that the City knew flooding was substantially certain to occur, there is also some evidence that it did not. City officials testified that they relied on the representations of engineers who assured them retention ponds could substitute for a drainage easement and the Wilson property would not be damaged. If the jury accepted this evidence as true, I agree that the intent element would be negated, which would preclude the City's takings liability. But I do not agree that the jury was bound to accept the City's testimony as true. The Court itself notes that jurors "may choose to believe one witness and disbelieve another," and that "[c]ourts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." 168 S.W.3d at 819. This statement mirrors our prior jurisprudence, which has long provided that a jury "has several alternatives available when presented with conflicting evidence" because it "may believe one witness and disbelieve others," "may resolve inconsistencies in the testimony of any witness," and "may accept lay testimony over that of experts." *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986) (citations omitted).

As the Court itself states, jurors are required to credit undisputed testimony only when it is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." 168 S.W.3d at 820. The City's testimony does not meet this standard. The City Manager did testify that the City "would not have approved the developments unless [it was] assured that the developments did not increase the velocity of water or the flow of water" onto the neighboring property. 86 S.W.3d at 706. But the Wilsons disputed whether the City's protestations were credible, pointing out that the City had a powerful incentive to profess a lack of knowledge through reliance on the engineers' assurances because it would then avoid the considerable expense of compensating the Wilsons for the property that would otherwise have been condemned under the Master Drainage Plan. *See id.* at 705.

Moreover, the Court's conclusion that juries cannot disregard a party's reliance on expert opinions is not consistent with our jurisprudence. The Court cites two cases for this proposition, but neither supports the Court's analysis; instead, both cases support the conclusion that the jury, as the finder of fact, should appropriately resolve factual disputes regarding a party's reliance on hired experts. *Provident Am. Ins. Co. v. Castañeda,* 988 S.W.2d 189, 194–95 (Tex.1998); *State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448–50 (Tex.1997).

In *Castañeda,* a bad-faith insurance case, there was no question that the insurer had relied on an expert's assurances and thus no dispute about whether the **\*833** jury could have disregarded that evidence. *Castañeda,* 988 S.W.2d at 194–95. In that case, we performed a traditional legal sufficiency analysis and concluded there was no evidence that the defendant acted in bad faith. *Id.* at 194. We did state that reliance on an expert's opinion will not preclude a finding of bad faith if the expert's opinion was "unreliable and the insurer knew or should have known that to be the case." *Id.* However, we did not hold that the jury must credit a party's testimony that it relied on an expert.

We reiterated this point in *Nicolau,* another bad-faith insurance case. There, the Court noted "we have never held that the mere fact that an insurer relies upon an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law," and again concluded that purported "reliance upon an expert's report, standing alone, will not necessarily shield" the defendant from liability. *Nicolau,* 951 S.W.2d at 448. The Court conceded that "[w]ere we the trier of fact in this case, we may well have concluded that [the insurer] did not act in bad faith," but concluded that the "determination is not ours to make" because "the Constitution allocates that task to the jury and prohibits us from reweighing the evidence." *Id.* at 450 (citing TEX. CONST. art. I, § 15, art. V, §§ 6, 10).

The same is true in this case. The jury was not required to believe that the City did not know flooding was substantially certain to occur because it relied on assurances to the contrary; as a reviewing Court, we should "assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." 168 S.W.3d at 819. Such credibility determinations are uniquely suited and constitutionally committed to the fact finder. *See* TEX. CONST. art. I, § 15, art. V, § 6; *see also Nicolau,* 951 S.W.2d at 450.

## II

Although I disagree with the Court's conclusion that the jury was required to credit the City's testimony, I agree with its judgment in the City's favor because, in my view, the City's mere approval of the private development plans did not result in a taking for public use, as the constitutional standard requires for a compensable taking. TEX. CONST. art. I, § 17. The City did not appropriate or even regulate the use of the Wilsons' land, nor did it design the drainage plan for the proposed subdivisions. Instead, the City merely approved subdivision plans designed by private developers, and that design included inadequate drainage capabilities. The City argues, and I agree, that its mere approval of private plans did not transfer responsibility for the content of those plans from the developers to the City. Municipalities review subdivision plats "to ensure that subdivisions are safely constructed and to promote the orderly development of the community." *City of Round Rock v. Smith,* 687 S.W.2d 300, 302 (Tex.1985); *see* TEX. LOC. GOV'T CODE § 212.002. Such a review is intended to protect the city's residents; it is not intended to transfer responsibility for a flawed subdivision design from the developers to the municipality. *See, e.g., City of Round Rock,* 687 S.W.2d at 302; *see also Cootey v. Sun Inv., Inc.,* 68 Haw. 480, 718 P.2d 1086, 1091 (1986) (holding that "[t]he permit process by which the County approves or disapproves the development of a proposed subdivision reflects an effort by government to require the developer to meet his responsibilities under the subdivision rules, regulations, and laws," and that "the primary responsibility of providing an adequate and safe development rests with ... the developer, and not with the County").

Because the primary responsibility for a development's design rests with the developer, **\*834** and because the plat-approval process does not transfer such responsibility to the municipality, mere plat approval cannot be a basis upon which to predicate takings liability. We have held that, to be liable for a taking, a governmental entity must "perform certain acts in the exercise of its lawful authority ... which resulted in the taking or damaging of plaintiffs' property, and which acts were the *proximate cause* of the taking or damaging of such property." *State v. Hale,* 136 Tex. 29, 146 S.W.2d 731, 736 (1941) (emphasis added). In this case, flooding resulted from the developers' defective drainage design, not from the City's approval of the plat; thus, the City's approval was not the proximate cause of the damage to the Wilson property.

Other courts, faced with similar facts, have also concluded that a governmental entity cannot be liable for a taking when its only action is to approve a private development plan. *See Phillips v. King County,* 136 Wash.2d 946, 968 P.2d 871, 879 (1998); *see also Pepper v. J.J. Welcome Constr. Co.,* 73 Wash.App. 523, 871 P.2d 601, 606 (1994). In *Phillips,* the Washington Supreme Court observed that there is no public aspect to a private development and concluded that "[i]f the county or city were liable for the negligence of a private developer, based on approval under existing regulations, then the municipalities, and ultimately the taxpayers, would become the guarantors or insurers for the actions of private developers whose development damages neighboring properties." *Phillips,* 968 P.2d at 878. The court in *Pepper* similarly examined an inverse condemnation claim based upon a county's approval of private developments with defective drainage plans; it, too, concluded that the county's approval did not cause the resultant flooding and did not result in an unconstitutional taking. *Pepper,* 871 P.2d at 606. The court noted that the flooding was "not the result of the County appropriating or regulating their use of the land," and held that "[t]he fact that a county regulates development and requires compliance with road and drainage restrictions does not transform a private development into a public project." *Id.* The court concluded that because "land use regulation of [the plaintiffs'] property did not cause the damages, no inverse condemnation was involved." *Id.* I am persuaded by the reasoning of the courts in *Phillips* and *Pepper,* and would similarly conclude that the City's plat approval in this case did not amount to an unconstitutional taking as a matter of law.

The court of appeals in this case advanced an alternative reason for affirming the trial court's judgment, suggesting that even if the City could not be liable for merely approving a subdivision plat, it could nevertheless be held liable for failing to condemn a drainage easement across the Wilson property. 86 S.W.3d at 707. The court of appeals stated that "the City chose not to condemn any of the Wilson property," but instead "allow[ed] the water flowing from the Sebastian easement to discharge, uncontrolled, across the Wilson property." *Id.* As noted above, however, it was the developers' plan—not the City's actions—that allowed the water to flood the Wilson property. Because the City's action did not cause the flooding, I disagree that the City's failure to condemn an easement is relevant to takings liability. If the City were responsible for the flooding but chose not to condemn the property, it might be subject to inverse-condemnation liability. *See Tarrant County Reg'l Water Dist.*

*v. Gragg,* 151 S.W.3d 546, 554 (Tex.2004) ("When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation."). However, if a governmental entity's actions are not the **\*835** "proximate cause of the taking or damaging" of the property, then the entity cannot be liable for a taking. *Hale,* 146 S.W.2d at 736. Accordingly, the entity need not condemn property merely because a private entity is causing damage. This rule does not leave owners of flooded property without a remedy; when a private development floods neighboring land, the owner of the damaged property will ordinarily have recourse against the private parties causing the damage. *See* TEX. WATER CODE § 11.086(a), (b) (providing that "[n]o person may divert or impound the natural flow of surface waters in this state ... in a manner that damages the property of another by the overflow of the water diverted or impounded" and that "[a] person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow"). Because the developers' design of the plat —not the City's approval—caused the flooding damage in this case, I would hold that the City cannot be held liable for an unconstitutional taking under Article I, Section 17 of the Texas Constitution.

### III

Because I believe the Court fails to give due regard to the jury's right to make credibility determinations, I cannot join Part V of the Court's opinion. But because I conclude that the City's mere act of approving a private development plan did not cause the Wilson property to be "taken, damaged or destroyed for or applied to public use," TEX. CONST. art. I, § 17, I agree that the City cannot be held liable for a taking in this case. Accordingly, I concur in the Court's judgment.

### All Citations

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848

### Footnotes

1     The City of Fort Worth asserts in an amicus brief that in 2001 alone it approved 325 subdivision plats creating 5,857 residential lots within its extraterritorial jurisdiction, which of course excludes surrounding communities.

2     Evidence at trial and briefs by amici indicate that cities normally acquire title to these easements to ensure they are properly mowed and maintained after the developers' departure.

3     TEX. CONST. art. I, § 17; *City of Dallas v. Jennings,* 142 S.W.3d 310, 313–14 (Tex.2004).

4     86 S.W.3d 693, 715, 717.

5     *Id.* at 700.

6     *See, e.g., Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 739 (Tex.2003) (per curiam); *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 69 (Tex.2000); *Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992); *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992); *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992); *Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex.1990); *Burkard v. ASCO Co.,* 779 S.W.2d 805, 806 (Tex.1989) (per curiam); *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 223 (Tex.1988); *City of Gladewater v. Pike,* 727 S.W.2d 514, 518 (Tex.1987); *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex.1984); *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981) (per curiam); *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex.1976); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152 (1912).

7     *See, e.g., St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.); *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998); *State Farm Lloyds Ins. Co. v. Maldonado,* 963 S.W.2d 38, 40 (Tex.1998); *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Burk Royalty v. Walls,* 616 S.W.2d 911, 922 (Tex.1981); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970); *De Winne v. Allen,* 154 Tex. 316, 277 S.W.2d 95, 97 (1955); *Hall v. Med. Bldg. of Houston,* 151 Tex. 425, 251 S.W.2d 497, 498 (1952).

8     *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 552 (Tex.2004); *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *Lozano v. Lozano,* 52 S.W.3d 141, 144 (Tex.2001) (per curiam); *La.-Pac. Corp. v. Andrade,*

*19 S.W.3d 245, 247 (Tex.1999); Latham v. Castillo, 972 S.W.2d 66, 68 (Tex.1998); Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex.1998).

9 *See, e.g., Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994) (per curiam); *compare Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 363 (1957) ("We may consider *only* that evidence, if any, which, viewed in its most favorable light, supports the jury findings, and we must disregard all evidence which would lead to a contrary result.") (emphasis added), *with Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 298 S.W.2d 79, 81 (1956) ("[T]he duty of this Court [is] to examine and consider *all* of the evidence bearing on the controlling issues, and having done so to decide whether there is evidence of probative value to support the answers made by the jury to the issues.") (quotation omitted) (emphasis added), *and Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 698 (1914) ("[W]e must reject all evidence favorable to the plaintiffs in error, and consider only the facts and circumstances which tend to sustain the verdict.... In considering this question, we must take into account all of the facts and circumstances attending the transaction.").

10 *See, e.g.,* W. Wendell Hall, *Standards of Review in Texas,* 34 ST. MARY'S L.J. 1, 159–62 (2002); William V. Dorsaneo, III, *Judges, Juries, & Reviewing Courts,* 53 SMU L.R. 1497, 1498, 1507–11 (2000); Phil Hardberger, *Juries Under Siege,* 30 ST. MARY'S L.J. 1, 40–41 (1998). *But see* William Powers, Jr., *Judge & Jury in the Texas Supreme Court,* 75 TEX. L.REV. 1699, 1699–1700, 1704–19 (1997) (concluding the Court is not changing the no-evidence standard of review but is moving away from broad definitions of duty and toward particularized definitions of duty).

11 Robert W. Calvert was an associate justice of this Court from 1950 to 1960, and Chief Justice from 1961 to 1972.

12 Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361 (1960).

13 *Id.* at 361.

14 "Most of what has been said here is repetitious of what has been said before in the cited cases and articles. The purpose of the writer here has been to try to bring former writings on the subject into compact form and under somewhat closer analysis." *Id.* at 371.

15 *Id.* at 362–63.

16 *See, e.g., King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003); *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003) (per curiam); *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998); *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Anderson v. City of Seven Points,* 806 S.W.2d 791, 795 n. 3 (Tex.1991); *Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991); *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990).

17 Calvert, *supra* note 12, at 364.

18 *See In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002); *Uniroyal,* 977 S.W.2d at 340; *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982).

19 Calvert, *supra* note 12, at 364 ("If there is an absolute absence of evidence of a vital fact ... an appellate court has no occasion to concern itself with an abstract rule such as how minds of reasonable men might view the situation.").

20 *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 158–59 (Tex.2004); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000); *Guisti v. Galveston Tribune,* 105 Tex. 497, 150 S.W. 874, 877–78 (1912).

21 *Bentley v. Bunton,* 94 S.W.3d 561, 581 (Tex.2002) (considering remarks in context of series of talk-show programs); *Turner,* 38 S.W.3d at 115 (holding defamation includes story in which details are right but gist is wrong).

22 *Shell Oil Co. v. Khan,* 138 S.W.3d 288, 292 (Tex.2004).

23 *DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex.1999).

24 *Tiller v. McLure,* 121 S.W.3d 709, 714 (Tex.2003) (per curiam); *see also Tex. Farm Bureau Mut. Ins. Cos. v. Sears,* 84 S.W.3d 604, 610–11 (Tex.2002); *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 612 (Tex.1999).

25 *See George Grubbs Enters., Inc. v. Bien,* 881 S.W.2d 843, 852–53 (Tex.App.-Fort Worth 1994) (holding that efforts to pressure deaf-mute consumer to buy car were legally sufficient evidence of intentional infliction), *rev'd on other grounds,* 900 S.W.2d 337, 338 (Tex.1995).

26 *See Tiller,* 121 S.W.3d at 714 (holding efforts to pressure widow of contracting party to complete project were legally insufficient evidence of intentional infliction).

27 *See, e.g., id.* at 713–14 (discussing contrary evidence showing defendant's reasonable concerns about timeliness of plaintiff's work); *Sears,* 84 S.W.3d at 612 (discussing contrary evidence that defendant believed claimant was involved in suspicious dealings).

28 *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684, 685 (Tex.2004) (holding no evidence supported defect as comments from deposition "were read out of context").

29 *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 n. 1 (Tex.2004) (citing *Henry v. Phillips,* 105 Tex. 459, 151 S.W. 533, 538 (1912)). This rule was changed for hearsay evidence in 1983. *See* TEX.R. EVID. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

30 *Tex. & P. Ry. Co. v. Ball,* 96 Tex. 622, 75 S.W. 4, 6 (1903).

31 *Minyard Food Stores, Inc. v. Goodman,* 80 S.W.3d 573, 579 (Tex.2002) (holding defamation was not in course and scope of employment as duties required employee to cooperate in investigation but not to lie); *Robertson Tank Lines, Inc. v. Van Cleave,* 468 S.W.2d 354, 360 (Tex.1971) (holding truck driver was not in course of employment during social visit to his father).

32 *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782–83 (1949) (affirming directed verdict against malpractice claim as inadequate expert testimony from doctor of same school or practice as defendant rendered proof legally insufficient).

33 *See Leitch v. Hornsby,* 935 S.W.2d 114, 119 (Tex.1996).

34 *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499–500 (Tex.1995) (holding opinion that spray caused frostbite was legally insufficient as it assumed absence of redness when plaintiff admitted the contrary); *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982) (holding opinion that physician should have warned of possible skull fracture was legally insufficient as it assumed physician was aware of fracture when there was no proof he was).

35 *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995) (adopting reasoning of *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

36 *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714, 720 (Tex.1997).

37 *Id.* at 711, 724–30.

38 *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254–57 (Tex.2004).

39 Calvert, *supra* note 12, at 364.

40 *Id.* at 364–65.

41 *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (holding evidence that truck caught fire unaccompanied by proof identifying any defect did not exceed a scintilla, as jurors would have to guess cause); *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam); *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997); *W. Tel. Corp. v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 900 (Tex.1937); Calvert, *supra* note 12, at 365.

42 *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991); *see also Litton Indus. Prods., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex.1984) (citing *Tex. Sling Co. v. Emanuel,* 431 S.W.2d 538, 541 (Tex.1968)).

43 *Lozano,* 52 S.W.3d at 167.

44 Calvert, *supra* note 12, at 365.

45 *Id.*

46 *Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 938 (Tex.1998).

47 *See Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam); *McCann,* 99 S.W.2d at 900.

48 Calvert, *supra* note 12, at 363–64. But other commentators disagree. *See* Powers, *supra* note 10, at 1703–10. We have held that a "conclusively and as a matter of law" point may be asserted under a "no evidence" point. *O'Neil v. Mack Trucks, Inc.,* 542 S.W.2d 112, 113 (Tex.1976). And the cases in this section note that conclusive proof is often asserted by parties that do *not* carry the burden of proof. *See also Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001) (per curiam) (court must first examine record for evidence supporting verdict, ignoring all evidence to the contrary; if there is no such evidence, the court then examines the entire record to see if the contrary finding is established as a matter of law).

49 Calvert, *supra* note 12, at 363–64. *But see, e.g., Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991) ("Cecil's points that (1) there was no evidence to support the findings and (2) the contrary of each finding was established as a matter of law will hereinafter collectively be referred to as her "no evidence" points.").

50 *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519–20 (Tex.2002) (plurality op.) (quoting *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 51 n. 1 (Tex.1997)).

51 *Tex. & N.O.R Co. v. Burden,* 146 Tex. 109, 203 S.W.2d 522, 528, 530 (1947); *see also Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 783 (Tex.1963) (finding evidence of suicide undisputed after disregarding disputed portion of facts).

52 *Sullivan v. Barnett,* 471 S.W.2d 39, 44 (Tex.1971); *Wright v. Vernon Compress Co.,* 156 Tex. 474, 296 S.W.2d 517, 523 (1956) ("[T]he trial court is required to submit only controverted issues. No jury finding is necessary to establish undisputed facts."); *Clark v. Nat'l Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820, 822 (1947) ( "Uncontroverted questions of fact need not be and should not be submitted to the jury for its determination."); *S. Underwriters v. Wheeler,* 132 Tex. 350, 123 S.W.2d 340, 341 (Tex.1939).

53 *County of Bexar v. Santikos,* 144 S.W.3d 455, 460–61 (Tex.2004).

54 *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 97–98 (Tex.2004).

55 *State Farm Lloyds Ins. Co. v. Maldonado,* 963 S.W.2d 38, 40 (Tex.1998).

56 *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709–10 (Tex.2003) (per curiam).

57 *See Johnson & Johnson Med., Inc. v. Sanchez,* 924 S.W.2d 925, 930 (Tex.1996).

58 *King v. Graham,* 126 S.W.3d 75, 78–79 (Tex.2003) (per curiam) (holding no evidence supported malicious prosecution claim as district attorney admitted prosecution was due to item he overlooked rather than any false statements by defendants).

59 *Travelers Ins. Co. v. Seabolt,* 361 S.W.2d 204, 206 (Tex.1962) (return to regular job in which use of hand was required conclusively established claimant did not suffer total loss of use).

60 *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309–10 (Tex.1986) (return to work did not conclusively establish injury was not total as claimant could not do regular work and employer voluntarily accommodated her with lesser duties).

61 *See, e.g., Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 783 (Tex.1963).

62 *See Republic Nat'l Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 552 (Tex.1976).

63 *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 340 (Tex.1998); *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982).

64 811 S.W.2d 557, 560 (Tex.1991).

65 *Id.* at 558.

66 *Id.* at 560. In defense of jurors, it should be noted that the trier-of-fact in *Murdock* was a judge.

67 135 Tex. 7, 136 S.W.2d 1113, 1115 (1940).

68 *Id.*

69 *Id.*

70 *Clewis v. State,* 922 S.W.2d 126, 133 n. 12 (Tex.Crim.App.1996) (en banc) (citation omitted).

71 *Hotchkiss v. Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911).

72 443 U.S. 307, 320 n. 14, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

73 *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex.2004).

74 Our sister court reviews the legal sufficiency of criminal convictions by considering "*all evidence* which the jury was permitted, whether rightly or wrongly, to consider" in the light most favorable to the prosecution. *Moff v. State,* 131 S.W.3d 485, 488 (Tex.Crim.App.2004); *see also Vodochodsky v. State,* 158 S.W.3d 502, 509 (Tex.Crim.App.2005).

75 *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002).

76 *Bentley v. Bunton,* 94 S.W.3d 561, 596 (Tex.2002); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

77 *Garza,* 164 S.W.3d at 627.

78 616 S.W.2d 911, 922 (Tex.1981).

79 *Id.* at 926 (Greenhill, C.J., concurring).

80 *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234–35 (Tex.2004).

81 *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 55–56 (Tex.1997).

82 *See id.* at 51 (noting same problem with previous test whether insurer had reasonable basis for denying claim).

83 *See Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262–63 (Tex.2002) (finding no evidence of bad faith based in part on defendant's correspondence showing misunderstanding regarding settlement terms); *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 45 (Tex.1998)(affirming bad-faith verdict after noting that insurer gave contradictory reasons for not interviewing potential arsonists); *Minn. Life Ins. Co. v. Vasquez,* 133 S.W.3d 320, 330 (Tex.App.-Corpus Christi 2004, pet. filed) (finding some evidence of bad faith because, though insurer showed hospital stymied its efforts to obtain records, insurer failed to seek same information from other sources); *Allstate Tex. Lloyds v. Mason,* 123 S.W.3d 690, 704–06 (Tex.App.-Fort Worth 2003, no pet.) (reversing bad-faith verdict for legal insufficiency because insurer reasonably relied on expert report); *Allison v. Fire Ins. Exch.,* 98 S.W.3d 227, 249–50 (Tex.App.-Austin 2002, pet. granted, judgm't vacated w.r.m.) (affirming bad-faith verdict after reviewing insurer's reasons for delay and insured's responsive evidence); *Oram v. State Farm Lloyds,* 977 S.W.2d 163, 167 (Tex.App.-Austin 1998, no pet.) (reversing bad-faith verdict for legal insufficiency because insurer's interpretation of exclusion was reasonable though incorrect).

84 *Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 740 (Tex.2003) (per curiam) (noting liability may be established by proof of discrimination plus proof employer's reason was pretext); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 452 (Tex.1996) (same).

85    *See, e.g., Univ. of Houston v. Clark,* 38 S.W.3d 578, 583 (Tex.2000) (noting good-faith test considers *all* circumstances on which official acted).

86    *See, e.g., PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 94 (Tex.2004) (holding no evidence supported jury verdict applying discovery rule based on contrary evidence that claimant's predecessor knew 3,000 windows had failed).

87    *See, e.g., Provident Am. Ins. Co. v. Castaneda,* 988 S.W.2d 189, 194–95 (Tex.1998) (finding no evidence insurer denied claim in bad faith due to conflicting medical evidence).

88    *See, e.g., State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex.1997) (holding some evidence showed expert report was pretext and thus denial of claim had no reasonable basis).

89    *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003); *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 28 (Tex.1993); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986); *Edrington v. Kiger,* 4 Tex. 89, 93 (1849).

90    *McGalliard,* 722 S.W.2d at 697; *Silcott v. Oglesby,* 721 S.W.2d 290, 293 (Tex.1986); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 563 (1952) (holding it was up to jurors "to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses"); *Houston, E. & W.T. Ry. Co. v. Runnels,* 92 Tex. 305, 47 S.W. 971, 972 (1898).

91    *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

92    *Runnels,* 47 S.W. at 972.

93    *Cochran v. Wool Growers Cent. Storage Co.,* 140 Tex. 184, 166 S.W.2d 904, 907 (1942) (noting the Court "read the entire statement of facts").

94    *Harbin v. Seale,* 461 S.W.2d 591, 594 (Tex.1970); *compare Harbin v. Seale,* 454 S.W.2d 271, 272 (Tex.Civ.App.-Dallas 1970) (reporting defendant's testimony that he was traveling only 40 miles per hour), *rev'd,* 461 S.W.2d 591 (Tex.1970).

95    *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 653–54 (Tex.1999) (holding evidence allowed jurors to disbelieve defendant's experts' testimony even though plaintiff's expert's testimony was shown to be in error); *Runnels,* 47 S.W. at 972; *Cheatham v. Riddle,* 12 Tex. 112, 118 (1854).

96    *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 100 (Tex.2004).

97    *Anchor Cas. Co. v. Bowers,* 393 S.W.2d 168, 169–70 (Tex.1965).

98    *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 338 (Tex.1998); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986).

99    *Bentley v. Bunton,* 94 S.W.3d 561, 599 (Tex.2002).

100   *See* TEX.R. CIV. P. 166a(c); *Wal–Mart Stores, Inc. v. Reece,* 81 S.W.3d 812, 817 (Tex.2002) (finding no evidence that store knew of puddle based in part on uncontradicted testimony by only employee in the area); *In re Doe 4,* 19 S.W.3d 322, 325 (Tex.2000); *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 574 (Tex.1998) (holding reporter's detailed explanation of foundation of report established lack of malice as matter of law).

101   *See, e.g., Dresser Indus., Inc. v. Lee,* 880 S.W.2d 750, 754 (Tex.1993); *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 601 (Tex.1993); *Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 365 (1957); *Howard Oil Co. v. Davis,* 76 Tex. 630, 13 S.W. 665, 667 (1890) (holding reviewing court must uphold jury verdict despite strong evidence to the contrary if evidence is conflicting).

102   *See, e.g., Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 592 (Tex.1999); *Caller–Times Publ'g Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 580 (Tex.1992); *Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex.1966).

103   *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48–49 (Tex.1998).

104   *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 286 (Tex.1998).

105   *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262–63 (Tex.1983).

106   *Hall v. Med. Bldg. of Houston,* 151 Tex. 425, 251 S.W.2d 497, 502 (1952).

107   *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 542–43 (Tex.2002) (plurality op.).

108   *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992).

109   *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 341–42 (Tex.1998).

110   *De Winne v. Allen,* 154 Tex. 316, 277 S.W.2d 95, 98–99 (1955).

111   *Lozano v. Lozano,* 52 S.W.3d 141, 144 (Tex.2001) (per curiam); *id.* at 162–63 (Hecht, J., concurring and dissenting).

112   *See Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 552 (Tex.2004); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004); *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 922 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25

(Tex.1994); *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992); *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 297 (Tex.1983) (per curiam).

113 *See* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" & "Insufficient Evidence,"* 69 TEX. L.R. 515, 517–20 (1991).

114 *Gragg,* 151 S.W.3d at 552; *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.); *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998) (per curiam); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Havner,* 953 S.W.2d at 711; *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 75 (Tex.1997) (Hecht, J., concurring); *Preferred Heating & Air Conditioning Co. v. Shelby,* 778 S.W.2d 67, 68 (Tex.1989) (per curiam); *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970); *W. Tel. Corp. v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 898 (Tex.1937).

115 *See St. Joseph Hosp.,* 94 S.W.3d at 519–20 (Tex.2002) (plurality op.); *Giles,* 950 S.W.2d at 51 n. 1 (citing *Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152 (1912) and *Tex. & N.O. Ry. Co. v. Rooks,* 293 S.W. 554, 556–57 (Tex.Comm'n.App.1927)).

116 *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 620 (Tex.2004) (citing *Choate v. San Antonio & A.P. Ry.,* 91 Tex. 406, 44 S.W. 69, 69 (1898); *Muhle v. N.Y., T. & M. Ry.,* 86 Tex. 459, 25 S.W. 607, 608 (1894)).

117 *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988); *Hart v. Van Zandt,* 399 S.W.2d 791, 793 (Tex.1965); *Triangle Motors v. Richmond,* 152 Tex. 354, 258 S.W.2d 60, 61 (1953); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 562 (1952); *Anglin v. Cisco Mortgage Loan Co.,* 135 Tex. 188, 141 S.W.2d 935, 938 (1940).

118 *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *S.V. v. R.V.,* 933 S.W.2d 1, 8 (Tex.1996); *Colvin v. Red Steel Co.,* 682 S.W.2d 243, 245 (Tex.1984); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 753 (Tex.1970); *Dunagan v. Bushey,* 152 Tex. 630, 263 S.W.2d 148, 153 (1953); *Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 258 (1951); *Kelly v. McKay,* 149 Tex. 343, 233 S.W.2d 121, 122 (1950); *White v. White,* 141 Tex. 328, 172 S.W.2d 295, 296 (1943); *McAfee v. Travis Gas Corp.,* 137 Tex. 314, 153 S.W.2d 442, 445 (1941); *Wellington Oil Co. v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 61 (1941); *Chicago, R.I. & G. Ry. Co. v. Carter,* 261 S.W. 135, 135 (Tex.Com.App.1924, judg't adopted); *Charles v. El Paso Elec. Ry. Co.,* 254 S.W. 1094, 1094–95 (Tex.Com.App.1923, holding approved, judg't adopted).

119 *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994) (per curiam); *Vance v. My Apartment Steak House of San Antonio, Inc.,* 677 S.W.2d 480, 483 (Tex.1984); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 295 (Tex.1983); *Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 865 (Tex.1982); *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978); *Henderson v. Travelers Ins. Co.,* 544 S.W.2d 649, 650 (Tex.1976); *Jones v. Nafco Oil & Gas, Inc.,* 380 S.W.2d 570, 574 (Tex.1964).

120 Act of April 25, 1931, 42d Leg., R.S., ch. 77, § 1, 1931 Tex. Gen. Laws 119; *Myers v. Crenshaw,* 134 Tex. 500, 137 S.W.2d 7, 13 (Tex.1940); *Hines v. Parks,* 128 Tex. 289, 96 S.W.2d 970, 971 (Tex.1936). *Cf. Deal v. Craven,* 277 S.W. 1046, 1047 (Tex.Com.App.1925, judg't adopted) ("It has long been settled in this state that the judgment must follow the verdict, and that the courts are without power to enter a judgment notwithstanding a verdict upon a material issue.").

121 *Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex.1998) ("[W]e consider the evidence in the light most favorable to the verdict and reasonable inferences that tend to support it."); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983) ("In acting on the motion [for judgment notwithstanding the verdict], *all* testimony must be viewed in a light most favorable to the party against whom the motion is sought, and every reasonable intendment deducible from the evidence is to be indulged in that party's favor.") (emphasis added); *Dowling v. NADW Mktg., Inc.,* 631 S.W.2d 726, 728 (Tex.1982) (same); *Douglass v. Panama, Inc.,* 504 S.W.2d 776, 777 (Tex.1974) (same); *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 550 (1962) (same); *Houston Fire & Cas. Ins. Co. v. Walker,* 152 Tex. 503, 260 S.W.2d 600, 603–04 (1953) (affirming trial court's implied disregard of one jury answer based on "consideration of the transcript as a whole"); *Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194, 199 (1952) ("[W]e must consider *all the testimony in the record* from the standpoint most favorable to the plaintiff.") (emphasis added); *Neyland v. Brown,* 141 Tex. 253, 170 S.W.2d 207, 211 (Tex.1943) (considering judgment non obstante veredicto "in the light of the record as a whole"); *Le Master v. Fort Worth Transit Co.,* 138 Tex. 512, 160 S.W.2d 224, 225 (1942) ("[W]e must view LeMaster's testimony, *as well as all other testimony in the record,* from a standpoint most favorable to him.") (emphasis added); *McAfee v. Travis Gas Corp.,* 137 Tex. 314, 153 S.W.2d 442, 445 (1941) ("[W]e must regard the evidence contained in this record in its most favorable light for McAfee ... because of the instructed verdict and judgment non obstante veredicto."); *see also Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424–29 (Tex.2004) (upholding judgment non obstante veredicto based on conclusive evidence contrary to verdict).

122 *See Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003) (per curiam); *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex.2003) (per curiam); *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990); *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990) (per curiam); *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex.1984); *Williams v. Bennett,* 610 S.W.2d 144, 145 (Tex.1980); *Freeman v. Tex. Comp. Ins. Co.,* 603 S.W.2d 186, 191 (Tex.1980); *Dodd v. Tex. Farm Prods. Co.,* 576 S.W.2d 812, 814–15 (Tex.1979); *Campbell v. Northwestern Nat'l Life Ins. Co.,* 573 S.W.2d 496, 497 (Tex.1978); *Miller v. Bock Laundry Mach. Co.,* 568 S.W.2d 648, 650 (Tex.1977); *Sobel v. Jenkins,* 477 S.W.2d 863, 865 (Tex.1972); *C. & R. Transp., Inc. v. Campbell,* 406 S.W.2d 191, 193 (Tex.1966).

123 *See Tiller,* 121 S.W.3d at 713 (citing *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001)); *Miller,* 102 S.W.3d at 709 (same); *Best,* 786 S.W.2d at 671 (citing *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985)); *Tomlinson,* 677 S.W.2d at 492 (citing *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981)); *Campbell,* 573 S.W.2d at 497 (citing *Martinez v. Delta Brands, Inc.,* 515 S.W.2d 263, 265 (Tex.1974)); *Campbell,* 406 S.W.2d at 193 (citing *Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 697–98 (1914)).

124 *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003); *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002); *Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 736 (Tex.1990); *Bayouth v. Lion Oil Co.,* 671 S.W.2d 867, 868 (Tex.1984).

125 *See* TEX.R. CIV. P. 166a(i).

126 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

127 FED.R.CIV.P. 50(a)(1).

128 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949).

129 *Id.* at 57, 69 S.Ct. 413.

130 *Reeves,* 530 U.S. at 149–50, 120 S.Ct. 2097 (citations omitted).

131 *Carter v. Steverson & Co.,* 106 S.W.3d 161, 166 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (emphasis added) (citation omitted); *accord Long v. Long,* 144 S.W.3d 64, 67 (Tex.App.-El Paso 2004, no pet.); *Gore v. Scotland Golf, Inc.,* 136 S.W.3d 26, 29 (Tex.App.-San Antonio 2003, pet. denied); *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 438 (Tex.App.-Dallas 2002, pet. denied); *N. Am. Van Lines, Inc. v. Emmons,* 50 S.W.3d 103, 113 n. 3 (Tex.App.-Beaumont 2001, pet. denied); *Molina v. Moore,* 33 S.W.3d 323, 329 (Tex.App.-Amarillo 2000, no pet.); *Wal–Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 470 n. 3 (Tex.App.-Austin 2000, pet. denied); *see also In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam) (holding court of appeals erred in failing to distinguish between legal and factual sufficiency review by not weighing all the evidence when conducting the latter).

132 *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981) (noting that review of gross negligence finding by considering all the evidence appeared to but did not conflict with traditional no-evidence test).

133 Dorsaneo, *supra* note 10, at 1503; *see also* Hardberger, *supra* note 10, at 17 (arguing exclusive standard is "designed to afford high deference to jury verdicts").

134 *State v. Biggar,* 873 S.W.2d 11, 13 (Tex.1994).

135 *See, e.g., CMH Homes, Inc. v. Daenen,* 15 S.W.3d 97, 102 (Tex.2000) (noting plaintiff argued defendant's frequent inspections of stairs showed knowledge of inherent danger, while court held it showed the opposite as inspections found nothing); *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 45 (Tex.1998) (affirming bad-faith verdict after noting insurer's reasons for denial were contradictory).

136 *See, e.g., Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 327 (Tex.1993) (noting evidence of single previous minor stumble supported negligence finding but not gross negligence).

137 *See* Judith Resnik, *Managerial Judges,* 96 HARV. L.R.. 374, 382–83 (1982) (noting that images of justice appeared blindfolded only within the last four hundred years).

138 Justice Calvert's use of the masculine in 1960 may perhaps be forgiven, for although Hattie Hennenberg, Hortense Ward, and Ruth Brazzil served temporarily on this Court in 1925, and Sarah T. Hughes was appointed as a state district judge ten years later, it was not until 1954 that the Texas Constitution was amended to allow women to serve as jurors, and not until 1973 that Mary Lou Robinson became the first women to serve as a state appellate judge. See James T. "Jim" Worthen, *The Organizational & Structural Development of Intermediate Appellate Courts in Texas,* 46 S. TEX. L.REV. 33, 75 (2004); Robert L. Dabney, Jr. *We Were There,* HOUSTON B.J. Nov.-Dec.1999, at 42, 44.

139 Calvert, *supra* note 12, at 364.

140 *Wilkerson v. McCarthy,* 336 U.S. 53, 65, 69 S.Ct. 413, 93 L.Ed. 497 (1949) (Frankfurter, J., concurring).

141 86 S.W.3d 693, 709.

142 *Id.* at 703, 705.

143 *Id.* at 705.

144 *Id.* at 704–05.

145 *Provident Am. Ins. Co. v. Castañeda,* 988 S.W.2d 189, 194–95 (Tex.1998); *see also State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex.1997) (holding reliance on expert report did not foreclose bad-faith claim because claimant "presented evidence from which a fact-finder could logically infer that Haag's reports were not objectively prepared, that State Farm was aware of Haag's lack of objectivity, and that State Farm's reliance on the reports was merely pretextual.").

146 *Cf. Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131, 140 (Tex.2004) (holding complaint letters may require manufacturer to investigate, but are not evidence complaints are true).

147 *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 555 (Tex.2004) (emphasis added).

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Superseded by Statute as Stated in** Raymond Overseas Holding, Ltd. v. Curry, Tex.App.-Fort Worth, November 4, 1997

925 S.W.2d 591
Supreme Court of Texas.

CSR LIMITED, Relator,

v.

The Honorable Scott LINK, Judge, Respondent.

No. 95–0933.  |  Argued Dec. 13, 1995.  |  Decided June 14, 1996.  |  Rehearing Overruled Aug. 16, 1996.

Defendant in asbestos suit sought mandamus relief to prevent trial court from asserting personal jurisdiction over it, after special appearance was denied. The Supreme Court, Spector, J., held that: (1) defendant, an Australian seller of asbestos, did not have systematic and continuous contacts sufficient to support general jurisdiction; (2) defendant did not have minimum contacts sufficient to support specific jurisdiction even if it could have foreseen that its asbestos might be used in Texas; and (3) special circumstances arising from the nature of mass tort litigation made mandamus relief appropriate.

Petition conditionally granted.

Gonzalez, J., filed a concurring opinion.

Baker, J., filed a dissenting opinion.

West Headnotes (15)

[1]  **Judgment**
        Jurisdiction of the person and subject-matter

Court must possess both subject matter jurisdiction over a case and personal jurisdiction over a party to issue a binding judgment.

20 Cases that cite this headnote

[2]  **Courts**
        Jurisdiction of Cause of Action

**Courts**

Jurisdiction of the Person in General

"Subject matter jurisdiction" refers to the court's power to hear a particular type of suit, while "personal jurisdiction" concerns the court's power to bind a particular person or party.

43 Cases that cite this headnote

[3]  **Constitutional Law**
        Non-residents in general

**Courts**
        Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the due process clause of the Fourteenth Amendment to the United States Constitution and the Texas long-arm statute are satisfied. U.S.C.A. Const.Amend. 14, § 1; V.T.C.A., Civil Practice & Remedies Code § 17.042.

120 Cases that cite this headnote

[4]  **Courts**
        Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

The requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations. U.S.C.A. Const.Amend. 14, § 1; V.T.C.A., Civil Practice & Remedies Code § 17.042.

78 Cases that cite this headnote

[5]  **Constitutional Law**
        Non-residents in general

Under the due process clause of the Fourteenth Amendment, a defendant must have certain minimum contacts with the forum such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." U.S.C.A. Const.Amend. 14.

54 Cases that cite this headnote

**[6] Courts**

🔑 Business contacts and activities; transacting or doing business

A nonresident defendant that has purposefully availed itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction, but a defendant should not be subject to the jurisdiction of a foreign court based upon "random," "fortuitous," or "attenuated" contacts, and minimum contacts are particularly important when the defendant is from a different country. U.S.C.A. Const.Amend. 14.

180 Cases that cite this headnote

**[7] Courts**

🔑 Corporations and business organizations

Defendant did not have systematic and continuous contacts with Texas sufficient to support general jurisdiction where defendant was an Australian company which had no offices in Texas, no employees in Texas, and no bank accounts in Texas, defendant had not solicited business in Texas and had not sent any correspondence to Texas, defendant had never owned property in Texas and had never paid taxes in Texas, and defendant had never entered into a contract in Texas. U.S.C.A. Const.Amend. 14, § 1; V.T.C.A., Civil Practice & Remedies Code § 17.042.

23 Cases that cite this headnote

**[8] Courts**

🔑 Defective, dangerous, or injurious products; products liability

Australian sales agent did not have minimum contacts with Texas sufficient to support specific jurisdiction in action for injuries allegedly caused by asbestos sold by it and sent directly to Houston in 1957, despite contention that it could have foreseen that its raw asbestos fiber would be used in Texas, where title to the asbestos passed to buyer in Australia and there was no evidence that defendant sales agent controlled or participated in the decision to ship the fiber

to Texas, buyer had plants in at least four other states, and defendant did not advertise its asbestos in Texas, did not provide advice to Texas buyers or have any sales agents in Texas, and did not create, control, or employ the distribution system that brought the asbestos into Texas. U.S.C.A. Const.Amend. 14.

56 Cases that cite this headnote

**[9] Courts**

🔑 Manufacture, Distribution, and Sale of Products

Although foreseeability is a factor to consider in a minimum contacts analysis, absent a purposeful act directed toward selling or distributing product in state, foreseeability alone will not support personal jurisdiction. U.S.C.A. Const.Amend. 14.

31 Cases that cite this headnote

**[10] Appearance**

🔑 Objections to jurisdiction in general

**Courts**

🔑 Presumptions and Burden of Proof as to Jurisdiction

Nonresident defendant must negate all bases of personal jurisdiction to prevail in a special appearance.

19 Cases that cite this headnote

**[11] Mandamus**

🔑 Modification or vacation of judgment or order

**Mandamus**

🔑 Proceedings in civil actions in general

Mandamus relief was warranted following denial of special appearance, when trial court exceeded the limitations imposed by the due process clause and thus clearly abused its discretion in denying defendant's special appearance and where extraordinary circumstances were present such that appeal was not adequate remedy because defendant was faced with mass tort litigation, which places significant strain on a defendant's resources and creates considerable

pressure to settle the case, regardless of the underlying merits, and since trial on the merits and appeal would not be efficient use of judicial resources.

50 Cases that cite this headnote

**[12]    Mandamus**
🔑 Nature and scope of remedy in general

Mandamus is an extraordinary remedy that is available only in limited circumstances and is appropriate only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law.

38 Cases that cite this headnote

**[13]    Mandamus**
🔑 Remedy by Appeal or Writ of Error

Generally, increased cost and delay alone do not make an ordinary appeal an inadequate remedy so as to warrant mandamus relief.

9 Cases that cite this headnote

**[14]    Mandamus**
🔑 Modification or vacation of judgment or order

**Mandamus**
🔑 Proceedings in civil actions in general

Mandamus typically will not lie from the denial of a special appearance but there may be extraordinary situations in which the denial of a special appearance cannot be adequately remedied on appeal, so that mandamus is appropriate.

8 Cases that cite this headnote

**[15]    Mandamus**
🔑 Remedy by Appeal or Writ of Error

The most efficient use of the state's judicial resources is a factor court may consider in determining whether an ordinary appeal would provide an adequate remedy, so as to preclude mandamus relief.

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*593**  Robin P. Hartman, Haynes and Boone, Dallas, Lynne Liberato, Beth Fancsali, Haynes and Boone, Houston, for relator.

Hartley Hampton, Young & Hampton, Houston, Marvin B. Peterson, Law Office of Marvin B. Peterson, Houston, Gary D. Elliston, DeHay & Elliston, Dallas, Jeffrey D. Roberts, Roberts Markel & Folger, Houston, James D. Smith, Dunn Kacal Adams Pappas & Law, Houston, T. John Ward, Brown McCarroll & Oaks Hartline, Longview, Kathryn Hermes, Patterson Lamberty Stanford & Walls, Dallas, Sharla J. Frost, James H. Powers, Powers & Frost, Houston, J. Michael Myers, Ball & Weed, San Antonio, Russell Ramsey, Ramsey & Murray, Houston, David W. Starnes, Strong Pipkin Nelson & Bissell, Beaumont, Jeffrey B. McClure, Butler & Binion, Houston, Mark R. Pharr, III, Galloway Johnson Tompkins & Burr, Houston, Richard N. Countiss, Law Office of Richard N. Countiss, Houston, James Mayer Harris, Holmes & Harris, Beaumont, David L. Lyle, Jr., Ness Motley Loadholt Richardson & Poole, Charleston, SC, Warren A. Gage, Cowles & Thompson, Dallas, Kevin J. Maguire, Strasburger & Price, Dallas, Robert E. Ballard, Abraham & Watkins, Houston, Stephen M. Vaughan, Mandell & Wright, Houston, F. Richard Leach, Ross Banks May Cron & Cavin, Houston, Gregg Morrison, Cook & Butler, Houston, C. Victor Haley, Fairchild Price Thomas & Haley, Center, Weldon Funderburk, Funderburk & Funderburk, Houston, Michael R. Ross, Law Offices of Michael R. Ross, Houston, John E. Williams, Jr., Williams Bailey & Wesner, Houston, Steven J. Kherkher, Williams Bailey Wesner & Kherkher, Houston, Ned Johnson, Johnson & Associates, Houston, John L. Hill, Liddell Sapp Zivley Hill & LaBoon, Houston, Peter A. Moir, Baker & Botts, Dallas, William J. Cozort, Jr., Bean & Manning, Houston, R. Lyn Stevens, Stevens & Baldo, Beaumont, Scott Baldwin, Baldwin & Baldwin, Marshall, Byron Sims, Brown Sims Wise & White, Houston, Brian S. Clary, Livingston & Markle, Houston, Sandra F. Clark, Mehaffy & Weber, Beaumont, Robert E. Thackston, Vial Hamilton Koch & Knox, Dallas, for respondent.

**Opinion**

SPECTOR, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, HECHT, CORNYN, ENOCH, OWEN and ABBOTT, JJ., join.

This original proceeding concerns the exercise of personal jurisdiction over a foreign corporation by Texas courts. Although mandamus does not ordinarily lie from the denial of a special appearance, exceptional circumstances may warrant this extraordinary relief. In this case, we find that mandamus is appropriate and conditionally grant the writ.

## I.

CSR Limited is a corporation organized under the laws of New South Wales, Australia, with its principal place of business in Sydney, Australia. For a period of time before 1967, CSR was the agent for sales of raw asbestos fiber mined by a subsidiary, Australian Blue Asbestos Proprietary, Limited. The Johns–Manville Corporation purchased this raw asbestos fiber and resold it **\*594** in the United States. Johns–Manville was the only company marketing CSR's fiber in this country.

On August 23, 1957, CSR sold 363 tons of raw Australian blue asbestos to Johns–Manville. CSR sold the asbestos to Johns–Manville F.O.B. Fremantle, Australia, so that title to the fiber passed to Johns–Manville when Johns–Manville loaded the fiber onto the ship in Australia. Johns–Manville shipped the asbestos to Houston; the fiber was eventually used for the manufacture of transite pipe. The plaintiffs in the underlying suit allege that they were injured by exposure to CSR asbestos used to manufacture pipe.

Because of the large number of asbestos cases that have been filed, the Harris County district courts have created a Master Asbestos File under the authority of local rule. HARRIS COUNTY (TEX.) DIST. CT. LOC. RR. 3.2.3(c); *In re: Asbestos Cases,* Cause No. 90–23333. The judge presiding over the Master Asbestos File rules on issues common to the individual asbestos cases in Harris County. Those rulings in the Master Asbestos File control all asbestos cases currently pending or that may be filed in Harris County. *See* Standing Order No. 2, *In re: Asbestos Cases,* Cause No. 90–23333 (Dist. Ct. of Harris County). CSR filed a special appearance in the Master Asbestos File asserting that the trial court lacked personal jurisdiction over the company. Judge Link,

the respondent in this case, overruled the motion. The court of appeals denied CSR leave to file its petition for writ of mandamus. CSR now seeks mandamus relief in this Court to prevent the trial court from asserting personal jurisdiction over it.

## II.

**[1]** **[2]** A court must possess both subject matter jurisdiction over a case and personal jurisdiction over a party to issue a binding judgment. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 701–03, 102 S.Ct. 2099, 2103–05, 72 L.Ed.2d 492 (1982). While subject matter jurisdiction refers to the court's power to hear a particular type of suit, personal jurisdiction concerns the court's power to bind a particular person or party. *See* 1 CASAD, JURISDICTION IN CIVIL ACTIONS § 1.01 (2d ed.1991). This case involves the trial court's personal jurisdiction over CSR.

**[3]** **[4]** A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the Texas long-arm statute are satisfied. *See* U.S. CONST. amend. XIV, § 1; TEX. CIV. PRAC. & REM.CODE § 17.042; *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 1871–72, 80 L.Ed.2d 404 (1984). The long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant that does business in Texas. In addition to a discrete list of activities that constitute doing business in Texas, the statute provides that "other acts" by the nonresident can satisfy the requirement. *See* TEX. CIV. PRAC. & REM.CODE § 17.042; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). Our Court has repeatedly interpreted this broad statutory language "to reach as far as the federal constitutional requirements of due process will allow." *Guardian Royal,* 815 S.W.2d at 226; *see also U–Anchor Advertising, Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977). Consequently, the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *See Guardian Royal,* 815 S.W.2d at 226.

**[5]** **[6]** Under the Due Process Clause of the Fourteenth Amendment, a defendant must have certain minimum contacts with the forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and

substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). A nonresident defendant that has purposefully availed itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction. *See* **\*595** *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985). A defendant should not be subject to the jurisdiction of a foreign court based upon "random," "fortuitous," or "attenuated" contacts. *Id.* Minimum contacts are particularly important when the defendant is from a different country because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system. *See Asahi Metal Industry Co., Ltd. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987).

A defendant's contacts with a forum can give rise to either general or specific jurisdiction. General jurisdiction is present when a defendant's contacts are continuous and systematic, permitting the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *See Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990). General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction. *See Guardian Royal,* 815 S.W.2d at 228. In contrast, specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *See id.* at 227.

 [7]   CSR is an Australian company headquartered in Sydney. It has no offices in Texas, no employees in Texas, and no bank accounts in Texas. CSR has not solicited business in Texas and has not sent any correspondence to Texas. CSR has never owned property in Texas and has never paid taxes in Texas. CSR has never entered into a contract in Texas. Under these facts, CSR did not have systematic and continuous contacts with Texas sufficient to support general jurisdiction. [1]

 [8]   CSR also argues that the trial court does not have specific jurisdiction in this case because the company conducted no activity in or related to Texas. It is undisputed that CSR sold Johns–Manville a shipment of 363 tons of raw asbestos that was sent directly to Houston in August of 1957. But title to the asbestos passed to Johns–Manville in Australia and there is no evidence that CSR controlled or participated in the decision

to ship the fiber to Texas. The plaintiffs contend, however, that CSR knew that one of Johns–Manville's plants was in Denison, Texas. The plaintiffs argue that CSR could have foreseen that its raw asbestos fiber would be used in Texas. Therefore, they argue, CSR should be subject to the personal jurisdiction of Texas courts.

 [9]   Although foreseeability is a factor to consider in a minimum contacts analysis, foreseeability alone will not support personal jurisdiction. *See Guardian Royal,* 815 S.W.2d at 227. The defendant must take an action "*purposefully directed* toward the forum state" to be subject to the jurisdiction of its courts. *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032 (emphasis added). Assuming that CSR could have known that the raw asbestos it sold to Johns–Manville might be distributed in Texas, "a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Id.* Additionally, CSR's knowledge that there was a Johns–Manville plant in Texas is not determinative in establishing jurisdiction because there are also Johns–Manville plants located in at least four other states: Louisiana, New Jersey, Illinois and California. *See State ex rel. CSR Ltd. v. MacQueen,* 190 W.Va. 695, 441 S.E.2d 658, 660 (1994). There must be some indication that CSR intended to serve the Texas market.

CSR did not advertise its asbestos in Texas. CSR did not provide advice to Texas buyers or have any sales agents in Texas. CSR did not "create, control, or employ" the distribution system that brought the asbestos into Texas. *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032. There is no direct evidence that **\*596** CSR knew that Johns–Manville would distribute its fiber in Texas. In short, the record contains no evidence that CSR took any act purposefully directed toward selling or distributing the raw asbestos fiber in Texas. Absent such a purposeful act, foreseeability alone cannot create minimum contacts between CSR and Texas. The Harris County courts, therefore, cannot exercise personal jurisdiction over CSR consistent with due process.

 [10]   In Texas, a nonresident defendant must negate all bases of personal jurisdiction to prevail in a special appearance. *See Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985). CSR has demonstrated that it had no systematic and continuous contacts with Texas, that it did not purposefully direct any act toward Texas, and that it took no act within Texas that gave rise to the plaintiffs' cause of

action. We therefore conclude that CSR has carried its burden to negate all bases of personal jurisdiction.

## III.

 [11]    [12]    [13]    [14]    Because the trial court exceeded the limitations imposed by the Due Process Clause of the federal Constitution, it clearly abused its discretion in denying CSR's special appearance. We now decide whether CSR has met the second requirement for showing itself entitled to mandamus relief, that it does not have an adequate remedy by ordinary appeal. Mandamus is an "extraordinary" remedy that is "available only in limited circumstances." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). Mandamus is appropriate "only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). Generally, increased cost and delay alone do not make an ordinary appeal an inadequate remedy. *Walker,* 827 S.W.2d at 842. Because in the ordinary case no circumstances apart from the increased cost and delay of trial and appeal are present, we have held that mandamus typically will not lie from the denial of a special appearance. *See Canadian Helicopters Ltd. v. Wittig,* 876 S.W.2d 304, 307 (Tex.1994).

This Court has recognized, however, that in some situations a challenge to personal jurisdiction cannot be adequately remedied on appeal. For example, an ordinary appeal may be inadequate in cases involving family law or implicating comity in foreign affairs. *See id.* at 306–07. In addition, this Court has recognized that there may be other "extraordinary situation[s]" in which the denial of a special appearance cannot be adequately remedied on appeal. *Id.* at 309–10; *see also National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 776 (Tex.1995).

The extraordinary circumstances present in this case stem from the problems inherent in many, if not all, mass tort cases. Although only five plaintiffs have sued CSR in the present case, thousands of potential claimants exist based on possible exposure to transite pipes containing CSR asbestos since 1957. [2] *See, e.g.,* Reina, *Recovery for Fear of Cancer and Increased Risk of Cancer: Problems with Gideon and a Proposed Solution,* 7 REV. LITIG. 39, 40 (1987) (estimating that more than 21,000,000 American workers have been exposed to asbestos, with Texas being "one of the five states generating the greatest volume of asbestos-related litigation"). Mass tort litigation such as this places significant strain on a defendant's resources and creates considerable pressure to settle the case, regardless of the underlying merits. *See Matter of Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293, 1297, 1298–1300 (7th Cir.1995). The large number of lawsuits to which CSR could potentially be exposed is significant to our determination that appeal is not an adequate remedy in this case.

 [15]    The most efficient use of the state's judicial resources is another factor we consider in determining whether an ordinary appeal would provide an adequate remedy. Over 1490 asbestos cases are pending in Harris County alone as of April 30, 1996. HARRIS COUNTY DISTRICT COURTS, JUSTICE INFORMATION AND MANAGEMENT SYSTEMS (May 13, 1996) (public document available at Harris **\*597** County District Clerk's Office). As evidenced by the creation of the Master File in Harris County, asbestos litigation in Texas is complicated, potentially involves a multitude of parties, and is usually quite lengthy: "No litigation in American history has involved as many individual claimants, been predicated upon the severity of injury, [or] consumed as many judicial resources ... as asbestos litigation." Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?,* 13 CARDOZO L. REV. 1819, 1819 (1992). As a result, the state expends a large amount of its limited judicial resources resolving these massive controversies. Under these circumstances, a trial on the merits and appeal would further overtax the state's judicial resources. *See Walker,* 827 S.W.2d at 843. The Arizona Supreme Court has noted that "in cases of this magnitude, the interests of all parties and of the public demand that serious questions of law pertaining to ... jurisdiction ... be decided by this court and settled at the earliest possible moment." *United States v. Superior Court,* 144 Ariz. 265, 697 P.2d 658, 662 (1985). Because of the size and complexity of the asbestos litigation, the most prudent use of judicial resources in this case is to permit a preliminary resolution of the fundamental issue of personal jurisdiction by writ of mandamus.

Our approach of permitting mandamus relief from the denial of a special appearance only when personal jurisdiction is clearly and completely lacking and when there are exceptional circumstances is in accord with the approach of other jurisdictions. *See Canadian Helicopters,* 876 S.W.2d at 309–10 (citing *United States v. Superior Court,* 697 P.2d at 662; *Lupo v. Lineberger,* 313 Ark. 315, 855 S.W.2d 293, 294 (1993) (permitting writs of prohibition to lie only when

a trial court is "clearly without jurisdiction or [has] acted without authority and the petitioner is unquestionably entitled to such relief"); *Conn v. ITT Aetna Fin. Co.,* 105 R.I. 397, 252 A.2d 184, 188 (1969) (finding that certiorari does not lie from preliminary jurisdiction rulings except if "the circumstances have been unusual or exceptional ... or where not to act might result in irreparable injury or loss")); *see also State ex rel. Fogle v. Steiner,* 74 Ohio St.3d 158, 656 N.E.2d 1288, 1292 (1995) (finding that although mandamus does not normally lie from the denial of a lack of jurisdiction, it will lie "where an inferior court patently and unambiguously lacks jurisdiction over the cause"). We emphasize that we do not relax or retreat from the requirement that a relator must show an inadequate remedy by appeal. While the question of personal jurisdiction is remediable by appeal in most cases, we hold that under the circumstances of this case, the concerns of judicial efficiency in mass tort litigation combined with the magnitude of the potential risk for mass tort actions against the defendant makes ordinary appeal inadequate.

## IV.

A single sale of 363 tons of raw asbestos in 1957 that was not purposefully directed toward this state is not sufficient to establish minimum contacts between CSR and Texas for personal jurisdiction. The trial court therefore clearly abused its discretion in denying CSR's special appearance. Although a writ of mandamus will not ordinarily lie from the denial of a special appearance, this case presents an extraordinary situation warranting such relief. Accordingly, we conditionally grant CSR's petition for writ of mandamus. This writ will only issue if the trial court fails to withdraw its order overruling CSR's special appearance.

GONZALEZ, J., concurs.

BAKER, J., dissents.

GONZALEZ, Justice, filed a concurring opinion.

" 'As a moth is drawn to the light, so is a litigant drawn to the United States.' " *Dow Chem. Co. v. Castro Alfaro,* 786 S.W.2d 674, 707 (Tex.1990) (Hecht, J., dissenting) (quoting *Smith Kline & French Labs. Ltd. v. Bloch,* (1983) 2 All E.R. 72, 74). Texas courts seem to be the venue of choice. *See Alfaro,* 786 S.W.2d at 690 & n. 2 (Gonzalez, J., dissenting) (noting the danger of Texas becoming the forum for all mass-

tort lawsuits); *Minnesota Mining & Mfg. Co. v. Nishika, Ltd.,* 885 S.W.2d 603, 639 (Tex.App.—Beaumont 1994, writ granted) (affirming $29,000,000 judgment in a suit between **\*598** Nevada, Georgia, and Minnesota corporations that involved no contacts with Texas). When a suit is brought against a party with no ties to Texas, it not only denies the non-forum defendant's constitutional rights, but it also clogs our already-crowded dockets. *Alfaro,* 786 S.W.2d at 690 (Gonzalez, J., dissenting). Denying a defendant's special appearance when the state clearly lacks personal jurisdiction is inherently harmful, both to the defendant and to our court system. Appeal is not an adequate remedy for such harm, and therefore mandamus relief is appropriate. I concur with the Court's judgment that mandamus should issue in this case. I disagree with the Court's opinion, however, because it retains the requirement that a relator challenging the denial of a special appearance by mandamus must make a specific showing of irreparable harm. Such proof is not necessary because the harm is inherent. Further, I would address the tension between our opinions in *Canadian Helicopters Ltd. v. Wittig,* 876 S.W.2d 304 (Tex.1994) (orig.proceeding) and *National Industrial Sand Association v. Gibson,* 897 S.W.2d 769 (Tex.1995) (orig.proceeding).

Unfortunately, in this era of complex multi-party litigation, defendants must take a hard look at whether they can afford to defend a case regardless of the merits. One notorious example is a mass products-liability lawsuit pending in Morris County, in which it is claimed that the products of more that 300 defendants, including such items as paper clips, hand soap, marking pens, and metal tables, contributed to a "toxic cloud" that caused injury to more than 3,000 plaintiffs. *See generally Able Supply Co. v. Moye,* 898 S.W.2d 766 (Tex.1995) (orig.proceeding); *Union Carbide Corp. v. Moye,* 798 S.W.2d 792 (Tex.1990) (orig.proceeding); Hollandsworth, *The Lawsuit from Hell,* TEX. MONTHLY, June 1996, at 105, 141. Although the case had been pending for more than eight years, the plaintiffs had never been required to produce evidence or testimony linking their injuries to any of the defendants' products. *Able Supply,* 898 S.W.2d at 769. Despite this lack of evidence, many defendants have felt compelled to settle for millions of dollars and cut their losses. By September 1994, nearly 200 defendants had settled for more than $66 million, and it is not clear that the case is any closer now to being tried than when it was filed. Hollandsworth, *supra,* at 145.

The burdens of this sort of litigation are exacerbated when, as in this case, the defendant has no contacts with the forum

state. Such defendants face demands of travel and time that go beyond "mere increased cost and delay." *Canadian Helicopters,* 876 S.W.2d at 308–09. More important is the damage done to the defendants' fundamental rights of due process under the state and federal constitutions. See *State ex rel. Connor v. McGough,* 46 Ohio St.3d 188, 546 N.E.2d 407, 410 (1989) (per curiam) (noting that fundamental notions of fairness and due process prohibited suit against a defendant who had no known contacts with the forum state "other than to attempt, unsuccessfully so far, to extricate himself from being sued here").

We have struggled with this issue, first in *Canadian Helicopters,* then in *National Industrial Sand.* In *Canadian Helicopters,* the Court denied mandamus relief to correct the special-appearance ruling in that case, but held that mandamus might be appropriate in some cases. The Court stated that mandamus might be available when the "trial court, in denying a special appearance, ... act[s] with such disregard for guiding principles of law that the harm to the defendant becomes irreparable, exceeding mere increased cost and delay." *Canadian Helicopters,* 876 S.W.2d at 308–09. The Court did not explain what that harm might be. In *National Industrial Sand,* we granted mandamus to correct a denial of a special appearance when the court clearly had no personal jurisdiction over the defendant. *National Indus. Sand,* 897 S.W.2d at 776. Although the holdings in *Canadian Helicopters* and *National Industrial Sand* are superficially consistent, it is clear that the application of the law to the facts in the two opinions is not reconcilable. The defendant in *Canadian Helicopters* had no more contacts with Texas than the defendant in *National Industrial Sand.* Thus, I would overrule *Walker v. Packer,* 827 S.W.2d 833 (Tex.1992) (orig.proceeding) and its progeny, including *Canadian Helicopters,* to the extent they hold that a foreign defendant **\*599** with no ties to Texas must make a separate showing of harm before mandamus will issue to correct an order denying a special appearance.

BAKER, Justice, dissenting.

Because the Court improperly departs from sound precedent and in my opinion, invites an unnecessary increase in mandamus practice, I respectfully dissent.

## The Special Appearance and Mandamus Relief

When a trial court overrules a special appearance, the moving party ordinarily has an adequate remedy on appeal and consequently, may not secure extraordinary relief through mandamus. *K.D.F. v. Rex,* 878 S.W.2d 589, 592 (Tex.1994). On the few occasions this Court has considered the issue in an original proceeding, we have found mandamus relief available "only in limited circumstances." *See Canadian Helicopters v. Wittig,* 876 S.W.2d 304, 305 (Tex.1994). These "limited circumstances" are cases involving sovereign immunity, comity and the parent-child relationship. Otherwise, we have held that mandamus relief for the denial of a special appearance is available only in extraordinary situations. [1] We have held extraordinary relief available only upon a showing that the trial court abused its discretion to the extent that it acted with "such disregard for guiding principles of law that the harm to the defendant becomes *irreparable,* exceeding mere increased cost and delay." *Canadian Helicopters,* 876 S.W.2d at 308–09 (emphasis added). Consequently, the relator must show that ordinary appeal is inadequate. *See Walker v. Packer,* 827 S.W.2d 833, 842 (Tex.1992); *National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 776 (Tex.1995)(Cornyn, J., dissenting).

## Special Appearance Hearing

The hearing on a special appearance is for the receipt of evidence and proof, "not just argument." *See* O'Connor & Davis, *O'Connor's Texas Rules * Civil Trials,* Ch. 3 § 7, at 118 (1996); *see also Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 269 n. 4 (Tex.1992). The non-resident defendant carries the burden of proof to negate all bases of personal jurisdiction. *See Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985). On mandamus review, the relator has the burden of showing, based on the evidence presented to the trial court, an abuse of discretion and the inadequacy of ordinary appeal. *Canadian Helicopters,* 876 S.W.2d at 305.

## Abuse of Discretion–Standard of Review

In any mandamus proceeding, we review the trial court's decision for an abuse of discretion. *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). To determine there is an abuse of discretion, we review the entire record. *See Morrow v. H.E.B., Inc.,* 714 S.W.2d 297 (Tex.1986). Our focus remains on the trial court order regardless of the court of appeals' decision. *Johnson,* 700 S.W.2d at 918. The party

challenging the trial court's decision must establish that the facts and law permit the trial court but one decision. *Johnson,* 700 S.W.2d at 917.

An appellate court may not reverse for an abuse of discretion merely because it disagrees with the trial court's decision, if that decision was within the trial court's discretionary authority. *See Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991). The reviewing court must give deference to the trial court's resolution of a factual issue, and cannot set that decision aside unless it is clear from the record that the trial court could have reached only one decision. *See Walker,* 827 S.W.2d at 839–40.

An appellate court may not deal with disputed factual matters in a mandamus proceeding. *Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 60 (Tex.1991); *Dikeman v. Snell,* 490 S.W.2d 183, 187 (Tex.1973). An abuse of discretion does not exist if the trial court bases its decision on conflicting evidence and some evidence reasonably supports **\*600** the trial court's decision. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978). [2]

An abuse of discretion does not exist if some evidence [3] in the record shows the trial court followed guiding rules and principles. *Morrow,* 714 S.W.2d at 298.

### Adequate Remedy on Appeal

In addition to showing that the trial court abused its discretion in reviewing the facts or in applying the law to the facts of a particular case, the relator must also make a mandamus record to show that ordinary appeal is not an adequate remedy. *See Canadian Helicopters,* 876 S.W.2d at 305. "This burden is a 'heavy one.' " *Canadian Helicopters,* 876 S.W.2d at 305. In its recent writings in the special appearance context, the Court has discussed this element in terms of forcing the non-resident to show "irreparable harm." *See National Sand,* 897 S.W.2d at 776; *Canadian Helicopters,* 876 S.W.2d at 305. I do not agree with this amorphous standard because it "snarl[s] mandamus law with new distinctions", [4] and as I discuss below, oversteps the bounds of mandamus review absent legislative or rules influence. Despite this unique and unfounded standard, the Court conducts a flawed analysis under the standard and provides CSR with an undeserved short cut to appellate relief.

### National Sand v. Canadian Helicopters

Unfortunately, I find today's opinion similar to *National Sand,* 897 S.W.2d at 769. In *National Sand,* the Court granted a defendant mandamus relief after the trial court denied its special appearance without any showing by the defendant that it did not have an adequate remedy on appeal. *See National Sand,* 897 S.W.2d at 777 (Cornyn, J., dissenting). Here, as in *National Sand,* CSR has not shown that without mandamus relief, its harm will be "irreparable, exceeding mere increased cost and delay." *See Canadian Helicopters,* 876 S.W.2d at 308–09. In fact, the Court's opinion is based almost entirely on the assertions of CSR's counsel that without mandamus relief, CSR may be forced to defend itself in numerous trials, which could be both lengthy and complicated. [5] 925 S.W.2d at 596. The Court also relies on an unrelated case from the Seventh Circuit to declare that because "[m]ass tort litigation ... places significant strain on a defendant's resources," CSR is entitled to extraordinary relief. 925 S.W.2d at 596 (*citing Matter of Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir.1995)). Here again, the Court misses the mark. CSR should not benefit from the Court's sympathetic logic drawn from a case in federal court involving different issues and different parties. Instead, we should require CSR to meet its heavy burden of showing irreparable harm.

CSR has not shown that the denial of its special appearance will compromise its ability to defend the underlying suit on the merits so that it will suffer irreparable harm. *Canadian Helicopters,* 876 S.W.2d at 308. The only proof directly from CSR in support of its special appearance is the affidavit of Edwin Anthony Smith, CSR's group manager of financial reporting. Despite his affidavit testimony that he is "familiar with the records of CSR Limited and the scope of CSR Limited's operations," Smith's affidavit does not provide any testimony, nor did CSR provide any other proof, that it would suffer irreparable harm by its continued presence in this **\*601** litigation pending an opportunity to pursue ordinary appeal. Absent such a showing, I cannot comprehend how the Court can rightfully conclude that CSR carried its burden of proving irreparable harm.

Although CSR's arguments about the trial court's lack of personal jurisdiction may be compelling, that issue ought to be resolved on appeal. As a majority of this Court recently stated:

The mere fact that a trial court's erroneous denial of a special appearance will result in an eventual reversal on appeal does not mean that the trial will be a 'waste of judicial resources' as that term was used in *Walker.* To hold otherwise would mean that virtually any trial court order constituting reversible error would be a proper subject for mandamus review. Such a result is inconsistent with the rule that mandamus is an extraordinary remedy to be used only in limited circumstances.

*Canadian Helicopters,* 876 S.W.2d at 308 n. 11 (*quoting Walker v. Packer,* 827 S.W.2d at 843). As in *Canadian Helicopters,* regardless of whether the trial court in this case erred, this is not the type of extraordinary situation where this Court should consider mandamus. *See Canadian Helicopters,* 876 S.W.2d at 309. To decide differently leaves this Court and the courts of appeals without clear guidelines for mandamus review in special appearance cases—not to mention the guesswork trial courts face.

### Rule Change or Legislative Enactment

Beyond this Court's narrow exceptions that allow for mandamus relief when a trial court denies a special appearance, I believe that Rule 120a provides, at least by implication, that ordinary appeal is the remedy for the denial of a special appearance. *See* TEX.R. CIV. P. 120a(4). [6] Until *National Sand,* Texas courts interpreted the rule to mean that if a party properly filed its special appearance, and unless the sovereign immunity/comity or parent-child exceptions applied, the moving party does not waive its special appearance and has an adequate remedy on appeal whenever the trial court denied its special appearance. *See, e.g., Aktienggesellschaft v. Kirk,* 859 S.W.2d 651, 652 (Tex.App.—Eastland 1993, orig. proceeding); *N.H. Helicopters, Inc. v. Brown,* 841 S.W.2d 424, 425–426 n. 1 (Tex.App.—Dallas 1992, orig. proceeding)(cited with approval in *Canadian Helicopters,* 876 S.W.2d at 306 n. 6); *Sullivan v. Tab Sales Co.,* 576 S.W.2d 137 (Tex.Civ.App.—Texarkana 1978, orig. proceeding); *Carpenter Body Works, Inc. v. McCulley,* 389 S.W.2d 331, 332 (Tex.Civ.App.—Houston 1965, writ ref'd), *cert. denied,* 382 U.S. 979, 86 S.Ct. 550, 15 L.Ed.2d 469

(1966); *see also* Thode, *In Personam Jurisdiction; Article 2031B, The Texas "Long Arm" Jurisdiction Statute; And The Appearance To Challenge Jurisdiction In Texas and Elsewhere,* 42 TEX. L. REV. 279, 332 (1964)(recognizing that "[t]he possible abuse of the interlocutory appeal as a vehicle for delay appears to outweigh the hardship presented by lack of an interlocutory appeal."). If Rule 120a should be changed to allow interlocutory appeal of an order on a defendant's special appearance, that change should be accomplished through the State Bar Rules Committee and in conjunction with the Court's rule-making authority, not by case law mandate. Amending Rule 120a to provide for interlocutory appeal of a denial of a special appearance as a part of a case would not be a novel addition to our rules of civil procedure. *See, e.g.,* TEX.R. CIV. P. 76a(8)(allowing for interlocutory appeal of order sealing court records).

Short of a rule change, the legislature could, if it desired, provide a statutory method for interlocutory appeal of the denial of a special appearance. [7] Again, this is not a **\*602** novel idea. The Texas Civil Practices and Remedies Code provides for interlocutory appeal of a number of pre-trial rulings. *See* TEX. CIV. PRAC. & REM.CODE § 51.014. [8] In my view, before the Court allows interlocutory appeals as a matter of course, or "[b]ecause of the size and complexity" of a case, we should await word from the legislature. 925 S.W.2d at 597.

### The Court's Authorities Are Flawed

The Court relies upon four cases from other states to justify its "approach" today. *See United States v. Superior Court,* 144 Ariz. 265, 697 P.2d 658 (1985); *Lupo v. Lineberger,* 313 Ark. 315, 855 S.W.2d 293 (1993); *State ex rel. Fogle v. Steiner,* 74 Ohio St.3d 158, 656 N.E.2d 1288 (1995); *Conn v. ITT Aetna Fin. Co.,* 105 R.I. 397, 252 A.2d 184 (1969). Notwithstanding the fact that our mandamus jurisprudence is fully developed, and until recently, appeared well-settled under the *Walker* standard, all four cases are distinguishable.

In *United States v. Superior Court,* the Arizona Supreme Court gave way to its "general policy of declining jurisdiction" of an original proceeding because the case dealt with adjudication and quantification of water rights, "one of the most important issues conceivable in an arid state such as Arizona." *United States v. Superior Court,* 697 P.2d at 662. CSR does not invoke such an issue in this case.

In *Lupo,* the Arkansas Supreme Court considered whether it should provide extraordinary relief to a physician who the trial court ordered to testify by deposition. *Lupo,* 855 S.W.2d at 293. Not only did the supreme court deny the petitioner extraordinary relief, but the case did not involve a special appearance. *Lupo,* 855 S.W.2d at 295. It involved a discovery dispute not unlike our recent "apex" deposition case where we afforded mandamus relief to corporate executive after the trial court ordered him to appear for deposition. *Lupo,* 855 S.W.2d at 294–96; *see also Crown Cent. Petroleum Corp. v. Garcia,* 904 S.W.2d 125 (Tex.1995). *Lupo* is not instructive here.

In *Steiner,* the Ohio Supreme Court granted extraordinary relief to a mother involved in a custody battle over her two children against her estranged mother-in-law. *Steiner,* 656 N.E.2d at 1290. *Steiner* offers no support for today's opinion because this Court has previously recognized that an adequate remedy on appeal may be lacking in special appearance cases involving the parent-child relationship. *See Canadian Helicopters,* 876 S.W.2d at 307.

*Conn* is the only case closely analogous to today's facts; however, it is distinguishable also. The Supreme Court of Rhode Island decided *Conn* in 1969, at a time where, because of a "changing economy" and greater "means of communication and transportation," courts, "to keep pace," began "to relax the jurisdictional strictures of **\*603** *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877)." *Conn,* 252 A.2d at 186. The *Conn* court allowed for interlocutory review of the denial of a corporate defendant's special appearance to interpret the state's new longarm statute and to "provide some guidance to the bar and to the courts on the scope of the statute...." *Conn,* 252 A.2d at 188. Except for the court's need to interpret the new longarm statute for "future litigation," the court would have denied extraordinary relief. *Conn,* 252 A.2d at 188. Over a quarter of a century has passed since the Supreme Court of Rhode Island decided *Conn.* Today's opinion is not necessary to explain anything to our state's bench and bar about now fully-evolved principles of personal jurisdiction. Consequently, *Conn's* logic does not support the Court's action here.

In some other states, courts have the benefit of a statutory guide or a rules device providing interlocutory relief following the denial of a special appearance or plea to the jurisdiction. *See, e.g., Miller v. Miller,* 506 So.2d 1084 (Fla.Dist.Ct.App.1987)(interlocutory relief allowed by Florida Rules of Appellate Procedure); *Healy v. Vaupel,* 133 Ill.2d 295, 140 Ill.Dec. 368, 549 N.E.2d 1240 (1990)(statute

and rules of procedure allowed for interlocutory relief); *Byrd v. Ontario Freight Lines Corp.,* 39 N.J.Super. 275, 120 A.2d 787 (1956)(discussing availability of statute allowing for interlocutory review of personal jurisdiction issue); *Poret v. State Personnel Comm'n,* 74 N.C.App. 536, 328 S.E.2d 880 (1985), *overruled sub nom. on other grounds, Batten v. N. Carolina Dep't of Correction,* 326 N.C. 338, 389 S.E.2d 35 (1990)(immediate appeal of jurisdictional question allowed by statute); *United Erectors, Inc. v. Pratt & Lambert Corp.,* 338 Pa.Super. 577, 488 A.2d 43 (1985)(discussing Pennsylvania Rule of Appellate Procedure allowing interlocutory relief from order sustaining personal or in rem jurisdiction). We do not. Without statute or rule to provide interlocutory appeal, I do not believe mandamus is appropriate after the denial of a special appearance except in cases involving sovereign immunity, comity and child custody issues. These limited exceptions invoke important, and many times, immediate public policy concerns, which is not the case here, nor was it the case in *National Sand.*

The Court's recent decisions in this area are troubling, and I believe, confirm my views. Compare *National Sand,* 897 S.W.2d at 769 (providing mandamus relief for denial of special appearance) *with Canadian Helicopters,* 876 S.W.2d at 304 (denying foreign defendant mandamus relief after denial of special appearance). These decisions, along with today's opinion, do not square. There is little rhyme or reason to these cases except perhaps the amorphous standard of "clear and super clear" abuse of discretion. *See Canadian Helicopters,* 876 S.W.2d at 310 (Hecht, J., dissenting). As the Court has been reminded, hard cases make bad law. *See Robinson v. Central Tex. MHMR Ctr.,* 780 S.W.2d 169, 172 n. 1. (Tex.1989)(Hecht, J., dissenting). CSR's position in this case offers hard enough facts. Nevertheless, I believe that the Court's decision today sets bad precedent that adds uncertainty to pretrial rulings and, as a result, encourages litigants to unnecessarily file original proceedings. [9]

### The Road of No Return–Ignoring Precedent

As the Court recently reminded us, "we adhere to our precedents for reasons of efficiency, fairness, and legitimacy." *See Weiner v. Wasson,* 900 S.W.2d 316, 320 (Tex.1995)(Cornyn, J., joined by Gonzalez, Enoch and Spector, JJ.). "[I]f we [do] not follow our own decisions, no issue could ever be considered resolved." *Weiner,* 900 S.W.2d at 320 (Cornyn, J., joined by Gonzalez, Enoch and Spector, JJ.). Following *Canadian Helicopters, National Sand* and

today's opinion, it is apparent that the Court has only paid lip service to its self-proclaimed **\*604** judicial edict that "stare decisis is a sound policy." *Weiner,* 900 S.W.2d at 320. The Court ought to practice what it preaches and "not succumb to a temptation to continually revisit prior decisions as new fact situations arise...." *See Weiner,* 900 S.W.2d at 332 (Owen, J., dissenting, joined by Phillips, C.J., and Hecht, J.). Mandamus should not issue simply because we disagree with a trial court's ruling. *See Buller,* 806 S.W.2d at 226.

Absent any legislative guidance, today's decision veers from the design of Rule 120a and bolts from precedent. Because today's decision can only lead the Court down a road of no return, I respectfully dissent.

**All Citations**

925 S.W.2d 591, Prod.Liab.Rep. (CCH) P 14,666, 39 Tex. Sup. Ct. J. 767

Footnotes

1   The plaintiffs claim that CSR waived the right to contest personal jurisdiction in Texas because of admissions CSR allegedly made before the West Virginia Supreme Court during unrecorded oral argument. *See State ex rel. CSR Ltd. v. MacQueen,* 190 W.Va. 695, 441 S.E.2d 658 (1994). CSR disputes that contention. Because there is a dispute about what was said, we do not find a judicial admission that knowingly waives a constitutional right under these circumstances.

2   As of June 11, 1996, CSR had been sued by approximately 1610 plaintiffs in at least twelve different lawsuits. DOCKET, 80TH DISTRICT COURT, HARRIS COUNTY, TEXAS (June 11, 1996).

1   *See Canadian Helicopters,* 876 S.W.2d at 308–09. Remarkably, Canadian Helicopter's "situation" and its argument to this Court were similar to CSR's "situation" and argument here. Nevertheless, the Court denied Canadian Helicopters mandamus relief.

2   There is at least some dispute about whether CSR made admissions about its Texas contacts while arguing a case to the West Virginia Supreme Court. 925 S.W.2d at 595 n. 1. Nevertheless, and despite warnings that, "in cases turning on disputed factual issues, mandamus would not be proper," the Court decides today that the trial court abused its discretion. *See Canadian Helicopters,* 876 S.W.2d at 312 (Hecht, J., dissenting)(*citing Brady v. Fourteenth Court of Appeals,* 795 S.W.2d 712, 714 (Tex.1990)); *see also Huey,* 571 S.W.2d at 862 ("[a]n abuse of discretion does not exist where the trial court bases its decision[ ] on conflicting evidence.").

3   Part of my quarrel with the Court's opinion is that the majority reviews CSR's evidence in a light most favorable to CSR, which in effect, makes for a no evidence review. This is contrary to the more limited and proper standard of abuse of discretion.

4   *See Canadian Helicopters,* 876 S.W.2d at 311 (Hecht, J., dissenting).

5   While this Court's grant of writ may relieve CSR of defending itself in a Texas state court, it hardly relieves CSR from "numerous trials" in other states.

6   The rule provides:

If the court sustains the objection to jurisdiction, an appropriate order shall be entered. If the objection to jurisdiction is overruled, the objecting party may thereafter appear generally for any purpose. Any such special appearance or such general appearance shall not be deemed a waiver of the objection to jurisdiction when the objecting party or subject matter is not amenable to process issued by the courts of this State.

TEX.R. CIV. P. 120a(4).

7   Commentators have recognized that a non-resident defendant may be highly inconvenienced by having to wait to appeal. However, they have urged that "[r]ather than the courts stretching the extraordinary remedy of mandamus to accommodate this need [for interlocutory review], the legislature could and should amend the Civil Practice and Remedies Code to contemplate interlocutory appeal of the denied special appearance." *See* Muldrow & Gray, *Treading the Mine Field: Suing and Defending Non–Residents in Texas State Courts,* 46 BAYLOR L. REV. 581, 609 (1994).

8   The statute provides that:

A person may appeal from an interlocutory order of a district court, county court at law, or county court that:

(1) appoints a receiver or trustee;

(2) overrules a motion to vacate an order that appoints a receiver or trustee;

(3) certifies or refuses to certify a class in a suit brought under Rule 42 of the Texas Rules of Civil Procedure;

(4) grants or refuses a temporary injunction or grants or overrules a motion to dissolve a temporary injunction as provided by Chapter 65;

(5) denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state; or

(6) denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73. TEX. CIV. PRAC. & REM.CODE § 51.014.

9   Following *National Sand* and today's opinion, one might ask what prudent Texas lawyer would advise a client to abide by Rule 120a(4). After today, there is little incentive to wait to appeal the denial of a special appearance when mandamus may be immediately available. Indeed, former Justice Barrow's mandamus "thicket" prophecy is now "reality." *Joachim v. Chambers,* 815 S.W.2d 234, 245 (Tex.1991)(Gonzalez, J., dissenting)(quoting *Jampole v. Touchy,* 673 S.W.2d 569, 578 (Tex.1984)(Barrow, J., dissenting)).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Called into Doubt by** Moore v. Pulmosan Safety Equipment Corp.,
Tex.App.-Hous. (14 Dist.), December 9, 2008

97 S.W.3d 847
Court of Appeals of Texas,
Corpus Christi-Edinburg.

EMI MUSIC MEXICO, S.A. De C.V., Appellant,
v.
Hermelinda RODRIGUEZ, individually
and as Representative of the Estate of
Silvestre Rodriguez, Jr., et al., Appellees.

No. 13–01–867–CV. | Jan. 30, 2003.

Members of musical group and relatives of deceased band members sued Mexican record company for negligence after car accident in Mexico. Record company filed special appearance. The 93rd District Court, Hidalgo County, Rodolfo Delgado, District Judge, denied the special appearance. Record company filed interlocutory appeal. The Court of Appeals, Yanez, J., held that: (1) company had substantial connection to Texas, and (2) exercise of jurisdiction did not offend traditional notions of fair play and substantial justice.

Affirmed.

West Headnotes (32)

**[1]** **Courts**
 Presumptions and Burden of Proof as to Jurisdiction

A nonresident defendant bears the burden of negating all bases of personal jurisdiction to prevail in a special appearance.

1 Cases that cite this headnote

**[2]** **Appeal and Error**
 Cases Triable in Appellate Court

**Appeal and Error**
 Proceedings preliminary to trial

In considering an order granting or denying a special appearance, the Court of Appeals reviews the trial court's resolution of disputed factual issues under a factual sufficiency of the evidence standard, and review the trial court's conclusions of law de novo.

Cases that cite this headnote

**[3]** **Appeal and Error**
 Cases Triable in Appellate Court

If a special appearance is based on undisputed or established facts, an appellate court conducts a de novo review of the trial court's order granting a special appearance as a question of law.

Cases that cite this headnote

**[4]** **Appeal and Error**
 Proceedings preliminary to trial

In conducting review of an order granting or denying special appearance, the appellate court will consider all of the evidence that was before the trial court, including the pleadings, any stipulations, affidavits and exhibits, the results of discovery, and any oral testimony.

Cases that cite this headnote

**[5]** **Appeal and Error**
 Appearance and representation by counsel

In reviewing a grant or denial of special appearance, all questions of fact are presumed to be found in support of the judgment if the record contains no findings of fact or conclusions of law.

1 Cases that cite this headnote

**[6]** **Constitutional Law**
 Non-residents in general
**Courts**
 Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

A Texas court may assert personal jurisdiction over a nonresident defendant only (1) when the Texas long-arm statute authorizes the exercise of jurisdiction and (2) when the exercise is

consistent with the due process guarantees embodied in both the United States and Texas constitutions.

Cases that cite this headnote

**[7]** **Courts**
☞ Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant as far as the federal constitutional requirements of due process will allow. V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[8]** **Constitutional Law**
☞ Non-residents in general

Due process permits a state court to exercise personal jurisdiction over a defendant only if the defendant has some minimum, purposeful contacts with the state, and the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[9]** **Courts**
☞ Business contacts and activities; transacting or doing business

A nonresident that purposefully avails itself of the privileges and benefits of conducting business in Texas is amenable to a suit in Texas.

Cases that cite this headnote

**[10]** **Courts**
☞ Nature, number, frequency, and extent of contacts and activities

A nonresident will not be subject to Texas jurisdiction based upon mere random, fortuitous, or attenuated contacts.

Cases that cite this headnote

**[11]** **Courts**
☞ Related contacts and activities; specific jurisdiction

Specific jurisdiction over a nonresident defendant is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum, which must be purposefully directed at the forum so the defendant could foresee being haled into court there.

Cases that cite this headnote

**[12]** **Courts**
☞ Related contacts and activities; specific jurisdiction

The number of the nonresident defendant's contacts is not controlling in specific jurisdiction analysis; rather, the importance lies with the quality and nature of these contacts.

Cases that cite this headnote

**[13]** **Courts**
☞ Related contacts and activities; specific jurisdiction

When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation.

Cases that cite this headnote

**[14]** **Courts**
☞ Related contacts and activities; specific jurisdiction

A single contact with Texas, of substantial quality and nature, may be sufficient to establish specific jurisdiction over a nonresident defendant when the cause of action arises from that contact.

2 Cases that cite this headnote

**[15] Courts**
  🔑 Unrelated contacts and activities; general jurisdiction

When general jurisdiction is alleged, there must be continuous and systematic contacts between the nonresident defendant and Texas.

Cases that cite this headnote

**[16] Courts**
  🔑 Unrelated contacts and activities; general jurisdiction

Contacts giving rise to general jurisdiction over a nonresident defendant would permit Texas courts to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the state.

Cases that cite this headnote

**[17] Courts**
  🔑 Unrelated contacts and activities; general jurisdiction

**Courts**
  🔑 Related contacts and activities; specific jurisdiction

General jurisdiction requires a showing of substantial activities by the nonresident defendant in Texas, a more demanding minimum contacts analysis than for specific jurisdiction.

Cases that cite this headnote

**[18] Constitutional Law**
  🔑 Non-residents in general

In determining whether the exercise of in personam jurisdiction over a nonresident defendant comports with fair-play and substantial justice, the court considers: (1) the burden on the nonresident defendant, (2) Texas's interest in adjudicating the dispute, (3) the plaintiff's interest in getting convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and (5) the states' shared interest in furthering fundamental substantive social policies.

1 Cases that cite this headnote

**[19] Courts**
  🔑 Factors Considered in General

When an international dispute is involved in asserting in personam jurisdiction over a nonresident defendant, additional factors should be considered in determining whether the exercise of jurisdiction comports with fair-play and substantial justice: (1) the unique burdens placed upon the defendant who must defend itself in a foreign legal system; and (2) the procedural and substantive policies of other nations whose interests are affected as well as the foreign government's interest in its foreign relation policies.

Cases that cite this headnote

**[20] Courts**
  🔑 Related contacts and activities; specific jurisdiction

The minimum contacts prong for specific jurisdiction can be satisfied by a single act if the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws.

2 Cases that cite this headnote

**[21] Courts**
  🔑 Jurisdiction of the Person

When reaching a decision to exercise or decline jurisdiction based on the nonresident defendant's alleged commission of a tort, the trial court should examine only the necessary jurisdictional facts and should not reach the merits of the case.

2 Cases that cite this headnote

**[22] Courts**
  🔑 Torts in general
**Courts**

🔑 Agents, Representatives, and Other Third Parties, Contacts and Activities of as Basis for Jurisdiction

Specific jurisdiction over a nonresident tort defendant is satisfied when the defendant, personally or through an agent, is the author of an act or omission within the forum state, and the petition states a claim in tort arising from such conduct.

Cases that cite this headnote

**[23]** **Negligence**
🔑 Elements in general

The elements of a negligence cause of action are: (1) a legal duty, (2) breach of that duty, and (3) damages proximately resulting from the breach.

1 Cases that cite this headnote

**[24]** **Labor and Employment**
🔑 Negligent Hiring

To successfully prosecute a claim of negligent hiring, supervision, or retention, a plaintiff is required to show that: (1) the employer owed a legal duty to protect third parties from the employee's actions, and (2) the third party sustained damages proximately caused by the employer's breach of that legal duty.

3 Cases that cite this headnote

**[25]** **Automobiles**
🔑 Permitting operation by incompetent person

Proof of negligent entrustment requires: (1) entrustment of a vehicle by the owner, (2) to an unlicensed, incompetent, or reckless driver, (3) that the owner knew or should have known to be unlicensed, incompetent, or reckless, (4) the driver's negligence on the occasion in question, (5) proximately caused the accident.

1 Cases that cite this headnote

**[26]** **Negligence**
🔑 Voluntarily Assumed Duty
**Negligence**

🔑 Voluntarily assumed duties

Texas courts have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation.

1 Cases that cite this headnote

**[27]** **Negligence**
🔑 Voluntarily Assumed Duty
**Negligence**
🔑 Voluntarily assumed duties

One who owes no legal duty, but who gratuitously acts, assumes a duty to act with reasonable care so as to prevent harm to that person or to others.

1 Cases that cite this headnote

**[28]** **Courts**
🔑 Automobile accidents; nonresident motorists

Foreign record company undertook to provide transportation services to band members in forum state, and thus, car accident that occurred in Mexico that injured and killed members of band had substantial connection to company's act of picking of band members in forum state and transporting them to Mexico, which satisfied necessary element to establish long-arm jurisdiction over foreign record company, where record company directed its employees to drive to Texas and pick-up band members and then transport them to Mexico.

Cases that cite this headnote

**[29]** **Constitutional Law**
🔑 Business, business organizations, and corporations in general
**Courts**
🔑 Automobile accidents; nonresident motorists

Exercise of long-arm jurisdiction over nonresident record company did not impose an undue burden on company to defend negligence suit brought by band members and relatives

after car driven by company employee had an accident that resulted in injury and death to bad members, to satisfy that element of due process requirements of fair play and substantial justice in asserting jurisdiction over nonresident defendant, where company had offices in Mexico that were only two or three hours from place of suit. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[30] **Courts**
 Commercial Contacts and Activities; Contracts and Transactions

Distance alone is not ordinarily sufficient to defeat long-arm jurisdiction over a nonresident defendant as modern transportation and communication have made it much less burdensome for a party sued to defend himself in a state where he engages in economic activity.

1 Cases that cite this headnote

[31] **Constitutional Law**
 Media and publishing
**Courts**
 Automobile accidents; nonresident motorists

Forum state had substantial interest in adjudicating negligence action brought by band members and relatives for injuries and death resulting from accident in Mexico involving car driven by company employee, which satisfied that element of due process requirement of fair play and substantial justice in asserting jurisdiction over nonresident defendant, where employee picked-up members in Texas and transported them to Mexico, and company officials traveled to state six to eight times a year to meet musicians and coordinate events. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

[32] **Constitutional Law**
 Business, business organizations, and corporations in general

**Courts**
 Automobile accidents; nonresident motorists

Interests of injured band members and relatives of deceased band members in adjudicating against record company that provided transportation from Texas to Mexico negligence action arising from car accident in Mexico satisfied that element of due process requirements of fair play and substantial justice in asserting long-arm jurisdiction over foreign record company, where state was forum in which entire dispute could be resolved. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*851** Barry A. Chasnoff, Roberta J. Sharp and Jo Beth Eubanks, San Antonio, for EMI Music Mexico, S.A. de C.V.

Kevin Dubose, J. Brett Busby, Hogan, Dubose & Townsend, Houston, David H. Hockema, Joe Escobedo, Jr., Hockema, Tippit & Escobedo, McAllen, David W. Showalter, Bellaire, Richard J. Plezia, David M. Valetutto, Houston, Roger G. Bresnahan, San Antonio, Jose E. Chapa, Jr., Yzaguirre & Chapa, Jay Joel Palacios, McAllen, for Appellees.

Jose E. Chapa, Jr., for Nicole Rodriguez, Minor.

David W. Showalter and Kevin Dubose, for Rita Gonzalez Vigil, Audrey Gonzalez, Angela Gonzalez, Amber Gonzalez.

Jay Joel Palacios, for Gonzalez Minors.

Kevin Dubose, Richard J. Plezia, David M. Valetutto and J. Brett Busby, for Hector Gonzalez, Dolores Gonzalez.

Kevin Dubose and Roger G. Bresnahan, for Intocable, L.L.C., Ricardo Munoz and Rene Martinez.

Before Justices HINOJOSA, YAÑEZ, and CASTILLO.

## OPINION

Opinion by Justice YAÑEZ.

Appellant, EMI Music Mexico, S.A. de C.V. ("EMI Mexico"), a Mexican corporation, brings this accelerated interlocutory appeal of an order denying its special appearance. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.2003); TEX.R.APP. P. 28.1. The underlying lawsuit is a personal injury suit brought by appellees[1] for damages arising out of a 1999 car crash in Mexico, which resulted in the deaths of several musicians and employees of a Texas musical group called "Intocable." In two issues, EMI Mexico contends the trial court erred in denying its special appearance because: (1) EMI Mexico's contacts with Texas are insufficient to support the exercise of general jurisdiction; and (2) EMI Mexico's conduct in sending its employees into Texas to pick up members of the band and transport them into Mexico is insufficient to support the exercise of specific jurisdiction. We affirm the trial court's ruling denying EMI Mexico's special appearance.

### Background

EMI Mexico is a Mexican corporation that is an indirect wholly-owned subsidiary **\*852** of EMI Group PLC, a United Kingdom holding company. EMI Latin[2] is an unincorporated division of Capitol Records, Inc. ("Capitol"), a United States corporation, which, like EMI Mexico, is also a wholly-owned subsidiary of EMI Group PLC. EMI Mexico's principal office is in Mexico City; it has no offices outside Mexico. EMI Mexico is not a resident of Texas, is not authorized or registered to do business in Texas, has no agents or representatives in Texas, owns no property in Texas, does not advertise in Texas, has no employees who are residents of Texas, and maintains no bank accounts in Texas.

EMI Mexico enters into recording contracts with Mexican artists, and promotes and sells those artists' recordings in Mexico. Outside Mexico, recordings of EMI Mexico artists are sold through a reciprocal license agreement with EMI Music International Services Limited ("EMIMUS"), a United Kingdom company also owned by EMI Group PLC. Through the agreement, called a Matrix Exchange Agreement ("MEA"), EMI Mexico has the exclusive right to manufacture, distribute and sell in Mexico any recordings within the repertoire of any EMI company around the world. In exchange, EMI Mexico: (1) grants to EMI Group an exclusive license to sell EMI Mexico repertoire everywhere in the world *except* Mexico, and (2) agrees to pay a royalty to EMI Group for each recording of another EMI company's repertoire sold by EMI Mexico in Mexico. Intocable has a

recording contract with EMI Latin. Thus, under the MEA, EMI Mexico is licensed to sell Intocable's recordings in Mexico.

When EMI Mexico organizes a promotional tour in Mexico by artists of another EMI repertoire owner, EMI Mexico is responsible for arrangements and related expenses inside Mexico; travel costs in and out of Mexico, however, are borne by the repertoire owner.

In January 1999, Lidia Salazar, then EMI Mexico's regional marketing manager, arranged a promotional tour for Intocable in Mexico. Initially, EMI Latin made travel arrangements for the band by booking a commercial flight from Texas to Mexico City. Several days later, however, the plans were changed because the band had not received the appropriate visas for a direct international flight. Salazar therefore arranged for EMI Mexico's Monterrey office to rent two Suburbans in Mexico to pick the band members up in McAllen and take them to Monterrey to catch a flight to Mexico City. The circumstances regarding who initiated the backup travel plans are somewhat in dispute.[3] It is undisputed, however, that in accordance with such plans, EMI Mexico assigned two of its employees, David Perez and Enrique **\*853** Herrera, to drive the Suburbans to McAllen and pick up the band and its equipment.

On January 30, 1999, the night before the tour was to begin, the band played at a festival in McAllen. The concert and follow-up activities lasted until the early morning hours. As planned, Perez and Herrera picked up the band members at the McAllen Holidome hotel around 7:30 a.m. on January 31, 1999.[4] The band members and the road manager rode in the Suburban driven by Perez; the Suburban driven by Herrera carried the band's equipment. At a checkpoint five miles south of the border, the Suburban driven by Perez was briefly delayed. According to deposition testimony of Rene Martinez, one of the band members, Perez began speeding following the delay to catch up with the other Suburban. While traveling southbound on Highway 40 to Monterrey, near China, in Nuevo Leon, the right rear passenger tire of the Suburban driven by Perez suffered a tread separation, and Perez was unable to retain control of the vehicle. The vehicle rolled over, and all but one of the passengers was thrown from the vehicle. As a result of the crash, band members Sylvestre Rodriguez, Jose Angel Farias, and road manager Jose Angel Gonzalez were killed. Band owners Ricardo Munoz and Rene Martinez, band members Sergio Serna and Daniel Sanchez, and the driver, Perez, suffered injuries.

The band, the injured band members, and relatives of the deceased band members filed suit in Texas district court. EMI Mexico was later added as a defendant. Appellees allege acts of negligence by EMI Mexico and its employee, Perez. EMI Mexico filed a special appearance challenging the court's *in personam* jurisdiction. Following a hearing, the trial court denied the special appearance. This interlocutory appeal followed.

## Standard of Review

**[1]** We begin with the presumption that the court has jurisdiction over the parties. *El Puerto de Liverpool v. Servi Mundo Llantero S.A. de C.V.,* 82 S.W.3d 622, 628 (Tex.App.-Corpus Christi 2002, pet. dism'd w.o.j.) (citing *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985)). A nonresident defendant bears the burden of negating all bases of personal jurisdiction to prevail in a special appearance. *Id.* (citing *CSR Ltd. v. Link,* 925 S.W.2d 591, 596 (Tex.1996) (orig.proceeding)).

**[2]** **[3]** **[4]** **[5]** In considering an order granting or denying a special appearance, we review the trial court's resolution of disputed factual issues under a factual sufficiency of the evidence standard, and review the trial court's conclusions of law *de novo. Id.* (citations omitted). However, if a special appearance is based on undisputed or established facts, an appellate court instead conducts a *de novo* review of the trial court's order granting a special appearance as a question of law. *Id.* In conducting its review, the appellate court will consider all of the evidence that was before the trial court, including the pleadings, any stipulations, affidavits and exhibits, the results of discovery, and any oral testimony. *BHP de Venezuela, C.A. v. Casteig,* 994 S.W.2d 321, 326 (Tex.App.-Corpus Christi 1999, pet. denied) (op. on reh'g). Where, as here, the record contains no findings of fact or conclusions of law, all questions of fact are presumed to be found in support **\*854** of the judgment. *Valsangiacomo v. Am. Juice Import, Inc.,* 35 S.W.3d 201, 205 (Tex.App.-Corpus Christi 2000, no pet.). Because the appellate record includes a reporter's record, however, these implied findings are not conclusive and an appellant may challenge the sufficiency of the evidence on appeal. *Id.*

## Applicable Law

In Texas, a party may contest personal jurisdiction by filing a special appearance. TEX.R. CIV. P. 120a(1). A special appearance is determined by reference to the pleadings, any stipulations made by and between the parties, any affidavits and attachments filed by the parties, discovery, and any oral testimony. TEX.R. CIV. P. 120a(3).

**[6]** **[7]** A Texas court may assert personal jurisdiction over a nonresident defendant only (1) when the Texas long-arm statute authorizes the exercise of jurisdiction and (2) when the exercise is consistent with the due process guarantees embodied in both the United States and Texas constitutions. *Ahadi v. Ahadi,* 61 S.W.3d 714, 718 (Tex.App.-Corpus Christi 2001, pet. denied) (citing *CSR Ltd.,* 925 S.W.2d at 594). The long-arm statute authorizes jurisdiction over a nonresident defendant "doing business" in Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). [5] The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant "as far as the federal constitutional requirements of due process will allow." *CSR Ltd.,* 925 S.W.2d at 594 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C,* 815 S.W.2d 223, 226 (Tex.1991)).

**[8]** **[9]** **[10]** Due process permits a state court to exercise personal jurisdiction over a defendant only if the defendant has some minimum, purposeful contacts with the state, and the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *Dawson–Austin v. Austin,* 968 S.W.2d 319, 326 (Tex.1998); *Liverpool,* 82 S.W.3d at 629; *Ahadi,* 61 S.W.3d at 719. A nonresident that purposefully avails itself of the privileges and benefits of conducting business in Texas is amenable to a suit in Texas. *CSR Ltd.,* 925 S.W.2d at 594; *Liverpool,* 82 S.W.3d at 629; *see Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). However, a nonresident will not be subject to Texas jurisdiction based upon mere random, fortuitous, or attenuated contacts. *CSR Ltd.,* 925 S.W.2d at 595; *Liverpool,* 82 S.W.3d at 629. Minimum contacts are particularly important when the defendant is from a different country because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system. *Liverpool,* 82 S.W.3d at 629.

**[11]** **[12]** **[13]** **[14]** A defendant's contacts with a forum can give rise to specific or general **\*855** jurisdiction. *CSR Ltd.,* 925 S.W.2d at 594; *Liverpool,* 82 S.W.3d at 627. Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted

within the forum. *CSR Ltd.,* 925 S.W.2d at 595. The activity must be purposefully directed at Texas so the defendant could foresee being haled into court here. *Id.* The number of the defendant's contacts is not controlling; rather, the importance lies with the quality and nature of these contacts. *Ahadi,* 61 S.W.3d at 719. When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation. *Id.; Guardian Royal,* 815 S.W.2d at 228. A single contact with Texas, of substantial quality and nature, may be sufficient to establish specific jurisdiction when the cause of action arises from that contact. *Ahadi,* 61 S.W.3d at 719; *Mem. Hosp. Sys. v. Fisher Ins. Agency, Inc.,* 835 S.W.2d 645, 650 (Tex.App.-Houston [14th Dist.] 1992, no writ). A substantial connection must exist between the contact and the cause of action in the forum state. *Ahadi,* 61 S.W.3d at 719. The concept of "foreseeability" is implicit in the requirement that there be a "substantial connection" between the nonresident defendant and Texas arising from action or conduct of the nonresident defendant purposefully directed toward Texas. *Id.* at 719–20.

[15] [16] [17] When general jurisdiction is alleged, there must be continuous and systematic contacts between the nonresident defendant and Texas. *Liverpool,* 82 S.W.3d at 627; *CSR Ltd.,* 925 S.W.2d at 595. Such contacts would permit Texas courts to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the state. *Liverpool,* 82 S.W.3d at 627; *CSR Ltd.,* 925 S.W.2d at 595; *see Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990). General jurisdiction requires a showing of substantial activities by the nonresident defendant in Texas, a more demanding minimum contacts analysis than for specific jurisdiction. *Liverpool,* 82 S.W.3d at 627; *CSR Ltd.,* 925 S.W.2d at 595.

[18] [19] Upon finding that the nonresident defendant purposefully established minimum contacts with the forum state, we must then determine if the exercise of *in personam* jurisdiction comports with fair-play and substantial justice. *Liverpool,* 82 S.W.3d at 637–38 (citing *Schlobohm,* 784 S.W.2d at 358). In making this determination, we consider: (1) the burden on the nonresident defendant; (2) Texas's interest in adjudicating the dispute; (3) the plaintiff's interest in getting convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the states' shared interest in furthering fundamental substantive social policies. *Id.; see Guardian Royal,* 815 S.W.2d at 228. When an international dispute is involved, the following factors should

also be considered: (1) the unique burdens placed upon the defendant who must defend itself in a foreign legal system; and (2) the procedural and substantive policies of other nations whose interests are affected as well as the foreign government's interest in its foreign relation policies. *Liverpool,* 82 S.W.3d at 638; *see Guardian Royal,* 815 S.W.2d at 229. Consideration of the fair-play analysis is separate and distinct from the minimum contacts issue, but it is unlikely the exercise of jurisdiction will fail the fair-play analysis because the minimum contacts analysis encompasses so many considerations of fairness. *Liverpool,* 82 S.W.3d at 638; *see Ahadi,* 61 S.W.3d at 721; *Guardian Royal,* 815 S.W.2d at 231.

### *856 Specific Jurisdiction

In this case, appellees asserted the trial court had both specific and general jurisdiction over EMI Mexico. We first address EMI Mexico's challenge to the exercise of specific jurisdiction.

[20] As noted, specific jurisdiction pertains to causes of action arising out of or relating to the defendant's contacts with Texas. *Guardian Royal,* 815 S.W.2d at 230. The minimum contacts prong for specific jurisdiction can be satisfied by a single act if the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws." *Guyton v. Pronav Ship Mgmt., Inc.,* 139 F.Supp.2d 815, 818 (S.D.Tex.2001) (citing *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174).

[21] [22] When reaching a decision to exercise or decline jurisdiction based on the defendant's alleged commission of a tort, the trial court should examine only the necessary jurisdictional facts and should not reach the merits of the case. *Arterbury v. Am. Bank & Trust Co.,* 553 S.W.2d 943, 948 (Tex.Civ.App.-Texarkana 1977, no writ); *see also Portland Sav. & Loan Ass'n v. Bernstein,* 716 S.W.2d 532, 535 (Tex.App.-Corpus Christi 1985, writ ref'd n.r.e.), *overruled on other grounds by, Dawson–Austin,* 968 S.W.2d at 328. Specific jurisdiction over a tort defendant is satisfied when "the defendant, personally or through an agent, is the author of an act or omission within the forum state, and the petition states a claim in tort arising from such conduct." *Baldwin v. Household Int'l, Inc.,* 36 S.W.3d 273, 277 (Tex.App.-Houston [14th Dist.] 2001, no pet.). The act or omission within the state is a sufficient basis for the exercise of jurisdiction to

determine whether or not the act or omission gives rise to liability in tort. *Id.* (citing *Bernstein,* 716 S.W.2d at 535).

Where an individual commits a tort in whole or in part in Texas, he satisfies the jurisdictional requirements of the Texas long-arm statute. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997); *Ring Power Sys. v. Int'l de Comercio Y Consultoria, S.A.,* 39 S.W.3d 350, 353 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

Here, EMI Mexico entered Texas to pick up and transport the band members to Mexico, and is being sued for damages arising out of an accident that occurred during that transportation. The pleadings show appellees alleged various acts of negligence by EMI Mexico, including failure to provide appellees with safe transportation, negligent hiring and training of Perez, and negligent entrustment of a vehicle to Perez. Appellees allege that at the time EMI Mexico negligently entrusted a vehicle to Perez, he was an "incompetent and unfit" driver and that he was "untrained, unlicensed, overworked, exhausted, and fatigued." Appellees further allege that EMI Mexico failed to provide safe transportation for the band members "from Hidalgo County, Texas into Mexico." They further allege EMI Mexico knew or should have known that as an incompetent and unfit driver, Perez would create an unreasonable risk of danger "on the public streets and highways of Texas and Mexico at the time of the [negligent] entrustment."

In support of allegations that Perez was an incompetent and unfit driver, appellees offered deposition testimony of various witnesses, including Alan Baxter, the manager of a singer who performed at a concert in Monterrey on the evening of January 30, 1999. Baxter testified he saw Perez drinking beer at a party in Monterrey on the afternoon of the 30th and later that evening, at the concert. He testified Perez did not leave the concert until **\*857** around 3:00 a.m. on the 31st. Paul Roland Olivarri, who works with Baxter, also testified he saw Perez drinking at the party and concert, and that Perez did not leave the concert until around 2:00 or 3:00 a.m. Sergio Serna, a member of the band, testified that although Perez was supposed to be at the McAllen Holidome Hotel at 7:00 a.m., he was not there, but was found a short time later at a different hotel, asleep in the Suburban. Serna testified that after loading up the band members and leaving the hotel, Perez ran a red light in McAllen. Several of the band members reminded him he was "not in Mexico," and that it was necessary to stop at red lights. Also, while still in McAllen, when the other Suburban stopped to get gas, Perez stopped in the middle of the roadway, without pulling over; again, the band members told him to move out of the roadway. Serna described Perez as a "reckless, careless" and very aggressive driver. According to Serna, on prior occasions when Perez had been assigned to drive the band in Monterrey, he had engaged in reckless driving, and the band had complained about his driving.

Rene Martinez, another member of the band, similarly testified that while still in McAllen, Perez ran a red light and stopped in the middle of the road, without pulling over to the side; on both occasions, the band told him he could be ticketed for such conduct. Martinez testified that Perez was wearing sunglasses, even though it was not sunny. He stated that Alan Baxter later told him Perez was seen drinking in Monterrey until 4:00 a.m. the morning he picked them up. Martinez testified that after the Suburban driven by Perez was briefly delayed at the checkpoint, Perez began speeding to catch up with the other Suburban. Martinez said he and others told Perez to slow down.

EMI Mexico argues it is not subject to specific jurisdiction because even though the long-arm statute permits the exercise of jurisdiction over a nonresident defendant who commits a tort in whole or in part in Texas, the alleged torts in this case were committed wholly in Mexico. It further argues jurisdiction cannot be predicated on any contract to be performed in whole or in part in Texas because there was no contract between EMI Mexico and the band regarding EMI Mexico's transportation of the band from Texas into Mexico. EMI Mexico argues it had no duty to provide transportation to the band, and that it came to Texas and provided transportation only because of the band's last-minute request that it do so.

Appellees cite *Chew v. Dietrich,* 143 F.3d 24, 30 (2d Cir.1998), in support of their position that the fact the injury occurred outside Texas does not, by itself, preclude a finding of specific jurisdiction. In *Chew,* the court found specific jurisdiction based on a nonresident defendant's transportation of people or goods from the forum state, even though the injury occurred outside the forum state. *See id.* Appellees also argue the exercise of specific jurisdiction is proper in Texas when any element of a tort, including breach of duty in a negligence action, takes place in the forum state. Appellees contend that by sending Perez, a fatigued and unfit driver, into Texas to pick up the band, EMI Mexico breached its duty *in Texas* to provide appellees with safe transportation, and thus committed part of a tort in Texas.

Appellees also argue EMI Mexico's attempt to distinguish *Chew* and other transportation cases [6] on the basis that those cases involved contracts is unpersuasive. **\*858** Appellees contend an agreement to transport people is not required to be in writing to be an enforceable contract, and that the band's acceptance of EMI Mexico's offer to arrange promotional events and provide transportation is supported by consideration.

Appellees' claims arise out of the accident which resulted from EMI Mexico's alleged negligence in sending Perez, an allegedly reckless, incompetent, and exhausted driver, into Texas to pick up the band. As noted, appellees also allege that EMI Mexico's breach of its duty to provide safe transportation occurred in Texas.

 [23]    The elements of a negligence cause of action are: (1) a legal duty; (2) breach of that duty; and (3) damages proximately resulting from the breach. *San Benito Bank & Trust Co. v. Landair Travels,* 31 S.W.3d 312, 317 (Tex.App.-Corpus Christi 2000, no pet.) (citing *Van Horn v. Chambers,* 970 S.W.2d 542, 544 (Tex.1998)).

 [24]    [25]    To successfully prosecute a claim of negligent hiring, supervision, or retention, a plaintiff is required to show that: (1) the employer owed a legal duty to protect third parties from the employee's actions; and (2) the third party sustained damages proximately caused by the employer's breach of that legal duty. *See Houser v. Smith,* 968 S.W.2d 542, 544 (Tex.App.-Austin 1998, no pet.); *see also Estate of Arrington v. Fields,* 578 S.W.2d 173, 178 (Tex.Civ.App.-Tyler 1979, writ ref'd n.r.e.) (holding basis of responsibility for negligent hiring is master's own negligence in hiring or retaining incompetent servant whom master knows or by exercise of reasonable care should have known was incompetent or unfit, thereby creating unreasonable risk of harm to others). Proof of negligent entrustment requires: (1) entrustment of a vehicle by the owner; (2) to an unlicensed, incompetent, or reckless driver; (3) that the owner knew or should have known to be unlicensed, incompetent, or reckless; (4) the driver's negligence on the occasion in question; (5) proximately caused the accident. *Williams v. Steves Indus., Inc.,* 699 S.W.2d 570, 571 (Tex.1985).

 [26]    [27]    Texas courts have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 837 (Tex.2000). One who owes no legal duty, but who gratuitously acts, assumes a duty to act with reasonable care so as to prevent harm to that person or to others. *Wal–Mart Stores, Inc. v. Lane,* 31 S.W.3d 282, 293 (Tex.App.-Corpus Christi 2000, pet. denied); *see also Munoz v. City of Pearsall,* 64 S.W.3d 119, 122 (Tex.App.-San Antonio 2001, no pet.).

 [28]    EMI Mexico argues that it came to Texas to provide transportation to the band only because the band requested that it do so. It also argues that its mere "footfall" into Texas is insufficient to support jurisdiction because its contacts with Texas were "incidental and immaterial" to the events which gave rise to appellees' claims and the band's location in Texas was entirely incidental to the agreement to travel into Mexico.

We are unpersuaded by EMI Mexico's argument that because it came to Texas only as an accommodation to the band, its contact with Texas is insufficient to support jurisdiction. A similar argument was rejected in *Summit Mach. Tool Mfg. Corp. v. Warren Transp.,* 920 F.Supp. 722, 725–26 (S.D.Tex.1996), where a Mexican trucking company that entered Texas to deliver equipment was found to have sufficient contact with Texas to support the exercise of specific jurisdiction, even though the **\*859** company argued it came into Texas only as an accommodation to and at the request of the Texas equipment yard owner where delivery was made. The court noted that "[w]hether or not [the defendant] was 'enticed' to come to Texas, it nevertheless freely did so, presumably finding it economically advantageous." *Id.* at 726. Because the plaintiff's claims arose from the defendant's contacts with Texas, the court found the exercise of jurisdiction was not contrary to due process. *Id.*

Here, the evidence shows EMI Mexico purposefully directed its activities toward Texas by sending its employee, Perez, to Texas to pick up the band. Appellees' claims arise out of EMI Mexico's alleged breach in Texas of its duty to provide safe transportation by sending an allegedly reckless, unfit, and exhausted driver to pick up the band.

EMI Mexico contends appellees' claims do not "arise out of or relate to" EMI Mexico's contacts with Texas because the test requires "virtually a direct link" between the claim and the contacts, a relationship analogous to the issue of proximate cause in tort law. Appellees note a split in the federal circuit courts on the standard to be applied in determining if a tort claim "relates" to the defendant's contacts within a state; some courts require that conduct within the state must be a proximate cause for the plaintiff's injury, while others hold

it sufficient if the conduct within the state is a "but for" cause of the plaintiff's injury. *See Chew,* 143 F.3d at 29 (citing cases). Appellees further note that some state courts have adopted a "discernible relationship" or "substantial connection" standard between contacts and claims. Appellees contend this Court need not decide which test to apply because the facts in this case satisfy even the most rigorous standard. This Court, however, has adopted the "substantial connection" standard and has held that a single Texas contact can support the exercise of specific jurisdiction if the suit arises out of that contact:

> A substantial connection must exist between the contact and the cause of action in the forum state. The concept of "foreseeability" is implicit in the requirement that there be a "substantial connection" between the nonresident defendant and Texas arising from action or conduct of the nonresident defendant purposefully directed toward Texas.

*Ahadi,* 61 S.W.3d at 719–20 (citations omitted); *see also, J & J Marine, Inc. v. Le,* 982 S.W.2d 918, 923 (Tex.App.-Corpus Christi 1998, no pet.).

If a nonresident defendant undertakes to provide transportation services to a forum resident, as EMI Mexico did here, he assumes a duty to act with reasonable care in doing so. *See Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983) ("[o]ne who voluntarily enters an affirmative course of action affecting the interests of another is regarded as assuming a duty to act and must do so with reasonable care."). If the defendant breaches such a duty by failing to act with reasonable care, there is a foreseeable consequence of injury to the forum resident. *See Ahadi,* 61 S.W.3d at 720. We hold that a substantial connection exists between EMI Mexico's contact with Texas and appellees' causes of action, as required for the exercise of specific jurisdiction.

### Fair Play and Substantial Justice

**[29]** We now determine whether the trial court's exercise of personal jurisdiction over EMI Mexico comports with traditional notions of fair play and substantial justice. *Guardian Royal,* 815 S.W.2d at 228. While conducting this inquiry, we bear in mind that only in rare cases will the exercise of jurisdiction not comport with fair play and

substantial justice when **\*860** the nonresident defendant has purposefully established minimum contacts with the state. *Id.* at 231. With this standard in place, we apply the relevant fair play and substantial justice factors, which are: (1) the nonresident's burden; (2) the forum state's interest in adjudicating the dispute; and (3) the plaintiff's interest in obtaining convenient and effective relief. *Id.* [7]

**[30]** EMI Mexico asserts that its status as an international defendant is a determinative factor in the fairness analysis. We disagree. EMI Mexico does not explain how it would be burdened by litigating this case in Texas, except to note that the injuries occurred in Mexico and that many of the witnesses are in Mexico. Appellees note that many of EMI Mexico's witnesses have testified by deposition in Mexico. Moreover, distance alone is not ordinarily sufficient to defeat jurisdiction as "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *See id.* (quoting *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)). Although EMI Mexico's principal office is located in Mexico City, it also has offices in Monterrey, which is a two to three hour drive from McAllen. We conclude that any inconvenience EMI Mexico may suffer defending this suit in Texas would not amount to a denial of due process.

**[31]** Texas has a substantial interest in adjudicating this matter because all but one of the members of the band were Texas residents at the time of the accident and the band itself, Intocable, L.L.C., is a Texas company. The evidence shows EMI Mexico officials traveled to Texas six to eight times a year to meet musicians in Texas to coordinate promotional events in Mexico. On some of these occasions, EMI Mexico officials picked up musicians in Texas and provided transportation into Mexico for the promotional events. Texas has a strong "interest in providing effective means of redress of its residents." *McGee,* 355 U.S. at 223, 78 S.Ct. 199. We find there is sufficient evidence to support the trial court's conclusion that Texas has an interest in adjudicating this dispute.

**[32]** The appellees' interests in convenient and effective relief also weigh in favor of finding that the exercise of jurisdiction over EMI Mexico is proper. Appellees note Texas may be the only forum in which the entire dispute can be resolved in a single proceeding because some plaintiffs have also sued other entities and individuals that are subject to jurisdiction in Texas and that have filed answers in the

lawsuit. Adjudication of the dispute in Texas thus allows the plaintiffs to obtain relief against all the parties in a single proceeding.

Taking into account all of the factors involved in a fairness analysis, we hold that the exercise of jurisdiction over EMI Mexico by a Texas court does not offend traditional notions of fair play and substantial justice. Accordingly, we overrule appellant's second issue and AFFIRM the trial court's denial of EMI Mexico's special appearance.

In light of our disposition of this issue, we need not address EMI Mexico's remaining issue. *See* TEX.R.APP. P. 47.1.

**All Citations**

97 S.W.3d 847

Footnotes

1   Appellees include surviving members of a Texas musical group called "Intocable," and relatives of the deceased band members and its employees. Intocable is a Texas limited liability company. At the time of the accident, five of Intocable's six members were Texas residents.

2   EMI Latin is also a defendant, but is not involved in this appeal.

3   In her affidavit, Salazar states that EMI Latin arranged for the revised itinerary providing for the band's commercial flight from Monterrey to Mexico City. She further states she made arrangements for the ground transportation from McAllen to Monterrey in response to a call from Intocable's agent, Servando Cano, who asked her to contact the band's business manager, Nikki Sandoval, for the purpose of coordinating the ground travel plans between McAllen and Monterrey. In her deposition testimony, Sandoval stated she was unsure whose idea it was to arrange for the band to travel to Monterrey in the Suburbans, but that she did not suggest the arrangements and believed that the plan "might have been" Salazar's idea. Sandoval also stated that J.J. Cheng of EMI Latin's office was advised of the revised travel plans in a telephone conference call. Rene Martinez, a member of the band, stated in deposition testimony that because the work visas had not arrived, Sandoval called EMI Latin's California office to request the flight change and that she also coordinated travel arrangements with EMI Mexico.

4   Herrera met the band as scheduled around 7:00 a.m. at the McAllen Holidome. Perez, however, was not there, and was found by one of the band members asleep in the other Suburban at the McAllen Sheraton hotel.

5   The Texas long-arm statute authorizes the exercise of jurisdiction over a nonresident defendant who does business in Texas. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). In pertinent part, the Texas Civil Practice and Remedies Code characterizes nonresident activity as "doing business" in Texas where the nonresident:

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

(2) commits a tort in whole or in part in this state;

(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state; or

(4) performs any other acts that may constitute doing business.

TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997).

6   *See Transportacion Especial Autorizada, S.A. de C.V. v. Seguros Comercial America, S.A. de C.V.,* 978 S.W.2d 716, 718–20 (Tex.App.-Austin 1998, no pet.).

7   The fourth and fifth factors, "the interstate judicial system's interest in obtaining the most efficient resolution of controversies [and] the shared interests of the several states in furthering fundamental substantive social policies," need not be considered in cases involving a foreign defendant. *Guardian Royal Exchange Assurance Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 232 n. 17 (Tex.1991).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** [Cenoplex, Inc. v. Fox,](#) Tex.App.-Austin, February 21, 2014

164 S.W.3d 698
Court of Appeals of Texas,
Austin.

Gene ENNIS, Appellant,

v.

Robert LOISEAU, Special Deputy Receiver
of American Benefit Plans, et. al., Appellee.

No. 03–04–00748–CV.    |    May 5, 2005.

**Synopsis**
**Background:** Insurance Commissioner's special deputy receiver sued fraudulent health insurers, administrators, and their nonresident president to liquidate them and collect their assets. The 53rd Judicial District Court, Travis County, [Darlene Byrne](#), J., denied president's special appearance challenging personal jurisdiction. President appealed.

**Holdings:** The Court of Appeals, [Jan P. Patterson](#), J., held that:

[1] president did not waive claim by failing to file motion to quash;

[2] proving that nonresident corporate officer engaged in intentionally tortious activity is not necessary to subject him to specific personal jurisdiction; and

[3] exercising personal jurisdiction did not violate due process.

Affirmed.

West Headnotes (21)

[1] **Appeal and Error**
   👉 Rulings on evidence in general
   Defendant failed to preserve error on whether plaintiff's exhibits were timely filed under rule governing affidavits offered in a special appearance; after objecting to timeliness of receipt on day before hearing, the defendant challenged the substance of the evidence and never obtained ruling on objection. [Rules App.Proc., Rule 33.1](#); [Vernon's Ann.Texas Rules Civ.Proc., Rule 120a](#), subd. 3.

   1 Cases that cite this headnote

[2] **Courts**
   👉 Allegations, pleadings, and affidavits
   Statements by corporate defendant's president in special appearance affidavits could be excluded as conclusory in determining personal jurisdiction; the president stated that he lacked any substantial connection with Texas arising from any actions or conduct purposefully directed toward Texas, the plaintiff's claims did not arise from and were not related to any activity conducted by president as an individual in Texas, and president lacked any continuing or systematic contacts with Texas and did not commit tort in state.

   6 Cases that cite this headnote

[3] **Courts**
   👉 Allegations, pleadings, and affidavits
   In attempting to subject a nonresident defendant to personal jurisdiction in state, the plaintiff bears the initial burden of pleading sufficient allegations to satisfy the long-arm statute. [V.T.C.A., Civil Practice & Remedies Code § 17.042](#).

   2 Cases that cite this headnote

[4] **Courts**
   👉 Presumptions and Burden of Proof as to Jurisdiction
   Plaintiff's pleading of sufficient allegations to satisfy the long-arm statute shifts the burden to the defendant to affirmatively negate all bases of jurisdiction asserted by the plaintiff. [V.T.C.A., Civil Practice & Remedies Code § 17.042](#); [Vernon's Ann.Texas Rules Civ.Proc., Rule 120a](#).

Cases that cite this headnote

**[5]    Courts**

👉 Waiver of Objections

Failure by corporate defendant's nonresident president to file a motion to quash did not result in waiver of claim that plaintiff failed to allege the necessary minimum contacts for personal jurisdiction; the president did not complain of any error regarding the service of process, but alleged non-curable defect, and the special appearance was the proper method for president to assert the claim.

Cases that cite this headnote

**[6]    Appearance**

👉 Objections to jurisdiction in general

A special appearance is the proper method for a nonresident defendant to assert that, based on the capacity in which he was sued, the plaintiff failed to allege sufficient minimum contacts to establish amenability to process and personal jurisdiction.

1 Cases that cite this headnote

**[7]    Courts**

👉 Allegations, pleadings, and affidavits

Plaintiff's original pleadings as well as its response to the defendant's special appearance can be considered in determining whether the plaintiff satisfied its burden of pleading a sufficient basis upon which to subject defendant to personal jurisdiction. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a, subd. 3.

3 Cases that cite this headnote

**[8]    Appeal and Error**

👉 Cases Triable in Appellate Court

On interlocutory appeal of order granting or denying special appearance, the Court of Appeals reviews de novo the legal question of whether a court can properly exercise personal jurisdiction over nonresident defendant.

V.T.C.A., Civil Practice & Remedies Code § 51.014(a)(7).

5 Cases that cite this headnote

**[9]    Appeal and Error**

👉 Particular findings implied

If the trial court denied special appearance without delineating findings of fact and conclusions of law, all facts necessary to support the order are implied in its favor, if they are supported by the record.

5 Cases that cite this headnote

**[10]    Appeal and Error**

👉 Sufficiency of Evidence in Support

When a clerk's and reporter's record are included on appeal, implied findings may be challenged for both legal and factual sufficiency.

Cases that cite this headnote

**[11]    Appeal and Error**

👉 Manifest weight

The Court of Appeals will set aside a trial court's implied finding only if it is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust.

2 Cases that cite this headnote

**[12]    Courts**

👉 Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

The broad language of the long-arm statute allows it to reach as far as the federal constitution permits under the due process clause. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

1 Cases that cite this headnote

**[13]    Constitutional Law**

👉 Non-residents in general

A three-prong test must be satisfied in order to subject a nonresident defendant to personal jurisdiction in compliance with the due process clause: (1) the defendant must establish minimum contacts by purposefully doing some act or consummating some transaction in the forum state; (2) the cause of action must arise from or be connected with such act or transaction, as to support specific jurisdiction, or the defendant's contacts with state must be continuing and systematic, as to support general jurisdiction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[14] Courts**
 Tortious or intentional conduct; fraud and breach of fiduciary duties

A corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct, directed at the forum state, for which he may be held personally liable.

11 Cases that cite this headnote

**[15] Courts**
 Jurisdiction of Agents, Representatives, or Other Third Parties Themselves

One's status as an employee does not somehow insulate him from personal jurisdiction, and there is no blanket protection from jurisdiction simply because a defendant's alleged acts were done in a corporate capacity.

Cases that cite this headnote

**[16] Corporations and Business Organizations**
 Participation in unauthorized or wrongful acts of corporation in general

A corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as to be the guiding spirit behind

the wrongful conduct or the central figure in the challenged corporate activity.

7 Cases that cite this headnote

**[17] Corporations and Business Organizations**
 Tortious acts in general

**Corporations and Business Organizations**
 Fraud

As a general rule, corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation.

9 Cases that cite this headnote

**[18] Courts**
 Tortious or intentional conduct; fraud and breach of fiduciary duties

Proving that nonresident corporate officer engaged in intentionally tortious activity is not necessary to subject him to specific personal jurisdiction; rather, the plaintiff must establish that the officer committed fraudulent or tortious acts for which he may be held individually liable.

13 Cases that cite this headnote

**[19] Courts**
 Tortious or intentional conduct; fraud and breach of fiduciary duties

If the evidence suggests that nonresident officer of corporation participated in tortious or fraudulent activities, which were directed at state and for which he may be held personally liable, then there is a sufficient basis to assert specific personal jurisdiction over him.

8 Cases that cite this headnote

**[20] Constitutional Law**
 Representatives of organizations; officers, agents, and employees

**Courts**
 Tortious or intentional conduct; fraud and breach of fiduciary duties

Exercising specific personal jurisdiction over corporation's nonresident president did not violate due process in suit arising out of multi-state network of fraudulent health insurers with which corporation had administrative and service agreements; the evidence indicated that president entered contracts with insurers, engaged in frequent communications with insurers' owner, traveled to state to facilitate business, knew of the fraudulent insurance scheme, could be held personally liable even if he acted in corporate capacity, and had minimum contacts with state as individual, the number of claims filed by state residents indicated nexus between the contacts, forum, and the litigation, and the president should have anticipated being haled into a Texas court. U.S.C.A. Const.Amend. 14.

9 Cases that cite this headnote

[21]     **Appeal and Error**
👉 Necessity of finding facts

**Appeal and Error**
👉 Insufficiency of verdict or findings

Court of Appeals would not require trial court to issue findings of fact and conclusions of law regarding personal jurisdiction over defendant; the defendant challenged the lack of findings and conclusions only in the alternative stating that he did not want the expense of returning to the trial court, if the Court of Appeals was able to determine the jurisdictional issues without the trial court's findings and conclusions, and the Court of Appeals was able to do so. Rules App.Proc., Rule 28.1.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*700** Toni Hunter, Douglas M. Becker, Gray & Becker, PC, Austin, TX, for appellant.

Jane M.N. Webre, Cynthia S. Connolly, S. Abraham Kuczaj, Scott, Douglass & McConnico, LLP, Austin, TX, for appellee.

Before Chief Justice LAW, Justices PATTERSON and PURYEAR.

*OPINION*

JAN P. PATTERSON, Justice.

After being appointed by the Texas Insurance Commissioner to serve as a Special Deputy Receiver for a conglomerate of entities [1] accused of participating in a multi-state **\*701** scheme of insurance fraud, appellee Robert Loiseau brought suit, as the assignee of the victims' claims, to liquidate and collect the entities' assets on behalf of the victims. Among the 140 defendants sued in the receivership action, Gene Ennis was named in his individual capacity as a "general agent," and two companies for which Ennis is president, Fidelity Benefit Administrators and NetPay USA, were named as corporate defendants. Ennis filed a special appearance, which was denied. He appeals, claiming in four issues that the trial court erred by denying his special appearance, admitting certain affidavits and exhibits offered by Loiseau, sustaining objections to Ennis's affidavit, and failing to enter findings of fact and conclusions of law. Because the evidence in the record is legally and factually sufficient to support the trial court's denial of Ennis's special appearance and no reversible error was committed, we affirm the trial court's order.

**BACKGROUND**

In 2002, the State of Texas began the process of shutting down a multi-state network of fraudulent insurers based in Fort Worth and primarily operated by Fort Worth resident Robert David Neal and his companies, American Benefit Plans (ABP), United Employers Voluntary Employees Beneficiary Association (UEVEBA), and National Association of Working Americans (NAWA). In May 2002, a final judgment and a permanent injunction were entered against many of the fraudulent insurers and Loiseau was appointed as the Special Deputy Receiver. The receiver took over and ceased all operations at Neal's Fort Worth offices. Thereafter, hundreds of victims of the scheme assigned their claims to Loiseau, and he filed the underlying receivership action to liquidate and collect the assets on their behalf.

Gene Ennis, Fidelity Benefit Administrators, and NetPay USA were three of the defendants sued in the receivership

action. Ennis is a Florida resident and is president of Fidelity and NetPay, both of which are incorporated in Florida. Loiseau's petition named Ennis as a "General Agent who engages in business in the State of Texas" and claimed that, despite the duties of care owed to "the employers, employee groups, enrollees, and insureds that purchased health insurance plans marketed by ABP, *et al.,*" many general agents operated without a license and all "negligently failed to use due diligence to determine whether the ABP programs were properly authorized and licensed," including the "fail [ure] to discover, through readily available open records, that ABP/NAWA was not licensed, that Robert David Neal was subject to numerous complaints," and "the true nature of any alleged reinsurance or other financial backing for the programs." Loiseau further alleged that each of the defendants "committed torts in the State of Texas and entered into contracts with one or more of the Receivership Defendants in the State of Texas" and profited from its involvement in the insurance scheme to the detriment of Texas and its residents. Finally, Loiseau asserted that there were "numerous communications between the Defendants in this case and the ABP/NAWA headquarters in Texas by way of telephone, fax, United States Postal Service, internet, and overnight courier services." Based on these allegations, Loiseau asserted that the defendants were subject to personal jurisdiction in Texas **\*702** and were liable for negligence, gross negligence, negligent misrepresentation, conspiracy, violation of Texas Insurance Code section 101.201, [2] and breach of fiduciary duty. Loiseau also sought disgorgement and exemplary damages, asserting that "the defendants had and/or should have had actual, subjective awareness of the risk involved, but proceeded with conscious indifference to the rights, safety, or welfare of others."

In response, Ennis and NetPay specially appeared. Fidelity did not challenge the court's jurisdiction. Ennis invoked the fiduciary shield doctrine by challenging that Texas lacked personal jurisdiction over him *as an individual* because all of his contacts with the state were performed in his corporate capacity as the president of Fidelity and NetPay. Ennis asserted that the jurisdictional pleadings were insufficient because they only named Ennis as an individual, while all of the receiver's evidence pertained to Ennis's corporate capacity, and because the pleadings did not establish alter ego or allege a cause of action for which Ennis could be held personally liable. However, Ennis acknowledged that he was the "man in charge" of both Fidelity and NetPay; he did not dispute the substantial connections between Fidelity and Texas-based Neal, ABP, UEVEBA, and NAWA; and

he agreed that NetPay contracted with NAWA, collected funds from Texas employers to support a carrier that insured Texas employees, and sold insurance documents to Texas employers via its website. Loiseau contended that the evidence established "abundant" contacts made by Ennis as the agent of Fidelity and NetPay and argued that Ennis was not shielded from personal jurisdiction simply by wearing his "president of Fidelity hat" while committing torts and engaging in a conspiracy to defraud Texas consumers.

The trial court denied the special appearances. Ennis requested that the trial court issue findings of fact and conclusions of law, but the court declined to do so, stating that "[b]ased on this short evidentiary hearing, the Court finds that Findings of Fact would be unnecessary in this case." NetPay did not challenge the denial of its special appearance. Ennis filed this interlocutory appeal, claiming that it is not appropriate to exercise jurisdiction over him as an individual because he is protected by the fiduciary shield doctrine, and that the trial court also committed reversible error by admitting evidence that was untimely offered by Loiseau, by sustaining Loiseau's objections to Ennis's affidavit, and by not issuing findings of fact and conclusions of law.

## ANALYSIS

### Evidentiary Challenges

As an initial matter, we address Ennis's second and third issues, in which he asserts two evidentiary errors pursuant to Rule 120a: He claims that the trial court erred in admitting affidavits and exhibits that were untimely filed by Loiseau and in sustaining Loiseau's objections to portions of Ennis's affidavits. *See* Tex.R. Civ. P. 120a(3). We address these claims initially because Ennis's primary issue on appeal, whether he is subject to personal jurisdiction **\*703** in Texas, relies in part on the contested evidence.

[1] In support of his challenge to Ennis's special appearance, Loiseau offered seventy affidavits at the special appearance hearing; each affidavit was attested to by Loiseau, as the Special Deputy Receiver on behalf of Texas Insurance Commissioner Jose Montemayor, and each certified that the attached records were held by Loiseau "in the course of delinquency proceedings against American Benefit Plans, *et. al.*" Ennis asserts that, because Loiseau did not provide copies to him until the day before the hearing, they were untimely filed and the trial court should have excluded them based on

the requirement that, in a special appearance, "affidavits, if any, shall be served at least seven days before the hearing." *Id.*

At the hearing, Ennis objected by saying, "Your Honor, I'd like to address for a few minutes the response that [Loiseau] made to—in opposition to Gene Ennis's special appearance, and I'd like to object because it's not very—it's not timely, just last evening at 4:30 or so. But speaking to its content...." Ennis then continued with a lengthy challenge to the substance of the evidence; he never returned to the timeliness issue and never obtained a ruling, express or implied, on that objection. In order to preserve error for appeal, a party must make a timely objection "with sufficient specificity to make the trial court aware of the complaint" and obtain a ruling on the record. Tex.R.App. P. 33.1. Because Ennis failed to preserve error on whether Loiseau's exhibits were timely filed under Rule 120a(3), the seventy exhibits offered by Loiseau may be properly relied on as support for subjecting Ennis to personal jurisdiction. Ennis's second issue is overruled.

 [2]    Ennis also claims that the trial court erred by sustaining Loiseau's objections that portions of Ennis's affidavit and supplemental affidavit were conclusory. The trial court sustained objections to the following statements, thereby excluding them as evidence to be considered in determining the special appearance:

- As an individual, I do not have any substantial connection with Texas arising from any of my actions or conduct purposefully directed toward Texas.

- The Plaintiffs' claims do not arise from and are not related to any activity conducted by me as an individual in Texas.

- As an individual, I do not have any continuing or systematic contacts with Texas.

- As an individual ... [I have not] committed any tort, in whole or in part, within the state.

Rule 120a(3) states that affidavits offered in a special appearance "shall be made on personal knowledge [and] shall set forth specific facts as would be admissible in evidence." Tex.R. Civ. P. 120a(3). Further, special appearance affidavits must be "direct, unmistakable, and unequivocal as to the facts sworn to." *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 250 n. 8 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (nonresident's statement that he had committed no torts in Texas was properly excluded as conclusory).

Here, the trial court overruled objections to portions of Ennis's affidavits that contained factual information and only sustained objections to the above statements, which were legal conclusions and did not set forth specific facts. In his brief, Ennis agrees that these statements were conclusory, but claims they "had to be conclusory to some extent in the absence of allegations of specific facts by the plaintiff." Because Loiseau satisfied his pleading burden, **\*704** this claim does not justify the conclusory nature of Ennis's affidavits. Thus, the trial court did not err in excluding the conclusory portions of Ennis's affidavits, and we do not consider those statements in weighing the sufficiency of the evidence. In any event, even if we were to consider the contested portions of Ennis's affidavit, it would not alter our conclusion. Ennis's third issue is overruled.

## Personal Jurisdiction

In his first issue, Ennis challenges the court's exercise of jurisdiction over him, asserting that the receiver failed to plead sufficient jurisdictional facts, that he satisfied his burden of negating the bases of jurisdiction pled, and that the evidence does not show that he, as an individual, purposefully established minimum contacts with Texas. Loiseau counters that, by not filing a motion to quash, Ennis failed to preserve error on the sufficiency of Loiseau's pleadings. Loiseau further asserts that the record evidence supports subjecting Ennis, individually as an agent of Fidelity and NetPay, to specific jurisdiction in Texas; Loiseau does not contend that Ennis should be subjected to general jurisdiction.

### Motion to Quash

 [3]    [4]    [5]    In attempting to subject a nonresident defendant to jurisdiction in Texas, the plaintiff bears the initial burden of pleading sufficient allegations to satisfy the Texas long-arm statute. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2001); *see* Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (West 1997) (jurisdiction proper upon showing that defendant is "doing business" in Texas, which includes entering contract with Texas resident and committing tort within Texas). The burden then shifts to the defendant to affirmatively negate all bases of jurisdiction asserted by the plaintiff. Tex.R. Civ. P. 120a; *BMC Software,* 83 S.W.3d at 793. Loiseau asserts that, because Ennis did not file a motion to quash, Ennis waived his complaint that the "[p]laintiff failed to allege the necessary minimum contacts ... to bring [Ennis] under the jurisdiction of a Texas court." Loiseau bases this claim on language in *Kawasaki Steel Corp. v. Middleton* stating that "defective jurisdictional allegations

in the petition ... must be challenged by a motion to quash, not a special appearance." 699 S.W.2d 199, 203 (Tex.1985).

However, reading *Kawasaki* as a whole, it is clear that the supreme court required a motion to quash only for the purpose of challenging curable, procedural defects with the service of process. *Id.* at 202 (motion to quash required to challenge such things as failure to serve defendant or defect in citation). The Court explained that the "jurisdictional facts" to be challenged with a motion to quash are those allegations "required for service under the long-arm statute" concerning why the secretary of state is an appropriate substituted agent for serving process on a nonresident defendant. *Id.* at 202; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 17.044 (West 1997) (*cited in Kawasaki* as "article 2031(b), R.C.S.").

Facts regarding the service of process, which are properly challenged with a motion to quash, are distinguishable from jurisdictional allegations establishing that the nonresident is amenable to personal jurisdiction based on his minimum contacts with this state. If a defendant wishes to challenge jurisdictional pleadings "on the ground that such party or property is not amenable to process issued by the courts of this State," then his proper tool is a special appearance. *Compare* Tex.R. Civ. P. 122 (motion to quash), *with id.* 120a (special appearance). The *Kawasaki* court recognized this distinction: "A curable defect in service of process does not affect a **\*705** nonresident defendant's amenability to service of process." 699 S.W.2d at 202. The distinction is based on the cures available from each motion. *Id.; Wright,* 137 S.W.3d at 245–46. Because a citation error is procedural and curable, the remedy provided by a motion to quash is additional time for the defendant to answer. *Kawasaki Steel Corp.,* 699 S.W.2d at 202. However, a substantive defect in the pleading is not curable and, thus, the remedy for a defendant's special appearance is dismissal from suit. *Id.*

 **[6]**    Accordingly, nonresidents routinely file special appearances to challenge jurisdiction; it follows that a special appearance is the proper method for a nonresident defendant to assert that, based on the capacity in which he was sued, the plaintiff failed to allege sufficient minimum contacts between the defendant and Texas to establish his amenability of process in this state. *See Morris v. Powell,* 150 S.W.3d 212, 221 (Tex.App.-San Antonio 2004, no pet.) (nonresidents filed special appearance to assert that plaintiff's allegations were insufficient to establish jurisdiction over them individually because all contacts were made in corporate capacity); *Brown v. General Brick Sales Co., Inc.,* 39 S.W.3d 291,

293 (Tex.App.-Fort Worth 2001, no pet.) (same). Ennis does not complain of any error regarding the service of process. Rather, he raises a standard special appearance challenge, asserting that the plaintiff failed to establish proof of minimum contacts between himself, in his individual capacity, and the forum. Ennis, therefore, did not waive his first issue by raising it in a special appearance rather than a motion to quash.

 **[7]**    Although Ennis preserved his challenge that Loiseau failed to plead a sufficient basis for subjecting him to personal jurisdiction, this does not provide grounds for reversal because Loiseau satisfied his burden. The plaintiff's original pleadings as well as its response to the defendant's special appearance can be considered in determining whether the plaintiff satisfied its burden. *Wright,* 137 S.W.3d at 249 n. 7. Rule 120a also states that, in determining whether the special appearance should be granted or denied, courts may consider evidence from "the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." Tex.R. Civ. P. 120a(3); *see also Gutierrez v. Deloitte & Touche,* 100 S.W.3d 261, 273 (Tex. App.-San Antonio 2002, pet. dism'd).

Loiseau's pleadings alleged that, as a general agent, Ennis engaged in business and committed torts in the State of Texas; entered into contracts with Texas entities; communicated via facsimile, telephone, and e-mail with Texas entities; and profited from his involvement with these entities, to the detriment of Texas residents. The pleadings also set forth specific allegations concerning how Ennis, as a general agent, had been negligent and breached his fiduciary duty. Loiseau also filed a response to Ennis's special appearance, further detailing why the court had personal jurisdiction over Ennis as an individual. He alleged that Ennis may be held personally liable for playing a "key role in the creation, marketing, and administration of the bogus health plans," provided a specific list of activities demonstrating Ennis's participation in the fraudulent scheme, explained why Ennis's corporate capacity did not shield him from jurisdiction, and offered proof that Ennis was aware that Fort Worth was the home base of the fraudulent programs. Seventy-six exhibits were admitted in support of Loiseau's response.

Loiseau, therefore, satisfied his initial burden of pleading a sufficient basis upon which to subject Ennis to personal jurisdiction. **\*706** To avoid litigating in Texas, it was then Ennis's burden to negate Loiseau's pleadings. After the special

appearance hearing, the trial court determined that Ennis failed to do so. We now review that determination.

### Standard of Review

 **[8]** A trial court's order granting or denying the special appearance is subject to an interlocutory appeal in which we review *de novo* the legal question of whether a Texas court can properly exercise personal jurisdiction over the nonresident defendant. Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (West Supp.2004–05); *BMC Software,* 83 S.W.3d at 794. Questions of fact must frequently be resolved by the trial court before reaching the jurisdictional inquiry. *Id.* While a special appearance is not the appropriate stage to make a determination on liability, we must consider facts regarding the defendant's actions that could foreseeably cause harm in Texas in order to determine whether the defendant should have anticipated being haled into a Texas court. *Wright,* 137 S.W.3d at 251.

 **[9]** **[10]** **[11]** If the trial court denied the special appearance without delineating findings of fact and conclusions of law, all facts necessary to support the order are implied in its favor, if they are supported by the record.[3] *BMC Software,* 83 S.W.3d at 795. When a clerk's and reporter's record are included on appeal, as here, these implied findings may be challenged for both legal and factual sufficiency. *Id.* In determining whether the evidence is sufficient to support a trial court's factual determinations, we consider the entire record and conduct an ordinary sufficiency review. *French v. Glorioso,* 94 S.W.3d 739, 744 (Tex.App.-San Antonio 2002, no pet.). We will set aside a trial court's implied finding only if it is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Id.* The trial court, as the fact-finder, is the sole arbiter of the witnesses' credibility and the weight that their testimony should be afforded. *Wyatt v. Wyatt,* 104 S.W.3d 337, 340 (Tex.App.-Dallas 2003, no pet.). This Court will not disturb a trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951).

### Minimum Contacts and the Fiduciary Shield Doctrine

 **[12]** **[13]** A Texas court may exercise personal jurisdiction over a nonresident defendant if it is authorized by the Texas long-arm statute and if it comports with the constitutional guarantees of due process. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990); *see* Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (West 1997). The broad language

of the Texas statute allows it to reach as far as the federal Constitution permits and thus the due process analysis under state law is consistent with the federal test. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). Accordingly, a three-prong test must be satisfied in order to subject a nonresident defendant to personal jurisdiction **\*707** in Texas: (i) the defendant must establish minimum contacts by purposefully doing some act or consummating some transaction in the forum state; (ii) the cause of action must arise from or be connected with such act or transaction, as to support specific jurisdiction, or the defendant's contacts with Texas must be continuing and systematic, as to support general jurisdiction; and (iii) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice. *Schlobohm,* 784 S.W.2d at 358.

Ennis claims that any contacts he purposefully directed at Texas were performed in his corporate capacity and, thus, pursuant to the fiduciary shield doctrine, it is inappropriate for a Texas court to exercise jurisdiction over him as an individual.[4] We need not determine whether the fiduciary shield doctrine should be adopted in this case, however, because the courts that have adopted it have expressly limited its application to *general* jurisdiction, and Loiseau does not assert that Ennis should be subjected to general jurisdiction. *See, e.g., Wright,* 137 S.W.3d at 250.

 **[14]** **[15]** **[16]** **[17]** Even if the fiduciary shield were adopted by this Court, it would not protect Ennis from the exercise of *specific* jurisdiction. Courts recognize that a corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct, directed at the forum state, for which he may be held personally liable. *Id.; see SITQ E.U., Inc. v. Reata Rest., Inc.,* 111 S.W.3d 638, 651 (Tex.App.-Fort Worth 2003, pet. denied); *see also Morris v. Kohls–York,* No. 03–04–00371–CV, 164 S.W.3d 686, 696, 2005 WL 1034082, at * 8 (Tex.App.-Austin May 5, 2005, no pet. h.). This rule is not based on an exception to the fiduciary shield doctrine, but rather on the well-established principle that "a corporate officer is primarily liable for his own torts." *Morris,* 150 S.W.3d at 219, 221 (specific jurisdiction satisfied based on allegations that officers committed negligence, fraud, and/or negligent misrepresentation in carrying out corporate activities). One's "status as an employee does not somehow insulate [him] from jurisdiction" and "there is no blanket protection from jurisdiction simply because a

defendant's alleged acts were done in a corporate capacity." *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *SITQ E.U., Inc.,* 111 S.W.3d at 651. A corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as to be the " 'guiding spirit' behind the wrongful conduct" or the " 'central figure' in the challenged corporate activity." *Mozingo v.* **\*708** *Correct Mfg. Corp.,* 752 F.2d 168, 174 (5th Cir.1985) (citations omitted). Hence, "[i]t is the general rule in Texas that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation." *Shapolsky v. Brewton,* 56 S.W.3d 120, 133 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

Citing *Wright v. Sage Engineering,* Ennis asserts that, in order to exercise specific jurisdiction over a nonresident corporate officer, the plaintiff must produce evidence of an *intentional* tort or fraud committed by the officer. *See* 137 S.W.3d at 250 (corporate officer not protected "from specific personal jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable"). It is true that an officer is not protected from specific jurisdiction if he has committed an intentional tort; yet, *Wright* does not stand for the proposition that specific jurisdiction can only be exercised over the corporate officer upon proof of an intentional tort. As noted in *Wright,* the key to subjecting an individual officer to specific jurisdiction is *whether he may be held individually liable* for those actions constituting minimum contacts with the forum, even if the actions were performed in his corporate capacity. *Id.* at 250–51 (because corporate officer could be individually liable for misrepresentations made as corporate representative, specific jurisdiction was proper over him in individual capacity). The court in *Wright* relied on cases that do not require proof of an intentional tort in order to exercise specific jurisdiction over corporate officers. *See, e.g., Jackson v. Kincaid,* 122 S.W.3d 440, 448 (Tex.App.-Corpus Christi 2003, pet. granted) (holding that is was proper to subject defendant-attorneys to specific jurisdiction based on proof that they had appeared *pro hac vice* in a Texas court, for which they could be individually liable, without stating that their actions were intentionally tortious or fraudulent); *Shapolsky,* 56 S.W.3d at 133–34 (specific jurisdiction appropriate over individual officer based on fraudulent misrepresentations made in corporate capacity); *General Elec. v. Brown & Ross Int'l Distribs., Inc.,* 804 S.W.2d 527, 532–33 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (allegations of bribery and conspiracy sufficient evidence of "tortious activity" to support exercise of specific jurisdiction over corporate officer); *see also Morris,* 150 S.W.3d at 219, 221 (specific

jurisdiction can be asserted over individual officer based on "torts for which the employee may be individually liable," without requiring that the torts be intentionally committed, because "a corporate officer is primarily liable for his own torts"). Moreover, the Fort Worth court has stated that a corporate officer is not protected from specific jurisdiction if the officer performed *any* action for which he may be individually liable, including unintentional torts. *SITQ E.U., Inc.,* 111 S.W.3d at 651.

 [18]    We agree with our sister courts that it is not necessary to prove that the corporate officer engaged in intentionally tortious activity to subject him to specific jurisdiction; rather, the plaintiff must establish that the officer committed fraudulent or tortious acts for which he may be held individually liable. In any event, there is sufficient evidence in the record to support the trial court's implied finding that Ennis engaged in intentionally tortious or fraudulent activity for which he may be personally liable.

 [19]    Because "ultimate liability in tort is not a jurisdictional fact, and the merits of the cause are not at issue," our jurisdictional inquiry focuses on whether Loiseau **\*709** sufficiently established facts suggesting that Ennis should have anticipated being haled into a Texas court based on his actions. *Wright,* 137 S.W.3d at 251; *French,* 94 S.W.3d at 743–44 (jurisdictional determination only requires sufficient evidence to support implied findings that suggest, but do not ultimately prove, liability). Hence, if the evidence suggests that the nonresident officer participated in tortious or fraudulent activities, which were directed at Texas and for which he may be held personally liable, then there is a sufficient basis to assert specific jurisdiction over him. *Wright,* 137 S.W.3d at 251.

 [20]    Ennis agrees that substantial connections exist between his companies—Fidelity and NetPay—and the Texas-based companies run by Neal that comprised the nucleus of the fraudulent insurance scheme—ABP, UEVEBA, and NAWA. Ennis testified that Fidelity hired Neal as a consultant and used his services to develop and sell three "limited benefit plans with a reduced prescription benefit," and that both Fidelity and NetPay used UEVEBA as a "funding mechanism." In connection with these arrangements, Ennis signed an "administrative and service agreement" on behalf of Fidelity identifying services Fidelity would provide to UEVEBA in exchange for a fee of 20% of all contributions collected. Ennis also testified about the "bank draft authorization" contract between Fidelity and NAWA:

individual employees who were members of NAWA would enroll in the ABP program and provide preauthorized bank drafts so that their monthly contributions could be automatically deducted from their checking accounts. The record contains copies of many of these preauthorized checks, evidencing that several of the participating employees were Texas residents. Fidelity then processed these automated transactions; wired a portion of the money to a bank account that was co-signed by NAWA, Neal, and Fidelity; and kept a percentage of the monthly contribution as its fee. Fidelity sent a letter to all participating employees, including those in Texas, stating that ABP had contracted with Fidelity to handle the automated monthly payments. Ennis testified that he understood Neal was responsible for distributing the wired money to the reinsurance carriers, but that at some point Neal began to fraudulently divert these funds. [5]

Ennis further testified that he was the "man in charge" of Fidelity and NetPay, that he was the "ultimate person in charge of putting together and finalizing the UEVEBA-related programs," and that, as president, it was his responsibility to be aware of and authorize all activities that his company engaged in with Neal or his entities. As such, Ennis signed several contracts establishing relations between his and Neal's companies and frequently communicated with Neal. Ennis testified about numerous e-mails, facsimiles, and telephone calls that he directed to Neal in Texas. Loiseau testified that this "raft of correspondence" shows Ennis and Neal to "clearly [be] on a first-name basis, writing in a very personal, familiar tone." Additionally, Ennis testified that he traveled to Texas to meet with Neal about the business deals between their various companies.

 **\*710** Ennis disputes that he knew he was directing his actions toward Texas; he claims that he believed UEVEBA was a California company with a Nevada domicile. Contrary to Ennis's claim, however, the record establishes his knowledge that he was dealing with a Texas resident and Texas-based companies. Ennis acknowledged that he traveled to Texas to meet with Neal, entered a contract with UEVEBA listing its address as located in Fort Worth, signed a document stating that all UEVEBA notices from Fidelity should be directed to Neal in Fort Worth, and communicated with Neal and several employees of Neal's companies in Fort Worth.

Regardless of whether Ennis is ultimately held liable for the actions he performed in connection with Neal, ABP, UEVEBA, and NAWA, the evidence presented in the context of the special appearance—primarily from Ennis's own testimony—suggests that Ennis participated in a fraudulent scheme, operating out of Texas, for which he may be held personally responsible. Ennis acknowledged that Neal's actions were fraudulent and testified that, during the time their companies were working together, he was aware that Neal had come under "regulatory scrutiny," with which he was "not comfortable." Ennis also testified that he had been the subject of insurance regulators' investigations based on his interaction with Neal. [6] Ennis testified that, because of this regulatory scrutiny, when he sent Fidelity's insurance documents to Neal, he attached a note advising Neal to "guard the complete set from our competitors and everyone except those in your inner circle" and to "reformat them to appear different from ours for the regulators."

This evidence suggests, for purposes of this special appearance, that Ennis took actions—such as entering contracts and engaging in frequent communications with Neal and his entities, and traveling to Texas to facilitate business with Neal—with knowledge that the arrangements between his and Neal's companies were part of a fraudulent insurance scheme. Ennis acquiesces to these facts, only challenging that they do not establish minimum contacts because he was acting on behalf of his corporations. Even if Ennis performed these actions in a corporate capacity, he can be held personally liable for fraudulent activity and, therefore, should have anticipated being haled into a Texas court to answer for these actions. Ennis's uncontroverted actions establish minimum contacts between him, as an individual, and the State of Texas.

### Specific Jurisdiction: Nexus and Due Process Considerations

Having established that Ennis purposefully directed minimum contacts toward Texas, thereby satisfying the first prong of Texas's three-part jurisdictional inquiry, the determination of whether it is appropriate to subject him to specific jurisdiction depends on (i) whether a nexus exists between those contacts, the forum, and the litigation and (ii) whether the exercise of jurisdiction would comport with due process considerations. *See BMC Software,* 83 S.W.3d at 795–96.

The insurance activities that occurred between Ennis's two companies and the Texas-based ABP, UEVEBA, and NAWA, are undisputably connected to the underlying litigation. Loiseau testified, and Ennis conceded, that of the 3,040 proofs of claims filed against Ennis, Fidelity, and

NetPay, 409 of them were filed by Texas residents. Based on this, a nexus is present between **\*711** Ennis's contacts, the forum, and the litigation.

Ennis does not assert that it would be burdensome for him to litigate in Texas. *See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)* (nonresident defendant has burden to present "compelling case" of why litigation in forum would be unduly burdensome to avoid jurisdiction). Even if his special appearance were granted, Ennis must be in Texas as a part of this litigation as the president of Fidelity, which did not challenge jurisdiction, and of NetPay, which filed a special appearance but did not challenge its denial. Because Ennis does not contest this issue, and because he does not assert that any greater burden results from appearing individually than already exists from appearing as a corporate representative, we determine that it does not violate the traditional notions of fair play and substantial justice to subject Ennis to personal jurisdiction in Texas.

It is, therefore, appropriate to exercise specific jurisdiction over Ennis, in his individual capacity, based on the evidence suggesting that he participated in a fraudulent scheme for which he may be personally liable. Because these actions established minimum contacts, which were substantially connected to Texas and the underlying litigation, and because it comports with due process considerations for Ennis to litigate in Texas, we affirm the trial court's order denying his special appearance. Ennis's first issue is overruled.

**Findings of Fact and Conclusions of Law**

 [21]    In his fourth issue, Ennis contends that the trial court erred by not issuing findings of fact and conclusions of law upon his request. Ennis recognizes that Texas Rule of Appellate Procedure 28.1 gives the trial court discretion whether to issue these. *See Tex.R.App. P. 28.1* ("The trial court *need not, but may*—within 30 days after the order is signed—file findings of fact and conclusions of law.") (emphasis added). Also, Ennis brings this claim only in the alternative, stating that "if this Court is able to determine the jurisdictional issues without the trial court's findings and conclusions," then "he does not want the expense of returning to the trial court" to obtain them. Because we are able to determine the jurisdictional issues on the record before us, we hold that the trial court did not abuse its discretion in deciding to not issue findings and conclusions. Ennis's fourth issue is overruled.

**CONCLUSION**

Holding that the record contains sufficient evidence to subject Ennis individually to specific personal jurisdiction in Texas and that no reversible error occurred, we overrule Ennis's issues and affirm the trial court's order denying his special appearance.

**All Citations**

164 S.W.3d 698

Footnotes

1    Appellee is the Special Deputy Receiver for the following entities: American Benefit Plans; National Association of Working Americans a/k/a National Association for Working Americans; United Employers Voluntary Employees Beneficiary Association; United Employers Voluntary Employees Beneficiary Association I; Electronic Benefits Group, Inc.; Enhanced Health Management, Inc.; Four Corners Company, LLC a/k/a Four Corners Co. LLC, a/k/a Four Corners Corp.; American Association of Agriculture, Forestry and Fishing Workers; American Association of Transportation, Communication, Electrical, Gas and Sanitary Workers; American Association of Wholesale Trade Workers; American Association of Manufacturer Workers; American Association of Service Workers; American Association of Construction Workers; and American Association of Professional Workers.

2    Section 101.201(a) states that "[a]n insurance contract effective in this state and entered into by an unauthorized insurer is unenforceable by the insurer. A person who in any manner assisted directly or indirectly in the procurement of the contract is liable to the insured for the full amount of a claim or loss under the terms of the contract if the unauthorized insurer fails to pay the claim or loss." Tex. Ins.Code Ann. § 101.201(a) (West Supp.2004–05).

3    Ennis asserts, without citing any authority, that "no facts should be implied in favor of the trial court's judgment" when a clerk's and reporter's record are provided. This is contrary to well-established precedent that such facts should be implied. *See, e.g., Sixth RMA Partners, L.P. v. Sibley, 111 S.W.3d 46, 52 (Tex.2003); Tempest Broad. Corp. v. Imlay, 150 S.W.3d 861, 867–68 (Tex.App.-Houston [1st Dist.] 2004, no pet.)* (rejecting defendant's argument in special appearance case

that, because findings were properly requested yet not issued, a less deferential standard of review should be applied to implied findings); *Smith v. Lanier,* 998 S.W.2d 324, 329–30 (Tex.App.-Austin 1999, pet. denied).

4    *See SITQ E.U., Inc. v. Reata Rest., Inc.,* 111 S.W.3d 638, 651 (Tex.App.-Fort Worth 2003, pet. denied) (fiduciary shield protects corporate officer, individually, from general jurisdiction if all contacts made in corporate capacity, unless alter ego is proven); *see also, Morris v. Powell,* 150 S.W.3d 212, 221 (Tex.App.-San Antonio 2004, no pet.); *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 250 & n. 9 (Tex.App.-Houston [1st Dist.] 2004, pet. denied); *Jackson v. Kincaid,* 122 S.W.3d 440, 448 (Tex.App.-Corpus Christi 2003, pet. granted); *D.H. Blair Inv. Banking Corp. v. Reardon,* 97 S.W.3d 269, 277 (Tex.App.-Houston [14th Dist.] 2002, pet. dism'd w.o.j.); *Tuscano v. Osterberg,* 82 S.W.3d 457, 467 (Tex.App.-El Paso 2002, no pet.). Although not formally adopted by the supreme court, the doctrine is consistent with the court's language in *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 437–38 (Tex.1982) (can impute individual liability to corporate officers upon proof of alter ego), and with the Supreme Court's holding in *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (jurisdiction proper over corporate officers, individually, because they were "primary participators in an alleged wrongdoing intentionally directed at" forum state).

5    Ennis claims that he stopped wiring money to the NAWA account as soon as he discovered this fraudulent activity, which he states did not happen until February 25, 2002. However, Ennis acknowledged in his deposition that, prior to that date, he was aware that both he and Neal were under investigation by insurance regulators. Even with this knowledge, Ennis continued to wire money to the NAWA account and otherwise transact business with Neal.

6    The Florida Department of Insurance informed Ennis in 2001 that their investigation determined Fidelity had engaged in unauthorized insurance practices.

---

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by**  S.E.C. v. Lucent Technologies, Inc.,  D.N.J.,
April 6, 2005

235 F.Supp.2d 549
United States District Court,
S.D. Texas,
Houston Division.

In re ENRON CORPORATION SECURITIES,
DERIVATIVE & ERISA LITIGATION.
This Document Relates to All Cases.
Mark Newby, et al., Plaintiffs,
v.
Enron Corporation, et al., Defendants.
The Regents of the University of California,
et al., Individually and on Behalf of All
Others Similarly Situated, Plaintiffs,
v.
Kenneth L. Lay, et al., Defendants.

MDL No. 1446  |  Civil Action
No. H−01−3624.  |  Dec. 19, 2002.

Investors brought securities fraud actions against corporation, individual executives, and others, alleging elaborate and large-scale Ponzi scheme to artificially inflate corporation's earnings and to conceal debt using corporation-controlled but unrecognized special purpose entities (SPEs). Secondary defendants, i.e. accounting firms, law firms, and investment banks/integrated financial services institutions, moved to dismiss. The District Court, Harmon, J., held that: (1) misrepresentation about value of particular security is not condition precedent for § 10(b) and Rule 10b-5 liability; (2) secondary actor who creates material misstatement on which investor relies can be liable as primary violator under § 10(b) even if actor's identity is not disclosed to investor; (3) knowledge gained in banks' lending and commercial areas was imputable to their analysts for purpose of stating scienter element of § 10(b) claim; (4) mere presence of disclaimers in financial services institutions' analysts' reports did not preclude statement of reliance element of § 10(b) claim; (5) Washington state investor had right of action under **TexasSecuritiesAct**; (6) investors partially stated scienter element of § 10(b) claim by alleging defendants' participation for their own gain in creation of SPEs; (7) investors failed to state § 10(b) claim against bank based on private placement letter and executives' subsequent profits;

(8) investors stated § 10(b) claims against various banks by alleging loans disguised as trades, participation in phony IPO, particular interests in SPE transactions, and cooperation with corporation's mark-to-marketing accounting, in various combinations; (9) investors stated § 10(b) claim against law firm by alleging participation in SPE creation, drafting of "true sales" opinions, and drafting of false SEC filings and press releases; (10) investors failed to state § 10(b) claim against second law firm by alleging representation of SPEs only; and (11) investors stated §10(b) claim against accounting firm by alleging violation of GAAP and GAAS, destruction of documents, intimate knowledge of corporation's fraudulent activities, and decision by firm's partners to continue working for corporation despite fraud based on lucrative nature of relationship.

Motions granted in part and denied in part.

See also 227 F.Supp.2d 1389.

West Headnotes (67)

[1]  **Federal Civil Procedure**
     Fraud, mistake and condition of mind

In securities fraud actions, federal civil procedure rule governing particularity of fraud pleadings is applied and strictly interpreted, requiring plaintiff to specify statements contended to be fraudulent, identify speaker, state when and where statements were made, and explain why statements were fraudulent. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Cases that cite this headnote

[2]  **Securities Regulation**
     Persons liable

Under **TexasSecuritiesAct** section governing fraud liability of sellers, liability may be imposed against defendant as long as defendant constituted any link in chain of fraudulent selling process. Vernon's Ann.Texas Civ.St. art. 581-33, subd. A(2).

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Cases that cite this headnote

**[3]** **Securities Regulation**

🔑 Fraudulent or other prohibited practices

To prevail under **TexasSecuritiesAct** section governing fraud liability of sellers, plaintiff must show that seller in offering or selling security made untrue statement of material fact or omission of material fact that was essential to make statement not misleading. Vernon's Ann.Texas Civ.St. art. 581-33, subd. A(2).

Cases that cite this headnote

**[4]** **Securities Regulation**

🔑 Fraudulent or other prohibited practices

Misrepresentation or omission is material, under **TexasSecuritiesAct** section governing fraud liability of sellers, if there is substantial likelihood that proper disclosure would have been viewed by reasonable investor as significantly altering total mix of information made available. Vernon's Ann.Texas Civ.St. art. 581-33, subd. A(2).

Cases that cite this headnote

**[5]** **Securities Regulation**

🔑 Fraudulent or other prohibited practices

Under **TexasSecuritiesAct** section governing fraud liability of sellers, investor/buyer has no duty to perform due diligence nor to discover truth by exercising ordinary care. Vernon's Ann.Texas Civ.St. art. 581-33, subd. A(2).

Cases that cite this headnote

**[6]** **Securities Regulation**

🔑 Persons liable

To make out prima facie case for **controlperson** liability under **TexasSecuritiesAct**, plaintiff must demonstrate that defendant had actual power or influence over controlled person and that defendant induced or participated in alleged violation; status alone is insufficient to establish that defendant is **controlperson** within statute's

ambit. Vernon's Ann.Texas Civ.St. art. 581-33, subd. F(1).

1 Cases that cite this headnote

**[7]** **Securities Regulation**

🔑 Persons liable

Under **TexasSecuritiesAct'scontrolperson** section, **controlperson** at corporation can be sued directly without joining corporation as defendant. Vernon's Ann.Texas Civ.St. art. 581-33, subd. F(1).

1 Cases that cite this headnote

**[8]** **Securities Regulation**

🔑 Persons liable

To establish aider and abettor liability under **TexasSecuritiesAct**, plaintiff must demonstrate: (1) existence of primary violation of securities law; (2) that aider has general awareness of its role in violation; (3) that aider gave substantial assistance in violation; and (4) that aider intended to deceive plaintiff or acted with reckless disregard for truth of representations made by primary violator. Vernon's Ann.Texas Civ.St. art. 581-33, subd. F(2).

5 Cases that cite this headnote

**[9]** **Securities Regulation**

🔑 Fraud on the market; price manipulation

"Manipulation" as used in § 10(b) refers to practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b).

2 Cases that cite this headnote

**[10]** **Securities Regulation**

🔑 Misrepresentation

To satisfy particularity requirement in § 10(b) and Rule 10b-5 complaint, plaintiff must: (1) specify each statement alleged to have been misleading; (2) identify speaker; (3) state when and where statement was made; (4) plead with

**In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)**

Fed. Sec. L. Rep. P 92,239

particularity contents of false representations; (5) plead with particularity what person making misrepresentation obtained thereby; (6) explain reason or reasons why statement is misleading; and (7) state with particularity all facts on which that belief is formed. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Cases that cite this headnote

[11] **Securities Regulation**
 Misrepresentation

When plaintiff in federal securities fraud action based on "information and belief" relies on confidential sources but also on other facts, he need not name his sources as long as such other facts provide adequate basis for believing that defendants' statements were false. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

[12] **Securities Regulation**
 Pleading

When federal securities fraud action is based on "investigation of counsel," same pleading requirements as for "upon information and belief" apply. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

[13] **Securities Regulation**
 Manipulative, Deceptive or Fraudulent Conduct

To state claim under § 10(b) and Rule 10b-5, plaintiff must allege, in connection with purchase or sale of securities: (1) misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which plaintiff relied; and (5) which proximately caused his injury. Securities

Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

[14] **Securities Regulation**
 Scienter, Intent, Knowledge, Negligence or Recklessness

Severe recklessness, i.e. highly unreasonable omissions or misrepresentations that involve extreme departure from standard of ordinary care, and that present danger of misleading buyers or sellers which is either known to defendant or is so obvious that defendant must have been aware of it, is sufficient to satisfy scienter requirement of § 10(b). Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

[15] **Securities Regulation**
 Misrepresentation, nondisclosure, and insider trading

Circumstantial evidence may be used to give rise to strong inference of scienter required under Private Securities Litigation Reform Act (PSLRA). Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

[16] **Securities Regulation**
 Scienter, Intent, Knowledge, Negligence or Recklessness

Allegations of motive and opportunity to commit fraud, by themselves, are generally insufficient to plead scienter in § 10(b) action, but may be employed along with other facts and circumstances to reach level of severe recklessness. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

**[17] Securities Regulation**

👉 Accountants, attorneys, underwriters and brokers

Mere publication of inaccurate accounting figures or failure to follow Generally Accepted Accounting Principles (GAAP), without more, does not establish scienter in § 10(b) action against accounting firm; plaintiff must show that firm deliberately misrepresented material facts or acted with reckless disregard about accuracy of its audits or reports. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

2 Cases that cite this headnote

**[18] Securities Regulation**

👉 Questions of law or fact; jury questions

Materiality of alleged misrepresentation in § 10(b) action is mixed question of fact and law and generally for jury. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

**[19] Securities Regulation**

👉 Reliance

Reliance element of § 10(b) action generally requires that plaintiff have known of particular misrepresentation complained of, have believed it to be true, and because of that knowledge and belief purchased or sold security in question. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

**[20] Securities Regulation**

👉 Presumptions and burden of proof

Defendant in § 10(b) action may rebut presumption of reliance arising under fraud-on-the-market doctrine by any showing that severs link between alleged misrepresentation and either price received or paid by plaintiff or his decision to trade at fair market price.

Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

**[21] Securities Regulation**

👉 Materiality of violation

Under truth-on-the-market defense to fraud-on-the-market doctrine's presumption that § 10(b) defendant's misrepresentations affected price of stock, misrepresentation is rendered immaterial if information was already known to market. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

**[22] Securities Regulation**

👉 Duty to Disclose or Refrain from Trading

When § 10(b) cause of action is based on allegation of material omission, plaintiff must demonstrate that defendant had fiduciary duty to disclose to plaintiff. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

**[23] Securities Regulation**

👉 Scienter, Intent, Knowledge, Negligence or Recklessness

Under Private Securities Litigation Reform Act (PSLRA) safe harbor provision, if forward-looking statement is accompanied by meaningful cautionary statements, defendant's state of mind is irrelevant. Securities Exchange Act of 1934, §§ 21D(b)(2), 21E(c)(1)(A)(i), (i)(1)(A), as amended, 15 U.S.C.A. §§ 78u-4(b)(2), 78u-5(c)(1)(A)(i), 78u-5(i)(1)(A).

5 Cases that cite this headnote

**[24] Securities Regulation**

👉 Forecasts, estimates, predictions or projections

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Private Securities Litigation Reform Act (PSLRA) safe harbor provision does not apply where defendants knew at time they were issuing statements that statements contained false and misleading information and thus lacked any reasonable basis for making them. Securities Exchange Act of 1934, § 21E(c)(1)(A)(i), as amended, 15 U.S.C.A. § 78u-5(c)(1)(A)(i).

6 Cases that cite this headnote

**[25]** **Securities Regulation**

Forecasts, estimates, predictions or projections

**Securities Regulation**

Materiality

Bespeaks caution doctrine cannot be applied as per se bar to liability for securities fraud under Sec. 10(b); rather, appropriate inquiry is whether, under all circumstances, omitted fact or prediction without reasonable basis is one that reasonable investor would consider significant in making decision to invest. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

**[26]** **Securities Regulation**

Manipulative, Deceptive or Fraudulent Conduct

Misrepresentation about value of particular security is not condition precedent for liability under § 10(b) and Rule 10b-5; liability may also be based on participation in course of business or device, scheme or artifice that operated as fraud on sellers or purchasers or stock, without materially false or misleading statement or omission. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(a, c).

5 Cases that cite this headnote

**[27]** **Securities Regulation**

Duty to Disclose or Refrain from Trading

Insider's trading in securities of his company based on material nonpublic information

qualifies as deceptive device under § 10(b). Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

**[28]** **Securities Regulation**

Scienter, Intent, Knowledge, Negligence or Recklessness

In order for insider trading to be probative of scienter under Sec. 10(b), plaintiff must allege trading that occurred in suspicious amounts or at suspicious times, out of line with trading practices or at times calculated to maximize personal profit. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

**[29]** **Securities Regulation**

Scienter, Intent, Knowledge, Negligence or Recklessness

Even unusual sales by one insider do not give rise to strong inference of scienter in § 10(b) class action, when other defendants do not sell some or all of their shares during class period. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

2 Cases that cite this headnote

**[30]** **Securities Regulation**

Fraud on the market; price manipulation

Section 10(b) claim based on market manipulation must allege direct participation in scheme to manipulate market for securities. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(a, c).

1 Cases that cite this headnote

**[31]** **Securities Regulation**

Fraud on the market; price manipulation

To state claim for market manipulation under § 10(b) and Rule 10b-5 against parties that

employed manipulative and deceptive practices in scheme to defraud, plaintiff must allege: (1) that it was injured; (2) in connection with purchase or sale of securities; (3) by relying on market for securities; (4) controlled or artificially affected by defendants' deceptive and manipulative conduct; and (5) defendants engaged in the manipulative conduct with scienter. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(a, c).

5 Cases that cite this headnote

**[32]** **Securities Regulation**
&#128273; Fraud on the market; price manipulation

In § 10(b) and Rule 10b-5 claim alleging market manipulation, where exact mechanism of scheme is likely to be unknown to plaintiffs, allegations of nature, purpose, and effect of fraudulent conduct and role of defendants are sufficient for alleging participation. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(a, c).

3 Cases that cite this headnote

**[33]** **Securities Regulation**
&#128273; Existence of private cause of action

Private plaintiff may not bring aiding and abetting claim under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

**[34]** **Securities Regulation**
&#128273; In general; **controlpersons**

When secondary actor in alleged securities fraud scheme, acting alone or with others, creates misrepresentation on which investor-plaintiff relies, such defendant "makes" material misstatement and thus can be liable as primary violator under § 10(b) if he acts with requisite scienter, even if defendant is not initiator of misrepresentation, and even if defendant's identity is not disclosed to investors. Securities

Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

11 Cases that cite this headnote

**[35]** **Securities Regulation**
&#128273; In general; **controlpersons**

Person who prepares truthful and complete portion of document cannot be liable as primary violator under § 10(b) for misrepresentations in other portions of document. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

**[36]** **Conspiracy**
&#128273; Conspiracy to defraud
**Securities Regulation**
&#128273; In general; **controlpersons**

There is no private cause of action merely for conspiracy to violate § 10(b) and Rule 10b-5; however, group of defendants may be liable based on allegations that they acted together to violate securities laws, as long as each defendant committed manipulative or deceptive act in furtherance of scheme, and plaintiff pleads and proves other requirements for primary liability as to each defendant, i.e. scienter and reliance. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(a, c).

6 Cases that cite this headnote

**[37]** **Securities Regulation**
&#128273; Grounds of and Defenses to Liability

Alleged controlling person in federal securities fraud action can meet requirements of good faith defense by showing that he used reasonable care to prevent securities violation. Securities Act of 1933, § 15, 15 U.S.C.A. § 77*o*; Securities Exchange Act of 1934, § 20(a), as amended, 15 U.S.C.A. § 78t(a).

Cases that cite this headnote

**[38]** **Securities Regulation**

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

☞ Scienter, Intent, Knowledge, Negligence or Recklessness

Negligence alone is insufficient to support controlling person liability in federal securities fraud action. Securities Act of 1933, § 15, 15 U.S.C.A. § 77*o*; Securities Exchange Act of 1934, § 20(a), as amended, 15 U.S.C.A. § 78t(a).

Cases that cite this headnote

**[39]    Securities Regulation**
☞ In general; **controlpersons**

To establish **controlperson** liability in federal securities fraud action, plaintiff need only show that alleged **controlperson** possessed power to control primary violator, not that alleged **controlperson** actually exercised power to control; however, plaintiff must allege some facts beyond alleged **controlperson's** position or title that show power to control. Securities Act of 1933, § 15, 15 U.S.C.A. § 77*o*; Securities Exchange Act of 1934, § 20(a), as amended, 15 U.S.C.A. § 78t(a).

2 Cases that cite this headnote

**[40]    Securities Regulation**
☞ In general; **controlpersons**

**Controlperson** liability in federal securities fraud action is derivative, i.e. depends on primary, independent violation by controlled person. Securities Act of 1933, §§ 11, 12, 15, 15 U.S.C.A. §§ 77k, 77*l*, 77*o*; Securities Exchange Act of 1934, §§ 10(b), 20(a), as amended, 15 U.S.C.A. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

**[41]    Securities Regulation**
☞ Scienter, absolute or strict liability

**Securities Regulation**
☞ Pleading

Where federal claim for false registration statement is grounded in negligence rather than fraud, there is no scienter requirement and complaint need only satisfy liberal pleading requirements of general federal civil procedure

rule. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k; Fed.Rules Civ.Proc.Rule 8, 28 U.S.C.A.

1 Cases that cite this headnote

**[42]    Securities Regulation**
☞ False Statements or Omissions; Accuracy

**Securities Regulation**
☞ Misrepresentation

False statements in registration statement can create liability under both Securities Act of 1933 and Securities Exchange Act of 1934; remedies are cumulative. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k; Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

**[43]    Securities Regulation**
☞ **Controlpersons** or groups and underwriters dealing with them

To state claim for **controlperson** liability under Securities Act of 1933, plaintiff must allege: (1) underlying primary violation by controlled person of Act's provision governing false registration statements; (2) control by defendant over controlled person; and (3) particularized facts as to controlling person's culpable participation in, i.e. exercise of control over, fraud perpetrated by controlled person. Securities Act of 1933, §§ 11, 15, 15 U.S.C.A. §§ 77k, 77*o*.

Cases that cite this headnote

**[44]    Attorney and Client**
☞ Duties and liabilities to adverse parties and to third persons

Ethical rules of conduct for attorneys, such as disciplinary rules, do not create corresponding legal duties nor constitute standards for imposition of civil liability on lawyers.

Cases that cite this headnote

**[45]    Securities Regulation**

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

🔑 Conduct of accountants, attorneys or other professionals

Even though in general lawyers are accountable only to their clients, not to third parties, for the sufficiency of their legal opinions, attorney who prepares signed opinion letter for use by third party is potentially liable for primary violation of Rule 10b-5 for material misstatement in letter upon which third party relies. 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

[46] **Attorney and Client**
🔑 Duties and liabilities to adverse parties and to third persons

Under Texas law, attorney may be liable to non-client for fraudulent misrepresentation if attorney knowingly makes misrepresentation intending that it be relied on by non-clients, or makes misrepresentation knowing that it is especially likely that it will be relied on by non-clients, or enters into conspiracy with client to defraud non-clients. Restatement (Second) of Torts §§ 531, 536.

Cases that cite this headnote

[47] **Fraud**
🔑 Intent

**Fraud**
🔑 Knowledge of defendant

Texas common law fraud requires that defendant knew that his representation was false or made recklessly without any knowledge of its truth and that defendant intended to induce plaintiff to act upon that representation.

Cases that cite this headnote

[48] **Attorney and Client**
🔑 Duties and liabilities to adverse parties and to third persons

Under Texas law, attorney has duty to non-client not in privity to use reasonable care to supply accurate information, where attorney is aware of non-client's identity and intends that non-client rely on information; breach of such

duty, followed by non-client's justifiable reliance and resulting in pecuniary loss to non-client, is negligent misrepresentation. Restatement (Second) of Torts § 552.

Cases that cite this headnote

[49] **Accountants**
🔑 Duties and liabilities to third persons

Independent public accountant who certifies public reports that collectively depict corporation's financial status owes ultimate allegiance to corporation's creditors and stockholders, as well as to investing public.

Cases that cite this headnote

[50] **Securities Regulation**
🔑 Persons Liable

**Securities Regulation**
🔑 Conduct of underwriters

Underwriter of public offering risks exposure to liability under Securities Act section governing false registration statements, as well as under § 10(b), for any material misstatements or omissions in registration statement made with scienter, and thus has duty to investigate issuer and securities that underwriter offers to investors. Securities Act of 1933, § 11(a), 15 U.S.C.A. § 77k(a); Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b).

4 Cases that cite this headnote

[51] **Securities Regulation**
🔑 Accountants, attorneys, underwriters and brokers

Knowledge gained in lending and commercial areas of banks and financial services institutions that were alleged to be secondary actors in corporation's fraudulent Ponzi scheme was imputable to banks' and institutions' analysts, for purpose of stating scienter element of § 10(b) and Rule 10b-5 claim, even though absence of effective "Chinese walls" was only conclusorily asserted; totality of circumstances, including facts unearthed in investigation by Securities and Exchange Commission (SEC) and New York

attorney general, rendered allegations adequate. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(a, c).

Cases that cite this headnote

**[52]** **Securities Regulation**
☞ In general; admissibility

Evidence of alleged misconduct that had occurred outside limitations period of § 10(b) and Rule 10b-5 suit, i.e. too early to be actionable, was admissible solely for purpose of establishing scheme and/or scienter, in action alleging elaborate and long-running Ponzi scheme. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(a, c).

1 Cases that cite this headnote

**[53]** **Securities Regulation**
☞ Reliance

Mere presence of disclaimers in financial services institutions' analysts' reports did not preclude investors from stating reliance element of securities fraud claim against institutions based on their alleged involvement in fraudulent Ponzi scheme, since disclaimers in question were generic and cursory and did not track substance of alleged misrepresentations. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(a, c).

Cases that cite this headnote

**[54]** **Securities Regulation**
☞ Persons who may assert illegality in general

Washington state investor had right of action under **TexasSecuritiesAct** arising from alleged misconduct occurring in Texas, i.e. issuance of registration statement for sale of notes that made materially false statements about entities formed by employees of Texas issuer, even though damage from misconduct, i.e. investor's purchase of notes at artificially inflated prices,

occurred outside Texas. Vernon's Ann.Texas Civ.St. art. 581-33.

2 Cases that cite this headnote

**[55]** **Securities Regulation**
☞ Fraud on the market

Reliance under "device, scheme, or artifice" and fraudulent "act, practice, or course of business" prongs of Rule 10b-5, as well as under material untrue statement prong, can be established by fraud-on-the-market doctrine. 17 C.F.R. § 240.10b-5.

2 Cases that cite this headnote

**[56]** **Securities Regulation**
☞ Accountants, attorneys, underwriters and brokers

Investors partially stated scienter element of securities fraud action against banks, accounting firms and law firms by alleging that for their own gain they had participated with defendant corporation in repeated creation of unlawful, corporation-controlled but unrecognized special purpose entities (SPEs), and in sale of corporation's unwanted assets to those entities in non-arm's-length transactions and often with guarantees of no risk, in order to shift debt off corporation's balance sheet and sham profits onto its books at critical times when quarterly or year-end reports to Securities and Exchange Commission (SEC) were due, followed in many cases by undoing of same deals once reports had been made. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(a, c).

Cases that cite this headnote

**[57]** **Securities Regulation**
☞ Accountants, attorneys, underwriters and brokers

**Securities Regulation**
☞ Pleading

**Securities Regulation**
☞ Scienter

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Investors fell short of particularity and scienter requirements of securities fraud claim against bank alleging participation in defendant corporation's alleged Ponzi scheme involving creation of corporation-controlled but unrecognized special purpose entities (SPEs) for purpose of hiding debt and artificially inflating earnings, by alleging that bank issued private placement memorandum/invitation-to-invest for SPE expressly indicating that corporation executive would be serving as officer for both corporation and SPE, and promising extraordinary returns to investors, and by alleging that bank's executives invested in and profited handsomely from SPE; memorandum was sufficient to raise red flags, but additional details were required concerning bank's knowledge at specific times, and its specific dealings. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1-2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1-2); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Cases that cite this headnote

**[58]** **Securities Regulation**
 Accountants, attorneys, underwriters and brokers

**Securities Regulation**
 Pleading

**Securities Regulation**
 Scienter

Investors satisfied particularity pleading requirement and stated scienter element of securities fraud claim against bank for its participation in defendant corporation's alleged scheme to hide debt and artificially inflate earnings, by alleging that bank on several occasions made $5 billion loans to corporation disguised as commodities trades, always at critical junctures just before quarter-end or year-end, as a contrivance to keep debt off corporation's books, and that "trades" were overseen by bank's senior credit officer, especially given existence of other similar contemporaneous transactions, fact that bank had purchased performance bond to insure

against corporation's default but insurer contested payment after default on fraud grounds, and excessive interest rate charged for "trades." Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1-2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1-2); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

**[59]** **Securities Regulation**
 Accountants, attorneys, underwriters and brokers

**Securities Regulation**
 Pleading

**Securities Regulation**
 Scienter

Investors satisfied particularity pleading requirement and stated scienter element of securities fraud claim against bank for its participation in defendant corporation's alleged scheme to hide debt and artificially inflate earnings, by alleging that bank participated in fraudulent IPO in which bank made sham loan to corporation to fund creation of fraudulent special purpose entity (SPE) and received "total return swap" guarantee to protect it from any loss, and that bank made loans to corporation totaling $2.4 billion, never disclosed on corporation's balance sheet, that were disguised as "pre-paid" swap transactions involving bank subsidiary, under which bank paid estimated fair value of its portion of swap immediately, but corporation was only obliged to repay cash over five years, with interest rate nearly double normal borrowing rate. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1-2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1-2); 17 C.F.R. § 240.10b-5.

2 Cases that cite this headnote

**[60]** **Securities Regulation**
 Accountants, attorneys, underwriters and brokers

**Securities Regulation**
 Pleading

**Securities Regulation**
 Scienter

Investors satisfied particularity pleading requirement and stated scienter element of securities fraud claim against bank for its participation in defendant corporation's alleged Ponzi scheme to hide debt and artificially inflate earnings, by alleging that bank served as lead underwriter for fraudulent IPO in which bank made sham loan to corporation to fund creation of fraudulent special purpose entity (SPE) and received "total return swap" guarantee to protect it from any loss; that bank made loan disguised as "swap" in which bank paid corporation up front but corporation was to repay bank over two years in payments varying with cost of oil; and that named bankers regularly designed, structured and funded corporation-controlled but unrecognized SPEs used to falsify corporation's financial condition by purchasing assets from corporation at inflated prices. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1-2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1-2); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

[61]  **Securities Regulation**
  👉 Accountants, attorneys, underwriters and brokers

  **Securities Regulation**
  👉 Pleading

  **Securities Regulation**
  👉 Scienter

Investors satisfied particularity pleading requirement and stated scienter element of securities fraud claim against bank for its participation in defendant corporation's alleged scheme to hide debt and artificially inflate earnings, by alleging that bank contributed more than its allocated share to prefund improper corporation-controlled but unrecognized special purpose entity (SPE), with bank executives among those receiving corporation's private placement memorandum predicting large returns and also among those secretly investing in SPE and reaping huge returns; that bank served as lead underwriter for fraudulent IPO in which bank made sham loan to corporation to fund creation of fraudulent SPE and received "total

return swap" guarantee to protect it from any loss; and that bank cooperated with corporation's misuse of mark-to-marketing accounting to improperly accelerate and record over $100 million of profits in risky entertainment joint venture. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1-2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1-2); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

[62]  **Securities Regulation**
  👉 Accountants, attorneys, underwriters and brokers

  **Securities Regulation**
  👉 Pleading

  **Securities Regulation**
  👉 Scienter

Investors satisfied particularity pleading requirement and stated scienter element of securities fraud claim against bank for its participation in defendant corporation's alleged scheme to hide debt and artificially inflate earnings, by alleging that bank was directly involved in formation and funding of fraudulent, corporation-controlled but unrecognized special purpose entities (SPEs), including one SPE that was created as sham independent entity to buy purported outsider's interest in second SPE, that bank loaned SPE $240 million and also lent money to two strawmen to provide necessary three percent independent equity investment in SPE, and that bank demanded that corporation provide secret guarantee that bank would be repaid and that SPE would establish cash reserve to insure against bank's risk of loss. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1-2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1-2); 17 C.F.R. § 240.10b-5.

Cases that cite this headnote

[63]  **Securities Regulation**
  👉 Accountants, attorneys, underwriters and brokers

  **Securities Regulation**
  👉 Scienter

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Investors failed to satisfy particularity and scienter requirements of securities fraud claim against banks and financial services companies by alleging only that their executives were among those who personally invested in allegedly fraudulent special purpose entity (SPE) controlled by defendant corporation but not recognized as such, and that those executives reaped profits from investment; events should have raised red flags, but were insufficient by themselves to establish strong inference of scienter. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1-2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1-2); 17 C.F.R. § 240.10b-5.

2 Cases that cite this headnote

**[64]    Securities Regulation**
 Conduct of accountants, attorneys or other professionals

Investors stated § 10(b) and Rule 10b-5 claim against law firm by alleging that firm for its own gain engaged in structuring for client corporation illicit partnerships and off-the-books special purpose entities (SPEs), controlled by corporation but not recognized as such, which were used to conduct Ponzi scheme to hide corporation's debt and artificially inflate earnings, drafted "true sales" opinions essential to effect SPEs' fraudulent transactions, and on frequent occasions drafted corporation's SEC filings and press releases knowing that they contained false statements about corporation's financial condition. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1-2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1-2); 17 C.F.R. § 240.10b-5.

3 Cases that cite this headnote

**[65]    Securities Regulation**
 Conduct of accountants, attorneys or other professionals

**Securities Regulation**
 Conduct of accountants or attorneys

Investors failed to state § 10(b) and Rule 10b-5 claim against law firm by alleging conclusorily that firm had represented some

of defendant corporation's controlled-but-unrecognized special purpose entities (SPEs) and partnerships allegedly used to conceal debt and artificially inflate earnings; complaint did not allege any investment in SPEs by firm, or profit on part of firm from any dealings with corporation other than performance of routine legal services for SPEs and partnerships, and indicated possible conflict of interest and breach of professional ethics at worst. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1-2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1-2); 17 C.F.R. § 240.10b-5.

1 Cases that cite this headnote

**[66]    Securities Regulation**
 Conduct of accountants or attorneys

Investors satisfied particularity pleading requirement of securities fraud claim against accounting firm for its participation in defendant corporation's alleged scheme to hide debt and artificially inflate earnings, by alleging with specificity that firm violated Generally Accepted Accounting Principles and Auditing Standards (GAAP and GAAS), ignored risk factors for fraud, and violated accounting rules and rules of professional conduct in its work for corporation, yet certified that corporation's financial statements were in compliance with GAAP and that its audits of those statements were in compliance with GAAS, and by alleging that firm destroyed documents to conceal its fraudulent accounting. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(1), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

5 Cases that cite this headnote

**[67]    Securities Regulation**
 Accountants, attorneys, underwriters and brokers

Investors stated scienter element of securities fraud claim against accounting firm for its participation in defendant corporation's alleged Ponzi scheme designed to hide debt and artificially inflate earnings, by alleging that

firm's comprehensive accounting, auditing and consulting services to corporation necessarily made it intimately privy to smallest details of corporation's fraudulent activity, that firm had engaged in similar prior fraudulent audits of other companies, that the Securities and Exchange Commission (SEC) and courts had repeatedly imposed penalties on firm and its employees arising from those audits, that senior firm partners at one point discussed corporation's various fraudulent practices and firm's own fraudulent accounting for corporation but decided to retain it as client due to lucrative nature of relationship, and that thereafter firm issued clean audit opinion on corporation's financial statements. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*559** Eric D. Green, pro se, Resolutions LLC, Boston, MA, for Mediator.

Richard J. Zook, Cunningham Darlow et al, Roger B. Greenberg, Schwartz Junell et al, Houston, TX, William S. Lerach, Milberg Weiss et al, San Diego, CA, Earnest W. Wotring, Connelly Baker et al, Houston, TX, Ira Press, Kirby McInerney et al, **\*560** New York, NY, Michael I. Behn, Futterman & Howard Chtd, Chicago, IL, Charles R. Parker, Hill and Parker, Houston, TX, James M. Finberg, Richard M. Heimann, Melanie M. Piech, Lieff Cabraser et al, San Francisco, CA, Stephen Lowey, Neil L. Selinger, Lowey Dannenberg et al, White Plains, NY, Elizabeth Cabraser, Lieff Cabraser et al, San Francisco, CA, Sherrie Savett, Arthur Stock, Berger & Montague PC, Philadelphia, PA, Thomas W. Sankey, Sankey & Luck, Houston, TX, Paul F. Bennett, Gold Bennett et al, San Francisco, CA, Thomas E. Bilek, Hoeffner Bilek & Eidman, Houston, TX, Helen J. Hodges, Milberg Weiss et al, San Diego, CA, William B. Federman, Federman & Sherwood, Oklahoma City, OK, Richard A. Speirs, Jeffrey C. Zwerling, Zwerling Schachter et al, New York, NY, Jack Edward McGehee, McGehee & Pianelli, Houston, TX, Robert B. Weintraub, Daniel W. Krasner, Wolf Haldenstein et al, New York, NY, Tom

Alan Cunningham, Cunningham Darlow et al, Houston, TX, Martin D. Chitwood, Jeffrey H. Konis, Chitwood & Harley, Atlanta, GA, Sidney S. Liebesman, Grant & Eisenhofer PA, Wilmington, DE, Jay W. Eisenhofer, Grant & Eisenhofer, Wilmington, DC, Edward H. Nicholson, Jr., Chitwood & Harley, Atlanta, GA, Ronald Joseph Kormanik, Sydow Kormanik Carrigan & Eckerson, Gregory Sean Jez, Fleming & Associates, Houston, TX, David C. Mattax, Office of Attorney General, Rose Ann Reeser, Texas Attorney General, Austin, TX, Stephen D. Oestreich, Entwistle & Cappuci LLP, New York, NY, Deborah R. Gross, Law Offices Bernard M. Bross PC, Philadelphia, PA, James F. Marshall, Attorney at Law, San Marino, CA, Meredith Cavallo, Larry E. Klayman, Judicial Watch Inc, Steven J. Toll, Cohen Milstein et al, Washington, DC, Theodore C. Anderson, Kilgore & Kilgore PLLC, Dallas, TX, David R. Scott, Attorney at Law, Neil Rothstein, James E. Miller, Scott & Scott LLC, Colchester, CT, John A. Lowther, James I. Jaconette, Alexandra S. Bernay, Milberg Weiss et al, San Diego, CA, Hector G. Gancedo, Gancedo & Nieves LLP, Pasadena, CA, Herbert Blake Tartt, Jr., Beirne Maynard et al, Houston, TX, Robert M. Kornreich, Wolf Popper LLP, New York, NY, Allyson L. Mihalick, Beirne Maynard et al, Houston, TX, Robert C. Finkel, Wolf Popper LLP, New York, NY, Thomas G. Shapiro, Shapiro Haber et al, Boston, MA, Joseph Albert McDermott, III, Attorney at Law, Houston, TX, Jonathan M. Plasse, Goodkind Labaton et al, New York, NY, David B. Kahn, Attorney at Law, Northfield, IL, Saul Roffe, Sirota & Sirota LLP, New York, NY, Sean F. Greenwood, Robins Cloud et al, John G. Emerson, Jr., The Emerson Firm, Richard Frankel, Hackerman Peterson et al, Houston, TX, Aaron Brody, Stull Stull et al, New York, NY, James D. Baskin, III, The Baskin Law Firm, Austin, TX, Klari Neuwelt, Attorney at Law, New York, NY, Michael D. Donovan, Donovan Searles LLC, Philadelphia, PA, Steven E. Cauley, Cauley Geller et al, Little Rock, AR, George M. Fleming, Fleming & Associates, Jeffery B. Kaiser, Sydow, Kormanik, Carrigan & Eckerson, LLP, Houston, TX, Andrew J. Mytelka, Greer Herz & Adams, Galveston, TX, Debra Brewer Hayes, Paul Thomas Warner, Reich & Binstock, Houston, TX, Harvey Greenfield, Attorney at Law, Laura M. Perrone, Law Firm of Harvey Greenfield, New York, NY, Edward Morgan Carstarphen, III, Ellis Carstarphen et al, Houston, TX, Fredrick F. Neid, Ass't Atty Gen, Lincoln, NE, Daniel Dean Gartner, Gartner Law Firm, PC, Robin L. Harrison, Campbell Harrison et al, Houston, TX, Lynn Lincoln Sarko, Derek W Loeser, Britt L. Tinglum, Keller Rohrback LLP, Seattle, WA, Steve W. Berman, Hagens Berman LLP, Erin M. Riley, Keller Rohrback LLP, Seattle, WA, Baxter Ward

Banowsky, Banowsky Betz & Levine, Dallas, **\*561** TX, Gary Benjamin Pitts, Pitts & Asoc, Houston, TX, Kenneth F. McCallion, McCallion & Associates, New York, NY, Damon Michael Young, Young Pickett et al, Texarkana, TX, Jeffrey R. Krinsk, Attorney at Law, San Diego, CA, Curtis L. Bowman, Cauley Geller et al, Little Rock, AR, Keith Alan Ward, Porter Rogers et al, Austin, TX, Mike Lange, Reinhardt Lange, Fairfield, CT, John Lee Ringgenberg, Attorney at Law, Englewood, CO, John A. Huettner, Attorney at Law, Cleveland, OH, Richard A. Lockridge, Lockridge Grindal et al, Minneapolis, MN, Stanley M. Grossman, Pomerantz Haudek et al, New York, NY, Steven N. Williams, Joseph W. Cotchett, Bruce L. Simon, Mark C. Molumphy, Cotchett Pitre et al, Burlingame, CA, Lynn W. Jinks, III, Jinks Daniel et al, Union Springs, AL, Ted L. Mann, Mann Cowan et al, Birmingham, AL, L. Shane Seaborn, Penn & Seaborn LLC, Clayton, AL, R. Paul Yetter, Yetter and Warden, Houston, TX, Philip T. Reinstein, Reinstein & Sherman, Howard C. Goode, Attorney at Law, Northbrook, IL, John H. Boone, Attorney at Law, Joseph M. Alioto, Alioto Law Firm, San Francisco, CA, Autry W. Ross, Yetter & Warden LLP, Houston, TX, Thomas Walter Umphrey, Provost & Umphrey, Beaumont, TX, Bonnie E. Spencer, Spencer and Associates, Houston, TX, Andy Wade Tindel, Provost & Umphrey Law Firm, Tyler, TX, for Plaintiffs/Consolidated Plaintiffs.

Stephen D. Susman, Susman Godfrey, Scott David Lassetter, John B. Strasburger, Weil Gotshal and Manges, Kenneth S. Marks, Susman Godfrey LLP, Craig Smyser, Jr., Smyser Kaplan & Veselka, Richard Bruce Drubel, Jr., Boies Schiller et al, Hanover, NH, John W. Keker, Jan Nielsen Little, Christa M. Anderson, Keker & Van Nest LLP, San Francisco, CA, James E. Coleman, Jr., Carrington Coleman et al, Dallas, TX, Robin C. Gibbs, Gibbs & Bruns, Houston, TX, Charles F. Richards, Jr., Richards Layton et al, Wilmington, DE, David Clarke, Jr., Keara M. Gordon, Piper Marbury et al, Washington, DC, Glenn E. Coe, Brenda M. Hamilton, Rome McGuigan et al, Hartford, CT, Ronald Gene Woods, Attorney at Law, Houston, TX, Bruce A. Hiler, O'Melveny & Myers, Washington, DC, Jeffrey Kilduff, O'Melveny & Myers, McLean, VA, Robert M. Stern, Attorney at Law, Washington, DC, Russell" Rusty" Hardin, Jr., Rusty Hardin and Associates, Houston, TX, Daniel F. Kolb, Sharon Katz, Davis Polk et al, New York, NY, Theresa Ann Foudy, Benard V. Preziosi, Eliot Lauer, Curtis Mallet–Prevost et al, New York, NY, Warren B. Lightfoot, Lightfoot Franklin et al, Birmingham, AL, Catherine E. Palmer, Latham & Watkins, New York, NY, Miles N. Ruthberg, Latham & Watkins, Los Angeles, CA, Peter Wald, Latham & Watkins, Stan G. Roman, Krieg Keller et al, San Francisco, CA, Turner P.

Smith, Samuel Rosenthal, Curtis Mallet–Prevost et al, New York, NY, Barry G. Flynn, Attorney at Law, George W. Billy Shepherd, III, Cruse Scott et al, Houston, TX, Michael D. Warden, Luisa Caro, Sidley Austin et al, Washington, DC, Eric J.R. Nichols, Beck Redden & Secrest, Clayton C. Cannon, Stumpf Craddock et al, Houston, TX, Scott B. Schreiber, John C. Massaro, Justin S. Antonipillai, Arnold & Potter, Washington, DC, Mark K. Glasser, King & Spalding, Charles G. King, III, King & Pennington, Houston, TX, Gregory A. Markel, Cadwalader Wickersham et al, New York, NY, Paul R. Bessette, Brobeck Phleger et al, Austin, TX, Ronit Setton, Nancy I. Ruskin, Cadwalader Wickersham et al, New York, NY, Lawrence David Finder, Haynes & Boone LLP, Houston, TX, Richard W. Clary, Karin A. DeMasi, Margaret K. Dooley, Rachel G. Skaistis, Julie Ann North, Melissa J. Baily, Joseph R. Wallin, Cravath Swaine et al, New York, NY, Barry Abrams, Abrams Scott et al, Houston, TX, David H. Braff, Sullivan & Cromwell, New York, NY, William H. Knull, III, **\*562** Mayer Brown et al, Houston, TX, Alan N. Salpeter, Mark McLaughlin, Andrew D. Campbell, Michele L. Odorizzi, Mayer Brown et al, Chicago, IL, Mark F. Pomerantz, Paul Weiss et al, New York, NY, Jacalyn D. Scott, Wilshire Scott et al, Houston, TX, Richard A. Rosen, Claudia Hammerman, Robyn F. Tarnofsky, Jonathan Hurwitz, Michael E. Gertzman, Brad S. Karp, Alyssa A. Qualls, Robert C. Weisz, Margaret E. McGuinness, Todd A. Kipnes, Paul Weiss et al, New York, NY, Joel M. Androphy, Berg & Androphy, Houston, TX, Lawrence Byrne, Owen Pell, Lance Croffoot–Suede, Timothy Pfeifer, White & Case LLP, New York, NY, Taylor M. Hicks, Jr., Hicks Thomas et al, Houston, TX, Robert F. Serio, Gibson Dunn & Crutcher, Christopher M. Joralemon, Clifford Chance et al, Marshall R. King, Gibson Dunn et al, Herbert S. Washer, James B. Weidner, James D. Miller, Ignatius Grande, Clifford Chance et al, New York, NY, Charles A. Gall, Jenkens & Gilchrist, Dallas, TX, Richard Warren Mithoff, Jr., Mithoff and Jacks, Houston, TX, John D. Roesser, David J. Woll, Thomas C. Rice, Jonathan K. Youngwood, Bruce D. Angiolillo, Christopher M. Caparelli, Jill M. O'Toole, George S. Wang, William M. Tong, Nihara K. Choudhri, Pieter H.B. Van Tol, Simpson Thacher et al, New York, NY, Keith Carter Hannigan, Jenkins & Gilchrist, Chicago, IL, Ronald Earl Cook, Cook Roach et al, Houston, TX, James F. Moyle, James N. Benedict, Rogers & Wells, Mark A. Kirsch, Clifford Chance et al, New York, NY, Kelly M. Klaus, Ronald L. Olson, Dennis C. Brown, John W. Spiegel, Kevin S. Allred, Kristin L. Myles, Munger, Tolles, & Olson, LLP, San Francisco, CA, Jack C. Nickens, Nickens Keeton et al, Houston, TX, Elizabeth T.

Parker, Pepper Hamilton LLP, Philadelphia, PA, Stephen J. Crimmins, Pepper Hamilton LLP, Washington, DC, Robert C. Micheletto, Jones Day et al, Chicago, IL, David L. Carden, Jones Day et al, New York, NY, Brian A. Troyer, Jones Day et al, Cleveland, OH, David Elliott Miller, Hugh R. Whiting, Jones Day et al, Houston, TX, William Edward Matthews, Gardere Wynne et al, Harvey G. Brown, Jr., Orgain Bell et al, Matthew D. Shaffer, Schechter McElwee et al, Houston, TX, Michael G. Davies, Hoguet Newman et al, New York, NY, James P. Pennington, King & Pennington LLP, Houston, TX, Paul Vizcarrondo, Jr., Jonathan E. Pickhardt, Wachtell Lipton et al, Max Gitter., Cleary Gottlieb et al, New York, NY, Murray J. Fogler, McDade Fogler et al, Houston, TX, Roger E. Zuckerman, Steven M. Salky, Deborah J. Jeffrey, Amy M. McNamer, Norman L. Eisen, Zuckerman Spaeder LLP, Washington, DC, Barnes H. Ellis, David H. Angeli, Stoel Rives LLP, Portland, OR, Amy Joseph Pedersen, William F. Martson, Zachary W.L. Wright, Tonkon Torp LLP, Portland, OR, Edward John O'Neill, Jr., Jason Carrington Norwood, Clements O'Neill et al, Houston, TX, Jennifer Piskun, John J. McKetta, III, Graves Dougherty et al, Austin, TX, Mark J. Rochon, Emmett B. Lewis, Miller & Chevalier Chartered, Washington, DC, H. Bruce Golden, Golden & Owens LLP, Houston, TX, Dennis H. Tracey, Brad M. Johnston, David Wertheimer, Hogan & Hartson LLP, New York, NY, Amelia Rudolph, Sutherland Asbill et al, Atlanta, GA, Kathryn Schaefer Zecca, Gary A. Orseck, Robbins Russell Englert Orseck & Untereiner, LLP, Lawrence S. Robbins, Robbins Russell et al, Washington, DC, Billy Jack Shepherd, Cruse Scott et al, Houston, TX, Peter Fleming, Jr., Michael J. Moscato, Curtis Mallet–Prevost et al, New York, NY, David E. Ross, Mark C. Hansen, Kellogg Huber et al, Washington, DC, Henry F. Schuelke, III, Janice Schuelke et al, Washington, DC, Robert Hayden Burns, Burns Wooley et al, Houston, TX, J. Clifford Gunter, III, Abigail K. Sullivan, Bracewell & Patterson LLP, Houston, TX, Damon Michael Young, Young Pickett et **563** al, Texarkana, TX, Walter J. Cicack, Adams & Reese, Houston, TX, Paul D. Clote, Attorney at Law, Rodney Acker, Jenkens & Gilchrist, Dallas, TX, for Defendants/Consolidated Defendants.

William S. Lerach, Milberg Weiss et al, San Diego, CA, Thomas E. Bilek, Hoeffner Bilek & Eidman, Houston, TX, Steven G. Schulman, Milberg Weiss Bershad Hynes and Lerach, New York, NY, R. Paul Yetter, Yetter and Warden, Houston, TX, Michael J. Pucillo, Burt & Pucillo, West Palm Beach, FL, Glen DeValerio, Jeffrey C. Block, Berman DeValerio et al, Boston, MA, Vincent R. Cappucci, Entwistle & Cappucci, New York, NY, James M. Finberg, Richard M. Heimann, Melanie M. Piech, Lieff Cabraser et

al, San Francisco, CA, Stephen Lowey, Lowey Dannenberg et al, White Plains, NY, Wendy Hope Zoberman, Berman DeValerio et al, West Palm Beach, FL, Johnston de Forest Whitman, Jr., AndrewJ. Entwistle, Entwistle & Cappucci LLP, New York, NY, Neil L. Selinger, Lowey Dannenberg et al, White Plains, NY, Roger B. Greenberg, Schwartz Junell et al, Houston, TX, Bonnee Linden, Dr, Hewlett, NY, Don R. Sampen, Illinois Ass't Atty Gen, Chicago, IL, Joseph D. Jamail, II, Jamail and Kolius, Houston, TX, John K. Villa, Mary G. Clark, George A. Borden, Williams & Connolly LLP, Washington, DC, Mark D. Starr, Fredrick F. Neid, Don Stenberg, Ass't Atty Gen, L. Steven Grasz, Deputy Atty Gen, Lincoln, NE, Daniel J. Doyle, Office of Atty Gen, Harrisburg, PA, Thomas J. Blessington, Office of Atty Gen, Philadelphia, PA, G. William Scott, Timothy Hauser, Robin Springberg Parry, Michael Schloss, U.S. Dept of Labor, Washington, DC, Damon Michael Young, Young Pickett et al, Texarkana, TX, Jeffrey S. Boyd, Deputy Atty Gen for Litigation, Austin, TX, Brian D. Salwowski, Deputy Atty Gen, Indianapolis, IN, Linda L. Addison, Fulbright and Jaworski, Houston, TX, David H. Donaldson, Jr., George & Donaldson, Austin, TX, James L. Petersen, Ice Miller, Indianapolis, IN, Mike McKool, Jr., McKool Smith, Dallas, TX, George David Gordon, Baggett Gordon & Deison, Conroe, TX, Brian D. Hail, Milbank Tweed et al, New York, NY, for Movants.

Joseph A. Grundfest, Stanford Law School, Stanford, CA, Stephen Webster, SEC, Legal Counsel, Fort Worth, TX, for Amicus.

Carolyn S. Schwartz, pro se, New York, NY, for Trustee.

### *MEMORANDUM AND ORDER*

### *RE SECONDARY ACTORS' MOTIONS TO DISMISS*

HARMON, District Judge.

The above referenced putative class action, brought on behalf of purchasers of Enron Corporation's publicly traded equity and debt securities during a proposed federal Class Period from October 19, 1998 through November 27, 2001, alleges securities violations (1) under Sections 11 and 15 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77k and 77o; (2) under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act" or "the 1934 Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t–1, and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5; and

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

(3) under the **TexasSecuritiesAct**, Texas Rev. Civ. Stat. Ann. art. 581–33 (Vernon's 1964 & 2002 Supp.).

 **[1]** Pending before the Court *inter alia* are motions to dismiss pursuant to Rules 8(e)(1),[1] 9(b),[2] and 12(b)(6)[3] of the **\*564** Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), codified at 15 U.S.C. § 78u–4(b)(3)(A), and *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), filed by the following accounting firms, law firms, and investment banks/ integrated financial services institutions ("secondary actors in securities markets"[4]): (1) Canadian Imperial Bank of Commerce ("CIBC")(# 615); (2) CitiGroup Inc. (# 629); (3) J.P. Morgan Chase & Co.(# 632); (4) Vinson & Elkins L.L.P. (# 648); (5) Arthur Andersen LLP (# 650); (6) Barclays PLC (# 653); (7) Credit Suisse First Boston (# 658); (8) Kirkland & Ellis (# 660); (9) Bank of America Corporation (# 664); (10) Merrill Lynch & Co. (# 667); (11) Lehman Brothers Holdings Inc. (# 679); and (12) Deutsche Bank AG (# 716).[5]

 **\*565** In essence Lead Plaintiff's consolidated complaint alleges that these and other named Defendants "are liable for (i) making false statements, or failing to disclose adverse facts while selling Enron securities and/or (ii) participating in a scheme to defraud and/or a course of business that operated as a fraud or deceit on purchasers of Enron's public securities during the Class Period...." Consolidated complaint (# 441) at 254.

## APPLICABLE LAW

The rapid collapse of Enron Corporation ("Enron") and the resulting scope, variety, and severity of losses are unprecedented in American corporate history. It is not surprising that this consolidated action raises a number of novel and/or controversial issues that the law has thus far not addressed or about which the courts are in substantial disagreement. Lead Plaintiff Regents of the University of California's claims are grounded in securities statutes, but judicial construction of those statutes spans the full spectrum of possibilities. After a careful review of frequently divergent case law and extensive deliberation, the Court applies the following law to the allegations in the consolidated complaint and, where appropriate, explains the bases for its selection.

## I. TexasSecuritiesAct

Plaintiff the Washington State Investment Board asserts a class action claim under the **TexasSecuritiesAct** against Defendants Arthur Andersen LLP, JP Morgan, and Lehman Brothers and against individual Enron Defendants Belfer, Blake, Buy, Causey, Chan, John Duncan, Fastow, Foy, Gramm, Harrison, Jaedicke, Lay, LeMaistre, Meyer, Jeffrey Skilling, Urquhart, Wakeham, Walker, Willison, Winokur in connection with the sale to the Washington Board and proposed subclass of $250 million of 6.95% Notes due July 15, 2028 and $250 million of 6.40% Notes due July 15, 2006.

 **[2]** Article 581–33 of the **TexasSecuritiesAct**, Tex.Rev.Civ. Stat. (Vernon's Supp.2002), provides in relevant portion,

### Civil Liabilities

A. Liability of Sellers.

. . . . .

(2) Untruth or Omission. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known of the untruth or omission. The issuer of the security (other than a **\*566** government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security....

F. Liability of **ControlPersons** and Aiders

(1) A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer....

Tex.Rev.Civ. Stat. art. 581–33(A)(2), (F)(1) and (2)(Vernon Supp.2002). "Person" *inter alia* includes a corporation, partnership, limited partnership, company, and firm. Art. 581–4(B). "Sells" is defined as any act by which a sale is made, including a solicitation to sell, an offer to sell, or an attempt to sell, and encompasses "subscription, an option for sale, a solicitation of sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly by an agent or salesman, by circular, letter, or advertisement or otherwise." *Texas Capital Securities Inc. v. Sandefer,* 58 S.W.3d 760, 775 (Tex.App.-Houston [1st Dist.] 2001, review denied), *citing* art. 581–4(e). Moreover, liability may be imposed against a defendant as long as the defendant constituted any link in the chain of the selling process. *Brown v. Cole,* 155 Tex. 624, 291 S.W.2d 704, 708 (Tex.1956); *Rio Grande Oil Co. v. State,* 539 S.W.2d 917, 922 (Tex.Civ.App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.); *Texas Capital Securities, Inc. v. Sandefer,* 58 S.W.3d at 775. The **TexasSecuritiesAct** is to be construed "to protect investors" and "because article 581–33 is remedial in nature in the civil context, it 'should be given the widest possible scope.' " *Texas Capital Securities,* 58 S.W.3d at 775,*citing*Tex.Rev.Civ. Stat. art. 581–10–1(b)(Vernon 2001) and *Flowers v. Dempsey–Tegeler & Co.,* 472 S.W.2d 112, 115 (Tex.1971).

Article 581–33(A) has some significant differences from § 10(b) and from common law fraud in that it does not require reliance by the purchaser on the seller's material misrepresentation or omission, i.e., the purchaser does not have to demonstrate that it would not have bought the security if it had known of the misrepresentation or omission. *Granader v. McBee,* 23 F.3d 120, 123 (5th Cir.1994); *Weatherly v. Deloitte & Touche,* 905 S.W.2d 642, 648–49 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.)("An omission or misrepresentation is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest. An investor is not required to prove that he would have acted differently but for the omission or misrepresentation.... [T]he focus under the **TexasSecuritiesAct** is on the conduct of

the seller or issuer of the securities, i.e., whether they made a material misrepresentation, not on the conduct of the individual buyers."); *Anheuser–Busch Companies, Inc. v. Summit Coffee Co.,* 858 S.W.2d 928, 936 (Tex.App.-Dallas 1993, writ denied); *Rio Grande Oil Co.,* 539 S.W.2d at 921;*Summers v. WellTech, Inc.,* 935 S.W.2d 228, 234 (Tex.App.-Houston [1st Dist.] n.w.h.). **\*567** Nor does the plaintiff have to demonstrate scienter under the Texas Act. *Wood v. Combustion Engineering, Inc.,* 643 F.2d 339, 345 (5th Cir.1981). [6]

Where there are similarities, Texas courts turn to cases construing federal securities laws for guidance in interpreting the **TexasSecuritiesAct**. *In re Westcap Enterprises,* 230 F.3d 717, 726 (5th Cir.2000); *Beebe v. Compaq Computer Corp.,* 940 S.W.2d 304, 306–07 (Tex.App.-Houston [14th Dist.] 1997, no writ)("While cases dealing with the federal securities laws are not dispositive concerning our interpretation of the **TexasSecuritiesAct**, they may provide persuasive guidance."); *Searsy v. Commercial Trading Corp.,* 560 S.W.2d 637, 639 (Tex.1977); *Star Supply Co. v. Jones,* 665 S.W.2d 194, 196 (Tex.App.-San Antonio 1984, no writ); *Campbell v. Payne,* 894 S.W.2d 411, 417 (Tex.App.-Amarillo 1995, writ denied).

 [3]  [4]  [5]  Thus to prevail under art. 581–33(A)(2), a plaintiff must show that the defendant seller in offering or selling a security made an untrue statement of material fact or an omission of material fact that was essential to make the statement not misleading. *Duperier v. Texas State Bank,* 28 S.W.3d 740, 745 (Tex.App.-Corpus Christi, 2000), *review dismissed by agreement* (Jan. 4, 2001). A misrepresentation or omission is "material if there is a substantial likelihood that proper disclosure would have been viewed by a reasonable investor as significantly altering the total mix of information made available.... In other words, the issue is whether a reasonable investor would consider the information important in deciding whether to invest." *Id.* (and cases cited therein). The investor/buyer has no duty to perform due diligence nor to discover the truth by exercising ordinary care. *Id.; In re Westcap Enterprises,* 230 F.3d at 726.

 [6]  [7]  Although the **TexasSecuritiesAct** does not define "**controlperson**," comments to the statute note, "control is used in the same broad sense as in federal securities law" and that "[d]epending on the circumstances, a **controlperson** might include an employer, an officer or director, a large shareholder, a parent company, and a management company." Art. 581–33F cmt. "The rationale for **controlperson** liability

is that a **controlperson** is in the position to prevent the violation and may be able to compensate the injured investor when the primary violator (e.g., a corporate issuer which has gone bankrupt) is not." *Summers v. WellTech, Inc.* 935 S.W.2d 228, 231 (Tex.App.-Houston [1st Dist.] 1996); *Texas Capital Securities Management, Inc.,* 80 S.W.3d at 268. To make a *prima facie* case for **controlperson** liability under the Texas statute, the plaintiff must demonstrate that the defendant had actual power or influence over the controlled person and that the defendant induced or participated in the alleged violation. *Texas Capital Securities,* 80 S.W.3d at 261, *citing Dennis v. Gen. Imaging, Inc.,* 918 F.2d 496, 509 (5th Cir.1990); *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 958 (5th Cir.1981). Status alone is insufficient to establish that a defendant is a **controlperson** within the ambit of the statute. *Id.* at 268, *citing Dennis,* 918 F.2d at 509. A **controlperson** at a corporation can be sued directly without joining the corporation as a defendant. *Summers v. WellTech, Inc.* 935 S.W.2d at 231. If the buyer still owns the securities at issue, rescission is the sole remedy available; only if he has sold the securities, may he **\*568** obtain money damages. *Id.; Texas Capital Securities, Inc.,* 58 S.W.3d at 775.

 **[8]** To establish aider and abettor liability under art. 581–33(F)(2), a plaintiff must demonstrate (1) the existence of a primary violation of the securities laws, (2) that the aider has a general awareness of its role in the violation, (3) that the aider gave substantial assistance in the violation, and (4) that the aider intended to deceive the plaintiff or acted with reckless disregard for the truth of the representations made by the primary violator. *Frank v. Bear, Stearns, & Co.,* 11 S.W.3d 380, 384 (Tex.App.-Houston [14th Dist.] 2000, writ denied). [7]

## II. Federal Securities Law

### A. Section 10(b) of the 1934 Act and Rule 10b–5

 **[9]** Section 10(b) of the Exchange Act states in relevant part,

> It shall be unlawful for any person, directly or indirectly ... (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative [8] or deceptive [9] device or contrivance **\*569** [10] in contravention of such rules and regulations as the [SEC] may proscribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b–5, which implements § 10(b), in turn provides in relevant part,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The scope of Rule 10b–5 is coextensive with the coverage of § 10(b). *United States v. O'Hagan,* 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *Ernst & Ernst,* 425 U.S. at 214, 96 S.Ct. 1375;*SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 1901 n. 1, 153 L.Ed.2d 1 (2002).

One objective underlying the enactment of § 10(b) following the 1929 stock market crash was "to insure honest securities markets and thereby promote investor confidence." *United States v. O'Hagan,* 521 U.S. at 658, 117 S.Ct. 2199. Furthermore Congress tried " 'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.' " *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 150, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), *quoting SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The Supreme Court has indicated that the statute should be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' " *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. at 151, 92 S.Ct. 1456,*quoting SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. at 195, 84 S.Ct. 275;*Zandford,* 122 S.Ct. at 1903.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

**\*570 a. Misleading Statements or Omissions**

The PSLRA amends the Exchange Act and applies to private class actions brought pursuant to the Federal Rules of Civil Procedure. Pub.L. No. 104–67, 109 Stat, 737, codified at 15 U.S.C. §§ 77k, 77*l*, 77z–1, 77z–2, 78a, 78j–1. 78t, 78u, 78u–4, 78u–5.

 **[10]**    Under the PSLRA, 15 U.S.C. § 78u–4(b)(1) & (2),

   (b) Requirements for securities fraud actions

   (1) Misleading statements and omissions In any private action arising under this chapter in which the plaintiff alleges that the defendant—

      (A) made an untrue statement of a material fact; or

      (B) omitted to state a material fact necessary in order to make the statements made in the light of the circumstances in which they were made, not misleading;

   the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

   (2) Required state of mind

   In any private action under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

If the facts are not pled with the requisite particularity, the action is to be dismissed. 15 U.S.C. § 78u–4(b)(3)(A). The Fifth Circuit views the standard of the PSLRA to "*at a minimum,* incorporate the standard for pleading fraud under" Rule 9(b). *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 349–50 (5th Cir.2002). Thus to plead a false or misleading statement or omission as the basis for a § 10(b) and Rule 10b–5(b) securities fraud claim and avoid dismissal, a plaintiff must

   (1) specify ... each statement alleged to have been misleading, i.e., contended to be fraudulent;

   (2) identify the speaker;

   (3) state when and where the statement was made;

   (4) plead with particularity the contents of the false representations;

   (5) plead with particularity what the person making the misrepresentation obtained thereby;

   (6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent .... the 'who, what, when, where, and how' required under Rule 9(b) ... [and] under 15 U.S.C. § 78u–4(b)(1), for allegations made on information and belief, ... and

   (7) state with particularity all facts on which that belief is formed, *i.e.,* set forth a factual basis for such belief.

*Id.* at 350.

 **[11]**    In most cases, at the pre-discovery stage, the allegations in the complaint are not based upon a plaintiff's personal knowledge and thus are based on "information and belief" regardless of whether they are so characterized. The Fifth Circuit, relying on the Second Circuit's reasoning in *Novak v. Kasaks,* 216 F.3d 300, 313–14 & n. (2d Cir.2000), *cert. denied,*531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000), has held with respect to the last requirement,

> [O]ur reading of the PSLRA rejects any notion that confidential sources must be named as a general matter. In our **\*571** view, notwithstanding the use of the word "all," [§ 78u–4(b)(1) ] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs. Accordingly, where plaintiffs rely on confidential sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement

that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out. Accordingly, a complaint can meet the new pleading requirement imposed by paragraph (b)(1) by providing documentary evidence and/ or a sufficient general description of the personal sources of the plaintiffs' beliefs.

*Id.* at 352. Nevertheless "if the other facts, *i.e.,* documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false *and* the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name the personal sources." *Id.* at 353.

[12] Moreover, the Fifth Circuit also noted that where the complaint states that its allegations were made on "investigation of counsel," the same pleading requirements as for "upon information and belief" apply. *Id.* at 351 n. 70, *citing In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 885 n. 33 (S.D.Tex.2001).

[13] [14] To state a securities fraud claim under § 10(b) of the Exchange Act and Rule 10b–5(b), a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or omission (2) of a material fact, (3) made with scienter, (4) on which the plaintiff relied and (5) which proximately caused his injury. *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 430 (5th Cir.2002), *citing Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520–21 (5th Cir.1993); *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 406–07 (5th Cir.2001). Scienter for a private cause of action under § 10(b), means "intent to deceive, manipulate or defraud" (*Abrams,* 292 F.3d at 430,*citing Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)) or at least knowing misconduct (*Herman & MacLean v. Huddleston,* 459 U.S. 375, 382–83, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)(mere

negligence is insufficient)). Because the PSLRA does not define generally the required scienter for private securities fraud claims under § 10(b) and Rule 10b–5, but only mandates that the plaintiff plead facts with particularity to give rise to a strong inference of the requisite state of mind, the Fifth Circuit has held that severe recklessness, "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it," is sufficient to satisfy the scienter requirement. *Nathenson,* 267 F.3d at 408.

[15] To survive a motion to dismiss, the plaintiff must plead specific facts with **\*572** particularity giving rise to a "strong inference" of scienter. *Nathenson,* 267 F.3d at 407. Circumstantial evidence may be used to give rise to a strong inference of scienter. *Abrams,* 292 F.3d at 430;*Nathenson,* 267 F.3d at 410. Rather than a piecemeal analysis, this court must view the totality of alleged facts and circumstances, together as a whole, to determine whether they raise the requisite strong inference of scienter. *Abrams,* 292 F.3d at 431.

[16] Allegations of motive and opportunity to commit fraud, by themselves, are generally insufficient to plead scienter in the Fifth Circuit, but may be employed along with other facts and circumstances to reach the level of severe recklessness. *Abrams,* 292 F.3d at 430;*Nathenson,* 267 F.3d at 410–411. Nor does a conclusory assertion that a defendant should have known about internal corporate problems based merely on his position or status within the corporation suffice. *Id. at 432.* Moreover, "[a]n unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. Such allegations must have corroborating details regarding the contents of the allegedly contrary reports, their authors and recipients." *Id. at 432.* Rejecting the need for pleading comprehensive, detailed evidentiary matter in securities litigation and embracing the more "sensible standard" of *Novak,* discussed *supra,* the Fifth Circuit requires "at least some specifics from these reports," such as "who prepared internal company reports, how frequently the reports were prepared and who reviewed them." *ABC Arbitrage,* 291 F.3d at 355.

[17] In addition, the Fifth Circuit has concluded that "the mere publication of inaccurate accounting figures or failure to

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

follow GAAP, [11] without more, does not establish scienter; a plaintiff must show that the accounting firm deliberately misrepresented material facts or acted with reckless disregard about the accuracy of its audits or reports. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information." *Abrams,* 292 F.3d at 430. [12] *See also Melder v.* **\*573** *Morris,* 27 F.3d 1097, 1103 (5th Cir.1994)("boilerplate averments that the accountants violated particular standards are not, without more, sufficient to support inferences of fraud").

Allegations that a defendant was motivated to commit fraud to enhance his incentive compensation or to raise capital are also inadequate to establish scienter because "the executives of virtually every corporation in the United States would be subject to fraud allegations." *Abrams,* 292 F.3d at 434 ("It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent.").

 [18]   A plaintiff must also demonstrate that the challenged misrepresentations in dispute were material, that he relied on them, and that as a proximate result, he was damaged. Misrepresentations or omissions are material if there is a substantial likelihood that a reasonable investor would have viewed the allegedly false, misleading or omitted statement as having significantly altered the total mix of information available to him in deciding whether to buy or sell his stock or, phrased another way, "if there was a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest."*Basic Inc. v. Levinson,* 485 U.S. 224, 230–31, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *ABC Arbitrage,* 291 F.3d at 359. Although materiality is a mixed question of fact and law and generally a decision for the jury, nevertheless, in reviewing a motion to dismiss, the court can determine that representations are immaterial as a matter of law. *ABC Arbitrage,* 291 F.3d at 359;*Nathenson,* 267 F.3d at 422.

 [19]   "Reliance ... generally requires that the plaintiff have known of the particular misrepresentation complained of, have believed it to be true and because of that knowledge and belief purchased or sold the security in question." *Nathenson,* 267 F.3d at 413. [13]

 **\*574**   To satisfy the reliance element in § 10(b) and Rule 10b–5 securities violation action, where a plaintiff investor who may not have read or heard the purported misrepresentations, a plaintiff may employ the "fraud-on-

the-market" doctrine. The Supreme Court has stated that this theory "is based on the hypothesis that in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. .... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. ...." *Basic,* 485 U.S. at 241–42, 108 S.Ct. 978,*citing Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3d Cir.1986). Thus the presumption is that the plaintiff relied on the value of the stock, which is the market's reflection of available material information about a company including the company's fraudulent statements. *Fine v. American Solar King Corp.,* 919 F.2d 290, 298 (5th Cir.1990), *cert. dism'd sub nom. Main Hurdman v. Fine,* 502 U.S. 976, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991).

 [20]   [21]   A defendant may rebut "the presumption of reliance by 'any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price.' " *Id., citing Basic,* 485 U.S. at 248, 108 S.Ct. 978. Thus the defendant can rebut the presumption by demonstrating that the nondisclosure had no effect on the stock's market price or that the plaintiff would have purchased the stock at the same price even if he had known the information that was not disclosed to the market or that the plaintiff actually knew about the information that was not disclosed to the market when he purchased the stock. *Id.; Nathenson,* 267 F.3d at 414. As a corollary to the fraud-on-the-market doctrine and a defense to rebut that doctrine's presumption that the defendant's misrepresentations affected the price of the company's stock, the truth-on-the-market doctrine views a misrepresentation as immaterial if the information is already known to the market because that misrepresentation therefore cannot defraud the market. *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 905–06 n. 46 (S.D.Tex.2001).

The fraud-on-the-market theory is particularly relevant where a § 10(b) and Rule 10b–5 case alleges market manipulation.

> Market manipulation schemes which are intended to distort the price of a security, if successful, necessarily defraud investors who purchase the security in reliance on the market's integrity. Absent the ... theory, the parties injured by such manipulative schemes could not plead the necessary element of reliance.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

*Scone Investments, L.P. v. American Third Market Corp.,* No. 97 CIV 3802(SAS), 1998 WL 205338, *5 (S.D.N.Y. Apr.28, 1998).

 **[22]**     When the cause of action under § 10(b) is based on an allegation of a material omission, the plaintiff must demonstrate that the defendant had a fiduciary duty to disclose to the plaintiff.*Central Bank,* 511 U.S. at 174, 114 S.Ct. 1439 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."). Such a duty to disclose under the federal securities laws "arises from the relationship between parties." *Dirks v. SEC,* 463 U.S. 646, 657–58, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). The plaintiff must be "entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States,* 445 U.S. 222, 226, 228, 230 n. 12, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)(holding that when a person engages in insider trading, thus not disclosing inside information, to violate § 10(b) the trader must have an **\*575** independent duty of disclosure; in dicta the court observed that corporate insiders violate a fiduciary duty to shareholders when they trade on nonpublic information). [14]

The PSLRA establishes a "safe harbor" shielding a "forward-looking" statement from Rule 10b–5 liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge ... that the statement was false and misleading." 15 U.S.C. § 78u–5 and § 78u–5(c)(1)(B)(i). A statement is "forward-looking" if, *inter alia,* it is

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A),(B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer....

15 U.S.C. § 78u–5(i)(1)(A).

 **[23]**     The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. 15 U.S.C. § 78u–5(c)(1)(A)(i) and (ii). If a statement is "accompanied by meaningful cautionary statements," the defendants' state of mind is not relevant. *Harris v. Ivax Corp.,* 182 F.3d 799, 803 (11th Cir.1999), *citing*H.R. Conf. Rep. 104–369, at 44 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.") *See also Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1213 (1st Cir.1996)("when statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the 'soft' statements may not be materially misleading under the securities laws"). Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u–5(c)(1)(B).

 **\*576 [24]**     The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them. *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1213 (1st Cir.1996); *Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1473 (N.D.Ga.1997); *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 930 (D.N.J.1998).

The PSLRA restricts review of forward-looking statements to those specified in the complaint. 15 U.S.C. § 78u–4(b)(1). Thus the Court must examine piecemeal the statements made by the company as expressed in the pleadings.

There is a judicially created equivalent to the PSLRA's "safe harbor" provision, the "bespeaks caution" doctrine,

which the Eleventh Circuit in *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1276 n. 7 (11th Cir.1999) explains "operates similarly, protecting statements in the nature of projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved, so as to 'bespeak caution' to investors that actual results may differ, thereby shielding the statements from § 10(b) and Rule 10b–5 liability." *Id., citing Saltzberg v. TM Sterling/ Austin Assoc.,* 45 F.3d 399 (11th Cir.1995)(*per curiam* )(holding that explicit cautionary language in private placement memorandum rendered alleged misstatements immaterial and made them not actionable under the "bespeaks caution" doctrine).

 [25]    The Fifth Circuit has rejected the application of the "bespeaks caution" doctrine as a *per se* bar to liability. *Rubinstein v. Collins,* 20 F.3d 160, 162 (5th Cir.1994). Observing that the use of the doctrine by district courts "reflects a relatively recent, ongoing, and somewhat uncertain evolution in securities law," the Fifth Circuit skeptically comments,

> In essence, predictive statements are just what the name implies: predictions. As such, any optimistic projections contained in such statements are necessarily contingent. Thus the "bespeaks caution" doctrine has developed to address situations in which optimistic projections are coupled with cautionary language —in particular, relevant specific facts or assumptions—affecting the reasonableness of the reliance on and the materiality of those projections. To put it another way, the "bespeaks caution" doctrine merely reflects the unremarkable proposition that statements must be analyzed in context.

*Id.* at 167 [footnotes and citations omitted]. Under Fifth Circuit precedent, "[C]autionary language is not necessarily sufficient in and of itself, to render predictive statements immaterial as a matter of law. Rather, ... materiality is not judged in the abstract, but in light of the surrounding circumstances." *Id.* at 167–68, *citing Krim v. BancTexas Group,* 989 F.2d 1435, 1448–49 (5th Cir.1993). The Fifth Circuit has defined the test: "The appropriate inquiry is whether, under all the circumstances, the omitted fact or

the prediction without a reasonable basis 'is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment.' " *Id.* at 168, *citing Krim,* 989 F.2d at 1445.

Similarly, vague optimistic statements are not actionable because a reasonable investor would not rely on them in deciding to buy or sell securities. *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir.1997); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.1996)(statement that company was " 'optimistic' about [its earnings] in 1993" and "*should* deliver income growth consistent **\*577** with its historically superior performance" held to be "puffery" and to "lack the sort of definitive positive projections that might require later correction"); *Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993)(statements in Annual Report that corporation predicted "10% to 30% growth rate over the next several years" and was "poised to carry the growth and success of 1991 well into the future" held to be mere puffery or immaterial statements); *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 888 (S.D.Tex.2001)("Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' 'projections of future performance not worded as guarantees,' and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts")(*citing Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993)).

### b. Manipulative or Deceptive Contrivance or Scheme to Deceive or Course of Business

Securities fraud actions under § 10(b) and Rule 10b–5 are not merely limited to the making of an untrue statement of material fact or omission to state a material fact. Section 10(b) prohibits "any manipulative or deceptive contrivance," which, as indicated above, the Supreme Court, relying on *Webster's International Dictionary,* includes "a scheme to deceive" or "scheme, plan or artifice." *Ernst & Ernst,* 425 U.S. at 199 n. 20, 96 S.Ct. 1375. While subsection (b) of Rule 10b–5 provides a cause of action based on the "making of an untrue statement of a material fact and the omission to state a material fact," subsections (a) and (c) "are not so restricted" and allow suit against defendants who, with scienter, participated in "a 'course of business' or a 'device, scheme or artifice' that operated as a fraud"

on sellers or purchasers of stock even if these defendants did not make a materially false or misleading statement or omission. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–53, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *See also Superintendent of Ins. v. Bankers Life & Cas. Co.* 404 U.S. 6, 11 n.7, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)("[I]t [is not] sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities.' We believe that § 10(b) and Rule 10b–5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception."); *Zandford,* 122 S.Ct. at 1903–04 (broker's "continuous series of unauthorized" sales of securities and personal retention of the proceeds without his client's knowledge to further his fraudulent scheme "are properly viewed" as a " 'course of business' that operated as a fraud or deceit on a stockbroker's customer" in connection with the sale of securities). Novel or atypical methods should not provide immunity from the securities laws.; *Santa Fe,* 430 U.S. at 475–76 and n. 15, 97 S.Ct. 1292 (stating that § 10(b) covers deceptive "practices" and "conduct"); *Central Bank,* 511 U.S. at 177, 114 S.Ct. 1439 ("we again conclude that the statute prohibits only the making of a material misstatement *or the commission of a manipulative act* [emphasis added]."); *In re Splash Technology Holdings, Inc. Sec. Litig.,* 2000 WL 1727377, *13 (N.D.Cal. Sept.29, 2000)("Whereas 10b 5(b) focuses on fraudulent statements, 10b–5(a) and (c) are not by their terms restricted to statements. In this case, plaintiffs allege both fraudulent statements and acts as their requisite manipulative or deceptive practices").

**\*578** [26] In *Zandford,* a unanimous Supreme Court opinion, leaving aside the misrepresentation and omission language since it was not relevant to the case, the high court focused on § 10(b)'s alternative basis for liability, "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe" and Rule 10b–5's ban on the use, "in connection with the purchase or sale of any security," of "any device *scheme,* or artifice to defraud" or any other "act, practice, or *course of business* " that "operates ... as a fraud or deceit [emphasis added]." 122 S.Ct. at 1903. The Supreme Court held that allegations of a stock broker's fraudulent scheme of "selling his customer's securities and using the proceeds for his own benefit without the customer's knowledge or consent" constituted "fraudulent conduct 'in connection with the purchase or sale of any security' " within

the meaning of § 10(b) and Rule 10b–5. 122 S.Ct. at 1900–01. The Court emphasized that "neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act." 122 S.Ct. at 1903.

Furthermore, employing a flexible approach to construing § 10(b), the Supreme Court clarified the statutory language, "in connection with the purchase or sale of any security." Noting that the stock sales and the broker's fraudulent practices were interdependent, the high court observed that the broker, who had discretion to manage his clients' investment account and a general power of attorney to engage in securities transactions without their prior authorization or approval, wrote checks to himself from the clients' mutual fund account that required the sale of securities to pay him. 122 S.Ct. at 1901. Thus the broker did not merely lawfully sell his clients' stock and then decide to misappropriate the proceeds. 122 S.Ct. at 1904. Instead, the fraud coincided with the sales, each of which furthered his scheme, through a "course of business," to defraud his clients and misappropriate their assets. [15]

[27] [28] [29] An insider's trading in securities of his company based on material nonpublic information "qualifies as a 'deceptive device' under § 10(b)." *United States v. O'Hagan,* 521 U.S. 642, 643, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), *quoting Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). The simple allegation that a defendant was motivated to sell his company stock at a high price without an allegation that the defendant profited from such inflation also will not give rise to a strong inference of scienter. *Abrams,* 292 F.3d at 434. To be probative of scienter, a plaintiff must allege insider trading that occurred in suspicious amounts or at suspicious times, "out of line with trading practices or at times calculated to maximize personal profit. Further, even unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class Period."*Id.* at 435.

**\*579** [30] Market manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company are other types of conduct prohibited by § 10(b) [16] and Rule 10b–5 that do not fall within the category of misleading statements and omissions. [17] *See, e.g., United States v. Langford,* 946 F.2d 798 (11th Cir.1991),

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

*cert. denied,*503 U.S. 960, 112 S.Ct. 1562, 118 L.Ed.2d 209 (1992) [18] ; *In re Blech Securities Litigation (Blech III),* No. 94 CIV. 7696 RWS, 2002 WL 31356498, \*3 (S.D.N.Y. Oct.17, 2002)(concluding that stock-purchaser plaintiffs' allegations that Bear Stearns & Co. [19] with scienter "directed" or "contrived" and agreed to fund specific fraudulent trades by Blech & Company, which Bear Stearns knew had a history of sham trading, and also processed the transactions, in an attempt to artificially inflate the price of Blech securities and reduce Blech's debit balance, and thereby knowingly engaged in a scheme to defraud through sham transactions, stated a claim for primary liability under § 10(b)); *Scone Investments, L.P. v. American Third Market Corp.,* No. 97 CIV. 3802, 1998 WL 205338, \*5 (S.D.N.Y. Apr.28, 1998); *In re Blech Sec. Litig. (Blech II),* 961 F.Supp. 569, 580 (S.D.N.Y.1997)("a plaintiff asserting a [§ 10(b) and Rule 10b–5] market manipulation claim must allege direct participation in a scheme to manipulate the market for securities"), *citing Ernst & Ernst v. Hochfelder,* 425 U.S. at 199, 96 S.Ct. 1375 (defining market manipulation as conduct "designed to deceive or defraud investors by controlling or artificially affecting the price of securities"). In *Blech III,* the court identified as practices constituting manipulation of the market "trades with controlled entities, fictitious trades, wash sales, prearranged matched trades, and 'painting the tape,' " together with lending money or securities or borrowing money or securities from a customer, guaranteeing any account against loss, entering purchase or sale orders designed to raise or lower the price of a security or to give the appearance of trading for purposes of inducing others to trade (*i.e.,* "marking the close" or "prearranged trading") and "making arrangements to 'park' any security away from the true owner." 2002 WL 31356498, \*5. The *Blech* court also made clear that plaintiffs in that suit had to allege facts giving rise to a strong inference of scienter and assert that "Bear Stearns *caused* or *directed* trading by Blech & Co.'s customers or *solicited* or *induced* them to buy Blech Securities at inflated prices," i.e., "in addition to alleging scienter of the Blech scheme, Plaintiffs must also allege that Bear Stearns itself engaged in the kind of manipulative conduct that Section 10(b) prohibits in this context." *Blech II,* 961 F.Supp. at 582–83 (Section 10(b) requires allegation that Bear Stearns "directly and knowingly participated in deceptive or manipulative **\*580** conduct that caused damage to the [plaintiff].").

Furthermore, conclusory "allegations that are consistent with the normal activity" of such a business entity, standing alone, e.g., in *Blech* the normal legitimate activity of a clearing broker, are insufficient to state a claim of primary liability under *Central Bank. Blech II,* 961 F.Supp. at 584 ("[T]he Complaint crosses the line dividing secondary liability from primary liability when it claims that Bear Stearns 'directed' or 'contrived' certain allegedly fraudulent trades. Under these circumstances, the Complaint adequately alleges that Bear Stearns engaged in conduct with scienter, in an attempt to affect the price of the Blech securities.") [20] ; *McDaniel v. Bear Stearns & Co., Inc.,* 196 F.Supp.2d 343, 353 (S.D.N.Y.2002)("[W]here a clearing firm moves beyond performing mere ministerial or routine clearing functions and [with actual knowledge] becomes actively involved in the introductory broker's [fraudulent] action, it may expose itself to liability with respect to the introductory broker's misdeeds.").

 **[31]**    Thus to state a claim for market manipulation under § 10(b) and Rule 10b–5 against parties that employed manipulative and deceptive practices in a scheme to defraud, a plaintiff must allege (1) that it was injured (2) in connection with the purchase or sale of securities (3) by relying on a market for securities (4) controlled or artificially affected by defendants' deceptive and manipulative conduct, and (5) the defendants engaged in the manipulative conduct with scienter. [21] *Blech II,* 961 F.Supp. at 582,*citing Ernst & Ernst v. Hochfelder,* 425 U.S. at 199, 96 S.Ct. 1375.

 **[32]**    Furthermore because courts acknowledge the difficulty of satisfying Rule 9(b) in pleading a claim of market manipulation, "where the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *Blech II,* 961 F.Supp. at 580;*see also Vandenberg v. Adler,* No. 98 CIV. 3544 WHP, 2000 WL 342718, \*5 (S.D.N.Y. Mar.31, 2000); **\*581** *In re Sterling Foster & Co., Inc. Sec. Litig.,* 222 F.Supp.2d 216, 278–79 (E.D.N.Y.2002)("Courts have found allegations of fraud to have been pled with sufficient particularity when the complaint specifies (1) the manipulative acts performed; (2) which defendants performed them; and (3) the effect the scheme had on the market for the securities at issue.").

Moreover, to effectuate the Congressional purpose behind the 1934 Act of " 'insur[ing] honest securities markets and thereby promot[ing] investor confidence,' " by requiring full disclosure " 'to achieve a high standard of business ethics in the securities industry,' " the Supreme Court has repeatedly "construed [the statute] 'not technically and restrictively, but

flexibly....' " *Zandford,* 122 S.Ct. at 1903 (citations omitted). The SEC has also "consistently adopted a broad reading of the phrase, 'in connection with the purchase or sale of any security' " and "maintained that a broker who accepts payments for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds" violates § 10(b) and Rule 10b–5, and the Supreme Court, in deference to the agency, followed suit in *Zandford. Id.* at 1903. In *Zandford,* concerned that "this statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)" and focusing on the broker's scheme over a two-year period during which he made a number of transactions and converted the proceeds of the sales of his clients' securities to his own use, the Supreme Court concluded,

> The securities sales and [the broker's] fraudulent practices were not independent events. This is not a case in which, after a lawful transaction had been consummated, a broker decided to steal the proceeds and did so. Nor is it a case in which a thief simply invested the proceeds of a routine conversion in the stock market. Rather respondent's fraud coincided with the sales themselves.

> Taking the allegations in the complaint as true, each sale was made to further respondent's fraudulent scheme; each was deceptive because it was neither authorized by, nor disclosed to, the [clients].... In the aggregate, the sales are properly viewed as a "course of business" that operated as a fraud or deceit on a stockbroker's customer.....

> The fact that [the broker] misappropriated the proceeds of the sales provides persuasive evidence that he had violated § 10(b) when he made the sales, but misappropriation is not an essential element of the offense.... It is enough that the scheme to defraud and the sale of the securities coincide.

*Id.* at 1903–04. The high court found that this type of fraud, based on silence, "represents an even greater threat to investor confidence in the securities industry" than merely an affirmative misrepresentation, in view of the fiduciary duty owed by a broker to a client with a discretionary account and the fact that this relationship of trust and confidence therefore gives rise to a duty to disclose. *Id.* at 1905. The Supreme Court concluded that because the broker "sold the [clients'] securities while secretly intending from the very beginning to keep the proceeds" and deprive the clients of that benefit, the "SEC complaint describes a fraudulent scheme in which the securities transactions and breaches of fiduciary

duty coincide" and the breaches were thus " 'in connection with' securities sales within the meaning of § 10(b)." *Id.* at 1905–06.

### c. *Central Bank* and Primary Violations

[33] Of substantial relevance to the motions this Court now reviews is the Supreme Court's holding in a 5–4 decision in *Central Bank of Denver, N.A. v. First* **\*582** *Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), based on the language and legislative history of the statute, that a private plaintiff may not bring an aiding and abetting claim under § 10(b) and Rule 10b–5.[22] The high court construed the general anti-fraud provision as prohibiting only the making of a material misstatement or a material omission or the commission of a manipulative act; therefore it does not prohibit giving aid to another, who then commits a primary § 10(b) violation. *Id.* at 177, 114 S.Ct. 1439. It further emphasized that none of the express private causes of action in both the Securities Act of 1933 and the 1934 Exchange Act imposes liability on one who aids or abets such primary violators. *Id.* at 179, 184, 114 S.Ct. 1439. Thus it reasoned, "[t]here is no reason to think that Congress would have attached aiding and abetting liability only to § 10(b) and not to any of the express private rights of action in the Act." *Id.* at 180, 114 S.Ct. 1439,*citing Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 736, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)(it would be "anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action."). The court rejected as implausible the argument that silence in the statute constituted an "implicit congressional intent to impose § 10(b) aiding and abetting liability." *Id.* Furthermore, the Supreme Court pointed out that the critical element for recovery under Rule 10b–5, reliance, would be eliminated if liability were imposed for aiding and abetting. *Id.* at 180, 114 S.Ct. 1439 ("Were we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions."). Nor did it find that anything in the legislative history "even implies that aiding and abetting was covered by the statutory prohibition on manipulative and deceptive conduct." *Id.* at 183, 114 S.Ct. 1439.[23]

Nevertheless, the Supreme Court did not conclude that secondary actors such as lawyers, accountants, banks, and underwriters were therefore always shielded from § 10(b) and Rule 10b–5 liability:

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Because the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b). The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in securities markets are always free from liability under the securities Act. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met. .... In any complex securities fraud, moreover, there are likely to be multiple violators....

*Id.* at 191, 114 S.Ct. 1439.

Furthermore, in *Central Bank* the defendant bank was the indenture trustee for $26 million in bonds issued by a public building authority, some in 1986 and more **\*583** in 1988. The bonds were secured by landowner assessment liens and contained covenants requiring that the subject land had to be worth at least 160% of the bonds' outstanding principal and interest and that the developer had to give the defendant bank an annual appraisal showing that the value of the land met this requirement. Even though the developer did so in 1998, the bank learned through the underwriter that the appraisal was questionable and that the value of the property securing the 1996 bonds may have declined, a fact confirmed by the bank's own in-house appraiser. Nevertheless the bank continued working with the developer and delayed obtaining an independent review of the developer's valuation of the land while the bank issued more bonds in 1988. Subsequently the building authority defaulted on the bonds and the bond purchasers did not only sue the authority, the bonds' underwriters, and the land developer, but they also sued the bank, but only as "secondarily liable under § 10(b) for its conduct in aiding and abetting the [other defendants'] fraud." 511 U.S. at 164, 114 S.Ct. 1439. The high court examined only the aiding and abetting claim pled against the bank and did not address the question whether the bank might

be a primary violator, since the plaintiffs had not alleged such a claim.

In sum, the Supreme Court left it to the lower courts to determine when the conduct of a secondary actor makes it a primary violator under the statute. In the aftermath of *Central Bank,* two divergent standards, the "bright line" test and the "substantial participation" test, have emerged.

Under the "bright line" test, in order for the conduct of a secondary actor to rise to the level of a primary violation, the secondary actor must not only make a material misstatement or omission, but "the misrepresentation must be attributed to the specific actor at the time of public dissemination," i.e., in advance of the investment decision, so as not to undermine the element of reliance required for § 10(b) liability. *Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir.1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999); *see also Shapiro v. Cantor,* 123 F.3d 717, 720 (2d Cir.1997)(" 'If *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be it is not enough to trigger liability under Section 10(b).' ")(*quoting In re MTC Electronic Technologies Shareholders Litigation,* 898 F.Supp. 974, 987 (E.D.N.Y.1995)). For example, according to the investor-plaintiffs' complaint in *Wright,* 152 F.3d 169, Ernst & Young LLP, an outside auditor for BT Office Products, Inc. ("BT"), violated § 10(b) by privately and orally approving false and misleading financial statements that the auditor knew would be passed on to investors. BT subsequently made these statements public during a press release, but represented that the information was unaudited and did not mention Ernst & Young. The district court granted the accounting firm's motion to dismiss based on *Central Bank's* rejection of aiding and abetting liability. On appeal, the Second Circuit affirmed, finding that a contrary result would in effect "revive aiding and abetting liability under a different name, and would therefore run afoul of the Supreme Court's holding in *Central Bank.*" *Id.* at 175. It also required that the defendant, to be liable, must have known or should have known that his representation would be disseminated to investors, although the defendant need not communicate the misrepresentation directly to them. *Wright,* 152 F.3d at 175, *citing* **\*584** *Anixter v. Home–Stake Production Co.,* 77 F.3d 1215, 1226 (10th Cir.1996). The Second Circuit noted that because in BT's press release BT did not mention Ernst

& Young, nor Ernst & Young's private prior approval of the statements made in the press release by BT, the auditor

neither directly nor indirectly communicated misrepresentations to investors. Therefore, the amended complaint failed to allege that Ernst & Young made "a material misstatement (or omission) on which a purchaser or seller of securities relie[d]." Moreover ... because the press release contained a clear and express warning that no audit had yet been completed, there is no basis for Wright to claim that Ernst & Young had endorsed the accuracy of those results.

152 F.3d at 175. The Second Circuit has found that words such as "assisting," "participating in," "complicity in," and synonyms employed throughout a complaint, "all fall within the prohibitive bar of *Central Bank.*" *Shapiro,* 123 F.3d at 720.

Other cases applying the "bright line" test include *In re Kendall Square Research Corporation Securities Litigation,* 868 F.Supp. 26, 28 (D.Mass.1994)(accounting firm's "review and approval" of financial statements and prospectus were not sufficient to impose liability on it under § 10(b)); *Vosgerichian v. Commodore International,* 862 F.Supp. 1371, 1378 (E.D.Pa.1994)(the accountant's advice to and guidance of a client, who then made allegedly false and misleading statements, were not enough to impose primary liability on accountant); *Anixter,* 77 F.3d at 1223–1227 & nn. 7–12;*Ziemba v. Cascade Intern'l, Inc.,* 256 F.3d 1194, 1205, 1207 (11th Cir.2001)("[I]n order for [a secondary actor, such as a law firm or an accounting firm,] to be primarily liable under § 10(b) and Rule 10b–5, the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the defendant at the time that the plaintiff's investment decision was made"; for an omission there must be a duty to disclose as determined by a multi-factor test); *In re Kendall Square Research Corp. Securities Litigation,* 868 F.Supp. 26 (D.Mass.1994)(accountant's review and approval of false or misleading financial statements does not support imposition of primary liability).

Unlike the Second Circuit, the Tenth Circuit does not require attribution of the alleged misrepresentation to the secondary actor at the time of the statement's dissemination to the public. For instance, the Tenth Circuit in *Anixter,* emphasizing that "[t]he critical element separating primary from aiding and abetting violations is the existence of a representation, either

by statement or omission, made by the defendant, that is relied upon by the plaintiff," states,

Clearly, accountants may make representations in their role as auditor to a firm selling securities. *See, e.g., Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)(defendant accountant found primarily liable for violating § 10(b) based on representations filed with the SEC). Typical representations include certifications of financial statements and opinion letters. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 628 (7th Cir.), *cert. denied,*498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). An accountant's false and misleading representations in connection with the sale of any security, if made with the proper state of mind and if relied upon by those purchasing or selling a security, can constitute a primary violation. *Central Bank of Denver,* 511 U.S. at 190–91, 114 S.Ct. at 1455; ... There is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach.... Nevertheless, for an accountant's misrepresentation to be actionable **\*585** as a primary violation, there must be a showing that he knew or should have known that his representation would be communicated to investors because § 10(b) and Rule 10b–5 focus on fraud made "in connection with the sale or purchase" of a security.

*Id.* at 1225.

The less stringent "substantial participation" test provides for primary liability where there is "substantial participation or intricate involvement" of the secondary party in the preparation of fraudulent statements "even though that participation might not lead to the actor's actual making of the statements." *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1061 n. 5 (9th Cir.2000).

Cases applying the "substantial participation" rule include *In re Software Toolworks,* 50 F.3d 615, 628 n. 3, 629 (9th Cir.1994)(accountant may become a primary violator under antifraud provision of § 10(b) where it reviews and plays a "significant role in drafting and editing" two letters, one not identifying the accounting firm, sent by the issuer client to the SEC; a reasonable factfinder could find that the accountants "as members of the drafting group, ... had access to all information that was available and deliberately chose to conceal the truth"), *cert. denied sub nom. Montgomery Securities v. Dannenberg,* 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995);

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

*In re ZZZZ Best Securities Litigation,* 864 F.Supp. 960, 970 (C.D.Cal.1994)(where accounting firm was "intricately involved" in the creation of false and misleading documents and the "resulting deception," it may be liable as a primary violator of § 10(b)); *Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 432–34 (N.D.Ill.1995)(primary liability may be established against accountants "centrally involved" in preparation of alleged false or misstated information for prospectuses or promotional material issued to investors that the accounting firm certified, audited, prepared or reported.); *McNamara v. Bre–X Minerals Ltd.,* 57 F.Supp.2d 396, 426 (E.D.Tex.1999)("if a defendant played a 'significant role' in preparing a false statement actually uttered by another, primary liability will lie").

A number of courts have criticized the substantial participation test as inconsistent with *Central Bank's* prohibition of aiding and abetting liability under § 10(b). *See, e.g., Anixter,* 77 F.3d at 1226 n. 10 ("To the extent that these cases allow liability to attach without requiring a representation be made by defendant and reformulate the 'substantial assistance' element of aiding and abetting liability into primary liability, they do not comport with *Central Bank of Denver.*"). Nevertheless the Court notes that this criticism typically issued before *Zandford,* which made crystal clear that a misrepresentation need not be involved and that a suit could be based on Rule 10b–5(a) or (c).

This Court recognizes that without a clearer definition and a narrowing of the kind of conduct and circumstances required to constitute "substantial participation" or "intricate involvement," the substantial participation test may fail to differentiate between primary liability and aiding and abetting, or even unrestricted conspiracy, and that the area of overlap may be significant under such an expansive test. Until or unless Congress addresses the question that definition appears to be the task of the courts.

 [34]    The SEC, in the role of *amicus curiae,* has filed a brief in this action that warrants consideration because it addresses the reasons why the bright-line test misses the mark. Brief attached to the SEC's motion for leave, as *amicus curiae,* to submit briefs (instrument # 821). The majority of its pleading is a submission filed on behalf of the plaintiffs in a case that was pending in the Third Circuit, but **\*586** which was settled before that appellate court could review the issue *en banc. Klein v. Boyd,* 949 F.Supp. 280 (E.D.Pa.1996), *aff'd,* —— F.3d ——, 1998 WL 55245, Fed. Sec. L. Rep. P 90,136

(3d Cir.1998), *rehearing en banc granted, judgment vacated* (Mar. 9, 1998). [24] As framed by the SEC, the issue is,

[i]s a person who makes a material misrepresentation, while acting with the requisite scienter, but who does not himself disseminate the misrepresentation to investors, and whose name is not made known to them, only an aider and abettor of the fraud, or is that person a primary violator subject to liability [under § 10(b) ]?

Brief at 5. More specifically, the issue is whether the phrase, "makes a material misstatement (or omission)," in Rule 10b–5 "means that a law firm or other secondary actor can be primarily liable for a misrepresentation only if it signs the document containing the misrepresentation or is otherwise identified to investors," in other words, does not disclose its identity to investors. The SEC argues that such a person is a primary violator under § 10(b), and in doing so, attacks the "bright line" test as an improper reading of *Central Bank.*

First, the SEC highlights the fact that the Supreme Court's use of the word, "makes," [25] in *Central Bank* does not mandate **\*587** that an allegedly material misstatement be signed by or attributed to the secondary party so that the secondary party is identified to investors. Brief at 13–14. The statute only makes it unlawful "for any person, directly or indirectly ... [t]o use or employ ... any manipulative deceptive device or contrivance" and the interpretation of "makes" must be consistent with that "directly or indirectly" language.*Id.* at 10, 20. The SEC proposes "creates," as opposed to the bright line test's interpretation, "signs," as the appropriate synonym for the term, "makes," in *Central Bank;* the SEC contends that "[a] person who creates a misrepresentation [26] but takes care not to be identified publicly with it, 'indirectly' uses or employs a deceptive device or contrivance and should be liable" under § 10(b). *Id.* at 14. The SEC argues that the bright line test's requirement of identification of the misrepresenter to investors at the time of dissemination

would have the unfortunate and unwarranted consequence of providing a safe harbor from liability for everyone except those identified with the misrepresentations by name. Creators of misrepresentations could escape liability as long as they concealed their identities. Not only outside lawyers would benefit from such a rule; others who are retained to prepare information for dissemination to investors, including accountants and public relations firms, could immunize themselves by remaining anonymous.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Indeed, in-house counsel and other corporate officials and employees could avoid liability for misrepresentations they created, as long as their identities were not made known to the public. In sum, by providing a safe harbor for anonymous creators of misrepresentations, a rule that imposes liability only when a person is identified with a misrepresentation would place a premium on concealment and subterfuge rather than on compliance with the federal securities laws.

*Id.* The SEC maintains that "[t]he Supreme Court did not set forth a bright line rule for liability, much less one that turns on whether the identity of a defendant is disclosed." *Id.* at 15. Moreover, under the SEC's construction of the statute, third-party defendants are still substantially protected from frivolous suits by the scienter requirement. *Id.* at 16. As for the element of reliance, the SEC insists that

> [t]he reliance a plaintiff in a securities fraud action must plead is reliance on a misrepresentation, not on the fact that a particular person made the misrepresentation. The Supreme Court stated in *Central Bank* that liability exists where "[a]ny person or entity, including a lawyer, accountant, or bank ... makes a material misstatement (or omission) on which a purchaser or seller of securities relies." ... Thus the Court placed the focus on the misrepresentation, not on the fact that a particular person made it.

**\*588** *Id.* at 17, *citing Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439. [27]

The SEC proposes instead the following rule for primary liability of a secondary party under § 10(b): "when a person, acting alone or with others, creates a misrepresentation [on which the investor-plaintiffs relied], the person can be liable as a primary violator ... if ... he acts with the requisite scienter." Brief at 18. "Moreover it would not be necessary for a person to be the initiator of a misrepresentation in order to be a primary violator. Provided that a plaintiff can plead and prove scienter, a person can be a primary violator if he or she writes misrepresentations for inclusion in a document to be given to investors, even if the idea for those misrepresentations came from someone else." *Id.* Furthermore, "a person who prepares a truthful and complete portion of a document would not be liable as a primary violator for misrepresentations in other portions of the document. Even assuming such a person knew of misrepresentations elsewhere in the document and thus had the requisite scienter, he or she would not have created those misrepresentations." *Id.* at p. 19. Finally, of course, the

plaintiff must plead and prove the elements of scienter and reliance.

**[35]** Because § 10(b) expressly delegated rule-making authority to the agency, [28] which it exercised *inter alia* in promulgating Rule 10b–5, this Court accords considerable weight to the SEC's construction of the statute since the Court finds that construction is not arbitrary, capricious or manifestly contrary to the statute. *Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)("[T]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance"); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations 'has been consistently followed by this Court whenever a decision as to the meaning or reach of a statute has involved reconciling conflicting policies ...' " if that construction is reasonable); *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) [29]; **\*589** *SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002)("[The agency's] interpretation of the ambiguous text of § 10(b), in the context of formal adjudication, is entitled to deference if it is reasonable," *citing Mead,* 533 U.S. at 229–30, 121 S.Ct. 2164).

Furthermore, this Court concludes that not only material misrepresentations, but also the statute's imposition of liability on "any person" that "directly or indirectly" uses or employs "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of security should be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' " [30] 15 U.S.C. § 78(j)(b); *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. at 151, 92 S.Ct. 1456, *quoting SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. at 195, 84 S.Ct. 275; *Zandford,* 122 S.Ct. at 1903. [31]

**\*590** This Court finds that the SEC's approach to liability under § 10(b) and Rule 10b–5(b) is well reasoned and reasonable, balanced in its concern for protection for victimized investors as well as for meritlessly harassed defendants (including **\*591** businesses, law firms, accountants and underwriters), in addition to the policies

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

underlying the statutory private right of action for defrauded investors and the PSLRA. Moreover, it is consistent with the language of § 10b(b), Rule 10b–5, and *Central Bank.* Therefore since the SEC's proposed test is a reasonable interpretation of the text of the statute and serves its underlying policies, the Court adopts and applies it in this litigation to claims under § 10(b) and Rule 10b–5(b).

 **[36]** *Central Bank's* holding (that there is no cause of action for aiding and abetting under § 10(b) and that "all requirements for primary liability under Rule 10b–5" must be satisfied), 511 U.S. at 191, 114 S.Ct. 1439, affects pleading standards where the plaintiffs allege that a group of defendants participated in a scheme or a course of business to defraud investors under § 10(b) and Rule 10b–5. It is generally agreed that *Central Bank* foreclosed a cause of action merely for conspiracy to violate § 10(b) and Rule 10b–5, in addition to aiding and abetting. *See, e.g., Dinsmore v. Squardron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 841 (2d Cir.1998)(and cases cited therein) [32] ; *In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 592 (9th Cir.1995); *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1243–44 (N.D.Cal.1994)(dismissing scheme claims as recharacterized conspiracy claims); *Stack v. Lobo,* 1995 WL 241448 *10 (N.D.Cal. Apr.20, 1995)(noting that in civil cases, conspiracy is a theory of liability available only after a completed tort exists, so where there is no primary violation pled under § 10(b) and Rule 10b–5, any secondary conspiracy claims must fail as well). Nevertheless, "*Central Bank* does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme." *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997). *Cooper* relied on a key passage in *Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439:

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met. In any complex securities fraud, moreover, there are likely to be multiple violators....

Thus whether or not the word "conspire" is used, to survive a motion to dismiss, a complaint alleging that more than one defendant participated in a "scheme" to defraud must allege a primary violation of § 10(b) by each defendant.

For example, in *SEC v. U.S. Environmental, Inc.,* 155 F.3d 107 (2d Cir.1998), *cert denied,* 526 U.S. 1111, 119 S.Ct. 1755, 143 L.Ed.2d 787 (1999), the Second Circuit held that the SEC had successfully pled a primary violation of § 10(b) ("the making of a material misstatement (or omission) or commission of a manipulative act") by a secondary actor, i.e., an employee, John Romano, of a securities broker-dealer, Castle Securities Corporation ("Castle"). **\*592** Castle allegedly had agreed to participate in a scheme with other entities to manipulate upward the price of stock of U.S. Environmental, Inc. The complaint asserted that the employee had knowingly and recklessly participated in and furthered the market manipulation in following a stock promoter's directions to execute stock trades that the employee knew, or was reckless in not knowing, were manipulative. In that litigation the district court had dismissed the complaint because it had concluded that the employee was only an aider and abettor because he merely "followed directions ... and 'did not, himself make wash sales, match orders, or use undisclosed nominees to artificially affect the price of securities' " and "did not share the promoter's ultimate 'manipulative ... purpose.' " 155 F.3d at 110. The Second Circuit disagreed. Noting that scienter was a separate issue and not relevant to the Supreme Court's holding in *Central Bank* that aiders and abettors cannot be primary violators under § 10(b), the Second Circuit focused on the complaint's allegations about the nature of the employee's own acts, not his state of mind when he performed them. *Id.* at 111. The SEC claimed that the employee " 'participated in the fraudulent scheme,' " by "effecting the very buy and sell orders that artificially manipulated USE's stock price upward," i.e. by "commi[tting] a manipulative act." *Id.* at 112. The appellate court observed, "Indeed, if the trader who executes manipulative buy and sell orders is not a primary violator, it is difficult to imagine who would remain liable after *Central Bank.*" *Id.* It further found "of no relevance that [the stock promoter] masterminded the USE stock manipulation and that the 'stock promoter's' group 'directed' [the employee] to effect the illegal trades." *Id.* The Second Circuit emphasized,

> Like lawyers, accountants, and banks who engage in fraudulent or deceptive practices at their clients' direction, Romano is a primary violator despite

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

the fact that someone else directed the market manipulation scheme. The Supreme Court in *Central Bank* never intended to restrict § 10(b) liability to supervisors or directors of securities fraud schemes while excluding from liability subordinates who also violated the securities law. In sum, the complaint alleges that Romano is primarily liable under § 10(b) and Rule 10b–5 for manipulation of USE stock.

*Id.*

Thus secondary actors may be liable for primary violations under an alleged scheme to defraud if all the requirements for liability under Rule 10b–5 have been satisfied as to each secondary-actor defendant and any additional heightened pleading requirements have been met. *Id.* If a plaintiff meets the requirements of pleading primary liability as to each defendant, i.e., alleges with factual specificity (1) that each defendant made a material misstatement (or omission) or committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud, (2) scienter, and (3) reliance, that plaintiff can plead a scheme to defraud and still satisfy *Central Bank. See, e.g., Cooper v. Pickett,* 137 F.3d 616 (9th Cir.1997); *Dinsmore,* 135 F.3d at 842 ("We simply hold that where the requirements for primary liability are not independently met, they may not be satisfied based solely on one's participation in a conspiracy in which *other parties* have committed a primary violation"; "secondary actors who conspire to commit ... violations will still be subject to liability so long as they independently satisfy requirements for private liability."); *Pegasus Holdings v. Veterinary Centers of America, Inc.,* 38 F.Supp.2d 1158, 1163–65 (C.D.Cal.1998).

Lead Plaintiff, using older cases, argues that a defendant that participates in a **\*593** scheme to defraud is liable for the damages caused by all the other acts taken by participants in a scheme in furtherance of the fraud. In addition to requiring that each participant be a primary violator of the act by itself making a material misrepresentation or omission or using a deceptive device or contrivance to defraud investors, this Court notes that under § 10(b), the PSLRA provides for joint and several liability only if the defendant is found to have knowingly committed the fraud, and otherwise the defendant, if only reckless, is liable only for the percentage of his responsibility for the fraud, i.e., proportionate liability. 15

U.S.C. § 78u–4(f). This express scheme for damages liability seems incompatible with Lead Plaintiff's argument that a participant is liable for damages caused by all participants, known or unknown, in the scheme.

Since the passage of the PSLRA with its procedural hurdles and stringent pleading standards to eliminate strike suits, this country has been overwhelmed with corporate scandals that place Congress' goal in enacting the PSLRA in a much wider perspective. Given the usual recent judicial focus on dismissing frivolous suits under the PSLRA, Judge Robert M. Parker provided balance in his concurrence in *Abrams,* 292 F.3d at 435–36,

History reminds us of the consequences when financial statements of publicly held companies do not accord with reality. Indeed it was to protect against them that our nation's securities laws were enacted. At the same time we must pay heed to a different set of consequences—those brought about by the overzealous prosecution of specious securities fraud actions. Congress, in passing the Private Securities Litigation Reform Act of 1995, took pains to deter such strike suits. Its findings and legislative history suggest that the cost of protecting against fraud was unduly impairing the efficient operation of lawful business. Today, when applying the PSLRA, courts must keep this policy consideration foremost in mind. But we must also recognize that Congress left unaffected shareholders' right to sue for recompense when they are made the victims of self-dealing and deceit. The PSLRA is a mechanism for winnowing out suits that lack a requisite level of specificity. It was not meant to let business and management run amuck to the detriment of shareholders.

The PSLRA's significance as a protective shield for business must be viewed within the context of the private right of action, granted decades before, to defrauded investors injured by corporate management, auditors, outside counsel, and

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

investment bankers where their conduct allegedly violated the federal securities laws. The Supreme Court has repeatedly emphasized the deterrent value of those private rights of action, which "provide 'a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to Commission action.' " *J.I. Case Co. v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *See also Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 729–30, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Randall v. Loftsgaarden,* 478 U.S. 647, 664, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). Indeed, in adopting the PSLRA, Congress emphasized that "[p]rivate securities litigation is an indispensable tool with which defrauded investors can recover their losses" and that private lawsuits "promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs." Joint Explanatory Statement of the Committee of Conference, Conference Report on Securities Litigation Reform, H.R. Conf. Rep. No. 104–369, at 31 (Nov. 28, 1995), 1995 **\*594** U.S.C.A.A.N. at 730. The importance of this tool has been highlighted by recent disclosures of extraordinary corporate misconduct. [33]

### 2. Controlling Person Liability Under the 1934 Act

 [37]  [38]  Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)(liability of controlling persons and those who aid and abet violations), establishes a derivative liability for persons who "control" those who are primarily liable under the Exchange Act. It provides,

> Joint and several liability; good faith defense
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

liability is an alternate ground for liability from that of a primary violation. Thus a plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the same defendant in the perpetration of the fraud. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996), *cert. denied,*522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997). A person charged with

control liability may assert a defense that he acted in good faith with respect to the securities violation, i.e., that he acted reasonably and did not act recklessly. A defendant can meet the requirements of a good faith defense by showing that he used reasonable care to prevent the securities violation. *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 957–58, 960 (5th Cir.1981); *Donohoe v. Consolidated Operating & Prod. Corp.,* 30 F.3d 907, 912 (7th Cir.1994). Negligence alone is insufficient to support controlling person liability. *Id.*

Although worded in different ways, the **controlperson** liability provisions of § 15 of the 1933 Securities Act and § 20(a) of the 1934 Exchange Act are interpreted the same way. *Pharo v. Smith,* 621 F.2d 656, 672,*on rehearing in part,*625 F.2d 1226 (5th Cir.1980); *First Interstate Bank v. Pring,* 969 F.2d 891, 897 (10th Cir.1992), *rev'd on other grounds,*511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). *See also Abbott v. Equity Group, Inc.,* 2 F.3d 613, 619 n. 15 (5th Cir.1993)("The **controlperson** sections of both acts are interpreted the same, at least with respect to the definition of 'controlling person,' " *citing G.A. Thompson,* 636 F.2d at 958 & n. 22),*cert. denied sub nom. Turnbull v. Home Insurance Co.,* 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Furthermore,  **\*595**  the provision for controlling person liability under the **TexasSecuritiesAct**, article 581–33(F), is modeled after and parallel to that for section 15 of the 1933 Securities Act and section 20 of the 1934 Act. Tex.Rev.Civ. Stat. Ann. art. 581–33 cmt; *Frank v. Bear, Stearns & Co.,* 11 S.W.3d 380, 383–84 (Tex.App.-Houston [14th Dist.] 2000, review denied); *Busse v. Pacific Cattle Feeding Fund # 1, Ltd.,* 896 S.W.2d 807, 814 (Tex.App.-Texarkana 1995, writ denied); *Marshall v. Quinn–L Equities, Inc.,* 704 F.Supp. 1384, 1391 (N.D.Tex.1988).

 [39]  [40]  There is a split among the Circuits as to whether in a *prima facie* case a person must show that the alleged **controlperson** actually exercised control over the primary violator's general affairs or merely that the **controlperson** had the power to exercise such control. *Maher v. Durango Metals, Inc.,* 144 F.3d 1302, 1306 n. 8 (10th Cir.1998)(and cases cited and discussed therein). The Fifth Circuit has stated that a plaintiff need only show that the alleged **controlpersons** possessed "the power to control [the primary violator], not the exercise of the power to control." *G.A. Thompson,* 636 F.2d at 958 (rejecting as a requirement for a *prima facie* case an allegation that the controlling person actually participated in the underlying primary violation); *Abbott v. Equity Group, Inc.,* 2 F.3d at 620. Nevertheless, a plaintiff needs to allege some facts beyond a defendant's

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

position or title that show that the defendant had actual power or control over the controlled person. *Dennis v. General Imaging, Inc.,* 918 F.2d 496, 509–10 (5th Cir.1990); *Kunzweiler v. Zero.Net, Inc.,* No. CIV. A. 3:00–CV–2553–P, 2002 WL 1461732, *13–14 (N.D.Tex. July 3, 2002). Furthermore, **controlperson** liability is derivative; a failure to plead a primary, independent violation by the controlled person § 10(b) and Rule 10b–5 precludes such a claim for secondary liability against the controlling person under § 20(a) of the Exchange Act, or, a violation of §§ 11 or 12 for **controlperson** liability under section 15 of the Securities Act of 1933. 15 U.S.C. §§ 78j(b), 78t(a); 15 U.S.C. § 77*o*; *ABC Arbitrage,* 291 F.3d at 348 n. 57, 362 n. 123. [34]

**\*596 3. Section 11 of the Securities Act of 1933**

Section 11, 15 U.S.C. § 77k(a), creates a private remedy for anyone who purchases a security based on a materially misleading registration statement at the time it became effective against the issuer of the securities, the issuer's directors or partners, the underwriters of the offering, and accountants named as preparers or certifiers of the registration statement. Section 11(a)(1–5) states in relevant part,

(a) Persons possessing cause of action; persons liable

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report

or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; [and]

(5) every underwriter with respect to such security.

Under § 77k(f), such individuals are jointly and severally liable.

To prevail on a claim under § 11, a plaintiff must show "(1) that the registration statement contained an omission or misrepresentation and (2) that the omission or misrepresentation was material, that it would have misled a reasonable investor about the nature of his or her investment." *Kaplan v. Rose,* 49 F.3d 1363, 1371 (9th Cir.1994), *cert. denied,*516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995); *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1445 (5th Cir.1993).

**[41]** A plaintiff generally is not required to demonstrate scienter under § 11, and a defendant will be liable for innocent or negligent material misrepresentations. *Id.* Where claims under Sections 11 and 12 of the Securities Act are grounded in negligence rather than fraud, there is no scienter requirement and it need only satisfy the liberal pleading requirements of Fed. R. of Civ. P. 8. *See, e.g., In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309, 314–16 (8th Cir.1997)("the particularity requirement of Rule 9(b) does not apply to claims under § 11 of the Securities Act because proof of fraud or mistake is not a prerequisite to establishing liability under § 11"), *cert. denied,*524 U.S. 927, 118 S.Ct. 2321, 141 L.Ed.2d 696 (1998); *Steiner v. Southmark Corp.,* 734 F.Supp. 269, 277 ("Section 11 violations need not, however, be pleaded with the specificity required of fraud claims governed by Rule 9(b)"), *clarified on other grounds,*739 F.Supp. 1087 (N.D.Tex.1990); **\*597** *Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301, 1310 (S.D.N.Y.1996)(Rule 9(b) does not apply to Sections 11 and 12(2) of the Securities Act of 1933 because proof of scienter is not required).

Nevertheless, where § 11 claims actually sound in fraud rather than negligence, the plaintiff is required to plead the circumstances constituting the alleged fraud with particularity satisfying Rule 9(b). *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994); [35] *In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1405 & n. 3 (9th Cir.1996), *cert. denied sub nom. Anderson v. Clow,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). The Fifth Circuit subsequently limited the holding of *Melder* and made clear that where a complaint

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

does not allege that the defendants are liable for fraudulent or intentional conduct, especially where it disavows and disclaims any allegations of fraud in its strict liability 1933 Securities Act claims, its claims do not "sound in fraud" and they cannot be dismissed for failure to satisfy Rule 9(b) if they can state a negligence claim under § 11. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363, 368 (5th Cir.2001)("The proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated."). *See also In re Stac Electronics Securities Litig.,* 89 F.3d at 1404–05 and n. 3[36]; *In re NationsMart,* 130 F.3d at 315.

Section 11 of the 1933 Act provides that liability to be imposed on an issuer, underwriter, and anyone that signs a registration statement containing a materially false or misleading statement. All except an issuer may assert certain statutory defenses: (1) the person conducted a "reasonable investigation" under § 11(b)(3)(A)(the "due diligence" defense); (2) the person relied on the opinion of an expert under § 11(b)(3)(B); the person's misconduct did not cause the investors' loss under § 11(e); and the right of contribution from more culpable parties under § 11(f).

 **[42]**  False statements in a registration statement can create liability under both the 1933 and 1934 Acts. *Huddleston,* 459 U.S. at 382–83, 103 S.Ct. 683. The remedies are cumulative. *Id.* at 383, 103 S.Ct. 683.

**4. Controlling Person Liability Under the 1933 Act**

Title 15 U.S.C. § 77*o*, Section 15 of the 1933 Securities Act, entitled "Liability of controlling persons," imposes joint and several liability upon controlling persons for acts committed by those under their control that violate §§ 11 and/or 12. Thus if a plaintiff fails to state a primary security violation under Section 77k, the plaintiff also fails to state a claim under § 15. *Lone Star Ladies Investment Club,* 238 F.3d at 369. Specifically § 77*o* reads,

> Every person, who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same

> extent as such controlled person to any person to whom such controlled person is liable, unless the controlling **\*598** person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o* (West 1997).

 **[43]**  To survive a motion to dismiss a claim for controlling person liability under Section 15 of the 1933 Act, Lead Plaintiff must allege (1) an underlying primary violation of § 11 by the controlled person, (2) control by the defendant over the controlled person, and (3) particularized facts as to the controlling person's culpable participation in (exercising control over) the "fraud perpetrated by the controlled person." *Ellison v. American Image Motor Co.,* 36 F.Supp.2d 628, 637–38 (S.D.N.Y.1999)(applying same test to 1933 Securities Act Section 15 claims and 1934 Exchange Act Section 20(a) claims, 15 U.S.C. § 78t(a))("Every person who, directly or indirectly, controls any person liable under any provision of this chapter or rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable"); *Sanders Confectionery Products, Inc. v. Heller Financial Inc.,* 973 F.2d 474, 486 (6th Cir.1992), *cert. denied,*506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993); *Metge v. Baehler,* 762 F.2d 621, 631 (8th Cir.1985), *cert. denied,*474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986).

Because a primary violation of § 11 is a necessary element of a § 15 claim, if a plaintiff fails to state a claim for a primary violation, he has also failed to state a claim under § 15. *Cooperman v. Individual, Inc.,* 171 F.3d 43, 52 (1st Cir.1999); *SEC v. First Jersey,* 101 F.3d at 1472.

Although whether a defendant is a **controlperson** is usually a question of fact, dismissal is appropriate where the plaintiff fails to plead any facts from which it can reasonably be inferred that the particular defendant was a **controlperson**. *Maher v. Durango Metals, Inc.,* 144 F.3d at 1306;*Sanders,* 973 F.2d at 485–86. Control can be established by demonstrating that the defendant possessed the power to direct or cause the direction of the management and policies of a person through ownership of voting securities, by contract, business relationships, interlocking directors, family

**In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)**

Fed. Sec. L. Rep. P 92,239

relationships, and the power to influence and control the activities of another. *Ellison,* 36 F.Supp.2d at 638.

**C. Professional Conduct/Duty to Nonclient Investors**

**1. Attorneys**

The issue of attorney liability involving a duty to disclose nonmisleading information to nonclients and third parties is a thorny one, complicated by tension between the need to provide remedy to parties suffering monetary loss because of a lawyer's conduct and the attorney-client relationship with its attendant confidentiality, loyalty and zealous representation requirements and policy concerns.

 **[44]**    Ethical rules of conduct such as disciplinary rules do not create corresponding legal duties nor constitute standards for imposition of civil liability on lawyers. *See, e.g., Schatz v. Rosenberg,* 943 F.2d 485, 492 (4th Cir.1991), *cert. denied,*503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992); Preliminary Statement, Model Code of Professional Responsibility (admonishing that the Code does not attempt "to define standards for civil liability of lawyers for professional conduct"); Section 15 of the Preamble to the Texas Disciplinary Rules of Professional Conduct ("These rules do not undertake to define standards of civil liability of lawyers for professional conduct. Violation of a rule does not give rise to a private cause of action nor does it create any presumption **\*599**  that a legal duty to a client has been breached."). They do, however, reflect public policy concerns. *See, e.g., Law Offices of Windle Turley v. Giunta,* No. 05–91–00776–CV, 1992 WL 57464 (Tex.App.-Dallas Mar. 23, 1992); *Polland & Cook v. Lehmann,* 832 S.W.2d 729, 736 (Tex.App.-Houston [1st Dist.] 1992, writ denied); *Kuhn, Collins & Rash v. Reynolds,* 614 S.W.2d 854, 856 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.).

ABA Model Rule of Professional Conduct 1.6 (2001) states, "A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation," except that the lawyer may, but does not have to, reveal confidential information (1) to the extent that the lawyer reasonably believes is necessary to prevent the client from committing a criminal act which the lawyer believes is likely to result in imminent death or substantial bodily harm,[37] or (2) to establish a claim or defense by the lawyer in a controversy between the lawyer and the client, or to establish a defense to a criminal or civil charge against the lawyer based on conduct in which the client was involved, or

to answer any allegations in any proceeding about the lawyer's representation of the client.

Pursuant to ABA Model Rule of Professional Conduct 1.2(d) an attorney "shall not counsel a client to engage, or assist a client in, conduct that the lawyer knows is criminal or fraudulent ...,"[38] but the attorney may discuss the legal consequences of any proposed conduct and help the client make a good faith effort to determine the application of the law to that proposed conduct. Comment 6 to the rule states, "The fact that a client uses advice in the course of action that is criminal or fraudulent does not, of itself, make a lawyer party to the course of action. However, a lawyer may not knowingly assist a client in criminal or fraudulent conduct. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity."

If the attorney learns that his client is involved in ongoing criminal or fraudulent acts, under ABA Model Rule 1.16 (2001),

> (a) Except as stated in paragraph (c), a lawyer shall ... withdraw from the representations of a client if: (1) the representation will result in violation of the rules of professional conduct or other law; ...

> (b) except as stated in paragraph (c) a lawyer may withdraw from representing a client ... if: (1) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent; (2) the client has used the lawyer's services to perpetrate a crime or fraud; and ...

> (c) When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.

> (d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled....

After withdrawal the lawyer must also refrain from disclosing the client's confidences except as allowed under Rule 1.6.

**In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)**

Fed. Sec. L. Rep. P 92,239

 **\*600** Model Rule 1.07 also bars a lawyer from representing a party where there is a substantial risk that the lawyer's representation would be materially and adversely affected by the lawyer's or his law firm's own interest.

The Texas Rules of Professional Conduct have similar but not identical provisions. Under Rule 1.02 of the Texas Rules of Professional Conduct (1990)(emphasis added),

. . . . .

> (c) A lawyer shall not assist or counsel a client to engage in conduct that the lawyer knows is criminal or fraudulent. A lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel and represent a client in connection with the making of a good faith effort to determine the validity, scope, meaning or application of the law.

> (d) When a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act *that is likely to result in substantial injury to the financial interests or property of another,* the lawyer shall promptly make reasonable efforts under the circumstances to dissuade the client from committing the crime or fraud.

> (e) When a lawyer has confidential information clearly establishing that the lawyer's client has committed a criminal or fraudulent act in the commission of which the lawyer's services have been used, the lawyer shall make reasonable efforts under the circumstances to persuade the client to take corrective action. [emphasis added]

Comment 8 to Rule 1.02 states,

> When a client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer may not reveal the client's wrongdoing, except as permitted or required by Rule 1.05. However, the lawyer also must avoid furthering the client's unlawful purpose, for example, by suggesting how it might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposes is legally proper but then discovers is criminal or fraudulent.

Withdrawal from the representation, therefore, may be required.

Rule 1.05(c)(7) allows the lawyer to reveal confidential information of the client or former client "[w]hen the lawyer has reason to believe it is necessary to do so in order to prevent the client from committing a criminal or fraudulent act." Only where "the lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in death or substantial bodily harm to a person," must he disclose information adverse to the client; otherwise his first obligation is to try to dissuade the client from continuing is such conduct. Rule 1.05(e) and Comments 18 and 19. Nevertheless, if the client "persists in a course of action involving the lawyer's services that the lawyer reasonably believes may be criminal or fraudulent" or "the client has used the lawyer's services to perpetrate a crime or fraud," the lawyer must withdraw. Rule 1.15(b)(2) and (3) and Comment 2. *See also* Rule 1.15(a)(1) (withdrawal required if "the representation will result in violation of ... rules of professional conduct or other law....").

Relevant to Vinson & Elkins' undertaking of the investigation for Enron in the fall of 2001, Rule 1.06(a)(2) bars a lawyer from representing a client where that representation "reasonably appears to be or becomes limited ... by the lawyer's or law firm's own interests." Comment 5 provides in relevant part,

> **\*601** The lawyer's own interests should not be permitted to have an adverse effect on representation of a client.... If the probity of a lawyer's own conduct in a transaction is in question, it may be difficult for the lawyer to give a client detached advice....

*See also* Roger C. Cramton, "Enron and the Corporate Lawyer: Professional Responsibility Issues," 1324 PLI/Corp. 841, 853 (Aug.2002). According to the Restatement of Law Governing Lawyers § 122(2)(c), a client's consent is not effective " 'if, in the circumstances, it is not reasonably likely that the lawyer will be able to provide adequate representation....' " *Id.*

The common law regarding attorney liability to nonclients for misstatements that are attributed specifically to him has been evolving steadily to address increasing concerns about attorney accountability or the lack thereof.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

[45]   The Fifth Circuit has only twice addressed the issue of an attorney's duty to disclose information accurately to a third party in the context of alleged securities violations. In 1988, the Fifth Circuit, in a suit challenging the accountability of an underwriter's counsel for the alleged inaccuracy of the underwriter's offering statement to the investing public, reaffirmed the traditional rule that "lawyers are accountable only to their clients for the sufficiency of their legal opinions" because "any significant increase in attorney liability to third parties could have a dramatic effect upon our entire system of legal ethics," established to require the attorney to avoid conflicting duties, "remain loyal to the client," and "keep attorney client confidences." *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1124 & nn. 18 and 19(5th Cir.1988), *vacated on other grounds,*492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989). The panel observed, "In general, the law recognizes such suits [by third parties] only if the non-client plaintiff can prove that the attorney prepared specific legal documents that represent explicitly the legal opinions of the attorney preparing them, for the benefit of the plaintiff." *Id.* at 1124 & n. 20 (noting that this rule, adopted by a growing number of states, reflects the increasing influence of the Restatement (Second) of Torts § 552, discussed *infra* ). The Fifth Circuit did concede that an attorney who prepared a signed opinion letter for use by a third party might be liable under Rule 10b–5, but otherwise declined to depart from the traditional rule because it found "no binding authority creating a special rule in the field of securities law." *Id.* at 1124–25. In 1993 the Fifth Circuit held that even though its opinion in *Abell* was vacated by the Supreme Court as to issues under RICO, the decisions "remains authoritative on the non-RICO issues." *Abbott v. The Equity Group, Inc.,* 2 F.3d at 621 n. 23.

Nevertheless, in *Trust Company of Louisiana v. N.N.P.,* 104 F.3d 1478 (5th Cir.1997), which makes only passing reference to *Abell,* [39] the Fifth Circuit concluded that **\*602** the plaintiff, a non-client and the payee of notes (which the Court concluded were "securities" within the federal securities law) purportedly secured by the Government National Mortgage Association certificates ("GNMAs"), had satisfied all the elements of proof to show that the attorney and his firm owed the payee a duty under Louisiana law for negligent misrepresentation and for the imposition of primary liability under Rule 10b–5 (i.e., that the lawyer knowingly and with scienter made material misstatements in connection with the purchase of a security upon which the plaintiff justifiably relied and suffered injury). Specifically the attorney had assured the plaintiff that his firm had possession of and was

the custodian for the GNMAs when counsel knew that the law firm did not have the certificates, but only assignments of interest in the certificates.

As noted earlier in footnote 24 of this memorandum and order, in *Klein v. Boyd,* a panel of the Third Circuit Court of Appeals held that once the law firm "elected to speak" by creating or participating in the creation of documents it knows would be distributed to investors, it could not make material misrepresentations or omit material facts in drafting the non-confidential documents.Fed. Sec. L. Rep. (CCH) ¶ 90,136, 90,323. The law firm's duty did "not arise from a fiduciary duty to the investors; rather, the duty arose when the law firm undertook the affirmative act of communicating with investors...." *Id.* at 90,323–24. [40] Thus the Third Circuit panel concluded that although the firm may not have a duty to blow the whistle on its client, once it chooses to speak, a law firm does have a duty to speak truthfully, to make accurate or correct material statements, even where the document does not indicate that the attorney authored it. *Id.* and at 90,325. The panel did require that the lawyer's "participation in the statement containing a misrepresentation or omission of a material fact [be] sufficiently significant that the statement can properly be attributed to the person as its author or co-author," so that it would not fall within the parameter of conduct constituting aiding and abetting. *Id.*

Similarly, in *Rubin v. Schottenstein, Zox & Dunn,* 143 F.3d 263, 267 (6th Cir.1998), relying on the text of Rule 10b–5 (it is unlawful for any person [not excepting lawyers] to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...."), the Sixth Circuit, sitting *en banc,* concluded that an attorney for a corporation issuing securities, who agreed to speak directly to two potential investors about the corporation's financial condition as it related to the investment, had a duty not to misrepresent or omit material facts to those investors. The Sixth Circuit explained,

Although under Rule 10b–5(b) and its predecessor, "only those individuals who had an affirmative obligation to reveal what was allegedly omitted can be held liable as primary participants in the alleged deception [, a] duty to disclose naturally devolve[s] on those who h[ave] direct contacts with 'the other side.' " *SEC v. Coffey,* 493 F.2d 1304, 1315 (6th Cir.1974). "Direct contacts may take many forms. An accountant or lawyer, for instance, who prepares a dishonest statement is a primary participant in

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

a violation even though someone else may conduct the personal negotiations with a **\*603** security purchaser." *Id. at 1315 n. 24.* "A person undertaking to furnish information which is misleading because of a failure to disclose a material fact is a primary participant." *SEC v. Washington County Util. Dist.,* 676 F.2d 218, 223 (6th Cir.1982).

*Id.* at 267. [41] It concluded that initially the attorney could have remained silent with no affirmative duty to disclose, but that once he chose to speak and make representations on behalf of the issuer, either alone or in participation with others, he had a duty to be accurate and complete about material matters and could not hide behind the attorney/client privilege. "In sum, while an attorney representing the seller in a securities transaction may not always be under an independent duty to volunteer information about the financial condition of his client, he assumes a duty to provide complete and nonmisleading information with respect to the subjects on which he undertakes to speak." 143 F.3d at 268. In *dictum,* the appellate court commented, "Admission to the bar, if anything, imposes a heightened, not a lessened, requirement of probity." *Id.* at 270.*See also Caiola v. Citibank, N.A.,* 295 F.3d 312, 331 (2d Cir.2002)(citing *Rubin,* 143 F.3d at 267–68, and concluding that if the plaintiff/investor can prove his allegations, "the lack of an independent duty [of Citibank to disclose its hedging strategy] is not, under such circumstances, a defense to Rule 10b–5 liability because upon choosing to speak, one must speak truthfully about material issues."). *See also Ackerman v. Schwartz,* 947 F.2d 841, 846, 848 (7th Cir.1991)(Easterbrook, J.) [42] ("Federal law requires persons to tell the truth about material facts once they commence speaking, but with rare exceptions it does not oblige them to start speaking"; "Under Rule 10b–5 ... the lack of an independent duty does not excuse a material lie. A subject of a tender offer or a merger bid has no duty to issue a press release, but if it chooses to speak it must tell the truth about material issues.... Although the **\*604** lack of duty to investors meant that [attorney] Schwarz had no obligation to blow the whistle ..., Schwarz cannot evade responsibility to the extent he permitted the promoters to release his letter [to agents of the investors].").

This Court notes that the circumstances in *Trust Company of Louisiana v. N.N.P.,* 104 F.3d 1478 (5th Cir.1997), in which an attorney was found liable for direct misrepresentations to a nonclient-prospective investor, fall within the parameters of the Sixth Circuit's *en banc* rule in *Rubin v. Schottenstein. See also Molecular Technology Corp. v. Valentine,* 925 F.2d 910, 917–18 (6th Cir.1991)(holding under direct contacts test

that an attorney who knowingly provided materially false or misleading information to investors may be liable as a primary participant under § 10(b)).

[46] In Texas, it has long been established that a lawyer may be liable if he knowingly commits a fraudulent act or enters into a conspiracy with his client to defraud a third person. *Poole v. Houston & T.C. Ry. Co.,* 58 Tex. 134, 138 (1882)(where an attorney acting on behalf of his client participates in fraudulent activities, his conduct is "foreign to the duties of an attorney"); *Likover v. Sunflower Terrace II, Ltd.,* 696 S.W.2d 468, 472 (Tex.Civ.App.-Houston [1st Dist.] 1985, no writ)("an attorney is liable if he knowingly commits a fraudulent act that injures a third person, or if he knowingly enters into a conspiracy to defraud a third person"); *Lewis v. American Exploration Co.,* 4 F.Supp.2d 673, 678 (S.D.Tex.1998); *Querner v. Rindfuss,* 966 S.W.2d 661, 666, 670 & n. 1 (Tex.App.-San Antonio 1998, writ denied). In the instant action, Lead Plaintiff alleges that Enron's lawyers, accountants, and underwriters participated together with Enron in a Ponzi scheme to enrich themselves, which, in a significant and essential part of the plan, defrauded third-party investors in Enron securities to keep funds flowing into the corporation.

The Restatement (Second) of Torts § 531 (1977) provides, "One who makes a fraudulent misrepresentation is subject to liability to the person or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced." Although Texas has not formally adopted § 531, which does not require privity, the Texas Supreme Court recently stated that Texas' "jurisprudence, which focuses on the defendant's knowledge and intent to induce reliance, is consistent with the *Restatement* and with the law in other jurisdictions that have considered the issue." *Ernst & Young, L.L.P. v. Pacific Mutual Life Ins. Co.,* 51 S.W.3d 573, 578 (Tex.2001). The high court observed, "[Texas] fraud jurisprudence has traditionally focused not on whether a misrepresentation is directly transmitted to a known person alleged to be in privity with the fraudfeasor, but on whether the misrepresentation was intended to reach a third person to induce reliance" and pointed out instances where Texas courts "have held that a misrepresentation made through an intermediary is actionable if it is intended to influence a third person's conduct." *Id.* The Texas Supreme Court further commented, "While it is true that Texas courts

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

have not used the words 'reason to expect' when discussing fraud's intent element, a defendant who acts with knowledge that a result will follow is considered to intend that result." *Id.* at 579, *citing Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48–49 (Tex.1998).

The facts in *Pacific Mutual,* summarized at 51 S.W.3d at 575–77, were that in **\*605** 1982 InterFirst Corporation issued a series of notes. Subsequently, encountering financial problems, InterFirst tried to negotiate a merger with RepublicBank, which appeared to be a more profitable bank and had Ernst & Young audit RepublicBank's financial statements for the year ending in December 1996. The auditor's report gave an unqualified opinion [43] that these financial statements fairly represented Republic Bank's financial situation.

RepublicBank then incorporated that audit report and the audited financial statement into the 1996 annual report that RepublicBank provided to its shareholders and the audited financial statement into its 1996 Form 10–K annual report filed with the SEC. The merger took place in June 1987, and RepublicBank contemporaneously offered several securities. With InterFirst, Republic Bank issued a Joint Proxy and Prospectus requesting their shareholders to vote to approve the merger, as well as several other prospectuses for other stock and notes that incorporated by reference the Joint Proxy and Prospectus. All three prospectuses incorporated RepublicBank's 1986 Form 10K. Furthermore Republic Bank incorporated all three prospectuses into the Form S–3 registration statements that it filed with the SEC. Ernst & Young consented to the inclusion of its audit opinion and of its accounting information, as well as mention of its name in the "Experts" section of the prospectuses. In 1987, after reviewing public information about the merger including the three prospectuses, Plaintiff Pacific Mutual Life Insurance purchased $415,725 of the 1982 InterFirst notes a month after the merger and another $8 million a few months later, allegedly in reliance *inter alia* on the audit reports. Significantly it did not purchase any of the securities that were offered in the three prospectuses. RepublicBank filed for bankruptcy soon afterwards, and Pacific Mutual sued the auditing firm among others for fraudulent misrepresentation and noncompliance with GAAS. [44]

In *Pacific Mutual,* after the trial court granted summary judgment to Ernst & Young, the appellate court reversed, and Ernst & Young appealed. On review, rendering judgment, the Texas Supreme Court rejected Ernst & Young's contention

that Pacific Mutual had to show that the auditor had direct intent to induce Pacific Mutual to rely on Ernst & Young's audit opinion and that Texas law requires privity to establish fraud. Nevertheless, the high court determined that the appeals court had not properly applied the reason-to-expect standard to the summary judgment evidence. *Id.* at 580. Finding that "[g]eneral industry practice or knowledge may establish a basis for foreseeability to show negligence, but it is not probative of fraudulent intent," the Texas Supreme Court focused on the language of comment d of § 531, stating that to show that an asserted "fraudfeasor had reason to expect reliance,"

> [t]he maker of the misrepresentation *must have information* that would lead a reasonable man to conclude that there is *an especial likelihood* that it will reach those persons and will influence their conduct. There must be something in the situation known to the maker that would lead a reasonable man to govern his conduct on the assumption **\*606** that this will occur. *If he has the information,* the maker is subject to liability under the rule stated here. [emphasis added]

51 S.W.3d at 581.

During the summary judgment litigation Pacific Mutual submitted evidence consisting of affidavits from two experts and an Ernst & Young employee demonstrating, in essence, that Ernst & Young had reason to expect that Pacific Mutual (based on generalized industry practice or understanding that prospectuses and proxy materials are widely distributed throughout the investment community), like other investors, would rely on such information. *Id.* at 580–81. Pacific Mutual cited as authority Restatement (Second) of Torts § 536 (1977), which states,

> If a statute requires information to be ... filed ... for the protection of a particular class of persons, one who makes a fraudulent misrepresentation in so doing is subject to liability to the persons for pecuniary loss suffered through their justifiable reliance upon the misrepresentation in a transaction of the kind in which the statute is intended to protect them.

51 S.W.3d at 581. Comment c to § 536 states that one who meets "a statutory filing [with the SEC] requirement is presumed to have reason to expect that the information will reach and influence the class of persons the statute is trying to protect." *Id.* Comment d to § 536 further indicates that in identifying the protected class, "the focus is on the statute's purpose rather than the person furnishing the information." *Id.* Pacific Mutual argued that the laws and rules requiring SEC filings, which were enacted after the 1929 stock market crash, were "generally designed to protect investors." *Id.* at 582. Pacific Mutual emphasized that in deciding to purchase the InterFirst 1982 notes, it had relied on all the publicly available information, including documents mandated by law to be filed with the SEC, that had incorporated subsequent audits prepared by Ernst. *Id.* at 581–82.

The Texas Supreme Court disagreed with Pacific Mutual and narrowly construed § 536. *Id.* at 582. It observed that Comment e of § 536 makes clear that the general purpose behind the law requiring public filings is to make the information available to anyone who considers it important in deciding what to do "in any type of transaction *with the corporation in question.*" *Id.* at 582 [emphasis added by this Court]. Pacific Mutual's purchase of InterFirst notes that were issued by InterFirst in 1982 prior to the merger with Republic was not a transaction with RepublicBank or with the proposed merger entity described in the offering by RepublicBank that incorporated the SEC filings. The court expressly chose not to decide if purchasers of securities issued by the merged entity or Republic Bank shareholders, which did not include Pacific Mutual, could rely on SEC filings, but emphasized that § 536's "reach [did not extend] to open-market purchases of unrelated securities." *Id.* at 582. Moreover, (1) because there was no counterpart to § 536 in Texas common law and other courts have rarely applied it, (2) because the case was originally brought in federal court under § 10(b) but was dismissed as time-barred, and (3) because investors have other remedies under federal and state securities laws, the Texas Supreme Court stated that "we are reluctant to apply section 536's presumption and subject market participants to liability for fraud damages to an almost limitless class of potential plaintiffs." *Id.* Because Pacific Mutual therefore had failed to prove the element of intent, under the high court's narrowly construed reason-to-expect standard, the court rendered judgment for the auditor.

**\*607** **[47]** As a relevant standard for comparison, in 1991 Texas has also recognized a duty of a professional to a nonclient to use reasonable care to supply accurate information under certain circumstances by adopting the Restatement (Second) of Torts § 552 (1977), defining a tort of negligent misrepresentation. *Federal Land Bank Association v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991). Section 552 provides,

(1) One who, in the course of his business, profession or employment, or in any transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Section 552 thus requires a species of intent that is closer to that for fraud than to that for negligence. Texas common law fraud requires that the defendant know that his representation was false or made recklessly without any knowledge of its truth and that the defendant intend to induce the plaintiff to act upon that representation. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983).

**[48]** Moreover, eleven years after the Fifth Circuit issued *Abell,* which had followed the traditional rule that an attorney owes no duty regarding the sufficiency of its legal opinions to a third party in absence of privity of contract, but which also had noted the increasing influence of § 552, the Texas Supreme Court held that § 552 applies to lawyers. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787 (Tex.1999).

The Texas Supreme Court observed that other courts, both state and federal, under Texas and other states' laws, have

applied § 552 to other professions in addition to lawyers, including auditors, physicians, securities placement agents, accountants, real estate brokers, title insurers, as well as other types of evaluations issued by the professional, e.g., warranty deeds, title certificates, offering statements, offering memoranda, placement memoranda, deeds of trust, annual reports, and opinion letters. It determined that there "was no reason to exempt lawyers." *McCamish,* 991 S.W.2d at 791, 793, 795. Recognizing that "[t]he theory of negligent misrepresentation permits plaintiffs who are not parties to a contract for professional services to recover from the contracting professionals" and "imposes a duty to avoid negligent misrepresentation irrespective of privity," the Texas Supreme Court held that where a nonclient, not in privity with the attorney, receives and relies on an evaluation, such an opinion letter, prepared by another entity's attorney, he may sue under § 552 if the attorney is aware of the nonclient and intends that the nonclient rely on the information. *Id.* at 792–93. The high court also noted that the application of section 552 to attorneys was validated by what was then a tentative **\*608** draft of the Restatement (Third) of the Law Governing Lawyers § 73 (entitled "Duty of Care to Certain Nonclients"), which is now final. [45] That draft (as well as the final version) incorporates section 552 and provides in relevant part that irrespective of privity an attorney "owes a duty of care to a nonclient 'when and to the extent that: (a) a lawyer ... invites the non-client to rely on the lawyer's opinion or provision of other legal services, and the non-client so relies, and (b) the non-client is not, under applicable tort law, too remote from the lawyer to be entitled to protection.' " *McCamish,* 991 S.W.2d at 794–95.

The high court distinguished between liability for legal malpractice, which is based on "the breach of a duty that a professional owes his clients or others in privity," and liability for negligent misrepresentation, which is "based on an independent duty to a nonclient based on the professional's manifest awareness of the nonclient's reliance on the misrepresentation and the professional's intention that the nonclient so rely." *Id.* at 792. The Texas Supreme Court found that "applying section 552 to attorneys does not offend the policy justifications for the strict privity rule in legal malpractice cases" because a client still has control over the attorney-client relationship and potential liability to third parties does not create a conflict of duties nor threaten the attorney-client privilege because ethical rules, including Texas Disciplinary Rule of Professional Conduct 2.02 protect against such. *Id.* at 793. Nor does § 552 expose an attorney "to almost unlimited liability" because of its

limitation on potential claimants to known parties to whom the attorney provided information for a known purpose and who justifiably relied upon that information. *Id.* at 793–94. Comment h to § 552 explains the restrictions on standing to sue for negligent misrepresentation to "[p]ersons for whose guidance the information is supplied" and distinguishes it from standing to sue for fraudulent misrepresentation:

> [The negligent supplier of information's liability] is somewhat more narrowly restricted than that of the maker of a fraudulent misrepresentation (see § 531), which extends to any person whom the maker of the representation has reason to expect to act in reliance upon it. Under this Section, as in the case of the fraudulent misrepresentation (see § 531), it is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words, it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the misrepresentation intends to reach and influence either a particular person or persons, known to him, or a group or class of persons distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit this information to a similar person, persons or group. It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon **\*609** it, on the part of anyone to whom it may be repeated.

*See also Trust Co. of Louisiana v. N.N.P., Inc.,* 104 F.3d 1478 (5th Cir.1997)(under Louisiana law, to prevail on a claim by a

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

nonclient against an attorney for negligent misrepresentation, the plaintiff must show that the attorney provided legal services and knew that the third party intended to rely on them).[46]

Thus, with respect to both fraudulent misrepresentation and negligent misrepresentation, Texas recognizes that an attorney has an established duty to third parties not to make material misrepresentations on which the attorney "knew or had reason-to-expect" that the parties would rely or the attorney intended to reach and influence a limited group that might reasonably be expected to have access to that information and act in reliance on it.[47] Plaintiffs must still prove **\*610** that they did justifiably rely on the attorney's (or accountant's) misrepresentations about a corporation's financial strengths and suffered monetary loss as a result in deciding to purchase that corporation's securities. The standard for scienter (actual knowledge or reckless disregard) for liability under § 10(b) and Rule 10b–5 is closer to that for fraudulent misrepresentation than for negligent misrepresentation. Therefore in light of the Texas high court's conclusion that § 531 is fully compatible with the Texas common law of fraud, the standard in § 531 is particularly relevant to this Court's analysis of an attorney's duty to third parties under § 10(b), although, as noted, the intent element in § 552 is closer to fraud than negligence.

This Court concludes that professionals, including lawyers and accountants, when they take the affirmative step of speaking out, whether individually or as essentially an author or co-author in a statement or report, whether identified or not, about their client's financial condition, do have a duty to third parties not in privity not to knowingly or with severe recklessness issue materially misleading statements on which they intend or have reason to expect that those third parties will rely. Such a duty has been established in cases including *Klein v. Boyd, Caiola v. Citibank, Rubin v. Schottenstein, Ackerman v. Schwartz, Trust Company of Louisiana v. N.N.P.,* and *Ernst & Young v. Pacific Mutual Life Ins.* Moreover, with respect to the element of reliance, for purposes of § 10(b) as well as the tort of fraudulent misrepresentation, the Court is concerned about avoiding the danger of opening the professional liability floodgates to any and every potential investor or foreseeable user of the allegedly misleading information **\*611** who might obtain and rely on the statement. Therefore this Court finds that a restrictive approach with respect to the group to which the attorney or accountant owes the duty and which thus should have standing to sue, such as that taken by Texas,

is appropriate and necessary. In this suit, Lead Plaintiff has alleged as a crucial part of the Ponzi scheme that at least some fraudulent misrepresentations were made by Vinson & Elkins and Arthur Andersen and were aimed at investors to attract funds into Enron, as well as at credit rating agencies to keep Enron's credit rating high and bank loans flowing. Therefore the "limited group" that the attorneys or accountants allegedly intended, or might reasonably have expected, to rely on their material misrepresentations, and who allegedly did rely and suffered pecuniary loss, included Plaintiffs in this suit.

### 2. Accountant/Auditor

 **[49]**    There is no accountant/client privilege analogous to that accorded to lawyers. The United States Supreme Court has held, "By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public." *United States v. Arthur Young & Co.,* 465 U.S. 805, 817–18, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984).

Significantly, although a major goal of the PSLRA was to limit the exposure of corporations to frivolous strike suits targeting "deep-pocket" defendants by heightening pleading standards and imposing procedural hoops, in contrast Congress expanded independent public accountants' watchdog duties. Harvey L. Pitt, et al., "Promises Made, Promises Kept: The Practical Implications of the Private Securities Litigation Reform of 1995," 33 San Diego L.Rev. 845, 848–51 (1996). Under 15 U.S.C. § 78j–1(a)(1), every audit must have "procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts[.]" If the accountant discovers a possibly illegal act, he must decide whether if it is likely to have occurred and determine its potential effect. 15 U.S.C. § 78j–1(b)(1)(A). If he finds an illegal act has taken place and that it is of consequence, he must as soon as "practicable" inform the appropriate management personnel of the issuer and "assure" its audit committee or, if there is no audit committee, its board of directors of its conclusions. 15 U.S.C. § 78j–1(b)(1)(B). That committee or board must notify the SEC within one day and send a copy of the notice to the accountant. 15 U.S.C. 78j–1(b)(2). If the accountant does not receive that notice, he must resign and report to the SEC. 15 U.S.C. § 78j-1(b)(3). The report must be submitted to the SEC within one

day, regardless. *Id. See generally* William F. Dietrich, "Legal and Ethical Issues for Attorneys Dealing with Financial Data: Heightened Scrutiny after the Enron and Andersen Debacle," 1325 PLI/Corp 925, 945–46 (Aug.2002).

GAAS and GAAP represent the industry standard for measuring the performance of an examination by an accountant. *Escott v. BarChris Const. Corp.,* 283 F.Supp. 643, 703 (S.D.N.Y.1968); *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 663 n. 5 (3d Cir.2002); *SEC v. Arthur Young & Co.,* 590 F.2d 785, 788 n. 2 (9th Cir.1979).

The discussions above regarding liability under § 10(b) and the duty of the professional to nonclients apply to accountants.

Under § 11, an accountant may be civilly liable for certifying or preparing any financial report that is included in a registration **\*612** statement or prospectus which contains a material misrepresentation or omission. 15 U.S.C. § 77k. *See Herman & MacLean v. Huddleston,* 459 U.S. at 382 n. 11, 103 S.Ct. 683 ("Accountants are liable under § 11 only for those matters which purport to have been prepared or certified by them."). An accountant may establish a defense of due diligence to a § 11 claim if he demonstrates that "he had, after reasonable investigation, reasonable grounds to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(B)(i).

### 3. Underwriters

 [50]    Section 11 imposes liability "[i]n case any part of [a] registration statement ... contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading" on a number of players and specifically on "every underwriter with respect to such security." 15 U.S.C. § 77k(a). An underwriter of a public offering risks exposure to such liability under § 11, as well as to liability under § 10(b) for any material misstatements or omissions in the registration statement made with scienter, and thus has a duty to investigate an issuer and the securities that the underwriter offers to investors. *Hanly v. SEC,* 415 F.2d 589, 595–96 (2d Cir.1969)(holding that brokers and salesmen have a duty to investigate and to analyze sales literature and must not blindly accept recommendations made about a security); *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977)(an

underwriter has a duty to investigate an issuer and may be liable under Rule 10b–5 for reckless failure to do so); *SEC v. Dain Rauscher,* 254 F.3d 852, 857–58 (9th Cir.2001).

This investigative duty is placed on the underwriter because, as noted by the Seventh Circuit, its role is critical to the integrity of the market and the confidence of the investing public:

> An underwriter's relationship with the issuer gives the underwriter access to facts that are not equally available to members of the public who must rely on published information. And the relationship between the underwriter and its customers implicitly involves a favorable recommendation of the issued security. Because the public relies on the integrity, independence and expertise of the underwriter, the underwriter's participation significantly enhances the marketability of the security. And since the underwriter is unquestionably aware of the nature of the public's reliance on his participation in the sale of the issue, the mere fact that he has underwritten it is an implied representation that he has met the standards of his profession in his investigation of the issuer [footnotes omitted].

*Sanders,* 524 F.2d at 1070. The Second Circuit has observed,

> Self-regulation is the mainspring of the federal securities laws. No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter. He is most heavily relied upon to verify published materials because of his expertise in appraising the securities issue and the issuer, and because of his incentive to do so. He is familiar with the process of investigating the business condition of a company and possesses extensive resources for doing so. Since he often has a financial stake in the issue,

**In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)**

Fed. Sec. L. Rep. P 92,239

he has a special motive thoroughly to investigate the issuer's **\*613** strengths and weaknesses. Prospective investors look to the underwriter, a fact well known to all concerned and especially to the underwriter, to pass on the soundness of the security and the correctness of the registration statement and prospectus.

*Chris–Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 370 (2d Cir.1973), *cert. denied,*414 U.S. 910, 94 S.Ct. 231, 232, 38 L.Ed.2d 148 (1973).

The underwriter also may protect itself from liability by establishing a "due diligence" defense under Section 11, i.e., prove that it "had after reasonable investigation, reasonable ground to believe and did believe ... that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3). The legal standard for measuring whether the underwriter satisfies the due diligence test is "the standard of reasonableness ... required of a prudent man in the management of his own property." 15 U.S.C. § 77(k)(c); *Toolworks,* 50 F.3d at 621. Thus due diligence is "[i]n effect ... a negligence standard." *Id., quoting Hochfelder,* 425 U.S. at 208, 96 S.Ct. 1375.

The court in *Escott v. BarChris Construction Corp.,* 283 F.Supp. 643, 697 (S.D.N.Y.1968), observed in an influential opinion,

> To effectuate the statute's purpose the phrase "reasonable investigation" must be construed to require more effort on the part of the underwriters than the mere accurate reporting in the prospectus of "data presented" to them by the company. It should make no difference that this data is elicited by questions addressed to the company officers by the underwriters, or that the underwriters at the time believed that the company's officers are truthful and reliable. In order to make the underwriter's participation in this enterprise of any value to the investors, the underwriters must make a reasonable attempt to verify the data

submitted to them. They may not rely solely on the company's officers or on the company's counsel. A prudent man in the management of his own property would not rely on them.

In addition to the availability of a due diligence defense, an underwriter may rely on expertised parts of a prospectus, such as financial statements certified by an accountant, unless it had reasonable grounds to believe the statements were untrue. 15 U.S.C. § 77k(b)(3)(C); *In re Software Toolworks, Inc., 50 F.3d at 623.*

### III. Lead Plaintiff's Allegations in Consolidated Complaint

### A. The Scheme, Generally

Lead Plaintiff asserts that Defendants participated in "an enormous Ponzi scheme, the largest in history," involving illusory profits "generated by phony, non-arm's-length transactions with Enron-controlled entities and improper accounting tricks" in order to inflate Enron's reported revenues and profits, conceal its growing debts, maintain its artificially high stock prices and investment grade credit rating, as well as allow individual defendants to personally enrich themselves by looting the corporation, while continuing to raise money from public offerings of Enron or related entities' securities to sustain the scheme and to postpone the collapse of the corporation, a scenario characterized by Lead Plaintiff as "a hall of mirrors inside a house of cards." Consolidated Complaint at 12. The consolidated complaint sets out an elaborate scheme of off-the-books, illicit partnerships, secretly controlled by Enron and established at times critical for requisite financial disclosures by Enron in order to conceal its actual financial status. These Enron-controlled entities typically **\*614** would buy troubled assets from Enron, which Enron would have had difficulty selling in an arm's length transaction to an independent entity and which otherwise would have to be reported on Enron's balance sheet, by means of sham swaps, hedges, and transfers, to record phony profits and conceal debt on Enron's balance sheet. Lead Plaintiff further paints a picture of participation in the scheme by Enron's accountants, outside law firms, and banks, which all were the beneficiaries of such enormous fees and increasing business, as well as investment opportunities for personal enrichment, with the result that their opinions were rubber stamps that deceived investors and the public.

According to the consolidated complaint, in 1997 Enron suffered a substantial financial setback because of a British natural gas transaction, resulting in a loss of one-third of its stock's value and analysts' downgrading its stock and lowering their forecasts of its future earnings' growth. Moreover, Enron had been involved in transactions with a special purpose entity ("SPE")[48] known as Joint Energy Development Incorporated ("JEDI"), which Enron, as a partner, had established in 1993 with an outside investor that held a 50% interest in JEDI. Because initially JEDI was independent, Enron was able to report JEDI's profits, but not carry JEDI's debt on Enron's books. According to the complaint, JEDI generated 40% of the profits that Enron reported in 1997 alone. In December 1997, ten months before the Class Period, a crisis arose when the independent investor sought to withdraw, forcing Enron either to restructure with a new, independent investor or to consolidate JEDI with Enron, and thereby wipe out 40% of the profits that Enron had reported earlier in 1997, and to report JEDI's $700 million debt on Enron's balance sheet, as well as lose the ability to generate future profits by utilizing JEDI as an SPE.

Unable to find a legitimate, independent outside investor to replace the one withdrawing, Enron, along with Vinson & Elkins and Kirkland & Ellis, resorted to forming another entity, Chewco, totally controlled by Enron, to buy the outsider's investment in JEDI. Enron then arranged with Barclays Bank to lend $240 million to Chewco to allow Chewco to invest in JEDI and obtain the necessary 3% equity interest to maintain the appearance that JEDI was independent. According to the consolidated complaint at 275, pursuant to advice from Vinson & Elkins, Michael Kopper (an Enron employee who worked for Andrew Fastow) was made manager of Chewco because he was not a senior officer of Enron and therefore his role in Chewco would not have to be disclosed. Vinson & Elkins prepared the legal documentation for JEDI and Chewco. On December 12, 1997 Kopper transferred his ownership interest in Chewco to his domestic partner, William Dodson, in a sham transaction effected solely to make it appear that Kopper, and through him, Enron, had no formal interest in Chewco.

Because in actuality there was no outside, independent equity investor with a 3% stake in Chewco, Enron arranged for **\*615** Barclays Bank to lend $11.4 million to two "straw" parties, Little River and Big River, to permit them to make the requisite 3% "equity" investment in Chewco. *Id.* at 275–76.

According to the complaint, Kirkland & Ellis helped structure these deals and represented the straw parties, Little River and Big River, as part of the scheme to conceal Enron's debt and losses, and therefore the law firm had knowledge of the manipulation. Consolidated complaint at 275, 277. Barclays and the Enron Defendants prepared the documentation characterizing the advances as loans, while Enron and Chewco characterized them as equity contributions to serve as the 3% equity investment needed for nonconsolidation of JEDI. Consolidated complaint at 276. The loans were noted in documents that resembled promissory notes and loan agreements, but which were titled "certificates" and "funding agreements" that required the borrowers to pay "yield" at a particular percentage rate, i.e., interest. *Id.* Nevertheless, reflecting Barclays' knowledge about Chewco's lack of an independent third-party investor and the resulting creation of strawmen Little River and Big River, Barclays insisted that the borrowers/Enron secretly establish cash "reserve accounts" in the amount of $6.6 million to secure repayment of Barclay's $11.4 million. The complaint further states that a clandestine agreement for Enron to provide the $6.6 million to fund Chewco's reserve accounts for Big River and Little River was drawn up by Vinson & Elkins, which therefore had to have knowledge of the manipulation and of the absence of outside equity. *Id.* at 276, 277. To fund the reserve accounts, JEDI wired $6.58 million to Barclay's on 12/30/97, thus cutting in half Chewco's illusory 3% equity interest in JEDI, essential for JEDI to be independent of Enron. *Id.* Because Chewco did not have the requisite equity at risk and did not qualify as an adequately capitalized SPE, it, like JEDI, should have been consolidated into Enron's consolidated financial statements from the outset, but was not. *Id.*

The complaint further alleges that Enron guaranteed the $240 million unsecured loan from Barclays to Chewco in December 1997, and that in exchange, Chewco agreed to pay Enron a guaranteed fee of $10 million up front (cash at closing) plus 315 basis points annually on the average outstanding balance of the loan. The fee calculation was not based on the risk involved, but on benefitting Enron's financial statement. Furthermore, during the year the loan was outstanding, JEDI, through Chewco, paid Enron $17.4 million under the fee arrangement. Enron characterized these payments as "structuring fees" and recognized income from the $10 million up-front fee in December 1997, when in actuality, the payments were improper transfers from one Enron pocket to another.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Thus Chewco was allegedly financed with debt, not equity, and neither JEDI nor Chewco was a valid SPE because neither met the requirements for nonconsolidation.[49] The establishment of Chewco not only allowed Enron to report JEDI profits *616 of $45 million illicitly, inflating Enron's 1997 reported profits, and to keep $700 million of debt off Enron's books, but it also provided Enron with the opportunity in the future to do non-arm's-length-transactions with an Enron-controlled entity that no independent entity would have done nor agreed to do and which provided a stream of sham profits onto Enron's books.

Chewco became a template for subsequent entities that Enron continued to establish in increasing numbers and size, all secretly controlled by Enron, which Enron and its banks would use to generate enormous phony profits and conceal massive debt. Moreover, contrary to representations made to investors, many of these entities were capitalized with Enron common stock, and Enron guaranteed that if the stock price declined below a certain "trigger" price level and Enron lost its investment grade credit rating, Enron would become liable for the debt of those entities. To pay such a debt, Enron would have to issue substantial amounts of new stock, which in turn would dilute the holdings of current stockholders to their detriment. In sum, Chewco was less than 3% owned by parties independent of Enron, was improperly excluded from Enron's financial statements despite being controlled by Enron, and was never disclosed in Enron's SEC filings during the Class Period. Furthermore, Enron continued to use Chewco/JEDI in non-arm's-length transactions to generate false profits and conceal Enron's actual indebtedness from 1997 through 2001 in transactions that Vinson & Elkins participated in structuring and provided false "true sale" opinions to effectuate.

Two other SPEs, LJM Cayman L.P. ("LJM1")[50] and LJM2 Co–Investment, L.P. ("LJM2"), were structured, reviewed, and approved by Arthur Andersen LLP, Vinson & Elkins, Kirkland & Ellis, individual Enron Defendants, and certain Enron bankers, and controlled by Enron's Chief Financial Officer Andrew Fastow to inflate Enron's financial results by more than a billion dollars, as well as to enrich Fastow and selected others by tens of millions of dollars.[51] LJM1 provided Enron *617 employees an opportunity to enrich themselves personally and quickly. For instance, in March 2000, Enron employees Andrew Fastow, Michael Kopper, Ben Glisan, Kristina Mordaunt, Kathy Lynn and Anne Yaeger Patel obtained financial interests in LJM1 for initial contributions of $25,000 by Fastow, $5,800 each for Glisan

and Mordaunt, and lesser amounts for the others, totaling $70,000. They quickly received extraordinary returns on their investments: on May 1, 2000, Fastow received $4.5 million, while Glisan and Mordaunt within a couple of months received approximately $1 million. Consolidated complaint at 282.

Lead Plaintiff labels the transactions with the two Enron-controlled LJM partnerships ("where Enron insiders would be on both sides of the transactions") as "the primary manipulative devices used to falsify Enron's financial results during the Class Period." Fastow, in particular, wore two hats, which allowed him to self-deal, according to the consolidated complaint. Because Enron insiders were on both sides of all LJM2 transactions, Defendants knew that LJM2 would be an extremely lucrative investment as the alleged Ponzi scheme proceeded, as evidenced by LJM1's early dealings. Lead Plaintiff alleges that therefore, top Enron officials and Merrill Lynch sent a confidential private placement memorandum, which Vinson & Elkins participated in drafting, to certain favored investment banks (including JP Morgan, Merrill Lynch, CIBC, and CitiGroup) and the banks' high-level officers and privileged Merrill Lynch clients. The memorandum, which was not a public document, invited them (1) to benefit from this "unusually attractive investment opportunity" arising from LJM2's connection to Enron, (2) emphasized that Fastow was Enron's CFO, (3) informed them that LJM2's day-to-day activities would be managed by Enron insiders Fastow, Michael Kopper, and Ben Glisan, (4) explained that LJM2 "expects that Enron will be the Partnership's primary source of investment opportunities" and that it "expects to benefit from having the opportunity to invest in Enron-generated investment opportunities that would not be available otherwise to outside investors," (5) noted that Fastow's "access to Enron's information pertaining to potential investments will contribute to superior returns," pointed out that investors in JEDI, another Fastow-controlled partnership, had done similar transactions with Enron and investors had tripled their investment in two years, (6) anticipated overall returns of 2,500% for LJM2 investors, and (7) and assured that investors would not be required to contribute additional capital if Fastow's dual role ended. Lead Plaintiff alleges that Enron's banks and high-level bankers were offered this investment opportunity as a reward for their ongoing participation in the Ponzi scheme. JP Morgan, CitiGroup, Credit Suisse Boston, CIBC, Merrill Lynch, Lehman Brothers, Bank America, Deutsche Bank and/or their top executives invested about $150 million and, at the same time, continued to issue positive analyst reports about Enron.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Lead Plaintiff claims that LJM2 was used to create a number of SPEs known as the Raptors,[52] which Defendants utilized in turn to artificially inflate profits and conceal debt that should have been included on Enron's balance sheet. Enron or Enron-related entities entered into twenty-four business relationships from June 1999 through September 2001,[53] crucially timed **\*618** just before financial reporting deadlines. These transactions included asset sales by Enron to LJM2 or vice versa; purchases of debt or equity interests by LJM1 or LJM2 in Enron affiliates or Enron SPEs or other entities in which Enron was an investor; purchases of equity investments by LJM1 or LJM2 in SPEs designed to mitigate market risk in Enron's investments; sale of a call option and a put option by LJM2 on physical assets; and a subordinated loan to LJM2 from an Enron affiliate. Furthermore these transactions were recorded as generating $229 million in "earnings" for Enron in the second half of 1999, out of total reported earnings of $549 million during that period.

Again with the help of its lawyers and bankers, Enron used other SPEs (Firefly and JV–Company) to conceal debt. Consolidated complaint at 292–93. It also manipulated financial results by treating transfers of assets, including energy related projects and dark-fiber broadband, to another Enron-related entity, e.g., the Osprey Trust and the Marlin Trust, as sales rather than loans so as to generate income and conceal debt. Consolidated complaint at 293. Enron guaranteed these transfers with promises to issue more Enron stock if the assets diminished in value and established triggers for the issuance of additional shares of Enron stock if the price of Enron stock declined below a certain point. Former Enron employees reported that many of the transferred assets declined in value by the second half of 2000 and that top management, including Jeffrey Skilling, was aware of the decline because of a daily 2–3 page report detailing the positions of the assets held by the company. Nevertheless Enron did not record charges to show the liabilities Enron had incurred and continued to record income from transactions with these entities.

The complaint asserts that these kinds of transfers of assets, with continuing involvement of and control by Enron, violated GAAP, SFAS No. 125, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, and should have been viewed as secured **\*619** borrowings. SFAS No. 125 permits accounting for transfers of financial assets as sales to the extent that consideration other than beneficial interests is received in exchange, when the transferor has surrendered control over the assets, if the following three conditions are met:

> 1. The transferred assets have been isolated from the transferor, i.e., they are beyond the reach of the transferor and its creditors.

> 2. One of the following is met:

> a. The transferee obtains the unconditional right to pledge or exchange the transferred assets.

> b. The transferee is a qualifying special-purpose entity and the holders of beneficial interests in that entity have the unconditional right to pledge or exchange those interests.

> 3. The transferor does not maintain effective control over the transferred assets either through an Offering that obligates the transferor to repurchase or redeem the assets before their maturity or through an Offering that entitles the transferor to repurchase or redeem transferred assets that are not readily obtainable.

Furthermore for the accounting scheme to work, Enron had to conceal its affiliation with and control of these entities, so Defendants created materially false and misleading financial statement disclosures during the Class Period to hide Enron's related-party transactions.[54] SFAS No. 57, Related Party Disclosures, requires financial statements to include the following disclosures in related-party transactions:

> (a) the nature of the relationship(s) involved; (b) a description of the transactions ... for each of the periods for which income statements are presented and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements; (c) the dollar amounts of the transactions for each of the periods for which income statements are presented; and (d) amounts due from or to related parties as of the date of each balance sheet presented, and, if not otherwise apparent, the terms and manner of settlement.

> Moreover ¶ 3 of No. 57 provides that related-party transactions cannot be presumed to have been effected on an arm's length basis.

Similarly Item 404 of SEC Regulation S–K imposes requirements for disclosure **\*620** of related-party transactions in non-financial statement portions of SEC filings, including proxy statements and the annual reports on Form 10–K. Among other things, Item 404(a) requires

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

disclosure of transactions over $60,000 in which an executive officer has a material interest,

> naming such person and indicating the person's relationship to the registrant, the nature of such person's interest in the transaction(s), the amount of such transaction(s), and, where practicable, the amount of such person's interest in the transaction(s).

According to the instructions to this section, whether the information was material was determined by "the significance of the information in light of all the circumstances," including "[t]he importance of the interest to the person having the interest, the relationship of the parties to the transaction with each other and the amount involved in the transaction."

Furthermore under GAAP, financial statements are complete only when they contain all material information required to represent validly the underlying events and conditions. Statements of Financial Accounting Concepts 2, ¶ 279. In addition, a financial statement must disclose the financial effects of transactions and events that have occurred previously. Statement of Financial Accounting Concepts 1, ¶ 21.

Moreover, the complaint alleges that, as expected, during the next two years these LJM2 investors realized extraordinary distributions of hundreds of millions of dollars from the Raptor SPEs generated by illegal transactions ("manipulative devices") between Enron and the Raptors to falsify Enron's financial status. Thus the banks and bankers who became partners in LJM2 not only participated in the scheme to defraud, but were economic beneficiaries of that scheme, in addition to receiving their huge advisory fees, underwriter fees, and interest and loan commitment fees. Enron continued to sell to the SPEs assets that no independent third party would have purchased and that Enron wanted to get off its books.

The complaint states that Enron did not disclose Chewco and JEDI as related parties during the Class Period; its 2000 Form 10–K reported only that it had "entered into transactions with limited partnerships (the Related Party) whose general partner's managing member is a senior officer of Enron." It did not identify that the managing member of the general partners of LJM1 and LJM2 was Fastow or disclose that he received more than $30 million relating to his management and investment activities, a violation of SFAS No. 57 and Item 404 of Regulation S–K. The omission

was intentional, as evidenced by significant discussion within Enron management and outside advisors as to how Enron could circumvent the mandated disclosure of Fastow's compensation from the related parties.

Citing specific examples, [55] the complaint charges that Enron's proxy statements, **\*621** Form 10Q and 10–K filings obfuscated the true nature of the LJM partnerships and falsely assured investors that transactions with them were fair to Enron when they were not, while the illicit transactions involving these entities allowed Enron to pay off key Enron insiders, including Fastow, as well as reward favored banks and bankers for their participation in the scheme.

Timing, standardly at the end of a financial year, was critical with these SPE transactions to allow Enron to record huge sales gains and conceal debts to meet the rosy forecasts made by the corporation and other participants in the scheme and to conceal Enron's true debt levels. LJM2 had to be formed before the end of 1999 so it could be utilized to consummate transactions with Enron to create huge profits for Enron in the final quarter of that year and allow Enron not only to meet, but to exceed, its forecasted 1999 earnings. When Merrill Lynch was unable to raise sufficient funds from outside investors to fund the partnership before the close of 1999, Enron, Fastow, Kopper, Arthur Andersen, Vinson & Elkins, Kirkland & Ellis, JP Morgan, CIBC, Deutsche Bank, and Credit Suisse First Boston created documentation that allowed the banks to advance virtually all of the moneys needed to "pre-fund" LJM2, much more than their allocated shares. After LJM2 was fully funded and after other investors contributed money, the banks' original "over-funding" in December 1999 was adjusted in subsequent capital contributions. Moreover, because LJM2 needed bank financing to effectuate Defendant's scheme to manipulate Enron's profits and debt, JP Morgan first gave a $65 million line of credit to LJM2, and then increased it to $120 million, while Credit Suisse Boston lent money to it insure that Enron, which was conducting deals [56] with LJM2 and its SPEs that were essential to avoid Enron's reporting a bad **\*622** 4th quarter for 1999. The complaint further states that JP Morgan and CitiGroup administered all financial affairs of LJM2, about which they were fully knowledgeable.

In these end-of-the-year transactions, according to the complaint, Enron typically promised to and did, in the next year, buy back the assets it sold to LJM2 before the close of the financial year and in the process gave the LJM2 partnership large profits on each transaction even if the asset

had declined in market value, while the transactions created "earnings" on the books for Enron. Often Enron in advance of the transaction guaranteed the LJM partnerships against any loss. In this manner the LJM partnerships functioned solely as vehicles to aid Defendants in the manipulation, falsification, and artificial inflation of Enron's reported financial results while simultaneously enriching LJM2's favored investors at exorbitant rates.

The consolidated complaint additionally alleges that as part of the pattern of fraud, Enron repetitively engaged in hedging transactions that gave an appearance that a third party was obligated to pay Enron the amount of large losses from its trading investments when the third party actually was an entity in which Enron had a substantial economic stake, e.g., funding the SPEs with Enron common stock so that if the value of the investments and the value of its stock fell at the same time, the SPEs would not be able to meet their obligations and the hedges would fail. This possibility put great pressure on participants in the fraudulent scheme to keep the price of the stock at artificially inflated levels. Once in late 2000 and again in 2001 the Raptors experienced such a dangerous decline.[57] They lacked sufficient credit capacity to pay Enron on the sham hedges and were in danger of coming unwound, with the potential of causing Enron to take a multi-million-dollar charge against its earnings and exposing the earlier falsification of its financial results. That in turn would cause the stock price to plunge and trigger the issuance of more stock. To avoid disaster, with the participation of Arthur Andersen, Vinson & Elkins, Kirkland & Ellis, and some of the banks, Enron restructured and capitalized the Raptor SPEs in December 2000 through more sham transactions that transferred rights to more shares of Enron stock to these SPEs in exchange for notes.

Furthermore, the complaint alleges that Enron employed accounting tricks to defraud investors. In particular it used and abused "mark-to-market" or "fair value" accounting to inflate the current and future success of the company by computing the economic value or profit that it would ultimately obtain on a multi-year contract, discount that figure to present value, and recognize the entire profit in the current period. In other words, Enron improperly and prematurely accelerated revenue recognition. Such accounting is permissible under GAAP only where contract revenue streams are predictable and are based on historical records of similar transactions. Enron had no historical track record for many of the transactions to which it applied mark-to-market accounting. In addition, unless the expected profit on the transaction was properly hedged, Enron was required in each following quarter to **\*623** recompute or readjust the profit computation, taking into account changing economic values. Mark-to-market accounting is appropriate only where the company has a long track record that allows it to estimate accurately and forecast future values with some certainty. Enron abused this mark-to-market accounting first by assigning unrealistic values to the ultimate transaction, which in turn inflated current period profits. Moreover, in reviewing its computations on a quarterly basis, it consistently increased the estimated value of the transaction even when data revealed a decrease in the estimated value to compensate for the anticipated loss, a practice known within Enron as "moving or shifting the curve."[58] The complaint alleges that during the Class Period, Enron misused mark-to-market accounting throughout its business operations in order to swell its reported revenues and profits, helped by managers who obtained larger bonuses from the inflated values.[59] The abuse was particularly evident in Enron's wholesale energy transactions, where unrealistic valuation greatly inflated current period income. In its new retail energy services operation Enron had no long-term track record to support use of mark-to-market accounting, but Enron used the technique anyway, falsifying the requisite historical earnings. Enron also used it to record huge current period profits on long-term, highly speculative retail energy risk-management contracts where Enron had no basis on which to project the amount of any future revenue streams, no less a profit, and where it knew that losses were likely. Similarly it had no track record in its broadband business, which, itself, was not a proven market, but abused the technique to create millions of dollars of illusory profits in several transactions, in particular its Blockbuster/Enron Video–On–Demand ("VOD") joint venture. Application of mark-to-market accounting was particularly improper in the broadband context because it involved service contracts, for services that had not yet been provided, rather than income from commodity components.[60]

**\*624** Falsified rosy financial statements were also issued regarding Enron's retail energy services business (EES), which attempted to manage energy needs of corporate customers for multi-year periods in return for fees to be paid over a number of years (demand-side management ("DSM") contracts). During the Class Period, Enron presented EES as tremendously successful by continually signing new multi-million or multi-billion dollar contracts that exceeded Enron's internal forecasts and representing that EES had become profitable in the 4th quarter of 1999 and achieved substantial

profits afterward. In actuality it was losing hundreds of millions of dollars because to induce large corporations to sign long-term energy management contracts and make the business seem instantly successful from the start, Enron entered into contracts that it, along with its accountants and lawyers, knew would probably result in enormous losses and that required Enron to make immediate, large expenditures for more efficient energy equipment and thereby additionally further strap Enron for cash. [61] Mark-to-market accounting was applied to EES also to overvalue grossly the ultimate worth of these contracts and to inflate greatly current period profits from transactions that in reality were producing little or no current period cash. To conceal the huge losses that the EES was suffering, Enron moved the losses into a larger wholesale energy operation and abused mark-to-market accounting and phony hedges with SPEs. [62]

**\*625** Enron also misrepresented the status and growth of its broadband services business ("EBS"), an 18,000–mile fiber optic network that Enron was constructing and using to engage in trading access to Enron's and other companies' fiber optic cable capability ("Broadband Intermediation"). It represented that the network was being and had been successfully constructed, that it was state of the art and offered unparalleled quality of service, and that the trading business was succeeding and achieving much higher trading volume and revenues than expected, i.e., "exponential growth." One of its ventures was the Blockbuster VOD, mentioned *supra.* Enron stated that the twenty-year agreement, announced in July 2000, had a billion dollar value and was a first-of-its-kind whereby consumers would be able to enjoy video-on-demand, provided by Blockbuster, in their homes via Internet because of technological advances made possible by the high quality of Enron's fiber optic network. [63] The consolidated complaint charges that along with an investment from CIBC in the deal after a no-loss guarantee from Enron, Enron abused mark-to-market accounting to claim a profit of over $110 million in the fourth quarter of 1999 and the first quarter of 2000. In reality EBS was a failure because Enron lacked the technology to deliver the product as represented and because Blockbuster had not and could not obtain the legal right to deliver movies from movie studios in a digital format, a necessity for VOD. According to the complaint at 301, when the deal was announced, Defendant Ken Rice told an engineer whom Rice was recruiting that Enron "can't deliver" on the deal. [64] Eight weeks after the deal was **\*626** announced with great fanfare and only weeks after representing that the system had been successfully tested in four cities and was

being launched nationwide, Enron abandoned the venture. Yet Enron did not reverse the huge profits that it had clandestinely and improperly reported on this transaction previously because such a disclosure would have exposed its ongoing abuse and misuse of mark-to-market accounting and caused the price of its stock to decline, thus triggering prices in the SPEs that would obligate Enron to pay off investors in the SPEs. Furthermore, aware of the fragility of Enron's financial condition and CIBC's overall exposure to Enron, CIBC did not demand that Enron honor its secret guarantee and refused to disclose its economic relationship with Enron or its affiliates, but instead used boilerplate disclosures in its analyst reports on Enron to conceal its investment and its resulting conflicts of interest.

In 2000, Enron owned millions of shares of stock in and controlled a private company known as New Power. According to the complaint, to obtain desperately needed profit to perpetuate its alleged Ponzi scheme, Enron decided to take New Power public and create a trading market in its stock in order to recognize a profit on the gain in value on its shares by a sham hedging transaction with an LJM2 SPE. With Credit Suisse Boston, CitiGroup, and CIBC, Enron effected a huge New Power initial public offering ("IPO") (27.6 million shares at $21 per share) in October 2000. Meanwhile Enron retained 13.6 million shares of New Power common stock and warrants to purchase 42 million more shares. Pursuant to a deal structured before the IPO, Enron, along with Vinson & Elkins, Arthur Andersen and CIBC, used LJM2 to hedge Enron's gain in the value of its New Power stock and create an enormous phony profit of $370 million in the fourth quarter of 2000. Immediately after the October IPO, Enron, Vinson & Elkins, Kirkland & Ellis, Arthur Andersen, and CIBC created an SPE designated Hawaii 125–0. CIBC and several other Enron banks, including Credit Suisse First Boston, made a sham "loan" of $125 million to Hawaii 125–0, but actually Enron gave the banks a secret "total return swap" guarantee that protected them from any loss. Enron sold millions of its New Power warrants to Hawaii 125–0 to "secure" the banks' loans while recording a $370 million profit on the claimed gain on the New Power warrants made possible by the IPO. Hawaii 125–0 simultaneously allegedly hedged the warrants with another entity created and controlled by Enron called "Porcupine," into which LJM2 had placed $30 million to capitalize it and facilitate the sham hedge of the New Power warrants; a week later, however, Porcupine paid back the $30 million to LJM2 along with $9.5 million profit, leaving Porcupine stripped of assets. When New Power stock fell

sharply in 2001, Enron's alleged gain on its Power equity holdings was converted into a loss of about $250 million. The consolidated complaint alleges that Enron, Vinson & Elkins, Kirkland & Ellis, and Arthur Andersen agreed to, and did, conceal that loss until October 2001, when Enron disclosed a $1 billion write-off and a $1 billion reduction in shareholder equity.

Lead Plaintiff further alleges that in September 2001, when Enron's stock value was dipping to precarious "trigger" levels and threatening the possibility of large asset write downs, Enron and Qwest, another Arthur Andersen client, with the aid of Arthur Andersen and Vinson & Elkins, effected another deal to limit the writeoffs and conceal Enron's financial situation by creating an appearance of healthy operating earnings. On September 30, 2001, the final day of the third quarter, solely for accounting purposes, they arranged a "swap" by which Quest agreed to overpay for Enron's "dark (i.e., not yet active) fiber" **\*627** between Salt Lake City and New Orleans, Enron agreed to buy "lit wavelength" (active fiber optic cable services) from Quest's network over a twenty-five year period, and the companies exchanged checks for about $112 million. Enron thus reported a sale and avoided reporting a loss on its dark fiber assets,[65] whose value on the open market was far lower than the price on Enron's books.[66]

As another "manipulative device" to conceal its true financial condition, the complaint claims that with some of Enron's banks Enron engaged in loans disguised as commodity (oil and gas) trades, with the ultimate cost differential in favor of the banks actually constituting the "interest" on the hidden loan. For example, JP Morgan set up, controlled, and utilized an entity known as "Mahonia," located in the Channel Islands off the coast of England. Enron, Mahonia, and JP Morgan got Vinson & Elkins to provide a false legal opinion that these disguised loans were legitimate commodities trades. Through this manipulative device, JP Morgan and Enron concealed some $3.9 billion in debt.

The loans were disguised as hedging or derivative transactions so that Enron would not have to record the $3.9 billion as debts on Enron's balance sheet. For instance, between December 1997 and December 2000, Enron Natural Gas Marketing Corporation or Enron North America Corporation, as sellers, entered into six different agreements, characterized as "forward sales contracts," supposedly to provide for the delivery of crude oil and natural gas over a four-to-five-year period, with either Mahonia or Mahonia Gas serving as the purchasers. In actuality the forward sales

contracts, amounting to $2.2 billion, were loans to Enron disguised as hedging contracts. Enron never intended to deliver the crude oil and natural gas, as is evidenced by (1) its failure to enter into contracts with suppliers to hedge its obligations to deliver the crude oil and gas under the six contracts; (2) the fact that Mahonia did not enter into contracts for delivery of the oil and gas to be supplied by Enron under the terms of the contracts, but instead secured them with surety bonds; (3) and the fact that Mahonia was not listed as a firm transportation customer of any of the pipelines at which the natural gas deliveries were to be made under the sales contracts, even though Mahonia expressly represented and warranted that it had the capacity and intended to take delivery of the natural gas and that it was acquiring the natural gas in the ordinary **\*628** course of business. Complaint at 311–12. Furthermore on the same day that Enron entered into the forward sales contracts with Mahonia, December 28, 2000, Enron entered into an agreement with Stoneville Aegean Ltd. to buy the same quantity of gas that Enron was supposed to sell to Mahonia, to be delivered on the same future dates that Enron was supposed to deliver the same quantities of gas to Mahonia. Moreover, Mahonia and Stoneville are offshore corporations established by the same company, Mourant du Feu & Jeune, with the same director, Ian James, and the same shareholders, Juris Ltd. and Lively Ltd. Mahonia, had agreed in its contract to pay Enron $330 million for gas on the same day that they entered into the contract, December 28, 2000; Enron agreed to pay Stoneville $394 million to buy back the same quantities of gas on the same delivery schedule, but with the $394 million to be paid at specified future dates, i.e., the equivalent of a 7% loan.

In a valid pre-paid forward sales contract, the purchaser wants long-term delivery of gas, but is exposed to the risk that the market price may decrease during the month and will be lower than the price pre-paid by the purchaser. Here J.P. Morgan assumed no economic risk that the price of natural gas might change because it or its related companies simultaneously bought and sold the same quantities of gas at pre-arranged prices to the same party, Enron. Thus the price or the availability of the gas was irrelevant; the transaction was a loan rather than a pre-paid sales contract.

Furthermore, allegedly knowing Enron's actual precarious financial condition, JP Morgan attempted to insure against default by Enron on the "loans" by buying performance bonds from several insurance companies. After Enron defaulted on the trade contracts after filing for bankruptcy, those insurers subsequently have refused to pay and contend that the

commodity trades were fraudulent and a subterfuge to hide the fact that the transactions were done to disguise loans to Enron.

The consolidated complaint also asserts that CitiGroup (from early 1999 through early 2002) engaged in subterfuge to disguise large loans amounting to $2.4 billion to Enron as a series of prepaid swaps, [67] and that Credit Suisse First Boston (in 2000) made loans of $150 million to Enron disguised as trades in derivatives, in order to paint a false picture of Enron's liquidity, financial condition, and balance sheet. Specifically, CitiGroup lent Enron $2.4 billion in a series of "pre-paid" swaps (the **\*629** "Delta transactions") by utilizing a CitiGroup Cayman Island subsidiary named Delta, based in the Cayman Islands. CitiGroup paid the estimated fair value of its portion of the swaps, hundreds of millions of dollars, immediately each time, but Enron was only obliged to repay the cash over five years. These Delta transactions were actually loans, though never disclosed as such on Enron's balance sheet, which reported them as assets and liabilities from price risk management and accounts payable and receivable.

Similarly Credit Suisse First Boston allegedly made loans disguised as trades in derivatives to Enron. In 2000, it gave Enron $150 million, to be repaid over two years with those repayments to vary based on the price of oil. [68] Enron kept the loans from Credit Suisse First Boston and CitiGroup off its balance sheet by characterizing them as "assets from price risk management" and perhaps as "accounts receivable" according to Arthur Andersen spokesman Charlie Leonard, so that investors, credit rating agencies, and industry analysts would not perceive the risk created by the debt incurred in obtaining new financing. [69]

The consolidated complaint details other fraudulent practices, such as Enron's inflation of revenues with respect to long-term construction contracts [70] and improper snowballing of costs on unsuccessful bids, [71] **\*630** followed by obfuscated "disclosures" to mislead investors about the true nature of the write down. Consolidated complaint at 316–19. The complaint claims that Enron also falsified its financial statements by omitting losses for the impairment or deterioration in value of long-term assets and investments, e.g., of Azurix Corporation, Broadband Services, the New Power Company, TGSS, the Dabhol Power Plant, PromiGas, and projects in Nicaragua, Puerto Rico, and Brazil, in violation of GAAP, SFAS No. 115. [72] Enron only belatedly

announced a write down of $1 billion in assets on October 16, 2001, even though the impairment occurred long before. Consolidated complaint at 319–25.

The complaint further alleges that Enron, in a phony transaction on June 29, 2001, sold its interest in Project Timber, a methanol and MTBE refinery, to Enron Oil Transportation and Trade ("EOTT"), an entity in which Enron was one-third owner and general partner, after Enron was unable for six years to sell that interest legitimately. MTBE is water soluble and is a potential carcinogen. The best price offered to Enron for Project Timber during the six years was $50 million, but Enron sold it to EOTT for $200 million. EOTT agreed to the terms because Enron guaranteed that it would purchase all the MTBE that the plant produced and would cover any liability. From that sale Enron improperly recognized $117 million, more **\*631** than a third of its second quarter 2001 earnings, even though the revenue was not realizable and the transaction was not arm's length. The transaction was a total return swap and should not have been recognized as revenue. Furthermore, Enron did not disclose that it recognized earnings from the "sale" or that it assumed liabilities under the contract.

The complaint summarizes that these improper accounting tactics violated GAAP because they violated general, fundamental accounting principles: that interim financial reporting should be based on the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶ 10); that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1 ¶ 34); that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that alter those resources and claims to those resources (FASB Statement of Concepts No. 1, ¶ 40); that financial reporting should provide information about how the management of an enterprise had discharged its stewardship responsibilities to its stockholders for the use of enterprise resources entrusted to it, especially when it voluntarily heightens its responsibility of accountability to prospective investors and the public generally when it offers securities of the enterprise to the public (FASB Statement of Concepts No. 1 ¶ 50); that financial reporting should provide information about an enterprise's financial performance during a period so investors can assess the enterprise's prospects (FASB Statement of Concepts No. 1

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

¶ 42); that financial reporting should be reliable (FASB Statement of Concepts No. 2); that the information is complete and nothing is omitted that is necessary to insure that the financial report represents the underlying events and conditions (FASB Statement of Concepts No. 2 ¶ 79); and that conservatism should be used as a prudent reaction to uncertainty in an attempt to ensure that uncertainties and risks inherent in business situations are adequately considered and the report truly represents what it purports to represent (FASB Statement of Concepts No. 2 ¶¶ 95, 97). Consolidated complaint at 326–27. Furthermore SEC regulations, regulations of the national stock exchanges, and customary business practice require disclosure of the kind of information concealed by Defendants, as corporate officials and their legal and financial advisors knew.

During 2001, Enron's stock price precipitously declined and the Raptor SPEs were imperiled by a lack of credit capacity, portending a "death spiral" for Enron. Fully aware of the situation, JP Morgan and CitiGroup, when Enron's "financial chicanery" had created a desperate "liquidity crunch," greatly increased the monies flowing into Enron as phony oil and gas trades and swaps to prop up Enron's diminished finances without disclosing that these two banks had just lent Enron between $4–6 billion, according to the complaint. If these phony commodity and swap trades had been treated as the loans they were, the internal procedures at both banks would have required a syndication of those loans to other banks, thus increasing the number of entities with knowledge of Enron's liquidity problems. Moreover, even structuring consolidation of loans of this size would have exposed Enron's problems to the financial community and would have been reported in specialized journals and then in the financial press focusing on bank lending syndication activity. With its financial fragility exposed, a substantial downgrade of Enron's credit rating would likely have followed, endangering its ability to borrow and activating stock issuance **\*632** price triggers. Lead Plaintiff emphasizes that even though under Enron's investment-grade rating at the time, Enron could have borrowed money at 3.75–4.25% interest, the fraudulent Mahonia and Delta transactions were structured to pay off JP Morgan and CitiGroup with, under the circumstances, "extortionate" interest rates between 6.5–7.0%, amounting to a big profit for the banks. Moreover, to reduce the economic risk, JP Morgan purchased security bond insurance by attempting to deceive the insurance companies into believing they were insuring commodity trades rather than loans, and obtained letters from other financial institutions with the

same deception. For the same purpose, CitiGroup sold Enron-linked securities as notes, including the Delta loans.

The complaint represents that Enron has conceded that in prior years it did not make audit adjustments and reclassifications proposed by Arthur Andersen that would have reduced Enron's net income because it considered the adjustments "immaterial." For instance the proposed adjustment for 1997 was $51 million, or 48% of its net income and 10% of its recurring net income. [73]

Ultimately Enron did restate its financial statements for 1997 through the second quarter of 2001, an action which the complaint characterizes as "an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material." Consolidated complaint at 299. Under GAAP, APB No. 20 at ¶¶ 7–14, the type of restatement made by Enron was to correct material errors in prior financial statements, a disfavored procedure because it diminishes investor confidence in financial statements. GAAP approves of restricting restatements to limited circumstances, e.g., when there is a change in the reporting entity or in accounting principles or to correct an error in a previously issued financial statement. In Enron's case, Lead Plaintiff quotes a February 22, 2002 article on *Accounting Malpractice.com:* "The emerging question is not whether a more conservative restatement would have reflected smaller profits, but whether a proper restatement would have reflected any profits from 1997 and forward." Consolidated complaint at 300.

In sum, the consolidated complaint charges that Defendants caused Enron to violate GAAP and SEC rules in order to overstate Enron's assets, shareholders' equity, net income and earnings per share, and to understate its debt. Defendants also caused Enron to present materially misleading statements in Enron's financial statements (including press releases and SEC filings, such as Form 10–Qs for interim results and Form 10–Ks for annual results), which were incorporated into (Registration Statements and Prospectuses filed during the Class Period). Enron also made misrepresentations about Defendants' manipulations, all concealed **\*633** by the following numerous, improper accounting ploys: not consolidating illicit SPEs into Enron's financial statements to properly reflect reduced earnings and debt on Enron's balance sheet; improperly accounting for common stock issued to a related-party entity that should have been treated as a reduction in shareholders' equity, but was identified as a note receivable; improperly accounting for

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

broadband transactions; abusing mark-to-market accounting; characterizing loans as forward contracts to conceal Enron's debt; improperly accounting for long-term contracts; failing to record required write-downs for impairment in value of Enron's investments, long-term assets, and its broadband and technology investments in a timely manner; failing to record an aggregate of $92 million in proposed audit adjustments from 1997 until the end of the Class period; failing to disclose related-party transactions; and misstating Enron's debt-to-equity ratio (measured as debt to total capitalization, a figure which rating agencies use to determine a company's credit rating) and ratio of earnings to fixed charges. Even while demonstrating the contrast between Enron's original financial statements and its restatement results, the consolidated complaint notes that many of Defendants' manipulations are not included in the restatement, such as the effects of Enron's abuse of accounting techniques.

Lead Plaintiff describes Enron's "corporate culture" as characterized by "a fixation on the price of Enron stock" and on pushing that price ever higher. Throughout Enron's Houston corporate headquarters, TV monitors constantly displayed the current market price of its stock. A repeated maxim was that managers were always to be "ABCing," i.e., "always be closing" deals to create revenue and profit even if they were questionable. Corporate managers and executives were compensated for closing transactions and placing high values on them, regardless of the economic realities of the deals, to generate profit when "marked to market." There was pressure to do anything necessary to make the numbers, and it was common knowledge that revenues and earnings were being falsified at the direction of top executives. Bonuses went to those who facilitated the company-wide fraudulent behavior. In August 2001, Sherron Watkins, an Enron executive and a former Arthur Andersen accountant, wrote to Kenneth Lay that Enron was "nothing but an elaborate accounting hoax" and that nothing "will protect Enron if these [SPE] transactions are ever disclosed in the bright light of day," while warning that many Enron employees believe, "[W]e're such a crooked company."

In 2001, matters at Enron began to fall apart, according to the complaint. In March 2001, just prior to the end of the quarter, it appeared that Enron would have to take a pre-tax charge against more than $500 million because of a shortfall in the credit capacity of the Raptor SPEs. To avoid the loss and its more dire consequences, Enron, Arthur Andersen, Vinson & Elkins, Kirkland & Ellis and some of the banks "restructured" the Raptors by transferring to them

more than $800 million of contracts to receive Enron stock for no consideration; this transfer was accounted for as an increase in equity and assets, in violation of GAAP. As with so many other previously described contrivances, the transfer allowed the participants in the scheme to continue concealing losses in Enron's merchant investments [74] **\*634** and kept the alleged Ponzi scheme working. Yet during early 2001, Enron also continued to report record results, certified by Arthur Andersen, and Enron's lawyers and bankers continued to make very positive statements about the business.

In June 2001, when Enron stock was trading at around $48.50 a share, statements made at a meeting between an Enron manager and two Credit Suisse First Boston managing directors reflected that Credit Suisse First Boston knew about the nature and extent of Enron's off-balance sheet exposure and Enron's falsification of its financial statements. The bank's directors made the following comments to the Enron manager: "How can you guys keep doing this?," in reference to Enron's repeated statements to the market that its stock was under valued. Even at $40 per share, Enron's stock was still overvalued in the bank directors' view, as reflected in their comments to the Enron manager: "Do employees actually believe it's worth what management is saying?"; "[Y]ou guys are at a critical price point right now"; that if Enron's stock price continued to fall, that drop would cause Raptor to unwind and the debt balance to come due; when the Enron executive stated that he thought Enron's off-balance sheet debt was between one and two billion dollars, the bank representatives responded, "Try eight to 12 billion."; and that if Enron's stock dips to $20 per share, things would come falling down and "you guys are gonna be fucked." Complaint at 37–38. Yet despite this knowledge, Credit Suisse First Boston issued a report on August 14, 2001, rating Enron a "Strong Buy" with a price target of $84.

According to the complaint, on July 13, 2001, Jeffrey Skilling told Kenneth Lay that he was going to quit because he knew that the Enron house of cards was crumbling. They and other top Enron officials made up a story that Skilling was resigning for personal reasons to hide the true reason and limit damage to the price of Enron's stock. On August 14, 2001, Fastow, Skilling and other top executives and bankers announced that Skilling, who had only become CEO a few months earlier, was resigning for personal reasons, that his departure did not raise "any accounting or business issues of any kind," that Enron's financial state "had never been **\*635** stronger" and its "future had never been brighter," that there was "nothing to disclose," that Enron's "numbers look good," that there were

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

"no problems" or "accounting issues," and that the Enron "machine was in top shape and continues to roll on—Enron's the best of the best."

The consolidated complaint quotes Enron management employees in August 2001 complaining to the Board about the fraud [75] Nevertheless, Enron's directors **\*636** did not investigate or disclose the matters the employees had raised. Instead, according to the consolidated complaint, they brought in Vinson & Elkins to cover up the wrongdoing. Vinson & Elkins issued a whitewash report dismissing these detailed complaints of fraud even though the law firm knew the allegations were true because it was involved in structuring many of the manipulative devices.

By May 2001, as the price of Enron stock continued to fall, criticism of Enron's aggressive accounting, termination of the Blockbuster VOD venture, and worries about Enron's broadband business caused the price to fall below "trigger" levels, thus forcing Enron to issue large amounts of additional stock to its SPEs. The Raptors' credit problems became unsolvable. Unable to avoid any longer a multi-million dollar loss in the third quarter of that year and recognizing the threat of disclosure of their previous misconduct, Enron and Arthur Andersen allegedly began destroying documents that reflected their fraudulent course of conduct. On October 16, 2001 Enron revealed charges of $1 billion and a reduction of shareholders' equity by $1.2 billion. The SEC began investigating and Fastow resigned. In a Form 8–K filed on November 8, 2001 Enron announced it would restate its annual financial statements for the years 1997, 1998, 1999 and 2000, and conceded that Chewco had never met SPE accounting requirements and, because JEDI's nonconsolidation status depended on Chewco's, neither did JEDI. Enron then consolidated Chewco and JEDI retroactive to 1997, resulting in a massive reduction in Enron's reported net income and a massive increase in its reported debt. In addition Enron confessed that it had failed to correct $51 million in errors found by Arthur Andersen for 1997 and that it was restating its 1997, 1998, 1999 and 2000 financial results to eliminate $600 million in previously reported profits and approximately $1.3 billion in shareholders' equity. Yet, according to the complaint, the restatements "just scratched the surface of the true extent of the prior falsification of Enron's financial statements, failing to eliminate additional hundreds of millions of dollars of phony profits as Enron, Arthur Andersen, Vinson & Elkins and the banks were still trying to keep Enron afloat and trying to conceal how extensive the fraud had really been." Consolidated complaint at 42.

In October 2001, in an effort to limit their own legal exposure and to stop Enron from becoming insolvent and preclude the investigations and revelations that insolvency would give rise to, Enron insiders, JP Morgan, and CitiGroup tried to effectuate the sale of Enron to, or a "salvation merger" with, Dynegy, a transaction that would also provide each bank with a $45 million fee. Consolidated complaint at 43. To preclude exposure of the two banks' participation in the alleged Ponzi scheme, according to the complaint, in late November 2001 Robert Rubin, the Vice Chairman of CitiGroup, and William Harrison, **\*637** the Chairman of JP Morgan, called Moody's Investment Service ("Moody's") and pressured it to keep Enron's investment grade credit rating in place until the sale of Enron to Dynegy was completed. They failed. Dynegy's due diligence investigations uncovered and its investment bankers discovered that Enron's financial condition was much worse than had been publicly disclosed at that point, Dynegy refused to acquire Enron. By November 28, 2001 the rating agencies had downgraded Enron's publicly traded debt to "junk" status, and Enron filed for bankruptcy on December 2, 2001.

The consolidated complaint charges that Enron's publicly filed reports disclosed the existence of the LJM partnerships, but not the essence of the transactions between Enron and the partnerships, nor the nature or extent of Fastow's financial interests in the partnerships. Instead the disclosures were crafted and approved by Enron's outside Arthur Andersen auditors and counsel (Vinson & Elkins and Kirkland & Ellis) in meetings with Enron top insiders. Moreover, Enron's manipulative devices, contrivances, and related-party transactions were extraordinarily lucrative for Fastow and investors in the LJM partnerships despite the relatively risk-free deals that protected them. Lead Plaintiff quotes a *Newsweek* article from the January 28, 2002 edition: "The key to the Enron mess is that the company was allowed to give misleading financial information to the world for years." Lead Plaintiff concludes that "the scheme to defraud Enron investors was extraordinary in its scope, duration and size," that it "was accomplished over a multi-year period through numerous manipulative devices and contrivances and misrepresentations to investors," and that it "was designed and/or perpetrated only via the active and knowing involvement of Enron's general counsel, Vinson & Elkins, the law firm for the LHM2 entity and its SPEs, Kirkland & Ellis, Enron's accounting firm, Arthur Andersen, and Enron's banks, including JP Morgan, CitiGroup, CS First

Boston, Merrill Lynch, Deutsche Bank, Barclays, Lehman Brothers and Bank America." Consolidated complaint at 45.

The Consolidated Complaint at 328–39 lists the offering documents and describes the kinds of allegedly false and misleading statements in Enron's offering documents for securities offerings from July 7, 1998 through July 18, 2001, which incorporated by reference prior Enron Form 10–Ks and 10–Qs, and which also misstated or misled the public about material matters and failed to disclose the fraudulent activity described above and its resulting deceptive version of Enron's financial status and results. These acts included Enron's deliberate failure to consolidate non-qualifying SPEs, straw transactions with banks, bogus hedging transactions leveraging Enron's own stock equity as credit support, misleading the public about Enron's financial risk management and credit risk, and false statements about its failing nascent businesses that were more conceptual than real, including EBS, EIN, and EBOS.

**B. Defendant–Specific Allegations**

**1. The Banks**
Lead Plaintiff alleges that the banks participated in the Ponzi scheme for personal enrichment and for continuing business generating spectacular fees (such as the "long gravy train" of lucrative underwriting of Enron stock and bond offerings). Moreover, according to the complaint, once they were involved, their continued participation was also to limit their exposure to risk, salvage their financial investments, and save their reputations.

The charges against the banks are a blend of repetitive, conclusory, cookie-cutter contentions and of assertions that are unique or limited to only a few Defendants. **\*638** In the former group, the consolidated complaint alleges that the banks structured and/or financed the partnerships and non-qualifying SPEs secretly controlled by Enron and advanced these illicit entities funds at key times to allow them and Enron to complete bogus transactions just before year- or quarter-end in order to create fake profits and to conceal billions of dollars of Enron debt that should have been reported on its balance sheet. Aware of Enron's financial fragility, the banks further made loans to Enron to insure its liquidity and continuing operations, while simultaneously aiding Enron in selling securities to public investors so that Enron could continue to pay down its short-term commercial paper and bank debt and keep the fraudulent Ponzi scheme afloat. The banks were central players in inflating and

supporting the price of Enron stock through issuance of glowing research reports with misleading information about Enron.

JP Morgan, CitiGroup, and Credit Suisse First Boston also concealed billions of dollars in loans to Enron that were disguised as sales transactions. In return for their participation in the Ponzi scheme, the banks and/or their top executives were rewarded in part with the opportunity to invest in the LJM2 partnership, with expectations of exorbitant returns because Enron officials were wearing the hats on both sides of its transactions, a conflict of interest constituting "blatant self-dealing" that was made explicit in the private offering memorandum inviting the banks and bank officers' investment. As discussed *supra,* the bank and banker Defendants knew that for Enron to avoid a very bad fourth quarter and 1999 year-end report, LJM2 had to be formed before the end of 1999 for Enron to create illusory profit and hide debt. Because Merrill Lynch was unable to raise the necessary funds from outside, J.P. Morgan, CIBC, CitiGroup, Deutsche Bank, Credit Suisse First Boston, Lehman Brothers and Merrill Lynch (the underwriter of LJM2), [76] aware of the fact that Enron officers would improperly control both sides of its transactions and thus insure high returns, on December 22, 1999 put up virtually 100% of the funds (far more than their allocated shares) needed to fund LJM2, with JP Morgan additionally providing a loan of $65 million. This infusion of cash enabled Enron to engage in the deals involving Whitewing, CLO, Nowa Sarzyna Power Plan, MEGS natural gas and Yosemite certificates to create phony profits and conceal debt before the year's end. They also benefitted from the distributions from the Raptor SPEs to LJM2, generated by illicit transactions between Enron and the Raptors used to falsify Enron's financial results. Furthermore the banks enjoyed enormous financial benefits from participating in the scheme in the form of interest and underwriting, consulting, and advisory fees, which by inference caused them to act contrary to their profession's principles and requirements.

The complaint asserts that the banks as lenders had to have detailed information about the actual financial condition of Enron throughout the Class Period and had to know that its financial condition was far worse than Enron was publicly disclosing. Banks are required not only by their individual internal procedures, but by the governmental regulation and oversight to perform an extensive credit analysis of any applicant for a commercial loan or credit facility and retain documentation in their files. Such an analysis must include the borrower's actual and contingent liabilities, **\*639** its

liquidity position, any equity issuance obligations with the potential of adversely affecting its shareholders' equity, any potential debt even if it is not directly on the borrower's books, the quality of the borrower's earnings, and its actual liquidity, including sources of funds to repay any loans. For large loans for commitments to credit facilities for a corporation, the bank had to monitor the company closely, frequently review its financial condition and ongoing operations for material changes, and require the borrower's top financial officers to keep the bank informed of the borrower's current business and financial condition.

The complaint further asserts that in addition to knowledge about the nature and purpose of LJM2, the bank Defendants knew that Chewco was engaging in the same kind of non-arm's-length transactions with Enron for the same purpose. Lead Plaintiff also claims that the banks knew about Enron's actual precarious financial position and false public disclosure because Enron was falsifying its financial results, was manipulating mark-to-market accounting, was utilizing illicit entities that it secretly controlled to move debt off its own balance sheets, and was involved in transactions, which Enron supported with its own stock and which would require Enron to issues millions of shares of common stock if the price of its stock dropped below a specified trigger price so as to make the debt of the SPEs become recourse to Enron.

### a. JP Morgan Chase & Co.

JP Morgan, an integrated financial services institution that, through its subsidiaries and divisions (J.P. Morgan Securities and Chase Securities, collectively, "JP Morgan"), is sued under § 10(b) and § 11 of the federal statutes and under the TexasSecuritiesAct. According to the complaint, JP Morgan provided commercial and investment banking services and advisory services, including acting as an underwriter in the sale of Enron securities and issuing investment analyses and opinions about Enron.

The complaint alleges that JP Morgan helped to structure or finance one or more of Enron's illicit partnerships or SPEs, including LJM2, and to falsify its financial statements, misrepresenting Enron's financial condition by hiding almost $4 billion in debt that should have been on Enron's balance sheet. Concurrently JP Morgan's analysts issued rosy, false and misleading reports on Enron. JP Morgan was a main bank lender to LJM2 and provided more than a $65 million credit line to that partnership. That money enabled LJM2 to form and finance several SPEs including the Raptors, which Enron in turn used in manipulative devices and transactions

to inflate its reported profits and conceal debt by moving it off its balance sheet into the SPEs. As a reward for JP Morgan's participation, top executives in JP Morgan were given the opportunity to invest and did invest at least $25 million in the lucrative LJM2. Lead Plaintiff pleads that during the Class Period top officials of the bank constantly interacted on an almost daily basis with Enron's top executives, i.e., Lay, Skilling, Causey, McMahon, and Fastow, with whom it discussed all aspects of Enron's business. JP Morgan's specific involvement in the fraudulent course of conduct and business included loans of over $4 billion to Enron during the Class Period, helping to structure and finance certain of the illicit SPEs and partnerships controlled by Enron to serve as vehicles for false reporting of its financial results, and engaging in transactions with Enron to disguise loans to Enron and to falsify for public perception Enron's financial condition, liquidity, and creditworthiness.

The complaint charges that JP Morgan acted as a consolidated, unified entity without **\*640** "Chinese walls" to seal off from its securities analysts information garnered by its commercial and investment banking service section.[77] Even if restrictions were imposed on the flow of such information, the complaint alternatively asserts that the Chinese was inadequate and therefore the knowledge and scienter of JP Morgan's commercial and investment entity should be imputed to its analysts.

The complaint at 349–50 lists five Enron offerings (two within the Class Period), for which the bank acted as underwriter or reseller of billions of dollars of Enron securities, two (both within the Class Period) of other Enron-related securities, and six instances (three within the Class Period) where it served as lender on Enron's main credit facilities, while helping to syndicate over $4 billion in loans to Enron and related entities. Two of the loans, a $1 billion and $3 billion commercial paper back up of credit facilities, permitted Enron to remain liquid and maintain access to the commercial paper market so that it could borrow billions to finance its day-to-day operations, for which JP Morgan received huge commitment fees. JP Morgan also arranged about $1.5 billion (lending part of the money and syndicating the rest) so that Enron could finance the illicit Sequoia, Choctaw, Cherokee and Cheyenne SPE/partnerships and the JEDI partnerships to move debt off Enron's balance sheet and improperly recognize millions in illusory profits. Not only did JP Morgan receive enormous fees and interest payments for the loans and syndication services, but it was also limiting its own risk of exposure[78] by working to maintain for Enron

an investment-grade credit rating, credible strong forecasts of revenue and profit growth, and access to the capital markets to raise fresh capital from public investors so that Enron could continue to repay or reduce its commercial paper debt and loans, including those from JP Morgan.

The complaint further charges that JP Morgan as a lead underwriter made false statements in Registration Statements and Prospectuses, including interim and financial statements as well as statements regarding Enron's relationship to SPEs and related parties and the value and condition of its business operations and assets. JP Morgan is allegedly liable for its participation in Enron's February 1999, 27.6–million–share stock offering, and its resale of Enron zero coupon convertible notes on and after July 18, 2001.

Lead Plaintiff also alleges that JP Morgan analysts' reports (including those dated 6/9/99, 7/15/99, 9/23/99, 11/26/99, 1/21/00, 2/9/00, 5/3/00, 5/15/00/ 7/3/00, 7/19/00, **\*641** 9/15/00, 9/29/00, 3/13/01, 3/23/01, 5/18/01, 6/15/01, 7/10/01, 7/21/01, 8/15/01, 8/17/01, 10/17/01, 10/20/01, 10/23/01, and 11/2/01) contained false and misleading statements to the securities markets about Enron's business, finances, and financial condition and prospects and thereby helped to artificially inflate the value of Enron's publicly traded securities. JP Morgan knew that if the value of the stock fell below the various "trigger" prices, Enron would have to issue millions of additional shares of stock, thus reducing shareholder equity by hundreds of millions, if not billions, of dollars and endangering its investment-grade rating and access to capital markets, a threat to the alleged ongoing Ponzi scheme feeding profits and repayments to JP Morgan and its partners.

JP Morgan also purportedly participated in the scheme to finance or otherwise involve itself in manipulative devices and illicit transactions that would enable Enron to continue to falsify its financial condition. Specifically, as detailed previously, JP Morgan and Enron engaged in fraudulent transactions involving over $5 billion, structured to appear to be natural gas futures contracts, or commodity trades, between Enron and Mahonia, Ltd., an entity secretly controlled by JP Morgan. In fact the transactions were disguised loans from JP Morgan to Enron to appear to boost its liquidity since Enron booked them as revenue while concealing over $3.9 billion in debt that should have been recorded on Enron's balance sheet. Because JP Morgan knew these transactions were manipulative devices and contrivances and because it knew that Enron's financial condition was precarious and the company might default, JP Morgan insured the "contracts" to protect itself from loss. After Enron filed for bankruptcy and JP Morgan filed claims with the insurance carriers that had issued surety bonds for the purported commodities trades between Enron and JP Morgan-controlled entities, the carriers refused to pay on the grounds that the trades were fraudulent and were in reality a series of loans from JP Morgan to Enron. The complaint points out that the Mahonia transactions were also frequently timed to occur just before the end of a quarter or of a year reporting periods.

The complaint also reiterates that in November 2001, desperate to arrange the sale of the failing Enron to Dynegy the Chairman of JP Morgan and Vice Chairman of CitiGroup called Moody's to pressure it to keep Enron's investment grade credit rating in place.

As a similar instance of JP Morgan's and Citigroup's practice of keeping the alleged Ponzi scheme operational, the complaint points to another lawsuit *Unicredito Italiano v. JPMorgan Chase Bank and CitiGroup.* In that suit [79] the plaintiff, an Italian bank, has claimed that JP Morgan and CitiGroup had represented to Unicredito that there had been no changes in Enron's financial condition as of 10/25/01. Unicredito relied on that representation and, to its detriment, funded a $22 million credit facility for Enron.

As evidence that JP Morgan's conduct was intentional and a regular course of business used to defraud, the complaint states that JP Morgan used the same contrivance in previous years with Sumitomo Trading Company, employing ostensible trading on copper futures to disguise what were actually loans. [80] The complaint asserts **\*642** that it was JP Morgan that suggested to Enron the idea of using disguised commodity trades to hide Enron's debt, while Enron provided JP Morgan with profits through excessive interest rates and fees for its services in putting together the sham Mahonia transactions.

Lead Plaintiff also claims that JP Morgan knew that Enron was falsifying its publicly reported financial results and situation because, as Enron's lead lending bank, JP Morgan had access to Enron's internal business and financial information and because it intimately interacted on a nearly daily basis with Enron's top executives (Lay, Skilling, Causey, McMahon and Fastow).

**b. CitiGroup**

Citigroup, sued under § 10(b) of the Exchange Act, is a large integrated financial services institution. Through its subsidiaries and divisions, including Salomon Smith Barney (collectively, "Citigroup"), Citigroup provided commercial and investment banking services, commercial loans, and advisory services regarding the structuring of financial transactions, including those at issue relating to derivatives and hedging. CitiGroup also acted as an underwriter in the sale of securities to the public and provided investment analysis and opinions through reports by its securities analysts.

The complaint asserts that like JP Morgan, CitiGroup enjoyed huge underwriting, advisory and transactional fees, interest, **\*643** and commitment charges, and that some of its executives were given the opportunity to invest and did invest $15 million in LJM2 for lucrative returns. Its senior executives also allegedly interacted nearly daily with top executives at Enron, discussing its business in detail. It participated in the fraudulent course of conduct and business through loans to Enron of over $4 billion during the Class Period, helping Enron raise over $2 billion from the investing public through the sale of securities during the Class Period; it helped to structure and finance one or more of the illicit partnerships or SPEs that Enron used to inflate its earnings and conceal its debt; and it engaged in disguised loans to Enron that allowed Enron to falsify its financial situation.

Lead Plaintiff also claims that CitiGroup functioned as a unified entity and there was no "Chinese wall" to seal its analysts from information collected by CitiGroup's commercial and banking services, or if there were restraints, they were inadequate and therefore all knowledge and scienter possessed by the CitiGroup commercial and investment entity should be imputed to its securities analysts.

The complaint at 358 lists fifteen instances (four within the Class Period) when CitiGroup served as an underwriter for Enron securities, and one within the Class Period for Enron-related (Yosemite) securities. CitiGroup also was lead underwriter in the sale of 27.6 million shares of New Power stock in its IPO at $21 per share by means of an allegedly false and misleading prospectus. The complaint asserts that CitiGroup, by deceiving the public and creating a market for these shares, knowingly enabled Enron, using a bogus, non-arm's-length transaction with an SPE controlled by LJM2, to report a $370 million, fourth-quarter 2000 profit by claiming a gain in value on the 13.6 million shares and 42.1 million warrants of New Power that Enron continued

to hold. Furthermore during the Class Period CitiGroup was one of Enron's principal lending banks, acting with JP Morgan as lead bank on Enron's main credit facilities, loaning hundreds of millions of dollars to Enron, and participating in syndicating over $4 billion in bank loans to Enron. CitiGroup was involved in a 6/01 loan of over $600 million to the disastrous Indian Dabhol power project, a 7/01 $582 million loan to Enron, an 8/01 $3 billion transaction for an Enron credit facility to back up commercial paper, an 11/01 $1 billion secured loan to Enron, and a 5/98 $500 million loan to JEDI.

According to the complaint, because CitiGroup knew that Enron's financial position was far more unstable than it was disclosing to the public and that Enron was falsifying its financial position and results, in an unusual procedure, purportedly the largest hedge of its kind ever, CitiGroup created securities issued from 8/00 to 5/01 that functioned as insurance policies for its own potential credit exposure of $1.4 billion to Enron. CitiGroup set up paper companies in the Channel Islands, the first in 8/00 and three more in 5/01, that offered highly rated five-year, credit-linked notes, i.e., notes linked to Enron's credit status, to investors. The arrangement was that if all went well, CitiGroup would return investors' principal when the five years had elapsed. Should Enron end up in bankruptcy, however, CitiGroup would stop paying the premium return to investors, take possession of the high-quality securities and keep the investors' principal, and give the investors Enron's worthless or impaired unsecured debt.

The complaint asserts that CitiGroup enjoyed and would continue to enjoy enormous profits, fees, interest payments for loans and syndication services as long as the Enron scheme continued in operation. **\*644** As long as Enron retained its investment-grade credit rating and continued to report (though not actually have) strong current financial results with credible forecasts of future revenue and profit growth, Enron's access to capital markets would permit it regularly to raise enormous sums of money, fresh capital, from public investors that Enron could then use to repay its existing commercial and bank indebtedness, including that to CitiGroup.

The complaint alleges that CitiGroup helped to finance or participated in illicit transactions with Enron that CitiGroup knew would contribute materially to Enron's ability to continue to falsify its financial conditions and keep the Ponzi operational. From late 1999 until 2001, CitiGroup lent

Enron $2.1 billion in a series of manipulative devices and transactions, i.e., the Delta pre-paid swaps discussed earlier.

CitiGroup purportedly also made false and misleading statements in the Registration Statements and Prospectuses for Enron securities sales for which it was an underwriter, including false interim and annual financial statements and statements regarding the structure of and Enron's relationship to SPEs and related parties. The complaint asserts that CitiGroup is liable for its participation as lead underwriter in the resale of the Enron zero coupon convertible notes on or after 7/18/01. [81]

Lead Plaintiff further complains that CitiGroup issued numerous analysts' reports on Enron that contained false and misleading statements about Enron's financial condition, including those dated 10/22/98, 1/27/99, 5/25/99, 7/20/99, 8/20/99, 9/20/99, 10/20/99, 4/12/00, 9/21/00, 3/12/01, 3/22/01, 5/18/01, 6/7/01, 7/13/01, 10/16/01, and 10/19/01, all serving to artificially inflate the price of Enron's publicly traded securities.

The complaint also charges CitiGroup with active participation in structuring and financing LJM2 and notes that CitiGroup's top executives were rewarded with the opportunity to invest about $13 million in that vehicle. These executives invested their money early, around 12/22/99, to enable LJM2 to fund four SPEs to effect deals with Enron before year end to create huge profits so that Enron could meet its '99 profit forecasts.

The complaint references the last-minute effort to arrange the "salvation merger" with Dynegy in October–November 2001, for which CitiGroup was paid a fee of $45 million.

### c. Credit Suisse First Boston

Credit Suisse, which provided both commercial banking and investment banking services to Enron, is sued under § 10(b) of the 1934 Act and Rule 10b–5. According to the complaint, this financial services enterprise received huge fees, interest and commitment charges from Enron, and its executives were rewarded by the opportunity to invest and did invest at least $22.5 million in LJM2.

The complaint states that Credit Suisse First Boston helped structure and finance several of Enron's illicit partnerships or SPEs and helped Enron to falsify its financial statements and misrepresent its financial condition, while Credit Suisse

First Boston's securities analysts continued to issue rosy reports about Enron's business success and positive prospects for strong revenue and earnings growth in the future. Its top executives also regularly interacted with Enron's top executives during the Class Period and discussed Enron's business **\*645** and financial situation in detail. Credit Suisse First Boston participated in over $4 billion of loans and in syndicating loans to Enron [82] and helped Enron raise over $3 billion from the investing public through sales of new securities during the Class Period. The complaint charges that Credit Suisse First Boston also had no "Chinese Wall" to preclude information from its commercial and investment banking services to Enron flowing to its securities analysts, or, if there were restraints, they were inadequate to preclude imputation of all knowledge and scienter by one section to the other.

Credit Suisse First Boston served as underwriter for nine sales (three during the Class Period) of Enron securities. Complaint at 365. Furthermore it was lead underwriter in the New Power IPO on 10/4/00, selling 27.6 million shares at $21, and bogus hedge transaction with an LJM2–controlled SPE, leading to Enron's recording of a $370 million profit on the gain in value of the New Power shares and warrants that Enron continued to hold. It also acted as underwriter in the Azurix IPO, selling 38.5 million shares of Azurix stock at $19 per share. Enron sold 19.5 million shares of Azurix stock in the offering and received $370 million in new capital. Credit Suisse First Boston also acted as underwriter for other Enron-related securities, including $1 billion in notes for Osprey Trust/Osprey I Inc., $500 million 6.19% and 6.31% notes for Marlin Water Trust/Marlin Water Capital Corporation II, and $650 million in 10.375% and 10.75% senior notes for Azurix. It also served as an Enron advisor about the $2 billion sale of Portland General Electric and helped Enron dispose of its international asset portfolio in the second half of '01 for between $5–7 billion in assets. It further advised Enron on several other merger and acquisition transactions.

The complaint claims that Credit Suisse First Boston participated in the fraudulent Ponzi scheme for enormous profits through syndication and investment banking fees and interest payments and so that Enron would have continued access to capital from investors to pay off its commercial paper debt and loans from the banks, thus limiting Credit Suisse First Boston' own risk.

The complaint charges that Credit Suisse First Boston made false and misleading statements (including interim and annual

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

financial statements and statements about the structure and nature of Enron's relationship to SPEs and related parties) in the Registration Statements and Prospectuses for Enron securities sales where Credit Suisse First Boston was an underwriter. Credit Suisse First Boston was lead underwriter in a February 1999 sale of 27.6 million shares of Enron stock at $31.34 each and the resale of Enron zero coupon convertible notes on or after July 18, 2001. It also issued analysts' reports containing false and misleading statements, including those dated 7/6/99, 7/13/99, 9/2/99, 9/22/99, 10/12/99, 11/30/99, 1/18/00, 1/21/00, 2/28/00, 4/13/00, 10/18/00, 2/20/01, 4/17/01, 8/14/01, 8/17/01, 10/19/01, and 10/23/01, directed at the investing public to keep Enron's stock price inflated.

In addition to the bank's own false and misleading statements, the complaint asserts, Credit Suisse First Boston participated in the fraudulent scheme by financing or otherwise becoming involved in illicit transactions with Enron that would materially support Enron's ability to continue to misrepresent its financial conditions and support the Ponzi scheme. **\*646** Like JP Morgan and CitiGroup, Credit Suisse First Boston made disguised loans to Enron to hide Enron's actual credit situation, liquidity, and debt levels. Initially it lent Enron money using trades in derivatives: in 2000, it gave Enron $150 million, to be repaid over two years by payments that varied with the price of oil. Although the deal was characterized as a swap and misrepresented on Enron's books, Credit Suisse First Boston, through spokesman Pen Pendleton, admitted that it paid Enron up front so that it was in essence "a floating-rate loan."

Credit Suisse First Boston, through a group of ten of its bankers headed by Lawrence Nath, also created some of the illicit SPEs, a process dubbed "structured products," including Marlin, Firefly, Mariner, Osprey, Whitewing, and the Raptors. Moreover Credit Suisse First Boston helped Enron sell assets at inflated prices to these entities, even though Enron could never have sold them at such prices in arm's-length transactions for profit, and thereby created sham profits and concealed massive debt. Lead Plaintiff alleges that Laurence Nath and Credit Suisse First Boston worked closely with Vinson & Elkins and Arthur Andersen to create and document these SPEs and transactions. When an asset was sold to one of the SPEs as a quick-fix solution to remove that asset from Enron's balance sheet, it was referred to as "monetising" the asset. Laurence Nath would go to Houston for a week or two, meet with a group from Enron's treasury and global finance departments ("Fastow's field marshals"),

including Jeff McMahon or Ben Glisan (successive treasurers of Enron), and create a solution in order to doctor the Enron books. According to the complaint, most of the vehicles created in this manner by Nath shared the same unusual feature: the SPEs held Enron stock to reassure lenders and secure an investment grade rating, but there were set "trigger points," or prices between $83–$19 per share, at which the stock's declining value would require Enron to put more shares into the entity or even force liquidation if Enron's credit rating was downgraded. At that point the debt of the SPEs became recourse to Enron. A knowledgeable banker stated, "Taken in combination, these partnerships clearly posed a material risk for the company." Complaint at 369. An Enron insider remarked, "There's no question that senior people at CSFB knew what was going on and that it was a house of cards." *Id.* One individual who attended stated that the triggers were discussed by senior Enron executives and Credit Suisse First Boston bankers at a meeting in July 2001, when Enron's stock had fallen into the $40s. It was reported that the bankers remarked, "If this thing hits the $20s, you better run for the hills," and "There was no question that they knew exactly what lay inside the structures, when the triggers went off—everything. You could almost say they knew more about the company than people in Enron did." *Id.* at 369–70.

As another indication that the bankers had knowledge about the nature and extent of Enron's off-balance sheet exposure was the discussion during a meeting in June 2001 between an Enron manager and two Credit Suisse First Boston managing directors, described on pages 147–48 of this memorandum and order.

The complaint asserts that Credit Suisse First Boston also helped to structure and finance LJM2 and that some of its senior executives invested $22.5 million in equity money into it by using DLJ Fund Investing Trust Partners and Merchant Capital. They invested the money early enough in December 1999 to allow LJM2 to fund four SPEs for timely deals with Enron to create huge end-of-'99 profits so Enron could meet Wall Street forecasts. Credit Suisse **\*647** First Boston additionally provided LJM2 with a credit line of more than $120 million to engage in such transactions to falsify its financial results for the year.

The complaint states that Credit Suisse First Boston knew that Enron was falsifying its publicly reported financial results and that its financial position was more endangered than the public knew because, as Enron's lead lending bank, it had unlimited access to Enron's internal business and financial

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

information and because it enjoyed intimate interaction with Enron's top officials almost daily.

### d. CIBC

CIBC is sued under both the 1933 and the 1934 Acts. The complaint alleges that CIBC, which provided commercial and investment banking services to Enron, also helped structure and/or finance one or more of the illicit partnerships or SPES, [83] helped Enron falsify its financial statements and misrepresent its financial condition at the same time that CIBC analysts were providing rosy reports about Enron's business success, strong financial condition, and prospects for strong revenue and earnings growth. Its top executives also allegedly met nearly daily with top officials at Enron to discuss Enron's business picture. The complaint alleges that there was no "Chinese wall" to seal off information known by its commercial banking and investment services from its securities analysts, or that any such restraint was ineffectual, so that the knowledge and scienter of one area should be imputed to the other. Like the others, CIBC involved itself in the alleged Ponzi scheme because of the enormous profits it generated for CIBC, including huge fees and interest payments for millions of dollars of loans and syndication services, as long as the participants could keep the scheme operating and Enron's access to capital markets open so that Enron could raise additional fresh capital from investors through offerings underwritten in part by CIBC to repay or reduce its commercial debt and loans, including CIBC's.

CIBC purportedly joined in and furthered Enron's fraudulent conduct and course of business through various acts. First, it participated in loans of over $3 billion to Enron during the Class Period. It also raised over $3 billion for Enron or the entities Enron controlled from the investing public through sales of securities during the Class Period. Specifically, CIBC acted as an underwriter on six offerings, two during the Class Period, listed in the complaint at page 372. In addition it acted as one of Enron's principal commercial lending banks. *Id.* [84] Moreover, in July 2001, CIBC acted as an underwriter for some Enron-related securities, specifically $1 billion, 6.31% and 6.19% Marlin Water Trust II and Marlin Water Capital Corporation II notes. Furthermore, CIBC, along with Credit Suisse First Boston and CitiGroup, was a lead underwriter in the New Power IPO on October 4, 2000, which sold 27.6 million shares at $21. By creating a trading market and a purported value for New Power stock, CIBC enabled Enron to report enormous profit on the gain in value of the 80 million shares that Enron continued to hold through a

sham hedge transaction with an LJM2–controlled **\*648** SPE, effected by Vinson & Elkins, Arthur Andersen, CIBC, and Enron, together. See previous discussion at 130–31 of this memorandum and order.

Where it acted as an underwriter, CIBC allegedly made false and misleading statements in the Registration Statements and Prospectuses. Lead Plaintiff asserts that CIBC is liable under § 11 in particular for its participation in May 1999 in an offer of $500 million, 7–and–3/4% Enron notes. [85]

Furthermore, throughout the class period, CIBC analysts issued reports with false and misleading statements to the securities market about Enron's business, including those dated 7/15/98, 10/14/98, 1/25/99, 4/14/99, 7/14/99, 10/7/99, 10/13/99, 1/6/00, 1/18/00, 1/21/00, 4/12/00/ 10/19/00, 4/19/01, 8/15/01, and 10/17/01, which helped to artificially inflate the price of Enron's publicly traded securities.

In addition, according to the complaint, CIBC and Enron engaged in fraudulent transactions using an entity controlled by the two known as "Project Braveheart," discussed at page 128 n. 63 of this memorandum and order, to improperly report more than $110 million in sham profits in the fourth quarter of 2000 and the first quarter of 2001, relating to Enron's VOD joint venture with Blockbuster. Although Enron and CIBC made glowing statements about the joint venture after it was first announced in July 2000, the complaint asserts that Enron and CIBC knew the joint venture was risky and plagued by technical and legal problems that made it unlikely that it would ever, or at least for a long time, advance beyond a pilot project stage. Nevertheless CIBC and Enron worked together so that Enron could employ mark-to-market accounting to the project to improperly accelerate and record over $110 million in desperately needed profit for Enron from the Blockbuster joint venture in year-end 2000 and first quarter of 2001 to conceal Enron's actual financial condition.

Specifically, on December 28, 2000, CIBC and Enron formed a partnership, EBS Content Systems LLC, known as "Project Braveheart." They immediately assigned an arbitrary and unrealistic value of $124 million to the partnership, and CIBC agreed to invest, not loan, $115 million in it in return for a large up-front fee and the right to receive 93% of Enron's profits from the VOD joint venture over the next 20 years. This investment enabled Enron to recognize over $110 million in fraudulent profits for what was actually no more than a failing pilot project, in the fourth quarter of 2000 and the first quarter of 2001. [86] Moreover because the

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

**\*649** CIBC–Enron project was a sham, CIBC demanded and got Enron to secretly guarantee repayment of CIBC's investment in Braveheart on the event of failure, so that CIBC was not a true investor nor at risk. Moreover, to create the appearance of a legitimate SPE with a 3% outside equity investor participation, CIBC and Enron got a company known as nCUBE, a contractor for Enron on the VOD project, to invest $2 million in Braveheart at year-end 2000, but CIBC and Enron secretly promised to return the $2 million right after the year end. As noted, not only was the financing phony, but the entire VOD partnership was an illusion because Enron did not have workable technology to deliver the content over its fiber optic network, as evidenced by its failure in a test of the system in late 2000, and Blockbuster did not have the legal right, nor could it obtain that legal right, to provide the VOD venture content (movies) in digital form. Although Enron abandoned the VOD venture in February 2001, only eight months after it was commenced, significantly Enron did not reverse the more than $110 million in sham profits that it had recorded from the project. Furthermore, because CIBC knew that Enron was unable to honor its secret guarantee to repay CIBC its $115 million investment in Braveheart, CIBC agreed to carry that amount for Enron until later on so that the alleged Ponzi scheme could continue.

### e. Merrill Lynch & Co.

Merrill Lynch, a financial services firm that provided investment banking services to Enron, is sued under § 10(b) and Rule 10b–5. According to the complaint it helped structure and finance one or more of Enron's illicit partnerships at the same time that its securities analysts were issuing very positive reports about Enron's financial circumstances. As with the other banks, Merrill Lynch's top executives had daily contact with Enron's, including Lay, Skilling, Causey, McMahon and Fastow, and they discussed Enron's business and financial condition, plans, needs, partnerships, SPEs, and future prospects in detail. Furthermore, the wife of Schyler Tilney, head of Merrill Lynch's Energy Investment banking operation, was an Enron Managing Director, involved in Enron's EES operations, thereby providing Schyler Tilney with unique access to information about the serious problems affecting EES operations. Merrill Lynch allegedly furthered Enron's fraudulent course of conduct and business by helping to raise billions of dollars from investors through the sale of new securities during the Class Period, as well as aiding in structuring and financing some of Enron's illicit SPEs and partnerships, the primary vehicle used by Enron to falsify its reported financial results. The complaint asserts that Merrill

Lynch also functioned as a consolidated and unified entity without effective Chinese walls to keep its securities analysts from information obtained by Merrill Lynch's commercial and investment banking services, so that all knowledge and scienter possessed by the entity should be imputed to the analysts.

Merrill Lynch served as lead underwriter for Enron on a number of public offerings. **\*650** The complaint at 381 lists six, two of which occurred in the Class Period. Moreover, its relationship with Enron was of such wide scope that Merrill Lynch underwrote the sale of about one third of Enron's outstanding bond issues.

Merrill Lynch helped Enron structure Azurix, Enron's would-be global water company. The complaint asserts that Merrill Lynch knew that Enron's main reason for purchasing Wessex Water for $2.3 billion to create Azurix and take it public was to compensate Rebecca Mark–Jusbasche after she lost out in a power struggle with Jeffrey Skilling to become Enron's CEO. Merrill Lynch was fully aware that the price Enron paid for Wessex Water was more than excessive, that the purchase was made without a detailed feasibility study or carefully designed business plan, and that Enron's worldwide water business was unlikely to succeed. In February 2000 Merrill Lynch acted as a lead underwriter for the Azurix IPO of 38.5 million shares at $19 per share, which brought in $370 million of needed capital for Enron. Later it was lead underwriter of over $650 million of 10.375% and 10.75% Azurix senior notes, raising millions for the water company.

Merrill Lynch allegedly participated in creating LJM2, which was an essential part of the Ponzi scheme, with full awareness that Enron officials would be operating on both sides of the transactions, virtually insuring certain enormous profits for its investing partners. Merrill Lynch's placement memorandum made clear that Enron would be the "source" of most, if not all, the deals to be done by LJM2, that Fastow, Kopper and Glisan would run the deals, and that LJM2 would benefit from investment opportunities that "would not be available otherwise to outside investors." See discussion on pages 111–12 of this memorandum and order. Merrill Lynch also told potential investors in LJM2 that in an earlier similar partnership run by Fastow doing deals with Enron, i.e., JEDI, investors had tripled their money in two years. The complaint at 382 states that Merrill Lynch made a "blatant offer to the investors to profit from self-dealing transactions with Enron whereby the investors were virtually guaranteed to reap huge returns." Lead Plaintiff alleges that Merrill

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Lynch participated in the decision to allow favored banks or officers of those banks to invest in LJM2. Moreover, top Merrill Lynch executives, including Bayly, Tilney, and Vice Chairman Thomas Davis, invested almost $22 million in LJM2 in late 1999, early enough to give LJM2 cash to fund four SPEs to do deals with Enron at year-end '99 to create huge profits so that Enron could meet its '99 profit forecasts. In addition, Merrill Lynch placed the remaining LJM2 partnership units with highly favored clients of Merrill Lynch. All this time Merrill Lynch knew that LJM2 was not independent of Enron, that the partnership would be used for non-arm's-length transactions to boost Enron's reported profits while improperly keeping debt off its balance sheets on terms that could not have been acceptable to independent, unrelated third parties. Merrill Lynch also provided a $120 million line of credit to LJM2 to provide financing needed for LJM2 to engage in transactions with the illicit SPEs and Enron, so that the falsification of Enron's records could continue.

Lead Plaintiff alleges that Merrill Lynch's motivation to participate in the Ponzi scheme increased in 2000–01 when Merrill Lynch pocketed millions of dollars by writing hundreds of millions of dollars of "credit default puts" on Enron's publicly traded debt securities, especially Enron's zero coupon convertible notes. These "puts" required Merrill Lynch to pay Enron's publicly traded debt if Enron defaulted within a given time period, thus exposing Merrill Lynch potentially to enormous **\*651** losses. As long as Merrill Lynch could keep Enron looking strong, Enron would continue to have access to the credit market to raise additional money that could be used to repay or reduce its commercial paper debt and loans.

As with the other banks, Merrill Lynch participated in the ongoing fraudulent scheme for continuing enormous profits, fees for services, and opportunities for its executives to gain personally from LJM2 investments.

Merrill Lynch also issued false and misleading statements in Registration Statements and Prospectuses for securities sales for which it was one of the lead underwriters, in particular the offering of 27.6 million shares of Enron stock at $31.34 in February 1999.

Furthermore, to help artificially inflate the trading prices of Enron's publicly traded securities, because Merrill Lynch knew that Enron would have to issue substantial additional shares of stock if the price dropped below the various

trigger points in its capitalization of a number of Enron-controlled entities and that Enron's investment grade credit rating would be in danger, Merrill Lynch's securities analysts issued reports containing false and misleading statements to the securities markets about Enron's business, finances, financial condition, and future prospects, including reports dated 1/20/99, 3/31/99, 4/13/99, 4/15/99, 7/14/99, 10/12/99 (Donato Eassey, *Bloomberg* ), 10/12/99, 1/18/00, 1/24/00, 4/12/00, 4/13/00 (Donato Eassey, *Houston Chronicle* ), 10/17/00, and 10/9/01.

The complaint asserts that from the beginning of the Class Period Merrill Lynch knew that Enron was falsifying its financial results and that its financial condition was far more precarious than it was disclosing to the public because Merrill Lynch had access to Enron's internal business and financial information as one of Enron's main underwriters and financial advisors, as well as its daily interaction with Enron executives. [87]

### \*652 f. Barclays PLC

Barclays, a financial services institution, which is sued only under § 10(b), provided commercial banking and investment banking services to Enron, helped Enron structure and finance one or more of its illicit partnerships or SPEs, including the year-end deal in 1997 where Chewco was formed to purchase an outside investor's interest in JEDI. Barclay's senior executives interacted with Enron's on an almost daily basis during the Class Period and discussed the details of Enron's business and finances. Barclays allegedly knew that Enron was falsifying its financial results because of its unlimited access as one of Enron's lead lending banks, to Enron's internal business and financial information. Moreover, Barclays participated in the fraudulent course of conduct and business by participating in loans to Enron of over $3 billion during the Class Period, helped raise almost $2 billion from investors through the sale of new securities during the Class Period, and helped Enron structure and finance some of the illicit SPEs and partnerships controlled by Enron and used to falsify its reported financial results.

Along with CitiGroup, Deutsche Bank, JP Morgan, and Bank America, Barclays acted as a placement agent or reseller in a February 2001 public offering of $1.9 billion zero coupon convertible bonds. [88] It underwrote sales of Enron-related securities, including $240 million 8.75% Yosemite–Enron–linked obligations. It was also one of the principal commercial lending banks to Enron during the Class Period in more

than $3 billion of bank loans. For instance, Barclays was lead lender on a $2.3 billion debt facility to finance Enron's purchase of Wessex Water in 1998; it was co-arranger of a $250 million loan to Enron in November 1997; it participated in the September 1998, $1–billion credit facility for Enron and the August 2001, $3–billion debt facility, both used to back up Enron's commercial paper debt; it participated in a September 1998, $250–million revolving credit facility for Enron in November 1998; and it helped to arrange and participated in a $500–million credit facility for JEDI in May 1998.

As with the other bank Defendants, Barclays allegedly participated in the scheme to receive the huge investment banking fees, interest payments, and syndication fees. It viewed its risk as limited because as long as it and the other banks helped Enron maintain its investment-grade credit rating and reports of strong financial results and credible expectations of continuing revenue and profit growth, Enron would have access to the capital markets to raise additional money to continue to repay or reduce its commercial paper debt and loans, including its indebtedness to Barclays.

In addition to loans to Enron and entities associated with the SPEs secretly controlled by Enron, Barclays and Enron engaged **\*653** in fraudulent transactions using Chewco. See pages 106–110 of this memorandum and order. When the scheme finally collapsed and Enron was forced to restate its earlier financial results, the impact of Barclays' and Enron's illicit transactions with Chewco was tremendous.

**g. Lehman Brothers Holding Inc. is sued under both § 10(b) and § 11 and under the TexasSecuritiesAct.**

The complaint repeats many of the same general claims asserted against other banks against Lehman Brothers: during the Class Period Lehman Brothers provided Enron with commercial and investment banking services, helped to structure and finance one or more of Enron's illicit SPEs or partnerships, and helped Enron falsify its financial statements and misrepresent its financial condition while Lehman's analysts continued to issue very positive reports about the company. As a reward, top executives of Lehman's were invited to invest and did invest at least $10 million in the lucrative LJM2 partnership. Top officials from Lehman Brothers interacted on a daily basis with Enron executives and discussed Enron's business and finances in detail, and therefore Lehman knew that Enron was falsifying its publicly reported financial results and financial condition. Lehman

participated in the fraudulent scheme by helping Enron and its related entities to raise over $4 billion through the sale of securities to public investors, helped structure and finance some of the illicit partnerships and SPEs that served as Enron's main vehicles to falsify its reported financial results, and engaged in transactions with Enron to conceal loans to Enron and helped misrepresent its actual financial condition, liquidity and creditworthiness. According to the complaint, Lehman Brothers, too, functioned as a unified entity and had no effective Chinese wall to seal off its securities analysts from information known to its commercial and investment bankers. Lehman was motivated to participate in the Ponzi scheme for past and future enormous profits, huge investment banking and syndication fees, and interest payments that the scheme provided to Lehman. Lehman allegedly was limiting its risk because it knew that with the involvement of the other banks helping Enron to maintain its investment-grade credit rating and issuing continued reports of strong current financial results and credible forecasts of strong ongoing revenue and profit growth, Enron could continue to raise fresh capital from investors to pay off or reduce its commercial paper debt and loans, including those from Lehman.

More specifically, the complaint alleges that Lehman acted as an underwriter for billions of dollars of Enron securities. The complaint at 390 lists eight instances, four within the Class Period. It also lists two instances when Lehman served as an underwriter for billions of dollars of Enron-related securities: (1) in October 2000 for 27.6 million shares of New Power at $21 per share and (2) in July 2001 for $1 billion 6.375% and 7.79% Osprey Trust and Osprey I Inc. notes. The complaint asserts that Lehman is liable under § 11 for allegedly making false and misleading statements in the Registration Statements and Prospectuses for a May 1999, $500–million sale of 7–and–3/8% Enron notes and a May 2000, $500–million sale of Enron notes, for which Lehman served as an underwriter, including interim and annual financial statements and false statements about the structure and nature of Enron's relationships to the SPEs and partnerships, as well as the financial condition of Enron's business operations and assets.

The complaint further charges Lehman with liability for false and misleading statements by its analysts in reports to the securities markets, knowingly made to help artificially inflate the trading prices of **\*654** Enron's publicly traded securities so that the various trigger prices in Enron's deals would not be reached and the Ponzi scheme endangered. The Lehman analysts' reports included those issued on 12/9/98,

4/7/99, 5/7/99, 9/21/99, 10/1/99 (Ted. A. Izatt, Lehman Brothers Senior Vice President, quoted in *CFO Magazine* ), 1/21/00, 4/13/00, 10/18/00, 3/12/01, 4/18/01, 7/26/01, 8/14/01, 8/15/01, 8/17/01, 10/23/01, and 10/24/01.

### h. Bank America Corporation

Bank America, which is sued under § 10(b) and § 11, provided both commercial and investment banking services to Enron during the Class Period. The complaint generally asserts that it, too, helped to structure and finance one or more illicit partnerships or SPEs, and helped Enron falsify its financial statements and misrepresent its financial condition while Bank America's analysts issued glowing reports about Enron. In return Bank America received huge underwriting and consulting fees and other payments, while top officials of Bank America were allowed personally to invest and did invest at least $45 million in the LJM2 partnership. Bank America's top executives also interacted nearly daily with those of Enron and they discussed Enron's business and financial situation in detail throughout the Class Period. Thus Bank America knew that Enron was falsifying its financial situation, which in actuality was precarious. Bank America became involved in the fraudulent scheme by participating in loans of over $4 billion during the Class Period, helping to raise over $2 billion from the investing public through securities sales during the Class Period, helped structure and finance some of the illicit partnerships and SPEs that served as the primary vehicles for manipulating Enron's financial results, and engaged in transactions with Enron to disguise loans to Enron and thereby conceal its actual financial condition, liquidity and creditworthiness from the public. The complaint here, too, charges that Bank America acted as a unified entity without effective Chinese walls to preclude information from its commercial and investment banking services from reaching its securities analysts and thus all knowledge and scienter of the former should be imputed to Bank America as an entity. Like the others, Bank America was allegedly motivated to participate in the Ponzi scheme by past, and hope for continuing, enormous profits that the scheme generated for Bank America, including huge investment banking and syndication fees and interest payments. Bank America, too, believed that it was limiting its risk because it knew the other banks would be shoring up Enron, helping to maintain its investment-grade credit rating with reports of strong financial results and projections for continued strong revenue and profit growth so that Enron could continue to obtain fresh capital from sales of securities to the investing public and to use those monies to repay or reduce Enron's commercial paper and bank indebtedness, including indebtedness to Bank America.

More particularly, Bank America is allegedly liable under § 11 for false and misleading statements that it made in Registration Statements and Prospectuses for offerings where it served as lead underwriter, including a May 1999 sale of $500 million of 7.375% Enron notes, an August 1999 sale of $222 million of 7% Enron exchangeable notes, and a May 2000 sale of $500 million of 8.375% Enron notes.[89] **\*655** Furthermore, throughout the Class Period, Bank America's analysts issued reports to the securities markets containing false and misleading statements about Enron's business, finances, financial conditions, and prospects, including those dated 9/30/99, 10/12/99, 10/15/99, 12/16/99, 1/12/00, 1/18/00, 1/20/00, 4/17/00, 10/17/00, 8/15/01, 8/28/01, and 10/16/01. These false and misleading statements were intended to inflate the trading prices of Enron securities to avoid the trigger prices that would require Enron to issue additional shares of stock, substantially reduce shareholders' equity, and endanger Enron's credit rating, which in turn would adversely affect its ability to raise new capital by new sales of securities so that it could repay its indebtedness to the banks and would expose the Ponzi scheme from which all the banking defendants were profiting.

Bank America also is alleged to have helped structure and finance LJM2. Bank America's top executives, too, were given the opportunity to invest and did invest about $45 million in equity money to finance the LJM2 early enough in December 1999 to allow LJM2 to fund four other SPEs to manipulate year-end profits for Enron.

### i. Deutsche Bank AG

Lead Plaintiff sues Deutsche Bank only under §§ 10(b) and 20(a) of the 1934 Act and Rule 10b–5. The complaint alleges that Deutsche Bank provided Enron with commercial banking and investment banking services during the Class Period, helped structure or finance one or more of the illicit SPEs and partnerships, and helped Enron falsify its financial statements and misrepresent its financial condition as well as its prospects for strong earnings and revenue growth, even while Deutsche Bank's securities analysts[90] were issuing glowing reports about Enron. Deutsche Bank's top officials had detailed daily interchanges with Enron's executives about Enron's business and financial situation and knew that Enron was falsifying its financial reports. Deutsche Bank joined the fraudulent scheme and furthered it by participating in loans of

over $2 billion to Enron during the Class Period and helping to raise over $5 billion from the investing public through sales of securities. It also helped structure and finance some of the illicit partnerships and SPEs and engaged in transactions with Enron to disguise loans to Enron and help it falsify its actual financial condition, liquidity, and creditworthiness. The complaint also claims that Deutsche Bank functions as a unified entity without effective Chinese Walls or restraints to seal off from its securities analysts information obtained by its commercial and investment banking services and thus the latter's knowledge and scienter should be attributed to the bank as a whole. Deutsche Bank willingly joined the fraudulent scheme because of the enormous profits, huge commercial and investment banking fees, and interest payments, as well as syndicating fees that it received from that scheme. Deutsche Bank also helped Enron structure and finance LJM2. As a reward for Deutsche Bank's participation in the alleged Ponzi scheme, its top executives were permitted to invest at least $10 million in LJM2. The executives **\*656** made the investments early enough for LJM2 to fund four other SPEs to help manipulate Enron's year-end profit report. Deutsche Bank also allegedly believed it was limiting its risk because it knew the other banks participating in the scheme would help Enron maintain its investment-grade credit rating and report current strong financial revenue and provide credible forecasts of future performance to keep the Ponzi scheme afloat and maintain access to capital markets for fresh infusions of funds from investors to repay Enron's indebtedness, including to Deutsche Bank.

Specifically the complaint at 398 lists three instances that Deutsche Bank acted as an underwriter for billions of dollars of Enron securities, two of which (February 1999 for 27.6 million shares of Enron common stock at $31.34 per share; and February 2001 for $1.9 billion Enron zero coupon convertible notes) were within the Class Period. It lists two other times during the Class Period that Deutsche Bank acted as underwriter for the sale of Enron-related securities: July 2001, for $1 billion 6.31% and 6.19% Marlin Water Trust I and Marlin Water Capital Corporation II notes; and September 2000 for $1 billion of 6.375% and 7.797% Osprey Trust and Osprey I Inc. notes.

In addition Deutsche Bank served as underwriter for the Azurix IPO on June 9, 1999, selling 38.5 million shares at $19 each. In that offering Enron sold at least 19.5 million shares of Azurix stock to obtain $370 million in much needed capital.

Deutsche Bank also purportedly made false and misleading statements in Registration Statements and Prospectuses for sales of Enron securities where Deutsche Bank served as a lead underwriter. Specifically the complaint asserts that Deutsche Bank is liable for its participation in Enron's 27.6 million-share common stock offering in February 1999 and in the resale of the Enron zero coupon convertible notes on or after July 18, 2001.

Throughout the Class Period, Deutsche Bank's analysts issued reports containing false and misleading statements about Enron's financial picture to the securities market to artificially inflate Enron's stock price, including reports dated 1/13/99, 1/20/99. 4/13/99, 5/25/99, 1/28/00, 4/14/00, 5/26/00, 7/25/00, and 9/15/00.

As one of Enron's principal commercial lending banks during the Class Period, Deutsche Bank, along with CitiGroup, functioned as a lead bank on Enron's main credit facilities, loaning over a billion dollars to Enron while helping to syndicate over $4 billion in loans to Enron or related entities. The complaint lists four examples, including two in the Class period: In November 1998 a $582 million Enron credit line and in July 2001 a $650 million Enron credit line.

### 2. Law Firms

The consolidated complaint claims that Vinson & Elkins, Enron's outside general counsel during the Class Period, and Kirkland & Ellis participated in writing, reviewing, and approving Enron's SEC filings, shareholder reports and financial press releases, and in creating Chewco, JEDI, LJM1, LJM2, and nearly all the related SPEs' transactions. They knew that LJM2's principal purpose was to engage in transactions with Enron and that Enron insiders Fastow, Kopper and Glisan were operating on both sides of the transactions, to virtually insure lucrative returns for the entities' partners.

#### a. Vinson & Elkins L.L.P.

Enron was Vinson & Elkins' largest client, accounting for more than 7% of the firm's revenues. Over the years more than twenty Vinson & Elkins lawyers have left the firm and joined Enron's in-house legal department.

**\*657** The complaint recites a long history of alleged improprieties by Vinson & Elkins as part of the elaborate Ponzi scheme.

The complaint asserts that Vinson & Elkins participated in the negotiations for, prepared the transactions for, participated in the structuring of, and approved the illicit partnerships (Chewco/JEDI and the LJMs) and the SPEs (Raptors/Condor, etc.) with knowledge that they were manipulative devices, not independent third parties and not valid SPEs, designed to move debt off Enron's books, inflate its earnings, and falsify Enron's reported financial results and financial condition at crucial times. Vinson & Elkins repeatedly provided "true sale" [91] and other opinions that were false and were indispensable for the sham deals to close and the fraudulent scheme to continue. Vinson & Elkins also allegedly drafted and/or approved the adequacy of Enron's press releases, shareholder reports, and SEC filings, including Form 10Ks and Registration Statements that Vinson & Elkins knew were false and misleading. Vinson & Elkins also drafted the disclosures about the related party transactions, which it also knew were false and misleading because they concealed material facts. It also was involved in structuring and providing advice about the bogus commodity trades utilized by JP Morgan and Enron with the involvement of Mahonia. Moreover, the firm continually issued false opinions about the illegitimate business transactions, such as that they were "true sales." When the scheme began to collapse in August 2001 and Skilling resigned, whistle-blower Sherron Watkins [92] sent her August 9, 2001 memorandum **\*658** warning Kenneth Lay not to use Vinson & Elkins to handle an investigation of her voiced concerns about Enron's accounting practices because Vinson & Elkins had a conflict in that "they provided some 'true sale' opinions on some of the [Condor and Raptor] deals." Complaint at 402, 404. Despite Watkins's warning, Vinson & Elkins was called and allegedly conducted a whitewash investigation of what it knew were accurate allegations of fraudulent misconduct that also involved Vinson & Elkins. Vinson & Elkins received over $100 million in legal fees from Enron.

Specifically, the complaint asserts that Vinson & Elkins provided advice in structuring virtually every Enron off-balance sheet transaction and prepared the transaction documents, including opinions, for deals involving the following vehicles used to defraud investors and the securities markets: Azurix; Canvasback; CASHco.; Cayco; Condor; Cortez Energy; EES; Egret; Enron Brazil; Enron Broadband; Enron Global Power; Firefly; Iguana; JEDI; JEDI/Big River/ Little River; JEDI/Condor; JEDI/Osprey/Whitewing/Condor; JEDI/Whitewing; JEDI II; JEDI I/Ontario; LJM; LJM/ Condor/Raptor; LJM/Brazil Power Plant; LJM2; LJM2/ Chewco; LJM2/Raptors I, II, III, IV; Mahonia Ltd.; Marengo;

Marlin; Newco; Osprey; Red River; Sonoma; Sundance; Wessex; Whitewing; Yosemite; and Yukon. Vinson & Elkins allegedly had to know about and joined in the fraudulent Ponzi scheme because of its continuing, intimate involvement in the formation of and transactions with these blatantly fraudulent entities, created solely to cook Enron's books.

For instance, Lead Plaintiff points to Vinson & Elkins' involvement in the eleventh-hour formation of Chewco in late 1997 when JEDI's outside investor withdrew and JEDI had to be restructured or Enron would have to consolidate JEDI on its books, carry JEDI's debt on its balance sheet, and lose its ability in the future to continue to generate profits from an independent SPE. See pages 106–110 of this memorandum and order. Vinson & Elkins prepared the documents for Chewco's financing and falsified them to make it appear that Chewco was independent of Enron. Because the arrangement had to be completed by year's end, Vinson & Elkins with Kirkland & Ellis drafted a side agreement, dated December 30, 1997, providing for Enron to give the required $6.6 million in cash to fund Chewco by means of clandestine reserve accounts for Big River Funding and Little River Funding. Furthermore, to avoid disclosure of the arrangement, because making Fastow manager of Chewco would necessitate disclosing that interest in Enron's SEC filings and potentially expose the non-arm's-length nature of the whole transaction, Vinson & Elkins, with Fastow, arranged **\*659** for Michael Kopper to be the manager and thus conceal Enron's financial relationship with Chewco from Enron shareholders. Kopper allegedly objected that there was a conflict of interest because Kopper was also an Enron employee, but the two law firms disregarded his concern. Neither law firm insisted on disclosure of the arrangement in Enron's SEC filings even though the impropriety was obvious. Moreover, Enron continued to use Chewco/JEDI to generate sham profits from 1997 through 2001 in transactions that Vinson & Elkins participated in structuring and providing bogus "true sale" opinions to facilitate, all for the same purpose.

In another example, Vinson & Elkins issued opinions to Enron, Mahonia and JP Morgan stating that the forward sales contracts of natural gas and oil by Enron were legitimate commodities trades when it knew they were a sham, manipulative devices to disguise loans from JP Morgan to Enron so that it would not have to record approximately $3.9 billion of loans as debts on Enron's balance sheet. Physical delivery of the gas and oil was not required or even contemplated.

Similarly Vinson & Elkins participated in the creation of both LJM partnerships and knew the reason for their establishment, i.e., so that Enron could effectuate transactions that it could not otherwise do with an independent entity, such as purchasing Enron assets that Enron otherwise was unable to sell at prices it would never otherwise receive. As discussed previously, LJM2, formed at the critical end of 1999, pursuant to documentation prepared by Vinson & Elkins that allowed the banks to advance 100% of the money needed to fund the partnership in sufficient time to falsify the books for the reporting period. LJM2 was one of the primary manipulative devices to misrepresent Enron's financial results, was also secretly controlled by Enron, and was used to create a number of SPEs, including the Raptors, which in turn served to falsely inflate Enron's profits and conceal its debts. Usually Enron provided the bulk of the capital to set up the SPEs, which the SPEs would then pay to Enron, so that Enron was always at risk. Furthermore Fastow's dual role at Enron and LJM2, by which he could and did self-deal to enrich himself and the other favored investors in the lucrative partnership, rewarded various participants in the Ponzi scheme for their roles. Vinson & Elkins structured a number of critical year-end transactions involving LJM2, including the Collateralized Loan Obligations ("CLOs"), Nowa Sarzyna power plant, MEGS, LLC, and Yosemite.[93] *See* page 113 n. 53 and pages 120–21 n. 56 of this memorandum and order. Typically transactions were timed near the end of financial reporting periods to manipulate, falsify, and artificially inflate Enron's reported financial results while enriching the investors in LJM2. Enron frequently agreed in advance to, and did, buy back the assets after the close of the financial reporting period, always at a profit for the LJM partnerships even if the market value of the assets declined, or the corporation promised to protect the LJM partnerships against any loss. Other transactions that Vinson & Elkins participated in that served as contrivances and manipulative devices to circumvent accounting rules and misrepresent Enron's financial results included the sham hedging transactions involving **\*660** Rhythms stock and the Raptor SPEs that were funded principally with Enron's own stock to "hedge" against loss of value in Enron's merchant investments.

As the end of 2000 neared, two of the Raptor SPEs were in danger of unwinding. Vinson & Elkins and Enron then restructured and capitalized them by transferring even more Enron stock to them, only adding to the pressure to keep the price of Enron's stock artificially high. Again in March 2001, Vinson & Elkins restructured the Raptors by transferring

more than $800 million of contracts to receive Enron stock before the quarter end. That transfer insured that Enron would not have to take a pre-tax charge of more than $500 million against earnings, and so that it could conceal substantial losses in its merchant investments and remove millions of dollars of debt from its balance sheet, thus keeping the alleged Ponzi scheme afloat.

According to the complaint, Vinson & Elkins was also involved in the New Power transactions. Before the IPO it structured the deal which permitted Enron to take a large phony profit by utilizing LJM2. After the IPO, Vinson & Elkins created Hawaii 125–0, with which, Vinson & Elkins knew, CIBC and several other banks finagled a "total return swap" that guaranteed CIBC's loan of $125 million to the SPE. Disclosures in the following SEC filings, drafted and approved by Vinson & Elkins, concealed material facts about the JEDI/Chewco, LJM, and/or Raptor transactions:

A. Quarterly Reports (on Form 10–Q) filed on: 8/16/99; 11/15/99; 5/15/00; 8/14/00; 11/14/00; 5/15/01; and 8/14/01.

B. Annual Reports (on Form 10–K) filed on 3/31/98; 3/31/99; 3/30/00; and 4/02/01.

C. Annual Proxies filed on: 3/30/99; 5/02/00; 5/01/01.

D. Report on Form 8–K, filed 2/28/01.

Furthermore, Enron related-party disclosures from Enron's previous Report on Form 10–K and Report on Form 10–Q were incorporated by reference into the following Registration Statements and Prospectuses for Enron securities offerings: the resale of zero coupon convertible senior notes, due 2021, filed 7/25/01; 7.875% notes due 6/15/03, filed 6/2/00; 8.375% notes due 5/23/05, filed 5/19/00; 7% exchangeable notes due 7/31/02, filed 8/11/99; 7.375% notes due 5/15/2019, filed 5/20/99; common stock, filed 2/12/99; 6.95% notes due 7/15/2028, filed 11/30/98; and floating notes due 3/30/00, filed 9/28/98. The disclosures consistently misrepresented that terms of Enron's transactions with related third parties were representative of terms that could have been obtained from independent third parties. Both Sherron Watkins' letter and the Powers' Report[94] concluded that the transactions **\*661** were not arm's length, lacked true economic import, and were such that no independent third party would have accepted.

More specifically, the complaint states that in Enron's Reports on Form 10–K for year-end 1997–2000, Vinson & Elkins approved a description of JEDI as an unconsolidated affiliate only 50% owned by Enron. In its Report on Form 10–K filed 3/30/00, Vinson & Elkins drafted and approved the following disclosure: "At December 31, 1999 JEDI held approximately 12 million shares of Enron Corp. common stock. The value of the Enron Corp. common stock has been hedged. In addition, an officer of Enron has invested in the limited partner of JEDI and from time to time acts as agent on behalf of the limited partner's management." These purported disclosures were false and misleading because Chewco, which was not independent of Enron, was not capitalized with outside equity at risk, but was capitalized by JEDI and an Enron guaranty. Enron did not disclose that Chewco was a limited partner of JEDI until Enron announced its catastrophic restatement on 11/8/01. Nor was it disclosed that JEDI's transactions were not true commercial, economic transactions comparable to those of independent third-parties in arm's-length bargains.

The complaint speaks to Vinson & Elkins' alleged false and misleading disclosures about JEDI/Chewco. In March 2001, Enron paid Michael Kopper and his domestic partner, William Dodson, $35 million in a "purchase" of Chewco's limited partnership interest in JEDI so that Kopper could buy Fastow's interest in the LJM partnerships. The deceptive disclosure [95] about the buyout, drafted and approved by Vinson & Elkins for inclusion in Enron's reports on Form 10–Q filed on 5/15/01 and 8/14/01, never stated that it was a deal among some Enron officers, Kopper and Fastow or that it included the $2.6 million gift to Kopper and Dodson. Moreover, the buyout was erroneously characterized as having a net positive effect on Enron's financial statements, when in actuality the consolidation of JEDI resulted in a massive reduction in Enron's reported net income and shareholders' equity and a massive increase in its reported debt.

The complaint quotes the Powers' report regarding false and misleading disclosures relating to LJM and the Raptor entities that were drafted and approved by Vinson & Elkins:

> [T]hese disclosures were obtuse, did not communicate the essence of the transactions completely or clearly, and failed to convey the substance of what was going on between Enron and the partnerships. The disclosures also did not communicate the nature or extent of Fastow's financial interest in the LJM partnerships. This was the result of an effort to avoid disclosing Fastow's financial interest and, in some respects, to disguise their substance and import.

Tracking the language in the Powers' report, the complaint asserts that common to all Enron related-party disclosures, drafted and approved by Vinson & Elkins, was **\*662** concealment of the following material matters known to Vinson & Elkins: (1) that the transactions were not true commercial, economic transactions comparable to those with independent third-parties; (2) the "disclosures" concealed the real substance and effect of the transactions on Enron and on its financial statements, e.g., that the transactions should have been consolidated on Enron's financial statements; and (3) they failed to disclose Fastow's actual financial interest in or compensation from the LJM partnerships. Instead the disclosures in SEC filings through the Class Period gave the impression that each transaction was fair to the company, not contrived, but made at arm's length as it would have been if made with an independent third party. [96] In actuality the transactions, which were controlled only by Enron, Fastow or Kopper through the LJM entities, were bogus, contrived to enrich individual Defendants, and, according to the Powers-led special investigative committee, designed "to accomplish financial results, not achieve *bona fide* economic objectives or to transfer risk." Complaint at 405, 420. [97] In nearly every transaction, Fastow or Kopper made millions of dollars while bearing little or no risk, and Enron obtained favorable financial-statement results while bearing all the risk.

In Enron's report on Form 10–Q, approved by Vinson & Elkins and filed on 8/14/01, a statement "disclosed" that Fastow, "who previously was the general partner of [the LJM] partnerships, sold all of his financial interests ... and no longer has any management responsibilities for these entities." In actuality, Fastow sold his interest to Kopper, who was also closely connected to and controlled by Enron, so the LJM partnerships were no more legitimate than when Fastow owned them.

The complaint contends that Vinson & Elkins throughout the Class Period drafted and approved as adequate disclosure statements with false and misleading descriptions about related-party transactions using LJM and the Raptors. These include disclosures in Enron's Reports on Form 10–Q filed

**In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)**

Fed. Sec. L. Rep. P 92,239

8/16/99 and 11/15/99 that only relate to, but fail to identify, the Rhythms transactions:

> In June 1999, Enron entered into a series of transactions involving a third party and LJM Cayman, L.P. (LJM). LJM is a private investment company which engages in acquiring or investing primarily in energy related investments. **\*663** A senior officer of Enron is managing member of LJM's general partner. The effect of the transactions was (i) Enron amended with the third party certain forward contracts to purchase shares of Enron common stock, resulting in Enron having forward contracts to purchase 3.3. million Enron common shares at the market price on that day, (ii) LJM received 3.4 million shares of Enron common stock subject to certain restrictions and (iii) Enron received a note receivable and a put option related to an investment held by Enron. Enron recorded the assets received and equity issued at estimated fair value.... Management believes that the terms of the transactions were reasonable and no less favorable than the terms of similar arrangements with unrelated third parties.

The complaint charges that this "disclosure" was false and misleading because there was no true third party to give a stamp of legitimacy to the transaction, but only self-dealing: Fastow filled the shoes of the third party, and LJM's general partner was capitalized with Enron stock provided by Enron. Because it did not consolidate LJM, Enron was able to overstate its net income by $95 million in 1999 and by $8 million in 2000.

Similar oblique references are made in inadequate "disclosures" of bogus hedges involving the Raptors, the purported "third parties" that were actually entities created by Enron and LJM2 and capitalized with Enron's stock, while the Raptors' credit capacity was largely determined by the price of Enron stock. In these transactions, LJM2 received its profits and capital from the Raptors up front, before any ostensible hedging took place, so Enron was the only entity left with a stake in the purported counterparty. The complaint

at 422 quotes from "disclosures" describing the Raptors' transactions with related parties, drafted and approved by Vinson & Elkins, made in Enron's reports on Form 10–Q, filed on 8/14/00 [98] and 11/14/00 [99], on Form 10–K filed on 4/01/01, [100] and references to similar statements in reports on Form 10–Q filed on 5/15/01 and 8/14/01 and in a Proxy filed on 3/17/01. The complaint states that these alleged disclosures were **\*664** false and misleading because (1) the "share settled options" were purchased by Enron when the transaction was actually based on a future material decrease in the price of Enron's stocks; (2) the disclosures of related party transaction did not disclose that Enron controlled the entities or vehicles; and (3) the transactions were structured to permit LJM2 to receive its profits and capital up front before any hedging (risk of loss), and because Enron carried the ultimate risk of the investment. These concealed matters, if disclosed, would have revealed that Enron was not dealing with valid SPEs and there was no real hedging since the hedges were of Enron investments with the value of Enron stock.

The complaint asserts that Vinson & Elkins also drafted and approved related-party disclosures concerning Enron's merchant assets sales and purchases that were false and misleading because they hid facts that would have demonstrated that Enron was playing a shell game to falsely inflate its 1999 net income by more than $130 million. The complaint quotes the related-party disclosures in Enron's report on Form 10–K filed on 3/30/00: "In the fourth quarter of 1999, LJM2, which has the same general partner as LJM, acquired, directly or indirectly, approximately $360 million of merchant assets and investments from Enron, on which Enron recognized pre-tax gains of approximately $16 million." Similar disclosures were made in Enron's report on Form 10–K, filed on 4/02/01: "In 1999, the Related Party acquired approximately $371 million, merchant assets and investments and other assets from Enron. Enron recognized pre-tax gains of approximately $16 million related to these transactions." A Proxy filed on 3/27/01 states, "[D]uring 2000, LJM2 sold to Enron certain merchant investment interests for a total consideration of approximately $76 million." Complaint at 423. Lead Plaintiff claims that these disclosures are false and misleading because Enron was merely buying back the same assets and investments that it was selling to Fastow. Sometimes the repurchase of assets was made within months, even before Enron filed its report on Form 10–K on 3/30/00 with the related-party disclosures indicating that Enron was selling the assets. Furthermore, in the third and fourth quarters of 1999, Enron sold seven assets to LJM to rid its balance sheet of debts before the

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

end of the financial reporting period. After the close of the reporting period, Enron bought back five of the seven assets in the transactions referenced, including the sale in 9/99 and subsequent repurchase of Enron's stake in the Cuiaba, Brazil power plant construction; the sale on 12/22/99 and subsequent repurchase of ENA collateralized loan obligations; the sale on 12/21/99 and subsequent repurchase of Enron's interest in the Nowa Sarzyna, Poland power plant construction; the sale on 12/29/99 and subsequent repurchase of Enron's equity interest in MEGS LLC; and the sale in 5–6/00 and subsequent resale of dark fiber (Enron's EBS sold the dark fiber to LJM2 and then resold it for LJM2). The disclosures drafted and approved by Vinson & Elkins did not reveal that in each repurchase, the LJM partnerships profited by millions of dollars, even when the assets had lost value.

The Enron investigative committee led by Dean Powers further found, "The failure to set forth Fastow's compensation from the LJM transactions and the process leading to that decision raise substantial issues." The complaint asserts that Vinson & Elkins knew important facts about Fastow's interest in the LJM transactions but did not reveal them in related-party disclosures [101] drafted and approved by Vinson & Elkins during the Class Period, in spite of specific requirements in SEC regulations that such economic interests **\*665** be disclosed. Had these facts been disclosed, they would have alerted investors that Fastow and the LJM partnerships were paid to move debt off of Enron's financial statements and not as part of commercial transactions. As a specific example, the complaint focuses on the Rhythms transaction which, before the Proxy was filed on 5/02/00, was terminated by a $30 million payment to Fastow's Swap Sub. Enron's special investigative committee determined that the termination was effected on the following terms: the Rhythms options held by Fastow's Swap Sub. were terminated; Fastow's Swap Sub. returned 3.1 million Enron shares to Enron, but retained $3.75 million in cash received from LJM1; and Enron paid Fastow's Swap Sub. $16.7 million, which included $30 million, plus $500,000 accrued dividends on Enron's stock held by Swap Sub., less $3.75 million in cash in Swap Sub., less $10.1 million in principal and interest on a loan Enron made to Swap Sub. just before the transaction's termination.

The complaint points out that although Sherron Watkins' August 2001 letter to Ken Lay represented that Vinson & Elkins had been involved in the fraud and had a clear conflict of interest, Lay still turned to top Vinson & Elkins partners to find out how to cover up the allegations. Furthermore, Vinson

& Elkins despite this obvious conflict, agreed to conduct an investigation into the charges and to issue a letter or report dismissing the allegations of fraud that Vinson & Elkins knew were true. Vinson & Elkins also agreed not to "second guess" the accounting work or judgments of Arthur Andersen and to limit its inquiry to top level executives at Enron. Vinson & Elkins' review took place between August 15 and October 15, 2001.

The complaint at 427–28 also quotes from a letter sent on August 29, 2001 by a management level employee at Enron's EES operation to Enron's Board of Directors detailing concealed losses and misrepresentations at Enron's EES. [102] The complaint claims the letter describing another **\*666** area of fraud caused "an explosion" at Enron.

During its investigation, according to the complaint, Vinson & Elkins only interviewed top level executives that Vinson & Elkins knew were involved in the fraud and would deny it. On October 15, 2001 the law firm issued a letter to Enron dismissing all of Sherron Watkins' allegations even though Vinson & Elkins knew they were true from its own involvement. The letter is quoted in part in the complaint at 429–31 [emphasis added by the complaint]:

You requested that Vinson & Elkins L.L.P. ("V & E") conduct an investigation into certain allegations initially made on an *anonymous* basis by an employee of Enron Corp. ("Enron"). Those allegations question the propriety of Enron's accounting treatment and public disclosures for certain deconsolidated entities known as Condor or Whitewing and certain transactions with a related party, LJM, and particularly transactions with LJM known as Raptor vehicles. The anonymous employee later identified herself as Sherron Watkins, who met with Kenneth L. Lay, Chairman and Chief Executive Officer of Enron, for approximately one hour to express her concerns and provided him with materials to supplement her initial anonymous letter....

In general, the scope of V & E's undertaking was to review the allegations raised by Ms. Watkins' *anonymous* letter and supplemental materials to conduct an investigation to determine whether the facts she has raised *warrant further independent legal or accounting review.*

By way of background, some of the supplemental materials provided by Ms. Watkins proposed a series of steps for addressing the problems she perceived, which included retention of independent legal counsel to

conduct a wide-spread investigation, and the engagement of independent auditors, apparently for the purpose of analyzing transactions in detail and opining as to the propriety of the accounting treatment employed by Enron and its auditors Arthur Andersen L.L.P. ("AA"). *In preliminary discussions with you, it was decided that our initial approach would not involve the second guessing of the accounting advice and treatment provided by AA, that there would be no detailed analysis of each and every transaction and that there would be no full scale discovery style inquiry. Instead the inquiry would be confined to a determination whether the anonymous letter and supplemental materials raised new factual information that would warrant a broader investigation.*

\* \* \* \* \* \*

Interviews were also conducted with various Enron personnel based either on **\*667** their connection with the transactions involving Condor/Whitewing, LJM and Raptor, or because they were identified in materials provided by Ms. Watkins as persons who might share her concerns. Those persons interviewed were: Andrew S. Fastow, Executive Vice President and Chief Financial Officer; Richard B. Causey, Executive Vice President and Chief Accounting Officer; Richard B. Buy, Executive Vice President and Chief Risk Officer; Greg Whalley, President and Chief Operating Office (formerly Chairman of Enron Wholesale); Jeffrey McMahon, President and Chief Executive Officer, Enron Industrial Markets (formerly Treasurer of Enron); Jordan H. Mintz, Vice President and General Counsel of Enron Global Finance; Mark E. Koenig, Executive Vice President, Investor Relations; Paula H. Rieker, Managing Director, Investor Relations; and Sherron Watkins, the author of the anonymous letter and supplemental materials.

Interviews were also conducted with David B. Duncan and Debra A. Cash, both partners with AA assigned to the Enron audit engagement.

\* \* \* \* \* \*

*In summary, none of the individuals interviewed could identify any transaction between Enron and LJM that was not reasonable from Enron's standpoint or that was contrary to Enron's best interests....*

As stated at the outset, the decision was made early in our preliminary investigation not to engage an independent

accounting firm to second guess the accounting advice and audit treatments provided by AA. Based on interviews with representatives of AA and Mr. Causey, all material facts of the Condor/Whitewing and Raptor vehicles, as well as other transactions involving LJM, appeared to have been disclosed to and reviewed by AA. In this regard, AA reviewed the LJM solicitation materials and partnership agreement to assure that certain safeguards were provided that would permit LJM to be a source of third party equity in transactions conducted with Enron. AA likewise reviewed specific transactions between Enron and LJM to assure that LJM had sufficient equity in transaction to justify the accounting and audit principles being applied.

\* \* \* \* \* \*

Enron and AA representatives both acknowledge that the accounting treatment on the Condor/Whitewing and Raptor transactions is creative and aggressive, but no one has reason to believe that it is inappropriate from a technical standpoint. In this regard, AA consulted with its senior technical experts in its Chicago office regarding the technical accounting treatment on the Condor/Whitewing and Raptor transactions, and the AA partners on the Enron account consulted with AA's senior practice committee in Houston on other aspects of the transactions. Enron may also take comfort from AA's audit opinion and report to the Audit Committee which implicitly approves the transaction involving Condor/Whitewing and Raptor structures in the context of the approval of Enron financial statements.

\* \* \* \* \* \*

Notwithstanding the expression of concern in Ms. Watkins' anonymous letter and supporting materials regarding the adequacy of Enron's disclosures as to the Condor/Whitewing and Raptor vehicles (which, to a large extent, reflect her opinion), AA is comfortable with the disclosure in the footnotes to the financials describing the Condor/Whitewing and Raptor structures and other relationships and transactions with LJM. **\*668** AA points out that the transactions involving Condor/Whitewing are disclosed in aggregate terms in the unconsolidated equity footnote and that the transactions with LJM, including the Raptor transactions, are disclosed in aggregate terms in the related party transactions footnote to the financials.

The concern with adequacy of disclosures is that one can always argue in hindsight that disclosures contained in proxy solicitations, management's discussion and analysis

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

and financial footnotes could be more detailed. *In this regard, it is our understanding that Enron's practice is to provide its financial statements and disclosure statements to V & E with a relatively short time frame with which to respond with comments.*

\* \* \* \* \* \*

*Based on the findings and conclusions set forth with respect to each of the four areas of primary concern discussed above, the facts disclosed through our preliminary investigation do not, in our judgment, warrant a further widespread investigation by independent counsel and auditors....*

*... Finally we believe that some response should be provided to Ms. Watkins to assure her that her concerns were thoroughly reviewed, analyzed, and although found not to raise new or undisclosed information, were given serious consideration.*

We have previously reported verbally to Mr. Lay and you regarding our investigation and conclusions and, at your request, have reported the same information to Robert K. Jaedicke, in his capacity of Chairman of the Audit Committee of Enron's Board of Directors. At Dr. Jaedicke's request, we gave a verbal summary of our review and conclusions to the full Audit Committee. [103]

 **\*669** The complaint recites that although Lay wanted to fire Watkins, he and Vinson & Elkins agreed that discharge would be a mistake and would lead to a wrongful termination suit, disclosing Watkins' allegations about transactions at Enron. So she was shifted to another position at Enron where she would have less exposure to information damaging to Enron.

### b. Kirkland & Ellis

The complaint alleges that Kirkland & Ellis actively engaged in the scheme to defraud and course of business that operated as a fraud on Enron investors. Kirkland & Ellis began working with Fastow, Enron, and Vinson & Elkins in the early #90's to create and use off balance sheet investment partnerships and SPEs that allowed Enron to engage in transactions designed to increase or maintain its credit rating by artificially inflating its profits and moving debt off of its balance sheet. The law firm's relationship with Fastow began in the 1980's when Fastow worked for Continental Bank in Chicago and intensified during the Class Period at Enron; in light of this close relationship, Jordon Mintz, Vice President and General Counsel of Enron Global Finance, referred to the firm as "Fastow's attorneys."

Lead Plaintiff asserts that Enron hand-picked Kirkland & Ellis to provide ostensibly "independent" representation for Chewco, JEDI, LJM1, LJM2, and other SPEs, but in actuality that the firm was selected by Fastow because it was willing to take direction from Fastow and Enron. Along with Arthur Andersen, Vinson & Elkins, and Enron's banks, Kirkland & Ellis under Enron's direction participated in structuring the manipulative devices at the heart of the scheme, including the partnerships and SPEs (LJM1 and 2, Chewco and the Raptors) and their related transactions to present a false picture of Enron's financial condition and results, with the law firm's full knowledge of that purpose. In addition to structuring the entities, Kirkland & Ellis allegedly participated in the monetization of assets, in the preparation of partnership and loan agreements for Chewco, LJM1, and LJM2, and in the offering and sale of partnership interests in LJM2 through private placement memoranda. The firm also allegedly generated false legal opinions about the structure, legality and *bona fides* of the SPEs and their transactions, representing that these were legitimate business deals. The complaint charges that Kirkland &  **\*670**  Ellis issued opinions related to numerous transactions and entities, including the following: JEDI I, Big River LLC, Little River LLC, LJM1, LJM2, Raptor I, Raptor II (Timberwolf), Raptor III (Condor), Raptor IV (Bobcat), Honer, Chewco, Bob West Treasure LLC, Cortez LLC, ENA CLO, Yosemite Securities, Southampton Place, Condor, SONR# 1 LLC, and SONR# 2 LLC. The firm's opinions were essential for effecting the transactions. Nevertheless, because the transactions were shams to inflate Enron's financial performance while favored insiders siphoned off Enron's assets and because the transactions were conducted on terms inconsistent with disclosures being made to investors by Enron, Vinson & Elkins, the banks, and Arthur Andersen, Kirkland & Ellis' opinions were also false. Kirkland & Ellis knew that the SPEs were contrived, manipulative devices that were not independent of Enron, but, like Kirkland & Ellis, acting under the control and direction of Fastow, Kopper, Skilling, Lay and other Enron officials. These Enron insiders directed the SPEs without regard for the legal or economic interests or rights of the SPEs, in whose behalf Kirkland & Ellis was purportedly served as independent counsel. Kirkland & Ellis received tens of millions of dollars in fees for its work, and most of that money was paid directly to it by Enron, even though the law firm was supposed to be

representing entities independent of Enron and with economic interests adverse to those of Enron.

More specifically, the complaint asserts that when Enron was unable to find a legitimate buyer for the outside investor's interest in JEDI in 1997 in time for year-end reporting, Kirkland & Ellis, directed by Fastow and Enron, along with Vinson & Elkins, Fastow and Kopper, created Chewco (controlled by Enron and Michael Kopper), Big River Funding and Little River Funding to purchase that stake in JEDI. Kirkland & Ellis did so even though it was supposed to be providing independent representation of Chewco and its equity investors. Kirkland & Ellis knew that Chewco lacked an independent outside investor with a 3% stake, required for independent third-party status for Chewco, and that Barclays' loan of $240 million to Chewco (guaranteed by Enron) and loans to straw parties by means of a $6 million cash deposit with Barclays to provide the money for the equity investment in Chewco, were an improper effort to circumvent that requirement for a valid SPE. Kirkland & Ellis and Vinson & Elkins prepared the documentation for Chewco's financing and falsified the documents to make it appear that Chewco was independent. They also prepared a side agreement, dated 12/30/97, reflecting that Enron would provide the necessary cash to fund Chewco through clandestine reserve accounts for Big River Funding and Little River Funding. The Kopper/Enron side agreement drawn up by the two firms indicates that no outside equity was used to fund Chewco and therefore it was not a viable SPE, but merely a manipulative device to further the fraud.

Kirkland & Ellis did more to conceal the real situation. If, as originally intended, Fastow were to have managerial control of Chewco, that interest would have to be disclosed in Enron's SEC filings and the non-arm's-length nature of the deal would be revealed. Kirkland & Ellis therefore arranged for Kopper, Fastow's subordinate, to manage the SPE.

In addition, during December 1997, Kirkland & Ellis restructured the transaction to avoid disclosure of Enron's financial relationship to Chewco at year end. Kirkland & Ellis converted the general partner of Chewco from a limited liability company to a limited partnership and made Kopper the manager of the general **\*671** partner instead of Fastow. Although Kopper expressed concern about the conflict of interest because he was simultaneously an Enron employee and the owner of both Chewco's general partner and of the equity of limited partner Big River Funding, Kirkland & Ellis went ahead anyway. Furthermore, Kirkland & Ellis,

with Arthur Andersen, Fastow, Kopper and Vinson & Elkins, participated in the concealment of Kopper's managerial position with Chewco by "transferring" Kopper's ownership interest in Big River Funding and Little River Funding to Kopper's domestic partner, Dodson, and completing the purchase of the 50% interest in JEDI by Chewco. Kirkland & Ellis knew that Chewco/JEDI was not a valid SPE, should have been consolidated, and was now available for Enron to use in more non-arm's-length transactions, which the law firm would also help structure from 1998–2001, to create billions of dollars of sham profits for Enron and conceal the true nature of its indebtedness.

Even though Kirkland & Ellis was supposed to be providing independent representation of the LJM partnerships and their SPEs, Kirkland & Ellis participated in creating, structuring, reviewing and approving the two LJM partnerships, which served as manipulative devices for Fastow and others to enrich themselves and for Enron to inflate its financial results. Kirkland & Ellis knew the partnerships were established to allow Enron to effect transactions that it would have been unable to accomplish with independent third-parties. Kirkland & Ellis was involved in transactions between the LJMs and Enron or its affiliates that occurred close to the end of financial reporting periods to perpetuate the alleged Ponzi scheme, including Enron's sale of interests in seven assets near the end of the third and fourth quarters of 1999, five of which Enron bought back after the close of the period as previously agreed among the parties, and on all of which the LJMs made profits even when the value of the assets had declined. The firm participated in June 1999 in structuring LJM1's purchase of an equity interest in Enron's Cuiaba power plant in Brazil, which was burdened with substantial debt that Enron did not want on its balance sheet. Enron sold to LJM1, with a promise to make LJM1 whole, a 13% stake in the Cuiaba plant, effective 9/99, and thus reduced Enron's ownership below the level at which it would have to consolidate its interest, so that Enron could once again "cook its books," but repurchased it in August 2001. The transaction was neither arm's length nor *bona fide*. Kirkland & Ellis also helped structure sham hedging transactions, including in 6/99 the Enron Rhythms stock deal, and transactions involving Enron's merchant assets with the Raptors in 2000–01. Kirkland & Ellis also helped to create the documentation to enable the banks to advance essentially all the money needed to fund LJM2 just before year-end 1999 to avoid reporting a very bad quarter for Enron, as well as to write the offering memorandum for LJM2, with its invitation to benefit from insider self-dealing transactions.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

In accordance with direction from Enron or Fastow, the firm also helped structure transactions and provided opinions required for year-end deals between LJM2 and Enron before the close of 1999 so that Enron could report strong growth: the CLOs, the Nowa Sarzyna (Poland Power Plant), MEGS LLC, and Yosemite.[104] These deals were then reversed in **\*672** the first quarter of 2000, reflecting that they were merely manipulative devices and contrivances designed by Kirkland & Ellis and others to manipulate Enron's financial results.

On March 20, 2000, with Fastow and Kopper, Kirkland & Ellis created a partnership agreement for Southampton Place L.P., with its general partner being Big Doe LLC, and funded it with $70,000 contributed by several Enron employees (Glisan, Mordaunt, Lynn and Patel) for the purpose of acquiring part of the interest held in LJM1 by an existing limited partner. Glisan even objected to Kirkland & Ellis that the transaction should be accounted for as a related-party transaction and should be disclosed. To further the fraudulent scheme, however, the law firm opined that even though these Enron employees were involved, Southampton's transaction with LJM1 and/or Enron did not have to be disclosed.

In May 2000, to generate revenue in Enron's fiber optic business (EBS) so that Enron could meet its earnings estimates for the quarter, when no legitimate purchaser could be found Fastow and Kirkland & Ellis structured a sale of Enron's dark fiber optic cable to LMJ2 for $100 million even though it was not worth even close to that amount. A second deal was effected in the third quarter of 2000 for more than $300 million so that Enron could make its numbers.

During 2000 Kirkland & Ellis and Vinson & Elkins structured increasingly aggressive SPEs to perpetuate the alleged Ponzi scheme. Functioning as both Fastow's personal counsel and as counsel to LJM2, Kirkland & Ellis devised mechanisms for Enron to abuse mark-to-market accounting to create sham income through the four Raptor entities, which were created by Kirkland & Ellis working with Fastow, Arthur Andersen, and Vinson & Elkins. Kirkland & Ellis knew the transactions were structured so that if the value of Enron's stock fell, the SPEs would be unable to meet their obligations and the sham hedges with Enron stock would fail.

In late 2000 and in early 2001, the Raptor SPEs lacked sufficient credit to pay Enron on the hedges and Enron faced having to record a "credit reserve" that would reveal the change in value of its merchant investments. Moreover by year-end 2000 two Raptor SPEs were in danger of coming

unwound because of insufficient credit capacity to support their credit obligations. If that happened Enron would have to take a multi-million dollar charge against earnings, which would expose the earlier falsification of Enron's financial results, cause its stock price to plunge, and activate the stock issuance triggers, i.e., precipitate a death spiral for the Ponzi scheme. To avoid this impending catastrophe, Kirkland & Ellis helped restructure and capitalize the Raptor SPEs at the end of 2000 by transferring even more shares of Enron stock to them. Again in 2001, to avoid taking a pre-tax charge against Enron's earnings of more than $500 million because of a credit capacity shortfall by Raptor entities and to conceal substantial losses in Enron's merchant investments, Kirkland & Ellis again helped restructure Raptor vehicles by having Enron transfer to them just before year's end more than $800 million of contracts to receive Enron's stock, with no consideration and in violation of accounting rules.

Kirkland & Ellis also participated in the New Power transaction by involvement in the creation of the Hawaii 125–0 SPE, which the law firm knew was financed by a $125 million "loan" from the banks that were guaranteed against loss through a "total return swap" by Enron.

Finally, Kirkland & Ellis participated in Enron's misleading disclosures. Indeed, **\*673** near the close of the Class Period, the law firm admitted to a senior Enron employee responsible for preparing Enron's SEC disclosures that there was no precedent for the law firm's rationalization for not disclosing various LJMs and LJM transactions. Kirkland & Ellis reviewed the SEC filings by Enron and knew that the related party transactions were unfair to Enron contrary to its false assertion that the transactions were on terms similar to those it could have obtained with independent third parties. Kirkland & Ellis continued to work on restructuring LJM2 in May 2001 to avoid having to disclose that SPE under Regulation S–K. Indeed throughout the Class Period the law firm evaded or finagled applicable disclosure requests by various means, including having Fastow and Kopper sell some of their ownership interests to others. One senior Enron employee responsible for Enron's SEC disclosures was so suspicious of Kirkland & Ellis that it hired another law firm to review Kirkland & Ellis' work.

### 3. The Accountant/Auditor: Arthur Andersen LLP[105]

Noting that an independent auditor is supposed to be the "investing public's watch dog," the complaint at 447 quotes the United States Supreme Court in *United States v. Arthur*

*Young & Co.,* 465 U.S. 805, 817–18, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984):

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.

The complaint charges that Arthur Anderson, which is sued under § 10(b) and § 11 of the federal statutes and under the TexasSecuritiesAct, abandoned its responsibilities to Enron investors and to the investing public and violated professional standards in perpetrating a massive accounting fraud.

The consolidated complaint maintains that Arthur Andersen was not independent of its client. Enron was Arthur Andersen's second largest client and Arthur Andersen was economically dependent on Enron, which generated approximately $50 million in fees annually for Arthur Andersen and expectations for more in the future. Indeed Arthur Andersen estimated internally that its fees for services for Enron could increase to $100 million per year. To generate even more fees, Arthur Andersen pressured, and provided incentive compensation to, its audit partners to solicit and market non-audit consulting services, which were far more lucrative, from Enron as well as other clients. David Duncan in the Houston office was earning as much as $2 million a year based largely on the level of fees he "controlled" or sold to his clients. The complaint asserts that the pressures on partners to generate more fees created a conflict of interest for auditors on the Enron engagement and were a substantial factor in Arthur Andersen's abandonment of its independence, objectivity, and integrity on the Enron financial statement audits and reviews.

Furthermore, Arthur Andersen's close relationship with Enron's management **\*674** also impaired the auditor's independence and objectivity in its audits of Enron during the Class Period. The complaint points to more than three hundred accounting and finance positions at Enron, many in mid-level and senior management, that were filled with former Arthur Andersen auditors and professionals. The complaint comments that Enron Defendants were comfortable with this fact because they knew the Arthur Andersen auditors were less likely to question improper accounting if done by their former co-workers and bosses, who were now officers and managers at Enron.

Arthur Andersen examined and opined on Enron's financial statements for 1997–2000 and reviewed its interim results and press releases from 1997–2001. Lead Plaintiff charges that Arthur Andersen not only permitted Enron to falsify its financial results, but falsely represented that Enron's financial statements from 1997–2001 were in accordance with GAAP, claimed that its audits of Enron's financial statements were performed in accordance with Generally Accepted Auditing Standards ("GAAS"), [106] certified the fraudulent figures, and actively engaged and participated in structuring the transactions (including involvement in the illicit partnerships and SPEs, misuse of mark-to-market accounting, and arranging dark fiber swaps with other Arthur Andersen clients, including Qwest and Global Crossing, in the telecom business) to participate in falsifying Enron's financial results. Anderson also agreed that its reports on Enron's financial statements could be incorporated into Enron's Form 10–Ks for those years and into ten of Enron's Registration statements: registration of $1 billion in Enron Debt Securities, Warrants, Preferred Stock and Depository Shares filed on 12/17/97; registration of 488,566 shares of common stock filed on 1/12/98; registration of 34.4 million shares of common stock filed on 4/28/98; registration of $1 billion in Enron Debt Securities, Warrants, Preferred Stock and Depository Share filed on 1/12/99; registration of 7.6 million shares of common stock filed on 4/5/99; registration of ten million Exchangeable Notes filed on 7/23/99; registration of 4.9 million shares of common stock filed on 4/4/00; registration of 616,778 shares of common stock on 6/15/00; registration of $1 billion in Enron Debt Securities, Warrants, Preferred Stock and Depositor Shares filed on 7/19/00; and registration of $1.9 billion in Zero Coupon Convertible Senior Notes due 2021 and filed on 6/01/01. Arthur Andersen agreed to the use of its name as an expert in each Prospectus filed and issued pursuant to these offerings, including the Prospectus for the Zero Coupon Notes filed on 7/25/01. [107] In the fall of 2001, after Enron's collapse and the federal investigation began, despite its professional duty to retain and preserve any documents and information **\*675** needed to support and defend the conclusions it had

reached and the work it had performed during its audit and review services for Enron, Arthur Andersen, along with Enron, destroyed documentary evidence that would implicate it in fraud at Enron and reveal that Arthur Andersen had violated an SEC consent decree arising out of its involvement in the Waste Management accounting scandal [108] by again participating in the cover-up of accounting fraud at another of its biggest clients. The complaint emphasizes that Arthur Andersen "is a repeat offender with a history of failed audits, conflicts of interest and document destruction in some of the most egregious cases of accounting fraud in history." Complaint at 455. After describing Arthur Andersen's improper conduct in Waste Management, [109] Sunbeam Corporation, [110] Baptist Foundation of Arizona, [111] Colonial Realty Company, [112] **\*676** Lincoln Savings/ACC, [113] the complaint [114] maintains that Arthur Andersen's conduct in these cases shares certain common characteristics with its role in Enron's fall and that Arthur Andersen has had a callous, reckless disregard for its duty to investors and the public trust for decades. The complaint contends that rather than change its improper behavior, Arthur Andersen merely sees the settlement sums as a cost of doing business.

Arthur Andersen knew that the critical factor to increasing its fees was to maintain Enron's investment-grade credit rating, requiring a careful balance between creating outside entities to hold assets and the debt Enron was incurring to finance them and making it appear that Enron was not controlling these entities to avoid consolidation of their assets and debts into Enron's financial statements under GAAP. Aware of the risk, in a meeting on February 2001 about Enron's accounting issues, top level Arthur Andersen partners from the Houston and Chicago offices decided that the potential for doubling its fees to $100 million a year justified retaining Enron as a client. Furthermore when partner Carl Bass objected to and opposed the improper accounting practices used at Enron in 1999–2000, and thereby upset Enron management, top level Arthur Andersen partners removed him from his oversight role on the Enron audits.

Arthur Andersen operated its consulting services in a manner that revealed its lack of independence in audits and reviews. During the early to mid–90's, to take audit **\*677** oversight away from Enron's internal auditors and have Arthur Andersen provide such services on an outsourced contract basis, Arthur Andersen and the other big accounting firms successfully lobbied the AICPA to allow them to provide both internal and external auditor services, despite many critics' complaints that the dual role was an outrageous conflict of interest. The complaint maintains that by stripping Enron of its internal audit function and assuming most of those responsibilities, Arthur Andersen in essence eliminated the possibility that another, independent body might discover and report the fraud. An Enron employee involved in the transition commented, "Going forward, Skilling was left to run a casino for a business with a day-care center for an auditor."

Arthur Andersen's commitment to generating fees and its assumption of Enron's internal audit function together impaired its integrity, objectivity and independence. On March 11, 2002, after Paul Volker accepted the chairmanship of the blue ribbon committee, established and funded by Arthur Andersen to look into its policies because of Enron's collapse, Volker rapidly concluded that if the conflicts of interest and impairment of independence that caused the problems in its Enron's audits were to be remedied, Arthur Andersen had to split its auditing and consulting practices, to ban current financial incentives that connected the auditors' compensation to their sales of consulting services, to refrain from reporting internal audit work on audit clients, and to adopt a waiting period before Arthur Andersen partners could become employees of a client.

The complaint identifies a number of "red flags," or significant indicators, of financial statement fraud at Enron, discussed below.

The complaint alleges that Arthur Andersen had direct knowledge of Enron's improper accounting and knew the risk of fraudulent financial reports was very high. Professional accounting standards, pursuant to SAS No. 82 (AU [115] §§ 316, 110), require that in designing and effecting audit procedures, auditors assess the risk of material misstatements due to fraud and plan an audit to increase the likelihood that fraud will be discovered. AU § 316 sets out categories of fraud risk factors for making that assessment. The complaint charges that Arthur Andersen knew that Enron possessed many of the risk factors delineated in AU § 316.16–.18, including,

> Overly complex organizational structure involving numerous or unusual legal entities, managerial lines of authority, or contractual arrangements without apparent business purpose.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm.

Significant, unusual, or highly complex transactions, especially those close to the year end, that pose difficult "substance over form" questions.

Significant bank accounts or subsidiary or branch operations in tax haven jurisdictions for which there appears to be no clear business justification.

Arthur Andersen was fully aware of Enron's unusually complex organization because it helped structure hundreds of complicated partnerships, many with no business purpose other than to conceal debt and losses. The number of related-party transactions was enormous, and in many Enron maintained control over the entities and deliberately and improperly did not consolidate them. Andersen knew **\*678** that Enron utilized at least 600 offshore tax haven entities to shift income, minimize taxation, circumvent United States laws, and maintain secrecy. It also knew that many of the Fastow-controlled partnerships were formed in offshore havens. Even Arthur Andersen's tax and consulting departments knew that Enron's use of such entities was excessive and that many had no business justification.

AU § 316.17(a) lists as risk factors relating to management's characteristics and influence over the control environment:

Management failing to correct known reportable conditions on a timely basis.

Management setting unduly aggressive financial targets and expectations for operating personnel.

A significant portion of management's compensation represented by bonuses, stock options, or other incentives, the value of which is contingent upon the entity achieving unduly aggressive targets for operating results, financial position, or cash flow.

An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices.

A practice by management of committing to analysts, creditors, and other third parties to achieve what appear to be unduly aggressive or clearly unrealistic forecasts.

The complaint charges that Arthur Andersen knew Enron management had an excessive and an unusual interest in maintaining the company's stock price. Arthur Andersen knew that Enron was recognizing income from the inflation of its own stock, that Enron's hedges depended upon keeping the price up, that insider trading constituted a substantial portion of management's income, and that Enron executives were enjoying millions of dollars from bonuses when they successfully hit a series of stock-price targets based on a program dubbed "Performance Unit Plan." Enron's business and management practices were focused on highly aggressive targets. Arthur Andersen also knew that Enron had failed to make audit adjustments of about $51 million recommended by Arthur Andersen in 1997 (discussed at ¶ 517 of the complaint). The presence of other risk factors at Enron, identified in AU § 316.17(c), included unusually rapid growth or profitability, especially compared with that of other companies in the same industry, and significant pressure to obtain additional capital necessary to stay competitive in view of the financial position of the entity, including the need for funds to finance major research and development or capital expenditures. Lead Plaintiff charts Enron's dramatic growth in net sales between 1995 and 2000 at 461 of the complaint: 1995, $9.2 billion; 1996, $13.3 billion; 1997, $20.3 billion; 1998, $31.3 billion; 1999, $40.1 billion; and 2000, $100.8 billion.

Thus because of its extensive audit, review, tax, internal control, and other consulting services that Arthur Andersen rendered to Enron (its fees in 2000 alone were $52 million), Arthur Andersen knew that all these and nearly every other fraud factor identified by AU § 316 applied to Enron during the Class Period. As a result, Arthur Andersen knew that these risk factors at Enron, taken collectively, meant that the risk of fraudulent financial reporting was extremely high. In fact in 2002 Arthur Andersen acknowledged this fact during Congressional hearings: a 10/9/01 e-mail, sent by an Arthur Andersen Chicago "risk-management" auditor Mark Zajac to Arthur Andersen partners on the Enron account, including David Duncan, was disclosed that reflected the same conclusion. The e-mail warned the partners that after these and other risk factors had been considered in a routine analysis to **\*679** determine the risk of fraud, the test had triggered a "red alert," meaning a heightened risk of fraud. Moreover, Arthur Andersen knew that these factors were present throughout the Class Period, but turned a blind eye to the many red flags and continued to issue "clean" audit opinions in order to generate big fees and increase the compensation of Arthur Andersen partners.

*In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

A number of surviving Arthur Andersen documents reveal that Arthur Andersen knew, was concerned about, yet covered up or ignored fraudulent accounting practices by Enron. For instance, Arthur Andersen Professional Standards Group ("PSG") [116] partner Carl Bass sent an e-mail on 12/19/99 to Defendants Steward and Neuhausen expressing opposition to Enron's accounting for LJM2 and urged that Arthur Andersen not support it. Again on 2/4/00 Bass sent another e-mail to Stewart stating that Bass thought that a particular SPE had no real substance and that he was annoyed that Enron would receive appreciation on the Enron stock that had been contributed to that SPE. That information was also sent to Bauer, Cash, and David Duncan. In an e-mail to Stewart and Neuhausen three days before, Bass had described several transactions at a different partnership and commented that "this whole deal looks like there is no substance." Later, on March 4, 2001, just before Bass was removed as PSG advisor for the Enron audit team, Bass sent Stewart another e-mail criticizing Enron's accounting for the Blockbuster and Raptor transactions, which, aggregated, constituted at least $150 million in improperly recognized income or avoided losses at year-end 2000. The complaint asserts that David Duncan, Cash, Steward and Neuhausen, with others, were heavily involved in structuring LJM2 and decisions to allow Enron to account improperly for the entity, as well as aware of Bass' disagreement with LJM2 accounting beginning in 2000.

During a meeting on February 5, 2001, top Arthur Andersen executives from the Chicago headquarters participated in a teleconference with top Houston and Gulf Coast partners assigned to the Enron engagement about whether to retain Enron as a client. Defendants Swanson, Stewart, Jones, David Duncan, Bauer, Lowther, Odom, Goolsby, Goddard, Bennett and partner Kutsenda were among those attending. The minutes of the meeting reflect a discussion, and therefore the participants' knowledge, of the accounting issues that ultimately caused Enron's collapse, including significant related-party transactions with LJM, the materiality of such amounts to Enron's income statement, and the amount retained "off balance sheet"; Fastow's conflict of interest in serving as CFO of Enron and LJM fund manager; Fastow's compensation for his services and participation in LJM; disclosures of transactions in the financial footnotes; Enron's mark-to-market earnings, described as "intelligent gambling" [117]; Enron's reliance on its credit rating to maintain solvency; and Enron's aggressive transaction structuring. They decided to keep Enron as a client despite the red flags because of the potential $100 million fee they could receive, and a few weeks later Arthur Andersen issued a "clean" audit opinion on Enron's 2000 financial statements.

**\*680** On August 20, 2001, Sherron Watkins called Arthur Andersen audit partner James A. Hecker and warned him about ongoing improper accounting practices at Enron. Hecker called an emergency meeting the next day with other Arthur Andersen partners, including Duncan, Swanson, Cash, and Odom, to discuss Watkins' concerns about "the propriety of accounting for certain related-party transactions" with LJM, which were similar to those expressed and then dismissed by Arthur Andersen in February 2001: Enron's repeated addition of its own stock to the collateral underlying an obligation owed to Enron by a related party without recognizing that fact in its financial statement; the failure to record on Enron's books Enron's stock contributions/issuances to LJM; incomplete or incomprehensible disclosures on Enron's financial statements about the Fastow entities and transactions; and the distribution of LJM's equity to its shareholders, including Fastow and CIBC concurrently or shortly after LJM's original formation. Watkins told Hecker that "she was concerned enough about these issues that she was going to discuss them with Ken Lay, Enron's Chairman, on Wed., 8/22/01."

Arthur Andersen also consulted on and reviewed many of the manipulative transactions involving Enron's broadband business and signed off on Enron's related mark-to-market accounting, which resulted in reporting more than $110 million in earnings, as discussed previously. *The New York Times* reported on 1/30/02, " 'Nobody in the division could comprehend how they got Arthur Andersen to sign off on that,' one former senior executive in the broadband division said. 'It just didn't make any sense. When we heard what they did, everybody's mouth just hung open. We weren't doing business on any scale even close to those numbers.' " Complaint at 464. Arthur Andersen's destruction of the documents relating to broadband, including documents in its Portland office where much of the broadband work was done, shows that it was involved in the improper accounting for the broadband swaps. The Associated Press reported on 3/15/02,

> Last October or November, after Arthur Andersen learned that the U.S. Securities and Exchange Commission was investigating Enron, a team of auditors from Houston asked a Portland employee to "clean up the files," Wilborn told the newspaper.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

The files were for Enron Broadband, the now-defunct telecommunications arm that for a time was based in Portland, he said.

Enron Broadband is now the focus of investigators because it booked hundreds of dollars worth of revenue by posting sales to Enron's notorious partnerships and by swapping capacity on its fiberoptic network with struggling telecom companies, a technique that investors claim was fraudulent.

The complaint asserts that Arthur Andersen and partners Steward, Petersen, and Neuhausen, continued to approve Enron's use of mark-to-market accounting, while Enron's revenue recognition became even more flagrant.

According to the complaint, the Enron Defendants, Arthur Andersen, and Enron's lawyers and banks, which participated in a scheme of structuring and accounting to keep debt off Enron's books and record income from purported third parties, knew that whenever Enron retained control over entities that it had created to doctor its books, GAAP required consolidation of the SPEs and partnerships into Enron's consolidated financial statements. GAAS also required certain strategies, methods, and procedures to conduct a proper audit. As noted, because of the comprehensive services it provided to Enron, **\*681** Arthur Andersen knew of the audit risks inherent at Enron and in the industries in which it operated. The complaint highlights the fact that Arthur Andersen billed Enron $5.7 million for its advice regarding the LJM and Chewco entities, a sum that reflects 28,000 hours of consulting and accounting work at an average hourly rate of $200. Moreover, the accounting decisions relating to the SPEs were made at the highest levels of Arthur Andersen. Enron communicated with Arthur Andersen Houston partners, including Cash, Duncan, Bauer, and Bass, with Arthur Andersen's National Office Group ("NOG"), and with PSG in Chicago. A former Enron tax manager stated that Enron's internal policies about whether certain SPEs would be consolidated on Enron's books were determined by Arthur Andersen and that whenever anyone at Enron asked how to structure a deal, the question was referred to Arthur Andersen engagement partner David Duncan, who would then consult with the Chicago office.

Arthur Andersen was required by AU § 334.09 to evaluate Chewco, JEDI, and LJM transactions carefully. [118] Arthur Andersen ignored its duty to understand the transactions and the business purpose for them and failed to demand that Enron make adequate disclosure and proper accounting for them.

It knew that Enron's employees and officers had interests in and control over certain SPEs; that Enron had recorded as an asset a note receivable in exchange for stock issued in 2000; that Barclay's investment in the Chewco deal had a reserve of $6.6 million so that there was not 3% independent equity in the partnership and Chewco (and by extension, JEDI) was not a qualifying SPE; and that Arthur Andersen's extensive involvement with JEDI and Chewco transactions is reflected in the $5.7 million it billed Enron for its work.

The complaint claims that Enron's practice of not consolidating its joint investments can be traced back to at least 1993 with the formation and capitalization of the JEDI joint venture, the first red flag signaling possible fraud. The formation of Chewco, in which Arthur Andersen assisted and for which it billed Enron $80,000 (equivalent to about 400 hours of review at an hourly rate of $200) at the end of 1997, discussed previously, raised numerous significant red flags regarding Enron's control of the SPE and the substance or questionable business purpose of the SPE. Specifically, Arthur Andersen knew (1) that Chewco's general partners were senior **\*682** financial employees at Enron; (2) that the arrangement did not meet the minimum requirement of a 3% independent, at risk, controlling capital because Barclays collateralized the loans with a reserve account deposit of $6.6 million and, according to Enron employees, Arthur Andersen was provided with documentation demonstrating the reserve; and (3) that Barclays' funding was more like a loan than an equity investment. Nevertheless Arthur Andersen ignored what it knew and helped Enron improperly keep the Chewco deal off its books, overstate its profits by $405 million, and understate its debt by hundreds of millions of dollars.

The LJM transactions also sent up red flags that Arthur Andersen ignored. With Arthur Andersen's approval, Enron designed and entered into the transactions with LJM mainly to hide debt and losses and to enrich personally certain Enron financial officers, including Fastow. Arthur Andersen read the partnership's private placement memorandum, the first few pages of which state clearly that (1) Enron would retain significant economic or operating interests in the investments; (2) the General Partner was owned and controlled by Fastow, Kopper and Glisan; (3) some of the banks that were original investors in LJM2 which were guaranteed that their investment would be returned and they would enjoy large profits before LJM2 entities could enter into hedging transactions with Enron; (4) senior-level Enron financial executives would manage LJM2 on a day-to-day basis; (5) LJM2 would invest in the assets "sold" by Enron,

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

but Enron would also require that LJM2 retain significant economic or operating interests in them. The document's representation that the investors would enjoy superior returns because LJM2's general partners were senior Enron finance executives, with access to inside information and resources, also raised a red flag. The memorandum further disclosed that $17 billion of Enron assets, or 33%, were "financed off-balance sheet" and that even though Enron might sell some, "in many cases, [Enron sought] to maintain an active or controlling role in the underlying investment."

Arthur Andersen's accounting work on LJM2 informed it clearly of the following accounting improprieties in LJM2 and other SPEs: (1) Enron management controlled LJM2, which should have been consolidated in accordance with accounting rules; (2) Arthur Andersen's failure to investigate thoroughly the business purpose and substantive reasons for accounting about 33% of Enron's total assets on an off-balance sheet basis, especially in view of the fact that Enron had at least $17 billion in assets and associated liabilities carried off of its balance sheet; (3) Enron's regular retention of control of its off-balance sheet investments; (4) Enron finance executives and insiders received tens of millions of dollars in management fees and quick profits; (5) the "sale" to LJM2 and swift reacquisition of Enron's assets at a gain for LJM2, even when the value of the assets had declined; (6) Enron's use of its own stock as security for alleged hedges of other Enron investments.

According to the complaint, Arthur Andersen also knew about the improper accounting for the Raptors. It permitted Enron to improperly account for notes received for stock issued. Arthur Andersen billed Enron in 2000 at least $335,000 (about 1,675 hours at $200 per hour) for its work relating to the Raptor deals, which resulted ultimately in a $1 billion reduction in shareholders' equity when the accounting errors were corrected. The complaint at 470 quotes an article from *Bloomberg,* dated 11/12/01:

> Lynn Turner, who was the SEC's chief accountant for three years until he **\*683** resigned in August, said Enron and Andersen ignored a basic accounting rule when they overstated shareholder's equity.

> Explaining the equity reduction last week, Enron said it had given common stock to companies created by Enron's former chief financial officer in exchange for notes receivable, and then improperly increased shareholder equity in its balance sheet by the value of the notes.

### "Basic Accounting"

> "What we teach in college is that you don't record equity until you get cash for it, and a note is not cash," said Turner, who is now director of the Center for Quality Financial Reporting at Colorado State University. "It's a mystery how both the company would violate, and the auditors would miss, such a basic accounting rule, when the number is one billion dollars."

The complaint asserts that Arthur Andersen knowingly violated several accounting rules: (1) a company may not recognize an increase in the value of its capital stock in its income statement except under limited circumstances not present here, yet the substance of the Raptors and other transactions allowed Enron to report net income and gains on its income statement that were secured almost entirely by Enron stock and contracts to receive Enron stock that were held by the Raptors (i.e., the transactions created net income out of the air); (2) in the frequent consultations with the PSG in Chicago, which originally required the Enron engagement team to analyze whether there was a minimum 3% independent, at-risk equity investment at the inception and each time a derivative transaction was commenced, Arthur Andersen later improperly agreed that the analysis only needed to be done at the inception and that a subsequent deterioration of the interest was insignificant; (3) e-mails among Cash, David Duncan and Stewart throughout the Class Period reveal that Arthur Andersen officials, including David Duncan, Cash, Lowther, Odom, and Steward among others, were responsible for Arthur Andersen's decision to allow Enron to improperly record individual impairment charges for Raptor investments that had significantly and permanently declined in value; (4) Arthur Andersen accountants failed to demonstrate objectivity, charged Enron about $1.3 million for Raptor-related services, offered advice throughout the Raptors' existence that Enron followed, and, in the 2001 restatement, did not require revision of the $1 billion in prior earnings improperly derived from the Raptors.

In its audits of Enron's financial statements in 1997, Arthur Andersen identified $51 million of adjustments where the accounting was improper. Arthur Andersen knew these adjustments altogether constituted almost 50% of Enron's $105 million net income for that year and were therefore clearly material to the financial statements and needed to be made if those statements were not to be misleading. Nevertheless, Enron informed Arthur Andersen it did not want to make those adjustments, which would radically

reduce the net income that management wanted to report to the public. Arthur Andersen acquiesced in order to retain its lucrative client, and it abandoned its role as a public watch dog and violated GAAS. To justify not making such large adjustments, Arthur Andersen obfuscated the information by calculating the $51 million as an immaterial 8% of a contrived figure that it denominated as "normalized earnings," requiring no adjustment, instead of as a very material 51% of Enron's net income for 1997, which would require an adjustment. The complaint asserts that in 2001, too late for thousands of investors who lost billions of dollars because they relied on earlier years' financial statements, Enron restated its financial statements for 1997–2000 and **\*684** Arthur Andersen commented that the audit reports covering the year-end financial statements for 1997–2000 "should not be relied upon."

Arthur Andersen was required by GAAS to consider whether Enron's disclosures accompanying its financial statements were adequate. SAS No. 32, set forth in AU §§ 431.02–.03 provides,

.02 The presentation of financial statements in conformity with generally accepted accounting principles includes adequate disclosure of material matters. These matters relate to the form, arrangement, and content of the financial statements and their appended notes, including, for example, the terminology used, the amount of detail given, the classification of items in the statements, and bases of amounts set forth. An independent auditor considers whether a particular matter should be disclosed in light of the circumstances and facts of which he is aware at the time.

.03 If management omits from the financial statements, including the accompanying notes, information that is required by generally accepted accounting principles, the auditor should express a qualified or an adverse opinion and should provide the information in his report, if practicable, unless its omission from the auditor's report is recognized as appropriate by a specific Statement on Auditing.

The requisite disclosures included information about related parties, about which auditors must gather sufficient information to ensure that they understand the relationships between or among the parties and the effects of any transactions on financial statements. The auditor must be satisfied after his investigation that the disclosure is adequate. [119]

In sum, the complaint lists Enron's "woefully inadequate" disclosures regarding its accounting practices and related parties, many known to Arthur Andersen because it helped develop accounting for them, including transactions involving Chewco, management involvement in LJM, manipulative transactions involving the Raptors, improper and abusive use of mark-to-market accounting, improper use of its own stock to generate income, manipulative practices involving broadband, and many other accounting manipulations.

From September to November 2001, believing that civil litigation and government investigation of Enron was imminent, in compliance with Arthur Andersen's "document retention policy" developed in the wake of its Waste Management debacle, Arthur Andersen offices destroyed "tons" of documents in the United States (in Houston, Portland, and Chicago) and in London that could implicate Arthur Andersen in fraud at Enron. Arthur Andersen was indicted for obstruction of justice in the Justice Department's investigation of the collapse of Enron. [120] The complaint at 474–77 discusses alleged memoranda and e-mails exchanged between Arthur Andersen's **\*685** Chicago and Houston offices; Arthur Andersen's in-house lawyer, Nancy Temple's "reminder" to personnel about the document retention policy and insistence on deletion of key e-mail, as well as removal of any references to her on accounting memoranda; Michael Odom's October 10, 2001 conference regarding the importance destruction of documents; meetings held among Arthur Andersen officials; and the subsequent shredding. The complaint also identifies a number of Principles and Rules of the Code of Professional Conduct, which the bylaws of AICPA require members to abide by, that Arthur Andersen allegedly violated. [121]

Arthur Andersen had the responsibility as Enron's independent auditor, but failed, to gather "[s]ufficient competent evidential matter ... to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§ 150, 110. Arthur Andersen also intentionally ignored information indicating that Enron's financial statements did not "present fairly" Enron's financial position. By its false statements, its knowledge of improper accounting, its failure to identify and modify its reports to reveal Enron's false financial reporting, and its lack of

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

independence, Arthur Andersen violated numerous GAAS standards. [122]

**\*686 4. Fraud–On–The–Market Doctrine and Safe Harbor**

Finally, the consolidated complaint insists that the presumption of reliance under the fraud-on-the-market doctrine applies here to its § 10(b) and Rule 10bS–5 claims. It points out that at all relevant times the market for Enron's publicly traded securities was efficient for a number of reasons including that (1) Enron's securities were listed and actively traded on the NYSE and the Over–the–Counter Market, both of which are efficient markets; (2) as a regulated issuer, Enron filed periodic public disclosure reports with the SEC; (3) Enron communicated with public investors through established market mechanisms on a regular basis, including press releases, analyst conferences, and conference calls; (4) and several securities analysts followed Enron and wrote reports that were published, distributed, and entered the public market place. The market promptly absorbed all current information from all publicly available sources and reflected that information in the price of Enron stock. Therefore, concludes the complaint, all purchasers of Enron publicly traded securities during the Class Period suffered similar injury by purchasing these securities at artificially inflated prices.

Finally Lead Plaintiff contends that the PSLRA's statutory safe harbor does not apply to the forward-looking statements pled in the complaint because (1) it does not apply to Enron's financial statements or financial results; (2) with the exception of conference calls on 11/12/01 and 11/14/01 Enron did not give any safe harbor warning in its conference calls during the Class Period; (3) the cautionary statements issued by Enron during the Class Period were not meaningful because the Enron Defendants all actually knew of Enron's financial problems and each speaker knew that each forward looking statement he made was false and that it was authorized and/or approved by an executive officer of Enron who also knew that it was false.

**III. Motions to Dismiss and the Court's Rulings**

**A. Defendants' Common Objections**

A number of Defendants argue that Lead Plaintiff's allegations that Defendants knew of the Ponzi scheme and yet poured millions of dollars into it or risked their reputations to conceal the scheme merely for fees, payments and profits,

and subsequently, once caught in the scheme, shored it up in order to limit their exposure to liability and obtain what payments they could on Enron's debts to them, are inherently irrational, implausible, and/or illogical and the alleged actions are against Defendants' own self-interest. This Court notes that what may have been implausible two or three years ago is hardly so today, in light of a plethora of revelations, investigations, evidence, indictments, guilty pleas, and confessions of widespread corporate corruption and fraud by companies, auditors, brokerage houses, and banks. Lining one's pockets with gold, at the expense of investors, employees, and the public, appears too often to be a dominating ambition, and public scepticism about the market is very prevalent.

**\*687** The third-party entities have objected with justification to the undifferentiated, boiler-plate allegations repetitively applied to all or many defendants or with generalized references to "the bank defendants" or "the law firm defendants," without the requisite entity-specific and particularized factual allegations for pleading fraud under § 10(b), as required by Rule 9(b) and the PSLRA. They also criticize claims of misconduct based on what are common, legitimate business actions or practices (e.g., loans, commodity swaps, passive investments, underwriting securities offerings, regular working relationships with a company's executives, issuance of analyst reports, and desire to earn profits) that are not inherently improper or fraudulent. This Court responds that the activities must be viewed in context, i.e., within the totality of surrounding circumstances, to determine whether they are merely ordinary and legitimate acts or contrivances and deceptive devices used to defraud. Moreover it is fully aware that more is needed than conclusory allegations to defeat a motion to dismiss under § 10(b) and Rule 10b–5.

Emphasizing the complaint's reliance on language like "assisting," "participating in," "helped," and "complicity in," the motions also argue that, at most, Plaintiff in essence is charging these third-party defendants with aiding and abetting violations that are barred in claims under § 10(b) and Rule 10b–5 by *Central Bank.* Defendants argue that they made no public misrepresentations or omissions in misreporting Enron's financial condition, but point the finger at Enron as the responsible party for any such conduct. Moreover some Defendants have argued that they can only be liable under § 10(b) and Rule 10b–5 for a material misrepresentation or omission.

The Court has indicated its interpretation of and the test it has selected for liability under *Central Bank* and will apply both to determine whether the allegations against each Defendant constitute a primary violation or merely an aiding and abetting violation. See "Applicable Law" section of this memorandum and order at 39–61. The Court has also indicated that in addition to claims under Rule 10b–5(b), plaintiffs may sue for securities law violations under Rule 10b–5(a) and (c) for conduct other than material misrepresentations or omissions.

In addition, Defendants emphasize that the complaint lacks particularized factual allegations that would give rise to strong inferences of scienter, which in turn under Fifth Circuit law requires pleading more than financial motive and opportunity. They justifiably underline that instead, Lead Plaintiff substantially relies on conclusory allegations, such as that Defendants knew of the fraudulent scheme because their executives interacted almost daily with Enron's or that they had unlimited access to Enron's business and financial information as Enron's lead lending banks, or that the banks in extending commercial loans or credit facilities were required to perform extensive credit analyses of the borrower financial situation. As will be discussed, such allegations are insufficient under Rule 9(b) and the PSLRA.

The Defendants contend that the complaint only conclusorily negates the existence of "Chinese Walls" that would keep any information from research analysts that was known to the investment banking services section of the banks. Defendants additionally object that the complaint charges that Defendants' analysts issued misleading reports, but fails to identify any misleading statements or plead any specific facts showing that the analysts had contemporaneous knowledge of facts contradicting specific statements in their reports.

In the complaint Lead Plaintiff explains that for decades after it was enacted following **\*688** the stock market crash of 1929, the Glass Steagall Act prohibited banks from acting in dual capacities as both commercial banks and brokerages, making loans to and selling the securities of their corporate customers. The Glass Steagall Act was repealed in 1999 and financial establishments were permitted to offer both commercial and investment banking services and trusted to establish Chinese walls between the two.

While the Court agrees that the absence of effective Chinese walls is only conclusorily asserted by Lead Plaintiff, the Court observes that the Chinese wall issue is another allegation that must be viewed in the total context, including facts unearthed in current investigations by the SEC and by prosecutors like Eliot Spitzer, the attorney general of New York. It has been widely reported that internal documents from firms including Merrill Lynch and Credit Suisse First Boston have revealed that their analysts issued recommendations to buy or sell stock even though their own research results were contrary to those recommendations, and that they conceded that the recommendations served to help attract business to their investment banking service. Moreover, ten of Wall Street's largest brokerage firms and investment banks are currently working with Mr. Spitzer and Stephen M. Cutler, director of enforcement for the SEC, to work out a settlement agreement with regulators to cure problems with stock research and possibly to subsidize stock research by independent companies that do not also operate investment banks underwriting stocks. In addition, Citigroup has just announced that it is separating its stock research and brokerage, in a new unit to be called Smith Barney, from its investment banking service to eliminate possible conflicts of interest.

Moreover reports abound daily as to what appears to be a standard absence of effective Chinese walls on Wall Street. In recent weeks the news has been filled with allegations about an e-mail suggesting that Salomon Smith Barney's former telecom analyst Jack Grubman raised his rating on AT & T's stock from "hold" to "buy" in 1999 to obtain admittance of his twin children into an exclusive nursery school through efforts of Citigroup's chairman Sandy Weill, who sat on the board of AT & T and asked Grubman to "take a fresh look" at his rating of its stock. A few months later, after Weill's firm reaped large fees from helping AT & T to sell investors shares in its wireless division and after obtaining admission for his twins, Grubman downgraded the stock, but only after it lost 50% of its value between Grubman's upgrading of the stock when it was valued at $57.43 and downgrading it when it was selling at $28.88. Investors lost approximately $80 billion in value. [123]

**[51]** Defendants contend that Lead Plaintiff has not adequately pleaded facts **\*689** showing that the analysts did not merely accurately report information provided to them by Enron and argue that the statements in those reports constitute either puffery or opinion and are therefore not actionable. The Court observes that Lead Plaintiff's complaint for claims under § 10(b) focuses in large part on pleading adequately the secondary-actors Defendants' involvement, with scienter, in acts, deceptive devices, contrivances, and scheme and/or course of business to defraud the public, i.e., primary

violations of Rule 10b 5(a) and (c). The very nature of Defendants' personal and intimate knowledge of the fraud from the alleged direct participation in the Ponzi scheme necessarily makes their highly positive public statements and buy-stock recommendations misrepresentations of the truth. Thus the legal basis of the claims makes irrelevant a specific analysis of each statement, which would be required if they were asserting only claims of a material misrepresentation or omission under Rule 10b–5(b). The alleged absence of effective Chinese walls, which the Court has found adequate in light of the totality of the circumstances, makes knowledge gained in the lending and commercial areas of the banks imputable to their analysts.

 [52]    Various Defendants have contended that specific claims under § 10(b) and Rule 10b–5 are time-barred as a matter of law. A private right of action under § 10(b) "must be commenced within one year after discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

Lead Plaintiff has responded that it is not seeking to recover damages for alleged misconduct that occurred more than three years before suit was filed, but is pleading such purported violations solely to establish evidence of a scheme and of scienter. Such evidence is admissible for this purpose. *Ashdown,* 509 F.2d 793 (5th Cir.1975)(mail fraud); *United States v. Blosser,* 440 F.2d 697, 699 (10th Cir.1971)(same); *Fitzgerald v. Henderson,* 251 F.3d 345 (2d Cir.2001)(Title VII). The Court agrees and considers those allegations to be admissible solely for the purpose of establishing a scheme and/or scienter.

Defendants have also argued that despite Lead Plaintiff's disclaimer that it is not grounding its Section 11 claims in fraud, Lead Plaintiff has incorporated allegations of fraud and its claims are based on the same fraudulent scheme as its § 10(b) and Rule 10b–5 claims, and therefore must be pleaded, but have not been, with Rule 9(b) particularity. *Lone Star Ladies Inv. Club,* 238 F.3d at 368;*Melder,* 27 F.3d at 1100 & n. 6. The Court disagrees. See pages 70–71 of this memorandum and order.

 [53]    A few Defendants have maintained that they are not liable for alleged misstatements in analysts' reports because the investors could not have reasonably relied on them, not only in light of their use of qualified language (e.g.,

"we believe," "we forecast," "we expect," "we feel very comfortable"), but also because of express disclaimers, such as "does not warrant its completeness or accuracy," "past performance is not indicative of future results," or "the recipient of this report must make its own independent decisions regarding any securities or financial instruments mentioned herein." The Court disagrees. Generally a disclaimer is **\*690** enforceable only where it "tracks the substance of the alleged misrepresentation."*Grumman Allied Indus. v. Rohr Indus., Inc.,* 748 F.2d 729, 735 (2d Cir.1984). *See also Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 316 (2d Cir.1993)(to be effective a disclaimer "must contain explicit disclaimers of the particular representations that form the basis" of the fraud claim). Under both the statutory safe harbor and the bespeaks caution doctrine, as discussed, the warnings may not be vague, generic, cursory disclaimers, but instead must be "meaningful cautionary statements" identifying important factors that might cause material differences in actual results, or must be adequate and specific. Moreover if the party is found to have the requisite scienter for fraud, i.e., knows the statements or omissions are materially misleading or untrue or is severely reckless about the truth of his statements, the safeguards will not apply.

Some Defendants have also argued that the plaintiff who purchased 7% Notes on November 5 and 9, 2001, Murray van de Velde, did so more than two years after the effective date of the registration (August 10, 1999) and after the issuance of an earning statement covering at least twelve months thereafter, not to mention a number of negative public disclosures about Enron. [124]  Therefore van de Velde cannot plead or prove the requisite actual reliance of the alleged misstatements in the prospectus, as required by § 11, 15 U.S.C. § 77k(a). [125] *See, e.g., Greenwald v. Integrated Energy, Inc.,* 102 F.R.D. 65, 71 n. 2 (S.D.Tex.1984)("Reliance is required under the one year provision of Section 11(a)...."); *Rudnick v. Franchard Corp.,* 237 F.Supp. 871, 873 n. 1 (S.D.N.Y.1965)("in all likelihood, the purchase and price of the security purchased after publication of [a subsequent earning statement] will be predicated on that statement rather than on the information disclosed upon [the original] registration")(citing H.R.Rep. No. 1838 (1934)).

Lead Plaintiff has conceded this point and no longer pursues claims based on the 7% Exchangeable Notes. [126]

 **\*691**  Defendants also insist that no facts have been pleaded to support the conclusory allegations of controlling person liability under § 15 of the 1933 Act, § 20(a) of the 1934 Act,

and article 581– § 33(F) of the TexasSecuritiesAct. Lead Plaintiff has not addressed the question of controlling person liability in its response to the secondary-actor Defendants' arguments that the complaint does not plead that any defendant exerted actual control over Enron or the other defendants so all claims under the appropriate provisions of the three statutes should be dismissed. The Court defers ruling on the issue under the federal and Texas statutes until it has thoroughly reviewed all the individual Defendants' motions.

[54] In addition, Defendants have moved to dismiss the Washington State Investment Board's claim relating to the underwriters of the 6.95% Notes and the 6.40% Notes under the TexasSecuritiesAct, Tex.Rev.Civ. Stat. Ann. art. 581–33, for lack of a nexus between the sales of the securities and the State of Texas, i.e., an allegation that the sales occurred in Texas. Moreover, they maintain, because the claim also sounds in fraud, it must be pleaded with particularity under Rule 9(b). One Defendant claims that Plaintiff has not pleaded under which provision in the TexasSecuritiesAct the Board's claims are brought.

Lead Plaintiff responds that the misconduct alleged, including false statements to sell Enron debt, occurred in and/or emanated from Texas in substantial part, justifying suing under article 581–33. Therefore, Lead Plaintiff maintains that Defendants cannot meet their burden of proof under Texas law for claiming foreign law applies: they must show the existence of a true conflict of laws and demonstrate which law should apply to Lead Plaintiff's claims based on state contacts. *Weatherly v. Deloitte & Touche,* 905 S.W.2d 642, 650 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.). As an example Lead Plaintiff contends that Enron's Form 10–K for 1997, which was incorporated into the Registration Statement for the sale of the Notes, was materially false because it concealed the debt moved off Enron's balance sheets and into the JEDI/Chewco entity. This illicit entity was formed *inter alia* by Vinson & Elkins, Enron, Enron employees, and Arthur Andersen employees in Houston, Texas.

Moreover, Lead Plaintiff observes that the Texas statute is a broad remedial statute **\*692** intended not only to protect Texas residents but also "non-Texas residents from fraudulent securities practices emanating from Texas." *Baron v. Strassner,* 7 F.Supp.2d 871, 875 (S.D.Tex.1998); *Rio Grande Oil Co. v. State,* 539 W.W.2d 917, 921 (Tex.Civ.App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.) ("A state is damaged if its citizens are permitted to engage in fraudulent practices even if those injured are outside its borders."). Lead Plaintiff insists it "does not have to show that the sale of the securities was primarily linked to Texas because the statute applies if any act in the selling process of securities covered by the Act occurs in Texas." *Id.* at 921–22; *see also Texas Capital Sec., Inc. v. Sandefer,* 58 S.W.3d 760, 776 (Tex. App.-Houston [1st Dist.] 2001, pet. ref'd)(same).

The Court agrees with Lead Plaintiff and finds that the objection to the TexasSecuritiesAct claims lacks merit.

## B. Section 10(b) Claims Against Defendants Individually

Rather than focusing upon deficiencies in the complaint, especially conclusory or boiler plate allegations, of which the Court agrees that there are many, the Court examines what Lead Plaintiff has specifically and successfully pled in this complaint against each Defendant to determine whether it adequately states a claim with specificity under § 10(b) and raises a strong inference of the requisite scienter that warrants denial of its motion to dismiss.

### 1. Legal Standards

As indicated for violations of § 10(b), Lead Plaintiff may assert and has asserted claims under all three prongs of Rule 10b–5, and is not limited to the second prong's material misrepresentation or omission category:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Furthermore, Plaintiff must allege specific facts sufficient to give rise to a strong inference of scienter, i.e., intent to deceive, manipulate or defraud, or at least knowing misconduct, which in this Circuit must reach the level of severe recklessness, "highly unreasonable omissions or misrepresentations [and/or use of manipulative and deceptive devices and contrivances to defraud and/or engagement in a practice or scheme or course of business that operated as a fraud upon the public in connection with the sale and purchase of Enron securities] that involve not merely

simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.”*Nathenson,* 267 F.3d at 408. Furthermore, scienter must be evaluated in view of the totality of alleged facts and circumstances, together as a whole, with all reasonable inferences drawn in Lead Plaintiff's favor. *Abrams,* 292 F.3d at 431.

This Court applies the SEC's test for primary liability for a material misrepresentation or omission under § 10(b) and the second prong of Rule 10b–5: “when a person, acting alone or with others, creates a misrepresentation [on which the investor-plaintiffs relied], the person can be liable as a primary violator ... if ... he acts with the requisite scienter.” SEC's Brief **\*693** (# 821) at 18. “Moreover it would not be necessary for a person to be the initiator of a misrepresentation in order to be a primary violator. Provided that a plaintiff can plead and prove scienter, a person can be a primary violator if he or she writes misrepresentations for inclusion in a document to be given to investors, even if the idea for those misrepresentations came from someone else.” *Id.* Furthermore, “a person who prepares a truthful and complete portion of a document would not be liable as a primary violator for misrepresentations in other portions of the document. Even assuming such a person knew of misrepresentations elsewhere in the document and thus had the requisite scienter, he or she would not have created those misrepresentations.” *Id.* at p. 19.

Lead Plaintiff must plead reliance on the alleged material misrepresentation or omission. As discussed *supra,* the fraud-on-the-market theory is applicable.

 **[55]**   Moreover, under Rule 10b–5(a) and (c), where a group of Defendants allegedly participated in the scheme to defraud the public and enrich themselves in connection with the purchase or sale of securities, any Defendant that itself, with the requisite scienter, actively employed a significant material device, contrivance, scheme, or artifice to defraud or actively engaged in a significant, material act, practice, or course of business that operated as a fraud or deceit upon any person in connection with the purchase or sale of any security may be primarily liable. As noted, the phrase “in connection with the purchase or sale of any security” must be construed broadly and flexibly to effectuate Congress' remedial goal in enacting the statute of insuring honest securities markets and promoting investor confidence. *O'Hagan,* 521 U.S. at

658, 117 S.Ct. 2199;*Zandford,* 122 S.Ct. at 1903. Reliance under prongs (a) and (c) can also be established by the fraud-on-the-market doctrine: Lead Plaintiff has alleged that the identified contrivances, deceitful devices, schemes and courses of business operated to present a falsely positive picture of Enron's financial condition and maintain its high credit ratings, thereby artificially inflating the value of Enron's publicly traded securities and continuing to attract funds from the investing public or encouraging shareholders not to sell.

### 2. Primary Violations by Specific Defendants

Lead Plaintiff alleges a scheme or course of business in which the various participant Defendants engaged in and concealed a pattern of conduct involving the creation of unlawful SPEs and utilizing fraudulent transactions with these entities having no economic purpose other than as contrivances or deceptive devices to misrepresent Enron's financial condition and defraud investors into continuing to pour money into Enron securities to keep the Ponzi scheme afloat and thereby enrich themselves in a variety of ways. It has also asserted that as part of this scheme Defendants knowingly made material misrepresentations upon which investors in Enron securities relied. Moreover, the purchase of Enron securities by unknowing investors was an integral part of the scheme, necessary to keep the house of cards out of bankruptcy and to further a scheme so lucrative for Defendants.

 **[56]**   As a factor common to all, the Court initially finds that the scienter pleading requirement is partially satisfied by allegations of a regular pattern of related and repeated conduct involving the creation of unlawful, Enron-controlled SPEs, sale of unwanted Enron assets to these entities in clearly non-arm's length transactions and often with guarantees of no risk, in order to shift debt off Enron's balance sheet and sham profits onto its **\*694**  books at critical times when quarterly or year-end reports to the SEC, and by extension the public, were due, followed in many cases by the undoing of these very deals once the reports had been made. These transactions were not isolated, one-of-a-kind instances of violations of the statutes, but deliberate, repeated actions with shared characteristics that were part of an alleged common scheme through which Defendants all profited handsomely, many exorbitantly. The very pattern that is alleged undermines claims of unintentional or negligent behavior and supports allegations of intent to defraud. Furthermore, the intrinsic nature of these devices and contrivances was fraudulent so that those intimately involved in structuring the entities and arranging the deals, especially more than one, would have to

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

have been aware that they were an illicit and deceptive means to misrepresent Enron's actual financial state and mislead investors about Enron securities, or at minimum, would have had to have been severely reckless as to that danger.

Moreover, Lead Plaintiff has pleaded effectively the common motive of, fixation on, and obsession with monetary gain. It has not only alleged that extraordinary fees, interest rates, etc., were pocketed by the secondary actor Defendants, which only inflated with the expanding mirage of corporate success that they allegedly fraudulently created. It has also described credit default puts that obligated Defendants to maintain Enron's strong financial image to avoid exposure to large losses. It has claimed that Defendants not only aided in structuring and funding the fraudulent entities from which they derived concrete, extraordinary benefits, but they also sold stock to the public investors and were repaid from the proceeds of those sales. The Court finds that the facts pled here constitute allegations of motive and opportunity that meaningfully enhance the strength of the inference of scienter, though they do not alone suffice. *Nathenson,* 267 F.3d at 412.

Similarly, conclusory allegations asserted against all or most of the secondary actor Defendants, such as the long-term, continuous, intimate and extensive relationships with Enron and daily interaction with Enron's top executives, necessarily raise the specter of potential and unusual opportunities to learn about and take an active role in Enron's financial affairs, open access to nonpublic information about Enron, intimacy blending into complicity fueled by financial interests, and involvement in formulating, funding, drafting, and decision-making about key aspects of Enron's business, including the structuring and financing of Enron's secretly controlled partnerships with no economic purpose other than to defraud. In addition, the provision of both commercial banking and investment banking services to Enron raises the possibility of conflicts of interest and the standard mandatory in-depth credit analyses required of borrowers by lenders, etc., which should have raised red flags, are all background factors to be considered. Nevertheless, without some particular facts about specific involvement of each Defendant in fraud that would alert a reasonable party to recognize its participation in a fraudulent scheme and indicate either actual knowledge or reckless disregard by that Defendant of the wrongdoing to misrepresent Enron's financial condition, such general allegations applied to every Defendant across the board are not sufficient by themselves to raise a strong inference of scienter. Defendants have

complained that they are being targeted for performing the normal functions of their businesses, e.g., lending money, underwriting stocks, accounting and auditing, or drafting legal documents. Obviously, regular business conduct within the bounds of the law would not support a claim of securities law violation; instead **\*695** the allegations must demonstrate that they knowingly or with reckless disregard stepped outside the boundary of legitimate and professionally acceptable activities in performing material acts to defraud the public.

The Court addresses party-specific, concrete factual allegations against each Defendant whose motion to dismiss is under review to see if Lead Plaintiff has asserted with specificity some material misrepresentation or omission, use of a deceptive device or contrivance or participation in a scheme or course of business to defraud investors in connection with the purchase or sale of securities that would raise a strong inference of scienter, sufficient for Lead Plaintiff's § 10(b) claims to survive. Where Lead Plaintiff has once adequately alleged that a party took such an affirmative step with scienter, not only that immediate act or material misrepresentation or omission, which without adequate public disclosure directly or indirectly manipulated the financial picture of Enron or the value of its securities, any alleged subsequent activity by that party, such as continuing to lend funds to Enron-controlled SPEs or soliciting or selling Enron securities or even silence, necessarily becomes suspect as further complicity in, expansion of, and perpetuation of the alleged Ponzi scheme.

### a. The Banks

#### (i) J.P. Morgan

[57]  Viewing the specific allegations together, the Court finds that Plaintiff has stated a claim against J.P. Morgan as a primary violator under § 10(b) and Rule 10b–5. Among the alleged circumstances that portray J.P. Morgan as knowingly or at least with severe recklessness making a material misrepresentation or employing a device, scheme, or artifice to defraud or engaging in an act, practice, or course of business that operated as a fraud or deceit upon Enron investors and that in combination give rise to a strong inference of scienter are the following.

The private placement memorandum/invitation-to-invest for LJM2, with its express indication that Andrew Fastow would be wearing two hats in a blatant conflict of interest and with an obvious opportunity for self-dealing, and its

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

promise of extraordinary returns to investors, [127] among which were J.P. Morgan's executives, who invested at least $25 million, allegedly served as a reward to executives of Defendants that participated in the Ponzi scheme. The allegations constitute an invitation for a highly lucrative, potentially illicit investment opportunity. More, however, is needed for pleading liability under § 10(b) and Rule 10b–5. Lead Plaintiff argues that the "prefunding" in amounts higher than each Defendant's allocated share just before the '99 year-end reports were due gave rise to the requisite scienter. The Court disagrees. The Court finds that Lead Plaintiff has failed to allege precise facts that would have alerted any of the various Defendant investors to suspect that their December 22, 1999 secret initial investment funds to capitalize LJM2 were to be used specifically to fund the CLOs, Nowa Sarzyna power plant, MEGS, LLC, and Yosemite deals through LJM2 in order to doctor Enron's balance sheet in time for the 1999 year-end reports or that these investors would have known **\*696** any particulars about those four deals merely because they put up money on an expedited basis. The Court does find, however, that Lead Plaintiff's claim that in a short time these investors were rewarded by actual, exorbitant returns (up to 2,500% on one deal and 51% overall within the first year), in view of the implied promises of private placement memorandum, would raise red flags to any objective party investing in it and especially a party having other business dealings with Enron. Nevertheless Lead Plaintiff provides no details about how, when, where or who of the investors learned what about the various entities and transactions involving Chewco. Moreover, Lead Plaintiff states generally that the greatest returns to the investors occurred sometime from 2000 to 2001 from deals involving the Raptors, somewhat later in the Ponzi scheme. Thus the Court finds that further involvement, beyond the fact of prefunding and investment in LJM2, is necessary to raise a strong inference of scienter regarding each Defendant's alleged participation in the purported Ponzi scheme.

Moreover in light of the substantial sum J.P. Morgan, a sophisticated business banking entity, poured into LJM2 in the prefunding personal investment and the $65 million line of credit J.P. Morgan extended to the partnership, the Court finds noncredible any contention that the bank would not have reviewed the structure and activities of that entity with care and would sooner or later have discovered its alleged illicit purpose. Nevertheless, as noted, Plaintiff has made cookie cutter allegations against all the bank Defendants, but failed to provide crucial specific facts identifying specifically

why, how, when or what J.P. Morgan or any of the other pre-funders learned about the individual SPEs and their transactions. The complaint does assert that J.P. Morgan funded at least four SPEs (Sequoia, Choctaw, Cherokee, and Cheyenne, generally as additional Enron-controlled entities used solely to artificially inflate Enron's profits and conceal its debt), but gives no particulars about their deals or what, when or how J.P. Morgan knew about them.

Lead Plaintiff has also generally alleged that J.P. Morgan and Citigroup administered the financial affairs of LJM2, including profit distributions and capital calls, and were thus informed about LJM2's deals, finances and distributions to investors. Such a role would necessarily have given both banks access to confidential information about the entity. These general allegations, along with many others in the complaint, are significant factors for consideration, but are clearly inadequate by themselves to raise a strong inference of scienter without some detailed facts pled that would indicate when and what particular information J.P. Morgan was aware of or that what it was severely reckless in disregarding.

 [58]  Lead Plaintiff does provide sufficient details to meet the pleading and scienter standards for § 10(b) claims relating to J.P. Morgan regarding JP Morgan's repeated "loans" of about $5 billion to Enron, disguised as commodities trades between 1997 and 2000. These loans were frequently made for years at critical junctures, just before quarter-end or year-end, by J.P. Morgan, utilizing its controlled entity Mahonia, as alleged manipulative or deceptive acts or contrivances, overseen by a senior credit officer at J.P. Morgan, Mark Shapiro, to falsify Enron's financial condition. These allegations do raise a strong inference of scienter. Lead Plaintiff has further asserted that these loans resemble a scheme that J.P. Morgan is accused of perpetrating earlier with a commodities trader from Sumitomo Corporation, which is currently being challenged as fraudulent in another suit. Lead Plaintiff's additional claims regarding the efforts **\*697** of J.P. Morgan to insure against Enron's default on the disguised loans by purchasing performance bonds from insurance companies, also at issue in litigation elsewhere, and the alleged excessive rate of interest J.P. Morgan charged for the disguised loans (more than 3% higher than normal rates, yielding an extra $120 million per year to be collected by J.P. Morgan) imply that it was aware of Enron's precarious financial condition and that it sought personal gain out of the ordinary from its fraudulent conduct, while simultaneously contributing to a strong inference of scienter. Moreover, these alleged disguised loans, which, the

complaint notes, investigating Congressional officials have criticized as having no legitimate economic purpose but instead as appearing to be devices to "allow Enron to covertly borrow hundreds of millions of dollars in undisclosed loans," are part of a pattern of subterfuge loans painted by the complaint that include the Delta transactions with Citigroup and the fake swap in which Credit Suisse First Boston lent Enron $150 million to be repaid over two years. Along with all the other general allegations of J.P. Morgan's extensive involvement with Enron, the pleadings relating to the bank's participation in, inflated benefits from, and failure to adequately disclose these transactions, as well as its awareness that LJM2, with its conflict of interest and potential for self-dealing, was enjoying extraordinary returns, imply J.P. Morgan had knowledge of the alleged illegitimacy of Enron's ongoing business dealings and the inaccuracy of its financial reports. Furthermore, according to the complaint, there were material misrepresentations in its analysts' consistently positive reports and registration statements, which purportedly did not change in any substantive way from the formation of LJM2 and the executives' undisclosed pre-funding. See pages 132–35, 159–65 of this memorandum and order.

For these reasons, the Court finds that Lead Plaintiff has alleged primary violations of § 10(b) and Rule 10b–5 and raised a strong inference of scienter, and it accordingly denies J.P. Morgan's motion to dismiss.

#### (ii) Citigroup

Viewing the specific allegations together, the Court finds that Plaintiff has stated a claim against Citigroup as a primary violator under § 10(b) and Rule 10b–5. Among the alleged circumstances that portray Citigroup as knowingly, or at least with severe recklessness, making a material misrepresentation or employing a device, scheme, or artifice to defraud or engaging in an act, practice, or course of business that operated as a fraud or deceit upon Enron investors, and that together give rise to a strong inference of scienter, are the following.

As indicated, the private placement memorandum/invitation-to-invest for LJM2, with its express indication that Andrew Fastow would be wearing two hats in a blatant conflict of interest and obvious opportunity for self-dealing, and its promise of extraordinary returns to investors, among which were Citigroup executives, and, most importantly, followed in a short time by actual, exorbitant returns, would raise flags to any objective party investing in it and doing continuing

business with Enron. By themselves, however, the Court finds these investments insufficient, without more, to raise a strong inference of scienter.

In light of the substantial sums of money Citigroup, a sophisticated business banking entity, poured into LJM2, i.e., $1,500,000 in pre-funding on 12/22/99 (many times more than its allocated share), and a $15 million dollar personal investment by its executives, the Court finds noncredible any contention that the **\*698** bank would not over time have scrutinized the structure and activities of the illicit entity. Moreover, beyond the significant investment in the partnership, Lead Plaintiff has alleged that Citigroup and JP Morgan administered the financial affairs of LJM2 from 1999–2001, including profit distributions and capital calls, and Citigroup thus would have been access to information about LJM2's financial operations and transactions, and those with its "spin-off" SPEs.

 **[59]** More specific are the allegations of Citigroup's involvement in the New Power IPO scheme in 10/00. With other banks it made a loan to fund Hawaii 125–0 and received a "total return swap" guarantee to protect it from any loss, while Enron sold its New Power warrants to that entity and falsely hedged it with the help of Enron-controlled LJM2 and Porcupine.

In addition, Citigroup, through its Cayman Island subsidiary, also allegedly participated in a repeated pattern of pre-paid swaps, i.e., disguised large loans to Enron totaling $2.4 billion that were never disclosed on its balance sheet, through the Delta transactions, at interest rates nearly double the normal borrowing rate, providing Citigroup with nearly $70 million annually for its participation in the Ponzi scheme. Moreover, Lead Plaintiff additionally alleges that to reduce Citigroup's own risk exposure in the event that Enron defaulted on what Citigroup knew were very dangerous transactions, Citigroup sold Enron-linked securities as notes, including the disguised Delta loans. While the Court does not disagree with Citigroup that credit-linked notes are "a well-recognized derivatives instrument, issued and traded in huge volumes each year by a wide variety of entirely proper purposes" in order to spread risk over a larger number of guarantors, as allegedly used in the context of the allegations in this case, they raise an inference that Citigroup knew how precarious the financial condition of Enron was in contrast to its positive public representations.[128]

*In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

The Court finds that the allegations of primary violations of § 10(b) and Rule 10b–5, which simultaneously raise a strong inference of scienter, warrant denial of Citigroup's motion to dismiss.

### (iii) Credit Suisse First Boston

Viewing the specific allegations together, the Court finds that Plaintiff has stated a claim against Credit Suisse as a primary violator under § 10(b) and Rule 10b–5. Among the alleged circumstances that portray Credit Suisse First Boston as knowingly or at least with severe recklessness employing a device, scheme, or artifice to defraud or engaging in an act, practice, or course of business that operated as a fraud or deceit upon Enron investors, and that together give rise to a strong inference of scienter, are the following.

The private placement memorandum/invitation-to-invest for LJM2, with its express indication that Andrew Fastow would be wearing two hats in a blatant conflict of interest and obvious opportunity for self-dealing, and its promise of extraordinary returns to investors, among which were Credit Suisse First Boston executives, and, most importantly, followed in a **\*699** short time by actual, exorbitant returns, would raise flags to any objective party investing in it and doing continuing business with Enron. Moreover, in light of the substantial sums of money Credit Suisse First Boston, a sophisticated business banking entity, poured into LJM2, i.e., a $120 million plus credit line to the partnership and a $22.5 million dollar personal investment by its executives, the Court finds noncredible any contention that the bank would not over time have scrutinized the structure and activities of the illicit entity. Lead Plaintiff, however, has failed to plead sufficiently specific facts that would demonstrate scienter with respect to the investments.

 **[60]**   Lead Plaintiff does succeed in pleading claims cognizable under § 10(b) and Rule 10b–5 with its additional allegations relating to Credit Suisse First Boston's alleged involvement in Enron's scheme to recognize a profit by taking New Power public. The complaint asserts that pursuant to a secret deal made before and carried out after the New Power IPO, for which Credit Suisse First Boston served as lead underwriter, Credit Suisse First Boston, together with other banks, made a sham loan of $125 million to Hawaii 125–0, when the banks actually and secretly received a total return swap guarantee from Enron against any loss. Credit Suisse under these allegations would have known its loan was a deceptive device or contrivance. Enron then sold millions of New Power warrants to Hawaii 125–0 to "secure" the

banks' loans and to create a $370 million profit for itself on the purported gain on these warrants. Hawaii 125–0 then purportedly "hedged" the warrants with Porcupine, also controlled by Enron, which LJM2 had previously capitalized with $30 million for the hedge of the New Power warrants. One week later, Porcupine emptied its coffers when it paid back the money plus $9.5 million to LJM2, another source of significant and suspicious fast returns for LJM's investors, which included top officials of Credit Suisse First Boston. See pages 130–31 of this memorandum and order.

Credit Suisse First Boston is also alleged to have made another disguised "loan" or sham swap of $150 million, to be repaid over two years to Enron in 2000 in payments varying with the cost of oil. According to the complaint, it was not a swap because Enron was paid up front. Moreover, Credit Suisse First Boston's spokesman, Pen Pendleton, is quoted as conceding, "It was like a floating-rate loan. We booked it as a loan."

Lead Plaintiff's specific explanation of how Credit Suisse First Boston regularly participated in the Ponzi scheme by designing, structuring and funding the SPEs that were the primary vehicles utilized by Enron to falsify its financial condition and misrepresent profits also constitutes a scheme to defraud investors raises a strong inference of scienter. The complaint charges that a group of ten bankers from Credit Suisse First Boston, headed by Laurence Nath, created some of the illicit SPEs, a process dubbed "structured products," including Marlin, Firefly, Mariner, Osprey, Whitewing, and the Raptors, to which Credit Suisse First Boston helped Enron sell assets at inflated prices in non-arm's-length transactions to create sham profits and conceal massive debt for Enron. Lead Plaintiff specifically explains that Laurence Nath and Credit Suisse First Boston worked closely with Vinson & Elkins and Arthur Andersen to create and document these SPEs and transactions. When an asset was sold to one of the SPEs as a quick-fix solution to remove that asset from Enron's balance sheet, it was referred to as "monetising" the asset. Laurence Nath would regularly go to Houston for a week or two, meet with a group from Enron's treasury and global finance departments **\*700** ("Fastow's field marshals"), including Jeff McMahon or Ben Glisan (successive treasurers of Enron), and create a solution to new problems in order to doctor the Enron books. According to the complaint, most of the vehicles created in this manner by Nath shared the same unusual feature: the SPEs held Enron stock to reassure lenders and secure an investment grade rating, but there were set "trigger points," or prices between $83 $19 per share, at

which the stock's declining value would require Enron to put more shares into the entity or even force liquidation if Enron's credit rating was downgraded. At that point the debt of the SPEs became recourse to Enron. Not only does such specific involvement in the scheme give rise to a strong inference of scienter, but the alleged acts of Nath and his team would constitute primary violations of the statute.

The complaint also describes discussions that it claims reflect Credit Suisse First Boston's actual knowledge of Enron's real financial condition underneath the cloak of false representations. The complaint quotes an Enron insider as remarking, "There's no question that senior people at CSFB knew what was going on and that it was a house of cards." One individual who attended a meeting in July 2001, when Enron's stock had fallen into the $40s, stated that the triggers were discussed by senior Enron executives and Credit Suisse First Boston bankers. It was reported that the bankers remarked, "If this thing hits the $20s, you better run for the hills," and "There was no question that they knew exactly what lay inside the structures, when the triggers went off—everything. You could almost say they knew more about the company than people in Enron did." See page 173–74 of this memorandum and order. While the content of these remarks may be subject to other interpretation, with respect to a Rule 12(b)(6) motion, the Court views the pleaded facts in favor of Lead Plaintiff.

The complaint also refers to a discussion at a meeting in June 2001, when Enron stock was trading at around $48.50 a share, between an Enron manager and two Credit Suisse First Boston managing directors reflecting that Credit Suisse First Boston knew about the nature and extent of Enron's off-balance sheet exposure and Enron's falsification of its financial statements. The bank's directors asked an Enron manager: "How can you guys keep doing this?," in reference to Enron's repeated statements to the market that its stock was under valued. Even at $40 per share, Enron's stock was still overvalued in the bank directors' view, as reflected in their comments to the Enron manager: "Do employees actually believe it's worth what management is saying?"; "[Y]ou guys are at a critical price point right now"; that if Enron's stock price continued to fall, that drop would cause Raptor to unwind and the debt balance to come due; when the Enron executive stated that he thought Enron's off-balance sheet debt was between one and two billion dollars, the bank representatives responded, "Try eight to 12 billion."; and that if Enron's stock dips to $20 per share, things would come falling down and "you guys are gonna be fucked."

In light of these specific allegations, Plaintiff's somewhat conclusory allegations that Credit Suisse First Boston's analysts' reports and recommendations and its Registration statements contained material misrepresentations about Enron's stock and financial condition carry more weight than they might otherwise be entitled to. Lead Plaintiff has pointed out that the bank's boilerplate disclosures remained the same as they were before the funding of LJM2 in December 1999, never mentioning specifically the investments of its top *701 executives in the entity, its funding of the partnership during 2001, its concealed loan transactions, or any of the significant conflicts of interest that would cast doubt on its analysts' objectivity and honesty in evaluating Enron stock. It has also identified specific positive statements in reports, including those in paragraphs 154, 158, 167, 171, 180, 191, 198, 205, 213, 229, 268, 285, 290, 319, 345, 354, 374, 378, 612–41, and 704 of the complaint, which, when set against its factual allegations of ongoing fraud which the Court presumes for purposes of the motion to dismiss to be true, constitute material misrepresentations. While Plaintiff has not sufficiently alleged scienter as to most of them, it has asserted reasons why from early in the Class Period Credit Suisse First Boston was aware of, or recklessly disregarded, obvious warning signs of illicit, fraudulent conduct by Enron and its officers more than sufficient for it to question if not truth or accuracy of its statements about particular matters, certainly the truth or accuracy of its unqualified, glowing picture of Enron, which in turn served to increase the sales and price of Enron's publicly traded securities, from which it derived monetary benefits.

### (iv) CIBC

[61] Beyond the global allegations of the complaint, such as that the bank "had an extensive and extremely close relations" with Enron, provided it with commercial and investment banking services, lent Enron substantial sums, underwrote numerous Enron-related securities and raised billions from the sale of Enron and Enron-related securities, helped structure and fund several of Enron's controlled partnerships and illicit transactions with its SPEs, and pocketed millions annually in interest payments and fees, Lead Plaintiff makes specific assertions against CIBC that, if true, would constitute primary violations of § 10(b) and Rule 10b–5 and give rise to a strong inference of scienter.

CIBC allegedly provided $2.25 million, much more than its allocated share, to prefund LJM2, with CIBC executives among those receiving the suggestive private placement memorandum and secretly invested in LJM2 and, from

its self-dealing transactions, management by Fastow with Enron insiders on both sides of the transactions, enjoyed the extraordinarily lucrative returns that should have alerted them to questionable dealings and practices. Ultimately CIBC invested $15 million in LJM2.

Second, Lead Plaintiff alleges that the New Power transactions permitted Enron again to falsify its financial results and improperly recognize sham profits and perpetuated the Ponzi scheme. According to the complaint, while serving as the lead underwriter in the New Power IPO, CIBC engaged in the secret deal structured before the New Power IPO to create and fund Hawaii 125–0 after it. CIBC and other banks "lent" money to Hawaii 125–0, but were protected from any risk by a total return swap, so that Enron could transfer millions of New Power warrants to the SPE and create a $370 million profit from the purported gain on them, which Enron recognized in the fourth quarter of 2000. Enron in a sham hedge "to secure" the banks' loan had LJM2 put $30 million into another Enron-controlled SPE, Porcupine, but Porcupine paid LJM2 back with profit in a week, so that there was no hedge. New Power stock's swift collapse shortly afterward turned the "gain" into a loss of about $250 million, which was concealed.

Third, according to the complaint, in 2000–01 CIBC was also involved in the Blockbuster VOD venture and worked with Enron to make this risky venture appear to be successful, first of its kind, **\*702** and worth more than $1 billion to Enron. The complaint states that to maintain Enron's public image as a highly successful business, including its new Broadband content delivery business, CIBC cooperated with Enron's misuse of mark-to-marketing accounting to improperly accelerate and record over $100 million of profits in year end 2000 and first quarter 2001. CIBC also allegedly participated in the creation of EBS Content Systems LLC, a/k/a Project Braveheart, to which without, any basis, they arbitrarily assigned a value of $124 million. CIBC purportedly "invested," not loaned, $115 million to Project Braveheart, but only after demanding and receiving a secret guarantee from Enron so that CIBC was not at risk from what it knew was a troubled business without the necessary technology or rights to provide the VOD venture content in digital form from the movie studios, and thus most unlikely to succeed. Enron then recognized $110 million in profits from this transaction in the fourth quarter of 2000 and first quarter of 2001. Moreover, to give the appearance that the partnership was a valid SPE, CIBC and Enron purportedly got a company named nCUBE, which worked as a contractor

for Enron on the VOD project, to put $2 million (or 3% outside equity) into Project Braveheart at the end of 2000 by secretly promising that the money would be returned immediately in 2001. Just a few months later, in March 2001 Enron abandoned the VOD venture, but it did not reverse the more than $110 million in sham profits that it had recognized on its books. The complaint also asserts that because CIBC knew that Enron's financial situation was precarious, it did not require Enron to honor its guarantee but carried over the loan so that the Ponzi scheme could continue. The complaint in addition quotes a statement from Blockbuster employee Ms. Raskopf about the venture found in a *Wall Street Journal* article: " 'It was nothing but a pilot project ... I don't know how anyone could have been booking revenues' " and that "Blockbuster ... never accounted for any financial gain or loss from the short-lived venture." The article further states that three former Enron employees familiar with the pattern of partnership deals employed by Enron, commented that the kind of guarantee made to CIBC to repay full value if the investment fails, "was designed to attract investors who otherwise might worry about the viability of the deals. 'The banks didn't care about the assets they invested in and that's how it got out of control,' says one former Enron employee who helped create some of the partnerships."

During the New Power and Project Braveheart deals, in which CIBC's alleged involvement would have had to give rise to its actual knowledge or a reckless disregard of fraud, the complaint points out that CIBC continued to issue positive analyst reports with boilerplate disclosures that did not change from the time its executives first secretly invested in LJM2.

### (v) Merrill Lynch & Co.

Merrill Lynch also allegedly was "intimately involved in creating, structuring and helping to finance" LJM2. As the placement manager it sold interests in LJM2 (though no allegations of specific day-to-day control or knowledge gained through particular exposure are made), purportedly to other participants in the Ponzi scheme to reward them for their participation, its executives invested at minimum $22 million in LJM2, lent money to it in the form of a $120 million line of credit in December 1999, and raised $390 million in private equity funds for LJM2. It too reaped the excessive returns that should have served as a red flag that LJM2 was involved in illicit transactions. **\*703** But such conclusory allegations alone are insufficient to create a strong inference of scienter. The complaint fails to assert any specific facts to give rise to actual knowledge of or reckless disregard of fraud.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Nevertheless, the Court notes that Lead Plaintiff was required without any discovery to file its consolidated complaint on an expedited schedule to allege securities violations in an extraordinarily complex scheme that even experts are struggling to decipher. In his opposition to Merrill Lynch's motion to dismiss Lead Plaintiff has made reference to Merrill Lynch's role in the purported Nigerian barge transaction in 1999. As the Court has indicated in footnote 87 of this memorandum and order, it is one of two potential sham transactions between Enron and Merrill Lynch, the other involving ENA, which in the wake of Congressional investigations have raised significant questions about possible fraud that have drawn substantial attention through media reports. Moreover, these two transactions fit the patterns of the scheme alleged by Lead Plaintiff throughout the complaint. See footnote 87 of this memorandum and order. In the interests of justice, this Court will allow Lead Plaintiff to supplement its claims to include one or both these issues. Because the facts asserted about these two transactions in the news would raise a strong inference of scienter, provided that Lead Plaintiff supplements its complaint, the Court denies Merrill Lynch's motion to dismiss.

### (vi) Barclays

 **[62]** Barclays, which provided commercial lending and underwriting services to Enron, is sued only under § 10(b) for alleged affirmative acts in furtherance of the fraudulent scheme. Lead Plaintiff's allegations about Barclays' direct involvement in the formation and funding of JEDI/Chewco in 1997 are sufficient by the very nature of the transactions to state a claim under § 10(b) and Rule 10b–5. According to the complaint Barclays, along with Lay, Skilling, and Fastow, formed Chewco, which Enron and Barclays controlled, as a sham independent entity to buy a purported independent, outsider's interest in JEDI. Barclays purportedly loaned Chewco $240 million and money to the two strawmen, Little River and Big River, to provide the $11.4 million for the 3% equity investment in Chewco. In addition, giving rise to a strong inference of scienter that it knew the transactions were non-arm's length and fraudulent, it demanded that Enron provide a secret guarantee that it would be repaid and that Chewco would establish a $6.6 million cash reserve deposit paid to Barclays to insure against risk of loss. Barclays lent an additional $500 million to JEDI in 1998. Its subsequent loans and lending commitments of over $4 billion and the $1.9 billion in raised by underwriting and selling Enron securities

give rise to a strong inference of Barclay's intent to keep the Ponzi scheme in operation.

### (vii) Lehman Brothers Holding, Inc.

 **[63]** The Court finds that Lead Plaintiff has failed to plead adequately a cause of action under § 10(b) against Lehman. Although the complaint alleges that Lehman executives were among those who personally invested in LJM2, prefunding it with $1.5 million and ultimately putting $10 million into it, the profits of which should have raised red flags to the bank to ask questions, that alone is not sufficient to establish the requisite strong inference of scienter. Unlike with respect to the other Defendants discussed thus far, the complaint fails to identify any specific act or material statement or omission or involvement in the alleged Ponzi scheme that would give rise to a strong inference of scienter.

### *704 (viii) Bank America Corporation

Bank America is sued under both § 11 of the 1933 Act and § 10(b) of the 1934 Act and Rule 10b–5. As is the case with the § 10(b) claims against Lehman, the § 10(b) allegations against Bank America fail to raise a strong inference of scienter. The complaint's only specific allegations relate to Bank America and/or its executives' investment of $45 million in LJM2, which made it the largest investor in LJM2. This investment was not properly disclosed to the investing public, and Bank America enjoyed lush returns from it. As indicated, the Court does not find the mere fact that it invested in a questionably profitable entity, without more to indicate how, when, and what it learned about the nature of the entities LJM2 dealt with and of the transactions it effected, sufficient to state a securities violation under § 10(b) and Rule 10b–5.

### (ix) Deutsche Bank AG

Deutsche Bank is sued only under the 1934 Act. Lead Plaintiff alleges that Deutsche Bank's top executives (through BT Investment Partners) were among those who prefunded LJM2. Deutsche Bank executives purportedly provided $1.5 million for that purpose and subsequently invested personally $10 million in LJM2, and thereafter enjoyed extraordinary distributions from that investment. Nevertheless, the complaint fails to allege any other involvement that would give rise to a strong inference of scienter, sufficient to establish liability based on its alleged false and misleading statements or loans or securities offerings under Rule 10(b) and Rule 10b–5.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

### b. The Law Firms

### (i) Vinson & Elkins

 [64]   Contrary to Vinson & Elkins' contention, the situation alleged in the consolidated complaint is not one in which Vinson & Elkins merely represented and kept confidential the interests of its client, which has "the final authority to control the contents of the registration statement, other filing, or prospectus." Vinson & Elkins' motion to dismiss (# 648) at 11 n. [citation omitted]. Instead, the complaint alleges that the two were in league, with others, participating in a plan, with each participant making material misrepresentations or omissions or employing a device, scheme or artifice to defraud, or engaging in an act, practice or course of business that operated as a fraud, in order to establish and perpetuate a Ponzi scheme that was making them all very rich.

Vinson & Elkins was necessarily privy to its client's confidences and intimately involved in and familiar with the creation and structure of its numerous businesses, and thus, as a law firm highly sophisticated in commercial matters, had to know of the alleged ongoing illicit and fraudulent conduct. Among the complaint's specific allegations of acts in furtherance of the scheme are that the firm's involvement in negotiation and structuring of the illicit partnerships and off-the-books SPEs, whose formation documentation it drafted, as well as that of the subsequent transactions of these entities. It advised making Kopper manager of Chewco so that Enron's involvement in and control of the SPE would not have to be disclosed, drafted "true sales" opinions that Lead Plaintiff asserts were essential to effect many of the allegedly fraudulent transactions. Vinson & Elkins was materially involved in the New Power IPO, and it structured and provided advice on the Mahonia trades, all actions constituting primary violations of § 10(b). In other words, it "effected the very" deceptive devices and contrivances that were the heart of the alleged Ponzi scheme. *SEC v. U.S. Environmental,* 155 F.3d at 112. According to the allegations in the complaint, Vinson & Elkins chose to **\*705** engage in illegal activity for and with its client in return for lucrative fees. Contrary to the Rules of Professional Conduct, it did not resign and thereby violated its professional principles and ethics. Nevertheless, had Vinson & Elkins remained silent publicly, the attorney/client relationship and the traditional rule of privity for suit against lawyers might protect Vinson & Elkins from liability to nonclients for such alleged actions on its client's (and its own) behalf.

But the complaint goes into great detail to demonstrate that Vinson & Elkins did not remain silent, but chose not once, but frequently, to make statements to the public about Enron's business and financial situation. See pages 203–22 of this memorandum and order. [129] Moreover in light of its alleged voluntary, essential, material, and deep involvement as a primary violator in the ongoing Ponzi scheme, Vinson & Elkins was not merely a drafter, but essentially a co-author of the documents it created for public consumption concealing its own and other participants' actions. Vinson & Elkins made the alleged fraudulent misrepresentations to potential investors, credit agencies, and banks, whose support was essential to the Ponzi scheme, and Vinson & Elkins deliberately or with severe recklessness directed those public statements toward them in order to influence those investors to purchase more securities, credit agencies to keep Enron's credit high, and banks to continue providing loans to keep the Ponzi scheme afloat. Therefore Vinson & Elkins had a duty to be accurate and truthful. Lead Plaintiff has alleged numerous inadequate disclosures by Vinson & Elkins that breached that duty.

Vinson & Elkins protests that its purported "whitewash" investigation and report in the wake of Sherron Watkins' August 1999 memorandum were not disclosed to the public until after Enron waived the attorney/client privilege and produced the report for Congressional hearings in 2002, after the Class Period ended, and thus cannot be the basis of a § 10(b) misrepresentation claim by the investors. Nevertheless the investigation and report can serve as the basis of a § 10(b) and Rule 10b–5(a) or (c) claim alleging use of a device, scheme or artifice to defraud or engagement in an act, practice or course of business that operated as a fraud in the perpetuation of the Ponzi scheme.

Furthermore, the complaint references, summarizes, and quotes from the Powers' investigative committee report the negatively critical findings about Vinson & Elkins' substantial and dubious role in the events of the Class Period, as delineated in the complaint, which support Lead Plaintiff's allegations. See pages 206–08, 213–14 of this memorandum and order.

For these reasons the Court finds that Lead Plaintiff has stated claims under § 10(b) against Vinson & Elkins.

### (ii) Kirkland & Ellis

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

[65] The Court agrees with Kirkland & Ellis that Lead Plaintiff has only alleged that Kirkland & Ellis represented some of the illicit Enron-controlled, non-public *706 SPEs and partnerships that Enron, but not Kirkland & Ellis, used for transactions (devices or contrivances) to hide its debt and record sham profits, disguising its true financial condition, and performed legal services on their and Enron's behalf. The complaint does not allege that Kirkland & Ellis invested in any partnership or profited from any dealings with Enron other than performing routine legal services for the partnerships. All the assertions against the firm are conclusory and general. While the allegations against Kirkland & Ellis may indicate that it acted with significant conflicts of interests and breached professional ethical standards, unlike its claims against Vinson & Elkins, Lead Plaintiff has not alleged that Kirkland & Ellis exceeded activities would be protected by an attorney client relationship and the traditional rule that only a client can sue for malpractice because it never made any material misrepresentations or omissions to investors or the public generally that might make it liable to nonclients under § 10(b). Any documents that it drafted were for private transactions between Enron and the SPEs and the partnerships and were not included in or drafted for any public disclosure or shareholder solicitation. Any opinion letters that the firm wrote are not alleged to have reached the plaintiffs nor been drafted for the benefit of the plaintiffs. It was not Enron's counsel for either its securities filings or its SEC filings. Thus the Court grants Kirkland & Ellis' motion to dismiss.

### c. The Accountant/Auditor: Arthur Andersen

[66] Lead Plaintiff has identified numerous violations by Arthur Andersen of GAAS, GAAP, risk factors for fraud, accounting rules, and rules of professional conduct for accounts that Arthur Andersen violated. Yet Arthur Andersen certified that Enron's financial statements for 1997–2000 were in compliance with GAAP and its audits of the financial statements complied with GAAS. Moreover it knew its reports would be relied upon by present and potential investors in Enron securities. It also consented to having the audited financial statements included in registration statements, prospectuses, and annual shareholders' reports that were filed by Enron during the Class Period. Lead Plaintiff has also alleged that Arthur Andersen destroyed documents to conceal its fraudulent accounting. All of these constitute primary violations under § 10(b).

[67] Furthermore Lead Plaintiff has alleged specific facts giving rise to a strong inference of scienter. Arthur Andersen's comprehensive accounting, auditing, and consulting services to Enron necessarily made it intimately privy to the smallest details of Enron's alleged fraudulent activity. Lead Plaintiff has described several similar prior fraudulent audits of other companies, establishing a pattern of such conduct, and the SEC's and courts' repeated imposition of penalties on Arthur Andersen and its employees, including the consent decree and injunction from the Waste Management fraud which was in effect at the time Lead Plaintiff alleges that Arthur Andersen violated § 10(b) in auditing Enron. Lead Plaintiff has also alleged details of the February 5, 2001 teleconference meeting of senior Arthur Andersen partners (including individual Defendants Bauer, Bennett, Goddard, Goolsby, Jones, Lowther, Odom, Steward and Swanson) from Chicago and Houston and the Gulf Coast when they discussed material concerns at the heart of the consolidated complaint: related-party transactions with LJM, Fastow's conflicts of interest, disclosures of transactions in financial footnotes, Enron's mark-to-market earnings, and Enron's aggressive transaction structuring, in essence the risk of continuing fraudulent accounting for Enron and *707 retaining it as a client. They decided to continue because Enron's business was so lucrative, and a few weeks later they issued a clean audit opinion on the 2000 financial statements. Moreover, it has described e-mails and internal memoranda between and among Arthur Andersen employees (Carl Bass, who had previously objected on December 18, 1999 to accounting on an Enron entity, Thomas Bauer, John Stewart, John Stewart Benjamin Neuhausen, and Debra Cash) before the '99 financial statements were issued that reflect Arthur Andersen's knowledge and intent to continue in the fraudulent scheme. Lead Plaintiff even mentions that Sherron Watkins in August 2001 called Arthur Andersen audit partner James Hecker about her concerns regarding improper accounting practices [130] at Enron and that she was going to discuss them with Ken Lay. Hecker called an emergency meeting of Arthur Andersen partners on August 21, 2001, one day after Sherron Watkins' wrote her memorandum to Lay.

Because Lead Plaintiff has alleged numerous violations of GAAP and GAAS and pleaded facts giving rise to a strong inference of scienter, he has pleaded a securities fraud claim against Arthur Andersen. *Melder*, 27 F.3d at 1103 ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more does not establish scienter. The party must know that it is publishing materially false information or the party must be severely reckless in publishing such information.").

**C. Section 11 Claims**

To plead a claim under § 11, a plaintiff must allege (1) that the defendant's registration statement contained an omission or misrepresentation and (2) that the omission or misrepresentation was material, that it would have misled a reasonable investor about the nature of his investment. *Krim v. BancTexas Group, Inc.,* 989 F.2d at 1445.

Lead Plaintiff has alleged numerous material transactions (deceptive devices and contrivances) in the complaint that were not clearly and adequately disclosed in registration statements. Moreover, given the fact that the complaint is filled with allegations of red flags and warnings at least some of which should have alerted an underwriter doing a due diligence investigation to look deeper and question more, the Court finds that the complaint adequately alleges Section 11 claims grounded in negligence and/or fraud against the following Defendants:

(1) Credit Suisse First Boston for material misrepresentations or omissions in registration statements filed on 2/99 for an offering of 27.6 million shares of Enron stock; on 10/00 for New Power stock; around July 18, 2001 for the resale of Enron zero coupon convertible notes;

(2) CIBC for its 5/99 Registration Statement of $500 million of Enron 7.375 **\*708** notes due on 5/15/2019; 2/99 Registration Statement for sale of 27.6 million shares of Enron stock at $31.34; 5/99 Registration Statement filed on 5/20/99 for the sale of $500 million of Enron 7.375% notes; and the 10/00 New Power Registration Statement for sale of 27.6 million shares of New Power stock;

(3) Lehman with regard to the registration statements for the sale of Enron's 7.375% Notes in May 1999 and the 7.875% Notes in May 2000; and

(4) Bank America for the sale of $500 million of 7.375% Enron Notes due 5/15/2019, pursuant to the Registration Statement filed on 5/15/99.

**D. Claims under the TexasSecuritiesAct, Article 581–33**

Because there are no heightened pleading requirements and because the Texas Act does not require proof of reliance, scienter, or a duty to disclose on the part of the offeror or sellers, the Court finds that Lead Plaintiff has stated a claim under the TexasSecuritiesAct against J.P. Morgan, Lehman, and Arthur Andersen.

Accordingly, for the reasons indicated above, the Court

ORDERS the following:

(1) CIBC's motion to dismiss(# 615) is DENIED;

(2) Citigroup's motion to dismiss (# 629) is DENIED;

(3) J.P. Morgan Chase & Co.'s motion to dismiss (# 632) is DENIED;

(4) Barclays' motion to dismiss (# 653) is DENIED;

(5) Credit Suisse First Boston's motion to dismiss (# 658) is DENIED;

(6) Bank of America Corporation's motion to dismiss (# 664) is GRANTED as to claims under § 10(b) and Rule 10b–5, but DENIED as to Lead Plaintiff's claim under § 11 for the 7.35% Notes due on 5/15/09, pursuant to the Registration Statement of 5/19/99;

(7) Provided that Lead Plaintiff supplements its complaint as indicated *supra,* Merrill Lynch & Co.'s motion to dismiss (# 667) is DENIED;

(8) Lehman Brothers Holdings Inc.'s motion to dismiss (# 679) is GRANTED as to Lead Plaintiff's claims under § 10(b) and Rule 10b–5, but DENIED as to claims under § 11 and the TexasSecuritiesAct;

(9) Deutsche Bank AG's motion to dismiss (# 716) is GRANTED;

(10) Kirkland & Ellis's motion to dismiss (# 660) is GRANTED;

(11) Vinson & Elkins L.L.P.'s motion to dismiss (# 648) is DENIED; and

(12) Arthur Andersen LLP's motion to dismiss (# 650) is DENIED; and

(13) Lead Plaintiff's § 10(b) claims relating to the 7% Exchangeable Notes and 8.375% Notes are DISMISSED.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

**All Citations**

235 F.Supp.2d 549, Fed. Sec. L. Rep. P 92,239

Footnotes

1   "Each averment of a pleading shall be simple, concise, and direct."

2   Rule 9(b) provides,

> **Fraud, Mistake, Condition of Mind** In all averments of fraud, or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

In securities fraud actions, the Fifth Circuit applies and strictly interprets Rule 9(b) as requiring a plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 430 (5th Cir.2002); *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 177 (5th Cir.)(*citing Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)), *cert. denied,* 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997).

The Fifth Circuit treats a dismissal for failure to plead fraud with particularity under Rule 9(b) as a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996), *citing Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520 (5th Cir.1993).

3   In reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), before any evidence has been submitted, the district court's task is limited. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support its claims. *Id.* The district court should consider all allegations in favor of the plaintiff and accept as true all well-pleaded facts in the complaint. *Lawal v. British Airways, PLC,* 812 F.Supp. 713, 716 (S.D.Tex.1992). Dismissal is not appropriate "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle him to relief". *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

> Nevertheless, conclusory allegations or legal conclusions masquerading as factual conclusions do not defeat a motion to dismiss. *Fernandez–Montes v. Allied Pilots Assoc.,* 987 F.2d 278, 284 (5th Cir.1993). Courts need only accept well-pleaded factual allegations as true. *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520, 523 (5th Cir.1993); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994)(courts should "not accept as true conclusory allegations or unwarranted deductions of fact.").

> In the instant action, as discussed above and below, Plaintiff must also satisfy the pleading requirements of Rule 9(b)(fraud must be pled with particularity) and for scienter under the PSLRA and Rule 10b–5.

4   *Central Bank v. First Interstate Bank,* 511 U.S. at 191, 114 S.Ct. 1439.

5   Plaintiff's consolidated complaint asserts claims against various subsidiaries and affiliates of J.P. Morgan Chase & Co., which Plaintiffs refer to collectively as "JPMorgan Chase." J.P. Morgan Chase & Co. objects that these corporations are separate entities. J.P. Morgan Chase & Co. was formed on December 31, 2000 by the merger of J.P. Morgan & Co. Incorporated and The Chase Manhattan Corporation.

> Although the consolidated complaint names Lehman Brothers Holdings Inc. as a defendant, Lehman Brothers asserts, and points to paragraph 108 in the complaint to show that Lead Plaintiff concedes that the banking and advisory services at issue are provided only by its subsidiary, Lehman Brothers Inc.

> Similarly in its memorandum supporting its motion to dismiss (# 630 at 10 n. 3), Citigroup writes, "For purposes of this motion only, we accept as true plaintiff's allegation that the entity that did those things [alleged by plaintiff] was Citigroup, Inc. In fact, however, any business dealings with Enron were those of Citigroup's subsidiaries, including Citibank, N.A. and Salomon Smith Barney, Inc." Bank of America raises a similar challenge with respect to its subsidiary, Bank of America Securities LLC. # 665 at 1 n. 1 and 9–10.

> These objections cannot be dealt with in the context of a motion to dismiss. Defendants who remain in this litigation may file an appropriate motion with a supporting brief and evidence challenging Plaintiff's one-entity approach, but for purposes of the motion to dismiss this Court will assume that Plaintiff's characterization is proper.

6   Article 33(a) was based on § 12(a)(2) of the 1933 Act, 15 U.S.C. § 77*l*(a)(2), and like § 12(a)(2) is basically a strict liability statute (unless one of the express exceptions applies) with no scienter requirement. *Texas Capital Securities,* 58 S.W.3d at 775, *citing Flowers,* 472 S.W.2d at 115.

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

7    This Court has found no cases addressing the effect of *Central Bank v. First Interstate Bank,* 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)(holding that a "private plaintiff may not maintain an aiding and abetting suit under § 10(b).") on the TexasSecuritiesAct. Because the Supreme Court relied on the language and legislative history of the federal 1934 Act, and because the Texas statute contains language expressly providing for aiding and abetting liability, this Court assumes the holding of *Central Bank* does not apply to the express provision for such secondary liability under article 581–33(F) in the TexasSecuritiesAct.

8    The United States Supreme Court has held that the term "manipulation" as used in § 10(b) is " 'virtually a term of art when used in connection with securities markets' " and refers to practices "such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), *quoting Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)(Market "manipulation" "connotes intentional and willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."). The Supreme Court explained,

> "Wash sales" are transactions involving no change in beneficial ownership. "Matched" orders are orders for the purchase/sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/ purchase of such security. Section 9(a) of the 1934 Act, 15 U.S.C. § 78i(a)(1), proscribes wash sales and matched orders when effectuated "(f)or the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or ... with respect to the market for any such security."

> *Ernst & Ernst,* 425 U.S. at 205 n. 25, 96 S.Ct. 1375. "[T]he basic aim of the antifraud provisions is to 'prevent rigging of the market and to permit operation of the natural law of supply and demand.' " *SEC v. First Jersey, Inc.,* 101 F.3d 1450, 1466 (2d Cir.1996)(*citing United States v. Stein,* 456 F.2d 844, 850 (2d Cir.)), *cert. denied,* (408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972)), *cert. denied,*522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1977). "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse,* 190 F.3d 37, 45 (2d Cir.1999).

9    In *Santa Fe* the Supreme Court defined "deception" as used in § 10(b) as the making of a material misrepresentation or the nondisclosure of material information in violation of a duty to disclose. 430 U.S. at 470, 97 S.Ct. 1292. Thus the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative or deceptive act. Because "manipulation" is essentially a limited term of art, the focus in most securities violations is on deception or misrepresentation. *Santa Fe,* 430 U.S. at 476, 97 S.Ct. 1292.*Id.* at 473, 97 S.Ct. 1292 (material misstatement (or omission)); at 475–77 (§ 10(b) must be, read flexibly, not technically and provides a cause of action for any Plaintiff who suffers an injury as a result of a deceptive practice touching its sale or purchase of a security. "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices."). Nevertheless aiding and abetting liability is not covered by § 10(b). *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. at 177, 114 S.Ct. 1439 ("The [statute's] proscription does not include giving aid to a person who commits a manipulative or deceptive act.").

10   In *Ernst & Ernst,* the Supreme Court turned to *Webster's International Dictionary* (2d ed.1934) for definitions of "device" and "contrivance" in concluding that "[t]he words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional conduct," and not merely negligence. 425 U.S. at 197, 199, 96 S.Ct. 1375. The dictionary defined " 'device' as '(t)hat which is devised, or formed by design'; a contrivance; an invention; project; scheme; often a scheme to deceive; a stratagem; an artifice, and 'contrivance' in pertinent part as '(a) thing contrived or used in contriving; a scheme, plan, or artifice.' In turn, 'contrive' in pertinent part is defined as '(t)o devise; to plan, to plot ... (t)o fabricate ... design; invent ... to scheme.' " 425 U.S. at 199 n. 20, 96 S.Ct. 1375.

11   GAAP, or Generally Accepted Accounting Principles, " 'are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").' " *In re K-tel Intern., Inc. Securities Litigation,* 300 F.3d 881, 889 (8th Cir.2002), *quoting Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 160 n. 4 (2d Cir.2000). These rules apply to preparation of regular reports such as the 10–K and 10–Q form statements that publicly traded corporations must file annually or quarterly with the SEC. " 'There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question.' " *Id.* at 889, *quoting Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). Thus GAAP " 'are far from being a canonical set of rules that will ensure identical accounting

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

treatment of identical transactions. [GAAP], rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management.' " *Id.,* quoting *Thor Power Tool Co. v. C.I.R.,* 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). " 'When ... conflicts arise, the accountant is directed to consult an elaborate hierarchy of GAAP sources to determine which treatment to follow.' " *Id.* " 'In the event there is no official pronouncement, the consensus of the accounting profession, as manifested in textbooks, for example, determines GAAP.' " *Id., quoting Providence Hosp. of Toppenish v. Shalala,* 52 F.3d 213, 218 n. 7 (9th Cir.1995).

12 In accord on the proposition that allegations of GAAP violations, standing alone, are insufficient to raise an inference of scienter under the federal securities laws are *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir.2002); *City of Philadelphia v. Fleming Cos., Inc.,* 264 F.3d 1245, 1261 (10th Cir.2001)( "Only where such allegations [of violations of GAAP] are coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be sufficient to state a claim."); *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1208 (11th Cir.2001); *In re K–tel Intern'l, Inc. Securities Litigation,* 300 F.3d 881; *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996)( "Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim").

13 In *Nathenson,* the Fifth Circuit quotes the following passage from *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1117–18 (5th Cir.1988), *vacated on other grounds sub nom. Fryar v. Abell,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), to explain the meaning of reliance for purposes of § 10(b) and Rule 10b–5:

> The element of reliance is the subjective counterpart to the objective element of materiality. Whereas materiality requires the plaintiff to demonstrate how a "reasonable" investor would have viewed the defendants' statements and omissions, reliance requires a plaintiff to prove that it *actually* based its decisions upon the defendants' misstatements or omissions. "Reliance is *causa sine qua non,* a type of 'but for' requirement: had the investor known the truth he would not have acted." ... Thus, [c]ourts sometimes consider the reliance component of the Rule 10b–5 action to be a part of the causation element. In this context, the term "transaction causation" is used to describe the requirement that the defendant's fraud must precipitate the investment decision.... On the other hand, "loss causation" refers to a direct causal link between the misstatement and the claimant's economic loss. [citations omitted]

> 267 F.3d at 413.

14 Corporate insiders do not have a duty to disclose all material information to the public; but rather their duty is either to disclose the confidential information which is the basis for their wanting to sell their stock or to abstain from trading until such disclosure is made. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968)(*en banc* ), *cert. denied,*394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Chiarella,* 445 U.S. at 228, 100 S.Ct. 1108.

15 Lead Plaintiff has alleged a scheme or course of business in which the various participant Defendants concealed a pattern of creating unlawful SPEs and utilizing fraudulent transactions with these entities as contrivances or deceptive devices to defraud investors into continuing to pour investment money into Enron securities to keep afloat the Ponzi scheme and thereby enrich themselves in a variety of ways. The Court finds that the purchase of Enron securities by misled investors was allegedly an integral part of the alleged scheme and necessary to further that scheme.

16 15 U.S.C. § 78j.

17 Common to claims of deceptive statements about the financial condition of an issuing corporation and to claims based on market manipulation through deceptive trading activity is the introduction of inaccurate information into the marketplace. *GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189, 205 (3d Cir.2001), *cert. denied,*536 U.S. 923, 122 S.Ct. 2588, 153 L.Ed.2d 778 (2002).

18 Although criminal violations of § 10(b) require a showing that the act was done willfully, the elements of a civil and criminal violations of the statute are otherwise the same, and courts in criminal cases frequently cite civil interpretations of the statute to determine whether there has been a violation.

19 Bear Stearns & Co. is a clearing broker for different brokerage houses.

20 In *Blech II,* the complaint alleged that Bear Stearns "acted as a direct participant in the alleged manipulative scheme"; that Bear Stearns "knew that the market prices of Blech Securities had to be maintained at artificially inflated levels in order for Blech to liquidate sufficient amounts of those securities to eliminate the debit balance outstanding at Bear Stearns and thereby eliminate Bear Stearns' own exposure to the risk of incurring losses"; that Bear Stearns had access to insider information about Blech's "financial condition, liquidity and net capital position"; that Blech had pledged its securities as collateral to lending banks and if the price declined, the banks would seize that collateral and sell it, thus lowering the market price; that if the stock went down, so would Blech's ability to borrow from the banks and it would be unable to meet margin calls on its own securities accounts, including accounts at Bear Stearns; that Bear Stearns had the "power to extend or deny credit to Blech ... based on the value of Blech securities held as collateral" and "the

**In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)**

Fed. Sec. L. Rep. P 92,239

power and control to determine whether or not to execute securities transactions on behalf of Blech & Co. and its clients,"; and that Bear Stearns insisted that Blech sell the securities to reduce the debt that Blech owed to Bear Stearns and to eliminate Bear Stearns' exposure. 961 F.Supp. at 577–78. Judge Sweet, in denying Bear Stearns' motion to dismiss, found that the alleged "pressure exerted by Bear Stearns on Blech to reduce his debit balance, when combined with Bear Sterns' knowledge of Blech's sham trading and its clearing of such trades, does not 'reflect ... the standard of [a] clearing broker.' " *Id.* at 585.

This Court, under the Fifth Circuit, applies a different standard for pleading scienter than the Second Circuit, which regularly allows pleading motive and opportunity by themselves to suffice.

From 1966 until 1994, private party suits against secondary actors for aiding and abetting primary violators of Section 10(b) had been allowed to proceed in federal court.

In contrast, in 1995 the PSLRA authorized the SEC to bring enforcement actions against those who "knowingly provide[ ] substantial assistance to another person" in violation of the federal securities laws, but did not create a parallel private cause of action. 15 U.S.C. § 78t(f).

In *Klein v. Boyd,* a panel of the Third Circuit Court of Appeals found that the law firm in the dispute could be liable as a primary violator of securities fraud even though the attorney did not sign the documents and was never known to the investor as a participant in the documents' creation. The appellate court concluded that once the law firm "elected to speak" by creating or participating in the creation of the documents it could not make material misrepresentations or omit material facts in drafting non-confidential documents such as opinion letters. Fed. Sec. L. Rep. (CCH) ¶ 90,136, 90,323 (3d Cir.1998)(citing and quoting from its earlier opinion, *Kline v. First W. Gov't Sec., Inc.,* 24 F.3d 480, 490–91 (3rd Cir.1994)). The law firm's duty did "not arise from a fiduciary duty to the investors; rather, the duty arose when the law firm undertook the affirmative act of communicating with investors...." *Id.* at 90,323–24. Thus the court concluded that although the firm may not have a duty to blow the whistle on its client, once it chooses to speak, a law firm does have a duty to speak truthfully, to make accurate or correct material statements, even though the document may not be facially attributed to the lawyer. Id. at 90,325. The panel did require that the lawyer's "participation in the statement containing a misrepresentation or omission of a material fact [be] sufficiently significant that the statement can properly be attributed to the person as its author or co-author," so that it would not fall within the parameter of conduct constituting aiding and abetting. *Id.* In sum, the Third Circuit panel held that

> when a person participates in the creation of a statement for distribution to investors that is misleading due to a material misstatement or omission, but the person is not identified to the investors, the person may still be liable as a primary violator of section 10(b) and Rule 10b–5 so long as (1) the person knows (or is reckless in not knowing) that the statement will be relied upon by investors, (2) the person is aware (or is reckless in not being aware) of the material misstatement or omission, (3) the person played such a substantial role in the creation of the statement that the person could fairly be said to be the "author" or "co-author" of the statement, and the other requirements of primary liability are satisfied.

> *Id.* at 90,325.

> The SEC's brief, submitted in this action, was written for the *en banc* review in *Klein,* but the case settled before the entire court could examine the issue.

As noted, § 10(b) uses the phrase "employs a manipulative device"; Rule 10b–5(b) uses the phrase, "makes a material misstatement (or omission)." As indicated in footnote 9 of this memorandum and order, the Supreme Court has interpreted "deception" as used in § 10(b) as meaning the making of a material misrepresentation or the nondisclosure of material information in violation of a duty to disclose, *Santa Fe,* 430 U.S. at 470, 97 S.Ct. 1292, and has thus concluded that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. *Santa Fe,* 430 U.S. at 473, 97 S.Ct. 1292 (holding that § 10(b) does not apply to breaches of fiduciary duty by majority shareholders against minority shareholders without an allegation of misrepresentation or lack of disclosure); *Central Bank,* 511 U.S. 164, 177, 114 S.Ct. 1439 (1994)("The proscription does not include giving aid to a person who commits a manipulative or deceptive act.").

The requirement that the secondary party, itself, allegedly make a misleading or false representation (or omission) or commit a deceptive act that violates § 10(b) brings the party within the primary liability definition of the statute and avoids aiding and abetting pitfalls of the too expansive "substantial participation" test.

The Attorneys General of a number of states have also submitted an *amicus curiae* memorandum and agree (see instruments # 861 at 9–10 and # 876).

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Section 10(b) makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance *in contravention of such rules and regulations as the [SEC] may prescribe* [emphasis added]." 15 U.S.C. § 78j.

The Supreme Court stated in *Mead,* 533 U.S. at 229, 121 S.Ct. 2164,

> This Court in *Chevron* recognized that Congress not only engages in express delegation of specific interpretive authority, but that [s]ometimes the legislative delegation to an agency on a particular question is implicit.... Congress, that is, may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap. Yet it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which "Congress did not have an intent" as to a particular result.... When circumstances implying such an expectation exist, a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise, ... but is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable [citations omitted]....

Congress passed the post-depression era securities fraud laws to achieve "broad remedial goals." *Pinter v. Dahl,* 486 U.S. 622, 653, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The Supreme Court identified these goals in *Basic,* 485 U.S. at 230, 108 S.Ct. 978:

> The 1934 Act was designed to protect investors against manipulation of stock prices. See S.Rep. No. 792, 73d Cong., 2d Sess., 1–5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H.R.Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the 'fundamental purpose' of the Act as implementing a 'philosophy' of full disclosure.' " *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 51 L.Ed.2d 480 ... (1977), quoting *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 ... (1963).

The Attorneys General of the States of Arkansas, California, Connecticut, Georgia, Illinois, Louisiana, Massachusetts, Montana, Nebraska, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Washington, West Virginia, and Wisconsin have filed an *amicus curiae* memorandum (# 861), joined by the Attorneys General of Indiana, Kentucky, Louisiana, Maryland, Michigan, Nevada, Oklahoma, and the Commonwealth of Puerto Rico (# 876). The Attorneys General also argue that Defendants have ignored the "scheme" or "course of business" liability or erroneously assumed that subsections (a) and (c) were impliedly struck down in *Central Bank* merely because it addressed only subsection (b) misrepresentation and omission and only secondary (aiding and abetting) liability. They point to the Supreme Court's subsequent opinion in *Zandford,* upholding scheme and course-of-business liability, as indicating that liability under subsections (a) and (c) remains intact. Construing Rule 10b–5 flexibly with a view to Congressional intent behind § 10(b) and noting that Rule 10b–5 was issued by the SEC in 1942 pursuant to § 10(b)'s authorization that the SEC define "manipulative or deceptive devices" or "contrivances" through rules and regulations, the Attorneys General argue, and the Court agrees, that the express language of the Rule's subdivisions, (a)(scheme liability),(b) (misrepresentation or omission liability), and (c)(course of business liability), establishes eight different types of manipulative or deceptive devices or contrivances that Defendants can commit and for which they can be held primarily liable:

1. Employing a device to defraud (Rule 10b–5(a));
2. Employing a scheme to defraud (Rule 10b–5(a));
3. Employing an artifice to defraud (Rule 10b–5(a));
4. Making any untrue statement of material fact (Rule 10b–5(b));
5. Omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading (Rule 10b–5(b));
6. Engaging in an act which operates or would operate as a fraud or deceit upon anyone (Rule 10b–5(c));
7. Engaging in a practice which operates or would operate as a fraud or deceit upon anyone (Rule 10b–5(c));
8. Engaging in a course of business which operates or would operate as a fraud or deceit upon anyone (Rule 10b–5(c)).

*Amicus Curiae* Memorandum (# 876) at 4. Thus the Attorneys General concur with this Court, contrary to the arguments of some Defendants, that liability is not limited to the making of a material misstatement or omission, nor to a few very technical forms of manipulation. *See, e.g., Santa Fe,* 430 U.S. at 477, 97 S.Ct. 1292 ("No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices"); *Herman & MacLean,* 459 U.S. at 386, 103 S.Ct. 683 ("In furtherance of its objective, § 10(b) makes it unlawful to use '*any* manipulative

**In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)**

Fed. Sec. L. Rep. P 92,239

or deceptive device or contrivance' in connection with the purchase or sale of any security [emphasis in original]"); *Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 11 n. 7, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)("#10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities whether the artifices employed involved a garden type variety of fraud, or present a unique form of deception [emphasis in original]." [citation omitted] ); *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997) (*Central Bank* "does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme"); *ZZZZ Best,* 864 F.Supp. at 971 ("It appears that the scope of deceptive devices or schemes prohibited by subsections (a) and (c) is quite extensive") (rejecting dismissal of plaintiffs' allegations that Ernst & Young was primarily liable for its participation in creating publicly released statements, issuing a review report, and failing to disclose additional material facts because the allegations taken as a whole might make it liable under a scheme to defraud).

This Court does disagree with the Attorneys General where they step over the line to conspiracy and argue that participants in a scheme to defraud, no matter how small, are liable for other participants' conduct in furtherance of the scheme even if the participants did not commit a key act that itself violated § 10(b) and Rule 10b–5. The Court also differs with respect to Lead Plaintiff's analogy of liability under the securities statutes to that for criminal liability under wire fraud or mail fraud statutes in contending that a participant is liable for the conduct of all other participants in the scheme.

The Court observes that in *Central Bank,* in rejecting the argument that the statute's language, "directly or indirectly," shows that the Congress intended to reach everyone who engages even indirectly in the proscribed activities, the Supreme Court noted that "the problem is that aiding and abetting liability extends beyond persons who engage even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." 511 U.S. at 176, 114 S.Ct. 1439. "Aiding and abetting is 'a method by which courts create secondary liability' in persons other than the violator of the statute." *Id.* at 184, 114 S.Ct. 1439 (*quoting Pinter v. Dahl,* 486 U.S. 622, 648 n. 24, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)). The Supreme Court commented that Congress "knew how to impose aiding and abetting liability when it chose to do so, did so in the general criminal statute" in 1995. *Id.* at 176, 114 S.Ct. 1439. Nevertheless Congress did not provide for private aiding and abetting liability in any of the causes of action in the securities statutes nor has it passed a general civil aiding and abetting statute, but has specified, when it desires to impose such liability, such liability in selected, individual statutes. *Id.* at 179, 182–83, 114 S.Ct. 1439. In 1995 in the PSLRA, Congress expressly gave only the SEC the right to pursue enforcement actions against aiders and abettors in securities actions, but did not proffer that right to plaintiffs in private civil actions. *Id.* at 183, 114 S.Ct. 1439; 15 U.S.C. § 78t(f).

As will be further discussed, § 10(b) is silent about conspiracy liability and the securities statutes do not contain any provision authorizing a private cause of action for conspiratorial conduct. *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 840–43 (2d Cir.1998)(holding "that where the requirements for primary liability [under § 10(b) ] are not independently met, they may not be satisfied solely on one's participation in a conspiracy in which *other parties* have committed a primary violation"); *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1098 (N.D.Cal.1994), *aff'd,* 95 F.3d 922 (9th Cir.1996).

The *Dinsmore* panel, 135 F.3d at 841, noted that the dissent in *Central Bank* recognized that the majority opinion barred conspiracy as the basis for a securities violation claim: "The Court's rationale would sweep away the decisions recognizing that a defendant may be found liable in a private action for conspiring to violate § 10(b) and Rule 10b–5." *Central Bank,* 114 S.Ct. at 1460 n. 12 (Stevens, J., dissenting).

In the September 8, 2002 edition of *The New York Times,* which extensively discussed the broad effects of the terrorist attacks on the World Trade Center, including on the stock market, Gretchen Morgenson commented,

> But perhaps a more significant lesson learned by investors is that, fearful though we all are of future attacks, a far greater risk to our continued prosperity and economic strength comes from within our shores, not without. The risk emanates from people in positions of power at corporations who cheat their shareholders, lie to investors and make millions in outsized compensation or well timed stock sales just before their games are exposed.

Gretchen Morgenson, "Market Watch: Rebound From Ruin, if Not From Distrust," Section 3 (Money and Business) at 1, *The New York Times,* (Sept. 8, 2002). The author included in her indictment "the huge financial institutions ... that appear to have helped companies hide their true financial positions from investors, earning handsome fees for their efforts." *Id.*

**In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)**

Fed. Sec. L. Rep. P 92,239

Although inapplicable to the entities whose motions to dismiss are under review in this memorandum and order, because the Court will be addressing the issue of insider trading in motions filed by individual defendants, it includes relevant law under § 20A of the 1934 Act.

Section 20A of the Exchange Act, as amended, 15 U.S.C. § 78t–1(a), provides a private cause of action against a corporate insider for insider trading based on contemporaneous trading:

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in the possession of material, nonpublic information shall be liable .... to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

Thus to have standing to sue under § 20A, a private plaintiff "must have 'purchased ... or sold ... securities of the same class' 'contemporaneously' with the insider transaction at issue." *Clay v. Intern. Corp.,* 157 F.3d 1259, 1263 n. 5 (11th Cir.1998), *vacated in part on other grounds,*176 F.3d 1381 (11th Cir.1999). As with **controlperson** liability under § 20(a) of the 1934 Act, liability under § 20A is derivative and requires proof of a separate underlying violation of the Act, such as a violation of § 10(b) and Rule 10b–5.*In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 541 (3d Cir.1999); *Jackson National Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 703 (2d Cir.1994)(reference to "this chapter" means that a plaintiff must plead a predicate violation of the 1934 Act or of rules and regulations promulgated thereunder); *In re VeriFone Sec. Litig.,* 11 F.3d 865, 872 (9th Cir.1993).

In *Melder,* the Fifth Circuit concluded that Rule 9(b) applied to the plaintiffs' 1933 Securities Act claims because their complaint adopted wholesale all their allegations under the securities fraud claims for purposes of their 1933 Securities Act claims.

Lead Plaintiff has made such disclaimers in the consolidated complaint regarding its § 11 claims.

Economic harm is not identified as a basis for the exception.

The Terminology section defines "knows" as "actual knowledge of the fact in question" and states that a "person's knowledge may be inferred from circumstances."

Rather than focusing on *Abell's* decision to follow the traditional privity rule for malpractice claims, *Trust Company* instead cites *Abell* for the proposition, "In order for an attorney to have a legal duty to supply correct information that he is liable to a non-client for malpractice, the plaintiff must show that the attorney provided legal services and that the attorney knew that the third party intended to rely upon those legal services." 104 F.3d at 1487,*citing Abell,* 858 F.2d at 1133. In *Trust Company,* the Court found the attorney liable for negligent misrepresentation under Louisiana law, based on a duty to a third party "that flows from the codal provision that establishes liability for a *stipulation pour autrui,*" or third party beneficiary. Having found that duty, the panel then determined that the plaintiff had satisfied all the elements for imposition of liability against the lawyer and his firm under Rule 10b–5.

*See also Anixter,* 77 F.3d at 1226–27 n. 12 (even where there is no fiduciary or other relationship of trust and confidence with non-clients, accountants may still have a "special duty to disclose when they make affirmative statements on which they know the investors will rely").

The Sixth Circuit's interpretation of "direct contacts" is broad. In *SEC v. Washington County Utility District,* 676 F.2d 218, 223 (6th Cir.1982), it explained,

A duty to disclose naturally devolved on those who had direct contacts with the 'other side.' Direct contacts require neither physical presence nor face to face conversation. A person undertaking to furnish information which is misleading because of a failure to disclose material facts is a primary participant.

While *SEC v. Washington County* dealt with aiding and abetting claims before *Central Bank* was issued, *Rubin,* applying the same test, applies it to a primary Rule 10b–5 violator.

In *Ackerman,* 106 bilked investors in a fraudulent tax shelter, as third parties, sued an attorney, Howard Schwarz, and his law firm for securities violations on the grounds that he wrote an opinion letter for the promoters representing that the venture was legitimate and stating that investors could rely on the credits and reductions that the promoters of the tax shelter were touting to sell the securities. The promoters subsequently absconded with the money and the IRS disavowed the deductions and credits and imposed interest and penalties on the investors. Schwarz argued that his duty ran only to the promoters to whom the opinion letter was addressed, and because the promoters knew the truth, the opinion letter's misrepresentations could not deceive them. Disagreeing, Judge Easterbrook wrote for the panel that Schwartz had consented to the distribution of his letter to accountants, attorneys, and tax advisors, who were agents of the investors, and that "[t]o give information to an agent is to give it to the principal ... so that it will affect the choice of investment." 947 F.2d at 847. Emphasizing that the case dealt with fraud, not negligence, the court concluded that Schwarz had acted

*In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

recklessly, constituting the scienter for fraud, and that once he spoke and permitted the promoters to release his letter, he had a duty to tell the truth about material issues under *Basic,* 485 U.S. at 232–36, 108 S.Ct. 978.947 F.2d at 847–48.

43 "An 'unqualified' or clean audit is the highest level of assurance that an auditor can give an organization's financial statements. Accountants will 'qualify' their opinion where discrepancies are identified in a client's financial statements." *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 663 n. 4 (3d Cir.2002).

44 Ernst & Young was the successor-in-interest to the actual auditing firm, Arthur Young & Co. 51 S.W.3d at 574 n. 1.

45 The final version of the part cited by the Texas Supreme Court in *McCamish,* and employing the same language as the draft, is Section 51, subsection 2 of the Restatement of Law Third–The Law Governing Lawyers (2000).

46 A number of other states have applied Section 552 to make attorneys liable to nonclients for negligent misrepresentation. *See Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, N.A.,* 892 P.2d 230, 236–37 (Colo.1995)(based on attorney's opinion letter that the suit against his client had no merit); *Petrillo v. Bachenberg,* 139 N.J. 472, 655 A.2d 1354, 1360 (1995)("a lawyer's duty may run to third parties who foreseeably rely on the lawyer's opinion or other legal services"); *Hines v. Data Line Sys., Inc.,* 114 Wash.2d 127, 787 P.2d 8, 21 (1990); *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.,* 106 N.M. 757, 750 P.2d 118, 122–23 (1988); *Collins v. Binkley,* 750 S.W.2d 737 (Tenn.1988); *Stinson v. Brand,* 738 S.W.2d 186, 190 (Tenn.1987). Federal courts, applying state law, have done the same. *See, e.g., Greycas, Inc. v. Proud,* 826 F.2d 1560, 1564–65 (7th Cir.1987)(applying Illinois law and concluding that an attorney owed a lender a duty to reveal the borrower's true financial status), *cert. denied,*484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988); *Menuskin v. Williams,* 145 F.3d 755, 760 (6th Cir.1998)(applying Tennessee law and holding that the attorney of a title insurance company who prepared warranty deeds on property bought by the plaintiff, stating that the property was free of all liens and encumbrances, might be liable if the plaintiff reasonably relied on the warranty deeds in making the purchase).

47 The Court is aware that the Fifth Circuit, in discussing what it surmised would be Texas' application of § 552 to accountants, reviewed three basic approaches to determining the scope of accountant liability for negligent representations to third parties that use and rely on the accountant's audit: (1) privity (the most restrictive); (2) foreseeability (the most expansive); and (3) the Restatement (Second) of Torts § 552, which falls in between, has been adopted by the majority of states, and is found by many courts "to be the most consistent with the policy foundations underlying the tort of negligent misrepresentation." *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.,* 81 F.3d 606, 611–14 (5th Cir.1996), *cert. denied,*519 U.S. 869, 117 S.Ct. 182, 136 L.Ed.2d 121 (1996). In its analysis the Fifth Circuit observed that § 552's limitation of standing "to a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it" has been held by a number of jurisdictions to not include all potential investors because that "would render the requirement meaningless." *Id.* at 613. The appellate court feared that "[t]o predicate an accountants' duty to third parties on such things as the general knowledge that accountants possess about typical investors or tenuous inferences concerning future events would be to eviscerate the Restatement rule in favor of a de facto foreseeability approach—an approach which the Texas courts have refused to embrace." *Id.* at 614. It concluded after examining dicta in several Texas cases that "the Texas Supreme Court is unlikely to adopt a rule so universally avoided by sister states." Nevertheless the Fifth Circuit qualified that comment in a subsequent statement that "we conclude that such a potential investor is *generally* not within a 'limited group' under Texas law [emphasis added by this Court]." *Id.* at 613, 614. In reaching its view of how Texas might apply § 552 to accountants, the panel merely relied on dicta in *Cook Consultants v. Larson,* 700 S.W.2d 231, 236 (Tex.App.-Dallas 1985, writ ref'd n.r.e.)(observing that the defendant was a surveyor "[u]nlike, for example, future purchasers of shares of stock attempting to hold an accountant liable, Larson is not a member of an unlimited class...."); *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.,* 715 S.W.2d 408, 411 (Tex.App.-Dallas 1986, writ ref'd)(holding that "actual knowledge of a particular plaintiff is not necessary if the defendant should have had this knowledge" and that "when the auditors supplied the corporation with a number of audit reports, indicating knowledge by the auditors that third parties would be given these reports, 'one of a limited number of *existing* [as opposed to potential] trade creditors' was in a 'limited group' under Texas law.") 81 F.3d at 614. Nevertheless, the Fifth Circuit did state, "[W]e do not suggest that a potential purchaser can never be a member of a limited group." *Id.* at 614.

This Court finds that the facts in *Scottish Heritable* and the Texas cases it discusses are easily distinguishable from those alleged here, in many ways that are not necessary to explain. The key factor is that in *Newby,* Lead Plaintiff has alleged that a vital part of the Ponzi scheme was to draw in continually more and more investors' funds through the continued sale of Enron securities so that Enron could expand its operations (an expensive proposition given the allegations that the sham transactions it engaged in through the SPEs were financial "losers" and the SPEs served to conceal Enron's ever-increasing debt) and to pay down its existing debt, including to the bank Defendants participating with Enron in the scheme. Thus the potential investors were allegedly the intended targets of the reports and documents

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

drafted and issued by Arthur Andersen and Vinson & Elkins, whether for Enron which they allegedly expected to use the misrepresentations to lure in more investment funds or for the public via SEC filings. As the Texas Supreme Court indicated in *McCamish,* the "limited group" restriction protects against unlimited liability: "[t]his formulation limits liability to situations in which the attorney who provides the information is aware of the nonclient and intends that the nonclient rely on the information."991 S.W.2d at 793. That is the circumstance alleged in the consolidated complaint. Furthermore, in *Pacific Mutual,* although a fraudulent misrepresentation case, the plaintiff was an institutional investor that relied on audits subsequently included in statements and filings following a merger. The reason why the plaintiff lost was not that it was merely a potential investor, but because the statements it relied on were issued by a different entity than the one whose notes the plaintiff purchased and the prospectuses related to other securities issued later by the bank with which the first issuer merged.

48 As one means of effectuating the alleged Ponzi scheme to defraud investors, a series of partnerships and SPEs clandestinely controlled by Enron were allegedly created, structured, financed and utilized by Defendants to inflate Enron's profits and conceal its debt. The complaint explains, "A public company that conducts business with an SPE may treat the SPE as if it were an independent entity only if it does not control the SPE. At a bare minimum, two conditions must be met: (i) an owner independent of the company must make an equity investment of *at least 3% of the SPE's assets, and that 3% must remain at risk throughout the transaction; and (ii) the independent owner must exercise control of the SPE.*" Consolidated complaint at 15 (emphasis added by complaint).

49 Lead Plaintiff points out that GAAP, Accounting Research Bulletin ("ARB") No. 51, states,

> There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies.

Consolidated complaint at 272. Moreover, FASB Statement of Financial Accounting Standards ("SFAS") No. 94 mandates consolidation of all majority-owned subsidiaries unless control is temporary or does not rest with the majority owner. Consolidated complaint at 273.

The complaint also quotes from FASB Emerging Issues Task Force Abstracts ("EITF"), Topic No. D–14, which provides guidance for non-consolidation of an SPE:

> Generally, the SEC staff believes that for nonconsolidation and sales recognition by the sponsor or transferor to be appropriate, the majority owner (or owners) of the SPE must be an independent third party who has made a substantive capital investment in the SPE, has control of the SPE, and has substantive risks and rewards of ownership of the assets of the SPE (including residuals). Conversely, the SEC staff believes that nonconsolidation and sales recognition are not appropriate by the sponsor or transferor when the majority owner of the SPE makes only a nominal capital investment, the activities of the SPE are virtually all on the sponsor's or transferor's behalf, and the substantive risks and rewards of the assets or the debt of the SPE rest directly or indirectly with the sponsor or transferor.

Consolidated complaint at 273 n. 7.

50 Lead Plaintiff asserts that LJM1 was utilized to allow Enron to engage in phony hedging transactions largely dependent on the value of Enron's own stock. The consolidated complaint details Enron's use of LJM1 to hedge its position in Rhythms NetConnections ("Rhythms") (at pp. 280–82, 413). Briefly, in 1999, to hedge Enron's gains on the value of Rhythms' stock, Enron transferred Enron stock to Rhythms in exchange for a note. The hedge was a sham because if the SPE had to pay Enron on the "hedge," Enron stock would be the source of that payment. Enron recognized $100 million from the hedging transaction in 1999.

51 As one reflection of their lack of independence, employees of both LJM partnerships allegedly were regular, full-time employees of Enron for benefits purposes. Consolidated complaint at 279.

52 See consolidated complaint at 287–92 for specific allegations about the Raptors and their purposes.

53 The consolidated complaint lists examples of manipulative transactions relating to unsuccessful assets acquired by Enron that were sold to, and thereby shifted losses to, LJM1 or LJM2 when a legitimate buyer could not be found because the assets for sale were unattractive. Lead Plaintiff briefly describes how each transaction was used to falsify Enron's financial results and financial condition. For instance, Enron shifted a 13% stake (sufficient to relieve it of "control" of that entity so that it did not have to consolidate its interest and report it on Enron's balance sheet) in a troubled power plant construction in Cuiaba, Brazil, to LJM1 for $11.3 billion in September 1999 so that Enron realized $34 million of mark-to-market income in the third quarter of 1999 and $31 million in the fourth quarter and another $41 million of mark-to-market income in the fourth quarter of 1999. (For an explanation of mark-to-market accounting, see pages 123–25 and nn. 58, 59 of this memorandum and order.) Then in August 2001 Enron repurchased LJM1's purchase for $14.4 million, giving

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

LJM1 investors a tidy profit. Because Enron had always promised to make LJM1 whole, LJM1's investment in the Cuiaba power plant was never "at risk." Other examples included Enron North America ("ENA") collateralized loan obligations, the lowest rated of which were sold to Enron-controlled Whitewing Associates, LLP and to LJM2 with assurances from Enron that the investors would be made whole; the Nowa Sarzyna power plant under construction in Poland, which Enron temporarily "sold" to LJM2 for $30 million so that Enron could record a profit of $16 million, but then repurchased later for $31.9 million, giving LJM2 an approximately 25% rate of return; a 90% interest in MEGS LLC (a company owning a natural gas gathering system in the Gulf of Mexico), which Enron sold to and repurchased from LJM2 at the maximum allowed rate; certificates of a trust known as Yosemite, improperly sold to LJM2 on December 29, 1999 to hold for one day and then sold to Condor, allowing Enron to avoid reporting its interest in Yosemite in its year-end financial statement; and Backbone telecommunications assets, i.e., unactivated ("dark") fiber optic cable, sold to LJM2 in May 2000 so that Enron could meet its second quarter numbers. Consolidated complaint at 284–87.

The Court notes that SEC Regulation S–X, 17 C.F.R. § 210.4–08(k)(1)(2001), requires identification of related party transactions and transaction amounts to be stated on the face of the balance sheet, income statement or statement of cash flows. William F. Dietrich, "Legal and Ethical Issues for attorneys dealing with Financial Data: Heightened Scrutiny After the Enron and Andersen Debacle," 1325 PLI/Corp 925, 947 and n. 57 (Aug.2002). While "related parties" include the parent company and its subsidiaries, an enterprise and its principal owners, management and members of their immediate families, and affiliates, the FASB's definition of "related parties" also reaches "other parties with which the enterprise may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests." *Id.* at 947 and nn. 58–60, citing FINANCIAL ACCOUNTING STANDARDS BOARD, Statement of Financial Accounting Standards No. 57: Related Party Disclosures, in 1 FINANCIAL ACCOUNTING STANDARDS BOARD, ORIGINAL PRONOUNCEMENTS: FASB STATEMENTS OF STANDARDS 1–100, at 556–57 (2001)("FAS 57"). There must also be disclosure of any control relationship when the reporting enterprise and another entity are under common ownership or management control that might affect the operating results or the financial status of the reporting enterprise, even if there are no transactions involved. *Id.* at 947–48, *citing* FAS 57 at ¶ 4 at 554.

For instance, in its May 2000 proxy statement Enron described each LJM partnership as "a private investment company that primarily engages in acquiring or investing in energy and communications related to investments," a statement that would not disclose to the reader either the nature of the transactions or their import. A similar statement was made in the Form 10–Q for second quarter 1999, with a nonspecific footnote saying, "A senior officer of Enron is managing member of LJM's general partner." Virtually identical "disclosures" were made in the third quarter Form 10–Q and the 1999 10–K. In its Form 1–Q for the second quarter of 2000, Enron stated about the LJM partnerships, "In the first half of 2000, Enron entered into transactions with limited partnerships (the Related Party) whose general partner's managing member is a senior officer of Enron. The limited partners of the Related Party are unrelated to Enron." From that time on, Enron did not identify LJM1 or LJM2 by name in financial statement disclosures. Consolidated complaint at 297–98.

The complaint identifies four examples. On December 22, 1999, Enron pooled purchaser collateralized loan rights ("CLOs") and sold the lowest-rated portion to an Enron Affiliate (Whitewing LLP) and LJM2. Whitewing in turn lent LJM2 the money to purchase Whitewing's interest in the CLOs. Enron surreptitiously guaranteed Whitewing's investment and its loan to LJM2. The deal allowed Enron to record a sale of millions of dollars in the fourth quarter of 1999 to an entity that was not independent and that should have been consolidated, with its debts listed on Enron's balance sheet.

Second, when it was unable to find an independent buyer before the end of 1999, Enron sold LJM2 a 75% interest in Nowa Sarzyna power plant for $30,000,000 (part loan, part equity). This transaction removed millions of dollars of debt from Enron's balance sheet and allowed Enron to record a gain of about $16 million from the sale. Although the debt financing required that Enron retain ownership of at least 47.5% of the equity until the project was completed, the lender waived this requirement until March 31, 2000, by which time Enron and Whitewing reacquired LJM2's equity interest and repaid the loan for a total of $31.9 million, providing LJM2 with a 25% rate of return.

Similarly, on December 29, 1999 Enron sold to LJM2 a 90% equity in MEGS LLC, a natural gas system in the Gulf of Mexico, thus avoiding consolidation and having to report millions of dollars in debt on Enron's balance sheet for that year. Enron also repurchased LJM2's interest in MEGS early the next year.

Finally, Enron made it appear that it sold certificates in a trust named Yosemite to LJM2 on December 29, 1999, to reduce Enron's interest in Yosemite from 50% to 10%, to avoid disclosing the certificates on Enron's 1999 financial statement. In actuality the transaction did not actually occur until February 28, 2000, but the legal documentation was clearly and deliberately back-dated to December 29, 1999. Meanwhile on December 29, 1999, Condor, which was an

**In re Enron Corp. Securities, Derivative & ERISA Litigation**, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

affiliate of Whitewing and was controlled by Enron, loaned $35 million to LJM2 so that it could buy the certificates. The next day, LJM2 transferred the certificates to Condor, satisfying the one-day loan.

According to the complaint, in phony hedging arrangements in 2000–01 Enron funded the Raptors with its own stock, supposedly to hedge against declines in the value of Enron's merchant investments, but the "hedges" were actually manipulative or deceptive devices to circumvent accounting rules. Enron always retained most of the risk because it provided most of the capital with which the SPES would pay; if the value of Enron stock declined, the SPEs could not meet their obligations and the "hedges" would fail.

The complaint recites, "A former employee noted, 'shifting the curve and making new deals to bury the losses from the past is constantly the strategy.' Another former trader stated: 'It was very simple. You just tweaked the assumptions on different variables, which were changed to make the return higher.' " Consolidated complaint at 305.

The complaint states, "Because most DSM deals were losing money when their curves were re-marked, Enron had to keep signing new contracts each quarter to show a profit—what a DSM manager described as 'feeding the beast.' " Complaint at 305–06. Recognizing earnings for long-term contracts in the quarter when the contract was signed forced Enron into increasingly aggressive and riskier deals, gave rise to enormous and growing accumulation of off-balance-sheet debt, contingent liabilities, and, by early in 2001, restricted opportunities to re-finance and restructure old deals, as well as to create new deals. Consolidated complaint at 306.

The complaint at 465 quotes from *U.S. News & World Report* regarding Enron's aggressive abuse of mark-to-market accounting since the early 1990's:

... Traditional accounting would book revenue from a long-term contract when it came in. But Skilling wanted Enron to book all anticipated revenue immediately. The practice is known as mark-to-market—or more colloquially, counting your chickens before they hatch. Whatever the term, it was the third time in five years that Enron had significantly changed its accounting.

Tallying all expected profits immediately would mean a huge earning kick for a company obsessed with debt. But it would also put Enron on a treadmill: To keep growing, it would have to book bigger and bigger deals every quarter. The result, in hindsight, was predictable: a shift from Enron developing economically sound partnerships to doing deals at all costs. "The focus wasn't on maintaining relationships and serving customers," says a former Enron official. "The quality of the deals deteriorated." The turning point, some say, was a deal involving a British power facility that earned Enron brass big bonuses. Yet, says one executive, the deal was "a disaster" that forced Enron to cough up $400 million when gas prices moved the wrong way.

The new accounting made workers eligible for fatter payoffs. Enron employees were urged to work together on deals. But the new arrangements created an incentive to cut out colleagues, because bringing them in meant carving more slices in the bonus pie. "It was a very intense and urgent form of accounting," says Dan Riser, a former employee who worked with Skilling.

As an example of such abuse in order to permit Enron to book improperly huge, illusory profits up front, the complaint at 306–07, describes a DSM with Eli Lilly. The complaint at 307 quotes from *The Washington Post,* 2/18/02:

Eli Lilly and Co., the Indianapolis pharmaceutical manufacturer, signed a $1.3 billion contract in February 2001 turning all its energy requirements over to Enron for 15 years. But Enron paid Eli Lilly $50 million upfront to win the deal, according to a former senior executive of Enron.

. . . . . .

*Such upfront payments were not unusual, said Glenn Dickson, a former EES director of asset operations. "It was fairly common on the really big deals to pay the customer to lose money, in effect, on the contract, whether you were paying the customer or losing the money you were charging less than it really cost."*

*What made it all work, Dickson said, was a form of accounting in which the company counted future projected earnings as current income. "It [w]as huge amounts of money that covered up those cash outlays."*

The complaint also identifies companies which made deals with Enron to which Enron improperly applied mark-to-market accounting, including J.C. Penney, IBM, Owens Illinois, and Quaker Oats. *Id.* at 307, 310–11.

Lead Plaintiff quotes several passages of a letter written to Enron's Board by an EES manager in August 2001:

One can only surmise that the removal of Jeff Skilling was an action taken by the board to correct the wrongdoings of the various management teams at Enron ... (i.e., EES's management's ... hiding losses/SEC violations).

... [I]t became obvious that EES had been doing deals for 2 years and was losing money on almost all deals they had booked.

... [I]t will add up to over $500MM that EES is losing and trying to hide in Wholesale. Rumor on the 7th floor is that it is closer to $1 Billion ... [T]hey decided ... to hide the $500MM in losses that EES was experiencing.... EES

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

has knowingly misrepresented EES['s] earnings. This is common knowledge among all the EES employees, and is actually joked about. But it should be taken seriously.

63 The complaint alleges that at the commencement of the deal, Enron created another partnership, EBS Content Systems LLC, or "Project Braveheart," again finagling to make it appear to be an independent entity when it was not and obtaining funding from CIBC with a guarantee from Enron, to improperly record $111 million in revenue from the sham Blockbuster deal. Consolidated complaint at 300–01. EBS then transferred its interest in the Blockbuster deal, fraudulently valued at $124.8 million, to Braveheart. No revenue should have been recorded from the Blockbuster deal because (1) Braveheart was not independent of Enron; (2) EBS could not provide the service it promised and thus could not earn the projected revenue; (3) most of the projected customers did not yet exist and were unlikely to pay for the severely restricted services (40 movies loaded onto a Sun Server in four test cities) that were actually provided; and (4) the improper use of mark-to-market accounting resulted in sham estimates of future revenue streams. A former employee stated, "[T]he Blockbuster deal was a fraud, and Enron's top management knew it."

The complaint describes another misuse of mark-to-market accounting in a broadband deal involving Rice University. The deal, for $14 million over ten years, was that EBS would provide broadband to Breimen University in Germany, a sister university to Rice. Enron recognized all $14 million earnings up front by applying mark-to-market accounting during the second and third quarters of 2000. Furthermore, to secure the deal, Lay gave Rice a $5 million donation to build a wing. Under the deal Breimen could cancel at any time and did so in early 2001. Thus the revenue stream had not been earned and was not collectible at the time it was recognized. Consolidated complaint at 308.

64 The complaint asserts that, as is typical of Enron's usual unfounded projections and manipulated calculations, in trying to decide how much it would cost to do VOD per subscriber, Enron developers "came up with a figure out of thin air-$1.20. There was no rational basis for this amount. However, it was used to calculate future profits to be derived from the project." Consolidated complaint at 301. In contrast, McKinsey Consulting told EBS that it would have to spend between $1,200–$1,600 per subscriber for equipment to get VOD to work.

65 "Dark fiber" refers to fiber optic cables that have been laid, but are not yet in use, or "lit." Consolidated complaint at 302.

66 The complaint asserts that Enron had a practice of engaging in swapping capacity of deliberately overvalued dark fiber and broadband trading with other telecom companies (including Dynegy, Williams, El Paso, Metromedia Fiber, Acrie Networks, Qwest, Level 3, 360 Networks, and Touch America). Many of these swaps were effected to create the illusion of trading activity and to report sham income, thus manipulating Enron (and other entities') financial results. Most of the $120 million of revenue in 1999 that Enron reported for broadband was from such dark fiber swaps. Consolidated complaint at 302–03. In June 2000, for example, Enron sold dark fiber cable for $100 million to LJM2. LJM2 paid Enron $30 million in cash and gave Enron an interest-bearing note for $70 million, even though the dark fiber was not worth even close to that price. Enron recognized $67 million in pre-tax earnings that year from the asset sale. In the third quarter of 2000, a similar deal took place worth more than $300 million, so that Enron could "make its numbers," but that arrangement failed to follow protocol because network developers and traders were not informed about it until after it was accomplished. Complaint at 303. Sometimes the broadband traders traded among various Enron-controlled entities, breaking one transaction into a number of transactions, to create the impression of multiple and increasing numbers of deals.

67 In a "true swap," according to the complaint,

two parties trade the future returns on investments over a set period of time. One party pays a small amount to receive a fixed interest rate on a corporate bond in lieu of uncertain gains on the same corporation's stock. The counterparty accepts the payment and swaps the return on the bond for the return on the stock. Neither party actually needs to hold the underlying assets as long as the payments are made. Typically, neither party in a true swap exchange receives all the agreed payments up front. In the Enron transactions, though, CitiGroup paid up front an estimate of the fair value of its portion of the swaps—hundreds of millions of dollars each time—payments made ***immediately. Enron was obliged to repay the cash over five years.*** These Delta transactions, though technically derivative trades known as prepaid swaps, perfectly replicated loans and were, in fact, manipulative devices to disguise what were, in reality, loans. Enron's balance sheet misrepresented these transactions. Enron posted the loans as "assets from price risk management" and as "accounts receivable," admitted Charlie Leonard, a spokesperson for Andersen. The repayments that Enron owed the banks were listed as "liabilities from price risk management" and possibly a small amount of accounts payable, Leonard said.

Consolidated complaint at 361.

68 The complaint quotes *The New York Times* on February 17, 2002:

> Technically, the transaction was a swap. But because CS First Boston paid Enron up front, the transaction took on the characteristics of a loan—a reality noted by the bank. "It was like a floating-rate loan," said Pam Pendleton, a CS First Boston spokesman. "We booked the transaction as a loan."

Complaint at 314.

The complaint discusses similar loans disguised as transactions, e.g., at p. 315–16, with the Connecticut Resources Recovery Authority ("CRRA") and Connecticut Light and Power Company ("CL & P"), which involved a loan disguised as an energy contract for which revenue could be reported. In March 2001 the CL & P paid an Enron subsidiary $220 million, purportedly for the Enron entity to assume a contract to purchase the CRRA's trash-generated steam electricity, with the Enron subsidiary agreeing to repay CRRA in monthly installments nearly $2.4 million per month (constituting interest plus principal) until May 31, 2012, when the contract would expire. Enron never actually purchased the electricity; Enron entered into the transaction to obtain the immediate $220 million cash infusion, another deal in its regular practice of shoring up the company's precarious financial condition for the present through a deal that made no long-term financial sense.

Enron International, a subsidiary of Enron, could properly recognize as revenue approximately 5% of a contract's value for construction services provided to Enron. Former employees, however, have reported that Enron International, in violation of GAAP, improperly recognized as revenue 10% of construction services contract values upon signing. Furthermore, it utilized a percentage of completion method of accounting, recognizing income as work progresses on the contract, for long-term construction contracts, a business practice which was false and misleading and resulted in an overstatement of revenues and earnings.

In 1997 and 1998, according to the complaint, Enron regularly capitalized, rather than expensed, costs related to unsuccessful bids for projects and improperly included them in costs for future projects. The costs were finally written off in the first quarter of 1999, but to conceal the true nature of the writedown, the expenses were attributed to a "change in accounting." This practice of accumulating capital expenditures incurred on unsuccessful project proposals was known by accounting and finance personnel throughout Enron as "snowballing." The complaint alleges that the "snowball grew exponentially," to the point that an international accounting officer told Enron's CAO Richard Causey that Enron had to take a writedown because so many proposals were no longer even arguably viable. But Causey, directed by Jeffrey Skilling, responded that "corporate did not have room" to take a writedown because reducing the snowball would result in Enron's earnings going below expectations. By 1997, the snowball on about 75 projects in Central and South America and the Dabhol power plant in India was about $100 million and dwarfed revenue returns. When Enron recorded an after-tax charge of $131 million in the first quarter of 1999, it misled investors by making the accumulated writeoff costs (improperly recorded as assets rather than expenses on the balance sheet for years) appear to be the result of the initial adoption of two new accounting pronouncements, including Statement of Position 98–5, Reporting on the Costs of Start-up Activities, which requires that costs for all start-up activities and organization costs be expensed as they are incurred.

The complaint maintains that SFAS No. 121 requires companies to review long-term assets to determine if they are impaired and in ¶ 5 identifies the following as circumstances requiring reassessment:

> a. A significant decrease in the market value of an asset
>
> b. A significant change in the extent or manner in which an asset is used or a significant physical change in an asset
>
> c. A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator
>
> d. An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset
>
> e. A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue.
>
> ... 6. If the examples of events or changes in circumstances set forth in paragraph 5 are present or if other events or changes in circumstances indicate that the carrying amount of an asset that an entity expects to hold and use may not be recoverable, the entity shall estimate the future cash flows expected to result from the use of the asset and its eventual disposition. Future cash flows are future cash inflows expected to be generated by an asset less the future cash outflows expected to be necessary to obtain those inflows. If the sum of the expected future cash flows (undiscounted and without interest charges) is less than the carrying amount of the asset, the entity shall recognize an impairment loss in accordance with this Statement. Otherwise, an impairment loss shall not be recognized; however, a review of depreciation policies may be appropriate.

SFAS No. 115 also requires that a loss be recorded for impairment in investments if the impairment is not temporary. Consolidated complaint at 319–20.

73  The complaint quotes SEC Staff Accounting Bulletin No. 99, which, although issued in August 1999 after Enron and Arthur decided not to make the adjustments, states that it did not create new GAAP, but merely reemphasized existing GAAP:

> Even though a misstatement of an individual amount may not cause the financial statements taken as a whole to be materially misstated, it may nonetheless, when aggregated with other misstatements, render the financial statements taken as a whole to be materially misleading. Registrants and the auditors of their financial statements accordingly should consider the effect of the misstatement on subtotals or totals. The auditor should aggregate all misstatements that affect each subtotal or total and consider whether the misstatements in the aggregate affect the subtotal or total in a way that causes the registrant's financial statements taken as a whole to be materially misleading.

74  Under GAAP, SFAS No. 115, Accounting for Certain Investments in Debt and Equity Securities, companies must record unrealized gains and losses on investments in securities that do not have readily determinable values as a separate component of stockholders' equity. Only unrealized holding gains and losses for trading securities, i.e., securities bought and held primarily to be sold in the near future, should be included in current earnings. SFAS No. 115 further provides that the fair value of an equity security is readily determinable if sales prices or bid-and-ask quotations are currently available on a securities exchange registered with the SEC or in the over-the-counter market, provided that those prices or quotations for the over-the-counter market are publicly reported by the National Association of Securities Dealers Automated System or by the National Quotation Bureau. Restricted stock does not qualify. Complaint at 309–10.

> The complaint, *id.,* asserts that during the Class Period, Enron made false and misleading financial statements, first overvaluing holdings in various portfolio companies ("Merchant Assets"), and then misrepresenting that many had pretax gains of easily determinable values under the definition in SFAS No. 115, permitting Enron to record such unrealized gains as current income. They should have been reported as unrealized gains and losses and reported net of applicable income taxes in a separate component of stockholders' equity. For instance Enron recognized pretax gains from sales of merchant assets and investments by an Enron division known as Assets and Investments, which *inter alia* was involved with building power plants worldwide, operating them, selling off pieces of them and investing in debt and equity securities of energy- and technology-related business. The complaint states that Enron recognized pretax gains from sales of merchant assets and investments totaling $628 million in 1998 and $756 million in 1999 and claimed much of them had readily determinable value recordable as income. *Id.* at 309.

75  Sherron Watkins wrote,

> Skilling's abrupt departure will raise suspicions of accounting improprieties and valuation issues. Enron has been very aggressive in its accounting—most notably the Raptor transactions and the Condor vehicle. We do have valuation issues with our international assets and possibly some of our EES MTM positions.
>
> The spotlight will be on us, the market just can't accept that Skilling is leaving his dream job.... How do we fix the Raptor and Condor deals? ... [W]e will have to pony up Enron stock and that won't go unnoticed.
>
> We have recognized over $550 million of fair value gains on stock via our swaps with Raptor, much of that stock has declined significantly—Avici by 98% from $178 mm to $5 mm. The New Power Co. by 70%, from $20/share to $6/share. The value in the swaps won't be there for Raptor, so once again Enron will issue stock to offset these losses. Raptor is an LJM entity. It sure looks to the layman on the street that we are hiding losses in a related company and will compensate that company with Enron stock in the future.
>
> ***I am incredibly nervous that we will implode in a wave of accounting scandals.... [T]he business world will consider the past successes as nothing but an elaborate accounting hoax....***
>
> ***[W]e booked the Condor and Raptor deals in 1999 and 2000, we enjoyed a wonderfully high stock price, many executives sold stock, we then try and reverse or fix the deals in 2001 and it's a bit like robbing the bank in one year and trying to pay it back 2 years later. Nice try, but investors were hurt, they bought at $70 and $80/share looking for $120/share and now they're at $38 or worse.*** We are under too much scrutiny and there are probably one or two disgruntled "redeployed" employees who know enough about "funny" accounting to get us in trouble.
>
> I realize that we have a lot of smart people looking at this.... ***None of that will protect Enron if these transactions are ever disclosed in the bright light of day*** ....
>
> ***There is a veil of secrecy around LJM and Raptor. Employees question our accounting propriety consistently and constantly*** .... a. Jeff McMahon was highly vexed over the inherent conflicts of LJM. ***He complained mightily to Jeff Skilling*** .... 3 days later, Skilling offered him the CEO spot at Enron Industrial Markets....
>
> b. ***Cliff Baxter complained mightily to Skilling and all who would listen about the inappropriateness of our transactions with LJM.***

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

c. I have heard one manager level employee ... say "*I know it would be devastating to all of us, but I wish we would get caught. We're such a crooked company." ... Many similar comments are made when you ask about these deals.*

A second Enron employee wrote the following statements:

One can only surmise that the removal of Jeff Skilling was an action taken by the board to correct the wrong doings of the various management teams at Enron. However ... I'm sure the board has only scratched the surface of the impending problems that plague Enron at the moment. (*i.e.,* EES's ... hiding losses/SEC violations ... lack of product, etc.)

[I]t became obvious that EES had been doing deals for 2 years and was losing money on almost all the deals they had booked. (JC Penney being a $60MM loss alone, then Safeway, Albertson's, GAP, etc.) Some customers threatened to sue if EES didn't close the deal with a loss (Simon Properties-$8MM loss day one).... Overnight the product offerings evaporated.... Starwood is also mad since EES has not invested the $45MM in equipment under the agreement.... Now you will loos [sic] at least $45MM on the deal.... You should also check on the Safeway contract, Albertson's, IBM and the California contracts that are being negotiated.... It will add up to over $500MM that EES is losing and trying to hide in Wholesale. Rumor on the 7th floor is that it is closer to $1 Billion....

This is when they decided to merge the EES risk group with Wholesale to hide the $500MM in losses that EES was experiencing. But somehow EES, to everyone's amazement, reported earnings for the 2nd quarter. According to FAS 131 Statement of Financial Accounting Standards (SFAS) # 131, "Disclosures about Segments of an Enterprise and related information", EES has knowingly misrepresented EES' earnings. This is common knowledge among all the EES employees and is actually joked about....

Some would say the house of cards are falling....

You, the board have a big task at hand. You have to decide the moral, or ethical things to do, to right the wrongs of your various management teams.

But all of the problems I have mentioned, they are very much common knowledge to hundreds of EES employees, past and present.

Consolidated complaint at 39–41.

76　The Consolidated Complaint at 345 quotes an article from *Business Week,* 2/11/02, stating that "[a]s many as 100 of Merrill's own top executives put their personal money into the deal."

77　Section 15(f) of the Exchange Act, 15 U.S.C. § 78*o*(f) provides,

Every registered broker or dealer shall establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such broker's or dealer's business, to prevent misuse ... of material, nonpublic information by such broker or dealer or any person associated with such broker or dealer.

The Act also permits the SEC to make appropriate rules or regulations about these policies and procedures. *See*17 C.F.R. §§ 230.137, 230.138, 230.139. Thus an investment bank is required to erect a Chinese wall between its securities analysts' research department and its divisions providing commercial banking, underwriting, or other services to issuers of securities to prevent information from the latter influencing the former.

78　As a prominent example, the complaint at 351 highlights the fact that JP Morgan wrote hundreds of millions of dollars of "credit default puts" on Enron's publicly traded debt securities, including zero coupon notes that it helped Enron to sell in 2001. (Zero coupon notes pay no interest, but are sold at a discount and redeemed upon maturity at face value.) These "puts" required JP Morgan to make good on Enron's publicly traded debt if Enron defaulted. Thus JP Morgan had an additional reason to keep Enron solvent.

79　This case, which is still pending, was recently transferred from the United States District Court for Delaware to the Southern District of New York. No. 02–104 GMS, 2002 WL 1378226 (D.Del. June 26, 2002).

80　The *New York Times* has reported a number of times that in 1996 the Sumitomo Corporation of Japan learned that one of its copper traders, Yasuo Hamanaka, during the previous ten years had lost $2.6 billion. Sumitomo sued J.P. Morgan and Chase Manhattan, which had not yet merged, alleging that the two banks engineered loans disguised as trades, or copper swaps, that allowed Hamanaka to hide the losses. The swaps appeared to involve the purchase of copper and exposure to fluctuating copper prices over time, but in actuality there was no copper physically traded nor financial transactions whose value was dependent on copper prices.

As discussed on pages 133–35 and 162–65 of this memorandum and order, in the instant litigation JP Morgan allegedly entered into deals to transfer commodities (oil and gas) that in reality were just paper transactions camouflaging loans. JP Morgan paid Enron upfront for the ostensible future deliveries. According to the complaint, knowing the "trades" were fraudulent, JP Morgan attempted to limit its risk exposure by "guaranteeing" Enron's performance on

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

the purported trades (through Mahonia) by obtaining surety bonds from eleven insurance companies. After Enron declared bankruptcy and defaulted on payments, the insurance companies refused to pay JP Morgan, arguing that the banks deliberately camouflaged loans as trades to hide their fraudulent scheme. JP Morgan then sued the insurance companies in federal district court in Manhattan for a declaratory judgment that the insurance companies were liable on six surety bonds because Enron entities had defaulted on their performance on the natural gas and crude oil forward sales contracts. The defendant insurers responded with a fraudulent inducement/fraudulent concealment claim that the sales contracts "were part of otherwise undisclosed circular transactions that, when revealed in their entirety, were nothing more than disguised loans that the defendants could not and would not have insured if they had known the full facts." *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.,* 209 F.R.D. 361, 362–63 (S.D.N.Y.2002). The judge, the Honorable Jed S. Rakoff, rejected a motion for summary judgment by J.P. Morgan to force immediate payment on the bonds and ruled that there was sufficient evidence to raise a factual issue for trial about whether the surety bonds were part of a larger fraudulent scheme involving Stoneville Aegean Ltd. to disguise loans as a sale of gas. *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.,* 189 F.Supp.2d 24, 29 (S.D.N.Y.2002). Judge Rakoff has also ruled that JP Morgan may pursue a breach of contract claim against the insurers. The suit is currently being tried.

An attorney for three of the insurance companies being sued by JP Morgan was also the attorney for the Sumitomo Corporation in the still pending suit that Sumitomo filed against JP Morgan in 1999, and he has contended there is a pattern of such loans disguised as trades by JP Morgan.

Lead Plaintiff now concedes that it no longer pursues claims on the 7% Exchangeable notes regarding which it previous asserted a claim against Citigroup *inter alia.*

The complaint at 366 lists five facilities for Enron in which Credit First Suisse Boston was involved.

As with the other banks, the complaint alleges that CIBC helped structure and finance LJM2, and that its executives were rewarded for participation in the Ponzi scheme by being allowed to invest and did invest approximately $15 million in the partnership. They, too, provided the funds around December 22, 1999 to provide cash for LJM2 to fund four SPEs by year-end so that Enron could "cook its books" for 1999 year-end and first-quarter 2000 reports.

The complaint at 372 lists three transactions before the Class Period and one in August 2001, a $3 billion committed credit facility for Enron to back up its commercial paper.

CIBC has objected that CIBC World Markets Corporation, and not CIBC, was the underwriter of the May 1999 offering and that CIBC, which represents that it is the parent company, is the only CIBC-related entity Lead Plaintiff has sued. It objects that Lead Plaintiff has defined "CIBC" to refer to the Bank and to its "controlled subsidiaries and divisions (such as CIBC Oppenheimer or CIBC World Markets)." As with JP Morgan and Lehman Brothers, if CIBC wishes to challenge Lead Plaintiff for naming the wrong party as a defendant, or to join others, it needs to file an appropriate motion with evidence and a brief.

The complaint, at 376–77, quotes an article from the *Wall Street Journal* reporting the bogus transaction. It notes that the partnership had no separate staff and no assets other than Enron's stake in the venture. It reports a Blockbuster spokesperson as stating, "It was nothing but a pilot project.... I don't know how anyone could have been booking revenues," and that Blockbuster never accounted for any financial gain or loss from the short-lived venture. The article also quotes an Enron employee who helped create some of the SPEs and was familiar with the partnership deals and the secret guarantees by Enron to repay investment amounts fully in order to attract investors who would otherwise doubt the deals: "The banks didn't care about the assets they invested in and that's how it got out of control." In view of the fact that Enron claimed a multi-million dollar profit within the first two weeks of commencing the Blockbuster venture, the article quotes one Enron employee as asking at the time, "How can they monetize this asset when we're still putting it together? It doesn't make any sense to me." ("Monetize" was a buzzword at Enron for a quick-fix solution for undesirable assets by selling them off to Enron-controlled SPEs to conceal debt and recognize sham profits.) When Enron recorded another $57.9 million profit from Blockbuster in the first quarter of 2001, that same employee noted that he "was just floored. I mean, I couldn't believe it."

Although the Consolidated Complaint does not mention two significant potential sham transactions between Merrill Lynch and Enron in December 1999 that have been in the news recently with respect to Congressional investigations and criminal complaints arising out of the Enron debacle, the Court notes that the allegations regarding these transactions fit the pattern of fraudulent activities alleged in the complaint.

In December 1999 Enron sold Merrill Lynch an interest in a group of barges located off the coast of Nigeria in time to record a multi-million dollar profit in the final quarter of the year and meet Wall Street projections. (Although not included in the complaint, Lead Plaintiff briefly references this deal in its opposition to Vinson & Elkins' motion to dismiss (# 843 at 13) and in its opposition to Merrill Lynch's motion to dismiss (# 846 at 14–15)). Purportedly Enron guaranteed

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

that it would repurchase the ownership stake within six months. After six months LJM bought the barges from Merrill Lynch, again at a purported profit of $8 million for Merrill Lynch, even though no arm's-length independent buyer could be found. Moreover, during the same time, Merrill Lynch analysts continued to promote Enron's stock to investors by positive statements about its financial performance. Lead Plaintiff does mention the barges in its opposition to the motions to dismiss: Lead Plaintiff alleges that "Merrill Lynch also helped Enron artificially boost its 99 results by taking a $500,000 payoff to pretend to purchase electricity-producing barges off the coast of Nigeria from Enron, **accepting a secret a no-loss guarantee from Enron,** as well as a promise by Enron to re-purchase or find a buyer for Merrill Lunch's Nigerian barges within six months, which Enron did in 7/00 causing LJM2 to repurchase the barges from Merrill Lynch." # 846 at 14–15.

Also during the final days of 1999, there was purportedly a much larger deal involving Enron North America ("ENA"), whose chairman was J. Clifford Baxter, who committed suicide last year. The deal involved a complex set of gas and power trades regarding the future output of a group of power plants under construction in the Midwest. When no third-party energy company could be found to participate, Enron made the deal with Merrill Lynch, which operated its own energy trading unit. The deal allowed Enron to record a year-end $60 million profit from the purported sham transaction. Moreover, Enron and Merrill Lynch allegedly had agreed that the deal would be canceled after the end of 1999, and after Enron had met earnings forecasts, and purportedly it was.

88 According to the complaint at 188, after the price of its stock surged, Enron, as usual in desperate need of cash, sold this extraordinarily large offering of zero coupon convertible notes to the banks, which then resold the notes or hedged their risk of loss on the notes by shorting Enron common stock. Enron had promised to register and did register the zero coupon convertible notes with the SEC within six months so that the purchasers could resell them. The proceeds were used by Enron to reduce its short-term debt, i.e., commercial paper and/or bank debt to JP Morgan or CitiGroup and to keep the Ponzi scheme alive.

89 Bank America contends that Lead Plaintiff's claims under § 10(b) and § 11 with respect to the 8.375% Notes fail because neither of the proposed representatives for the subclass (Hawaii Laborers Pension Plan and the Archdiocese of Milwaukee), as reflected in their certifications (Appendix Exs. 5 and 6), purchased any of these notes at any time. Lead Plaintiff has not responded to the objection. Bank America also argues that the § 11 claims based on the 7% Exchangeable Notes must be dismissed because the only Plaintiff to have purchased them, Murray Van de Velde, bought them more than two years after the securities issued and thus cannot plead or prove reliance on the offering statements. In response Lead Plaintiff has stated that it no longer pursues its § 11 claims based on those notes and the 7% Exchangeable Notes. Memorandum in Opposition to Motion to Dismiss by Bank of America at p. 51, n. 38. and 92.

90 Deutsche Bank identifies Deutsche Bank Ales. Brown as its research arm.

91 The complaint explains, "[T]rue sales opinions are letters that law firms write vouching for the fact that the business transactions meet particular legal requirements." Complaint at 404.

92 Sherron S. Watkins was an Enron executive, a vice president of corporate development, who had come to Enron eight years earlier from Arthur Andersen, LLP and was very knowledgeable about accounting practices. The complaint at 425–27 quotes excerpts from her letter and references portions of it at various times. See footnote 75 of this memorandum and order for the contents of Watkins' memorandum. Other portions not quoted in footnote 75 (pp. 148–50) of this memorandum and order include the following:

Skilling is resigning now for "personal reasons" but I think he wasn't having fun, looked down the road and knew this stuff was unfixable and would rather abandon ship now than resign in shame in 2 years.

Is there a way our accounting guru's can unwind these deals now? I have thought and thought about how to do this, but I keep bumping into one big problem—*we booked the Condor and Raptor deals in 1999 and 2000, we enjoyed a wonderfully high stock price, many executives sold stock, we then try and reverse or fix the deals in 2001 and it's a bit like robbing the bank in one year and trying to pay it back 2 years later. Nice try, but investors were hurt, they bought at $70 and $80/share looking for $120/share and now they're at $38 or worse.* We are under too much scrutiny and there are probably one or two disgruntled "redeployed" employees who know enough about the "funny" accounting to get us in trouble.

My concern explain the transactions. If adequately explained, the investor would know that the "Entities" described in our related party footnote are thinly capitalized, that equity holders have no skin in the game, and all the values in the entities comes from the underlying value of the derivatives (unfortunately in this case, a big loss) AND Enron stock and N/P. *Looking at the stock we swapped, I also don't believe any other company would have entered into the equity derivative transactions with us at the same prices or without substantial premiums from Enron.*

* * * * * *

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

Raptor looks to be a big bet, if the underlying stocks did well, then no one would be the wiser. If Enron stock did well, the stock issuances to these entities would decline and the transactions would be less noticeable. ***All has gone against us. The stocks, most notably Hanover, The New Power Co., and Avici are underwater to great or lesser degrees.***

* * * * * *

I firmly believe that the probability of discovery significantly increased with Skilling's shocking departure. Too many people are looking for a smoking gun.

Summary of Raptor Oddities:

* * * * * *

2. ***The equity derivative transactions do not appear to be at arms length.***

a. Enron hedged New Power, Hanover, and Avici with the related party at what now appears to be the peak of the market. New Power and Avici have fallen away significantly since. The related party was unable to lay off this risk. This fact pattern is once again very negative for Enron.

b. ***I don't think that any other unrelated company would have entered into these transactions at any price.*** What else is going on here? What was the compensation to the related party to induce it to enter into such transactions?

93   The complaint asserts that the one-week Yosemite fraudulent transaction was created and structured by Fastow, Vinson & Elkins, Kirkland & Ellis and others, and that its legal documents were drafted by Kirkland & Ellis and approved by Vinson & Elkins, then clearly and deliberately back dated during February 2000. See footnote 56 on pp. 120–21 of this memorandum and order.

94   After revelations of Sherron Watkins' letter of August 2001 raising concerns about the questionable partnerships and accounting and after being briefed on Vinson & Elkins' subsequent investigation report in October, 2001, Enron's board of directors created a special investigative committee, composed of a number of individuals who had been involved in some way in either creating the partnerships at issue or reviewing the transactions, but headed by outsider William C. Powers, Jr., dean of the University of Texas School of Law. The committee performed a review and issued a 217–page report (the "Powers' report"), drafted by a former enforcement director of the SEC, William McLucas, partner in Wilmer, Cutler & Pickering, in February, 2002 that concluded that Enron executives had intentionally manipulated the company's profits and inflated them through a series of transactions with a complex tangle of partnerships that served no economic purpose other than such manipulation and failed to comply with federal securities and accounting law, while personally enriching themselves. It also criticized Enron's auditor, Arthur Andersen, and lawyers at Vinson & Elkins, as well as Enron's board of directors.

95   The disclosure was as follows:

In March 2001, Enron acquired the limited partner's interests in an unconsolidated equity affiliate, Joint Energy Development Investments Limited Partnership (JEDI), for $35 million. As a result of the acquisition, JEDI has been consolidated. JEDI's balance sheet as of the date of acquisition consisted of net assets of approximately $500 million, including an investment of 12 million shares of Enron common stock valued at approximately $785 million, merchant investments and other assets of approximately $670 million and third-party debt and debt owed to Enron of approximately $950 million. Enron repaid the third-party debt of approximately $620 million prior to March 31, 2001.

96   For example, in Enron's Report on Form 10–Q, filed on 8/16/99, is a statement drafted and approved by Vinson & Elkins: "Management believes that the terms of the transactions were reasonable and no less favorable than the terms of similar arrangements with unrelated third parties."

97   The complaint at 405–06 quotes additional critical passages from the Powers' report:

1. The Powers' report "sharply criticizes the firm for 'an absence of ... objective and critical professional advice.' "

2. A number of transactions among the SPEs and partnerships "were implemented—improperly, as we are informed by our accounting advisors—to offset losses". They allowed Enron to conceal from the market very large losses resulting from Enron's merchant investments by creating an appearance that those investments were hedged ... when in fact that third party was simply an entity in which only Enron had a substantial economic stake.

3. Vinson & Elkins "provided advice and documentation" for many of the partnership deals and "assisted Enron with the preparation of its disclosures of related-party transaction in the proxy statements and the footnotes to the financial statements in Enron's periodic SEC filings."

4. Enron's board and management "relied heavily on the perceived approval by Vinson & Elkins of the structure and disclosure of the transactions." It concludes that Vinson & Elkins "should have brought a stronger, more objective and more critical voice to the disclosure process."

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

The statement provides,

In the second quarter of 2000, Enron entered into transactions with the Related Party to hedge certain merchant investments. As part of the transactions Enron contributed to newly-formed entities (the Entities) assets valued at approximately $800 million, including 3.7 million restricted shares of outstanding Enron common stock, $100 million in Enron notes payable and the right to receive up to 11.7 million shares of outstanding Enron common stock in March 2003 (subject to certain conditions).

This disclosure stated,

In the third quarter of 2000, Enron entered into derivative transactions with the Entities with a combined notational value of approximately $1.2 billion to hedge certain merchant investments and other assets.

The 4/02/01 Form 10–K disclosure provides,

In 2000, Enron entered into transactions with the Related Party to hedge certain merchant investments and other assets. As part of the transactions, Enron (i) contributed to newly-formed entities (the Entities) assets valued at approximately $1.2 billion, including $150 million in Enron notes payable, 3.7 million restricted shares of outstanding Enron common stock and the right to receive up to 18.0 million shares of outstanding Enron common stock in March 2003 (subject to certain conditions) and (ii) transferred to the Entities assets valued at approximately $309 million, including a $50 million note payable and an investment in an equity that indirectly holds warrants convertible into common stock of an Enron equity method invitee....

In 2000, Enron entered into derivative transactions with entities with a combined notational amount of approximately $2.1 billion to hedge certain merchant investments and other assets.

As examples, the complaint at 424 references disclosures in Enron's Proxies filed on 5/02/00 and 5/01/01.

The letter stated,

One can only surmise that the removal of Jeff Skilling was an action taken by the board to correct the wrong doings of the various management teams at Enron. However, based on my experience with this company, I'm sure the board has only scratched the surface of the impending problems that plague Enron at the moment. (*i.e.,* EES's ... hiding losses/SEC violations ... lack of product, etc.).

... I feel it is my responsibility to bring to the Board's attention the various ongoing [sic] that I observed during my short tenure (9 months) with the company.

EES Management

... [I]t became obvious that EES has been doing deals for 2 years and was long money on almost all the deals they had booked. (JC Penney being a $60MM loss alone, then Safeway, Alberto's, GAP, etc.). Some customers threatened to sue if EES didn't close the deal with a loss (Simon Properties—$8MM loss day one).... Overnight the product offerings evaporated. The only product left is for the hotel and mall customers. Except that Starwood is also mad since EES has not invested the $45MM in equipment under the agreement. Enron was supposed to invest $45MM over the first 3 years of the contract. The people who negotiated the contract FORGOT to put in, at Enron's discretion ... it turns out that it doesn't make financial sense for Enron to put in the equipment, but Starwood wants it. Now you will loose [sic] at least $45MM on the deal. The Crisis was set in motion. You should also check on the Safeway contract, Alberto's, IBM and the California contracts that are being renegotiated.... It will add up to over $500MM that EES is losing and trying to hide in Wholesale. Rumor on the 7th floor is that it is closer to $1 Billion.... This is when they decided to merge the EES risk group with Wholesale to hide the $500MM in losses that EES was experiencing. But somehow EES, to everyone's amazement, reported earnings for the 2nd quarter. According to FAS 131 Statement of Financial Accounting Standards (SFAS) # 131, "Disclosures about Segments of an Enterprise and Related Information," EES has knowingly misrepresented EES' earnings. This is common knowledge among all the EES employees, and is actually joked about....

There are numerous operational problems with all the accounts.

* * * * * *

... Some would say the house of cards are falling....

You are potentially facing Shareholder lawsuits, Employee lawsuits ... Heat from the Analysts and newspapers. The market has lost all confidence, and it's obvious why.

You, the board have a big task at hand. You have to decide the moral, or ethical things to do, to right the wrongs of your various management teams.

* * * * * *

... But of all the problems I have mentioned, they are very much common knowledge to hundreds of EES employees, past and present.

Check out the 7th floor.... They are very talkative at the moment.

103 The Court observes that this letter alone raises issues of a serious conflict of interest and the propriety of Vinson & Elkins' undertaking this investigation on behalf of Enron. In light of the fact that Enron was Vinson & Elkins' biggest client and of Vinson & Elkins' extensive involvement in the structuring and documenting of the specific transactions with the SPEs that Lead Plaintiff has identified as devices and contrivances manipulated to defraud investors, commentator Roger C. Cramton, evaluating the ethical and legal implications of the law firm's investigation, has opined, "The investigation required V & E to assess objectively, as if it had not been there at all, the soundness and propriety of its prior representations. Thus the situation presented a huge conflict between Enron's presumed interest in an objective investigation and V & E's own interests.... [T]here remains a serious question whether [Enron's] consent was a valid one, and even if it was, whether ... the objective standard that the lawyer reasonably believe the representation will not be adversely affected by the lawyer's conflict of interest ... was satisfied." Cramton, 1324 PLI/Corp at 854. Cramton critically observes,

In any event, there remains a serious doubt whether V & E's conflict would not "adversely affect" its performance of the investigation. V & E's opinion letter stated that the Enron transactions it facilitated and approved were "creative and aggressive," suggesting that they went to the outer edge of legality. The letter also concluded that "because of bad cosmetics involving the LJM entities and Raptor transactions, coupled with the poor performance of the merchant investment assets placed in those vehicles and the decline in the value of Enron stock, there is a serious risk of adverse publicity and litigation." It was reasonably foreseeable, as has happened, that the litigation would include V & E as a defendant and that Enron officers, directors, and other co-defendants would defend themselves by blaming V & E for giving poor advice. Under these circumstances, the conflict appears to be too severe to be undertaken: a reasonable lawyer would not believe that his representation would not be adversely affected.

... The adequacy of the investigation is also questionable. V & E interviewed only seven high-level officials, most of whom were directly implicated in the self-dealing and fiduciary violations raised by the Watkins allegations. V & E relied on the denials of wrong doing by those officers and on the fact that none of the persons interviewed could identify a specific transaction that was illegal. Although McMahon, one of those interviewed, mentioned nine lower-level employees who might be good sources of information concerning Fastow's self-dealing, V & E failed to interview any of them. V & E was informed of the "mistake" that was made concerning the failure of the Chewco transaction to meet the required degree of outside equity participation, but never pursued the issue. The investigation as a whole, when compared to the subsequent investigation by the board's special committee, using the services of Wilmer, Cutler & Pickering, appears perfunctory. As the Powers Report stated, the result of the V & E investigation "was largely predetermined by the scope and nature of the investigation and the process employed." It was performed with "insufficient skepticism." ... There is a serious question of whether adequate representation was provided to the entity client, as distinct from satisfying the manager's apparent desire to have a protective document.

*Id.* at 854. Cramton closes with the suggestion that these issues regarding the investigation might provide grounds not only for a malpractice claim against the law firm by Enron, but, along with other allegations, might give rise to a suit by shareholders and employees charging that Vinson & Elkins "participated as a principal along with Enron managers and directors and others in intentional violations of the federal securities acts." *Id.*

104 The complaint asserts that the documents for the Yosemite transaction that were prepared in February 2000, but deliberately back-dated to make it look as if the sale occurred before year-end 1999 and to conceal the fraudulent scheme from Enron's shareholders, were approved and drafted by Kirkland & Ellis.

105 The Court does not address the allegations against the international Arthur Andersen entities because they have reached a proposed settlement for which they are in the process of obtaining approval.

106 GAAS are standards established by the Auditing Standards Board of the American Institute of Certified Public Accountants for the conduct of auditors in the performance of an examination. *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 663 n. 5 (3d Cir.2002), *citing SEC v. Arthur Young & Co.,* 590 F.2d 785, 788 n.2 (9th Cir.1979); *Ziemba,* 256 F.3d at 1200 n. 3. The complaint charges Arthur Andersen with violating the public's trust and the American Institute of Certified Public Accountant's ("AICPA's") Code of Professional Ethics which calls for "an unswerving commitment to honorable behavior, even at the sacrifice of personal advantage" and "discharge [of] their responsibilities with integrity, objectivity, due professional care, and a genuine interest in serving the public." Complaint at 449.

107 The complaint asserts that Arthur Andersen's issuance of and multiple consents to reissue materially false reports on Enron's 1997–2000 financial statements are violations of GAAS.

108 The complaint, at 455–56, states that following a 1998 investigation of accounting fraud at Waste Management, which during that year restated its 1992–96 financial statements that had been audited by Houston's Arthur Andersen office,

In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)

Fed. Sec. L. Rep. P 92,239

the SEC found that Arthur Andersen's internal documents demonstrated that Arthur Andersen not only knew of Waste Management's fraud, but was deeply involved in covering it up. Once exposed, Arthur Andersen, which signed the consent decree, was enjoined from such fraudulent conduct in the future and penalized with a $7 million fine, the largest civil penalty imposed on an accounting firm in the SEC's history, while several high-level partners were sanctioned for inappropriate behavior.

The complaint asserts at 456,

As with Enron, Andersen's willingness to keep quiet about fraudulent accounting to protect the huge fees it earned played a significant role in Waste Management's ability to perpetrate one of the largest frauds in history. Andersen recognized Waste Management's "aggressive" accounting as early as 88, according to SEC documents, and by 93, Andersen had documented that Waste Management was a "high-risk client" and that the client inflated profits by more than $100 million. However, during the same time frame, Andersen was relentlessly marketing its consulting services to the client, resulting in consulting fees more than double the size of the audit fees. Even when Waste Management refused to fix the improper accounting practices recommended by Andersen in prior years, Andersen caved in and continued to sign off on the company's annual audits. This went on for the next three years. According to the SEC those decisions were backed at the highest levels of Andersen's Chicago office, including Andersen's Practice Director, the firm's Managing Partner and the Audit Division Head for the firm's National office in Chicago.... Several parallels exist between Andersen's conduct on Waste Management and Enron. For example: Enron and Waste Management were Andersen's two largest clients. Andersen's Houston office audited both Waste Management and Enron. Further Andersen partners, including Swanson and Goolsby [who signed the consent decree for Andersen in the Waste Management SEC action], had oversight responsibility over both the Waste Management and Enron engagements.

The complaint at 456–57 asserts,

In 5/01, the SEC filed an injunctive action against Andersen partner Philip E. Harlow, the former engagement partner on the Sunbeam account, for authorizing the issuance of unqualified audit opinions on Sunbeam's 96 and 97 financial statements, even though he was aware of many of the company's accounting improprieties and disclosure failures. In 01, Andersen paid $110 million to settle shareholder lawsuits in connection with Sunbeam's restatement of six quarters of financial results.... In this case, as in Enron, Andersen's document destruction was a common theme. In fact, an Andersen partner testified that months after the restatements were announced and after the shareholder lawsuits had been filed, the firm ordered its Fort Lauderdale employees to dispose of any work papers or correspondence that did not agree with the final documentation of the Sunbeam restatement.

The complaint at 457–58 observes that the Arizona Attorney General filed suit on behalf of investors, many retirees, who lost $590 million of their savings in a Ponzi scheme run by individuals at the Baptist Foundation of Arizona, which was audited by Arthur Andersen. In a settlement Arthur Andersen agreed to pay the investors $217 million, and Arizona is in the process of revoking the licenses of three auditors, while three individuals from the Foundation have pled guilty to felony charges and five others have been indicted. A senior Arthur Andersen partner on the audit, Jay Steven Ozer, who had also been involved in audits of Charles Keating's Lincoln Savings & Loan, has agreed to give up his Arizona accounting license. As was typical of accounting in the Enron debacle, the Foundation used off-balance-sheet entities to hide significant losses in real estate investments from investors. The Foundation sold real estate at inflated prices to a company known as ALO, a related-party controlled by the Foundation, in exchange for an IOU rather than cash. Although several outside accountants and professionals warned the Arthur Andersen auditors for two years that they were suspicious of fraudulent accounting at the Foundation, Arthur Andersen paid no heed. Review of public records of AOL revealed that it had a negative worth of $106 million and was not capable of making good on its debt to the Foundation. From the first warning until the Foundation failed, Arthur Andersen issued two more unqualified opinions that permitted the Foundation to raise another $200 million of investor savings.

The complaint represents that the State of Connecticut revoked Arthur Andersen's license to practice because of audits for a national real estate syndication firm, Colonial Realty Company, following its collapse. Colonial Realty was involved in a Ponzi scheme arising from exaggerated valuations of Colonial Realty properties. Arthur Andersen provided unqualified opinions supporting the inflated values and claims and assisted in preparing private placement memoranda in connection with public offerings that caused investors to suffer substantial losses. Furthermore, in conduct like that alleged at Enron, the Connecticut Attorney General found that Arthur Andersen employees had destroyed incriminating documents under the excuse that it was complying with Arthur Andersen's document retention policy.

In 1984 and 1985, according to the complaint at 458, Arthur Andersen issued "clean" or unqualified audit opinions on the ACC/Lincoln financial statements that were included in SEC filing and aided Charles Keating to "promote an illusion of

**In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)**

Fed. Sec. L. Rep. P 92,239

prosperity that was used to market notes to investors" and to bilk them out of more than $500 million. Arthur Andersen paid approximately $30 million to settle the suit that arose out of the fraud.

114 See complaint at 455–59.

115 The complaint explains at 449 that "AU" refers to the American Institute of Certified Public Accountants' Auditing Standards, which are "recognized by the AICPA as the interpretation of GAAS."

116 Elsewhere Lead Plaintiff identifies PSG as "Andersen's oversight authority." # 854 at 1–2.

117 In a 2/01 e-mail, Arthur Andersen Partner Michael D. Jones wrote, "A significant discussion was also held regarding Enron's MTM earnings and the fact that it was 'intelligent gambling.' We discussed Enron's risk management activities including authority, limits, valuation and position monitoring." Complaint at 465.

118 AU § 334.09 provides,

.09 After identifying related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management. Procedures that should be considered include the following:

a. Obtain an understanding of the transaction.

b. Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents.

c. Determine whether the transaction has been approved by the board of directors or other appropriate officials.

d. Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in financial statements.

e. Arrange for the audits of intercompany account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information.

f. Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

119 AU § 334.11, complaint at 473, provides,

For each material related party transaction (or aggregation of similar transactions) or common ownership or management control relationship, for which FASB Statement No. 57 [AC section R36] requires disclosure, the auditor should consider whether he has obtained sufficient competent evidential matter to understand the relationship of the parties and, for related party transactions, the effects of the transaction on the financial statements. He should then evaluate all the information available to him concerning the related party transaction or control relationship and satisfy himself on the basis of his professional judgment that it is adequately disclosed in the financial statements.

120 Since Lead Plaintiff's complaint was filed, Arthur Andersen has been found guilty of obstruction of justice by a jury and sentenced by this Court.

121 ET § 53—Article II—The Public Interest

Members should accept the obligation to act in a way that will serve the public interest, honor the public trust, and demonstrate commitment to professionalism.

ET § 102 Integrity and Objectivity

.02 Knowing misrepresentation in the preparation of financial statements or records. A member shall be considered to have knowingly misrepresented facts in violation of rule 102 [ET section 102.01] when he or she knowingly—

a. Makes, or permits or directs another to make, materially false and misleading entries in an entity's financial statements or records shall be considered to have knowingly misrepresented facts in violation of rule 102 [ET section 102.01]....

ET § 501—Acts Discreditable

.05 501.4—Negligence in the preparation of financial statements or records. A member shall be considered to have committed an act discreditable to the profession in violation of rule 501 [ET section 501.01] when, by virtue of his or her negligence, such member—

a. Makes, or permits or directs another to make, materially false and misleading entries in the financial statements or records of an entity; or

b. Fails to correct an entity's financial statements that are materially false and misleading when the member has the authority to record an entry; or

c. Signs, or permits or directs another to sign, a document containing materially false and misleading information.

AU § 220 Independence

.01 The second general standard is:

In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

.02 This standard requires that the auditor be independent; aside from being in public practice (as distinct from being in private practice), he must be without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be. However, independence does not imply the attitude of a prosecutor but rather a judicial impartiality that recognizes an obligation for fairness not only to management and owners of a business but also to creditors and those who may otherwise rely (in part, at least) upon the auditor's report, as in the case of prospective owners or creditors.

As examples the complaint lists the following: (1) that the audit should be performed by persons having adequate technical training and proficiency as auditors; (2) auditors should maintain independence in mental attitude in all matters relating to the engagement; (3) due professional care should be exercised in the audit and preparation of the report; (4) the audit should be properly planned and assistants properly supervised; (5) the auditor should obtain a sufficient understanding of internal controls to be able to plan the audit and determine the nature, timing and extent of the tests to be performed; (6) the auditor should obtain sufficient competent evidential matter to constitute a reasonable basis for an opinion on the financial statements under audit; (7) the report should state whether the financial statements are presented in accordance with GAAP; (8) the report shall identify circumstances in which GAAP has not been consistently observed; the informative disclosures are regarded as reasonably adequate unless the report indicates otherwise; and (9) the report shall contain an expression of opinion or present reasons why an opinion cannot be given.

Gretchen Morgenson, "Does the Rot on Wall Street Reach Right to the Top?," Section 3 (Money & Business) at 1, *The New York Times,* Nov. 17, 2002. In an article on the Op–Ed page of November 15, 2002's *New York Times at A27,* a former research analyst at Goldman Sachs, in defending analysts by explaining the difficulties of predicting what the stock market will do and the reasons why their role is misunderstood, perfunctorily stated, "[A]nalysts are subject to internal and external pressures to be positive on essentially every stock they cover. From the inside, investment bankers arm-twist analysts to write and speak favorably about their firms' existing and prospective clients. From the outside, some executives bypass their bankers and go straight to the analysts, hoping to win a higher rating (and hoping, no doubt, that the fruits of that rating will enable them to buy more gold umbrellas stands and diamond-studded shower rods)." See also Marcia Vickers & Mike France, "Wall Street: How Corrupt is It?," *Business Week,* May 13, 2002 at 36–44, Ex. 1 to Lead Plaintiff's Appendix in Support of Plaintiffs' Oppositions to Motions to Dismiss (# 858), To dismiss Lead Plaintiff's allegation of ineffective Chinese walls and to not consider it as a circumstance relevant to the alleged fraud would be remiss and contrary to common sense.

For instance by November 1, 2001, a number of securities fraud and shareholder derivative suits had already been filed against Enron alleging that its public disclosures were materially misleading, the SEC had launched a formal investigation into its accounting practices, and Moody's had downgraded its long-term debt ratings. On November 8, 2001 Enron filed a Form 8–K stating that it would be restating previous financial statements back to 1997 and warned investors not to rely on those prior statements, which included those incorporated into the prospectus for the 7% Notes.

Section 77k(a) provides in relevant part,

If such a person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement of such person.

Defendants have also contended that Van de Velde has not claimed that he purchased in the initial public offering of those notes. They argue that the rule in *Gustafson v. Alloyd Co., Inc.* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), that standing to sue under § 12(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2), is restricted to persons who purchased securities in the initial public offering, and thus those who purchased their securities in private initial offerings or on the secondary market are deprived of the antifraud protection of § 12(2), also applies to claims under § 11, 15 U.S.C. § 77k(a).

After reviewing the law, this Court is persuaded by the three federal appellate courts that have thus far addressed this issue. They have concluded that the *Gustafson* rule does not apply to § 11 in part because (1) § 11's language, "any person acquiring such security ... may sue," is more expansive that § 12(2)'s language providing that any person who "offers or sells a security" by means of a "prospectus or oral communication" that contains a material false statement or omission shall be liable to "the person purchasing such security from him"; (2) § 11(a)'s provision that a person who has

**In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549 (2002)**

Fed. Sec. L. Rep. P 92,239

acquired a security "after the issue has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effect date of the registration statement" must prove actual reliance on the registration statement to recover would be redundant or meaningless; (3) the same would be true of § 11(e)'s damages provision establishing as the baseline for damages the difference in the amount for which the security is sold and the amount paid, not exceeding the price at which it was offered to the public, if the only plaintiffs with standing were those who bought at the initial offering at the offering price; and (4) the Congressional purpose behind the statutes, i.e., the 1933 Act was intended to regulate the initial distribution of securities while the 1934 Act was passed to regulate trading in the open market. *Lee v. Ernst & Young, LLP,* 294 F.3d 969, 976–77 (8th Cir.2002); *Joseph v. Wiles,* 223 F.3d 1155, 1159–60 (10th Cir.2000); *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1079–82 (9th Cir.1999).

Some Defendants argue that the private placement memorandum also discussed significant steps that Enron would take to avoid a conflict of interest, such as that "Richard Causey, Executive Vice President and Chief Accounting Officer of Enron, will, in behalf of Enron, monitor and mediate conflict-of-interests between Enron and the Partnership." The Court notes that the allegations in the complaint imply that such steps were either never initiated or ineffective.

The Court is also aware from reports in the press of current Congressional investigations of two particular deals between Enron and Citigroup that fit the pattern of many alleged by Lead Plaintiff. One, an off-the-books partnership known as Bacchus, in which Citigroup invested 3% equity, is an echo of the 3% equity investment in JEDI by Barclays via Chewco, with an alleged guarantee by Enron that Citigroup's investment in Bacchus would not be at risk. The second is a venture known as Sundance, which Citigroup's own risk managers and other employees objected was too aggressive and risky, but which Citigroup purportedly went forward with despite the warnings.

Lead Plaintiff has charged Vinson & Elkins with drafting and approving over years a great many of Enron's "disclosures" for public SEC filings, press releases, and shareholder reports, which it knew or had reason to expect potential investors to have access to and rely upon in deciding to invest in Enron securities. The complaint asserts that these fraudulent "disclosures" were necessary to expand and perpetuate the scheme. The public reports and statements contained numerous alleged fraudulent misrepresentations, carefully detailed by Lead Plaintiff, with respect to various transactions (devices or contrivances) involving the Enron-controlled SPE. See pages 203–23 of this memorandum and order.

The complaint at 463 lists the following as examples:

> How Enron could, with its own capital stock, repeatedly add to the collateral underlying an obligation owed to Enron from a related party without recognizing it in the financial statements.
>
> Enron's stock contributions/ issuances to LJM did not appear to be recorded on Enron's books.
>
> Enron's financial statement disclosures related to the Fastow investment-company relationships and transactions were (putting it kindly) hard to understand or incomplete.
>
> The LJM equity had been distributed to its shareholders, including Fastow and CIBC, concurrently, or shortly after, its original formation.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by**   Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC,   N.M.App.,   July 18, 2012

52 S.W.3d 749
Supreme Court of Texas.

In re FIRSTMERIT BANK, N.A. f/k/a Signal Bank, N.A. and Mobile Consultants, Inc., Relators.

No. 00–0548.   |   Argued Feb. 14, 2001.   |   Decided June 14, 2001.

Mobile home buyers and donees, their child and son-in-law, brought action against lender and its servicing agent to recover for breach of contract, revocation of acceptance, breach of warranty, negligence, and fraud in connection with condition of the home. The trial court denied motion by lender and agent to compel arbitration. Lender and agent petitioned for writ of mandamus. The Supreme Court, Enoch, J., held that: (1) the installment contract related to interstate commerce and, therefore, was subject to the Federal Arbitration Act (FAA); (2) claims by buyers and donees were subject to arbitration; (3) the donees were subject to the arbitration clause; (4) the clause was not unconscionable; (5) sellers' alleged fraud did not invalidate the agreement; and (6) the revocation issue concerning the installment contract was subject to arbitration.

Writ conditionally granted.

West Headnotes (24)

[1]   **Mandamus**
        Nature and scope of remedy in general

Mandamus is an extraordinary remedy available only in limited circumstances.

5 Cases that cite this headnote

[2]   **Mandamus**
        Remedy at Law
      **Mandamus**
        Nature of acts to be commanded

A court should issue mandamus only to correct a clear abuse of discretion or the violation of a legal duty when there is no other adequate remedy at law.

8 Cases that cite this headnote

[3]   **Mandamus**
        Remedy at Law

When a trial court erroneously denies a party's motion to compel arbitration under the Federal Arbitration Act (FAA), the movant has no adequate remedy at law and is entitled to a writ of mandamus. 9 U.S.C.A. § 1 et seq.

30 Cases that cite this headnote

[4]   **Mandamus**
        Civil proceedings other than actions

A party seeking to compel arbitration by mandamus must first establish the existence of an arbitration agreement subject to the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.

53 Cases that cite this headnote

[5]   **Alternative Dispute Resolution**
        Disputes and Matters Arbitrable Under Agreement

Once the movant seeking arbitration establishes an agreement, the court must then determine whether the arbitration agreement covers the nonmovant's claims.

32 Cases that cite this headnote

[6]   **Alternative Dispute Resolution**
        Evidence

A presumption exists favoring agreements to arbitrate under the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.

26 Cases that cite this headnote

[7]   **Alternative Dispute Resolution**
        Construction in favor of arbitration

Courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration.

48 Cases that cite this headnote

**[8]** **Alternative Dispute Resolution**
🔑 Discretion

**Alternative Dispute Resolution**
🔑 Remedies and Proceedings for Enforcement in General

Once the trial court concludes that an arbitration agreement encompasses the claims and that the party opposing arbitration has failed to prove its defenses, the trial court has no discretion but to compel arbitration and stay its own proceedings.

56 Cases that cite this headnote

**[9]** **Commerce**
🔑 Arbitration

Installment contract for sale of mobile home related to interstate commerce and, therefore, was subject to the Federal Arbitration Act (FAA); secured lender and its servicing agent were corporations in another state and received installment payments there, and the arbitration addendum stated that the loan involved interstate commerce and was governed by the FAA. 9 U.S.C.A. § 1 et seq.

16 Cases that cite this headnote

**[10]** **Alternative Dispute Resolution**
🔑 Disputes and Matters Arbitrable Under Agreement

To determine whether a party's claims fall within an arbitration agreement's scope, courts focus on the complaint's factual allegations, rather than the legal causes of action asserted.

61 Cases that cite this headnote

**[11]** **Alternative Dispute Resolution**
🔑 Sales contracts disputes

Mobile home buyers' claims against lender and its agent to challenge right to repossess the home and to recover for condition of the home and sellers' failure to remedy defects were covered by agreement to arbitrate all disputes, claims,

or other matters arising out of or relating to the loan, its interpretation, validity, performance, or breach; the arbitration clause defined "loan" to include the installment contract and all other loan documents and was thus not limited to claims relating directly to financing.

33 Cases that cite this headnote

**[12]** **Alternative Dispute Resolution**
🔑 Sales contracts disputes

The question whether mobile home sellers made any misrepresentations in the inducement of the underlying contract related to the validity of the contract and, therefore, was subject to arbitration in buyers' suit against lender and its agent; the agreement required arbitration of all disputes, claims, or other matters arising out of or relating to the loan, its interpretation, validity, performance, or breach and defined "loan" to include the installment contract and all other loan documents.

23 Cases that cite this headnote

**[13]** **Alternative Dispute Resolution**
🔑 Persons affected or bound

Mobile home donees' suit against lender and its agent based on parents' installment contract as buyers and borrowers subjected residents to the contract's terms, including the arbitration agreement, even though they never signed it.

10 Cases that cite this headnote

**[14]** **Alternative Dispute Resolution**
🔑 Validity of assent

**Alternative Dispute Resolution**
🔑 Unconscionability

Defenses of unconscionability, duress, fraudulent inducement, and revocation needed to specifically relate to the arbitration agreement itself, not the contract as a whole, in order to defeat arbitration; defenses that pertained to the entire installment contract could be arbitrated.

39 Cases that cite this headnote

**[15] Alternative Dispute Resolution**
  👈 Evidence

Since the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration.

34 Cases that cite this headnote

**[16] Alternative Dispute Resolution**
  👈 Unconscionability

The possibility that arbitration could subject mobile home buyers to substantial costs and fees did not make the arbitration agreement unconscionable without specific evidence that the buyers would actually be charged excessive fees to arbitrate claims against lender and its agent.

14 Cases that cite this headnote

**[17] Alternative Dispute Resolution**
  👈 Unconscionability

The party opposing arbitration on the ground that fees and costs make the arbitration clause unconscionable must prove the likelihood of incurring such costs.

24 Cases that cite this headnote

**[18] Alternative Dispute Resolution**
  👈 Unconscionability

Some specific information of future costs is required in order to show that an arbitration agreement is made unconscionable by subjecting parties to substantial costs and fees.

34 Cases that cite this headnote

**[19] Alternative Dispute Resolution**
  👈 Unconscionability

Lender's right to seek judicial relief to enforce its security agreement, recover payments from mobile home buyers, and foreclose did not render unconscionable an arbitration agreement covering their claims against the lender to challenge right to repossess the home and to

recover for condition of the home and sellers' failure to remedy defects.

10 Cases that cite this headnote

**[20] Contracts**
  👈 Unconscionable Contracts

The basic test for unconscionability is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract; the principle is one of preventing oppression and unfair surprise and not of disturbing allocation of risks because of superior bargaining power.

46 Cases that cite this headnote

**[21] Alternative Dispute Resolution**
  👈 Validity of assent

Mobile home sellers did not commit duress by stating only that they would not sell the home if the buyers refused to sign the arbitration agreement; the sellers had a legal right to refuse to sell under that condition.

2 Cases that cite this headnote

**[22] Alternative Dispute Resolution**
  👈 Validity of assent

Mobile home sellers' alleged fraud by representing ownership of the land under the home and the existence of a septic system and driveway, by failing to refer to an arbitration clause in advertisements and pre-sale statements, and by inadequately explaining the consequences of signing the agreement did not invalidate the agreement; nothing indicated that the sellers actually misrepresented the agreement's terms or made any false material representations with regard to the agreement itself.

29 Cases that cite this headnote

**[23] Fraud**

☞ Elements of Actual Fraud

The elements of fraud are that: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

234 Cases that cite this headnote

[24] **Alternative Dispute Resolution**
☞ Existence and validity of agreement

The issue of whether the underlying installment contract for sale of a mobile home was revoked was subject to arbitration in buyers' suit against lender and its agent; the issue arose from or related to the contract.

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*752** John A. Seib, Jr., The Seib Law Firm, Dallas, Michael Deitch, Law Offices of Michael Deitch, Austin, Steven Marc Reback, Law Offices of Michael Deitch, Austin, for Relator.

F. Terry Callahan, Law Offices of F. Terry Callahan, San Antonio, for Respondent.

**Opinion**

Justice ENOCH delivered the opinion of the Court.

FirstMerit Bank and Mobile Consultants seek mandamus relief after the trial court denied their motion to compel arbitration. Because the Federal Arbitration Act (FAA) requires the trial court to compel arbitration in this case, we conditionally grant their petition and order the trial court to compel arbitration in accordance with the parties' agreement.

**I. BACKGROUND**

Pete and Janie de los Santos purchased a mobile home for their daughter, Sarah, and her husband, Gary Alvarez. They bought the home from Verde Homes under Verde's retail installment financing agreement. Verde assigned this contract, which Pete and Janie signed, to Signal Bank (now FirstMerit Bank). The agreement contained an Arbitration Addendum, which required binding arbitration for "all disputes, claims, or other matters in question arising out of or relating to this Loan, its interpretation, validity, performance or the breach thereof." The word "Loan" referred to "all manufactured home loan documents, including but not limited to the retail installment contract...." The Addendum further stated that "the scope of arbitrability is broad and includes, without limitation, contractual, tort, statutory, and caselaw claims." The Addendum also permitted the bank to seek judicial relief to enforce its security interest, recover the buyers' monetary loan obligation, and foreclose. **\*753** But aside from these three exceptions, the Addendum required arbitration for all other disputes relating to the installment contract.

After Verde delivered the home, the de los Santoses tried to revoke their acceptance, claiming that the home was defective and that Verde failed to perform certain promised repairs. Although Verde Homes refused to rescind the sale, the de los Santoses apparently stopped making their monthly loan payments. In response, Signal Bank took possession of the home. The de los Santoses then sued Signal Bank, Mobile Consultants (Signal's servicing agent), Verde Homes, and two Verde employees, alleging breach of contract, revocation of acceptance, breach of warranty, negligence, and fraud. They also alleged violations of the Deceptive Trade Practices Act, Fair Debt Collection Practices Act, Equal Credit Opportunity Act, and Fair Credit Reporting Act. Additionally, the de los Santoses claimed that their successful revocation of acceptance entitled them to a security interest in the home, equal to the amount they had paid on the installment contract. To enforce their security interest, they requested an injunction forcing FirstMerit to return possession of the home until it refunded the de los Santoses' loan payments.

In response, FirstMerit and Mobile moved to compel arbitration.[1] The trial court denied their motion. FirstMerit Bank and Mobile then petitioned the Third Court of Appeals for a writ of mandamus, which the court denied. FirstMerit and Mobile now ask this Court for mandamus relief.

## II. WHETHER TO ORDER ARBITRATION

**[1]** **[2]** **[3]** Mandamus is an extraordinary remedy available only in limited circumstances. [2] A court should issue mandamus only to correct a clear abuse of discretion or the violation of a legal duty when there is no other adequate remedy at law. [3] When a trial court erroneously denies a party's motion to compel arbitration under the FAA, the movant has no adequate remedy at law and is entitled to a writ of mandamus. [4] Thus, we must determine whether the movants established their right to arbitration.

**[4]** **[5]** **[6]** **[7]** **[8]** A party seeking to compel arbitration by mandamus must first establish the existence of an arbitration agreement subject to the FAA. [5] Once the movant establishes an agreement, the court must then determine whether the arbitration agreement covers the nonmovant's claims. [6] Because state and federal policies continue to favor arbitration, [7] a presumption exists favoring agreements to arbitrate under the FAA, [8] and courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration. [9] Once the trial court **\*754** concludes that the arbitration agreement encompasses the claims, and that the party opposing arbitration has failed to prove its defenses, [10] the trial court has no discretion but to compel arbitration and stay its own proceedings. [11]

### A. SCOPE OF ARBITRATION

**[9]** Here, there is no dispute about the Arbitration Addendum's existence. The de los Santoses instead contend that the installment contract was completed entirely in Texas, did not involve interstate commerce, and, accordingly, was not subject to the FAA. As defined in the FAA, however, "interstate commerce" is not limited to the interstate shipment of goods, but includes all contracts "relating to" interstate commerce. [12] In fact, the United States Supreme Court has construed the FAA to extend as far as the Commerce Clause of the United States Constitution will reach. [13] In this case, the evidence demonstrates that the loan was made in interstate commerce. Signal Bank and Mobile Consultants were Ohio corporations, while the de los Santoses were Texas residents. The installment contract stated that Signal Bank was located in Ohio. The record includes several photocopies of loan

payment checks drawn on a Texas bank that Signal Bank had deposited in Ohio. And both Signal and Mobile Consultants corresponded with the de los Santoses from Ohio. The de los Santoses also listed Signal's Ohio address at the top of their revocation of acceptance letter. Moreover, the Arbitration Addendum, which Pete and Janie de los Santos both signed, states that the loan "involves interstate commerce ... and shall be governed by the Federal Arbitration Act...." In light of these facts, we conclude that the installment contract relates to interstate commerce and is subject to the FAA. [14]

**[10]** **[11]** Because FirstMerit and Mobile have established the existence of an agreement to arbitrate under the FAA, we must next determine whether the Arbitration Addendum covers the de los Santoses' claims. To determine whether a party's claims fall within an arbitration agreement's scope, we focus on the complaint's factual allegations rather than the legal causes of action asserted. [15] And again, we resolve any doubts about the Arbitration Addendum's factual scope in favor of coverage. Further, we reiterate that the parties' Arbitration Addendum covers "all disputes, claims, or other matters in question arising out of or relating to this Loan, its interpretation, validity, performance, or the breach thereof" and states that "the scope of arbitrability is broad and includes, without limitation, contractual, tort, statutory, and case law claims."

We now turn to the de los Santoses' factual allegations. The de los Santoses asserted that the sellers misrepresented that they owned the homesite, and that the homesite included a driveway and septic system. They also claimed that the sellers were not properly licensed, misrepresented **\*755** the terms of the loan, failed to provide a credit report to Sarah and Gary Alvarez, and failed to make other disclosures regarding interest rates and credit. The de los Santoses further alleged that the sellers fraudulently double-charged them for insurance that was already paid for in the installment contract. In addition, the de los Santoses asserted that after taking possession of the home, they learned that the home was not yet complete, that it lacked carpeting and air conditioning, and that it was not installed properly. They also charged that the sellers failed to repair these defects in a timely and workmanlike manner, that they never installed an air conditioner, and that the sellers' attempts to repair the septic tank were untimely and defective. Finally, the de los Santoses asserted that the bank wrongfully denied their attempt to revoke the contract, criminally trespassed on their property, and wrongfully repossessed the home.

 **[12]** In light of the Addendum's broad language, all of the de los Santoses' factual allegations fall within the Addendum's scope. The de los Santoses contend that because the Addendum "relat(es) to the Loan," it only covers claims that relate directly to the home's financing, and does not cover their allegations about the home's post-sale condition and repairs. But this interpretation ignores the Addendum's broad definition of "Loan" to include the installment contract and all other loan documents. Further, irrespective of the Addendum's broad language, we also note that the home was the bank's collateral under the Loan. The de los Santoses alleged that the sellers' failure to remedy the home's physical problems entitled them to a security interest in the home, which would prevent the bank from repossessing its collateral. [16] Thus, the home's post-sale condition, and the sellers' post-sale failure to remedy the home's problems, relate to the bank's right to repossess its collateral under the loan. In sum, all of the de los Santoses' factual allegations arise out of or relate to either the sellers' conduct in selling the home and negotiating the installment contract, or to the performance or alleged breach of the installment contract. Furthermore, while fraud in the inducement of an arbitration agreement is a defense to arbitration, whether the sellers made any misrepresentations in the inducement of the underlying contract relates to the contract's validity and can be arbitrated. [17] As for the de los Santoses' wrongful repossession allegations, the Addendum provides that "any counterclaims in suits brought by Seller/Assignee pursuant to this provision," including complaints about foreclosure, may be arbitrated. Given the Addendum's language on counterclaims, the Arbitration Addendum covers all of the de los Santoses' complaints about the bank's right to repossess the home.

 **[13]** As a specific challenge, Sarah and Gary Alvarez contend that their claims are exempt from the Arbitration Addendum because they did not sign the contract. But a litigant who sues based on a contract subjects him or herself to the contract's terms. [18] Here, the Alvarezes fully joined the de los Santoses' contract claims. In fact, the de los Santoses' original petition **\*756** makes no distinction between the parents' claims and the Alvarezes' claims. Thus, by suing FirstMerit based on the de los Santoses' installment contract, the Alvarezes subjected themselves to the contract's terms, including the Arbitration Addendum.

Accordingly, unless the de los Santoses can prove one of their defenses to the Arbitration Addendum, the FAA requires arbitration. [19]

### B. DEFENSES TO ARBITRATION

 **[14]** **[15]** The de los Santoses assert the defenses of unconscionability, duress, fraudulent inducement, and revocation. We again note that these defenses must specifically relate to the Arbitration Addendum itself, not the contract as a whole, if they are to defeat arbitration. [20] Defenses that pertain to the entire installment contract can be arbitrated. [21] We further note that the de los Santoses' defenses against the Addendum are governed by Texas law. [22] Again, since the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration. [23]

 **[16]** **[17]** The de los Santoses contend that the Arbitration Addendum is unconscionable because arbitration might subject them to substantial costs and fees. On this issue, in *Green Tree Financial Corp. v. Randolph,* the United States Supreme Court recognized that "the existence of large arbitration costs could preclude a litigant ... from vindicating her federal statutory rights...." [24] Nonetheless, the Supreme Court concluded that an arbitration agreement's mere silence with respect to costs and fees, by itself, is a "plainly insufficient" basis for invalidating the agreement. [25] Instead, the party opposing arbitration must prove the likelihood of incurring such costs. [26] To hold otherwise would "undermine the liberal federal policy favoring arbitration agreements." [27]

 **[18]** While the Supreme Court did not specify "how detailed the showing of prohibitive expense must be," there is no doubt that *some* specific information of future costs is required. [28] In *Green Tree,* the party resisting arbitration cited what she claimed were American Arbitration Association (AAA) figures on arbitration costs, but she provided no evidence that the AAA would actually conduct the arbitration or charge her the fees she identified. [29] Because of this uncertainty, the Supreme Court deemed the evidence insufficient to defeat arbitration. [30]

Here, the de los Santoses testified, in two sworn affidavits, that the AAA charged a minimum $2,000 filing fee and

a $250/day/party hearing fee, along with several other unspecified fees, for hearings before a three-member panel. But we **\*757** need not decide whether these costs would be excessive. As in *Green Tree,* the de los Santoses provided no evidence that the AAA would actually conduct the arbitration or charge the specified fees. The Arbitration Addendum does not state that the AAA will conduct the arbitration, and it makes no mention of arbitration costs. We also note that the most recent AAA commercial arbitration rules provide that "the AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." [31] Moreover, in the event the de los Santoses do not avail themselves of FirstMerit Bank's choice of arbitrators, the FAA permits the trial court to choose an alternate set of arbitrators. [32] The de los Santoses also complain that the requirement of three arbitrators is inherently costly. But again, without any specific information on what the costs will be, this requirement is not evidence of unconscionability. Finally, in agreeing to the Addendum, Pete and Janie de los Santos agreed "that arbitration is a less expensive method of dispute resolution that decreases servicing costs of this loan...." Because the record contains no specific evidence that the de los Santoses will actually be charged excessive arbitration fees, we conclude that there is legally insufficient evidence that the plaintiffs would be denied access to arbitration based on excessive costs.

 **[19]**    **[20]**    The de los Santoses also argue that the agreement's terms are unconscionable because they force the weaker party to arbitrate their claims, while permitting the stronger party to litigate their claims. [33] They point us to decisions in other jurisdictions that have found this type of clause to be unconscionable. [34] Most federal courts, however, have rejected similar challenges on the grounds that an arbitration clause does not require mutuality of obligation, so long as the underlying contract is supported by adequate consideration. [35] In any event, the basic test for unconscionability is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract. [36] The principle is one of preventing oppression and unfair surprise and not of disturbing allocation of risks because of superior bargaining power. [37] Here, the Arbitration Addendum allows the bank to seek judicial relief to enforce its security agreement, recover the buyers' monetary loan obligation, and foreclose. Given the weight of federal precedent and the routine nature

of mobile **\*758** home financing agreements, [38] we find that the Arbitration Addendum in this case, by excepting claims essentially protecting the bank's security interest, is not unconscionable. [39] We also recognize that the plaintiffs are free to pursue their unconscionability defense in the arbitral forum.

 **[21]**    Moreover, the de los Santoses cannot prevail on their duress defense, since there is no evidence that the sellers threatened to do anything they did not have a legal right to do. [40] At most, the sellers stated only that they would not sell the home if the de los Santoses would not sign the Addendum, which is not evidence of duress. [41]

 **[22]**    **[23]**    The de los Santoses also alleged fraud in the inducement of the Arbitration Addendum. The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. [42] In this case, the de los Santoses alleged that the sellers fraudulently represented that they owned the land under the home, and that the home had a septic system and driveway. They also allege that the sellers' advertisements and pre-sale statements made no reference to an arbitration clause, and that the sellers did not adequately explain the consequences of signing the Addendum. However, there is no evidence that the sellers actually misrepresented the Addendum's terms, or that they made any false material representations with regard to the Arbitration Addendum itself. Accordingly, we decline to invalidate the Arbitration Addendum based on fraud.

 **[24]**    Finally, the de los Santoses argue that their alleged revocation of the installment contract also applies to the Arbitration Addendum, rendering it unenforceable. But this claim really pertains to the entire installment contract and not just the Arbitration Addendum. Again, the Arbitration Addendum's validity is a separate issue from the validity of the whole contract. [43] And given that the FAA's primary objective is to encourage the arbitration of contract-related issues, the issue of whether the underlying contract was revoked is an issue that should be arbitrated, since it "arises from or relates to" the contract. [44]

## III. CONCLUSION

Because the claims in this lawsuit are within the scope of the parties' agreement to arbitrate, we conditionally grant the writ of mandamus and direct the trial court to order that all claims proceed to arbitration. The clerk is instructed to issue **\*759** the writ only if the trial court fails to do so.

**All Citations**

52 S.W.3d 749, 44 Tex. Sup. Ct. J. 900

Footnotes

1   The other parties did not answer the suit, and a default judgment was entered against them.

2   *In re Masonite Corp.,* 997 S.W.2d 194, 197 (Tex.1999).

3   *Id.*

4   *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 88 (Tex.1996).

5   *In re Oakwood Mobile Homes,* 987 S.W.2d 571, 573 (Tex.1999).

6   *Cantella & Co. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996).

7   *Id.; Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, 91, 121 S.Ct. 513, 522, 148 L.Ed.2d 373 (2000).

8   *Cantella,* 924 S.W.2d at 944.

9   *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Prudential Sec., Inc. v. Marshall,* 909 S.W.2d 896, 899 (Tex.1995).

10   *See In re Oakwood,* 987 S.W.2d at 573.

11   *Cantella,* 924 S.W.2d at 944.

12   *See Lost Creek Mun. Util. Dist. v. Travis Indus. Painters, Inc.,* 827 S.W.2d 103, 105 (Tex.App.—Austin 1992, writ denied).

13   *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 272–74, 276–78, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

14   *See, e.g., Mesa Operating Ltd. P'ship v. Louisiana Intrastate Gas Corp.,* 797 F.2d 238, 243 (5th Cir.1986); *Snyder v. Smith,* 736 F.2d 409, 418 (7th Cir.1984), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984).

15   *Prudential Sec.,* 909 S.W.2d at 900.

16   *See* TEX. BUS. & COM.CODE § 2.608(a), 2.711(c).

17   *See Pepe Int'l Dev. Co. v. Pub Brewing Co.,* 915 S.W.2d 925, 930 (Tex.App.—Houston [1st Dist.] 1996, no writ); *New Process Steel Corp. v. Titan Indus. Corp.,* 555 F.Supp. 1018, 1022 (S.D.Tex.1983).

18   *See Nationwide of Bryan, Inc. v. Dyer,* 969 S.W.2d 518, 520 (Tex.App.—Austin 1998, no pet.).

19   *See In re Oakwood,* 987 S.W.2d at 573.

20   *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

21   *See id.*

22   *In re Oakwood,* 987 S.W.2d at 574.

23   *Id.* at 573.

24   531 U.S. 79, 91, 121 S.Ct. at 522, 148 L.Ed.2d 373.

25   *Id.*

26   *Id.*

27   *Id.*

28   *Id.* at 522–23.

29   *Id.* at 522 & n. 6.

30   *See id.*

31   American Arbitration Association, Arbitration Rules for the Real Estate Industry, Rule 51.

32   *See* 9 U.S.C. § 5.

33   *See In re Conseco Fin. Servicing Corp.,* 19 S.W.3d 562, 569 n. 3 (Tex.App.—Waco 2000, pet. dism'd by agr.).

34   *See, e.g., Armendariz v. Foundation Health Psychcare Servs.,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 691–94 (Cal.2000); *Iwen v. U.S. West Direct,* 293 Mont. 512, 977 P.2d 989, 995–96 (1999).

35   *See, e.g., Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 183 (3d Cir.1999); *Doctor's Assoc., Inc. v. Distajo,* 66 F.3d 438, 451–53 (2d Cir.1995); *Wilson Elec. Contractors, Inc. v. Minnotte Contracting Corp.,* 878 F.2d 167, 168–69 (6th Cir.1989); *Young v. Jim Walter Homes, Inc.,* 110 F.Supp.2d 1344, 1350 (M.D.Ala.2000); *Pridgen v. Green Tree Fin. Servicing Corp.,*

88 F.Supp.2d 655, 658–59 (S.D.Miss.2000); *Gray v. Conseco, Inc.,* 2000 WL 1480273, 2000 U.S. Dist. LEXIS 14821, 13–16 (C.D.Cal. Sept. 29, 2000).

36   TEX. BUS. & COM.CODE § 2.302 cmt. 1.

37   *Id.*

38   *See Palm Harbor Homes, Inc. v. McCoy,* 944 S.W.2d 716, 723 n. 8 (Tex.App.—Fort Worth 1997, orig. proceeding).

39   *See Pridgen,* 88 F.Supp.2d at 658–59; see *also Conseco Fin. Servicing Corp. v. Wilder,* 47 S.W.3d 335 (Ky.App.2001).

40   *In re Oakwood,* 987 S.W.2d at 574.

41   *See id.*

42   *Formosa Plastics Corp. v. Presidio Engrs. & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998).

43   *See Miller v. Puritan Fashions Corp.,* 516 S.W.2d 234, 238–39 (Tex.Civ.App.—Waco 1974, writ ref'd n.r.e.).

44   *See Mewbourne Oil Co. v. Blackburn,* 793 S.W.2d 735, 737 (Tex.App.—Amarillo 1990, orig. proceeding).

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** Clark v. Noyes, Tex.App.-Dallas, January 13, 1994

815 S.W.2d 223
Supreme Court of Texas.

GUARDIAN ROYAL EXCHANGE
ASSURANCE, LTD., Petitioner,

v.

ENGLISH CHINA CLAYS, P.L.C. et al., Respondent.

No. C–8367.   |   Feb. 27, 1991.   |
Rehearing Overruled Sept. 11, 1991.

English company and American subsidiaries brought action against English insurer who had issued policy to English company. The District Court Number 25, Gonzales County, Gus J. Strauss, J., granted insurer's special appearance and dismissed cause. Appeal was taken. The Corpus Christi Court of Appeals, Thirteenth Judicial District, 762 S.W.2d 927, Noah Kennedy, J., reversed and remanded for trial. Appeal was taken. The Supreme Court, Hightower, J., held that it would be inconsistent with federal constitutional requirements of due process for Texas courts to assert in personam jurisdiction over insurer.

Reversed.

Mauzy, J., dissented and issued an opinion.

West Headnotes (12)

**[1]**   **Courts**
   Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Texas long-arm statute reaches as far as federal constitutional requirements of due process will allow. V.T.C.A., Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

97 Cases that cite this headnote

**[2]**   **Courts**

Nature, number, frequency, and extent of contacts and activities

Exercise of personal jurisdiction over nonresident defendant is proper when contacts proximately result from actions of nonresident defendant purposely directed toward forum state which creates substantial connection with forum state. V.T.C.A., Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

52 Cases that cite this headnote

**[3]**   **Constitutional Law**
   Non-residents in general
   **Courts**
   Purpose, intent, and foreseeability; purposeful availment

While "foreseeability" is important consideration in deciding whether nonresident defendant had purposely established "minimum contacts" with forum state so that personal jurisdiction could be exercised over defendant without offending due process, "foreseeability" is not necessarily determinative. V.T.C.A., Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

164 Cases that cite this headnote

**[4]**   **Constitutional Law**
   Insurers and insurance
   **Courts**
   Insurers and insurance

When nonresident defendant is insurance company, court should consider insurer's awareness that it was responsible to cover losses arising from substantial subject of insurance regularly present in forum state, and nature of particular insurance contract and its coverage, when determining whether defendant had purposely established "minimum contacts" with forum state such that personal jurisdiction could be exercised over defendant without offending due process. V.T.C.A., Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

19 Cases that cite this headnote

**[5]     Courts**

👉 Unrelated contacts and activities;  general jurisdiction

General jurisdiction may be asserted over nonresident defendant when cause of action does not arise from or relate to nonresident defendant's purposeful conduct within forum state but there are continuous and systematic contacts between nonresident defendant and forum state, but when general jurisdiction is asserted, minimum contacts analysis is more demanding than when personal jurisdiction is asserted and requires showing of substantial activities in forum state. V.T.C.A., Civil Practice & Remedies Code § 17.042.

222 Cases that cite this headnote

**[6]     Constitutional Law**

👉 Non-residents in general

Once it has been determined that nonresident defendant purposely established minimum contacts with state, contacts are evaluated in light of other factors to determine whether assertion of personal jurisdiction over nonresident defendant comports with fair play and substantial justice. V.T.C.A., Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

229 Cases that cite this headnote

**[7]     Constitutional Law**

👉 Non-residents in general

When nonresident defendant is resident of another nation, district court, when determining whether exercise of personal jurisdiction over nonresident defendant would comport with due process, must consider procedural and substantive policies of other nations whose interests are affected by assertion of jurisdiction, and consider unique burdens place upon defendant who must defend itself in foreign legal system. V.T.C.A., Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

60 Cases that cite this headnote

**[8]     Constitutional Law**

👉 Non-residents in general

**Courts**

👉 Factors Considered in General

**Courts**

👉 Nature, number, frequency, and extent of contacts and activities

Forum state's regulatory interests are important consideration in deciding whether exercise of personal jurisdiction over nonresident defendant is reasonable, and state's regulatory interests may establish reasonableness of jurisdiction upon lesser showing of minimum contacts then would otherwise be required, but state's regulatory interests alone are not sufficient to provide basis for jurisdiction. V.T.C.A., Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

3 Cases that cite this headnote

**[9]     Courts**

👉 Unrelated contacts and activities;  general jurisdiction

**Courts**

👉 Related contacts and activities;  specific jurisdiction

For Texas to exercise jurisdiction over nonresident defendant, nonresident must have purposely established "minimum contacts" with Texas, there must be "substantial connection" between defendant and Texas arising from action or conduct of defendant purposely directed toward Texas, when specific jurisdiction is asserted, cause of action must arise out of or relate to defendant's contacts with Texas, when general jurisdiction is alleged, there must be continuous and systematic contacts between defendant and Texas, and assertion of jurisdiction must comport with fair play and substantial justice. V.T.C.A., Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

322 Cases that cite this headnote

**[10]** **Constitutional Law**
🔑 Insurers and insurance

When determining whether assertion of personal jurisdiction over nonresident defendant comports with fair play and substantial justice, court should consider burden on defendant, interests of forum state in adjudicating dispute —including state's special regulatory interest in areas such as insurance, plaintiff's interest in obtaining convenient and effective relief, interstate judicial system's interest in obtaining most efficient resolution of controversies, and shared interest of several states in furthering fundamental substantive social policies. V.T.C.A., Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

198 Cases that cite this headnote

**[11]** **Courts**
🔑 Related or affiliated entities; parent and subsidiary

English insurance company with office and principal place of business in England purposefully established "minimum contacts" with Texas by issuing policy and endorsements providing coverage for third-party liability occurring anywhere in world that English company with American subsidiaries— including Texas corporations—did business; insurer could reasonably anticipate significant risk that subsidiary would become involved in disputes and litigation in many countries in world including United States, and policy language acknowledged formation of significant relationship between insurer and each subsidiary. V.T.C.A., Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

5 Cases that cite this headnote

**[12]** **Constitutional Law**
🔑 Insurers and insurance
**Courts**

🔑 Related or affiliated entities; parent and subsidiary

Assertion of personal jurisdiction over English insurer which issued policy to English company with American subsidiaries—including Texas corporations—would not comport with fair play and substantial justice; insurer was unaffiliated with American companies, dispute was between English insurer, and American insurers who sought "reimbursement" for contribution to settlement of wrongful death suits against English company's subsidiaries, and Texas' interest in adjudicating dispute was diminished since neither insurers were Texas consumers or insureds. V.T.C.A. Civil Practice & Remedies Code § 17.042; U.S.C.A. Const.Amends. 5, 14.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*225** Gayle A. Boone, Edward S. Hubbard, Michael L. Dinnin and J. Clifford Gunter, III, Houston, for petitioner.

Elizabeth J. Lindell, Donald D. Gavlick, San Antonio, for respondent.

**OPINION**

HIGHTOWER, Justice.

The issue before this court is whether it is consistent with the requirements of due process of law under the United States Constitution for Texas courts to assert *in personam* jurisdiction over Guardian Royal Exchange Assurance, Ltd. ("Guardian Royal"), an English insurance company. Southern Clay Products, Inc. ("Southern Clay"), Gonzales Clay Corporation ("Gonzales Clay"), English China Clays Overseas Investments Ltd. ("Overseas Investments") and English China Clays, P.L.C. ("English China")[1] sued Guardian Royal in Gonzales County, Texas. The trial court granted Guardian Royal's special appearance and dismissed the cause. The court of appeals reversed the judgment of the trial court and remanded the cause for trial. 762 S.W.2d 927. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

Guardian Royal is an English insurance company with its office and principal place of business in England. English China is an English company with American subsidiaries including Southern Clay and Gonzales Clay, which are Texas corporations. In 1980–81, Guardian Royal issued an insurance policy including several endorsements [2] to English China providing coverage for third party liability occurring anywhere in the world English China and its subsidiary companies did business. These transactions occurred in England between an English insurer and an English insured. All acts concerning the negotiation, implementation and performance of the policy and endorsement (including the payment of premiums) occurred in England between Guardian Royal and English China.

Guardian Royal asserts that the coverage was extended to the American subsidiaries on the understanding that they would obtain underlying liability insurance from American insurers. Although the endorsement to the policy listed Southern Clay and Gonzales Clay as located in the "U.S.A.", there was no indication that these subsidiaries were located in Texas. [3] Furthermore, Guardian Royal did not know whether English China or its American subsidiaries did business in Texas or sent products to Texas. Subsequently Southern Clay acquired liability coverage from United States Fire Insurance Company ("U.S. Fire") and others.

In 1982, an employee of Southern Clay was killed in an on-the-job accident in Gonzales County, Texas. The deceased's family filed wrongful death lawsuits against the English China entities and others in federal and state courts in Texas. The English China entities settled the lawsuits and U.S. Fire contributed approximately $600,000 to the settlement. Asserting that the policy covered English China and its subsidiaries only for liability in excess of the coverage provided by American insurers, Guardian Royal declined to participate in or contribute to the settlement of the lawsuits. The English China entities asserted that Guardian Royal should "reimburse" U.S. Fire [4] for its settlement contribution on their behalf because Guardian Royal was the "primary insurer." After **\*226** Guardian Royal refused to "reimburse" U.S. Fire, the English China entities sued Guardian Royal. Guardian Royal filed a special appearance pursuant to Rule 120a of the Texas Rules of Civil Procedure asserting that it did not have such minimum contacts with Texas as would allow the court to exercise personal jurisdiction without offending traditional notions of fair play and substantial justice. The trial court granted the special appearance and dismissed the cause.

The court of appeals reversed the judgment of the trial court and remanded the cause for trial. 762 S.W.2d 927.

Guardian Royal argues that it is inconsistent with federal constitutional requirements of due process for Texas courts to assert *in personam* jurisdiction over Guardian Royal in this cause. We agree.

[1] The Texas long-arm statute authorizes the exercise of jurisdiction over nonresidents "doing business" in Texas. TEX.CIV.PRAC. & REM.CODE ANN. § 17.042 (Vernon 1986). Although it lists particular acts which constitute "doing business," the statute also provides that the nonresident's "other acts" may satisfy the "doing business" requirement. *Id. See Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990). The broad language of the long-arm statute's "doing business" requirement permits the statute to reach as far as the federal constitutional requirements of due process will allow. *Schlobohm,* 784 S.W.2d at 357; *U–Anchor Advertising, Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977). As a result, we consider only whether it is consistent with federal constitutional requirements of due process for Texas courts to assert *in personam* jurisdiction over Guardian Royal. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 1871–72, 80 L.Ed.2d 404, 410–11 (1984).

Federal constitutional requirements of due process limit the power of the state to assert personal jurisdiction over a nonresident defendant such as Guardian Royal. *Helicopteros,* 466 U.S. at 413–14, 104 S.Ct. at 1872. The United States Supreme Court divides the due process requirements into two parts: (1) whether the nonresident defendant has purposely established "minimum contacts" with the forum state; and (2) if so, whether the exercise of jurisdiction comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528, 542–43 (1985). *See Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872.

## I.

Under the minimum contacts analysis, we must determine whether the nonresident defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Burger King,* 471 U.S. at 474–75, 105 S.Ct. at 2183. This "purposeful availment" requirement ensures that

a nonresident defendant will not be haled into a jurisdiction based solely upon "random," "fortuitous" or "attenuated" contacts or the "unilateral activity of another party or a third person." *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183; *Helicopteros,* 466 U.S. at 417, 104 S.Ct. at 1873; *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 502 (1980). Furthermore, individuals must have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign. *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182; *Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 663 (Tex.1987).

 **[2]**　The exercise of personal jurisdiction is proper when the contacts proximately result from actions of the nonresident defendant which create a substantial connection with the forum state. *Burger King,* 471 U.S. at 474–75, 105 S.Ct. at 2183–84. The substantial connection between the nonresident defendant and the forum state necessary for a finding of minimum contacts must come about by action or conduct of the nonresident defendant purposefully directed toward the forum state. *Burger King,* 471 U.S. at 472–76, 105 S.Ct. at 2182–84. However, "the constitutional touchstone remains whether the [nonresident] **\*227** defendant purposefully established 'minimum contacts' in the forum State." *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183.

 **[3]**　 **[4]**　Foreseeability is also an important consideration in deciding whether the nonresident defendant has purposely established "minimum contacts" with the forum state. However, "foreseeability" is not necessarily determinative when considering whether the nonresident defendant purposefully established "minimum contacts" with the forum state. Although not an independent component of the minimum contacts analysis, the concept of "foreseeability" is implicit in the requirement that there be a "substantial connection" between the nonresident defendant and Texas arising from action or conduct of the nonresident defendant purposefully directed toward Texas. *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567; *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183. "Foreseeability" is especially pertinent when the nonresident defendant is an insurance company. *See Rossman v. State Farm Mutual Ins. Co.,* 832 F.2d 282 (4th Cir.1987); *Eli Lilly & Co. v. Home Ins. Co.,* 794 F.2d 710 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990, 991 (1987); *Commonwealth of Puerto Rico v. S.S. Zoe Colocotroni,* 628 F.2d 652 (1st Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981); *American & Foreign Insurance Ass'n v. Commercial Ins. Co.,* 575 F.2d

980 (1st Cir.1978). These authorities upheld the assertion of personal jurisdiction over insurance companies based primarily upon "foreseeability."[5] *Rossman,* 832 F.2d at 286–87 (automobile liability); *Eli Lilly,* 794 F.2d at 720–21 (pharmaceutical products); *Colocotroni,* 628 F.2d at 668–70 (maritime "vessels" such as oil tankers); *American & Foreign Insurance Ass'n,* 575 F.2d at 981–82 (glass bottles). "Foreseeability" was based upon the insurer's awareness "that it was responsible to cover losses arising from a substantial subject of insurance regularly present in" the forum state, *Colocotroni,* 628 F.2d at 669 and *American & Foreign Insurance Ass'n,* 575 F.2d at 982, or the nature of the particular insurance contract and coverage,[6] *Rossman,* 832 F.2d at 286 and *Eli Lilly,* 794 F.2d at 720–21. Thus, when the nonresident defendant is an insurance company, the following factors, when appropriate, should be considered when determining whether the nonresident defendant has purposely established "minimum contacts" with the forum state: (a) the insurer's awareness that it was responsible to cover losses arising from a substantial subject of insurance regularly present in the forum state; and (b) the nature of the particular insurance contract and its coverage.

The United States Supreme Court has refined the minimum contacts analysis into specific and general jurisdiction. When specific jurisdiction is asserted, the cause of action must arise out of or relate to the nonresident defendant's contact with the forum state in order to satisfy the minimum contacts requirement. *Helicopteros,* 466 U.S. at 414 n. 8, 104 S.Ct. at 1872 n. 8. *See World–Wide Volkswagen,* 444 U.S. at 293–94, 100 S.Ct. at 565. However, the contact must have resulted from the nonresident defendant's purposeful conduct and not the unilateral activity of the plaintiff or others. *See* **\*228** *Helicopteros,* 466 U.S. at 417, 104 S.Ct. at 1873; *World–Wide Volkswagen,* 444 U.S. at 298, 100 S.Ct. at 567–68. Furthermore, the nonresident defendant's activities must have been "purposefully directed" to the forum and the litigation must result from alleged injuries that "arise out of or relate to" those activities. *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182; *Zac Smith & Co.,* 734 S.W.2d at 663. When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship among the defendant, the forum and the litigation. *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872; *Schlobohm,* 784 S.W.2d at 357.

 **[5]**　General jurisdiction may be asserted when the cause of action does not arise from or relate to the nonresident defendant's purposeful conduct within the forum state but there are continuous and systematic contacts between the

nonresident defendant and the forum state. *Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. at 1872–73; *Schlobohm,* 784 S.W.2d at 357. When general jurisdiction is asserted, the minimum contacts analysis is more demanding and requires a showing of substantial activities in the forum state. *Schlobohm,* 784 S.W.2d at 357.

## II.

 **[6]**     Once it has been determined that the nonresident defendant purposefully established minimum contacts with the forum state, the contacts are evaluated in light of other factors to determine whether the assertion of personal jurisdiction comports with fair play and substantial justice. *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113–15, 107 S.Ct. 1026, 1033–34, 94 L.Ed.2d 92, 105 (1987); *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184. These factors include (1) "the burden on the defendant," (2) the interests of the forum state in adjudicating the dispute, (3) "the plaintiff's interest in obtaining convenient and effective relief," [7] (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5) "the shared interest of the several States in furthering fundamental substantive social policies." *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564; *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184; *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1033–34. "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184. However, regardless of these factors, it must be established that the nonresident defendant purposely established minimum contacts with the forum state. Even if the nonresident defendant has purposely established minimum contacts with the forum state, the exercise of jurisdiction may not be fair and reasonable under the facts in a particular case. *Burger King,* 471 U.S. at 477–78, 105 S.Ct. at 2185.

 **[7]**     When the defendant is a resident of another nation, the court must also consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by a state court:

> *World–Wide Volkswagen* also admonished courts to take into consideration the interests of the "several States," in addition to the forum State, in the efficient judicial resolution of the dispute and the advancement of substantive policies. In the present case, this advice

calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by the California court. The procedural and substantive interests of other nations in a state court's assertion of jurisdiction over an alien defendant will differ from case to case. In every case, however, those interests, as well as the Federal Government's interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the **\*229** assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State. "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *United States v. First National City Bank,* 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965) (Harlan, J., dissenting).

*Asahi,* 480 U.S. at 115, 107 S.Ct. at 1034–35 (emphasis in original). "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi,* 480 U.S. at 114, 107 S.Ct. at 1034. Thus, when an "international dispute" is involved, the following factors, when appropriate, should also be considered: (a) the unique burdens placed upon the defendant who must defend itself in a foreign legal system; and (b) the procedural and substantive policies of other nations whose interests are affected as well as the federal government's interest in its foreign relations policies.

 **[8]**     The state's regulatory interests are also an important consideration in deciding whether the exercise of jurisdiction is reasonable. Other courts have recognized that the states have a legitimate concern in areas in which the state possesses a manifest regulatory interest such as insurance, securities and hazardous and toxic waste. *See Shaffer v. Heitner,* 433 U.S. 186, 222–26, 97 S.Ct. 2569, 2589–91, 53 L.Ed.2d 683, 708–12 (1977) (Brennan, J., concurring in part and dissenting in part). [8] Traditionally, regulation of the "business of insurance" has been delegated to the states by the federal government. *See* McCarran–Ferguson Act, 15 U.S.C. § 1012 (1976); Reyes, *Insurance Company Liquidation in Texas —"The Basics,"* 51 TEX.B.J. 957 (1988).

The State of Texas has a special interest in regulating certain areas such as insurance, and the Texas courts

have implicitly recognized the role of that interest for purposes of determining personal jurisdiction. *See First National Bank of Libby, Montana v. Rector,* 710 S.W.2d 100, 106 (Tex.App.—Austin 1986, writ ref'd n.r.e.); *Texas Commerce Bank v. Interpol '80 Ltd.,* 703 S.W.2d 765, 773–74 (Tex.App.—Corpus Christi 1985, no writ); *GRM v. Equine Inv. & Management Group,* 596 F.Supp. 307, 317 (S.D.Tex.1984); *but see Beechem v. Pippin,* 686 S.W.2d 356, 360–61 (Tex.App.—Austin 1985, no writ). We find that a state's regulatory interest in a certain area or activity such as insurance is an important consideration in deciding whether the exercise of jurisdiction is reasonable and that a state's regulatory interest may establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. However, a state's regulatory interest alone is not in and of itself sufficient to provide a basis for jurisdiction.

### III.

In *O'Brien v. Lanpar Co.,* 399 S.W.2d 340 (Tex.1966), this court adopted the following "formula" articulated by the Supreme Court of Washington in **\*230** *Tyee Construction Co. v. Dulien Steel Products, Inc.,* 62 Wash.2d 106, 381 P.2d 245, 251 (1963), to determine when assertion of jurisdiction over a nonresident defendant is proper:

(1) the nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state;

(2) the cause of action must arise from, or be connected with, such act or transaction; and

(3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.

*O'Brien v. Lanpar Co.,* 399 S.W.2d at 342. This jurisdictional formula [9] was designed in an effort to ensure compliance with the federal constitutional requirements of due process. *Schlobohm,* 784 S.W.2d at 358. Since 1966, this court has dutifully repeated this jurisdictional formula. *See, e.g., U–Anchor Advertising,* 553 S.W.2d at 762; *Siskind v. Villa Foundation for Education, Inc.,* 642 S.W.2d 434, 436

(Tex.1982); *Hall v. Helicopteros Nacionales de Colombia,* 638 S.W.2d 870, 872 (Tex.1982), *rev'd on other grounds,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Zac Smith & Co.,* 734 S.W.2d at 664; *Schlobohm,* 784 S.W.2d at 358. However, during the past 24 years, the parameters of personal jurisdiction have evolved as the United States Supreme Court has continued to examine, develop and refine the permissible reach of federal due process. [10] Therefore, under appropriate circumstances, the jurisdictional formula may be reviewed, and, if necessary, modified to ensure compliance with federal constitutional requirements of due process. This court recently acknowledged the necessity to review the jurisdictional formula, and, as a result, modified the second part of the formula to include the concept of general jurisdiction. *Schlobohm,* 784 S.W.2d at 358.

### IV.

[9] Today, we further clarify the jurisdictional formula to ensure compliance with federal constitutional requirements of due process. First, the nonresident defendant must have purposefully established "minimum contacts" with Texas. [11] There must be a "substantial connection" [12] between the nonresident defendant and Texas arising from action or conduct of the nonresident defendant purposefully directed toward Texas. When specific jurisdiction is asserted, the cause of action must arise out of or relate to the nonresident defendant's contacts with Texas. When general jurisdiction is alleged, there must be continuous and systematic contacts between the nonresident defendant and Texas. General jurisdiction requires a showing of substantial activities by the nonresident defendant in Texas.

[10] **\*231** Second, the assertion of personal jurisdiction must comport with fair play and substantial justice. In this inquiry, it is incumbent upon the defendant to present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185; *see also Zac Smith & Co.,* 734 S.W.2d at 664. [13] The following factors, when appropriate, should be considered: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute (including the state's special regulatory interest in areas such as insurance); (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of

controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.

Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *See Burger King,* 471 U.S. at 477–78, 105 S.Ct. at 2185; *see also Schlobohm,* 784 S.W.2d at 358 ("it has become less likely that the exercise of jurisdiction will fail a fair play analysis."). [14] The stringent standard to be applied is set forth in *Burger King:*

> [W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable. *Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional.* For example, the potential clash of the forum's law with the "fundamental substantive social policies" of another State may be accommodated through application of the forum's choice-of-law rules. Similarly, a defendant claiming substantial inconvenience may seek a change of venue.
> 471 U.S. at 477, 105 S.Ct. at 2185 (emphasis added) (footnotes omitted); *see also Zac Smith & Co.,* 734 S.W.2d at 664 (quoting same language). Nor is distance alone ordinarily sufficient to defeat jurisdiction: "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *McGee,* 355 U.S. at 223, 78 S.Ct. at 201.

## V.

In applying the jurisdictional formula to a particular case, the facts must be carefully weighed and mechanical application of any test, including the Texas formula, must be avoided. *Schlobohm,* 784 S.W.2d at 358. *See Burger King,* 471 U.S. at 477–78, 105 S.Ct. at 2185. In addition, Texas courts should strive to utilize a realistic approach when applying the jurisdictional formula. *See Burger King,* 471 U.S. at 478–79, 105 S.Ct. at 2185. The jurisdictional formula is a useful jurisdictional checklist which ensures that all aspects of the necessary analysis have been considered. *See Schlobohm,* 784 S.W.2d at 358.

[11]    We must first determine whether Guardian Royal purposefully established "minimum contacts" with Texas; in other words, whether there was a "substantial connection" between Guardian Royal and Texas arising from action or conduct of Guardian Royal purposefully directed toward Texas. The policy and endorsements provided coverage for third party liability occurring anywhere in the world English China did business. Among other things, the policy stated that "[t]he words 'The Insured' wherever they appear shall apply to each party described in the Schedule as **\*232** if a separate insurance had been issued to each...." [15] The endorsements to the policy (1) extended coverage to English China's subsidiaries including Southern Clay and Gonzales Clay, (2) extended the definition of "Insured" to include any associated and subsidiary company of English China anywhere in the world, and (3) deleted the policy's geographical limits. Furthermore, under these facts and circumstances, it is apparent that the nature of the insurance contract between Guardian Royal and English China and its coverage are sufficient to establish that Guardian Royal purposefully established "minimum contacts" with Texas. [16] As the insurer of English China and its approximately 120 subsidiary companies located in many countries in the world including the United States and the issuer of an insurance policy providing coverage for third party liability occurring anywhere in the world English China and its subsidiary companies did business, Guardian Royal could reasonably anticipate the significant risk (if not the probability) that a subsidiary would become involved in disputes and litigation in many countries in the world including any state in the United States. In addition, Guardian Royal could reasonably anticipate the significant risk that an insurance coverage dispute or question with a subsidiary would arise concerning the litigation brought in one of many countries including any state in the United States. Furthermore, the policy language that "[t]he words 'The Insured' wherever they appear shall apply to each [subsidiary] ... as if a separate insurance [policy] had been issued to each [subsidiary]" acknowledges the formation of a significant relationship between Guardian Royal and each subsidiary including Southern Clay. Under these facts and circumstances, we find that Guardian Royal purposefully established "minimum contacts" with Texas.

## VI.

[12]    Second, we must determine whether the assertion of personal jurisdiction comports with fair play and substantial justice. In making this determination, the following factors,

when appropriate, should be considered: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. [17] *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564; *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184; *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1033–34. After a careful analysis of these factors, we conclude that the assertion of personal jurisdiction over Guardian Royal is unreasonable.

Requiring Guardian Royal, an English insurer, to submit its dispute with its English insured to a foreign nation's judicial system is burdensome. All acts concerning the negotiation, implementation and performance of the policy and endorsements (including the payment of premiums) occurred in England. Frequently the interests of the forum state and the plaintiff will justify the severe burden placed upon the nonresident defendant. *See Asahi,* 480 U.S. at 114, 107 S.Ct. at 1033. In this case, however, the interests of Texas in adjudicating the dispute and the English China entities in obtaining convenient and effective relief are minimal. Like California, Texas "has a manifest interest in providing **\*233** effective means of redress for its residents when their insurers refuse to pay claims. These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable." *McGee,* 355 U.S. at 223, 78 S.Ct. at 201. However, this is a dispute between two insurers—Guardian Royal and U.S. Fire as subrogee to the rights of the English China entities. Among other things, U.S. Fire is seeking "reimbursement" for its contribution to the settlement of the wrongful death lawsuits against the English China entities. The family of the deceased employee of Southern Clay has been compensated and the English China entities, the insureds, were defended and indemnified. Thus, in reality, U.S. Fire is the real party in interest and neither the family of the deceased employee nor the English China entities have an interest in the outcome of this lawsuit. In addition, since Guardian Royal and U.S. Fire are neither Texas consumers nor insureds, Texas' interest in adjudicating the dispute (including its special interest in regulating insurance) is considerably diminished. While Texas "has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims," Texas does not have a compelling interest in providing a forum for resolution of disputes between these

insurers. Under these facts and circumstances, we find that the assertion of personal jurisdiction over Guardian Royal is unreasonable and does not comport with fair play and substantial justice. Accordingly, we hold that it is inconsistent with federal constitutional requirements of due process for Texas courts to assert *in personam* jurisdiction over Guardian Royal in this cause.

For the reasons explained herein, we reverse the judgment of the court of appeals and affirm the judgment of the trial court.

MAUZY, J., dissents.

MAUZY, Justice, dissenting.

I respectfully dissent. The pertinent inquiry in this due process analysis is whether, based upon the conduct of Guardian Royal, it would have been reasonably foreseeable that the Company would be "haled into court" in Texas. *See, World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) An insurer should foresee being sued in any jurisdiction in which its insured has substantial contacts. *Eli Lilly and Co. v. Home Ins. Co.* 794 F.2d 710, 721 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990, 991 (1981). In the endorsements to the English China policy, Guardian Royal extended coverage to the Texas subsidiaries Southern Clay and Gonzales Clay, extended the definition of "Insured" to include any subsidiary of English China anywhere in the world, and specifically deleted the policy's geographical limits. Clearly, Guardian Royal should have foreseen being "haled into court" in a jurisdiction where English China subsidiaries are located.

Insurance companies offer broad-based coverage to induce customers to buy policies and pay higher premiums for them. Substantial financial benefits may accrue to companies which offer such policies. If Guardian Royal had desired to avoid suit in Texas, it could have refused to insure entities located in Texas and refused to provide coverage for acts occurring in Texas. As was the case in *Rossman v. State Farm Mutual Auto Ins. Co.,* 832 F.2d 282 (4th Cir.1987), Guardian Royal's willingness to being haled into court in a foreign state was an express, and very marketable, feature of its policy. *Id.* at 286. The company's contacts with the state of Texas cannot be viewed as "random" or "fortuitous." Since Guardian Royal purposefully availed itself of the privilege of conducting business with English China and its Texas subsidiaries, it

now has the burden of presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528, 543–44 (1985). [1]

**\*234** There is no such compelling case here. In determining reasonableness of the exercise of jurisdiction in a case, the court should evaluate several factors. The court must consider the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief. *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 113–115, 107 S.Ct. 1026, 1033–34, 94 L.Ed.2d 92, 105 (1987). The insured subsidiaries in this case, Southern Clay and Gonzales Clay are Texas corporations and their principal places of business are in Texas. Texas has a manifest interest in providing a forum for its residents. The fact that United States Fire Insurance Company subrogated to the interests of the insured should not be relevant. A subrogee "stands in the shoes" of his subrogor. *Fox v. Kroeger,* 119 Tex. 511, 35 S.W.2d 679, 681 (Tex.1931). This holding extends to procedural as well as substantive matters. *See Seale v. Hudgens,* 538 S.W.2d 459, 460 (Tex.Civ.App.—San Antonio 1976, writ dism'd) (venue). The result here should be no different than if Gonzales Clay and Southern Clay brought this lawsuit directly, rather than as subrogees. Texas has an interest in encouraging subrogation since it facilitates recovery of injured plaintiffs and functions to distribute the incidence of loss in accordance with responsibility for the loss. Considering Guardian Royal's purposeful contacts with the state, it cannot be said that the exercise of jurisdiction does not comport with fair play and substantial justice. I would affirm the decision of the court of appeals.

## All Citations

815 S.W.2d 223, 59 USLW 2547

Footnotes

1   In this opinion these parties are collectively referred to as the "English China entities."
2   The endorsements substantially altered the terms of the original policy. Among other things, the endorsements (1) extended coverage to English China's subsidiaries including Southern Clay and Gonzales Clay, (2) extended the definition of "Insured" to include any associated or subsidiary company of English China anywhere in the world, and (3) deleted the policy's geographical limits.
3   Of approximately 120 subsidiaries of English China identified in the endorsement, only 9 subsidiaries were located in the United States.
4   As a result of the settlement, U.S. Fire has been subrogated to the rights of the English China entities in this cause. Therefore, U.S. Fire is the real party in interest.
5   These authorities also considered the insurer's ability to protect itself based upon, among other things, its power to limit the coverage to specific jurisdictions and by charging higher premiums. *Rossman,* 832 F.2d at 287; *Eli Lilly,* 794 F.2d at 721; *Colocotroni,* 628 F.2d at 669–70. However, while an insurer may undoubtedly protect itself by limiting coverage to specific jurisdictions and charging higher premiums, this is irrelevant in determining whether the insurer purposefully established "minimum contacts" with the forum state.
6   "As an automobile liability insurer, Consolidated [the insurer] could anticipate the risk that its clients would travel in their automobiles to different states and become involved in accidents and litigation there." *Rossman,* 832 F.2d at 286. The insurers "knew that their insured, Lilly, distributed its [pharmaceutical] products nationwide" and "therefore were aware that *Lilly* was likely to be sued in any jurisdiction in the nation...." *Eli Lilly,* 794 F.2d at 720. Furthermore, "an insurer has a commercial interest in knowing how, and to what degree, an insured manufacturer has contacts with a forum state." *Id.* at 721.
7   This factor was fully described in *World–Wide Volkswagen* as "the plaintiff's interest in obtaining convenient and effective relief ... at least when that interest is not adequately protected by the plaintiff's power to choose the forum...." 444 U.S. at 292, 100 S.Ct. at 564 (citations omitted).
8   A "State's valid substantive interests are important considerations in assessing whether it constitutionally may claim jurisdiction over a given cause of action." *Shaffer,* 433 U.S. at 223, 97 S.Ct. at 2589 (Brennan, J., concurring in part and dissenting in part). "[S]tate courts have legitimately read their jurisdiction expansively when a cause of action centers in an area in which the forum State possesses a manifest regulatory interest." 433 U.S. at 223, 97 S.Ct. at 2590 (Brennan, J., concurring in part and dissenting in part). *See, e.g., McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223, 226 (1957) (insurance regulation: "It cannot be denied that California has a manifest interest

in providing effective means of redress for its residents when their insurers refuse to pay claims."); *O'Neil v. Picillo,* 682 F.Supp. 706, 714 n. 1 (D.R.I.1988) (heavily regulated activities—hazardous/toxic substances); *Wichita Federal Savings & Loan Ass'n v. Landmark Group, Inc.,* 674 F.Supp. 321, 326 (D.Kan.1987) (securities regulation: "It is also relevant to this inquiry that the defendants are engaging in a highly regulated activity, making it more foreseeable that they might have to litigate in a distant forum.").

In *Schlobohm,* the second part of the jurisdictional formula was modified to incorporate the concept of general jurisdiction:
> (2) The cause of action must arise from, or be connected with, such act or transaction. Even if the cause of action does not arise from a specific contact, jurisdiction may be exercised if the defendant's contacts with Texas are continuing and systematic.
>
> 784 S.W.2d at 358.

*See, e.g., Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

In analyzing minimum contacts, it is not the number, but rather the quality and nature of the nonresident defendant's contacts with the forum state that is important. *Texas Commerce Bank v. Interpol '80 Ltd.,* 703 S.W.2d 765, 772 (Tex.App.—Corpus Christi 1985, no writ).

"So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. at 2184 n. 18. *See McGee,* 355 U.S. at 223, 78 S.Ct. at 201.

We have previously held that the nonresident defendant must negate all bases of personal jurisdiction. *Zac Smith & Co.,* 734 S.W.2d at 664; *Siskind v. Villa Foundation for Education, Inc.,* 642 S.W.2d at 438.

*Accord Asahi,* 480 U.S. at 116, 107 S.Ct. at 1035 (Brennan, J., concurring) ("This is one of those rare cases in which 'minimum requirements inherent in the concept of 'fair play and substantial justice' ... defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities.' *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477–78, 85 L Ed 2d 528, 105 S Ct 2174 (1985).").

The "Schedule" of the policy identified "THE INSURED" as "ENGLISH CHINA CLAYS LIMITED and Subsidiary Companies as within specified."

Since we have determined that Guardian Royal has purposefully established "minimum contacts" with Texas based upon the nature of the insurance contract between Guardian Royal and English China and its coverage, it is not necessary to consider whether Guardian Royal was aware that it was responsible to cover losses arising from a substantial subject of insurance regularly present in Texas.

Since this is an international dispute and not a dispute between coequal sovereigns in our federal system, we need not consider the interstate judicial system's interest in obtaining the most efficient resolution of controversies or the shared interest of the several states in furthering fundamental substantive social policies.

It should be noted that the Uniform Interstate and International Procedure Act, 13 Uniform Laws Ann. 361 (Master Ed.1986), which has been adopted by several states provides:
> § 1.03 [Personal Jurisdiction Based Upon Conduct]
>
> (a) A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a [cause of action] [claim for relief] arising from the person's
>
> ....
>
> (6) Contracting to insure any person, property, or risk located within this state at the time of contracting.

Under the provisions of the act, Guardian Royal would have subjected itself to state court jurisdiction solely by reason of its contracting to insure Gonzales Clay and Southern Clay.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

54 S.W.3d 518
Court of Appeals of Texas,
Eastland.

Darrell HODGE, Appellant,

v.

NORTHERN TRUST BANK
OF TEXAS, N.A., Appellee.

No. 11–00–00350–CV.    |    Aug. 16, 2001.

Beneficiary of certificate of deposit (CD) brought action against bank, alleging bank wrongfully placed funds belonging to him in his mother's account and then seized those funds by applying them against the mother's debts to bank. The District Court, Dallas County, David W. Evans, J., entered summary judgment for bank on limitations grounds. Beneficiary appealed. The Court of Appeals, McCall, J., held that: (1) beneficiary's conversion action against bank accrued when bank withdrew funds without requisite court authorization, and two-year statute of limitations on action began to run when beneficiary later reached majority; (2) statute of limitations applicable to action for breach of depository contract did not apply to action; and (3) CD was a special deposit, and not a negotiable instrument, and thus, six-year limitations period applicable to an action to enforce the obligation of a party to a certificate of deposit to pay the instrument did not apply.

Affirmed.

West Headnotes (20)

**[1]**   **Banks and Banking**
  👉 Certificates of deposit
**Banks and Banking**
  👉 Special deposits
Certificate of deposit (CD) issued to mother "as next best friend to" her son was a "special deposit," where money that funded the deposit resulted from settlement of personal injury lawsuit on behalf of son, and court ordered that bank restrict account so as to prevent any withdrawal of funds, except as ordered by the court.

1 Cases that cite this headnote

**[2]**   **Banks and Banking**
  👉 Relation between bank and depositor in general
**Banks and Banking**
  👉 Title to and Disposition of Deposits
Ordinarily, a "general deposit" of money with a bank creates a creditor-debtor relationship between the depositor and the bank; title to the money passes to the bank, subject to the depositor's demand for payment.

4 Cases that cite this headnote

**[3]**   **Banks and Banking**
  👉 Title to and Disposition of Deposits
**Banks and Banking**
  👉 Special deposits
A "special deposit" of money with a bank creates a bailor-bailee relationship whereby the bank keeps or transmits identical property or funds entrusted to it; the bank receives no title to money deposited for a special purpose but instead becomes responsible for the safekeeping, return, or disbursement of the money in question.

1 Cases that cite this headnote

**[4]**   **Banks and Banking**
  👉 Certificates of deposit
A certificate of deposit (CD) can be either a general or a special deposit, depending on the agreement between the bank and the depositor.

Cases that cite this headnote

**[5]**   **Banks and Banking**
  👉 Actions by Depositors or Others for Deposits
Because a general deposit becomes the property of the bank, the depositor generally has no action for conversion when the bank wrongfully pays out the deposit; a special deposit, on the other hand, remains the property of the depositor and is subject to an action for conversion.

1 Cases that cite this headnote

**[6]** **Banks and Banking**

🔑 Application of funds deposited by one as trustee

When a bank has knowledge that a general deposit is held by the depositor in trust for a third party, the bank may not offset the trust funds against the depositor's individual debt, and the bank becomes liable for conversion if it does so.

Cases that cite this headnote

**[7]** **Limitation of Actions**

🔑 Limitation as affected by nature or form of remedy in general

**Pleading**

🔑 Sufficiency of amendment

A plaintiff may not recast his claim in the language of another cause of action to avoid limitations or compliance with mandatory statutes or to circumvent existing case law contrary to the plaintiff's position.

2 Cases that cite this headnote

**[8]** **Conversion and Civil Theft**

🔑 Assertion of ownership or control in general

Conversion occurs when one person makes an unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights.

Cases that cite this headnote

**[9]** **Limitation of Actions**

🔑 Nature of statutory limitation

Limitations, unlike other defenses, do not reach the merits of a cause of action, they merely challenge the availability of a remedy.

Cases that cite this headnote

**[10]** **Limitation of Actions**

🔑 Infancy

**Limitation of Actions**

🔑 Injuries to property

Beneficiary of certificate of deposit (CD) had constructive notice of court records concerning personal injury lawsuit on his behalf when he was a minor, including an agreed settlement and court-ordered transfer of settlement funds to the CD account subject to specific instructions, and thus, beneficiary's conversion action against bank accrued when bank withdrew funds without requisite court authorization, and two-year statute of limitations on action began to run when beneficiary later reached majority. V.T.C.A., Civil Practice & Remedies Code §§ 16.003(a), 16.001(b).

Cases that cite this headnote

**[11]** **Limitation of Actions**

🔑 In general; what constitutes discovery

The discovery rule delays the running of limitations in cases in which the injury involved is inherently undiscoverable.

1 Cases that cite this headnote

**[12]** **Limitation of Actions**

🔑 Fraud of person acting in official or fiduciary capacity

Injuries from a breach of fiduciary duty are presumed to be inherently undiscoverable, for limitations purposes.

1 Cases that cite this headnote

**[13]** **Judgment**

🔑 Presumptions and burden of proof

By filing a motion for summary judgment under traditional summary judgment rule, defendant in conversion action assumed plaintiff's burden as to application of discovery rule and had to conclusively negate the discovery rule by establishing that plaintiff knew, or should have known with the exercise of reasonable diligence, of the alleged conversion. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c); V.T.C.A., Civil Practice & Remedies Code § 16.003(a).

Cases that cite this headnote

**[14]**   **Judgment**
      👈 Personal knowledge or belief of affiant
   **Judgment**
      👈 Matters of fact or conclusions

Summary judgment affidavit containing mere conclusions or beliefs was insufficient to raise a genuine issue of material fact as to date beneficiary of certificate of deposit (CD) knew of bank's alleged conversion of the funds, as required to preclude summary judgment on limitations grounds. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[15]**   **Notice**
      👈 Constructive Notice

A person is charged with constructive notice of the actual knowledge that could have been acquired by examining public records.

Cases that cite this headnote

**[16]**   **Banks and Banking**
      👈 Time to sue and limitations

By its terms, statute of limitations applicable to action for breach of depository contract was limited to a "deposit contract without a maturity date," and thus did not apply to action against bank alleging wrongful taking of funds in a certificate of deposit (CD), where CD had a specific maturity date. V.T.C.A., Finance Code § 34.301(b).

Cases that cite this headnote

**[17]**   **Banks and Banking**
      👈 Time to sue and limitations

Certificate of deposit (CD) issued to mother "as next best friend to" her son was a special deposit, and not a "negotiable instrument," and thus, six-year limitations period applicable to an action to enforce the obligation of a party to a certificate of deposit to pay the instrument did not apply to

action alleging bank wrongfully withdrew funds from CD account without requisite authorization by court order. V.T.C.A., Bus. & C. §§ 3.602, 3.118(e).

1 Cases that cite this headnote

**[18]**   **Judgment**
      👈 Sufficiency of pleading

While pleadings do not constitute summary judgment evidence, a party may plead itself out of court by pleading facts that bar a claim.

Cases that cite this headnote

**[19]**   **Banks and Banking**
      👈 Repayment in general

When a bank makes a wrongful payment from a general deposit, there is no violation of the deposit agreement because the bank has title to the funds as the general depositor is simply a creditor of the bank; it is when the bank refuses a demand for payment of the general deposit that the bank breaches its relationship with the depositor.

5 Cases that cite this headnote

**[20]**   **Banks and Banking**
      👈 Title to and Disposition of Deposits
   **Banks and Banking**
      👈 Special deposits
   **Limitation of Actions**
      👈 Breach of contract in general

Unlike a general deposit, the special deposit keeps title in the depositor, and the bank is subject to a specific set of instructions for payment; thus, when the bank wrongfully pays a special deposit, the wrong has occurred at that point, for limitations purposes.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*520** David Kelley II, Loe, Warren, Rosenfield, Kaitcer & Hibbs, Fort Worth, for appellant.

Patricia Lehtola, Lehtola & Associates, Dallas, for appellee.

Panel consists of ARNOT, C.J., WRIGHT and McCALL, JJ.

## Opinion

McCALL, Justice.

The principal issue in this summary judgment case is whether Darrell Hodge's claims against Northern Trust Bank of Texas, N.A. (Northern) are barred by limitations. Hodge alleges that in 1983 Northern wrongfully placed funds belonging to him in his mother's account and then seized those funds by applying them against the mother's debts to Northern. We affirm the trial court's summary judgment for Northern.

### Standard of Review

A trial court must grant a motion for summary judgment if the moving party **\*521** establishes that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). A trial court properly grants summary judgment for a defendant if he establishes all the elements of an affirmative defense. *American Tobacco Company, Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). Once the movant establishes his right to a summary judgment, the non-movant must come forward with evidence or law that precludes summary judgment. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678–79 (Tex.1979). When reviewing a summary judgment, the appellate court takes as true evidence favorable to the non-movant and indulges every reasonable inference and resolves any doubts in favor of the non-movant. *American Tobacco Company, Inc. v. Grinnell, supra* at 425; *Nixon v. Mr. Property Management Company, Inc.*, 690 S.W.2d 546, 548–49 (Tex.1985).

### Summary Judgment Evidence

In 1980, Hodge's mother, Connie Murray, individually and as Hodge's next friend, settled a lawsuit brought after Hodge received severe electrical burns while playing at his family's apartment complex. The settlement awarded $45,000 to Murray, as Hodge's next friend, for the use and benefit of Hodge. The agreed judgment entered in the case ordered that the money be placed into interest-bearing time deposits and that Murray obtain a court order before she made any withdrawals. In 1983, Murray obtained a court order allowing her to transfer the money to the predecessor in interest of Northern. [1] The transfer order stated, in pertinent part:

It is further ORDERED that the cashier's check or other order representing the transfer of such funds shall bear the notation: "For account of Connie Murray, Individually and as Next Friend of Darrell Hodge, subject to restrictions and final judgment in Cause No. 79 CI 4822, 131st Judicial District Court, Bexar County, Texas."

It is further ORDERED that upon receipt of such funds, [Northern] shall create one or more interest bearing accounts for Connie Murray, as Next Friend of Darrell Hodge, each account to be restricted so as to prevent any withdrawal of funds, except as expressly authorized by Order of this Court.

Northern issued a certificate of deposit (CD) to "Connie Murray as next Best Friend to Darrell Hodge" on April 26, 1983. The CD bore a maturity date of October 25, 1983. On October 25, 1983, Northern credited the individual account of Murray with the proceeds from the CD and then debited her account for the payment of several notes, each apparently representing the individual debt of Murray to Northern.

Hodge reached majority on July 30, 1987. He did not make a demand on Northern for payment of the CD until March 12, 1999. Hodge filed his lawsuit on January 11, 2000. Northern contended in the trial court, and contends here, that Hodge's only viable cause of action is for conversion and that his suit is barred by the two-year statute of limitations set forth in TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (Vernon Supp.2001). The trial court agreed with Northern and granted summary judgment against Hodge **\*522** on the grounds of limitations. Hodge argues that the discovery rule applies to toll the running of limitations on his conversion claim. Hodge also argues that he can assert causes of action for breach of depository contract and to enforce payment of the CD because those causes of action do not accrue and limitations do not begin to run until demand for payment is made. See TEX. BUS. & COM. CODE ANN. § 3.118(e) (Vernon Supp.2001); see also TEX. FIN. CODE ANN. § 34.301(b) (Vernon Supp.2001).

### *General Deposits versus Special Deposits*

 **[1]**   **[2]**   **[3]**   **[4]**   Texas law divides bank deposits into "general deposits" and "special deposits." See *Bandy v. First State Bank, Overton, Texas*, 835 S.W.2d 609, 618–19 (Tex.1992); *Hudnall v. Tyler Bank and Trust Company*, 458 S.W.2d 183, 186 (Tex.1970). Ordinarily, a general deposit of money with a bank creates a creditor-debtor relationship between the depositor and the bank. Title to the money passes to the bank, subject to the depositor's demand for payment. *Bandy v. First State Bank, Overton, Texas, supra* at 618–19, n. 4; *Mesquite State Bank v. Professional Investment Corporation*, 488 S.W.2d 73, 75 (Tex.1972); *City Nat. Bank of Bryan v. Gustavus*, 130 Tex. 83, 106 S.W.2d 262 (1937). A "special deposit" creates a bailor-bailee relationship whereby the bank keeps or transmits identical property or funds entrusted to it. The bank receives no title to money deposited for a special purpose but instead becomes responsible for the safekeeping, return, or disbursement of the money in question. See *Citizens National Bank of Dallas v. Hill*, 505 S.W.2d 246, 248 (Tex.1974). A CD can be either a general or a special deposit, depending on the agreement between the bank and the depositor. *Texas Bank and Trust Co. v. Spur Security Bank*, 705 S.W.2d 349, 352 (Tex.App.—Amarillo 1986, no writ). It is clear from the court order that the CD in this case was a special deposit.

 **[5]**   **[6]**   The designation of a deposit has great significance in an attempted action for conversion. Because a general deposit becomes the property of the bank, the depositor has no action for conversion when the bank wrongfully pays out the deposit. A special deposit, on the other hand, remains the property of the depositor and is subject to an action for conversion. *Houston National Bank v. Biber*, 613 S.W.2d 771, 774 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.). There is an exception to the rule for general deposits when the bank has knowledge that a general deposit is held by the depositor in trust for a third party. In that case, the bank may not offset the trust funds against the depositor's individual debt, and the bank becomes liable for conversion if it does so. See *National Indemnity Company v. Spring Branch State Bank*, 162 Tex. 521, 348 S.W.2d 528, 529 (1961). Hodge, in his first amended petition, pleaded that:

> The certificate of deposit ... clearly stated on its face that the account was opened by "Connie Murray as Next Best Friend to Darrell Hodge."... This notation clearly put

[Northern] on notice that it was accepting this deposit for a special purpose, the trust character of these funds, that it was assuming certain fiduciary responsibilities, and/or that Plaintiff was the true owner of these funds.

Northern contends that Hodge is estopped from contending that the CD represented anything but a special deposit and that Hodge's real claim is for conversion which is barred by limitations.

 **[7]**   A plaintiff may not recast his claim in the language of another cause of action **\*523** to avoid limitations or compliance with mandatory statutes or to circumvent existing case law contrary to the plaintiff's position. See *Earle v. Ratliff*, 998 S.W.2d 882, 893 (Tex.1999)(essence of plaintiff's claim was that defendant was negligent by not conforming to the applicable standard of care despite labeling claims as DTPA causes of action); *In re Kimball Hill Homes Texas, Inc.*, 969 S.W.2d 522, 526 (Tex.App.—Houston [14th Dist.] 1998, orig. proceeding)(nature of claim controls and plaintiff cannot, by artful pleading, recast claim to avoid adverse effect of statute); *Martz v. Weyerhaeuser Company*, 965 S.W.2d 584, 589 (Tex.App.—Eastland 1998, no pet'n). Despite his contentions, Hodge's underlying claim is for conversion.

### *Conversion*

 **[8]**   **[9]**   In its motion for summary judgment, Northern asserted that Hodge's claim was for conversion and that Hodge's claim was barred by the two-year prescription period set forth in TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (Vernon Supp.2001). Conversion occurs when one person makes an unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex.1971). A cause of action for conversion, if it did occur, [2] accrued in 1983. Because Hodge was a minor at that time, limitations did not begin to run until July 30, 1987, when he reached majority. TEX. CIV. PRAC. & REM. CODE ANN. § 16.001(b) (Vernon Supp.2001). The discovery rule could further delay limitations, if it applies.

 **[10]**   **[11]**   **[12]**   **[13]**   Hodge argues that the discovery rule applies to his conversion claim. The discovery rule delays the running of limitations in cases in which the injury involved is inherently undiscoverable. *HECI Exploration Company v. Neel*, 982 S.W.2d 881, 886 (Tex.1998). Hodge pleaded a

cause of action for breach of fiduciary duty. Injuries from a breach of fiduciary duty are presumed to be inherently undiscoverable. *Computer Associates International, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex.1994). A plaintiff, nevertheless, must be diligent in protecting his rights. At trial, Hodge would have the burden on the discovery rule issues; the presumption aids him in carrying that burden. By filing a motion for summary judgment under Rule 166a(c), Northern assumed that burden and had to conclusively negate the discovery rule by establishing that Hodge knew, or should have known with the exercise of reasonable diligence, of the alleged conversion. *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex.1990).

 **[14]**    Northern introduced a 1992 report of the Dallas County Adult Probation Department which stated that:

> The defendant [Hodge] mentioned he has had a large trust fund since he was ten years old after he was burned in an electrocution accident. He said his mother initially received the monthly payments but that he took them over when he was eighteen years old.

Thus, Hodge knew of the fund in 1992. Hodge sought to create a fact issue regarding **\*524** his knowledge through an affidavit, but his affidavit contains mere conclusions or beliefs which are insufficient to raise an issue of fact. See *Texas Division—Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex.1994); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex.1984).

 **[15]**    Hodge also had constructive notice of the court records concerning his 1980 lawsuit. Those records include the agreed judgment establishing the fund, as well as the court's transfer order quoted above. A person is charged with constructive notice of the actual knowledge that could have been acquired by examining public records. See *HECI Exploration Company v. Neel, supra* at 887; *Mooney v. Harlin*, 622 S.W.2d 83, 85 (Tex.1981); "*Moore*" *Burger, Inc. v. Phillips Petroleum Company*, 492 S.W.2d 934, 939 (Tex.1972).

Limitations began to run on July 30, 1987, when Hodge reached majority and expired two years later. See TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a). The trial court properly granted summary judgment on Northern's limitations defense to Hodge's conversion claims. [3]

### *Hodge's Remaining Claims*

Hodge's principal contention is that his causes of action for breach of depository contract and to enforce payment of a certificate of deposit are not barred because these causes of action did not begin to accrue until he made a demand on Northern in 1999. These claims are simply an effort by Hodge to avoid his limitations problem.

 **[16]**    In support of his breach of depository contract claim, Hodge relies upon *Canyon Lake Bank v. New Braunfels Utilities*, 638 S.W.2d 944, 949 (Tex.App.—Austin 1982, no writ). The only claim against the bank in *Canyon Lake Bank* was for breach of depository contract. Hodge directs our attention to the following language by the court in *Canyon Lake Bank:*

> Having concluded the trial court correctly interpreted suit to be for the breach of a depository contract, it necessarily follows the four-year statute of limitations of TEX.REV.CIV.STAT.ANN. arts. 342–701 (1973) and 5527 (1981) applies. Where a deposit of money is made, the statute of limitations is four years and does not begin to run against the depositor until demand is made and refused or an adverse claim is asserted. *Hinds v. Southwestern Savings Association*, 562 S.W.2d 4 (Tex.Civ.App.—Beaumont 1977, writ ref'd n.r.e.).

*Hinds* involved a general deposit, not a special deposit. Article 342–701 was a predecessor to TEX. FIN. CODE ANN. § 34.301(b). By its terms, Section 34.301(b) does not apply to the CD in this case because Section 34.301(b) is limited to a "deposit contract without a maturity date." Section 34.301(b) would appear to apply to the ordinary general deposit that has no maturity date, such as a checking account. Article 5527 was a predecessor to TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 (Vernon Supp.2001) which includes suits for a debt and which would include the ordinary general deposit. As mentioned earlier, general deposits may be held in trust by the depositor for a third party. *Canyon Lake Bank* involved trustee accounts that the court considered to be general deposits. See **\*525** *Upper Valley Aviation, Inc. v. Mercantile National Bank*, 656 S.W.2d 952 (Tex.App.—

*Dallas 1983, writ ref'd n.r.e.),* another general deposit case, which cites *Canyon Lake Bank* for the proposition that an action for breach of depository contract (an action based on debt) is appropriate where the deposit is a general deposit. *Upper Valley Aviation, Inc. v. Mercantile National Bank, supra* at 955.

[17]     Hodge's argument supporting his claim to enforce payment of a certificate of deposit is more involved. Hodge pleaded that Northern cashed the CD in 1983; that, by cashing the CD, Northern "acquired possession of the certificate of deposit and [Hodge] was unable to present the certificate to [Northern] for payment"; that Hodge demanded payment on March 12, 1999; and that Northern refused to comply with his demand in violation of TEX. BUS. & COM. CODE ANN. Chapters 3 and 4 (Vernon 1994 & Supp.2001). On appeal, Hodge bases his argument on Chapter 3, and he does not refer to Chapter 4.

[18]     Hodge claims that Northern never "paid" the CD because any payment by Northern was in violation of TEX. BUS. & COM. CODE § 3.602. Based on this premise, Hodge argues that TEX. BUS. & COM. CODE ANN. § 3.118 is the statutory provision most directly applicable to this case. Section 3.118(e) provides:

> An action to enforce the obligation of a party to a certificate of deposit to pay the instrument must be commenced within six years after demand for payment is made to the maker, but if the instrument states a due date and the maker is not required to pay before that date, the six-year period begins when a demand for payment is in effect and the due date has passed.

As the State Bar Committee Comments following Section 3.118 note, Chapter 3 only applies to negotiable instruments. [4] TEX. BUS. & COM. CODE ANN. § 3.104(a) requires an unconditional promise or order [5] to pay money "to

bearer or to order" before an instrument can be a negotiable instrument; here the CD was payable to "Connie Murray as next Best Friend to Darrell Hodge." Any withdrawal of funds from the account had to be expressly authorized by court order. The CD in this case was a special deposit; it was not a negotiable instrument. Therefore, Sections 3.602 and 3.118(e) are not applicable. Hodge pleaded that the transfer order set forth restrictions on this deposit and that withdrawals were subject to approval by court order. While pleadings do not constitute summary judgment evidence, a party may plead itself out of court by pleading facts that bar a claim. See *Texas Department of Corrections v. Herring,* 513 S.W.2d 6, 9 (Tex.1974); *Martz v. Weyerhaeuser Company, supra* at 588.

[19]     [20]     Hodge fails to note the distinction between a general account and a special account and the legal consequences flowing from that categorization. A CD can be either a general or a special deposit. *Texas Bank and Trust Co. v. Spur Security Bank, supra* at 352. The cases relied upon by Hodge deal with general deposits and are not applicable. When a bank makes a "wrongful payment" from a **\*526** general deposit, there is no violation of the deposit agreement because the bank has title to the funds. The general depositor is simply a creditor of the bank. It is when the bank refuses a demand for payment of the general deposit that the bank breaches its relationship with the depositor. Unlike a general deposit, the special deposit keeps title in the depositor, and the bank is subject to a specific set of instructions for payment. When the bank wrongfully pays a special deposit, the wrong has occurred at that point.

### *This Court's Ruling*

The summary judgment of the trial court is affirmed.

**All Citations**

54 S.W.3d 518

Footnotes

1     We shall refer to Northern's predecessor in interest as "Northern" for purposes of simplicity.

2     This case is before us solely on the issue of Northern's limitations defense. Limitations, unlike other defenses, do not reach the merits of a cause of action, they merely challenge the availability of a remedy. *Russell v. Ingersoll–Rand Company,* 841 S.W.2d 343, 359 (Tex.1992); *Robinson v. Weaver,* 550 S.W.2d 18, 20 (Tex.1977). Thus, we do not decide whether Northern properly or improperly placed the proceeds from the CD into Murray's account or properly used them

to offset her personal debt. Questions regarding whether Northern made proper payment of the CD are part of Hodge's claims or Northern's defenses.

3     Hodge's claim of breach of fiduciary duty is for conversion by the fiduciary. Even if TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(5) (Vernon Supp.2001) applied, the four-year period expired long before Hodge filed this suit.

4     The Uniform Commercial Code Comment following Section 3.118 points out that:

> The only purpose of Section 3–118 is to define the time within which an action to enforce an obligation, duty, or right *arising under Article 3* must be commenced. (Emphasis added)

5     "Order" means a written instruction to pay money signed by the person giving the instruction. TEX. BUS. & COM. CODE ANN. § 3.103(6). If payable to order, a negotiable instrument must be payable to order at the time it is issued or first comes into possession of a holder. Section 3.104(a)(1).

---

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

377 S.W.3d 115
Court of Appeals of Texas,
Houston (14th Dist.).

Chana HOROWITZ, Appellant

v.

Francisc BERGER; Tiberiu Roman; Sara Bergman;
Pinchas Bergman; Alexander Davidovich; Inna
Davidovich; Aron Eherentrew; Ronnie Eilam;
Yitshak Eliyahu; Revital Eliyahu; Arnon Erez;
Netanel Feiger; Noam Fishman; Hadas Fishman;
Frank Freedland; Gisa Freedland; Israel Freedland;
Rivka Freedland; Shmuel Freedland; Tzipora
Faige; Tova Shnitman; Naftali Friedlander;
Michael Gitik; Daniel Glinert; D. Glinert Holdings,
Ltd.; Sagi Goldberg; Moshe Gotlib; Yuray Gross;
Eva Gross; Arie Guttman; Tzipora Hellmanm;
Henry Kalb; Miriam Raskin Kiryati; Bruria Klein;
Avraham Krakover; Shulamit Krakover; Aharon
Laher; Sara Shterna–Lando; Nida Laohachai;
Moshe Lavi; Malka Lavi; Amir Levi; Sandra Levi;
Rivka Likvornik; Adina Mastbaum; Menahem
Nagar; Gavriel Nesgi; Nahum Olschwang; Mishel
Haim Papismedov; Moshe Peleg; Yossef Potash;
Yaakov Rabinovits; Avraham Raizman; Hadasa
Raizman; Elad Regev; Bien Shai; Liron Rukach;
Shlomit Shaked; Iris Shany; Eliezer Spund;
Moshe Spund; Yadin Terem; Tzachi Naim; Nir
Ventura; Dan Willner; Dganit Willner; Arie Chaim
Yoffe; Gad Zeitlin; Rachel Zeitlinm; Ezra Kaim;
Dan Schwarz; and Zahava Schwarz, Appellees.

No. 14–11–00576–CV.    |    June 21, 2012.

**Synopsis**

**Background:** Nonresident real estate agent, against whom
purchasers of Texas condominiums brought action, entered
**special appearance** to contest venue and personal
jurisdiction. The 122nd District Court, Galveston County,
John A. Ellisor, Jr., J., denied **special appearance** upon
finding that agent had sufficient contacts with Texas to
support the exercise of specific personal jurisdiction. Agent
appealed.

**Holdings:** The Court of Appeals, Tracy Christopher, J., held
that:

[1] defective **special appearance** was cured by agent's filing
of a verified amended **special appearance** before the hearing
on the matter;

[2] agent did not waive her **special appearance** by filing a
motion to compel discovery;

[3] agent's failure to address alternative theory raised by
purchasers in her original appellate brief did not serve to
abandon her arguments in remaining appellate proceedings;

[4] agent's conversation in another country about the real
property in the forum state did not demonstrate the sort of
contact with forum state that was necessary to support trial
court's exercise of personal jurisdiction;

[5] agent's act of convincing purchasers to enter purchase
agreement that referenced agreement to arbitrate claims
in accordance with American arbitration rules did not
demonstrate the sort of contact with forum state that
was necessary to support trial court's exercise of personal
jurisdiction; and

[6] agent's previous visit to Texas condominiums was not
a sufficient contact with forum state to support trial court's
exercise of specific jurisdiction.

Reversed and remanded.

Kem Thompson Frost, J., issued concurring opinion.

West Headnotes (31)

[1]    **Constitutional Law**
        👉 Non-residents in general
       **Courts**
        👉 Contacts with forum state in general
       Requirements of long-arm statute are fulfilled
       if the defendant has certain minimum contacts
       with the forum state such that the maintenance
       of the suit does not offend traditional notions of

fair play and substantial justice. V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[2]** **Courts**

⌐ Purpose, intent, and foreseeability; purposeful availment

Minimum contacts are sufficient to support the exercise of personal jurisdiction if they show that the nonresident defendant has purposefully availed herself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

Cases that cite this headnote

**[3]** **Courts**

⌐ Purpose, intent, and foreseeability; purposeful availment

In determining whether the purposeful availment requirement is satisfied as to establish personal jurisdiction over nonresident defendant, courts consider only the defendant's contacts with the forum state, and not the unilateral activity of a third party.

Cases that cite this headnote

**[4]** **Courts**

⌐ Purpose, intent, and foreseeability; purposeful availment

To satisfy purposeful availment requirement for personal jurisdiction, the nonresident defendant's contacts with the forum state must be purposeful rather than merely fortuitous.

Cases that cite this headnote

**[5]** **Courts**

⌐ Purpose, intent, and foreseeability; purposeful availment

To satisfy purposeful availment requirement for personal jurisdiction, the nonresident defendant must seek some benefit, advantage, or profit by availing herself of the forum.

Cases that cite this headnote

**[6]** **Courts**

⌐ Unrelated contacts and activities; general jurisdiction

**Courts**

⌐ Related contacts and activities; specific jurisdiction

Personal jurisdiction may be general or specific.

Cases that cite this headnote

**[7]** **Courts**

⌐ Unrelated contacts and activities; general jurisdiction

A trial court properly may exercise general jurisdiction over a defendant whose contacts with the forum state have been continuous and systematic.

Cases that cite this headnote

**[8]** **Courts**

⌐ Unrelated contacts and activities; general jurisdiction

When general jurisdiction is at issue, only the defendant's pre-suit contacts are relevant.

Cases that cite this headnote

**[9]** **Courts**

⌐ Related contacts and activities; specific jurisdiction

When there is a substantial connection between the defendant's purposeful contacts with the forum state and the operative facts of the litigation, a trial court properly may exercise specific jurisdiction over the defendant.

Cases that cite this headnote

**[10]** **Courts**

⌐ Allegations, pleadings, and affidavits

**Courts**

⌐ Presumptions and Burden of Proof as to Jurisdiction

A defendant challenging a forum state court's exercise of personal jurisdiction must negate all jurisdictional bases alleged; thus, the plaintiff has the initial burden of pleading sufficient facts to bring the nonresident defendant within the provisions of the long-arm statute. V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[11]    Courts**
    Allegations, pleadings, and affidavits

If the plaintiff fails to satisfy the initial burden of pleading sufficient facts to bring the nonresident defendant within the provisions of the long-arm statute, then proof of the defendant's nonresidency is sufficient to negate personal jurisdiction. V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[12]    Constitutional Law**
    Non-residents in general

**Courts**
    Unrelated contacts and activities; general jurisdiction

**Courts**
    Related contacts and activities; specific jurisdiction

If the plaintiff alleges sufficient jurisdictional facts to bring the nonresident defendant within the provisions of the long-arm statute, then the defendant can defeat jurisdiction by, for instance, introducing evidence contradicting the plaintiff's factual allegations, showing that the defendant's contacts with the forum state fall short of purposeful availment, demonstrating that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction, or, if specific jurisdiction is at issue, showing that the plaintiff's claims do not arise from the defendant's contacts with the forum state. V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[13]    Appeal and Error**
    Cases Triable in Appellate Court

Whether a trial court has personal jurisdiction over a defendant is a question of law that is reviewed de novo.

1 Cases that cite this headnote

**[14]    Appeal and Error**
    Proceedings preliminary to trial

When the trial court issues findings of fact and conclusions of law in connection with its ruling on special appearance contesting its exercise of personal jurisdiction, the defendant may challenge the trial court's factual findings for legal and factual sufficiency.

3 Cases that cite this headnote

**[15]    Appeal and Error**
    Extent of Review

On appeal of ruling on special appearance contesting a trial court's exercise of personal jurisdiction, the scope of review includes all evidence in the record.

3 Cases that cite this headnote

**[16]    Appeal and Error**
    Findings of Court or Referee

When reviewing factual findings for legal sufficiency, the appellate court considers the evidence in the light most favorable to the finding and indulges every reasonable inference that supports the challenged finding.

Cases that cite this headnote

**[17]    Appeal and Error**
    Findings of Court or Referee

When reviewing factual findings for legal sufficiency, the appellate court credits favorable evidence if a reasonable fact finder could and disregards contrary evidence unless a reasonable fact finder could not.

1 Cases that cite this headnote

**[18] Appeal and Error**
⚷ Sufficiency of Evidence in Support

**Appeal and Error**
⚷ Total failure of proof

When reviewing factual findings for **legal sufficiency**, the appellate court will conclude that the evidence is legally insufficient to support the finding only if: (1) there is a complete absence of evidence of a vital fact; (2) the appellate court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.

Cases that cite this headnote

**[19] Appeal and Error**
⚷ Extent of Review

**Appeal and Error**
⚷ Clearly, plainly, or palpably contrary

In reviewing factual findings for **factual sufficiency**, the appellate court considers all of the evidence and will set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

2 Cases that cite this headnote

**[20] Appeal and Error**
⚷ Cases Triable in Appellate Court

The trial court's conclusions of law are reviewed de novo.

Cases that cite this headnote

**[21] Appearance**
⚷ General or **Special Appearance**

Nonresident real estate agent's initial filing of defective **special appearance** that did not include a verification as required by **special appearance** rule was cured by her filing of a verified amended **special appearance**

before the hearing on the matter; rather than waiving **special appearance**, the amended **special appearance** related back, curing and replacing the original **special appearance**. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

5 Cases that cite this headnote

**[22] Appearance**
⚷ General or **Special Appearance**

**Special appearance** rule does not require a defendant to forego the filing of other pleadings and motions in order to preserve the right to cure a defective **special appearance**. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

1 Cases that cite this headnote

**[23] Appearance**
⚷ Motions in general

Nonresident real estate agent against whom purchasers of Texas condominiums brought action did not waive her **special appearance** by filing a motion to compel discovery; by its express terms, motion to compel discovery was made subject to defendant's **special appearance** and her motion to dismiss for forum non conveniens. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a(2).

3 Cases that cite this headnote

**[24] Courts**
⚷ Construction and application of particular rules

Courts cannot ignore the plain meaning of Rules of Civil Procedure, which have the same effect as statutes, and must construe the rules to ensure a fair and equitable adjudication of the rights of litigants.

Cases that cite this headnote

**[25] Appeal and Error**
⚷ To jurisdiction

Nonresident real estate agent's failure to address, in her original appellate brief, plaintiff purchasers' alternative theory that

denial of agent's **special appearance** was warranted due to waiver did not serve to abandon agent's right to oppose the alternative theory in remaining appellate proceedings; trial court expressly found that agent had sufficient contacts to support its exercise of specific jurisdiction, meaning trial court impliedly rejected purchasers' alternative theories, including the argument that agent waived her **special appearance**.

Cases that cite this headnote

**[26]** **Courts**
   👉 Nature, number, frequency, and extent of contacts and activities

Nonresident real estate agent's conversation in another country about the real property in the forum state did not demonstrate the sort of contact with forum state that was necessary to support trial court's exercise of personal jurisdiction over her, in action brought by purchasers of Texas condominiums.

1 Cases that cite this headnote

**[27]** **Courts**
   👉 Nature, number, frequency, and extent of contacts and activities

Personal jurisdiction cannot be sustained solely on the content of the nonresident's communications outside of the forum state.

Cases that cite this headnote

**[28]** **Courts**
   👉 Nature, number, frequency, and extent of contacts and activities

Nonresident real estate agent's act of convincing purchasers to enter purchase agreement that referenced agreement to arbitrate claims in accordance with American arbitration rules did not demonstrate the sort of contact with forum state that was necessary to support trial court's exercise of personal jurisdiction over her, in action brought by purchasers of Texas condominiums; agent was not a party to any of the contracts and she did not prepare them.

Cases that cite this headnote

**[29]** **Courts**
   👉 Nature, number, frequency, and extent of contacts and activities

Personal jurisdiction cannot be based on contractual provisions that pertain only to the conduct and not to the substance of the litigation, and that do not demonstrate a tie between the nonresident defendant and the forum state.

Cases that cite this headnote

**[30]** **Courts**
   👉 Factors Considered in General
**Courts**
   👉 Related contacts and activities; specific jurisdiction

A state is powerless to create jurisdiction over a nonresident by establishing a remedy for a private wrong and a mechanism to seek that relief; jurisdictional analysis always centers on the defendant's actions and choices to enter the forum state and conduct business.

Cases that cite this headnote

**[31]** **Courts**
   👉 Related contacts and activities; specific jurisdiction

Nonresident real estate agent's previous visit to Texas condominiums, which were the subject of action brought by purchasers, was not a sufficient contact with forum state to support trial court's exercise of specific jurisdiction; there was no substantial relationship between agent's visit and the operative facts of the litigation.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*119** George Vie, III, Houston, for Appellant.

Danny M. Sheena, Jerry L. Elmore, Stephen M. Loftin, Victor Weitao Zhao, Houston, Stretch R. Lewis Jr., Galveston, for Appellees.

Panel consists of Justices FROST, BROWN, and CHRISTOPHER.

## OPINION

TRACY CHRISTOPHER, Justice.

In this interlocutory appeal, Chana Horowitz challenges the trial court's denial of her **special appearance**. We reverse and remand with instructions to the trial court to dismiss Horowitz from the suit for lack of personal jurisdiction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Chana Horowitz is an Israeli citizen residing in Israel, where she worked as an independent contractor for the Israeli company, Founders T–M Real Estate & Investments, Ltd. ("Founders Israel"). Most of the seventy-two plaintiffs also are Israeli; none resides in the United States. The plaintiffs allege that Horowitz made representations to some of them in Israel [1] that persuaded them to purchase condominiums in a development referred to as "the Fairways Project" in League City, Texas from Roam Development Group, LP, a Texas limited partnership. Horowitz responded by filing a single document that included an unverified **special appearance**, a general denial, and a motion to dismiss for *forum non conveniens.* She subsequently served discovery requests to the plaintiffs and filed a motion to compel fuller responses to that discovery, and she later amended and verified her **special appearance**.

In the meantime, Founders Israel and two other defendants moved to compel the plaintiffs to arbitrate the claims against them. These defendants relied on an arbitration provision found in the Declaration of Condominium that applied to the property that the plaintiffs had purchased. Based on this motion, the plaintiffs argued that the trial court could exercise specific jurisdiction over Horowitz because she caused the plaintiffs to execute documents that incorporated the Declaration of Condominium.

Horowitz supported her amended **special appearance** with an affidavit in which she attested as follows:

- Horowitz is a citizen and resident of Israel.

- She worked as an independent contractor for Founders Israel from August 2002 through June 26, 2005.

- Under her contract with Founders Israel, she was required to follow its instructions. Founders Israel provided all sales tools, marketing materials, advertising, contracts, and other documents. She was not required to travel to Texas or perform any duties here.

- She has never lived, worked, contracted, owned property, or paid taxes in Texas.

- **\*120** • She has never maintained an office, address, telephone number, or bank account in Texas.

- In her individual capacity, Horowitz has never entered into a contract or conducted any business with a Texas business, citizen, or resident.

- She does not advertise or provide any services in Texas.

- She does not direct any mass mailings to Texas or have an ownership interest in any business located in Texas.

- She is not licensed or regulated by any Texas authority.

- She has never conducted any business in Texas or interacted with any of the plaintiffs in Texas.

- All of the contracts and documents she provided to the plaintiffs were prepared and provided by Founders Israel.

- All of her meetings and communications with the plaintiffs took place in Israel.

- She did not attend any of the property closings, all of which occurred after she stopped working for Founders Israel.

- Any payments by the plaintiffs would have been made to Founders Israel, who would then pay Horowitz and the other sales agents. Founders Israel paid her only in Israel.

- English is not Horowitz's native language and she never advised any of the plaintiffs that she was giving them a professional translation of any documents.

- It was not part of her job to train or advise other sales agents.

- As a reward for their services, Founders Israel sent Horowitz and other sales agents on a five-day trip to Las Vegas. On the way, the agents stopped in Texas for one-and-one-half days and viewed the Fairways Project, which is the property that is the subject of this suit.

- The only other time that Horowitz visited Texas was after she ceased working for Founders Israel in 2005.

The plaintiffs opposed Horowitz's **special appearance** and supported their opposition with affidavits in which they attested that they executed documents in English and in Hebrew; that English was not their native language; that Horowitz told them the English documents contained information similar to the information contained in the Hebrew documents; and that they never were given copies of the Declaration of Condominium.

Before any of Horowitz's other motions were heard, the trial court heard and denied her **special appearance**, concluding that Horowitz had sufficient contacts with Texas to support the exercise of specific personal jurisdiction. At Horowitz's request, the trial court also made findings of fact and conclusions of law in support of that ruling. In two appellate issues, Horowitz challenges the legal and **factual sufficiency** of the trial court's factual findings, and argues that the trial court erred in concluding that it properly could exercise specific jurisdiction over her.

## II. GOVERNING LAW

 **[1]** **[2]** **[3]** **[4]** **[5]** The Texas Supreme Court has interpreted the broad language of the Texas long-arm statute to extend Texas courts' exercise of personal jurisdiction " 'as far as the federal constitutional requirements of due process will permit.' " *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002) (quoting *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977)). Those requirements are fulfilled if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of **\*121** the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). Minimum contacts are sufficient to support the exercise of personal jurisdiction if they show that the nonresident defendant has purposefully availed herself of the privilege of conducting activities within

the forum state, thus invoking the benefits and protections of its laws. *See id.* at 319, 66 S.Ct. at 160; *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). In determining whether the purposeful-availment requirement is satisfied, courts consider only the defendant's contacts with the forum state, and not the unilateral activity of a third party. *Michiana,* 168 S.W.3d at 785. The defendant's contacts with the forum state must be purposeful rather than merely fortuitous. *Id.* In addition, the defendant must seek some benefit, advantage, or profit by availing herself of the forum. *Id.*

 **[6]** **[7]** **[8]** **[9]** Personal jurisdiction may be "general" or "specific." *Zinc Nacional, S.A. v. Bouche Trucking, Inc.,* 308 S.W.3d 395, 397 (Tex.2010). A trial court properly may exercise general jurisdiction over a defendant whose contacts with the forum state have been continuous and systematic. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 575 (Tex.2007); *BMC Software,* 83 S.W.3d at 796. When general jurisdiction is at issue, only the defendant's pre-suit contacts are relevant. *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 169 (Tex.2007). On the other hand, when there is a substantial connection between the defendant's purposeful contacts with Texas and the operative facts of the litigation, a trial court properly may exercise specific jurisdiction over the defendant. *Moki Mac,* 221 S.W.3d at 585.

 **[10]** **[11]** **[12]** A defendant challenging a Texas court's personal jurisdiction must negate all jurisdictional bases alleged. *BMC Software,* 83 S.W.3d at 793; *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 772 (Tex.1995). Thus, the plaintiff has the initial burden of pleading sufficient facts to bring the nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software,* 83 S.W.3d at 793; *Brocail v. Anderson,* 132 S.W.3d 552, 556 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). If the plaintiff fails to do so, then proof of the defendant's nonresidency is sufficient to negate personal jurisdiction. *Kelly v. Gen. Interior Constr., Inc.,* 301 S.W.3d 653, 658–59 (Tex.2010). If the plaintiff does allege sufficient jurisdictional facts, then the defendant can defeat jurisdiction in several ways. The defendant can introduce evidence contradicting the plaintiff's factual allegations,[2] or show that the defendant's contacts with the forum state "fall short of purposeful availment";[3] or demonstrate that "traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction."[4] If specific jurisdiction is at issue, then the

defendant also can show that the plaintiff's claims do not arise from the defendant's contacts with Texas. [5]

### III. STANDARD OF REVIEW

 **[13]**   **[14]**   **[15]**   Whether a trial court has personal jurisdiction over a defendant is a **\*122** question of law we review de novo. *Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 794. When, as here, the trial court issues findings of fact and conclusions of law in connection with its **special**-**appearance** ruling, the defendant may challenge the trial court's factual findings for legal and **factual sufficiency**. *BMC Software,* 83 S.W.3d at 794. On appeal, the scope of review includes all evidence in the record. *Vosko v. Chase Manhattan Bank, N.A.,* 909 S.W.2d 95, 99 (Tex.App.-Houston [14th Dist.] 1995, writ denied).

 **[16]**   **[17]**   **[18]**   **[19]**   **[20]**   We review the challenged factual findings by applying the same standards used in reviewing jury findings. *Wiese v. Pro Am Servs., Inc.,* 317 S.W.3d 857, 860 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (citing *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991)). When reviewing for **legal sufficiency**, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* We will conclude that the evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) we are barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. In reviewing for **factual sufficiency**, we consider all of the evidence and will set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Meehl v. Wise,* 285 S.W.3d 561, 565 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (citing *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996)). We review the trial court's conclusions of law de novo. *Greenfield Energy, Inc. v. Duprey,* 252 S.W.3d 721, 730 (Tex.App.-Houston [14th Dist.] 2008, no pet.).

### IV. ABSENCE OF WAIVER

As a threshold matter, the plaintiffs contend that we must affirm the trial court's ruling because Horowitz waived her **special appearance** or entered a general appearance. The plaintiffs further point out that an appellant may not raise new arguments in a reply brief, and contend that because Horowitz failed to argue in her original appellate brief that she did *not* waive her **special appearance**, she subsequently could not challenge the plaintiffs' assertion that she *did* waive her **special appearance**. We address each of these arguments in turn.

### A. Cure of Defective **Special Appearance**

 **[21]**   The plaintiffs' waiver arguments focus on the chain of events that began when Horowitz initially filed her **special appearance** without including a verification as required by the Texas Rules of Civil Procedure. *See* TEX.R. CIV. P. 120a. She instead filed a single unverified document that incorporated her **special appearance**, a general denial, and a motion to dismiss for *forum non conveniens.* She then set the **special appearance** and the motion to dismiss for hearing, and served the plaintiffs with requests for admission and interrogatories. Some of these requests and interrogatories are related to Horowitz's challenge to the trial court's exercise of personal jurisdiction over her, but other requests concern the merits of the plaintiffs' claims. Before the date set for the hearing on Horowitz's **special appearance**, the plaintiffs served answers to the discovery, **\*123** and Horowitz filed a motion in which she asked the trial court to overrule the plaintiffs' objections, deem certain matters admitted, and compel the plaintiffs to respond more fully to her discovery requests. Finally, on the day originally set for the hearing on her **special appearance**, the plaintiffs filed a response and Horowitz filed an amended **special appearance** that was both verified and supported by her affidavit. The hearing was reset at the plaintiffs' request, and the plaintiffs filed a supplemental response in which they argued that (1) Horowitz waived her **special appearance**; and (2) in any event, she had sufficient minimum contacts to subject her to the trial court's jurisdiction.

 **[22]**   We disagree with the plaintiffs' assertion that by this conduct, Horowitz waived her **special appearance**. By filing a verified amended **special appearance** before the hearing on the matter, Horowitz cured her initial failure to verify the **special appearance**. Rule 120a expressly

provides that if a **special appearance** is filed, "*any* other plea, pleading, or motion may be contained in the same instrument or filed subsequent thereto without waiver of such **special appearance**; and may be amended to cure defects." TEX.R. CIV. P. 120a (emphasis added). The plaintiffs' reading of the rule would make these two options mutually exclusive, because a defendant who filed any other pleading or motion with or after a **special appearance** would, in effect, have caused any defects in the **special appearance** to become incurable. We do not believe that Rule 120a will bear this construction. *See* TEX.R. CIV. P. 1 (requiring that the Rules of Civil Procedure "shall be given a liberal construction"); *Dawson–Austin v. Austin,* 968 S.W.2d 319, 322 (Tex.1998) ( "By 'cure,' the rule means to restore the **special appearance**.... An amendment that adds a verification cures the **special appearance**."). The amended **special appearance** relates back, curing and replacing the original **special appearance**. *See* TEX.R. CIV. P. 62 ("The object of an amendment ... is to add something to, or withdraw something from, that which has been previously pleaded so as to perfect that which may be deficient...."); TEX.R. CIV. P. 65 (explaining that, with limited exceptions inapplicable here, a substituted instrument takes the place of the original, and the original "shall no longer be regarded as part of the pleading in the record of the cause"). Thus, Rule 120a does not require a defendant to forego the filing of other pleadings and motions in order to preserve the right to cure a defective **special appearance**. *See Dennett v. First Cont'l Inv. Corp.,* 559 S.W.2d 384, 386 (Tex.Civ.App.-Dallas 1977, no writ) ("[I]n **special appearances**, ... the crucial focus is on the allowance of amendment, and the timing of the amendment is not determinative.").

### B. Discovery and Related Dispute

[23] [24] Horowitz also did not waive her **special appearance** by serving the plaintiffs with discovery requests. "[T]he plain language of Rule 120a requires only that a **special appearance** be filed before any other 'plea, pleading or motion.' " *Exito Elecs. v. Trejo,* 142 S.W.3d 302, 305 (Tex.2004) (per curiam) (explaining that a party does not waive a **special appearance** by first filing a Rule 11 agreement because the latter is not a "plea, pleading, or motion"). "Courts cannot ignore the plain meaning of the Texas Rules of Civil Procedure, which have the same effect as statutes, and must construe the rules to ensure a fair and equitable adjudication of the rights of litigants." **\*124** *Esty v. Beal Bank S.S.B.,* 298 S.W.3d 280, 297 (Tex.App.-Dallas 2009, no pet.).[6] Interrogatories and requests for admission

are not pleas, pleadings, or motions. *See Exito,* 142 S.W.3d at 305 n. 11 (noting that the "pleadings" in a suit are the petition and answer, and a "motion" is an " 'application requesting a court to make a specified rule or order' ") (citing TEX.R. CIV. P. 45 and quoting BLACK'S LAW DICTIONARY 1031 (7th ed.1999)).

Further, Horowitz did not waive her **special appearance** by filing a motion to compel discovery. By its express terms, the motion was made subject to Horowitz's **special appearance** and her motion to dismiss for *forum non conveniens. See Puri v. Mansukhani,* 973 S.W.2d 701, 707 (Tex.App.-Houston [14th Dist.] 1998, no pet.) (holding that defendant did not waive his **special appearance** by filing a motion for new trial subject to the **special appearance**). The motion to compel was not heard or decided before the trial court heard and ruled on the **special appearance**. *Cf.* TEX.R. CIV. P. 120a(2) ("Any motion to challenge the jurisdiction provided for herein *shall be heard and determined* before a motion to transfer venue or any other plea or pleading *may be heard.*") (emphasis added); *Xenos Yuen v. Fisher,* 227 S.W.3d 193, 199 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (holding that the defendant did not waive his **special appearance** by filing a motion for sanctions that was made "subject to" and in the alternative to his **special appearance**, and where the motion for sanctions was not heard or ruled upon).

### C. Absence of Briefing Waiver

[25] Finally, the plaintiffs point out that they argued to the trial court that Horowitz had waived her **special appearance**, and they contend that we must affirm because, in her original appellate brief, Horowitz failed to challenge this alternative basis for the trial court's ruling. Again, we disagree. Although the plaintiffs argued in the trial court that there were several reasons to deny Horowitz's **special appearance**, we are not presented with a case in which the trial court failed to state the basis for its ruling or made findings that supported multiple theories. To the contrary, the trial court expressly found that Horowitz had sufficient contacts to support its exercise of specific jurisdiction. Thus, the trial court impliedly rejected the plaintiffs' alternative theories—including the argument that Horowitz waived her **special appearance**. *See Knight Corp. v. Knight,* Nos. 14–11–00770–CV & 14–11–00994–CV, 2012 WL 1059389, at *2–3 (Tex.App.-Houston [14th Dist.] Mar. 29, 2012, orig. proceeding) (noting **\*125** that there was no finding of waiver where the argument was raised in the trial court, but the trial court ruled on the **special appearance** on its merits). Inasmuch as the trial court rejected the plaintiffs' contention that Horowitz waived her **special**

**appearance**, she had no reason to revisit that argument on appeal. *Compare* TEX.R. CIV. P. 299 ("The judgment may not be supported upon appeal by a presumed finding upon any ground of recovery or defense, no element of which has been included in the findings of fact ....") *with Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.,* 747 S.W.2d 785, 787 (Tex.1988) (explaining that when there are favorable findings on alternative theories, the prevailing party may seek recovery under an alternative theory if the judgment is reversed on appeal). We therefore may consider the merits of Horowitz's challenge to the trial court's findings of fact and conclusions of law.

## V. FAILURE OF SPECIFIC JURISDICTION

The trial court made twenty-nine findings of fact, and although Horowitz challenges the sufficiency of the evidence to support some of the findings, she primarily argues that the findings, even if true, are insufficient to support the trial court's exercise of specific jurisdiction. We agree.

**[26]** **[27]** Seventeen of the factual findings concern representations that Horowitz allegedly made to some of the plaintiffs in Israel.[7] But, jurisdiction cannot be sustained solely on the content of the nonresident's communications outside of the forum state. *See Michiana,* 168 S.W.3d at 791 (observing that virtually all plaintiffs will allege that the communication was tortious and virtually all defendants will deny wrongdoing). A conversation in another country about real property in the forum state is not itself a sufficient contact to support the forum state's exercise of specific jurisdiction over the speaker. Moreover, Horowitz is not a party to any of the contracts that were the subject of the alleged misrepresentations, and neither Horowitz nor the plaintiffs with whom she spoke were Texas residents. *See Peredo v. M. Holland Co.,* 310 S.W.3d 468, 474 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (reversing the denial of **special appearance** by a nonresident who responded to inquiries by Texas resident concerning contracts to which the nonresident was not a party).

**[28]** **[29]** One finding concerns only the contentions that other defendants in this case made in their motion to compel arbitration,[8] and in another finding, the trial court quoted "[t]he purported arbitration language relied on by other Defendants, which is contained in the Declaration of Condominium."[9] But in determining whether Horowitz has

purposefully availed herself of the privilege of conducting business in the forum state, only her own conduct matters. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (explaining that the purposeful-availment requirement ensures that a nonresident will not be haled into a foreign jurisdiction based on " '[t]he unilateral activity of those who claim some relationship' " with the defendant or as the result of " 'random,' 'fortuitous,' or 'attenuated' contacts." (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958))). Thus, language employed solely by other defendants cannot support the trial court's exercise of specific jurisdiction **\*126** over Horowitz. Moreover, the other defendants' reliance on an arbitration clause is not an operative fact of the litigation. Jurisdiction cannot be based on contractual provisions that pertain only to the conduct and not to the substance of the litigation, and that do not demonstrate a tie between the nonresident defendant and the forum state. *Rush v. Savchuk,* 444 U.S. 320, 329, 100 S.Ct. 571, 578, 62 L.Ed.2d 516 (1980); *Moki Mac,* 221 S.W.3d at 584.

Most of the trial court's remaining findings fall into even weaker versions of the two categories we have just discussed, i.e., those that concern Horowitz's role in persuading other nonresidents to execute sales documents in Israel for the purchase of Texas real estate from a third party; and those that concern the connection between those documents and an arbitration provision relied on by other defendants. None of them constitutes purposeful availment of the privilege of conducting activities in Texas.

The findings concerning Horowitz's role in the allegedly fraudulent transactions are as follows:

> (a) Horowitz, at the relevant time, was in the business of recruiting investors in Israel to invest in real estate in Texas and the United States, including the property that is the subject of this suit (the "Fairways Project").

> (b) Horowitz's actions were purposeful and taken with the goal in mind of recruiting Israeli investors to purchase real property in Galveston County, Texas, namely the Fairways Project.

> (c) Among these investors are several plaintiffs (her "Client Plaintiffs"). While she was employed by co-Defendant Founders T–M Real Estate and Investments, Ltd., she was a principal salesperson in Israel selling units in the Fairways Project.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

...

(t) She was instrumental in causing the sale documents to be executed by the Client Plaintiffs.

...

(aa) Horowitz profited monetarily from defendants' real estate transactions with the Client Plaintiffs.

...

(cc) Horowitz was an instrumental "but for" cause of the Client Plaintiffs executing the documents necessary to purchase units at the Fairways Project.

 **[30]**    These are the kind of findings that might be relevant in addressing the merits of the plaintiffs' claims, but these facts, even if true, [10] are not contacts with Texas. As the Texas Supreme Court has explained, facts that might justify the imposition of liability do not substitute for facts necessary to establish jurisdiction. "The mere existence of a cause of action does not automatically satisfy jurisdictional due process concerns. A state is powerless to create jurisdiction over a nonresident by establishing a remedy for a private wrong and a mechanism to seek that relief." *Kelly,* 301 S.W.3d at 660. To the contrary, "jurisdictional analysis *always* centers on the defendant's actions and choices to enter the forum state and conduct business." *Id.* (emphasis added). In contrast, each of the findings cited above concerns Horowitz's business in Israel.

With one exception, the remaining findings appear intended to link Horowitz to an arbitration provision invoked by the other defendants in the suit. These are as follows:

(v) The English sale documents incorporated by reference an arbitration provision, **\*127** which other sales[-]agent defendants are now seeking to enforce.

...

(y) Horowitz was the sales person and marketing agent who got the Customer Plaintiffs to execute the English language purchase agreement that contains reference to the above arbitration provision. Said arbitration provision requires arbitration of all claims against sales personnel and marketing agents in accordance with "American" Arbitration Association rules.

(z) Horowitz procured an arbitration provision that contains language for her protection, as the principal sales and marketing agent for the Fairways Project.

It is undisputed that Horowitz did not prepare any of these documents, and was not a party to any of these agreements; thus, even if true, these findings would not support the exercise of personal jurisdiction in Texas because none constitutes a contact with Texas by Horowitz. *Id.*

 **[31]**    Of the trial court's twenty-nine findings of fact, only a portion of the following finding is both a contact with Texas and supported by the record:

> (p) [Horowitz] visited the Fairways Project personally, and informed the Client Plaintiffs the same in an attempt to bolster her credibility when selling units in the Fairways Project.

In this statement, the trial court actually found two facts: first, that Horowitz visited the Fairways Project, and second, that in an effort to bolster her credibility, Horowitz told some of the plaintiffs that she had visited the project. The first took place in Texas, and it is a contact with the forum state; the second took place in Israel, and as with the trial court's other findings about Horowitz's alleged misrepresentations, it is not a contact with the forum state. It instead is simply a representation made in Israel by one resident of Israel to another resident of that country. Thus, we need concern ourselves only with the trial court's finding that Horowitz visited the Fairways Project.

We conclude, however, that Horowitz's visit to the Fairways Project is not a sufficient contact with Texas to support the trial court's exercise of specific jurisdiction. There is no substantial relationship between Horowitz's visit and the operative facts of the litigation. *See Moki Mac,* 221 S.W.3d at 578. The plaintiffs asserted claims against Horowitz for (a) fraud, (b) fraud in a real estate transaction, [11] (c) violations of the Texas Theft Liability Act, [12] (d) breach of fiduciary duty, (e) negligent misrepresentation, (f) conversion, (g) conspiracy to defraud, (h) breach of warranty of title, (i) violations of the Texas Securities Act, [13] (j) violations of the Securities Exchange Act, [14] (k) unjust enrichment, (*l* ) defalcation, and (m) civil racketeering. Each of their claims concerns statements that Horowitz allegedly made or failed to

make to some of the plaintiffs. It is undisputed, however, that Horowitz interacted with the plaintiffs exclusively in Israel.

In concluding that these findings support the exercise of specific jurisdiction, the trial court seems to have relied on the fact that the plaintiffs have alleged fraud in a real estate transaction, and the real property at issue is located in Texas. *Cf. Retamco Operating, Inc. v. Republic Drilling* **\*128** *Co.,* 278 S.W.3d 333, 341 (Tex.2009) ("[T]he real property itself will also be an operative fact, or at the very least, will have a substantial connection to the operative facts. Without an asset, no fraudulent transfer can occur...."). But unlike the nonresident defendant in *Retamco,* Horowitz never owned the Texas real estate at issue. *See also Michiana,* 168 S.W.3d at 787 ("It is true that in some circumstances a single *contract* may meet the purposeful-availment standard, but not when it involves a single *contact* taking place outside the forum state.").

Because the evidence fails to support the trial court's exercise of personal jurisdiction over Horowitz, we sustain the first issue presented for our review.

### VI. CONCLUSION

Having concluded that Horowitz lacks sufficient contacts with Texas to support the trial court's exercise of personal jurisdiction over her, we reverse the trial court's order denying her **special appearance** and remand the case to the trial court with instructions to sever and dismiss the claims against her. *See Peredo,* 310 S.W.3d at 476 (when the minimum-contacts requirement has not been met, it is unnecessary to address the "fair play" portion of the due-process test).

FROST, J., concurring.

KEM THOMPSON FROST, Justice, concurring.

The interests of litigants are best served when courts adopt and utilize measures that foster and enhance judicial economy. The Supreme Court of Texas has recognized the importance of taking this approach and has adopted such measures in summary judgment appeals, holding that appellate courts reviewing summary judgments may consider all summary-judgment grounds presented to the trial court, including grounds that the trial court rejected as a basis for its summary judgment. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 627 (Tex.1996). This well-reasoned approach enables appellate courts to dispose of cases on grounds fully vetted in the trial court even when the trial court did not base its ruling on those grounds. Today, this court should follow the high court's lead and hold that procedures analogous to those announced in *Cincinnati Life Ins. Co. v. Cates* apply in the review of a trial court's ruling on a **special appearance**.

The appellees/plaintiffs in today's case urged the trial court to deny the appellant/defendant Chana Horowitz's **special appearance** on multiple grounds that included waiver and the existence of minimum contacts justifying the exercise of personal jurisdiction based upon specific jurisdiction. The trial court denied the **special appearance**, basing its ruling only upon the specific-jurisdiction theory. Noting that the trial court did not base its ruling upon the waiver arguments, Horowitz, in her opening appellate brief, did not present any argument challenging the waiver grounds asserted in the trial court. Curiously, the majority analyzes the waiver arguments, rejects them, and then concludes that Horowitz did not need to challenge them in her appellate briefing because the trial court did not base its ruling on waiver. The majority never explains this unusual approach nor reveals why this court addresses the waiver arguments given that the trial court's ruling was not based upon waiver and that Horowitz did not have to challenge these arguments on appeal. Though the majority's waiver analysis in this case seems to be without purpose, such an analysis *could* serve a useful function and also further the worthy goals of judicial economy in this type of appeal.

**\*129** Today, this court should conclude that, on appeal from an order denying a **special appearance**, while an appellate court must consider whether the trial court erred in denying appellant's **special appearance** on the grounds that the trial court made the basis of its ruling, in the interests of judicial economy, the reviewing court may also consider the merits of waiver arguments advanced by the appellees but not adopted by the trial court.

**This court should hold that procedures analogous to those announced in *Cincinnati Life Ins. Co. v. Cates* apply in appeals from a trial court's ruling on a special appearance.**

In response to Horowitz's **special appearance**, appellees/plaintiffs asserted that Horowitz had waived her **special appearance** by taking various actions. The majority correctly concludes that because the trial court rejected these waiver arguments in denying the **special appearance**, Horowitz was

not required to attack them on appeal. But, the majority does not address whether or how this court could affirm the trial court's order based upon the waiver arguments. In keeping with our high court's commitment to enhancing judicial economy and the sound approach adopted in *Cincinnati Life Ins. Co. v. Cates* for summary-judgment appeals, this court should hold that parallel procedures apply in the **special**-**appearance** context.

In *Cates,* the Supreme Court of Texas held that, in reviewing a summary judgment, appellate courts should consider all summary-judgment grounds on which the trial court ruled and the movant preserved error that are necessary for final disposition of the appeal. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 627 (Tex.1996). In addition, the high court held that, in the interest of judicial economy, appellate courts may consider other grounds that the movant preserved for appellate review and the trial court did not make a basis of its summary judgment. *See id.* Today, this court should implement this procedure and hold that, in reviewing a denial of a **special appearance** to determine whether the trial court erred in overruling the jurisdictional challenges, the reviewing court, in the interest of judicial economy, may consider waiver arguments that were presented to the trial court but not made a basis of the trial court's ruling on the **special appearance**. *See id.* Under this procedure, if the trial court could not exercise personal jurisdiction over the defendant under either general or specific jurisdiction, the appellate court, in the interest of justice, could consider the preserved waiver arguments, even though the trial court rejected these arguments. This would mean that even though an appellant like Horowitz is not required to attack the waiver arguments in her opening appellate brief, the reviewing court could consider the waiver grounds as a possible basis for affirming the trial court's order. *See id.* This approach would allow appellate courts the greatest opportunity to review all **special**-**appearance** grounds presented, examined, and preserved in the trial court and thereby dispose of time-sensitive **special**-**appearance** appeals in a manner that maximizes efficiency.

### The majority defines "contact with Texas" in a narrow manner that conflicts with controlling precedent.

Though this court reaches the correct result in this appeal, the majority's specific-jurisdiction analysis is flawed. In several parts of its opinion, the majority states that various actions in Israel regarding land known to be in Texas do not constitute contacts with Texas. These conclusions conflict with the broad construction that the United States Supreme Court, the Supreme Court of Texas, and this court **\*130** have given as to what a "contact with the forum state" is for purposes of a personal-jurisdiction analysis. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985) ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another state, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."); *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 337–40 (Tex.2009) (holding that a defendant's acceptance in California of an assignment of oil and gas leases was a contact with Texas for personal-jurisdiction purposes because the assignment was of real property interests located in Texas, even though the defendant never physically entered Texas); *Alenia Spazio, S.p.A. v. Reid,* 130 S.W.3d 201, 212 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (considering a wide variety of alleged connections between the defendant and Texas to be "contacts with Texas," even if these contacts did not involve conduct by the defendant in Texas). Even though the majority correctly concludes that Horowitz's contacts with Texas do not justify the exercise of specific jurisdiction in this case, the majority's characterization of the contacts is incongruent with binding precedent.

The majority concludes that none of the following constitute a contact with Texas for the purposes of a personal-jurisdiction analysis:

(1) being in the business of recruiting investors in Israel to invest in real estate in Texas,

(2) taking purposeful action with the goal of recruiting Israeli investors to purchase real property in Texas,

(3) being a principal salesperson at T–M Real Estate and Investments, Ltd. selling Texas real property to people in Israel,

(4) being instrumental in causing sale documents to be executed by people in which they purchase real property in Texas,

(5) profiting monetarily from the sale of real property located in Texas,

(6) being an instrumental "but for" cause of the people executing documents necessary to purchase real property in Texas,

(7) being the principal sales and marketing agent who got certain people to execute English language agreements under which they purchased land in Texas, and

(8) telling certain people in Israel of a visit to real property in Texas in an effort to bolster one's credibility in selling Texas real property to people in Israel.

*See ante* at pp. 125–27. Some of these purported contacts may not be supported by the evidence before the trial court, and some of these contacts may not be high-quality contacts with Texas. But that does not mean they are not contacts with Texas.

The evidence before the trial court shows that Horowitz did not have sufficient contacts with Texas to support the exercise of personal jurisdiction because Horowitz is a citizen and resident of Israel who did not purposefully avail herself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of its laws. *See Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). Nonetheless, contrary to the majority's analysis, the above-mentioned contacts are "contacts with Texas." *See Burger King Corp.,* 471 U.S. at 476, 105 S.Ct.

at 2184; *Retamco Operating, Inc.,* 278 S.W.3d at 337–40; *Alenia Spazio, S.p.A.,* 130 S.W.3d at 212.

### *131 Conclusion

Under the applicable standard of review, because the evidence before the trial court negated both specific and general jurisdiction, the trial court erred in finding that it could exercise personal jurisdiction over Horowitz.[1] Though the trial court rejected appellees' waiver arguments, this court nevertheless would have good reason to address these arguments if this court were to adopt procedures akin to those announced by the Supreme Court of Texas in *Cates.*[2] This approach not only would bring meaning and purpose to today's waiver analysis but also would advance important principles of judicial economy and lay the groundwork for application of the *Cates* rule in future **special**-**appearance** cases.

### All Citations

377 S.W.3d 115

Footnotes

1    Other plaintiffs have no connection with Horowitz.

2    *See Parker v. Robert Ryan Realtors, Inc.,* No. 14–10–00325–CV, 2010 WL 4226550, at *3 (Tex.App.-Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem. op.) ("[B]oth parties can present evidence either proving or disproving the allegations.") (citing *Kelly,* 301 S.W.3d at 659).

3    *Kelly,* 301 S.W.3d at 659.

4    *Id.*

5    *Id.*

6    *Cf. Dawson–Austin,* 968 S.W.2d at 323. In that case, the court held that the defendant who filed a **special appearance** and a motion to quash and sought a continuance of the hearings on both matters did not waive her jurisdictional challenge. *Id.* at 323–24. The court explained that because the defendant requested a continuance of the hearing on the **special appearance**, she also had to request a continuance of the hearings on non-jurisdictional matters in order to stay within the requirement of Rule 120a(2) that jurisdictional challenges "shall be heard and determined before ... any other plea or pleading may be heard." *Id.* at 323. The court distinguished the case that would have been presented if the defendant had sought and obtained a continuance of the **special**-**appearance** hearing in order to conduct non-jurisdictional discovery before the **special appearance** was decided. *Id.* The court noted that in such circumstances, it would be important that the defendant delayed conducting non-jurisdictional discovery until after the **special appearance** was decided. *Id.* Here, however, Horowitz did not require the court's intervention in order to take nonjurisdictional discovery. When she found the plaintiffs' answers to the discovery unsatisfactory, she filed a motion to compel, but the record does not show that she set the motion for hearing or submission or that the court ruled on it.

7    These are findings (d)-(*o*), (q)-(s), (u), and (bb).

8    Finding (w).

9    Finding (x).

10    There is no evidence, however, that Horowitz was "a principal salesperson."

11    *See* TEX. BUS. & COM.CODE ANN. § 27.01 (West 2009).

12    *See* TEX. CIV. PRAC. & REM.CODE ANN. § 134.003(a) (West 2011).

13    TEX.REV.CIV. STAT. ANN.. art. 581–1, *et seq.* (West 2010).

14    Specifically, 15 U.S.C.A. § 78j(b) and 17 C.F.R. § 240.10b–5.

1     Nonetheless, in reaching this conclusion, the majority erroneously concludes that various alleged connections between Horowitz and Texas are not "contacts with Texas." *See ante* at pp. 125–27.

2     The Supreme Court of Texas has not yet addressed whether engaging in discovery regarding the merits of a plaintiff's claims constitutes a waiver of a defendant's **special appearance** and today's opinion appears to be the first time that the Fourteenth Court of Appeals has addressed this issue. Though the majority correctly concludes that this conduct does not waive a **special appearance**, the majority fails to cite language from Rule 120a and cases from sister courts that support this conclusion. *See, e.g.,* Tex.R. Civ. P. 120a (stating that "the issuance of process for witnesses, the taking of depositions, the serving of requests for admissions, and the use of discovery processes, shall not constitute a waiver of such **special appearance**" and containing no limitation of this language to jurisdictional issues); *Silbaugh v. Ramirez,* 126 S.W.3d 88, 93 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (holding that defendant does not waive **special appearance** by engaging in discovery regarding merits of plaintiff's claims); *Minucci v. Sogevalor, S.A.,* 14 S.W.3d 790, 799–801 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (same as *Silbaugh* ).

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

862 S.W.2d 752
Court of Appeals of Texas,
El Paso.

Robert K. HUTCHINGS, et al., Appellants,

v.

CHEVRON U.S.A., INC., Appellee.

No. 08–91–00404–CV. | Sept. 8,
1993. | Rehearing Denied Oct. 6, 1993.

Lessee sought declaratory judgment defining its royalty obligations under long-term oil and gas lease. Royalty owners counterclaimed for underpaid royalties. The 143rd District Court, Ward County, Bob Parks, J., by partial summary judgment, interpreted casinghead gas royalty clause of lease to provide for a one eighth of four cents per 1,000 cubic feet (mcf) royalty on casinghead gas sold by lessee, and subsequently entered judgment on jury verdict that lessee had not underpaid royalties. Royalty owners appealed. The Court of Appeals, Koehler, J., held that: (1) sale of casinghead gas was governed by lease provision related to saving and utilization of casinghead gas; (2) royalty owners did not prove as matter of law or by great weight and preponderance of evidence that lessee underpaid royalties; and (3) trial court properly declined to order accounting.

Affirmed.

West Headnotes (32)

**[1]** **Appeal and Error**
  ⚷ Extent of Review Dependent on Nature of Decision Appealed from

In summary judgment appeal, Court of Appeals must determine whether successful movant in trial court carried its burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as matter of law.

Cases that cite this headnote

**[2]** **Judgment**
  ⚷ Presumptions and burden of proof

In deciding whether there is disputed fact issue precluding summary judgment, evidence favorable to nonmovant is to be taken as true, and in that connection, every reasonable inference must be indulged in favor of nonmovant and any doubts resolved in his favor.

Cases that cite this headnote

**[3]** **Contracts**
  ⚷ Intention of Parties

When parties disagree over meaning of unambiguous contract, court must determine intent of parties.

1 Cases that cite this headnote

**[4]** **Contracts**
  ⚷ Intention of Parties

Determination as to intent of parties to unambiguous contract must be based upon objective intent of parties as expressed in agreement, and not their present interpretation.

2 Cases that cite this headnote

**[5]** **Contracts**
  ⚷ Questions for Jury

Construction of unambiguous contract is question of law for court.

Cases that cite this headnote

**[6]** **Contracts**
  ⚷ Construing whole contract together

To determine objective intent of parties to contract, court should examine entire instrument in effort to harmonize and give effect to all provisions of contract so that none will be rendered meaningless.

3 Cases that cite this headnote

**[7]** **Mines and Minerals**
  ⚷ Amount and time of payment

Under oil and gas lease, sale of casinghead gas was governed by lease provision relating to saving and utilization of casinghead gas, rather than natural gas royalty provision, and,

therefore, lessee was required to pay royalties on casinghead gas that it sold at rate of one eighth of four cents per 1,000 cubic feet (mcf), rather than at rate of one eighth of net proceeds from sale.

Cases that cite this headnote

**[8]    Mines and Minerals**
   👉 Rights and liabilities

Fact that casinghead gas is form of natural gas was not dispositive of whether parties, upon entering into oil and gas lease in 1925, intended and desired that sales of casinghead gas be governed by lease's natural gas royalty provision, rather than provision relating to saving and utilization of casinghead gas, where authorities indicated that, in 1925, casinghead gas was considered part of oil.

Cases that cite this headnote

**[9]    Appeal and Error**
   👉 Interrogatories and special verdicts

In considering legal insufficiency or "proved as a matter of law" point, appellate court considers only evidence which tends to support jury's findings and disregards all evidence and inferences to the contrary.

Cases that cite this headnote

**[10]    Appeal and Error**
   👉 Extent of Review

**Appeal and Error**
   👉 Manifest weight of evidence

Factual insufficiency point requires examination of all evidence in determining whether finding in question is so against great weight and preponderance of evidence as to be manifestly unjust.

Cases that cite this headnote

**[11]    Appeal and Error**
   👉 Conclusiveness in General

**Appeal and Error**
   👉 Sufficiency of Evidence in Support

Reviewing court cannot substitute its conclusions for those of jury; rather, if there is sufficient competent evidence of probative force to support jury's finding, it must be sustained.

Cases that cite this headnote

**[12]    Appeal and Error**
   👉 Province of jury

**Appeal and Error**
   👉 On conflicting evidence

**Appeal and Error**
   👉 Province of jury or trial court

It is not within province of Court of Appeals to interfere with jury's resolution of conflicts in evidence or to pass on weight or credibility of witness' testimony.

Cases that cite this headnote

**[13]    Appeal and Error**
   👉 On conflicting evidence

When there is conflicting evidence, jury's verdict on such matters is generally regarded as conclusive.

Cases that cite this headnote

**[14]    Mines and Minerals**
   👉 Rights and liabilities

Natural gas produced from oil well through perforations in well casing at level of gas reservoir, or "gas cap," when "gas cap" exists at horizon above oil reservoir, will not be "casinghead gas"; only gas produced from oil stratum is "casinghead gas."

Cases that cite this headnote

**[15]    Mines and Minerals**
   👉 Actions

In action to recover allegedly underpaid royalties under oil and gas lease, evidence was sufficient to support jury's implied finding that all gas drawn from lessee's oil wells was casinghead gas, rather than natural gas produced from gas stratum, and that there was no commingling

of casinghead gas with natural gas produced through oil wells.

Cases that cite this headnote

**[16]    Mines and Minerals**

 Rights and liabilities

Reservoir is considered "oil stratum," and gas produced therefrom is "casinghead gas," if well produces 100,000 cubic feet of gas or less per barrel of oil.

1 Cases that cite this headnote

**[17]    Mines and Minerals**

 Implied obligation

Oil and gas lease includes lessee's implied duty to manage and administer lease.

Cases that cite this headnote

**[18]    Mines and Minerals**

 Extent of production, paying quantities, and marketing

Lessee's implied duty under oil and gas lease to manage and administer lease includes duty to obtain best price reasonably possible for marketed production.

1 Cases that cite this headnote

**[19]    Mines and Minerals**

 Extent of production, paying quantities, and marketing

**Mines and Minerals**

 Amount and time of payment

Lessee's implied duty under oil and gas lease to obtain best price reasonably possible for marketed production did not apply to sale of casinghead gas, where lease provided for set royalty amount on that gas, and royalty was not dependent upon proceeds from sale of gas.

1 Cases that cite this headnote

**[20]    Mines and Minerals**

 Construction, Breach, and Penalties

Under oil and gas lease, lessee is held to standard of care of reasonably prudent operator under same or similar circumstances.

Cases that cite this headnote

**[21]    Mines and Minerals**

 Actions

On claim by royalty owners for underpaid royalties under oil and gas lease, jury could reasonably have found that lessee did not breach its implied duty to market gas, but acted as reasonably prudent operator under circumstances, where royalty owners were paid at rate equal to or greater than market rate.

Cases that cite this headnote

**[22]    Evidence**

 Testimony of Experts

Expert opinion testimony does not establish any material fact as matter of law.

Cases that cite this headnote

**[23]    Evidence**

 Testimony of Experts

When circumstances tend to discredit or impeach expert testimony, that testimony does no more than raise fact issue.

Cases that cite this headnote

**[24]    Mines and Minerals**

 Actions

Royalty owners, who claimed that royalties were underpaid by oil and gas lessee, bore burden of proving by preponderance of evidence that lessee failed to make proper royalty payments based on volume.

Cases that cite this headnote

**[25]    Mines and Minerals**

 Actions

Royalty owners did not prove as matter of law or by great weight and preponderance

of evidence that oil and gas lessee underpaid royalties, even though owners' expert accounting witness found discrepancies between production volumes reported to Railroad Commission and volumes used to calculate royalties, where owners' expert's own testimony regarding his use of computational shortcut and his errors in calculation discredited his testimony to some degree.

Cases that cite this headnote

**[26]  Trial**
 Admission of evidence in general

Admission or exclusion of evidence is matter within trial court's discretion.

Cases that cite this headnote

**[27]  Appeal and Error**
 Rulings on admissibility of evidence in general

To obtain reversal of judgment based upon trial court's decision to admit or exclude evidence, appellant must show that trial court abused its discretion in making decision, and that error was reasonably calculated to cause and probably did cause rendition of improper judgment. Rules App.Proc., Rule 81(b)(1).

2 Cases that cite this headnote

**[28]  Evidence**
 Determination of question of competency

Wide discretion is afforded to trial court in determining whether to admit or exclude expert testimony regarding ultimate fact issues in case.

2 Cases that cite this headnote

**[29]  Mines and Minerals**
 Actions

Oil and gas lessee's expert's testimony comparing prices on which royalties were paid with spot market prices was relevant to best price reasonably obtainable by reasonably prudent gas seller, and was highly relevant to whether lessee acted as reasonably prudent lessee or breached

its implied duty to prudently market gas, and, therefore, testimony was admissible with respect to royalty owners' claims that lessee underpaid royalties.

Cases that cite this headnote

**[30]  Account**
 Complicated transactions or circumstances

Equitable accounting is proper when facts and accounts presented are so complex that adequate relief may not be obtained at law.

17 Cases that cite this headnote

**[31]  Mines and Minerals**
 Actions

Trial court properly declined to order oil and gas lessee to render accounting of royalty payments made and that should have been made on gas produced from lease, where royalty owner did not explain why standard discovery procedures, such as requests for production, interrogatories, and subpoena duces tecum, were inadequate to provide it with information sought regarding payment of royalties.

4 Cases that cite this headnote

**[32]  Mines and Minerals**
 Actions

Royalty owner's request for accounting from oil and gas lessee was moot, since jury's finding that lessee had not underpaid royalties was binding on owner, and, thus, foreclosed any possibility that owner was entitled to recover such damages.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*755**  Andrew M. Taylor, Bracewell & Patterson, Austin, William Key Wilde, Bracewell & Patterson, Van E. McFarland, Van McFarland & Associates, Houston, William B. Browder, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Midland, for appellants.

Hal Upchurch, Monahans, J. Knox Moore, Brady, Wm. Randall Lundy, Jr., Texaco Inc., Denver, CO, C.B. McDaniel, Hondo Oil & Gas Co., Roswell, NM, Charles Tighe, Julia E. Vaughan, Cotton, Bledsoe, Tighe & Dawson, Midland, Richard Henderson, Victoria, for appellee.

Before KOEHLER, BARAJAS and LARSEN, JJ.

### OPINION

KOEHLER, Justice.

This is an oil and gas case in which Chevron U.S.A. sought a declaratory judgment defining its royalty obligations under a long term lease. The royalty owners, represented here by two groups (the Abel Appellants and Mobil–OXY), counterclaimed for underpaid royalties. By partial summary judgment, the trial court interpreted the casinghead gas royalty clause of the lease to provide for a # of four cents per mcf royalty on casinghead gas Chevron sold. At trial, the jury found that Chevron had not underpaid royalties. From a judgment on the verdict and the summary judgment, the two groups of Appellants bring this appeal. We affirm.

### RELEVANT FACTS

On August 4, 1925, the Hutchings Joint Stock Association executed an oil and gas lease with Gulf Production Co. ("HSA Lease"). The HSA Lease covers 30,450 acres of land in Ward County, Texas, south of Monahans. Chevron U.S.A., Inc. ("Chevron") is Gulf's successor in interest. The Appellants (the "Abel Appellants" and Mobil–OXY or "Mobil") are some of the present royalty owners under the HSA Lease.

The lease contains different royalty provisions relating to oil, natural gas, and casinghead gas. Chevron filed this suit for a declaratory judgment interpreting the royalty provisions. Chevron claims that the casinghead gas sold by it is and should be controlled by the royalty provision relating to casinghead gas. The royalty owners counterclaimed for underpaid royalties. They contend that casinghead gas sold by Chevron is governed by the royalty clause for natural gas "used off the premises or marketed," which requires the royalty payment to be based on net proceeds. The trial judge granted partial summary judgment declaring that the lease required royalties on casinghead gas sold by Chevron to be paid only in accordance with the casinghead gas "save[d] and

utilize[d]" royalty provision, which provides a royalty of # of four cents per mcf. The suit then went to trial, the jury finding that Chevron had not underpaid royalties. The court rendered a take-nothing judgment against the royalty owners, and they appeal.

### ISSUES PRESENTED

The royalty owners argue [1] that the trial court erred both in granting Chevron's motion, and in denying their motion, for partial summary judgment and in rendering judgment for Chevron based on the jury's answer to Question No. 1. They assert that, as a matter of law under terms of the lease, they were entitled to # of Chevron's net proceeds from the sale of the casinghead gas, not just # of four cents per mcf. The royalty owners also contend that they proved as a matter of law or by the great weight and preponderance of the evidence that Chevron had underpaid royalties, contrary to the jury's finding. The Abel Appellants further contest the admission of one expert witness's testimony. Appellant Mobil also appeals from the trial court's refusal to order an accounting of royalties due and paid. By a conditional cross-point, Chevron argues that the trial court should have ruled that limitations barred any claims for royalties underpaid more than four years before the royalty owners filed their claims.

### *756 SUMMARY JUDGMENT

[1] [2] In a summary judgment appeal, we must determine whether the successful movant in the trial court carried its burden of showing that there is no genuine issue of a material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548 (Tex.1985). In deciding whether or not there is a disputed fact issue precluding summary judgment, evidence favorable to the non-movant is to be taken as true, and in that connection, every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in his favor. *Nixon,* 690 S.W.2d at 548–49.

### LEASE CONSTRUCTION

[3] [4] [5] [6] Because the partial summary judgment was based on a question of law, the first issue is whether the court correctly determined the construction of the royalty

provisions of the HSA Lease. The parties agree that the lease was unambiguous. When parties disagree over the meaning of an unambiguous contract, the court must determine the intent of the parties. This determination must be based upon the objective intent of the parties as expressed in the agreement, and not their present interpretation. The construction of an unambiguous contract is a question of law for the court. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *First City Nat'l Bank of Midland v. Concord Oil Co.,* 808 S.W.2d 133, 137 (Tex.App.—El Paso 1991, no writ). To determine the objective intent of the parties, a court should examine the entire instrument in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *Coker,* 650 S.W.2d at 393.

**[7]**  The royalty provisions of the lease provided as follows:

> [1] If oil shall be found on said premises, Lessee shall deliver as royalty to Lessor, free of expense, an [sic] one eighth (#) part of the oil saved from that produced after deducting such part as maybe used for drilling and operating on the landand [sic] treating the oil or gas as to make it merchantable; .... [2] *If Lessee shall operate so as to save and utilize casing head gas* from said premises, then Lessee shall pay as royalty to Lessor, one eighth (#) part of the value of such gas, calculated at the rate of four cents (4) per one thousand (1000) cubic feet of the casing head gas, .... [3] *If any well on said premises shall produce natural gas in paying quantities, andssuch [sic] natural gas is used off the premises or marketed by Lessee,* then Lessor shall bepaid [sic] at the rate of one-eighth (#) of the net proceeds of the sale of such gas at the mouth of the well. [Emphasis added].

The lease was signed on August 4, 1925. We are faced with the question of whether the lease required Chevron to pay royalties on casinghead gas it sold in accordance with the second or the third provision.

Casinghead gas is "[g]as produced with oil in oil wells, the gas being taken from the well through the casinghead at the top of the well, as distinguished from gas produced from a gas well." Williams and Meyers, MANUAL OF OIL AND GAS TERMS, (8th ed. 1991). It has been judicially noticed that until about 1918, casinghead gas was a by-product of oil production that was "more often than not permitted to go to waste." *Gulf Prod. Co. v. Taylor,* 28 S.W.2d 914, 917 (Tex.Civ.App.—Eastland 1930, writ dism'd). Chevron has sold casinghead gas drawn from its oil wells on this tract since 1937. As previously noted, Chevron maintains that the second royalty term of the lease applies, requiring it to pay royalties on the casinghead gas it sold at the rate of # of four cents per mcf. Appellants argue that casinghead gas sold by Chevron was governed by the third royalty clause, and Chevron should have paid royalties at the rate of # of the net proceeds from the sale of the gas. The trial court agreed with Chevron and granted partial summary judgment interpreting the contract to require Chevron to pay only # of 4 cents per mcf as royalty on the casinghead gas it sold. The parties proceeded to trial under this interpretation of the lease.

In their challenge of the trial court's holding, the royalty owners rely primarily upon *Southland Royalty Co. v. Pan Am. Petroleum* **\*757** *Corp.,* 378 S.W.2d 50 (Tex.1964). The lease in *Southland* contained three royalty provisions: the first provided for a royalty of # of the oil produced and saved and # of the proceeds from potash and other minerals; the second paragraph provided for a flat-rate royalty on gas-well gas used off the premises; and the third provided for a flat royalty on gas produced from oil wells and used off the premises. *Southland Royalty Co.,* 378 S.W.2d at 52. The Supreme Court determined that gas was included within "other minerals" on which a # of proceeds royalty was due, and that gas "used off the premises" did not include gas sold for use off the premises. *Id.* at 54, 57. The royalty owners analogize *Southland* to the case at bar, arguing that if Chevron markets casinghead gas, it is governed by the royalty provision for natural gas "used off the premises or marketed" rather than the flat-rate royalty on casinghead gas "save[d] and utilize[d]." Unlike the case at bar, the Supreme Court held that the clause "used off the premises" in the *Southland* lease was ambiguous. *Southland,* 378 S.W.2d at 56. The *Southland* ruling was based upon a perceived conflict between the # of net proceeds royalty for "other minerals," including gas, and the flat-rate royalties on gas "used off the premises." *Southland,* 378 S.W.2d at 57. Because it held that gas was included within "other minerals," the Supreme Court was forced to reconcile that royalty provision with the ones governing gas used off the premises. The Court did so by deciding that gas sold by the lessee was not included within gas "used off the premises." The Court wrote that the expression "used off the premises"

did not necessarily exclude gas sold by the lessee, but that in the *Southland* lease, it was the only way to reconcile the various royalty provisions. [2] *Southland,* 378 S.W.2d at 56–57.

 **[8]** Although casinghead gas is a form of natural gas, a fact admitted by Chevron, that fact is not dispositive of whether the parties in 1925 intended and desired sales of casinghead gas to be governed by the natural gas royalty provision, rather than the one relating to casinghead gas royalties. Significantly, a 1925 hornbook on oil and gas law defines casinghead gas as a component part of oil. Thornton, THE LAW RELATING TO OIL AND GAS, at 391 (4th ed. 1925). [3] The case of *Livingston Oil Corp. v. Waggoner,* 273 S.W. 903 (Tex.Civ.App.—Amarillo 1925, writ ref'd) is also probative. The lease in that case provided for a # royalty on oil produced, and a flat royalty on gas from each well where gas only was found. The Amarillo Court of Civil Appeals determined that casinghead gas was a constituent element of oil, and that the lessee was required to pay a # royalty on production of casinghead gas under the oil royalty provision. *Livingston Oil Corp.,* 273 S.W. at 906. *See also Poe v. Humble Oil & Refining Co.,* 288 S.W. 264, 266 (Tex.Civ.App.—Eastland 1926) ("The courts will take judicial knowledge that casing-head gas or gasoline is oil."), *rev'd on other grounds,* 29 S.W.2d 1019, 1020 (Tex.Comm'n App.1930, judgm't adopted) ("There is a well-defined distinction in law between gas produced from a gas well and casing-head gas."). These authorities indicate that in 1925, casinghead gas was considered a part of oil. The net result of these cases is that in 1925, the "natural gas" royalty provision of the HSA Lease did not necessarily include casinghead gas which was considered a constituent of oil at the time.

More persuasive than *Southland* is the case of *Gulf Prod. Co. v. Taylor,* cited above, in which the Court was confronted by a 1918 oil and gas lease with royalty provisions nearly identical to those in the case *sub judice.* The *Taylor* lease read:

> If oil shall be found in paying quantities on said premises, the Company shall deliver as royalty to said lessor, free of expense, one-eighth (#) part of the oil saved from that produced ... *if said Company shall operate so as to save and utilize casinghead gas from said premises,* (as it may do if it wishes) then it

shall pay as **\*758** royalty to lessor one-eighth (#) of the value calculated at the rate of four (4) cents per thousand (1000) cubic feet, of the casinghead gas so saved, in addition to the royalty to which lessor may be entitled on the oil produced from such oil well ... and *if any well on said premises shall produce natural gas in paying quantities, and such natural gas be used off the premises or marketed* by said Company, then lessor shall be paid one-eighth of the net proceeds received from the sale of gas at the mouth of the well.... [Emphasis added].

*Taylor,* 28 S.W.2d at 915. The royalty owner was paid # of four cents per mcf for casinghead gas produced on the lease which was processed into gasoline and sold by the lessee. The lessor sought additional royalties in the amount of # of the value of the gasoline, under the oil royalty provision of the lease. *Taylor,* 28 S.W.2d at 915. The Eastland Court of Civil Appeals rejected his argument, writing that the parties had clearly intended to distinguish oil, gas, and casinghead gas as different substances on which different royalties would be due. *Id.* at 916–17. The Court rejected a limitation on the casinghead gas royalty provision based upon the use made of the casinghead gas. *Id.* at 917. The Court wrote that it was not limited to a particular utilization of the casinghead gas, and that the sale of the gas to third parties was a means of "utiliz[ing]" it within the meaning of the royalty provision for casinghead gas "save[d] and utilize[d]." *Id.* The only royalty due on the casinghead gas was the specified # of four cents per mcf. *Id.*

Additionally, the *Taylor* Court wrote that as a matter of common knowledge at the time the lease was executed, "casinghead gas, or the gas produced from oil wells, was relatively less important than natural gas or gas from a well producing gas only." *Id.* at 916. This indicates a distinction made at the time between casinghead gas and natural gas, bolstering Chevron's argument that the "natural gas" royalty provision of the HSA Lease was not intended to include casinghead gas.

*Taylor* provides a nearly contemporaneous interpretation of royalty terms almost identical to those of the case at bar. The *Taylor* Court noted a distinction between casinghead gas and natural gas, found that the parties had recognized

that distinction in drafting the royalty provisions, stated that "utiliz[ing]" casinghead gas includes the sale of that gas, and held that the only royalty due on casinghead gas sold by the lessee was # of four cents per mcf. This 1930 case provides highly persuasive authority for interpreting the 1925 HSA Lease to allow a royalty of only # of four cents per mcf on casinghead gas sold by Chevron. We conclude, based in part on the similarities of *Taylor* and the distinctions of *Southland* that the trial court's interpretation of the lease was correct. We therefore hold that the sale of casinghead gas is governed by the second lease provision relating to the saving and utilization of casinghead gas. Abel Point of Error No. One and Mobil Points of Error Nos. One through Eight are overruled.

### *SUFFICIENCY OF THE EVIDENCE*

 **[9]**    **[10]**    **[11]**    **[12]**    **[13]**    The royalty owners also challenge the legal and factual sufficiency of the evidence to support the jury's finding that Chevron had not failed to pay royalties due them. They contend that they proved underpayment of royalties as a matter of law or by the great weight and preponderance of the evidence. In considering a legal insufficiency or "proved as a matter of law" point, the appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *Worsham Steel Co.,* 831 S.W.2d 81. A factual insufficiency point requires examination of all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (Tex.1951); *Worsham Steel Co. v. Arias,* 831 S.W.2d 81 (Tex.App.—El Paso 1992, no writ). The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Carrasco v. Goatcher,* 623 S.W.2d 769 (Tex.App.—El Paso 1981, no writ). It is not within the **\*759** province of the Court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness's testimony. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951); *Reynolds v. Kessler,* 669 S.W.2d 801, 807 (Tex.App. —El Paso 1984, no writ). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck,* 204 S.W.2d 508 (Tex.1947); *Clark v. National Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820 (1947); *Oechsner v.*

*Ameritrust Texas, N.A.,* 840 S.W.2d 131, 136 (Tex.App.—El Paso 1992, writ denied).

Because the royalty owners presented several theories in support of their claim that Chevron had failed to pay the royalties properly, the jury's "No" answer to Question No. 1 of the charge required the jury to make the following implied findings, based on the instructions in the charge: (1) All gas drawn from Chevron's oil wells was "casinghead gas," rather than natural gas produced from a gas stratum, and there was no commingling of casinghead gas with natural gas produced through oil wells; (2) Chevron prudently marketed the gas produced from the lease; and (3) Chevron did not make accounting errors based upon volume discrepancies resulting in improper royalty payments. Because the royalty owners challenge the factual and legal sufficiency of the evidence to support each of these findings, they will be addressed separately.

### *ALL GAS WAS CASINGHEAD GAS*

 **[14]**    **[15]**    The royalty owners theorize that Chevron illegally produced natural gas from its oil wells and wrongfully characterized that gas as casinghead gas in order to pay a smaller royalty on the gas. As explained by the Texas Supreme Court in *Amarillo Oil Co. v. Energy–Agri Products, Inc.,* 794 S.W.2d 20, 25 (Tex.1990), separate reservoirs of oil and natural gas may exist at different subsurface planes under the same well. If a gas reservoir, or "gas cap," exists at a horizon above an oil reservoir, then natural gas may be produced from an oil well through perforations in the well casing at the level of the gas cap. This gas will not be casinghead gas; only gas produced from the oil stratum is casinghead gas. *See generally Amarillo Oil Co.,* 794 S.W.2d at 20–25. Texas Railroad Commission Rule 13(b)(4)(B) requires oil well casings to be perforated in the oil-saturated portion of a reservoir below the gas-oil contact, defined as the line between the oil zone and the gas zone of a reservoir. 16 TEX.ADMIN.CODE § 3.13(b)(4)(B) (West 1993); Williams and Meyers, MANUAL OF OIL AND GAS TERMS, (8th ed. 1991). Perforations in the gas cap are referred to as "high perfs." The royalty owners argue that illegal "high perfs" caused the production of natural gas from gas caps through oil wells, on which Chevron underpaid royalty by mischaracterizing the gas as casinghead gas.

The evidence on this issue was conflicting. The royalty owners' expert concluded that Chevron had produced natural

gas from high perfs. However, Chevron presented evidence that any gas cap which may have once existed in the field had been dissipated by the late 1950's. Other Chevron witnesses testified that there was no gas/oil contact in the field after a waterflood [4] in the 1950's.

 [16]    The royalty owners rely heavily upon a statement by Kevin Sullivan, Chevron's petroleum engineer, that two wells were perforated in gas pockets. Sullivan went on to explain that one well was cement-squeezed to eliminate gas production from that well. A "cement squeeze" is defined as "[a] method whereby perforations and fissures in well walls may be sealed off." Williams and Meyers, MANUAL OF OIL AND GAS TERMS, (8th ed. 1991). The other well was actually drilled to supply gas for an injection project on the leasehold. In 1963, that well was cement-squeezed and deepened to produce from an oil strata. Sullivan's testimony does not demonstrate that Chevron produced and sold natural gas from oil wells or commingled natural gas with casinghead **\*760**  gas. [5]

Because the evidence on this matter was conflicting, the jury's verdict may not be overturned; the jury could reasonably have determined that the royalty owners failed to prove that Chevron produced natural gas from its oil wells. Since the jury was justified in making this determination, it could also have found that there was no commingling of casinghead gas with natural gas produced from oil wells. This argument provides no basis for reversal.

### *CHEVRON PRUDENTLY MARKETED*

 [17]    [18]    [19]    [20]    [21]    The royalty owners argue that Chevron underpaid royalties by failing to obtain the best possible price for the gas it produced, breaching its duty to market the gas prudently. An oil and gas lease includes an implied duty to manage and administer the lease. *Cabot Corp. v. Brown,* 754 S.W.2d 104, 106 (Tex.1987). This duty includes a duty to obtain the best price reasonably possible for the marketed production. [6] *Id.* "Under a gas royalty clause providing for royalties based on market value, the lessee has an obligation to obtain the best current price reasonably available." *Cabot Corp.,* 754 S.W.2d at 106. The lessee is held to the standard of care of a reasonably prudent operator under the same or similar circumstances. *Id.* The jury was instructed on this standard.

The trial court further instructed the jury that with respect to certain royalty owners who had settled a prior lawsuit, Chevron's duty to market production was embodied in a letter from Morgan Copeland, Chevron's former general counsel and negotiator of the settlement, to Preston Shirley (known as the "Copeland Letter"). Chevron objected to this instruction. The royalty owners argue that there is no reason to distinguish the settling royalty owners from them, and therefore the Copeland Letter also reflects Chevron's duty to prudently market with respect to them.

The Copeland Letter, dated January 16, 1980, provided that Chevron would calculate the net proceeds from the sale of gas on the basis of the "prevailing price" for the gas, as agreed upon by Chevron and Valero Industrial Gas Company ("Valero"), which was not to exceed the maximum lawful price under the Natural Gas Policy Act of 1978 (NGPA). The royalty owners contend that the prevailing price was the price established by NGPA section 102, and royalties should have been based on that price. However, Thomas Liles, Chevron's gas marketing expert, testified that the NGPA section 102 price was not the "prevailing price" under the contract until 1985, when a price established in 1980 for 1985 sales exceeded the NGPA price. Valero never paid that price because by a December 27, 1984 letter, Valero and Chevron agreed to a lower price pursuant to a portion of the contract permitting renegotiation in case of economic hardship to either party. [7] Liles testified that the agreed-upon price was a reasonable market price for the gas. The royalty owners contend that this agreement did not affect Chevron's duty to pay royalties based upon the maximum lawful price under the NGPA, because the contract price was modified under the economic hardship provision, rather than the "prevailing price" section.

Liles opined that Chevron marketed the gas prudently. He stated that from March 1985 to September 1986, royalty was paid at **\*761**  a rate in excess of the market price. For some time prior thereto, the royalty was based upon the NGPA section 102 price, or the maximum lawful price for gas. The royalty owners brought forth no evidence demonstrating that Chevron could have obtained a higher price for gas than it actually received. The jury could reasonably have found that Chevron did not breach its implied duty to market the gas, but acted as a reasonably prudent operator under the circumstances because the royalty owners were paid at a rate equal to or greater than the market rate. This argument affords no ground for reversal.

### *VOLUME DISCREPANCIES*

The royalty owners' expert accounting witness, Mark Layton, reviewed Chevron's royalty calculation worksheet volumes and compared those volumes to the production volumes reported to the Railroad Commission. The royalty owners contend that discrepancies between the production volumes reported to the Railroad Commission and the volumes used to calculate royalties demonstrate that Chevron underpaid royalties. The discrepancy amounted to about 8,500 mcf, the royalty on which Layton valued at $35,000.

Layton admitted to taking a "shortcut" in his calculations, because "it would cost more to make this calculation than the affect on our calculation." Layton also admitted error in failing to deduct certain expenses in his calculations. No other evidence was presented on the volume discrepancies identified by Layton. The issue for this Court is whether the jury was required to accept Layton's conclusions.

**[22]** **[23]** **[24]** **[25]** Expert opinion testimony does not establish any material fact as a matter of law. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). When circumstances tend to discredit or impeach expert testimony, that testimony does no more than raise a fact issue. *Id.* Layton's own testimony regarding his use of a computational shortcut and his errors in calculation discredited his testimony to some degree. The royalty owners bore the burden of proving by a preponderance of the evidence that Chevron had failed to make proper royalty payments based on volume. The jury was free to find that Layton's testimony alone did not satisfy this burden of proof. There is no basis here for a reversal.

In sum, the royalty owners did not prove as a matter of law or by the great weight and preponderance of the evidence that Chevron underpaid royalties. The Abel Appellants' second and third points of error and Mobil Points of Error Nos. Nine and Ten are overruled.

### *ADMISSION OF EVIDENCE*

**[26]** **[27]** **[28]** The royalty owners complain that the trial court erred in admitting into evidence the testimony of Chevron expert Thomas Liles, comparing the prices on which royalties were paid with spot market prices. Admission or exclusion of evidence is a matter within the trial court's discretion. *Syndex Corp. v. Dean,* 820 S.W.2d 869, 873 (Tex.App.—Austin 1991, writ denied); *Dudley v. Humana Hosp. Corp.,* 817 S.W.2d 124, 126 (Tex.App.—Houston [14th Dist.] 1991, no writ). To obtain a reversal of a judgment based upon a trial court's decision to admit or exclude evidence, the Appellant must show: (1) that the trial court abused its discretion in making the decision; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394 (Tex.1989); TEX.R.APP.P. 81(b)(1). Wide discretion is afforded to the trial court in determining whether to admit or exclude expert testimony regarding ultimate fact issues in a case. *Herrera v. FMC Corp.,* 672 S.W.2d 5, 7 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Dillard v. Broyles,* 633 S.W.2d 636, 643–44 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983).

**[29]** The royalty owners contend that Liles' testimony was irrelevant because his testimony comparing spot market prices with prices obtained by Chevron for the gas was not probative of the best price obtainable for the gas, i.e., the price under the long-term contract with Valero. However, Liles' testimony was relevant to the best price reasonably **\*762** obtainable by a reasonably prudent gas seller. The testimony was highly relevant to whether Chevron acted as a reasonably prudent lessee, or breached its implied duty to prudently market the gas. Therefore, the trial court did not abuse his discretion in admitting the evidence. The Abel Appellants' Point of Error No. Four is overruled.

### *ACCOUNTING*

In addition, Appellant Mobil contends that the trial court erred in refusing to order Chevron to render an accounting of royalty payments made and which should have been made on the gas produced from the lease. Mobil argues that it was impossible or impracticable for them to ascertain the amount of royalties paid and the amount legally due and payable, and therefore the trial judge should have ordered Chevron to render an accounting of royalties paid. In response, Chevron contends that an equitable accounting need not be ordered when the party seeking an accounting has an adequate alternative remedy, and Mobil has failed to explain the inadequacy of standard discovery procedures to obtain the information it desired.

**[30]** **[31]** An equitable accounting is proper when the facts and accounts presented are so complex that adequate relief may not be obtained at law. *Richardson v. First National Life Ins. Co.,* 419 S.W.2d 836, 838 (Tex.1967). Mobil has not explained why the standard discovery procedures, such as requests for production, interrogatories, and *subpoena duces tecum,* were inadequate to provide it with the information sought regarding the payment of royalties. Mobil could have obtained adequate relief at law by the use of those legal procedures. The trial court did not err by failing to order an accounting.

**[32]** Furthermore, Mobil did not object to the submission of Question No. 1 to the jury, asking whether Chevron had underpaid royalties. The jury's determination that Chevron had not underpaid royalties, supported by sufficient evidence, is binding on Mobil. Therefore, Mobil's request for an accounting is moot; the jury's finding that Chevron had not underpaid royalties forecloses any possibility that Mobil was entitled to recover such damages. *Compare Advertising and Policy Comm. of the Avis Rent A Car Sys. v. Avis Rent A Car Sys.,* 780 S.W.2d 391 (Tex.App.—Houston [14th Dist.] 1989), *vacated as settled,* 796 S.W.2d 707 (Tex.1990) (request for an accounting abandoned when the party seeking it sought to prove damages at trial and asked the jury to determine damages). Mobil's Points of Error Nos. Eleven and Twelve are overruled.

### *LIMITATIONS*

By a conditional cross-point, Chevron contends that if the suit is reversed, the Court should rule that limitations bars the royalty owners' claims for royalties underpaid more than four years before the filing of their counterclaim. In view of our resolutions of the Appellants' points of error, it is unnecessary for us to consider this cross-point.

Judgment of the trial court is affirmed.

**All Citations**

862 S.W.2d 752

Footnotes

1   The Abel Appellants in four points of error and the Mobil–Oxy Appellants in twelve points of error.
2   Another way to reconcile the conflict which had been adopted by this Court in *Southland* before its appeal to the Supreme Court, was to read "other minerals" to exclude gas. The Supreme Court found this interpretation to conflict with a large body of case law. *Southland,* 378 S.W.2d at 53–54.
3   Attached as Exhibit 4 to Chevron's brief.
4   Water flooding is a method of secondary recovery of oil "in which water is injected into an oil reservoir for the purpose of washing the oil out of the reservoir rock and into the bore of a producing well." Williams and Meyers, MANUAL OF OIL AND GAS TERMS, (8th ed. 1991).
5   The royalty owners also point to a "gas-oil ratio" showing that one well produced as much as 85,000 cubic feet of gas per barrel of oil. However, a reservoir is considered an oil stratum, and the gas produced therefrom is casinghead gas, if a well produces 100,000 cubic feet of gas or less per barrel of oil. *Amarillo Oil Co.,* 794 S.W.2d at 25.
6   This duty does not apply to the sale of casinghead gas, because the lease provided for a set royalty amount on that gas, and the royalty was not dependent upon the proceeds from sale of the gas. *See Cabot Corp.,* 754 S.W.2d at 106; *El Paso Natural Gas Co. v. American Petrofina Co. of Texas,* 733 S.W.2d 541, 550 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), *cert. dism'd,* 485 U.S. 930, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988). ("The operator of an oil and/or gas lease has an implied duty to act in good faith in marketing the gas of its royalty owners *when the amount of the royalty depends upon the price at which the product is marketed.*") [Emphasis added].
7   In fact, Valero did not purchase any gas under the contract from 1985 to December 1990.

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

359 S.W.3d 881
Court of Appeals of Texas,
Houston (14th Dist.).

MERRY HOMES, INC., Appellant,

v.

LUC DAO, Appellee.

No. 14–11–00259–CV.　|　Jan. 31, 2012.

**Synopsis**
**Background:** After a trial court entered declaratory judgment that commercial lease was void, plaintiff, who was not a party to the lease but who had paid money to landlord to secure the leased premises, brought action against landlord for money had and received. The 151st District Court, Harris County, Mike Engelhart, J., granted summary judgment to plaintiff. Landlord appealed.

**[Holding:]** The Court of Appeals, Adele Hedges, C.J., held that two-year limitations period applies to a claim for money had and received.

Reversed and remanded.

West Headnotes (7)

**[1]　Appeal and Error**
　　👉 Cases Triable in Appellate Court

A trial court's summary judgment is reviewed de novo.

1 Cases that cite this headnote

**[2]　Appeal and Error**
　　👉 Judgment

In reviewing a summary judgment, the appellate court takes as true all evidence favorable to the nonmovant, indulging every reasonable inference, and resolves any doubts in the nonmovant's favor.

Cases that cite this headnote

**[3]　Implied and Constructive Contracts**
　　👉 Nature of right

Money had and received is an equitable doctrine designed to prevent unjust enrichment.

4 Cases that cite this headnote

**[4]　Implied and Constructive Contracts**
　　👉 Nature of right

A cause of action for money had and received arises when a party obtains money that, in equity and good conscience, belongs to another.

5 Cases that cite this headnote

**[5]　Implied and Constructive Contracts**
　　👉 Nature of right

A claim for money had and received is not based on wrongdoing; rather, the only question is whether the defendant holds money that, in equity and good conscience, belongs to another.

5 Cases that cite this headnote

**[6]　Limitation of Actions**
　　👉 Implied Contracts and Debts and Obligations Not Evidenced by Writing

Because money had and received is an equitable doctrine designed to prevent unjust enrichment, the proper statute of limitations for such a claim is that applicable to claims for unjust enrichment, which is the two-year statute of limitations for "taking or detaining the personal property of another." V.T.C.A., Civil Practice & Remedies Code § 16.003(a).

1 Cases that cite this headnote

**[7]　Appeal and Error**
　　👉 Time of bringing suit, limitations, and laches

Court of Appeals would not consider argument raised by plaintiff for first time on appeal, on defendant commercial landlord's appeal from the summary judgment for plaintiff in action for money had and received, that plaintiff's claim did not accrue, for limitations purposes, until

the commercial lease was declared void; plaintiff had not made that argument in his summary judgment motion. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*882** Jennifer M. Dean, Kerrville, for appellant.

John Fason, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices BROWN and CHRISTOPHER.

## OPINION

ADELE HEDGES, Chief Justice.

In this appeal from a summary judgment granted in favor of appellee, Luc Dao, appellant Merry Homes, Inc. contends the trial court erred in concluding that Dao's claim for money had and received was subject to a four-year statute of limitations. Because a claim for money had and received is a quasi-contract action based on a promise implied in law, not an action for breach of contract, it is governed by the two-year statute of limitations for "taking or detaining the personal property of another." Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a) (West 2002). Accordingly, we reverse and remand for further proceedings.

## BACKGROUND

In May 2005, Chi Hung Luu leased property from Merry Homes to operate a night club. Luu paid $6,000 under the lease; Luc Dao paid Merry Homes an additional $6,000 to secure the leased property. Dao was not a party to the lease contract.

Luu later discovered that the property was not eligible for use as a bar or night club because it was located too close to a school. Luu sued Merry Homes for a declaration that the lease was void and to recover the money he had paid. The trial court declared the lease void and entered a final judgment on February 9, 2009. The trial court awarded Luu the $6,000 he

had paid under the lease, but because Dao was neither a party to the lease nor to the declaratory judgment action, it did not **\*883** award Dao the $6,000 he had paid Merry Homes.

Dao sued Merry Homes on April 16, 2009, seeking to recover his $6,000 as money had and received. He moved for summary judgment on his claim in February 2011. Merry Homes did not file its own motion for summary judgment, instead responding to Dao's motion by asserting that the two-year statute of limitations provided by section 16.003(a) of the Texas Civil Practice and Remedies Code applied to Dao's claim. Thus, Merry Homes contended that Dao's claim was barred because it accrued when he paid the money to Merry Homes in May 2005, which was four years before Dao filed suit.

The trial court granted Dao's summary judgment. In its final judgment awarding Dao $6,000, it stated:

> The Court is persuaded by the clear, unequivocal language of *Amoco Production Co. v. Smith,* 946 S.W.2d 162, 164–65 (Tex.App.-El Paso 1997, no pet.), that a cause of action for "money had and received is an action for debt, governed by the four-year statute of limitations." The Court recognizes the argument that Defendant has asserted regarding the language about unjust enrichment and the Supreme Court's holding in *Elledge v. Friberg–Cooper Water Supply Corp.,* 240 S.W.3d 869, 870–71 (Tex.2007) regarding a 2 year statute of limitations for unjust enrichment actions. However, the two causes of action are not identical. The Court will not conclude that a two-year statute of limitations applies to "money had and received" absent a clear statement from our appellate courts to that effect.

Merry Homes timely appealed the trial court's final summary judgment.

## ANALYSIS

In a single issue, Merry Homes asserts that the trial court erred in determining that the four-year statute of limitations period applies to a claim for money had and received.

[1] [2] We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). In reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference, and we resolve any doubts in

the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 549 (Tex.1985).

 **[3]** **[4]** **[5]** Money had and received is an equitable doctrine designed to prevent unjust enrichment. *London v. London,* 192 S.W.3d 6, 13 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). This cause of action arises when a party obtains money that, in equity and good conscience, belongs to another. *Hunt v. Baldwin,* 68 S.W.3d 117, 132 (Tex.App.-Houston [14th Dist.] 2001, no pet.). A claim for money had and received is not based on wrongdoing; rather, the only question is whether the defendant holds money that, in equity and good conscience, belongs to another. *See London,* 192 S.W.3d at 13.

 **[6]** Because money had and received is an equitable doctrine designed to prevent unjust enrichment, the proper statute of limitations for such a claim is that applicable to claims for unjust enrichment. *Cf. Autry v. Dearman,* 933 S.W.2d 182, 190 n. 7 (Tex.App.-Houston [14th Dist.] 1996, writ denied) (noting that plaintiff's claims for money had and received and unjust enrichment would be barred by the two-year statute of limitations). In a series of three decisions, the Supreme Court of Texas has concluded that unjust enrichment claims are governed by the two-year statute of limitations provided by section 16.003 of the Texas Civil Practice and Remedies Code. *See Elledge v. Friberg–Cooper Water* **\*884** *Supply Corp.,* 240 S.W.3d 869, 871 (Tex.2007) (per curiam); *Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 737 (Tex.2001); *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 885 (Tex.1998). Indeed, in Elledge, the Supreme Court

declared "categorically" that "[u]njust enrichment claims are governed by the two-year statute of limitations in section 16.003 of the Civil Practice and Remedies Code." 240 S.W.3d at 871. In light of this clear precedent, we hold that Dao's claim for money had and received is subject to the two-year statute of limitations provided by section 16.003 of the Civil Practice and Remedies Code. Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a)

 **[7]** For the first time on appeal, Dao asserts that his cause of action to recover the $6,000 accrued only once the lease was declared void in the earlier lawsuit between Luu and Merry Homes. But because he did not make this argument in his summary-judgment motion, we may not consider it on appeal. *See* Tex.R. Civ. P. 166a(c). Accordingly, we sustain Merry Home's sole issue on appeal.

## CONCLUSION

We have sustained Merry Home's issue and hold that the two-year statute of limitations applies to Dao's claim for money had and received. Because Merry Homes did not file its own summary-judgment motion conclusively establishing the accrual date of Dao's claim, however, we reverse and remand to the trial court for further proceedings.

## All Citations

359 S.W.3d 881

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

📁 KeyCite Yellow Flag - Negative Treatment
**Declined to Follow by** Staton Holdings, Inc. v. Hilton Apparel Group,
N.D.Tex., July 5, 2007

168 S.W.3d 777
Supreme Court of Texas.

MICHIANA EASY LIVIN' COUNTRY,
INC., d/b/a Michiana R.V., Petitioner,
v.
James G. HOLTEN, Respondent.

No. 04–0016. | Argued Jan. 6,
2005. | Decided May 27, 2005.
| Rehearing Denied Sept. 2, 2005.

**Synopsis**
**Background:** Buyer brought action against nonresident seller
of recreational vehicle (RV), among others, alleging violation
of Deceptive Trade Practices Consumer Protection Act,
common law fraud, breach of warranty, and breach of
contract. The 334th District Court, Harris County, J. Dale
Wainwright, J., denied seller's special appearance. Seller
brought interlocutory appeal. On rehearing, the Houston
Court of Appeals, First District, 127 S.W.3d 89, affirmed.
Review was granted.

**Holdings:** The Supreme Court, Scott Brister, J., held that:

[1] purposeful availment requirement in due process
minimum contacts analysis was not satisfied, because
nonresident seller's only contact with Texas was buyer's
decision to place an order from Texas;

[2] purposeful availment requirement is not necessarily
established by allegations or evidence, in support of specific
jurisdiction, that a nonresident committed a tort during a
conversation initiated by a person with a Texas telephone
number, disapproving of *Boissiere v. Nova Capital, LLC*, 106
S.W.3d 897, *Ahadi v. Ahadi*, 61 S.W.3d 714, *Ring Power
Sys. v. Int'l de Comercio Y Consultoria*, 39 S.W.3d 350, and
*Memorial Hosp. Sys. v. Fisher Ins. Agency*, 835 S.W.2d 645;

[3] purposeful availment requirement does not turn on
whether nonresident defendant's contacts were tortious, as
basis for specific jurisdiction, disapproving of *Mabry v. Reid*,
130 S.W.3d 385, *Boissiere v. Nova Capital, LLC*, 106 S.W.3d

897, *French v. Glorioso*, 94 S.W.3d 739, and *Runnells v.
Firestone*, 746 S.W.2d 845; and

[4] contractual forum selection clause could not be ignored,
in the purposeful availment analysis.

Reversed and rendered.

David M. Medina, J., filed a dissenting opinion, in which
O'Neill, J., joined.

West Headnotes (26)

**[1]** **Appeal and Error**
⬤ Organization and Jurisdiction of Lower
Court
Petition for review filed by nonresident seller
of recreational vehicle (RV), stating the issue
presented as whether factually and legally
sufficient evidence existed in clerk's record to
support implied finding by trial court that seller
committed a tort in Texas, and stating that
such implied finding was the only basis for
personal jurisdiction over seller by Texas courts,
necessarily included subsidiary question of
whether seller had sufficient minimum contacts
with Texas, as required by due process; thus,
seller did not improperly raise the due process
minimum contacts issue for first time in its
appellate merits brief. U.S.C.A. Const.Amend.
14; Rules App.Proc., Rule 55.2.

3 Cases that cite this headnote

**[2]** **Appeal and Error**
⬤ Appearance and representation by counsel
Supreme Court would not presume that evidence
was presented at special appearance hearing in
action against nonresident seller of recreational
vehicle (RV), as basis for further presumption
that evidence was presented that supported trial
court's order, where buyer and seller conceded
that evidence was not presented at the special
appearance hearing.

3 Cases that cite this headnote

**[3]** **Appeal and Error**

🔑 Questions and Objections in General

For pretrial proceedings in the trial court, a reporter's record is required, to establish harmful error on appeal, only if evidence is introduced in open court; for nonevidentiary hearings in the trial court, a reporter's record is superfluous. Rules App.Proc., Rule 34.1.

20 Cases that cite this headnote

**[4]** **Appeal and Error**

🔑 Matters not included or shown in general

If all the evidence in the pretrial proceeding in the trial court is filed with the court clerk and only arguments by counsel are presented in open court, the appeal should be decided on the clerk's record alone.

8 Cases that cite this headnote

**[5]** **Appeal and Error**

🔑 Presentation and Reservation of Grounds of Review

**Appeal and Error**

🔑 Failure to set forth evidence in general

If the pretrial proceeding's nature, the trial court's order, the party's briefs, or other indications show that an evidentiary hearing took place in open court, then a complaining party must present a record of that hearing, to establish harmful error, but otherwise, appellate courts should presume that pretrial hearings are nonevidentiary, and that the trial court considered only the evidence filed with the court clerk.

37 Cases that cite this headnote

**[6]** **Attorney and Client**

🔑 Candor, and disclosure to opponent or court

The rules of professional conduct, which require candor toward a tribunal, prohibit a lawyer from asserting to the appellate court that a pretrial hearing was evidentiary, when it was not. State

Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App. A, Art. 10, § 9, Rules of Prof.Conduct, Rule 3.03.

Cases that cite this headnote

**[7]** **Appeal and Error**

🔑 Nature of remedy by dismissal

The appellate rules are designed to resolve appeals on the merits, and the appellate court must interpret and apply them whenever possible to achieve that aim.

4 Cases that cite this headnote

**[8]** **Constitutional Law**

🔑 Non-residents in general

For due process purposes with respect to personal jurisdiction over nonresident defendants, it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. U.S.C.A. Const.Amend. 14.

95 Cases that cite this headnote

**[9]** **Constitutional Law**

🔑 Non-residents in general

It is only the nonresident defendant's contacts with the forum state, and not unilateral activity of another party or a third person, that counts, under purposeful availment requirement in due process minimum contacts analysis for personal jurisdiction over nonresident defendant. U.S.C.A. Const.Amend. 14.

177 Cases that cite this headnote

**[10]** **Constitutional Law**

🔑 Manufacture, distribution, and sale

Under due process minimum contacts analysis for personal jurisdiction, nonresident sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities; by

contrast, a defendant will not be haled into a jurisdiction solely based on contacts that are random, isolated, or fortuitous. U.S.C.A. Const.Amend. 14.

21 Cases that cite this headnote

**[11]    Constitutional Law**
&#128273; Non-residents in general

Under purposeful availment requirement in due process minimum contacts analysis for personal jurisdiction, the nonresident defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction, and jurisdiction is premised on notions of implied consent, i.e., by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there. U.S.C.A. Const.Amend. 14.

133 Cases that cite this headnote

**[12]    Constitutional Law**
&#128273; Non-residents in general

Under purposeful availment requirement in due process minimum contacts analysis for exercising personal jurisdiction over a nonresident, a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction. U.S.C.A. Const.Amend. 14.

20 Cases that cite this headnote

**[13]    Constitutional Law**
&#128273; Manufacture, distribution, and sale

In the context of product sales, a nonresident seller need not have offices or employees in a forum state in order to meet the purposeful availment test in due process minimum contacts analysis for personal jurisdiction over the nonresident. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

**[14]    Constitutional Law**
&#128273; Manufacture, distribution, and sale

Under purposeful availment requirement in due process minimum contacts analysis for personal jurisdiction over nonresident, a nonresident that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit in Texas in disputes arising from that business. U.S.C.A. Const.Amend. 14.

23 Cases that cite this headnote

**[15]    Constitutional Law**
&#128273; Manufacture, distribution, and sale

**Courts**
&#128273; Contract disputes

**Courts**
&#128273; Fraud, racketeering, and deceptive practices

Purposeful availment requirement in due process minimum contacts analysis was not satisfied, as to personal jurisdiction in Texas over Indiana-based seller of recreational vehicle (RV), in action by Texas-resident buyer for common law fraud, breach of warranty, breach of contract, and violation of Deceptive Trade Practices Consumer Protection Act, where nonresident seller's only contact with Texas was buyer's decision to place an order from Texas. U.S.C.A. Const.Amend. 14; V.T.C.A. Bus. & C., § 17.41 et seq.

40 Cases that cite this headnote

**[16]    Constitutional Law**
&#128273; Non-residents in general

Financial benefits accruing to the nonresident defendant from a collateral relation to the forum State will not support personal jurisdiction if they do not stem from a constitutionally cognizable contact with that State under due process minimum contacts analysis. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

**[17]    Constitutional Law**
&#128273; Manufacture, distribution, and sale

**Courts**

☞ Manufacture, Distribution, and Sale of Products

**Courts**

☞ Fraud, racketeering, and deceptive practices

Nonresident seller's conduct in arranging with shipper to deliver recreational vehicle (RV) to buyer for use in Texas did not satisfy purposeful availment requirement in due process minimum contacts analysis for personal jurisdiction over seller in Texas courts, in action by Texas-resident buyer for common law fraud, breach of warranty, breach of contract, and violation of Deceptive Trade Practices Consumer Protection Act; delivery in Texas was at buyer's sole request and sole expense. U.S.C.A. Const.Amend. 14; V.T.C.A. Bus. & C., § 17.41 et seq.

30 Cases that cite this headnote

**[18]** **Courts**

☞ Torts in general

The broad language of the Texas long-arm statute, authorizing personal jurisdiction over a nonresident defendant who commits a tort in whole or in part in Texas, extends only as far as the Due Process Clause of the United States Constitution will permit. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

9 Cases that cite this headnote

**[19]** **Courts**

☞ Determination of questions of jurisdiction in general

Personal jurisdiction is a question of law for the court, even if it requires resolving questions of fact.

9 Cases that cite this headnote

**[20]** **Constitutional Law**

☞ Particular Parties or Circumstances

Purposeful availment requirement in minimum contacts due process analysis for personal jurisdiction over nonresidents is not necessarily established by allegations or evidence, in support of specific jurisdiction, that a nonresident

committed a tort during a conversation initiated by a person with a Texas telephone number; disapproving of *Boissiere v. Nova Capital, LLC*, 106 S.W.3d 897, *Ahadi v. Ahadi*, 61 S.W.3d 714, *Ring Power Sys. v. Int'l de Comercio Y Consultoria*, 39 S.W.3d 350, and *Memorial Hosp. Sys. v. Fisher Ins. Agency*, 835 S.W.2d 645. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

14 Cases that cite this headnote

**[21]** **Constitutional Law**

☞ Non-residents in general

Purposeful availment requirement in minimum contacts due process analysis for personal jurisdiction over nonresidents does not turn on whether nonresident defendant's contacts were tortious, as basis for specific jurisdiction; disapproving of *Mabry v. Reid*, 130 S.W.3d 385, *Boissiere v. Nova Capital, LLC*, 106 S.W.3d 897, *French v. Glorioso*, 94 S.W.3d 739, and *Runnells v. Firestone*, 746 S.W.2d 845. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

3 Cases that cite this headnote

**[22]** **Constitutional Law**

☞ Consent; forum-selection clauses

**Courts**

☞ Of the person

Generally, a forum selection clause in a contract operates as consent to jurisdiction in one forum, not proof that the Due Process Clause would allow no other forum to exercise personal jurisdiction over a nonresident. U.S.C.A. Const.Amend. 14.

8 Cases that cite this headnote

**[23]** **Constitutional Law**

☞ Manufacture, distribution, and sale

**Courts**

☞ Manufacture, Distribution, and Sale of Products

Insertion, in contract for sale of recreational vehicle (RV), of forum selection clause

designating Indiana as forum for litigation between buyer residing in Texas and seller located in Indiana could not be ignored, when determining whether purposeful availment requirement, in due process minimum contacts analysis, was satisfied with respect to Texas court exercising personal jurisdiction over seller; forum selection clause suggested that seller did not intend to avail itself of benefits and protections of Texas laws. U.S.C.A. Const.Amend. 14.

155 Cases that cite this headnote

**[24]**   **Stipulations**
☞ Necessity for writing in general

**Stipulations**
☞ Oral stipulations in court

**Stipulations**
☞ Entry, filing, or record

Alleged concession by counsel for nonresident seller of recreational vehicle (RV), at special appearance hearing in Texas regarding personal jurisdiction over seller, that forum selection clause in sales contract, designating Indiana as forum for litigation between buyer and seller was inapplicable, was unenforceable in the Texas action, where there was no reporter's record of the hearing; Texas civil procedure rule required an agreement between counsel or parties to be in writing or to be made in open court and entered of record. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

2 Cases that cite this headnote

**[25]**   **Contracts**
☞ Agreement as to place of bringing suit; forum selection clauses

Enforcement of a contractual forum selection clause is mandatory absent a showing that enforcement would be unreasonable and unjust, or that the clause was invalid due to fraud or overreaching.

18 Cases that cite this headnote

**[26]**   **Constitutional Law**

☞ Jurisdiction and Venue

The Due Process Clause ensures that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*780**  William G. Rossick, Watson & Rossick, Austin, Charles A. Watson, Kelly Michael Kowis, Watson, Kowis & Rossick, Houston, Larry D. Thompson, and Robert G. Smith Jr., Lorance & Thompson, P.C., Houston, for Petitioner.

**\*781**  Brock C. Akers and Neal Kieval, Phillips & Akers, P.C., Houston, for Respondent.

Craig Madison Patrick, Craddock Reneker & Davis, L.L.P., Dallas, and Evelyn L. Becker, O'Melveney & Myers LLP, Washington, DC, for Others.

**Opinion**

Justice BRISTER delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice OWEN, and Justice GREEN joined.

James Holten decided to buy a $64,000 Coachmen recreational vehicle sight unseen. Eschewing every RV dealer in Texas, he sought a lower price from Michiana Easy Livin' Country, Inc., an outlet store that only did business in Indiana. Holten called Michiana in Indiana, sent payment to Indiana, paid for delivery from Indiana, and agreed to resolve every dispute in Indiana. But when a dispute actually arose, he filed suit in Texas.

The trial court and court of appeals denied Michiana's special appearance. Because of a conflict in the decisions of the courts of appeals, [1] we have jurisdiction to review this conclusion. [2] Finding Michiana does not have minimum contacts with Texas, we reverse.

**I**

## A. Petition and Brief

We first address two questions of error preservation.

 **[1]** First, Holten argues that Michiana cannot assert a minimum-contacts challenge because it was raised for the first time in Michiana's brief on the merits rather than in its petition for review. [3] In its petition for review, Michiana stated the issue presented as follows:

> Whether factually and legally sufficient evidence exists in the Clerk's Record to support the implied finding by the trial court that Michiana committed a tort in Texas—the only basis for personal jurisdiction over Michiana by Texas courts.

Both the opinion below and the petition for review here list undisputed facts showing that Michiana had no contact with Texas or Texans except for the alleged tort. Michiana's petition is correct—the sole ground on which the court of appeals based jurisdiction was the commission of a tort in Texas. [4] The argument that this conclusion was incorrect necessarily included the subsidiary argument detailed in Michiana's brief—that without that ground, jurisdiction did not exist. This is all the rules require. [5]

## B. The Record in Pretrial Hearings

 **[2]** Second, the appellate record contains no reporter's record of the special appearance hearing. Though candidly conceding that no oral testimony or new exhibits were presented at that hearing, Holten nevertheless argues we must presume evidence was presented that supports the trial court's order.

It is difficult to state a bright-line rule regarding unrecorded pretrial proceedings, as they come in so many shapes and sizes. Many pretrial "hearings" take place entirely on paper, while others involve a personal **\*782** appearance in court. [6] In some the parties must file all evidence with the clerk; [7] in others they must present it in open court; [8] in most the manner of presentation is discretionary; [9] in at least one the answer is unclear. [10]

 **[3]** **[4]** What is clear is that a reporter's record is required only if evidence is introduced in open court; for nonevidentiary hearings, it is superfluous. [11] If all the evidence is filed with the clerk and only arguments by counsel are presented in open court, the appeal should be decided on the clerk's record alone. [12]

The difficulty of course is that the absence of a reporter's record does not tell us whether a pretrial hearing was nonevidentiary, or evidentiary but not preserved. Presuming them all the former unfairly penalizes a party that presents evidence in open court that the other party does not bother to preserve. But presuming them all the latter would require *every* hearing to be recorded—whether evidentiary (to show what was presented) or not (to show nothing was). Besides being wasteful, this would frustrate the intent of our appellate rule requiring a reporter's record only "if necessary to the appeal." [13]

For some years now the trend has been away from full evidentiary hearings in open court for most pretrial matters. While we have generally encouraged oral hearings when arguments may be helpful, [14] both the Legislature and this Court have discouraged oral presentation of testimony and evidence when they can be fairly submitted in writing. [15] Counsel can almost always direct the trial court's attention to pertinent deposition excerpts, discovery responses, or affidavits in less time **\*783** than it takes to recreate them in open court. Presuming that most pretrial proceedings are evidentiary would not only discourage this trend, but would encumber thousands of routine hearings by requiring formal proof that no proof was offered.

 **[5]** Accordingly, we have in the past presumed that pretrial hearings are nonevidentiary absent a specific indication or assertion to the contrary. [16] If the proceeding's nature, the trial court's order, the party's briefs, or other indications show that an evidentiary hearing took place in open court, then a complaining party must present a record of that hearing to establish harmful error. [17] But otherwise, appellate courts should presume that pretrial hearings are nonevidentiary, and that the trial court considered only the evidence filed with the clerk.

It is true that a dozen years ago in *Piotrowski v. Minns* we stated: "[a] litigant who fails to request that the reporter record pretrial proceedings risks waiver of any complaint

with respect to error occurring during those proceedings." [18] But the appellant there conceded that the special appearance hearing was evidentiary. [19] Moreover, since that time the rules have changed so that court reporters no longer attend court and make a record only "when requested" but now must do so "unless excused by agreement of the parties." [20] The former rule implied a lack of diligence when the losing party requested no record; [21] the current rule implies an agreement that no record was made because none was needed.

 **[6]** Either party, of course, may allege that a hearing was evidentiary, but that allegation must be specific. Merely asserting that the trial court "considered evidence at the hearing" is not enough—trial courts do that when a hearing is conducted entirely on paper, or based solely on affidavits and exhibits filed beforehand. Instead, there must be a specific indication that exhibits or testimony was presented in open court *beyond* that filed with the clerk. As the rules of professional conduct prohibit assertions that a hearing was evidentiary when it was not, [22] and **\*784** as events in open court can usually be confirmed by many witnesses, there is no reason to expect that such assertions will be lightly fabricated.

 **[7]** Our appellate rules are designed to resolve appeals on the merits, and we must interpret and apply them whenever possible to achieve that aim. [23] Accordingly, we decline to presume the special appearance hearing here was evidentiary when everyone concedes it was not.

## II

### A. Background

As its name invertedly suggests, Michiana is located in Indiana a few miles from the Michigan border. It is a separate legal entity from the manufacturer or any other dealers of Coachmen RVs. It has neither employees nor property in Texas, and is not authorized to do business here. It does not advertise in Texas or on the Internet, and thus did not solicit business from Holten or anyone else in Texas.

The sale at issue here was initiated entirely by Holten. Seeking a cheaper price than he could get from any of Coachmen's many dealers in Texas, Holten called the Coachmen factory. He was informed that Coachmen did not sell directly from the factory, but that a lower price could be obtained from Michiana, a "factory outlet." Holten obtained Michiana's number from the factory and placed the call that initiated the transaction here.

The RV was constructed and equipped outside Texas. It was paid for outside Texas. It was shipped to Texas at Holten's request and entirely at his expense.

The question presented is whether suit can be brought in Texas based on a nonresident's alleged misrepresentations in a telephone call with a Texas resident. The courts of appeals are split on this question of specific jurisdiction [24] — some holding it would violate constitutional standards, [25] and others (including the lower court here) that it would not. [26]

### B. Purposeful Availment

 **[8]** For half a century, the touchstone of jurisdictional due process has been "purposeful availment." Since *Hanson v. Denckla,* "it is essential in each case that there be some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." [27]

 **\*785** **[9]** Three aspects of this requirement are relevant here. First, it is only the defendant's contacts with the forum that count: purposeful availment "ensures that a defendant will not be haled into a jurisdiction solely as a result of ... the 'unilateral activity of another party or a third person.' " [28]

 **[10]** Second, the acts relied on must be "purposeful" rather than fortuitous. [29] Sellers who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to the jurisdiction of the latter in suits based on their activities. [30] By contrast, a defendant will not be haled into a jurisdiction solely based on contacts that are "random, isolated, or fortuitous." [31]

 **[11]** **[12]** Third, a defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction. [32] Jurisdiction is premised on notions of implied consent— that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there. [33] By contrast, a nonresident may purposefully avoid a particular jurisdiction

by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction. [34]

### C. Stream of Commerce

**[13]** In the context of product sales, a nonresident need not have offices or employees in a forum state in order to meet the purposeful availment test. In *International Shoe Co. v. Washington,* a nonresident corporation had neither offices nor inventory in the state of Washington, but did have a dozen resident salesmen on commission who exhibited samples, solicited orders, and transmitted them to other states for shipment to resident consumers. [35] The operation of a sales and distribution network rendered the nonresident subject to the state's jurisdiction. [36]

**[14]** Thus, a nonresident that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit here in disputes arising from that business. Advertising in telephone directories in Texas cities, [37] operating an office for sales information and support, [38] and certain activities over the Internet [39] all meet this standard.

**\*786** It is less clear whether a nonresident "purposefully avails" itself of a forum when it benefits from a major market without doing any of the marketing. Almost twenty years ago, four justices of the United States Supreme Court held that a nonresident's mere awareness that thousands of its products were ultimately being sold in the forum state established purposeful availment; [40] four others held that "additional conduct" was required (e.g., designing the product for or advertising it in the forum State); [41] the ninth held that, assuming "additional conduct" was required, regular sales resulting in thousands of products reaching the forum state over many years would suffice "[i]n most circumstances." [42]

Since that time, we have noted that our cases appear to follow the "additional conduct" standard. [43] Thus, for example, we have held that shipping hundreds of tons of raw asbestos to Houston was insufficient to establish jurisdiction absent evidence that a nonresident participated in the decision to send it there. [44]

**[15]** Whichever of these standards is ultimately correct, Michiana's conduct meets none of them. Michiana did not

place large numbers of RVs in a "stream of commerce" flowing to Texas; as we have noted before, stream-of-commerce jurisdiction requires a stream, not a dribble. [45] Nor is there any evidence of any "additional conduct"— Michiana did not design, advertise, or distribute RVs in Texas. Exercising jurisdiction here would go far beyond anything we have approved in other commercial cases.

### D. Single Sales

The court of appeals relied on several cases by intermediate courts in Texas holding that a single contact with the state is sufficient to establish jurisdiction. [46] But the United States Supreme Court has emphatically answered the question whether a single contract with a Texas resident can automatically establish jurisdiction—"the answer clearly is that it cannot." [47]

Both the United States Supreme Court and this Court have found no purposeful availment in cases involving isolated sales solicited by consumers who proposed to use the product in a state where the defendant did no business. In *World–Wide Volkswagen Corp. v. Woodson,* the Supreme Court held that dealers who sold a car in New York could not be sued in Oklahoma just because the buyers were involved in a collision there:

> [W]e find in the record before us a total absence of those affiliating circumstances that are a necessary predicate to any exercise of state-court jurisdiction. Petitioners carry on no activity whatsoever in Oklahoma. They close no sales and perform no services there. They avail themselves of none of the privileges **\*787** and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market. In short, respondents seek to base jurisdiction on one, isolated occurrence and

whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma. [48]

The facts here are not the same as those in *Woodson,* but do not differ in any material respect. Michiana *knew* Holten would take his RV to Texas, while it was merely *foreseeable* to the defendant in *Woodson* that its buyer would drive his Audi to Oklahoma. [49] But in either case the choice was entirely that of the purchaser; the seller had no say in the matter. Under Holten's theory, Michiana could be sued in any state or country from which he chose to place his call and take delivery. But as the Supreme Court stated, "unilateral activity ... cannot satisfy the requirement of contact with the forum State." [50]

This Court addressed the same question in 1996 in *CMMC v. Salinas.* [51] In that case, a French manufacturer had made no effort to market its winepress equipment in Texas, had made only one other sale in Texas, and did not initiate the sale at issue to a Texas buyer. [52] We held that the Due Process Clause prohibited specific jurisdiction of a tort suit in Texas based on injuries resulting from alleged defects. [53] As Michiana's contacts here are certainly no more and arguably somewhat less than those in *CMMC,* the result must be the same, as the Due Process Clause has not changed in the interim.

It is true that in some circumstances a single *contract* may meet the purposeful-availment standard, but not when it involves a single *contact* taking place outside the forum state. A long-term franchise agreement may establish minimum contacts because, though it stems from a single contract, it involves many contacts over a long period of time. [54] Similarly, a life-insurance policy may stem from a single contract, but necessarily involves a series of contacts until death does the parties part. [55]

Certainly a nonresident corporation ought to be subject to suit in any jurisdiction where it "enjoys the benefits and protection of the laws of that state." [56] Here, it is hard to imagine what possible benefits and protection Michiana enjoyed from Texas law. Holten paid for the RV in advance, and could not have planned on taking it to Indiana regularly for service.

Everything Michiana wanted out of the contract it had in hand. Indeed, it is hard to imagine how Michiana would have conducted its activities any differently if Texas had no law at all.

**\*788** **[16]** Clearly, Michiana anticipated some profit from this single sale, at least until the litigation started. But "financial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State." [57] We find none here.

### III

The court of appeals affirmed on the basis of two contacts between Michiana and Texas: (1) misrepresentations Michiana allegedly made in response to a phone call from Holten, and (2) Michiana's arrangements with a shipper to deliver the RV to Holten for use in Texas. Neither is sufficient.

### A. Shipping to Texas

**[17]** The second ground is easily disposable. Delivery in Texas was at Holten's sole request and sole expense. If a seller of chattels is subject to suit wherever a customer requests delivery, then the chattel has become its agent for service of process—a conclusion the United States Supreme Court has expressly rejected. [58]

We too rejected this argument in *CMMC,* in which we stated: "The sole question in this case is whether the Fourteenth Amendment permits a state court to take personal jurisdiction over a foreign manufacturer merely because it knew its allegedly defective product would be shipped to that state. *We answer no,* and thus reverse...." [59] Accordingly, we must do the same here.

### B. Committing a Tort "in" Texas

The court of appeals relied most heavily on the first ground—Holten's allegation that Michiana committed a tort in Texas.

**[18]** Allegations that a tort was committed in Texas satisfy the Texas Long–Arm Statute, [60] but not necessarily the U.S.

Constitution; the broad language of the former extends only as far as the latter will permit. [61] Thus, for example, the plaintiffs in both *Woodson* and *CMMC* alleged torts, and the defendants surely foresaw that defective products could harm local buyers—but in neither case was that enough to establish jurisdiction. [62]

The court below joined many of its sister courts in stating the following as a rule of jurisdiction: "If a tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum state, he must reasonably anticipate being haled into court there to answer for his actions." [63] But neither this Court nor the **\*789** United States Supreme Court has ever said so.

To the contrary, twenty years ago the United States Supreme Court wrote: "Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction." [64] This Court too has expressly rejected jurisdiction "based solely upon the effects or consequences of an alleged conspiracy" in the forum state. [65] Instead, it is "the defendant's conduct and connection with the forum" that are critical. [66]

It is true that on one occasion the United States Supreme Court found specific jurisdiction based on alleged wrongdoing intentionally directed at a forum resident. In *Calder v. Jones,* a reporter and editor collaborated on an allegedly defamatory article, but they did so knowing the article was for their employer, the *National Enquirer,* which sold more than 600,000 copies in the forum state every week. [67] Whether or not a jury found the article defamatory, there was no question the defendant's article constituted a substantial "presence" in the state.

Texas courts that base jurisdiction on torts committed during the receipt of an out-of-state phone call apparently assume that *Calder* would have come out the same way if the defamation had occurred in a single unsolicited phone call a nonresident answered from a single private individual in the forum state. But if "the defendant's conduct and connection with the forum" must play a critical role, the two cases cannot be the same.

A companion case decided by the same Court on the same day as *Calder* shows that the important factor was the extent of the defendant's activities, not merely the residence of the victim. In *Keeton v. Hustler Magazine, Inc.,* the victim of another allegedly defamatory article sued not in the state where she lived, but in a different state with a longer statute of limitations. [68] Noting that the defendant had sold more than 10,000 copies of its magazine every month in the forum state, the Supreme Court held that "it must reasonably anticipate being haled into court there." [69]

Our dissenting colleagues cite no other authority that a single conversation with a private citizen constitutes purposeful availment of any jurisdiction in which that citizen happens to live. While torts were alleged in some of the cases cited in the dissent, the defendant's conduct in each case was much more extensive and was aimed at getting extensive business in or **\*790** from the forum state. [70] Exercising jurisdiction here would go far beyond anything we have approved in other tort cases.

### C. The Consequences

Several problems arise if jurisdiction turns not on a defendant's contacts, but on where it "directed a tort." First, it shifts a court's focus from the "relationship among the *defendant,* the forum, and the litigation" [71] to the relationship among the *"plaintiff,* the forum ... and the litigation." [72] The place where a plaintiff relies on fraud may determine the choice of law, [73] but choice-of-law analysis considers all parties, local courts, legal policies, interested states, and the interstate and international systems. [74] By contrast, minimum-contacts analysis focuses solely on the actions and reasonable expectations of the defendant. [75]

**[19]** Second, directed-a-tort jurisdiction confuses the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits. If purposeful availment depends on whether a tort was directed toward Texas, then a nonresident may defeat jurisdiction by proving there was no tort. [76] Personal jurisdiction is a **\*791** question of law for the court, even if it requires resolving questions of fact. [77] But what if a judge and jury could disagree? May a trial judge effectively grant summary judgment in a local jurisdiction by deciding contested liability facts in favor of the defendant? And if a jury absolves a defendant of tort liability, is the judgment void

because the court never had jurisdiction of the defendant in the first place?[78]

Business contacts are generally a matter of physical fact, while tort liability (especially in misrepresentation cases) turns on what the parties thought, said, or intended. Far better that judges should limit their jurisdictional decisions to the former rather than involving themselves in trying the latter.

Third, in cases dealing with commerce, a plaintiff often has the option to sue in either contract or tort. Here, for example, Holten alleged tort, contract, and statutory claims, as Texas law often allows a plaintiff to do.[79] If directing a tort at Texas is enough, then personal jurisdiction arises when plaintiffs allege a tort, but not when they allege breach of contract. Thus, the *defendant's* purposeful availment depends on the form of claim selected by the *plaintiff.*

Fourth, changes in technology have made reliance on phone calls obsolete as proof of purposeful availment. While the ubiquity of "caller ID" may allow nonresidents to know a caller's telephone number, that number no longer necessarily indicates anything about the caller's location. If jurisdiction can be based on phone conversations "directed at" a forum, how does a defendant avail itself of any jurisdiction when it can never know where the other party has forwarded calls or traveled with a mobile phone?

In their dissenting opinion, our colleagues remind us seven times that Michiana did not deny Holten's fraud allegations. Of course, Michiana did deny his allegations in its answer, but rightly focused its jurisdictional affidavits on lack of *contacts* rather than lack of *culpability.* Jurisdiction cannot turn on whether a defendant denies wrongdoing—as virtually all will. Nor can it turn on whether a plaintiff merely alleges wrongdoing—again as virtually all will. If committing a tort establishes jurisdiction, our colleagues will have to decide who is correct—and then the Texas jurisdictional rule will be: guilty nonresidents can be sued here, innocent ones cannot. The dissenting opinion shows little doubt on that score;[80] but if we address jurisdictional questions in this spirit, nonresidents will avoid not just our courts but our state and all its residents as well.

 **[20]**    **[21]**    For the reasons stated above, we disapprove of those opinions holding that (1) specific jurisdiction is necessarily established by allegations or evidence that **\*792** a nonresident committed a tort in a telephone call from a Texas number,[81] or that (2) specific jurisdiction turns on whether a defendant's contacts were tortious rather than the contacts themselves.[82]

## IV

Finally, the one-page contract signed by the parties provided that any litigation between them would occur in Indiana:

> CONTROLLING LAW AND PLACE OF SUIT. The law of the State, in which I [Holten] sign this contract, is the law which is to be used in interpreting the terms of the contract. You [Michiana] and I agree that if any dispute between us is submitted to a court for resolution, such legal proceeding or suit shall take place in the county in which your principle [sic.] offices are located.

Michiana asserted this clause as a separate ground for granting its special appearance, and moved to dismiss on that basis, but has not sought mandamus to enforce it. Instead, Michiana asserts the clause as additional proof that it never purposefully availed itself of the benefits and protections of Texas law.

 **[22]**    We agree with the court of appeals that a forum-selection clause designating Indiana does not necessarily indicate Michiana had no minimum contacts anywhere else.[83] Generally, a forum-selection clause operates as consent to jurisdiction in one forum, not proof that the Constitution would allow no other.[84]

 **[23]**    But this Court has held that deletion of a forum-selection clause designating a foreign jurisdiction is some evidence that local jurisdiction was anticipated.[85] By the same token, insertion of a clause designating a foreign forum suggests that no local availment was intended. The Supreme Court has held that choice-of-law provisions should not be ignored in considering whether a defendant has "purposefully invoked the benefits and protections of a State's laws."[86] For the same reasons, **\*793** the forum-selection clause here cannot be ignored either.

 **[24]**  Holten asserts three arguments in response. First, he asserts the forum-selection clause was waived because Michiana raised it shortly before the special appearance hearing, and at the hearing "agreed the clause was inapplicable." Although the special appearance was not decided until two years after filing, the record before us reflects little activity other than the special appearance, and nothing to suggest any prejudice to Holten from the delay.[87] As there was no reporter's record of the hearing, the alleged concession by counsel was not only unrecorded but unenforceable.[88]

Second, Holten argues the forum-selection clause is limited to disputes regarding "interpreting the terms of the contract," a phrase appearing in the same section but a preceding sentence. But the title of the paragraph shows that two different topics were addressed in it, and the forum-selection clause itself refers only to "*any* dispute between us" (emphasis added). The parties were not required to put these two sentences in two different paragraphs to show that one did not modify the other.

 **[25]**  Third, Holten argues it was within the trial court's discretion to refuse to enforce this clause. But enforcement of a forum-selection clause is mandatory absent a showing that "enforcement would be unreasonable and unjust, or that the clause was invalid due to fraud or overreaching."[89] Holten does not assert that the clause itself was fraudulently induced, and presented no evidence showing why enforcement would be unreasonable or unjust. Accordingly, he should be held to it.

\* \* \*

 **[26]**  The Due Process Clause "ensure[s] that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system."[90] In the sixty years since *International Shoe,* the United States Supreme Court has decided only about a dozen minimum-contacts cases, but two of them reversed Texas courts: once for reaching too far,[91] and once for preventing a sister state from reaching far enough.[92] Ours is certainly a large state, but we must recognize our own limits and those of our coequal sovereigns.

The Due Process Clause of the United States Constitution forbids jurisdiction over:

● a nonresident automobile dealer whose only contact with the forum was a customer's decision to drive there;[93]

● a nonresident father whose only contact with the forum was his ex-wife's decision to move there;[94] and

 **\*794** ● a nonresident trustee whose only contact with the forum was the settlor's exercise of a power of appointment there.[95]

Because Michiana's only contact with Texas was Holten's decision to place his order from there, we reverse the court of appeals' judgment and render judgment dismissing the claims against Michiana for want of jurisdiction.

Justice MEDINA filed a dissenting opinion, in which Justice O'NEILL joined.

Justice WAINWRIGHT and Justice JOHNSON did not participate in the decision.

Justice MEDINA, joined by Justice O'NEILL, dissenting.
Today the Court holds that an out-of-state defendant who intentionally defrauds a Texas resident, with full knowledge that reliance and damages will occur in Texas, cannot be made to answer for its conduct in a Texas court simply because the defrauded Texan initiated the phone call. Because the assumption of jurisdiction by Texas courts in this case does not offend the due process clause, I dissent.

**I**

This special appearance case arises out of James Holten's purchase of a motor home from Michiana Easy Livin' Country, Inc. Holten, a resident of Harris County, contacted Michiana regarding the purchase of a Class A Coachmen Catalina motor home, customized to meet certain specifications. According to Holten's affidavit, he informed Michiana that he resided in Texas and wanted the motor home delivered to his residence. Holten further avers that Michiana agreed to sell him the motor home, manufactured to his specifications, and to deliver its product to Texas, but that the motor home did not meet his specifications. Although Michiana's affidavit disputes whether delivery in Texas was planned from the start, its affidavits do not dispute Holten's averments concerning Michiana's misrepresentations.

Holten sued Ford Motor Company, Coachmen Industries, Coachmen Recreational Vehicle Company, and Michiana for violations of the Texas Deceptive Trade Practices Consumer Protection Act, fraud, breach of warranty, and breach of contract. Holten alleged that at the time he purchased the motor home, Michiana represented to him that the motor home would (1) be constructed of solid wood fastened with screws, (2) not contain nails or staples, (3) contain a bathtub and shower, (4) contain a double-pedal foot-flush toilet, and (5) be serviceable by any authorized Ford dealer. Holten avers that these representations turned out to be false.

Nevertheless, the Court concludes that the undisputed evidence of misrepresentations regarding the custom motor home are not actionable in Texas because the contacts with Texas are too attenuated to support jurisdiction here. Because I believe that torts perpetrated in Texas on Texas residents are actionable in this state, I dissent.

## II

A nonresident defendant who commits a tort in Texas or transacts business with a Texas resident may be subject to the jurisdiction of a Texas court under the long-arm statute. *TEX. CIV. PRAC. & REM.CODE § 17.042.* The tort of misrepresentation occurs in Texas when reliance occurs in Texas. *See Siskind v. Villa Found. for Educ.,* **\*795** *Inc.,* 642 S.W.2d 434, 437 (Tex.1982).[1] The record contains evidence that Michiana, knowing that Holten was a Texas resident and wished any motor home he purchased to be delivered to him in Texas, made misrepresentations to Holten upon which he relied in Texas. Therefore, on this record, it is undisputed that Michiana committed the tort of misrepresentation in Texas.

The Texas long-arm statute extends "as far as the federal constitutional requirements of due process will permit." *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002). The due process clause prevents an individual from being subjected to jurisdiction in a forum "with which he has established no meaningful 'contacts, ties, or relations.' " *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) *quoting Int'l Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). This "allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."

*World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

A defendant's contacts with a forum state can support either general or specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, nn. 8, 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The parties agree that Michiana's contacts with Texas are insufficient to give rise to general jurisdiction, in which a state exercises jurisdiction in a suit that does not arise out of the defendant's contacts with the forum. *See id.* at 414 n. 9. But contacts that are insufficient to support general jurisdiction may still support specific jurisdiction. "Even a single purposeful contact may be sufficient to meet the requirements of minimum contacts when the cause of action arises from the contact." *Micromedia v. Automated Broadcast Controls,* 799 F.2d 230, 234 (5th Cir.1984), *citing McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

"Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there," the defendant must have " 'purposefully directed' his activities at residents of the forum," and the suit must result from "injuries that 'arise out of or relate to' those activities." *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174 (citations omitted). For our part, we have held that for a Texas court to exercise specific jurisdiction over a defendant, (1) the defendant's contact with Texas must be purposeful, and (2) the cause of action must arise from those contacts. *See Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002). Furthermore, "assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice." *O'Brien v. Lanpar Co.,* 399 S.W.2d 340, 342 (Tex.1966).

Holten claims that Michiana is subject to specific jurisdiction. There is evidence, based on the affidavits, that Michiana had two significant contacts with Texas: (1) Michiana made misrepresentations about the motor home to Holten, knowing that he would rely on them in Texas and that any resulting damages would be suffered in Texas; and (2) Michiana shipped its product to Holten in Texas. This action clearly arises out of those contacts. The **\*796** question remains whether Michiana's contact with Texas was purposeful.

## III

### A

The unilateral actions of a plaintiff cannot form the basis for long arm jurisdiction. *See World–Wide Volkswagen,* 444 U.S. at 298, 100 S.Ct. 559. But when a tortfeasor commits a tort in the forum state by directing its actions toward the forum state with full knowledge that injury will occur in the forum state, jurisdiction is appropriate. *See Wien Air Alaska, Inc. v. Brandt,* 195 F.3d 208, 211 (5th Cir.1999), *citing Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *see also Mem. Hosp. Sys. v. Fisher Ins. Agency, Inc.,* 835 S.W.2d 645, 650–52 (Tex.App.-Houston [14th Dist.] 1992, no writ) (holding that a single phone call was sufficient). Here, although Holten initiated contact, Michiana made the decision to deal with him, made misrepresentations to him knowing that he was in Texas, and shipped the motor home to Texas. Michiana's conduct was therefore sufficiently purposeful to support jurisdiction.

The Court makes much of the fact that this transaction arises primarily out of a single phone call. However, it is not the quantity or duration of contacts that matters in the specific jurisdiction context but the nature of the contacts. *Miss. Interstate Exp. Inc. v. Transpo, Inc.,* 681 F.2d 1003, 1006 (5th Cir.1982); *see also Am. Type Culture Collection,* 83 S.W.3d at 810. When a defendant purposefully directs tortious conduct at a forum, whether in person, by correspondence, or in a single phone call, that defendant should expect to be subject to the forum's jurisdiction. [2]

A defendant's mere knowledge that its product will end up in the forum does not, without more, give rise to jurisdiction. *See CMMC v. Salinas,* 929 S.W.2d 435, 439 (Tex.1996). However, numerous courts have held that under the right circumstances, a single sale by an out-of-state defendant can give rise to jurisdiction in an action arising out of that sale. [3] And in *McGee v. International Life Insurance Company,* the Supreme Court held that a single insurance contract mailed to the forum could support specific jurisdiction. 355 U.S. at 223, 78 S.Ct. 199. Furthermore, when a plaintiff in a patent-infringement action alleges that the defendant **\*797** shipped the infringing material into the forum state "through an established distribution channel," and "[t]he cause of action is alleged to arise out of these activities[,][n]o more is usually required to establish specific jurisdiction." *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1565 (Fed.Cir.1994), *cert. dismissed,* 512 U.S. 1273, 115 S.Ct. 18, 129 L.Ed.2d 917, *citing Burger King,* 471 U.S. at 472–73, 105

S.Ct. 2174; *see also No. Am. Philips Corp. v. Am. Vending Sales, Inc.,* 35 F.3d 1576, 1578–79 (Fed.Cir.1994). One court has gone so far as to hold that "[o]nce a defendant knowingly enters into a contract through a website, ... that defendant has purposefully availed him or herself of the privileges of the forum state .... [and] may be subject to suit there." *Stewart v. Hennesey,* 214 F.Supp.2d 1198, 1203 (D.Utah 2002). I do not endorse that rule, but it further illustrates that finding jurisdiction on this record falls well within the pale.

In *World–Wide Volkswagen,* New York residents, who had purchased their automobile from a dealership in New York, were injured when their car caught fire in Oklahoma. The United States Supreme Court held that an Oklahoma court could not exercise personal jurisdiction over the dealership, which operated only in the northeast and had no way of knowing the automobile would end up in Oklahoma. *See World–Wide Volkswagen Corp.,* 444 U.S. 286, 100 S.Ct. 559. But the Court further stated that a "forum State does not exceed its powers under the due process clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 297–98, 100 S.Ct. 559; *see also Keen v. Ashot Ashkelon, Ltd.,* 748 S.W.2d 91, 93 (Tex.1988) (overruled in part on other grounds by *Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 594 (Tex.1999)). Contrary to the Court's assertion, the facts here materially differ from those in *World–Wide Volkswagen.* In that case, the defendant never agreed to send its product to Oklahoma—it was merely foreseeable that the car might end up in Oklahoma because car purchasers in New York sometimes drive to Oklahoma. Here, Michiana not only shipped its motor home to Texas with the full knowledge that a Texas resident would use it, but also directed misrepresentations toward Texas.

The Court also maintains that Michiana's contacts with Texas are no more substantial than those of the defendant in *CMMC v. Salinas,* 929 S.W.2d 435 (Tex.1996). In that case, the plaintiff ordered a winepress from CMMC, a foreign corporation, through an out-of-state middleman. The plaintiff's only causes of action were for negligence and strict products liability; there was no evidence that CMMC committed any intentional torts in Texas by directing misrepresentations at a Texas buyer. Arguably, CMMC could have foreseen injury in Texas; but here, Michiana *knew* that injury would occur in Texas when it *deliberately* committed a tort there, as Holten avers. *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 772 (5th Cir.1988), is distinguishable on

the same grounds. In that case, the Fifth Circuit held that no jurisdiction existed because there was no evidence that the defendant had "expressly aimed" its tortious conduct at Texas. *See id.* Injury only "occurred" in Texas because of the fortuity that the plaintiff's principal place of business was in Texas. *See id.* at 773. Here, there is evidence that any misrepresentation was knowingly aimed at Texas because Michiana, with the knowledge that Holten was a Texas resident who expected the motor home to be delivered to Texas, **\*798** made representations to him regarding the custom motor home.

The Court further errs in its analysis of the special appearance process when it states that "[i]f committing a tort establishes jurisdiction ... guilty nonresidents can be sued here[;] innocent ones cannot." 168 S.W.3d at 791. To establish jurisdiction, a plaintiff must plead facts sufficient to support jurisdiction; to overcome this, a defendant must negate all bases of jurisdiction. *See BMC Software,* 83 S.W.3d at 793. Because jurisdiction under the long arm statute's tort provision turns on whether the defendant committed a tort in Texas, facts supporting jurisdiction often relate to the merits of the case. However, to establish jurisdiction, there need only be a prima facie showing of a purposeful contact with Texas, not proof of liability in tort. *See Arterbury v. Am. Bank & Trust Co.,* 553 S.W.2d 943, 947–48 (Tex.Civ.App.— Texarkana 1977, no writ). Sometimes, as here, the same act is alleged to be both the purposeful contact and the tort, and under these circumstances prima facie proof of a potentially tortious act may be required. *See French v. Glorioso,* 94 S.W.3d 739, 746 (Tex.App.—San Antonio 2002, no pet.). Such a showing gives the trial court jurisdiction to determine ultimate liability in tort. *See Arterbury,* 553 S.W.2d at 948. A subsequent finding that a tort was not committed does not mean that the trial court lacked jurisdiction. [4]

The Court's suggestion that plaintiffs will always allege a tort to get jurisdiction is also misplaced. If a plaintiff can secure jurisdiction by averring that the defendant committed a tort, why can the plaintiff not achieve the same result by averring that the defendant traveled to Texas (which, I assume, the Court would agree is sufficient)? Either case can easily turn into a swearing contest, but that is no justification for failure to give Texas residents the full protection of the long arm statute. We choose to decide jurisdiction based on allegations and averments. *See BMC Software,* 83 S.W.3d at 793. In any event, it is not the tortiousness of the defendant's conduct that creates jurisdiction; it is its purposefulness. Whether a tort was committed is a question for the trial on the merits.

Here, there were uncontroverted averments of a purposeful act directed toward Texas, which Michiana did not bother to refute. Thus, it can hardly be said that Michiana negated this basis of jurisdiction. *See BMC Software,* 83 S.W.3d at 793. The trial court therefore had jurisdiction to determine whether the alleged acts were in fact tortious.

## B

The Court makes much of the forum-selection clause in the contract of sale. Michiana's brief refers to the forum selection clause only as evidence of its own desire that litigation take place in Indiana. Sufficient contacts do not become insufficient simply because the defendant does not want to travel.

Furthermore, this interlocutory appeal under section 51.014(a)(7) of the Civil Practice and Remedies Code concerns the special appearance only. Texas law provides no interlocutory appeal from a denial of a motion for summary judgment based on a forum-selection clause. *See* TEX. CIV. PRAC. & REM.CODE § 51.014. Even if the issue could be considered here, Michiana has not briefed the validity and enforceability of the clause, and it is thus not **\*799** properly a part of this interlocutory appeal.

## IV

Finally, "the exercise of jurisdiction [must] comport[ ] with traditional notions of fair play and substantial justice." *BMC Software,* 83 S.W.3d at 795; *Asahi Metal Indus. Co. v.Super. Ct.,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Factors courts consider are the burden on the defendant, the forum state's interest in adjudicating the controversy, the plaintiff's interest in obtaining efficient resolution of the case, and the shared interest of states in furthering their respective interests. *See Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. The burden on Michiana is not great. This case arises out of Michiana's decision to avail itself of a business opportunity in Texas and to commit the tort of misrepresentation in Texas (intentionally, according to the only evidence in the record). Surely Texas has the right to expect that companies doing business with Texas residents can reasonably anticipate having to answer in Texas courts for torts they commit in Texas.

The Court urges that relying on where a tort was directed impermissibly shifts our focus from the defendant's relation to the forum to the plaintiff's relation to the forum. It does not, however, because knowingly directing a tort at a forum, as Michiana allegedly did, is itself a contact with the forum. The Court attempts to cloud the issue with hypotheticals about cell phones. 168 S.W.3d at 791. Certainly, if a defendant did not know, or were mistaken about, where it was directing its conduct, that "direction" could not serve as a valid basis for jurisdiction but that is not this case. Let there be no mistake: under the Court's opinion, a defendant who intentionally defrauds a Texas resident, with full knowledge that reliance and damages will occur in Texas, cannot be made to answer for its conduct in a Texas court so long as the plaintiff initiated the phone call. [5]

Nothing prevented Michiana from producing evidence to negate jurisdiction, if it existed. The trial court might have even ruled in Michiana's favor. See *French,* 94 S.W.3d at 747. But Michiana did not attempt to refute Holten's averment that it committed a tort in Texas. The trial court therefore did not err in denying Michiana's special appearance, and the court of appeals correctly affirmed the judgment of the trial court.

* * * *

This action arises out of Michiana's contacts with Texas. Because those contacts are sufficient to support specific jurisdiction in this case without violating due process, I would affirm the judgment of the court of appeals.

**All Citations**

168 S.W.3d 777, 48 Tex. Sup. Ct. J. 789

Footnotes

1    *See infra* notes 25–26.
2    TEX. GOV'T CODE § 22.001(a)(2), § 22.225(c).
3    *See* TEX.R.APP. P. 55.2 ("The petitioner's brief on the merits must be confined to the issues or points stated in the petition for review....").
4    127 S.W.3d 89, 96–99.
5    TEX.R.APP. P. 55.2(f) (providing that issues presented "will be treated as covering every subsidiary question that is fairly included").
6    *Martin v. Martin, Martin & Richards, Inc.,* 989 S.W.2d 357, 359 (Tex.1998) (per curiam) ("Unless required by the express language or the context of the particular rule, the term 'hearing' does not necessarily contemplate either a personal appearance before the court or an oral presentation to the court.").
7    *See, e.g.,* TEX.R. CIV. P. 87(3)(b) (motion to transfer venue); *id.* 166a(c) (summary judgment).
8    *See, e.g., Millwrights Local Union No. 2484 v. Rust Eng'g Co.,* 433 S.W.2d 683, 687 (Tex.1968) (holding temporary injunction may not be proved by affidavit unless parties agree otherwise); *see also Union Carbide Corp. v. Moye,* 798 S.W.2d 792, 794 (Tex.1990) (Hecht, J., concurring) (arguing trial court is "obliged ... to hear live testimony when it is necessary to resolve issues that cannot be determined on a written record").
9    *See, e.g.,* TEX.R. CIV. P. 120a(3) (special appearance); 193.4(a) (privilege objections); 199.6 (deposition objections); *compare Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 702 (Tex.2003) (noting five-day certification hearing included twelve bound volumes of exhibits and six volumes of testimony) *with Snyder Communications, L.P. v. Magana,* 142 S.W.3d 295, 297 (Tex.2004) (per curiam) (noting thirty-minute certification hearing included only brief deposition testimony of one claimant).
10   *Union Carbide Corp.,* 798 S.W.2d at 793 (reserving question whether transfer of venue alleging local prejudice required or allowed oral testimony).
11   *Tilton v. Moye,* 869 S.W.2d 955, 957 (Tex.1994); *Otis Elevator Co. v. Parmelee,* 850 S.W.2d 179, 181 (Tex.1993).
12   *Parmelee,* 850 S.W.2d at 181.
13   TEX.R.APP. P. 34.1.
14   *Martin v. Martin, Martin & Richards, Inc.,* 989 S.W.2d 357, 359 (Tex.1998) (per curiam) ("An oral hearing on a motion for summary judgment may be helpful to the parties and the court, just as oral argument is often helpful on appeal.").
15   *See, e.g.,* Act of June 17, 1983, 68th Leg., R.S., ch. 385, § 2, 1983 Tex. Gen. Laws 2119, 2124 (repealing TEX.REV.CIV. STAT. art.2008, which provided for plea of privilege hearings); TEX.R. CIV. P. 120(a) (amended to allow proof by affidavit in special appearances, 785–786 S.W.2d (Tex.Cases) xlviii (1990)).

16    *See Tilton,* 869 S.W.2d at 957 ("The order at issue, however, indicates that the trial court's consideration of the motion to compel was based only on the argument of counsel. Additionally, at oral argument, counsel for Smith conceded that the trial court took no testimony at the hearings. Thus, no statement of facts is necessary."); *Otis Elevator Co.,* 850 S.W.2d at 181 ("The court of appeals held that defendants were precluded from raising their complaint on appeal because they had failed to bring forward a statement of facts from [other pretrial] hearings. This holding, too, is incorrect. There is no indication or assertion that any other hearing to which [plaintiff] alludes involved the taking of evidence.").

17    *See, e.g.,* TEX.R.APP. P. 44.1, 61.1; *Walker v. Packer,* 827 S.W.2d 833, 837 (Tex.1992) ("Since an evidentiary hearing was held, the Walkers had the burden of providing us not only a petition and affidavit, but also a statement of facts from the hearing.") (citation omitted); *see also RP&R, Inc. v. Territo,* 32 S.W.3d 396, 401 (Tex.App.—Houston [14th Dist.] 2000, no pet.) (reversing temporary injunction as record contained no testimony from claimant).

18    873 S.W.2d 368, 370–71 (Tex.1993).

19    *Id.* at 370.

20    *Compare* TEX.R.APP. P. 11(a), 49 TEX. B.J. 961 (1986, superseded 1997) *with* TEX.R.APP. P. 13.1(a) (adopted in 1997); *see also* TEX. GOV'T CODE § 52.046(a) (requiring a court reporter to attend court and make a record "on request"); *id.* § 54.046(c) (granting Supreme Court authority to adopt rules governing court reporter's duties in civil proceedings).

21    *Piotrowski,* 873 S.W.2d at 370–71.

22    TEX. DISCIPLINARY R. PROF'L CONDUCT 3.03 (requiring candor toward tribunal); TEX. LAWYER'S CREED: A MANDATE FOR PROFESSIONALISM IV(6) ("I will not knowingly misrepresent, mischaracterize, misquote or miscite facts or authorities to gain an advantage.").

23    *Bennett v. Cochran,* 96 S.W.3d 227, 230 (Tex.2002) (per curiam).

24    *See BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 796 (Tex.2002) ("Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum.").

25    *City of Riverview, Michigan v. Am. Factors, Inc.,* 77 S.W.3d 855, 858 (Tex.App.—Dallas 2002, no pet.); *Hayes v. Wissel,* 882 S.W.2d 97, 98–100 (Tex.App.—Fort Worth 1994, no pet.); *Laykin v. McFall,* 830 S.W.2d 266, 269 (Tex.App.—Amarillo 1992, no pet.); *C.W. Brown Mach. Shop, Inc. v. Stanley Mach. Corp.,* 670 S.W.2d 791, 793 (Tex.App.—Fort Worth 1984, no writ).

26    127 S.W.3d at 95; *Boissiere v. Nova Capital, LLC,* 106 S.W.3d 897, 904 (Tex.App.—Dallas 2003, no pet.); *Ahadi v. Ahadi,* 61 S.W.3d 714, 720 (Tex.App.-Corpus Christi 2001, pet. denied); *Ring Power Sys. v. Int'l de Comercio Y Consultoria,* 39 S.W.3d 350, 353–54 (Tex.App.—Houston [14th Dist.] 2001, no pet.); *Mem. Hosp. Sys. v. Fisher Ins. Agency,* 835 S.W.2d 645, 650–51 (Tex.App.—Houston [14th Dist.] 1992, no writ).

27    357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (emphasis added).

28    *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

29    *Id.*

30    *Id.* at 473 (citing *Travelers Health Assn. v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 94 L.Ed. 1154 (1950)).

31    *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

32    *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 79 (10th ed. 1993) ("Avail: ... to be of use or advantage to: profit.").

33    *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559 (1980) ("The Due Process Clause ... gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."); *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 808 (Tex.2002).

34    *Burger King,* 471 U.S. at 473, 105 S.Ct. 2174.

35    326 U.S. 310, 313–14, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

36    *Id.* at 320, 66 S.Ct. 154.

37    *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 436 (Tex.1982).

38    *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 201 (Tex.1985) (per curiam).

39    *See, e.g., Reiff v. Roy,* 115 S.W.3d 700, 705–06 (Tex.App.-Dallas 2003, pet. denied) (surveying Texas law on Internet activities).

40    *Asahi Metal Ind. Co., Ltd. v. Superior Court,* 480 U.S. 102, 121, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (Brennan, J., concurring in part).

41    *Id.* at 112, 107 S.Ct. 1026 (O'Connor, J., plurality opinion).

42    *Id.* at 122, 107 S.Ct. 1026 (Stevens, J., concurring in part).

43   *CMMC v. Salinas,* 929 S.W.2d 435, 440 (Tex.1996) ("If anything, *Keen* suggests that we would follow Justice O'Connor's formulation of the stream-of-commerce rule in Texas.").

44   *CSR Ltd. v. Link,* 925 S.W.2d 591, 595–96 (Tex.1996).

45   *CMMC,* 929 S.W.2d at 439.

46   127 S.W.3d at 96.

47   *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 n. 18, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

48   *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559 (1980).

49   *Id.* at 296–97, 100 S.Ct. 559.

50   *Id.* at 298, 100 S.Ct. 559.

51   929 S.W.2d 435 (Tex.1996).

52   *Id.* at 436.

53   *Id.* at 439.

54   *Id.* at 480.

55   *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

56   *Int'l Shoe,* 326 U.S. at 319, 66 S.Ct. 154.

57   *Woodson,* 444 U.S. at 299, 100 S.Ct. 559.

58   *Id.* at 296, 100 S.Ct. 559.

59   929 S.W.2d 435, 436 (Tex.1996) (emphasis added). *CMMC* also made clear that, to the extent of any conflict, our earlier opinion in *Keen v. Ashot Ashkelon, Ltd.,* 748 S.W.2d 91 (Tex.1988) should not be read to extend stream-of-commerce jurisdiction to a single sale. 929 S.W.2d at 439–40.

60   TEX. CIV. PRAC. & REM.CODE § 17.042(2).

61   *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002); *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977).

62   *Woodson,* 444 U.S. at 288, 100 S.Ct. 559; *CMMC,* 929 S.W.2d at 437; *see also Antonio v. Marino,* 910 S.W.2d 624, 628 (Tex.App.—Houston [14th Dist.] 1995, no writ) (holding nonresident shipowner whose agent assaulted and denied wages to seamen in Texas port had not purposefully availed itself of Texas as ship's location was fortuitous).

63   127 S.W.3d at 95; *Morris v. Powell,* 150 S.W.3d 212, 221 (Tex.App.—San Antonio 2004, no pet.); *Stern v. KEI Consultants, Ltd.,* 123 S.W.3d 482, 490 (Tex.App.—San Antonio 2003, no pet.); *AmQuip Corp. v. Cloud,* 73 S.W.3d 380, 386 (Tex.App.—Houston [1st Dist.] 2002, no pet.); *Ahadi v. Ahadi,* 61 S.W.3d 714, 720 (Tex.App.—Corpus Christi 2001, pet. denied); *Shapolsky v. Brewton,* 56 S.W.3d 120, 134 (Tex.App.—Houston [14th Dist.] 2001, pet. denied); *Royal Mortg. Corp. v. Montague,* 41 S.W.3d 721, 731 (Tex.App.—Fort Worth 2001, no pet.); *Mem'l Hosp. Sys. v. Fisher Ins. Agency, Inc.,* 835 S.W.2d 645, 650 (Tex.App.—Houston [14th Dist.] 1992, no writ); *see also Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 772 (5th Cir.1988).

64   *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

65   *National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 773 (Tex.1995).

66   *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174 (quoting *Woodson,* 444 U.S. at 297, 100 S.Ct. 559).

67   *Calder v. Jones,* 465 U.S. 783, 785 n. 2, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

68   465 U.S. 770, 772, 778, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

69   *Id.* at 781, 104 S.Ct. 1473.

70   *See D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.,* 754 F.2d 542, 547 (5th Cir.1985) (basing jurisdiction on nonresident's transfer of its distributorship rights in forum state); *Union Carbide Corp. v. UGI Corp.,* 731 F.2d 1186, 1189–90 (5th Cir.1984) (basing jurisdiction on acts that sought to obtain business in Texas); *Brown v. Flowers Indus., Inc.,* 688 F.2d 328, 333–34 (5th Cir.1982) (basing jurisdiction on defamatory phone call to district attorney attempting to wrest business from resident); *Miss. Interstate Exp. Inc. v. Transpo, Inc.,* 681 F.2d 1003, 1006, 1008 (5th Cir.1982) (basing jurisdiction on nineteen shipping contracts between nonresident broker and resident trucking firm). Especially troubling is the Court's reliance on *Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162 (5th Cir.1985), in which not only were the dispositive acts entirely different from anything here (i.e., a post-sale shipment of a defective replacement part to the forum state), but the court *expressly acknowledged* that jurisdiction *would not* exist on facts *identical* to those here. *Id.* at 1171 ("[T]he mere knowledge that [defendant] was selling to [forum state] residents would be insufficient to support the exercise of jurisdiction.").

71 *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)) (emphasis added).

72 *See Rush v. Savchuk,* 444 U.S. 320, 332, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980) (emphasis added).

73 *See, e.g., Tracker Marine, L.P. v. Ogle,* 108 S.W.3d 349, (Tex.App.-Houston [14th Dist.] 2003, no pet.); RESTATEMENT (SECOND) CONFLICT OF LAWS § 148(2)(a).

74 RESTATEMENT § 6.

75 *Burger King,* 471 U.S. at 481–82, 105 S.Ct. 2174.

76 *See, e.g., Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 774 (Tex.1995) (holding opposition to silica regulation could not form basis of jurisdiction as it was constitutionally protected activity); *Mabry v. Reid,* 130 S.W.3d 385, 389 (Tex.App.—Beaumont 2004, no pet.) (affirming order granting special appearance as some evidence supported trial court's factual determination that either there was no settlement agreement or it was not fraudulent); *Boissiere v. Nova Capital, LLC,* 106 S.W.3d 897, 904 (Tex.App.—Dallas 2003, no pet.) (affirming order denying special appearance as some evidence supported trial court's factual determination that nonresidents committed misrepresentation); *French v. Glorioso,* 94 S.W.3d 739, 746–47 (Tex.App.—San Antonio 2002, no pet.) (affirming order granting special appearance as some evidence supported trial court's factual determination that nonresident never made any misrepresentations to resident); *Runnells v. Firestone,* 746 S.W.2d 845, 851–52 (Tex.App.—Houston [14th Dist.] 1988), *writ denied,* 760 S.W.2d 240 (Tex.1988) (affirming order granting special appearance as some evidence supported trial court's factual determination that there was no contract).

77 *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 805–06 (Tex.2002).

78 *See CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996).

79 *See, e.g., PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 83 (Tex.2004) (noting that Texas law allows consumers to assert warranty claims as breach of contract or violation of DTPA); *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 46 (Tex.1998) (holding Texas law allows party fraudulently induced to sign contract to sue in contract or tort).

80 *See, e.g.,* 168 S.W.3d at 794 ("Today the Court holds that an out-of-state defendant who intentionally defrauds a Texas resident, with full knowledge that reliance and damages will occur in Texas, cannot be made to answer for its conduct in a Texas court simply because the defrauded Texan initiated the phone call.").

81 *Boissiere v. Nova Capital, LLC,* 106 S.W.3d 897, 904–05 (Tex.App.—Dallas 2003, no pet.); *Ahadi v. Ahadi,* 61 S.W.3d 714, 720 (Tex.App.—Corpus Christi 2001, pet. denied); *Ring Power Sys. v. Int'l de Comercio Y Consultoria,* 39 S.W.3d 350, 353–54 (Tex.App.—Houston [14th Dist.] 2001, no pet.); *Mem. Hosp. Sys. v. Fisher Ins. Agency,* 835 S.W.2d 645, 650–51 (Tex.App.—Houston [14th Dist.] 1992, no writ).

82 *Mabry v. Reid,* 130 S.W.3d 385, 389 (Tex.App.—Beaumont 2004, no pet.) (affirming order granting special appearance as some evidence supported trial court's factual determination that either there was no settlement agreement or it was not fraudulent); *Boissiere v. Nova Capital, LLC,* 106 S.W.3d 897, 904 (Tex.App.—Dallas 2003, no pet.) (affirming order denying special appearance as some evidence supported trial court's factual determination that nonresidents committed misrepresentation); *French v. Glorioso,* 94 S.W.3d 739, 746–47 (Tex.App.—San Antonio 2002, no pet.) (affirming order granting special appearance as some evidence supported trial court's factual determination that nonresident never made any misrepresentations to resident); *Runnells v. Firestone,* 746 S.W.2d 845, 851–52 (Tex.App.—Houston [14th Dist.] 1988), *writ denied,* 760 S.W.2d 240 (Tex.1988) (affirming order granting special appearance as some evidence supported trial court's factual determination that there was no contract).

83 127 S.W.3d at 98.

84 *See, e.g., Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (upholding forum-selection clause without discussing contacts between nonresident passengers and forum state).

85 *See Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 437 (Tex.1982).

86 *Burger King,* 471 U.S. at 482, 105 S.Ct. 2174.

87 *In re Automated Collection Techs., Inc.,* 156 S.W.3d 557, 559 (Tex.2004) (per curiam) (holding forum-selection clause was not waived without showing of prejudice).

88 *See* TEX.R. CIV. P. 11.

89 *Automated Collection Techs., Inc.,* 156 S.W.3d at 559 (Tex.2004) (quoting *In re AIU Ins. Co.,* 148 S.W.3d 109, 112 (Tex.2004)).

90 *Woodson,* 444 U.S. at 292, 100 S.Ct. 559.

91 *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

92    *See McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

93    *Woodson,* 444 U.S. at 296–99, 100 S.Ct. 559.

94    *Kulko v. Superior Court of California,* 436 U.S. 84, 93–94, 98 S.Ct. 1690, 56 L.Ed.2d 132(1978).

95    *Hanson v. Denckla,* 357 U.S. 235, 251–54, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

1    *See also Ring Power Sys. v. Int'l de Comercio Y Consultoria,* 39 S.W.3d 350, 354 (Tex.App.—Houston [14th Dist.] 2001, no pet.); *Union Carbide Corp. v. UGI Corp.,* 731 F.2d 1186, 1189–90 (5th Cir.1984) (stating that for jurisdictional purposes, a tort occurs in Texas if the resulting injury occurs in Texas).

2    *See D.J. Invs. v. Metzeler Motorcycle Tire Agent Gregg, Inc.,* 754 F.2d 542, 547 (5th Cir.1985); *Brown v. Flowers Indus., Inc.,* 688 F.2d 328, 333–34 (5th Cir.1982) (holding that a single defamatory phone call directed at a forum was sufficient), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 496 (1983); *Union Carbide,* 731 F.2d at 1189–90 (holding that out of state acts that caused in-state injury were sufficient); *see also Ahadi v. Ahadi,* 61 S.W.3d 714 (Tex.App.—Corpus Christi 2001, pet. denied); *Ring Power Sys.,* 39 S.W.3d at 354; *Rowland & Rowland, P.C. v. Tex. Employers Indem. Co.,* 973 S.W.2d 432, 435–36 (Tex.App.—Austin 1998, no pet.); *Mem. Hosp. Sys.,* 835 S.W.2d at 650–52.

3    *See Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162 (5th Cir.1985) ("The sale and shipment of the master cylinder into Mississippi represented an affirmative act by Crimson to introduce its product into Mississippi for use in that state. By this shipment, Crimson purposefully availed itself of the privilege of conducting activities in Mississippi and its connection with the forum is such that it should reasonably anticipate being haled into court there...."); *Ajax Realty Corp. v. J.F. Zook, Inc.,* 493 F.2d 818 (4th Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2148, 36 L.Ed.2d 687 (1973); *Edwards v. Radventures, Inc.,* 164 F.Supp.2d 190 (D.Mass.2001) (finding specific jurisdiction where Massachusetts plaintiff purchased a monoski via fax from a defendant with no other contacts with Massachusetts and was injured when the ski malfunctioned); *Houston Technical Ceramics, Inc. v. Iwao Jiki Kogyo, Co.,* 742 F.Supp. 387 (S.D.Tex.1990).

4    *BMC Software,* 83 S.W.3d at 793. *See also Boissiere v. Nova Capital, LLC,* 106 S.W.3d 897, 904 (Tex.App.—Dallas 2003, no pet.). This stands in contrast to subject-matter jurisdiction. *See Tex. A & M Univ. v. Bishop,* 156 S.W.3d 580 (Tex.2005) (determining that no subject-matter jurisdiction existed only after a trial on the merits).

5    For example, the Court argues that a single defamatory phone call to an individual in the forum state is not enough to support jurisdiction in an action for libel. 168 S.W.3d at 791. However, the Fifth Circuit has held precisely the opposite that a single defamatory phone call to a United States Attorney in Mississippi was sufficient to create jurisdiction in Mississippi. *See Brown,* 688 F.2d at 333–34.

---

**End of Document**                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Overruling Recognized by**      Waller Marine, Inc. v. Magie,      Tex.App.-Hous. (14 Dist.),      March 26, 2015

221 S.W.3d 569
Supreme Court of Texas.

MOKI MAC RIVER EXPEDITIONS, Petitioner,

v.

Charles DRUGG and Betsy Drugg, Individually,
and as Representatives of the Estate of
Andrew Patrick Drugg, Respondents.

No. 04–0432.     |     Argued Nov. 17,
2005.     |     Decided March 2, 2007.

**Synopsis**
**Background:** Parents of 13-year-old child who died while hiking with nonresident expedition company out-of-state sued company for wrongful death and intentional and negligent misrepresentation. The 134th District Court, Dallas County, Anne Ashby, J., denied company's request for special appearance. Company appealed. The Dallas Court of Appeals, 2004 WL 100389, affirmed. Review was granted.

**Holdings:** The Supreme Court, Harriet O'Neill, J., held that:

[1] as a matter of first impression, for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, for purposes of minimum contacts element of federal due-process analysis for exercising personal jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation, and

[2] nonresident expedition company's contacts with Texas were not substantially connected with operative facts of the litigation.

Reversed and remanded.

Phil Johnson, J., filed a dissenting opinion, in which Medina, J., joined.

West Headnotes (26)

**[1]**    **Courts**
🔑 Review by or certificate to Supreme Court by Court of Civil Appeals of questions where its decision conflicts with or overrules that of another Court of Civil Appeals or that of the Supreme Court

Generally, a Texas Court of Appeals' decision in an interlocutory appeal in a civil case is final, so that a petition for review is not allowed to the Texas Supreme Court, but if the Court of Appeals holds differently from a prior decision of another Texas Court of Appeals, the Texas Supreme Court, or the United States Supreme Court, has jurisdiction to resolve the disagreement or conflict. V.T.C.A., Government Code §§ 22.001(a)(1, 2), 22.225(b)(3), (c).

Cases that cite this headnote

**[2]**    **Courts**
🔑 Allegations, pleadings, and affidavits

The plaintiff bears the initial burden of pleading sufficient allegations to invoke jurisdiction under the Texas long-arm statute. V.T.C.A., Civil Practice & Remedies Code § 17.001 et seq.

19 Cases that cite this headnote

**[3]**    **Courts**
🔑 Presumptions and Burden of Proof as to Jurisdiction

If the plaintiff meets the initial burden of pleading sufficient allegations to invoke jurisdiction under the Texas long-arm statute, the nonresident defendant then assumes the burden of negating all bases of jurisdiction in those allegations. V.T.C.A., Civil Practice & Remedies Code § 17.001 et seq.

33 Cases that cite this headnote

**[4]**    **Appeal and Error**
🔑 Cases Triable in Appellate Court

Because the question of a trial court's exercise of personal jurisdiction over a nonresident defendant is one of law, the appellate court reviews a trial court's determination on a request for a special appearance de novo.

33 Cases that cite this headnote

[5]    **Appeal and Error**
       Necessity of finding facts

When the trial court does not make findings of fact and conclusions of law in support of its ruling, the appellate court infers all facts necessary to support the judgment and supported by the evidence.

5 Cases that cite this headnote

[6]    **Constitutional Law**
       Non-residents in general
       **Courts**
       Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Texas courts may assert in personam jurisdiction over a nonresident if: (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 19; V.T.C.A., Civil Practice & Remedies Code § 17.001 et seq.

44 Cases that cite this headnote

[7]    **Courts**
       Fraud, racketeering, and deceptive practices

Negligent and intentional misrepresentation claims brought by parents of 13-year-old child who died outside of state while hiking with nonresident expedition company, which claims were based on brochures which company had sent to Texas resident who shared them with child and his family and release form which company sent to child's family in Texas, satisfied the doing-business requirement for personal jurisdiction under Texas long-arm

statute. V.T.C.A., Civil Practice & Remedies Code § 17.042(1, 2).

Cases that cite this headnote

[8]    **Courts**
       Business contacts and activities; transacting or doing business

The Texas long-arm statute's broad doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow, and thus, the requirements of the Texas long-arm statute are satisfied if an assertion of jurisdiction accords with federal due-process limitations. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(1, 2).

36 Cases that cite this headnote

[9]    **Constitutional Law**
       Non-residents in general

Under federal due-process requirements, personal jurisdiction is proper when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

45 Cases that cite this headnote

[10]   **Constitutional Law**
       Non-residents in general

Nonresident's contacts with forum state are sufficient, for purposes of minimum contacts element of federal due-process analysis for exercising personal jurisdiction over nonresident defendant, when nonresident defendant purposefully avails itself of privilege of conducting activities within forum state, thus invoking benefits and protections of its laws. U.S.C.A. Const.Amend. 14.

99 Cases that cite this headnote

[11]   **Constitutional Law**
       Non-residents in general

Only nonresident defendant's contacts with forum state are relevant to purposeful availment, for purposes of minimum contacts element of federal due-process analysis for exercising personal jurisdiction; unilateral activity of another party or third person is irrelevant. U.S.C.A. Const.Amend. 14.

26 Cases that cite this headnote

**[12]    Constitutional Law**
 Non-residents in general

For purposes of minimum contacts element of federal due-process analysis for exercising personal jurisdiction, nonresident defendant's contacts with forum state must be purposeful rather than random, fortuitous, or attenuated. U.S.C.A. Const.Amend. 14.

18 Cases that cite this headnote

**[13]    Constitutional Law**
 Manufacture, distribution, and sale

Sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities, under federal due-process principles. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote

**[14]    Constitutional Law**
 Non-residents in general

A nonresident defendant may purposefully avoid a particular forum, so that federal due-process principles preclude the forum's exercise of personal jurisdiction over defendant, by structuring its transactions in such a way as to neither profit from forum's laws nor subject itself to jurisdiction there. U.S.C.A. Const.Amend. 14.

5 Cases that cite this headnote

**[15]    Courts**
 Unrelated contacts and activities; general jurisdiction

If nonresident defendant has made continuous and systematic contacts with forum, general jurisdiction is established whether or not defendant's alleged liability arises from those contacts.

58 Cases that cite this headnote

**[16]    Constitutional Law**
 Non-residents in general

When specific jurisdiction is alleged, court focuses the federal due process minimum-contacts analysis for exercising personal jurisdiction on the relationship among the nonresident defendant, the forum, and the litigation. U.S.C.A. Const.Amend. 14.

21 Cases that cite this headnote

**[17]    Courts**
 Related contacts and activities; specific jurisdiction

Specific jurisdiction is established if the nonresident defendant's alleged liability arises out of or is related to an activity conducted within the forum.

19 Cases that cite this headnote

**[18]    Constitutional Law**
 Manufacture, distribution, and sale

A nonresident defendant that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit in Texas, based on federal due-process principles, for alleged liability arising from or relating to that business. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[19]    Constitutional Law**
 Manufacture, distribution, and sale

A nonresident who places products into the "stream of commerce" with the expectation that they will be sold in the forum state is subject to personal jurisdiction in the forum, under federal due-process principles. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[20] Constitutional Law**
⌖ Non-residents in general

While a nonresident defendant's single contact with the forum state can support personal jurisdiction, under federal due-process principles, if that contact creates a substantial connection with the forum, jurisdiction cannot be established where the contact creates only an attenuated affiliation with the forum. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[21] Constitutional Law**
⌖ Manufacture, distribution, and sale

A nonresident defendant's mere sale of a product to a Texas resident will not generally suffice to confer specific jurisdiction upon Texas courts, for purposes of minimum contacts element of federal due-process analysis for exercising personal jurisdiction; instead, the facts alleged must indicate that the seller intended to serve the Texas market. U.S.C.A. Const.Amend. 14.

10 Cases that cite this headnote

**[22] Constitutional Law**
⌖ Business, business organizations, and corporations in general

In determining whether nonresident defendant purposefully directed action toward Texas, for purposes of minimum contacts element of federal due-process analysis for exercising personal jurisdiction, court may look to conduct beyond the particular business transaction at issue, because additional conduct of defendant may indicate intent or purpose to serve market in forum state. U.S.C.A. Const.Amend. 14.

34 Cases that cite this headnote

**[23] Constitutional Law**
⌖ Services and service providers
**Courts**

⌖ Fraud, racketeering, and deceptive practices

Nonresident expedition company purposefully directed action toward Texas, for purposes of minimum contacts element of federal due-process analysis for exercising personal jurisdiction, in action for intentional and negligent misrepresentation brought by parents of 13-year-old child who died outside of state while hiking with company; company knowingly sold rafting trips to Texas residents and purposefully directed marketing efforts to Texas, including mass and targeted direct-marketing email campaigns and the use of particular customers as de facto group leaders who planned, organized, and promoted its trips. U.S.C.A. Const.Amend. 14.

25 Cases that cite this headnote

**[24] Negligence**
⌖ Necessity of causation
**Negligence**
⌖ Foreseeability

Proximate cause, as element of negligence, requires the defendant's conduct to be both the cause in fact and the foreseeable cause of injury.

4 Cases that cite this headnote

**[25] Constitutional Law**
⌖ Non-residents in general

For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, for purposes of minimum contacts element of federal due-process analysis for exercising personal jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. U.S.C.A. Const.Amend. 14.

70 Cases that cite this headnote

**[26] Constitutional Law**
⌖ Services and service providers
**Courts**
⌖ Fraud, racketeering, and deceptive practices

Nonresident expedition company's contacts with Texas were not substantially connected with operative facts of the litigation, and thus, specific jurisdiction was not a basis for satisfying minimum contacts element of federal due-process analysis for exercising personal jurisdiction, in action for wrongful death and intentional and negligent misrepresentation brought by parents of 13-year-old child who died outside of state while hiking with company; even if child might not have gone on expedition if company had not made representations, in promotional materials reviewed by child's family in Texas, regarding safety of company's river rafting trips, operative facts of case principally concerned guides' conduct of the hiking expedition and whether they exercised reasonable care in supervising child. U.S.C.A. Const.Amend. 14.

41 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*572** E. Thomas Bishop, Alexander N. Beard and Stephanie Ann Finch, Bishop & Hummert, P.C., Dallas, for Petitioner.

Steven E. Aldous, Michael Braden and Robert Ray Varner Jr., Braden, Vamer & Aldous, P.C., Dallas, for Respondent.

Douglas Alexander, Alexander Dubose Jones & Townsend, LLP, Austin, for Amicus Curiae.

**Opinion**

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice BRISTER, Justice GREEN, and Justice WILLETT joined.

A Texas court may assert specific jurisdiction over an out-of-state defendant if **\*573** the defendant's contact with this state is purposeful and the injury arises from or relates to those contacts. In this wrongful-death case against a Utah-based river-rafting outfitter, the defendant contends the plaintiff's death on a Grand Canyon hiking trail did not arise from or relate to its instate commercial activities so as to establish specific jurisdiction over it in Texas. We agree. Accordingly,

we reverse and remand the case to the court of appeals to determine whether general jurisdiction exists.

**I. Background**

Charles and Betsy Drugg's thirteen-year-old son, Andy, died on a June 2001, river-rafting trip in Arizona with Moki Mac River Expeditions, a Utah-based river-rafting outfitter. Moki Mac did not directly solicit the Druggs to participate in the trip. Instead, the Druggs learned about Moki Mac's excursions from a fellow Texas resident, Annie Seals, who had contacted the company regarding a rafting trip in the Grand Canyon. There was no space available for her at that time, but Seals's contact information was placed on Moki Mac's computerized mailing list so that she would automatically receive a brochure for the 2001 season when it became available. Moki Mac subsequently sent two brochures to Seals in Texas detailing pricing and schedules for upcoming excursions. Seals informed Moki Mac of the interest of several others in Texas with whom she shared the literature, including Andy and members of his family.

Betsy Drugg reviewed the brochures and information from Moki Mac's website. After corresponding with Moki Mac representatives from her home in Texas, Betsy ultimately decided to send Andy on the rafting trip. Andy's grandmother sent Moki Mac an application and payment for herself and Andy. As was its practice, Moki Mac sent a letter confirming payment to the Druggs' home in Texas along with an acknowledgment-of-risk and release form, which the company requires participants to sign as a prerequisite to attendance. Both Andy and his mother signed the form and returned it to Moki Mac.

The Druggs allege that on the second day of Andy's fourteen-day trip, Moki Mac guides led the group up an incline on a trail that narrowed around and was obstructed by a large boulder. The guides were positioned at the head and rear of the group, but no guide was present near the boulder. As Andy attempted to negotiate the boulder-blocked path, requiring him to lean back while attempting to cross a very narrow ledge, he fell backwards approximately fifty-five feet and was fatally injured.

The Druggs filed suit in Texas for wrongful death due to Moki Mac's negligence and for intentional and negligent misrepresentation.[1] The trial court denied Moki Mac's special appearance and the court of appeals affirmed on

the basis of specific jurisdiction, holding that the Druggs' misrepresentation claim arose from, and related to, Moki Mac's purposeful contacts with Texas. 2004 WL 100389. Because the court of appeals found specific jurisdiction, it did not consider whether general jurisdiction was proper. We granted Moki Mac's petition for review to consider the extent to which a claim must "arise from or relate to" forum contacts in **\*574** order to confer specific jurisdiction over a nonresident defendant. [2]

## II. Jurisdiction

 [1]  As a threshold matter, the Druggs contend we do not have jurisdiction over Moki Mac's interlocutory appeal in this case. Generally, a court of appeals' decision in an interlocutory appeal is final. TEX. GOV'T CODE § 22.225(b)(3). When, however, the court of appeals holds differently from a prior decision of another court of appeals, this Court, or the United States Supreme Court, we have jurisdiction to resolve the disagreement or conflict. TEX. GOV'T CODE §§ 22.001(a)(1), (2) and 22.225(c); *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675 (Tex.2002). Moki Mac contends the court of appeals' decision in this case conflicts, *inter alia,* with *Laykin v. McFall,* 830 S.W.2d 266 (Tex.App.-Amarillo 1992, orig. proceeding). There, the court of appeals held that a Texas court could not assert jurisdiction over an out-of-state defendant in a suit by a Texas resident alleging fraud and conversion because the "focal point" of the allegedly tortious activity and the plaintiff's damages did not lie in Texas. *Id.* at 270. In this case, in contrast, the court of appeals held that the Texas court could assert jurisdiction without regard to the likely focus of the parties' efforts in the underlying lawsuit. 2004 WL 100389, at \*4. We have jurisdiction to resolve the conflict in this interlocutory appeal. TEX. GOV'T CODE § 22.001(a)(2).

## III. *In Personam* Jurisdiction

 [2]   [3]   [4]   [5]   The plaintiff bears the initial burden of pleading sufficient allegations to invoke jurisdiction under the Texas long-arm statute. *Am. Type Culture Collection v. Coleman,* 83 S.W.3d 801, 807 (Tex.2002). The nonresident defendant then assumes the burden of negating all bases of jurisdiction in those allegations. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2002). Because the question of a court's exercise of personal jurisdiction over a nonresident defendant is one of law, we review a trial court's

determination of a special appearance *de novo. Id.* at 794. When, as here, the trial court does not make findings of fact and conclusions of law in support of its ruling, we infer "all facts necessary to support the judgment and supported by the evidence...." *Id.* at 795.

 [6]   [7]   Texas courts may assert *in personam* jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990). Our long-arm statute describes what, "[i]n addition to other acts," may constitute doing business in this state. TEX. CIV. PRAC. & REM.CODE § 17.042. Pertinent to this case are the first two subsections, which provide that a nonresident does business in Texas if it:

> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; [or]

> (2) commits a tort in whole or in part in this state;

*Id.* § 17.042(1), (2). The Druggs' negligent and intentional misrepresentation claims based on Moki Mac's brochures and release form satisfy the doing-business requirement for jurisdiction under the plain **\*575** language of the statute. But the exercise of jurisdiction under the statute must be consistent with federal and state constitutional guarantees of due process. *See Schlobohm,* 784 S.W.2d at 356.

 [8]   We have said that the long-arm statute's broad doing-business language allows the statute to "reach as far as the federal constitutional requirements of due process will allow." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991); *see also Schlobohm,* 784 S.W.2d at 357; *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977). Thus, the requirements of the Texas long-arm statute are satisfied if an assertion of jurisdiction accords with federal due-process limitations. *Am. Type Culture Collection,* 83 S.W.3d at 806; *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996); *Schlobohm,* 784 S.W.2d at 357.

 [9]   [10]   Federal due-process requirements limit a state's power to assert personal jurisdiction over a nonresident defendant. *See Guardian Royal,* 815 S.W.2d at 226. Personal jurisdiction is proper when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with " 'traditional notions

of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant " 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (quoting *Int'l Shoe Co.,* 326 U.S. at 319, 66 S.Ct. 154); *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005).

 **[11]**  **[12]**  **[13]**  **[14]**  We have recently explained that there are three parts to a "purposeful availment" inquiry. *Michiana,* 168 S.W.3d at 784–85. First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. *Id.* at 785. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. *Id.; see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 n. 18, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Thus, "[s]ellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities." *Michiana,* 168 S.W.3d at 785 (quoting *Burger King,* 471 U.S. at 473, 105 S.Ct. 2174). Finally, the "defendant must seek some benefit, advantage or profit by 'availing' itself of the jurisdiction." *Michiana,* 168 S.W.3d at 785. In contrast, a defendant may purposefully avoid a particular forum by structuring its transactions in such a way as to neither profit from the forum's laws nor subject itself to jurisdiction there. *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174.

 **[15]**  **[16]**  **[17]**  A nonresident defendant's forum-state contacts may give rise to two types of personal jurisdiction. *BMC Software,* 83 S.W.3d at 795–96. If the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability arises from those contacts. *Id.* at 796; *CSR Ltd.,* 925 S.W.2d at 595. In contrast, when specific jurisdiction is alleged, we focus the minimum-contacts analysis on the "relationship among the defendant, the forum [,] and the **\*576** litigation." *Guardian Royal,* 815 S.W.2d at 228 (citing *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Schlobohm,* 784 S.W.2d at 357). Specific jurisdiction

is established if the defendant's alleged liability "aris[es] out of or [is] related to" an activity conducted within the forum. *Helicopteros,* 466 U.S. at 414 n. 8, 104 S.Ct. 1868; *see also CSR Ltd.,* 925 S.W.2d at 595. The United States Supreme Court has provided relatively little guidance on the "arise from or relate to" requirement, nor have we had occasion to examine the strength of the nexus required to establish specific jurisdiction.

### IV. Jurisdictional Analysis

The Druggs assert that Moki Mac established sufficient minimum contacts with Texas by making material misrepresentations to them here, upon which they relied, regarding the nature of the services that would be provided on its trips. The wrongful death of their son, the Druggs argue, arose from or related to the fact that Moki Mac's services did not meet the standards it represented in Texas. Moki Mac's principal argument is that there is an insufficient nexus between any alleged misrepresentations that it made in Texas and Andy's wrongful death in Arizona to satisfy jurisdictional due process. According to Moki Mac, Andy's death might have arisen out of or related to alleged negligence that occurred in Arizona, but it had no meaningful connection to Moki Mac's alleged misrepresentations in Texas.

For a Texas forum to properly exercise specific jurisdiction in this case, (1) Moki Mac must have made minimum contacts with Texas by purposefully availing itself of the privilege of conducting activities here, and (2) Moki Mac's liability must have arisen from or related to those contacts. *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 806. Before deciding whether Moki Mac's liability arose from or related to its forum contacts, we must first examine the nature of those contacts and whether Moki Mac purposefully availed itself of the privilege of conducting business here. *See Michiana,* 168 S.W.3d at 784–85.

### A. Purposeful Availment

 **[18]**  A nonresident defendant that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit here for alleged liability arising from or relating to that business. *Id.,* 168 S.W.3d at 785. In *Michiana,* we concluded that a single product sale stemming from a single phone call initiated from Texas to a nonresident defendant was not a purposeful contact sufficient to satisfy the due-process

minimum-contacts test because the seller did not purposefully direct marketing efforts here to solicit sales. *Id.* at 781, 785–86. In that case, Holten, a Texas resident, called Michiana, the nonresident defendant, to purchase an RV manufactured outside of Texas, which Michiana delivered to Texas entirely at Holten's expense. *Id.* at 784. Michiana did not advertise in Texas and undertook no affirmative efforts to solicit business here. *Id.* We held that the alleged commission of a tort by making misrepresentations during a phone call initiated by Holten was insufficient, by itself, to establish jurisdiction. *Id.* at 791–92. Such a test, we reasoned, would improperly focus the purposeful-availment analysis on the form of the action chosen by the plaintiff rather than on the defendant's efforts to avail itself of the forum. *Id.* at 791. We also held that, standing alone, delivery of the single RV to Texas to accommodate Holten was a similarly deficient basis for jurisdiction. *Id.* at 786–88.

[19] [20] The United States Supreme Court has recognized that a nonresident **\*577** who places products into the "stream of commerce" with the expectation that they will be sold in the forum state is subject to the forum's jurisdiction. *World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. 559. Although the Court has also stated that a single contact can support jurisdiction if that contact creates a "substantial connection" with the forum, jurisdiction cannot be established where the contact creates only an " 'attenuated' affiliation with the forum." *Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. 2174 (quoting *World–Wide Volkswagen,* 444 U.S. at 299, 100 S.Ct. 559). Indeed, in *World–Wide Volkswagen,* the Court held that a New York dealership that did not advertise or solicit business in Oklahoma was not subject to suit there simply because it sold a car to New York residents in New York who "happened to suffer an accident while passing through" Oklahoma. *World–Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. 580. The Court reasoned that this one occurrence was mere fortuity and too attenuated to support jurisdiction, given the dealership's complete lack of affiliation with Oklahoma. *Id.* Similarly, Michiana's single contact with Texas was too attenuated to support jurisdiction in Texas. Michiana had no control over the point of customer contact that generated the sale and, like the defendant in *World–Wide Volkswagen,* had no say over where the RV would end up. *Michiana,* 168 S.W.3d at 787. Rather, Michiana's sale to Texas resulted from the mere fortuity that Holten happened to reside here, and Holten's unilateral activity could not subject Michiana to specific jurisdiction here. *Id.* at 787.

[21] [22] Thus, the mere sale of a product to a Texas resident will not generally suffice to confer specific jurisdiction upon our courts. Instead, the facts alleged must indicate that the seller intended to serve the Texas market. *CSR Ltd.,* 925 S.W.2d at 595; *see Asahi Metal Ind. Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). This rule accords with the due-process requirement that a nonresident defendant must take action that is purposefully directed toward the forum state. *See Asahi,* 480 U.S. at 112, 107 S.Ct. 1026. In determining whether the defendant purposefully directed action toward Texas, we may look to conduct beyond the particular business transaction at issue: "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State." *Id.; see also Michiana,* 168 S.W.3d at 786 (stating that Texas "cases appear to follow the 'additional conduct standard' "). Examples of additional conduct that may indicate whether a defendant purposefully availed itself of a particular forum include advertising and establishing channels of regular communication to customers in the forum state. *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026.

[23] Unlike in *Michiana,* the evidence in this cases indicates that Moki Mac does intend to serve the Texas market. Moki Mac knowingly sells rafting trips to Texas residents and purposefully directs marketing efforts to Texas with the intent to solicit business from this state. In addition to sending the brochures and release to the Druggs, the evidence shows that Moki Mac regularly advertised in Texas. It has placed advertisements in a variety of nationally circulated publications that have Texas subscribers. Moki Mac also hired public relations firms to target media groups and tour operators, some of whom were located in Texas. In 1996, Moki Mac promoted its trips within Texas by taking out an advertisement in the *Austin Chronicle.* We have said that a nonresident defendant's advertising in local media "in and of itself, is a sufficiently purposeful act that is done in Texas." *Siskind v. Villa* **\*578** *Found. for Educ., Inc.,* 642 S.W.2d 434, 436 (Tex.1982).

Moki Mac's efforts to solicit business in Texas, however, go further. It solicited Texas residents through mass and targeted direct-marketing email campaigns. Moki Mac compiled a mailing list by collecting contact information from interested parties either by phone, email, or through the company's website. In addition, Moki Mac obtained a list of potential customers from a commercial source. Both its own mailing list and the commercial mailing list included Texas residents. The company would automatically send brochures and trip

information to people who had previously expressed interest in a trip, even in years when that person had not expressed interest. As part of those promotions, Moki Mac offered "a free float" as an incentive to customers who coordinated a group of ten or more. Moki Mac provided this compensation to at least two Texas residents. Moki Mac occasionally provided musicians to accompany float trips free of charge. On one particular trip, Moki Mac permitted a string quartet from Fort Worth to accompany a Texas group on its float trip, free of charge to the musicians. Moki Mac also paid a fee to a travel agency located in Houston, resulting in multiple trips involving Texas residents.

In addition, Moki Mac established channels of regular communication with its customers in Texas. It was Moki Mac's practice to utilize particular customers, who would become *de facto* group leaders, to plan, organize, and promote its trips. Annie Seals was one such contact. By communicating with all of its customers through correspondence with a single group leader, Moki Mac streamlined its reservations process. The company kept these communication channels open; it was Moki Mac's practice to automatically send information regarding new trips, schedules, and prices to those on its mailing list who had been a customer or who had simply expressed interest in a trip within a three-year period.

We stated in *Michiana* that the contacts of "[s]ellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' " are purposeful rather than fortuitous. *Michiana,* 168 S.W.3d at 785 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Moki Mac's contacts with Texas did not result, as did the defendant's in *Michiana,* from the mere fortuity that the Druggs happened to reside here. Rather, the contacts it had with Texas resulted from additional conduct through which it aimed to get extensive business in or from this state.

Purposeful availment requires that "a defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id.* at 785. The notion necessarily implies that the nonresident submit to suit in the forum, and that a nonresident may avoid being haled into court in a particular forum by purposefully conducting business so as not to derive benefit or profit from a forum's laws. *Id.* We held in *Michiana* that the defendant did not purposefully avail itself of the benefits and protections of Texas law because it did not regularly sell RVs in Texas, did not design,

advertise, or distribute RVs in Texas, and because the single relationship with Holten would end once the sale was consummated. *Id.* at 785–86, 794. Moki Mac, conversely, sought and obtained profit from Texas residents, with whom the company maintained communications, and it derived a substantial amount of its business from Texas. Unlike in *Michiana,* where we characterized a single sale resulting from a single phone call originating from a Texas number as a "dribble," *id.* at 786, the **\*579** "stream of commerce" Moki Mac tapped into was significant. There is evidence that, over the preceding five years, between 105 and 128 of Moki Mac's customers (between 7–11%) were from Texas. We have emphasized that mere profit originating from the forum, if unrelated to a contact with the forum, is not purposeful availment. *Id.* at 787–88; *see also World–Wide Volkswagen,* 444 U.S. at 299, 100 S.Ct. 559. But Moki Mac's business with Texas residents stems from its marketing and advertising activities purposefully directed at gaining Texas customers, and it thus availed itself of doing business here.

This Court found purposeful availment in a similar case concerning an out-of-state school that sent information to a Texas individual upon his request. *Siskind,* 642 S.W.2d at 435. In *Siskind,* we held that an exercise of personal jurisdiction was proper over a school for troubled children located in Arizona. *Id.* at 435. Siskind paid tuition for his son to attend Villa with the understanding from the school's brochures and Siskind's modified enrollment contract that he would be reimbursed if his son left during the school year. *Id.* Villa expelled Siskind's son, but when Villa refused to refund the tuition, Siskind sued the school in Texas for breach of contract, misrepresentation, and violation of the Texas Deceptive Trade Practices Act. *Id.* at 435–36. A significant number of Villa's students were Texas residents, and the school advertised in the El Paso, Houston, and Lubbock telephone directories as well as solicited business in a number of national publications that were circulated in Texas. *Id.* at 435. We held that Villa's advertisements, "in conjunction with its practice of mailing informational packets, applications for admission, invitations to re-enroll, and enrollment contracts to Texas residents," indicated that the school had affirmatively sought business in Texas. *Id.* at 436. Here, Moki Mac not only sent brochures and release forms to the Druggs in Texas, it also engaged in additional conduct demonstrating that, like the defendant in *Siskind,* it actively solicited business in Texas.

We conclude that Moki Mac had sufficient purposeful contact with Texas to satisfy the first prong of jurisdictional

due process. But purposeful availment alone will not support an exercise of specific jurisdiction. Specific-jurisdiction analysis has two co-equal components. For specific-jurisdiction purposes, purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts. Moki Mac contends there was an insufficient nexus between Andy's injuries and Moki Mac's contacts with Texas to establish specific jurisdiction, an argument to which we now turn.

### B. Relatedness Requirement

The "arise from or relate to" requirement lies at the heart of specific jurisdiction by defining the required nexus between the nonresident defendant, the litigation, and the forum. To support specific jurisdiction, the Supreme Court has given relatively little guidance as to how closely related a cause of action must be to the defendant's forum activities. In assessing the relationship between a nonresident's contacts and the litigation, most courts have focused on causation, but they have differed over the proper causative threshold. *See Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 714 (1st Cir.1996) (discussing various causative approaches). Some courts have pursued an expansive but-for causative approach, others have adopted a restrictive relatedness view requiring forum contacts to be relevant to a necessary element of proof, and some have applied a sliding-scale analysis that attempts **\*580** to strike a balance between the two. *See* Mark M. Maloney, *Specific Jurisdiction and the "Arise From or Relate to" Requirement ... What Does it Mean?,* 50 WASH. & LEE L.REV. 1265, 1276, 1299 (1993). Each approach has proponents and detractors, for the reasons we examine below.

### 1. "But–For" Relatedness

In *Helicopteros Nacionales de Colombia v. Hall,* the Supreme Court evaluated a Colombian corporation's limited contacts with Texas and decided they were not sufficiently continuous and systematic to support general jurisdiction over the defendant in Texas. 466 U.S. at 418–19, 104 S.Ct. 1868. The Court did not reach specific jurisdiction because the parties had conceded that the plaintiffs' claims did not arise from or relate to the defendant's activities in Texas. *Id.* at 415–16, 104 S.Ct. 1868. Justice Brennan, though, dissented, espousing a broad "but-for" approach to relatedness, and courts that have applied that test have generally relied on his view. *Id.* at 427–28, 104 S.Ct. 1868.

Courts that support the but-for approach have said that a cause of action arises from or relates to a defendant's forum contacts when, but for those contacts, the cause of action would never have arisen. *See Shute v. Carnival Cruise Lines,* 897 F.2d 377, 385 (9th Cir.1990), *rev'd on other grounds,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *see also Prejean v. Sonatrach, Inc.,* 652 F.2d 1260, 1270 n. 21 (5th Cir.1981) (holding that a "contract [was] a but for causative factor" for the tort suit); *cf. Lanier v. Am. Bd. of Endodontics,* 843 F.2d 901, 909 (6th Cir.1988) (interpreting "arising out of" language in Michigan's long-arm statute and concluding that alleged discrimination would not have occurred but for the defendants' contacts with the forum). Rather than considering only isolated contacts that relate to a specific element of proof or the proximate cause of injury, the but-for analysis considers jurisdictional contacts that occur over the "entire course of events" of the relationship between the defendant, the forum, and the litigation. *See Shute,* 897 F.2d at 384.

As the sole jurisdiction to explicitly adopt the but-for test, the Ninth Circuit Court of Appeals has been its staunchest advocate, and *Shute's* progeny have generally demonstrated the circuit's continuing support. *Nowak,* 94 F.3d at 714 (noting the Ninth Circuit as "the most forceful defender of the 'but for' test"); *see Ballard v. Savage,* 65 F.3d 1495, 1500 (9th Cir.1995); *Terracom v. Valley Nat'l Bank,* 49 F.3d 555, 561 (9th Cir.1995); *but see Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 271 (9th Cir.1995) (noting that "[t]he authority of our decision in *Shute* is questionable"). Applying the but-for test, the *Shute* court held that a passenger's personal injuries suffered aboard a cruise ship arose out of the nonresident cruise line's contacts with Washington because, but for the cruise line's advertisements there, the passenger would not have purchased a ticket and boarded the ship. *Shute,* 897 F.2d at 386. The cruise line advertised in local media and sent brochures to the state. *Id.* at 379. The court reasoned that, when a defendant demonstrates "continuing efforts to solicit business in the forum state," whether a cause of action arises from those efforts must be viewed over the entire course of events. *Id.* at 385–86. The court did not limit its relatedness analysis to the passenger's reservation contract, but instead analyzed the range of the cruise line's solicitation activities. *Id.* at 385–86.

The Fifth Circuit appeared to apply relatedness in a similarly expansive manner in *Prejean,* 652 F.2d at 1270. There, the spouses of passengers who died in a plane crash brought a wrongful-death action in **\*581** Texas against, among others,

an Algerian oil company that chartered the flight. *Id.* In reversing the trial court's dismissal for want of personal jurisdiction and remanding for further factual inquiry, the Fifth Circuit stated that, assuming the defendant had chartered the plane, the wrongful-death suit would arise from that charter because the charter contract would be a but-for causative factor for the tort of wrongful death. *Id.*

Several justifications have been posited for the but-for approach. *See Shute,* 897 F.2d at 385. In *Shute,* the court explained that the but-for test preserves the specific-jurisdiction requirement that there be a nexus between the cause of action and the defendant's activities in the forum. *Id.* At the same time, the court opined, the expansive approach is more fundamentally fair because it does not allow a defendant to engage in significant purposeful activities in the forum yet still avoid jurisdiction when the relationship of the cause of action to those activities is tenuous. *Id.* at 385–86.

On the other hand, the but-for approach has been widely criticized for the expanse of its seemingly unlimited jurisdictional reach: "[a] 'but for' requirement ... has in itself no limiting principle; it literally embraces every event that hindsight can logically identify in the causative chain." *Nowak,* 94 F.3d at 715; *see also* Lea Brilmayer, *Related Contacts and Personal Jurisdiction,* 101 HARV. L.REV.. 1444, 1462 (1988) (criticizing the but-for test for its limitless reach). Although the *Shute* court posited that the required reasonableness inquiry would act as a check on the but-for test's expansiveness, commentators have questioned the efficacy of the reasonableness safeguard, calling it "highly deferential." *See, e.g.,* Maloney, *supra* at 1298.

Few courts beyond the Ninth Circuit have adopted the but-for approach to relatedness. Specifically, both the Fifth and Sixth Circuits have signaled a movement away from such a broad test. [3] We agree with those courts and commentators who view the but-for test as too broad and judicially unmoored to satisfy due-process concerns.

### 2. Substantive Relevance/Proximate Cause

Far more structured than the but-for approach is the restrictive view of relatedness **\*582** known as "substantive relevance." As the name implies, this test requires forum-related contacts to be substantively relevant, or even necessary, to proof of the claim. *See Tecre Co. v. Buttonpro, Inc.,* 387 F.Supp.2d 927, 933 (E.D.Wis.2005) (citing *Marino v. Hyatt Corp.,* 793

F.2d 427, 430 (1st Cir.1986)). One iteration of this standard is known as the "proximate cause" test, reasoning that a contact that is the proximate or legal cause of an injury is substantively relevant to a cause of action that arises from it. The First, Second, and Eighth Circuits appear to have followed this approach. *See United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1089 (1st Cir.1992); *Pizarro v. Hoteles Concorde Int'l, C.A.,* 907 F.2d 1256, 1259–60 (1st Cir.1990); *Marino,* 793 F.2d at 429–30; *Morris v. Barkbuster, Inc.,* 923 F.2d 1277, 1281 (8th Cir.1991); *Pearrow v. Nat'l Life & Accident Ins. Co.,* 703 F.2d 1067, 1068–69 (8th Cir.1983); *Gelfand v. Tanner Motor Tours,* 339 F.2d 317, 321–22 (2d Cir.1964).

[24] Proximate cause requires the defendant's conduct to be both the cause in fact and the foreseeable cause of injury. *See Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). Under this more stringent relatedness standard, the purposeful contact that is a proximate cause of injury is an essential liability element and is thus substantively relevant to a plaintiff's claim of harm.

In *Marino,* for instance, a Massachusetts resident brought suit in her home state against Hyatt, a Delaware corporation, for injuries sustained when she slipped in the bathtub of her Hawaii hotel room. *Marino,* 793 F.2d 427. Applying the relatedness requirement restrictively, the court concluded that Marino's claim did not "arise from" any business that Hyatt transacted in Massachusetts. *Id.* at 431. The court reasoned that "[the] plaintiffs' advance reservation agreement with Hyatt would hardly be an important, or perhaps even a material, element of proof in [the] slip and fall case," and emphasized that to accept the plaintiffs' argument "would be to render the 'arising from' requirement ... a virtual nullity." *Id.* at 430; *see also Pizarro,* 907 F.2d at 1259–60 (holding that personal injuries sustained in an Aruban hotel did not arise out of or result from advertisements in Puerto Rico). Courts in the Third and Tenth Circuits have similarly applied the substantive-relevance/proximate-cause standard. *See Wims v. Beach Terrace Motor Inn, Inc.,* 759 F.Supp. 264, 267–69 (E.D.Pa.1991) (holding that the causal link between brochures the Inn sent to Pennsylvania and the injury sustained at the Inn in New Jersey was "simply too attenuated to say that the injury arose from Beach Terrace's activities in the Commonwealth of Pennsylvania"); *Dirks v. Carnival Cruise Lines,* 642 F.Supp. 971, 975 (D.Kan.1986) (finding the connection between the cruise ship operator's negligent preparation of food on board ship in California and

its acts of soliciting passengers and sending tickets to Kansas too tenuous to support jurisdiction).

In *Gelfand,* the Second Circuit implicitly rejected the but-for approach on facts largely similar to those before us. 339 F.2d at 321–22. There, the Gelfands sued a tour bus company for injuries sustained during a motor vehicle crash. *Id.* at 318. The court held that the sale of bus tickets in New York was an insufficient basis to establish personal jurisdiction over the non-resident defendant because the claim did not arise from the sale. *Id.* at 321–22; *see also Reich v. Signal Oil & Gas Co.,* 409 F.Supp. 846, 852 (S.D.Tex.1974) (concluding that a contract signed in Texas to build a helicopter that crashed in Ghana, killing **\*583** two oil rig workers, was too tenuous a contact to say that the tort arose from it).

Although Moki Mac urges us to follow the substantive-relevance approach, we have generally eschewed pinning jurisdictional analysis on the type of claim alleged. *See, e.g., Michiana,* 168 S.W.3d at 791–92. In *Michiana,* we warned against the dangers of the plaintiff's pleadings driving the analysis, stating that such an approach "shifts a court's focus from the relationship among the *defendant,* the forum, and the litigation to the relationship among the plaintiff, the forum ... and litigation." *Id.* at 790 (emphasis in original) (internal citations omitted). We reject a categorical approach that runs the danger of posing too narrow an inquiry. Although ostensibly imbued with a bright-line benefit, in practice it would require a court to delve into the merits to determine whether a jurisdictional fact is actually a legal cause of the injury. *See* Maloney, *supra* at 1290. Moreover, ease of application should not overshadow the principal constitutional due-process inquiry, which is whether the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). We note, too, that the substantive-relevance/proximate-cause standard is more stringent than the Supreme Court has, at least thus far, required. *Helicopteros,* 466 U.S. at 415 n. 10, 104 S.Ct. 1868.

### 3. "Sliding Scale" Relationship

Attempting to moderate the seemingly categorical effects of the but-for and substantive-relevance tests, some commentators have espoused, and a few courts have adopted, a "sliding scale" approach that examines the relationship between forum contacts and the litigation along a continuum. Under this view, as the extent of forum contacts goes up, the degree of relatedness to the litigation necessary to establish specific jurisdiction goes down, and *vice versa.* Maloney, *supra* at 1299–1300. As articulated by the Supreme Court of California, "as the relationship of the defendant with the state seeking to exercise jurisdiction over him grows more tenuous, the scope of jurisdiction also retracts, and fairness is assured by limiting the circumstances under which the plaintiff can compel him to appear and defend." *Vons Cos. v. Seabest Foods, Inc.,* 14 Cal.4th 434, 58 Cal.Rptr.2d 899, 926 P.2d 1085, 1094 (1996); *see also Davis v. Baylor Univ.,* 976 S.W.2d 5, 9 (Mo.Ct.App.1998); William M. Richman, *Jurisdiction in Civil Actions,* 72 CAL. L.REV. 1328, 1338–40 (1984) (review essay).

Although the sliding scale jurisdictional analysis studiously avoids the extremes that the other two relatedness tests present, it too presents a number of problems. Most significantly, deciding jurisdiction based on a sliding continuum blurs the distinction between general and specific jurisdiction that our judicial system has firmly embraced and that provides an established structure for courts to analyze questions of *in personam* jurisdiction. *See* Maloney, *supra* at 1299–1300. Removing the jurisdictional analysis from these judicial underpinnings allows general and specific jurisdiction "to melt together in the middle ... severely weaken[ing] the defendant's ability to anticipate the jurisdictional consequences of its conduct." Linda Sandstrom Simard, *Meeting Expectations: Two Profiles for Specific Jurisdiction,* 38 IND. L.REV. 343, 366 (2005). In sum, "this tradeoff does not fulfill the underlying goals of either general or specific jurisdiction" and "may raise far more difficult questions than it resolves." *Id.* at 366–67. **\*584** For these reasons, we decline to adopt the sliding-scale approach to relatedness.

### 4. Substantial Connection to Operative Facts

As we have said, the but-for relatedness test is too broad and conceptually unlimited in scope, the substantive-relevance/proximate-cause test poses too narrow an inquiry, and the sliding-scale analysis conflates the fundamental distinction between general and specific jurisdiction that is firmly embedded in our jurisprudence. In light of these concerns, some courts have applied alternative approaches, requiring that a cause of action "lie in the wake of the [defendant's]

commercial activities" in the forum, *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.,* 726 F.2d 1209, 1215–16 (7th Cir.1984), or that the forum contacts be "critical steps in the chain of events that led to the [injury]," *In re Oil Spill by Amoco Cadiz,* 699 F.2d 909, 915–16 (7th Cir.1983). The Sixth Circuit has generally applied a test that falls somewhere between "proximate cause" and "but-for," requiring a "substantial connection" between the defendant's contacts and the plaintiff's claim to warrant the exercise of specific jurisdiction. *See WEDGE Group, Inc.,* 882 F.2d at 1091 (6th Cir.1989); *Southern Mach. Co. v. Mohasco Indus., Inc.,* 401 F.2d 374, 384 n. 27 (6th Cir.1968). In *WEDGE Group, Inc.,* the court explained that the specific jurisdiction's relatedness element "does not require that the cause of action formally 'arise from' defendant's contacts with the forum [but instead requires] that the cause of action, of whatever type, *have a substantial connection with* the defendant's in-state activities." *WEDGE Group Inc.,* 882 F.2d at 1091 (emphasis in original) (quoting *Southern Mach. Co.,* 401 F.2d at 384 n. 27).

The Supreme Court has yet to explicate the degree of relatedness necessary to support specific jurisdiction over a nonresident defendant. However, in *Rush v. Savchuk,* the Court did consider the relation between forum contacts and the litigation in a case filed in Minnesota for personal injuries arising from an Indiana automobile accident. 444 U.S. 320, 324, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980). The plaintiff claimed jurisdiction was proper in Minnesota because the defendant's insurance company did business there, and the insurer's obligation to defend and indemnify its insured in the accident litigation was inevitably the focus that would determine the victim's rights and obligations. *Id.* at 327–28, 100 S.Ct. 571. Holding that the insurance company's contacts could not be imputed to the defendant for the purpose of establishing jurisdiction, the Court concluded there were not "significant contacts between the litigation and the forum" because "the insurance policy is not the subject matter of the case ... nor is it related to the operative facts of the negligence action." *Id.* at 329, 100 S.Ct. 571. The Court concluded that the insurance contract pertained only to the conduct and "not the substance [ ] of the litigation," and therefore the forum's jurisdiction was not affected. *Id.*

[25]    Our limited jurisprudence similarly suggests a middle ground, more flexible than substantive relevance but more structured than but-for relatedness, in assessing the strength of the necessary connection between the defendant, the forum, and the litigation. *See Guardian Royal,* 815 S.W.2d

at 229–33. In *Guardian Royal,* we spoke in terms of a "substantial connection" between the nonresident defendant and Texas arising from purposeful action or conduct directed here. *Id.* at 226 (citing *Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. 2174) (stating "[s]o long as it creates **\*585** a 'substantial connection' with the forum, even a single act can support jurisdiction"); *see also Shell Compania Argentina de Petroleo, S.A. v. Reef Exploration, Inc.,* 84 S.W.3d 830, 837 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (stating contacts "must have a 'substantial connection' that results in the alleged injuries") (citing *Guardian Royal,* 815 S.W.2d at 226). Considering our own jurisprudence and the Supreme Court's analysis in *Rush,* we believe that for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. *See Guardian Royal,* 815 S.W.2d at 229–33; *Rush,* 444 U.S. at 329, 100 S.Ct. 571.

### C. Relatedness of Moki Mac's Contacts

[26]    Betsy Drugg alleges she was induced to send Andy on the rafting trip by Moki Mac's direct solicitation, which included statements made in Moki Mac's brochures and in the release it sent to the Druggs. Specifically, Andy's mother claims she made the decision to send Andy on the trip based on Moki Mac's assurances that "[y]ou don't need 'mountain man' camping skills to participate in one of our trips," children age twelve or above are suited to participate, and "Moki Mac has taken reasonable steps to provide you with appropriate equipment and/or skilled guides." But for these promises, the Druggs claim, they would not have sent Andy on the rafting trip and he would not have fallen on the hiking trail.

Certainly on a river rafting trip safety is a paramount concern, and we accept as true the Druggs' claim that Andy might not have gone on the trip were it not for Moki Mac's representations about safety. However, the operative facts of the Druggs' suit concern principally the guides' conduct of the hiking expedition and whether they exercised reasonable care in supervising Andy. The events on the trail and the guides' supervision of the hike will be the focus of the trial, will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question. Only after thoroughly considering the manner in which the hike was conducted will the jury be able to assess the Druggs' misrepresentation claim. In sum, "the [alleged

misrepresentation] is not the subject matter of the case ... nor is it related to the operative facts of the negligence action." *Rush,* 444 U.S. at 329, 100 S.Ct. 571. Whatever connection there may be between Moki Mac's promotional materials sent to Texas and the operative facts that led to Andy's death, we do not believe it is sufficiently direct to meet due-process concerns. Analogous cases from other courts support our view.

Federal district courts in Texas have generally held that a nonresident's in-state advertising is insufficiently related to a negligence claim based on personal injury that occurs out of state to support an exercise of specific jurisdiction. In *Kervin v. Red River Ski Area, Inc.,* for example, the plaintiff fell while descending a flight of wooden steps leading to her ski lodge in New Mexico. 711 F.Supp. at 1385. The Kervins sued the ski resort in Texas alleging negligence in failing to maintain safe premises. *Id.* The plaintiffs asserted *in personam* jurisdiction based on the resort's contacts with Texas, which included television and print advertising and mailing brochures to potential customers. *Id.* at 1386. The court determined that "*[i]n personam* jurisprudence has taken a restrictive view of the relationship between causes of action and contacts, seemingly to require virtually a direct link between [the] claim and [the] contacts." *Id.* at 1389. Although the court ultimately determined **\*586** that general jurisdiction was proper, it held that specific jurisdiction was not because there was no substantial connection between the resort's advertising in Texas and its negligent maintenance of the stairwell in New Mexico. *Id.*

In *Gorman v. Grand Casino of Louisiana, Inc.-Coushatta,* the plaintiff, a Texas resident, sued a Louisiana casino in Texas claiming that its employee intentionally served her a drink containing Benzodiazepine (one of the "date-rape" drugs) and then made advances to her. 1 F.Supp.2d at 658. The court held that there was an insufficient link between Gorman's sexual-harassment claim and the casino's marketing scheme in Texas to support the exercise of specific jurisdiction, concluding "[b]illboard advertisements of slot machine payouts ... ha[ve] nothing to do with the conduct of that casino's employees." *Id.; see also Luna,* 851 F.Supp. at 832–33 (holding claim involving plaintiff's death in a plane crash over Panama arose not from her ticket purchase in Texas but from alleged negligence in Panama).

Courts in other jurisdictions have similarly addressed the issue, concluding that claims arising out of personal injury that occurs outside the forum do not arise from or relate to

a defendant's forum advertising. In *Oberlies v. Searchmont Resort, Inc.,* a Michigan resident visited a Canadian ski resort after seeing the resort's advertisement in a Michigan newspaper. 246 Mich.App. 424, 633 N.W.2d 408, 411 (2001). Claiming she was injured when resort employees negligently loaded her onto a ski lift, the plaintiff filed suit in Michigan. *Id.* The court concluded that the resort's advertising activities in the forum were insufficient to support *in personam* jurisdiction, and that it would violate due process to hale the Canadian resort into a Michigan court:

> [n]otwithstanding defendant's purposeful availment of Michigan business opportunities through its advertising, we are compelled to find that the presence of other factors render the exercise of jurisdiction unreasonable. Simply put, the connection between plaintiff's cause of action [negligence] and defendant's Michigan advertising is so attenuated that it is unreasonable to exercise jurisdiction over defendant....

*Id.* at 416 (internal citations omitted). [4]

Somewhat analogous to advertising cases are those that concern efforts to recruit forum residents. Most courts have held that merely mailing letters and exchanging phone calls in recruitment efforts is insufficient to support specific jurisdiction over nonresidents for claims that arise outside the forum, although some courts have exercised jurisdiction when the defendant **\*587** physically recruited in the forum. For example, in *Cassell v. Loyola University,* a Florida student who was a resident of Tennessee was recruited to play basketball for a New Orleans university. 294 F.Supp. 622, 622–23 (E.D.Tenn.1968). When the university subsequently refused to grant Cassell a scholarship, he sued for breach of contract in Tennessee. *Id.* at 623. The only connections with the forum were that it was the student's domicile, it was where his father had signed the recruitment contract, and agents of the university had communicated there by mail and telephone. *Id.* The court held that the "asserted cause of action does not arise out of business transacted in Tennessee" and thus there was an insufficient connection between the forum and the litigation to justify personal jurisdiction. *Id.* at 624. [5]

In *Kelly v. Syria Shell Petroleum Development B. V.,* two Texas oil well workers who had contracted their services to

Syrian oil companies were killed while performing work in Syria. *213 F.3d at 855.* Their families sued for wrongful death in Texas, but the Fifth Circuit held there was no specific jurisdiction over their claims. *Id.* at 844. The court noted that, even assuming the Syrian company possessed minimum contacts with Texas, including signing a contract for the well workers' services, "specific jurisdiction does *not* exist ... because Appellants' claims do *not* arise out of those contacts. Instead, they arise out of alleged tortious acts committed ... in Syria." *Id.* at 855 (emphasis in original). [6]

The Druggs cite our decision in *Siskind* to support their claim that Moki Mac's solicitations in Texas and Andy's death on the Arizona hiking trail are sufficiently related to support specific jurisdiction. *Siskind,* 642 S.W.2d at 437. But the operative facts in *Siskind* that supported liability and related to the defendant's forum contacts differ significantly from those presented here. The school solicited students in Texas through national magazines and local telephone books and the contract between Siskind and the school specifically provided that, if Siskind's son left during the school year, his tuition would be reimbursed. *Id.* at 435–36. When his son was expelled, the school refused to refund Siskind's tuition. *Id.* Siskind sued the school in Texas for the promised refund. *Id.* Under these circumstances, we held there was "a connection between Siskind's claim for breach of contract and Villa's contacts **\*588** with Texas." *Id.* at 437. Here, however, Moki Mac's statements in its brochures and release do not bear the same direct link to Andy's injury as did Siskind's claim to recover money lost under the contract. Moki Mac's promotional representations, while theoretically related to Andy's injury on the hiking trail in the sense that but for them he might not have been there, are not sufficiently related to the operative facts underlying Andy's injury for which the Druggs seek recovery in wrongful death to sustain the exercise of specific jurisdiction.

This case more closely resembles the situation presented in *Brocail v. Anderson,* 132 S.W.3d 552 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). In that case, Brocail, a former Detroit Tigers baseball player, underwent treatment by a team physician in Michigan. *Id.* at 555. Of his own volition, Brocail moved to his home in Texas during his rehabilitation, and at Brocail's request, his doctor, Anderson, prescribed follow-up treatments that were administered by a healthcare group in Houston. *Id.* at 555–56. Brocail sued Anderson in Texas for medical negligence and fraud related to his physical therapy, and alleged Texas had specific jurisdiction because Anderson had faxed prescriptions to Texas and communicated with the

Texas healthcare group regarding Brocail's progress. *Id.* at 558. Brocail also asserted jurisdiction was proper because Anderson had made misrepresentations in Texas by failing to fully disclose the true extent of Brocail's injuries in his forum contacts. *Id.* at 563. The court of appeals held that Brocail's claims did not arise from or relate to any Texas contacts because "Brocail is complaining about a physical injury based on a course of treatment. Any tort occurred in the exercise of medical judgment in prescribing a course of physical therapy in Michigan, not from the communication of that prescription [to Texas]." *Id.*

Similarly, the injuries for which the Druggs seek recovery are based on Andy's death on the hiking trail in Arizona, and the relationship between the operative facts of the litigation and Moki Mac's promotional activities in Texas are simply too attenuated to satisfy specific jurisdiction's due-process concerns.

### V. Conclusion

We reverse the court of appeals' judgment and remand the case to that court to consider the Druggs' assertion that Moki Mac is subject to general jurisdiction in Texas.

Justice JOHNSON filed a dissenting opinion, in which Justice MEDINA joined.

Justice JOHNSON, joined by Justice MEDINA, dissenting. Texas' long-arm jurisdiction over non residents reaches as far as the federal constitution allows. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). But, just how far the constitution allows has not been a simple question since *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *See* Mark Maloney, *Specific Personal Jurisdiction and the "Arise From or Relate To" Requirement ... What Does It Mean?,* 50 WASH. & LEE L. REV. 1265, 1266–67 (1993). As to a state's exercising in personam jurisdiction over a non resident, federal due process requires "only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe,* 326 U.S. at 316 (quoting *Milliken v.* **\*589** *Meyer,* 311 U.S. 457, 463, 61

S.Ct. 339, 85 L.Ed. 278 (1940)). Specific jurisdiction over a nonresident defendant comports with federal constitutional due process if the defendant's alleged liability arises from or is related to an activity conducted within the forum state. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414 & n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). It is "the defendant's conduct and connection with the forum" that are critical. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 789 (Tex.2005) *(citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

There is nothing wrong with an enterprise arranging its affairs so that it avoids doing business in or engaging in activities directed toward a particular forum and thereby precludes that forum's exercise of jurisdiction over it. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The key inquiry is whether a defendant *has* so arranged its affairs. If not, then "he should reasonably anticipate being haled into court" in the forum. *Id.* The Supreme Court has not been overly restrictive in its view of federal due process limits on a forum's exercise of jurisdiction over nonresidents that purposefully direct activities toward the forum's residents:

> [W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional. For example, the potential clash of the forum's law with the "fundamental substantive social policies" of another State may be accommodated through application of the forum's choice-of-law rules. Similarly, a defendant claiming substantial inconvenience may seek a change of venue.

*Burger King,* 471 U.S. at 477.

Moki Mac is a Utah company which has conducted guided tours in the Grand Canyon for many years. In addition to general advertising and maintaining a website for potential clients to access, Moki Mac's efforts to attract customers include targeting particular persons to whom it sends brochures describing Moki Mac's rafting and hiking trips. Its targeted audience includes persons who previously inquired about or have taken its trips. At and for several years prior to the time reservations were made for Andy's trip in 2001, Moki Mac's targeted audience included Texas residents. As the Court sets out, some of Moki Mac's efforts which were directed toward Texas residents included regular advertising in Texas, hiring public relations firms to target media groups and tour operators in Texas, soliciting Texas residents through mass and targeted direct-mail campaigns, and utilizing particular customers to become *de facto* group leaders to plan, organize and promote Moki Mac trips. Moki Mac also has given discounted trip prices to some Texas clients who brought potential customers to Moki Mac's attention.

Participants on Moki Mac's guided rafting and hiking trips engage in activities and encounter conditions which Moki Mac recognizes pose risks of injury and death. Its brochures and "Visitors Acknowledgment of Risk" form (the VAR agreement) identify certain risks, warn that enumerated risks and "other unknown or unanticipated risks may cause injury or death," and state that Moki Mac has taken reasonable steps to provide "appropriate equipment and/or skilled guides so you can enjoy **\*590** an activity for which you may not be skilled." One of the specific dangers warned of was falling during a hike with resulting injury or death. Andy Drugg fell during a hike and was killed.

The Druggs received Moki Mac's brochures from a Texas acquaintance. After reviewing the brochures and corresponding with Moki Mac from Texas, the Druggs decided to allow thirteen-year-old Andy to go on one of the trips. Moki Mac confirmed Andy's reservation and in accordance with its usual procedures forwarded to the Druggs a VAR agreement which Moki Mac required to be signed before persons could take one of their trips. Betsy and Andy signed the agreement in Texas and returned it to Moki Mac. The agreement set out several risks which could be encountered on a Moki Mac trip and specified the possibility of injury or death:

> In consideration of the services of Moki Mac River Expeditions, Inc., their officers, agents, employees, and stockholders, and all other persons or entities associated with those businesses, (hereinafter collectively referred to as "Moki Mac"), I agree as follows: ...

I agree to assume responsibility for the risks identified.... Therefore, I assume full responsibility for myself, including my minor children, for bodily injury, death, loss of personal property, and expenses thereof as a result of those inherent risks an/or of my negligence in participating in this activity.

...

[T]his agreement shall be effective and binding upon myself, my heirs, assigns, personal representatives, estate, and all members of my family, including any minors accompanying me.

At its special appearance hearing, Moki Mac's representative testified that Moki Mac considered the VAR agreement to have been effective when and where it was signed by the Druggs—in this case, Texas.

The Court notes that for Texas courts to properly exercise specific jurisdiction over Moki Mac as a non resident, Moki Mac must have had (1) minimum contacts with Texas by purposefully availing itself of the privilege of conducting activities here, and (2) liability arising from or related to those contacts. 221 S.W.3d 569. The Court concludes that Moki Mac's contacts with Texas were targeted to a particular audience, were purposeful, not a "mere fortuity," and thus satisfied the first prong of the jurisdictional due process inquiry. *See id.* at 578. However, the Court determines that the Druggs' suit did not "arise from or relate to" Moki Mac's activities in Texas and that the second prong of the due process inquiry was not met.

As part of its analysis the Court references a "restrictive proximate-cause" test used by the First Circuit Court of Appeals. *See Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708 (1st Cir.1996), *cert. denied* 520 U.S. 1155, 117 S.Ct. 1333, 137 L.Ed.2d 493 (1997). The *Nowak* facts are analogous to those before us and in my view the opinion sets out a fair and reasonable approach to the relatedness aspect of the jurisdictional question.

Tak How was a Hong Kong corporation which owned a hotel in Hong Kong and had no place of business outside Hong Kong. It had no shareholders, assets, or employees in Massachusetts. It advertised in national and international magazines and listed the hotel in various hotel guides used at travel agencies in Massachusetts. On one occasion it sent direct mail solicitations to former Tak How guests,

including previous guests living in Massachusetts. The company employing Mr. Nowak in Massachusetts had an agreement with Tak How for rates when its employees stayed at the hotel. When **\*591** its employees went to Hong Kong for business the company booked reservations at the hotel. Mrs. Nowak accompanied her husband to Hong Kong on a business trip and they stayed at the hotel pursuant to reservations made by the company. Mrs. Nowak drowned in the hotel swimming pool. Mr. Nowak and his children sued Tak How in Massachusetts. Tak How removed the case to federal court and the federal district court refused to dismiss for lack of personal jurisdiction. The First Circuit affirmed. In doing so, the court surveyed and discussed the various approaches taken to the due process relatedness issue, just as the Court does in its opinion. The *Nowak* court then noted the First Circuit's reputation as a proponent of the more restrictive "proximate-cause" standard as to the relatedness issue and the importance of foreseeability in the due process analysis: "Foreseeability is a critical component in the due process inquiry, particularly in evaluating purposeful availment, and we think it also informs the relatedness prong." *Id.* at 715 (emphasis added). *See also Burger King,* 471 U.S. at 474 ("[T]he foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.") (*quoting World–Wide Volkswagen,* 444 U.S. at 297). The *Nowak* court concluded that adherence to the proximate cause construct in jurisdictional issues should not be so strict as in tort issues:

We see no reason why, in the context of a relationship between a contractual or business association and a subsequent tort, the absence of proximate cause per se should always render the exercise of specific jurisdiction unconstitutional.

When a foreign corporation directly targets residents in an ongoing effort to further a business relationship, and achieves its purpose, it may not necessarily be unreasonable to subject that corporation to forum jurisdiction when the efforts lead to a tortious result. The corporation's own conduct increases the likelihood that a specific resident will respond favorably. If the resident is harmed while engaged in activities integral to the relationship the corporation sought to establish, we think the nexus between the contacts and the cause of action is sufficiently strong to survive the due process inquiry at least at the relatedness stage.

...

While the nexus between Tak How's solicitation of [Nowak's employer's] business and Mrs. Nowak's death does not constitute a proximate cause relationship, it does represent a meaningful link between Tak How's contact and the harm suffered.

*Id.* at 715–16.

The court then applied further considerations articulated by the Supreme Court as being appropriate to determining if the exercise of personal jurisdiction by a forum over a non resident defendant would be constitutional:

Our conclusion ... does not end the inquiry. Personal jurisdiction may only be exercised if it comports with traditional notions of "fair play and substantial justice." *International Shoe,* 326 U.S. at 320. Out of this requirement, courts have developed a series of factors that bear on the fairness of subjecting a nonresident to a foreign tribunal ... as follows: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns **\*592** in promoting substantive social policies."

*Id.* at 717 (quoting *United Elec., Radio & Mach. Workers v. Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir.1992)); *see Burger King,* 471 U.S. at 477–78. Such an approach properly focuses on and emphasizes the actions of a nonresident defendant that has purposefully directed actions at a forum's residents, and on the reasonable foreseeability to the defendant that its actions will make it amenable to suit in that forum.

While Moki Mac might have a strong *forum non conveniens* argument, *see* TEX. CIV. PRAC. & REM. CODE § 71.051, the facts before us do not present a compelling case that Texas' exercise of *jurisdiction* over Moki Mac would be unreasonable. *See Burger King,* 471 U.S. at 477. Moki Mac's

conduct was particularly designed to and did increase the likelihood that Texas residents would respond favorably. Andy Drugg's death occurred while he was engaged in activities integral to the relationship Moki Mac induced by its efforts specifically directed toward Texas residents. Moki Mac should have reasonably foreseen that an injury to a client such as Andy while the client participated in activities integral to the relationship directly produced through Moki Mac's activities directed toward Texas residents would subject Moki Mac to being sued over the injury in Texas. There was a meaningful link between Moki Mac's actions directed toward Texas residents and the Druggs' suit. Accordingly, I would hold that the substance of the Druggs' suit is related to Moki Mac's activities which were purposefully directed toward Texas residents; the second prong of the due process inquiry is satisfied; it is not unreasonable or unfair to Moki Mac for Texas to exercise jurisdiction over Moki Mac as to the Druggs' suit; and subject to a "fair play and substantial justice" analysis, the exercise of jurisdiction by Texas in this case falls within the boundaries of federal constitutional due process requirements. *See Nowak,* 94 F.3d at 715–16.

The court of appeals performed the "fair play and substantial justice" analysis which the Supreme Court has indicated both protects a non resident from improper exercise of jurisdiction by a forum, and yet might allow a lesser showing for the exercise of jurisdiction over a defendant who purposefully directs activities toward the forum. *See Burger King,* 471 U.S. at 477–78 (noting considerations which sometimes "serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required"). I agree with the court of appeals' analysis and determination that the exercise of specific jurisdiction over Moki Mac by Texas would not offend traditional notions of fair play and substantial justice. 221 S.W.3d 569.

I would affirm the judgment of the court of appeals.

**All Citations**

221 S.W.3d 569, 50 Tex. Sup. Ct. J. 498

Footnotes

1    The Druggs also claimed Moki Mac breached its agreement to provide the safety measures represented in its materials. Because the Druggs did not argue their breach-of-contract claim in the court of appeals and do not do so in their briefs to this Court, we only address the Druggs' wrongful-death claim.

2    We received an amicus brief supporting Moki Mac's position from Grand Canyon Outfitters Association and America Outdoors.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

3   *See Felch v. Transportes Lar–Mex SA DE CV,* 92 F.3d 320, 324 (5th Cir.1996) (finding no specific jurisdiction over a Mexican trucking company that was sued in Texas when a truck hit the plaintiff's mother's vehicle on a Mexican highway); *Kelly v. Syria Shell Petroleum Dev. B. V.,* 213 F.3d 841, 855–56 (5th Cir.2000) (concluding that Syrian oil companies were not amenable to specific jurisdiction in Texas because the wrongful-death claims of workers killed in Syria were not closely related to the companies' recruiting activities in Texas); *Gorman v. Grand Casino of La., Inc.-Coushatta,* 1 F.Supp.2d 656, 658 (E.D.Tex.1998) (holding plaintiff's claim of sexual assault by a casino employee did not support specific jurisdiction because the claim did not arise out of the casino's extensive advertising in Texas but arose from the casino's Louisiana operations); *Luna v. Compania Panamena De Aviacion, S.A.,* 851 F.Supp. 826, 832 (S.D.Tex.1994) (holding no specific jurisdiction in Texas because plaintiff's death in a plane crash over Panama did "not result from the fact that she purchased the ticket for her airline travel in Texas"); *Kervin v. Red River Ski Area, Inc.,* 711 F.Supp. 1383, 1389 (E.D.Tex.1989) (holding plaintiffs could not assert specific jurisdiction over nonresident ski resort because their negligence claim did not arise out of its advertising contacts with Texas but arose as a result of the resort's alleged negligence in failing to maintain safe premises in New Mexico); *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.,* 882 F.2d 1087, 1091 (6th Cir.1989) (moving away from the court's previous emphasis on a "made possible by" interpretation of the arise from requirement to a focus on the cause of action having a "substantial connection" to the defendant's in-state activities).

4   *See also Wims,* 759 F.Supp. at 269 (concluding that the Pennsylvania plaintiff's injuries at a New Jersey motel did not arise from defendant's forum contacts because there was no causal link between the motel's brochures sent to Pennsylvania and the plaintiff's action for "negligent willful, wanton and reckless conduct"); *Coleman v. Chen,* 712 F.Supp. 117, 122 (S.D.Ohio 1988) (holding that a slip-and-fall claim arose not from the defendant's solicitation in Ohio but from the condition of the hotel parking lot outside the forum); *Smith v. Jefferson County Chamber of Commerce,* 683 F.Supp. 536, 538–39 (D.Md.1988), *aff'd without opinion,* 885 F.2d 865 (4th Cir.1989) (holding that a personal injury claim that occurred at a West Virginia crafts festival did not arise out of the defendant's contacts with Maryland); *Slocum v. Sandestin Beach Resort Hotel, Div. of Beachside # 1 Condo Ass'n,* 679 F.Supp. 899, 901–02 (E.D.Ark.1988), *appeal dismissed,* 855 F.2d 856 (8th Cir.1988) (holding that the plaintiff's injuries at a Florida resort were not related to the defendant's solicitation in the forum state); *Morse v. Walt Disney World Co.,* 675 F.Supp. 42, 43–44 (D.Mass.1987) (same); *Szakacs v. Anheuser–Busch Cos.,* 644 F.Supp. 1121, 1123–24 (N.D.Ind.1986) (same).

5   In doing so, the court distinguished college athletic recruiting from ordinary commercial activities.

6   *See also Hardnett v. Duquesne Univ.,* 897 F.Supp. 920, 922–24 (D.Md.1995) (holding that the student's negligence claim against the Pennsylvania university for injuries sustained while attending a rock concert there did not "arise out of" the university's forum-related contacts with Maryland which included mailing materials and an acceptance letter to the student's home); *Tung v. Am. Univ. of the Caribbean,* 353 N.W.2d 869, 871–72 (Iowa Ct.App.1984) (holding that employer's forum contacts that included sending two letters and making three telephone calls were not sufficiently related to the plaintiff's claim for breach of an employment contract to support specific jurisdiction); *City of Riverview v. Am. Factors, Inc.,* 77 S.W.3d 855, 858–59 (Tex.App.Dallas 2002, no pet.) (holding that a telephone conversation between a city employee and the company was insufficient to establish minimum contacts with Texas). *Cf. Barile v. Univ. of Va.,* 2 Ohio App.3d 233, 441 N.E.2d 608, 612–15 (1981) (holding that two visits to the forum by university agents for the purpose of recruiting the plaintiff to play football was sufficient to establish *in personam* jurisdiction over the plaintiff's breach of contract claim); *Davis v. Baylor University,* 976 S.W.2d 5, 13–14 (Mo.Ct.App.1998) (holding that the dispatching of agents to the forum state to actively recruit a resident is of a quality and quantity sufficient to support specific jurisdiction for breach of contract and fraudulent misrepresentation claim).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)**

56 Tex. Sup. Ct. J. 1023

414 S.W.3d 142
Supreme Court of Texas.

MONCRIEF OIL

INTERNATIONAL INC., Petitioner,

v.

OAO GAZPROM, Gazprom Export, LLC, and

Gazprom Marketing & Trading, Ltd., Respondents.

No. 11–0195.    |    Argued Feb. 6,
2012.    |    Decided Aug. 30, 2013.

**Synopsis**

**Background:** Texas oil and natural gas company brought action against Russian oil and natural gas company and its subsidiaries for tortious interference, trade-secret misappropriation, conspiracy to tortiously interfere, and conspiracy to misappropriate trade secrets. The District Court, Tarrant County, Melody Wilkinson, J., granted special appearances filed by Russian companies, and Texas company appealed. The Court of Appeals, Sue Walker, J., 332 S.W.3d 1, affirmed. Texas company sought review which was granted.

**Holdings:** The Supreme Court, Guzman, J., held that:

[1] defendants' contacts with Texas were not random and fortuitous and, thus, supported exercise of personal jurisdiction with regard to trade secrets claim;

[2] assertion of jurisdiction over defendants did not offend traditional notions of fair play and substantial justice with regard to trade secrets claim;

[3] exercise of **specific jurisdiction** by Texas courts over tortious interference claim would not comport with long-arm statute or due process; and

[4] trial court did not abuse its discretion in refusing to allow deposition of deputy chairman of Russian oil and gas company and representative of bank.

Affirmed in part, reversed in part, and remanded.

**West Headnotes (36)**

**[1]    Courts**

    ☞ Related contacts and activities;  **specific jurisdiction**

What the parties thought, said, or intended is generally irrelevant to their jurisdictional contacts needed for specific personal jurisdiction over a nonresident defendant.

3 Cases that cite this headnote

**[2]    Courts**

    ☞ Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Courts may exercise personal jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

8 Cases that cite this headnote

**[3]    Courts**

    ☞ Allegations, pleadings, and affidavits

Under the Texas long-arm statute, the plaintiff bears the initial burden of pleading allegations sufficient to confer jurisdiction. V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

2 Cases that cite this headnote

**[4]    Constitutional Law**

    ☞ Non-residents in general

**Courts**

    ☞ Allegations, pleadings, and affidavits

Although allegations that a tort was committed in Texas satisfy the long-arm statute, such allegations do not necessarily satisfy the Due Process Clause of the United States Constitution. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

**Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)**

56 Tex. Sup. Ct. J. 1023

Cases that cite this headnote

**[5]    Courts**
        ☞ Presumptions and Burden of Proof as to Jurisdiction

When the initial burden of pleading allegations sufficient to confer jurisdiction under the long-arm statute is met, the burden shifts to the defendant to negate all potential bases for personal jurisdiction the plaintiff pled. V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

5 Cases that cite this headnote

**[6]    Constitutional Law**
        ☞ Non-residents in general

Asserting personal jurisdiction under the long-arm statute comports with due process when (1) the nonresident defendant has **minimum contacts** with the forum state, and (2) asserting jurisdiction complies with traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

5 Cases that cite this headnote

**[7]    Constitutional Law**
        ☞ Non-residents in general

**Courts**
        ☞ Purpose, intent, and foreseeability; **purposeful availment**

A defendant establishes **minimum contacts** with a forum, as required for the exercise of long-arm jurisdiction over it to satisfy due process, when it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

3 Cases that cite this headnote

**[8]    Courts**
        ☞ Unrelated contacts and activities; general jurisdiction

**Courts**

        ☞ Related contacts and activities; **specific jurisdiction**

Continuous and systematic contacts with a state give rise to general jurisdiction, while **specific jurisdiction** exists when the cause of action arises from, or is related to, purposeful activities in the state.

5 Cases that cite this headnote

**[9]    Appeal and Error**
        ☞ Necessity of finding facts

When the trial court does not issue findings of fact and conclusions of law, Supreme Court implies all relevant facts necessary to support the judgment that are supported by evidence.

3 Cases that cite this headnote

**[10]   Appeal and Error**
        ☞ Cases Triable in Appellate Court

**Courts**
        ☞ Determination of questions of jurisdiction in general

The ultimate question of whether a court has personal jurisdiction over a nonresident defendant is a question of law that Supreme Court reviews de novo.

2 Cases that cite this headnote

**[11]   Constitutional Law**
        ☞ Non-residents in general

**Courts**
        ☞ Related contacts and activities; **specific jurisdiction**

Claim of **specific jurisdiction** requires Supreme Court to conduct analysis of jurisdictional contacts with regard to whether exercise of jurisdiction satisfies due process on a claim-by-claim basis. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote

**[12]   Constitutional Law**
        ☞ Non-residents in general

Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)

56 Tex. Sup. Ct. J. 1023

If a defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[13] Constitutional Law**

⌐ Non-residents in general

**Courts**

⌐ Related contacts and activities; **specific jurisdiction**

A court need not assess jurisdictional contacts on a claim-by-claim basis to determine whether exercise of **specific jurisdiction** satisfies due process if all claims arise from the same forum contacts. U.S.C.A. Const.Amend. 14.

9 Cases that cite this headnote

**[14] Constitutional Law**

⌐ Non-residents in general

**Courts**

⌐ Related contacts and activities; **specific jurisdiction**

When determining whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas as required for the exercise of **specific jurisdiction** under the long-arm statute on the basis of jurisdictional contacts as required to satisfy due process, Supreme Court considers only the defendant's contacts with the forum, not the unilateral activity of another party or a third person. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

3 Cases that cite this headnote

**[15] Constitutional Law**

⌐ Non-residents in general

When determining whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas as required for the exercise of **specific jurisdiction** under the long-arm statute on the basis of jurisdictional

contacts as required to satisfy due process, the contacts relied upon must be purposeful, rather than random, fortuitous, or attenuated; thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

**[16] Constitutional Law**

⌐ Non-residents in general

When determining whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas as required for the exercise of **specific jurisdiction** under the long-arm statute on the basis of jurisdictional contacts as required to satisfy due process, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. U.S.C.A. Const.Amend. 14; 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

2 Cases that cite this headnote

**[17] Constitutional Law**

⌐ Non-residents in general

Analysis of jurisdictional contacts used to establish that **specific jurisdiction** under the long-arm statute comports with due process assesses the quality and nature of the contacts, not the quantity. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

**[18] Constitutional Law**

⌐ Non-residents in general

A substantial connection with a jurisdiction, such that long-arm jurisdiction over non-resident defendant comports with due process, can result from even a single act; but, the unilateral activity of another person cannot create jurisdiction. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

**Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)**

56 Tex. Sup. Ct. J. 1023

Cases that cite this headnote

**[19]  Constitutional Law**
   ☞ Non-residents in general
   **Courts**
      ☞ Purpose, intent, and foreseeability; **purposeful availment**

Physical presence in the state is not required for long-arm jurisdiction over a non-resident defendant to comport with due process, but frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

**[20]  Constitutional Law**
   ☞ Non-residents in general

At its core, the **purposeful availment** analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there so that the exercise of long-arm jurisdiction would not violate due process. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

**[21]  Courts**
   ☞ Torts in general

A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory; torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor shall be liable for damages which are the proximate result of his tort. Restatement (Second) of Conflicts of Laws § 36, cmt. c.

Cases that cite this headnote

**[22]  Constitutional Law**

   ☞ Non-residents in general
   **Courts**
      ☞ Torts in general

Although a forum's interest in protecting against torts may operate to enhance the substantiality of the connection between the defendant and the forum in determination of whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court in the forum so that the exercise of long-arm jurisdiction would not violate due process, the interest cannot displace the **purposeful availment** inquiry. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

2 Cases that cite this headnote

**[23]  Constitutional Law**
   ☞ Business, business organizations, and corporations in general
   **Courts**
      ☞ Property disputes; wills, trusts, and estates

Contacts of Russian oil and natural gas company and its subsidiaries with Texas were not random and fortuitous, or unilateral activities by Texas oil and natural gas company, as would render the exercise of personal jurisdiction under the long-arm statute a violation of due process in action against Russian company for trade-secret misappropriation, where Russian company agreed to attend meetings in Texas and accepted Texas company's alleged trade secrets regarding a proposed Texas joint venture, which was the crux of the matter, at those meetings, contacts were purposeful and substantial because their activity was aimed at getting extensive business in or from the forum state, and Russian company benefited from Texas. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

2 Cases that cite this headnote

**[24]  Courts**
   ☞ Jurisdiction to Be Shown by Record

Record did not support an implied finding that Russian oil and gas company and its subsidiaries

**Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)**

56 Tex. Sup. Ct. J. 1023

did not receive the alleged trade secrets at the meetings in Texas, where Texas oil and gas company presented evidence that the defendants accepted alleged trade secrets at the Texas meetings, including an affidavit of meeting attendee stating that Texas company provided the defendants updated versions of the trade secrets at meetings.

2 Cases that cite this headnote

**[25]    Constitutional Law**
 ⚷ Business, business organizations, and corporations in general
**Courts**
 ⚷ Property disputes; wills, trusts, and estates

Previous meetings between Russian oil and gas company and its subsidiaries and Texas oil and gas company in Moscow, Boston, and Washington, D.C. did not render two Texas meetings random and fortuitous, as opposed to purposeful contacts that were required for exercise of personal jurisdiction under the long-arm statute to comport with due process in action against Russian company for trade-secret misappropriation, where the discussions were regarding a joint venture in Texas, and Texas company was headquartered in Texas. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

1 Cases that cite this headnote

**[26]    Constitutional Law**
 ⚷ Non-residents in general

For a non-resident defendant's contacts to be purposeful, as would support notion that jurisdiction under the long-arm statute comports with due process, the defendant must seek some benefit, advantage, or profit by availing itself of the forum. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

**[27]    Courts**

 ⚷ Business contacts and activities; transacting or doing business

A nonresident may structure its business so as to not profit from a forum's laws and not be subject to its jurisdiction under the long-arm statute. V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

**[28]    Courts**
 ⚷ Of the person

A nonresident consents to suit through the long-arm statute by invoking the benefits and protections of a forum's laws. V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

**[29]    Constitutional Law**
 ⚷ Non-residents in general

In addition to minimum contacts, due process requires the exercise of personal jurisdiction over a non-resident defendant through the long-arm statute to comply with traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[30]    Constitutional Law**
 ⚷ Non-residents in general

If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident through the long-arm statute not comport with traditional due process notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

1 Cases that cite this headnote

**[31]    Constitutional Law**
 ⚷ Non-residents in general

To determine whether exercise of personal jurisdiction over nonresident defendant through long-arm statute complies with traditional

Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)

56 Tex. Sup. Ct. J. 1023

notions of fair play and substantial justice as required for due process, court evaluates the following factors, when appropriate: (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

2 Cases that cite this headnote

**[32]** **Constitutional Law**
☛ Business, business organizations, and corporations in general

**Courts**
☛ Property disputes; wills, trusts, and estates

Assertion of jurisdiction over Russian oil and gas company and its subsidiaries through long-arm statute did not offend traditional notions of fair play and substantial justice, as required for personal jurisdiction under the long-arm statute to comport with due process in action by Texas oil and natural gas company for trade-secret misappropriation, although subjecting Russian defendants to suit in Texas imposed a burden on them, and Russian government was majority owner of Russian company, where burden was somewhat mitigated by the convenience to Texas company of litigating in the forum where the alleged trade secrets were appropriated and purportedly used, Texas company alleged that Russian defendants committed a tort in Texas, which implicated a serious state interest in adjudicating the dispute, and it promoted judicial economy to litigate in a Texas court claims against Russian company with claims against Russian company's U.S. subsidiary, and Russian company was not wholly owned by the Russian government, and Texas company's claims did not implicate government officials. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

**[33]** **Constitutional Law**
☛ Business, business organizations, and corporations in general

**Courts**
☛ Torts in general

Texas oil and gas company's claim against Russian oil and gas company and its subsidiaries of tortious interference with existing and prospective business relationships did not arise from Texas meetings or receipt of information from Texas oil and gas company, and, thus, exercise of **specific jurisdiction** by Texas courts would not comport with long-arm statute or due process, where claim was principally concerned with a California meeting and the competing Texas enterprise, not the purported misappropriation of alleged trade secrets. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

1 Cases that cite this headnote

**[34]** **Constitutional Law**
☛ Non-residents in general

A nonresident directing a tort at Texas from afar is insufficient for exercise of **specific jurisdiction** under long-arm statute to comport with due process. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

1 Cases that cite this headnote

**[35]** **Constitutional Law**
☛ Business, business organizations, and corporations in general

**Courts**
☛ Torts in general

Allegation by Texas oil and gas company that Russian oil and gas company's U.S. subsidiary established a competing enterprise in Texas did not support exercise of **specific jurisdiction** over Russian company and its subsidiaries under due process analysis and long-arm statute in action for tortious interference, where Texas

Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)

56 Tex. Sup. Ct. J. 1023

company did not allege that Russian company and its subsidiaries provided the trade secrets to the subsidiary in Texas, and, therefore, the contacts regarding the competing enterprise could not be imputed to the defendants. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042(2).

Cases that cite this headnote

[36] **Pretrial Procedure**
☞ Corporate officers, agents, and employees

Trial court did not abuse its discretion in refusing to allow deposition of deputy chairman of Russian oil and gas company and representative of bank in action by Texas oil and gas company for tortious interference, trade-secret misappropriation, conspiracy to tortiously interfere, and conspiracy to misappropriate trade secrets, where Texas company did not demonstrate what additional jurisdictional facts the depositions would have provided.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*147** Clarence Andrew Weber, Kelly Hart & Hallman LLP, Harriet O'Neill, Law Office of Harriet O'Neill, PC, Austin, TX, John H. Cayce, Jr., Marshall M. Searcy, Jr., Michael Dana Anderson Kelly Hart & Hallman LLP, Fort Worth, TX, for Petitioner Moncrief Oil International, Inc.

Aaron M. Streett, Lauren Elizabeth Tanner, Michael S. Goldberg, Timothy Conway Shelby, Baker Botts, L.L.P., Houston, TX, Jerry D. Bullard, Neal W. Adams, Adams, Lynch & Loftin, P.C., Thomas R. Phillips, Baker Botts LLP, Austin TX, for Respondent OAO Gazprom, Gazprom Export, LLC, and Gazprom Marketing & Trading, Ltd.

George S. Christian, Austin, TX, for Amicus Curiae Texas Civil Justce League, Inc., Texas Oil & Gas Assoc., Texas Assoc. of Manufacturers, Assoc. of Electric Companies of Texas, and Texas Assoc., of Business

**Opinion**

Justice GUZMAN delivered the opinion of the Court.

**[1]** We have observed that the business contacts needed for specific personal jurisdiction over a nonresident defendant "are generally a matter of physical fact, while tort liability (especially misrepresentation cases) turns on what the parties thought, said, or intended. Far better that judges should limit their jurisdictional decisions to the former rather than involving themselves in trying the latter." [1] Here, nonresident defendants allegedly committed the tort of misappropriating purported trade secrets from a Texas company concerning a proposed Texas venture during two meetings in Texas. The defendants claim their intent in attending the meetings was to discuss an unrelated matter and that they informed the plaintiff of that intent at the meetings. But what the parties thought, said, or intended is generally irrelevant to their jurisdictional contacts. Regardless of the defendants' subjective intent, their Texas contacts are sufficient to confer specific jurisdiction over the defendants as to the trade secrets claim.

The nonresident defendants also face claims of tortious interference with the Texas corporation's relationship with a California corporation. But the tortious interference claims either arise from a meeting in California (which cannot support jurisdiction in Texas) or the formation of a competing enterprise in Texas by an entity not subject to jurisdiction in this proceeding. The trial court granted the special appearance, which the court of appeals affirmed. Because we hold there is jurisdiction over the trade secrets claim, but not over the tortious interference claims, we reverse in part and affirm in part the court of appeals' judgment and **\*148** remand to the trial court for further proceedings.

**I. Background**

Moncrief Oil International, Inc. (Moncrief) is a Texas-based company that entered into a series of contracts in 1997 and 1998 with two subsidiaries of OAO Gazprom (Gazprom) regarding development of a Russian gas field known as the Y–R Field. *Moncrief Oil Int'l Inc. v. OAO Gazprom,* 481 F.3d 309, 310 (5th Cir.2007). Gazprom, a Russian company, is among the world's largest producers of natural gas. After assuring Moncrief it would honor the contractual obligations of its subsidiaries, Gazprom later contracted with German entities to develop the Y–R Field. *Moncrief,* 481 F.3d at 311.

In the fall of 2003, Gazprom announced its intention to sell liquified natural gas to the United States and contacted oil companies in the American market. When Moncrief

asked Gazprom to recognize its claimed interest or sell it an interest in the Y–R Field, Gazprom replied that it was interested only in trading its resources for access to the American downstream market. Along those lines, Moncrief had developed alleged trade secret information regarding a proposed joint venture with California-based Occidental Petroleum Corporation to import liquified natural gas to a regasification facility to be built in Ingleside, Texas.

Moncrief and Gazprom engaged in a series of communications (including phone calls, emails, and in-person meetings) to discuss Moncrief's rights in the Y–R Field and the establishment of a consortium with Moncrief, Occidental, and Gazprom to import liquified natural gas to Texas. Gazprom Export, LLC (Gazprom Export)—the Gazprom subsidiary that exports natural gas to countries outside the former Soviet Union—also took part in the discussions.

These discussions began with a meeting in Moscow in September 2004, where Moncrief proposed that: (1) Gazprom would grant Moncrief an interest in the Y–R Field; (2) Moncrief would grant Gazprom an interest in the proposed Texas regasification facility; and (3) Moncrief would grant Occidental a share of its interest in the Y–R Field. At the meeting, Moncrief provided Gazprom alleged trade secrets concerning the Texas facility and marketing plan. Later that month, Moncrief and Gazprom met in Washington, D.C., where Moncrief again provided Gazprom the alleged trade secrets. The parties then exchanged a series of emails and phone calls regarding the proposal.

In February 2005, Gazprom informed Moncrief it would not accept Moncrief's proposal. In June 2005, Moncrief sued Gazprom and the two subsidiaries it dealt with regarding the Y–R Field in federal court in Texas over its interest in the Y–R Field. *Moncrief,* 481 F.3d at 311. Ultimately, the Fifth Circuit Court of Appeals affirmed the dismissal of Gazprom due to lack of personal jurisdiction but noted that "even without other contacts, jurisdiction would exist if Gazprom committed a tort while in the state." *Id.* at 314–15.

In late 2005, the parties resumed in-person discussions, with meetings in Houston, Boston, and Fort Worth, where Moncrief provided updated versions of the alleged trade secrets to Gazprom. Gazprom representatives later met directly with Occidental representatives in California, and Occidental terminated the proposed venture with Moncrief after Gazprom refused to participate in the venture. A

subsidiary of Gazprom Export (Gazprom Marketing & Trading, Ltd.) then established Gazprom Marketing & Trading USA, Inc. (GMT USA) in Houston to import **\*149** Gazprom's liquified natural gas, regasify it, and sell it in the Unites States.

Moncrief sued Gazprom, Gazprom Export, and GMT USA in state court for tortious interference, trade-secret misappropriation, conspiracy to tortiously interfere, and conspiracy to misappropriate trade secrets. Gazprom and Gazprom Export (collectively the Gazprom Defendants) specially appeared, asserting that their contacts with Texas were random, not purposeful, and that Moncrief unilaterally disclosed the trade secrets. After a special appearance hearing with no live testimony, the trial court granted the Gazprom Defendants' special appearances. Findings of fact and conclusions of law were not requested or filed.

The court of appeals affirmed, holding that legally and factually sufficient evidence supported an implied finding that the location of the two Texas meetings was "merely random or fortuitous" as to Moncrief's trade secrets claim. 332 S.W.3d 1, 19–20. As to the tortious interference claims, the court held that the record conclusively established that any alleged tortious interference that might have occurred took place in California. *Id.* at 13–14. The court of appeals further held that the trial court did not abuse its discretion in refusing to allow Moncrief additional depositions.[2] *Id.* at 22–23.[3]

## II. Discussion

### A. Standard of Review

[2] [3] [4] Texas courts may exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007). Under the Texas long-arm statute, the plaintiff bears the initial burden of pleading allegations sufficient to confer jurisdiction. *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 337 (Tex.2009). The long-arm statute allows the exercise of personal jurisdiction over a nonresident defendant who "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM.CODE § 17.042(2). Although allegations that a tort was committed

Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)

56 Tex. Sup. Ct. J. 1023

in Texas satisfy our long-arm statute, such allegations do not necessarily satisfy the U.S. Constitution. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 788 (Tex.2005). Here, Moncrief pled that the Gazprom Defendants committed torts in Texas by misappropriating Moncrief's alleged trade secrets at Texas meetings. Thus, Moncrief has met its initial burden of alleging a cause of action sufficient to confer jurisdiction under the long-arm statute. *See* TEX. CIV. PRAC. & REM.CODE § 17.042(2).

[5]  [6]  [7]  When the initial burden is met, the burden shifts to the defendant to negate all potential bases for personal jurisdiction the plaintiff pled. *Retamco,* 278 S.W.3d at 337. As Moncrief's sole allegation as to personal jurisdiction is that the **\*150** Gazprom Defendants committed torts in Texas, the Gazprom Defendants must negate that basis. In response, the Gazprom Defendants argue that exercising jurisdiction over them would violate due process. Asserting personal jurisdiction comports with due process when (1) the nonresident defendant has minimum contacts with the forum state, and (2) asserting jurisdiction complies with traditional notions of fair play and substantial justice. *Id.* at 338. A defendant establishes minimum contacts with a forum when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

[8]  A nonresident's contacts can give rise to general or specific personal jurisdiction. *Id.* Continuous and systematic contacts with a state give rise to general jurisdiction, while specific jurisdiction exists when the cause of action arises from or is related to purposeful activities in the state. *Id.* Here, Moncrief's asserted basis is specific jurisdiction, which focuses on the relationship between the defendant, Texas, and the litigation to determine whether the claim arises from the Texas contacts. *See id.*

[9]  [10]  When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by evidence.[4] *Id.* at 337 (quoting *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002)). The ultimate question of whether a court has personal jurisdiction over a nonresident defendant is a question of law we review *de novo. Moki Mac,* 221 S.W.3d at 574.

[11]  [12]  [13]  As an initial matter, specific jurisdiction requires us to analyze jurisdictional contacts on a claim-by-claim basis. *See, e.g., Kelly v. Gen. Interior Constr., Inc.,* 301 S.W.3d 653, 660 (Tex.2010) (separately analyzing jurisdictional contacts for fraud and trust fund claims to determine specific jurisdiction). The Fifth Circuit has expressly held that a "plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 275 (5th Cir.2006). As the Court explained,

> This result flows logically from the distinction between general and specific jurisdiction and is confirmed by the decisions of our sister circuits. If a defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts.

*Id.* at 274–75.[5] Of course, a court need not assess contacts on a claim-by-claim basis if **\*151** all claims arise from the same forum contacts.[6] Because we determine that the tortious interference claims arise from separate jurisdictional contacts than the trade secrets claim, we analyze those contacts separately.

### B. Trade Secrets Claim

#### 1. Minimum Contacts

The parties primarily dispute whether Gazprom's Texas contacts relating to the trade secrets claim were purposeful. The Gazprom Defendants assert that any contacts with Texas were not purposeful because Moncrief unilaterally disclosed the alleged trade secrets and the meetings in Texas were simply fortuitous—as evidenced by meetings held in Moscow, Boston, and Washington, D.C. The Gazprom Defendants assert they informed Moncrief at the meetings that they would only discuss the potential venture once Moncrief dismissed the lawsuit regarding the Y–R Field. Moncrief contends the disclosure was not unilateral because: (1) the purpose of discussions was to settle the dispute relating to the Y–R Field in exchange for Gazprom's participation in

the venture, and (2) the Texas meetings were not fortuitous because they were located in the state where Moncrief is headquartered and where the proposed regasification facility would be located. We agree with Moncrief that the contacts were purposeful but for different reasons.

 [14]  [15]  [16]  [17]  When determining whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas, we consider three factors:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Retamco,* 278 S.W.3d at 338–39; *see Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). This analysis assesses the quality and nature of the contacts, not the quantity. *Retamco,* 278 S.W.3d at 339.

 [18]  [19]  [20]  The United States Supreme Court has specified that a nonresident's contacts are not unilateral or random and fortuitous when the defendant "has created 'continuing obligations' between *himself* and residents of the forum," which shields the nonresident with the benefits and protections of the forum's laws. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174 (quoting *Travelers Health Ass'n v. Virginia,* 339 U.S. 643, 648, 70 S.Ct. 927, 94 L.Ed. 1154 (1950)). Further, the Court has stated that jurisdiction is proper "where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum State." *Id.* (quotation marks omitted). A substantial connection can result from even a single act. **\*152** *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). But the unilateral activity of another person cannot create jurisdiction. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. Physical presence in the state is not required but

"frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there." *Id.* at 476, 105 S.Ct. 2174. At its core, the **purposeful availment** analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there. *Id.* at 474, 105 S.Ct. 2174.

 [21]  The Court has also recognized "it is beyond dispute that [a forum] has a significant interest in redressing injuries that actually occur within the State." *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). As the Court has expounded:

> A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory. This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor shall be liable for damages which are the proximate result of his tort.

*Id.* (quoting *Leeper v. Leeper,* 114 N.H. 294, 319 A.2d 626, 629 (1974); RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 36, cmt. c (1971)). [7] Of course, states have an interest in protecting against more than torts, and the Supreme Court has recognized state interests in protecting regulatory schemes and contracts as well. *See Travelers Health Ass'n,* 339 U.S. at 648, 70 S.Ct. 927 (recognizing the "state's interest in faithful observance" of its regulatory scheme by nonresidents); *McGee,* 355 U.S. at 223, 78 S.Ct. 199 (observing that the forum "has a manifest interest in providing effective means of redress for its residents" in relation to contract disputes).

 [22]  Although a forum's interest in protecting against torts may operate to enhance the substantiality of the connection between the defendant and the forum, it cannot displace the **purposeful availment** inquiry. We have previously observed that Texas's interest in protecting its citizens against torts is insufficient to automatically exercise personal jurisdiction upon an allegation that a nonresident directed a tort from outside the forum against a resident. *Michiana,* 168 S.W.3d at 790–91. In *Michiana,* a Texan placed a phone call to an Indiana recreational vehicle dealer, paid for the vehicle in Indiana, and arranged to have the vehicle shipped from Indiana to Texas. *Id.* at 784. He later sued the dealer in

Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)

56 Tex. Sup. Ct. J. 1023

Texas, claiming a misrepresentation in the phone call from Texas subjected the dealer to specific personal jurisdiction in Texas court. *Id.* We held that, although the dealer allegedly committed a tort against a resident, its contacts with Texas were only receiving the phone call and transferring the vehicle to the shipper the buyer had designated to transport the vehicle to Texas. *Id.* at 786–87. Neither contact constituted **purposeful availment** because the dealer "had no say in the matter."[8] *Id.* at 787.

*Michiana* overruled a myriad of court of appeals cases where jurisdiction was predicated solely on the receipt of an out-of- **\*153** state phone call or that analyzed whether the defendant's contacts were tortious rather than examining the contacts themselves. *Id.* at 791–92. But, importantly, we differentiated cases where the defendant's conduct "was much more extensive and was aimed at getting extensive business in or from the forum state." *Id.* at 789–90 & n. 70. We cited as an example a case predicating jurisdiction on acts seeking to obtain business in Texas. *Id.* at 790 n. 70 (citing *Union Carbide Corp. v. UGI Corp.,* 731 F.2d 1186, 1189–90 (5th Cir.1984)).

 [23]    [24]    [25]    Here, the Gazprom Defendants' contacts with Texas were neither unilateral activities by Moncrief nor random and fortuitous. Unlike in *Michiana,* the Gazprom Defendants had a "say in the matter." 168 S.W.3d at 787. They were not unilaterally haled into forming contacts with Texas; rather, they agreed to attend Texas meetings.[9] And the Gazprom Defendants accepted Moncrief's alleged trade secrets at those meetings.[10] *See Retamco,* 278 S.W.3d at 340 (affirming exercise of specific personal jurisdiction when defendant "was a willing participant in a transaction with an affiliated Texas company").[11]

Additionally, the Gazprom Defendants' contacts were purposeful and substantial because their activity "was aimed at getting extensive business in or from the forum state." *Michiana,* 168 S.W.3d at 789–90. While we have held that a single business transaction occurring outside the state is insufficient to confer **specific jurisdiction**, *id.* at 787–88, the United States Supreme Court concluded that forming an enterprise in one state to send payments to a corporation in the forum state was sufficient to confer **specific jurisdiction**, *Burger King,* 471 U.S. at 468, 478, 105 S.Ct. 2174. Because the Gazprom Defendants attended two Texas meetings, at which they accepted Moncrief's alleged trade secrets regarding a proposed joint venture in Texas, their contacts

were not    **\*154**   unilaterally from Moncrief, nor were they random and fortuitous.[12]

The Gazprom Defendants protest that their subjective intent in attending the meetings was solely to discuss settlement of the Y–R Field dispute, indicating they did not purposefully avail themselves of doing business in Texas. But the Gazprom Defendants attended the two Texas meetings where they accepted the alleged trade secrets regarding a proposed Texas joint venture, which is the crux of the matter. As we stated in *Michiana,* courts at the jurisdiction phase examine business contacts, not what the parties thought or intended—which is the role of the fact-finder in assessing the merits of the claim. *See* 168 S.W.3d at 791. For example, if a nonresident defendant intended to drive through Texas and caused a vehicular accident in the state, her intent to simply pass through the state would not negate the fact that she caused a vehicular accident. Here, the Gazprom Defendants intended to, and did, come to Texas for two meetings, at which they accepted alleged trade secrets from Moncrief that involved a proposed joint venture in Texas. The Gazprom Defendants' subjective intent does not negate their business contacts. *See id.*

 [26]    [27]    [28]    Finally, the Gazprom Defendants benefitted from Texas. For contacts to be purposeful, the defendant must seek some "benefit, advantage, or profit" by availing itself of the forum. *Id.* at 785. This is premised on implied consent: a nonresident consents to suit by invoking the benefits and protections of a forum's laws.[13] *Id.* at 784. We have found jurisdiction over nonresidents with no physical ties to Texas when an out-of-state contract was formed "for the sole purpose of building a hotel in Texas," *Zac Smith & Co., Inc. v. Otis Elevator Co.,* 734 S.W.2d 662, 665–66 (Tex.1987), and when enrollment for out-of-state school was executed in Arizona but was "actively and successfully solicited" in Texas, *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 437 (Tex.1982); *see also Michiana,* 168 S.W.3d at 789–90 (discussing cases finding **specific jurisdiction** when forum contact "was aimed at getting extensive business in or from the forum state"). Here, Gazprom attended two Texas meetings with a Texas corporation and accepted alleged trade secrets created in Texas regarding a potential joint venture in Texas with the Texas corporation. Far from seeking to avoid Texas, Gazprom sought out Texas and the benefits and protections of its laws. *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174; *Michiana,* 168 S.W.3d at 785; *BMC Software,* 83 S.W.3d at 795.

Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)

56 Tex. Sup. Ct. J. 1023

## 2. Fair Play and Substantial Justice

[29] [30] [31] In addition to minimum contacts, due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice. *Retamco,* 278 S.W.3d at 338. If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction *155 over the nonresident not comport with traditional notions of fair play and substantial justice. *Id.* at 341. We undertake this evaluation in light of the following factors, when appropriate: (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies. *Spir Star AG v. Kimich,* 310 S.W.3d 868, 878 (Tex.2010); *see Asahi Metal Indus. Co. v. Superior Court of Cal.,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

[32] On balance, asserting personal jurisdiction over the Gazprom Defendants as to the trade secrets claim would not offend traditional notions of fair play and substantial justice. Subjecting the Gazprom Defendants to suit in Texas certainly imposes a burden on them, but the same can be said of all nonresidents. Distance alone cannot ordinarily defeat jurisdiction. *Spir Star,* 310 S.W.3d at 879 ("Nor is distance alone ordinarily sufficient to defeat jurisdiction: 'modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.' " (quoting *McGee,* 355 U.S. at 223, 78 S.Ct. 199)). Given the Gazprom Defendants' meetings with Moncrief in Texas and their increased familiarity with the forum and legal system through establishing a subsidiary headquartered here, the burden of litigating in Texas is not so severe as to defeat jurisdiction. *See id.* (holding jurisdiction was appropriate where German company officers traveled to Houston to establish a distributing company). And this burden is somewhat mitigated by the convenience to Moncrief, a Texas resident, of litigating in the forum where the alleged trade secrets were appropriated and then purportedly used. Moreover, the allegations that the Gazprom Defendants committed a tort in Texas against a resident implicate a serious state interest in adjudicating the dispute.[14] Finally, because these claims will be litigated with GMT USA in a Texas court, it promotes judicial economy to litigate the

claims as to all parties in one court. *See id.* ("[B]ecause the claims against [the resident defendant] will be heard in Texas, it would be more efficient to adjudicate the entire case in the same place."). On balance, the burden on the Gazprom Defendants of litigating in a foreign jurisdiction is minimal and outweighed by Texas's interests in adjudicating the dispute. *Id.* at 879–80.

The Gazprom Defendants counter that the Russian government is the majority owner of Gazprom and government officials at the highest level are aware of Moncrief's claims. In support, the Gazprom Defendants cite to *Solgas Energy Ltd. v. Global Steel Holdings Ltd.,* where a nonresident was sued over an alleged bribe to a Nigerian official to terminate its contract with the plaintiff. No. 04–06–00731–CV, 2007 WL 1892206, at *2, 7 (Tex.App.–San Antonio July 3, 2007, no pet.) (mem.op.). There, the court of appeals held that Texas's interest in resolving the dispute was tenuous because the United States federal government has an interest in foreign relations and the bribery allegations implicated Nigerian law. *156 *Id.* at *7. But here, Gazprom is not wholly owned by the Russian government, Moncrief's claims against the Gazprom Defendants do not implicate any government officials, and no other jurisdiction has as significant an interest as Texas does in resolving a claim for a tort committed in Texas against a Texas resident. On balance, this is not one of the rare cases where exercising jurisdiction fails to comport with fairplay and substantial justice.[15] Accordingly, we hold that the trial court has jurisdiction over the Gazprom Defendants as to the trade secrets claim.

### C. Tortious Interference Claims

Moncrief also brought claims against the Gazprom Defendants for tortiously interfering with existing and prospective business relationships. Moncrief contends the Gazprom Defendants' appropriation of the alleged trade secrets in Texas and use of the information to form a competing enterprise destroyed Moncrief's existing and prospective relationships with Occidental. The Gazprom Defendants respond, and the court of appeals held, that the tortious interference claims do not arise from the Texas meetings or their receipt of the information from Moncrief. We agree.

Specific jurisdiction exists only if the alleged liability arises out of or is related to the defendant's activity within the forum. *Moki Mac,* 221 S.W.3d at 573. In considering competing

Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)

56 Tex. Sup. Ct. J. 1023

interpretations of the phrase, we ultimately determined "for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Id.* at 585. In *Moki Mac,* a Texas teenager fell to his death in Arizona while on a hike supervised by a Utah-based company. *Id.* at 573. His parents filed suit against the company in Texas for wrongful death, maintaining the claim arose from misrepresentations in documents the company mailed to them in Texas as well as the company's other Texas contacts. *Id.* at 573, 576. We disagreed, holding "the operative facts of the [plaintiffs'] suit concern principally the guides' conduct of the hiking expedition and whether they exercised reasonable care in supervising" the teenager. *Id.* at 585. We further observed the "events on the trail and the guides' supervision of the hike will be the focus of the trial, will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question." *Id.*

Here, Moncrief alleges the Gazprom Defendants tortiously interfered with its agreement and relationship with Occidental, causing Occidental to breach its agreement and cease its relationship with Moncrief. *See Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 721–22, 727 (Tex.2001) (discussing tortious interference with contract and tortious interference with prospective contractual or business relations claims). Under the framework we established in *Moki Mac,* Moncrief's tortious inference claims principally concern two activities: (1) discussions between Gazprom and Occidental in California where Gazprom allegedly attempted to convince Occidental to proceed with a joint venture that did not include Moncrief, and (2) the Gazprom Defendants' establishment of a competing enterprise in Texas, thereby diminishing the value of a joint venture between Occidental and **\*157** Moncrief to accomplish the same purpose. *See Moki Mac,* 221 S.W.3d at 585.

[33]  Moncrief also argues its tortious interference claims arise from a third set of contacts: the Gazprom Defendants' purported misappropriation of Moncrief's alleged trade secrets in Texas. We disagree. Much like the accident in *Moki Mac* would not have occurred but for executing contract materials in Texas, the establishment of a competing enterprise arguably would not be possible without the Gazprom Defendants' purported acquisition of the alleged trade secrets. *See id.* at 585. However, but-for causation alone is insufficient. *Id.* Just as the wrongful death claim in *Moki Mac* was principally concerned with alleged negligence in

Arizona, the tortious interference claim here is principally concerned with the California meeting and the competing Texas enterprise—not the purported misappropriation of alleged trade secrets. *See id.*

[34]  Neither the California meeting nor the competing enterprise in Texas can form the basis for specific jurisdiction over the Gazprom Defendants in Texas. As we held in *Michiana,* a nonresident directing a tort at Texas from afar is insufficient to confer specific jurisdiction. 168 S.W.3d at 790–92. The focus is properly on the extent of the defendant's activities in the forum, not the residence of the plaintiff. *Id.* at 789. Thus, the Gazprom Defendants' alleged tortious conduct in California against a Texas resident is insufficient to confer specific jurisdiction over the Gazprom Defendants as to Moncrief's tortious interference claims. *See id.* at 789–92.

[35]  Moreover, Moncrief's allegation that the Gazprom Defendants established a competing enterprise in Texas cannot support specific jurisdiction. Moncrief alleges Gazprom Marketing & Trading, Ltd., a Gazprom subsidiary, formed GMT USA as a competing enterprise in Texas. But the court of appeals rejected Moncrief's theory that GMT USA is the alter ego of Gazprom Marketing & Trading, Ltd. 332 S.W.3d at 20–22; *see PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 175 (Tex.2007) (imputing jurisdictional contacts to another entity requires assessing "the amount of the subsidiary's stock owned by the parent corporation, the existence of separate headquarters, the observance of corporate formalities, and the degree of the parent's control over the general policy and administration of the subsidiary"). Moncrief does not challenge that ruling here. Additionally, Moncrief does not allege the Gazprom Defendants provided the trade secrets to GMT USA in Texas. Therefore, we cannot impute the Texas contacts regarding the competing enterprise to the Gazprom Defendants. In sum, we conclude neither the California contacts nor the establishment of a competing enterprise supports an exercise of jurisdiction over the Gazprom Defendants as to the tortious interference claims.

### D. Additional Depositions

Finally, Moncrief contends the trial court erred in refusing to allow the deposition of Gazprom's deputy chairman and a representative of Gazprom Bank. The court of appeals held the trial court did not abuse its discretion because it could have

Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)

56 Tex. Sup. Ct. J. 1023

reasonably concluded the testimony would be cumulative as to the jurisdictional facts. 332 S.W.3d at 23. We agree.

Initially, we note that because we have concluded the trial court has **specific jurisdiction** over the Gazprom Defendants as to the trade secrets claim, further deposition testimony regarding these claims is unnecessary. But we have also determined there is no **specific jurisdiction** over the Gazprom Defendants as to the tortious **\*158** interference claims. If the depositions Moncrief sought could yield jurisdictional facts that support jurisdiction as to the tortious interference claims, then the trial court abused its discretion.

[36] Because Moncrief has not demonstrated what additional jurisdictional facts the depositions would provide, we conclude the trial court did not abuse its discretion. Moncrief claims Gazprom's deputy chairman sent a representative of Gazprom Bank to California to meet with Occidental. In its motion to compel, Moncrief sought to depose Gazprom's deputy chairman because it believed he would provide testimony regarding the meetings with Moncrief. It also sought to depose the Gazprom Bank representative because it believed he would provide testimony regarding his meeting with Occidental. But Moncrief already deposed the consultant for Gazprom who attended the meeting with Occidental (as well as both Texas meetings) and one of Occidental's representatives from that meeting—who both testified as to what the Gazprom Bank representative said. Moncrief has not identified what additional testimony the depositions of the Gazprom Bank representative or Gazprom's deputy chairman would provide regarding Texas contacts with respect to the tortious interference claims. Therefore, we hold the trial court did not

abuse its discretion in denying Moncrief's motion to compel the depositions. *See BMC Software,* 83 S.W.3d at 800–01 (holding trial court did not abuse discretion in denying continuance before special appearance hearing).

### III. Conclusion

The Gazprom Defendants attended two Texas meetings with a Texas corporation and accepted alleged trade secrets created in Texas regarding a potential Texas-based joint venture with the Texas corporation. These contacts were neither unilaterally from Moncrief nor random and fortuitous, and they indicate the Gazprom Defendants were benefitting from the protection of Texas laws. Therefore, we conclude the trial court has specific personal jurisdiction over Moncrief's trade secrets claim, and the court of appeals erred in affirming the special appearance as to this claims. [16] But we agree with court of appeals that the trial court has no specific personal jurisdiction over the Gazprom Defendants as to Moncrief's tortious interference claims and that the trial court did not abuse its discretion in refusing to compel additional depositions. Accordingly, we reverse the judgment of the court of appeals in part, affirm in part, and remand to the trial court for further proceedings consistent with this opinion.

Chief Justice JEFFERSON did not participate in the decision.

**Parallel Citations**

56 Tex. Sup. Ct. J. 1023

---

Footnotes

1    *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 791 (Tex.2005).

2    Moncrief also sued Gazprom Marketing & Trading, Ltd. and Gazprom Bank. Gazprom Bank was allegedly part of Gazprom's meeting with Occidental in California. The trial court granted its special appearance, and the court of appeals granted Moncrief's motion to dismiss Gazprom Bank. 332 S.W.3d at 5, n. 1. Further, the court of appeals held that there was no jurisdiction over Gazprom Marketing & Trading, Ltd.—which Moncrief does not complain of here. *Id.* at 20–22.

3    The Texas Civil Justice League, the Texas Oil & Gas Association, the Texas Association of Manufacturers, the Association of Electric Companies of Texas, and the Texas Association of Business collectively submitted an *amicus curiae* brief in support of Moncrief.

4    Moncrief's briefing asserts that an appellate court should review a trial court's implied findings on a special appearance *de novo* when there is no live testimony. But we need not address this issue because the relevant facts are undisputed. As to the trade secrets claim, the Gazprom Defendants' contacts with Texas are sufficient to support **specific jurisdiction** under our existing framework for reviewing special appearance rulings. *See infra* Part II.B. And as to the tortious interference claims, we agree with the courts below that the claims do not arise from or relate to Texas contacts—

**Moncrief Oil Intern. Inc. v. OAO Gazprom, 414 S.W.3d 142 (2013)**

56 Tex. Sup. Ct. J. 1023

a question of law unaffected by the operation of implied findings of relevant fact necessary to support the special appearance ruling. *See infra* Part II.C; *see also Moki Mac,* 221 S.W.3d at 588–89.

*See also Touradji v. Beach Capital P'ship,* 316 S.W.3d 15, 25–26 (Tex.App.–Houston [1st Dist.] 2010, no pet.); *Barnhill v. Automated Shrimp Corp.,* 222 S.W.3d 756, 766–67 (Tex.App.–Waco 2007, no pet.); *Remick v. Manfredy,* 238 F.3d 248, 255–56 (3d Cir.2001); *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.,* 196 F.3d 284, 289 (1st Cir.1999).

*See, e.g., Touradji,* 316 S.W.3d at 26; *Sutton v. Advanced Aquaculture Sys., Inc.,* 621 F.Supp.2d 435, 442 (W.D.Tex.2007).

The Restatement provides that "[a] state has power to exercise judicial jurisdiction over an individual who has done, or has caused to be done, an act in the state with respect to any cause of action in tort arising from the act." RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 36 (1971).

*See also CMMC v. Salinas,* 929 S.W.2d 435, 439 (Tex.1996) (a French winepress maker shipping a winepress to a Texas customer was insufficient to constitute purposeful availment).

*See Woodson,* 444 U.S. at 299, 100 S.Ct. 559 (no jurisdiction over a nonresident automobile distributor whose only tie to the state was a customer's unilateral decision to drive there); *Kulko v. Cal. Superior Court,* 436 U.S. 84, 93–94, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (no jurisdiction over a nonresident divorced husband owing child support to a former spouse who unilaterally decided to move to another state); *Hanson,* 357 U.S. at 251, 78 S.Ct. 1228 (no jurisdiction over a nonresident trustee whose only connection to the state resulted from the settlor's unilateral decision to exercise her power of appointment in that state).

Moncrief substantiated its allegations with evidence that the Gazprom Defendants accepted the alleged trade secrets at the Texas meetings. For example, an affidavit and deposition testimony of Richard Moncrief, who attended the Texas meetings, stated that Moncrief provided the Gazprom Defendants updated versions of the trade secrets at both meetings. The Gazprom Defendants cite to evidence that they announced an intent not to discuss the proposed joint venture at the meetings and did not agree to keep the alleged trade secrets confidential in exchange for receiving them. But the Gazprom Defendants do not cite, and we cannot locate, any evidence in the record that the Gazprom Defendants did not receive the alleged trade secrets at the meetings. Therefore, we cannot imply a finding that the Gazprom Defendants did not receive the alleged trade secrets because such a finding is not supported by evidence. *See Retamco,* 278 S.W.3d at 337.

Moreover, the previous meetings in Moscow, Boston, and Washington, D.C. did not render the two Texas meetings random and fortuitous because: (1) the discussions were regarding a joint venture in Texas, *see Michiana,* 168 S.W.3d at 789–90 & n. 70, and (2) Moncrief was headquartered in Texas, *see Asahi Metal Indus. Co. v. Superior Court of Cal.,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Moreover, the information was revised and updated before the Texas meetings.

Moncrief also asserts in its briefing the additional contacts by the Gazprom Defendants of use of the trade secrets in Texas. But Moncrief's live pleading alleges GMT USA is using those trade secrets in Texas and does not allege that the Gazprom Defendants provided the trade secrets to GMT USA in Texas. Moreover, the court of appeals rejected Moncrief's theory that GMT USA is the alter ego of another Gazprom subsidiary, which Moncrief does not appeal here. 332 S.W.3d at 20–22. Accordingly, we will not analyze these contacts for our purposeful availment analysis.

A nonresident may structure its business so as to not profit from a forum's laws and not be subject to its jurisdiction. *Michiana,* 168 S.W.3d at 785.

*See Keeton,* 465 U.S. at 776, 104 S.Ct. 1473 ("A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory."); *see also Asahi Metal,* 480 U.S. at 114, 107 S.Ct. 1026 ("Because the plaintiff is not a California resident, California's legitimate interests in the dispute have considerably diminished.").

The Gazprom Defendants also contend the information they received from Moncrief did not constitute trade secrets. Although they may well ultimately prevail on this theory, it is a merits issue that is inappropriate at the jurisdiction stage. *Michiana,* 168 S.W.3d at 790–91.

Moncrief's conspiracy claims (for conspiracy to tortiously interfere and conspiracy to misappropriate trade secrets) are not factually distinct from the underlying trade secret and tortious interference claims. *See* 332 S.W.3d at 10 n. 7 ("[B]ecause no factually distinct basis exists for Moncrief Oil's conspiracy claims, they add nothing to our jurisdictional analysis."). Accordingly, the exercise of jurisdiction is proper over the conspiracy to misappropriate trade secrets claim, *see supra* Part II.B, and improper over the conspiracy to tortiously interfere claim, *see supra* Part II.C.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment

**Called into Doubt by** Baty v. ProTech Ins. Agency, Tex.App.-Hous. (14 Dist.), November 29, 2001

29 S.W.3d 74
Supreme Court of Texas.

The PRUDENTIAL INSURANCE
COMPANY OF AMERICA, Petitioner,
v.
FINANCIAL REVIEW
SERVICES, INC., Respondent.

No. 98–1053. | Argued Oct. 6, 1999. | Decided June 29, 2000. | Rehearing Overruled Nov. 9, 2000.

Auditing company for collection of hospitals' bills brought action against health insurer for tortious interference with contract or prospective business relations. The District Court entered partial summary judgment and directed verdict in favor of the insurer. Company appealed. The Court of Appeals, Wanda McKee Fowler, J., affirmed in part, reversed in part, and remanded. Review was granted. The Supreme Court, Gonzales, J., held that: (1) company's status as hospitals' agent to collect for uncharged services and supplies was not a barrier to its suit; (2) the insurer had a privilege to communicate with its insureds about claims against their policies and with hospitals about the propriety of the charges; (3) the privilege would not authorize the insurer to falsely and maliciously disparage the company; (4) letters to the insureds did not amount to trade disparagement and did not defeat the privilege; (5) the insurer's right to challenge the hospitals' bills would not entitle the insurer to falsely accuse the company of fraud; and (6) evidence created jury questions on the privilege defense.

Affirmed.

Hecht, J., dissented and filed opinion joined by Owen and Baker, JJ.

Enoch, J., dissented and filed opinion joined by Owen and Baker, JJ.

West Headnotes (15)

**[1] Torts**
 Contracts

The elements of tortious interference with an existing contract are (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) proximately caused injury, and (4) actual damages or loss.

91 Cases that cite this headnote

**[2] Torts**
 Defense, justification or privilege in general

As an affirmative defense, a defendant may negate liability for tortious interference with an existing contract on the ground that its conduct was privileged or justified.

25 Cases that cite this headnote

**[3] Torts**
 Physicians and health care; health insurance

Auditing company's status as hospitals' agent to collect for uncharged services and supplies was not a barrier to its suit against a health insurer for tortious interference with its contract with the hospitals; even though the company was paid a commission, it lacked a sufficient identity of interest with the hospitals.

Cases that cite this headnote

**[4] Torts**
 Defense, justification or privilege in general

Justification is an affirmative defense to tortious interference with contract and tortious interference with prospective business relations.

53 Cases that cite this headnote

**[5] Torts**
 Defense, justification or privilege in general

The justification defense to tortious interference with contract and tortious interference with prospective business relations can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken.

49 Cases that cite this headnote

**[6]** **Torts**
  ☞ Business relations or economic advantage, in general

**Torts**
  ☞ Contracts in general

The question whether a communication was privileged or justified or merely the exercise of a colorable right is a one of law in a suit alleging tortious interference with contract and prospective business relations.

3 Cases that cite this headnote

**[7]** **Torts**
  ☞ Contracts

The issue of the defendant's good faith is pertinent only if the court determines the defendant had a colorable right, but not a privilege, to engage in the conduct claimed to have interfered with a contract.

8 Cases that cite this headnote

**[8]** **Torts**
  ☞ Physicians and health care; health insurance

Health insurer that was sued by hospitals' auditing company for tortious interference with contract and prospective business relations had a privilege to communicate with its insureds about claims against their policies and with hospitals about the propriety of the charges, but the privilege would not authorize the insurer to falsely and maliciously disparage the company; the insurer had a right to challenge the bills. V.A.T.S. Insurance Code, art. 21.55, §§ 2, 3.

9 Cases that cite this headnote

**[9]** **Torts**
  ☞ Defense, justification or privilege in general

Generally, justification as a defense to tortious interference with contract or prospective business relations is established when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights.

68 Cases that cite this headnote

**[10]** **Torts**
  ☞ Defense, justification or privilege in general

A party may not exercise an otherwise legitimate privilege by resort to illegal or tortious means to interfere with contract or prospective business relations.

4 Cases that cite this headnote

**[11]** **Torts**
  ☞ Absence of justification or privilege

**Torts**
  ☞ Improper means; wrongful, tortious or illegal conduct

**Torts**
  ☞ Defense, justification or privilege in general

If the plaintiff pleads and proves methods of interference with contract or prospective business relations that are tortious in themselves, then the issue of privilege or justification never arises.

3 Cases that cite this headnote

**[12]** **Libel and Slander**
  ☞ Actionable words or conduct relating to quality or value

The general elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages.

13 Cases that cite this headnote

**[13]    Torts**

🔑 Physicians and health care;  health insurance

Health insurer's letters to insureds about hospitals' unpaid bills allegedly uncovered by auditing company did not amount to trade disparagement and did not defeat privilege against liability to company on claims of tortious interference with contract or prospective business relations; the letters merely informed the insureds of the insurer's position with respect to the bills. V.A.T.S. Insurance Code, art. 21.55, §§ 2, 3.

1 Cases that cite this headnote

**[14]    Torts**

🔑 Physicians and health care;  health insurance

Evidence created jury questions whether health insurer falsely accused auditing company of fraud in seeking to collect hospitals' bills for uncharged services or supplies, whether causation existed, and, thus, whether the insurer was liable for tortious interference with contract or prospective business relations.

4 Cases that cite this headnote

**[15]    Torts**

🔑 Physicians and health care;  health insurance

Health insurer's right to challenge hospitals' bills uncovered by auditing company would not entitle the insurer to falsely accuse the company of fraud, knowing its charges are baseless, and, therefore, would not protect it from liability for tortious interference with contract or prospective business relations.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*76** James McConn, Jr., Craig S. Wolcott, Susan C. Stevenson, Hays McConn Rice & Pickering, Houston, for Petitioner.

Norman Riedmueller, Houston, for Respondent.

**Opinion**

Justice GONZALES delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ABBOTT, Justice HANKINSON, and Justice O'NEILL joined.

The principal issue we consider is whether the defendant, The Prudential Insurance Company of America, conclusively established its justification defense in this tortious interference case. The trial court granted Prudential a partial summary judgment on some issues and directed a verdict on the remaining issues after the plaintiff rested its case. The court of appeals reversed the judgment and remanded to the trial court, holding that fact issues remained for the factfinder to resolve. —— S.W.3d ——. We conclude that Prudential did not conclusively establish that its interference with the plaintiff's contracts and future business relations was justified. Accordingly, we affirm the judgment of the court of appeals.

**Background**

Financial Review Services, Inc. (FRS) audits hospital bills, looking for uncharged services and supplies omitted from patients' hospital bills. FRS provides its services to hospitals for an equal share of the otherwise-lost charges it collects. Two of FRS's early audit contracts were with hospitals affiliated with Hospital Corporation of America (HCA), one of the major healthcare corporations in the United States. In June 1991, FRS obtained contracts with two HCA hospitals in Houston, HCA Women's Hospital of Texas and HCA Medical Center Hospital. These two Houston hospitals together are known as the HCA Center for Health Excellence (CHE). Each CHE hospital gave FRS a six-month contract to discover and collect their unbilled medical services, and the parties renewed both contracts for another six months at the end of the initial terms. Meanwhile, FRS began negotiating a similar contract with an HCA hospital in another city, HCA Rio Grande.

After it audited CHE, FRS sent out an initial group of about 2000 bills for previously unbilled services. Approximately 100 of the bills went to Prudential for hospital services rendered to its policyholders. Prudential responded with a letter to John Gilbert, CHE's chief financial officer, stating that Prudential would not consider the claims unless CHE first billed the patients and provided their complete medical records to Prudential for review. CHE complied with this request. Prudential then conducted its own audit and denied all the claims as unsupported by CHE records. Meanwhile, Prudential sent letters to its policyholders about the status of these claims. A significant number of Prudential policyholders, other patients, doctors, and the Better Business Bureau complained to CHE about the back-billing. Eventually, CHE terminated its contracts with FRS. Also, FRS lost the contract it had obtained with HCA Rio Grande.

FRS sued Prudential, claiming that it tortiously interfered with FRS's "business and contractual relationships with HCA and its hospitals," in particular, FRS's existing contracts with CHE and HCA Rio Grande, and that Prudential breached an oral agreement with FRS to abide by the results of Prudential's audit of FRS's bills. FRS contended that Prudential tortiously interfered in five ways: (1) Prudential refused to pay FRS's bills and other bills **\*77** from HCA hospitals, (2) Prudential "maligned" FRS to CHE and the patients, (3) Prudential harassed HCA officials with "sham" audits, pressure tactics, and unreasonable, bad faith demands, (4) Prudential stirred up the insureds to make patient complaints to CHE, and (5) Prudential started false rumors about FRS, intending that they reach HCA management.

Prudential moved for summary judgment on all claims. The trial court granted a partial summary judgment resolving some of the tortious interference issues against FRS. The court decided that FRS had no cause of action for Prudential's handling of bills audited by FRS, because Prudential owed FRS no duty to pay CHE's bills in the first place. The court also determined Prudential had an absolute right to object to, question, and investigate the bills, and had the right to complain about the practice of late billing in general and FRS's procedures in particular. Finally, the court decided that Prudential had an absolute right to communicate with its insureds about the billing. However, it denied summary judgment on FRS's complaints about Prudential's communications to the insureds and CHE because, the trial court concluded, the communications could be tortious depending on their content.

At trial on these remaining issues, FRS presented its case for breach of contract and tortious interference and then rested. Prudential orally moved for directed verdict on all issues. Prudential argued that the trial court's partial summary judgment reduced the issues to whether Prudential breached a contract with FRS and whether Prudential's communications concerning FRS tortiously interfered with FRS's auditing contracts. Prudential urged that it was entitled to judgment because (1) there was no evidence of a contract and (2) all of Prudential's communications and conduct were justified and did not cause FRS to lose its contracts. The court granted the motion, rendering a final take-nothing judgment on all of FRS's claims.

On appeal, FRS challenged both the partial summary judgment and the directed verdict. The court of appeals affirmed the partial summary judgment and the breach of contract portion of the directed verdict. ——— S.W.3d ———. But the court of appeals reversed and remanded the remainder of the directed verdict. The court held that there were fact questions about whether some of Prudential's conduct and communications tortiously interfered with FRS's contracts and business relationships. ——— S.W.3d ———. Prudential has petitioned this Court for review.

### Standard of Review

A court may instruct a verdict if no evidence of probative force raises a fact issue on the material questions in the suit. *See Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). A directed verdict for a defendant may be proper in two situations. First, a court may direct a verdict when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery. *See Latham v. Castillo,* 972 S.W.2d 66, 67–68, 70–71 (Tex.1998). Second, as other courts have held, a trial court may direct a verdict for the defendant if the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *See, e.g., Villegas v. Griffin Indus.,* 975 S.W.2d 745, 748–49 (Tex.App.—Corpus Christi 1998, pet. denied); *Davis v. Mathis,* 846 S.W.2d 84, 86 (Tex.App.—Dallas 1992, no writ); *see generally* Elliot, *Jury Trial: General, in* 4 MCDONALD TEXAS CIVIL PRACTICE § 21:52 (Allen et al. eds., 1992 ed.).

**[1]** **[2]** We have identified the elements of tortious interference with an existing contract as: (1) an existing contract subject to interference, (2) a willful and intentional

act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss. *See ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). Also, as an affirmative defense, a **\*78** defendant may negate liability on the ground that its conduct was privileged or justified. *See id.* at 431. Under a directed verdict standard, then, a judgment for Prudential could be proper if (1) FRS failed to present evidence about one of the elements of the tort, (2) Prudential conclusively negated one of those elements, or (3) Prudential conclusively established its justification defense.

In addition to FRS's claim of tortious interference with its existing contracts with CHE and HCA Rio Grande, FRS's pleadings claimed Prudential's conduct caused FRS to lose its "business and contractual relationship with HCA and its hospitals." After the CHE contracts were terminated, FRS had no existing contracts with HCA. Therefore, FRS's pleadings seem to seek damages for the lost opportunity to obtain contracts in the future with other HCA affiliated hospitals. In other words, FRS appears to be asserting a claim for tortious interference with prospective contracts with other HCA affiliated hospitals. We have never enumerated the elements of a cause of action for tortious interference with prospective contracts, although we have concluded that justification is an affirmative defense to tortious interference with prospective business relations as well as to tortious interference with an existing contract. *See Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996). Neither the courts below nor the parties in their briefing here have distinguished between the two torts. But we may address Prudential's specific arguments without deciding what all of the elements of proof for tortious interference with prospective business relations might be.

Prudential contends that the trial court correctly directed a verdict because FRS's status as CHE's and HCA Rio Grande's agent precludes FRS's tortious interference claim, and nothing Prudential did caused FRS to lose its contracts and relationships. Additionally, Prudential claims that the evidence conclusively established its justification defense. We consider first Prudential's agency arguments.

### Tortious Interference with an Agent's Contract

 **[3]**    Prudential argues that because FRS is CHE's and HCA Rio Grande's agent for collecting payment, FRS cannot bring a claim for tortious interference with contract. Prudential's arguments are based on the proposition that, for many

purposes, an agent and principal are treated as one, and one cannot interfere with one's own contract. From these premises, Prudential contends that an agent cannot sue a third party for the commissions the agent would have received on a contract between the third party and the agent's principal. We understand Prudential's arguments as pertaining only to FRS's claim of tortious interference with existing contracts with CHE and HCA Rio Grande, because only those entities had a principal-agent relationship with FRS.

To properly consider Prudential's arguments it is important to identify the contractual relationships between Prudential, CHE, HCA Rio Grande, and FRS. CHE and HCA Rio Grande have a contractual relationship with Prudential, because Prudential's insureds assigned their policy rights to those hospitals when they were patients. But FRS brought suit for claimed interference with its auditing contracts with CHE and HCA Rio Grande, not the contracts between Prudential and the hospitals.

Prudential argues that the contracts are inseparable, because CHE employed FRS to assist it in CHE's relations with Prudential and others like it. Prudential claims that FRS's suit is, in essence, a suit for the commissions FRS would have received if Prudential had paid its bills to the hospitals. Thus, Prudential contends that the identity of interests of the hospitals and their agent, FRS, prevents FRS from suing for tortious interference. Prudential bases this argument on three cases, *Holloway v. Skinner,* 898 S.W.2d 793 (Tex.1995), **\*79** *Morgan Stanley & Co. v. Texas Oil Co.,* 958 S.W.2d 178 (Tex.1997), and *LA & N Interests, Inc. v. Fish,* 864 S.W.2d 745 (Tex.App.—Houston [14th Dist.] 1993, no writ), *disapproved on other grounds by, Trammell Crow Co. No. 60 v. Harkinson,* 944 S.W.2d 631 (Tex.1997). Prudential asks us to draw a broad principle from these cases—that an agent cannot sue a third party for lost commissions on a contract between the third party and the agent's principal.

In *Holloway,* the holder of a corporation's promissory note sued the director of a corporation for tortiously interfering by inducing the corporation to default on the note. 898 S.W.2d at 794. We noted that a suit against a corporation's agent posed special problems for the second element of a tortious interference claim, that a non-party to the contract interfered with the contract. *See id.* at 796. We recognized the fundamental principle that a party to a contract cannot tortiously interfere with its own contract. *See id.* at 795. Yet a corporation can only act through its agents, so that it is necessary to differentiate between the acts of an agent on

behalf of the principal from those done in the agent's self-interest. *See id.* at 795–96. Consequently, we held that to hold an agent liable under such circumstances, the plaintiff had to show that the agent acted so contrary to the principal's best interests that his actions could only have been motivated by personal interests. *See id.* at 796.

In *Morgan Stanley,* we applied the *Holloway* rule to a claim for tortious interference with a prospective business relation, emphasizing that the plaintiff cannot recover without proof that the agent acted in its own interest at the expense of the principal. *Morgan Stanley,* 958 S.W.2d 178, 179 (Tex.1997). We also held that if a corporation does not complain about its agent's actions, then the agent cannot be held to have acted contrary to the corporation's interests. *See id.* at 182*; see also Powell Indus., Inc. v. Allen,* 985 S.W.2d 455, 457 (Tex.1998).

Prudential argues that *Morgan Stanley* stands for the proposition that if the principal does not complain about another party's conduct on a matter of interest to the principal, then neither can the agent. While we noted in *Holloway* and *Morgan Stanley* that the interests of an agent and a principal are often the same, those cases do not otherwise apply. In those cases the agent was the defendant, and the issue was how to differentiate whether the defendant was acting in the company's interest or in the agent's self-interest when the agent allegedly interfered with a third party's contract. In *Holloway* and *Morgan Stanley,* we held, "for reasons of logic and law," that a third party generally has no cause of action against an agent for inducing the principal to breach a contract with a third party. *Morgan Stanley,* 958 S.W.2d at 179; *Holloway,* 898 S.W.2d at 796. We held in both cases that to recover for tortious interference in such a situation, a plaintiff must prove that the agent willfully or intentionally acted to advance the agent's own interests at the principal's expense. *See Morgan Stanley,* 958 S.W.2d at 179; *Holloway,* 898 S.W.2d at 798.

But here, FRS, the agent, is the plaintiff complaining that Prudential interfered with its auditing contracts with CHE and HCA Rio Grande. Prudential is neither a party to, nor an agent of the hospitals under those contracts. Because the concerns in *Holloway* and *Morgan Stanley* are not implicated here, neither case supports the absolute rule that Prudential urges.

Prudential also argues that, because FRS was paid on commission, its interests are essentially the same as the hospitals', and because the hospitals may not sue Prudential in tort for not paying the bills, neither can FRS. Prudential bases this argument on *LA & N Interests, Inc. v. Fish,* 864 S.W.2d 745, 749 (Tex.App.—Houston [14 th Dist.] 1993, no writ), in which the court of appeals held that a real- **\*80** estate agent had no tortious interference claim against a prospective purchaser based on the purchaser's breach of contract that denied the agent's commission. *See LA & N Interests, Inc.,* 864 S.W.2d at 749. But *LA & N* does not apply because there the only claimed injury was the commission the agent would have realized from the sale to the third party. Here, FRS is not merely seeking its lost commissions on Prudential's bills, FRS also alleges that Prudential interfered with its contract to audit bills of all CHE and HCA Rio Grande patients. The majority of patient accounts that FRS audited for CHE did not concern Prudential policyholders. Of the initial 2,000 bills that FRS sent out for CHE, fewer than 100 were to Prudential policyholders. FRS eventually sent out 9,000 bills. HCA Rio Grande terminated its contract before FRS sent out any bills, so we do not know if any bills would have been sent to Prudential policyholders. The fact that FRS was CHE's and HCA Rio Grande's agent, paid on commission, does not establish the identity of interest between FRS and those hospitals that was important in *LA & N.*

Accordingly, we conclude that FRS's agency status is not a barrier to a tortious interference claim involving FRS's auditing contracts with CHE and HCA Rio Grande. We turn next to Prudential's arguments that it conclusively established its justification defense and that it did nothing to cause FRS to lose its contracts.

## Justification Defense

[4] [5] Prudential claims that it established its justification defense as a matter of law. Justification is an affirmative defense to tortious interference with contract and tortious interference with prospective business relations. *See Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996). As we explained in *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996), the justification defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. We stated that if a trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, the defendant has conclusively established the justification defense, and the motive is irrelevant. *See id.* Alternatively, if the defendant cannot prove justification as a matter of law, it can still establish the defense if the trial court determines that the

defendant interfered while exercising a colorable right, and the jury finds that, although mistaken, the defendant exercised that colorable right in good faith. *See id.*

The trial court here granted summary judgment against FRS on all of its tortious interference claims except those based on Prudential's communications to its own policyholders and to CHE. The court of appeals affirmed the summary judgment, characterizing Prudential's privilege to communicate to its policyholders and CHE as a "qualified" privilege. ⸺ S.W.3d ⸺. The court of appeals's opinion implied that an insurance company's communications to its policyholders, other than those conveying truthful information, can never be privileged as a matter of law, and necessarily present a fact question about good faith. ⸺ S.W.3d ⸺. The opinion also held that Prudential's communications with the hospitals were privileged only if it had a good faith belief in a colorable right, a fact question for the jury. ⸺ S.W.3d ⸺.

 **[6]**   **[7]**   There well may be a fact question about what Prudential said to CHE or the policyholders. But, as *Texas Beef* explains, whether the communication was privileged or justified, or merely the exercise of a colorable right, is a question of law for the court. *See Texas Beef,* 921 S.W.2d at 211. The issue of the defendant's good faith is pertinent only if the court determines the defendant had a colorable right, but not a privilege, to engage in the conduct claimed to have interfered with a contract.

 **\*81**   **[8]**   We agree with the trial court that Prudential would be justified as a matter of law to communicate with its policyholders and CHE about certain subjects. As the trial court determined in its partial summary judgment:

> [Prudential] had an absolute right to communicate with its insureds regarding the claims that were billed against the insureds' policies; and that [Prudential was] not limited to communications that requested information regarding services rendered and statements of benefits paid; and that Defendants were not limited to any particular number of communications to their insureds.

Prudential is statutorily obligated to communicate with its insureds to acknowledge receipt of a claim, commence any investigation of the claim, and advise claimants of any actions taken with respect to the claim. *See* TEX.INS.CODE ANN. art. 21.55, §§ 2, 3 (Supp.2000).

 **[9]**   With respect to Prudential's communications to CHE, the trial court determined in its partial summary judgment:

> [Prudential] had an absolute right to object to the bills, question[ ] the bills, investigate the bills, complain about the procedures used to come up with the bills, and to complain generally about the practice of late-charge billing.

Generally, justification is established as a matter of law when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights. *See ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 431 (Tex.1997); *Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 283 (Tex.1996); *Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996). As Prudential was obligated only for reasonable charges under its policies, it had the contractual right to challenge the propriety of the FRS bills.

 **[10]**   **[11]**   We, therefore, conclude that Prudential had a privilege to communicate with its insureds about claims against their policies and with CHE about the propriety of charges. But that does not mean that Prudential could say or do anything under the guise of exercising a privilege. A party may not exercise an otherwise legitimate privilege by resort to illegal or tortious means. As *Prosser and Keeton* observed:

> Methods tortious in themselves are of course unjustified and liability is appropriately imposed where the plaintiff's contract rights are invaded by violence, threats and intimidation, defamation, misrepresentation, unfair competition, bribery and the like.

KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 992 (5th ed.1984). Thus, if the plaintiff pleads and proves methods of interference that are tortious in themselves, then the issue of privilege or justification never arises.

Here, FRS pleaded that Prudential interfered with FRS's contracts and business relations by (1) falsely accusing FRS of double billing in letters to policyholders by referring to items as having been "previously considered"; (2)

"maligning" FRS to CHE in a meeting by accusing FRS of billing for undocumented items that were documented; (3) harassing CHE with sham audits, requesting hundreds of records and asserting that CHE charged for medically unnecessary procedures; (4) pressuring CHE to stop using FRS by refusing to pay any FRS bill and withholding other claims until FRS was terminated; and (5) agitating the policyholders to complain about FRS.

[12] Absent special exceptions, we construe a petition liberally in favor of the pleader. *See Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982). FRS pleaded that Prudential interfered with its business and contractual relations with HCA hospitals by "maligning" FRS to hospital officials and Prudential policyholders. Given a liberal construction, FRS's pleadings allege that Prudential interfered by conduct constituting business disparagement, a means of interference which is tortious in itself. *See* **\*82** *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987). The general elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages. *See id.* Accordingly, Prudential was privileged to speak to its policyholders and complain to CHE, but that privilege would not authorize Prudential to falsely and maliciously disparage FRS. Because Prudential would not be privileged to interfere with FRS's contract through means tortious in themselves, a directed verdict would not be proper if there is evidence that Prudential tortiously disparaged FRS.

To raise an issue of whether Prudential interfered with FRS's contract by tortiously disparaging FRS, there must be evidence that Prudential made statements rising to the level of trade disparagement. To do so, FRS must first present evidence that Prudential made false statements of fact about FRS. *See id.*

[13] FRS argues that several instances show that Prudential intended to cause FRS to lose its HCA contracts by falsely accusing FRS of fraudulent business practices. FRS contends first, that the letters to the insureds accused it of fraudulent double billing. For example, one states:

> Please be advised that we have determined the late billings totaling $585.48 for the period of February 12, 1991 have been previously considered by Prudential. We have notified the hospital accordingly.

Sheryl Kapella, a registered nurse who co-founded FRS with Michael P. Lewis, testified at trial that this letter was false, because she could point to charges that Prudential had not considered from that time period. We disagree that sending the letters to the insureds constitute a tortious act by Prudential. Prudential has a legal duty to communicate with its policyholders about the status of potential claims. The letters merely inform the policyholder of the position Prudential took with respect to the bills, and do not disparage FRS in any way. There is no suggestion that FRS's actions or intentions were dishonest. Companies should be able to communicate frankly about disputes without fear of a claim by third parties for tortious interference. We conclude that the contents in Prudential's letters to its insureds did not make them tortious.

[14] FRS also contends that Prudential falsely maligned FRS to CHE. Kapella claimed that one of Prudential's auditors told her that "they would like to see all firms like [FRS] go out of business." Kapella further testified that Prudential's auditors had asserted that FRS had double billed but she was able to convince them that they were mistaken. But later Prudential made the same accusations of double billing in front of CHE officials. Kapella said, "I was very upset at the mention I was double billing or fraudulently billing for items that weren't documented." Also, there was a letter from Gilbert, CHE's chief financial officer, to FRS's Lewis stating that he had heard that Prudential was spreading the word that FRS double billed and billed for service items that CHE normally did not bill.

[15] The evidence is not conclusive about what Prudential's representatives actually said about FRS. Prudential clearly was entitled to challenge FRS's accounting methods and take the position that FRS's methods resulted in unfair charges. It also was entitled to disagree strongly, even in front of representatives of CHE, with the actions taken by FRS representatives. In matters of settlement, businesses should be given leeway to take, and express candidly, hard positions without risking tortious interference claims from third parties. But the right to challenge the bills would not entitle Prudential to falsely accuse FRS of fraud, knowing its charges are baseless. Here we must indulge all reasonable inferences in favor of FRS, the nonmovant. *See Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). That being the case, Kapella's testimony and Gilbert's letter are at least some evidence **\*83** that Prudential disparaged FRS's business by accusing it of fraud knowing the charge was baseless. We conclude Prudential did not establish its justification defense

as a matter of law with respect to FRS's theory of tortious interference by business disparagement. If there is some evidence that Prudential caused FRS injury through tortious conduct, then directed verdict was not proper. And if the directed verdict was improper as to this theory, we need not resolve here whether FRS has sufficiently alleged any other acts of interference by means tortious in themselves. We turn now to Prudential's causation arguments.

### Causation

Prudential argues that there is no evidence that anything it did caused CHE to terminate its contracts with FRS. Prudential refers to the testimony of Judith Novak, CHE's chief executive officer, who testified that she terminated the contracts with FRS because of public relations problems caused by the late billing and her disagreement with FRS business practices, not because of anything Prudential said or did. However, under the proper standard for reviewing a directed verdict, we must disregard this evidence. *See Szczepanik,* 883 S.W.2d at 649.

We limit our inquiry here to whether there is evidence that Prudential's alleged business disparagement caused FRS injury. There is evidence that after the meeting between FRS, Prudential, and CHE, Novak directed FRS not to send out any further bills, and ultimately terminated FRS's contract. Also there is evidence that because of Prudential's allegations of double billing, an HCA official decided to prohibit HCA hospitals in the Western Region from doing any business with FRS. Thus we conclude there is some evidence that Prudential's alleged disparagement caused injury to FRS's contractual relations. Therefore, Prudential was not entitled to a directed verdict on the issue of causation.

### Conclusion

In summary, we conclude that FRS's agency status did not create such a unity of interest with CHE so as to preclude FRS from suit for tortious interference with its auditing contracts. We also conclude Prudential did not conclusively negate causation, nor did it conclusively establish its justification defense. Thus, we hold that the trial court erred in directing a verdict for Prudential. Accordingly, we affirm the judgment of the court of appeals.

Justice HECHT filed a dissenting opinion, in which Justice OWEN and Justice BAKER joined.

Justice ENOCH filed a dissenting opinion, in which Justice OWEN and Justice BAKER joined.

Justice HECHT, joined by Justice OWEN and Justice BAKER, dissenting.
The Court concludes that Prudential was justified as a matter of law in writing to its insureds that it was being double-billed by their hospital, even if there was some evidence that its statements were false, but Prudential was not justified in complaining of double-billing *to the hospital itself.* [1] Any logic lurking in this reasoning eludes me. How can telling policyholders that their hospital is overbilling be more justified than telling the hospital to its face?

The Court says that Prudential had no right to falsely accuse FRS of fraud. In some circumstances, that would be true. But what harm does it do to tell X that Y is a fraud if X knows it is not true? The hospital could look at its own records and decide for itself whether FRS was overbilling. The hospital had no need to rely on Prudential's view on the subject; indeed, **\*84** the hospital had every reason to disbelieve Prudential.

In fact, the hospital did look at its records. And having looked, has it complained that Prudential forced it to terminate its relationship with FRS even though FRS was acting properly? No. The hospital takes the *opposite* position: that it terminated the relationship because it, too, was concerned about FRS's bills. How did Prudential disparage FRS's billing to the hospital *when the hospital itself was troubled by FRS's bills?*

The rule in this case is that if a person complains that he has been overcharged, and his creditor agrees and terminates its agent who sent the bill, the agent may sue the person who complained for tortious interference. I disagree with this rule and therefore dissent.

Justice ENOCH, joined by Justice OWEN and Justice BAKER, dissenting.
The Center for Health Excellence precipitated a fee dispute with an insurer of a number of the Health Center's patients when it hired a bill collecting firm, Financial Review Services. Financial Review promised the Health Center that it could find unbilled charges, that it would bill those who owed for uncharged services, and that the cost of its billing

services would be a percentage of what it collected. Not surprisingly, when notified of charges due, the insurer was unpersuaded that services had been provided to its insureds for which it had, either directly or indirectly on behalf of its insureds, not been previously billed. And it fought back. But what is surprising, is this Court's conclusion that the insurer seemingly owes a duty to the bill collecting firm to not get it fired by the Health Center as a result of the dispute. Because I believe that, as a matter of law, Financial Review cannot establish the elements of tortious interference with contract, I respectfully dissent.

To reach its decision, the Court initially concludes that although Financial Review is the Health Center's agent for collecting unbilled charges, that fact is no barrier to Financial Review's tortious interference with contract cause of action against Prudential. The Court then holds that Prudential did not conclusively establish that its interference with Financial Review's contracts was justified. But the fact that Financial Review *was* the Health Center's agent to collect the unbilled charges against Prudential *is* the dispositive fact.

Only a stranger to a contract can tortiously interfere with that contract.[1] The parties to a contract, therefore, cannot as a matter of law tortiously interfere with that contract.[2] Nor can the parties' agents while they are acting in their principals' interests.[3] The efficacy of this latter proposition is self-evident in the context of corporate entities. Corporations cannot act but through agents, who are usually but not always, its employees.[4] Necessarily then, Texas law views a principal and its agent as the same legal entity when the agent deals with others on behalf of the principal.[5]

Holding, as the Court does, that one contracting party may be exposed to tort liability for the firing of the other party's agent unduly muddles this established principle. Moreover, the decision's effect is heedless of the potential for unlimited expansion of the tort. For example, any employee of the Health Center who is discharged by the Health Center because of the Health Center's dispute with Prudential **\*85** will have a cause of action for tortious interference with contract against Prudential. But the foundation of agency law is that the agent and its principal are the same entity with respect to the principal's contracting party. A corollary proposition then is that the contracting party cannot be a third-party to the other party's agency relationship. Because in this case Financial Review is the same entity as the Health Center as far as Prudential is concerned, Financial Review cannot establish

the elements of tortious interference with a contract for its claim against Prudential.

The Court errs in permitting Financial Review to act as the Health Center's agent in billing Prudential and then allowing it to interpose its agency contract to split its identity from the Health Center, enabling it to hold Prudential liable for its being fired because Prudential objected to that billing. The great flaw in the Court's adopting Financial Review's theory that it can sue Prudential for tortiously interfering with its agency contract is that this theory potentially converts into a tort every breach of contract claim when one party to the contract is represented by an agent. The mischief of the Court's reasoning is particularly evident in this case. Here, the Health Center has not even claimed that its contract with Prudential has been breached, but rather it fired its agent for mishandling that contract.

The Court, rejecting Prudential's position, asserts that Prudential asks us to draw too broad a principle—that an agent cannot sue a third-party for tortious interference with its agency contract. But the Court recasts Prudential's argument in order to avoid a critical element of the argument. Prudential is not a third-party to Financial Review's agency contract with the Health Center because that contract makes Financial Review one with the Health Center with respect to Prudential. This does not foreclose actions against true third-parties. Another bill auditing company seeking to replace Financial Review, for example, could interfere with Financial Review's agency contract with the Health Center. This is so because Financial Review's agency contract does not make it one with the Health Center with respect to this other auditing company. As well, were Prudential to have engaged in some conduct, not related to its dispute with the Health Center over the billing, with the intent that Financial Review's agency be terminated, then that would be tortious interference. And this is so because outside the context of Prudential's contract with the Health Center, Prudential would not be dealing with Financial Review as the Health Center's agent.

Finally, the Court suggests that the concerns in *Morgan Stanley*[6] and *Holloway*[7] are not present here, and that those cases are therefore inapposite. But the Court errs in its judgment because in its reasoning, it too easily dismisses these cases. On the surface, *Morgan Stanley* and *Holloway* can be distinguished because in those cases the principal's agent did not sue, but *was* sued, for tortious interference. Below the surface of those decisions, though, underlies the agency principle that pervades this decision.

Both cases are predicated on the principle that because principals and agents are legally the same entity, they are both considered party to a contract the principal makes with another. And both cases recognize that if both principal and agent are party to a contract for which tortious interference is alleged, the tort is confounded because parties to a contract cannot tortiously interfere with it as a matter of law. Consequently, to allow the claim to proceed, the Court had to identify some factor that would separate the legal identity of principal and agent such that the agent could be considered a third-party to the contract. Thus, those cases held that when agents are sued for tortious interference **\*86** by a party to the principal's contract, the agents are only liable if they break the identity of interests between principal and agent by acting in their own self-interest at the expense of the principal's. [8]

Here, by contrast, it is not even suggested that Financial Review's identity of interests that bonded its legal identity to that of its principal was abrogated. And *Holloway* flatly states that "[w]hen there is a complete identity of interests [between principal and agent], there can be no interference as a matter of law." [9]

## Conclusion

Financial Review was hired by the Health Center to negotiate on its behalf for payment of previously unbilled services from Prudential. As a matter of law, Financial Review, the agent, and the Health Center, the principal, are the legal equivalent for the purposes of bill collecting under the Health Center's contract with Prudential. Now that it has been fired, Financial Review cannot cleave its legal identity from that of the Health Center's and point to its agency contract in order to claim tortious interference with contract. Because as a matter of law Prudential is not a third-party to Financial Review's agency relationship with the Health Center, Financial Review cannot establish the elements of tortious interference with contract as a matter of law. Therefore the court of appeals' judgment should be reversed. I respectfully dissent.

## All Citations

29 S.W.3d 74, 43 Tex. Sup. Ct. J. 980

## Footnotes

1    *Ante* at 81.

1    *See Morgan Stanley & Co. v. Texas Oil Co.,* 958 S.W.2d 178, 179 (Tex.1997) (citing *Holloway v. Skinner,* 898 S.W.2d 793, 797 (Tex.1995)).

2    *See Baker v. Welch,* 735 S.W.2d 548, 549 (Tex.App.-Houston [1 st Dist.] 1987, writ dism'd).

3    *See Morgan Stanley,* 958 S.W.2d at 179.

4    *See Holloway,* 898 S.W.2d at 795.

5    *Morgan Stanley,* 958 S.W.2d at 182 (Enoch, J., concurring).

6    958 S.W.2d 178.

7    898 S.W.2d 793.

8    *See Morgan Stanley,* 958 S.W.2d at 179 (quoting *Holloway,* 898 S.W.2d at 797.).

9    *Holloway,* 898 S.W.2d at 797.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Parex Resources, Inc. v. ERG Resources, LLC,

Tex.App.-Hous. (14 Dist.), January 28, 2014

278 S.W.3d 333
Supreme Court of Texas.

RETAMCO OPERATING, INC., Petitioner,

v.

REPUBLIC DRILLING COMPANY, Respondent.

No. 07–0599. | Argued Sept. 11,
2008. | Decided Feb. 27, 2009.

**Synopsis**

**Background:** Following an interlocutory default judgment against Texas corporation in action over unpaid royalties related to oil and gas interests, plaintiff, another Texas corporation, amended its petition to include claim against nonresident transferee of such gas and oil interests. Transferee filed special appearance arguing lack of jurisdiction. The trial court denied special appearance and transferee filed interlocutory appeal. The Court of Appeals for The Fourth District of Texas, Karen Angelini, J., 2007 WL 913206, reversed. Plaintiff appealed.

**Holdings:** The Supreme Court, Green, J., held that:

[1] transferee had purposely availed itself of privilege of conducting activities in Texas;

[2] allegations were sufficient to demonstrate alleged tort occurred at least, in part, in Texas; and

[3] exercise of specific jurisdiction over nonresident transferee of Texas oil and gas interests would not offend traditional notions of fair play and substantial justice.

Reversed and remanded.

West Headnotes (27)

[1] **Courts**
 Allegations, pleadings, and affidavits

Under the Texas long-arm statute, plaintiff has the initial burden to plead sufficient allegations to confer jurisdiction.

15 Cases that cite this headnote

[2] **Courts**
 Presumptions and Burden of Proof as to Jurisdiction

Defendant seeking to avoid being sued in Texas has the burden to negate all potential bases for jurisdiction pled by the plaintiff.

3 Cases that cite this headnote

[3] **Appeal and Error**
 Necessity of finding facts

When the trial court does not make findings of fact and conclusions of law in support of its ruling, all facts necessary to support the judgment and supported by the evidence are implied.

10 Cases that cite this headnote

[4] **Appeal and Error**
 Cases Triable in Appellate Court

Personal jurisdiction is a question of law which the Texas Supreme Court reviews de novo.

4 Cases that cite this headnote

[5] **Constitutional Law**
 Non-residents in general
**Courts**
 Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Texas courts may assert in personam jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees.

17 Cases that cite this headnote

**[6]    Courts**
    👈 Business contacts and activities;
    transacting or doing business

Texas long-arm statute's broad doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow. U.S.C.A. Const.Amend. 14.

12 Cases that cite this headnote

**[7]    Constitutional Law**
    👈 Non-residents in general

Under constitutional due-process analysis, personal jurisdiction is achieved when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the assertion of jurisdiction complies with traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

21 Cases that cite this headnote

**[8]    Courts**
    👈 Factors Considered in General

Texas Supreme Court focuses on a defendant's activities and expectations when deciding whether it is proper to call the defendant before a Texas court.

1 Cases that cite this headnote

**[9]    Courts**
    👈 Purpose, intent, and foreseeability;
    purposeful availment

A defendant establishes minimum contacts with a state, for purposes of determining whether personal jurisdiction exists, when it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

34 Cases that cite this headnote

**[10]    Courts**
    👈 Purpose, intent, and foreseeability;
    purposeful availment

To establish personal jurisdiction over a nonresident defendant, defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court.

2 Cases that cite this headnote

**[11]    Courts**
    👈 Unrelated contacts and activities; general jurisdiction
    **Courts**
    👈 Related contacts and activities; **specific jurisdiction**

A nonresident's contacts with a jurisdiction can give rise to either specific or general jurisdiction.

4 Cases that cite this headnote

**[12]    Courts**
    👈 Unrelated contacts and activities; general jurisdiction

General jurisdiction arises when the defendant's contacts with the forum are continuous and systematic.

6 Cases that cite this headnote

**[13]    Courts**
    👈 Related contacts and activities; **specific jurisdiction**

**Specific jurisdiction** arises when (1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities.

20 Cases that cite this headnote

**[14]    Courts**
    👈 Related contacts and activities; **specific jurisdiction**

In a **specific jurisdiction** analysis, the Texas Supreme Court focuses on the relationship among the defendant, the forum, and the litigation.

3 Cases that cite this headnote

**[15]    Courts**

🔑 Purpose, intent, and foreseeability; purposeful availment

**Courts**

🔑 Agents, Representatives, and Other Third Parties, Contacts and Activities of as Basis for Jurisdiction

Texas Supreme Court considers three issues in determining whether a defendant purposefully availed itself of the privilege of conducting activities in Texas: first, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person; second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated; and finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

31 Cases that cite this headnote

**[16]    Courts**

🔑 Nature, number, frequency, and extent of contacts and activities

In determining whether personal jurisdiction over a nonresident defendant exists, minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number.

8 Cases that cite this headnote

**[17]    Courts**

🔑 Property disputes; wills, trusts, and estates

Purchases of oil and gas interests located in Texas by nonresident transferee of Texas oil and gas interests were purposeful, not random, fortuitous, or attenuated contacts with Texas, and thus transferee had purposely availed itself of the privilege of conducting activities in Texas, as required to support finding of **specific jurisdiction** over transferee in action over unpaid royalties related to oil and gas interests, despite transferee's having never physically entered the State; such ownership allowed

transferee to enjoy the benefits and protection of Texas laws, contacts with Texas were not the result of unilateral actions of a third party, and transferee had reaped benefits from the property.

15 Cases that cite this headnote

**[18]    Mines and Minerals**

🔑 Interest in real estate

Oil and gas interests are real property interests.

1 Cases that cite this headnote

**[19]    Courts**

🔑 Factors Considered in General

Jurisdiction may not be avoided merely because the defendant did not physically enter the forum state.

1 Cases that cite this headnote

**[20]    Courts**

🔑 Nature, number, frequency, and extent of contacts and activities

Purchase of real property in Texas does not establish a single contact, for purposes of determining whether a nonresident defendant is subject to personal jurisdiction, like that of a sale of personal property.

1 Cases that cite this headnote

**[21]    Courts**

🔑 Related contacts and activities; **specific jurisdiction**

Purposeful availment alone will not support an exercise of **specific jurisdiction** unless the defendant's liability arises from or relates to the forum contacts.

6 Cases that cite this headnote

**[22]    Courts**

🔑 Related contacts and activities; **specific jurisdiction**

In determining whether a nonresident defendant is subject to personal jurisdiction, the Texas

Supreme Court looks for a substantial connection between defendant's forum contacts and the operative facts of the litigation.

6 Cases that cite this headnote

**[23]    Courts**
☞ Fraud, racketeering, and deceptive practices

Allegations that nonresident transferee of Texas oil and gas interests received transfer of Texas real property from a Texas resident, during the pendency of a Texas suit, for the purpose of defrauding a Texas resident were sufficient to demonstrate alleged tort occurred at least, in part, in Texas, as required to support finding of specific jurisdiction over transferee. V.T.C.A., Civil Practice & Remedies Code § 17.042.

13 Cases that cite this headnote

**[24]    Constitutional Law**
☞ Manufacture, distribution, and sale
**Courts**
☞ Property disputes; wills, trusts, and estates

Exercise of specific jurisdiction over nonresident transferee of Texas oil and gas interests would not offend traditional notions of fair play and substantial justice; controversy began in Texas, action involved real property within Texas border, prior litigation dealt with this property and it was most efficient to continue to use Texas as the forum to resolve the dispute, and transferee's forum state had much less of an interest in resolving Texas real property disputes.

14 Cases that cite this headnote

**[25]    Constitutional Law**
☞ Non-residents in general

Having determined that a nonresident defendant has minimum contacts with Texas sufficient to support specific jurisdiction, the Texas Supreme Court must determine whether an assertion of jurisdiction over defendant comports with traditional notions of fair play and substantial justice.

17 Cases that cite this headnote

**[26]    Constitutional Law**
☞ Non-residents in general

Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state.

9 Cases that cite this headnote

**[27]    Constitutional Law**
☞ Non-residents in general

In determining whether an assertion of jurisdiction over defendant comports with traditional notions of fair play and substantial justice, the Texas Supreme Court considers: (1) burden on the defendant; (2) interests of the forum state in adjudicating the dispute; (3) plaintiff's interest in obtaining convenient and effective relief; (4) interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) shared interest of the several States in furthering fundamental substantive social policies.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*335** James L. Drought, Calhoun Bobbitt, Drought Drought & Bobbitt LLP, James W. Carter IV, San Antonio TX, for Petitioner.

Juan M. Castillo, Ray B. Jeffrey, Patricia F. Miller, Stumpt Craddock Massey & Farrimond, PC, Jeffrey D. Small, Law Office of Jeff Small, San Antonio, Douglas Alexander, Alexander Dubose Jones & Townsend, LLP, Austin TX, for Respondent.

**Opinion**

Justice GREEN delivered the opinion of the Court.

In this case, we decide whether a Texas court has personal jurisdiction over an out- **\*336** of-state company accused of

violating the Uniform Fraudulent Transfer Act (UFTA) by acting as the transferee of Texas oil and gas interests. We hold that, under the facts of this case, the defendant is subject to the jurisdiction of the Texas courts and, therefore, reverse the court of appeals' judgment and remand for trial.

## I

Retamco Operating, Inc. (ROI), a Texas corporation, sued Paradigm Oil, Inc. (Paradigm), another Texas corporation, in a Texas district court, over unpaid royalties related to oil and gas interests in several Texas counties. After a finding of discovery abuse, sanctions were assessed against Paradigm and the trial court entered a $16 million default judgment against Paradigm.[1] Following this interlocutory judgment, ROI amended its petition to include a claim against Republic Drilling Company (Republic), a California corporation, for violation of the Uniform Fraudulent Transfer Act. *See* TEX. BUS. & COM.CODE § 24.001–.013. ROI claimed that during the pendency of the litigation, Paradigm assigned to Republic[2] a 72% interest in Paradigm's oil and gas wells and leases in Fayette County and a 72% interest in an option to acquire an interest in a lease in Dimmit and Webb Counties.[3] ROI alleged that these transfers were fraudulent, and that they led to Paradigm's insolvency, rendering it unable to satisfy ROI's claims.

In response to the amended petition, Republic filed a special appearance, arguing that it does not have minimum contacts with Texas, and that even if it did, ROI's cause of action did not arise from or relate to those contacts. It also argued that the trial court's assertion of jurisdiction offended traditional notions of fair play and substantial justice. Specifically, **\*337** Republic argued that because the allegedly fraudulent assignment of the Texas leases occurred entirely outside of Texas—in California—the Texas court did not have personal jurisdiction over Republic. Following a hearing, the trial court denied Republic's special appearance, making no findings of fact or conclusions of law. Republic then filed an interlocutory appeal with the court of appeals. The court of appeals reversed, holding that Republic is not subject to personal jurisdiction in Texas. 2007 WL 913206, *6–7. Because we conclude that by its actions Republic subjected itself to the jurisdiction of Texas courts, we reverse the court of appeals' judgment.

## II

**[1]** **[2]** **[3]** Under the Texas long-arm statute, the plaintiff has the initial burden to plead sufficient allegations to confer jurisdiction. *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807 (Tex.2002). The defendant seeking to avoid being sued in Texas then has the burden to negate all potential bases for jurisdiction pled by the plaintiff. *Id.* When, as here, the trial court does not make findings of fact and conclusions of law in support of its ruling, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002) (citations omitted). Here, ROI has pled that Republic is subject to personal jurisdiction because it is the fraudulent transferee of Texas real property—oil and gas interests. Republic does not dispute that the property at issue is located in Texas or that it was transferred from Paradigm to Republic. However, Republic argues that because the transaction causing the transfer occurred in California, jurisdiction is negated. For the reasons discussed below, we disagree.

**[4]** **[5]** Personal jurisdiction is a question of law which we review *de novo. Id.* at 794. "Texas courts may assert *in personam* jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007).

### (1) The Long Arm Statute

**[6]** As an initial matter, Republic argues that ROI "never fulfilled its initial pleading burden to bring Republic within the reach of the long-arm statute," because ROI alleged no acts that constitute "doing business" under the long-arm statute. But the Texas long-arm statute's broad doing-business language "allows the statute to reach as far as the federal constitutional requirements of due process will allow." *Id.* at 575 (citations omitted); *accord Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 788 (Tex.2005).[4] Therefore, we only analyze whether Republic's acts would bring Republic within Texas' jurisdiction consistent with constitutional due process requirements. *See* **\*338** *Moki Mac,* 221 S.W.3d at 575 (citations omitted); *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991).[5]

**(2) Due Process Constraints**

 [7]    [8]    Under constitutional due-process analysis, personal jurisdiction is achieved when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the assertion of jurisdiction complies with "traditional notions of fair play and substantial justice." *Moki Mac,* 221 S.W.3d at 575 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). We focus on the defendant's activities and expectations when deciding whether it is proper to call the defendant before a Texas court. *Int'l Shoe Co.,* 326 U.S. at 316, 66 S.Ct. 154.

**(A) Minimum Contacts**

 [9]    [10]    [11]    [12]    [13]    [14]    A defendant establishes minimum contacts with a state when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (citing *Int'l Shoe Co.,* 326 U.S. at 319, 66 S.Ct. 154). "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Am. Type Culture Collection,* 83 S.W.3d at 806 (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). A nonresident's contacts can give rise to either specific or general jurisdiction. *Am. Type Culture Collection,* 83 S.W.3d at 806. General jurisdiction arises when the defendant's contacts with the forum are continuous and systematic. *Id.* at 807. Specific jurisdiction, which is alleged here, arises when (1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 774 (Tex.1995). In a specific jurisdiction analysis, "we focus ... on the 'relationship among the defendant, the forum [,] and the litigation.' " *Moki Mac,* 221 S.W.3d at 575–76 (citing *Guardian Royal,* 815 S.W.2d at 228).

*1. Purposeful Availment*

 [15]    [16]    We consider three issues in determining whether a defendant purposefully availed itself of the privilege of conducting activities in Texas:

 **\*339**    First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Moki Mac,* 221 S.W.3d at 575 (internal citations and quotations omitted). Additionally, the minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number. *Am. Type Culture Collection,* 83 S.W.3d at 806. Here, these considerations lead us to conclude that Republic purposefully availed itself of the privilege of conducting activities in Texas.

 [17]    [18]    [19]    Republic's contacts with Texas were purposeful, not random, fortuitous, or attenuated. Oil and gas interests are real property interests. *Renwar Oil Corp. v. Lancaster,* 154 Tex. 311, 276 S.W.2d 774, 776 (1955); *State v. Quintana Petroleum Co.,* 134 Tex. 179, 133 S.W.2d 112, 115 (1939) (citing *Sheffield v. Hogg,* 124 Tex. 290, 77 S.W.2d 1021, 1030 (1934)). Republic was aware that the oil and gas interests it received were located in Fayette, Dimmit, and Webb Counties, Texas. Thus, Republic purposefully took assignment of Texas real property. And while Republic may not have actually entered the state to purchase this real property, "[j]urisdiction ... may not be avoided merely because the defendant did not physically enter the forum state." *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another state, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."). Republic, by taking assignment of Texas real property, reached out and created a continuing relationship in Texas. Under the assignment, it is liable for obligations and expenses related to the interests. This ownership also allows Republic to "enjoy ... the benefits and protection of [Texas laws.]" *Michiana,* 168 S.W.3d at 787 (citing *Int'l Shoe,* 326 U.S. at 319, 66 S.Ct. 154). Unlike personal property, Republic's real property will always be in

Texas, which leaves no doubt of the continuing relationship that this ownership creates.

 [20]    We noted in *Michiana* that "in some circumstances a single *contract* may meet the purposeful-availment standard, but not when it involves a single *contact* taking place outside the forum state." *Id.* at 787. (emphasis in original) (holding that an Indiana RV dealer did not have minimum contacts with Texas where the dealer's only contact with Texas was the Texas resident's decision to place an order from Texas). But the purchase of real property in Texas does not establish a single contact like that of the sale of the recreational vehicle in *Michiana. See id.* Rather, the purchase and ownership of real property could "involve[ ] many contacts over a long period of time," which would carry with it certain continuing obligations; *e.g.,* valuation and tax issues, and potential expenses of maintaining the interest. *See id.* In *Michiana,* we found it "hard to imagine what possible benefits and protection Michiana enjoyed from Texas law." *Id.* at 787, 794. To the RV dealer, the destination of the RV was fortuitous. Here, the location of the transferred asset is not fortuitous; the property's location is fixed in this state. This case, then, is different from *Michiana,* and we have no difficulty imagining just how Republic would benefit **\*340**  from the processes and protections of Texas law. Should Republic ever wish to enforce rights under its interest in Texas oil and gas leases and wells, it is this state where those rights can be enforced, not California.

Republic's contacts with Texas were also not the result of the unilateral actions of a third party. Republic was a willing participant in a transaction with an affiliated Texas company to purchase Texas real property. Unlike in *Michiana,* where the contacts with Texas and the sale at issue was "initiated entirely by [the plaintiff]," 168 S.W.3d at 784, Republic here went well beyond answering a phone call from a Texas resident or shipping goods to Texas. Where a phone call originates or where a shipment ends up may be random or fortuitous, but when purchasing real property, the location matters.

Lastly, Republic has sought a "benefit, advantage or profit" in Texas. *Id.* at 785. The assignment gave Republic valuable assets in Texas, including the right to enforce warranties and covenants related to the real property. Republic's additional conduct since the transfer also indicates that Republic sought a benefit from the transaction. *See Moki Mac,* 221 S.W.3d at 577 ("In determining whether the defendant purposefully directed action towards Texas, we may look to

conduct beyond a particular business transaction at issue...."). Republic has reaped benefits from the property in the amount of approximately $1.2 million in revenues, and has sold some of the property.

We have said that "a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as to neither profit from the forum's laws nor be subject to its jurisdiction." *Michiana,* 168 S.W.3d at 785. Certainly this is true in some transactions, such as the purchase of personal property or out-of-state services. *See, e.g., BMC Software Belgium,* 83 S.W.3d at 793 (finding no personal jurisdiction where details of a personal services contract were discussed in Texas); *U–Anchor Advertising, Inc. v. Burt,* 553 S.W.2d 760, 763 (Tex.1977) (finding no personal jurisdiction over Oklahoma defendant where the contract for installation of highway advertisement signs by Texas company was signed and performed in Oklahoma). But we have found that, even in instances where a contract was signed in another state, an out-of-state company with no physical ties to Texas still has minimum contacts with Texas when it is clear the company purposefully directed its activities towards Texas. *See, e.g., Zac Smith & Co., Inc. v. Otis Elevator Co.,* 734 S.W.2d 662, 665–66 (Tex.1987) (finding personal jurisdiction where out-of-state contract was formed "for the sole purpose of building a hotel in Texas"); *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 437 (Tex.1982) (finding personal jurisdiction where enrollment for out-of-state school was "actively and successfully solicited" in Texas even though the defendant signed the contract in Arizona). Here, we find the same. Republic, by purchasing Texas real property, has purposefully availed itself of the privilege of conducting activities in Texas. *See Michiana,* 168 S.W.3d at 784–85.

### 2. Arise From or Related to

 [21]    [22]    "[P]urposeful availment alone will not support an exercise of **specific jurisdiction** ... unless the defendant's liability arises from or relates to the forum contacts." *Moki Mac,* 221 S.W.3d at 579. We look for a "substantial connection between [the defendant's forum] contacts and the operative facts of the litigation." *Id.* at 585. Thus, we must consider the claims involved in the litigation to determine the operative facts. ROI alleges that Republic is the transferee of a fraudulent transfer in **\*341**  violation of the UFTA. The UFTA provides, in part, that "[a] transfer ... is fraudulent ... if the debtor made the transfer ... with actual intent to hinder, delay, or defraud any creditor of the debtor; or without receiving a reasonably equivalent value in exchange for the transfer or obligation." TEX. BUS. & COM.CODE

§ 24.005(a)(1), (2); *Trigeant Holdings, Ltd. v. Jones,* 183 S.W.3d 717, 726 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (noting that "the UFTA not only creates liability against 'the person for whose benefit the transfer was made,' such as the debtor, but also against 'the first transferee of the asset,' or any 'subsequent transferee' ").

Republic argues that the focus of the litigation will be on the assignment that took place in California because the operative facts involved will be whether reasonably equivalent value was given for the property and whether the leases were taken in good faith. *See* TEX. BUS. & COM.CODE §§ 24.005(a)(2), .006, .009. We agree that the assignment will be an operative fact, but the real property itself will also be an operative fact, or at the very least, will have a substantial connection to the operative facts. Without an asset, no fraudulent transfer can occur under the UFTA. *See id.* § 24.002(12) ( " 'Transfer' means ... disposing of or parting *with an asset or an interest in an asset* ....") (emphasis added). Here, the Texas oil and gas interests are the assets. Proof that these assets were transferred and an assessment of their value will be essential to the UFTA analysis; without that proof, the UFTA claim fails.

 [23]    Republic is alleged to have received transfer of Texas real property from a Texas resident, during the pendency of a Texas suit, for the purpose of defrauding a Texas resident. As a result of this transaction, assets ROI may have recovered from Paradigm are now in the possession of Republic. These contacts are sufficient to demonstrate that this alleged **tort** occurred at least, in part, in Texas. *See* TEX. CIV. PRAC. & REM.CODE § 17.042 ("a nonresident does business in this state if the nonresident ... commits a **tort** in whole or in part in this state"); *see also In re Tex. Am. Express, Inc.,* 190 S.W.3d 720, 725 (Tex.App.-Dallas, no pet.) (noting that a fraudulent transfer under the UFTA is a **tort**).

**(B) Traditional Notions of Fair Play and Substantial Justice**

 [24]    [25]    [26]    [27]    Having determined that Republic has minimum contacts with Texas sufficient to support **specific jurisdiction**, we must determine whether an assertion of

jurisdiction over Republic comports with "traditional notions of fair play and substantial justice." *Guardian Royal,* 815 S.W.2d at 228. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.* at 231 (citing *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174). Nonetheless, we still consider: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Guardian Royal,* 815 S.W.2d at 228, 231 (citing *Burger King,* 471 U.S. at 477–78, 105 S.Ct. 2174). These factors weigh heavily in ROI's favor. ROI has an interest in resolving this controversy in Texas because that is where the litigation began. Texas has an interest in resolving controversies involving real property within its borders **\*342** and, given that the prior litigation deals with this property, it is most efficient to continue to use Texas as the forum to resolve the dispute. Moreover, California has much less of an interest in resolving Texas real property disputes than does Texas. Republic may be burdened by litigating outside its home state, but these other factors weigh heavily against this burden.

### III

Republic has established minimum contacts with Texas, and the trial court's assertion of jurisdiction over Republic does not offend traditional notions of fair play and substantial justice. *See Guardian Royal,* 815 S.W.2d at 228. Therefore, we reverse the court of appeals' judgment and remand to the trial court for further proceeding consistent with this opinion.

**All Citations**

278 S.W.3d 333, 171 Oil & Gas Rep. 266, 52 Tex. Sup. Ct. J. 395

Footnotes

1    Numerous appeals have been spawned by the *ROI v. Paradigm* litigation. First, the "death penalty" discovery sanctions against Paradigm were upheld on appeal, but the court of appeals remanded the case for a determination of unliquidated damages. *Paradigm Oil, Inc. v. Retamco Operating, Inc.,* 161 S.W.3d 531, 540 (Tex.App.-San Antonio 2004, pet. denied). The trial court then found actual damages of $5.6 million, as well as, attorney's fees and exemplary damages. *Paradigm*

*Oil, Inc. v. Retamco Operating, Inc.,* 242 S.W.3d 67, 70 (Tex.App.-San Antonio 2007, pet. denied). Next, the court of appeals reversed this finding due to insufficient evidence and remanded for another hearing on unliquidated damages. *Id.* at 75. ROI also originally sued Finley Oilwell Service, but the claim was severed. The result was the same. *Finley Oilwell Service, Inc. v. Retamco Operating, Inc.,* 248 S.W.3d 314, 317 (Tex.App.-San Antonio 2007, pet. denied). Following a default judgment, the trial court entered actual damages of $5.6 million, along with attorney's fees and exemplary damages. *Id.* The court of appeals reversed this due to insufficient evidence. *Id.* Finally, one other case arising from this litigation involved a severed claim against the alleged alter ego of Paradigm and Finley. *See Carone v. Retamco Operating, Inc.,* 138 S.W.3d 1, 15 (Tex.App.-San Antonio 2004, no pet.) (dismissing claim against alleged alter ego of companies due to lack of personal jurisdiction).

2 Paradigm and Republic are affiliated, but the record is unclear as to the extent and structure of that affiliation.

3 ROI also sued Douglas McCallum, LLC (DMLLC), a Colorado limited liability company, alleging fraudulent transfer. DMLLC was the recipient of the remaining 28% of the assignment of interests and options. DMLLC also filed a special appearance, which was granted following the court of appeals holding in this case. DMLLC's special appearance ruling was then appealed and affirmed. *Retamco Operating, Inc. v. McCallum,* 2008 WL 939196, *5 (Tex.App.-San Antonio 2008). ROI has appealed this ruling to the Court as well. These two cases pose almost identical issues, as DMLLC argues it is not subject to personal jurisdiction because the contract to assign the oil and gas interests was signed in Colorado. *See Retamco Operating, Inc. v. McCallum,* 278 S.W.3d 778 (Tex.2009) (per curiam).

4 The Texas long-arm statute provides:

"In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

(2) commits a **tort** in whole or in part in this state; or

(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state."

TEX. CIV. PRAC. & REM.CODE § 17.042.

5 Republic also argues that the business certification waiver provision of section 8.01B(13) of the Texas Business Corporation Act limits jurisdiction. TEX. BUS. CORP. ACT § 8.01B(13) ("a foreign corporation shall not be considered to be transacting business in this state ... by reason of ... acquiring, in transactions outside of Texas, royalties and other non-operating mineral interests"). The certification provisions of the Business Corporation Act do not limit the scope of the Texas long-arm statute. *Moki Mac,* 221 S.W.3d at 575 ("the long-arm statute's broad doing-business language allows the statute to 'reach as far as the federal constitutional requirements of due process will allow' "). Thus, the Act has no bearing on constitutional due-process analysis. *See Amer. Type Culture Collection,* 83 S.W.3d at 806 ("We rely on precedent from the United States Supreme Court as well as our own state's decisions in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction.") Further, the business certification requirements do not act as a definitive list of those out-of-state defendants that would or would not have a reasonable expectation of being called into a Texas courtroom.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Mr. W. Fireworks, Inc. v. Mitchell, Tex., October 7, 1981

419 S.W.2d 836
Supreme Court of Texas.

Kent W. RICHARDSON, Petitioner,

v.

FIRST NATIONAL LIFE INSURANCE
COMPANY, Respondent.

No. A—11613. | July 26, 1967.
| Rehearing Denied Nov. 1, 1967.

Suit for accounting and payment of commissions due and owing to plaintiff from insurance policies sold according to contract with defendant. The District Court, Bexar County, dismissed at plaintiff's costs on jurisdictional grounds. On appeal, the San Antonio Court of Civil Appeals of the Fourth Supreme Judicial District, 408 S.W.2d 524, affirmed and plaintiff brought error. The Supreme Court, Griffin, J., held that allegations asking for an accounting and for recovery in the sum of 'at least' $314.37 did not present a suit in equity within general residuary jurisdiction of the District Court but merely presented a money demand for less than $500, the jurisdictional minimum of District Court.

Affirmed.

Smith, Walker, and Steakley, JJ., dissented.

West Headnotes (7)

**[1]** **Courts**
 Texas

District court has general residuary jurisdiction only in those cases for which a remedy or jurisdiction is not provided by law or the Constitution. Vernon's Ann.Civ.St. art. 1909; Vernon's Ann.St.Const. art. 5, § 8.

1 Cases that cite this headnote

**[2]** **Courts**
Exclusive or Concurrent Jurisdiction

General residuary jurisdiction of district court is not concurrent with the jurisdiction of other courts, but is an exclusive jurisdiction within its field. Vernon's Ann.Civ.St. art. 1909; Vernon's Ann.St.Const. art. 5, § 8.

Cases that cite this headnote

**[3]** **Courts**
County courts

Where plaintiff alleged that defendant had failed to pay him commissions due on policies sold according to agency contract with defendant and that defendant owed him "at least" $314.37 and where plaintiff demanded that defendant make an accounting of commissions, suit was not an equitable action but a money demand in an ordinary suit on a written contract and being within jurisdiction of county court, could not be heard in district court. Rules of Civil Procedure, rule 172; Vernon's Ann.Civ.St. art. 1909; Vernon's Ann.St.Const. art. 5, § 8.

8 Cases that cite this headnote

**[4]** **Courts**
Texas

Allegation seeking an accounting of commission due under employment contract did not make an equitable action of plaintiff's demand within general residuary jurisdiction of district court. Vernon's Ann.Civ.St. art. 1909; Vernon's Ann.St.Const. art. 5, § 8.

4 Cases that cite this headnote

**[5]** **Courts**
Allegations, pleadings, and affidavits

Allegations of plaintiff's petition must state facts which affirmatively show the jurisdiction of the court in which action is brought.

35 Cases that cite this headnote

**[6]** **Pleading**
General and specific allegations

If plaintiff pleads generally a state of facts, and goes further and pleads specifically and

particularly on the same subject, he cannot rely upon the general allegations but is confined in his recovery to those specifically and particularly pleaded since specific allegations control those of a general character.

8 Cases that cite this headnote

**[7]** **Courts**
 Allegations and prayers in pleadings

Jurisdiction of various courts to determine suits for debts is based on allegations in petition as to amount in controversy.

18 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*837** Colunga & Wennermark, John D. Wennermark, San Antonio, for petitioner.

Heath & Davis, Dudley D. McCalla, Austin, for respondent.

**Opinion**

GRIFFIN, Justice.

Petitioner, as plaintiff below, filed suit in a district court of Bexar County, Texas, against respondent, as defendant, for commissions due him as agent for the defendant. He alleged 'that plaintiff believes that at least the amount of Three Hundred Fourteen and 37/100 Dollars ($314.37) is due him for commissions from the policies sold under said contract.' He further asked for an accounting. Defendant filed its plea to the jurisdiction of the court because it appeared 'from the face of the petition that the matter in controversy, exclusive of interest, amounts in value to less than $500.00,' etc. The trial court sustained this plea and dismissed the suit at plaintiff's costs. On appeal, the Court of Civil Appeals affirmed. 408 S.W.2d 525. We affirm the judgments of the courts below.

Petitioner says that his suit was one for an accounting and that it was properly brought in the district court, as that court is a court of general jurisdiction. The allegations of plaintiff's petition are that on February 13, 1961, plaintiff entered into a contract with defendant to sell insurance policies in defendant's company as defendant's agent; that plaintiff has in all things complied with the 'stipulations, conditions, and agreements' placed on him by the contract,

but that defendant has failed and refused to pay plaintiff the commissions due him on the policies 'pursuant to the provisions of said contract.' Plaintiff further alleged that he has 'demanded an accounting for said commissions' and has been refused such accounting by defendant at all times. Then follows the only allegation of any sum due plaintiff by defendant: 'That plaintiff believes that at least the amount of Three Hundred Fourteen and 37/100 Dollars ($314.37) is due him for commissions from the policies sold under said contract.'

In his prayer plaintiff prays that defendant be required to make an accounting, 'that plaintiff have judgment against the defendant for at least $314.37, and for such other sums as shall be found due on such accounting,' and for general relief.

 **[1]** **[2]** Petitioner's contention is based upon the fact that the constitutional and statutory provisions confer upon the district court general residuary jurisdiction. This contention has application only when considered in connection with the language of Art. V, Sec. 8 of our State Constitution, Vernon's Ann.St. That language does not say the district court has jurisdiction of all suits that may be brought. The exact language of the residuary clause is, 'The District Court shall have original jurisdiction * * * (in enumerated cases) when the matter in controversy shall be valued at or amount to five hundred dollars exclusive of interest * * * and shall have general original jurisdiction over all causes of action whatever For which a remedy or jurisdiction is not provided by law or this Constitution * * *.' Art. 1909, Revised Civil Statutes 1925, as amended, contains language of similar import. The residuary clause of the Constitution applies Only to those cases 'for which a remedy or jurisdiction Is not provided' by law or the Constitution. The jurisdiction given by this language is not concurrent with the jurisdiction of the other courts, but is an exclusive **\*838** jurisdiction within its field. (All emphasis is that of this Court.)

 **[3]** The only way the district court's jurisdiction could be sustained would be to hold that this is a suit in equity. That is not correct. This suit is an ordinary suit on a written contract of employment which plaintiff attaches to his petition. Plaintiff's demand is a money demand. The residuary clause of Art. V, Sec 8 applies only to causes of action for which a remedy or jurisdiction Is not provided by law or the Constitution. The Constitution provides that suit must be brought in the county court for a debt that exceeds $200.00 and does not exceed $500.00. Rule 172, Texas Rules of Civil Procedure, provides among other things that when an investigation of accounts or examination of vouchers is

necessary in any suit, the trial court 'shall appoint an auditor or auditors to state the accounts between the parties,' etc.

This plaintiff's cause of action herein is not an equitable action; it is not an action for which no remedy nor jurisdiction is provided by the Constitution and the law. Therefore, it is not entitled to be heard in the district court, but must be heard in the county court.

 **[4]**    With regard to the contention that the allegation seeking an accounting makes an equitable action of plaintiff's demand and also makes the residuary clause of Art. V, Sec. 8 controlling, there is an excellent annotation in 3 A.L.R.2d 1310, entitled 'Availability of Equitable Remedy of Accounting Between Principal and Agent.' In this annotation there is quoted from Restatement of Agency, Vol. 2, Sec. 399, the rules governing an accounting suit between principal and agent:

> 'A principal does not have a bill for an account or other equitable relief against an agent merely from the fact of agency or from the fact that the agent has received something for the principal. Equitable relief may, however, be granted not only on the ground that there is no adequate remedy of law, as where an injunction is sought, but also where there is a close fiduciary relationship. * * * On the other hand, unless there is such a complication of accounts that it is difficult for the machinery of the law courts to cope with them, the principal ordinarily cannot bring a bill in equity for money due; if his remedy otherwise would be solely in the courts of law, he cannot bring a bill for an account merely on the ground of the agency relationship.'

These same rules apply to an action of an agent against his principal. 3 A.L.R.2d 1369 et seq., s 19. This annotation also quotes from 4 Pomeroy Equity Jurisprudence, 5th Edition, Sec. 1421,

> 'The instances in which legal remedies are held to be inadequate and thus a suit in equity for an accounting may be brought are stated to be: (1) Where

there are mutual accounts between the parties, that is, where each of them has received and paid on account of the other, as distinguished from matters of set-off and accounts on one side only. (2) Where the accounts are all on one side but there are circumstances of great complication or difficulties in the way of adequate relief at law. To determine what degree of complication is required for a pure accounting the rule was established by the English courts that the account be so complicated that a court of law would be incompetent to examine it by application of the trial procedure at nisi prius proceedings although many of the present statutes and practice rules governing courts of general jurisdiction enable matters of accounting to be referred to officers or referees. The only test recognized by modern decisions is that if the facts and accounts presented relate to so many different transactions and items in such relationship to each other that it is doubtful whether adequate relief could be obtained at law, equity should entertain jurisdiction. * * *'

 ***839**  From the above annotation and the excerpts we have cited, we find that this suit does not qualify as an equitable proceeding for which our Constitution and statutes provide no remedy or jurisdiction.

 **[5]**    The general rule is that the allegations of the plaintiff's petition must state facts which affirmatively show the jurisdiction of the court in which the action is brought. Brown v. Peters, 127 Tex. 300, 94 S.W.2d 129 (1936); Smith v. Horton, 92 Tex. 21, 46 S.W. 627 (1898); Texas & N.O.R.R. Co. v. Farrington (Tex.Com.App., 1905), 40 Tex.Civ.App. 205, 88 S.W. 889.

 **[6]**    'The rule of law seems to be well settled in this state that, if plaintiff Pleads generally a state of facts, and Goes further and pleads specifically and particularly on the same subject, He cannot rely upon the general allegations, but is confined in his recovery to those specifically and particularly pleaded. Specific allegations will control those of a general character.' (Citing authorities.) Houston Printing Company v.

Hunter (Tex.Civ.App. 1937), 105 S.W.2d 312, 318, aff'd 129 Tex. 652, 106 S.W.2d 1043.

 **[7]**     In our case the Constitution and statutes do give jurisdiction to various courts to determine suits for debt, based on the allegations in the petition as to the amount in controversy. Also, in our case the only allegation as to a definite debt is $314.37, and that amount is not within the jurisdiction of a district court.

We affirm the judgments of both courts below.

CALVERT, C.J., concurs in the result.

### Dissenting Opinion On Motion for Rehearing

SMITH, Justice.

I respectfully dissent. This case presents the narrow question of whether the district or county court has jurisdiction to entertain the suit. In order to determine this question, the nature of the relief sought must be first determined. This is a suit for equitable relief in a situation where the terms of the contract reveal a close fiduciary relationship between Richardson and First National. Richardson alleged in his petition facts showing that he was seeking an accounting. The contract attached to the petition reflects that First National was under a duty to keep an accurate account of all commissions due Richardson. The contract specifically states that '(t)he ledger account of the Company shall be competent and conclusive evidence of the state of accounts between you (Richardson) and the Company.' It is clear that any records kept by Richardson would be of no avail in the event of the failure of First National to divulge the contents of its ledger accounts pertaining to Richardson. First National collected all premiums, but, according to Richardson's pleadings, '* * * failed and refused, and still fails and refuses, to perform said contract on its part, in that Defendant, notwithstanding said contract, did collect monies on the policies sold by Plaintiff pursuant to said contract, and has failed and refused to pay Plaintiff the commissions due on said policies to him pursuant to the provisions of said contract. That Plaintiff has demanded an accounting for said commissions from Defendant repeatedly since May 1st, 1964, and has been refused such accounting by Defendant at all times.' Then, follows the allegation: '* * * Plaintiff believes that at least the amount of Three Hundred Fourteen and 37/100 Dollars

($314.37), is due him for commissions from the policies sold under said contract.' Then, follows the prayer:
'Wherefore, premises considered, Plaintiff prays that Defendant be required to make an accounting, that Plaintiff have Judgment against the Defendant for at least the sum of Three Hundred Fourteen and 37/100 Dollars ($314.37), and for such further sums as shall be found due on such accounting, for a reasonable  **\*840**  sum as attorneys' fees, for cost of suit, and for such other and further relief to which he may be entitled either at law or in equity.' (Emphasis added.)

There are certain provisions of the contract which conclusively demonstrate that Richardson by the decision of this Court has been deprived of his constitutional right to a trial. His petition alleges that 'Defendant is a foreign Life Insurance Company, having its home office at * * * Phoenix 14, Arizona, which has designated * * * Commissioner of Insurance, State Board of Insurance, * * * as its duly authorized agent and attorney in fact, etc.' So far as this record indicates, all accounts and records of premium collections are kept by the Company at its home office in Phoenix, Arizona. Regardless of where such records are kept, Richardson can never successfully obtain a judgment until First National is compelled to perform its part of the agreement. It follows that he could not at the time of filing suit know the exact amount due him. Consider the following provisions of the contract in determining whether this is a suit for an accounting, an equitable action, or is, as stated by this Court, '* * * an ordinary suit on a written contract of employment.'

To be found in the contract are provisions that all life policies written by Richardson, the face amount of which is $50,000.00 or more, First National has the right to fix the Amount of the first year commission. The contract provides that this commission shall not be reduced below the commission provided in Paragraph A, Section 4 by More than 10% Of the first year premium. To further complicate the matter of accounting and to point up the error of this Court's holding, there appears as a part of the contract a 'supplement to agent's agreement', dated June 2, 1959, which reads:

> 'It is further understood and agreed that, on all earned premiums, after the first premium, you will receive a servicing Commission of 15% Of premiums; such servicing commission to continue so long as the business remains in force with the Company, and provided that this contract is in full force and effect, and further provided that you are actually servicing

said business to the satisfaction of the Company.'

Finally, I point to the provision of the contract dealing with 'Commissions on Conversions.':

> 'Commissions on conversions, policies substituted or rewritten for another on the same life, modified forms of policies and policies other than as specified above shall be governed, irrespective of any other provisions of this agreement, by the rules and practices of the Company as established from time to time.'

Under the record in this case, Richardson's suit should be classed as a proceeding in equity. He has clearly brought a suit where all of the essential facts are peculiarly within the knowledge of First National. Therefore, Richardson was required only to allege, as he did, with reasonable certainty the employment as agent for First National, the Manner of Compensation, the performance of services showing some commissions to be due, and the facts and circumstances demonstrating that the correct amount could not be ascertained without an accounting. See Brea v. McGlashan (1934) 3 Cal.App.2d 454, 39 P.2d 877; Arbuckle v. Clifford F. Reid, Inc. (1931) 118 Cal.App. 272, 4 P.2d 978; Shepard v. Brown (1863) 9 Jur.NS (Eng) 195; Williams v. Finlaw, Mueller & Co. (1928) 292 Pa. 244, 141 A. 47; Miller v. Russell (1906) 224 Ill. 68, 79 N.E. 434. This latter case emphasizes the fact that the agent in that case, as here, was without adequate means of ascertaining the true status of the accounts. The Supreme Court of Illinois in Miller, supra, a case factually similar to the present case, held against the contention of Miller that the cause of action was an ordinary suit on a contract. The Court rejected Miller's contention that the Company occupied no fiduciary relation to Russell and that the Company did not hold **\*841** the money received by it in trust for Russell. The Court also rejected Miller's contention that Russell had 'an ample and adequate remedy at law'.

The Court, after stating that Russell's 'objections go to the jurisdiction of a court of equity', held:

> 'A similar question has been before us on other occasions, and the law settled, at least in this state, against the contention of plaintiffs in error. In Hair Co. v.

Daily, 161 Ill. 379, 43 N.E. 1096, we held that, as a general rule, in matters of account courts of equity have a general jurisdiction where the accounts are mutual; also where they are on but one side, a discovery being sought which is material to the relief prayed. And again in the case of Gleason & Bailey Manf. Co. v. Hoffman, 168 Ill. 25, 48 N.E. 143, it was held that jurisdiction in equity exists where there are mutual accounts between the parties, or where the account is all on one side, and there are complications or difficulties in the way of an adequate remedy at law, or where a fiduciary relation exists, and a duty rests upon the respondent to render an account. In the case of Crown Coal & Tow Co. v. Thomas, 177 Ill. 534, 52 N.E. 1042, it was again held that equity may take jurisdiction in matters of account when the state of account between the parties is intricate and complicated, or so involved with the rights of third parties that it would be difficult for a jury to unravel the numerous transactions, and that the jurisdiction of equity in matters of account does not depend upon the existence of a remedy at law, but upon the adequacy and practicability of such remedy and upon the discretion of the court. Bispham's Principles of Equity (4th Ed.) p. 536, and cases cited in note 2. We think the facts in this case clearly within the rule. The defendant in error entered into a contract with the association, represented by the plaintiffs in error, under which he made many sales of land in conformity with said development contract. He was to receive compensation in small amounts on each of the sales, and this compensation was paid to the association, and entered upon their books. The payments were not made to him, but by the terms of the contract were all payable to the association. He had no means of telling when or in what amounts such payments were made except through its books,

and it is apparent from the evidence that the association neglected and refused to give him this information. He made frequent demands upon its officers for that purpose, which were refused. While the account was, therefore, upon one side, the information as to the state of the account was entirely in the possession of the association. The account stated by the master was shown to be complicated and very intricate, and covered many pages of the abstract. Manifestly it would have been practically impossible for a jury, even with the books in evidence, to figure out the amount due the complainant. For that, if no other, reason, the claim of the complainant was the proper subject of an accounting by the master. Moreover, the bill not only prays for an accounting, but for a discovery against the association. The contract between the parties provided that complainant should have the right to make resale of all forfeited shares, and the evidence shows that 186 shares were forfeited by the association, and no report whatever of them made to him. He had no adequate means of ascertaining this fact except by a bill for discovery. The bill is not, however, a bill for general discovery, but one seeking the discovery of facts upon which the complainant bases his action, which he alleges are wrongfully withheld from him.'

If Courts of equity have general jurisdiction, we turn to the question we have before us.

In determining whether the district or county court has jurisdiction to entertain this suit in equity, I pose the hypothetical question: What would happen if, under **\*842** the same allegations, suit had been brought in the county court? In deciding this question, it should be kept in mind that, disregarding certain types of suits (none of which are involved here) where jurisdiction is determined by the subject matter of the case, the county court has potential jurisdiction when the amount in controversy is between $200 and $1,000. See Texas Constitution, Article V, Section 16;

Vernon's Annotated Texas Statutes [1], Article 1949; Article 1950. Jurisdiction in the district court, on the other hand, commences at $500 and is without limit. See Tex.Const., Article V, Section 8, Vernon's Ann.St. Article 1906. Thus, between $500 and $1,000 the county courts and the district courts have concurrent jurisdiction. To be considered in connection with the above provisions are the statutory and constitutional provisions which confer upon the district court general, residual jurisdiction. Thus, by Article V, Section 8 of the State Constitution, it is provided in part:

'The District Court * * * shall have general original jurisdiction over all causes of action whatever for which a remedy or jurisdiction is not provided by law or this Constitution, and such other jurisdiction, original or appellate, as may be provided by law.'

Article 1909, provides:

> 'Such (district) court shall have general original jurisdictions over all causes of action, for which a remedy or jurisdiction is not provided by law or the constitution, and such other jurisdiction, original and appellate as may be provided by law.'

First National argues that it affirmatively appears from the pleadings that the amount in controversy is less than $500 and therefore jurisdiction for this case is not in the district court. I disagree with this conclusion. It does not affirmatively appear from the pleadings that this cause falls within the jurisdiction of the county court. In fact, if the suit had been brought in the county court, the sustaining of a plea to the jurisdiction would have been proper. As the county court is a court of limited jurisdiction, it is without power to render a judgment which exceeds its constitutional limit of $1,000. If, of course, jurisdiction in the instant case were improperly placed in the county court an entry of a judgment exceeding $1,000 would be void. No authority need be cited for the proposition that a void judgment is an absolute nullity and, as such, confers no rights and binds no one. These propositions are elementary. As was stated in Freeman v. Freeman, 160 Tex. 148, 327 S.W.2d 428 (1959):

> 'Judgments are void for lack of power in courts to render them when they are rendered contrary to constitutional or valid statutory prohibition or outside limiting constitutional or statutory authority.'

Thus, if the present case were brought in the county court, and if a plea to the jurisdiction was not sustained and if subsequently developed that Richardson was entitled to a judgment of more than $1,000, the court would be powerless to enter the judgment. The point is that an Allegation that Richardson is entitled to at least $314.37 plus whatever an accounting may reveal he is entitled to could yield a total of more than $1,000. The county court being unable to enter a judgment for more than $1,000, Richardson would then be forced to seek his relief in a district court. This Court should refuse to countenance such a spectacle.

As I read the pleadings, Richardson believes he is entitled to at least $314.37, and such additional sums to which an accounting may reveal he is owed. As the case has not gone to a trial on its merits and there is no statement of facts, this Court has no way of knowing what, if anything, First National may owe Richardson under the contract, although it should be pointed out that the contract contains the usual provisions **\*843** for commissions for the sale of policies. In my view of the case, however, this is immaterial as this Court is here concerned solely with determining the proper court in which this lawsuit should be maintained on the basis of the pleadings. The proper forum for this case is in the district court pursuant to Article V, Section 8 of the State Constitution, supra, and Article 1909, supra.

The judgments of the trial court and the Court of Civil Appeals should be reversed and the cause remanded to the district court for a trial on the merits.

WALKER and STEAKLEY, JJ., join in this dissent.

**All Citations**

419 S.W.2d 836

Footnotes

1    All statutory references hereinafter contained are to Vernon's Annotated Texas Civil Statutes.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

🟨 KeyCite Yellow Flag - Negative Treatment

**Distinguished by** TexVa, Inc. v. Boone, Tex.App.-Dallas, November 12, 2009

104 S.W.3d 725
Court of Appeals of Texas,
Dallas.

Ronald A. RITTENMEYER, Solely in his Capacity as Plan Administrator of AFD Fund, The Post–Confirmation Estate of the Bankruptcy Cases of AmeriServe Food Distribution, Inc., and its Affiliates, and Not Individually, Appellant,
v.
Peter GRAUER, Benoit Jamar, and Leif F. Onarheim, Appellees.

No. 05–02–01866–CV. | April 17, 2003. | Rehearing Overruled May 20, 2003.

Bankruptcy plan administrator of corporate estate sued various directors and companies alleging breach of fiduciary duty resulting from corporate merger. Directors filed special appearance and contested jurisdiction. The County Court at Law No. 2, Dallas County, Fred Harless, J., sustained the special appearance and dismissed claims against the directors. Administrator appealed. The Court of Appeals, James, J., held that: (1) evidence supported implied finding that corporate headquarters were not in state; (2) state of incorporation was crucial factor in determining personal jurisdiction over directors; (3) voting for merger in another forum was not purposefully availing directors of privilege of acting in state; (4) directors were not transacting business in state; (5) voluntary association with corporation did not lead directors to anticipate being haled into state court; and (6) directors actions out-of-state did not result in direct injury within state.

Affirmed.

West Headnotes (22)

**[1]** **Constitutional Law**
   👉 Non-residents in general
**Courts**

   👉 Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

A Texas court may exercise jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction and (2) the exercise of jurisdiction is consistent with federal and state guarantees of due process. V.T.C.A., Civil Practice & Remedies Code §§ 17.041–17.045.

Cases that cite this headnote

**[2]** **Constitutional Law**
   👉 Non-residents in general

Federal due process mandates that non-resident defendant "purposefully avail" itself of the privilege of conducting activity within the forum state, thus invoking the benefits and protections of its laws, in order to be subject to state's jurisdiction. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[3]** **Courts**
   👉 Purpose, intent, and foreseeability; purposeful availment

In order to establish personal jurisdiction over a non-resident defendant, the defendant's conduct and connection with the state must be such that it could reasonably anticipate being sued in the forum state.

Cases that cite this headnote

**[4]** **Appeal and Error**
   👉 Extent of Review Dependent on Nature of Decision Appealed from

On appeal of order dismissing claims for lack of personal jurisdiction, the Court of Appeals determines whether (1) the nonresident defendant has purposefully established minimum contacts with Texas and, if so, (2) the exercise of jurisdiction comports with notions of fair play and substantial justice.

1 Cases that cite this headnote

**[5]** **Courts**
🔑 Unrelated contacts and activities; general jurisdiction

**Courts**
🔑 Related contacts and activities; specific jurisdiction

A defendant's contacts with a forum can give rise to either specific or general jurisdiction.

1 Cases that cite this headnote

**[6]** **Courts**
🔑 Related contacts and activities; specific jurisdiction

For a court to exercise specific jurisdiction over a nonresident defendant, two requirements must be met: (1) the defendant's contacts with the forum must be purposeful, and (2) the cause of action must arise from or relate to those contacts.

3 Cases that cite this headnote

**[7]** **Courts**
🔑 Related contacts and activities; specific jurisdiction

**Courts**
🔑 Agents, Representatives, and Other Third Parties, Contacts and Activities of as Basis for Jurisdiction

In evaluating whether there are sufficient contacts between forum state and nonresident defendant to establish specific jurisdiction, the defendant's purposeful conduct, not the unilateral activity of the plaintiff or others, must have caused the contact.

3 Cases that cite this headnote

**[8]** **Courts**
🔑 Presumptions and Burden of Proof as to Jurisdiction

The plaintiff has the initial burden of pleading facts sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute.

Cases that cite this headnote

**[9]** **Courts**
🔑 Presumptions and Burden of Proof as to Jurisdiction

When a nonresident defendant challenges a trial court's exercise of personal jurisdiction through a special appearance, it carries the burden of negating all bases for personal jurisdiction.

Cases that cite this headnote

**[10]** **Courts**
🔑 Determination of questions of jurisdiction in general

The exercise of personal jurisdiction requires the trial judge to resolve any factual disputes before applying the jurisdictional formula.

Cases that cite this headnote

**[11]** **Appeal and Error**
🔑 Cases Triable in Appellate Court

On appeal, the appropriate standard of review of the trial court's order granting or denying a special appearance is a de novo review.

Cases that cite this headnote

**[12]** **Appeal and Error**
🔑 Cases Triable in Appellate Court

**Appeal and Error**
🔑 Proceedings preliminary to trial

The Court of Appeals applies a factual sufficiency of the evidence review to all of the evidence before the trial judge on the question of jurisdiction, and once all factual disputes are resolved the court examines de novo whether the facts negate all bases for personal jurisdiction.

Cases that cite this headnote

**[13]** **Appeal and Error**
🔑 Particular findings implied

When a trial court does not issue findings of fact and conclusions of law with its special

appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied on appeal.

Cases that cite this headnote

**[14]    Appeal and Error**
  Proceedings preliminary to trial

When the appellate record of a special appearance ruling includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appellate court.

Cases that cite this headnote

**[15]    Appeal and Error**
  Proceedings preliminary to trial

For legal sufficiency points of a special appearance ruling on appeal, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails.

Cases that cite this headnote

**[16]    Appeal and Error**
  Particular findings implied

There were no findings of fact and conclusions of law for special appearance ruling finding court lacked personal jurisdiction over nonresident directors of corporation, and thus, conflicting evidence of location of corporate headquarters on date of alleged breach of fiduciary duty by directors required implied finding that headquarters were not in Texas, where various officers and directors testified that headquarters were not in Texas or were in transition to Texas as time of alleged breach.

Cases that cite this headnote

**[17]    Courts**
  Tortious or intentional conduct;  fraud and breach of fiduciary duties

Mere fact that Delaware corporation had its headquarters in Texas at the time of alleged breach of fiduciary duty was not sufficient minimum contacts to give Texas

courts personal jurisdiction over nonresident directors who voted for merger that led to tort allegations by corporation; incorporating state had strong, compelling interest to provide forum for resolution of disputes, only a portion of corporate assets were located in Texas.

6 Cases that cite this headnote

**[18]    Courts**
  Tortious or intentional conduct;  fraud and breach of fiduciary duties

Nonresident directors did not "purposefully avail" themselves of privilege of acting in Texas, to be subject to personal jurisdiction of Texas court, by voting for merger that resulted in allegations of breach of fiduciary duty, given that vote was taken in Florida during board meeting.

Cases that cite this headnote

**[19]    Courts**
  Tortious or intentional conduct;  fraud and breach of fiduciary duties

A breach of fiduciary duty by a corporate director's action of voting at a board meeting occurs in the state where the meeting was held, making it forum state for subsequent tort action for purposes of specific jurisdiction.

Cases that cite this headnote

**[20]    Courts**
  Tortious or intentional conduct;  fraud and breach of fiduciary duties

Nonresident directors did not purposefully choose to move corporate headquarters to Texas, and thus, they were not transacting business in Texas to confer personal jurisdiction in Texas court in action brought by Chapter 11 plan administrator alleging directors breached their fiduciary duty in approving a merger, where administrator failed to introduce evidence that directors "purposefully" chose to move headquarters to state or that directors were responsible for headquarters being consolidated in Texas.

2 Cases that cite this headnote

**[21]  Courts**
👉 Tortious or intentional conduct;  fraud and breach of fiduciary duties

Nonresident directors' voluntary association with corporation with headquarters in Texas did not lead them to reasonably anticipate being haled into Texas court, but did subject them to jurisdiction of court in state of incorporation, in action brought by Chapter 11 plan administrator alleging directors breached fiduciary duty in approving merger that eventually led corporation to file for bankruptcy protection.

1 Cases that cite this headnote

**[22]  Courts**
👉 Jurisdiction of Agents, Representatives, or Other Third Parties Themselves

Merger of nonresident corporations that resulted in financial collapse and bankruptcy was not result of nonresident directors' action directed at Texas or resulting in injury in Texas to confer Texas courts with specific personal jurisdiction over directors; "brunt of injury" occurred to nonresident majority shareholder, directors did not intend that merger would result in bankruptcy, chief executive officer, rather than directors, was central figure or guiding light of merger proposal, and majority of corporate operations and personnel was not located in Texas.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*727** James E. Coleman, Jr., Fletcher L. Yarbrough, Jeffrey S. Levinger, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, for Appellant.

Rodney Acker, Jenkens & Gilchrist, P.C., Jay J. Madrid, Winstead Sechrest & Minick, P.C., Dallas, for Appellees.

Before Justices JAMES, BRIDGES, and RICHTER.

**OPINION**

Opinion By Justice JAMES.

Ronald A. Rittenmeyer, solely in his capacity as plan administrator of AFD Fund, the post-confirmation estate of the bankruptcy cases of AmeriServe Food Distribution, Inc., and its affiliates, and not individually, appeals the interlocutory orders of the trial court granting the special appearances of Peter Grauer, Benoit Jamar, and Leif Onarheim and dismissing Rittenmeyer's claims against them. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a) (7) (Vernon Supp.2003). Appellant brings a single issue on appeal: whether Texas courts may exercise specific personal jurisdiction **\*728** over nonresident directors of a foreign corporation headquartered in Texas for the directors' acts occurring outside Texas. We hold that a nonresident director of a foreign corporation is not subject to personal jurisdiction solely because the corporation has its headquarters in Texas. We also hold the trial court did not err in determining appellees lacked sufficient minimum contacts with Texas to permit the Texas courts to exercise personal jurisdiction over them. We affirm the trial court's orders sustaining appellees' special appearances and dismissing appellant's claims against them.

**FACTUAL BACKGROUND**

Appellees are three of the eight directors of AmeriServe Food Distribution, Inc. (AmeriServe) and are not residents of the State of Texas. Grauer and Jamar are residents of Connecticut, and Onarheim is a resident of Norway. AmeriServe is incorporated in Delaware, its executive and management offices were in Wisconsin and Connecticut, and its operational headquarters were in Texas. On January 29, 1998, at a meeting in Miami, Florida, the board of directors of AmeriServe approved the merger of AmeriServe with a larger food distribution company, ProSource, Inc. Onarheim was not physically present at the Florida meeting but participated by telephone from Norway. AmeriServe's fortunes after the merger were not good, and on January 31, 2000, AmeriServe filed for bankruptcy.

Appellant was appointed the plan administrator of AmeriServe's post-confirmation estate, the purpose of which was to acquire funds, including through litigation, for

distribution to AmeriServe's unpaid creditors. Appellant, on behalf of the post-confirmation estate, brought suit in Dallas County Court at Law No. 2 against AmeriServe's parent companies, its officers and directors, and the companies that advised and financed the merger. Appellant alleged the directors, including appellees, breached their fiduciary duty by voting to approve the merger with ProSource. Appellant also alleged that Jamar and Grauer, who were executives of the company financing the merger, [1] and which earned millions of dollars from the merger, breached their fiduciary duties by not disclosing their conflict of interest to the other board members. Appellees filed special appearances, and the parties filed voluminous evidence in support of their positions.

On November 8, 2002, the trial court granted appellees' special appearances and dismissed appellant's claims against them. Appellant timely filed his notice of appeal on November 26, 2002. *See* TEX.R.APP. P. 26.1(b).

## SPECIAL APPEARANCE

 [1]    [2]    [3]    [4]    A Texas court may exercise jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction and (2) the exercise of jurisdiction is consistent with federal and state guarantees of due process. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 17.041–045 (Vernon 1997 & Supp.2003); *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002); *Kelly Inv., Inc. v. Basic Capital Mgmt., Inc.,* 85 S.W.3d 371, 374 (Tex.App.-Dallas 2002, no pet.).* Federal due process mandates that the defendant "purposefully avail" itself of the privilege of conducting activity within the forum state, thus invoking the benefits and protections of its laws. **\*729** *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (random, fortuitous, or attenuated contacts insufficient). The defendant's conduct and connection with the state must be such that it could reasonably anticipate being sued in the forum state. *Id.* We determine whether (1) the nonresident defendant has purposefully established minimum contacts with Texas and, if so, (2) the exercise of jurisdiction comports with "notions of fair play and substantial justice." *Id.* The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

A defendant is not subject to jurisdiction here if its Texas contacts are random, fortuitous, or attenuated. *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 806.

 [5]    [6]    [7]    A defendant's contacts with a forum can give rise to either specific or general jurisdiction. *Id.* For a court to exercise specific jurisdiction over a nonresident defendant, two requirements must be met: (1) the defendant's contacts with the forum must be purposeful, and (2) the cause of action must arise from or relate to those contacts. *Id.* Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 & n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *CSR Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996). The defendant's purposeful conduct, not the unilateral activity of the plaintiff or others, must have caused the contact. *Helicopteros,* 466 U.S. at 417, 104 S.Ct. 1868 (focus is on relationship among defendant, forum, and litigation); *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 806.

### Burden of Proof

 [8]    [9]    The plaintiff has the initial burden of pleading facts sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *See Hotel Partners v. KPMG Peat Marwick,* 847 S.W.2d 630, 633 (Tex.App.-Dallas 1993, writ denied). When a nonresident defendant challenges a trial court's exercise of personal jurisdiction through a special appearance, it carries the burden of negating all bases for personal jurisdiction. *See Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985).

### Standard of Review

 [10]    [11]    [12]    The exercise of personal jurisdiction requires the trial judge to resolve any factual disputes before applying the jurisdictional formula. *Hotel Partners v. Craig,* 993 S.W.2d 116, 120–21 (Tex.App.-Dallas 1994, pet. denied). On appeal, the appropriate standard of review of the trial court's order granting or denying a special appearance is a de novo review, applying the supreme court's jurisdictional formula. *See Craig,* 993 S.W.2d at 120. We apply a factual sufficiency of the evidence review to all of the evidence before the trial judge on the question of jurisdiction. *Craig,* 993 S.W.2d at 120; *KPMG Peat Marwick,* 847 S.W.2d at 632. Once all factual disputes are resolved we examine de novo

whether the facts negate all bases for personal jurisdiction. *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 806; *Craig,* 993 S.W.2d at 120.

 **[13]**    **[14]**    **[15]**    When, as in this case, a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002). When the appellate record includes the reporter's and clerk's records, **\*730** these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appellate court. *Id.* For legal sufficiency points, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Id.*

### Location of Corporate Headquarters

 **[16]**    Appellant first asserts appellees are subject to the personal jurisdiction of Texas courts as a matter of law because AmeriServe had its headquarters in Texas at the time of the alleged breach of fiduciary duty, January 29, 1998. Because a finding that AmeriServe's headquarters were not in Texas on January 29, 1998 supports the trial court's orders, we must imply that finding unless it is not supported by more than a scintilla of evidence.

The record shows that before July 1997, AmeriServe's executive offices were in Wisconsin, and that its chief executive officer and chairman of the board, John Holten, had his office in Connecticut, which was where AmeriServe's parent company was based. In July 1997, AmeriServe acquired a significantly larger food distribution company, PepsiCo Food Service (PFS), which distributed food for the restaurant chains owned by PepsiCo, Inc. PFS had its main accounts processing staff of 300 to 400 people in Texas, but its marketing staff was located in California, Kansas, and Kentucky, with each location handling the marketing for one of the major chains. After acquiring PFS, AmeriServe fired PFS's executives and replaced them with AmeriServe's executives. However, the record contains evidence that the work of the executives was performed mostly in Wisconsin and Connecticut, with frequent visits to Dallas and other locations around the country.

ProSource had its headquarters in Miami. Press releases, letterhead, SEC filings, etc. indicate that by March 1998, the operational headquarters of AmeriServe, PFS, and ProSource were consolidated in Texas. However, the evidence is disputed whether AmeriServe's headquarters were in Texas on January 29, 1998. Kevin Rogan, the Senior Vice–President, Secretary, and General Counsel for AmeriServe from October 1997 to late 2000, testified in his affidavit that from the time he joined AmeriServe in October 1997 until its liquidation, its principal place of business and headquarters were in Texas. [2] Diana Moog, AmeriServe's Senior Vice–President–Finance and Treasurer from July 1997 to January 1998, and AmeriServe's Chief Financial Officer from January 1998 to November 2000, stated in her affidavit that in November or December 1997, AmeriServe's Wisconsin office had only a skeletal crew of five to ten employees, and the other employees had either moved to Texas or been let go. A January 30, 1998 press release from AmeriServe and ProSource announced the merger and stated, "AmeriServe will continue to have its headquarters in Dallas.... AmeriServe also has customer support offices in Wichita, KS, Louisville, KY, and Irvine, CA, in addition to its corporate headquarters in Dallas."

 **\*731**    However, Holten, AmeriServe's chief executive officer and chairman of the board, testified in his affidavit:

> Prior to December 1997, AmeriServe's strategic and capital markets headquarters were located in Greenwich, Connecticut, and its operational headquarters were located in Brookfield Wisconsin, although key management functions were also located in other states across the U.S. *Beginning* in or about December 1997, ... certain operational, financial and other management functions were *gradually* moved from Brookfield, Wisconsin to Dallas, Texas, although key management personnel and executive functions were also located in other states, including California, Kansas, Nebraska, Kentucky, etc.

(Emphasis added.) Additionally, Onarheim testified, "The operational headquarters was [sic] in Brookfield, Missouri [sic], but most of the—I would say, all the time till the Chapter 11 the strategic and financial decisions were taken or were developed in Greenwich, Connecticut." Jamar testified, "From my point of view the headquarters of the company were always Greenwich Connecticut...." Grauer testified, "As it relates to any of the AmeriServe activities, all of the

decisionmaking and interaction with, on anything to do with AmeriServe, ProSource or anything else, was always done in Greenwich, Connecticut." Grauer also testified he expected any lawsuit related to his actions as a director to be filed in Connecticut, not Texas.

Thus, where the headquarters were actually located at the time of the alleged breach of fiduciary duty, January 29, 1998, was not clear from the evidence. Holten's and appellees' testimony suggests AmeriServe's headquarters were not located in Texas but were spread throughout the country, with its strategic headquarters in Connecticut, the operational headquarters in Wisconsin and in transition to Texas, and with other key management and executive functions in other states. Because appellant did not request, and the trial court did not file, findings of fact and conclusions of law, we must imply the finding that will support the trial court's order, in this case, that on January 29, 1998, the "headquarters" for AmeriServe were not located in Texas.

This implied finding is also supported by the January 29, 1998 Agreement and Plan of Merger of AmeriServe and ProSource. The agreement did not explicitly list the headquarters or principal place of business for AmeriServe, but it did list AmeriServe's address as being in Connecticut for the address to which all notices, requests, and other communications required by the agreement had to be sent. Accordingly, appellant's argument that appellees are, as a matter of law, subject to personal jurisdiction in Texas because they were directors of a corporation headquartered in Texas at the time of their allegedly wrongful actions lacks a factual basis.

 **[17]**    However, even if the evidence conclusively established that AmeriServe's headquarters on January 29, 1998 were in Texas, appellant's argument—that appellees are, as a matter of law, subject to the personal jurisdiction of the Texas courts because AmeriServe's headquarters were located in Texas on January 29, 1998—would still lack merit. Appellant relies principally on two cases in support of its argument that a state where a corporation's headquarters are located has personal jurisdiction over the corporation's directors for breach of fiduciary duty. *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.,* 831 F.2d 522 (4th Cir.1987), concerned a West Virginia corporation with its principal place of business in West **\*732** Virginia. *Id.* at 524. A merger involving the corporation occurred, and plaintiff, a stockholder in the corporation, brought a derivative action in West Virginia against the directors. *Id.* Two of the directors were not residents of West Virginia, and they asserted West Virginia

could not assert personal jurisdiction over them. *Id.* Appellant asserts *Pittsburgh Terminal Corp.* held the fact that the corporation's principal place of business was in West Virginia gave the West Virginia courts personal jurisdiction over the directors. The Fourth Circuit said no such thing. The Fourth Circuit held the fact that the corporation was incorporated in West Virginia, and thus controlled by West Virginia law, made the actions of the directors subject to West Virginia law. *Id.* at 527. The location of the principal place of business was irrelevant to the Fourth Circuit's reasoning.

> Wherever the acts took place in soliciting the proxy or wherever the proxy was mailed from and to, it could have been given effect only in West Virginia by virtue of the law of West Virginia under which Mid Allegheny operated.... Each act which each of them [the nonresident directors] took with respect to this transaction was given effect in West Virginia by virtue of West Virginia law just as surely as if they had been in the principal office of the corporation in West Virginia, present and voting in person....

> Excellent reasons exist for allowing a State to assert jurisdiction over non-resident directors of domestic corporations. A chartering State has a strong, even compelling interest in providing a forum for redressing harm done by corporate fiduciaries, harm endured principally by a resident of that State, the corporation.... Given the high degree of regulation over corporate fiduciaries, the State's interest in providing a convenient forum for a derivative suit charging misfeasance or nonfeasance of a director cannot be overemphasized.

*Id.* at 527–28. Applying *Pittsburgh Terminal Corp.* to this case, we would conclude appellees were deemed to have been transacting business in Delaware, the state of incorporation, and not Texas, by voting for the merger.

Appellant's other principal case, *International Harvester Co. v. Mann,* 460 So.2d 580 (Fla.Dist.Ct.App.1984), *overruled by Doe v. Thompson,* 620 So.2d 1004 (Fla.1993), involved a Delaware corporation, Mann International, Inc. (MI) whose physical assets and operations were entirely within Florida. *Id.* at 582. The plaintiff and the defendants were the board of directors of the corporation; the defendants owned all the voting shares, and the plaintiff owned all the nonvoting shares. *Id.* at 581. The defendants held a meeting in Delaware without notifying the plaintiff, and they voted to dissolve the corporation. The plaintiff brought a derivative action and a personal breach of fiduciary duty action against the defendants in Florida. The defendants,

who were Georgia residents, asserted the Florida courts lacked personal jurisdiction over them. The Florida court stated, "Although MI was formed as a corporation under the laws of Delaware, its physical assets and it operation as a business were solely within the state of Florida. Therefore, any injury to its inventory or operation as a business concern, as alleged must have occurred within Florida." *Id.* at 582. Unlike the facts of *International Harvester,* AmeriServe did not have all its assets and operations solely within the state of Texas; instead, AmeriServe's assets and operations were spread throughout the United States, Mexico, and Canada. *International Harvester* does not support appellant's argument. The other cases appellant cites are equally inapplicable. **\*733** *See DeCook v. Envtl. Sec. Corp.,* 258 N.W.2d 721, 728 (Iowa 1977) (nonresident directors of Iowa corporation subject to personal jurisdiction in Iowa); *Ellwein v. Sun–Rise, Inc.,* 295 Minn. 109, 203 N.W.2d 403, (1972) (nonresident directors of Minnesota corporation subject to personal jurisdiction in Minnesota); *Springs Indus. v. Gasson,* 923 F.Supp. 823, 826 & n. 1 (D.S.C.1996) (nonresident directors of South Carolina corporation subject to personal jurisdiction in South Carolina).

The mere fact that a Delaware corporation had its headquarters in Texas at the time of the allegedly wrongful act is not sufficient minimum contacts to give Texas courts personal jurisdiction over a nonresident director who commits a tort against the corporation. Appellant's argument to the contrary lacks merit.

### Location of Actions

 [18]    [19]    Appellant next asserts Texas courts have specific jurisdiction over appellees because they "purposefully availed" themselves of the privilege of acting in Texas by committing torts in Texas. The "tort" appellant alleges is breach of fiduciary duty. A breach of fiduciary duty by a corporate director's action of voting at a board meeting occurs in the state where the meeting was held. *Heil v. Morrison Knudsen Corp.,* 863 F.2d 546, 550–51 (7th Cir.1988). In this case, the meeting was held in Florida; thus, any breach of fiduciary duty by appellees was committed in Florida and not in Texas.

 [20]    Appellant next argues appellees are amenable to jurisdiction in Texas because they effectively transacted business in Texas by their decision to acquire ProSource. Appellant asserts Texas was "the focal point of all

communications regarding corporate business," and that the directors had "purposefully chosen Texas as the consolidated headquarters of AmeriServe and ProSource." Thus, appellant argues, quoting *Pittsburgh Terminal Corp.,* appellees were " 'transacting business' in Texas 'just as surely as if they had been in the principal office of the corporation in [Texas], present and voting in person.' " *Pittsburgh Terminal Corp.,* 831 F.2d at 527 (bracketed material added by appellant). As discussed above, appellant misapplies *Pittsburgh Terminal Corp.* because the Fourth Circuit held the fact that the corporation was a West Virginia corporation made the director's actions occur in West Virginia; the location of the corporate headquarters was irrelevant to the Fourth Circuit's analysis. *Id.* at 527–28. Furthermore, the record shows the directors did not "purposefully [choose] Texas as the consolidated headquarters of AmeriServe and ProSource." Jamar's testimony indicates he was aware the headquarters were going to be consolidated in Texas, he listened to arguments before the decision about whether the headquarters should be moved to Miami, but he did not "have a position" on the issue. Appellant does not cite to the record any evidence showing the directors "purposefully" chose to consolidate AmeriServe's headquarters in Texas. Appellant also argues appellees "were responsible for the operational headquarters of AmeriServe being consolidated in Dallas when they made the conscious (and fatal) decision to approve the ProSource acquisition." This argument is not supported by the record, which shows the consolidation was underway before the vote on the ProSource merger took place. Also, appellees testified the focal point of communications regarding corporate business was Connecticut, not Texas. Appellant's argument lacks merit.

 [21]    Appellant next argues appellees are subject to Texas jurisdiction because they created "continuing obligations" with Texas by virtue of their service on AmeriServe's **\*734** board. Appellant again cites *Pittsburgh Terminal Corp.* in support of this argument. As discussed above, the focus of the Fourth Circuit was the fact that the corporation was incorporated in West Virginia, which gave the directors continuing obligations under West Virginia law. *Id.* at 529. Appellant also argues, quoting *Oakridge Holdings, Inc. v. Brukman,* 528 N.W.2d 274 (Minn.Ct.App.1995), "Because the directors thus voluntarily associated themselves with a Texas-based company, 'they cannot argue that they could not reasonably anticipate defending an action in [Texas] by their [Texas] corporation asserting acts harmful to the corporation.' " *Id.* at 277 (bracketed material added by appellant). The flaw in the argument is that AmeriServe

is not a Texas corporation. *Oakridge Holdings* concerned a Minnesota corporation suing nonresident directors for breaches of fiduciary duty. The company's headquarters were in Arizona and later in California. *Id.* at 276. The directors resided in Arizona and California. Citing *Pittsburgh Terminal Corp.,* the Minnesota Court of Appeals held the nonresident directors were subject to the Minnesota courts' jurisdiction because they were directors of a Minnesota corporation. *Id.* at 277. We conclude *Oakridge Holdings* does not support appellant's argument. Applying *Pittsburgh Terminal Corp.* and *Oakridge Holdings* leads to the conclusion that appellees created continuing obligations in Delaware, not Texas, by virtue of their service on AmeriServe's board. Appellant's argument lacks merit.

### Location of Injury

 **[22]**   Appellant also argues the record supports the Texas courts' exercise of specific jurisdiction over appellees because their action of voting to approve the ProSource merger, although occurring outside of Texas, produced injury within Texas. Appellant cites to *Springs Industries, Inc. v. Gasson,* where the federal district court stated a nonresident corporate agent could be subject to jurisdiction in the corporation's home state for an act occurring outside that state where the injury is caused by the agent's direct personal involvement and "the defendant agent is the guiding spirit behind the wrongful conduct, or the central figure in the challenged corporate activity." *Springs Indus., Inc.,* 923 F.Supp. at 827 (quoting *Magic Toyota v. SE Toyota Distribs., Inc.,* 784 F.Supp. 306, 315 (D.S.C.1992)). Thus, appellant appears to argue Jamar and Grauer are the "guiding spirit" and "central figure" behind the vote of the board of directors because they had the authority to veto any board decision. The record shows Jamar and Grauer rarely spent more than five to ten percent of their time on AmeriServe's business. The record also shows Jamar and Grauer were "extensively" and "fully" briefed on the ProSource merger by Holten. The trial court could conclude from the record that Holten, AmeriServe's chief executive officer and the sole stockholder of the company that owned the majority of AmeriServe, [3] was the true "guiding spirit" and "central figure" of the merger decision, and that Jamar and Grauer were neither "guiding spirit[s]" nor "central figure[s]" of the merger decision. Appellant's argument lacks merit.

In *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the Supreme  **\*735**  Court held the defendants'

commission of a tort in Florida could give California courts specific jurisdiction over the defendants because their actions were expressly aimed at California and "they knew that the brunt of that injury would be felt by [the plaintiff] in the State in which she lives." *Id.* at 789–90, 104 S.Ct. 1482. [4] In that case, the plaintiff, a resident of California, sued two Florida journalists for libel based on an article they wrote for a nationwide newspaper. *Id.* at 785, 104 S.Ct. 1482. In this case, the record supports implied findings that appellees did not know "the brunt" of injury from the merger decision would be felt in Texas. The record shows that on December 31, 1999, AmeriServe:

> had approximately 8,300 full-time employees, approximately 600 of whom were employed in corporate support functions and approximately 7,700 of whom were warehouse, transportation, sales, and administrative staff at the distribution centers.
>
> After the merger with ProSource, AmeriServe had more than seventy-five distribution centers in the United States, but it planned to reduce those to twenty-two distribution centers. As of the date it filed its petition in bankruptcy, AmeriServe leased 150,000 square feet of office space for its headquarters in Addison, Texas. AmeriServe also operated or was constructing forty-two distribution centers in twenty-four states as well as Mexico and Canada. Three of the distribution centers were in Texas, but New York and Illinois also had three distribution centers, and California had four. Most of the distribution centers were between 100,000 and 200,000 square feet in size. Onarheim testified that Texas was not the most important part of AmeriServe. Additionally, the trial court could conclude Holten, a Connecticut resident and the prime shareholder of the companies owning AmeriServe, suffered the "brunt" of the injury from AmeriServe's collapse. Based on this evidence, the trial court could make the implied finding that the "brunt" of the injury would not be felt in Texas.

Appellant also relies on *Guidry v. United States Tobacco Co.,* 188 F.3d 619 (5th Cir.1999), where the Fifth Circuit stated, "an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Id.* at 628. Nothing in the record shows appellees intended for their vote to merge AmeriServe and ProSource to result in the financial collapse, bankruptcy, and liquidation of AmeriServe. Nor does any

evidence show these consequences "were highly likely to follow from [appellees'] conduct." *Guidry* is not applicable.

Appellant also relies on *Mergenthaler Linotype Co. v. Leonard Storch Enterprises, Inc.,* 66 Ill.App.3d 789, 23 Ill.Dec. 352, 383 N.E.2d 1379 (1978), for the proposition that "the injury" occurred in Texas. In that case, plaintiff and defendant were New York corporations in the business of manufacturing and selling fonts. *Id.* at 1382. Besides being incorporated in New York, both companies had their principal places of business and all their manufacturing facilities in the state of New York. The plaintiff sued the defendant for unlawful **\*736** competition, alleging the defendant was inexpensively copying the plaintiff's fonts and selling them at a lower cost. *Id.* at 1382–83. The Illinois Appellate Court determined, "The injury to the plaintiff in this case is only to its pocketbook. It is alleging that it lost sales because of the defendants' misdeeds and because it lost sales, it lost profits. But the plaintiff's pocketbook is located in New York where it resides, i.e., has its major place of business." *Id.* at 1384. Thus, appellant argues, because AmeriServe "has its major place of business" in Texas, the injury occurred in Texas. However, although Texas may have been AmeriServe's corporate headquarters, the record supports an implied finding that Texas was not AmeriServe's "major place of business." The record shows that fewer than fourteen percent of AmeriServe's employees were in corporate support functions, and many of these employees may not have been located at the headquarters in Texas.[5] Even after the

headquarters were moved to Texas, the record does not show where AmeriServe's "major place of business" was located, or even if it had one. Likewise, the record supports an implied finding that AmeriServe's "pocketbook" was not in Texas: Jamar testified AmeriServe's "accounting controls, that kind of thing was clearly in Dallas. But the financing function was clearly in Greenwich, Connecticut." All appellees testified that the financial information they received about AmeriServe came from Connecticut, not Texas. Appellant's argument lacks merit.

After reviewing the entire record, we conclude the record supports the trial court's implied finding that appellees' vote in Florida to approve the AmeriServe–ProSource merger, two Delaware corporations with continent-wide operations, did not constitute sufficient purposeful availment of doing business in Texas or the performance of an act purposefully directed toward Texas or Texas residents. We conclude the trial court did not err in determining appellees lacked sufficient minimum contacts with Texas to give the Texas courts specific personal jurisdiction over them.

We resolve appellant's issue against him. We affirm the trial court's orders.

**All Citations**

104 S.W.3d 725

Footnotes

1   This company had financed previous expansions by AmeriServe. As a condition of the financing, the company got to appoint two directors who had authority to veto any decision by the remaining directors.

2   Appellant asserts in his brief that the location of AmeriServe's headquarters was established as being in Texas "when AmeriServe filed its Form 10–K with the SEC for the fiscal year ended December 27, 1997," which listed Dallas, Texas as the address of principal executive offices, and which was signed by appellees. Although the financial information in the Form 10–K was for the fiscal year ended December 27, 1997, appellees signed the Form on March 27, 1998, by which time the executive offices had been moved to Dallas. Thus, the Form 10–K is no evidence of where the headquarters were located on January 29, 1998, when the board approved the merger.

3   In his petition, appellant sets out the chain of ownership leading to AmeriServe. At the top of the chain is Holten, who owns 100% of Holberg Inc., which owns 66% of Holberg Industries, Inc., which owns 92.9% of Nebco Evans Distributors, Inc., which owns 100% of Nebco Evans Holding Co., which owns 100% of AmeriServe. It is AmeriServe and its subsidiaries that actually conduct the food-distribution operations.

4   Appellant also cites *Global Fin. Corp. v. Triarc Corp.,* 93 N.Y.2d 525, 693 N.Y.S.2d 479, 715 N.E.2d 482, 485 (1999), for the proposition, "When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." That case, however, involved application of New York statute of limitations, not the long-arm statute or minimum contacts.

5   Holten testified in an affidavit that after the headquarters were moved to Texas, "key management personnel and executive functions were also located in other states, including California, Kansas, Nebraska, Kentucky, etc."

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 722509
Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION. UNDER TX R RAP RULE 47.7, UNPUBLISHED OPINIONS HAVE NO PRECEDENTIAL VALUE BUT MAY BE CITED WITH THE NOTATION "(not designated for publication)."

Court of Appeals of Texas, Dallas.

Thomas K. RUSSELL, Hillel A. Meyers and Donald G. Saunders, Appellants,
v.
A.E. MARKETING, L.L.C., Appellee.

No. 05-00-01583-CV. | June 28, 2001.

On Appeal from the 193rd Judicial District Court, Dallas County, Texas, Trial Court Cause No. DV99-07896-L.

Before LAGARDE, BRIDGES, and RICHTER, JJ.

## OPINION

RICHTER.

**\*1** A.E. Marketing, L.L.C., ("A.E.Marketing") filed suit in Texas against Meyers, Russell, and Saunders for breach of fiduciary duty, fraud, conspiracy to commit fraud, Texas Securities Act violations, and declaratory judgment. Appellants filed a **special appearance** contesting the court's jurisdiction. After a hearing, the trial court overruled appellant's **special appearance**. In this interlocutory appeal, appellants contend the trial court erred in holding they were subject to jurisdiction in Texas. We affirm the trial court's order overruling appellants' **special appearance**.

### Factual and Procedural Background

Appellants are the founders of Premier, a Nevada corporation. At Premier's inception, Meyers and Saunders each held a 50% ownership interest. Appellants formed Premier for the sole purpose of acquiring the Maxim, a Las Vegas, Nevada hotel and casino. Meyers is a Florida resident, while Russell and Saunders reside in California. At the time of formation, Premier maintained places of business in California and Nevada. Following the purchase of the Maxim, Premier relocated its principal business office to Dallas, Texas.

Sometime in the early formation of Premier, A.E. Marketing, through its President, Gary Kornman, invested in Premier. Saunders asserts Kornman requested the opportunity for A.E. Marketing to invest in Premier, while Kornman contends A.E. Marketing was solicited to invest by Saunders. A.E. Marketing's initial investment in Premier in November of 1998, was a $375,000 contribution wired from a Texas bank to a Nevada title company. This initial investment represented one-half of the $750,000 initial deposit on the purchase of the Maxim hotel and casino. In exchange, A.E. Marketing became a 24 1/2 percent shareholder in Premier. To accommodate A.E. Marketing's ownership interest, appellants reduced Saunders' interest in Premier to 24 1/2 percent and awarded Russell a one percent ownership interest. Meyers maintained a 50% ownership interest.

In January 1999, appellants requested that A.E. Marketing provide further financing for Premier. A.E. Marketing paid an additional $750,000, representing the second deposit due on the Maxim purchase. A.E. Marketing's investment in Premier ultimately grew to a total of $1.5 million, and A.E. Marketing's ownership interest was adjusted accordingly to reflect the increased investment.

Following A.E. Marketing's initial funding of the Premier transaction, appellants made several unsuccessful attempts to secure funding for the remaining purchase price of the Maxim hotel and casino. A.E. Marketing eventually secured a forty-two million dollar loan from a Georgia limited partnership to purchase the Maxim. At the scheduled Maxim hotel and casino closing, Meyers demanded payment of one million dollars to sign the closing papers. The papers remained unsigned. Therefore, a merger was arranged between Premier and the current owner of the Maxim hotel and casino, Maxim Holdings, a Nevada corporation. The merger provided for Premier's acquisition of the Maxim assets. A.E. Marketing, Saunders, and Russell voted in favor of the merger on behalf of Premier. As a consequence of the merger, A.E. Marketing received 99.85% of Premier's issued and outstanding common stock, as well as voting control of Premier.

**\*2** Appellants filed suit in Clark County, Nevada against Kornman and others. Appellee filed suit in Dallas County, Texas, seeking relief for breach of contract and fiduciary duty, fraud, civil conspiracy, violations of the Texas Securities Act,

and for declaratory relief as to the validity of the merger between Premier and Maxim Holdings. Appellants filed their **special appearance**, which the trial court denied, holding appellants were subject to Texas jurisdiction. In particular, the trial court found appellant's intentional tort conduct supported the exercise of jurisdiction. Appellants appeal the trial court's order.

### Burden of Proof

The plaintiff has the burden of pleading facts sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Hotel Partners v. KPMG Peat Marwick,* 847 S.W.2d 630, 633 (Tex.App.-Dallas 1993, writ denied). When a nonresident defendant challenges a trial court's exercise of personal jurisdiction through a **special appearance**, it carries the burden of negating all grounds for personal jurisdiction. *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985).

### Standard of Review

The exercise of personal jurisdiction requires the trial court to resolve any factual disputes before applying the jurisdictional formula. *Hotel Partners v. Craig,* 993 S.W.2d 116, 120 (Tex.App.-Dallas 1994, writ denied). The appropriate standard for reviewing a trial court's order sustaining or overruling a **special appearance** is de novo review, applying the supreme court's jurisdictional formula. *Craig,* 993 S.W.2d at 120. We apply a factual sufficiency review to all of the evidence before the trial judge on the question of jurisdiction. *KPMG Peat Marwick,* 847 S.W.2d at 632; *see also Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). Once all factual issues are resolved or if the facts are undisputed, we examine de novo whether the facts negate all grounds for personal jurisdiction. *Craig,* 993 S.W.2d at 120. Unless challenged on appeal, the trial court's findings of fact are binding upon the appellate court. *KPMG Peat Marwick,* 847 S.W.2d at 632 (citations omitted). If the record contains some probative evidence from which reasonable inferences can be drawn or the findings are not so contrary to the overwhelming weight of the evidence as to be manifestly wrong, we may not disregard the trial courts findings on appeal. *Id.*

### Exercise of Jurisdiction

Personal jurisdiction consists of two elements: (1) the defendant must be amenable to the jurisdiction of the court under either specific or general jurisdiction; and (2) the plaintiff must validly invoke the court's jurisdiction through valid service of process. *Kawaski Steel Corp.,* 699 S.W.2d at 200; *Guardian Royal Exch.,* 815 S.W.2d at 227-28. Amenable to process means the Texas court validly obtains jurisdiction over the person with regard to the cause of action pleaded under federal and state constitutions, and appropriate state statutes. *Kawaski,* 699 S.W.2d at 202.

**\*3** A Texas court may exercise jurisdiction over a non-resident defendant if authorized by the Texas long-arm statute and the exercise of that jurisdiction comports with federal due process. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 17.041-17.045 (Vernon 1997); *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990). Review of whether the exercise of jurisdiction comports with federal due process is a two part inquiry. First, the non-resident defendant must purposely establish minimum contacts with the forum state. Second, if minimum contacts are established, the exercise of jurisdiction must comport with fair play and substantial justice. *Asahi Metal Indus. v.Super. Ct of Calif.,* 480 U.S. 102, 108-15 (1987); *Burger King v. Rudzewicz,* 471 U.S. 462, 476 (1985); *Int'l Shoe Co. v. State of Wash.,* 326 U.S. 310, 316 (1945).

### Agency

Appellants assert any contacts they established with Texas were as agents of Premier. Therefore, they are shielded from the court's exercise of personal jurisdiction in Texas. Jurisdiction over an individual generally cannot be based on jurisdiction over a corporation with which he is associated unless the corporation is the alter ego of the individual. *Vosko v. Chase Manhattan Bank, N.A.,* 909 S.W.2d 95, 99-100 (Tex.App.-Houston [14th Dist.] 1995, writ denied). However, appellee is not asserting that jurisdiction over the defendants is derivative of jurisdiction over Premier; rather, he asserts appellants individually have minimum contacts with Texas to authorize the exercise of jurisdiction. Appellants confuse the nature of jurisdiction with that of liability. Agency is an **affirmative defense** to liability. *Seale v. Nicholas,* 505 S.W.2d 251, 254 (Tex.1974). An agency relationship does not shield an individual from jurisdictional contacts with a state: only from possible liability for the activities

conducted within the state. *E.g. Smith v. Lanier,* 998 S.W.2d 324, 334-35 (Tex.App.-Austin 1999, pet. denied) (citing *Zac Smith & Co. v. Otis Elevator,* 734 S.W.2d 662, 666 (Tex.1987); *Solow v. Century Assets Corp.,* 12 S.W.3d 512, 516 (Tex.App.-Beaumont 1999, no pet.); *Vosko,* 909 S .W.2d at 100. We conclude appellants are not shielded from the exercise of jurisdiction solely based upon agency principles. Accordingly, we will examine whether appellants' contacts are sufficient to establish jurisdiction.

### The Long-arm Statute

Personal jurisdiction under the long-arm statute extends to non-resident defendants that either continuously or systematically "do business" in Texas or who are parties to litigation arising from or related to business they conducted in Texas. TEX.CIV.PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). Under section 17.042 of the civil practices and remedies code, a non-resident "does business" in Texas if they (1) contract with a Texas resident, by mail or otherwise, and either party is to perform the contract in whole or in part in Texas; (2) commit a tort in whole or in part in Texas; or (3) recruit Texas residents, directly, or through an intermediary located in Texas, for employment inside or outside the state. The doing business reach of the Texas long-arm statute extends as far as the federal constitutional limits of due process. *Guardian Royal,* 815 S.W.2d at 226 (Tex.1991).

 **\*4** In its amended petition, appellees assert appellants were doing business in Texas because they (1) contracted with a Texas resident by mail and appellee was to perform the contract in Texas, and (2) appellees misrepresented the terms of the Premier investment to appellee while in Texas, thus committing a tort in Texas.

When reaching a decision to exercise or decline jurisdiction based on the alleged commission of a tort by a defendant, the trial court relies only on the necessary jurisdictional facts and not the underlying merits of the case. *Arterbury v. Am. Bank & Trust Co.,* 553 S.W.2d 943, 948 (Tex.Civ.App.-Texarkana 1977, no writ). Ultimate tort liability is not at issue in determining the jurisdictional facts. *Portland Sav. & Loan Ass'n v. Bernstain,* 716 S.W.2d 532, 535 (Tex.App.-Corpus Christi 1985, writ ref'd n.r.e .). The proof necessary to sustain jurisdiction based upon the commission of a tort is that the purposeful act was committed in Texas. *Aterbury,* 553 S.W.2d at 947. Here, appellees alleged that appellants made misrepresentations to Kornman in Texas, and knew

A.E. Marketing would perform its portion of the contract from Texas. Appellants do not dispute the requirements of the long arm statute have been met. Accordingly, we will determine whether jurisdiction over appellants violates due process.

### Specific Jurisdiction

The United States Supreme Court has refined the minimum contacts analysis into specific and general jurisdiction. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414-15 (1984) Specific jurisdiction arises when a defendant commits an act in Texas that gives rise to the cause of action against him. *Schlobohm,* 784 S.W.2d at 357. General jurisdiction arises when a defendant has continuing and systematic contacts with Texas. *Id .* When general jurisdiction is asserted, the minimum contacts analysis is more demanding and requires a showing of substantial activities in the forum state. *Id.* A.E. Marketing does not contest the lack of general jurisdiction. It asserts only that appellants are subject to specific jurisdiction.

When reviewing an assertion of specific jurisdiction, the minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation. *Guardian Royal,* 815 S.W.2d at 228. To satisfy the minimum contacts requirements, the cause of action must arise out of or relate to the non-resident defendant's contact with the forum state. *Helicopteros,* 466 U.S. 408 at 414 n. 8. In addition, the non-resident defendant's activities must have been purposefully directed to the forum and the litigation must result from or relate to those activities. *In re S.A.V.,* 837 S.W.2d 80, 85 (Tex.1992).

### Minimum Contacts

Appellants contend their telephone, mail, and personal contacts are insufficient to establish minimum contacts with Texas. Appellants assert that any contact with appellee in Texas was fortuitous, involving the negotiation of a contract to be performed in Nevada, and not an attempt to purposefully avail themselves of the benefits of Texas. Moreover, appellants contend the trial court erred in holding appellants were subject to tort jurisdiction, because appellee failed to allege a tort was committed in Texas, and any acts committed were not purposefully directed toward Texas. Appellee asserts appellants' telephone calls, faxes, and visit to Texas establish minimum contacts, and that appellants'

misrepresentations and breaches of contract were committed in Texas, caused harm to appellee while in Texas, and were sufficiently plead.

**\*5** In their <mark>special appearance</mark>, each appellant offered affidavit testimony specifically asserting they were not residents of, and did not maintain offices, addresses, or telephone service in Texas. Meyers and Russell stated they had visited Texas many years ago for unrelated matters. Saunders asserts that although he traveled to Texas and met with Kornman on one occasion, the contact dealt with an unrelated business venture. Appellants presented no other evidence.

A.E. Marketing presented Kornman's testimony that appellants solicited him to invest in Premier while he was in Texas. Kornman received all correspondence and executed all contracts regarding the Premier transaction in Texas. During Saunders' trip to Texas, he and Kornman discussed the Premier investment, as well as other investments held by Kornman's son. A.E. Marketing also presented a list of appellants' contacts with Kornman or A.E. Marketing representatives over the months preceding and following the transaction. The list revealed no less than 95 telephone or mail contacts made with A.E. Marketing in Texas. In addition, appellee presented telephone bills of Saunders, Meyers, and Russell for calls ranging from December 1998, through September 1999, as evidence of the contacts established by appellants. Kornman testified he spoke with appellants an average of once a day. Moreover, the funds for the Premier investment were transferred from Texas to Nevada. All agreements between Premier and A.E. Marketing were signed in Texas.

A review of the record reveals sufficient evidence to support a conclusion that appellants purposefully communicated the alleged misrepresentations to A.E. Marketing in Texas by phone, mail, facsimile, and in person. Based on these facts, we find that appellants' contacts with Texas were not random or fortuitous. Appellants purposefully established contacts with Texas.

Having concluded appellant's contacts were, in fact, purposeful, we must now determine whether those contacts establish a substantial connection between the nonresident defendant and the forum state. *Guardian Royal,* 815 S.W.2d at 230. Here, a strong nexus exists between the tort that occurred in Texas and appellants' contacts with Texas. A.E. Marketing contends it relied on the misrepresentations made

by the appellants in telephone calls and other contacts occurring within the State. We find sufficient support in the record to conclude that appellants could reasonably foresee that A.E. Marketing would rely on the statements made by appellants. If a tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum state, it must reasonably anticipate being haled into court there to answer for its actions. *Mem'l Hosp. Sys. v. Fisher Ins. Agency, Inc.,* 835 S.W.2d 645, 650 (Tex.App.-Houston [14th Dist.] 1992, no writ)(op. on reh'g) (holding a single fraudulent telephone call is sufficient to establish minimum contacts). We are satisfied the trial court could have found appellants established sufficient minimum contacts with Texas to exercise jurisdiction.

### Fair Play and Substantial Justice

**\*6** Because we hold that a Texas court's exercise of jurisdiction in these circumstances withstands a minimum contacts analysis, we must now determine whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King,* 471 U.S. at 476. When the non-resident defendant has purposefully established minimum contacts with the forum state, it will only be in rare cases that the exercise of jurisdiction does not comport with fair play and substantial justice. *Guardian Royal,* 815 S.W.2d at 231. In making this determination, we are guided by (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interests of the several states in furthering substantive social policies. *Id.* To avoid being haled into a foreign court, the defendants must "present a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477.

Appellants contend the assertion of jurisdiction over them does not comport with fair play and substantial justice because appellants are not residents of Texas. As non-residents, it would be costly and time-consuming to litigate in Texas. The mere fact that appellants are not physically present in Texas is not persuasive when deciding personal jurisdiction. *Burger King,* 471 U.S. at 476. Distance alone is ordinarily insufficient to defeat jurisdiction because "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State

where he engages in economic activity." *Guardian Royal, 815 S.W.2d at 231* (citing *McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)*). In the present case, appellants are residents of states on each coast. It is likely that at least one appellant would be required to travel across the county to litigate wherever suit is brought. Appellants' trips to Nevada and Texas, indicate that traveling to Texas does not present an undue hardship.

Appellants further contend traditional notions of fair play and substantial justice would be offended because Texas has a low interest in adjudicating the suit. Texas' interest in ensuring that its citizens are protected from tortious acts by others and appellants' interest in obtaining convenient and effective relief weigh in favor of exercising jurisdiction over the dispute. The wide range of law to be applied in this dispute fails to weigh in favor or against any particular forum. Although Nevada law is involved due to the merger of two Nevada corporations, so, too, is Texas tort law; thus, Texas possesses an interest in the resolution of the dispute. We conclude the trial court's exercise of jurisdiction over appellants does not offend traditional notions of fair play and substantial justice. Appellant has failed to negate all grounds for the exercise of personal jurisdiction. Consequently, the trial court correctly overruled appellants' **special appearance**. We overrule appellants' issues and affirm the trial court's order.

**All Citations**

Not Reported in S.W.3d, 2001 WL 722509

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

2013 WL 690534
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas,
San Antonio Division.

Robert G. SAUCEDA, Plaintiff,
v.
WELLS FARGO BANK, N.A., Defendant.

CV. No. SA–12–CV–01094–
DAE.    |    Feb. 25, 2013.

*ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS*

DAVID ALAN EZRA, Senior District Judge.

**\*1** Before the Court is a Motion to Dismiss brought by Defendant Wells Fargo Bank, N.A. ("Defendant"). (Doc. # 2.) After careful consideration, the Court **GRANTS** Defendant's Motion to Dismiss.

*BACKGROUND*

On or about August 31, 2004, Plaintiff Robert Sauceda ("Plaintiff") entered into a loan transaction which was secured by a mortgage encumbering real property located at 9910 Shady Meadows, San Antonio, Texas 78245 (the "Subject Property"). ("Mot.," Doc. # 2 ¶ 2.) The Deed of Trust was recorded the Official Public Records of Bexar County. (*Id.*)

On November 5, 2012, Plaintiff filed suit in Texas state court seeking equitable relief in the form of an accounting and an injunction preventing the foreclosure sale of the Subject Property scheduled for November 6, 2012. (Doc. # 1 Ex. C.) Plaintiff obtained an *ex parte* temporary restraining order preventing Defendant from "posting or selling Plaintiff's homestead at auction ."(*Id.*)

On November 19, 2012, Defendant removed the instant case to federal court. (Doc. # 1.) On November 28, 2012, Defendant filed a Motion to Dismiss. (Doc. # 2.) Plaintiff did not file any Response in Opposition.

*STANDARD OF REVIEW*

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."Review is limited to the contents of the complaint and matters properly subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). In analyzing a motion to dismiss for failure to state a claim, "[t]he court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.' " *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir.2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir.2004)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss. *See Twombly,* 550 U.S. 544, 555–56 (2007). In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action. *See id.* at 556–57."The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation."*Iqbal,* 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations."*Tuchman v. DSC Commc'ns Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994); *see also Plotkin v. IP Axess Inc.,* 407 F.3d 690, 696 (5th Cir.2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

**\*2** When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court."*Twombly,* 550 U.S. at 558 (citation omitted). However, the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice.*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir.2002).

## DISCUSSION

In his pleading, Plaintiff seeks "a complete accounting of the sums paid and a reasonable opportunity to satisfy or reinstate Plaintiff's mortgage note owing to Defendant."(Mot. Ex. C ¶ 8.) In support of this request, he alleges that Defendant acted in bad faith by "failing to negotiate fairly and justly toward fixing the extent of and curing any default [on the mortgage]."(*Id.* ¶ 6.)

"An action for accounting may be a suit in equity, or it may be a particular remedy sought in conjunction with another cause of action."*Michael v. Dyke,* 41 S.W.3d 746, 754 (Tex.App.2001). To be entitled to an accounting, a plaintiff usually must have a contractual or fiduciary relationship with the party from which the plaintiff seeks the accounting. *T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n,* 79 S.W.3d 712, 717 (Tex.App.2002). An action for an accounting is a proper action "when the facts and accounts in issue are so complex that adequate relief cannot be obtained by law."*Hutchings v. Chevron U.S.A.,* 862 S.W.2d 752, 762 (Tex.App.1993) (citing *Richardson v. First Nat'l Life Ins. Co.,* 419 S.W.2d 836, 838 (Tex.1967)). Granting an accounting is within the discretion of the trial court. *Sw. Livestock & Trucking Co. v. Dooley,* 884 S.W.2d 805, 809 (Tex.App.1994).

In the instant case, Plaintiff has not argued that the facts surrounding his mortgage payments "are so complex that adequate relief cannot be obtained by law."Thus, to the extent that Plaintiff seeks to pursue a stand-alone equitable action for an accounting, he has not plead sufficient facts to warrant such an action.

Additionally, to the extent Plaintiff appears to argue that an accounting might serve as a remedy for some type of "bad faith" claim, his action for an accounting fails because he fails to state a claim for bad faith. The Texas Supreme Court has expressly refused to impose an obligation of good faith and fair dealing on the performance of contracts absent a "special relationship marked by shared trust or an imbalance in bargaining power."*See Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987); *see also City of Midland v. O'Bryant,* 18 S.W.3d 209, 215 (Tex.2000). Moreover, "[t]he relationship of mortgagor and mortgagee ordinarily does not involve a duty of good faith."*FDIC v. Coleman,* 795 S.W.2d 706, 708–09 (Tex.1990) (citing *English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983)). In the instant case, Plaintiff does not even plead a formal cause of action for the tort of bad faith, let alone allege some kind of "special relationship" with Defendant that would give rise to a bad faith claim under Texas law. As such, Plaintiff has failed to state a claim for bad faith, and the remedy of an action for accounting must therefore also fail.

## CONCLUSION

**\*3** For the reasons stated above, the Court **GRANTS** Defendant's Motion to Dismiss. (Doc. # 2.)

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 690534

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

🟨 KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Cornerstone Healthcare Group Holding, Inc. v. Reliant Splitter, L.P., Tex.App.-Dallas, June 5, 2014

310 S.W.3d 868
Supreme Court of Texas.

SPIR STAR AG, Petitioner,

v.

Louis KIMICH, Respondent.

No. 07–0340. | Argued Dec. 10, 2008. | Decided March 12, 2010.

**Synopsis**

**Background:** Worker who was seriously injured by rupture of high-pressure hose brought products liability action against distributor and German manufacturer. The 125th District Court, Harris County, John A. Coselli, Jr., J., denied manufacturer's special appearance. Manufacturer appealed. The Houston Court of Appeals, First District, Evelyn V. Keyes, J., 311 S.W.3d 1, affirmed. Manufacturer's petition for review was granted.

**Holdings:** The Supreme Court, Jefferson, C.J., held that:

[1] manufacturer purposefully availed itself of benefits and protections of Texas law by using Texas distributor, and

[2] exercising jurisdiction was consistent with traditional notions of fair play and substantial justice.

Affirmed.

West Headnotes (26)

**[1]** **Constitutional Law**
👉 Manufacture, distribution, and sale

Foreign manufacturer is subject to specific personal jurisdiction in Texas consistently with due process clause when it intentionally targets Texas as the marketplace for its products, and using a distributor-intermediary for that purpose

provides no haven from the jurisdiction of a Texas court. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote

**[2]** **Judgment**
👉 Jurisdiction of the person and subject-matter

To render a binding judgment, a court must have both subject matter jurisdiction over the controversy and personal jurisdiction over the parties.

7 Cases that cite this headnote

**[3]** **Appeal and Error**
👉 Cases Triable in Appellate Court
**Courts**
👉 Determination of questions of jurisdiction in general

Whether a court has personal jurisdiction over a defendant is determined as a matter of law, which appellate courts review de novo.

12 Cases that cite this headnote

**[4]** **Appeal and Error**
👉 Particular findings implied

When a trial court does not issue findings of fact or conclusions of law to support its determination on motion for special appearance, appellate court presumes that all factual disputes were resolved in favor of the trial court's ruling.

13 Cases that cite this headnote

**[5]** **Courts**
👉 Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Long-arm statute reaches as far as the federal constitutional requirements for due process will allow; consequently, the statute's requirements are satisfied if exercising jurisdiction comports with federal due process limitations. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

7 Cases that cite this headnote

**[6]    Constitutional Law**
    Non-residents in general

Personal jurisdiction over nonresident defendants is constitutional under the due process clause only when: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

23 Cases that cite this headnote

**[7]    Constitutional Law**
    Non-residents in general

When a nonresident defendant has purposefully availed itself of the privilege of conducting business in a foreign jurisdiction, it is both fair and just, under the due process clause, to subject that defendant to the authority of that forum's courts. U.S.C.A. Const. Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

2 Cases that cite this headnote

**[8]    Courts**
    Unrelated contacts and activities; general jurisdiction
    **Courts**
    Related contacts and activities; **specific jurisdiction**

A defendant's contacts with a forum can give rise to either specific or general jurisdiction.

5 Cases that cite this headnote

**[9]    Courts**
    Unrelated contacts and activities; general jurisdiction

"General jurisdiction" exists when a defendant's contacts are continuous and systematic, even if the cause of action did not arise from activities performed in the forum state.

5 Cases that cite this headnote

**[10]    Courts**
    Related contacts and activities; **specific jurisdiction**

A court has "**specific jurisdiction**" over a defendant if its alleged liability arises from or is related to an activity conducted within the forum.

5 Cases that cite this headnote

**[11]    Courts**
    Related contacts and activities; **specific jurisdiction**

To determine **specific jurisdiction**, courts focus on the relationship among the defendant, the forum, and the litigation.

2 Cases that cite this headnote

**[12]    Courts**
    Related contacts and activities; **specific jurisdiction**

**Specific jurisdiction** is appropriate when (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts.

13 Cases that cite this headnote

**[13]    Constitutional Law**
    Non-residents in general

The touchstone of jurisdictional due process is purposeful availment which requires a defendant to seek some benefit, advantage, or profit by availing itself of the jurisdiction. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[14]    Courts**
    Commercial Contacts and Activities; Contracts and Transactions

Sellers who reach beyond one state and create continuing relationships with residents of another state are subject to the **specific jurisdiction** of the latter in suits arising from those activities. V.T.C.A., Civil Practice & Remedies Code § 17.042.

4 Cases that cite this headnote

**[15]   Constitutional Law**
        Manufacture, distribution, and sale

Seller's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act that is purposefully directed toward the forum state and could subject seller to personal jurisdiction consistently with due process; rather, some additional conduct in required indicating intent or purpose to serve the market in the forum state. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

**[16]   Corporations and Business Organizations**
        Jurisdiction and venue in general

To fuse two corporations for jurisdictional purposes, a parent must control the internal business operations and affairs of the subsidiary to an extent beyond its role as an investor.

Cases that cite this headnote

**[17]   Constitutional Law**
        Manufacture, distribution, and sale

Nonresident defendant's purposeful availment of local markets potentially subjecting defendant to specific personal jurisdiction consistently with due process may be either direct, through defendant's own offices and employees, or indirect, through affiliates or independent distributors. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[18]   Constitutional Law**
        Manufacture, distribution, and sale

If sale of a product is not simply an isolated occurrence, but arises from the efforts of the manufacturer to serve directly or indirectly, the market for its product in other states, it is not unreasonable under due process clause to subject it to specific personal jurisdiction in one of those states if its allegedly defective merchandise has

there been the source of injury to its owner or to others. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[19]   Courts**
        Commercial Contacts and Activities; Contracts and Transactions

Stream-of-commerce analysis is relevant only to the exercise of **specific jurisdiction**; it provides no basis for exercising general jurisdiction over a nonresident defendant.

2 Cases that cite this headnote

**[20]   Courts**
        Related contacts and activities; **specific jurisdiction**

**Specific jurisdiction** is limited to claims that arise out of or relate to a nonresident's forum contacts; there must be a substantial connection between the defendant's contacts and the operative facts of the litigation.

5 Cases that cite this headnote

**[21]   Courts**
        Agents, Representatives, and Other Third Parties, Contacts and Activities of as Basis for Jurisdiction
**Courts**
        Related or affiliated entities; parent and subsidiary

When a nonresident's only contacts with Texas involve indirect sales through a distributor or subsidiary, **specific jurisdiction** is limited to claims arising out of those sales.

1 Cases that cite this headnote

**[22]   Constitutional Law**
        Manufacture, distribution, and sale

Nonresident manufacturer must have intended to serve the Texas market to be subject to specific personal jurisdiction consistently with due process clause. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[23]** **Constitutional Law**
👉 Manufacture, distribution, and sale

**Courts**
👉 Particular cases

German manufacturer of high-pressure hoses purposefully availed itself of benefits and protections of Texas law by using Texas distributor and satisfied additional conduct standard for exercising specific personal jurisdiction consistently with due process clause in products liability action, even though manufacturer's shareholders formed the distributor and manufacturer relinquished title in Europe and did not receive distributor's profits; manufacturer directly targeted state's market. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[24]** **Constitutional Law**
👉 Manufacture, distribution, and sale

**Courts**
👉 Particular cases

Exercising specific personal jurisdiction over German manufacturer of high-pressure hoses was consistent with traditional notions of fair play and substantial justice and, thus, with due process clause in products liability action; manufacturer's president spent six months of year in Texas as distributor's president, other directors had traveled to state, manufacturer's directors owned most of distributor, and adjudicating claims against distributor and manufacturer in same place would be more efficient. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[25]** **Constitutional Law**
👉 Non-residents in general

Only in rare cases will the exercise of jurisdiction not comport with due process requirements of fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. U.S.C.A. Const.Amend. 14.

13 Cases that cite this headnote

**[26]** **Courts**
👉 Appellate jurisdiction of Supreme Court in general

Supreme Court's jurisdiction over interlocutory appeal was given by Court of Appeals' disparate holding differing from Supreme Court opinion on consideration of international interest in efficient resolution as factor in due process challenge to personal jurisdiction. U.S.C.A. Const.Amend. 14; V.T.C.A., Government Code § 22.225(c, e).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*870** Sarah B. Duncan, Elissa Gail Underwood, Mike A. Hatchell, Locke Lord Bissell & Liddell, LLP, Austin, TX, Rick Lee Oldenettel, Oldenettel & Associates, P.C., Houston, TX, for Petitioner.

Scott Rothenberg, Law Offices of Scott Rothenberg, Keith M. Fletcher, Simmons & Fletcher, Houston, TX, for Respondent.

**Opinion**

**\*871** Chief Justice JEFFERSON delivered the opinion of the Court.

**[1]** A foreign manufacturer sold its products in Texas through a Texas distributor. We must decide whether the use of that distributorship insulates the manufacturer from the reach of a Texas court when one of the products injures a Texas citizen. We hold that a manufacturer is subject to specific personal jurisdiction in Texas when it intentionally targets Texas as the marketplace for its products, and that using a distributor-intermediary for that purpose provides no haven from the jurisdiction of a Texas court. Because, in this case, personal jurisdiction comports with traditional notions of fair play and substantial justice, we affirm the court of appeals' judgment.

**I. Factual and Procedural Background**

Spir Star AG ("AG"), a German corporation headquartered in Rimbach, Germany, manufactures high-pressure hoses and fittings for sale throughout the world. AG is owned by three German citizens: Werner Büchner, Gerhard Strobach, and Walter de Graaf. In 1995, AG decided that Houston would be the optimal location for a distributorship because the Texas coastal region's numerous refineries were well suited for AG's energy-related products. AG's executives traveled to Houston, leased office space, and established a Texas distributorship, Spir Star Inc., now Spir Star Limited ("Limited"). AG's directors gave Limited permission to use the trademarked "Spir Star" name free of charge. Although it sells products other than AG's, Limited is AG's exclusive distributor in Texas and North America.

AG manufactures hoses that are used primarily in the energy industry. Each month, Limited purchases a maritime container full of AG's products, which are then shipped to the port of Houston. Limited assembles the hoses using AG–provided training and tools and sells them to customers in Texas and elsewhere. Title to the hoses passes to Limited in Europe. The Texas distributorship accounts for thirty-five percent of AG's annual sales, although Limited and AG do not share profits or finances with each other.

De Graaf, AG's president, is also the president of Limited. He splits his time between Houston and Germany, and regularly conducts AG's business in Texas. De Graaf and AG's other two officers own seventy-five percent of Limited; twenty-five percent is owned by Limited employees.

In 2003, an AG high-pressure hose ruptured and seriously injured Louis Kimich. AG had sold the hose to Limited, which in turn sold it to Kimich's employer. Kimich sued his employer and the premises owner, and later added claims against AG and Limited. [1]

AG filed a special appearance, which the trial court and the court of appeals denied. 311 S.W.3d 1. We granted AG's petition for review, 51 Tex. Sup.Ct. J. 1403, 1416 (Sept. 26, 2008), and now affirm.

## II. Applicable Law

 [2]   [3]   [4]   To render a binding judgment, a court must have both subject matter jurisdiction over the controversy and personal jurisdiction over the parties. *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996). Whether a court has personal jurisdiction over a defendant is determined as a matter of law,

which appellate courts review de novo. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). When, as here, a trial court does not issue findings of fact or conclusions of law to **\*872** support its special-appearance determination, we presume that all factual disputes were resolved in favor of the trial court's ruling. *Id.*

 [5]   Texas courts have personal jurisdiction over a nonresident defendant when (1) the Texas long-arm statute provides for it, and (2) the exercise of jurisdiction is consistent with federal and state due process guarantees. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002). Our long-arm statute reaches " 'as far as the federal constitutional requirements for due process will allow.' " *Id.* (quoting *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991)). Consequently, the statute's requirements are satisfied if exercising jurisdiction comports with federal due process limitations. *Id.*

 [6]   If a defendant has never invoked the protections that a forum offers its residents, or has no purposeful contact with it, the forum court's jurisdiction is confined. Personal jurisdiction over nonresident defendants is constitutional only when: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 167 (Tex.2007). The catchphrase "traditional notions of fair play and substantial justice," first used in *Milliken v. Meyer,* 311 U.S. 457, 463–64, 61 S.Ct. 339, 85 L.Ed. 278 (1940), has its origins in a 1917 decision that referred to both "fair play" and "substantial justice" when the Supreme Court considered whether service by publication comported with the due process clause. *See McDonald v. Mabee,* 243 U.S. 90, 91–92, 37 S.Ct. 343, 61 L.Ed. 608 (1917) (reversing a judgment of the Supreme Court of Texas). Since that time, we have incorporated the phrase into our own jurisprudence, beginning with *O'Brien v. Lanpar Co.,* 399 S.W.2d 340, 342 (Tex.1966) (quoting *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154). The phrase remains a hallmark of personal jurisdiction today. *See, e.g., Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 337 (Tex.2009); *PHC–Minden,* 235 S.W.3d at 166; *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007).

 [7]   Although this "fair play" and "substantial justice" test is well known to appellate courts, the expression is imprecise.

It gains meaning, however, when viewed in light of the "minimum contacts" a defendant has with the forum. *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154. Significant contacts suggest that the defendant has taken advantage of forum-related benefits, while minor ones imply that the forum itself was beside the point. When a nonresident defendant has purposefully availed itself of the privilege of conducting business in a foreign jurisdiction, it is both fair and just to subject that defendant to the authority of that forum's courts. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1984).

 **[8]**   **[9]**   A defendant's contacts with a forum can give rise to either specific or general jurisdiction. *CSR,* 925 S.W.2d at 595. General jurisdiction exists when a defendant's contacts are continuous and systematic, even if the cause of action did not arise from activities performed in the forum state. *Id.* Here, the court of appeals concluded that AG's continuous and systematic contacts with Texas established general jurisdiction. 311 S.W.3d at 5. We do not reach that issue, however, because we conclude instead that the trial court had specific jurisdiction over AG.

 **\*873  III. AG satisfies the "additional conduct" standard required for specific jurisdiction.**
 **[10]**   **[11]**   **[12]**   A court has specific jurisdiction over a defendant if its alleged liability arises from or is related to an activity conducted within the forum. *CSR,* 925 S.W.2d at 595. Unlike general jurisdiction, which requires a "more demanding minimum contacts analysis," *id.* at 595, specific jurisdiction "may be asserted when the defendant's forum contacts are isolated or sporadic, but the plaintiff's cause of action arises out of those contacts with the state." 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (3d ed. 2002). In such cases, "we focus on the 'relationship among the defendant, the forum[,] and the litigation.' " *Moki Mac,* 221 S.W.3d at 575–76 (quoting *Guardian Royal,* 815 S.W.2d at 228). Specific jurisdiction is appropriate when (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts. *See Retamco,* 278 S.W.3d at 338.

 **[13]**   **[14]**   The "touchstone of jurisdictional due process [is] 'purposeful availment.' " *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). Purposeful availment requires a defendant to seek some "benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id.* at 785. Thus, sellers who reach beyond one state and create

continuing relationships with residents of another state are subject to the specific jurisdiction of the latter in suits arising from those activities. *Moki Mac,* 221 S.W.3d at 575.

 **[15]**   Notably, however, a seller's awareness " 'that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.' " *CSR,* 925 S.W.2d at 595 (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion)). Instead, our precedent generally follows Justice O'Connor's plurality opinion in *Asahi,* which requires some "additional conduct"—beyond merely placing the product in the stream of commerce-that indicates "an intent or purpose to serve the market in the forum State." *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026; *Moki Mac,* 221 S.W.3d at 577; *Michiana,* 168 S.W.3d at 786. Examples of this additional conduct include: (1) "designing the product for the market in the forum State," (2) "advertising in the forum State," (3) "establishing channels for providing regular advice to customers in the forum State," and (4) "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026; *see also Moki Mac,* 221 S.W.3d at 577; *Michiana,* 168 S.W.3d at 786; *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 201 (Tex.1985). In this case, Kimich argues that AG's substantial sales plus utilization of Limited as its distributor meets this standard.

 **[16]**   AG relies on a different line of cases that reject jurisdiction "[w]hen a nonresident defendant purposefully structures transactions to avoid the benefits and protections of a forum's laws." *Am. Type Culture,* 83 S.W.3d at 808. Twice recently we have rejected attempts to sue foreign subsidiaries in Texas based on a parent corporation's contacts, holding that jurisdiction over one does not automatically establish jurisdiction over the other. *PHC–Minden,* 235 S.W.3d at 172; *see also BMC Software,* 83 S.W.3d at 800. Instead, to "fuse" two corporations for jurisdictional purposes, a parent must "control[ ] the **\*874** internal business operations and affairs of the subsidiary" to an extent beyond its role as an investor. *PHC–Minden,* 235 S.W.3d at 175.

AG argues the same principles apply here, even though this case involves a foreign corporation's use of a Texas distributorship rather than a parent/subsidiary relationship. The issue is not, however, whether Limited's actions in Texas

can be imputed to AG. Rather, our concern is with AG's own conduct directed toward marketing its products in Texas.

 [17]    [18]    When an out-of-state manufacturer like AG specifically targets Texas as a market for its products, that manufacturer is subject to a product liability suit in Texas based on a product sold here, even if the sales are conducted through a Texas distributor or affiliate. *See Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 ("Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, ... marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."). In such cases, it is not the actions of the Texas intermediary that count, but the actions of the foreign manufacturer who markets and distributes the product to profit from the Texas economy. As the United States Supreme Court stated in *World–Wide Volkswagen Corp. v. Woodson*, purposeful availment of local markets may be either direct (through one's own offices and employees) or indirect (through affiliates or independent distributors):

> [I]f the sale of a product of a manufacturer ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer ... to serve *directly or indirectly,* the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.

*World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (emphasis added).

 [19]    There are several limitations inherent in this rule. First, it is limited to the **specific jurisdiction** context, because stream-of-commerce analysis "is relevant only to the exercise of **specific jurisdiction**; it provides no basis for exercising general jurisdiction over a nonresident defendant." *Purdue Research Found. v. Sanofi–Synthelabo, S.A.,* 338 F.3d 773, 788 (7th Cir.2003); *accord D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.,* 566 F.3d 94, 106 (3rd Cir.2009); *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 380 (5th Cir.2002); *Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 612 (8th Cir.1994); *Moki Mac,* 221 S.W.3d at 579; Joseph S. Pevsner and Gregory W. Curry, *Down the Block But Outside Jurisdiction: Personal Jurisdiction in a Modern World,* 29 TEX. TECH L.REV. 977, 991 (1998). If sales alone created general jurisdiction,

a foreign manufacturer like AG could be sued in Texas for labor practices occurring in Germany even though they had nothing to do with Texas.

 [20]    [21]    Second, **specific jurisdiction** is limited to claims that "arise out of or relate to" a nonresident's forum contacts. *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174; *Retamco,* 278 S.W.3d at 338. In such cases, there must be a "substantial connection" between the defendant's contacts and the operative facts of the litigation. *See Moki Mac,* 221 S.W.3d at 585. So when a nonresident's only contacts with Texas involve indirect sales through a distributor or subsidiary, **specific jurisdiction** is limited to claims arising out of those sales. *See, e.g., Alpine View Co. Ltd. v.* **\*875** *Atlas Copco AB,* 205 F.3d 208, 216 (5th Cir.2000) ("Appellants are correct in noting that we have not, in our decisions dealing with the stream-of-commerce theory, entirely foreclosed its application to cases not involving product liability claims. We need not decide here whether the theory is, or is not applicable to a broader range of cases.").

Third, not every product claim against a foreign manufacturer is included; there must be a substantial connection. That similar products were sold in Texas would not create a substantial connection as to products that were not. Similarly, a nonresident that buys a Texas distributor might have no substantial connection with sales that occurred before that purchase. *See Commonwealth Gen. Corp. v. York,* 177 S.W.3d 923, 924 (Tex.2005).

 [22]    Finally, the manufacturer must have intended to serve the Texas market. *CSR,* 925 S.W.2d at 596. While use of a Texas distributor may satisfy this requirement, there may be situations in which it does not. A Texas distributorship may increase the manufacturer's bottom line because it is more efficient or has greater access to economies of scale, and not because it is intended to serve Texas consumers. *Cf. Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 ("Additional conduct" may include "marketing the product through a distributor *who has agreed to serve as the sales agent in the forum State.*" (emphasis added)).

Many transactions can be structured to avoid any benefit from or availment of Texas law—but not all. A nonresident manufacturer does not avoid Texas law merely by forming a Texas affiliate or utilizing a Texas distributor to sell its products in Texas markets. Just as manufacturers cannot escape liability for defective products by selling them through

a subsidiary or distributor, neither can they avoid jurisdiction related to such claims by the same means.

 **[23]**  The question is whether AG has purposefully directed acts towards Texas or purposefully availed itself of the benefits and protections of Texas law. We conclude that it has.

### A. AG marketed its products exclusively through Limited, a Texas distributor.

AG argues that its individual owners—rather than AG itself—established Limited. Even if that were true, by "marketing [its] product through a distributor who has agreed to serve as the sales agent in the forum state," AG has met *Asahi*'s "additional conduct standard." *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026.

AG also contends that, because it receives none of Limited's profits and relinquishes title to the hoses before they reach Texas, AG does not benefit from Limited's Texas connections. But AG reaps substantial economic gain through its sales to Limited, its largest distributor by far, responsible for over one-third of AG's annual sales. *See Moki Mac,* 221 S.W.3d at 578 (finding purposeful availment because of foreign corporation's "additional conduct through which it aimed to get extensive business in or from this state"). Indeed, **specific jurisdiction** over foreign manufacturers is often premised on sales by independent distributors. *See, e.g., Bridgeport Music, Inc. v. Still N The Water Publ'g,* 327 F.3d 472, 483–84 (6th Cir.2003) (finding **specific jurisdiction** under "additional conduct" standard based in part on nationwide distribution agreement with independent distributor); *Kuenzle v. HTM Sport–Und Freizeitgeräte AG,* 102 F.3d 453, 458 (10th Cir.1996) (noting that "[t]he actions of an independent distributor may not insulate a foreign company from **specific jurisdiction**"); *Tobin v. Astra Pharm.* **\*876** *Prods., Inc.,* 993 F.2d 528, 533–34 (6th Cir.1993) (holding that foreign drug manufacturer who marketed its product in Kentucky through independent distributor was nonetheless subject to personal jurisdiction in forum under *Asahi*'s "additional conduct" standard); *see also Pennzoil Prods. Co. v. Colelli & Assocs.,* 149 F.3d 197, 206–07 (3d Cir.1998) (applying "additional conduct" standard and finding **specific jurisdiction** in Pennsylvania over Ohio chemical producer who sold products to independent Ohio oil well producers that then sold oil to Pennsylvania refineries).

Thus, it is not persuasive that title to the hoses passed in Europe, rather than in Texas. *See Renner v. Lanard Toys Ltd.,* 33 F.3d 277, 282 (3d Cir.1994) (noting that "a

foreign manufacturer or seller [which] rids itself of title by a sale F.O.B. a foreign port [does not] insulate [itself] from jurisdiction if there is the other type of activity" indicating purposeful availment); *Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.,* 898 F.2d 1071, 1073 (5th Cir.1990) (observing that "the simple fact that a sales transaction is consummated outside that jurisdiction does not prevent the sale from forming the basis of jurisdiction"); *Benitez–Allende v. Alcan Aluminio Do Brasil, S.A.,* 857 F.2d 26, 30 (1st Cir.1988) (holding that title passing in Brazil "is beside the point" in a **specific jurisdiction** analysis); Charles W. "Rocky" Rhodes, *The Predictability Principle in Personal Jurisdiction Doctrine: A Case Study on the Effects of a "Generally" Too Broad, but "Specifically" Too Narrow Approach to Minimum Contacts,* 57 BAYLOR L.REV. 135, 213 (2005).

### B. AG intended to serve the Texas market, and Kimich's claim arose from AG's purposeful direction of acts towards Texas.

Not only did AG market its products through a distributor in the forum state, AG directly targeted the Texas market. In *CSR,* we held that there was no **specific jurisdiction** over CSR, a foreign asbestos supplier whose product wound up in Texas: CSR's knowledge that its buyer, a pipe manufacturer, had a plant in Texas was not determinative because that manufacturer also had plants in at least four other states, and CSR's awareness that the stream of commerce may sweep the product into Texas " '[did] not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.' " *CSR,* 925 S.W.2d at 595 (quoting *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026). Instead, we held that "there must be some indication that CSR intended to serve the Texas market." *Id.* at 595.

This is consistent with federal authority holding that no **specific jurisdiction** exists over a manufacturer whose product just happens to end up in the forum state. For example, the Seventh Circuit Court of Appeals recently held that a Danish jack manufacturer was not subject to **specific jurisdiction** in Indiana, because there was no evidence that the manufacturer had "an awareness or expectation that some of its products would be purchased in Indiana":

> In *World–Wide Volkswagen,* the Supreme Court held that personal jurisdiction was lacking because, in part, there was no evidence in the record that any products that

the defendants distributed (in that case, automobiles) were ever sold to retail customers in the forum state. Similarly in this case, Jennings produced no evidence that any of AC Hydraulic's products (including the jack at issue in this suit) were ever sold in Indiana. Jennings claims that an Indiana company purchased the jack, but even if we were to accept this unsubstantiated allegation as evidence, Jennings does not tell us in what state or from whom this company purchased the **\*877** jack. Additionally, Jennings established that AC Hydraulic sells some of its products to two distributors in Florida, but she did not present any volume information for these sales or provide us with information about where the distributors resell the products, so the scope of any alleged distribution in the rest of the United States, and whether any AC Hydraulic products have been distributed in Indiana, cannot be determined. The bottom line is that, relying on the sparse evidence that Jennings presented, we do not know how the jack in question got to Indiana, or if any other AC Hydraulic products have ever been sold there. It is possible that the "unilateral activity" of a third party, *rather than the defendant's distribution scheme,* landed the jack in Indiana, which is the very scenario that doomed the plaintiffs' case in *World–Wide Volkswagen.*

*Jennings v. AC Hydraulic A/S,* 383 F.3d 546, 550–51 (7th Cir.2004) (internal citations omitted)(emphasis added); [2] *see also Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671, 683 (1st Cir.1992) (finding no <mark>specific jurisdiction</mark> over foreign corporation because there was "no evidence that [corporation] intended to serve the market in Maine").

Contrast those cases with the situation here. AG's board of directors created Limited because AG wanted to take advantage of "the biggest economy in the world." Strobach testified that "the whole board ... decided that [Houston would

be the best place for a distributor] because we knew that— we thought that would be the greatest need, because of the immediate vicinity of all the refineries." Strobach traveled to Houston because "we wanted to establish an office in Houston." The Board's selection of a Houston office preceded by a few days the arrival of Walter De Graaf, president of both AG and Limited and an employee of each, who signed the documents that created Limited. De Graaf spends half the year working in Houston and is paid by both AG and Limited while there; his contract with AG authorizes him to act on its behalf no matter where he is.

After deciding to establish Limited, AG authorized Limited to use the "Spir Star" name, and Limited became AG's exclusive distributor in Texas and throughout North America. According to one of AG's directors, Limited has been "very successful indeed," and it is AG's largest customer by far. AG has sold millions of dollars worth of hoses to Limited; each month, AG sells Limited a maritime container full of reels of hose, which are shipped to the port of Houston. AG supplies Limited with crimping and assembly tools and written assembly standards, and AG personnel train Limited's employees in hose assembly.

AG's website, authored by one of its employees, states that:

> In order to cover the world-wide market and provide quick service to our customers, office [sic] were opened in the following countries: SPIR STAR France, S.A.R.L. 1991 in Haguenau/France, SPIR STAR Inc. [Limited] 1995 in Housten [sic]/Texas (U.S.A.) and SPIR STAR Asia Pty. Ltd. 1999 in Singapore.

Limited's website, which is written from AG's perspective, states that "the decision was made that the company should expand its activities outside of Europe" and that "we ventured across the Atlantic and **\*878** founded SPIR STAR, Ltd. in Houston, Texas." The same website touts Limited as "the main link for our growing market share in North and South America." Under the heading "Spir Star Companies," four entities are listed: AG, Limited, Spir Star France, and Spir Star Asia, PTE Ltd. De Graaf, AG's president, testified that he reviewed the content of both websites prior to their publication. The trial court could have believed, as Kimich argues, that AG, acting through its directors and officers, created Limited or that the website statements were admissions by AG. Or the trial court simply could

have determined that AG "marketed [its] product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026. If the foregoing evidence does not indicate "an intent or purpose to serve the market in [Texas]," it is difficult to imagine what would. *Cf. id.* (finding no **specific jurisdiction** in California because "respondents have not demonstrated any action by Asahi to purposefully avail itself of the California market").

Finally, Kimich's claim arose from AG's Texas contacts. *See World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559 ("[I]f the sale of a product of a manufacturer ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer ... to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others."); *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 374 (5th Cir.1987) ("When the contact stems from a product, sold or manufactured by the foreign defendant, which has caused harm in the forum state, the court has [**specific jurisdiction**]" provided defendant purposefully availed itself of the privilege of conducting activities within the forum); *cf. Hicks v. Kawasaki Heavy Indus.,* 452 F.Supp. 130, 134 (M.D.Pa.1978)(noting that "there exists a direct relationship between the cause of action and [Kawasaki's] contacts with the state," as motorcycle sold by foreign manufacturer to distributor "is alleged to have caused injury in the state to a resident of the state"), *cited in Asahi,* 480 U.S. at 112–13, 107 S.Ct. 1026.

### IV. Exercising jurisdiction over AG comports with traditional notions of fair play and substantial justice.

 **[24]**     **[25]**     **[26]**    Because AG's Texas contacts support **specific jurisdiction**, we must now determine whether jurisdiction is consistent with traditional notions of fair play and substantial justice. *Retamco,* 278 S.W.3d at 341. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal,* 815 S.W.2d at 231 (citing *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174). To evaluate this component, we must consider AG's contacts in light of: (1) "the burden on the defendant"; (2) "the interests of the forum state in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; (4) the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several

nations or states in furthering fundamental substantive social policies.[3] *Id.* at 231. To defeat jurisdiction, **\*879** AG must present " 'a compelling case that the presence of some consideration would render jurisdiction unreasonable' "— something AG has not done. *See id.* (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174).

Requiring AG to defend Kimich's claim in Texas would not pose an undue burden for the company. The fact that AG is headquartered in Germany cannot, by itself, defeat jurisdiction. *See id.* at 231 ("Nor is distance alone ordinarily sufficient to defeat jurisdiction: 'modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.' " (quoting *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957))). Houston is familiar territory for AG's leadership: its president spends six months of the year there (and can carry on AG's business while there),[4] two of AG's directors traveled to Houston to establish Limited, and one of them returned—at AG's expense—to celebrate Limited's fifth anniversary. *Cf. id.* at 232–33, 78 S.Ct. 199 (finding jurisdiction unreasonable because, among other things, the English defendant was unaffiliated with any American companies). Three of AG's directors collectively own seventy-five percent of Limited, which will be litigating in Houston.

Moreover, Texas has a significant interest in exercising jurisdiction over controversies arising from injuries a Texas resident sustains from products that are purposefully brought into the state and purchased by Texas companies. *Cf. Asahi,* 480 U.S. at 114, 107 S.Ct. 1026 ("Because the plaintiff is not a California resident, California's legitimate interests in the dispute have considerably diminished."); *Guardian,* 815 S.W.2d at 233 ("[S]ince Guardian Royal and U.S. Fire are neither Texas consumers nor insureds, Texas' interest in adjudicating the dispute ... is considerably diminished."). Not only would Kimich face an undue burden were he forced to litigate his product liability claim against AG in Germany, but because the claims against Limited will be heard in Texas, it would be more efficient to adjudicate the entire case in the same place. *See Retamco,* 278 S.W.3d at 341 ("[The plaintiff] has an interest in resolving this controversy in Texas because that is where the litigation began."). We recognize "the unique and onerous burden placed on a party called to defend a suit in a foreign legal system." *CSR,* 925 S.W.2d at 595 (citing *Asahi,* 480 U.S. at 114, 107 S.Ct. 1026). In this case, that burden is minimal and is outweighed by Kimich's and Texas's interests **\*880** in adjudicating the dispute here. *See*

*Asahi,* 480 U.S. at 114, 107 S.Ct. 1026. Asserting personal jurisdiction over AG comports with traditional notions of fair play and substantial justice.

## V. Conclusion

Under the appropriate standard of review, our task ends when, as here, some evidence supports the trial court's denial of AG's special appearance. *BMC,* 83 S.W.3d at 794–95. AG did not merely set its products afloat in a stream of commerce that happened to carry them to Texas. AG "marketed [its] product through a distributor who has agreed to serve as [its] sales agent in [Texas]," *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026,

and AG undoubtedly "intended to serve the Texas market," *CSR,* 925 S.W.2d at 595. Further, AG's potential liability arises out of its contacts with Texas, and exercising personal jurisdiction over AG does not offend traditional notions of fair play and substantial justice. The court of appeals and the trial court correctly concluded that Texas courts have personal jurisdiction over this claim against AG. We affirm the court of appeals' judgment. TEX.R.APP. P. 60.2(a).

## All Citations

310 S.W.3d 868, Prod.Liab.Rep. (CCH) P 18,380, 53 Tex. Sup. Ct. J. 423

### Footnotes

1     Limited has not challenged jurisdiction.

2     The court did not resolve whether Justice O'Connor's or Justice Brennan's *Asahi* standard should be applied, because the plaintiff failed to make even a threshold showing that AC Hydraulic had an awareness or expectation that some of its products would be purchased in Indiana. *Jennings,* 383 F.3d at 551 n. 2.

3     There is some confusion about a court's need to evaluate the fourth and fifth considerations in cases involving a foreign defendant. In *Guardian Royal,* we held that in cases involving a foreign defendant rather than two "coequal sovereigns in our federal system, we need not consider the interstate judicial system's interest in obtaining the most efficient resolution of controversies or the shared interest of the several states in furthering fundamental substantive social policies," *Guardian Royal,* 815 S.W.2d at 232 n. 17, considerations that would be relevant in a dispute among residents of differing states. While this is true, we failed to explain that in such cases courts must instead consider the interests of "other *nations* whose interests are affected by the assertion of jurisdiction." *Asahi,* 480 U.S. at 115, 107 S.Ct. 1026. Here, the court of appeals examined the international interest in obtaining the most efficient resolution of controversies but failed to consider the shared interest of the several nations in furthering fundamental substantive social policies. 311 S.W.3d at 8 ("We will not address the fifth factor as only one state is involved in this dispute."). This disparate holding gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c), (e) (noting that one court "holds differently from another when there is inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants").

4     De Graaf has established a residence in Houston and obtained a "green card" in 2000.

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

168 S.W.3d 835
Supreme Court of Texas.

STERLING TRUST COMPANY, Petitioner,

v.

Roderick ADDERLEY, et al., Respondents.

No. 03–1001. | Argued Sept. 29, 2004. | Decided June 17, 2005. | Rehearing Denied Aug. 26, 2005.

**Synopsis**

**Background:** Investors in qualified securities, who were defrauded by broker seller in illegal Ponzi scheme, filed lawsuit against broker, brokerage firm he worked for, and third-party trustee for investors' retirement accounts. Broker died and claims against brokerage firm were severed, leaving trustee as sole defendant. The 236th District Court, Tarrant County, Thomas Wilson Lowe III, J., after jury found that trustee aided and abetted broker in committing securities fraud and that it breached its fiduciary duty to investors, rendered judgment against trustee for over $6 million based on jury's actual damages findings, and awarded investors $250,000, the amount of exemplary damages found by jury, for trustee's malicious breach of fiduciary duty. Upon denial of its motions for new trial and judgment notwithstanding the verdict (JNOV), trustee appealed. The Ft. Worth Court of Appeals, 119 S.W.3d 312, affirmed the award of actual damages but reversed the award of exemplary damages. Review was granted.

**Holdings:** The Supreme Court, Harriet O'Neill, J., held that:

[1] aider liability under Texas Securities Act requires defendant's subjective awareness of primary violator's improper activity;

[2] instructional error on aider liability was not harmless; and

[3] instruction on breach of fiduciary duty was overly broad and defective.

Court of Appeals reversed; remanded.

West Headnotes (7)

[1] **Securities Regulation**
 Construction and Operation in General

The Legislature intended the Texas Securities Act (TSA) to be interpreted in harmony with federal securities law. Vernon's Ann.Texas Civ.St. art. 581–10–1, subd. A.

2 Cases that cite this headnote

[2] **Securities Regulation**
 Persons Liable

Texas Securities Act's (TSA) requirement of "reckless disregard for the truth or the law," as element for liability for aiding a securities violation, means an alleged aider is subject to liability as secondary violator only if it rendered assistance to primary violator in face of perceived risk that its assistance would facilitate untruthful or illegal activity by primary violator, which does not mean that aider must know of exact misrepresentations or omissions made by primary violator, but does mean that aider must be subjectively aware of primary violator's improper activity. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F(2).

18 Cases that cite this headnote

[3] **Appeal and Error**
 Failure or Refusal to Charge

Error in failing to instruct jury on subjective awareness requirement for aider liability under Texas Securities Act (TSA) was not harmless, though jury was instructed that defendant trustee for plaintiff investors' retirement accounts had to have acted with reckless disregard for the truth or the law in order to be liable for aiding securities broker-seller's securities law violations; jury might well have thought that reckless disregard could be based on evidence of trustee's negligent handling of accounts even if trustee had no actual knowledge of broker-seller's improprieties, and investors themselves created such risk of misinterpretation by arguing

repeatedly at trial that trustee either knew fully what broker-seller was doing or exercised reckless disregard by ignoring trustee's internal procedures that would have brought broker-seller's activities to light. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F(2).

11 Cases that cite this headnote

**[4]** **Securities Regulation**
 Persons Liable

The Texas Securities Act (TSA) does not require the aider to have had direct dealing with the defrauded party, in order to be liable for aiding a securities violation; a person who "materially aids a seller" may have no contact at all with the investors. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F(2).

4 Cases that cite this headnote

**[5]** **Securities Regulation**
 Persons Liable

The Texas Securities Act (TSA) does not provide an affirmative defense, to aider liability as secondary violator under TSA, that alleged aider did not know, and in exercise of reasonable care could not have known, of the untruth or omission by primary violator. Vernon's Ann.Texas Civ.St. art. 581–33, subds. A(2), F(2).

8 Cases that cite this headnote

**[6]** **Securities Regulation**
 Persons Liable

Jury's finding that defendant trustee for plaintiff investors' retirement accounts did not know and could not have reasonably known of the untruth or omission made by broker-seller, which finding provided affirmative defense to trustee's primary liability to investors under Texas Securities Act (TSA), did not preclude as matter of law a finding that trustee acted with reckless disregard for the truth or the law, as element for liability to investors under TSA for aiding broker-seller's securities violations; finding on affirmative defense to trustee's liability as primary violator did not establish

whether trustee knew of broker-seller's improper activity in general. Vernon's Ann.Texas Civ.St. art. 581–33, subds. A(2), F(2).

15 Cases that cite this headnote

**[7]** **Trusts**
 Trial

Failure of instruction on standard for breach of fiduciary duty to account for contractual modifications of trustee's fiduciary duties rendered the instruction overly broad and defective, in investors' action against trustee for their Individual Retirement Accounts (IRA), relating to investors' losses from Ponzi scheme run by securities broker, into which scheme investors self-directed funds from IRAs for which trustee served as custodian. V.T.C.A., Property Code § 113.059.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*837** Donald E. Herrmann, Dee J. Kelly, Todd W. Spake, John Thomas Wilson IV, Kelly Hart & Hallman, P.C., Fort Worth, Robert B. Gilbreath, V. Elizabeth Kellow, Alan R. Bromberg, Jenkens & Gilchrist, P.C., Dallas, Sharon E. Callaway, Crofts & Callaway, P.C., San Antonio, for Petitioner.

Rickey J. Brantley, David E. Keltner, Jose Henry Brantley & Keltner, L.L.P., Thomas G. Farrier, Murphy Mahon Keffler & Farrier, L.L.P., Fort Worth, James Dan Moorhead, Law Office of James Dan Moorhead, Arlington, for Respondents.

Karen Sue Neeley, Joseph R. Knight, Baker & Botts, L.L.P., Austin, Philip John Kuhl Jr., Sanford & Kuhl, N. Scott Fletcher, Houston, Royal B. Lea III, Bingham & Lea, P.C., San Antonio, for Amici Curiae.

**Opinion**

Justice O'NEILL delivered the opinion of the Court.

The Texas Securities Act (TSA) imposes liability on a person who sells securities "by means of an untrue statement of a material fact or an omission to state a material fact," and imposes liability on a person who "materially aids a seller,

buyer, or issuer of a security" if the person acts "with intent to deceive or defraud or with reckless disregard for the truth or the law." TEX. REV. CIV. STAT. ANN. ART. 581–33F(2) (Vernon Supp.2004–2005). The trial court and court of appeals interpreted the latter provision to allow aider liability even if the aider was unaware of its role in the securities violation. We conclude, however, that the TSA's requirement of "reckless disregard for the truth or the law" means that an alleged aider is subject to liability only if it rendered assistance to the seller in the face of a perceived risk that its assistance would facilitate untruthful or illegal activity by the primary violator. This standard does not mean that the aider must know of the exact misrepresentations or omissions made by the seller, but it does mean that the aider must be subjectively aware of the primary violator's improper activity. Accordingly, we reverse the court of appeals' judgment and remand this case to the trial court for further proceedings consistent with this opinion.

## I

During the early to mid–1990s, Norman Cornelius formed Avalon Custom Homes and a number of related corporate entities (collectively referred to as "Avalon") designed to develop and sell luxury homes. At that time, Cornelius worked as an investment advisor and broker for Sunpoint Securities. Cornelius operated Avalon out of his Sunpoint office and encouraged his brokerage clients to invest their money in Avalon. Cornelius also persuaded members of his church and retirees from Mrs. Baird's Bakery to invest in Avalon, offering investors promissory notes that bore as much as an eighteen percent rate of **\*838** return and allowed conversion to Avalon stock.

Many of the investors chose to invest their retirement savings in Avalon. Because certain retirement accounts such as IRAs and lump-sum pension distributions must be held by a third-party trustee to maintain their preferential tax status, Avalon needed a third-party trustee in order to accept such funds. In 1994, Cornelius began recommending that Avalon investors use Sterling Trust Company, a custodian of self-directed IRA accounts, as their IRA custodian. From 1994 until 1997, Sterling served as the exclusive trustee over the retirement money that the investors self-directed to Cornelius.

In 1997, the Securities and Exchange Commission (SEC) filed suit against Cornelius, alleging that Cornelius misrepresented the risks associated with the investments,

misrepresented the uses of investment funds, and misrepresented the commingling and misappropriation of funds. Avalon was forced into receivership, and the Avalon investors collectively lost millions of dollars. A number of elderly investors lost their entire retirement savings. The investors sued Cornelius, Sunpoint Securities, Van Lewis (the owner of Sunpoint), and Sterling Trust. After suit was filed, but before the case was tried, Cornelius died and Sunpoint entered receivership. The claims against Sunpoint were severed from the suit as a result of the receivership, but Sunpoint was still included in the charge as a party to which the jury could apportion responsibility.

At trial, the investors put forth several theories of liability. The jury charge asked (1) whether each of the defendants offered or sold securities "by means of an untrue statement of material fact or the omission to state a material fact necessary in order to make the statements made, if any, in light of the circumstances under which they were made not misleading"; (2) whether Sterling aided Cornelius in committing securities fraud by "directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aid[ing] a seller of a security"; (3) whether Sterling was "part of a conspiracy that damaged [the investors]"; (4) whether Sterling "fail[ed] to comply with its fiduciary duty" to its account holders; and (5) whether the defendants committed fraud against the investors.

In support of these contentions, the investors provided evidence that Cornelius told investors that investing in Avalon carried "no risk" and that any principal invested would be protected. There was also evidence that Avalon was not profitable and that early investors were paid with the proceeds of later investors, thus creating a pyramid effect that collapsed when new investments dried up. [1]

The investors argued that Sterling played an essential role in allowing the investment scheme to continue as long as it did. They argued that Sterling had a duty to undertake a "suitability analysis" and that it should have informed the investors that "too much of their net worth" was held in "overly risky investments." The investors provided evidence that Sterling's failure to comply with several of its **\*839** own internal procedures facilitated Cornelius's pyramid scheme and allowed Cornelius to hide the nature of his scheme from the investors. For example, the investors showed that, although Sterling's policies prohibited it from holding promissory notes that were in default, it nevertheless held such notes. The investors also provided

evidence that Sterling failed to obtain many of the Avalon stock certificates and original promissory notes; ordinarily, Sterling employees could not enter transactions into Sterling's computer system without such documents. When lower-level Sterling employees alerted management to the lack of such documents, they were told that Sterling had made an agreement allowing Avalon to retain those documents. There was also evidence that Sterling failed to obtain copies of the security agreements for the promissory notes that purported to be secured by real estate, even though Sterling's internal procedures required it to keep such documents on file. In addition, the investors provided evidence that Sterling was aware that Cornelius was commingling investors' funds by having one or more of the Avalon companies make payments on notes for which another Avalon company was indebted, and that at least one of Sterling's internal memos questioned this practice. Finally, the investors demonstrated that Cornelius did not pay the principal balance on a number of notes as they became due, but instead transferred the investors' money into new investment vehicles in other Avalon entities. There was evidence that Sterling allowed Cornelius to unilaterally make such transfers despite its own policy requiring documentation of investor approval for new investments.

The jury returned a verdict against Cornelius on all counts. On the issues pertaining to Sterling, however, the verdict was mixed. Specifically, the jury found that Sterling was not a "seller" of securities, that Sterling did not conspire to damage the investors, and that Sterling did not commit fraud. However, the jury found that Sterling aided Cornelius's securities violation and that Sterling breached its fiduciary duty to its account holders. The investors elected to recover on the aiding-and-abetting finding, and the trial court rendered judgment against Sterling for $6 million in actual damages and $250,000 in exemplary damages. The court of appeals affirmed the trial court's award of actual damages, but reversed the exemplary damages award. 119 S.W.3d 312. We granted Sterling's petition for review to consider the scope of its potential liability to the investors and related issues.

## II

The Texas Securities Act establishes both primary and secondary liability for securities violations. Primary liability arises when a person "offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they are made, not misleading." TEX. REV. CIV. STAT. ANN. art. 581–33A(2) (Vernon Supp.2004–2005). Secondary liability is derivative liability for another person's securities violation; it can attach to either a control person, defined as "[a] person who directly or indirectly controls a seller, buyer, or issuer of a security," or to an aider, defined as one "who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." *Id.* art. 581–33F(1)–(2). Both control persons and aiders are jointly and severally liable with the primary violator "to the same extent as if [they] were" the primary violator. *Id.*

 **\*840** In this case, the jury found that Sterling was secondarily liable as an aider. Sterling argues that the trial court erred by failing to instruct the jury that an alleged aider cannot be held secondarily liable unless it had a "general awareness" of its role in the primary violation. *See Frank v. Bear, Stearns & Co.,* 11 S.W.3d 380, 384 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (holding that "[i]n order to establish liability" for aiding a securities violation, "a plaintiff must demonstrate ... that the alleged aider had 'general awareness' of its role in this violation") (citations omitted). At the charge conference, Sterling objected to the trial court's proposed instruction on aider liability because it made no mention of the "general awareness" requirement. The trial court overruled this objection. The court of appeals held that the failure to include such an instruction was not error, concluding that "the TSA does not require proof that an aider is generally aware of its role in the securities violation to be liable as an aider." 119 S.W.3d at 320. Sterling contends the court of appeals' holding conflicts with opinions from other Texas courts of appeals that have held that the TSA does impose such a requirement. *See Goldstein v. Mortenson,* 113 S.W.3d 769, 776 (Tex.App.-Austin 2003, no pet.); *Crescendo Invs., Inc. v. Brice,* 61 S.W.3d 465, 472 (Tex.App.-San Antonio 2001, pet. denied); *Bear, Stearns & Co.,* 11 S.W.3d at 384. In this case, the court of appeals noted the conflict but concluded that, because the "language of the TSA" does not explicitly impose such a requirement, the proper course was to "decline to follow those opinions ... that have concluded that the TSA contains a general awareness requirement." 119 S.W.3d at 319–20.

 **[1]**   We disagree with the court of appeals' conclusion that the TSA contains no awareness requirement. The statute's history demonstrates that the Legislature intended the TSA to be interpreted in harmony with federal securities

law, and the TSA itself instructs that "[t]his Act may be construed and implemented to effectuate its general purpose to maximize coordination with federal and other states' law and administration." TEX. REV. CIV. STAT. ANN. art. 581–10–1A (Vernon Supp.2004–2005). When the Legislature added the aider-liability provision to the TSA in 1977, most federal courts considering the issue had held that aider liability could be imposed under the federal securities law only when the aider was generally aware of its role in an improper scheme. [2] *See Gould v. American–Hawaiian S.S. Co.,* 535 F.2d 761, 779–80 (3d Cir.1976) (stating that "[t]he required knowledge of the act has been defined as a 'general awareness (on the part of the aider and abettor) that his role was part of an overall activity that is improper' " and that "the proof offered must establish conscious involvement in impropriety or constructive notice of intended impropriety") (quoting *SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir.1974)); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 96 (5th Cir.1975) ("The postman who mails a fraudulent letter is not covered by the Act, nor is the company that **\*841** manufactured the paper on which the violating documents are printed.... [T]he proof must demonstrate actual awareness [3] of the party's role in the fraudulent scheme.") (citations omitted).

The investors argue that the federal cases are irrelevant because the Texas Legislature chose a different, lesser standard for aider liability under the TSA; specifically, the investors point out that liability may be imposed on an aider who acted "with intent to ... defraud or with reckless disregard for the truth or the law," and argue that "reckless disregard" may be shown even if the aider had no awareness of its role in an improper scheme. *See* TEX. REV. CIV. STAT. ANN. art. 581–33F(2). As support for this proposition, the investors point to a Texas court of appeals case which held that a "failure to conduct minimal investigation and inquiry" before rendering assistance with a securities transaction can suffice to create liability under the "reckless disregard" standard. *See Goldstein,* 113 S.W.3d at 777.

**[2]** We disagree that the "reckless disregard" standard either imposes a lesser standard than the "general awareness" requirement or allows liability to be imposed for a mere failure to investigate. Instead, we conclude that the statute's use of the phrase "reckless disregard for the truth or the law" accords with the requirement that an aider must be aware of the primary violator's improper activities before it may be held liable for assisting in the securities violation. The Legislature's use of the phrase "reckless disregard" is consistent with a requirement of subjective awareness; at the

time that the Legislature enacted the TSA, this Court had long held that "recklessness" required evidence of "conscious indifference" in the context of gross negligence. *See Rowan v. Allen,* 134 Tex. 215, 134 S.W.2d 1022, 1025 (1940) (holding that "reckless disregard of the rights of [the] plaintiff" means "a conscious indifference to her rights or welfare"). The United States Supreme Court has noted a number of other civil actions in which recklessness requires a subjective awareness of, and indifference to, the risk posed by the defendant's conduct. *See Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). In *Kolstad,* the Court stated that "recklessness in its subjective form" requires "a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.' " *Id.* at 536, 119 S.Ct. 2118. The Court noted that "recklessness in its subjective form" has been applied to the recovery of punitive damages in certain civil-rights actions and has also been applied in defamation cases, which require "knowledge of falsity or reckless disregard **\*842** for the truth," *id.,* a requirement that has been interpreted to mean that the defendant "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). In *Kolstad,* the Court applied this subjective standard to the award of punitive damages in certain employment discrimination actions, holding that the statute's "reckless indifference" requirement meant that "an employer must at least discriminate in the face of a *perceived risk* that its actions will violate federal law to be liable in punitive damages." *Kolstad,* 527 U.S. at 536, 119 S.Ct. 2118 (emphasis added).

We conclude that the TSA's scienter requirement of "reckless disregard for the truth or the law" is similarly intended to impose a requirement of "recklessness in its subjective form," and this recklessness must be directly related to the primary violator's securities violation. *Id.* When the Texas Legislature adopted the aider provision of the TSA, it explicitly stated that aider liability should be imposed "only if the aider has the requisite scienter." TEX. REV. CIV. STAT. ANN. art. 581–33, Comment—1977 Amendment (Vernon Supp.2004–2005). Furthermore, at the time this amendment was adopted, some scholars had suggested that the policy concerns favoring a subjective scienter standard outweighed the potential investor protections available under a "should have known" standard:

> In most cases, the alleged aider and abettor ... will merely be engaging in customary business activities, such as loaning money, managing

a corporation, preparing financial statements, distributing press releases, completing brokerage transactions, or giving legal advice. If each of these parties will be required to investigate the ultimate activities of the party whom he is assisting, a burden may be imposed upon business activities that is too great.... The essential point is that imposition of a duty to investigate under the guise of a "should have known" standard in essence would amount to eliminating scienter as a necessary element in imposing aiding and abetting liability and the substitution of a negligence standard.

Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy,* In Pari Delicto, *Indemnification, and Contribution,* 120 U. PA. L. REV. 597, 632–33 (1972). The Legislature presumably weighed these policy concerns when it chose to adopt the "reckless disregard" standard instead of a lower negligence or "should have known" standard.

We therefore hold that the TSA's "reckless disregard for the truth or the law" standard means that an alleged aider can only be held liable if it rendered assistance "in the face of a perceived risk" that its assistance would facilitate untruthful or illegal activity by the primary violator. TEX. REV. CIV. STAT. ANN. art. 581–33F(2); *Kolstad,* 527 U.S. at 536, 119 S.Ct. 2118. In order to perceive such a risk, the alleged aider must possess a " 'general awareness that his role was part of an overall activity that is improper.' " *Gould,* 535 F.2d at 780.

 **[3]**  We further hold that the trial court's failure to include the subjective awareness requirement in the jury charge was harmful error. The investors assert that no such instruction was needed; they acknowledge that "the TSA aider liability 'reckless disregard for the truth or the law' language is not inconsistent with the federal 'general awareness' language," but argue that the charge's inclusion of the "reckless disregard" requirement was sufficient to instruct the jury on the standard for liability. We disagree. The trial court is required to "submit such instructions  **\*843**  and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. In this case, the jury may well have thought that "reckless disregard" could be based on evidence of Sterling's negligent handling of accounts even if Sterling

had no actual knowledge of Cornelius's improprieties; the plaintiffs themselves created such a risk of misinterpretation by arguing repeatedly at trial that Sterling "either knew fully what Cornelius was doing" *or* "exercised reckless disregard" by ignoring internal procedures that would have brought Cornelius's activities to light. Ignoring internal procedures that might have alerted Sterling to Cornelius's scheme may be negligence, but it is not "reckless disregard for the truth or the law." Therefore, "consider[ing] the pleadings of the parties, the evidence presented at trial, and the charge in its entirety," we conclude that the absence of an instruction on the subjective awareness requirement "was reasonably calculated [to] and probably did cause the rendition of an improper judgment." *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986).

### III

 **[4]**  Sterling makes two other arguments that it should be absolved of liability for aiding a securities violation. First, it argues that it cannot be liable as an aider "with respect to transactions and persons with which Sterling had no contact." As the court of appeals correctly noted, however, the TSA does not require the aider to have had direct dealing with the defrauded party; indeed, a person who "materially aids a seller" may have no contact at all with the investors. *See* TEX. REV. CIV. STAT. ANN. art. 581–33F(2).

 **[5]**  Sterling also argues that it cannot be liable as an aider because the jury found in Sterling's favor on its affirmative defense that it did not know, and could not have known, of the particular misrepresentations or omissions made by Cornelius. This affirmative defense is available to persons alleged to have committed a primary violation of the securities laws. As noted above, the statute provides that a seller of a security may be held liable if it "offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." *Id.* art. 581–33A(2). The statute permits the seller to avoid liability by proving the affirmative defense that "he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." *Id.*

Because the jury was asked whether Sterling should be held liable as a seller, it was also asked if Sterling had established this affirmative defense; specifically, the question

asked whether Sterling "did not know, and in the exercise of reasonable care, could not have known of the untruth or omission" made by the seller. The jury found that Sterling lacked such knowledge and thereby absolved Sterling of primary liability as a seller. Sterling argues that this lack of knowledge also establishes that it cannot be liable as an aider. We disagree.

The TSA provides different knowledge requirements for different classes of defendants; one standard applies to sellers, another applies to control persons, and a third standard applies to aiders. As noted above, sellers are absolved of liability if they prove that they lacked knowledge of the "untruth or omission." *Id.* Control persons may invoke a similar, but not identical, lack-of-knowledge defense:

> **\*844** A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that *he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.*

*Id.* art. 581–33F(1) (emphasis added). The control-person defense differs slightly from the one applied to sellers; instead of proving that they did not know of the "untruths or omissions," control persons must show that they did not know of "the facts by reason of which liability is alleged to exist." *Id.*

Finally, the knowledge requirement for aiders is different from both the standard for control persons and the standard for sellers:

> A person who directly or indirectly *with intent to deceive or defraud or with reckless disregard for the truth or the law* materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

*Id.* art. 581–33F(2) (emphasis added). Instead of requiring the aider to establish lack of knowledge as an affirmative defense, the section on aider liability requires a plaintiff to prove that the aider acted with "intent to deceive or defraud or with reckless disregard for the truth or the law." *Id.*

The legislative history of this provision reflects that the Legislature intended to apply distinct liability standards to the different categories of defendants. The Legislature's comment to section 33F states that the provision "derives in part from Uniform Securities Act § 410(b)." *Id.* art. 581–33, Comment—1977 Amendment. Unlike the TSA, however, this section of the Uniform Securities Act applies the same standard to control persons and to aiders:

> Every person who directly or indirectly controls a seller liable [for unlawful sales of securities], every partner, officer, or director of such a seller, ... every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

UNIF. SECURITIES ACT § 410(b), 7C U.L.A. 266 (1956).

It thus appears that the TSA adopted the Uniform Securities Act's liability standard for control persons but modified its standard for aiders; while the TSA allows a broader class of persons to qualify as aiders, it imposes a stricter scienter restriction on them. For example, the Uniform Securities Act of 1956 limited aider liability to a seller's employees, brokers, or agents, *id.,* but the TSA permits "[a] person" who provides material aid to be held liable. TEX. REV. CIV. STAT. ANN. art. 581–33F(2). In contrast to its narrow class of defendants, the Uniform Securities Act imposed a more relaxed scienter requirement, allowing liability to be imposed on an aider if it negligently failed to discover the facts creating liability. § 410(b). Conversely, the TSA creates a broader class of defendants, but requires more than mere negligence to impose liability; the TSA only

imposes liability if the aider **\*845** acted with "intent to deceive or defraud or with reckless disregard for the truth or the law." TEX. REV. CIV. STAT. ANN. art. 581–33F(2). Furthermore, the TSA places the burden of proof on the plaintiff to prove that the defendant acted with the requisite scienter, *id.,* while the Uniform Securities Act required the defendant to prove that it acted with reasonable care. § 410(b). Finally, the TSA focuses on the aider's reckless disregard "for the truth or the law," art. 581–33F(2), instead of the aider's knowledge "of the existence of the facts by reason of which the liability is alleged." § 410(b). These modifications indicate that the Legislature gave significant consideration to the proper scienter standard for aiders. We decline to imply an additional defense not offered to aiders under the text of the statute.

Sterling argues that the failure to imply such a defense renders the statute illogical and allows secondary violators to be held liable even when a primary violator could escape liability by invoking an affirmative defense. We disagree. First, a secondary violator's liability depends upon the primary violator's culpability; even without an additional affirmative defense, a secondary violator may only be held liable "to the same extent as" the primary violator. TEX. REV. CIV. STAT. ANN. art. 581–33F(2). Thus, if it were proven that the seller reasonably believed its statements to be true, there would be no primary violation and no derivative liability to attach to the aider. Second, the Legislature did not act illogically by adopting different scienter standards for primary and secondary violators; the different standards make sense in light of the facts that these parties may reasonably be expected to know. A primary violator is the party actually making the misrepresentations or misleading omissions, and it therefore makes sense to focus on whether it knew the statements were untrue. On the other hand, an aider may know that the primary violator is engaging in improper activity, but, if the aider is not involved in the actual sale or offer of the securities, it may not know what particular misrepresentations or misleading omissions were made to the investors. Consequently, it makes sense to predicate liability on the aider's "reckless disregard for the truth or the law" rather than the aider's knowledge of specific misrepresentations or omissions. In this case, for example, Sterling argued to the jury that its answer to Question 8—whether Sterling lacked knowledge of the untrue statement or omission found to constitute securities fraud in Question 1—had to be "yes" because "Sterling Trust Company had no way of knowing what Norman Cornelius was telling or not telling these people."

The investors acknowledge that Sterling may not have known the exact misrepresentations that Cornelius was making to the investors, but they argue that Sterling did know that Cornelius was operating an illegal pyramid scheme. We agree that knowledge of such an illegal scheme, if proven, could support a finding that Sterling acted "with reckless disregard for the truth or the law" even if Sterling could not have known of the particular misrepresentations made by Cornelius. *See State ex rel. Goettsch v. Diacide Distribs., Inc.,* 561 N.W.2d 369, 382 (Iowa 1997) (permitting aider liability under Iowa's securities statute to be based on the aider's knowledge that the primary violator was engaging in "atypical business transactions [that] amounted to a Ponzi scheme"); *see also Graham v. Sec. & Exch. Comm'n,* 222 F.3d 994, 1005 (D.C.Cir.2000) (scienter established when aider continued to assist primary violator despite knowledge of his "irrational trading" and financial difficulties).

[6]   We acknowledge that there is some tension between the jury's finding that **\*846** Sterling acted with "reckless disregard for the truth or the law" and its finding that Sterling did not know and could not have reasonably known of "the untruth or omission" made by Cornelius. However, Sterling does not argue in this Court that the two findings conflict, and Sterling did not seek to have the jury harmonize these two answers in the trial court. *See* TEX. R. CIV. P. 295 (providing that, when a jury's verdict contains conflicting answers, "the court shall in writing instruct the jury in open court of the nature of the ... conflict, provide the jury such additional instructions as may be proper, and retire the jury for further deliberations"). Instead, Sterling argues only that its lack of knowledge of Cornelius's "untruth or omission" establishes as a matter of law that it cannot have acted "with reckless disregard for the truth or the law." We disagree. Because the finding referred specifically to knowledge "of the untruth or omission," we conclude that this finding does not establish whether Sterling knew of Cornelius's improper activity in general, and therefore does not necessarily trump the jury's finding that Sterling acted "with intent to deceive or defraud or with reckless disregard for the truth or the law."

In this case, the jury may have agreed that Sterling could not have known what Cornelius was telling the investors but nevertheless believed that Sterling knew that Cornelius was operating an illegal pyramid scheme. Because the jury in this case was asked only whether Sterling knew of "the untruth or omission," the jury's "no" answer does not shed light on whether the jury believed that Sterling knew Cornelius was engaged in illegal activity. Sterling's argument to the

jury also focused on whether Sterling had knowledge of Cornelius's statements, not whether it had knowledge of the underlying scheme. Specifically, Sterling argued that the jury must find that Sterling "did not know, and in the exercise of reasonable care, could not have known of the untruth or omission" because Sterling "had no way of knowing what Norman Cornelius was telling or not telling these people." Consequently, we hold that the jury's finding that Sterling "did not know, and in the exercise of reasonable care could not have known of the untruth or omission" is not dispositive of the question of whether Sterling had knowledge of the underlying wrongdoing.

## IV

[7] Sterling also argues that the trial court improperly instructed the jury on the standard for breach of fiduciary duty. The trial court instructed the jury that Sterling failed to comply with its fiduciary duties if:

a. Sterling Trust Company did not make reasonable use of the confidence placed in it; or

b. Sterling Trust Company did not act in the utmost good faith and did not exercise the most scrupulous honesty toward the plaintiffs; or

c. Sterling Trust Company did not place the interests of the plaintiffs before its own, used the advantage of its position to gain benefit for itself at the expense of the plaintiffs, and placed itself in a position where its self-interest might conflict with its obligations as a fiduciary.

At the charge conference, Sterling objected to this instruction,[4] arguing that it **\*847** failed to reflect Sterling's

contractual limitation of its fiduciary duties. For example, in a document signed by all account holders, Sterling provided that "Sterling Trust has no responsibility to question any investment directions given by the individual regardless of the nature of the investment," and that "Sterling Trust is in no way responsible for providing investment advice." The Texas Trust Code allows parties to contractually limit a trustee's duties. *See* TEX. PROP. CODE § 113.059. Because the question on breach of fiduciary duty did not account for these contractual modifications, it was overly broad and rendered the question defective. *See Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994) (holding that a question in the jury charge that defined the "unfair practice in the business of insurance" as "any act or series of acts which is arbitrary, without justification, or takes advantage of a person to the extent that an unjust or inequitable result is obtained" was defective because the statute limited the actions for which the defendant could be liable and the instruction did not reflect those limitations).

\* \* \*

For the foregoing reasons, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

Justice JOHNSON did not participate in the decision.

**All Citations**

168 S.W.3d 835, Blue Sky L. Rep. P 74,547, 48 Tex. Sup. Ct. J. 887

---

Footnotes

1    This type of pyramid scheme is often referred to as a "Ponzi scheme," a term "derived from one Charles Ponzi, a famous Boston swindler. With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days. Ponzi collected nearly $10 million in 8 months ... using the funds of new investors to pay off those whose notes had come due." *United States v. Shelton,* 669 F.2d 446, 449 n. 2 (7th Cir.1982).

2    The United States Supreme Court later held that Congress did not intend to create a private cause of action for aiding and abetting a securities violation under section 10(b) of the Securities Exchange Act. *Cent. Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). However, that decision does not affect the SEC's ability to impose penalties against parties who have "willfully aided" another's violation of the securities laws. 15 U.S.C. § 78u–2(a)(2). Such SEC actions still require " 'a general awareness by the aider and abettor that his role was part of an activity that was improper.' " *Howard v. Sec. & Exch. Comm'n,* 376 F.3d 1136, 1142 (D.C.Cir.2004) (citations omitted).

3    The Fifth Circuit has clarified that its use of the term "actual awareness" did not encompass a different standard than the term "general awareness." *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1126 (5th Cir.1988) ("In *Woodward,* we explained what these scienter requirements mean. 'General awareness,' we said, means knowledge which, though it may be adduced from reckless conduct, means actual awareness.") (citing *Woodward,* 522 F.2d at 96). Federal courts have typically used the term "general awareness" as a shorthand to describe actual awareness of general wrongdoing. *See, e.g., Investors Research Corp. v. Sec. & Exch. Comm'n,* 628 F.2d 168, 178 (D.C.Cir.1980) (noting that the SEC "failed to consider whether Driehaus had a general awareness that he was assisting Stowers in wrongful conduct"); *see also K & S P'ship v. Cont'l Bank, N.A.,* 952 F.2d 971, 977 (8th Cir.1991) ("[A] defendant's general awareness of its overall role in the primary violator's illegal scheme is sufficient knowledge for aiding and abetting liability.... If an illegal scheme exists and a bank's loan assists in that scheme, the bank's knowledge of the scheme is the crucial element that prevents it from suffering automatic liability for the conduct of insiders to whom it loaned the money.").

4    The investors argue that Sterling waived error by agreeing to this instruction in an earlier pretrial hearing and by submitting a proposed charge that included a similar instruction. However, the proposed charge was superseded by a subsequent amended charge that contained no such instruction, and the alleged pretrial agreement is not part of the record. Because Sterling made a clear, timely objection and obtained a ruling, we conclude that it preserved error. *See State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992).

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Stull v. LaPlant, Tex.App.-Dallas, August 28, 2013

372 S.W.3d 658
Court of Appeals of Texas,
Dallas.

Moris and Lillian TABACINIC, Appellants

v.

Dr. William J. and Veronica FRAZIER, Appellees.

No. 05–11–00286–CV. | April 19, 2012.

**Synopsis**

**Background:** Purchasers of residential real property in Texas brought action in Texas state court against individual nonresident defendants, as the putative vendors, for fraudulent inducement, negligent misrepresentation, and breach of warranty. Defendants filed special appearance, asserting lack of personal jurisdiction. Following an evidentiary hearing, the County Court at Law No. 1, Dallas County, denied the special appearance. Defendants appealed.

**Holdings:** The Court of Appeals, Richter, J., held that:

[1] purchasers met burden of pleading sufficient jurisdictional facts for exercise of personal jurisdiction;

[2] defendants, who formed corporate entities for purpose of investing in and selling real estate in Texas, had sufficient purposeful contacts with Texas to support exercise of specific personal jurisdiction over them on breach of warranty claims;

[3] defendants were not protected under fiduciary shield doctrine from exercise of personal jurisdiction;

[4] with respect to negligent misrepresentation and fraudulent inducement claims, defendants purposefully availed themselves of privilege of conducting activities in Texas; and

[5] exercise of specific personal jurisdiction over defendants comported with traditional notions of fair play and substantial justice.

Affirmed.

West Headnotes (30)

[1] **Courts**
⚖ Determination of questions of jurisdiction in general

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. V.T.C.A., Civil Practice & Remedies Code § 17.041 et seq.

1 Cases that cite this headnote

[2] **Appeal and Error**
⚖ Cases Triable in Appellate Court

Because the trial court's exercise of personal jurisdiction over a nonresident defendant is one of law, an appellate court reviews the trial court's determination of a special appearance de novo. V.T.C.A., Civil Practice & Remedies Code § 17.041 et seq.

1 Cases that cite this headnote

[3] **Appeal and Error**
⚖ Appearance and representation by counsel

When a party challenges a trial court's ruling on a special appearance to contest personal jurisdiction, and the trial court did not make findings of fact and conclusions of law, the Court of Appeals infers all facts necessary to support the judgment if they are supported by the evidence.

Cases that cite this headnote

[4] **Constitutional Law**
⚖ Non-residents in general

The Due Process Clause of the Fourteenth Amendment operates to limit the power of a state to assert personal jurisdiction over a nonresident defendant. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[5] **Constitutional Law**

Non-residents in general

The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[6]  Constitutional Law**
Non-residents in general

Under the Due Process Clause, personal jurisdiction over a nonresident defendant is constitutional when the nonresident defendant has established minimum contacts with the forum state and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[7]  Constitutional Law**
Non-residents in general

Purposeful availment of forum statute is the touchstone of due process analysis with respect to forum state's exercise of personal jurisdiction over nonresident defendant. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[8]  Constitutional Law**
Non-residents in general

In order for exercise of personal jurisdiction over nonresident defendant to satisfy due process, nonresident defendant's activities must be purposefully directed toward the forum state so that the nonresident defendant could foresee being haled into court there. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[9]  Constitutional Law**
Non-residents in general

There are three parts to the purposeful availment inquiry under Due Process Clause for exercise of

personal jurisdiction over nonresident defendant: (1) only the nonresident defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person; (2) the contacts relied on must be purposeful rather than random, fortuitous, or attenuated; and (3) the nonresident defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[10]  Courts**
Purpose, intent, and foreseeability; purposeful availment

Personal jurisdiction over a nonresident defendant is based on notions of implied consent, i.e., that a nonresident consents to suit in forum state by invoking the benefits and protections of its laws.

Cases that cite this headnote

**[11]  Constitutional Law**
Non-residents in general

When specific jurisdiction is asserted over a nonresident defendant, the minimum-contacts due process analysis focuses on the relationship between the nonresident defendant, the forum state, and the litigation. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[12]  Courts**
Related contacts and activities; specific jurisdiction

For a court to exercise specific jurisdiction over a nonresident defendant, two requirements must be met: (1) the nonresident defendant's contacts with the forum state must be purposeful; and (2) the cause of action must arise from or relate to those contacts.

2 Cases that cite this headnote

**[13]  Courts**
Contract disputes

**Courts**

👈 Fraud, racketeering, and deceptive practices

Purchasers of new home located in Texas met burden of pleading sufficient jurisdictional facts for exercise of personal jurisdiction over nonresident individual defendants in action for fraudulent inducement, negligent misrepresentation, and breach of contract; purchasers, who were Texas residents, pleaded that defendants invested in multiple Texas properties, including property at issue, through corporate entities they created for that purpose, that no major decisions concerning property at issue were made without approval of defendants, and that defendants accepted $1.5 million from purchasers but failed to provide purchasers a completed home as agreed. V.T.C.A., Civil Practice & Remedies Code § 17.041 et seq.

Cases that cite this headnote

**[14]** **Courts**

👈 Allegations, pleadings, and affidavits

Court considers the original pleadings, as well as plaintiff's response to a nonresident defendant's special appearance contesting personal jurisdiction, in examining whether plaintiff has met burden of pleading sufficient jurisdictional facts to satisfy long-arm statute. V.T.C.A., Civil Practice & Remedies Code § 17.041 et seq.

Cases that cite this headnote

**[15]** **Constitutional Law**

👈 Manufacture, distribution, and sale

**Courts**

👈 Corporations and business organizations

Under Due Process Clause and long-arm statute, individual nonresident defendants who formed corporate entities for purpose of investing in and selling real estate in Texas had sufficient purposeful contacts with Texas to support exercise of specific personal jurisdiction over them on breach of warranty claims by purchasers of residential property; defendants first purchased property in Texas by signing a contract to be performed in Texas, then signed contract of sale with purchasers, who were Texas residents, that included a "punch list" of tasks to be completed in connection with sale, and defendants signed those contracts in their individual, as opposed to their corporate, capacities. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.041 et seq.

Cases that cite this headnote

**[16]** **Contracts**

👈 Particular capacity

A signatory is personally liable on an instrument that does not show he signed in a representative capacity.

Cases that cite this headnote

**[17]** **Constitutional Law**

👈 Particular Parties or Circumstances

A single contract with a resident of forum state does not automatically establish specific personal jurisdiction over a nonresident defendant, but a single contract may meet the "purposeful availment" due process standard where the agreement involves many contacts between the defendant and the forum over a period of time. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[18]** **Constitutional Law**

👈 Manufacture, distribution, and sale

While a contract for an isolated sale in a state where the defendant does no business does not rise to the level of purposeful availment, other types of contracts, such as a franchise agreement, may establish the minimum contacts necessary under Due Process Clause for exercise of personal jurisdiction over a nonresident defendant. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[19]** **Constitutional Law**

👈 Manufacture, distribution, and sale

A contract for the purchase or assignment of Texas real property may establish minimum contacts necessary under Due Process Clause for exercise of personal jurisdiction over nonresident defendant. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[20] **Courts**
📎 Fiduciary duties in general; fiduciary shield

Individual nonresident defendants who formed corporate entities for purpose of acquiring and selling real estate in Texas were not protected under the fiduciary shield doctrine from the exercise of specific personal jurisdiction in action by Texas residents asserting negligent misrepresentation and fraudulent inducement in connection with their purchase of residential real estate; case involved allegations sounding in tort for which defendants might be held individually liable.

5 Cases that cite this headnote

[21] **Corporations and Business Organizations**
📎 Tortious acts in general

**Corporations and Business Organizations**
📎 Fraud

Corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation.

4 Cases that cite this headnote

[22] **Courts**
📎 Tortious or intentional conduct; fraud and breach of fiduciary duties

A corporate officer is not protected from the exercise of specific personal jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct directed at the forum state for which he may be held personally liable.

5 Cases that cite this headnote

[23] **Courts**

📎 Jurisdiction of Agents, Representatives, or Other Third Parties Themselves

Personal jurisdiction over a nonresident individual generally cannot be based on jurisdiction over a corporation with which he is associated unless the corporation is the alter ego of the individual.

4 Cases that cite this headnote

[24] **Courts**
📎 Jurisdiction of Agents, Representatives, or Other Third Parties Themselves

While nonresident individuals' contacts with a forum state are not to be analyzed based on their employer's activities in that forum, their status as employees does not somehow insulate them from personal jurisdiction.

1 Cases that cite this headnote

[25] **Corporations and Business Organizations**
📎 Participation in unauthorized or wrongful acts of corporation in general

A corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as the guiding spirit behind the wrongful conduct or the central figure in the challenged corporate activity.

Cases that cite this headnote

[26] **Courts**
📎 Fraud, racketeering, and deceptive practices

When examining fraud allegations as a basis for specific personal jurisdiction over a nonresident defendant, court must be careful to focus on the defendant's conduct and its relationship to the forum rather than where the plaintiff relies on the fraud.

1 Cases that cite this headnote

[27] **Constitutional Law**
📎 Manufacture, distribution, and sale
**Courts**
📎 Fraud, racketeering, and deceptive practices

Nonresident individual defendants purposefully availed themselves of privilege of conducting activities in Texas, thus meeting one due process requirement for exercise of personal jurisdiction on claims of negligent misrepresentation and fraudulent inducement brought by purchasers of residential real estate, though defendants created corporate entities to structure sale; alleged misrepresentations related to tasks to be completed in Texas on Texas real estate being sold to Texas residents, those alleged misrepresentations were purportedly contained in contract of sale that defendants signed in their individual capacity, and defendants stood to reap financial benefits through alleged fraud. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[28] **Constitutional Law**
 Manufacture, distribution, and sale
**Courts**
 Fraud, racketeering, and deceptive practices

Texas court's exercise of specific personal jurisdiction over nonresident defendants living in Florida comported with traditional notions of fair play and substantial justice, as necessary to satisfy due process, in action by purchasers of residential property in Texas who asserted breach of warranty, negligent misrepresentation, and fraudulent inducement claims in connection with the sale; distance between Texas and Florida was not sufficient alone to defeat jurisdiction, purchasers had significant interest in seeking convenient and effective relief in Texas, and Texas had strong interest in adjudicating disputes concerning real property and contracts to be performed within its borders. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[29] **Constitutional Law**
 Non-residents in general

In determining whether exercise of personal jurisdiction over nonresident defendant comports with traditional notions of fair play and substantial justice, as required under

Due Process Clause, courts evaluate: (1) the defendant's burden; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the states' shared interest in furthering fundamental substantive social policies. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[30] **Constitutional Law**
 Non-residents in general

Only rarely will the exercise of personal jurisdiction over nonresident not comport with fair play and substantial justice, so as to violate due process, when the nonresident has purposefully established minimum contacts with the forum state. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*662** John K. Broussard, Jr., N. Terry Adams, Jr., Houston, TX, Sawnie A. McEntire, Dallas, TX, Beirne, Maynard & Parsons, L.L.P., for Appellant.

Joan R. Tarpley, Tarpley Dispute Resolutions, Robert H. Osburn, Billy R. McGill, Robert H. Osburn, P.C., Dallas, TX, for Appellee.

Before Justices MORRIS, RICHTER, and LANG–MIERS.

**OPINION**

Opinion by Justice RICHTER.

In this interlocutory appeal from the trial court's denial of their special appearance, appellants Moris and Lillian Tabacinic assert their contacts with the State of Texas are insufficient to support personal jurisdiction because all of the actions forming the basis of the lawsuit occurred in Florida and were undertaken in their corporate capacities. Because we conclude the Tabacinics' individual contacts with Texas are sufficient to support specific jurisdiction and the exercise of

jurisdiction is consistent with traditional notions of fair play and substantial justice, we affirm the trial court's order.

## I. BACKGROUND

This case arises out of contract for the purchase of residential real property in Texas. William and Vernica Frazier, the Texas residents who purchased the property, sued Moris and Lillian Tabacinic and others in a Texas state court for fraudulent inducement, negligent misrepresentation, and breach of warranty. The Tabacinics filed a special appearance, asserting their contacts with Texas are insufficient to support the exercise of personal jurisdiction over them because they acted only in Florida in their corporate capacity. The Fraziers responded to the special appearance, and the trial court conducted an evidentiary hearing. Upon conclusion of the hearing, the trial court denied the special appearance. The trial court did not make any findings of fact or conclusions of law.

## II. DISCUSSION

In two issues, the Tabacinics assert the Fraziers did not meet their burden to plead or prove facts to satisfy the exercise of personal jurisdiction, and because the jurisdictional allegations are not supported by the record, any implied finding "fails on legal and/or factual sufficiency grounds." We will address these issues together.

### A. Applicable Law and Standard of Review

Texas courts may exercise personal jurisdiction over nonresident defendants in **\*663** accordance with the Texas long-arm statute. TEX. CIV. PRAC. & REM.CODE ANN. § 17.041–.045 (West 2008). The plaintiff bears the initial burden of pleading facts sufficient to bring the defendant within the reach of the Texas long-arm statute. *Id.; BMC Software, Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002); *Alliance Royalties, LLC v. Boothe,* 329 S.W.3d 117, 120 (Tex.App.-Dallas 2010, no pet.). Once the plaintiff meets his initial burden, the burden then shifts to the defendant to negate all bases for personal jurisdiction asserted by the plaintiff. *Id.* If the defendant does so, the burden shifts back to the plaintiff to show the court has personal jurisdiction over the defendant as a matter of law. *Id.*

**[1]** **[2]** **[3]** Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 790–91 (Tex.2005). Because the trial court's exercise of personal jurisdiction over a nonresident defendant is one of law, an appellate court reviews the trial court's determination of a special appearance de novo. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *BMC Software,* 83 S.W.3d at 794. When a party challenges a trial court's ruling on a special appearance, and the court did not make findings of fact and conclusions of law, we infer all facts necessary to support the judgment if they are supported by the evidence. *Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 794–95.

**[4]** **[5]** **[6]** The Due Process Clause of the Fourteenth Amendment operates to limit the power of a state to assert personal jurisdiction over a nonresident defendant. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County,* 480 U.S. 102, 108, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404, (1984). The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 294, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Under the Due Process Clause, personal jurisdiction over a nonresident defendant is constitutional when the nonresident defendant has established minimum contacts with the forum state and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174; *Int'l Shoe,* 326 U.S. at 320, 66 S.Ct. 154.

**[7]** **[8]** **[9]** **[10]** Purposeful availment is the touchstone of the jurisdictional due process analysis. *Asahi,* 480 U.S. at 108–09, 107 S.Ct. 1026; *Capital Technology Information Services, Inc. v. Arias & Arias,* 270 S.W.3d 741, 750 (Tex.App.-Dallas 2008, pet. denied). A nonresident defendant's activities must be purposefully directed toward the forum state so that the nonresident defendant could foresee being haled into court there. *See Burger King,* 471 U.S. at 474, 105 S.Ct. 2174. There are three parts to a purposeful availment inquiry: (1) only the nonresident defendant's contacts with the forum are relevant, not the

unilateral activity of another party or a third person; (2) the contacts relied on must be purposeful rather than random, fortuitous, or attenuated; and (3) the nonresident defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Michiana,* 168 S.W.3d at 785; *see also Moki Mac,* 221 S.W.3d at 575; *Capital Tech.,* 270 S.W.3d at 750. **\*664** "Jurisdiction is based on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Michiana,* 168 S.W.3d at 784.

 [11]   [12]   A defendant's contacts with a forum may give rise to either general or specific jurisdiction. Specific jurisdiction may exist over a nonresident defendant in a lawsuit that arises out of or is related to the nonresident defendant's contacts with the forum state. *Capital Tech.,* 270 S.W.3d at 749 (citing *Moki Mac,* 221 S.W.3d at 576). When specific jurisdiction is asserted, the minimum-contacts analysis focuses on the relationship between the nonresident defendant, the forum state, and the litigation. *Moki Mac,* 221 S.W.3d at 575–576. For a court to exercise specific jurisdiction over a nonresident defendant, two requirements must be met: (1) the nonresident defendant's contacts with the forum state must be purposeful; and (2) the cause of action must arise from or relate to those contacts. *See Burger King,* 471 U.S. at 474–75, 105 S.Ct. 2174; *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559; *Moki Mac,* 221 S.W.3d at 576. In the present case, the Fraziers assert the Texas court has specific, rather than general jurisdiction over the Tabacinics. Our inquiry is limited accordingly. [1]

### B. Did the Fraziers Plead Sufficient Jurisdictional Facts?

 [13]   [14]   First, we examine whether the Fraziers met their burden to plead sufficient jurisdictional facts to satisfy the long-arm statute. In doing so, we consider the original pleadings as well as the response to the special appearance. *See Proctor v. Buell,* 293 S.W.3d 924, 930 (Tex.App.-Dallas 2009, no pet.); *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 249 n. 7 (Tex.App.-Houston [1st Dist.] 2004, pet. denied).

The Fraziers' petition asserts the Tabacinics reside in Florida and engage in business in the state of Texas. The long-arm statute permits Texas courts to exercise jurisdiction over non-resident defendants that do business in Texas. *See BMC Software,* 83 S.W.3d at 795. The statute sets out a list of activities that constitute doing business in Texas. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (West 2008). Among other acts, a non-resident defendant does business

in Texas if the non-resident contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state, or commits a tort in whole or in part in this state. *See id.* According to the petition, the Tabacinics sold the Fraziers a new home (the "Home") that was not properly constructed in accordance with the parties' agreement. Although a partnership was the purported seller, the Fraziers were told the Tabacinics were really the sellers. Upon completion of the Home, numerous subcontractors were not paid and subsequently filed mechanics and materialmen's liens against the property. The petition asserts the Tabacinics and other defendants made negligent misrepresentations concerning the construction of the home and payment of subcontractors. In the alternative, the petition asserts the Fraziers were fraudulently induced to purchase the home. The petition further alleges the defendants breached express and implied warranties that the home was habitable, built in a good an workmanlike manner, fit for ordinary use, and fit for its particular purpose.

 **\*665** In the Fraziers' response to the special appearance they assert: (1) the Tabacinics invested in multiple properties in Dallas, Texas through corporate entities they created for this express purpose; (2) the Tabacinics knew that their actions concerning the property in the instant case would have an effect on the Fraziers as Texas residents; (3) Tex Dynasty, LLC ("Tex Dynasty") was one of the entities the Tabacinics created for the purpose of managing the real estate they purchased in Dallas, Texas; (4) the Tabacinics also created 6418 Royalton, L.P. (the "Royalton Partnership"), and only the Tabacinics could authorize actions taken by the Royalton Partnership and Tex Dynasty; (5) the Tabacinics, through the Royalton Partnership, purchased the property at 6418 Royalton Drive (the "Royalton Property") as an investment property; (6) the Home was built on the Royalton Property; (7) the Tabacinics' niece, Sandy Tabacinic, was one of the builders of the Home; (8) Moris Tabacinic approved the transfer of funds from Tex Dynasty to the Royalton Partnership to fund the construction of the Home; (9) Moris Tabacinic stayed informed about the Royalton Property and approved or disapproved wire transfers relating to the construction of the Home; (10) Moris Tabacinic made all major and final decisions concerning the Royalton Property, including but not limited to how much money to invest in the Royalton Partnership; (11) the Home was still under construction when the Fraziers decided to purchase it, leaving the Fraziers the option to make certain decisions about construction and decor; (12) no major decisions concerning the Royalton Property were made without the approval of the

Tabacinics; (13) the Tabacinics promised the Fraziers that certain tasks would be completed with regard to the Home, and signed a "punch list" agreeing to complete these items; (14) the items the Tabacinics agreed to complete were not completed; (15) the Tabacinics were aware that the items had not been completed, but refused to fund the repairs; (16) the Tabacinics accepted $1.5 million from the Fraziers but failed to provide them with a completed home as agreed; (17) the Tabacinics made the conscious decision not to fund the completion of the Home and this undercapitalization and refusal of funding requests resulted in the Home having significant defects; and (18) the Tabacinics knew their actions would have an adverse impact on the Fraziers.

Based on the foregoing, we conclude the Fraziers satisfied their initial burden to plead a sufficient basis upon which to subject the Tabacinics to personal jurisdiction. To avoid litigating in Texas, it was then the Tabacinics burden to negate the bases for jurisdiction asserted by the Fraziers. After the special appearance hearing, the court determined the Tabacinics failed to do so. We now review that determination.

### C. Do the Facts Underlying The Contract Claims Support Jurisdiction?

 **[15]**    The Tabacinics contend the documents relating to the purchase and sale of the Home were signed in a representative capacity on behalf of the Royalton Partnership and are therefore not germane to our consideration of individual jurisdiction. Thus, we must first resolve the threshold question as to the universe of contacts to be considered. The record reflects that the Tabacinics purchased the Royalton Property from Kinneret Custom Homes. Although the introductory paragraph of the purchase contract identifies Royalton Partnership as the buyer, Moris Tabacinic signed the signature line for buyer without indicating he was signing in a representative capacity. Likewise, the contract the Fraziers signed to purchase the property, which was made using a Texas Real Estate **\*666** Commission form, identifies the seller as the Royalton Partnership. The signature lines for the seller are signed by: Daniel Sragowicz ("Daniel") on behalf of the Royalton Partnership, and Moris and Lillian Tabacinic. Neither of the Tabacinics indicated they were signing in a representative capacity. Three addenda to the contract are similarly signed. Specifically, the "Addendum to New Home Contract" and the "Third Party Financing Condition Addendum" are signed by Daniel on behalf of the partnership, and Moris and Lillian Tabacinic individually. A third document, referred to as the "punch list," shows only

the initials "DS," "MT," and "LT," with no reference to the partnership at all.

The Tabacinics testified they signed the foregoing documents in their corporate capacity on the lines designated for "seller," and argue that the contract defines "seller" as the Royalton Partnership. The general warranty deed for the property identifies the Royalton Partnership as the grantor. Dr. Frazier testified in his deposition that he understood the Royalton Partnership was the seller.

The record also reflects that on the same day the Tabacinics signed the sales contract for the Royalton Property, Moris Tabacinic signed two other corporate documents to form the Royalton Partnership. Both of these documents reflect that they were signed by Moris Tabacinic in his representative capacity for Tex Dynasty (the general partner of the Royalton Partnership).

 **[16]**    It is well-established that a signatory is personally liable on an instrument that does not show he signed in a representative capacity. *See A. Duda & Sons, Inc. v. Madera,* 687 S.W.2d 83, 85 (Tex.App.-Houston [1st Dist.] 1985, no writ).* Here, however, we are not charged with determination of the Tabacinics' liability on the contract, but whether the manner in which they signed the contract constitutes a sufficiently purposeful contact to justify the exercise of jurisdiction. *See Michiana,* 168 S.W.3d at 791–92 (stating special appearance involves consideration of only jurisdiction, not merits or liability); *Pulmosan Safety Equip. Corp. v. Lamb,* 273 S.W.3d 829, 839 (Tex.App.-Houston [14th Dist.] 2008, pet. denied) (same). The Fraziers argue that the manner in which the Tabacinics signed the documents forming the Royalton Partnership, as contrasted with the manner in which they signed the contract for the sale of the Royalton Property demonstrates their understanding of the distinction between an individual and representative signature. We agree. Despite his testimony that he signed the Royalton Property documents in a representative capacity, Moris Tabacinic admitted that unlike the documents forming the Royalton Partnership, the signatures on the Royalton Property contract and addenda include no such designation or notation.

 **[17]**    **[18]**    **[19]**    The Tabacinics further assert that specific jurisdiction fails "when the only jurisdictional allegation is that the individual defendant signed a document in an individual capacity." We agree that a single contract with a Texas resident does not automatically establish jurisdiction.

But a single contract may meet the purposeful availment standard where the agreement involves many contacts between the defendant and the forum over a period of time. *See Michiana,* 168 S.W.3d at 786–87. Thus, while a contract for an isolated sale in a state where the defendant does no business does not rise to the level of purposeful availment, other types of contracts, such as a franchise agreement, may establish minimum contacts. *See id; see also Rogers v. TexWest, L.L.C.,* 261 S.W.3d 818, 822 (Tex.App.-Dallas 2008, no pet.) (signing limited partnership agreement for creation of partnership to operate **\*667** in Texas). A contract for the purchase or assignment of Texas real property is such a contract. *See Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 339 (Tex.2008).

In *Retamco,* the Texas Supreme Court observed that, unlike the sale of a recreational vehicle in *Michiana,* the purchase of real property does not establish a single contact. *Id.* Instead, the purchase and ownership of real property could 'involve many contacts over a long period of time,' which would carry with it certain continuing obligations." *Id.* (citing *Michiana,* 168 S.W.3d at 787). Unlike personal property, real property will always be in Texas, "which leaves no doubt of the continuing relationship that this ownership creates." *Retamco,* 278 S.W.3d at 339.

The Tabacinics testified that they do not have a residence, maintain an agent, a place of business, or real or personal property in Texas, and have never paid taxes in Texas. The Tabacinics further testified they have been to Texas only twice for personal reasons. They have never met the Fraziers or communicated with them by telephone or correspondence.

Moris Tabacinic testified that he made the decision to invest in the Royalton Property. Tex Dynasty and Dynasty Investments ("DI") funded the purchase of the lot and construction. Moris Tabacinic approved the design and budget for the construction of the Home, and along with his wife, made all of the financial decisions concerning construction. He also approved six to twelve wire transfers from Tex Dynasty for the construction, and acknowledged that he knew his decisions would have an impact on the construction of the Home and the final product.

Daniel was an employee of the Royalton Partnership and reported to Moris Tabacinic concerning the construction of the Home. Daniel was charged with supervision of the construction and payments to subcontractors, and traveled to Texas several times for this purpose. When he did so, he reported back to Moris Tabacinic. During the construction of the Home, Daniel and Moris Tabacinic had discussions concerning the progress of the construction, including whether the work was completed on time and within the budget.

The punch list that the Tabacinics initialed and agreed to consisted of a number of items the Fraziers requested be completed in connection with the construction of the Home. The Fraziers testified they would not have purchased the Home but for the Tabacinics' representation that the punch list items would be completed. Moris Tabacinic testified that he had discussions with Daniel about the punch list and paying for the items on the list, and admitted that he and his wife made the decisions about whether to fund the items on the list.

There appears to be no dispute that the punch list items were not completed. Moris Tabacinic testified he was not aware the items had not been completed until the lawsuit was filed. Dr. Frazier testified that the items on the punch list were not completed, as well as numerous other construction items. In addition to the punch list, the contract for the purchase of the property provides for the substantial completion of improvements by the specified date. The contract further provides:

> Seller represents that as of the Closing Date there will be no liens, assessments, or security interests against the Property which will not be satisfied.

Dr. Frazier testified, however, that after closing, he discovered that many of the subcontractors who worked on the Home had not been paid and filed liens against the property in excess of $45,000. Neither the Tabacinics nor our review have identified any evidence to contravene the Fraziers' **\*668** allegations concerning these liens or the construction items that were not completed.

Given the arguments and proof, we conclude the manner in which the Tabacinics signed the contract, coupled with the nature of the contract itself, constitute sufficiently purposeful contacts to support the exercise of jurisdiction. Moris Tabacinic properly limited the capacity in which he signed the documents forming the Royalton Partnership by indicating he signed in a representative capacity. In contrast, the contract with the Fraziers contains no such designation. The signature line immediately above the Tabacinics' indicates

that Daniel is the party signing the contract on behalf of the Royalton Partnership. By failing to indicate they signed in a representative capacity and initialing the punch list, the Tabacinics undertook a purposeful act that engendered a relationship between the Tabacinics, the Texas forum, and the subject matter of the pending litigation. Unlike a single contract for an isolated sale of a product to a Texas resident, the contract at issue here involves continuous contacts with Texas. These contacts are neither random nor fortuitous. The Tabacinics first purchased real property in Texas by signing a contract to be performed in Texas. Then, they sold the Texas real property by signing a contract with Texas residents that required development of the property in Texas. Through these purposeful actions, the Tabacinics invoked the benefits and protections of the laws of this state and created continuing obligations between themselves and residents of this state. Thus, the Tabacinics manifestly availed themselves of the privilege of conducting business in Texas.

### D. Do the Facts Underlying the Tort Claims Support Jurisdiction?

[20]     In addition to the claims sounding in contract, the Fraziers also assert the Tabacinics made negligent misrepresentations and fraudulently induced them to purchase the Home. Relying on the fiduciary shield doctrine, the Tabacinics insist they cannot be individually hailed into Texas because they acted exclusively in their corporate capacity. We disagree.

[21]     [22]     The fiduciary shield doctrine protects a nonresident corporate officer or employee from the exercise of jurisdiction when all of his contacts with Texas were made on behalf of his employer. *Nichols v. Tseng Hsiang Lin,* 282 S.W.3d 743, 750 (Tex.App.-Dallas 2009, no pet.). Courts that have applied the fiduciary shield doctrine, however, have limited its application to attempts to exercise *general* jurisdiction over a nonresident defendant. *Crithfield v. Boothe,* 343 S.W.3d 274, 287 (Tex.App.-Dallas 2011, no pet.); *Brown v. Gen. Brick Sales Co.,* 39 S.W.3d 291, 300 (Tex.App.-Fort Worth 2001, no pet.); *see also Garner v. Furmanite Australia Pty., Ltd.,* 966 S.W.2d 798, 803 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). A corporate officer or employee is not shielded from the exercise of *specific* jurisdiction as to torts for which the officer or employee may be held individually liable. *Tuscano v. Osterberg,* 82 S.W.3d 457, 467–68 (Tex.App.-El Paso 2002, no pet.); *see also Gen. Elec. v. Brown & Ross Int'l Distribs., Inc.,* 804 S.W.2d 527, 532–33 (Tex.App.-Houston [1st Dist.]

1990, writ denied). Corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation. *Shapolsky v. Brewton,* 56 S.W.3d 120, 133 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Thus, a corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct **\*669** directed at the forum state for which he may be held personally liable. *See Ennis v. Loiseau,* 164 S.W.3d 698, 707 (Tex.App.-Austin 2005, no pet.). Because this specific jurisdiction case includes allegations sounding in tort for which the Tabacinics may be held individually liable, the fiduciary shield doctrine does not apply.

The Tabacinics' efforts to cloak themselves in the protection of the corporate veil similarly fail. [2] Citing *Wolf v. Summers–Wood, L.P.,* 214 S.W.3d 783, 793 (Tex.App.-Dallas 2007, no pet.), the Tabacinics assert they acted only in a corporate capacity and are not subject to personal jurisdiction because the Fraziers failed to pierce the corporate veil. We are not persuaded by this argument.

[23]     Jurisdiction over an individual generally cannot be based on jurisdiction over a corporation with which he is associated unless the corporation is the alter ego of the individual. *Davey v. Shaw,* 225 S.W.3d 843, 856 (Tex.App.-Dallas 2007, no pet.). Under an alter ego theory, personal jurisdiction may be established by imputing the jurisdictional contacts of one person to its alter ego. *BMC Software,* 83 S.W.3d at 798; *Ramirez v. Hariri,* 165 S.W.3d 912, 916 (Tex.App.-Dallas 2005, no pet.). To defeat the protection of the fiduciary shield doctrine, the plaintiff must show the individual was an alter ego of his employer. *Brown v. Gen. Brick Sales Co., Inc.,* 39 S.W.3d 291, 298 (Tex.App.-Fort Worth 2001, no pet.).

Here, it is undisputed that the alter ego claim asserted in the third amended petition was not before the court at the time the special appearance was heard. [3] Moreover, we have already concluded that the fiduciary shield doctrine is inapplicable in this specific jurisdiction case. Therefore, the Fraziers were not required to defeat the fiduciary shield doctrine by piercing the corporate veil to establish alter ego. In so concluding, we note that the Tabacinics' reliance on *Wolf* is misplaced. In *Wolf,* plaintiffs alleged the corporate entity was used as a sham to perpetrate a fraud, but offered no evidence in support of these allegations. *Id.* at 790. Significantly, there were no allegations of specific individual acts. *Id.* at 792. Instead,

the *Wolf* plaintiffs relied on conclusory allegations that the individual defendants used the corporate form for "wrongful, fraudulent, and tortious acts personally committed by [the individuals]." As a result, the court concluded the pleadings failed to provide facts to support plaintiffs' allegations or meet plaintiffs' burden. *Id.*

 [24]    [25]    In the present case, in addition to the fact that there was no alter ego claim before the court, the alleged fraudulent acts and omissions were not imputed to the Tabacinics; they were attributed to them individually. While individuals' contacts with a forum state are not to be analyzed based on their employer's activities in that forum, "their status as employees does not somehow insulate them from jurisdiction." *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). A corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as to be the "guiding spirit behind the wrongful conduct" or the "central figure in the challenged **\*670** corporate activity." *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 174 (5th Cir.1985).

The record reflects that the Royalton Partnership was formed for the purpose of acquiring the Royalton Property. The formation documents for the Royalton Partnership were signed on the same day as the contract for the sale of the Home. Tex Dynasty owns 0.05% of the Royalton Partnership and is its general partner. DI is the single limited partner of the Royalton Partnership and owns 99%. DI also owns Tex Dynasty. The Tabacinics are managers of Tex Dynasty, which Moris Tabacinic testified "could have" been formed to invest in Texas property. In addition to the Royalton Property, Tex Dynasty has invested in three other pieces of Texas real estate. Moris Tabacinic is also the president of Tex Dynasty. DI is owned by the MOTL trust, of which the Tabacinics are discretionary beneficiaries.

Moris Tabacinic testified that the only assets that the Royalton Partnership ever possessed were the Royalton Property and the cash funds infused into it by DI and Tex Dynasty. The Home sold to the Fraziers for $1.5 million. These proceeds were initially paid to the Royalton Partnership, and then subsequently transferred to DI and Tex Dynasty, leaving the Royalton Partnership with no assets. As a result, the Royalton Partnership no longer exists. Moris Tabacinic also testified that the funds DI received from the sale of the Home were used to make other investments. The decisions concerning the other investments were made by the Tabacinics.

On this evidence, we cannot conclude the Tabacinics' contacts with Texas did not include those made in their individual capacity. To the contrary, the evidence shows the Tabacinics had sufficient minimum contacts to support the exercise of specific jurisdiction over them individually, even if all of their activities in Texas were done in their capacity as an officer, manager or employee of the Royalton Partnership, Tex Dynasty, or DI. We also cannot conclude the Tabacinics' conduct was limited to Florida. The record reflects that the Tabacinics had a "substantial presence" in Texas.

 [26]    The Tabacinics complain that jurisdiction may not be based on whether a defendant "directed a tort in Texas." We do not dispute that courts have been instructed to focus on "where the defendant's actions were carried out" and "the contacts themselves," as opposed to "whether the contacts were tortious." *Michiana,* 168 S.W.3d at 792. When examining tort allegations as a basis for specific jurisdiction, we must be careful to focus on the defendant's conduct and its relationship to the forum rather than where the plaintiff relies on the fraud. *See Michiana,* 168 S.W.3d at 790.

 [27]    In the present case, the alleged torts, fraudulent inducement and negligent misrepresentation, are premised on the representations the Tabacinics made concerning the Home to be constructed in Texas. These alleged misrepresentations were purportedly contained in the contract and addenda the Tabacinics signed in their individual capacity. Although he contends he signed on behalf of the partnership, Moris Tabacinic acknowledged that initialing the punch list constituted a representation that the items listed on the punch list would be completed. There is no dispute that these actions were to occur in Texas. Because the representations underlying the tort claims concerned activity relating to Texas real property, sold to Texas residents, to occur in Texas, we conclude the Tabacinics purposefully directed their activities to the forum state and could reasonably **\*671** anticipate being haled into a Texas court to defend a lawsuit.

We further conclude the Tabacinics sought some benefit, advantage, or profit by availing themselves of the benefits and protections of Texas. *See Michiana,* 168 S.W.3d at 785. Despite the existence of the various entities the Tabacinics created to structure the transaction, the Tabacinics stood to reap financial benefits from the money obtained from the Texas residents through the alleged fraud. *See SITQ E.U., Inc. v. Reata Rest. Inc.,* 111 S.W.3d 638, 650–52 (Tex.App.-Fort Worth 2003, pet. denied). The proceeds and benefits from the sale of the Home were used to make other investments

through entities the Tabacinics created and controlled. Both the decision to make other investments as well as the decision concerning the investments to be made were made by the Tabacinics.

On this record, the Tabacinics' contacts with Texas were sufficient to implicate the need for Texas to provide a forum for redress to its citizens. Accordingly, all three factors described in *Michiana* are resolved in favor of determining the Tabacinics' contacts constitute "purposeful availment" of the privilege of conducting activities in Texas. *See Michiana,* 168 S.W.3d at 785.

### E. Fair Play and Substantial Justice

 [28]    [29]    [30]    The exercise of personal jurisdiction must also comport with traditional notions of fair play and substantial justice. *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. We evaluate the contact in light of: (1) the defendant's burden; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the states' shared interest in furthering fundamental substantive social policies. *Id.; TexVa, Inc. v. Boone,* 300 S.W.3d 879, 891 (Tex.App.-Dallas 2009, pet. denied). Only rarely will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident has purposefully established minimum contacts with the forum state. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 227 (Tex.1991).

Considering these factors in the context of this case, we first conclude the Tabacinics' burden and inconvenience in defending against the claims in the Texas litigation does not render jurisdiction over them in Texas unfair or unjust. There is nothing in the record showing that litigation in Texas would be unfair or unjust to the Tabacinics. Although there is some geographical distance between Texas and Florida, distance alone is not sufficient to defeat jurisdiction. *Guardian Royal,* 815 S.W.2d at 231. On the other hand, the Fraziers have a significant interest in seeking convenient and effective relief in the state in which they purchased the property at issue. Texas has a strong interest in adjudicating disputes concerning real property and contracts to be performed within its borders, and the efficiency of the interstate judicial system is best served by determining such suits in the state where the real property is located. Similarly, the states' shared interest in furthering fundamental substantive social policies strongly supports the notion that the forum state's jurisdiction over the Tabacinics is neither unfair nor unjust. To permit out of state residents to acquire and sell Texas property without subjecting themselves to specific jurisdiction as to lawsuits concerning that property would invite such residents to avail themselves of the privileges of conducting business in this state free from the corresponding obligations. The fundamental interest of state **\*672** courts in discouraging such activity, in conjunction with the other factors, supports the conclusion that the exercise of jurisdiction in this case comports with the notions of fair play and substantial justice. The Tabacinics' issues are overruled. The trial court's order denying the special appearance is affirmed.

### All Citations

372 S.W.3d 658

### Footnotes

1    The Tabacinics also argue on appeal they are not subject to general jurisdiction. The Fraziers, however, do not allege the Tabacinics are subject to general jurisdiction or had continuous or systematic contacts with Texas, and expressly limited their argument to specific jurisdiction at the special appearance hearing and during oral argument on appeal.

2    Although they fail to specify, the Tabacinics' corporate veil argument appears to be based on alter ego. Alter ego is one of several veil piercing theories. *See Service Corp. Intern., v. Guerra,* 348 S.W.3d 221, 228 n. 2 (Tex.2011).

3    The alter ago claim was asserted in the third amended petition two days before the special appearance hearing. Following the Tabacinics' objection, the Fraziers informed the court the hearing could proceed on the second amended petition and the court indicated it would so proceed.

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by**    Holk v. USA Managed Care Organization, Inc.,
Tex.App.-Austin,    July 15, 2004

12 S.W.3d 900
Court of Appeals of Texas,
Austin.

TELEVENTURES, INC., Appellant,
v.
INTERNATIONAL GAME
TECHNOLOGY and IGT, Appellees.

No. 03–99–00116–CV.    |    Feb. 25, 2000.
|    Rehearing Overruled March 30, 2000.

Corporation with its principal place of business in Texas sued nonresident corporation for breach of contract, breach of fiduciary duties, fraud in the inducement of letters of intent, fraudulent concealment, negligent misrepresentation, and tortious interference, and nonresident corporation specially appeared challenging personal jurisdiction. The 250th Judicial District Court, Travis County, Ernest C. Garcia, J., sustained nonresident corporation's special appearance, and plaintiff appealed. The Court of Appeals, Yeakel, J., held that: (1) letters of intent and parties' negotiations did not reveal purposeful conduct by nonresident corporation sufficient to establish jurisdiction over it; (2) parties' communications were not sufficiently related to causes of action to justify exercise of jurisdiction; (3) fact that plaintiff hired employees in Texas to help it develop system did not justify exercise of jurisdiction; and (4) nonresident corporation made no communication that, if false, gave rise to cause of action, and thus jurisdiction was not justified on basis of such communication.

Affirmed.

West Headnotes (25)

**[1]    Appearance**
        Objections to jurisdiction in general
In interposing a special appearance, the nonresident defendant challenging personal jurisdiction bears the burden of proof to negate all bases of personal jurisdiction alleged by the plaintiff. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

Cases that cite this headnote

**[2]    Appeal and Error**
        Cases Triable in Appellate Court
Court of Appeals reviews the trial court's conclusions of law de novo, and conclusions of law will not be reversed unless they are erroneous as a matter of law.

3 Cases that cite this headnote

**[3]    Constitutional Law**
        Non-residents in general
    **Courts**
        Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction
Texas court may exercise personal jurisdiction over a nonresident defendant if: (1) jurisdiction is authorized by the Texas long-arm statute, and (2) the exercise of jurisdiction is consistent with federal and state due process standards. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

3 Cases that cite this headnote

**[4]    Constitutional Law**
        Non-residents in general
    **Courts**
        Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction
Long-arm statute allows Texas courts jurisdiction to the full extent permitted by the United States Constitution, and thus, the only limitations on Texas courts in asserting personal jurisdiction over a nonresident defendant are those imposed by the due process clause of the Fourteenth Amendment. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

4 Cases that cite this headnote

**[5] Constitutional Law**
🔑 Non-residents in general

To establish jurisdiction over a nonresident defendant, due process requires a showing that the nonresident defendant has purposefully established minimum contacts with Texas and that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

5 Cases that cite this headnote

**[6] Courts**
🔑 Nature, number, frequency, and extent of contacts and activities

Although the jurisdiction of Texas courts is always dependent on the defendant's having some minimum contacts with Texas, the requisite extent of those contacts varies depending on the type of in personam jurisdiction sought to be imposed. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

Cases that cite this headnote

**[7] Courts**
🔑 Related contacts and activities; specific jurisdiction
**Courts**
🔑 Agents, Representatives, and Other Third Parties, Contacts and Activities of as Basis for Jurisdiction

To establish specific jurisdiction over a nonresident, the cause of action must arise out of or relate to the nonresident defendant's contact with the forum state and the conduct must have resulted from that defendant's purposeful conduct, not the unilateral conduct of the plaintiff or others. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

4 Cases that cite this headnote

**[8] Courts**

🔑 Related contacts and activities; specific jurisdiction

In analyzing minimum contacts for purposes of Texas courts' specific jurisdiction over a nonresident defendant, court focuses on the relationship among the nonresident defendant, the forum, and the litigation. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

3 Cases that cite this headnote

**[9] Courts**
🔑 Unrelated contacts and activities; general jurisdiction

Assertion of general jurisdiction over a nonresident defendant compels a more demanding minimum-contacts analysis and requires a showing of substantial activities within the forum state. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

Cases that cite this headnote

**[10] Courts**
🔑 Unrelated contacts and activities; general jurisdiction

To establish general jurisdiction over a nonresident defendant, the cause of action need not arise from or relate to the nonresident defendant's purposeful conduct within the forum state, but there must be continuous and systematic contacts between the nonresident defendant and the forum state. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

4 Cases that cite this headnote

**[11] Constitutional Law**
🔑 Non-residents in general
**Courts**
🔑 Related contacts and activities; specific jurisdiction

To establish specific jurisdiction over a nonresident defendant, the nonresident defendant must have purposefully established minimum contacts with Texas, the cause of action must arise out of or relate to these contacts, the contacts must give rise to a

substantial connection between Texas and the nonresident, and the assumption of jurisdiction by Texas must comport with fair play and substantial justice. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

6 Cases that cite this headnote

[12] **Courts**
 Purpose, intent, and foreseeability; purposeful availment

In order to exercise jurisdiction over a nonresident defendant, the nonresident defendant must have purposely availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

Cases that cite this headnote

[13] **Courts**
 Purpose, intent, and foreseeability; purposeful availment

**Courts**
 Agents, Representatives, and Other Third Parties, Contacts and Activities of as Basis for Jurisdiction

Purposeful availment requirement for exercise of jurisdiction over a nonresident defendant ensures that a nonresident defendant will not be haled into a foreign jurisdiction based solely on random, fortuitous, or attenuated contacts, or unilateral activity of another party or a third person. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

Cases that cite this headnote

[14] **Courts**
 Factors Considered in General

Nonresident defendant must have fair warning that a particular activity may subject it to the jurisdiction of a foreign sovereign in order for it to have jurisdiction over the nonresident. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

Cases that cite this headnote

[15] **Courts**
 Nature, number, frequency, and extent of contacts and activities

Isolated contacts with the forum state or its residents are not sufficient for a court to assume personal jurisdiction over a nonresident defendant. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

Cases that cite this headnote

[16] **Courts**
 Partnerships and joint ventures

Terms of letters of intent and history of negotiations between plaintiff and nonresident corporation regarding agreement to jointly develop in-room gaming system did not reveal purposeful conduct by nonresident corporation sufficient to subject it to jurisdiction of Texas district court, even though nonresident corporation requested that plaintiff develop business summary, and plaintiff developed game cube and marketing materials, where business summary was just part of ongoing communication, plaintiffs independently developed game cube and marketing tools, nonresident corporation did not use game cube, and letter agreements did not indicate place of performance or state where contemplated partnership was to be formed or domiciled. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

2 Cases that cite this headnote

[17] **Courts**
 Commercial Contacts and Activities; Contracts and Transactions

Merely contracting with a Texas corporation does not satisfy the minimum-contacts requirement for the purpose of establishing specific jurisdiction over a nonresident defendant. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

4 Cases that cite this headnote

**[18]  Courts**

🔑 Business contacts and activities; transacting or doing business

To establish jurisdiction over a nonresident defendant, courts must apply a highly realistic approach that recognizes that a contract is ordinarily merely an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

Cases that cite this headnote

**[19]  Courts**

🔑 Commercial Contacts and Activities; Contracts and Transactions

Prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing must be evaluated in determining whether the nonresident defendant purposefully established minimum contacts within the forum, for the purpose of establishing specific jurisdiction over the defendant. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

3 Cases that cite this headnote

**[20]  Courts**

🔑 Commercial Contacts and Activities; Contracts and Transactions

Partial performance of a contract in Texas is not the sine qua non of personal jurisdiction. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

1 Cases that cite this headnote

**[21]  Courts**

🔑 Nature, number, frequency, and extent of contacts and activities

In a minimum-contacts analysis, for the purpose of determining whether personal jurisdiction can

be exercised over a nonresident, it is not the number, but rather the quality and nature of the nonresident's contacts with Texas that are important. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

Cases that cite this headnote

**[22]  Courts**

🔑 Partnerships and joint ventures

Telephone, mail, and facsimile communications between parties were not sufficiently related to breach of contract and fraud causes of action to justify exercise of specific jurisdiction over nonresident corporation on basis of purposeful availment of benefits and protections of Texas law, even though nonresident corporation admitted that decisions regarding proposed joint project were made in such communication, and plaintiff alleged that termination letter sent to Texas constituted complained of breach of contract, where communications consisted for most part of development updates and travel arrangements, and if there was a breach, it occurred when and where nonresident corporation ceased its performance of contract, not in letter. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

8 Cases that cite this headnote

**[23]  Courts**

🔑 Commercial Contacts and Activities; Contracts and Transactions

Minimum contacts, for the purpose of establishing specific jurisdiction over a nonresident defendant, may not be satisfied by merely engaging in communications with a Texas corporation during performance of a contract. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

9 Cases that cite this headnote

**[24]  Courts**

🔑 Particular cases

Fact that plaintiff hired employees in Texas to help it develop in-room gaming system,

which it had agreed to develop with nonresident corporation, did not satisfy section of long-arm statute condition that provided jurisdiction over nonresident corporation that recruited Texas residents through an intermediary located in Texas. V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

[25]  **Courts**
 👈 Corporations and business organizations

No communication by nonresident corporation was directed to and intended to be relied upon by plaintiff that, if false, gave rise to any cause of action alleged by plaintiff, and thus Texas court could not exercise jurisdiction over nonresident corporation on the basis of such a communication. V.T.C.A., Civil Practice & Remedies Code §§ 17.041-17.045.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*903** Jerry Galow, Watson, Bishop, London & Galow, P.C., Austin, for appellant.

John L. Foster, Minton, Burton, Foster & Collins, P.C., Austin, for appellee.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and YEAKEL.

**Opinion**

LEE YEAKEL, Justice.

This is an appeal arising from the district court's sustaining appellees' special appearance. [1] The sole issue on appeal is whether Texas courts can assert *in personam* jurisdiction over a Nevada corporation in a suit concerning termination of its relationship with a Texas corporation. Appellees International Game Technology and IGT specially appeared challenging **\*904** the district court's personal jurisdiction. The district court sustained their special appearance and dismissed appellant TeleVentures, Inc.'s suit for want of jurisdiction. We will affirm.

**BACKGROUND**

In early 1995, Chris Tyson, the president and principal owner of TeleVentures, Inc. ("TeleVentures"), contacted IGT, a manufacturer of slot machines, to discuss his concept for "in-room gaming." [2] Tyson's first contact with IGT was by telephone from Tyson's office in Texas to IGT's office in Reno, Nevada. Tyson followed his call with a personal visit to IGT's Reno office. IGT is a Nevada corporation with its principal place of business in Nevada. It neither does business nor is authorized to do business in Texas. It has no agents, offices, or property in Texas and is not a party to any contract requiring acts to be performed in Texas. IGT has not directly hired any employees in Texas nor has it asked others such as TeleVentures to hire employees in Texas. The same is true of IGT's parent corporation, International Game Technology. [3] Ultimately, TeleVentures and IGT signed two letters of intent. At the time the letters of intent were signed, TeleVentures was a Texas corporation with its principal place of business in Austin. [4]

After IGT expressed an initial interest in the in-room gaming concept, other meetings followed, always in Nevada. IGT and TeleVentures concluded that there were two ways to connect hotel televisions to IGT's gaming technology. Tyson had previously developed one of these alternatives with the assistance of U.S. West Marketing Resources Group Inc. ("U.S.West"), a Colorado corporation. The process consisted of attaching an IGT game board to a U.S. West switch, which would in turn be attached to an On Command Video ("OCV") switch. [5] The second concept, developed by IGT during its relationship with TeleVentures, involved directly attaching an IGT game board to an OCV switch, thus eliminating the need for the intermediate use of the U.S. West switch.

U.S. West demonstrated its technology to IGT and TeleVentures at its offices in Colorado in September 1995. While in Colorado, IGT and TeleVentures signed the first of two letters of intent. The letter provided that IGT and TeleVentures would develop an in-room gaming system; the two would "work together using their best efforts to develop and install the System by combining the existing and future technology and equipment of TeleVentures with the existing and future technology of IGT"; they would "mutually agree upon a hotel property designated as a test location in which to install and evaluate the performance of the system";

the test would be conducted and the results evaluated; and if both agreed that those results were satisfactory, they would enter into a formal agreement to develop, market, or install the system on a commercial basis. Following the September letter, IGT and TeleVentures signed the second letter of intent "wherein a mutually beneficial business relationship is contemplated between Hospitality Network, Ltd., a Texas limited **\*905** partnership, [6] and a newly formed partnership [to be called Game Ventures] consisting of IGT, a Nevada corporation ('IGT') and TeleVentures, Inc., a Texas corporation." This letter was prepared by TeleVentures in its Austin office and mailed to Nevada, where it was signed by IGT.

After considering the two alternatives for linking IGT's devices to hotel room television sets, IGT decided, for reasons of cost, convenience, and security, that the direct-attachment system was the better choice. IGT made this decision after the first few meetings with TeleVentures but continued to work with TeleVentures because TeleVentures had "the concept" of in-room gaming, "an understanding of in-room television," and a personal connection with Hospitality Network, which had a "good understanding of in-room television in the hotel business."

Although IGT had anticipated that some of the technology and equipment for the concept would be provided by TeleVentures, IGT's decision not to use the U.S. West system resulted in IGT's dealing directly with OCV because for reasons not indicated in the record, OCV refused to work with TeleVentures. Additionally, IGT did not share any information regarding its gaming technology with TeleVentures. As a result, TeleVentures did not contribute further to the development of the direct-attachment system. However, TeleVentures, on its own initiative, began to explore a third alternative, the "game cube," that could be used in hotels not wired with the OCV system. IGT was aware of TeleVentures' work but never incorporated the game cube into its development plans.

During their relationship, IGT and TeleVentures communicated via personal visits, facsimiles, letters, and telephone calls. TeleVentures' employees traveled to Nevada; however, no IGT employees or representatives came to Texas. The record reflects at least seventy written communications to and from Texas consisting of development updates, travel arrangements, meeting schedules, and even a Christmas card. Decisions regarding how the project was to move forward were made during the calls, visits, and written communications. TeleVentures prepared and forwarded a proposed draft of a partnership and operating agreement to IGT in Nevada, but IGT never signed them.

TeleVentures established offices and a payroll in Austin, Texas, and created several marketing devices: (1) a study of potential test sites and marketplaces for the system; (2) an updated business plan introducing the name "CasinoVision"; (3) brochures, a logo, and other marketing material to promote "CasinoVision"; and (4) at IGT's request, a "Business Summary." TeleVentures asked IGT for a videotape that TeleVentures could implant onto a CD ROM, which could be used to demonstrate "hotel in-room gaming using a remote control like in a hotel room." All TeleVentures' activities were performed in Texas.

In March 1996, IGT connected one of its gaming boards to an OCV switch and conducted a mini-demonstration in Nevada. IGT and TeleVentures also planned to travel to Aruba to conduct a hotel test of the in-room gaming system. The trip never occurred, and in June 1996, IGT announced its decision to discontinue pursuing the idea of in-room gaming with TeleVentures. The parties attempted to rework their arrangement, but the effort was abandoned on January 9, 1997 when IGT sent a final letter unilaterally terminating any relations with TeleVentures (the "termination letter").

TeleVentures filed this suit against IGT accusing IGT of breach of contract, breach of fiduciary duties, fraud in the inducement of the letters of intent, fraudulent concealment, negligent misrepresentation, and tortious interference. IGT specially appeared challenging the district court's personal jurisdiction. *See* **\*906** Tex.R. Civ. P. 120a. The district court sustained IGT's challenge. TeleVentures appeals.

## DISCUSSION

In its sole issue on appeal, TeleVentures claims that the district court erred in sustaining IGT's special appearance and dismissing the suit for lack of *in personam* jurisdiction because: (1) IGT purposefully directed activities into Texas; (2) this lawsuit arises from and relates directly to such activities and torts committed in this state; and (3) the district court's exercise of jurisdiction over IGT does not offend traditional notions of fair play and substantial justice. TeleVentures argues that IGT entered into a contract with a Texas corporation knowing that the majority of

TeleVentures' work was to be done in Texas, and through IGT's constant contact with TeleVentures by phone calls, letters, facsimiles, and personal visits, IGT was aware of and approved the work done in Texas. TeleVentures also argues that IGT, through TeleVentures, recruited Texas residents located in Texas for performance of their joint objectives. TeleVentures further asserts that its causes of action, which include breach of contract, breach of fiduciary duties, fraud in the inducement, fraudulent concealment, negligent misrepresentation, and tortious interference arise from and are related to IGT's contacts with Texas because: (1) the breach of contract and breach of fiduciary duties involve a contract that was to be partially performed in Texas; (2) the breach of contract, breach of fiduciary duties, fraud in the inducement, fraudulent concealment, negligent misrepresentation, and tortious interference occurred in Texas when IGT sent the termination letter to TeleVentures in Texas; and (3) the causes of action for fraud in the inducement, negligent misrepresentation, and tortious interference are based, in part, upon statements IGT made in communications to TeleVentures in Texas with the intent of inducing TeleVentures to enter into the two letters of intent. Finally, TeleVentures asserts that the assumption of jurisdiction in Texas does not offend notions of fair play and substantial justice because IGT is a multi-million dollar conglomerate that does business throughout the world. Thus, litigation in Texas would not be excessively burdensome to IGT, in contrast to the burden that litigation in Nevada would impose on TeleVentures, a start-up company with little or no revenue.

### Burden of Proof and Standard of Review

 **[1]**    In interposing a special appearance, the nonresident defendant challenging personal jurisdiction bears the burden of proof to negate all bases of personal jurisdiction alleged by the plaintiff. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 231 n. 13 (Tex.1991) (citing *Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 664 (Tex.1987); *Siskind v. Villa Found. for Educ., Inc.* 642 S.W.2d 434, 438 (Tex.1982)); *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985).

 **[2]**    The district court filed findings of fact and a conclusion of law.[7] *See* **\*907** Tex.R. Civ. P. 296–297. TeleVentures asserts that the "findings of fact are not findings at all, but rather, legal conclusions." The parties do not dispute the material facts before the district court in any significant degree. We agree with TeleVentures that the district court's

"findings" and "conclusion" are, in actuality, all conclusions of law and we will consider them as such. We review the trial court's conclusions of law *de novo. See Piazza v. City of Granger,* 909 S.W.2d 529, 532 (Tex.App.—Austin 1995, no writ). Conclusions of law will not be reversed unless they are erroneous as a matter of law. *See id.* (citing *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ)).

### Jurisdiction

 **[3]**    **[4]**    **[5]**    A Texas court may exercise personal jurisdiction over a nonresident defendant if: (1) jurisdiction is authorized by the Texas long-arm statute,[8] and (2) the exercise of jurisdiction is consistent with federal and state due process standards. *See Guardian Royal,* 815 S.W.2d at 226; *Transportacion Especial Autorizada, S.A. v. Seguros Comercial America, S.A.,* 978 S.W.2d 716, 719 (Tex.App.—Austin 1998, no pet.). The long-arm statute allows Texas courts jurisdiction to the full extent permitted by the United States Constitution. *See Guardian Royal,* 815 S.W.2d at 226. Thus, the only limitations on Texas courts in asserting personal jurisdiction over a nonresident defendant are those imposed by the Due Process Clause of the Fourteenth Amendment. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Due process requires a showing that the nonresident defendant has purposefully established "minimum contacts" with Texas and that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Guardian Royal,* 815 S.W.2d at 230–31.

 **[6]**    Although the jurisdiction of Texas courts is always dependent on the defendant's having some minimum contacts with Texas, the requisite extent of those contacts varies depending on the type of *in personam* jurisdiction sought to be imposed. Thus, the United States Supreme Court has refined the minimum-contacts analysis into specific and general jurisdiction. *See Guardian Royal,* 815 S.W.2d at 227 (citing *Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. 1868).

 **[7]**    **[8]**    To establish specific jurisdiction, the cause of action must arise out of or relate to the nonresident defendant's contact with the forum state and the conduct must have resulted from that defendant's purposeful conduct, not the unilateral conduct of the plaintiff or others. *See id.* (citing *Helicopteros,* 466 U.S. at 414 n. 8, 417, 104 S.Ct. 1868;

*World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 293–94, 298, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). "Furthermore, the nonresident defendant's activities must have been 'purposefully directed' to the forum and the litigation must result from alleged injuries that 'arise out of or relate to' those activities." *Id.* at 228, 100 S.Ct. 559 (citing **\*908** *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Zac Smith & Co.,* 734 S.W.2d at 663). Thus, in analyzing minimum contacts for purposes of Texas courts' specific jurisdiction, we focus on the relationship among the nonresident defendant, the forum, and the litigation. *See id.* (citing *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868; *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990)).

 [9]   [10]   An assertion of general jurisdiction compels a more demanding minimum-contacts analysis and requires a showing of substantial activities within the forum state. *See id.* (citing *Schlobohm,* 784 S.W.2d at 357). The cause of action need not arise from or relate to the nonresident defendant's purposeful conduct within the forum state, but there must be "continuous and systematic contacts" between the nonresident defendant and the forum state. *See id.* (citing *Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. 1868; *Schlobohm,* 784 S.W.2d at 357). In the present case, the parties agree that the district court does not have general jurisdiction over IGT; therefore, we will address only specific jurisdiction.

 [11]   To ensure compliance with the federal constitutional requirements of due process, the Texas Supreme Court has developed what it terms a "formula" for determining jurisdiction. *See generally Guardian Royal,* 815 S.W.2d at 229–31.[9] Initially, the nonresident defendant must have purposefully established minimum contacts with Texas, and when, as here, specific jurisdiction is asserted, the cause of action must arise out of or relate to these contacts. *See id.* at 230. Also, the action or conduct of the nonresident defendant purposefully directed toward Texas must give rise to a "substantial connection between" Texas and the nonresident. *See id.* Second, the assumption of jurisdiction by Texas must comport with fair play and substantial justice. *See id.* at 230–31 (citing *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174; *Zac Smith & Co.,* 734 S.W.2d at 664).

## Minimum Contacts

 [12]   [13]   [14]   [15]   [16]   We must first decide whether TeleVentures' causes of action arise out of or relate to IGT's contacts with Texas. The nonresident defendant must have purposely availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws. *See Burger King,* 471 U.S. at 474–75, 105 S.Ct. 2174. The purposeful-availment requirement ensures that a nonresident defendant will not be haled into a foreign jurisdiction based solely on random, fortuitous, or attenuated contacts or unilateral activity of another party or a third person. *See id.* at 475, 105 S.Ct. 2174. A nonresident defendant must have fair warning that a particular activity may subject it to the jurisdiction of a foreign sovereign. *See id.* at 472, 105 S.Ct. 2174. Isolated contacts with the forum state or its residents are not sufficient for a court to assume personal jurisdiction over a nonresident defendant. *See id.* at 475, 105 S.Ct. 2174. In assessing IGT's contacts with Texas, we will look first to the letters of intent.

### *Letters of Intent*
 [17]   [18]   [19]   [20]   TeleVentures argues that personal jurisdiction is established because its suit concerns agreements (the letters of intent) made between TeleVentures, a Texas corporation, and IGT that were to be partially performed in Texas. However, merely contracting with a Texas corporation does not satisfy the minimum-contacts requirement. *See* **\*909** *Burger King,* 471 U.S. at 478, 105 S.Ct. 2174; *Magnolia Gas Co. v. Knight Equip. & Mfg. Corp.,* 994 S.W.2d 684, 691 (Tex.App.—San Antonio 1998, no pet.). Instead, courts must apply a "highly realistic" approach that recognizes that a "contract ... [is] ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King,* 471 U.S. at 478, 105 S.Ct. 2174. Prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum. *See id.* at 478–79, 105 S.Ct. 2174. Likewise, partial performance of a contract in Texas is "not the *sine qua non* of personal jurisdiction." *Magnolia Gas Co.,* 994 S.W.2d at 692; *see also U–Anchor Advertising, Inc. v. Burt,* 553 S.W.2d 760, 763 (Tex.1977) (finding no personal jurisdiction even though plaintiff's cause of action was connected with contractual obligations that were partially performable in Texas).

The crux of both letters of intent is the agreement by TeleVentures and IGT to develop an "in-room gaming

system." The first letter refers only to TeleVentures and IGT. The second letter refers to "a newly formed partnership" between TeleVentures and IGT that "shall be called 'Game Ventures' " and will establish a "beneficial business relationship" with Hospitality Network. The system to be developed by TeleVentures and IGT, as Game Ventures, is the same as referenced in the earlier letter. Neither letter indicates a place of performance nor gives any guidance with regard to the state in which either TeleVentures or IGT will perform any obligation arising from the letters. The second letter does not disclose the state in which the new Game Ventures partnership is to be formed or domiciled. IGT acknowledges that it anticipated TeleVentures would contribute to the technological development of the system. However, once the decision was made to use the direct attachment system, TeleVentures did not participate in the further development of that system for two reasons: (1) OCV would not participate if TeleVentures was present at any discussions between itself and IGT; and (2) IGT did not give TeleVentures its gaming board information, which was necessary to develop the in-room gaming system. As a result, TeleVentures' contributions were limited to its unilateral decisions to develop the game cube and various marketing tools.

Although IGT had knowledge of the game cube, IGT neither required nor requested it. IGT had decided to use the direct-attachment system. In addition, IGT did not use the game cube. The focus of the analysis must be on the actions of IGT, not TeleVentures, and the contacts that give rise to jurisdiction must come from IGT's purposeful conduct, not the one-sided activity of TeleVentures. *See Helicopteros,* 466 U.S. at 417, 104 S.Ct. 1868; *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559. TeleVentures' independent action in developing the game cube is not sufficient to confer jurisdiction over IGT. *See Barnstone v. Congregation Am. Echad,* 574 F.2d 286, 288–89 (5th Cir.1978) (dismissing case for lack of jurisdiction because contract with Texas architect to design and oversee construction of synagogue was wholly performable in Maine, negotiations took place through mail, and only connection with Texas was unilateral activity of architect in preparing sketches for building at architect's office in Texas). For the most part, TeleVentures' act of developing various marketing tools was also unilateral. While a "Business Summary" was prepared at IGT's request, such request does not establish jurisdiction. According to Tyson, the business summary was designed to serve as a marketing tool and to solicit and attract interest from third-party investors. The letters of intent each contemplate

that a subsequent agreement regarding marketing would be prepared *after* successful testing of the in-room gaming system. The preparation **\*910** of the business summary was no more than a part of the ongoing communications between TeleVentures and IGT and was not required by either letter agreement. *See Magnolia Gas Co.,* 994 S.W.2d at 692 (no minimum contacts where defendant "neither required nor bargained for" work to be done in Texas). Simply asking TeleVentures to produce a business summary does not establish a "substantial connection" between IGT and Texas. *See Guardian Royal,* 815 S.W.2d at 230 (requiring substantial connection between non-resident and forum state).

The unexecuted proposed formal partnership agreement prepared by TeleVentures provided for performance in Nevada. TeleVentures changed its state of incorporation from Texas to Nevada during its relationship with IGT. The terms of the letters of intent and the history of the parties' negotiations do not reveal purposeful conduct by IGT sufficient to subject it to the jurisdiction of the Texas district court.

#### Numerous Contacts & Recruiting Texas Employees

[21] [22] [23] TeleVentures argues that the numerous and repeated contacts between it and IGT by telephone, mail, and facsimile establish the requisite minimum contacts by IGT. In a minimum-contacts analysis, it is not the number, but rather the quality and nature of the nonresident's contacts with Texas that are important. *See Guardian Royal,* 815 S.W.2d at 230 n. 11 (citing *Texas Commerce Bank v. Interpol '80 Ltd.,* 703 S.W.2d 765, 772 (Tex.App.—Corpus Christi 1985, no writ)); *Memorial Hosp. Sys. v. Fisher Ins.,* 835 S.W.2d 645, 650 (Tex.App.—Houston [14th Dist.] 1992, no writ). After reviewing the communications between the parties contained in the record, we conclude that they are not sufficiently related to the cause of action. They consist for the most part of development updates and travel arrangements. While IGT admits that decisions regarding the project were made while in communication with TeleVentures, these contacts are insufficient to establish *in personam* jurisdiction. Minimum contacts may not be satisfied by merely engaging in communications with a Texas corporation during performance of a contract. *See Magnolia Gas Co.,* 994 S.W.2d at 691 (citing *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.,* 85 F.3d 201, 205–08 (5th Cir.1996)). The exchange of communications between TeleVentures and IGT in the course of developing and carrying out the contract is in itself insufficient to constitute purposeful availment of the benefits and protections of Texas

law. *See Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 778 (5th Cir.1986) (citing *Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1147 (5th Cir.1985)) (numerous telephone calls from defendant to forum during course of performance insufficient to support specific jurisdiction).

TeleVentures also posits that Texas has jurisdiction over IGT because the termination letter, which it argues breached the agreement created by the letters of intent, was sent into Texas from without the state. TeleVentures cites no authority for this proposition. The breach, if any, was not created by the termination letter; rather, if there was a breach, it occurred when and where IGT ceased its performance of the contract. *See Methodist Hosps. v. Corporate Communicators, Inc.,* 806 S.W.2d 879, 882 (Tex.App.—Dallas 1991, writ denied) (breach of contract occurs when party fails or refuses to perform); *see also* Restatement (Second) of Contracts § 235(2) (when performance is due, any non-performance is breach). The termination letter gives TeleVentures notice that IGT will no longer pursue the concept of in-room gaming and will proceed no further with TeleVentures. Considering that (1) contracting with a Texas resident is not enough to confer jurisdiction; [10] and (2) communications between **\*911** the resident and non-resident during performance of a contract will not confer jurisdiction, [11] we hold that the mailing of a notice that IGT will no longer pursue in-room gaming is likewise not sufficient to establish jurisdiction.

 **[24]**    TeleVentures' argument that IGT recruited Texas residents for employment is not substantiated by the record. The fact that *TeleVentures* hired employees to help it develop the in-room gaming concept does not satisfy the long-arm statute condition that *IGT* recruit Texas residents through an intermediary located in Texas. *See* Tex. Civ. Prac. & Rem.Code § 17.042.

### Tortious Acts

TeleVentures argues that IGT's alleged fraudulent and negligent misrepresentations made by way of phone calls, letters, and facsimiles constitute tortious acts committed by IGT in Texas. TeleVentures directs us to the decisions of several state and federal courts to support its position. We do not find these cases persuasive. In each, the communication itself was the specific conduct that constituted the tortious act. In *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the *National Enquirer* published an allegedly libelous story concerning the California activities of a California resident. *See* 465 U.S. at 784–85, 104 S.Ct.

1482. The defendants were Florida residents, one a reporter for and the other the president of the *Enquirer. See id.* at 785–86, 104 S.Ct. 1482. Most of the research and writing of the article was done in Florida. *See id.* at 785, 104 S.Ct. 1482. The *Calder* court held that the defendants, who between them wrote and edited the article, could anticipate being haled into a California court when the article was published, as California was the state in which the subject of the article resided and where the *Enquirer* had its largest circulation. *See id.* at 789–90, 104 S.Ct. 1482. The article itself was the basis of the injury and the cause of action.

*McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), involved the mailing of a reinsurance certificate to a California resident, Franklin, by a Texas insurance company. *See* 355 U.S. at 221, 78 S.Ct. 199. The certificate was an offer by the Texas company to insure Franklin in accordance with an insurance contract Franklin held with an Arizona insurance company whose insurance obligations had been assumed by the Texas company. *See id.* Franklin accepted the offer and from then until his death mailed premiums from California to Texas. *See id.* at 221–22, 78 S.Ct. 199. California jurisdiction was proper because the contract itself had a substantial connection with that state and California had "a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims." *Id.* at 223, 78 S.Ct. 199. That "manifest interest" is largely a creature of regulatory law and is not applicable to the facts before us. [12]

*Rowland & Rowland v. Texas Employers Indemnity Co.,* 973 S.W.2d 432 (Tex.App.—Austin 1998, no pet.), centered on a single letter written by the nonresident defendant, a Tennessee law firm, to the plaintiff, a Texas indemnity company. *See* 973 S.W.2d at 434. The Texas company, relying on representations in the letter that the Tennessee firm would protect its interest in a wrongful death suit pending in Tennessee, did not intervene in the Tennessee litigation. *See id.* At the conclusion of the suit, the law firm distributed the entire recovery to the wrongful death claimants to the exclusion of the Texas company, which then sued the Tennessee firm in Texas for negligent misrepresentation. *See id.* Texas jurisdiction was upheld on two bases: the letter itself **\*912** constituted a purposeful contact directed to Texas with the intent that its representations be relied upon, and the Tennessee law firm unilaterally decided to distribute all of the proceeds to the wrongful death claimants and their lawyers, all of whom were residents of Texas. *See id.* at 435–36.

In *Memorial Hospital System v. Fisher Insurance Agency, Inc.,* 835 S.W.2d 645 (Tex.App.—Houston [14th Dist.] 1992, no writ), the plaintiff hospital telephoned the defendant, a Mississippi insurance agency, to verify workers' compensation insurance coverage prior to admitting an injured worker. *See* 835 S.W.2d at 648. Relying on the Mississippi agency's affirmative response, the hospital admitted and treated the worker. *See id.* When it discovered that there was in fact no coverage, the hospital brought suit in Texas against the Mississippi agency. *See id.* The court of appeals affirmed jurisdiction in Texas because the specific representation in the call was relied upon in Texas. *See id.* Both *Rowland & Rowland* and *Memorial Hospital System* demonstrate allegedly tortious conduct in a specific communication intended to be relied upon within the state of Texas. While TeleVentures directs us to a quantity of communications between it and IGT, it fails to point to any specific representation that constitutes an allegedly tortious act, as distinguished from general, ongoing communications during the performance of a contract. *See Guardian Royal,* 815 S.W.2d at 230 n. 11 (quality, not quantity, determines sufficiency of nonresident's contacts with Texas); *Magnolia Gas Co.,* 994 S.W.2d at 691 (minimum contacts not satisfied by merely engaging in communications during performance of contract).

Finally, in *Brown v. Flowers Industries, Inc.,* 688 F.2d 328 (5th Cir.1982), Brown alleged that he lost the chance to obtain a loan because of a defamatory statement made in a telephone call made by Karlis, an Indiana resident, from his office in Indiana to the United States Attorney in Mississippi. *See* 688 F.2d at 330–31. The Mississippi court had jurisdiction over Karlis because, in the specific call initiated by Karlis, he allegedly committed an intentional tort, the injurious effect of which was felt in Mississippi and was foreseeable at the time of the call. *See id.* at 334.

 [25]   In the record before us, we find no communication by IGT directed to and intended to be relied upon by TeleVentures in Texas that, if false, gives rise to any cause of action alleged by TeleVentures.

## CONCLUSION

We hold that IGT did not conduct purposeful activities in Texas in its dealings with TeleVentures. The record reveals much activity in Texas by TeleVentures but no activity of substance by IGT. IGT's Texas contacts were incidental and immaterial to the purpose of the contract, the development of an in-room gaming system, and were not instigated by IGT. We overrule TeleVentures' issue. [13]

We hold that the district court properly found it could not exercise *in personam* jurisdiction over IGT and affirm the district court's order sustaining IGT's special appearance and dismissing TeleVentures' suit for lack of personal jurisdiction.

### All Citations

12 S.W.3d 900

---

Footnotes

1    In its brief, TeleVentures states that it is appealing pursuant to Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (West Supp.2000) (appeal may be brought from interlocutory order granting or denying special appearance). However, the district court's "Order" dismisses the entire case: "IT IS ... ORDERED by the Court that [appellees'] special appearance motion is hereby sustained, and that this cause is dismissed for want of jurisdiction with prejudice for refiling same in Texas." We will address the appeal as one from a final order of the district court.

2    For purposes of this case, "in-room gaming" is a concept where a hotel guest would be able to gamble and play games such as blackjack, slots, or poker on the television set in the guest's hotel room.

3    This suit arises from IGT's dealings with TeleVentures. International Game Technology was sued on *alter ego* theories based on its relationship with IGT. Their interests do not diverge. We will refer to appellees jointly as "IGT."

4    During the events preceding this suit, TeleVentures merged with a Nevada corporation of the same name. TeleVentures thus became a Nevada corporation but maintained its principal place of business in Austin, Texas.

5    On Command Video is a California corporation that IGT testified could bring "secure and undistorted data from IGT's devices to hotel rooms."

6    Hospitality Network, Ltd. is a provider of interactive hotel television services.

7    The district court made five "findings of fact":

1. Neither IGT nor International Game Technology have maintained continuous or systematic contacts with the State of Texas;

2. The liability of IGT and International Game Technology alleged by [TeleVentures] does not arise from, nor is it related to, activity by those companies conducted in Texas;

3. The injuries alleged in [TeleVentures'] pleadings do no[t] arise from, nor are they related to, activities of IGT or International Game Technology purposefully directed to the State of Texas;

4. The contact[s] of IGT and International Game Technology with the State of Texas were minimal and fortuitous and not a result of their purposefully conducted activities with the State of Texas; and

5. The exercise of personal jurisdiction over IGT [and] International Game Technology in the State of Texas would not comport with traditional notions of fair play and substantial justice;

and one "conclusion of law":

The courts of the State of Texas may not, consistent with the Constitution of the United States, exercise personal jurisdiction over IGT and International Game Technology.

8  *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 17.041–.045 (West 1997). The long-arm statute provides a non-exclusive enumeration of acts by a nonresident that constitute doing business in Texas: "(1) contract [ing] by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in [Texas]; (2) commit [ting] a tort in whole or in part in [Texas]; or (3) recruit[ing] Texas residents, directly or through an intermediary located in [Texas], for employment inside or outside of [Texas]." *Id.* § 17.042; *see also Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991); *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990).

9  This formula was first expressed by the supreme court in *O'Brien v. Lanpar Co.,* 399 S.W.2d 340 (Tex.1966), when the court adopted the Washington Supreme Court's articulation in *Tyee Construction Co. v. Dulien Steel Products, Inc.,* 62 Wash.2d 106, 381 P.2d 245 (1963). The formula has been reviewed and modified as the United States Supreme Court has examined, developed, and refined the permissible reach of federal due process. *See Guardian Royal,* 815 S.W.2d at 230; *Schlobohm,* 784 S.W.2d at 358.

10  *See, e.g., Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

11  *See, e.g., Magnolia Gas Co.,* 994 S.W.2d at 691.

12  The Texas Supreme Court has specifically discussed *McGee* in such a context. *See Guardian Royal,* 815 S.W.2d at 229 n. 8.

13  Because we hold that IGT did not have the requisite minimum contacts with Texas to be subject to the jurisdiction of the district court, we need not address the second inquiry of the jurisdictional formula—whether the assertion of personal jurisdiction would comport with fair play and substantial justice. *See Guardian Royal,* 815 S.W.2d at 231.

KeyCite Yellow Flag - Negative Treatment

**Disagreed With by** Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc., Tex.App.-Austin, July 12, 2011

80 S.W.3d 260
Court of Appeals of Texas,
Texarkana.

TEXAS CAPITAL SECURITIES
MANAGEMENT, INC., et al., Appellants,
v.
J.D. SANDEFER, III, et al., Appellees.

No. 06–01–00131–CV. | Submitted
May 30, 2002. | Decided June 19, 2002.

Investors, who had successfully sued brokerage firm for damages stemming from sale of certain stock, sued officers of firm and firm's management company, alleging that they were liable for firm's violations of the Texas Securities Act. The 270th Judicial District Court, Harris County, Brent Gamble, J., granted summary judgment in favor of investors. Officers and management company appealed. The Texarkana Court of Appeals, Donald R. Ross, J., held that: (1) fact questions as to whether defendants were in privity with brokerage firm precluded application of collateral estoppel to establish Securities Act violations, and (2) fact questions as to whether defendants qualified as "control persons" of brokerage firm precluded summary judgment on Securities Act claims.

Reversed and remanded.

West Headnotes (24)

**[1]** **Appeal and Error**
 Extent of Review Dependent on Nature of Decision Appealed from

Since a no-evidence summary judgment is essentially a pretrial directed verdict, reviewing court will apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as it applies in reviewing a directed verdict.

4 Cases that cite this headnote

**[2]** **Judgment**
 Scope and Extent of Estoppel in General

Collateral estoppel, also known as issue preclusion, is more narrow than res judicata in that it only precludes the relitigation of identical issues of fact or law that were actually litigated and essential to the judgment in a prior suit.

3 Cases that cite this headnote

**[3]** **Judgment**
 Matters Actually Litigated and Determined
**Judgment**
 Essentials of Adjudication

Under the doctrine of collateral estoppel, once an actually litigated and essential issue is determined, that issue is conclusive in a subsequent action between the same parties.

Cases that cite this headnote

**[4]** **Judgment**
 Matters Which Might Have Been Litigated

Unlike the broader res judicata doctrine, collateral estoppel analysis does not focus on what could have been litigated, but only on what was actually litigated and essential to the judgment.

2 Cases that cite this headnote

**[5]** **Judgment**
 Identity of Persons in General
**Judgment**
 Scope and Extent of Estoppel in General
**Judgment**
 Facts Necessary to Sustain Judgment

In order to invoke collateral estoppel, a party must establish that: (1) the facts sought to be litigated in the first action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.

Cases that cite this headnote

**[6]** **Judgment**

 Mutuality of Estoppel in General

Mutuality is not required for the invocation of collateral estoppel; rather, it is only necessary that the party against whom the plea of collateral estoppel is being asserted be a party or in privity with a party in the prior litigation.

1 Cases that cite this headnote

**[7]** **Judgment**

Presumption and Burden of Proof

The party seeking to invoke collateral estoppel has the burden to present sufficient evidence to establish that the doctrine of collateral estoppel is applicable.

1 Cases that cite this headnote

**[8]** **Judgment**

Evidence as to Identity of Issues or Matters Decided

While party relying on doctrine of collateral estoppel is usually required to introduce into evidence both the prior judgment and pleadings from the prior suit, so long as the record before the court in the second case adequately provides what was determined in the earlier case, pleadings need not be filed.

1 Cases that cite this headnote

**[9]** **Judgment**

Evidence as to Identity of Issues or Matters Decided

Investors seeking to invoke collateral estoppel in suit to hold officers of brokerage firm and firm's management company liable for violations of Texas Securities Act were not required to introduce into evidence the pleadings from prior suit against brokerage firm, since investors had filed a copy of the judgment and jury charge from the prior action and they clearly stated what was determined in that case. Vernon's Ann.Texas Civ.St. art. 581–1 et seq.

1 Cases that cite this headnote

**[10]** **Constitutional Law**

Conclusiveness

Due process requires that the rule of collateral estoppel operate only against persons who have had their day in court either as a party to the prior suit or as a privy. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[11]** **Judgment**

What Constitutes Privity in General

There is no general definition of privity, for purposes of collateral estoppel, and the determination of who are privies requires a careful examination into the circumstances of each case.

1 Cases that cite this headnote

**[12]** **Judgment**

Persons Participating in or Promoting Action or Defense

**Judgment**

What Constitutes Privity in General

**Judgment**

Successive Estates or Interests

The word "privy," for purposes of collateral estoppel, includes those who control an action although not parties to it, those whose interests are presented by a party to the action, and successors in interests.

Cases that cite this headnote

**[13]** **Judgment**

What Constitutes Privity in General

Privity, for purposes of collateral estoppel, connotes those who are in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right.

Cases that cite this headnote

**[14]** **Judgment**

🔑 Corporations and Corporate Officers and Stockholders

A party's status as shareholder or officer of a corporation does not automatically show that the party had control over prior action involving corporation or that its interests were represented in that action, so as to establish the privity needed to invoke collateral estoppel.

3 Cases that cite this headnote

**[15] Judgment**
🔑 Privity in General

Question of privity, for purposes of collateral estoppel, revolves around the prior cause of action, not the time of injury.

Cases that cite this headnote

**[16] Judgment**
🔑 Effect of Prior Decision

Fact questions as to whether officers of brokerage firm and firm's management company were in privity with firm, such that collateral estoppel prevented them from contesting earlier determination that firm had violated Texas Securities Act, precluded summary judgment for investors in suit to hold officers and management company liable for firm's violations of the Securities Act. Vernon's Ann.Texas Civ.St. art. 581–1 et seq.

Cases that cite this headnote

**[17] Judgment**
🔑 Corporations and Corporate Officers and Stockholders

**Judgment**
🔑 Evidence as to Identity of Parties

Individual's status as secretary and treasurer of brokerage firm was insufficient, without more evidence, to establish privity with firm, as required to invoke collateral estoppel based on earlier lawsuit against firm.

Cases that cite this headnote

**[18] Judgment**
🔑 Corporations and Corporate Officers and Stockholders

**Judgment**
🔑 Evidence as to Identity of Parties

Management company's status as wholly owned subsidiary of brokerage firm was insufficient, without more evidence, to establish privity with firm, as required to invoke collateral estoppel based on earlier lawsuit against firm.

Cases that cite this headnote

**[19] Judgment**
🔑 Corporations and Corporate Officers and Stockholders

Fact that officers of brokerage firm and firm's management company, who were being sued by investors, used same attorney as firm had used in prior suit was insufficient to establish privity with firm, as required to invoke collateral estoppel based on prior suit.

1 Cases that cite this headnote

**[20] Securities Regulation**
🔑 Persons Liable

National Association of Securities Dealers (NASD) form which listed brokerage firm's president, vice-president, and secretary/treasurer as control persons did not conclusively establish that these officers were "control persons" within meaning of Texas Securities Act. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F(1).

1 Cases that cite this headnote

**[21] Securities Regulation**
🔑 Persons Liable

Status alone does not automatically cause officers to be deemed "control persons" under Texas Securities Act, and evidence is also required that an officer had influence over at least the direction of the corporation. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F(1).

1 Cases that cite this headnote

**[22] Judgment**
&#x1F511; Stock and Stockholders, Cases Involving

Fact question as to whether president of brokerage firm was "control person" precluded summary judgment on investors' claim that president was liable for firm's Texas Securities Act violations. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F(1).

Cases that cite this headnote

**[23] Judgment**
&#x1F511; Stock and Stockholders, Cases Involving

Fact question as to whether secretary/treasurer of brokerage firm was "control person" precluded summary judgment on investors' claim that secretary/treasurer was liable for firm's Texas Securities Act violations. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F(1).

Cases that cite this headnote

**[24] Judgment**
&#x1F511; Stock and Stockholders, Cases Involving

Fact question as to whether management company for brokerage firm was "control person" precluded summary judgment on investors' claim that company was liable for firm's Texas Securities Act violations. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F(1).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*262** Robert M. Corn, McFall Sherwood & Breitbeil, PC, Houston, for Texas Capital Securities Management, Thomas Buckley, Patrick Smetek.

Randall L. Brim, Kurt M. Hanson, Singleton, Cooksey, Hanson & Lamberth, LLP, Houston, for Thomas Reckling, IV.

Patrick A. Zummo, Zummo, Mitchell & Perry, Houston, for appellee.

Before GRANT, ROSS and CORNELIUS, [*] JJ.

## \*263 OPINION

Opinion by Justice ROSS.

Thomas Buckley, Patrick Smetek, Thomas R. Reckling, IV, and Texas Capital Securities Management, Inc. (TCSM) (collectively Appellants) appeal the trial court's granting of summary judgment in favor of J.D. Sandefer, III, and Stephen F. Smith (Appellees) on their claims under the Texas Securities Act. [1] Appellees sued Appellants for common-law fraud, statutory fraud, violation of the Texas Securities Act, and constructive fraud. Appellees nonsuited as to the fraud claims, leaving only the violation of the Texas Securities Act claim.

Appellants contend that the trial court erred in granting Appellees' motion for summary judgment and that the trial court erred in not reducing the sum of money awarded in the summary judgment, or in not deeming the judgment satisfied. Reckling further contends the trial court erred by not granting his post-trial motions.

In *Texas Capital Securities v. Sandefer,* Appellees sued various defendants and recovered damages stemming from the sale of stock in Titan Resources, Inc. *Tex. Capital Sec., Inc. v. Sandefer,* 58 S.W.3d 760 (Tex.App.-Houston [1st Dist.] 2001, two pets. denied). Appellants were not parties to that lawsuit. The evidence in that case showed that Sandefer and Smith each invested in Titan based on the recommendation and representations of Steven Johnson, a stockbroker with Texas Capital Securities, Inc., and that both suffered losses when the value of the stock fell. Appellees sued Titan, Harris D. Ballow (a stock promoter and principal at Titan), Johnson, and Texas Capital Securities, Inc. Titan and Johnson settled before trial. A jury found that Ballow and Texas Capital Securities, Inc. made fraudulent misrepresentations to Appellees. The jury further found Ballow and Texas Capital Securities, Inc. jointly and severally liable for the $359,063.00 purchase price of the stock and determined that Ballow should pay eight million dollars in punitive damages.

In this case, Appellees sued Appellants individually for violations of the Texas Securities Act, contending they are control persons and aiders under Article 581–33 of the Texas Securities Act and are therefore liable for the conduct of Texas Capital Securities, Inc. Appellees contend that, as control persons, Appellants were in a position to prevent the violations of the Act found against Texas Capital Securities, Inc. in the *Texas Capital* case. *Id.* at 775–76.

Appellants first contend the trial court erred in holding them jointly and severally liable for the sums for which Texas Capital Securities, Inc. is liable to Appellees under the final judgment in the *Texas Capital* case. Appellees moved for a traditional summary judgment under TEX.R. CIV. P. 166a(c), based on the principle of collateral estoppel, contending Appellants are prevented from contesting the liability of Texas Capital Securities, Inc. for violating the Texas Securities Act. Appellees contend the issue of Texas Capital Securities, Inc.'s liability has already been litigated, and because Appellants were in privity with Texas Capital Securities, Inc., the *Texas Capital* judgment establishes their liability under the Texas Securities Act. Appellees also moved for traditional summary judgment based on Appellants' status as "control persons," as defined by the Texas Securities Act. Appellees contend Appellants are also liable for the actions of Texas Capital Securities, Inc. pursuant to **\*264** this status. Appellees further moved for traditional summary judgment that Appellants cannot prevail on one of the elements of their affirmative defense. Appellees finally moved for a no-evidence summary judgment under TEX.R. CIV. P. 166a(i) because they contend there is no evidence to support Appellants' affirmative defenses.

Summary judgment under Rule 166a(c) may only be granted in favor of the movants if they prove there is no genuine issue of material fact and they are entitled to judgment as a matter of law. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995). Because the movant bears the burden of proof, all conflicts in the evidence are disregarded, evidence favorable to the nonmovant is taken as true, and all doubts as to the genuine issue of material fact are resolved in favor of the nonmovant. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in the nonmovant's favor. *Id.* at 549.

 **[1]**  A no-evidence summary judgment is essentially a pretrial directed verdict. We therefore apply the same legal sufficiency standard in reviewing a no-evidence summary

judgment as we apply in reviewing a directed verdict. *McCombs v. Children's Med. Ctr.,* 1 S.W.3d 256, 258–59 (Tex.App.-Texarkana 1999, pet. denied); *Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68, 70 (Tex.App.-Austin 1998, no pet.).

 **[2]**   **[3]**   **[4]**  Appellants contend Appellees failed to establish the requisites of collateral estoppel. Collateral estoppel is also known as issue preclusion. *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex.1985). Collateral estoppel is more narrow than res judicata in that it only precludes the relitigation of identical issues of fact or law that were actually litigated and essential to the judgment in a prior suit. *Id.; see Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 628 (Tex.1992). Once an actually litigated and essential issue is determined, that issue is conclusive in a subsequent action between the same parties. *Van Dyke,* 697 S.W.2d at 384. Thus, unlike the broader res judicata doctrine, collateral estoppel analysis does not focus on what could have been litigated, but only on what was actually litigated and essential to the judgment.

 **[5]**   **[6]**  In order to invoke collateral estoppel, a party must establish that: 1) the facts sought to be litigated in the first action were fully and fairly litigated in the prior action; 2) those facts were essential to the judgment in the first action; and 3) the parties were cast as adversaries in the first action. *Eagle Props., Ltd. v. Scharbauer,* 807 S.W.2d 714, 721 (Tex.1991). Mutuality is not required for the invocation of collateral estoppel; rather, it is only necessary that the party against whom the plea of collateral estoppel is being asserted be a party or in privity with a party in the prior litigation. *Id.*

 **[7]**   **[8]**  Appellees had the burden to present sufficient evidence to establish that the doctrine of collateral estoppel is applicable. *See Scurlock Oil Co. v. Smithwick,* 787 S.W.2d 560, 562 (Tex.App.-Corpus Christi 1990, no writ). "To meet this burden, the party relying on the doctrine is required to introduce into evidence both the prior judgment *and pleadings* from the prior suit." *Jones v. City of Houston,* 907 S.W.2d 871, 874 (Tex.App.-Houston [1st Dist.] 1995, writ denied); *see Cuellar v. City of San Antonio,* 821 S.W.2d 250, 256 (Tex.App.-San Antonio 1991, writ denied); *Smithwick,* 787 S.W.2d at 562 (party asserting collateral estoppel must introduce into evidence judgment and pleadings from prior suit or doctrine will **\*265** not apply); *Traweek v. Larkin,* 708 S.W.2d 942, 945 (Tex.App.-Tyler 1986, writ ref'd n.r.e.) (doctrine of collateral estoppel not applicable in second suit if party does not introduce both prior judgment and pleadings);

*but see Bass v. Champion Int'l Corp.,* 787 S.W.2d 208, 214 (Tex.App.-Beaumont 1990, no writ) (finding no error in basing summary judgment on judgment alone without pleadings because judgment so clearly stated what was determined by earlier court there was no need to resort to pleadings). We agree with the reasoning in *Bass* that, so long as the record before the court in the second case adequately provides what was determined in the earlier case, pleadings need not be filed.

 **[9]**   In this case, Appellees filed a copy of the judgment and jury charge with their motion for summary judgment, but did not include a copy of the pleadings from the *Texas Capital* case. Appellees contend the judgment and jury charge satisfy the purpose of attaching the pleadings. Appellees further contend that, at any rate, the pleadings from the *Texas Capital* case were part of the record before the trial court because Reckling included the plaintiffs' fourth amended original petition from that case in his response to Appellees' motion for summary judgment in this case. Actually, what Reckling included in his response was a copy of Sandefer and Smith's motion for leave to join additional parties in the *Texas Capital* case. It was this motion that had a copy of plaintiffs' fourth amended original petition attached as an exhibit. The record shows the trial court in the *Texas Capital* case denied the motion to join additional parties. Therefore, plaintiffs' fourth amended original petition never became a live pleading in the *Texas Capital* case.

Despite the lack of pleadings, the record before us contains the jury charge and judgment from the *Texas Capital* case and, taken together, clearly state what was determined in that case.

 **[10]**   **[11]**   **[12]**   **[13]**   Appellants contend that Appellees have failed to prove there is no genuine issue of material fact and that Appellants were, as a matter of law, in privity to the parties in the *Texas Capital* case. "Due process requires that the rule of collateral estoppel operate only against persons who have had their day in court either as a party to the prior suit or as a privy, ...." *Benson v. Wanda Petroleum Co.,* 468 S.W.2d 361, 363 (Tex.1971); *see Eagle Props., Ltd.,* 807 S.W.2d at 721; *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 819 (Tex.1984). There is no general definition of privity, and the determination of who are privies requires a careful examination into the circumstances of each case. *Dairyland County Mut. Ins. Co. v. Childress,* 650 S.W.2d 770, 774 (Tex.1983); *Benson,* 468 S.W.2d at 363. "[T]he word 'privy' includes those who control an action although not parties to it * * *; those whose interests are represented by a

party to the action * * *; successors in interests." *Benson,* 468 S.W.2d at 363; *see Getty Oil Co. v. Ins. Co. of N. Am.,* 845 S.W.2d 794, 800–01 (Tex.1992); *Dairyland County Mut. Ins. Co.,* 650 S.W.2d at 774. Privity connotes those who are in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right. *Benson,* 468 S.W.2d at 363; *Cannon v. Tex. Indep. Bank,* 1 S.W.3d 218, 224 (Tex.App.-Texarkana 1999, pet. denied).

Appellants contend their interests were not actually and adequately represented in the *Texas Capital* case, so it is not fair to bind them to the prior results. *See Eagle Props., Ltd.,* 807 S.W.2d at 721. Appellees argue that directors of a corporation are automatically in privity with the corporation **\*266**  and cite *Eagle Properties* for their position. *See id.* The directors in *Eagle Properties,* as in this suit, were defendants. However, unlike this suit, the directors in *Eagle Properties* were the ones seeking to assert collateral estoppel against the plaintiffs. The Texas Supreme Court's specific holding was that mutuality is not required for the invocation of collateral estoppel; rather, it is only necessary that the party against whom the plea of collateral estoppel is being asserted be a party or in privity with a party in the prior litigation. *Id.* No one asserted collateral estoppel against the directors in *Eagle Properties,* and the Texas Supreme Court did not hold the directors were in privity with anyone in the prior suit. *Id.* Appellees' reliance on *Eagle Properties* is misplaced; they have not directed us to any other case holding that a party's status as director or officer automatically makes the party a privy, and we have not found a case so holding.

 **[14]**    **[15]**   Federal courts have held stockholders and officers are not in privity to their corporations. *Dudley v. Smith,* 504 F.2d 979, 982 (5th Cir.1974); *Am. Range Lines, Inc. v. Comm'r of Internal Revenue,* 200 F.2d 844, 845 (2d Cir.1952). This status does not automatically show the parties had control over the prior action or that their interests were represented by a party to the action. *Benson,* 468 S.W.2d at 363. The question of privy revolves around the prior cause of action, not the time of injury. *See Myrick v. Moody Nat'l Bank,* 590 S.W.2d 766, 769 (Tex.Civ.App.-Houston [14th Dist.] 1979, writ ref'd n.r.e.).

 **[16]**    **[17]**   Appellees present evidence that, when they purchased the Titan stock in 1996, an unamended form filed in 1993 with the National Association of Securities Dealers (NASD) lists Smetek, Reckling, and Buckley as officers of Texas Capital Securities, Inc. Appellees provide no evidence

that at the time of the *Texas Capital* case these three appellants still held these positions. Smetek and Reckling both create genuine issues of material fact in their affidavits. Smetek states he was president and a director until 1997. The *Texas Capital* case was instigated in late 1997. Reckling denies being an officer or director of Texas Capital Securities, Inc. in his affidavit. Each of these affidavits creates genuine issues of material fact on the issue of privity. The evidence clearly shows all three are shareholders, but a party's mere status as shareholder does not create privity absent further evidence. Although Buckley did not dispute being an officer during the *Texas Capital* case, the only evidence put forth by Appellees was that Buckley was the secretary and treasurer. This status alone, without more evidence, does not, as a matter of law, establish privity. Appellees presented no evidence Buckley, Smetek, Reckling, or TCSM participated in the *Texas Capital* lawsuit. In fact, Reckling contends he had no knowledge of the suit until the very end.

 **[18]**    Appellees contend TCSM, a wholly owned subsidiary of Texas Capital Securities, Inc., is in privity with Texas Capital Securities, Inc., based on a management role. The evidence provided to show TCSM's management role is the 1997 annual report which states:

> Texas Capital Securities Management Co., Inc. has entered into an agreement to indemnify the Company, assume primary liability related to certain settlement agreements with former customers and pay certain legal fees. The Company paid Texas Capital Securities Management Co., Inc. $154,000 during 1997. This amount is reflected in management fees.

 **\*267**  No further evidence is provided as to what TCSM did. There is no evidence TCSM exerted control over or managed Texas Capital Securities, Inc. in any way. Buckley's affidavit states TCSM has never been in a position of control over Texas Capital Securities, Inc. and that it is merely a service provider and is not engaged in the securities business.

 **[19]**    Appellees also contend the fact that Appellants used the same attorney as Texas Capital Securities, Inc. shows they are in privity with Texas Capital Securities, Inc. They direct our attention to caselaw stating that an attorney's knowledge gained during the existence of the attorney-client relationship is imputed to the client. *Allied Res. Corp. v. Mo–Vac Serv. Co.,* 871 S.W.2d 773, 778 (Tex.App.-Corpus Christi 1994,

writ denied). Appellees would have us extend this principle of imputed knowledge to the circumstances of this case, where Appellants hired the attorney who represented Texas Capital Securities, Inc. in the *Texas Capital* case. Appellees contend this mutual representation in separate actions imputes privity. The caselaw on which they rely deals with settled law that imputes the knowledge of an attorney to the client in that attorney-client relationship. The mere fact that these Appellants enlisted the services of the same attorney who defended Texas Capital Securities, Inc. in the previous case does not prove privity between Appellants and Texas Capital Securities, Inc.

Genuine questions of fact remain regarding each of the Appellants and whether they were in privity with Texas Capital Securities, Inc. We hold the trial court erred in applying collateral estoppel to the Appellants.

Appellants' second point of error concerns the determination by the trial court in its summary judgment that Appellants are liable as control persons under the Texas Securities Act. Appellees seek to establish joint and several liability of Appellants as control persons for Texas Capital Securities, Inc.'s violations of the Texas Securities Act. Appellants contend the trial court erred in holding they are control persons under the Act. TEX.REV.CIV. STAT. ANN. art. 581–33(F)(1) (Vernon Supp.2002).

Under the Act, a control person is:

> A person[2] who directly or indirectly controls a seller, buyer, or issuer of a security is liable ... jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

*Id.*

The burden rested on the Appellees to establish that the Appellants are control persons under the statute. Appellants contend genuine issues of material fact remain as to whether

they are control persons, and therefore the trial court improperly granted summary judgment.

The Texas Securities Act does not provide a definition of "control persons." *Id.* The comments to the statute state, "control is used in the same broad sense as in federal securities law." TEX.REV.CIV. STAT. ANN. art. 581–33F cmt. "Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, **\*268** and a management company." *Id.* [3] The rationale for control person liability is that a control person is in a position to prevent the violation and may be able to compensate the injured investor when the primary violator is not. *Id.* The United States Fifth Circuit Court of Appeals has held that, to make a prima facie case that the defendant is a control person, a plaintiff must prove that each had actual power or influence over the controlled person and that each induced or participated in the alleged violation. *Dennis v. Gen. Imaging, Inc.,* 918 F.2d 496, 509 (5th Cir.1990); *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 958 (5th Cir.1981).

[20]  As evidence of Smetek's, Buckley's, and Reckling's status as control persons, Appellees rely partly on the "Form BD" filed by Texas Capital Securities, Inc. in 1993 with the NASD, which lists Smetek, Buckley, and Reckling as control persons. Appellants contend this form does not prove they are control persons for purposes of the Texas Securities Act. They contend Appellees have not proved the term "control person" has the same meaning for purposes of the NASD as under the Texas Securities Act. NASD "Form BD" has instructions defining the term "control," but this definition was not included in Appellees' summary judgment evidence. In the absence of such definition, we cannot say the label of "control person" on the NASD form conclusively establishes Appellants as control persons under the Texas Securities Act.

[21]  [22]  [23]  The evidence presented clearly proves Smetek was president, a director of Texas Capital Securities, Inc., and owned between ten and twenty-five percent of the stock when the transactions occurred in 1996. According to the forms filed with the NASD, Buckley owned between ten and twenty-five percent of the stock. Both the form and Buckley's affidavit reveal he was secretary and treasurer of Texas Capital Securities, Inc. However, status alone does not automatically cause defendants to be deemed control persons under the statute. *See Dennis,* 918 F.2d at 509. Evidence was required that Smetek and Buckley had influence over at least the direction of Texas Capital Securities, Inc.

*See id.* Smetek states in his affidavit that he was not responsible for reviewing information that companies seeking investors wanted forwarded to Texas Capital Securities, Inc. customers, that he was unaware any Texas Capital Securities, Inc. customer had invested with Titan, and that he had no knowledge of the investments and no reason to have knowledge of the investments. Genuine issues of material fact remain regarding whether Smetek was a control person, and the trial court erred in granting summary judgment. As for Buckley, the evidence shows he was secretary and treasurer of Texas Capital Securities, Inc., but his affidavit shows that he did not hold a license entitling him to supervise registered representatives and that he was not responsible for supervising Texas Capital Securities, Inc. brokers or representatives, did not review information that companies seeking investors wanted forwarded to Texas Capital Securities, Inc. customers, and had no knowledge or reason to have knowledge of the purchase of Titan stock by Texas Capital Securities, Inc. customers. Because genuine issues of material fact remain regarding Buckley's status as a control person, the trial court erred in **\*269** granting summary judgment on this issue as to Buckley.

[24]  Although the NASD forms list Reckling as a vice president, Reckling's affidavit states his relationship with Texas Capital Securities, Inc. was that of a shareholder and that he was not an officer or director. This clearly creates a fact question as to Reckling's status. The trial court improperly granted summary judgment holding that Reckling was a control person.

We finally consider whether it was proper to grant summary judgment holding that TCSM, a wholly owned subsidiary of Texas Capital Securities, Inc., was a control person under the Texas Securities Act. The only evidence provided regarding TCSM is the 1997 annual report calling the fees paid to TCSM "management fees." The evidence shows TCSM agreed to indemnify Texas Capital Securities, Inc., assume primary liability related to certain settlement agreements with former customers, and pay certain legal fees. This evidence does not show any form of power or influence over Texas Capital Securities, Inc. or over Johnson, the Texas Capital Securities, Inc. broker who arranged for the sale of the Titan stock. Buckley's affidavit states TCSM has no responsibility to supervise or otherwise monitor any securities salesmen at Texas Capital Securities, Inc. Appellees failed to produce sufficient evidence to prove as a matter of law that TCSM was a control person for its parent company, Texas Capital Securities, Inc., and evidence presented by Appellants raises

genuine issues of material fact regarding this issue. The trial court erred in holding TCSM was a control person of Texas Capital Securities, Inc.

Because we find the trial court erred in granting summary judgment against Appellants, we need not address Appellants' remaining points.

We reverse the summary judgment and remand the case to the trial court for further proceedings.

**All Citations**

80 S.W.3d 260

Footnotes

*   William J. Cornelius, C.J., Retired, Sitting by Assignment.
1   TEX.REV.CIV. STAT. ANN. art. 581–1, et seq. (Vernon 1964 & Supp.2002).
2   The Act defines "person" to include a corporation. TEX.REV.CIV. STAT. ANN. art. 581–4(B) (Vernon Supp.2002).
3   Although in *Busse v. Pac. Cattle Feeding Fund # 1,* 896 S.W.2d 807, 815 (Tex.App.-Texarkana 1995, writ denied), we found Busse, who was a majority shareholder and a director, to be a control person, we do not construe this case to mean evidence solely of status creates a prima facie showing of control person.

**End of Document**                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

300 S.W.3d 879
Court of Appeals of Texas,
Dallas.

TEXVA, INC. and R. Bradley Bierman, Appellants

v.

James BOONE and Cindy Hayes, Appellees.

No. 05–08–01564–CV.    |    Nov. 12, 2009.

**Synopsis**
**Background:** Texas officer of corporation brought action against California officers of corporation, alleging breach of contract, breach of fiduciary duty, negligent misrepresentation, and shareholder oppression. The 416th Judicial District Court, Collin County, Chris Oldner, J., granted special appearances of California officers. Texas officer appealed.

**Holdings:** The Court of Appeals, Richter, J., held that:

[1] California officers' contacts with Texas were not continuous and systematic, and thus trial court lacked general jurisdiction over them;

[2] California officers purposefully availed themselves of privilege of conducting business in Texas, as required for assertion of specific jurisdiction over them;

[3] action arose from and was related to California officers' contacts with Texas, as required for assertion of specific jurisdiction over them; and

[4] assertion of personal jurisdiction over California officers would comport with traditional notions of fair play and substantial justice.

Reversed and remanded.

West Headnotes (26)

**[1]**    **Courts**
 👉 Allegations, pleadings, and affidavits

A plaintiff bears the initial burden of pleading sufficient allegations to establish personal jurisdiction over a defendant.

Cases that cite this headnote

**[2]**    **Courts**
 👉 Presumptions and Burden of Proof as to Jurisdiction

When a nonresident challenges personal jurisdiction through a special appearance, it carries the burden of negating all bases for jurisdiction.

Cases that cite this headnote

**[3]**    **Appeal and Error**
 👉 Proceedings preliminary to trial

Where a trial court denies a special appearance for personal jurisdiction purposes and the court issues findings of fact and conclusions of law, the findings of fact may be challenged on legal and factual sufficiency grounds.

Cases that cite this headnote

**[4]**    **Appeal and Error**
 👉 Particular findings implied
 **Appeal and Error**
 👉 Proceedings preliminary to trial

Legal conclusions may not be challenged for factual insufficiency, in an appeal of a trial court's denial of a special appearance, and if the trial judge does not issue findings of fact and conclusions of law then all facts necessary to support the judgment and supported by the evidence are implied.

Cases that cite this headnote

**[5]**    **Appeal and Error**
 👉 Sufficiency of Evidence in Support

When the clerk's and court reporter's record are included in the appellate record, the implied findings of facts necessary to support the judgment are not conclusive and may be

challenged on appeal for legal and factual sufficiency.

Cases that cite this headnote

**[6]    Appeal and Error**
  👈 Total failure of proof

When considering the legal sufficiency of implied factual findings necessary to support a judgment, a no-evidence challenge fails if there is more than a scintilla of evidence to support the finding.

Cases that cite this headnote

**[7]    Appeal and Error**
  👈 Manifest weight

When the factual sufficiency of implied factual findings necessary to support a judgment is challenged, the trial court's decision may only be set aside if its ruling is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

Cases that cite this headnote

**[8]    Constitutional Law**
  👈 Non-residents in general
**Courts**
  👈 Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

A court may exercise jurisdiction over a nonresident defendant when two conditions are met: first, the Texas long arm statute authorizes the exercise of jurisdiction, and second, the exercise of jurisdiction must satisfy the requirement of due process. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[9]    Constitutional Law**
  👈 Non-residents in general

There are two requirements to satisfy due process for purposes of establishing personal jurisdiction

over a nonresident defendant: (1) the defendant had sufficient minimum contacts with the forum state, and (2) maintenance of the suit does not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[10]    Constitutional Law**
  👈 Non-residents in general

Minimum contacts, for purposes of establishing personal jurisdiction over a nonresident defendant so as to comport with due process, requires that the nonresident defendant purposefully avail itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[11]    Courts**
  👈 Unrelated contacts and activities; general jurisdiction
**Courts**
  👈 Related contacts and activities; specific jurisdiction

A nonresident defendant's minimum contacts with a forum can give rise to either general or specific jurisdiction: general jurisdiction is found when the defendant's contacts are continuous and systematic so that the state would have jurisdiction even if the claim did not arise from the activities conducted in the forum, and specific jurisdiction is limited to where the defendant's alleged liability arises from or is related to activity conducted in the forum state. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[12]    Courts**
  👈 Tortious or intentional conduct; fraud and breach of fiduciary duties

Contacts of California officers of corporation with Texas were not continuous and systematic, and thus Texas trial court lacked general jurisdiction over them in action by Texas

officer of corporation against California officers for breaches of contract and fiduciary duty, negligent misrepresentation, and shareholder oppression, where California officers' contacts with Texas were limited to their business relationship with Texas officer, and California officers did not own any real property in Texas, did not have any personal bank accounts or offices in Texas, and did not frequent Texas for personal reasons, but rather resided and conducted most of their business operations in California. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

[13]   **Constitutional Law**
　　🗝 Non-residents in general

The minimum contacts inquiry, in determining whether a court has personal jurisdiction over a nonresident defendant so as to comport with due process, is broader and more demanding when general jurisdiction is alleged, requiring a showing of substantial activities in the forum state. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[14]   **Courts**
　　🗝 Related contacts and activities; specific jurisdiction

Specific jurisdiction over a nonresident defendant has two requirements: (1) the defendant's contacts with the forum must be purposeful, and (2) the cause of action must arise from or relate to those contacts.

Cases that cite this headnote

[15]   **Constitutional Law**
　　🗝 Non-residents in general

The touchstone of jurisdictional due process is purposeful availment, in determining whether a trial court can establish personal jurisdiction over a nonresident defendant. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[16]   **Courts**
　　🗝 Purpose, intent, and foreseeability; purposeful availment
　　**Courts**
　　🗝 Business contacts and activities; transacting or doing business
　　**Courts**
　　🗝 Agents, Representatives, and Other Third Parties, Contacts and Activities of as Basis for Jurisdiction

The Court of Appeals must consider three issues in determining whether a defendant has purposefully availed itself of the privilege of conducting business or other activities in Texas, so as to be subject to personal jurisdiction in Texas courts: first, the court should consider only the defendant's contacts with the forum, not the actions of a third party, second, the relevant contacts must be purposeful and not random, isolated, or fortuitous, and third, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

[17]   **Constitutional Law**
　　🗝 Representatives of organizations; officers, agents, and employees
　　**Courts**
　　🗝 Tortious or intentional conduct; fraud and breach of fiduciary duties

California officers of corporation purposefully availed themselves of privilege of conducting business in Texas, as required for trial court's assertion of personal jurisdiction over them within requirements of due process, in action by Texas officer of corporation for breaches of contract and fiduciary duty, negligent misrepresentation, and shareholder oppression, where California officers agreed to incorporate company with Texas officer and accepted roles as corporate officers, corporation conducted activities in Texas, its domain name was established in Texas and its trademark registrations utilized Texas address, and California officers visited Texas on two

occasions to discuss what Texas officer wanted to do with business. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[18]  Constitutional Law**
      Manufacture, distribution, and sale

Sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state engage in purposeful contacts with the latter state, and therefore are subject to the jurisdiction of that state in suits based on their activities, under federal due-process principles. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[19]  Corporations and Business Organizations**
      Tortious acts in general
**Corporations and Business Organizations**
      Jurisdiction and venue
**Courts**
      Tortious or intentional conduct; fraud and breach of fiduciary duties

Fiduciary shield doctrine under Texas law was not available to shield California officers of corporation from liability or jurisdiction in their personal capacity, in action brought in Texas court by Texas officer of corporation against California officers for breaches of contract and fiduciary duty, negligent misrepresentation, and shareholder oppression, as Texas officer alleged in original pleading that California officers directed number of tortious activities toward Texas.

1 Cases that cite this headnote

**[20]  Courts**
      Fiduciary duties in general; fiduciary shield

The fiduciary shield doctrine under Texas law protects nonresident officers and employees of a corporation from being subject to the jurisdiction of the Texas courts when all of the individual's contacts with the state are on behalf of the corporation.

2 Cases that cite this headnote

**[21]  Courts**
      Tortious or intentional conduct; fraud and breach of fiduciary duties

A corporate officer is not protected from the exercise of specific jurisdiction under Texas' fiduciary shield doctrine, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct, directed at the forum state, for which he may be held personally liable.

2 Cases that cite this headnote

**[22]  Constitutional Law**
      Representatives of organizations; officers, agents, and employees
**Courts**
      Tortious or intentional conduct; fraud and breach of fiduciary duties

Action by Texas officer of corporation against California officers of corporation for breaches of contract and fiduciary duty, negligent misrepresentation, and shareholder oppression, arose from and was related to California officer's contacts with Texas and its residents, including incorporation in Texas, as required under due process for Texas court to assert personal jurisdiction over California officers, as underlying litigation concerned whether one party breached agreement or fiduciary duty arising from business relationship. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[23]  Courts**
      Related contacts and activities; specific jurisdiction

There must be a substantial connection between a nonresident defendant's contacts with a forum state and the operative facts of the litigation, in order to establish specific jurisdiction over a defendant.

**[24]** **Constitutional Law**
⚬ Non-residents in general

Once the Court of Appeals has concluded that the minimum contacts requirement is met, in determining whether a trial court can assert personal jurisdiction over a nonresident defendant within the requirements of due process, the Court must still consider whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice, and the Court considers the following five factors in making that decision: (i) the burden on the nonresident defendant; (ii) the forum state's interest in adjudicating the dispute; (iii) the plaintiff's interest in obtaining convenient and effective relief; (iv) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (v) the shared interest of several states in furthering substantive social policies. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote

**[25]** **Constitutional Law**
⚬ Non-residents in general

Only in rare cases will the exercise of personal jurisdiction by a trial court not comport with the traditional notions of fair play and substantial justice, for purposes of due process, when the nonresident defendant has purposefully established minimum contacts with the forum state. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote

**[26]** **Constitutional Law**
⚬ Representatives of organizations; officers, agents, and employees

**Courts**
⚬ Tortious or intentional conduct; fraud and breach of fiduciary duties

Assertion of personal jurisdiction by Texas court over California officers of corporation in action by Texas officer of corporation

for breaches of contract and fiduciary duty, negligent misrepresentation, and shareholder oppression would comport with traditional notions of fair play and substantial justice for due process purposes, even though California officers resided and worked in California and it would be burdensome for them to litigate in Texas, as Texas had strong interest in redressing alleged wrong by corporate fiduciaries, in that corporation was formed in Texas, half of corporate shares were owned by Texas officer, and corporation conducted some business in Texas. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*883** Raymond V. Jobe, Dallas, TX, for Appellant.

Mark A. Alexander, Addison, TX, Abhay Dhir, Irving, TX, for Appellee.

Before Chief Justice WRIGHT, and Justices RICHTER and LANG.

## OPINION

Opinion By Justice RICHTER.

TexVa, Inc. ("TexVa") and R. Bradley Bierman ("Bierman") appeal the trial court's order granting the special appearances of Cindy Hayes ("Hayes") and James Boone ("Boone"), both residents of California. Appellants contend that the trial court erred in sustaining the special appearances of Boone and Hayes. For the reasons set forth below, we conclude that Hayes' and Boone's contacts with the State of Texas are sufficient to support specific jurisdiction, and the exercise of jurisdiction over them by a Texas court is consistent with traditional notions of fair play and substantial justice. Accordingly, we reverse the trial judge's order and remand this case for further proceedings.

## BACKGROUND

Bierman, a resident of Texas, and TexVa, a Texas corporation, filed suit against Boone and Hayes, both residents of California. The claims raised in this proceeding are for breach of contract, breach of fiduciary duty, negligent misrepresentation and shareholder oppression related to a business they own. Currently, the parties **\*884** operate a company known as CoreTex Products, Inc. ("CoreTex"). CoreTex is in the business of formulating and selling skin care products. It is organized as a Texas corporation. However, Bierman, Hayes and Boone, first started doing business in 1999 through a partnership called CoreTex Products ("CoreTex Partnership"). CoreTex Partnership was owned equally by CoreLinks Systems ("CoreLinks"), a partnership owned by appellees, Boone and Hayes, and TexVa, owned in part by Bierman.

When the parties first commenced business as CoreTex Partnership they agreed to operate out of their respective homes. Bierman has continuously operated from his home in Plano, Texas and Hayes and Boone operate from Bakersfield, California. During this time period, Bierman's son was hired to develop a domain for CoreTex Products. Bierman's son is also a resident of Texas, although he was a student at Tulane University at that time. Bierman testified that his son had sole responsibility for creating the web site, while Boone claimed that they created it together. This dispute is not material to our analysis because the business records admitted at the hearing show that Bierman's son was the technical and administrative contact for issues with the website and provided a Texas contact number and Plano address on behalf of CoreTex Products. Tax returns filed on behalf of CoreTex Partnership establish that the parties operated as a partnership for two years prior to incorporation. Schedule K–1 shows that profits or losses were split evenly between CoreLinks and TexVa for operations in 1999 and 2000.

In late 2000, the parties decided to incorporate and CoreTex Products, Inc. ("CoreTex"), a Texas corporation, was formed. The parties agreed to have Bierman's father, a Texas lawyer, incorporate CoreTex for them. The parties offered conflicting testimony as to why Texas was chosen as the state of incorporation. Boone testified that it was merely as a convenience because Bierman's father would prepare the documents for free. Bierman testified that Texas was chosen because of its favorable tax rate and other advantages. CoreTex is equally owned by TexVa and CoreLinks. Bierman is the president of CoreTex, Boone is the vice-president and treasurer and Hayes is the secretary. Bierman and Boone are the directors of CoreTex.

It is undisputed that CoreTex is headquartered in Bakersfield, California. Almost all of CoreTex's business is conducted out of its Bakersfield office. All corporate brochures and invoices list the Bakersfield address. However, Bierman retains an office in his home in Plano, Texas and conducts some CoreTex business from that location. Bierman was primarily responsible for EPA and FDA regulations and helped create formulations and trademarks. Bierman filed trademark registrations for CoreTex. Three Certificates of Registration were issued by the U.S. Patent and Trademark Office in November of 2004. All three certificates show CoreTex as the owner, and use the Plano, Texas address. The location of the registered agent is also in Plano, Texas. From the commencement of the relationship as partners, through the present, CoreTex has had some suppliers and customers in Texas, although the number is disputed.

The appellees testified at the special appearance hearing that they have traveled to Texas only four times. Two trips were for personal reasons and two were business trips as representatives of CoreTex. The first of the two business trips took place after Bierman's role in the corporation had diminished and Boone and Hayes **\*885** wanted to find out what Bierman wanted to do with the company. The issue of selling his interest was raised, but it is disputed who raised the issue. Hayes had people in California, including his son, who were interested in possibly purchasing TexVa's interest in the business. Bierman was uncertain what he wanted to do with the business or its worth and requested some financial records.

Bierman subsequently obtained copies of the tax returns and was surprised by the amount of salary that Boone was being paid. Bierman testified that TexVa was not receiving payments regularly and Hayes and Boone had told him it was because they were short on funds. After Bierman had reviewed the tax returns there was a second meeting in Texas. There is also a factual dispute concerning what transpired at this meeting, however, it is clear that the meeting was very short because a dispute arose over Boone's salary.

It is undisputed that Bierman is not currently involved in the day to day management of CoreTex. There has also been little, to no contact, between the parties for the past year or more.

Suit was filed on March 24, 2008, against CoreTex, Boone and Hayes. Boone and Hayes filed special appearances and a

hearing was held on July 3, 2008. The trial court granted the special appearances, but did not issue findings of fact.

## BURDEN OF PROOF AND STANDARD OF REVIEW

[1] [2] The plaintiff bears the initial burden of pleading sufficient allegations to establish personal jurisdiction over a defendant. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2002). When a nonresident challenges jurisdiction through a special appearance, it carries the burden of negating all bases for jurisdiction. *Id.*

[3] [4] [5] [6] [7] Whether a trial court has personal jurisdiction over a defendant is a legal issue, which is subject to de novo review. *BMC Software,* 83 S.W.3d at 794. Where the trial court denies a special appearance and the court issues findings of fact and conclusions of law, the findings of fact may be challenged on legal and factual sufficiency grounds. *Id.* Legal conclusions may not be challenged for factual insufficiency. *Id.* If the trial judge does not issue findings of fact and conclusions of law then "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software,* 83 S.W.3d at 795. When the clerk's and court reporter's record are included in the appellate record the implied findings are not conclusive and may be challenged on appeal for legal and factual sufficiency. *Id.* In this case the trial court did not issue findings of fact and conclusions of law, but the clerk's and court reporter's record have been included in the appellate record. Therefore, this Court reviews both legal and factual sufficiency. When considering legal sufficiency, "the no-evidence challenge fails if there is more than a scintilla of evidence to support the finding." *Id.* When factual sufficiency is challenged the trial court's decision may only be set aside if "its ruling is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *Tempest Broadcasting Co. v. Imlay,* 150 S.W.3d 861 (Tex.App.-Houston [14th Dist.] 2004, no pet.), quoting, *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

## PERSONAL JURISDICTION

### A. *Long Arm Statute and Minimum Contacts.*

[8] Appellees Hayes and Boone are residents of California. A Texas court **\*886** may exercise jurisdiction over a nonresident defendant when two conditions are met. First, the Texas long arm statute authorizes the exercise of

jurisdiction. Second, the exercise of jurisdiction must satisfy the constitutional requirement of due process. *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002). The Texas long arm statute authorizes Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in the state, including the commission of a tort, in whole or in part, in this state. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 2008). The broad language of the Texas long arm statute has been interpreted to allow Texas courts to exercise jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software,* 83 S.W.3d at 795.

[9] [10] There are two requirements to satisfy the constitutional requirement of due process: (1) the defendant had sufficient "minimum contacts" with the forum state, and (2) maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Minimum contacts requires that the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its law." *Id.,* 326 U.S. at 319, 66 S.Ct. 154.

[11] The defendant's minimum contacts with the forum can give rise to either general or specific jurisdiction. General jurisdiction is found when the defendant's contacts are "continuous and systematic" so that the state would have jurisdiction even if the claim did not arise from the activities conducted in the forum. *BMC Software,* 83 S.W.3d at 796. On the other hand, specific jurisdiction is limited to where the defendant's alleged liability arises from or is related to activity conducted in the forum state. *Id.*

### B. *General Jurisdiction*

[12] [13] Appellants argue that Hayes' and Boone's contacts with Texas are sufficient for a Texas court to exercise general jurisdiction over them. The "minimum contacts inquiry is broader and more demanding when general jurisdiction is alleged, requiring a showing of *substantial activities* in the forum state." *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990) (emphasis added). This Court recently analyzed the requirements for general jurisdiction in *Moki Mac River Expeditions v. Drugg,* 270 S.W.3d 799 (Tex.App.-Dallas 2008, no pet.). In *Moki Mac* we noted that general jurisdiction is "dispute blind" and the availability of jurisdiction may be tested against a hypothetical claim that has no connection with the forum. *Id.* at 802. We therefore

examine Hayes' and Boone's activities in Texas to determine if they satisfy this requirement.

The record shows that Hayes' and Boone's contacts with the State of Texas are limited to their business relationship with Bierman and TexVa, first as partners and later as officers and director of CoreTex. They own no real property in the state. They do not personally have any bank accounts or offices in the state. Nor do they frequent the State of Texas for personal reasons. Instead, their activities in or directed at Texas have been limited to involvement with CoreTex. When we consider those facts in contrast with the fact that Hayes and Boone reside in California and conduct most of their business operations in California, we conclude that their contacts with Texas are not continuous and systematic and are not sufficient to exercise general jurisdiction over them.

**\*887  C. *Specific Jurisdiction***

 [14]    Specific jurisdiction has two requirements: "(1) the defendant's contacts with the forum must be purposeful, and (2) the cause of action must arise from or relate to those contacts." *American Type Culture,* 83 S.W.3d at 806. We have already noted that all of the appellees' contacts with Texas relate to the management and control of Core Tex. Appellants allege that Boone, as an officer and director of a Texas corporation, and Hayes as an officer, have taken control of the corporation resulting in injury to the remaining director and shareholder, both residents of Texas. Appellants argue that the ongoing business relationship between the California and Texas residents, and subsequent dispute over control of a Texas corporation satisfies the conducting business requirement in this state for purposes of personal jurisdiction. We agree.

In *Rittenmeyer v. Grauer,* 104 S.W.3d 725, 732 (Tex.App.-Dallas 2003, no pet.) this Court held that "a nonresident director of a foreign corporation is not subject to personal jurisdiction solely because the corporation has its *headquarters* in Texas." (Emphasis in original). However, in reaching this conclusion we discussed and distinguished the facts in *Rittenmeyer* from those in *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.,* 831 F.2d 522, 527 (4th Cir.1987). In *Pittsburgh Terminal,* the Fourth Circuit concluded that personal jurisdiction existed over a nonresident director of a corporation that was incorporated in West Virginia and controlled by West Virginia law, even where the acts complained of were taken by the director when he was physically outside the forum state. We quoted the court's reasoning:

Excellent reasons exist for allowing a State to assert jurisdiction over non-resident directors of domestic corporations. A chartering State has a strong, even compelling interest in providing a forum for redressing harm done by corporate fiduciaries, harm endured principally by a resident of that State, the corporation....Given the high degree of regulation over corporate fiduciaries, the State's interest in providing a convenient forum for a derivative suit charging misfeasance or nonfeasance of a director cannot be overemphasized.

*Rittenmeyer,* 104 S.W.3d at 732, *quoting Pittsburgh Terminal,* 831 F.2d at 527–28. Unlike *Rittenmeyer,* but similar to *Pittsburgh Terminal,* Hayes and Boone are nonresident officers of a Texas corporation, and Boone is also one of only two directors. In addition, like *Pittsburgh Terminal,* this suit charges misfeasance in the operation of the domestic corporation and injury to the remaining director and shareholder of the corporation, both residents of this state. Finally, the relevant long arm statute is similar to that in *Pittsburgh Terminal.* The Texas long arm statute confers jurisdiction over any nonresident "doing business" in the state, while the West Virginia statute confers jurisdiction over any nonresidents "transacting any business." WEST VIRGINIA CODE § 56–3–33(a)(1) (2008).

The Texas Supreme Court has issued numerous opinions on the scope of personal jurisdiction. It has not, however, offered a bright line test that permits Texas courts to exercise jurisdiction over nonresident directors and officers of domestic corporations. Nor has the Texas legislature indicated in either the long-arm statute or the Business Organization Code that a nonresident consents to jurisdiction when it accepts the position as an officer or director in a domestic corporation. Therefore, while we find the appellees' contacts with this state based upon their roles as corporate officers significant, we  **\*888**  will also analyze their contacts under a traditional minimum contacts test.

**1. *Purposeful Availment***

 [15]    [16]    The "touchstone of jurisdictional due process [is] 'purposeful availment.' " *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 785 (Tex.2005). In *Michiana* the

Texas Supreme Court directed the courts to consider three issues in determining whether a defendant has purposefully availed itself of the privilege of conducting business or other activities in Texas. First, the court should consider only the defendant's contacts with the forum, not the actions of a third party. Second, the relevant contacts must be purposeful and not "random, isolated or fortuitous." Third, the "defendant must seek some benefit, advantage or profit by 'availing' itself of the jurisdiction." *Id.; see also Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 575 (Tex.2009).

In *Michiana* the court addressed the narrow issue whether an out of state seller could be hailed into a Texas court for an alleged misrepresentation made during a single telephone call initiated by a Texas resident. The court in *Michiana* relied heavily on *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) a case involving a long term contractual relationship between residents of different states that is more analogous to this case. *Burger King* involved a breach of a franchise agreement entered into between a Michigan resident and Burger King, headquartered in Florida. The Court found that Florida had jurisdiction over the Michigan resident based upon the parties long term contractual relationship that involved negotiations and course of dealing between both states. It noted:

> It is these factors, prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.

*Id.,* 471 U.S. at 479, 105 S.Ct. 2174.

 [17]   With these guidelines in mind, we turn to the first factor whether Hayes' and Boone's contacts with Texas were the result of "unilateral activity of another person." *Michiana,* 168 S.W.3d at 785. Hayes and Boone have had ongoing contacts with Texas residents since they initially agreed to form CoreTex Partnership. Prior to incorporating CoreTex, Hayes and Boone, through CoreTex Partnership, agreed to establish a business with a Texas resident. They later agreed to incorporate that business under the laws of the State of Texas. The parties disputed where the pre-incorporation meeting took place. However, we do not find the location of that meeting dispositive to our analysis. Hayes and Boone participated in the decision to organize a Texas corporation

and accepted roles as officers and director of that corporation. They also agreed that a Texas resident would be the President and that he would conduct his share of the business from Texas. Although there is a factual dispute over why Texas was chosen as the state of incorporation, the fact remains that Bierman, Hayes and Boone had a choice of where to incorporate and they chose Texas. Finally, Hayes and Boone traveled to Texas on two occasions to discuss what Bierman wanted to do with the business. Based upon this record we conclude that Hayes' and Boone's contacts with Texas were not the result of conduct by another person, but were a direct result of their voluntary decisions and actions.

 [18]   The second *Michiana* factor requires us to analyze whether the defendants' contacts were "purposeful" rather **\*889**  than "random, isolated or fortuitous." *Id.* Again, we consider the facts cited above that Hayes and Boone agreed to form an ongoing business relationship with Texas residents, form a Texas corporation and act as officers and director of that corporation. They also agreed at the outset that each would conduct operations from their homes; for Bierman that meant he would operate from his home in Plano, Texas. This required Hayes and Boone to have ongoing communications with Texas and its residents as long as their business relationship continued. The evidence is undisputed that CoreTex is headquartered in and conducts most of its operations from California. It is also undisputed that there has always been some business conducted in Texas. The domain for CoreTex Products was established in and shown as Plano, Texas. Boone had a role in either hiring Bierman's son or working with his son to develop the website for CoreTex Products. Trademark registrations also utilize the Plano, Texas address. CoreTex has always had some suppliers and customers in Texas. Finally, Hayes and Boone attended at least two meetings related to the ongoing business relationship between the parties in Texas. All of these events could hardly be described as "fortuitous." As the Texas Supreme Court noted in *Michiana* and *Moki Mac* the contacts of "[s]ellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are purposeful rather than fortuitous." *Moki Mac,* 221 S.W.3d at 578, (quoting *Michiana,* 168 S.W.3d at 785).

The remaining factor requires the defendants to seek some benefit, advantage or profit by 'availing' itself of the state. In this case, Hayes and Boone clearly sought to profit from their ongoing business relationship with Bierman through formation of a Texas corporation. All of these facts lead

us to conclude that Hayes and Boone purposefully availed themselves of the privilege of conducting business in Texas. *See also Lewis v. Indian Springs Land Corp.,* 175 S.W.3d 906 (Tex.App.-Dallas 2005, no pet.) (a Florida resident was subject to jurisdiction in Texas based upon his position as a founder, shareholder and owner of companies organized under Texas law; he executed a promissory note payable in Dallas, Texas and governed by Texas law; and the ongoing business relationship required him to communicate with Texas business associates.)

**[19]** **[20]** Appellees argue that all of those contacts with Texas and Bierman, as more fully described above, were as either representatives of CoreLinks, or officers and directors of CoreTex. They also testified that when they met with Bierman in Texas to discuss what Bierman wanted to do with the business that it was as representatives of CoreTex. They argue that they cannot be subject to personal jurisdiction in a Texas court when all of their activities related to Texas were in a representative capacity. This argument, however, confuses application of the fiduciary shield doctrine. The fiduciary shield doctrine protects officers and employees of a corporation from being subject to the jurisdiction in this state when all of the individual's contacts with this state are on behalf of the corporation. *Wolf v. Summers–Wood, L.P.,* 214 S.W.3d 783, 790 (Tex.App.-Dallas 2007, no pet.). The fiduciary shield doctrine has been limited by Texas courts to the exercise of general jurisdiction, it does not shield an officer or employee for their actions that are tortious or fraudulent. *See, SITQ E.U., Inc. v. Reata Restaurants, Inc.,* 111 S.W.3d 638, 650–51 (Tex.App.-Fort Worth 2003, pet. denied) (nonresident officer of a foreign corporation subject to personal jurisdiction where the officer participated in the decision to terminate tenants' leases **\*890** while directing others to assure tenants that building would be rebuilt); *D.H. Blair Investment Banking Corp. v. Reardon,* 97 S.W.3d 269 (Tex.App.-Houston [14th Dist.] 2002, pet. dism'd w.o.j.) (nonresident officers of a corporation subject to jurisdiction in Texas in a suit by shareholders of that corporation for fraud, negligent misrepresentation, breach of fiduciary duty and conspiracy); *Smith v. Lanier,* 998 S.W.2d 324, 334–35 (Tex.App.-Austin 1999, pet. denied) ("[a]n agency relationship does not shield an individual from jurisdictional contacts with a state...."); *Ennis,* 164 S.W.3d at 708 (plaintiff need not prove that the defendant committed intentionally tortious acts, a corporate officer is subject to jurisdiction if he or she committed any tortious act for which he is liable individually).

**[21]** Appellants alleged in their original pleading that the appellees directed a number of tortious activities toward Texas, including that they usurped CoreTex for their own personal benefit, used their positions as officers of CoreTex to take control of CoreTex, breached a fiduciary duty to CoreTex and its shareholders and that they made misrepresentations to Bierman during the course and scope of their positions as officers of CoreTex. "Courts recognize that a corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct, directed at the forum state, for which he may be held personally liable." *Ennis,* 164 S.W.3d at 707. Therefore, we conclude that the fiduciary shield doctrine is not available to shield Hayes and Boone from liability or jurisdiction in their personal capacity.

### 2. Arise From or Related to

**[22]** **[23]** We now turn to the final requirement to establish specific jurisdiction-the litigation must arise from or be related to those contacts. This requires that there "be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac,* 221 S.W.3d at 585. All of appellees contact with Texas relate to their business relationship with appellants. The underlying litigation concerns whether one of the parties has breached an agreement or a fiduciary duty arising from that business relationship. Therefore, we have no difficulty concluding that the litigation in this case arises from the appellees' contacts with the forum.

The remaining cases cited by appellees in support of their contention that they did not have sufficient minimum contacts with Texas to create personal jurisdiction are inapposite. None of those cases involved a controversy concerning the internal management of a Texas corporation, by officers of that domestic corporation. *Michiana* involved a suit by a purchaser of an RV against an out of state distributor of the RV. The only contact between the Texas and the foreign distributor was a single phone call initiated by the Texas resident. In *Commonwealth Gen. Corp. v. York,* 177 S.W.3d 923 (Tex.2005) the court held that it did not have jurisdiction over a foreign corporation that was the sole shareholder of corporation headquartered in Texas. Although employees of the foreign corporation traveled to Texas for meetings related to corporate business, none of those activities related to the plaintiffs' complaint that benefits had been wrongfully denied under an insurance policy issued by the subsidiary headquartered in Texas. In *Nichols v. Lin,* 282 S.W.3d 743

(Tex.App.-Dallas 2009, no pet.), this court considered only general jurisdiction and did not reach the specific jurisdiction analysis.

**\*891** The evidence established that Hayes and Boone had numerous contacts with Texas and its residents. They agreed to partner with and establish a business with a Texas resident. They agreed to form a Texas corporation and accepted roles as officers and director of that corporation. When problems arose in that business relationship, they traveled to Texas on two occasions to attempt to resolve those issues. They allegedly made false misrepresentations to Bierman, who at all times resided in Texas, and allegedly breached a fiduciary duty owed to the remaining shareholders of CoreTex who are residents of Texas. Now Bierman and TexVa are asking a Texas court to resolve those disputes and management and control of CoreTex. Even if Hayes and Boone were acting in their corporate capacity when they performed these actions, they can be held personally liable for those tortious acts and subject to jurisdiction in Texas.

**D.** *Traditional Notions of Fair Play and Substantial Justice*

**[24]** **[25]** Once we have concluded that the minimum contacts requirement is met, we must still consider whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. We consider the following five factors in making that decision: "(i) the burden on the nonresident defendant; (ii) the forum state's interest in adjudicating the dispute; (iii) the plaintiff's interest in obtaining convenient and effective relief; (iv) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (v) the shared interest of several states in furthering substantive social policies." *Wolf,* 214 S.W.3d at 789. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.*

**[26]** The fact that the appellees reside and work in California and it would be burdensome to litigate in Texas does not offend traditional notions of fair play and substantial justice. In multi state disputes, someone will always be inconvenienced. Accordingly, this argument has frequently been rejected as a basis for denying personal jurisdiction. *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. Moreover, as we noted in *Rittenmeyer,* Texas has "a strong, even compelling interest in providing a forum for redressing harm done by corporate fiduciaries, harm endured principally by a resident of that State." *Rittenmeyer,* 104 S.W.3d at 732. In this case Texas has an even stronger interest in redressing the alleged wrong done by the corporate fiduciaries, not only is the corporation a domestic corporation, but 50% of the shares of the corporation are owned by a Texas resident and some of the corporation's business is conducted in Texas. Therefore, we conclude that the exercise of jurisdiction over appellees does not offend traditional notions of fair play and substantial justice.

**CONCLUSION**

The appellees had the burden to negate all jurisdictional bases at the special appearance hearing. *BMC Software,* 83 S.W.3d at 793. We conclude that the evidence admitted at the hearing conclusively established the existence of specific jurisdiction. Therefore, the trial court's ruling was against the overwhelming weight and preponderance of the evidence. For all the foregoing reasons, we conclude that appellees have failed to carry their burden of negating all bases for the exercise of personal jurisdiction by a Texas court and reverse the trial court's order granting the **\*892** appellees' special appearance and remand this case for further proceedings.

**All Citations**

300 S.W.3d 879

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** [Ranger Steel Services, L.P. v. Orleans Materials & Equipment Co., Inc.,](#) S.D.Tex., January 14, 2010

2007 WL 631276
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

TRANSFIRST HOLDINGS, INC., TransFirst
Merchant Services, Inc., and Payment
Resources International, LLC, Plaintiffs,
v.
Andrew M. PHILLIPS, Dominic J. Magliarditi,
John S. Blaugrund, Payment Resources
International, a Nevada Corporation, SSF
Holdings, LLC, DII Investments, Inc.,
and TP Investments, LLC, Defendants.

Civil Action No. 3:06-
CV-2303-P. | March 1, 2007.

**Attorneys and Law Firms**

[David R. McAtee, II,](#) [Brian Matthew Collins,](#) [Charles Stephen Cantu,](#) [Peter D. Marketos,](#) Haynes & Boone, Dallas, TX, for Plaintiffs.

[Brian W. Clark,](#) [Bruce M. Flowers,](#) [Michael A. Logan,](#) Kane Russell Coleman & Logan, [G. Michael Gruber,](#) [Elizabeth K. Hameline,](#) [Rodolfo Rodriguez, Jr.,](#) Gruber Hurst Johansen & Hail, [Karl W. Koen,](#) [Robert J. Collins,](#) Grau Koen, Dallas, TX, for Defendants.

### *MEMORANDUM OPINION & ORDER*

[JORGE A. SOLIS,](#) United States District Judge.

**\*1** Now before the Court are Emergency Motion of Defendants Dominic J. Magliarditi and DII Investments, Inc. To Dismiss for Lack of Personal Jurisdiction and Improper Venue ("Magliarditi Motion") and Defendant John Blaugrund's Motion to Dismiss for Improper Venue ("Blaugrund Motion"), both filed on January 8, 2007. Responses were filed on January 15, 2007, and replies were filed on January 19, 2007. For the reasons stated below, the Magliarditi Motion is hereby DENIED and the Blaugrund

Motion is also DENIED. Plaintiffs' also filed a motion for leave to file a surreply on January 30, 2007. A response was filed on the same day, and a reply was filed on February 8, 2007. In light of this Order, the Court hereby DENIES AS MOOT the Motion for Leave to File a Surreply.

### I. BACKGROUND

Plaintiff TransFirst Holdings, Inc. ("TransFirst") is a provider of transaction processing services and payment processing technology. (App. Pls.' Resp. Magliarditi Mot. at 1.) In March of 2004, TransFirst purchased substantially all the assets of Defendant Payment Resources International ("PRI, Inc."), a Nevada Corporation operating out of Newport Beach, California. (*Id.* at 2) Among the principal shareholders of PRI, Inc. were Defendants Nick Magliarditi and John Blaugrund. (*Id.*) Pursuant to the Asset Purchase Agreement ("APA") of March 1, 2004 TransFirst paid over $30 million for the assets of PRI, Inc. PRI, Inc's assets were acquired by TransFirst's wholly owned subsidiary Payment Resources International, LLC ("PRI").(*Id.*)

The APA is a lengthy and detailed document and by its own terms compromises a number of other materials attached as schedules and exhibits. (*See generally id.* at 7-72.)The APA was negotiated in California and Dallas, Texas.(*Id.* at 4.) Pursuant to its own terms, the APA closed in Dallas on March 1, 2004. (*Id.* at 32-33.)The APA includes non-compete provisions. The owners of PRI Inc., including Defendants Magliarditi and Blaugrund, agreed that they would not directly or indirectly (i) engage in competing business; (ii) render competitive services for existing clients; (iii) become agents, consultants, or representatives of competing businesses; (iv) become a shareholder, joint venturer or owner of a competing business; or (v) attempt to solicit any TransFirst customer or client to conduct business with a competitor or persuade a customer or client to reduce the amount of business it conducted with TransFirst. (*Id.* at 54.)The APA does not contain a forum selection clause for dispute resolution. (*See id.* at 7-72.)The APA does provide that "the legal relations between the parties and the adjudication and the enforcement thereof shall be governed by and interpreted and construed in accordance with the internal substantive laws of the state of Texas."(*Id.* at 69.)

The sale of PRI Inc.'s assets to TransFirst under the APA was conditioned in part on the understanding that Magliarditi and Blaugrund, among others, would serve in PRI. Pursuant to their obligations under the APA, Magliarditi and Blaugrund entered into identical Employment Agreements ("EAs")

with PRI.(*Id.* at 89-104; 105-120.) The EAs provided that Magliarditi and Blaugrund would be employed as senior vice presidents. (*Id.* at 90; 106.) Section 1.01 of the EAs state that the employee

> **\*2** agrees to devote his full business time, energy and skill to his duties at Employer. Employee's duties will include, but not be limited to, those duties normally performed by a company senior vice president as well as any other reasonable duties that may be assigned to him from time to time by the Employer's Board of Directors. (*Id.*)

The EAs were executed on the same day that the APA closed, March 1, 2004. In August of 2004, the management comittee of PRI elected Magliarditi and Blaugrund to serve as vice presidents of PRI. (*Id.* at 121.)

Section 6.02 of the EAs ("Section 6.02") is a dispute resolution provision containing a forum selection clause. The provision reads, in relevant part,

> In the event of any dispute or claim relating to arising out of Employee's employment relationship with Employer, this Agreement or the termination of Employee's employment with Employer for any reason (including, but not limited to, any claims of breach of contract, wrongful termination or age, sex, race, sexual orientation, disability or other discrimination or harassment), Employee and Employer agree that all such disputes shall be fully, finally and exclusively resolved by means of a court trial conducted in (i) the Superior Court of Orange County, California, or (ii) any federal district court located in that county. (*Id.* at 96; 112.)

Section 4.01 of the EAs ("Section 4.01") discusses termination for cause. The definition of "cause" includes "any material breach by Employee of any of the terms of this Agreement, the Asset Purchase Agreement, or any other agreement entered into between Employee and Employer."(*Id.* at 92; 108.) The APA similarly defines

termination for cause when discussing the ability of Defendants to achieve Earn Out amounts. Earn-Out amounts were additional sums to be paid by TransFirst should the business reach certain growth targets over three years. (Compl. at 9, ¶ 31.) Thus, they could be affected by terminations for cause. The APA states that the employment of Defendants Magliarditi and Blaugrund (referred to as "Principal Shareholders") could be deemed terminated for cause where there had been a

> material breach by such Principal Shareholder of any of the terms of this Agreement or any other agreement entered into between such Principal Shareholder and Holdings or Purchaser (including without limitation any non-disclosure, confidentiality, non-compete, and/or employment agreement. (*Id.* at 22.)

Magliarditi is a California resident. He is president of Defendant DII Investments Inc. ("DII"), a Nevada corporation. (Magliarditi Mot. at 3, 5.) Magliarditi asserts that neither he nor DII has ever transacted any business in Texas. (*Id.* at 4, 5.)

Plaintiffs make several allegations of wrongful conduct against Defendant Magliarditi. It is alleged that at the time of entering into the APA, Magliarditi made fraudulent representations directed at the TransFirst office in Dallas, particularly about the non-compete provisions. (App. Pls.' Resp. Magliarditi Mot. at 2.) Plaintiffs allege that Magliarditi, through DII, engaged in competitive activity in violation of the APA and actively concealed such competition from PRI and TransFirst. (*Id.* at 4.) Plaintiffs allege that on June 1, 2006, Magliarditi informed TransFirst's accounting personnel, Charlene Strahs, that TransFirst owed $160,000 to Easy Pay Financial Services LLC ("Easy Pay") for merchant referral services. (*Id.*) According to Plaintiffs, Magliarditi was an officer of Easy Pay, a direct competitor and customer of PRI and TransFirst. (*Id.*) Plaintiffs also allege that Magliarditi, acting individually and on behalf of DII, directed false communications to TransFirst offices in Dallas Texas over the course of three months. (*Id.*) It is alleged that Magliarditi falsely denied any association with Easy Pay, particularly in an email to Andrew Rueff, a TransFirst officer in Dallas, TX. (*Id.* at 125.)Plaintiffs assert that Magliarditi never conceded the true nature of his ownership of Easy Pay. (*Id.* at 5.) Plaintiffs submit documents to show Magliarditi

included the value of his ownership of Easy Pay on DII's balance sheet in calculating his personal net worth. (*Id.* at 126.)Magliarditi ultimately resigned from employment in November of 2006. (Compl. at 17, ¶ 58.)

**\*3** John Blaugrund was terminated from employment on December 14, 2006. He received a termination letter stating that he owned and operated a competitive company and deprived TransFirst and its affiliate companies of his honest services. The letter stated that Blaugrund had breached his fiduciary duties as an employee and corporate officer. Blaugrund was deemed "terminated for 'Cause'." (App. Reply Blaugrund Mot. at 83.)

Plaintiffs' assert claims against Magliarditi and Blaugrund based on RICO violations, fraud, breach of fiduciary duties, and breach of the APA. (Compl. at 17-30.) Magliarditi and DII assert that this Court lacks personal jurisdiction over them, and Magliarditi, DII, and Blaugrund seek to have this case dismissed based on improper venue.

## II. LEGAL STANDARD

The plaintiff bears the burden of establishing a district court's personal jurisdiction over a nonresident defendant who moves for dismissal. *See Wilson v. Belin,* 20 F.3d 644, 648 (5th Cir.1994). When a court rules on a challenge to personal jurisdiction without an evidentiary hearing, the plaintiff has only to establish a *prima facie* case of personal jurisdiction. *See id.*The Court must accept as true all uncontroverted allegations in the complaint, and all factual conflicts presented by the parties must be resolved in favor of the plaintiff. *See id.*

The standard for determining if venue is proper is similar to the personal jurisdiction standard. 28 U.S.C. § 1406(a) instructs District Courts to dismiss or transfer a case if venue is improper where filed. A party may move to dismiss an action based on improper venue pursuant to Fed.R.Civ.P. 12(b)(3).*See Psarros v. Avior Shipping, Inc.,* 192 F.Supp.2d 751, 754 n. 4 (S.D.Tex.2002); *Mitsui & Co. (USA), Inc. v. MIRA M/V,* 111 F.3d 33, 37 (5th Cir.1997). Once a defendant raises the issue of proper venue by motion, the burden of sustaining venue lies with the plaintiff. *Psarros,* 192 F.Supp.2d at 753. In the absence of an evidentiary hearing, a plaintiff meets this burden by setting forth facts that, taken as true, establish venue. *Id.* The court should accept all uncontroverted facts as true and resolve all disputed facts in favor of the plaintiff. *Id.*

## III. ANALYSIS

### A. Personal Jurisdiction

Defendants Magliarditi and DII assert that this court does not have personal jurisdiction over them. To exercise personal jurisdiction over a nonresident defendant, the Court must determine that due process standards are satisfied by engaging in a two-pronged analysis. First, the Court determines whether the defendant has purposefully established "minimum contacts" in the foreign state. If so, the Court must then assess whether the exercise of personal jurisdiction would offend "traditional notions of fair play and substantial justice."*See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473-75, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Bullion v. Gillespie,* 895 F.2d 213, 216 (5th Cir.1990). Defendant Magliarditi also argues that even if these tests are met, this court cannot exercise personal jurisdiction over him because he is protected by the fiduciary shield doctrine.

### 1. *Minimum Contacts*

**\*4** Sufficient minimum contacts can be established through a showing of the existence of general or specific jurisdiction. *See Freudensprung v. Offshore Technical Serv. Inc.,* 379 F.3d 327, 343 (5th Cir.2003). Plaintiffs argue in this case that specific jurisdiction exists. "A court may exercise specific jurisdiction over a nonresident defendant if the lawsuit arises from or relates to the defendant's contact with the forum state."*Icee Distribs. Inc. v. J & J Snack Foods Corp.,* 325 F.3d 586, 591 (5th Cir.2003). Specific jurisdiction exists where a defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."*Burger King,* 471 U.S. at 475. The "purposeful availment" necessary for specific jurisdiction protects a defendant from being brought into a jurisdiction based solely on "random," "fortuitous," or "attenuated" contacts. *Id.* A single act may form a sufficient basis for personal jurisdiction if the claim arises from that single act and the defendant can reasonably foresee being brought into court in the forum state. *See Icee Distribs.,* 325 F.3d at 591. Merely contracting with a resident of the forum state does not sufficiently support the exercise of jurisdiction over the defendant. *See Id.*

### a. *Personal Jurisdiction Over Magliarditi*

The commission of an intentional tort aimed at the forum state will satisfy the purposeful availment inquiry of the minimum contacts requirement. *See Lewis v. Fresne,* 252 F.3d 352,

359 (5th Cir.2001); *Wien Air Alaska Inc. v. Brandt,* 195 F.3d 208, 213 (5th Cir.1999). In *Fowler v. Broussard, No. Civ.A.3:00-CV-1878-D, 2001 WL 184237, \* 5,* the court found that the introduction of evidence of misrepresentations transmitted to a Dallas, Texas office through e-mail and telephone conversations was sufficient to assert personal jurisdiction.

Plaintiffs argues that the Court has specific jurisdiction over Magliarditi because he directed fraudulent statements and misrepresentations at Texas. These allegedly fraudulent communications include false representations in the APA, emails, letters, and phone calls directed towards TransFirst's homes office in Texas. TransFirst's evidence of these fraudulent conduct consists primarily of the signed Declaration of Mark W. Travis, CFO and Senior Vice President of TransFirst. (*See generally* App. Pl.'s Resp. Magliarditi Mot. at 1-5.) Plaintiffs assert that Magliarditi directed false representations to TransFirst in Dallas, TX to induce TransFirst to enter into the APA. These alleged fraudulent representations were specifically in regards to the non-compete provisions of the APA. (*Id.* at 4.) It is further alleged that Magliarditi directed false representations to TransFirst in Dallas, Texas to conceal Magliarditi's ownership of Easy Pay between August and November of 2006. (*Id.* at 4-5.)Plaintiffs submit a copy of an email to Andrew Rueff, who they assert is a TransFirst officer, in which Magliarditi denies any affiliation with Easy Pay. (*Id.* at 125.)Plaintiffs attempt to show the fraudulent nature of the email by submitting a copy of Magliarditi's DII balance sheet in which Easy Pay is included as an asset. (*Id.* at 126.)These false representations, according to Plaintiffs, were directed at TransFirst's officers in Dallas, Texas. (*Id.* at 5.)

**\*5** Plaintiffs argue that these fraudulent representations directed towards Dallas, Texas are sufficient minimum contacts for the court to establish personal jurisdiction over Magliarditi, since an intentional tort aimed at a forum states satisfies the standard. Magliarditi disputes the admissibility and sufficiency of the evidence that Plaintiffs present to establish their *prima facie* case of personal jurisdiction. Magliarditi makes a number of challenges to Plaintiffs' evidence, but the court need not deal with every challenge as even a single contact may be sufficient if the defendant can reasonably foresee being brought before the court of the forum state. *See Icee Distribs.,* 325 F.3d at 591. Magliarditi contends that there is no evidence that he did not intend to comply with the APA non-compete provisions, and thus there is no evidence that he made fraudulent representations

directed at Texas. While Magliarditi may dispute the truth of Mr. Travis's statements, a court must resolve all disputed facts in favor of the plaintiffs when it considers personal jurisdiction.

Magliarditi asserts that Plaintiffs have merely made conclusory allegations. To the contrary, Plaintiffs did submit the Declaration of Mark W. Travis as evidentiary support of the allegedly tortious activity. The court in *Wien Air Alaska,* 195 F.3d at 212, established minimum contacts through the use of a sworn affidavit and records of communications, such as faxes and letters. Similarly, in *Double G Energy Inc. v. At Gas Gathering, Inc.,* No.Civ.A 3:05-CV-0749-P, 2005 WL 1837953, at \* 4, n. 3 (N.D.Tex. July 28, 2005), the Court found that a declaration was sufficient evidence for the purpose of establishing a *prima facie* case of personal jurisdiction. The Declaration, copies of emails, and the balance sheet submitted to the Court are competent evidence to establish personal jurisdiction.

Magliarditi challenges the truth of Plaintiffs' factual allegations. Plaintiffs allege that Magliarditi's email to Andrew Rueff, stating that he was not an officer, director, or owner of Easy Pay, was fraudulent. Magliarditi contends that this was a true statement, and to demonstrate this submits Easy Pay's Articles of Organization, which lists only Charles Oliverio as an Easy Pay officer. (App. Magliarditi Mot. at 21-23.) Plaintiffs have submitted a balance sheet prepared by Magliarditi which lists Easy Pay among the assets of DII. Magliarditi has conceded an ownership interest in DII. Given the contradictory evidence of whether the statements about Magliarditi's relationship with Easy Pay were true or false, the court must resolve the issue in Plaintiffs' favor. Since Plaintiffs submit evidence tending to show that Magliarditi made fraudulent communications, the Court may accept Plaintiffs argument for personal jurisdiction based on intentionally tortious acts directed at Texas.

Magliarditi also contends that Andrew Rueff was an officer of PRI, working in California, and therefore any representations made to him would not have been directed at Dallas, Texas. He submits a PRI document appointing Andrew Rueff as vice president and secretary of PRI in support of his contention. (App. Magliarditi Reply at 26.) However, in his declaration, Mark Travis, a CFO and Senior Vice President of TransFirst, contends that Andrew Rueff is an officer of TransFirst. Once again, where facts are disputed, the court must resolve the issue in favor of Plaintiffs. Plaintiffs have presented evidence

that any false statements made to Rueff would have been aimed at TransFirst in Dallas, Texas.

**\*6** Plaintiffs allege that Magliarditi and DII never revealed to Plaintiffs that through DII, Magliarditi was engaged in directly competitive activity. (App. Resp. Magliarditi Mot. at 4.) Magliarditi asserts that if such conduct did occur, the harm was directed towards PRI, a California corporation. While PRI would have been harmed by the concealment of competitive activity, TransFirst, in Dallas, Texas, was also harmed. Magliarditi had obligations to TransFirst under the APA. Magliarditi should reasonably have foreseen that the harm resulting from fraudulently concealing competitive activity would flow to Texas. Thus, if competitive activity was concealed as Plaintiffs allege, the harm from the intentional tort would have been directed, at least in part, at Texas. The exercise of personal jurisdiction over Magliarditi is appropriate.

**b. *Personal Jurisdiction Over DII***

Plaintiffs have alleged that Magliarditi, through DII, engaged in activity competitive with the business of TransFirst, and then concealed such activity. Magliarditi was the sole owner and president of DII. (*Id.* at 4.) Plaintiffs allege that when making fraudulent representations to TransFirst, Magliarditi was acting on behalf of DII. (App. Resp. Magliarditi Mot. at 4.) Any knowledge Magliarditi had about the propriety of concealing competitive activity, in light of the APA, and any knowledge he had about the effects of tortious actions on Texas must be ascribed to DII as well. Plaintiffs allege and present supporting evidence through the Travis Declaration that DII, through the actions of its owner and officer Magliarditi, engaged in tortious conduct with foreseeable effects in Dallas. This is a sufficient allegation of minimum contacts to support the court's exercise of personal jurisdiction.

**2. *Fiduciary Shield Doctrine***

Magliarditi argues that the fiduciary shield doctrine prevents this Court from exercising jurisdiction over him. The fiduciary shield doctrine holds that "an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual."*Stuart v. Spademan,* 772 F.2d 1185, 1197 (5th Cir.1985).*"The doctrine shields a nonresident defendant from suit in a forum state when his or her only contacts with that state are in a representative capacity."*Pessina v. Rosson,* 77 S.W.3d, 293, 200 (Tex.App.-Austin 2001.)*The

doctrine does not protect a corporate officer who engages in tortious conduct, even if such acts were performed within the scope of employment. *Fowler v. Broussard,* No. Civ.A.3:00-CV-1878-D, 2001 WL 184237, at \*4 (N.D.Tex. Jan.22, 2001).

The fiduciary shield doctrine is inapplicable here. It is alleged that Magliarditi concealed his competitive activity on his own behalf and on behalf of DII, and was not acting in his capacity as an officer or employee of PRI. The fiduciary shield doctrine protects a corporate officer from being haled into court, in districts that would not otherwise have jurisdiction over him for activities solely related to his corporate position. Precedent in no way suggests that the fiduciary shield doctrine should protect a corporate officer from jurisdiction where he engaged in activity on his own behalf, and not in his capacity as a corporate officer. *See Pessina,* 77 S.W.3d at 300.

**\*7** Furthermore, Plaintiffs alleged that Magliarditi committed fraud when he represented in the APA that he would not engage in competitive activity. This occurred before Magliarditi was even elected a PRI officer. Therefore, he could not have been acting on behalf of PRI at the time of the events surrounding the execution of the APA. The fiduciary shield doctrine would not prevent the exercise of personal jurisdiction with respect to these claims.

Magliarditi has not convincingly asserted a basis for the application of the fiduciary shield doctrine since Plaintiffs allegations center around activity unrelated to his corporate position. Even if Magliarditi was acting as an officer of PRI, as he asserts, Plaintiffs allege he engaged in intentional tortious activity. Allegations of tortious activity overcome the application of the fiduciary shield doctrine. *See Fowler,* 2001 WL 184237, at \*4. The fiduciary shield doctrine does not prevent this court from exercising jurisdiction over Magliarditi.

**3. *Traditional Notions of Fair Play and Substantial Justice***

Magliarditi argues that it would offend traditional notions of fair play and substantial justice for the Court to exercise personal jurisdiction over him. Magliarditi contends that the venue clause in the EA gave him a justifiable expectation that a dispute such as this would be litigated in Orange County, California. According to Magliarditi, allowing this proceeding to occur in Texas violates his due process rights under the Texas and United States constitutions.

A defendant bears the burden of showing that this Court's assertion of jurisdiction would offend traditional notions of fair play and substantial justice. *See Burger King,* 471 U.S. at 476-77. Once minimum contacts are established, as they have been above, the defendant must make a "compelling case" against the exercise of personal jurisdiction. *Wien Air Alaska,* 195 F.3d at 215. A court must balance the burden on the defendant to litigate in this forum; the plaintiff's interests in convenient and effective relief; the judicial system's interest in efficient resolution of controversies; and the state's shared interest in furthering fundamental social policies. *Id.*

Defendant Magliarditi's argument as to why the exercise of jurisdiction over him offends traditional notions of fair play and substantial justice is far from compelling. He has not shown that there would be any burden on him in litigating in Texas. As will be discussed below, Magliarditi was not justified in expecting the forum selection clause of his EA to apply to a suit of this nature. Magliarditi has not shown that the state or judicial system has an interest in this case being litigated in California. Since minimum contacts have been established, and Magliarditi has not made a compelling case otherwise, the Court finds its exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

### B. Venue

**\*8** Defendants Magliarditi, DII, and Blaugrund assert that Plaintiffs' claims should be dismissed because venue is improper. DII asserts that 28 U.S.C. § 1391(b)(2) does not provide a basis for venue in this District in relation to the claims against it. Defendants Magliarditi and Blaugrund argue that venue is not proper because the EAs contain a valid, enforceable forum selection clause that requires this litigation to be pursued elsewhere. [1] The validity and enforcement of a forum selection clause is a question of law. *Mitsui & Co.,* 111 F.3d at 35.

### 1. *DII*

Plaintiffs rely on 28 U.S.C. § 1391(b)(2) as the basis to establish that this is an appropriate venue. Under this provision, an action may be brought in a judicial district "in which a substantial part of the events or omissions giving rise to the claim occurred."DII contends that it was not a party to the APA, received no payment from Texas under the APA, and undertook no actions in this district.

A court may find venue is proper where a defendant directs communications toward a particular forum if the communications are sufficiently related to the cause of action. *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,* 241 F.3d 135, 153 (2d Cir.2001); *FC Investment Group LC v. Lichtenstein,* 441 F.Supp.2d 3, 11 (D.D.C.2006) (interpreting *Titan* and a parallel statutory provision, 28 U.S.C. § 1391(a)(2)). The fact that a plaintiff residing in a particular judicial district feels the effect of a defendant's conduct in that district does not necessarily mean that the events or omissions occurred there. *See Bigham v. Envirocare of Utah,* 123 F.Supp.2d 1046, 1048 (S.D.Tex.2000).

Plaintiffs' allegations do more than state that the effects of Defendants' actions were felt in the forum state. Plaintiffs allege that DII, through the actions of its officer and owner Magliarditi, directed false communications to TransFirst officers in Dallas, Texas. (App. Resp. Magliarditi Mot. at 4). These false communications are the focus of Plaintiffs' claims of fraudulent representations. Therefore, they are sufficiently related to the cause of action to support venue. The direction of fraudulent misrepresentations to Dallas, Texas can establish that the events or omissions giving rise to the cause of action occurred in Dallas, Texas. Plaintiffs have made allegations and offered factual support sufficient for the purpose of establishing that this district is the proper venue for the claims against DII.

### 2. *Magliarditi and Blaugrund*

Defendants Magliarditi and Blaugrund argue that venue is improper in this district because each of their EAs contained valid, enforceable forum selection clauses that require this litigation be conducted elsewhere. Section 6.02 of the EAs read, in relevant part,

> In the event of any dispute or claim relating to arising out of Employee's employment relationship with Employer, this Agreement or the termination of Employee's employment with Employer for any reason (including, but not limited to, any claims of breach of contract, wrongful termination or age, sex, race, sexual orientation, disability or other discrimination or harassment), Employee and Employer agree that all such disputes shall be fully, finally and exclusively resolved by means of a

court trial conducted in (i) the Superior Court of Orange County, California, or (ii) any federal district court located in that county. (App. Resp. Magliarditi Mot. at 96; 112.)

**\*9** Plaintiffs do not dispute that the dispute resolution provision and forum selection clause of the EAs are valid and enforceable in relation to employment disputes. Rather, Plaintiffs argue that because the causes of action in this suit are unrelated to the employment relationship between the parties, the forum selection clauses of the EAs are inapplicable. Plaintiffs assert that the fraud in the inducement claims and breach of the APA claims relate to the APA and not to employment. Further, the breach of fiduciary duty claims relate to Defendants roles as officers of PRI, and not to their employment relationship with PRI. Finally, Plaintiffs assert that the RICO claims do not relate to Defendants' employment.

**a.** *Is Section 6.02 of the EAs Necessarily Implicated by Claims of APA Violations?*

Defendants Magliarditi and Blaugrund both argue that the APA and the EA are integrated and interdependent in such a way as to require the court to read the contracts together as one agreement. Therefore, a breach of one contract, would necessarily implicate the terms of the other. Magliarditi and Blaugrund support this argument by citing references within the APA to the EAs. For instance, Defendants' employment could be terminated for cause due to violations of the APA. Magliarditi and Blaugrund were required to enter into their respective EAs as a condition of the APA. The APA states that all schedules and exhibits are incorporated by reference into the APA, and the EAs are included among the schedules. The EAs and APA were all executed on the same date, March 1, 2004. Blaugrund cites *Nova Ribbon Product Inc. v. Lincoln Ribbon, Inc.,* Civ. A. No. 89-4340, 1992 WL 211544, \*5 (E.D.Pa. Aug.24 1992) for the proposition that where "documents are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole. This rule applies even though the parties to the separate writings may not be the same as long as the writings pertain to the same transaction and interpretation is aided by reading them together."

Defendants essentially argue that a violation of the APA is necessarily a violation of the EA. Thus, the EA would be implicated in Plaintiffs' claims of APA violations, and the EA's forum selection clause would apply whenever there was a breach of the APA. This interpretation of the contracts is not reasonable. The EAs merely state that a violation of the APA may be a basis for termination of employment for cause. (App. Resp. Magliarditi Mot. at 92, 108.) This does not mean that a breach of the APA is automatically a breach of the EAs. Blaugrund refers to Section 3.1(b)(v) and (vi) of the APA, which defines termination for cause to include a violation of the EA for the purpose of making determinations related to Earn-Out amounts. The purpose of 3.1(b) (v) and (vi) of the APA is not to link breaches of the EAs to breaches of the APA, but rather to set terms for Defendants ability to achieve Earn-Out amounts.

**\*10** While the APA and EAs are certainly related, the Court does not find that reading the documents together aids in interpretation of either document because each document deals with, and was intended to deal with, a distinct aspect of the parties' relationship. Even if the Court were to accept as true the proposition that the APA and EAs were interdependent and intertwined, it would still not be inclined to find that the dispute resolution provisions of the EAs were applicable to every cause of action against Magliarditi or Blaugrund arising out of the APA. The fact that two contracts were executed on the same day, by the same parties, and about the same general subject matter does not mean that the terms of one contract apply to the other contract. The existence of the two separately signed documents indicates that the employment aspects of the relationship were distinct, to at least some degree, from the asset purchase aspects of the transaction.

The plain language of the EAs themselves limit the application of Section 6.02 to "any dispute or claim relating to or arising out of Employee's employment relationship with Employer, this Agreement [defined in the document as the Employment Agreement], or the termination of Employee's employment with Employer for any reason."The plain language does not suggest an intent to cover obligations arising pursuant to the asset purchase aspects of the parties' relationship. The EAs' dispute resolution provision is limited to employment matters

By comparing the contracts, it does not appear that in executing the EAs and the APA, the parties intended that every violation of the APA would result in a breach of an EA, and that the EA's dispute resolution provision would become applicable. The APA did not contain a forum selection provision, although the parties certainly knew how to create

one. The language of the contracts does not show that the parties intended the forum selection provision of the EAs, lodged in one document among the fifty or so attached to the APA, to apply to violations of the APA. If the parties intended every violation of the APA to be litigated in Orange County, California, they could have set this out in the APA itself. The APA contains a Texas choice of law provision, while the EAs mandate that California law apply. (App. Resp. Magliarditi Mot. at 98; 114.) If violations of the APA were necessarily violations of the EAs, the choice of law provisions in the two documents would conflict. The mere fact that the APA and EAs were part of the same complex transaction does not suggest that the parties intended a violation of one agreement to trigger the provisions of the other, except where expressly stated. It is unreasonable to read the contract otherwise or suggest that the parties intended otherwise.

**b.** *Do Plaintiffs' Claims Fall Within the Scope of Section 6.02 of the EAs?*

While not every breach of the APA invokes the provisions of the EAs, the Court must assess whether Plaintiffs' allegations in this case fall within the scope of the dispute resolution provisions of the EAs. Section 6.02 of the EAs provides that

> **\*11** [i]n the event of any dispute or claim relating to arising out of Employee's employment relationship with Employer, this Agreement or the termination of Employee's employment with Employer for any reason (including, but not limited to, any claims of breach of contract, wrongful termination or age, sex, race, sexual orientation, disability or other discrimination or harassment)

the claims shall be litigated in Orange County, California. (App. Resp. Magliarditi Mot. at 96; 112.) Magliarditi and Blaugrund argue that the claims against them do relate to their employment relationships, while Plaintiffs contend that the causes of action and facts at issue are separate from employment.

A court looks to the parties' contract to determine which causes of action are governed by a forum selection clause. *Marine Chance Shipping, Ltd. v. Sebastian,* 143 F.3d 216, 22 (5th Cir.1998).“[I]f the *substance* of [the plaintiff's] claims, stripped of their labels, does not fall within the scope of the [forum selection] clause [ ], the clause[ ] cannot apply.”*Soil

*Bldg. Sys. v. CMI Terex Corp.,* No. Civ.A.3:04-CV-0210-G, 2004 WL 1283966, at \*4 (N.D.Tex. June 9, 2004) (alterations in original).

Defendants argue for an expansive interpretation of the contractual language, stating that the EAs dispute resolution provisions are very broad. Section 6.02 covers “any dispute or claim relating to or arising out of Employee's employment relationship with Employer.”As discussed above, the court is unconvinced that the parties intended for Section 6.02 of the EAs to apply so broadly that every kind of dispute about the APA would always be covered by the EA. Magliarditi and Blaugrund argue that the EAs use expansive language such as “any dispute” in order to encompass nearly all suits involving Magliarditi and Blaugrund. However, the language of the contract itself suggests that the parties intended to limit the dispute resolution provisions of the EAs to traditional employment-related issues. The claims must relate to or arise out of the employment relationship, which suggests more than a tangential connection to employment is necessary for the forum selection clause to apply. Section 6.02 specifically lists certain types of disputes that are covered, including discrimination, wrongful termination, and harassment. While this list is not exhaustive, it illuminates the understanding of the parties as to what kind of disputes would be governed by Section 6.02 of the EAs. The parties clearly were contemplating the dispute resolution provisions of the EAs to apply to traditional employment disputes.

Defendants note that included in the list of types of disputes to be resolved under Section 6.02 is “any claims of breach of contract.”Section 6.02 does not explicitly limit the forum selection provision to breaches of the EAs. The Court does not find that this language changes its analysis. It is unreasonable to assert that the parties intended that this parenthetical phrase would make every dispute related to an APA violation subject to the terms of the EAs. The better reading is to understand the term in the EAs to refer to employment-related contracts.

### i. *Fraud, Breach of the APA*

**\*12** Plaintiffs' argue that their claims for fraud and breach of the APA are not related to Magliarditi or Blaugrund's employment relationship. The Court agrees that these causes of action relate to the APA and not to employment or the employment contract. These causes of action and the facts at issue involve representations made and obligations incurred as part of the asset purchase transaction. This transaction

is separate from the parties' employment relationship. Therefore, these claims do not fall within the scope of the employment contract's dispute resolution provision.

Defendant Blaugrund argues that his termination letter stated that he was terminated for breach of the APA and the EAs. (App. Reply Blaugrund Mot. at 83.) He argues that this means that the terms of the EA are necessarily relevant to the APA-based claims at hand. This argument is unavailing because, whatever the reasons for firing Blaugrund, this suit is not about his termination from employment. Rather, Plaintiffs allege fraud, breach of the APA, and RICO claims. Therefore, even though a breach of the EA might have occurred, that breach is not relevant to this suit because the claims do not concern a breach of the EAs. Therefore, the forum selection provisions of the EA are not applicable to these claims.

### ii. *Breach of Fiduciary Duty, RICO*

While the claims related to fraudulent representations and breach of the APA do not appear to be employment-related, it is not so clear whether Plaintiffs' claims based on RICO and breach of fiduciary duties are covered by the dispute resolution provisions of the EAs. The RICO claims are based on mail and wire fraud, allegedly undertaken to deprive Plaintiffs of honest services. (Compl. at 18.) The breach of fiduciary duty claims are based on Magliarditi and Blaugrund's positions with PRI. Plaintiffs assert that the breach of fiduciary duty claims relate solely to Magliarditi and Blaugrunds roles as corporate officers and not to their roles as employees. Maintaining this distinction is difficult in light of the fact that each held only one position-that of senior vice president. *Cf. Loy v. Harter,* 128 S.W.3d 397, 404-05 (Tex.App.-Texarkana 2004) (finding employment agreement pertained to party's role as employee (CFO) of corporation and not to his role as a *director* ). Determining the scope of the EAs' coverage depends upon whether the Defendants' duties as corporate officers can be separated from their obligations as employees. If these two aspects of Defendants' roles with PRI cannot be separated, then Plaintiffs' allegations fall within the scope of the EAs because the claims relate to Defendants' responsibilities as employees. If the role of officer and employee can be divided, then the EAs are not necessarily implicated in this lawsuit and the forum selection clause would not necessarily be applicable here.

Plaintiffs cite cases involving the applicability of a contract's arbitration provisions to tort claims. *See Ford v. NYLCARE*

*Health Plans of the Gulf Coast,* 141 F.3d 243, 245, 250 (5th Cir.1998); *Hearthshire v. Braeswood Plaza Ltd. Partnership v. Bill Kelly Co.,* 849 S.W.2d 380, 391 (Tex.App.-Houston 1993). In *Ford,* 141 F.3d at 250, the contract stated that all disputes "arising out of or relating to" the contract must be arbitrated. The *Ford* court's analysis focused on whether the cause of action could be maintained independent of the contract to determine whether the claim was related to the contract. *Id.* at 251.In *Hearthshire,* 849 S.W.2d at 383, the relevant contract read, "[a]ll claims or disputes between the Contractor and the Owner arising out [of] or relating to the Contract, or the breach thereof, shall be decided by arbitration."In deciding whether the arbitration provision applied, the *Hearthshire* court similarly focused on whether reference to the contract was necessary in order to maintain the plaintiff's tort claims.

**\*13** These cases are inapposite to this situation where the EAs' forum selections clause covers matters broader than disputes arising out the EAs themselves. Section 6.02 of the EAs covers disputes "arising out of Employee's employment relationship with Employer, this Agreement, or the termination of Employee's employment."This contract provision applies to more than disputes arising out of the employment agreement-it applies to matters arising out of the employment relationship itself as well. The test of whether the action could be maintained independently of the contract is not helpful where the dispute resolution provision explicitly encompasses matters beyond the scope of the contract.

The Court believes that Defendants Magliarditi and Blaugrund's roles as corporate officers cannot be distinguished from their roles as employees for the purposes of the RICO claims for deprivation of honest services or the breach of fiduciary duty claims. Although a corporate officer is not necessarily an employee by virtue of holding his position (*see* William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 266 (2006), in this case Magliarditi and Blaugrund were clearly considered employees under the EAs. Importantly, the EAs state that Magliarditi and Blaugrund will be employed as senior vice presidents. It does not appear that the parties contemplated a distinction between the roles of officer and employee. Section 1.01 of the EAs provide that each Defendant will "devote his full business time, energy and skill to his duties at Employer."(App. Resp. Magliarditi Mot. at 90; 106.) Defendants' duties included "duties normally performed by a company senior vice president."(*Id.*) The substance of the breach of fiduciary duty and RICO claims relate to the services Magliarditi and

Blaugrund were required to render as employees under the EAs. These claims, as alleged, could not be brought in the absence of the employment relationship.

The plain language of the EAs purport to encompass all claims arising out of the employment relationship. The Court can find no principled way to separate the duties owed as a fiduciary and corporate officer from those owed as an employee where Defendants were employed as corporate officers, specifically as senior vice presidents. Plaintiffs' claims based on RICO and breach of fiduciary duty are related to Defendants' obligations and responsibilities as employees and corporate officers. The Court must find that these claims arise out of the employment relationship. While the claims could be maintained without any reference to the EAs, the forum selection provisions of the EAs encompass these claims.

While the forum selection clause of the EAs may cover the RICO and breach of fiduciary duty claims, the Court nevertheless declines to give effect to the forum selection clause in the interest of judicial economy. "A motion to enforce a forum selection clause is governed by 28 U.S.C § 1404(a)" ("§ 1404(a)").*Brock v. Entre Computer Centers, Inc.,* 740 F.Supp. 428, 431 (E.D.Tex.1990) (citing *Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22, 27-28, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)).Section 1404(a) reads, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."A "district court must weigh the plaintiff's forum choice against considerations of convenience, cost, judicial economy, and expedition of discovery and trial processes."*Brock,* 740 F.Supp. at 431. The factors to be considered under 1404(a) are (1) the plaintiff's choice of forum, (2) the convenience of the parties, (3) the convenience of witnesses, and (4) the interest of justice. *Stewart Organizations,* 487 U.S. at 28. The presence of a forum selection clause is not dispositive, but "a significant factor to figure centrally in the district courts' calculus."*Brock,* 740 F.Supp. at 431-32 (citing *Stewart Organization,* 487 U.S. at 28-29.)

**\*14** Courts often choose not to enforce forum selection clauses when to do so would contravene the interests of judicial economy. In *Brown v. Petroleum Helicopters Inc.,* 347 F.Supp.2d 370, 374 (S.D.Tex.2004), the court noted that since some claims would not be transferred out of the district, severing and transferring the claims subject to the forum selection clause would increase cost and inconvenience

for the parties. *Id.* The court held that "because all the 1404(a) factors [were] neutral or weigh against transfer," and because requiring litigation in two courts would not "serve the interests of judicial economy," the court would not enforce the forum selection clause. *Id.* Similarly, in *Somerset Marine Inc. v. Olympic Marine Co.,* No. Civ.A. 97-3451, 1998 WL 433801, *2 (E.D.La.1998), the court declined to give effect to a forum selection clause where the court had personal jurisdiction over all parties. The court stated, "transferring only the cross-claim to another venue makes little sense in terms of judicial economy, economy to the parties, and convenience to the parties and witnesses."*Id.* The court also noted that "one fact-finder should have all the evidence before it."*Id.*

18 U.S.C. § 1965 ("§ 1965") is a statutory venue provision that applies specifically to RICO claims. [2] Section 1965 has been interpreted to establish that "if one defendant before the court has the required minimum contacts with the forum state, then, *other* parties are subject to nationwide service of process."*Hawkins v. Upjohn Co.,* 890 F.Supp. 601, 606 (E.D.Tex.1994). With § 1965, Congress has shown an intent to allow plaintiffs to bring RICO claims against multiple defendants in one forum where, in the absence of the statute, venue or jurisdiction in that forum might not otherwise be proper. *See Butcher's Union Local No. 498 v. United Food and Commercial Workers,* 788 F.2d 535 (9th Cir.1986); *Snider,* 672 F.Supp. at 981.

In *Snider v. Lone Star Art Trading Co., Inc.,* 672 F.Supp. 977, 979 (E.D.Mich.1987) the court refused to give effect to a forum selection clause contained in one of six agreements. The *Snider* court states, "Equity, as well as an efficient administration of justice, militate against requiring a RICO claim involving six Defendants (and not a claim in contract) to be brought in the location which is specified in a contract with one of the Defendants."*Id.* The court further supported its determination by looking to § 1965. The *Snider* court noted that "the RICO venue provision evinces Congress' desire to give to a plaintiff the authority to bring suit [wherever] the transaction occurred."*Snider,* 672 F.Supp. at 981. The contract was governed by Texas law, and the Court found that, under Texas law, forum selection clauses were disfavored. Therefore, the Court held that "under Texas law, the broad RICO venue statutory section takes precedence over a venue provision in a private [contract]."*Id.* at 982-83.

**\*15** California law is the governing law designated by the EAs. (App. Resp. Magliarditi Mot. 98; 114.) In California,

a forum selection clause is prima facie valid, but can be set aside if enforcement is not reasonable under the circumstances. *See Furda v. Superior Court,* 161 Cal.App.3d 418, 425, 207 Cal.Rptr. 646 (1984). Enforcement of a forum selection may be unreasonable where it would violate the principle of judicial economy. *See Bancomer, S.A. v. Superior Court,* 44 Cal.App.4th 1450, 1462, 52 Cal.Rptr.2d 435 (1996) (finding it unreasonable to enforce a forum selection clause where a party would be required to litigate similar matters simultaneously in two different forums).

The Court will not enforce the parties' forum selection clause because, given the circumstances at hand, it would not be in the interest of justice or judicial economy to sever the RICO and breach of fiduciary claims against Blaugrund and Magliarditi from the other claims in this case. The Court does have personal jurisdiction over all the defendants in this suit, and venue has been uncontested or been found proper as to all of the claims apart from the forum selection clause. To dismiss some of the claims against two of the defendants in this multi-defendant, multi-claim lawsuit would result in similar facts and arguments being brought before, and decided by, two different fact finders. The principles of judicial efficiency and economy weigh in favor of retaining the RICO and breach of fiduciary duty claims here rather than handling the claims in a piecemeal fashion and running the risk of conflicting judgments.

The breach of contract and fraud causes of action against Blaugrund and Magliarditi will have to be defended in this forum. These claims involve the same core of facts and similar legal theories. Since some claims will be litigated in this forum, the parties will be inconvenienced by having other related claims decided elsewhere. As some of Magliarditi and Blaugrund's claims will be litigated here, their expectations regarding the forum the claims would be litigated in does not factor heavily in the analysis. *See Nippon Fire & Marine Ins. Co. v. M/V Spring Wave,* 92 F.Supp.2d 574, 577 (E.D.La.2000).

In addition, the Court finds that the RICO venue statute, § 1965, provides another basis for it to decline to enforce the forum selection clause. In this case, venue is proper for all claims, and only the forum selection clause would suggest otherwise. The remaining RICO claims against defendants other than Blaugrund and Magliarditi will be litigated in this district. This court, by declining to apply the forum selection clause of the EAs, acts in keeping with the Congressional purpose of § 1965 to bring all RICO claims and Defendants involved in the alleged scheme before one court.

Interpreting the forum selection clause of the employment contracts in light of California law further supports this court's maintenance of the claims in this court. Under California law, a court may decline to enforce a forum selection clause where it would be unreasonable to do so. In this case, for the reason of judicial economy discussed above, it would be unreasonable to sever particular claims against Blaugrund and Magliarditi from the rest of the action. Both the RICO venue statute and principles of judicial economy should take precedence over the parties' contractual choice of forum.

 **\*16** The Court believes that the interests of judicial economy dictate that the forum selection clause not be enforced in these circumstances. Therefore, although the dispute resolution provisions of the EAs would apply to the breach of fiduciary duty and RICO claims, the Court does not find that these claims should be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby DENIES Defendants' Motions. In light of this Order, the Court also DENIES AS MOOT Plaintiffs' Motion for Leave to File a Surreply.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 631276

Footnotes

1   Defendants Magliarditi and Blaugrund have filed separate motions contending that a valid arbitration agreement between the parties requires that this matter be arbitrated. Thus, they do not desire for this case to be transferred to another judicial district, but rather seek dismissal.

2   **18 U.S.C. § 1965**-Venue and process

     **(a)** Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

**(b)** In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

**(c)** In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpenas issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpena shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

**(d)** All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment

**Distinguished by**    Cenoplex, Inc. v. Fox,    Tex.App.-Austin,    February 21, 2014

137 S.W.3d 238
Court of Appeals of Texas,
Houston (1st Dist.).

A.C.S. WRIGHT, Appellant,
v.
SAGE ENGINEERING, INC., John S. Templeton,
III, and Ronald L. Boggess, Appellees.

No. 01–03–01018–CV.    |    April 8, 2004.

**Synopsis**

**Background:** Manufacturer of oilfield testing equipment sued sole director of shareholder corporation, and others, alleging defendants stole design technology related to miniature testing equipment. Director, who was Swiss citizen and resident, filed special appearance asserting lack of personal jurisdiction. The 133rd District Court, Harris County, Lamar McCorkle, J., denied special appearance, and director appealed.

**Holdings:** The Court of Appeals, Laura Carter Higley, J., held that:

[1] defendant improperly claimed defective service in special appearance;

[2] fiduciary shield doctrine did not apply to protect director from specific personal jurisdiction of state court;

[3] director had sufficient minimum contacts with state to confer personal jurisdiction;

[4] exercise of personal jurisdiction did not offend traditional notions of fair play and substantial justice.

Affirmed.

West Headnotes (41)

**[1]    Appearance**
   Objections to jurisdiction in general

The special appearance rule applies only when a defendant contends he is not amenable to process. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

Cases that cite this headnote

**[2]    Appearance**
   Objections to jurisdiction in general

The words "not amenable to process issued by the courts of this state" in the rule governing special appearances mean that the special appearance is available solely to establish that the Texas court cannot, under the federal and state constitutions and the appropriate state statutes, validly obtain jurisdiction over the person or the property of the defendant. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

2 Cases that cite this headnote

**[3]    Process**
   Defects and irregularities in service or return or proof thereof

Curable defect in service of process does not defeat a nonresident's amenability to the court's process and serves only to provide the non-resident defendant with more time to answer. Vernon's Ann.Texas Rules Civ.Proc., Rule 122.

3 Cases that cite this headnote

**[4]    Courts**
   Highest appellate court

Absent a clear expression that a decision of state Supreme Court has been overruled, Court of Appeals is bound by its decisions.

Cases that cite this headnote

**[5]    Appearance**

☞ Objections relating to process or service

**Process**

☞ Quashing or vacating service or return or proof thereof in general

Nonresident defendant improperly raised claim in special appearance that service of process of misappropriation of trade secrets complaint was defective for plaintiffs' failure to serve him in compliance with Hague Convention, given that defective service of process claim did not affect state court's personal jurisdiction over defendant, and that motion to quash service was proper method for raising defective service claim. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a; Vernon's Ann.Texas Rules Civ.Proc., Rule 122.

1 Cases that cite this headnote

**[6]** **Appearance**

☞ Defects in Process or Service

Requirement that defendant raise defective service of process claim in motion to quash rather than in special appearance does not waive claim that defendant is not amenable to process issued by a state court, as complaining defendant can limit his special appearance rule arguments to lack of minimum contacts issue, and then, if that fails, he can immediately file a motion to quash. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

1 Cases that cite this headnote

**[7]** **Pretrial Procedure**

☞ Process, defects and objections as to

**Process**

☞ Defects and irregularities in service or return or proof thereof

The remedy for defective service in state court is additional time to answer the suit, not dismissal. Vernon's Ann.Texas Rules Civ.Proc., Rule 122.

Cases that cite this headnote

**[8]** **Constitutional Law**

☞ Non-residents in general

**Courts**

☞ Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Two conditions must be met for state court to exercise personal jurisdiction over a nonresident defendant: state long-arm statute must authorize the exercise of jurisdiction, and exercise of jurisdiction must be consistent with the guarantees of due process. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

2 Cases that cite this headnote

**[9]** **Courts**

☞ Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Because the language of state long-arm statute is broad, its requirements are considered satisfied if the exercise of personal jurisdiction comports with federal due process limitations. U.S.C.A. Const.Amend.14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

3 Cases that cite this headnote

**[10]** **Constitutional Law**

☞ Non-residents in general

The cornerstone of due process in the context of personal jurisdiction is the minimum contacts analysis. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[11]** **Constitutional Law**

☞ Non-residents in general

Goal of minimum contacts analysis is to protect a defendant from being unjustifiably called before the courts of a foreign state in violation of due process rights. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[12]** **Constitutional Law**

☞ Non-residents in general

For purposes of obtaining personal jurisdiction over nonresident defendant, to establish minimum contacts with a state required to satisfy due process, the defendant must do something purposeful to avail himself of the privilege of conducting activities in the forum, thus invoking the benefit and protection of its laws. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

1 Cases that cite this headnote

**[13]** **Constitutional Law**
🔑 Non-residents in general

A nonresident defendant should not be subject to the personal jurisdiction of state court, under federal due process, based upon random, fortuitous, or attenuated contacts. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[14]** **Constitutional Law**
🔑 Non-residents in general

Under due process minimum contacts analysis for personal jurisdiction over nonresident defendant, purposeful availment requirement ensures that the nonresident defendant's contact must result from its purposeful contact, not the unilateral activity of the plaintiff or a third party. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[15]** **Constitutional Law**
🔑 Non-residents in general

It is the quality and nature of nonresident defendant's contacts with state, rather than their number, that is important in determining whether exercise of personal jurisdiction over nonresident defendant comports with due process requirements. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[16]** **Constitutional Law**
🔑 Non-residents in general

The exercise of personal jurisdiction over nonresident defendant is proper, for purpose of due process, when contacts proximately result from actions of the nonresident defendant that create a substantial connection with the forum state. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[17]** **Constitutional Law**
🔑 Non-residents in general

Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established minimum contacts with the forum state to satisfy due process. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[18]** **Constitutional Law**
🔑 Non-residents in general

Foreseeability is not an independent component of the minimum contacts analysis in determining whether exercise of personal jurisdiction over nonresident defendant comports with due process requirements, but is implicit in the requirement that there be a "substantial connection" between the nonresident defendant and forum state arising from the action or conduct of the nonresident defendant purposefully directed toward forum state. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[19]** **Constitutional Law**
🔑 Non-residents in general

Individuals must have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign to satisfy due process requirements. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[20]** **Constitutional Law**
🔑 Non-residents in general

Important inquiry in analysis of whether exercise of personal jurisdiction over nonresident defendant comports with due process is whether the defendant's conduct and connection with the forum state is such that he should reasonably anticipate being haled into court there. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[21]** **Courts**
🗝 Unrelated contacts and activities; general jurisdiction

**Courts**
🗝 Related contacts and activities; specific jurisdiction

Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[22]** **Courts**
🗝 Related contacts and activities; specific jurisdiction

Specific jurisdiction is established if the nonresident defendant's alleged liability arises from or is related to the defendant's purposeful contact with the forum. V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[23]** **Constitutional Law**
🗝 Non-residents in general

When specific jurisdiction over nonresident defendant is asserted, the minimum contacts analysis for due process focuses on the relationship among the defendant, the forum, and the litigation. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

1 Cases that cite this headnote

**[24]** **Courts**

🗝 Related contacts and activities; specific jurisdiction

For purposes of asserting specific jurisdiction over nonresident defendant, it is not necessary that a nonresident defendant's conduct actually occur in state, as long as the defendant's acts were purposefully directed toward the state. V.T.C.A., Civil Practice & Remedies Code § 17.042.

2 Cases that cite this headnote

**[25]** **Constitutional Law**
🗝 Non-residents in general

For purposes of due process, nonresident defendant should reasonably anticipate being haled into court where the effects of its conduct have been intentionally caused through the purposeful direction of activity toward the forum state, even if the defendant never physically enters the state. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[26]** **Appeal and Error**
🗝 Cases Triable in Appellate Court

Whether a state court has personal jurisdiction over a defendant is a question of law, which is reviewed de novo.

Cases that cite this headnote

**[27]** **Appeal and Error**
🗝 Necessity of finding facts

When trial court does not issue findings of fact and conclusions of law with its special-appearance ruling regarding personal jurisdiction over nonresident defendant, all facts necessary to support the judgment and supported by the evidence are implied. V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[28]** **Appeal and Error**
🗝 Conclusiveness in General

**Appeal and Error**
🗝 Sufficiency of Evidence in Support

Where appellate record includes both the reporter's and clerk's records, implied findings of trial court, necessary to support judgment, are not conclusive and may be challenged for legal and factual sufficiency.

1 Cases that cite this headnote

**[29]** **Appeal and Error**
👉 Cases Triable in Appellate Court

Court of Appeals reviews trial court's decision to grant or deny special appearance de novo when underlying facts are undisputed or otherwise established. V.T.C.A., Civil Practice & Remedies Code § 17.042; Vernon's Ann.Texas Rules Civ.Proc., Rule 120a.

Cases that cite this headnote

**[30]** **Courts**
👉 Presumptions and Burden of Proof as to Jurisdiction

Plaintiff bear initial burden to make sufficient allegations to bring nonresident defendant within the personal jurisdiction of the trial court. V.T.C.A., Civil Practice & Remedies Code § 17.042.

2 Cases that cite this headnote

**[31]** **Courts**
👉 Presumptions and Burden of Proof as to Jurisdiction

A defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases. V.T.C.A., Civil Practice & Remedies Code § 17.042.

3 Cases that cite this headnote

**[32]** **Constitutional Law**
👉 Non-residents in general

Due process considerations for personal jurisdiction under state long-arm statute are satisfied if a defendant directs his tortious conduct toward the forum state with the foreseeable knowledge that his actions will cause harm to a resident of the forum and the defendant

purposefully avails himself of the privilege of conducting activities within the forum state. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[33]** **Courts**
👉 Fiduciary duties in general; fiduciary shield

Fiduciary shield doctrine protects a corporate officer or employee from the trial court's exercise of general personal jurisdiction when all of the individual's contacts with Texas were on behalf of his employer. V.T.C.A., Civil Practice & Remedies Code § 17.042.

14 Cases that cite this headnote

**[34]** **Courts**
👉 Fiduciary duties in general; fiduciary shield

Fiduciary shield doctrine did not apply to negate bases of specific personal jurisdiction over nonresident director of corporation holding shares in manufacturer, asserted by manufacturer in action alleging director misappropriated trade secrets and confidential information held by manufacturer, given that director could be held personally liable for misrepresentations directed to shareholders in state regarding terms under which trade secrets and confidential information would be held, and fiduciary shield doctrine applied only to general personal jurisdiction. V.T.C.A., Civil Practice & Remedies Code § 17.042.

11 Cases that cite this headnote

**[35]** **Courts**
👉 Tortious or intentional conduct; fraud and breach of fiduciary duties

The fiduciary shield doctrine does not protect a nonresident corporate officer from specific personal jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable in Texas. V.T.C.A., Civil Practice & Remedies Code § 17.042.

16 Cases that cite this headnote

**[36] Corporations and Business Organizations**
  ☞ Fraud

Corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a corporate representative.

3 Cases that cite this headnote

**[37] Constitutional Law**
  ☞ Manufacture, distribution, and sale
**Courts**
  ☞ Tortious or intentional conduct; fraud and breach of fiduciary duties

Nonresident director of corporation holding shares in local manufacturer had sufficient minimum contacts with state to satisfy due process requirements for state court to exercise personal jurisdiction in manufacturer's suit alleging director misappropriated its trade secrets and confidential information; director allegedly made intentional misrepresentations to other shareholders in state by telephone and e-mail that induced them to contribute trade secrets and confidential information to manufacturer, by which he availed himself of benefits of state, and it was foreseeable to director that he might be haled into state court as result of misrepresentations. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[38] Constitutional Law**
  ☞ Non-residents in general

Factors considered in assessing whether exercise of personal jurisdiction over nonresident defendant offends traditional notions of fair play and substantial justice required by due process are: (1) burden on defendant, (2) interests of forum state in adjudicating dispute, (3) plaintiff's interest in obtaining convenient and effective relief, (4) interstate judicial system's interest in obtaining most efficient resolution of controversies, and (5) shared interest of the several states

in furthering fundamental substantive social policies. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

1 Cases that cite this headnote

**[39] Constitutional Law**
  ☞ Non-residents in general

When nonresident defendant is resident of another nation, trial court, when determining whether exercise of personal jurisdiction over nonresident defendant would comport with due process, must consider unique burdens placed upon defendant who must defend itself in foreign legal system, and procedural and substantive policies of other nations whose interests are affected as well as the federal government's interest in its foreign relations policies. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

5 Cases that cite this headnote

**[40] Courts**
  ☞ Presumptions and Burden of Proof as to Jurisdiction

Where nonresident defendant has purposefully established minimum contacts with forum state, burden is on defendant to present a "compelling" case that presence of some other considerations would render jurisdiction unreasonable. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

Cases that cite this headnote

**[41] Constitutional Law**
  ☞ Manufacture, distribution, and sale
**Courts**
  ☞ Tortious or intentional conduct; fraud and breach of fiduciary duties

Texas had strong interest in adjudicating alleged misappropriation of trade secrets and confidential information held by resident manufacturing corporation by which exercise of specific personal jurisdiction over nonresident director of Swiss corporation holding shares

in manufacturer did not offend traditional notions of fair play and substantial justice, even though defendant had considerable burden in defending suit in Texas, given that defendant allegedly committed tortious act directed at state residents that caused injury in state. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*243** Mario Alejandro Martinez, David L. Countiss, Fred Lee Butler, Adams And Reese, LLP, Houston, TX, for Appellant.

Melanie Goins Cowart, Akin, Gump, Strauss, Hauer & Feld, LLP, San Antonio, TX, David E. Warden, Eric P. Chenoweth, Yetter & Warden, L.L.P, Houston, TX, for Appellees.

Panel consists of Justices TAFT, HANKS, and HIGLEY.

**OPINION**

LAURA CARTER HIGLEY, Justice.

A.C.S. Wright ("Wright") appeals the denial of his special appearance [1] in a suit brought against him by appellees Sage Engineering, Inc., John S. Templeton, III, and Ronald L. Boggess. In addressing Wright's three issues raised on appeal, we **\*244** determine (1) whether Wright properly asserted in the trial court his complaint that appellees failed to serve him in accordance with the Hague Convention, (2) whether Wright had the requisite minimum contacts with Texas for the trial court to exercise personal jurisdiction over him, and (3) whether the exercise of personal jurisdiction over Wright comports with traditional notions of fair play and substantial justice.

We affirm.

**Factual and Procedural Background**

Wright is a citizen and resident of Switzerland. Sage Engineering, Inc. ("SEI") is a Texas corporation formed in 1995 with its principal place of business in Houston. SEI designs, manufactures, and sells miniature penetrometer testing equipment used in offshore oilfield production. The founding shareholders of SEI were John S. Templeton, III, ("Templeton"), Ronald L. Boggess ("Boggess"), and Sage Holding AG ("Sage Holding").

Wright is the sole director of Sage Holding. In November 2000, Wright signed an agreement for the sale of Sage Holding to Thales, Inc. Thales eventually merged Sage Holding into Thales Geosolutions, Inc. SEI, Templeton, and Boggess (collectively referred to as "appellees") sued Wright, Sage Holding, and several Thales entities. [2] Appellees allege that the defendants stole their design technology related to the miniature penetrometer testing equipment. The claims asserted by appellees included misappropriation of trade secrets, breach of fiduciary duty, unjust enrichment, breach of contract, conversion, conspiracy, fraud, and fraudulent inducement.

In their original petition, appellees made the following factual allegations:

· Boggess and Templeton provided SEI with their design technology for miniature penetrometer testing equipment.

· The design technology is the trade secrets and confidential information of the appellees.

· SEI was "the exclusive provider of the miniature penetrometer testing equipment to Sage Holding" and Sage Holding's corporate affiliates.

· Sage Geodia, a corporate affiliate of Sage Holding, purchased equipment and parts from SEI. Rather, than using this equipment to service their clients, Sage Geodia and "other affiliates" "reverse engineered" and duplicated the equipment and technology.

· Wright negotiated the purchase of Sage Holding by Thales. Under the terms of this agreement, Sage Holding agreed to provide Thales with "the technology, trade secrets, confidential information and other property and rights" of appellees.

· The Sage parties and Thales agreed to keep the negotiations secret from SEI and to exclude SEI from the corporate acquisition.

· Thales purchased Sage Holding in November 2000. At that time, Thales "folded" Sage Holding and SEI's misappropriated technology into Thales Geosolutions, which then used SEI's technology, i.e., trade secrets, to market and sell miniature penetrometer testing equipment.

Wright filed a special appearance asserting that he was not amenable to process issued by a Texas court. Wright argued that the trial court lacked personal jurisdiction **\*245** over him because (1) appellees' failed to serve him through the Hague Convention; (2) Wright lacked the requisite minimum contacts with Texas to satisfy the requirements of due process; and (3) the trial court's exercise of personal jurisdiction over him does not comport with traditional notions of fair play and substantial justice. The trial court denied Wright's special appearance. This interlocutory appeal followed.

### Defective Service of Process

In his first issue, Wright contends that the trial court should have granted his special appearance on the basis that appellees failed to serve him with process in compliance with the Hague Convention. Appellees counter that Wright's special appearance was properly denied on this basis because, if he thought that service was defective, Wright should have raised that complaint in a motion to quash, not in a special appearance. [3]

 [1]    [2]    A special appearance is a specific procedural mechanism to litigate one issue: that is, a special appearance is "for the purpose of objecting to the jurisdiction of the court over the person or property of the defendant on the ground that such party or property is not amenable to process issued by the courts of this State." TEX.R. CIV. P. 120a; *see also Tex. Commerce Bank N.A. v. Interpol 1980 Ltd. P'ship,* 703 S.W.2d 765, 775 (Tex.App.-Corpus Christi 1985, no writ). The rule applies only when a defendant contends he is not amenable to process. *See Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 201–02 (Tex.1985); *Oliver v. Boutwell,* 601 S.W.2d 393, 395 (Tex.Civ.App.-Dallas 1980, no writ). The words "not amenable to process issued by the courts of this state" mean that the special appearance is available solely to establish that the Texas court cannot, under the federal and state constitutions and the appropriate state statutes, validly

obtain jurisdiction over the person or the property of the defendant. *Kawasaki,* 699 S.W.2d at 202.

 [3]    Our supreme court held in *Kawasaki* that defective service of process must be challenged by a motion to quash rather than by a special appearance. *Id.* This is because a curable defect in service of process does not defeat a nonresident's amenability to the court's process and serves only to provide the non-resident defendant with more time to answer. *See id.* at 202; *see also* TEX.R. CIV. P. 122.

Wright acknowledges the holding in *Kawasaki* but argues that it has been called into question by the Unites States Supreme Court's decision in *Murphy Bros. v. Michetti Pipe Stringing,* 526 U.S. 344, 346, 119 S.Ct. 1322, 1325, 143 L.Ed.2d 448 (1999). In *Murphy Bros.,* the court held that mere receipt of a complaint unattended by any formal service did not trigger a defendant's time to remove a case from state court. *Murphy Bros.,* 526 U.S. at 347–48, 119 S.Ct. at 1325. Wright cites *Murphy Bros.* for the proposition that "[a]n individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority by formal process." *Murphy Bros.,* 526 U.S. at 347–48, 119 S.Ct. at 1325. Wright contends **\*246** that requiring him to raise his complaint regarding defective service in a motion to quash, rather than in a special appearance, violates this principle because it requires him to make an appearance in a suit for which he has not been properly served and forces him to waive his complaint that he is not amenable to process issued by a Texas court.

 [4]    As an intermediate court of appeals, we must follow our state supreme court's expressions of the law and leave changes in the law to that court. *See Lubbock County v. Trammel's Lubbock Bail Bonds,* 80 S.W.3d 580, 585 (Tex.2002) ("It is not the function of a court of appeals to abrogate or modify established precedent. That function lies solely with [the Supreme] Court."); *Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989) ( "This court need not defend its opinions from criticism from courts of appeals; rather they must follow this court's pronouncements."). Absent a clear expression that a decision of our supreme court has been overruled, we are bound by its decisions. *See Trammel's Lubbock Bail Bonds,* 80 S.W.3d at 585; *Lofton,* 777 S.W.2d at 386. *Murphy Bros.* does not contain such a clear expression with regard to our supreme court's decision in *Kawasaki.* We also note that, since the issuance of the decision in *Murphy Bros.,* the Texas Supreme Court has cited *Kawasaki* for the proposition that a motion to quash is the appropriate device to

object to procedural error in service. *See Baker v. Monsanto, 111 S.W.3d 158, 161 (Tex.2003).* Thus, we leave to our state supreme court—or the United States Supreme Court—the determination of whether the decision in *Kawasaki* is in conflict with the decision in *Murphy Bros.* Until that time, we are bound by *Kawasaki.*

 **[5]**    **[6]**    **[7]**    Applying the principles enunciated in *Kawasaki* to the present case, we conclude that it was not appropriate for Wright to assert his complaint regarding defective service of process in his special appearance. A complaint regarding a curable defect in service of process, such as the one raised by Wright, does not defeat a nonresident's amenability to the court's process; thus, it should not be brought via a special appearance.[4] *See Kawasaki,* 699 S.W.2d at 202; *see also* TEX.R. CIV. P. 120a. Rather, a motion to quash is the appropriate procedural device to raise such objection. *See Wheat v. Toone,* 700 S.W.2d 915, 915 (Tex.1985); *Tex. Dept. of Pub. Safety v. Kreipe,* 29 S.W.3d 334, 336 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). The remedy for defective service in Texas state court is additional time to answer the suit, not dismissal.[5] *See Kawasaki,* 699 S.W.2d at 202–03; *Alcala v. Williams,* 908 S.W.2d 54, 56 (Tex.App.-San Antonio 1995, no writ); *see also* TEX.R. CIV. P. 122. Accordingly, we hold that the trial court did not err in failing to grant Wright's special **\*247** appearance on the basis that appellees did not serve him with process in accordance with the Hague Convention.

We overrule Wright's first issue.

### Amenability to Service of Process

In his second issue, Wright contends that the trial court erred in denying his special appearance because he does not have sufficient minimum contacts with this forum for a Texas court to exercise personal jurisdiction over him.

### *General Principles of Personal Jurisdiction*

### *Due process considerations*

 **[8]**    **[9]**    Two conditions must be met for a Texas court to exercise personal jurisdiction over a nonresident defendant such as Wright: the Texas long-arm statute must authorize the exercise of jurisdiction, and the exercise of jurisdiction must be consistent with the guarantees of due process. *Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002);

*Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990). The long-arm statute provides for the assertion of jurisdiction over any nonresident "doing business" in Texas, which by statutory definition includes those defendants who commit torts in whole or in part in this state. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042(2) (Vernon 1997). Because the language of the long-arm statute is broad, its requirements are considered satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996). Thus, in practice, the two conditions are conflated into one requirement of due process. *City of Riverview, Michigan v. Am. Factors, Inc.,* 77 S.W.3d 855, 857 (Tex.App.-Dallas 2002, no pet.).

 **[10]**    **[11]**    **[12]**    The cornerstone of due process in the context of jurisdiction is the minimum contacts analysis. *Id.* The goal of this analysis is to protect a defendant from being unjustifiably called before the courts of a foreign state. *Id.* To establish minimum contacts with a state, the defendant "must do something purposeful to avail himself of the privilege of conducting activities in the forum, thus invoking the benefit and protection of its laws." *Schlobohm,* 784 S.W.2d at 357; *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985).

 **[13]**    **[14]**    **[15]**    **[16]**    A defendant should not be subject to the jurisdiction of a Texas court based upon random, fortuitous, or attenuated contacts. *CSR,* 925 S.W.2d at 595. The purposeful availment requirement ensures that the nonresident defendant's contact must result from its purposeful contact, not the unilateral activity of the plaintiff or a third party. *See Guardian Royal,* 815 S.W.2d at 227. It is the quality and nature of the contacts, rather than their number, that is important. *Id.* at 230, n. 11. The exercise of personal jurisdiction is proper when the contacts proximately result from actions of the nonresident defendant that create a substantial connection with the forum state. *Id.* at 226.

### *Foreseeability*

 **[17]**    **[18]**    **[19]**    **[20]**    Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established minimum contacts with the forum state. *Id.* at 227. Foreseeability is not an independent component of the minimum contacts analysis but is implicit in the requirement that there be a "substantial connection" between the nonresident defendant and Texas arising from the action or conduct of the nonresident defendant purposefully directed toward Texas. *Id.* Individuals must have fair warning that a

**\*248** particular activity may subject them to the jurisdiction of a foreign sovereign. *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182; *Guardian Royal,* 815 S.W.2d at 226. In other words, an important inquiry in the jurisdictional analysis is whether "the defendant's conduct and connection with the forum State [is] such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

### Specific Jurisdiction

 [21]    [22]    Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14 & nn. 8–9, 104 S.Ct. 1868, 1872 & nn. 8–9, 80 L.Ed.2d 404 (1984); *Guardian Royal,* 815 S.W.2d at 227. Specific jurisdiction is established if the nonresident defendant's alleged liability arises from or is related to the defendant's purposeful contact with the forum. *Helicopteros,* 466 U.S. 414 & n. 8, 104 S.Ct. at 1872 & n. 8; *Guardian Royal,* 815 S.W.2d at 228.

 [23]    [24]    [25]    When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation. *Guardian Royal,* 815 S.W.2d at 227–28. It is not necessary that a nonresident defendant's conduct actually occur in Texas, as long as the defendant's acts were purposefully directed toward the state. *Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984); *CSR,* 925 S.W.2d at 595. "[A] defendant should reasonably anticipate being haled into court where the effects of its conduct have been intentionally caused through the purposeful direction of activity toward the forum state, even if the defendant never physically enters the state." *Cole v. Tobacco Inst.,* 47 F.Supp.2d 812, 815 (E.D.Tex.1999).

### Standard and Scope of Review

 [26]    [27]    [28]    [29]    Whether a court has personal jurisdiction over a defendant is a question of law, which we review de novo. *Marchand,* 83 S.W.3d at 794. However, the trial court frequently must resolve questions of fact before deciding the jurisdiction question. *Id.* When, as here, the trial court does not issue findings of fact and conclusions of law with its special-appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Id.* at 795. In cases in which the appellate record includes both the reporter's and clerk's records, these

implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.* In contrast, we review the trial court's decision de novo when the underlying facts are undisputed or otherwise established. *AmQuip Corp. v. Cloud,* 73 S.W.3d 380, 384 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *Experimental Aircraft Ass'n v. Doctor,* 76 S.W.3d 496, 502–03 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

### Specific Jurisdiction Based on Torts "Committed in Whole or in Part in Texas"

 [30]    [31]    We begin our review of the trial court's denial of Wright's special appearance by determining whether specific jurisdiction exists over Wright. As plaintiffs, appellees bore the initial burden to make sufficient allegations to bring Wright within the personal jurisdiction of the trial court. *Marchand,* 83 S.W.3d at 793; *McKanna v. Edgar,* 388 S.W.2d 927, 930 (Tex.1965). Once appellees met this burden, then Wright was required to negate **\*249** all possible grounds for personal jurisdiction. *Marchand,* 83 S.W.3d at 793.

 [32]    Appellees alleged in their original petition—the live pleading at the time the trial court decided the special appearance—that Wright committed tortious acts in Texas. Appellees correctly assert that our long-arm statute allows personal jurisdiction for any tort "committed in whole or in part in Texas." TEX. CIV. PRAC. & REM.CODE ANN. § 17.042(2). Due process considerations are also satisfied if a defendant directs his tortious conduct toward the forum state with the foreseeable knowledge that his actions will cause harm to a resident of the forum and the defendant purposefully avails himself of the privilege of conducting activities within the forum state. *See Burger King,* 471 U.S. at 474–76, 105 S.Ct. at 2182–84; *Calder,* 465 U.S. at 789–90, 104 S.Ct. at 1487.

Appellees also alleged in their original petition that Wright induced Templeton and Boggess to contribute their trade secrets and "confidential information" to SEI. Appellees asserted, "Wright misrepresented the terms upon which these assets of Plaintiffs were contributed to SEI, as evidenced by ... misappropriating the trade secrets, confidential information, corporate assets and corporate opportunities of Plaintiffs Templeton and Boggess."

Appellees expounded on these allegations in their response to Wright's special appearance. In support of their response, appellees submitted the affidavit testimony of Templeton.

Regarding misrepresentations made by Wright in Texas, Templeton's affidavit provided as follows:

> At the time of the formation of SEI, numerous representations were made by Wright and Sage Holding that equipment design technology, that I, along with Ronald Boggess, held at that time would remain the property of SEI, as would all corporate opportunities arising from the production and sale of that equipment. Those representations were made to me and Boggess and supported repeatedly by Wright in a series of telephone calls to me and SEI in Texas and e-mail correspondence sent to Texas, all of which occurred at the time of the formation of SEI in and around December 1995. [6]

We conclude that appellees met their burden of pleading sufficient jurisdictional allegations to bring Wright within the specific personal jurisdiction of the trial court. [7]

### Fiduciary Shield Doctrine

Because appellees met their initial burden, Wright was required to negate all possible grounds for personal jurisdiction. Within the context of the special appearance proceeding, Wright offered no evidence refuting appellees' claim that he **\*250** made the "numerous representations" referenced in Templeton's affidavit. [8] Wright neither disputes that the alleged representations were directed toward Texas nor denies that appellees' tort claims arise out of or relate to the representations. Wright also does not contend that he could not have reasonably foreseen being subject to jurisdiction in Texas because of such representations. Rather, Wright contends that he lacks the requisite minimum contacts with Texas because he performed the alleged tortious acts as a corporate representative of Sage AG, not in his individual capacity.

 [33]   In this respect, Wright invokes the fiduciary shield doctrine, which protects a corporate officer or employee from the trial court's exercise of general personal jurisdiction when all of the individual's contacts with Texas were on behalf of his employer. [9] *SITQ E.U., Inc. v. Reata Rests., Inc.,* 111 S.W.3d 638, 650–51 (Tex.App.-Fort Worth 2003,

pet. filed); *Brown v. Gen. Brick Sales Co.,* 39 S.W.3d 291, 297–98 (Tex.App.-Fort Worth 2001, no pet.). Texas courts applying the fiduciary shield doctrine have expressly limited its application to attempts to exercise *general* jurisdiction over a nonresident defendant. *Stern v. KEI Consultants, Ltd.,* 123 S.W.3d 482, 488 (Tex.App.-San Antonio 2003, no pet. h.); *SITQ,* 111 S.W.3d at 651; *Brown,* 39 S.W.3d at 300; *cf. Garner v. Furmanite Australia Pty., Ltd.,* 966 S.W.2d 798, 803 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (holding that fiduciary shield doctrine protected Australian resident from trial court's exercise of *general* jurisdiction because his only contacts with Texas were on his employer's business) (emphasis added).

 [34]    [35]    [36]    The fiduciary shield doctrine does not protect a corporate officer from specific personal jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable. *Jackson v. Kincaid,* 122 S.W.3d 440, 448 (Tex.App.-Corpus Christi 2003, no pet. h.); *SITQ,* 111 S.W.3d at 651; *see also Gen. Elec. v. Brown & Ross Int'l Distribs., Inc.,* 804 S.W.2d 527, 532–33 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (holding that corporate officers, who had personally arranged theft of design plans, ordered counterfeit and mislabeled parts, and made misrepresentations to customers were subject to personal jurisdiction in Texas). It is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a corporate representative. *Shapolsky v. Brewton,* 56 S.W.3d 120, 133 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); **\*251** *see also Miller v. Keyser,* 90 S.W.3d 712, 714–18 (Tex.2002) (holding sales agent may be held individually liable under DTPA for misrepresentations); *Barclay v. Johnson,* 686 S.W.2d 334, 336–37 (Tex.App.-Houston [1st Dist.] 1985, no writ) (holding corporate agent personally liable for false representations). The causes of action asserted by appellees against Wright individually, which are based on Wright's alleged misrepresentations, are claims for which Wright could be held individually liable. Therefore, the fiduciary shield doctrine is not available to Wright as a defense to the trial court's exercise of specific personal jurisdiction based on his alleged misrepresentations. *See D.H. Blair Investment Banking Corp. v. Reardon,* 97 S.W.3d 269, 278 (Tex.App.-Houston [14th Dist.] 2002, pet. dism'd w.o.j.) (refusing to apply fiduciary shield doctrine to protect defendant from personal jurisdiction based on alleged misrepresentations that were directed into Texas and foreseeably relied on in Texas, despite defendant's claim that he acted only in corporate capacity); *Shapolsky,* 56

S.W.3d at 133–34 (same). We conclude that, by invoking the fiduciary shield doctrine, Wright has not satisfied his burden of negating the assertion of personal jurisdiction based on specific jurisdiction.

### Minimum Contacts Analysis

That Wright is alleged to have committed a tort in Texas is not dispositive of the jurisdictional issue presented here; such allegations alone do not give Texas courts jurisdiction over a nonresident. *Shapolsky,* 56 S.W.3d at 133. Rather, there must be a substantial connection between the contact and the cause of action in the forum state. [10] *See id.*

 **[37]**    Comporting with well-settled law, this and other appellate courts have held that a misrepresentation made by a nonresident defendant directed toward Texas is sufficient to assert specific jurisdiction. *Michiana Easy Livin' Country, Inc. v. Holten,* 127 S.W.3d 89, 98–99 (Tex.App.-Houston [1st Dist.] 2003, pet. filed) (holding that nonresident defendant had sufficient minimum contacts to subject it to specific personal jurisdiction in Texas in case in which plaintiff alleged that, during negotiations conducted by telephone, nonresident defendant made misrepresentations regarding product defendant sold to plaintiff and that these misrepresentations constituted violations of the DTPA, fraud, breach of warranty, and breach of contract); *Boissiere v. Nova Capital,* 106 S.W.3d 897, 904–06 (Tex.App.-Dallas 2003, no pet.) (concluding that allegations asserted in fraud and negligent misrepresentation case that nonresident defendants made misrepresentations in telephone calls to Texas resident, who relied on representations in Texas and was induced to provide defendants with plaintiff's trade secret information, were sufficient to support **\*252** specific jurisdiction in Texas); *Shapolsky,* 56 S.W.3d at 135 (holding that plaintiff's allegations that nonresident defendant made intentional misrepresentations to plaintiff in Texas by phone, fax, and mail to induce plaintiff to contract with defendant were sufficient to support specific jurisdiction).

Regardless of what the evidence may ultimately show on full trial of this matter, the uncontroverted allegations and evidence presented within the context of the special appearance proceeding show the following: (1) Wright made numerous representations, oral and written, on which Templeton and Boggess relied, ultimately to their economic detriment; (2) Wright directed the alleged misrepresentations toward Texas residents who received and relied on the misrepresentations in Texas; and (3)

Wright's misrepresentations induced Templeton and Boggess to transfer their proprietary information to SEI, a corporation formed under the laws of Texas, with its principal place of business in Houston. By making misrepresentations in Texas with the ultimate goal of obtaining the trade secrets of Texas residents, Wright purposefully availed himself of the benefits and protections of Texas law. *See Shapolsky,* 56 S.W.3d at 134. When, as here, a defendant intentionally sends false information into a state, knowing it will be relied on by a resident of the forum state, there is a foreseeable consequence of direct economic injury to the resident at its domicile. *Id.* Thus, it should have been foreseeable to Wright that he might be haled into a Texas court to defend a lawsuit arising out of the alleged misrepresentations. *See id.* Relatedly, a nexus exists between the torts that appellees claim against Wright and the alleged contacts with Texas; that is, Wright's alleged misrepresentations give rise to some of the causes of action appellees assert against him, particularly appellees' claims for fraud and fraudulent inducement. *See id.* (finding nexus between contacts and allegations that misrepresentations induced plaintiff to enter into contract with nonresident defendant). Thus, we conclude that Wright's alleged misrepresentations constitute sufficient purposeful minimum contacts with Texas to satisfy due process considerations. [11]

We overrule Wright's second issue.

### Fair Play and Substantial Justice

 **[38]**    **[39]**    **[40]**    Having concluded that Wright had sufficient contacts with Texas, we next consider Wright's third issue in which he contends that the exercise of jurisdiction over him offends traditional notions of fair play and substantial justice. *See Guardian Royal,* 815 S.W.2d at 231. The following factors, when appropriate, should be considered in making this assessment: (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* When an international dispute is involved, the following factors, when appropriate, should also be considered: (1) the unique burdens placed upon the defendant who must defend itself in a foreign legal system; **\*253** and (2) the procedural and substantive policies of other nations whose interests are affected as well as the federal

government's interest in its foreign relations policies. *Id* at 229. But only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when, as here, the nonresident defendant has purposefully established minimum contacts with the forum. *Id.* at 231. Thus, the burden is on the defendant to " 'present a *compelling* case that the presence of some other considerations would render jurisdiction unreasonable.' " *Id.* (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185) (emphasis added).

 **[41]**    Wright first asserts that his status as an international defendant is a determinative factor in the fairness analysis. In support of this contention, Wright relies on our holding in *Minucci v. Sogevalor, S.A.,* 14 S.W.3d 790 (Tex.App.-Houston [1st Dist.] 2000, no pet.). In *Minucci,* we held that subjecting an Italian citizen to jurisdiction in Texas did not comport with traditional notions of fair play and substantial justice. *Id.* at 799. In reaching this decision, we reasoned as follows:

> Texas has no interest in adjudicating this dispute. The cause of action did not occur in Texas; neither party is a resident of this state; Swiss law governs the dispute, none of the investors were Texas citizens, and the contract was written in Italian. Thus, Texas would not be protecting its citizens from the potential future actions of Minucci.

*Id.* at 798. In this case, the opposite can be said. Here, Texas has a strong interest in adjudicating this dispute. As discussed in the minimum contacts analysis, Wright is alleged to have committed tortious acts in Texas against Texas residents. The State of Texas has an obvious interest in providing a forum for resolving disputes involving its citizens, particularly those disputes in which the defendant allegedly committed a tort in whole or in part in Texas. *Shapolsky,* 56 S.W.3d at 135.

In support of his contention that defending this case in Texas would subject him to extreme financial and personal burdens, Wright testified as follows in his affidavit offered in support of his special appearance:

> At the present time, I am the sole custodian for my three children who live with me in Switzerland. If I were compelled to appear in Texas to defend this lawsuit[,] it would be an extreme burden upon my children, and myself, to be away from them. It would also be a tremendous

expense to have to travel to Texas to litigate this dispute while leaving my children behind in Switzerland. The financial expense of traveling to Texas while leaving my children behind in Switzerland, would place great strain on myself, and my family.

> On July 1, 2003, Thales Overseas Holdings Limited ("Thales Overseas") lodged a Request for Arbitration against me in accordance with Article 4 of the 1998 Rules of Arbitration of the International Chamber of Commerce. Thales Overseas request for Arbitration seeks monetary damages from me personally. The laws of Switzerland exclusively govern the Request for Arbitration. Thales Overseas acknowledges Switzerland's exclusive jurisdiction in its request. The arbitration is to take place in Zurich, Switzerland.

> ... [H]aving to litigate one dispute in Texas and one dispute in Switzlerland over substantially the same issues would be a great hardship on me, and my children.

Undoubtedly, litigation away from home creates hardship for a defendant; however, there is no legal requirement that this hardship must be borne instead by the plaintiff whenever the defendant is not **\*254** found in the state of the plaintiff's residence. *See Brown & Ross Int'l Distribs.,* 804 S.W.2d at 531–32 (rejecting nonresident defendant's argument that defending suit in Texas was financially burdensome because it would be equally burdensome for plaintiff to litigate in nonresident defendant's forum). While the burden on the nonresident defendant is a consideration in our due process analysis, it is not determinative. *See Guardian Royal,* 815 S.W.2d at 231 (stating that nonresident defendant must present compelling case of presence of other considerations, outside inconvenience, and distance to render jurisdiction unreasonable). This is particularly true when, as in this case, Texas has a strong interest both in providing a forum for its residents and in holding parties who committed tortious acts against its residents accountable. *See id.* at 232 (recognizing that interests of forum state and plaintiff will frequently justify severe burden placed on nonresident defendant) (citing *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987)). We conclude that the exercise of personal jurisdiction over Wright in this case comports with traditional notions of fair play and substantial justice.

We overrule Wright's third issue.

## Conclusion

We hold that the trial court properly denied Wright's special appearance. Wright did not successfully negate specific jurisdiction and failed to show that the exercise of personal jurisdiction over him offends traditional notions of fair play and substantial justice. We affirm the order of the trial court denying Wright's special appearance.

## All Citations

137 S.W.3d 238

Footnotes

1   *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.2004) (providing parties may challenge by interlocutory appeal trial courts' orders regarding special appearances).

2   Other defendants in the underlying suit include Thales Geosolutions, Inc., Thales S.A., Thales Geosolutions Group Ltd., and Sage Holding AG. These defendants are not parties to this interlocutory appeal.

3   Appellees also contend that this issue is moot because they have served Wright in accordance with the Hague Convention since the trial court denied Wright's special appearance. In the appendix to their brief, appellees have attached documents purportedly showing service in compliance with the treaty; however, because these documents are not part of the appellate record in this case, we may not consider them. *See Carlton v. Trinity Univ. Ins. Co.,* 32 S.W.3d 454, 457–58 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

4   Irrespective of the supreme court's opinion in *Kawasaki,* we also disagree with Wright's contention that requiring him to raise his complaint regarding defective service in a motion to quash rather than in a special appearance forces him to waive his complaint that he is not amenable to process issued by a Texas court. As noted by the intermediate appellate court in *Kawasaki,* such complaint is without merit because a complaining defendant can limit his rule 120a special appearance arguments to the lack of minimum contacts issue, and then, if that fails, he can immediately file a motion to quash. *Middleton v. Kawasaki Steel Corp.,* 687 S.W.2d 42, 47(Tex.App.-Houston [14th Dist.] 1985), writ ref'd n.r.e. per curiam, 699 S.W.2d 199 (Tex.1985).

5   Although Federal Rules of Civil Procedure 12(b)(4) and 12(b)(5) provide for dismissal of a suit for failure to serve process or for insufficient service of process, the Texas Rules of Civil Procedure do not contain analogous provisions. *See* FED.R.CIV.P. 12(b)(4), 12(b)(5).

6   Wright objects to Templeton's affidavit on numerous grounds; however, none of these objections are specifically directed at Templeton's testimony regarding Wright's "numerous representations." For this reason, we do not address Wright's complaints regarding Templeton's affidavit.

7   We need not separately evaluate whether the trial court had jurisdiction over Wright based solely on the allegations in appellees' original petition. For purposes of this opinion, we assume, without deciding, that the allegations in appellees' original petition that Wright committed torts in Texas, either alone or coupled with appellees' later assertions, offered in support of their response to Wright's special appearance, meet appellees' initial burden to plead sufficient jurisdictional facts. *See El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero, S.A. de C.V.,* 82 S.W.3d 622, 629 (Tex.App.-Corpus Christi 2002, pet. dism'd w.o.j.) (concluding that plaintiff who pled that nonresident defendant was "doing business in the State of Texas" and had "committed torts in Texas" had pled sufficiently clear jurisdictional facts).

8   In an affidavit offered in support of his special appearance, Wright testified that he had committed no torts in Texas. Rule 120a provides affidavits shall "set forth specific facts as would be admissible in evidence...." TEX.R. CIV. P. 120a(3). Further, the affidavit must be direct, unmistakable, and unequivocal as to the facts sworn to, allowing perjury to be assigned on it. *See Burke v. Satterfield,* 525 S.W.2d 950, 955 (Tex.1975); *Int'l Turbine Service, Inc. v. Lovitt,* 881 S.W.2d 805, 808 (Tex.App.-Fort Worth 1994, writ denied). We agree with appellees that Wright's testimony that he committed no torts in Texas is a legal conclusion without any probative force. *See* Tex.R. Civ. P. 120a(3); *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984) (holding that affidavit must set forth facts, not mere legal conclusions). Thus, we do not consider Wright's statement in evaluating the propriety of the trial court's ruling on Wright's special appearance.

9   The fiduciary shield doctrine has not been expressly adopted by the Texas Supreme Court. The doctrine's application by Texas intermediate appellate courts was discussed in depth by the Fort Worth Court of Appeals in *Brown v. General Brick Sales Co.,* 39 S.W.3d 291, 297–99 (Tex.App.-Fort Worth 2001, no pet.).

10  In reaching a decision to exercise or decline jurisdiction based on the defendant's alleged commission of a tort, the trial court should rely only on the necessary jurisdictional facts and should not reach the merits of the case. *Ring Power Sys. v. Int'l de Comercio Y Consultoria,* 39 S.W.3d 350, 353 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Arterbury v. Am.*

*Bank & Trust Co.,* 553 S.W.2d 943, 949 (Tex.Civ.App.-Texarkana 1977, no writ). In other words, ultimate liability in tort is not a jurisdictional fact, and the merits of the cause are not at issue. *Ring Power Sys.,* 39 S.W.3d at 353. Rather, the purpose of a special appearance is to determine whether the actions alleged by a plaintiff suggest that a defendant should expect to be subject to jurisdiction in Texas. *Michiana Easy Livin' Country, Inc. v. Holten,* 127 S.W.3d 89, 97 (Tex.App.-Houston [1st Dist.] 2003, pet. filed). Accordingly, if the plaintiff alleges an action in tort that arose out of an act committed in Texas, the necessary proof is only that the purposeful act was committed in this State. *Ring Power Sys.,* 39 S.W.3d at 353; *Arterbury,* 553 S.W.2d at 947.

11 Because a nonresident defendant must successfully negate *all bases* of personal jurisdiction to prevail in a special appearance, we need not address appellees' other jurisdictional allegations advancing additional bases to support both general and specific jurisdiction over Wright. *See Boissiere v. Nova Capital,* 106 S.W.3d 897, 906 (Tex.App.-Dallas 2003, no pet.); *D.H. Blair Investing Banking Corp. v. Reardon,* 97 S.W.3d 269, 278 (Tex.App.-Houston [14th Dist.] 2002, pet. dism'd w.o.j.).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Civil Statutes (Refs & Annos)
        Title 19. Blue Sky Law--Securities (Refs & Annos)

Vernon's Ann.Texas Civ.St. Art. 581-4

Art. 581-4. Definitions

Effective: September 1, 2003
Currentness

The following terms shall, unless the context otherwise indicates, have the following respective meanings:

A. The term "security" or "securities" shall include any limited partner interest in a limited partnership, share, stock, treasury stock, stock certificate under a voting trust agreement, collateral trust certificate, equipment trust certificate, preorganization certificate or receipt, subscription or reorganization certificate, note, bond, debenture, mortgage certificate or other evidence of indebtedness, any form of commercial paper, certificate in or under a profit sharing or participation agreement, certificate or any instrument representing any interest in or under an oil, gas or mining lease, fee or title, or any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, investment contract, or any other instrument commonly known as a security, whether similar to those herein referred to or not. The term applies regardless of whether the "security" or "securities" are evidenced by a written instrument. Provided, however, that this definition shall not apply to any insurance policy, endowment policy, annuity contract, optional annuity contract, or any contract or agreement in relation to and in consequence of any such policy or contract, issued by an insurance company subject to the supervision or control of the Texas Department of Insurance when the form of such policy or contract has been duly filed with the Department as now or hereafter required by law.

B. The terms "person" and "company" shall include a corporation, person, joint stock company, partnership, limited partnership, association, company, firm, syndicate, trust, incorporated or unincorporated, heretofore or hereafter formed under the laws of this or any other state, country, sovereignty or political subdivision thereof, and shall include a government, or a political subdivision or agency thereof. As used herein, the term "trust" shall be deemed to include a common law trust, but shall not include a trust created or appointed under or by virtue of a last will and testament or by a court of law or equity.

C. The term "dealer" shall include every person or company other than an agent, who engages in this state, either for all or part of his or its time, directly or through an agent, in selling, offering for sale or delivery or soliciting subscriptions to or orders for, or undertaking to dispose of, or to invite offers for any security or securities and every person or company who deals in any other manner in any security or securities within this state. Any issuer other than a registered dealer of a security or securities, who, directly or through any person or company, other than a registered dealer, offers for sale, sells or makes sales of its own security or securities shall be deemed a dealer and shall be required to comply with the provisions hereof; provided, however, this section or provision shall not apply to such issuer when such security or securities are offered for sale or sold either to a registered dealer or only by or through a registered dealer acting as fiscal agent for the issuer; and provided further, this section or provision shall not apply to such issuer if the transaction is within the exemptions contained in the provisions of Section 5 [1] of this Act.

D. The term "agent" shall include every person or company employed or appointed or authorized by a dealer to sell, offer for sale or delivery, or solicit subscriptions to or orders for, or deal in any other manner, in securities within this state, whether by direct

act or through subagents; provided, that the officers of a corporation or partners of a partnership shall not be deemed agents solely because of their status as officers or partners, where such corporation or partnership is registered as a dealer hereunder.

E. The terms "sale" or "offer for sale" or "sell" shall include every disposition, or attempt to dispose of a security for value. The term "sale" means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or other things of value, or any transfer or agreement to transfer, in trust or otherwise. Any security given or delivered with or as a bonus on account of any purchase of securities or other thing of value, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been sold for value. The term "sell" means any act by which a sale is made, and the term "sale" or "offer for sale" shall include a subscription, an option for sale, a solicitation of sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly or by an agent, by a circular, letter, or advertisement or otherwise, including the deposit in a United States Post Office or mail box or in any manner in the United States mails within this State of a letter, circular or other advertising matter. Nothing herein shall limit or diminish the full meaning of the terms "sale," "sell" or "offer for sale" as used by or accepted in courts of law or equity. The sale of a security under conditions which entitle the purchaser or subsequent holder to exchange the same for, or to purchase some other security, shall not be deemed a sale or offer for sale of such other security; but no exchange for or sale of such other security shall ever be made unless and until the sale thereof shall have been first authorized in Texas under this Act, if not exempt hereunder, or by other provisions of law.

F. The terms "fraud" or "fraudulent practice" shall include any misrepresentations, in any manner, of a relevant fact; any promise or representation or predication as to the future not made honestly and in good faith, or an intentional failure to disclose a material fact; the gaining, directly or indirectly, through the sale of any security, of an underwriting or promotion fee or profit, selling or managing commission or profit, so gross or exorbitant as to be unconscionable; any scheme, device or other artifice to obtain such profit, fee or commission; provided, that nothing herein shall limit or diminish the full meaning of the terms "fraud," "fraudulent," and "fraudulent practice" as applied or accepted in courts of law or equity.

G. "Issuer" shall mean and include every company or person who proposes to issue, has issued, or shall hereafter issue any security.

H. "Broker" shall mean dealer as herein defined.

I. "Mortgage" shall be deemed to include a deed of trust to secure a debt.

J. If the sense requires it, words in the present tense include the future tense, in the masculine gender include the feminine and neuter gender, in the singular number include the plural number, and in the plural number include the singular number; "and" may be read "or" and "or" may be read "and".

K. "No par value" or "non-par" as applied to shares of stock or other securities shall mean that such shares of stock or other securities are without a given or specified par value. Whenever any classification or computation in this Act mentioned is based upon "par value" as applied to shares of stock or other securities of no par value, the amount for which such securities are sold or offered for sale to the public shall be used as a basis of such classification or computation.

L. The term "include" when used in a definition contained in this Act shall not be deemed to exclude other things or persons otherwise within the meaning of the term defined.

M. "Registered dealer" shall mean a dealer as hereinabove defined who has been duly registered by the Commissioner as in Section 15 of this Act provided.

N. "Investment adviser" includes a person who, for compensation, engages in the business of advising another, either directly or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities or a person who, for compensation and as part of a regular business, issues or adopts analyses or a report concerning securities, as may be further defined by Board rule. The term does not include:

(1) a bank or a bank holding company, as defined by the Bank Holding Company Act of 1956 (12 U.S.C. Section 1841 et seq.), as amended, that is not an investment company;

(2) a lawyer, accountant, engineer, teacher, or geologist whose performance of the services is solely incidental to the practice of the person's profession;

(3) a dealer or agent who receives no special compensation for those services and whose performance of those services is solely incidental to transacting business as a dealer or agent;

(4) the publisher of a bona fide newspaper, news magazine, or business or financial publication of general and regular circulation; or

(5) a person whose advice, analyses, or report does not concern a security other than a security that is:

(A) a direct obligation of or an obligation the principal or interest of which is guaranteed by the United States government; or

(B) issued or guaranteed by a corporation in which the United States has a direct or indirect interest and designated by the United States Secretary of the Treasury under Section 3(a)(12), Securities Exchange Act of 1934 (15 U.S.C. Section 78c(a)(12)), as amended, as an exempt security for purposes of that Act.

O. "Federal covered investment adviser" means an investment adviser who is registered under the Investment Advisers Act of 1940 (15 U.S.C. Section 80b-1 et seq.), as amended.

P. "Investment adviser representative" or "representative of an investment adviser" includes each person or company who, for compensation, is employed, appointed, or authorized by an investment adviser to solicit clients for the investment adviser or who, on behalf of an investment adviser, provides investment advice, directly or through subagents, as defined by Board rule, to the investment adviser's clients. The term does not include a partner of a partnership or an officer of a corporation or other entity that is registered as an investment adviser under this Act solely because of the person's status as an officer or partner of that entity.

Q. "Registered investment adviser" means an investment adviser who has been issued a registration certificate by the Commissioner under Section 15 of this Act.

**Credits**

Acts 1957, 55th Leg., p. 575, ch. 269, § 4. Amended by Acts 1971, 62nd Leg., p. 1085, ch. 235, § 1, eff. May 17, 1971; Acts 1979, 66th Leg., p. 348, ch. 160, § 1, eff. May 15, 1979; Acts 1989, 71st Leg., ch. 733, § 1, eff. Sept. 1, 1989; Acts 1993, 73rd Leg., ch. 917, § 3, eff. Jan. 1, 1994; Acts 1995, 74th Leg., ch. 228, § 3, eff. Sept. 1, 1995; Acts 2001, 77th Leg., ch. 1091, § 2.01, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 108, § 1, eff. May 20, 2003.

Notes of Decisions (132)

Footnotes

1      Vernon's Ann.Civ.St. art. 581-5.

Vernon's Ann. Texas Civ. St. Art. 581-4, TX CIV ST Art. 581-4

Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                                                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's **Texas** Statutes and Codes Annotated
Civil Statutes (Refs & Annos)
Title 19. Blue Sky Law--Securities (Refs & Annos)

Vernon's Ann.Texas Civ.St. Art. 581-33

Art. 581-33. Civil Liability with Respect to Issuance or Sale of a Security

Effective: September 1, 2001
Currentness

A. Liability of Sellers. (1) Registration and Related Violations. A person who offers or sells a security in violation of Section 7, 9 (or a requirement of the Commissioner thereunder), 12, 23C, or an order under 23A or 23-2 of this Act is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security.

(2) Untruth or Omission. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. The issuer of the security (other than a government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under Section 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security.

B. Liability of Buyers. A person who offers to buy or buys a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person selling the security to him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the seller knew of the untruth or omission, or (b) he (the offeror or buyer) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

C. Liability of Nonselling Issuers Which Register.

(1) This Section 33C applies only to an issuer which registers under Section 7A, 7B, or 7C of this Act, or under Section 6 of the U.S. **Securities Act** of 1933, [1] its outstanding securities for offer and sale by or for the owner of the securities.

(2) If the prospectus required in connection with the registration contains, as of its effective date, an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the issuer is liable to a person buying the registered security, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the securities. However, an issuer is not liable if it sustains the burden of proof that the buyer knew of the untruth or omission.

D. Rescission and Damages. For this Section 33:

(1) On rescission, a buyer shall recover (a) the consideration he paid for the security plus interest thereon at the legal rate from the date of payment by him, less (b) the amount of any income he received on the security, upon tender of the security (or a security of the same class and series).

(2) On rescission, a seller shall recover the security (or a security of the same class and series) upon tender of (a) the consideration he received for the security plus interest thereon at the legal rate from the date of receipt by him, less (b) the amount of any income the buyer received on the security.

(3) In damages, a buyer shall recover (a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of:

(i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or

(ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security.

(4) In damages, a seller shall recover (a) the value of the security at the time of sale plus the amount of any income the buyer received on the security, less (b) the consideration paid the seller for the security plus interest thereon at the legal rate from the date of payment to the seller.

(5) For a buyer suing under Section 33C, the consideration he paid shall be deemed the lesser of (a) the price he paid and (b) the price at which the security was offered to the public.

(6) On rescission or as a part of damages, a buyer or a seller shall also recover costs.

(7) On rescission or as a part of damages, a buyer or a seller may also recover reasonable attorney's fees if the court finds that the recovery would be equitable in the circumstances.

E. Time of Tender. Any tender specified in Section 33D may be made at any time before entry of judgment.

F. Liability of Control Persons and Aiders.

(1) A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

(3) There is contribution as in cases of contract among the several persons so liable.

G. Survivability of Actions. Every cause of action under this Act survives the death of any person who might have been a plaintiff or defendant.

H. Statute of Limitations.

(1) No person may sue under Section 33A(1) or 33F so far as it relates to Section 33A(1):

(a) more than three years after the sale; or

(b) if he received a rescission offer (meeting the requirements of Section 33I) before suit unless he (i) rejected the offer in writing within 30 days of its receipt and (ii) expressly reserved in the rejection his right to sue; or

(c) more than one year after he so rejected a rescission offer meeting the requirements of Section 33I.

(2) No person may sue under Section 33A(2), 33C, or 33F so far as it relates to 33A(2) or 33C:

(a) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence; or

(b) more than five years after the sale; or

(c) if he received a rescission offer (meeting the requirements of Section 33I) before suit, unless he (i) rejected the offer in writing within 30 days of its receipt, and (ii) expressly reserved in the rejection his right to sue; or

(d) more than one year after he so rejected a rescission offer meeting the requirements of Section 33I.

(3) No person may sue under Section 33B or 33F so far as it relates to Section 33B:

(a) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence; or

(b) more than five years after the purchase; or

(c) if he received a rescission offer (meeting the requirements of Section 33J) before suit unless he (i) rejected the offer in writing within 30 days of its receipt, and (ii) expressly reserved in the rejection his right to sue; or

(d) more than one year after he so rejected a rescission offer meeting the requirements of Section 33J.

I. Requirements of a Rescission Offer to Buyers. A rescission offer under Section 33H(1) or (2) shall meet the following requirements:

(1) The offer shall include financial and other information material to the offeree's decision whether to accept the offer, and shall not contain an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

(2) The offeror shall deposit funds in escrow in a state or national bank doing business in Texas (or in another bank approved by the commissioner) or receive an unqualified commitment from such a bank to furnish funds sufficient to pay the amount offered.

(3) The amount of the offer to a buyer who still owns the security shall be the amount (excluding costs and attorney's fees) he would recover on rescission under Section 33D(1).

(4) The amount of the offer to a buyer who no longer owns the security shall be the amount (excluding costs and attorney's fees) he would recover in damages under Section 33D(3).

(5) The offer shall state:

(a) the amount of the offer, as determined pursuant to Paragraph (3) or (4) above, which shall be given (i) so far as practicable in terms of a specified number of dollars and a specified rate of interest for a period starting at a specified date, and (ii) so far as necessary, in terms of specified elements (such as the value of the security when it was disposed of by the offeree) known to the offeree but not to the offeror, which are subject to the furnishing of reasonable evidence by the offeree.

(b) the name and address of the bank where the amount of the offer will be paid.

(c) that the offeree will receive the amount of the offer within a specified number of days (not more than 30) after receipt by the bank, in form reasonably acceptable to the offeror, and in compliance with the instructions in the offer, of:

(i) the security, if the offeree still owns it, or evidence of the fact and date of disposition if he no longer owns it; and

(ii) evidence, if necessary, of elements referred to in Paragraph (a)(ii) above.

(d) conspicuously that the offeree may not sue on his purchase under Section 33 unless:

(i) he accepts the offer but does not receive the amount of the offer, in which case he may sue within the time allowed by Section 33H(1)(a) or 33H(2)(a) or (b), as applicable; or

(ii) he rejects the offer in writing within 30 days of its receipt and expressly reserves in the rejection his right to sue, in which case he may sue within one year after he so rejects.

(e) in reasonable detail, the nature of the violation of this Act that occurred or may have occurred.

(f) any other information the offeror wants to include.

J. Requirements of a Rescission Offer to Sellers. A rescission offer under Section 33H(3) shall meet the following requirements:

(1) The offer shall include financial and other information material to the offeree's decision whether to accept the offer, and shall not contain an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

(2) The offeror shall deposit the securities in escrow in a state or national bank doing business in **Texas** (or in another bank approved by the commissioner).

(3) The terms of the offer shall be the same (excluding costs and attorney's fees) as the seller would recover on rescission under Section 33D(2).

(4) The offer shall state:

(a) the terms of the offer, as determined pursuant to Paragraph (3) above, which shall be given (i) so far as practicable in terms of a specified number and kind of securities and a specified rate of interest for a period starting at a specified date, and (ii) so far as necessary, in terms of specified elements known to the offeree but not the offeror, which are subject to the furnishing of reasonable evidence by the offeree.

(b) the name and address of the bank where the terms of the offer will be carried out.

(c) that the offeree will receive the securities within a specified number of days (not more than 30) after receipt by the bank, in form reasonably acceptable to the offeror, and in compliance with the instructions in the offer, of:

(i) the amount required by the terms of the offer; and

(ii) evidence, if necessary, of elements referred to in Paragraph (a)(ii) above.

(d) conspicuously that the offeree may not sue on his sale under Section 33 unless:

(i) he accepts the offer but does not receive the securities, in which case he may sue within the time allowed by Section 33H(3) (a) or (b), as applicable; or

(ii) he rejects the offer in writing within 30 days of its receipt and expressly reserves in the rejection his right to sue, in which case he may sue within one year after he so rejects.

(e) in reasonable detail, the nature of the violation of this Act that occurred or may have occurred.

(f) any other information the offeror wants to include.

K. Unenforceability of Illegal Contracts. No person who has made or engaged in the performance of any contract in violation of any provision of this Act or any rule or order or requirement hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract.

L. Waivers Void. A condition, stipulation, or provision binding a buyer or seller of a security or a purchaser of services rendered by an investment adviser or investment adviser representative to waive compliance with a provision of this Act or a rule or order or requirement hereunder is void.

M. Saving of Existing Remedies. The rights and remedies provided by this Act are in addition to any other rights (including exemplary or punitive damages) or remedies that may exist at law or in equity.

N. Limitation of Liability in Small Business Issuances. (1) For purposes of this Section 33N, unless the context otherwise requires, "small business issuer" means an issuer of securities that, at the time of an offer to which this Section 33N applies:

(a) has annual gross revenues in an amount that does not exceed $25 million; and

(b) does not have a class of equity securities registered, or required to be registered, with the Securities and Exchange Commission under Section 12 of the Securities Exchange Act of 1934, as amended (15 U.S.C. Section 78*l*).

(2) This Section 33N applies only to:

(a) an offer of securities made by a small business issuer or by the seller of securities of a small business issuer that is in an aggregate amount that does not exceed $5 million; and

(b) a person who has been engaged to provide services relating to an offer of securities described by Section 33N(2)(a), including an attorney, an accountant, a consultant, or the firm of the attorney, accountant, or consultant.

(3) The maximum amount that may be recovered against a person to which this Section 33N applies in any action or series of actions under Section 33 relating to an offer of securities to which this Section 33N applies is an amount equal to three times the fee paid by the issuer or other seller to the person for the services related to the offer of securities, unless the trier of fact finds the person engaged in intentional wrongdoing in providing the services.

(4) A small business issuer making an offer of securities shall provide to the prospective buyer a written disclosure of the limitation of liability created by this Section 33N and shall receive a signed acknowledgement that the disclosure was provided.

**Credits**

Acts 1957, 55th Leg., p. 575, ch. 269, § 33; Amended by Acts 1963, 58th Leg., p. 473, ch. 170, § 12; Acts 1977, 65th Leg., p. 344, ch. 170, § 1, eff. Aug. 29, 1977; Acts 1979, 66th Leg., p. 361, ch. 160, § 8, eff. May 15, 1979; Acts 1997, 75th Leg., ch. 638, § 1, eff. Sept. 1, 1997; Acts 2001, 77th Leg., ch. 1091, § 3.14, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 1091, § 3.16, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 1091, § 3.17, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 1091, § 3.15, eff. Sept. 1, 2001.

**Editors' Notes**

### SAVED FROM REPEAL

<The Uniform Commercial Code, enacted by Acts 1965, 59th Leg., vol. 2, p. 1, ch. 721, provided that the Act did not repeal or diminish arts. 581-1 through 581-39, and further provided that if in any respect there was any inconsistency between those articles and the Commercial Code, the provisions of those articles should control. Acts 1965, 59th Leg., vol. 2, p. 1, ch. 721, was itself repealed by Acts 1967, 60th Leg., vol. 2, p. 2343, ch. 785, adopting the Business & Commerce Code effective September 1, 1967. However, the latter Act specifically provided that the repeal did not affect the prior operation of the 1965 Act or any prior action taken under it.>

### GENERAL NOTES

### LAW REVIEW COMMENTARIES

Annual survey of **Texas** Law: Corporations and partnerships. Robert W. Hamilton, 32 Sw.L.J. 221 (1978); 36 Sw.L.J. 227 (1982).

Civil liability under **Texas Securities Act** § 33 (1977) and related claims. Alan R. Bromberg, 32 Sw.L.J. 867 (1978).

Civil remedies under **Texas** securities laws. Claude P. Bordwine, Jr., 8 Hous.L.Rev. 657 (1971).

Recent developments--**Texas Securities Act**. J. Leon Lebowitz, 28 Sw.L.J. 861 (1974).

**Securities Act**; annual survey of **Texas** law. J. Leon Lebowitz, 26 Sw.L.J. 112 (1972).

Securities litigation: 1977 modernization of § 33 of **Texas Securities Act**. Hal M. Bateman, 15 Hous.L.Rev. 839 (1978).

The sky is still blue in **Texas**: State law alternative to federal securities remedies. Keith A. Rowley. 50 Baylor L.Rev. 99 (Winter 1998).

Statutory attorney fees in **Texas**: Update. Ralph H. Brock, 41 Tex.B.J. 65 (1978).

### RESEARCH REFERENCES

### 2015 Electronic Update

## ALR Library

26 ALR, Federal 495, Construction and Application of § 14 of **Securities** **Act** of 1933 (15 U.S.C.A. § 77n) and § 29(A) of Securities Exchange Act of 1934 (15 U.S.C.A. § 78cc(A)), Voiding Waiver of Compliance With Statutory...

183 ALR, Federal 141, Liability of Officer, Director, Employee, or Other Individual Associated With Seller or Issuer of Securities as "Control Person" Under § 15 of **Securities** **Act** (15 U.S.C.A. § 77) and § 20(A) of Securities Exchange Act...

59 ALR 2nd 1030, Who, Other Than Officers and Directors of a Corporation, is Civilly Liable Under the State **Securities** **Acts** (Blue Sky Laws) for Purchase Price of Unauthorized Securities.

## Encyclopedias

TX Jur. 3d Oil and Gas § 729, Regulation Under **Texas** **Securities** **Act**.

## Forms

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 17:18, Illegality--Violation of Blue Sky Law.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:2, Civil Liability for Issuance or Sale.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:4, Other Remedies.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:7, Petition--Fraud--Stock Sale Induced by Seller's Misrepresentation that Company Owned Valuable Patent.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:8, Petition--False Misrepresentation--Fraudulent Inducement to Open Commodities Trading Account.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:9, Petition--To Recover Purchase Price of Stock Sold in Violation of **Securities** **Act**.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:11, Answer--Affirmative Defense--In Damage Action Against Offeror, Seller, Control Person--Three-Year Statute of Limitations.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:12, Answer--Affirmative Defense--In Damage Action Against Offeror, Seller, Issuer, Control Person for Untruth or Omission--Three-Year Statute of...

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:13, Answer--Affirmative Defense--In Damage Action Against Offeror, Buyer, or Control Person for Untruth or Omission--Three-Year Statute of Limitations.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:14, Answer--Affirmative Defense--In Damage Action Against Offeror, Seller, Issuer, Buyer, or Control Person for Untruth or Omission--Five-Year Statute of...

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:15, Answer--Affirmative Defense--Failure of Corporation to Secure Permit from Securities Commissioner.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:16, Answer--Affirmative Defense--In Action by Purchaser Against Offeror or Seller--For False Statement of Material Fact--Buyer Knew of Untruth or...

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:17, Answer--Affirmative Defense--In Action by Purchaser Against Offeror or Seller--For False Statement of Material Fact--Offeror or Seller Did Not Know of Untruth or...

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:18, Answer--Affirmative Defense--In Action Against Buyer for Untruth or Omission--Seller Knew of Untruth or Omission.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:19, Answer--Affirmative Defense--In Action Against Buyer for Untruth or Omission--Buyer Did Not Know of Untruth or Omission.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:20, Answer--Affirmative Defense--In Action by Buyer Against Issuer for Untruth or Omission in Prospectus--Buyer Knew of Untruth.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 220:21, Answer--Affirmative Defense--In Action by Purchaser Against Controlling Person--Controlling Person Did Not Know of Untruth or Omission.

**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 200B:83, **Securities** **Act**.

3 West's **Texas** Forms § 2.10.1, Defendant's Original Counterclaim(S).

3 West's **Texas** Forms § 2.11.1, Defendant's Original Cross-Claim.

3 West's **Texas** Forms § 2.8.31, Defendant's Original Answer--Affirmative Defense--Illegality.

3 West's **Texas** Forms § 2.8.70, Defendant's Original Answer--Affirmative Defense--Statute of Limitations.

3A West's **Texas** Forms § 4.1, Class Action Petition--General Form.

3A West's **Texas** Forms § 9.9.2, Answer.

3A West's **Texas** Forms § 10.1.1, Petition.

3A West's **Texas** Forms § 10.2.1, Petition.

3A West's **Texas** Forms § 10.2.2, Answer.

3A West's **Texas** Forms § 10.3.1, Petition.

3A West's **Texas** Forms § 10.3.2, Answer.

3A West's **Texas** Forms § 10.4.1, Petition.

3A West's **Texas** Forms § 10.4.2, Answer.

3A West's **Texas** Forms § 10.5.1, Petition.

3A West's **Texas** Forms § 10.5.2, Answer.

3A West's **Texas** Forms § 10.6.1, Petition.

3A West's **Texas** Forms § 10.6.2, Answer.

3A West's **Texas** Forms § 10.7.1, Petition.

3A West's **Texas** Forms § 10.8.2, Answer.

3A West's **Texas** Forms § 9.10.2, Answer.

3A West's **Texas** Forms Ch. 10 Intro., Introduction.

3A West's **Texas** Forms Ch. 9.3 Intro., Introduction.

3A West's **Texas** Forms Ch. 10.1 Intro., Introduction.

3A West's **Texas** Forms Ch. 10.2 Intro., Introduction.

3A West's **Texas** Forms Ch. 10.3 Intro., Introduction.

3A West's **Texas** Forms Ch. 10.4 Intro., Introduction.

3A West's **Texas** Forms Ch. 10.5 Intro., Introduction.

3A West's **Texas** Forms Ch. 10.6 Intro., Introduction.

3A West's **Texas** Forms Ch. 10.8 Intro., Introduction.

### Treatises and Practice Aids

Blue Sky Law § 9:160, Liability of the Investor's Broker-Dealer or Agent for the Wrongful Acts of the Independent Investment Adviser--Bases of Potential Liability--Liability Under the Uniform **Securities Acts**.

McDonald & Carlson **Texas** Civil Practice § 9:72, Express Limitations for Statutory Causes of Action.

NOTES OF DECISIONS

**In general**

To prevail under **Texas Securities Act** section governing fraud liability of sellers, plaintiff must show that seller in offering or selling security made untrue statement of material fact or omission of material fact that was essential to make statement not misleading. In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex.2002, 235 F.Supp.2d 549. Securities Regulation ☞ 278

In respect to the requirement subd. B of this article that the false statement or omission concern a material fact, it would be presumed, having at hand a technical definition of the term "material" within the field of federal securities regulation, that the **Texas** legislature intended to employ the word in that same precise sense. American General Ins. Co. v. Equitable General Corp., 1980, 493 F.Supp. 721. Securities Regulation ☞ 278

**Texas Securities Act** (TSA) applies to persons and corporations who offer or sell unregistered securities. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation ☞ 256.1

In adopting **Securities Act**, legislature is presumed to have been familiar with decisions of the court of last resort that corporations generally could not be prosecuted for violations of the criminal statutes. Dempsey-Tegeler & Co. v. Flowers (Civ.App. 1971) 465 S.W.2d 208, error granted, reversed 472 S.W.2d 112. Securities Regulation ☞ 246

Definition of "sales" taken directly from **Securities Act** was not erroneous in purchaser's suit to recover price paid for unregistered stock sold by defendants. Christie v. Brewer (Civ.App. 1964) 374 S.W.2d 908, ref. n.r.e. Securities Regulation ☞ 299

### Construction with other laws

Unlike the **Texas Securities Act** (TSA), which is the **Texas** Blue Sky Law, investors have neither an express nor an implied private right of action for securities fraud under New York's Blue Sky Law, the Martin Act. In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex.2011, 761 F.Supp.2d 504. Securities Regulation ☞ 297

**Texas** general fraud statute (V.T.C.A. Bus. & C. § 27.01) and this article were applicable to securities transaction in which stock broker recommended that client purchase certain securities, and client could not maintain strict liability action under **Texas** Deceptive Trade Practices-Consumer Protection Act (V.T.C.A. Bus. & C. § 17.41 et seq.), in that permitting such an action would emasculate the due diligence defense permitted under Blue Sky Law. Allais v. Donaldson, Lufkin & Jenrette, S.D.Tex.1982, 532 F.Supp. 749. Antitrust And Trade Regulation ☞ 219

When interpreting "control," for purposes of a control person's secondary liability under the **Texas Securities Act** (TSA), **Texas** courts use the same general definitions of control used under federal securities law. Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation ☞ 302

Interpretations of **Securities Act** of 1933 may be reliable guidelines in interpreting **Texas Securities Act** when they contain virtually same wording, but when statutes use materially different language, court bases its interpretation of **Texas Securities Act** on legislature's language. Anheuser-Busch Companies, Inc. v. Summit Coffee Co. (App. 5 Dist. 1996) 934 S.W.2d 705, writ dismissed by agreement. Securities Regulation ☞ 246

Securities Litigation Uniform Standards Act (SLUSA) did not preempt claims raised by investors' state-law petition alleging violations of the **Texas Securities Act** and other state-law claims since action was not a "covered class action;"investors were composed of only eight entities that did not seek damages on behalf of others similarly situated, and their suit was not consolidated by the state court with any other state court securities actions. In re Enron Corp. Securities, Derivative & ""ERISA"" Litigation, S.D.Tex.2002, 2002 WL 32107216, Unreported. Securities Regulation ☞ 278; States ☞ 18.77

### Standing

Limited partners' loss of value of their investments in two energy funds did not provide them standing to bring claims against the funds and individuals who ran them directly as opposed to derivatively, for conversion, violation of the **Texas** Theft Liability Act, money had and received, breach of fiduciary duty, negligence, common law fraud, and violation of the **Texas Securities Act**; rather, **Texas** law required limited partners to bring all such claims, which arose from misrepresentations made after they had invested in the funds, derivatively. Wesolek v. Layton, S.D.Tex.2012, 871 F.Supp.2d 620. Partnership ☞ 370

### Rules of construction

**Texas Securities Act** (TSA) must be construed so as to give affect to intent of enacting legislature. Quest Medical, Inc. v. Apprill, C.A.5 (Tex.)1996, 90 F.3d 1080, rehearing and suggestion for rehearing en banc denied 99 F.3d 1137. Securities Regulation ☞ 246

"Control," for purposes of a control person's secondary liability under the **Texas Securities Act** (TSA), means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation ➤ 302

In civil context, provision of **Texas Securities Act** prohibiting misrepresentation in connection with offer or sale of security is remedial in nature, and should be given widest possible scope. Anheuser-Busch Companies, Inc. v. Summit Coffee Co. (App. 5 Dist. 1996) 934 S.W.2d 705, writ dismissed by agreement. Securities Regulation ➤ 278

Sections of the **Securities Act** will be considered in pari materia, but in interpreting this article, creating civil cause of action, the court will give consideration to all applicable sections of the Act and not look solely to one particular section. Dempsey-Tegeler & Co. v. Flowers (Civ.App. 1971) 465 S.W.2d 208, error granted, reversed 472 S.W.2d 112. Securities Regulation ➤ 246

### Unregistered stock

Stock seller's and buyer's practical construction of sale of 2,000 shares in a **Texas** corporation as the legal equivalent of sale of 6,000 shares of a Delaware corporation, which was successor of **Texas** corporation, was binding upon seller and upon buyer who sued seller for rescission on ground that stock was not registered. Prokop v. Krenek (Civ.App. 1964) 374 S.W.2d 265, ref. n.r.e. Securities Regulation ➤ 299

### Tender of stock

Minority shareholder of closely-held natural gas exploration company, who agreed to redemption of his stock before company was sold for 20 times the value used to determine redemption price of his interest, could not, on his claim under **Texas Securities Act** (TSA), recover the amount paid by company's buyer to acquire the minority shareholder's prior ownership interest in company as "income" under the TSA. Allen v. Devon Energy Holdings, L.L.C. (App. 1 Dist. 2012) 367 S.W.3d 355, review granted, judgment set aside, and remanded by agreement, opinion after remand from supreme court 2013 WL 273026. Securities Regulation ➤ 297

### Offer or sell

**Texas Securities Act** is limited to those who are actively engaged in sale process, and does not reach those who merely participate in preparing offering. Huddleston v. Herman & MacLean, C.A.5 (Tex.)1981, 640 F.2d 534, certiorari granted 102 S.Ct. 1766, 456 U.S. 914, 72 L.Ed.2d 173, affirmed in part, reversed in part 103 S.Ct. 683, 459 U.S. 375, 74 L.Ed.2d 548, on remand 705 F.2d 775. Securities Regulation ➤ 256.1

Like the **Securities Act** provision governing prospectus liability, the **Texas Security Act's** (TSA) provision prohibiting offers or sales of a security by means of an untrue statement of a material fact or an omission, imposes liability only on persons who actually pass title or who actively engage in solicitation of the securities purchased by a plaintiff. **Securities Act** of 1933, § 12(a)(2), 15 U.S.C.A. § 77*l*(a)(2); Vernon's Ann.Texas Civ.St. In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex.2011, 761 F.Supp.2d 504. Securities Regulation ➤ 302

Bank's sales of trust certificates secured by nearly worthless assets purchased from energy trading company, as part of alleged conspiracy to manipulate company's financial statements and defraud institutional investors, did not constitute primary violation of **Texas Security Act** (TSA), prohibiting offers or sales of security by means of fraud emanating from **Texas** based on untrue statement of material fact or omission by offeror or seller in privity with buyer, since sales took place in New York, and energy

company was only **Texas**-based entity but was neither seller nor offeror in privity with investors. In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex.2011, 761 F.Supp.2d 504. Securities Regulation ☞ 302

Provision of **Texas** **Securities** **Act** prohibiting misrepresentation in connection with offer or sale of security applies to private, secondary securities transactions. Anheuser-Busch Companies, Inc. v. Summit Coffee Co. (App. 5 Dist. 1996) 934 S.W.2d 705, writ dismissed by agreement. Securities Regulation ☞ 262.1

Corporation's agent in preparation of private placement memorandum and in placement and offering of corporation's bonds to investors was "seller" within meaning of **Texas** **Securities** **Act**. Lutheran Broth. v. Kidder Peabody & Co., Inc. (App. 6 Dist. 1992) 829 S.W.2d 300, writ dismissed, writ withdrawn, writ granted, set aside 840 S.W.2d 384. Securities Regulation ☞ 256.1

Provision of **Texas** **Securities** **Act** prohibiting misrepresentations by persons who offer or sell a security applies if defendant was any link in chain of selling process; thus, one who "offers or sells" security is not limited to those who pass title. Lutheran Broth. v. Kidder Peabody & Co., Inc. (App. 6 Dist. 1992) 829 S.W.2d 300, writ dismissed, writ withdrawn, writ granted, set aside 840 S.W.2d 384. Securities Regulation ☞ 256.1

**Offers to buy or buys**

Term "offers to buy or buys," as used in State **Securities** **Act** prohibition of fraud by person who "offers to buy or buys" security, includes every acquisition of, or attempt to acquire, security for value. Pitman v. Lightfoot (App. 4 Dist. 1996) 937 S.W.2d 496, writ denied, rehearing of writ of error overruled. Securities Regulation ☞ 278

**Fraud, untruth or omission**

Under **Texas** law, as predicted by the Court of Appeals, absent any allegation of acquiring company's fraudulent intent, stockholders of acquired company failed to state a claim for violation of the **Texas** **Securities** **Act** (TSA) based on acquiring company's untrue promise of future performance, even if such a claim was cognizable under the TSA. Herrmann Holdings Ltd. v. Lucent Technologies Inc., C.A.5 (Tex.)2002, 302 F.3d 552. Securities Regulation ☞ 278

Limited partners in two energy funds failed to plead fraud with particularity required to state claims against the funds and individuals who ran them for common law fraud arising from misrepresentations that induced them to purchase fund units and for violation of the **Texas** **Securities** **Act**, where they did not allege facts showing exactly when and where the statements were made, to whom they were made, or why they were material to their decisions to purchase fund units, nor did they allege facts that if true would show that when the statements were made, defendants knew they were untrue or, in light of the circumstances in which they were made, misleading. Wesolek v. Layton, S.D.Tex.2012, 871 F.Supp.2d 620. Federal Civil Procedure ☞ 636

Retrospective desire on part on investors in limited partnership to have effects of general partner's management authority spelled out in painstakingly detailed chapter and verse did not amount to meritorious claim for securities fraud under the **Texas** **Securities** **Act** (TSA); sour grapes and hindsight did not a securities fraud action make. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation ☞ 278

Failed investment is not necessarily a mark of securities fraud, of kind actionable under the **Texas** **Securities** **Act** (TSA). In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation ☞ 278

For purposes of a claim under the **Texas** **Securities** **Act**, cautionary statements and warnings may render allegedly misleading statements immaterial, but only when they exhaust the misleading statement's capacity to influence the reasonable investor. Highland Capital Management, L.P. v. Ryder Scott Co. (App. 1 Dist. 2012) 402 S.W.3d 719. Securities Regulation ☞ 278

Genuine issues of material fact existed regarding whether damages suffered by minority shareholder of closely-held natural gas exploration company, who agreed to redemption of his stock before company was sold for 20 times the value used to determine redemption price of his interest, were too speculative, precluding summary judgment on issue of damages with respect to minority shareholder's claims for fraud, breach of fiduciary duty, and violations of **Texas Securities Act** (TSA). Allen v. Devon Energy Holdings, L.L.C. (App. 1 Dist. 2012) 367 S.W.3d 355, review granted, judgment set aside, and remanded by agreement, opinion after remand from supreme court 2013 WL 273026. Judgment ☞ 181(31)

Claims by holders of oil and gas company's unsecured subordinated notes against reservoir-evaluation consulting firm, asserting that firm fraudulently or negligently misrepresented company's proven reserves and violated the **Texas Securities Act**, were not property of company's bankruptcy estate, and thus holders had standing to pursue fraud, negligent misrepresentation and **Securities Act** action against firm in state court, as company could not have asserted such claims at the commencement of its bankruptcy; holders' claims were based upon their reliance on firm's representations, claims were based on direct harm to holders and not a derivative harm to company, and company could not have pursued **Securities Act** claim against firm as claim arose from holders' purchase of securities. Highland Capital Management, L.P. v. Ryder Scott Co. (App. 1 Dist. 2006) 212 S.W.3d 522, rehearing overruled, review denied, on remand 2009 WL 8620816. Bankruptcy ☞ 2154.1; Bankruptcy ☞ 2553; Bankruptcy ☞ 2556

Trial court's error in failing to give brokerage firm's mitigating instruction that jury could not draw inference, from 30-minute videotape in which stock broker asserted privilege against self-incrimination in response to nearly every question about stock purchasers' civil claims of fraud in the sale of securities, of brokerage's involvement in criminal activity, was harmless, where brokerage was sued for its individual actions in failing to supervise the broker and for violating the **Texas Securities Act's** anti-fraud provision, and stock purchasers did not claim that brokerage firm and broker were acting in collusion to defraud potential investors. **Texas** Capital Securities, Inc. v. Sandefer (App. 1 Dist. 2001) 58 S.W.3d 760, review denied. Appeal And Error ☞ 1067

Statements by broker's employee that World Bank's currency-based promissory notes were a safe and suitable investment for a bank and its trust department and that there was no realistic chance the yield would fall to zero due to European currency rates were "opinions" and were not actionable as securities fraud; the statements are the employee's attempts to compare the notes to his knowledge of the bank's past investments and to its investment philosophy, and the employee was merely providing his assessment for the future of the notes based on the information he possessed at the time. Duperier v. **Texas** State Bank (App. 13 Dist. 2000) 28 S.W.3d 740, review dismissed by agreement. Securities Regulation ☞ 278

Characterization of investment in oil and gas waterflood project as "low risk," and representation in field summary that unit could reasonably be expected to produce large revenues for a long time, were statements of opinion that were not actionable as fraud under **Texas Securities Act** or common law, or as negligent misrepresentation, despite seller's greater expertise, where purchasers had equal access to information on which opinions were based, and made no showing that field summary statements lacked reasonable basis. Paull v. Capital Resource Management, Inc. (App. 3 Dist. 1999) 987 S.W.2d 214, rehearing overruled, review denied. Fraud ☞ 11(2); Securities Regulation ☞ 278

Securities fraud action may be brought under either the **Texas Securities Act** [Civ. St. art. 581-1 et seq.] or the Deceptive Trade Practices Act [Bus. & C. § 17.41 et seq.], although double recovery for the same act is precluded. Frizzell v. Cook (App. 4 Dist. 1990) 790 S.W.2d 41, writ denied, rehearing of writ of error overruled. Antitrust And Trade Regulation ☞ 282; Damages ☞ 15; Securities Regulation ☞ 278

For investor to prevail in action against seller brought under **Texas Securities Act** for alleged fraudulent misrepresentations, investor must introduce evidence that untrue statements related to security purchased and induced purchase thereof; untrue statements made after purchase are not the "means" by which the security was sold. Nicholas v. Crocker (App. 12 Dist. 1984) 687 S.W.2d 365, ref. n.r.e. Securities Regulation ☞ 278

**Materiality**

Allegations that, at the time acquiring company agreed to use "its reasonable best efforts to prepare, file and cause [the S-3 registration statement] to become effective, as promptly as practicable after [acquiring company] shall have received all relevant information," acquiring company had, in fact, already received "all relevant information" from acquired company, stated claim under the **Texas** **Securities** **Act** (TSA) for an untrue promise to do a future act, as opposed to an untrue statement of existing material fact. Herrmann Holdings Ltd. v. Lucent Technologies Inc., C.A.5 (Tex.)2002, 302 F.3d 552. Securities Regulation 278

Under **Texas** securities law, a misrepresentation or omission is "material" if there was an appreciable likelihood that it could have significantly affected the investment decisions of a reasonable investor by substantially altering the information available to him in deciding whether to invest. In re Westcap Enterprises, C.A.5 (Tex.)2000, 230 F.3d 717, rehearing and rehearing en banc denied 239 F.3d 367. Securities Regulation 278

Brokers' alleged representations that investor could sell its support class principal-only (PO) collateralized mortgage obligation (CMO) bonds for profit before settlement date, that investor could purchase and sell PO bonds for profit before actually having to pay for them, and that mortgage interest rate spike was merely buying opportunity, did not constitute material misrepresentations that were actionable under **Texas** securities fraud statute; investor knew that profit depended on changes in mortgage interest rate and how quickly mortgages were refinanced, and investor knew that brokers' opinions or predictions were based on unpredictable changes in interest rate. In re Westcap Enterprises, C.A.5 (Tex.)2000, 230 F.3d 717, rehearing and rehearing en banc denied 239 F.3d 367. Securities Regulation 278

Failure of brokers, who sold support class principal-only (PO) collateralized mortgage obligation (CMO) bonds to treasurer who handled investment portfolio for group of colleges, to inform treasurer that bonds were unsuitable in light of colleges' conservative investment policy and that high-risk bonds made up disproportionately large share of colleges' portfolio were not material, and, thus, were not actionable under **Texas** securities fraud statute; treasurer had been purchasing CMOs for several years before dealing with defendant-brokers, treasurer gave every indication of being sophisticated investor to brokers, treasurer was aware of risks of CMOs, treasurer refused to disclose portfolio to brokers, treasurer did not tell brokers about colleges' cash-flow needs, colleges' board of trustees was aware of increased purchases of CMOs, and outside auditor made no mention that purchase of CMOs violated colleges' investment policy. In re Westcap Enterprises, C.A.5 (Tex.)2000, 230 F.3d 717, rehearing and rehearing en banc denied 239 F.3d 367. Securities Regulation 278

Investor's appearance of sophistication is relevant to determination of whether broker's omission constituted securities fraud under **Texas** law, because it speaks to whether broker knew about materiality of its omission to investor. In re Westcap Enterprises, C.A.5 (Tex.)2000, 230 F.3d 717, rehearing and rehearing en banc denied 239 F.3d 367. Securities Regulation 278

Although reliance is not required in securities fraud action brought under **Texas** **Security** **Act**, materiality is required. Granader v. McBee, C.A.5 (Tex.)1994, 23 F.3d 120. Securities Regulation 278

Omitted facts in prospectus is "material" under **Texas** **Securities** **Act** if there is substantial likelihood that, under all circumstances, amended fact would have assumed actual significance in deliberations of reasonable shareholder. Granader v. McBee, C.A.5 (Tex.)1994, 23 F.3d 120. Securities Regulation 278

While prospectus provided to investors, to induce them to purchase class B shares in limited partnership, indicated that some of general partner's management decisions were subject to approval of investment committee, its failure, when advising that entity controlled by general partner had unfettered discretion with respect to appointment of members of committee, to specifically advise that committee members might be replaced with employees of real estate brokerage firm with ties to general partner, did not significantly alter total mix of information that was made available, and was not "material" omission which would permit

investors to pursue rescission claim under fraud provision of the **Texas Securities Act** (TSA); it was enough that prospectus disclosed broad authority possessed by entity controlled by general partner in appointment of committee members, without having to anticipate all possible outcomes of that broad authority. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation 278

While prospectus provided to investors, to induce them to purchase class B shares in limited partnership, touted real estate business acumen of the three Class A limited partners, its failure to disclose that these Class A limited partners were subject to change, or that partnership agreement contained "buy/sell" provision that allowed Class A limited partners to transfer their partnership interests to one another, did not significantly alter total mix of information that was made available, and were not "material" omissions which would permit investors to pursue rescission claim under fraud provision of the **Texas Securities Act** (TSA), where prospectus specifically warned that general partner, an entity controlled by one of these Class A limited partners, had complete authority to manage partnership without consent of other Class A limited partners, such that a reasonable investor would not have presumed that partnership would be managed at all times by "tripartite" management team consisting of original Class A limited partners, and where prospectus not only referred to attached partnership agreement and specifically advised investors to read it carefully, but adequately summarized "buy/sell" provision. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation 278

Omission is "material," for purpose of fraud provision of the **Texas Securities Act** (TSA), if there is substantial likelihood that proper disclosure would have been viewed by reasonable investor as significantly altering total mix of information made available. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation 278

Omission of fact is "material," for purpose of fraud provision of the **Texas Securities Act** (TSA), if there is substantial likelihood that reasonable investor would consider it important in deciding to invest. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation 278

For purposes of the **Texas Securities Act**, an omission or misrepresentation is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest. Highland Capital Management, L.P. v. Ryder Scott Co. (App. 1 Dist. 2012) 402 S.W.3d 719. Securities Regulation 278

Evidence established defendant's general awareness of his role in primary violations of **Texas Securities Act** (TSA) by corporate offeror of unregistered securities for participation in oil and gas joint ventures and that defendant provided substantial assistance in the violations, as basis for defendant's liability under TSA for aiding offeror's primary violations in selling securities to venturers in violation of TSA and in making untrue statements of material fact or failing to state material facts necessary so that offeror's statements would not be misleading; defendant was secretary and treasurer of offeror, he had access to offeror's accounts and control over how those accounts were set up and was authorized to pay expenses of offeror, which served as managing partner for the ventures, and after he became aware of problems in funding of oil and gas operations, he sent an e-mail to venturers stating that "up to date reports" would be sent to all venturers, which did not occur. Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation 302

Brokerage firm was liable, under the **Texas Securities Act's** rescission remedy for a seller's untruth or omission to purchasers of stock regarding a material fact, to stock purchasers who still held the stock, for the purchase price of their stock, even if the purchasers did not have actual damages. **Texas** Capital Securities, Inc. v. Sandefer (App. 1 Dist. 2001) 58 S.W.3d 760, review denied. Securities Regulation 299

Stock's classification as a penny stock and the fact the stock was not registered were "material facts," within meaning of **Texas Securities Act's** provision making a securities seller liable for an untruth or omission regarding a material fact. **Texas** Capital Securities, Inc. v. Sandefer (App. 1 Dist. 2001) 58 S.W.3d 760, review denied. Securities Regulation 278

An omission or misrepresentation is "material" if there is a substantial likelihood that proper disclosure would have been viewed by a reasonable investor as significantly altering the total mix of information made available. Duperier v. **Texas** State Bank (App. 13 Dist. 2000) 28 S.W.3d 740, review dismissed by agreement. Securities Regulation 278

Simple interest of ten percent was the rate of prejudgment interest in a securities fraud suit. Duperier v. **Texas** State Bank (App. 13 Dist. 2000) 28 S.W.3d 740, review dismissed by agreement. Interest 31; Interest 60

Under **Texas Securities Act**, omission or misrepresentation is material if there is substantial likelihood that reasonable investor would consider it important in deciding to invest; investor is not required to prove that he would have acted differently but for omission or misrepresentation. Weatherly v. Deloitte & Touche (App. 14 Dist. 1995) 905 S.W.2d 642, rehearing overruled, writ dismissed w.o.j., rehearing of writ of error overruled, motion to file mandamus granted, subsequent mandamus proceeding 951 S.W.2d 394. Securities Regulation 278; Securities Regulation 297

For purposes of determining whether to certify securities fraud suit by investors who purchased debentures from corporation as class action, misrepresentation that was material to one class member as reasonable investor would be considered material as to all class members; focus under **Texas Securities Act** was on conduct of seller or issuer of securities and whether they made material representation, not on conduct of individual buyers. Weatherly v. Deloitte & Touche (App. 14 Dist. 1995) 905 S.W.2d 642, rehearing overruled, writ dismissed w.o.j., rehearing of writ of error overruled, motion to file mandamus granted, subsequent mandamus proceeding 951 S.W.2d 394. Parties 35.85

Elements of an action under the antifraud provision of **Texas Securities Act** include an offer or sale of a security by means of an untrue statement of a material fact or an omission of a material fact which is necessary in order to make the statement may not misleading under the circumstances; security buyer may sue at law or in equity for rescission, or for damages if the buyer no longer owns the security. Anderson v. Vinson Exploration, Inc. (App. 8 Dist. 1992) 832 S.W.2d 657, rehearing overruled, writ denied. Securities Regulation 278

Evidence was sufficient to create a jury question as to whether there were misstatements and omissions of material fact, as required to bring an action under the **Texas Securities Act**; lease operator testified he was aware that investors were seeking a "reasonably low risk" investment, there was expert testimony that the lease was a "fairly high risk" investment, investors were not made aware that nearby wells were dry or had been plugged and abandoned, some by lease operator, that operators had been rejected by four or five oil companies when they previously tried to sell the prospect that was sold to investors, and the current instance was only the second time in 25 years in which lease operator had not taken a working interest in the operation. Anderson v. Vinson Exploration, Inc. (App. 8 Dist. 1992) 832 S.W.2d 657, rehearing overruled, writ denied. Securities Regulation 309

Liability under **Texas Securities Act** and for negligent misrepresentation may be based, not only on false statement, but on omissions to state material fact necessary to make other statements not misleading. Lutheran Broth. v. Kidder Peabody & Co., Inc. (App. 6 Dist. 1992) 829 S.W.2d 300, writ dismissed, writ withdrawn, writ granted, set aside 840 S.W.2d 384. Fraud 16; Securities Regulation 278

**Opinion**

In considering whether an expression of opinion can be actionable under the **Texas** securities fraud statute, courts look to the statement's specificity and the relative knowledge of the speaker and the recipient. In re Westcap Enterprises, C.A.5 (Tex.)2000, 230 F.3d 717, rehearing and rehearing en banc denied 239 F.3d 367. Securities Regulation 278

Statements of opinion or "puffing" are to be expected of securities dealers and are generally not actionable under the **Texas Securities Act** (TSA). In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation 278

**Scienter**

Unlike a claim for seller liability under the <mark>Texas</mark> <mark>Securities</mark> <mark>Act</mark> (TSA), a claim for aider and abettor liability requires that a plaintiff plead and prove scienter. Dorsey v. Portfolio Equities, Inc., C.A.5 (Tex.)2008, 540 F.3d 333. Securities Regulation 278

Unlike a common law fraud cause of action, a claim for seller liability under the <mark>Texas</mark> <mark>Securities</mark> <mark>Act</mark> (TSA) does not require "scienter," that is, proof that the speaker knew that the representation was false, or made it without regard to its truth or falsity. Dorsey v. Portfolio Equities, Inc., C.A.5 (Tex.)2008, 540 F.3d 333. Securities Regulation 278

Plaintiffs seeking to recover under the 1933 <mark>Securities</mark> <mark>Act</mark> antifraud provision and under this section cannot recover if they know of misstatement or omission upon which the claim of fraud is based; knowing that misstatement or omission has been made is not the same as knowing the true fact which was misrepresented or omitted. Haralson v. E.F. Hutton Group, Inc., C.A.5 (Tex.)1990, 919 F.2d 1014, rehearing denied. Securities Regulation 27.39; Securities Regulation 297

<mark>Texas</mark> <mark>Securities</mark> <mark>Act</mark> contains no requirement of scienter. American General Ins. Co. v. Equitable General Corp., 1980, 493 F.Supp. 721. Securities Regulation 297

Even if minority shareholder of closely held natural gas exploration company, who agreed to redemption of his stock after letter from majority shareholder indicated that wells in expansion area were non-economic and that drilling could result in the decline of company's value, had knowledge that natural gas prices had increased during eight months between letter and redemption of his stock, such knowledge did not preclude his claim under the <mark>Texas</mark> <mark>Securities</mark> <mark>Act</mark> (TSA), to extent that minority shareholder relied on other statements in letter about state of drilling technology and its effect on profitability of drilling in expansion area which, by time of company's actual redemption of minority shareholder's interest, were no longer accurate. Allen v. Devon Energy Holdings, L.L.C. (App. 1 Dist. 2012) 367 S.W.3d 355, review granted, judgment set aside, and remanded by agreement, opinion after remand from supreme court 2013 WL 273026. Securities Regulation 278

Minority shareholder of closely held natural gas exploration company, who agreed to redemption of his stock after letter from majority shareholder indicated that wells in expansion area were non-economic and that drilling could result in the decline of company's value, had knowledge that natural gas prices had increased during eight months between letter and redemption of his stock, precluding his claim under the <mark>Texas</mark> <mark>Securities</mark> <mark>Act</mark> (TSA) to extent that minority shareholder alleged he was misled by statements in letter as to company's value at the time of redemption, changes in company's value during the eight month period, and the redemption. Allen v. Devon Energy Holdings, L.L.C. (App. 1 Dist. 2012) 367 S.W.3d 355, review granted, judgment set aside, and remanded by agreement, opinion after remand from supreme court 2013 WL 273026. Securities Regulation 278

<mark>Texas</mark> <mark>Securities</mark> <mark>Act</mark> does not require proof of scienter. Busse v. Pacific Cattle Feeding Fund No. 1, Ltd. (App. 6 Dist. 1995) 896 S.W.2d 807, rehearing overruled, writ denied. Securities Regulation 297

**Reliance**

In view of admission by buyer that he could not prove that he relied upon representation, communication, or statement by bank president when he purchased bank's stock, buyer failed to establish cause of action under <mark>Texas</mark> law for common-law or securities fraud. Granader v. McBee, C.A.5 (Tex.)1994, 23 F.3d 120. Fraud 20; Securities Regulation 278

Investment company could not have justifiably relied on representations of investor's ownership interest in savings and loan association when entering into agreement to resolve investor's debt to the company where the two employees in the investment company who best knew the investor knew of investor's ownership interest in savings and loan association, and that knowledge would be imputed to the investment company and it could not recover for common-law, statutory, or securities fraud under

federal or **Texas** law. Haralson v. E.F. Hutton Group, Inc., C.A.5 (Tex.)1990, 919 F.2d 1014, rehearing denied. Fraud 🗝 23; Securities Regulation 🗝 297

Investment company could not have justifiably relied on concealment of fact that savings and loan association, the proceeds of the sale of which were being offered to secure agreement to resolve investor's trading losses, had entered into supervision agreement with the **Texas** Savings and Loan Department where there was abundant evidence that there were problems between the owner of the savings and loan association and the Department; investment company thus could not recover on theories of common-law or statutory fraud or federal or state securities fraud. Haralson v. E.F. Hutton Group, Inc., C.A.5 (Tex.)1990, 919 F.2d 1014, rehearing denied. Fraud 🗝 23; Securities Regulation 🗝 60.48(1); Securities Regulation 🗝 297

The **Texas Securities Act** (TSA) does not require a buyer of a security to prove reliance on the sellers' misrepresentation or omission, nor does the TSA require proof of scienter or causation. In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex.2011, 761 F.Supp.2d 504. Securities Regulation 🗝 278

**Texas Security Act** (TSA) does not require buyer to prove reliance as part of claim against seller of security for alleged omission or misrepresentation of material fact regarding sale of security. Geodyne Energy Income Production Partnership I-E v. Newton Corp. (App. 5 Dist. 2003) 97 S.W.3d 779, review denied, rehearing of petition for review granted, withdrawn, reversed in part 161 S.W.3d 482. Securities Regulation 🗝 278

Reliance was not element of investor's claims under **Texas Securities Act** against accounting firm that provided auditing, tax, and transaction verification services to dealer. Hendricks v. Thornton (App. 9 Dist. 1998) 973 S.W.2d 348, rehearing overruled, review denied. Securities Regulation 🗝 278

**Due diligence**

Under the **Texas** securities fraud statute, the buyer is not required to prove his own due diligence, nor that he relied on the alleged misrepresentations or omissions. In re Westcap Enterprises, C.A.5 (Tex.)2000, 230 F.3d 717, rehearing and rehearing en banc denied 239 F.3d 367. Securities Regulation 🗝 278

Under **Texas Securities Act** section governing fraud liability of sellers, investor/buyer has no duty to perform due diligence nor to discover truth by exercising ordinary care. In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex.2002, 235 F.Supp.2d 549. Securities Regulation 🗝 278

The investor has no duty of due diligence; the securities fraud statute merely requires proof of a misrepresentation or omission by the seller. Duperier v. **Texas** State Bank (App. 13 Dist. 2000) 28 S.W.3d 740, review dismissed by agreement. Securities Regulation 🗝 278

Expert testimony in a securities fraud suit that broker had not done enough due diligence on the World Bank's currency-based promissory notes prior to sale to investor did not establish a misrepresentation by broker's employee when he claimed that broker had done more due diligence on the notes than on any other; no evidence compared the amount of due diligence performed on these notes with that performed for other notes. Duperier v. **Texas** State Bank (App. 13 Dist. 2000) 28 S.W.3d 740, review dismissed by agreement. Evidence 🗝 571(3)

There is no fundamental inconsistency between the **Texas Securities Act** [Civ. St. art. 581-33 A(2)] due diligence defense and the defenses of Bus. & C. § 17.506. Frizzell v. Cook (App. 4 Dist. 1990) 790 S.W.2d 41, writ denied, rehearing of writ of error overruled. Securities Regulation 🗝 246

**Reasonable investor**

Under "reasonable investor" standard applied in cause of action under fraud provision of the Texas Securities Act (TSA), reasonable investor will at least have read memorandum describing investment opportunity. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation ⚷ 278

Under "reasonable investor" standard applied in cause of action under fraud provision of the Texas Securities Act (TSA), test for reasonable investor is objective one, which inquires whether information disclosed would have been misleading, upon those points about which information's adequacy is questioned, to a reasonable, potential investor who read information as whole. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation ⚷ 278

While investor asserting a claim under fraud provision of the Texas Securities Act (TSA) is held to "reasonable investor" standard, it is no defense that investor could have discovered the truth by exercising ordinary care. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation ⚷ 278

**Rescission of sale**

Buyer's complaint that he would not have purchased stock if he had known that stock was going to be issued in his name rather than his children's names, did not, as matter of law, rise to level of "materiality" required to establish fraud under Texas Securities Act. Granader v. McBee, C.A.5 (Tex.)1994, 23 F.3d 120. Securities Regulation ⚷ 278

Rescission remedy of the Texas Securities Act (TSA) is intended to restore investors to their original position, and does not require a showing of actual damages. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation ⚷ 299

Rescission of sale was appropriate remedy for buyer of security regarding interest in oil well following jury's determination that seller violated Texas Security Act (TSA) by making omission or misrepresentation of material fact regarding sale, since buyer still owned security. Geodyne Energy Income Production Partnership I-E v. Newton Corp. (App. 5 Dist. 2003) 97 S.W.3d 779, review denied, rehearing of petition for review granted, withdrawn, reversed in part 161 S.W.3d 482. Securities Regulation ⚷ 299

Stock buyer's tender of 6,000 shares of Delaware corporation prior to suing seller for rescission of sale of 2,000 shares of Texas corporation, which was predecessor of Delaware corporation, on ground that stock was not registered would be a proper tender where the only stock delivered to buyer was the 6,000 shares and they were treated as the legal equivalent of the 2,000 shares. Prokop v. Krenek (Civ.App. 1964) 374 S.W.2d 265, ref. n.r.e. Securities Regulation ⚷ 304

**Recovery of consideration**

In suit to recover the consideration paid for shares of stock on ground that they were sold in violation of Securities Act wherein plaintiff pleaded that through his attorney he had made written demand on seller to refund the amount paid and that plaintiff had tendered two written assignments for the stock but there was neither pleading nor evidence that before suit plaintiff tendered the securities sold in proper form for transfer as required by act, nor that plaintiff had tendered the amount of all dividends, interest and other income distributions received while he was in possession of the stock, and plaintiff demanded that he be paid a specific sum in cash which was in excess of twice the value of his equity in machinery sold for the stock as found by the jury, plaintiff's failure to comply with requirements of the Act was fatal to his recovery. Riggs v. Riggs (Civ.App. 1959) 322 S.W.2d 571. Securities Regulation ⚷ 306

In suit to recover considerations paid for shares of stock sold in alleged violation of Securities Act, the burden was on defendant to prove facts to bring himself within exemption provisions of the Act, but his failure to show his exemption was harmless error

in view of holding that plaintiff was not entitled to judgment because of his failure to comply with the Act. Riggs v. Riggs (Civ.App. 1959) 322 S.W.2d 571. Appeal And Error 1029; Securities Regulation 307

Where named lessee, a person who engaged in dealing in oil lands, took mineral lease only upon learning of another person's interest therein and, on same day lease was executed, made an assignment to that person for certain consideration, named lessee was not entitled to recover the consideration expressed in assignment contract without showing compliance with Texas Securities Act, even if compensation were due under contract. Mecom v. Hamblen (Sup. 1956) 155 Tex. 494, 289 S.W.2d 553. Securities Regulation 292

### Damages

Exemplary damages are unavailable under Texas Securities Act (TSA). Quest Medical, Inc. v. Apprill, C.A.5 (Tex.)1996, 90 F.3d 1080, rehearing and suggestion for rehearing en banc denied 99 F.3d 1137. Securities Regulation 309

Section of Civil Practice and Remedies Code relating to "exemplary damages" did not create right to recover exemplary damages under Texas Securities Act (TSA); provisions were not intended to create new avenues for recovery of exemplary damages, but to provide ascertainable standards for and reasonable limits upon recovery of such damages under those causes of action already determined to support such claims. Quest Medical, Inc. v. Apprill, C.A.5 (Tex.)1996, 90 F.3d 1080, rehearing and suggestion for rehearing en banc denied 99 F.3d 1137. Securities Regulation 309

Plaintiff could not tack any exemplary damages award based on his statutory or common-law fraud theories onto actual damages award under Texas Securities Act (TSA), which did not allow recovery of exemplary damages. Quest Medical, Inc. v. Apprill, C.A.5 (Tex.)1996, 90 F.3d 1080, rehearing and suggestion for rehearing en banc denied 99 F.3d 1137. Securities Regulation 309

Trial court could not tack jury's punitive damages award for malicious breach of fiduciary duty against third-party trustee onto actual damages award against trustee for aiding and abetting securities fraud in violation of state securities act, in lawsuit by investors defrauded by broker in Ponzi scheme, although investors argued that saving language in civil liability article of act allowed addition of punitive damages recovered under alternative theory; investors could not pick and choose actual damage award under one theory and punitive damages under alternative theory. Sterling Trust Co. v. Adderley (App. 2 Dist. 2003) 119 S.W.3d 312, rehearing overruled, review granted, reversed 168 S.W.3d 835, rehearing denied. Securities Regulation 309

Plaintiff's failure to mitigate damages does not reduce defendant's liability for securities fraud. Duperier v. Texas State Bank (App. 13 Dist. 2000) 28 S.W.3d 740, review dismissed by agreement. Securities Regulation 297

Investors were not limited to seeking rescission under Texas Securities Act on grounds that they still owned securities in question, but could also seek damages as result of placement agent's alleged misrepresentations. Lutheran Broth. v. Kidder Peabody & Co., Inc. (App. 6 Dist. 1992) 829 S.W.2d 300, writ dismissed, writ withdrawn, writ granted, set aside 840 S.W.2d 384. Securities Regulation 299

### Persons liable

Broker could not be held liable under Texas law for aiding and abetting securities fraud absent showing of a primary violation by issuer or dealer which sold issuer's commercial paper to plaintiff insurance companies and investment companies as issuer's alleged agent. In re Enron Corp. Securities, Derivative & ""ERISA" Litigation, S.D.Tex.2007, 491 F.Supp.2d 690. Securities Regulation 302

Under **Texas Securities Act** section governing fraud liability of sellers, liability may be imposed against defendant as long as defendant constituted any link in chain of fraudulent selling process. In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex.2002, 235 F.Supp.2d 549. Securities Regulation 302

Holder of bankrupt oil and gas company's secured notes was not aware of the company's improper activities under the **Texas Securities Act** (TSA), as required for holder's of company's unsecured notes to bring action against secured note holder as an aider in the securities violation; affidavits explicitly stated that holder was not aware that the proved reserve estimates supplied by reservoir-evaluation consulting firm were inaccurate or contained irregularities, and the holder was unaware that the proved reserve estimates would later be reduced by firm. Highland Capital Management, L.P. v. Ryder Scott Co. (App. 1 Dist. 2012) 402 S.W.3d 719. Securities Regulation 302

"Primary liability" under the **Texas Securities Act** (TSA) arises when a person offers to sell or buy a security by means of an untrue statement of a material fact or an omission of the statement of a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation 302

A two-prong test is applied to determine whether a person is a control person, for purposes of secondary liability under the **Texas Securities Act** (TSA): (1) the person exercised control over the operations of the corporation in general, and (2) the person had the power to control the specific transaction or activity upon which the primary violation is predicated. Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation 302

Attorney representing limited partnership and general partner was not liable to non-client limited partner, under **Texas Securities Act** (TSA), for aiding and abetting securities fraud, regarding inaccuracies in partner ownership percentages, in absence of evidence of scienter, i.e., that attorney acted with intent to deceive or defraud or with reckless disregard for the truth. Kastner v. Jenkens & Gilchrist, P.C. (App. 5 Dist. 2007) 231 S.W.3d 571. Securities Regulation 278

Evidence was sufficient that third-party trustee directly or indirectly, with intent to deceive or defraud or with reckless disregard for truth or law, materially aided broker in committing securities fraud against qualified securities investors, as required to hold trustee secondarily liable as aider-abetter under state **securities act**; trustee knew that broker was commingling qualified and unqualified funds but did nothing despite duty to keep funds segregated, and trustee unilaterally transferred investments between broker's entities, enabling broker to avoid paying principal balance of notes as they became due. Sterling Trust Co. v. Adderley (App. 2 Dist. 2003) 119 S.W.3d 312, rehearing overruled, review granted, reversed 168 S.W.3d 835, rehearing denied. Securities Regulation 308

Fact questions as to whether officers of brokerage firm and firm's management company were in privity with firm, such that collateral estoppel prevented them from contesting earlier determination that firm had violated **Texas Securities Act**, precluded summary judgment for investors in suit to hold officers and management company liable for firm's violations of the **Securities Act**. **Texas** Capital Securities Management, Inc. v. Sandefer (App. 6 Dist. 2002) 80 S.W.3d 260, petition stricken. Judgment 181(13)

Individual's status as secretary and treasurer of brokerage firm was insufficient, without more evidence, to establish privity with firm, as required to invoke collateral estoppel based on earlier lawsuit against firm. **Texas** Capital Securities Management, Inc. v. Sandefer (App. 6 Dist. 2002) 80 S.W.3d 260, petition stricken. Judgment 701; Judgment 955

Fact that officers of brokerage firm and firm's management company, who were being sued by investors, used same attorney as firm had used in prior suit was insufficient to establish privity with firm, as required to invoke collateral estoppel based on prior suit. **Texas** Capital Securities Management, Inc. v. Sandefer (App. 6 Dist. 2002) 80 S.W.3d 260, petition stricken. Judgment 701

In order to establish liability under provision of **Texas Securities Act** (TSA) imposing joint and several liability for anyone who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security, a plaintiff must demonstrate: (1) that a primary violation of the securities laws occurred, (2) that the alleged aider had general awareness of its role in this violation, (3) that the actor rendered substantial assistance in this violation, and (4) that the alleged aider either intended to deceive plaintiff or acted with reckless disregard for the truth of the representations made by the primary violator. Frank v. Bear, Stearns & Co. (App. 14 Dist. 2000) 11 S.W.3d 380, review denied. Securities Regulation ☞ 302

Underwriters did not have duty to communicate riskiness of investment to investors, and thus were not liable under **Texas Securities Act** (TSA) for aiding corporation that allegedly sold securities in violation of TSA, where there was no showing that underwriters knew of any securities law violation by, or enforcement action against, corporation that solicited investors and sold securities. Frank v. Bear, Stearns & Co. (App. 14 Dist. 2000) 11 S.W.3d 380, review denied. Securities Regulation ☞ 260

Failure to disclose the SEC injunction against syndicator of oil and gas partnerships and failure to adequately disclose poor performance of past programs of syndicator to investors were violations of the **Texas Security Act** on part of insurer which was liable as aider and abettor through its underwriting program and marketing of partnerships in connection with sale of surety bonds guarantying investor's investments, and such securities fraud was defense to investors to payment of notes. Insurance Co. of North America v. Morris (App. 14 Dist. 1996) 928 S.W.2d 133, rehearing overruled, writ granted, affirmed in part, reversed in part 981 S.W.2d 667. Bills And Notes ☞ 106; Securities Regulation ☞ 278

Person or corporation who offers or sells unregistered security is liable to the buyer, who may sue for damages, under **Texas Securities Act**. Busse v. Pacific Cattle Feeding Fund No. 1, Ltd. (App. 6 Dist. 1995) 896 S.W.2d 807, rehearing overruled, writ denied. Securities Regulation ☞ 302

Investors in corporate bonds could litigate **Texas Securities Act** claims against corporation's placement agent in **Texas**, even if they had no connection with **Texas** and purchase of bonds did not occur in **Texas**, where placement agent had office in **Texas** and did business there. Vernon's Ann.Texas Civ.St. art. 581-33. Lutheran Broth. v. Kidder Peabody & Co., Inc. (App. 6 Dist. 1992) 829 S.W.2d 300, writ dismissed, writ withdrawn, writ granted, set aside 840 S.W.2d 384. Courts ☞ 13.5(12)

Failure of company hired to train investment company's Chinese employees on the day trading of stocks to properly register as an investment adviser, as required under **Texas Securities Act**, precluded contractual and quasi-contractual claims against investment company. S & D Trading Academy, LLC v. AAFIS Inc., C.A.5 (Tex.)2009, 336 Fed.Appx. 443, 2009 WL 1885881, Unreported, certiorari denied 130 S.Ct. 1054, 558 U.S. 1111, 175 L.Ed.2d 883. Securities Regulation ☞ 293

**Secondary liability**

For purposes of secondary aider liability under the **Texas Securities Act** (TSA), an alleged aider can only be held liable if it rendered assistance in the face of a perceived risk that its assistance would facilitate untruthful or illegal activity by the primary violator; in order to perceive such a risk, the alleged aider must possess a general awareness that his role was part of an overall activity that is improper. Highland Capital Management, L.P. v. Ryder Scott Co. (App. 1 Dist. 2012) 402 S.W.3d 719. Securities Regulation ☞ 302

To prove secondary aider liability under the **Texas Securities Act** (TSA), the plaintiff must demonstrate: (1) a primary violation of the securities laws occurred; (2) the alleged aider had general awareness of its role in this violation; (3) the actor rendered substantial assistance in this violation; and (4) that the alleged aider either (a) intended to deceive the plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator. Highland Capital Management, L.P. v. Ryder Scott Co. (App. 1 Dist. 2012) 402 S.W.3d 719. Securities Regulation ☞ 302

"Secondary liability" under the **Texas Securities Act** (TSA) is derivative liability for another person's securities violation either because he is a control person or because he aided the seller or buyer of the securities. Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation 302

**Control persons and aiders**

For purposes of secondary liability, **Texas Securities Act** (TSA) does not require aider to have had direct dealing with the defrauded party or an investor to prove that he relied on the alleged misrepresentations or omissions. In re Enron Corporation Securities, Derivative & "ERISA" Litigation, S.D.Tex.2007, 540 F.Supp.2d 759. Securities Regulation 302

A prerequisite for establishing secondary liability for aiding and abetting under the **Texas Securities Act** (TSA) is a primary violation under the statute. In re Enron Corporation Securities, Derivative & "ERISA" Litigation, S.D.Tex.2007, 540 F.Supp.2d 759. Securities Regulation 302

To state claim for aider and abettor liability under **Texas Securities Act** (TSA), plaintiff must allege that: (1) there was primary violation of securities laws; (2) aider and abettor had general awareness of his role in violation; (3) aider and abettor gave substantial assistance in violation; and (4) aider and abettor intended to deceive plaintiff or acted with reckless disregard for truth of primary violator's misrepresentations. In re Enron Corp. Securities, Derivative & ""ERISA" Litigation, S.D.Tex.2007, 490 F.Supp.2d 784. Securities Regulation 302

To make out prima facie case for control person liability under **Texas Securities Act**, plaintiff must demonstrate that defendant had actual power or influence over controlled person and that defendant induced or participated in alleged violation; status alone is insufficient to establish that defendant is control person within statute's ambit. In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex.2002, 235 F.Supp.2d 549. Securities Regulation 302

Under **Texas Securities Act's** control person section, control person at corporation can be sued directly without joining corporation as defendant. In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex.2002, 235 F.Supp.2d 549.

Considering that the language of subd. F of this article pertaining to controlling person liability tracks that contained in the federal statute, and the commentary so suggesting, the district court would interpret the **Texas** statute to impose the same requirements as are established under the federal provisions. American General Ins. Co. v. Equitable General Corp., 1980, 493 F.Supp. 721. Securities Regulation 302

Since the element of scienter was not proved with respect to those individual defendants who were outside directors of the corporate defendant, liability would not lie against them under § 10(b) of the Securities Exchange Act [15 U.S.C.A. § 78j(b)] or Rule 10b-5; furthermore, absent the requisite element of scienter or any evidence of culpable conduct whatever, those defendants could not be held liable as controlling persons under the Securities Exchange Act or the **Texas Securities Act**. American General Ins. Co. v. Equitable General Corp., 1980, 493 F.Supp. 721. Securities Regulation 60.45(1); Securities Regulation 302

Genuine issue of material fact existed as to whether investment firm, as employer of securities broker, had power to control or influence the broker's sale of his interests in outside corporations to purchaser, precluding summary judgment in purchaser's action against employer in which purchaser alleged control person liability under **Texas Securities Act**. Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc. (App. 3 Dist. 2011) 2011 WL 2769838, appeal abated 2011 WL 4424291, withdrawn, appeal dismissed 2014 WL 5801862. Judgment 181(18)

The word "control," as used in the **Texas Securities Act** provision governing control person liability, is used in the same broad sense as in federal securities law and means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Fernea v.

Merrill Lynch Pierce Fenner & Smith, Inc. (App. 3 Dist. 2011) 2011 WL 2769838, appeal abated 2011 WL 4424291, withdrawn, appeal dismissed 2014 WL 5801862. Securities Regulation 302

To prove aider-and-abettor liability under the **Texas Securities Act**, the plaintiff must demonstrate: (1) that a primary violation of the securities laws occurred; (2) that the alleged aider had general awareness of its role in this violation; (3) that the actor rendered substantial assistance in this violation; and (4) that the alleged aider either intended to deceive plaintiff or acted with reckless disregard for the truth of the representations made by the primary violator. Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc. (App. 3 Dist. 2011) 2011 WL 2769838, appeal abated 2011 WL 4424291, withdrawn, appeal dismissed 2014 WL 5801862. Securities Regulation 302

In a trial for control person liability under the **Texas Securities Act**, the plaintiff must prove that the alleged controlling person: (1) had actual power or influence over the controlled person, and (2) had the power to control or influence the specific transaction or activity that gave rise to the underlying violation; the plaintiff need not prove that the alleged controlling person culpably participated in the primary violation. Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc. (App. 3 Dist. 2011) 2011 WL 2769838, appeal abated 2011 WL 4424291, withdrawn, appeal dismissed 2014 WL 5801862. Securities Regulation 302

Investment firm that employed securities broker was not liable as an aider and abettor for broker's violation of the **Texas Securities Act** in selling unregistered securities to purchaser, absent showing that firm had general awareness about the nature of specific transaction at issue, as opposed to merely general awareness that broker was trying to sell his companies. Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc. (App. 3 Dist. 2011) 2011 WL 2769838, appeal abated 2011 WL 4424291, withdrawn, appeal dismissed 2014 WL 5801862. Securities Regulation 302

The standard of reckless disregard for the truth or the law, as required to prove aider-and-abettor liability under the **Texas Securities Act** (TSA, means that an alleged aider can be held liable only if it rendered assistance in the face of a perceived risk that its assistance would facilitate untruthful or illegal activity by the primary violator; in order to perceive such a risk, the alleged aider must possess a general awareness that his role was part of an overall activity that is improper. Willis v. Marshall (App. 8 Dist. 2013) 401 S.W.3d 689. Securities Regulation 302

To prove aider-and-abettor liability under the **Texas Securities Act** (TSA), the plaintiff must demonstrate: (1) that a primary violation of the securities laws occurred; (2) that the alleged aider had general awareness of its role in this violation; 3) that the alleged aider rendered substantial assistance in this violation; and (4) that the alleged aider either intended to deceive plaintiff or acted with reckless disregard for the truth of the representations made by the primary violator. Willis v. Marshall (App. 8 Dist. 2013) 401 S.W.3d 689. Securities Regulation 302

Accounting firm that prepared financial reports in preparation for sale of partnership interests did not rendered substantial assistance in a primary violation of the **Texas Securities Act** (TSA), as required for firm to be liable as an aidor and abettor for TSA violation by client who sought to sell the interests, in action by investors who had purchased the interests; disclaimer letters accompanying the reports and addressed to the partners warned that firm had not audited or reviewed the financial statements comprising compilation, explained that a compilation was the mere presentation of information that was the representation of management upon which it did not express an opinion or any other form of assurance, that management had elected to omit substantially all of the disclosures and the statement of cash flows required by generally-accepted accounting principle, and that the inclusion of the information omitted by management could influence a report user's conclusions about partnership's financial condition. Willis v. Marshall (App. 8 Dist. 2013) 401 S.W.3d 689. Securities Regulation 302

Under the **Texas Securities Act** (TSA), both control persons and aiders are jointly and severally liable with the primary violator to the same extent as if they were the primary violator. Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation 302

*Frank* test for determining whether a defendant was a control person for purposes of imposing control person liability under the **Texas** **Security** **Act** (TSA) was applicable to investors' claims against securities brokerage firm arising from agent's purportedly fraudulent conduct involving sale of church-related securities. Barnes v. SWS Financial Services, Inc. (App. 5 Dist. 2003) 97 S.W.3d 759. Securities Regulation ⬥ 302

It is not necessary for a plaintiff to show culpable participation by a defendant in order to establish the defendant was a control person, for purposes of imposing control person liability under the **Texas** **Securities** **Act** (TSA), because lack of participation and good faith constitute an affirmative defense for a controlling person. Barnes v. SWS Financial Services, Inc. (App. 5 Dist. 2003) 97 S.W.3d 759. Securities Regulation ⬥ 302

For purposes of establishing whether a defendant is a control person subject to control person liability under **Texas** **Securities** **Act** (TSA), separating the issue of control from the issue of good faith is crucial, as the burden of proof with respect to good faith is on the defendant while the burden of establishing control is on the plaintiff. Barnes v. SWS Financial Services, Inc. (App. 5 Dist. 2003) 97 S.W.3d 759. Securities Regulation ⬥ 302; Securities Regulation ⬥ 307

National Association of Securities Dealers (NASD) form which listed brokerage firm's president, vice-president, and secretary/treasurer as control persons did not conclusively establish that these officers were "control persons" within meaning of **Texas** **Securities** **Act**. **Texas** Capital Securities Management, Inc. v. Sandefer (App. 6 Dist. 2002) 80 S.W.3d 260, petition stricken. Securities Regulation ⬥ 302

Status alone does not automatically cause officers to be deemed "control persons" under **Texas** **Securities** **Act**, and evidence is also required that an officer had influence over at least the direction of the corporation. **Texas** Capital Securities Management, Inc. v. Sandefer (App. 6 Dist. 2002) 80 S.W.3d 260, petition stricken. Securities Regulation ⬥ 302

Evidence that two owners of yogurt store franchisor knew of franchisee's development delays and late payment of franchise obligations, that one owner knew franchisee was raising money from investors, that owners knew two of franchisor's corporate officers were acting as references for franchisee, and that franchisee relied on owners' celebrity status when recruiting investors in franchisee's proposed stores, did not establish intent to deceive or reckless disregard for truth of representations that could conceivably be attributed to owners, as basis for aider and abettor liability under **Texas** **Securities** **Act**, relating to investors' allegations that franchisee, and the corporate officers as co-conspirators, absconded with investor funds instead of fully developing proposed stores. Crescendo Investments, Inc. v. Brice (App. 4 Dist. 2001) 61 S.W.3d 465, rehearing overruled, review denied. Securities Regulation ⬥ 308

Underwriters could not be liable under **Texas** **Securities** **Act** (TSA) for directly or indirectly controlling corporation that allegedly sold securities in violation of TSA, absent competent proof that underwriters controlled internal affairs of corporation that solicited investors and sold securities at issue. Frank v. Bear, Stearns & Co. (App. 14 Dist. 2000) 11 S.W.3d 380, review denied. Securities Regulation ⬥ 260

State **Securities** **Act** imposed joint and several liability on control persons of corporation issuing securities, allowing for suit against control persons of issuing corporation without joining corporation. Summers v. WellTech, Inc. (App. 1 Dist. 1996) 935 S.W.2d 228. Securities Regulation ⬥ 302

Person who directly or indirectly controls seller or issuer of a security is liable jointly and severally under **Texas** **Securities** **Act** statute providing that offerer or seller of unregistered security may be liable to the buyer, together with the seller or issuer and to the same extent as the seller or issuer. Busse v. Pacific Cattle Feeding Fund No. 1, Ltd. (App. 6 Dist. 1995) 896 S.W.2d 807, rehearing overruled, writ denied. Securities Regulation ⬥ 302

Term "control person" in **Texas Securities Act** is used in same broad sense as in federal statute, and major shareholders and directors are control persons. Busse v. Pacific Cattle Feeding Fund No. 1, Ltd. (App. 6 Dist. 1995) 896 S.W.2d 807, rehearing overruled, writ denied. Securities Regulation 302

Defendant waived complaint to comment by plaintiff's counsel that court had already determined in deciding earlier motion that defendant was a control person for a company selling securities in violation of **Texas Securities Act**, where not until the next day did the defendants move for mistrial on grounds that statement improperly informed jury of court's prior ruling and implied that defendant was a wrongdoer, and failed to request curative instruction. Busse v. Pacific Cattle Feeding Fund No. 1, Ltd. (App. 6 Dist. 1995) 896 S.W.2d 807, rehearing overruled, writ denied. Trial 131(2)

### Quitclaim deed

Assertions by buyer of interest in oil lease, that provision of **Texas Securities Act** (TSA) which rendered void any contractual provision requiring a buyer of securities to waive compliance with TSA rendered void warnings in auction documents that seller was making no representation or warranty, and that another provision of TSA impliedly prohibited seller from asserting, as defense to claim of untruth or omission, that neither party knew the representation was false but both might have discovered its falsity, were irrelevant, where conveyance from seller to buyer was by quitclaim deed, so that seller made no representation to buyer that lease was valid. Geodyne Energy Income Production Partnership I-E v. Newton Corp. (Sup. 2005) 161 S.W.3d 482. Securities Regulation 278

### Sellers

Under the **Texas Securities Act**, (TSA) a statutory "seller" is person who sold security directly to purchaser, or who acted as vendor's agent and solicited the sale. In re Enron Corp. Securities, Derivative & Erisa Litigation, S.D.Tex.2010, 762 F.Supp.2d 942. Securities Regulation 302

A "seller" of securities for purposes of **Texas Securities Act** can include a person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner, such as a broker. Highland Capital Management, L.P. v. Ryder Scott Co. (App. 1 Dist. 2012) 402 S.W.3d 719. Securities Regulation 302

### Waiver

Only way by which investment company could have waived rights it had under the 1933 **Securities Act** antifraud provision when it ratified original agreement would be if the ratification was found to operate as a settlement between it and those who allegedly fraudulently induced it to enter into the original agreement. Haralson v. E.F. Hutton Group, Inc., C.A.5 (Tex.)1990, 919 F.2d 1014, rehearing denied. Securities Regulation 35.24

Buyer of security regarding interest in oil well did not waive its right to seek rescission of transaction by not submitting issue to jury in action against seller under **Texas Security Act** (TSA) for alleged omission or misrepresentation of material fact regarding sale, since jury's finding on availability of rescission, which was an issue of law, would have been immaterial. Geodyne Energy Income Production Partnership I-E v. Newton Corp. (App. 5 Dist. 2003) 97 S.W.3d 779, review denied, rehearing of petition for review granted, withdrawn, reversed in part 161 S.W.3d 482. Securities Regulation 309

Inclusion of an "as is" or waiver clause in sale agreement for security does not release or waive any cause of action buyer may have for current violation of **Texas Security Act** (TSA) of which buyer has neither actual nor constructive knowledge. Geodyne Energy Income Production Partnership I-E v. Newton Corp. (App. 5 Dist. 2003) 97 S.W.3d 779, review denied, rehearing of petition for review granted, withdrawn, reversed in part 161 S.W.3d 482. Securities Regulation 278

Brokerage firm waived its right to have the issue of exemption from registration under the **Texas** **Securities** **Act** submitted to the jury in an action under the Act's anti-fraud provision, where the issue had not been raised specifically in an affirmative written pleading. **Texas** Capital Securities, Inc. v. Sandefer (App. 1 Dist. 2001) 58 S.W.3d 760, review denied. Securities Regulation 306

### Disclaimer

"As is" clause in agreement for sale of security involving interest in oil well did not preclude buyer from asserting claim against seller under **Texas** **Security** **Act** (TSA) for alleged omission or misrepresentation of material fact regarding sale, because TSA did not require proof that misrepresentation or omission either caused buyer to purchase security or caused buyer's loss. Geodyne Energy Income Production Partnership I-E v. Newton Corp. (App. 5 Dist. 2003) 97 S.W.3d 779, review denied, rehearing of petition for review granted, withdrawn, reversed in part 161 S.W.3d 482. Securities Regulation 278

### Jurisdiction

Anti-waiver provisions of federal and state **Securities** **Acts** did not bar enforcement of international forum selection clause in shareholder agreement for purchase of company's stock, stating that parties agreed to exclusive jurisdiction of courts of Ontario, Canada to adjudicate any and all disputes arising under or relating to shareholder agreement and/or sale, purchase, or holding of company's common shares; public policy strongly favored enforcement of forum selection clauses, and securities laws were only affected in cases where parties exercised their rights to freely and voluntarily enter into a contract mandating that suits be brought in courts and under laws of another country. Young v. Valt.X Holdings, Inc. (App. 3 Dist. 2010) 336 S.W.3d 258, review dismissed. Contracts 127(4)

Exercise of personal jurisdiction over administrator of investor's individual retirement account did not offend traditional notions of fair play and substantial justice required to satisfy due process; administrator would not be substantially burdened, **Texas** had strong interest in protecting its residents who purchase securities, **Texas** was a convenient forum, a **Texas** court could efficiently resolve the controversy and promote the policies implicated by the **Texas** **Securities** **Act**, and **Texas** had an interest in providing an effective means of redress for its residents. Ira Resources, Inc. v. Griego (App. 13 Dist. 2005) 161 S.W.3d 248, rehearing overruled, review granted, reversed 221 S.W.3d 592, on remand 235 S.W.3d 263. Constitutional Law 3965(7); Securities Regulation 303.1

Petition, alleging that defendant foreign corporation was engaged in business in **Texas** and maintained office and principal place of business in Dallas, that corporation had misused solicited funds and made misrepresentations in prospectuses, and that solicited funds were to be paid into trust account at bank in Dallas, was sufficient to permit court to acquire personal jurisdiction by substituted service over corporation, which had made special appearance in action seeking an accounting for common-law fraud, statutory fraud, and violation of this article. Minexa Arizona, Inc. v. Staubauch (App. 5 Dist. 1984) 667 S.W.2d 563. Courts 32.5(2)

Out-of-state securities investors were subject to **Texas** jurisdiction in action brought by client who alleged that investors fraudulently cause her to invest money in foreign bank securities; investors directly controlled the receipt and disbursement of funds obtained from client in a scheme involving fraudulent investments in foreign securities, investors did not deny that they were the recipients of client's funds, evidence indicated that investors participated in a scheme that caused harm to **Texas** consumers, and investors were subject to jurisdiction based on their status as recipients of the funds at issue, or, put another way, as links in the chain in the money trail. Leben v. Treen (App. 13 Dist. 2003) 2003 WL 22479150, Unreported. Courts 13.5(12)

### Parties

Sellers of oil and gas leases and associated personal property had no standing under Texas Securities Act or Securities Act of 1933 to sue buyers, since sellers did not purchase any securities from buyers as part of transaction, notwithstanding claim that buyers' agreement to pay sellers 25% of net profits from production constituted a "security" and that sellers "purchased" it when they executed agreement, since, rather than buying net profits interest, sellers did no more than retain a portion of their rights as working interest owners. Ratner v. Sioux Natural Gas Corp., C.A.5 (Tex.)1985, 770 F.2d 512. Securities Regulation 25.60; Securities Regulation 300

Oil lessee's sale of his interests in certain oil and gas wells to a third party did not make investor, who had purchased a three-eighths interest in five operating wells, a forced seller such as would give him standing to assert claims under federal and Texas security laws. Jeanes v. Henderson, C.A.5 (Tex.)1983, 703 F.2d 855. Securities Regulation 60.37; Securities Regulation 300

Washington state investor had right of action under Texas Securities Act arising from alleged misconduct occurring in Texas, i.e. issuance of registration statement for sale of notes that made materially false statements about entities formed by employees of Texas issuer, even though damage from misconduct, i.e. investor's purchase of notes at artificially inflated prices, occurred outside Texas. In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex.2002, 235 F.Supp.2d 549. Securities Regulation 300

A major shareholder or director can be a "control person" for purposes of secondary liability under the Texas Securities Act (TSA). Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation 302

Insured demonstrated he would vigorously prosecute class members' claims and defenses against insurer alleged to have sold securities as an unregistered dealer in violation of Securities Act, and thus, insured satisfied that element of adequacy of representation requirement for class certification, where insured showed personal integrity and intelligence to understand proceedings, and he demonstrated familiarity with proceedings and willingness to prosecute those claims. Citizens Ins. Co. of America v. Hakim Daccach (App. 3 Dist. 2003) 105 S.W.3d 712, review granted, reversed 217 S.W.3d 430. Parties 35.85

### Laches and limitations

Under Texas law, three-year statute of limitations on plaintiffs' claims against corporation's officers and directors and several financial institutions for aiding and abetting under the Texas Securities Act began to run when plaintiffs had notice of the claims when corporation publicly announced that it had incurred a $683 million loss and was taking non-recurring charges of $1.01 billion after-tax in the third quarter of that year. Tex.Rev.Civ. Stat. Ann. art. Newby v. Enron Corp., C.A.5 (Tex.)2008, 542 F.3d 463. Limitation Of Actions 95(18)

The two-year limitations period applicable to general fraud statute in Texas Business and Commerce Code (V.T.C.A. Bus. & C. § 27.01) and not three-year statute of limitations for actions brought under this article applied to Rule 10b-5 action for which Texas was forum state. Wood v. Combustion Engineering, Inc., C.A.5 (Tex.)1981, 643 F.2d 339. Securities Regulation 134

Under allegations of complaint under SEC rule 106-5, 17 C.F.R. 240.10b-5, and Securities and Exchange Act of 1934, § 10b [15 U.S.C.A. § 78j(b) ] against use of deceptive or manipulative device or contrivance, plaintiffs either knew or should have known about alleged fraud at such a time that their action was barred by three-year Texas statute of limitations. Berry Petroleum Co. v. Adams and Peck, C.A.2 (N.Y.)1975, 518 F.2d 402. Limitation Of Actions 179(2)

Action under SEC rule 10b-5, 17 C.F.R. 240.10b-5, against use of any manipulative, deceptive or other fraudulent device or contrivance is more nearly approximated by cause of action for false or misleading statement under this article than cause of action under Texas fraud statute (V.T.C.A. Bus. & C. § 27.01), and Texas three-year statute of limitations (this article) should be applied to suits by buyers in Texas under the federal rule. Berry Petroleum Co. v. Adams and Peck, C.A.2 (N.Y.)1975, 518 F.2d 402. Securities Regulation 134

Under the limitations period of **Texas** **Security** **Act** of three years from discovery but within five years of initial purchase, claims by investors under Act claims were barred for investments made more than five years before filing suit. Hanley v. First Investors Corp., E.D.Tex.1992, 793 F.Supp. 719. Securities Regulation ☞ 305

Two-year **Texas** statute of limitations under general fraud statute (V.T.C.A. Bus. & C. § 27.01) applied to action alleging securities fraud under the Securities Exchange Act [15 U.S.C.A. § 78j(b) ], rather than this article. Keys v. Wolfe, N.D.Tex.1982, 540 F.Supp. 1054, reversed 709 F.2d 413. Securities Regulation ☞ 134

Actions brought in **Texas** for violation of Securities Exchange Commission rule governing use of manipulative or deceptive devices or contrivances in connection with purchase or sale of securities are controlled by three-year limitation period of this article. Richardson v. Salinas, N.D.Tex.1972, 336 F.Supp. 997. Securities Regulation ☞ 134

Cause of action for registration violations under the **Texas** **Securities** **Act** from sale of viatical and life settlements accrued, and three-year limitations period began to run, at moment of sale, not when purchasers made further payment of additional premiums on the life insurance policies from which the settlements were produced. Arnold v. Life Partners, Inc. (App. 5 Dist. 2013) 416 S.W.3d 577, rehearing overruled, petition for review filed, review granted. Limitation of Actions ☞ 58(1)

The limitations period began to run on claim under the **Texas** **Securities** **Act** (TSA) on the date minority shareholder in natural gas exploration company discovered or, in the exercise of reasonable diligence, should have discovered majority shareholder's purported untruths or omissions in regards to redemption of shares. Allen v. Devon Energy Holdings, L.L.C. (App. 1 Dist. 2012) 367 S.W.3d 355, review granted, judgment set aside, and remanded by agreement, opinion after remand from supreme court 2013 WL 273026. Limitation of Actions ☞ 100(6)

Action under **Securities** **Act** alleging failure to secure permit or registration for issue was barred by three-year statute of limitations in subd. C of this article where, more than three years before action was filed, securities buyer signed promissory note for purchase price of securities and security agreement was executed giving seller security interest in shares to secure payment due on note. Stone v. Enstam (Civ.App. 1976) 541 S.W.2d 473. Limitation Of Actions ☞ 58(1)

**Class actions**

Definition of class, in action alleging insurer was unregistered dealer in securities by selling life insurance policies with stock purchase option, was not dependent on merits of case and did not permit class members to bring individual claims if class claims were rejected, and thus, class was determined by objective criteria and did not create impermissible "fail-safe" class, even though definition permitted members to retain policy and opt-out of rescission remedy; **Securities** **Act** prohibited members who chose to opt-out from bringing individual claims, and definition did not depend on ultimate legal conclusion of whether policies were "securities" sold in state. Citizens Ins. Co. of America v. Hakim Daccach (App. 3 Dist. 2003) 105 S.W.3d 712, review granted, reversed 217 S.W.3d 430. Parties ☞ 35.41; Parties ☞ 35.85

Class representative alleged "overall scheme" by insurer in sale of policies that were securities by unregistered dealer in violation of **Securities** **Act**, and thus, he was typical of class members, as essential element of class certification, even though insurer claimed statute of limitations defense, that he lacked reliance on claim that policy was investment, and that representative's policy did not contain arbitration clause found in other policies; statute of limitations claim did not destroy typicality, reliance was not element of cause of action, and arbitration clause did not destroy "nexus" between representative's injuries and those of other members. Citizens Ins. Co. of America v. Hakim Daccach (App. 3 Dist. 2003) 105 S.W.3d 712, review granted, reversed 217 S.W.3d 430. Parties ☞ 35.85

Class action alleging unregistered securities dealer's sale of insurance policies as investment vehicle violated **Securities** **Act** was both more fair and efficient than individual claims, and satisfied superiority requirement for class certification, where

issues were limited to whether insurance policies were "securities" and whether those policies were sold from state by insurer, claimants would be required to relitigate same issues if individual claims were brought, and small monetary value of rescission precluded non-residents from bearing costs of travel to state to prosecute claims. Citizens Ins. Co. of America v. Hakim Daccach (App. 3 Dist. 2003) 105 S.W.3d 712, review granted, reversed 217 S.W.3d 430. Parties ⟨key⟩ 35.85

## Venue

There was no probative evidence that all or a substantial part of the events giving rise to fraud, negligent misrepresentation and **Texas Securities Act** action, brought against reservoir-evaluation consulting firm that had prepared reports on oil company's proven reserves by holders of company's unsecured subordinated notes, occurred in county in which holders initially brought action, and thus venue was not maintainable in such county under general permissive venue statute, where only event cited by holders that occurred in such county was that one of their portfolio managers received and reviewed in such county company's security forms that incorporated firm's reports, there was no allegation that holders met with representatives of firm or company in such county or that firm directed security forms to holders in such county, and all of the work that firm performed for company occurred in another county. Highland Capital Management, L.P. v. Ryder Scott Co. (App. 1 Dist. 2006) 212 S.W.3d 522, rehearing overruled, review denied, on remand 2009 WL 8620816. Venue ⟨key⟩ 8.5(1); Venue ⟨key⟩ 8.5(2); Venue ⟨key⟩ 8.5(8)

## Pleadings

District Court would not consider, on corporate borrower and its insiders' motion to dismiss lenders' claim alleging violation of the **Texas Securities Act**, borrower and insiders' claim that funds they set up to finance purchase of oil and gas drilling rigs were exempt from Act's registration requirements because there were fewer than 35 total sales for each contract, where borrower and insiders did not include the claim in their pleadings. Biliouris v. Sundance Resources, Inc., N.D.Tex.2008, 559 F.Supp.2d 733. Securities Regulation ⟨key⟩ 306

Investors failed to state claims against issuer's bank for aiding and abetting fraud in violation of **Texas Securities Act** (TSA) and **Texas** Business and Commerce Code, common law fraud, and conspiracy to commit fraud since they did not adequately plead a primary violation by issuer under the TSA and Business and Commerce Code, common law fraud, and the underlying fraud for the conspiracy claim; investors failed to allege with particularity the requisite facts about issuer's alleged misrepresentations and omissions, when and where the statements were made, why the statements were fraudulent, what material facts were omitted and where, and why those omissions made the representations misleading, and investors failed to adequately plead reliance. In re Enron Corporation Securities, Derivative & "ERISA" Litigation, S.D.Tex.2007, 540 F.Supp.2d 759. Federal Civil Procedure ⟨key⟩ 636

Investors alleging scheme to artificially inflate energy corporation's earnings and to conceal debt adequately pleaded facts demonstrating that auditor's officer had general awareness of his role in scheme, as required to state claim for aiding and abetting liability under **Texas Securities Act** (TSA); complaint averred that officer assisted corporation in "cooking its books," and that officer acted with intention of deceiving investors or with reckless disregard about truth or applicable law. In re Enron Corp. Securities, Derivative & ""ERISA" Litigation, S.D.Tex.2007, 490 F.Supp.2d 784. Securities Regulation ⟨key⟩ 302

Investors who sued energy corporation and auditor, alleging scheme to artificially inflate corporation's earnings and to conceal debt, adequately pleaded facts demonstrating that auditor had general awareness of its role in scheme, as required to state claim for aiding and abetting liability under **Texas Securities Act** (TSA); complaint averred that auditor fired analyst and replaced him at corporation's behest, and that auditor gave substantial assistance in allowing corporation to deceptively report $60 million in income. In re Enron Corp. Securities, Derivative & ""ERISA" Litigation, S.D.Tex.2007, 490 F.Supp.2d 784. Securities Regulation ⟨key⟩ 302

Investors who sued energy corporation and auditor, alleging scheme to artificially inflate corporation's earnings and to conceal debt, failed to allege corporation's primary violation of **Texas** **Securities** **Act** (TSA) with requisite specificity under federal rules; although investors pleaded specific figures for purported sham earnings, they failed to point to locations in corporation's financial documents where such amounts were misrepresented. In re Enron Corp. Securities, Derivative & ""ERISA" Litigation, S.D.Tex.2007, 490 F.Supp.2d 784. Federal Civil Procedure ⚷ 636

Allegations in complaint were insufficient to support inference that individual who gave positive reference to investors on behalf of hedge fund was recruited by fund to be an active seller of securities, as was required to state claims under **Texas** **Securities** **Act**, Arkansas **Securities** **Act**, and Tennessee **Securities** **Act**. Harding University v. Consulting Services Group, L.P., N.D. Ill.1998, 22 F.Supp.2d 824. Securities Regulation ⚷ 278

**Summary judgment**

Genuine issue of material fact existed as to whether oil reserve estimates that reservoir-evaluation consulting firm made for oil and gas company, which were included in prospectus, were material misrepresentations, despite the fact that prospectus included cautionary language regarding reserve estimates, precluding summary judgment on claims by holders of unsecured bonds in bankrupt oil and gas company against consulting firm alleging that firm materially aided company in violating **Texas** **Securities** **Act**. Highland Capital Management, L.P. v. Ryder Scott Co. (App. 1 Dist. 2012) 402 S.W.3d 719. Judgment ⚷ 181(31)

Genuine issue of material fact existed as to whether securities brokers who sold unsecured bonds in oil and gas company were motivated at least in part by a desire to serve their own financial interests or those of the securities owner so as to make them "sellers" under the **Texas** **Securities** **Act**, precluding summary judgment on bond holders' claims against reservoir-evaluation consulting firm that had prepared reports on company's proven reserves alleging that firm aided sellers in a primary violation of the Act. Highland Capital Management, L.P. v. Ryder Scott Co. (App. 1 Dist. 2012) 402 S.W.3d 719. Judgment ⚷ 181(18); Judgment ⚷ 181(31)

**Defenses**

Where a plaintiff proceeding under fraud provision of the **Texas** **Securities** **Act** (subd. B of this article) proves intentional, fraudulent conduct, the defendant, by the statute's terms, has no defense; where a plaintiff likewise proves reckless conduct, the due care defense is also of no avail, for conduct, which is an "extreme departure" from ordinary standards of care cannot simultaneously admit to a finding of reasonable care; but where plaintiff can prove only negligence, without intentional or reckless conduct, defendant can prevail if he can establish his own exercise of due care. American General Ins. Co. v. Equitable General Corp., 1980, 493 F.Supp. 721. Securities Regulation ⚷ 297

Jury's finding that third-party trustee, sued as aider-abetter under state **securities** **act**, lacked knowledge of broker's untrue statement or omission defrauding investors in qualified securities through illegal Ponzi scheme, did not constitute a defense to trustee's secondary liability as an aider-abetter. Sterling Trust Co. v. Adderley (App. 2 Dist. 2003) 119 S.W.3d 312, rehearing overruled, review granted, reversed 168 S.W.3d 835, rehearing denied. Securities Regulation ⚷ 278

Ratification is not a defense to securities fraud. Duperier v. **Texas** State Bank (App. 13 Dist. 2000) 28 S.W.3d 740, review dismissed by agreement. Securities Regulation ⚷ 297

Comparative fault is not a defense to securities fraud. Duperier v. **Texas** State Bank (App. 13 Dist. 2000) 28 S.W.3d 740, review dismissed by agreement. Securities Regulation ⚷ 297

Loss causation is not a defense to securities fraud. Duperier v. **Texas** State Bank (App. 13 Dist. 2000) 28 S.W.3d 740, review dismissed by agreement. Securities Regulation ⚷ 297

Common law defenses of estoppel and ratification are not available in Deceptive Trade Practices Act (DTPA) or <mark>Texas Securities Act</mark> (TSA) actions. Insurance Co. of North America v. Morris (App. 14 Dist. 1996) 928 S.W.2d 133, rehearing overruled, writ granted, affirmed in part, reversed in part 981 S.W.2d 667. Antitrust And Trade Regulation ☞ 294; Securities Regulation ☞ 301

A joint venture is a defense to any cause of action arising under the <mark>Texas Securities Act</mark>. Anderson v. Vinson Exploration, Inc. (App. 8 Dist. 1992) 832 S.W.2d 657, rehearing overruled, writ denied. Securities Regulation ☞ 291.1

Evidence was sufficient to create a jury question as to whether oil and gas lease joint operating agreement was a joint venture and thus not subject to the <mark>Texas Securities Act</mark>; joint operating agreement wholly excluded owners of working interest from participation in the drilling, operating and control of the wells in question, lease operator encouraged but did not contribute to initial investment of the project, and lease operators were to share in profits only to the extent of the overriding royalty. Anderson v. Vinson Exploration, Inc. (App. 8 Dist. 1992) 832 S.W.2d 657, rehearing overruled, writ denied. Securities Regulation ☞ 309

In suit to recover consideration paid for shares of stock allegedly sold in violation of <mark>Securities Act</mark>, laches was not available to defendant as a defense since plaintiff was seeking to enforce a statutory legal right, but court's error with respect to laches was harmless in view of holding that plaintiff was not entitled to judgment because of his failure to comply with the Act. Riggs v. Riggs (Civ.App. 1959) 322 S.W.2d 571. Appeal And Error ☞ 1029; Securities Regulation ☞ 305

**Presumptions and burden of proof**

To state a claim for aider and abettor liability under the <mark>Texas Securities Act</mark> (TSA), a plaintiff must show: (1) a primary violation of the securities laws, (2) that the aider and abettor has a general awareness of his role in the violation, (3) that he gave substantial assistance in the violation, and (4) that he intended to deceive the plaintiff or acted with reckless disregard for the truth of the primary violator's misrepresentations. Dorsey v. Portfolio Equities, Inc., C.A.5 (Tex.)2008, 540 F.3d 333. Securities Regulation ☞ 302

Under the <mark>Texas</mark> securities fraud statute, the buyer is not required to prove his own due diligence, nor that he relied on the alleged misrepresentations or omissions. In re Westcap Enterprises, C.A.5 (Tex.)2000, 230 F.3d 717, rehearing and rehearing en banc denied 239 F.3d 367. Securities Regulation ☞ 278

Focus of the <mark>Texas Securities Act</mark> is upon conduct of seller or issuer of securities, i.e., on whether they made a material misrepresentation, and not on conduct of individual buyers, and buyer, to recover under fraud provision of the TSA, need not prove that he would have acted differently but for omission or misrepresentation. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation ☞ 278

To recover under fraud provision of the <mark>Texas Securities Act</mark> (TSA), investor must introduce evidence of material misrepresentation or omission that related to security and induced its purchase, and must also prove that material misrepresentation or omission occurred prior to time of purchase. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation ☞ 278

To recover under fraud provision of the <mark>Texas Securities Act</mark> (TSA), investor must prove that security was sold by means of (1) untrue statement of material fact, or (2) failure to state material fact which was necessary to make any statement made not misleading. In re Perry, Bkrtcy.S.D.Tex.2009, 404 B.R. 196. Securities Regulation ☞ 278

The injured investor is not required to show that the defendant participated in the alleged violation in order to establish control person liability under the <mark>Texas Securities Act</mark> (TSA). Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation ☞ 302

To prove aider-and-abettor liability under the ==Texas== ==Securities== ==Act== (TSA), the plaintiff must demonstrate: (1) that a primary violation of the securities laws occurred; (2) that the alleged aider had general awareness of its role in this violation; (3) that the alleged aider rendered substantial assistance in this violation; and (4) that the alleged aider either (a) intended to deceive plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator. Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation ⚷ 302

### Admissibility of evidence

Investors could not use vacated convictions of issuer's employees for wire fraud and conspiracy to prove that broker was liable under ==Texas== law for aiding and abetting securities fraud. In re Enron Corp. Securities, Derivative & ""ERISA" Litigation, S.D.Tex.2007, 491 F.Supp.2d 690. Judgment ⚷ 648; Judgment ⚷ 664; Securities Regulation ⚷ 302

A statement made after purchase of the securities could not induce purchase and is therefore not relevant to liability under the ==Texas== ==Securities== ==Act== for selling a security by means of an untrue statement of a material fact or an omission of a material fact necessary to prevent statements made from being misleading. Crescendo Investments, Inc. v. Brice (App. 4 Dist. 2001) 61 S.W.3d 465, rehearing overruled, review denied. Securities Regulation ⚷ 307

Stock broker's testimony that he did not know the identity of the issuer of a document titled "manual exemption" failed to meet the evidentiary requirement of making known to the court the substance of the evidence, and thus, brokerage firm was not entitled to have the document admitted to establish the "recognized securities manual" exemption from registration under the ==Texas== ==Securities== ==Act==, in an action under the Act's anti-fraud provision. ==Texas== Capital Securities, Inc. v. Sandefer (App. 1 Dist. 2001) 58 S.W.3d 760, review denied. Trial ⚷ 45(1)

### Sufficiency of evidence

Evidence established that defendant was a control person for corporate offeror of unregistered securities for participation in oil and gas joint ventures, as basis for defendant's secondary liability under ==Texas== ==Securities== ==Act== (TSA) for offeror's primary violations in selling securities to venturers in violation of TSA and in making untrue statements of material fact or failing to state material facts necessary so that offeror's statements would not be misleading; defendant was board member, secretary, and treasurer of offeror, and he exercised control over offeror's general operations and had power to control the specific transaction or activity upon which primary violations were predicated. Darocy v. Abildtrup (App. 5 Dist. 2011) 345 S.W.3d 129. Securities Regulation ⚷ 302

Legally and factually sufficient evidence existed to support jury's finding that seller omitted a material fact that was necessary to make seller's statement that it owned a ten-percent working interest in lease not misleading, in buyer's action asserting claim under ==Texas== ==Security== ==Act== (TSA) for alleged omission or misrepresentation of material fact regarding sale of security involving oil-well lease; evidence indicated that lease had expired before time of sale. Geodyne Energy Income Production Partnership I-E v. Newton Corp. (App. 5 Dist. 2003) 97 S.W.3d 779, review denied, rehearing of petition for review granted, withdrawn, reversed in part 161 S.W.3d 482. Securities Regulation ⚷ 308

Investors seeking to invoke collateral estoppel in suit to hold officers of brokerage firm and firm's management company liable for violations of ==Texas== ==Securities== ==Act== were not required to introduce into evidence the pleadings from prior suit against brokerage firm, since investors had filed a copy of the judgment and jury charge from the prior action and they clearly stated what was determined in that case. ==Texas== Capital Securities Management, Inc. v. Sandefer (App. 6 Dist. 2002) 80 S.W.3d 260, petition stricken. Judgment ⚷ 956(.5)

**Instructions**

Third-party trustee, sued under state **securities act** by qualified securities investors defrauded by broker in Ponzi scheme, was not entitled to general awareness jury instruction; state **securities act** did not require proof that an aider was generally aware of its role in the securities violation to be liable as an aider. Sterling Trust Co. v. Adderley (App. 2 Dist. 2003) 119 S.W.3d 312, rehearing overruled, review granted, reversed 168 S.W.3d 835, rehearing denied. Securities Regulation 🔑 309

**Verdict**

Jury's answer that securities seller did not violate the anti-fraud provision of the **Texas Securities Act** was not "immaterial," though the jury also found that seller's control persons were liable for securities fraud conspiracy, and, thus, the trial court properly declined to disregard the answer; the liability of a control person could not be used to impute liability to the seller under the Act. Crescendo Investments, Inc. v. Brice (App. 4 Dist. 2001) 61 S.W.3d 465, rehearing overruled, review denied. Securities Regulation 🔑 302; Securities Regulation 🔑 309

**Remedies**

The purpose of the saving language in civil liability article of state **securities act**, stating that rights and remedies provided by act are in addition to any other rights, including exemplary or punitive damages, or remedies that may exist at law or in equity, is to confirm that other theories of recovery that provide relief for a transaction that gives rise to a cause of action under the act are not preempted by the act; it is not intended to permit a plaintiff to mix and match actual and punitive damage awards based on alternative theories of recovery. Sterling Trust Co. v. Adderley (App. 2 Dist. 2003) 119 S.W.3d 312, rehearing overruled, review granted, reversed 168 S.W.3d 835, rehearing denied. Securities Regulation 🔑 309

Under subd. M of this article providing that rights and remedies provided by **Texas Securities Act** (art. 581-1 et seq.) are in addition to any other rights or remedies that may exist at law or in equity, no such right exists with respect to matter committed to primary jurisdiction of administrative agency. Simmons v. Danco, Inc. (Civ.App. 1978) 563 S.W.2d 376, ref. n.r.e. Securities Regulation 🔑 275

**Attorney fees**

Issues presented to trial court for determination of equitable attorney fees if class members prevailed on claim that insurer was an unregistered dealer who sold "securities" from the state in violation of **Securities Act** were limited to whether life insurance policies were securities and whether policies were sold from within the state, and thus, common question predominated over issues of individual class members in determining equitable attorney fees, as essential element of class certification; entire claim was based solely on insurer's conduct and status of policies, and conduct and knowledge of policyholders were irrelevant to whether or not insurer violated Act. Citizens Ins. Co. of America v. Hakim Daccach (App. 3 Dist. 2003) 105 S.W.3d 712, review granted, reversed 217 S.W.3d 430. Parties 🔑 35.85

**Interest**

Simple interest of ten percent was the rate of prejudgment interest in a securities fraud suit. Duperier v. **Texas** State Bank (App. 13 Dist. 2000) 28 S.W.3d 740, review dismissed by agreement. Interest 🔑 31; Interest 🔑 60

**Review**

Jury's finding that third-party trustee, sued under state **securities act** by qualified securities investors defrauded by broker in Ponzi scheme, did not know and could not have known of untruth or omission on which securities fraud claim against broker was based did not conflict with finding that trustee aided broker's securities fraud and, thus, there was no reversible error attributable to conflict in findings; former finding related to trustee's defense to investors' primary liability claim against it, while latter related to investors' secondary liability claim against it. Sterling Trust Co. v. Adderley (App. 2 Dist. 2003) 119 S.W.3d 312, rehearing overruled, review granted, reversed 168 S.W.3d 835, rehearing denied. Securities Regulation 🗝 309

Court of Appeals looks to federal cases interpreting section of Federal **Securities Act** of 1933 imposing liability on sellers of securities for untrue statement of material fact or omission of material fact as guide in interpreting section of **Texas Security Act** dealing with omissions and untrue statements of material fact, because state statute is virtually identical in all relevant aspects to federal statute. Geodyne Energy Income Production Partnership I-E v. Newton Corp. (App. 5 Dist. 2003) 97 S.W.3d 779, review denied, rehearing of petition for review granted, withdrawn, reversed in part 161 S.W.3d 482. Courts 🗝 97(5)

Footnotes

1      15 U.S.C.A. § 77f.

Vernon's Ann. **Texas** Civ. St. Art. 581-33, TX CIV ST Art. 581-33

Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                                                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

> **Vernon's Texas Statutes and Codes Annotated**
>   Civil Practice and Remedies Code (Refs & Annos)
>     Title 2. Trial, Judgment, and Appeal
>       Subtitle B. Trial Matters
>         Chapter 17. Parties; Citation; Long-Arm Jurisdiction (Refs & Annos)
>           Subchapter C. Long-Arm Jurisdiction in Suit on Business Transaction or Tort (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 17.042

§ 17.042. Acts Constituting Business in This State

Currentness

In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

(2) commits a tort in whole or in part in this state; or

(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

**Credits**
Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (1506)

V. T. C. A., Civil Practice & Remedies Code § 17.042, TX CIV PRAC & REM § 17.042
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

> Vernon's Texas Statutes and Codes Annotated
>   Civil Practice and Remedies Code (Refs & Annos)
>     Title 2. Trial, Judgment, and Appeal
>       Subtitle B. Trial Matters
>         Chapter 17. Parties; Citation; Long-Arm Jurisdiction (Refs & Annos)
>           Subchapter C. Long-Arm Jurisdiction in Suit on Business Transaction or Tort (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 17.045

§ 17.045. Notice to Nonresident

Effective: September 1, 2001
Currentness

(a) If the secretary of state is served with duplicate copies of process for a nonresident, the documents shall contain a statement of the name and address of the nonresident's home or home office and the secretary of state shall immediately mail a copy of the process to the nonresident at the address provided.

(b) If the secretary of state is served with process under Section 17.044(a)(3), he shall immediately mail a copy of the process to the nonresident (if an individual), to the person in charge of the nonresident's business, or to a corporate officer (if the nonresident is a corporation).

(c) If the person in charge of a nonresident's business is served with process under Section 17.043, a copy of the process and notice of the service must be immediately mailed to the nonresident or the nonresident's principal place of business.

(d) The process or notice must be sent by registered mail or by certified mail, return receipt requested.

(e) If the secretary of state is served with duplicate copies of process as an agent for a person who is a nonresident administrator, executor, heir, guardian, or personal representative of a nonresident, the secretary shall require a statement of the person's name and address and shall immediately mail a copy of the process to the person.

**Credits**
Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., ch. 158, § 2, eff. May 25, 1987; Acts 2001, 77th Leg., ch. 275, § 1, eff. Sept. 1, 2001.

Notes of Decisions (67)

V. T. C. A., Civil Practice & Remedies Code § 17.045, TX CIV PRAC & REM § 17.045
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.